UNITED STATES DISTRICT COURT
DISTRICT OF MASSACUSETTS

|  |  |
|---|---|
| CONVERSE INC., | ) |
| Plaintiff, | ) |
| vs. | ) |
| ALON INTERNATIONAL S.A., | ) |
| Defendant. | ) |

DOCKET NO.: 04-12591-PBS

## AMENDED COMPLAINT AS OF RIGHT

### The Parties To The Action

1.      Plaintiff Converse Inc. (at times Plaintiff or "Converse"), is a corporation organized under the laws of the State of Delaware and has a principal place of business in the Commonwealth of Massachusetts.

2.      Defendant Alon International S.A. (at times Defendant or "Alon") is a corporation organized under the laws of the Republic of Panama and has, at all times relevant, had its principal place of business at 1160 E. Hallandale Beach Blvd, Suite A, Hallandale, Florida.

### The Personal And Subject Matter Jurisdiction Of The Court

3.      This Court has subject matter jurisdiction over this action in accordance with 28 U.S.C. § 1331 and the Federal Arbitration Act, as well as 28 U.S.C. § 1332 in that there is complete diversity of citizenship and the injunctive and declaratory relief sought herein has a value in excess of $75,000, exclusive of interest and costs.

1

4.    The Court has personal jurisdiction under G. L. c. 223A, § 3, in that Alon has transacted business in the Commonwealth of Massachusetts by entering into a contract with Plaintiff Converse, with a principal place of business in North Andover, Massachusetts. ALON also, in its contract with Converse, expressly or impliedly consented to jurisdiction in Massachusetts when it agreed in the contract to arbitration in Massachusetts.

### The Business Relationship Between The Parties

5.    Converse is a seller of athletic and leisure footwear, activewear, and accessories manufactured for Converse using the Converse name and trademarks. Converse is also a licensor of the Converse name and trademarks in areas outside of the states and territories of the United States of America.

6.    On or about September 1, 2001, the parties entered into a Manufacturing, Distribution, And License Agreement Between Converse, Inc. and Alon International S.A. ("Agreement"). A true and accurate copy of the Agreement is attached hereto as **Exhibit A** and incorporated by reference herein.

7.    The Agreement delimits a business relationship between Converse as licensor and Alon as licensee in which Alon was permitted to utilize certain Converse trademarks in the territory of Brazil, Argentina, Paraguay, and Uruguay.

8.    The Agreement is for a finite period of time and expires on its own terms on December 31, 2004. In consideration for the limited license to utilize Converse trademarks in the foregoing countries, Alon was obligated to fulfill numerous conditions, requirements, and provisions of the Agreement.

2

9.    The Agreement, *inter alia,* requires Alon to: (a) refrain from sublicensing or assigning any of Alon's rights granted by the Agreement without obtaining prior approval (¶¶ 29, 35); (b) expend reasonable sums amounting to 5 % or more of Alon's net sales per contract year for advertising licensed articles bearing Converse trademarks (¶ 7(d)); and (c) to pay Converse royalties (¶ 15*).*

10.    The royalty payments under the Agreement are based upon a percentage of net sales by Alon, subject to a guaranteed annual minimum royalty per contract year.

11.    The Agreement also contains a choice of law provision requiring the application of the law of the Commonwealth of Massachusetts and provides for the arbitration of disputes between the parties in Boston, Massachusetts under the auspices of the American Arbitration Association.

### The Malfeasance Of Alon In Violation Of The Agreement

12.    In November Converse first saw copies of a number of contracts Alon had with Coopershoes Cooperativa De Calcados E Componentes Joanetense LTDA ("Coopershoes"). These contracts included: (a) a Distribution and Copyright Licensing Contract (true and accurate copy attached hereto as **Exhibit B);** (b) a Professional and Technical Service Contract (true and accurate copy attached hereto as **Exhibit C**); and (c) a "Main Contract" (true and accurate copy attached hereto as **Exhibit D).** The foregoing shall be collectively referred to as "Coopershoes Contracts" and are dated July 24, 2002.

13.    The Coopershoes Contracts violate the Agreement, *inter alia,* in that they are an impermissible sublicensing of Converse trademarks.  In addition, the Coopershoes Contracts constitute an attempted subterfuge in which Alon would receive "royalty" payments

for the use of Converse trademarks in the guise of providing technical/advisory services.

14.     In addition, Alon has, among other acts: (a) failed to pay royalties to Converse in violation of Paragraph 15(a) of the Agreement; (b) used improper exchange rates to calculate royalty payments; and (c) failed to expend sums required by the Agreement for the advertising of goods bearing Converse trademarks.

15.     As a result of the foregoing breaches of the Agreement, Converse has suffered substantial harm, including, *inter alia:* (a) dilution and/or devaluation of its trademarks; (b) monetary losses of at least $600,000 due to Alon miscalculating and not paying full royalty payments; (c) unjust enrichment for upcharging sublicensees of approximately $4,000,000; and (d) failure to meet the minimum advertising expenditure threshold by approximately $840,000 and thereby causing a monetary loss of at least an equivalent amount. As a result, Converse has suffered damages in excess of approximately $5.4 million.

16.     On or about November 30, 2004, Converse, acting by and through its counsel, notified Alon that Defendant was in breach of the terms of the Agreement and provided Alon with the opportunity to cure its violations. Converse also notified Alon on said date that if Converse's claims were not resolved within thirty days, Converse would pursue its arbitration rights under Paragraph 33 of the Agreement.

17.     As of the instant date, Alon has not cured its breaches of the Agreement. Moreover, it has denied Converse's claims and previously demanded that Converse withdraw its demand for arbitration. Most recently, however, it has threatened litigation in Brazil, but has also filed a demand for arbitration in New York. Upon information and belief, Alon's actions are a subterfuge calculated to create the appearance of compliance with the letter and

4

spirit of the arbitration clause. At the same time, Alon intends to commence litigation in

Brazil that is inconsistent with its demand for arbitration and is ultimately designed to

undercut the scope and force of the arbitration clause.

18.     Given the scope and breadth of the arbitration clause at issue in the Agreement,

the refusal of Alon to arbitrate entire dispute between the parties amounts to a further violation

of the Agreement.

19.     Paragraph 33 of the Agreement states *inter alia:*

[t]he parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly. <u>Any</u> controversy or claim arising out of or <u>relating directly or indirectly to this Agreement,</u> including but not limited to transactions pursuant thereto, rights and obligations of the parties thereunder, the capacity or authority of the parties thereto, the performance or breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one party to the other setting forth with specificity any such controversy or claim, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association. The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association. The parties expressly agree that arbitration shall be held in the offices of the American Arbitration Association in Boston, Massachusetts, U.S.A., or such other locations within the Commonwealth of Massachusetts as the American Arbitration Association may direct....

20.     The foregoing arbitration clause is valid, enforceable, and Converse has fulfilled

any and all conditions precedent necessary to invoke the arbitration clause.

### Count I, Claim For Injunctive Relief

21.     Plaintiff incorporates Paragraphs 1-20 as if fully set forth herein.

22.     On or about December 8, 2004, Converse became aware that Alon had retained

counsel in Brazil. Upon information and belief, Alon intends to file suit against Converse in

Brazil in the immediate future. The anticipated suit in Brazil will encompass claims within the

5

scope of the arbitration clause of the Agreement. Alon's anticipated suit in Brazil is sham litigation calculated to deprive Converse of arbitration rights that it expressly bargained for in the Agreement. Alon's anticipated suit in Brazil is also an attempt to prolong the dispute between the parties, to prevent a prompt resolution of the dispute by arbitration, to undercut the scope and force of the arbitration clause, and to use the process of civil litigation to extort a resolution to the dispute that is more favorable to Alon. Converse faces imminent and certain harm as a result of the anticipated litigation in Brazil.

23.    The malfeasance set forth in Paragraph 22, as aforesaid, is an attempt at forum shopping by Alon in violation of the clear language and intent of the Agreement.

24.    Alon's refusal to submit the entire dispute between the parties to arbitration and its expressed intention to file a lawsuit addressing matters within the scope of the arbitration clause is in clear violation of the Agreement. Alon's conduct has caused, and will continue to cause, Converse to suffer irreparable harm for which there is no adequate remedy at law.

25.    Converse is likely to ultimately succeed on the merits of its claim against Alon, both in terms of compelling Along to submit to arbitration before the American Arbitration Association in Boston, Massachusetts, and on the merits of its claim.

26.    If injunctive relief is not granted, Converse will suffer substantial harm, as aforesaid. In contrast, the injunctive relief sought herein will merely compel Alon to fulfill its obligations under the Agreement. Moreover, the injunctive relief sought herein will not deprive Alon of the ability to defend on the merits since Alon will be able to assert any defenses that it has against Converse's claims in a proper forum-arbitration before the American Arbitration Association in Boston, Massachusetts.

6

27.    The injunctive relief sought herein will not adversely affect the public interest. In fact, requiring Alon to submit to arbitration will fulfill the important public of interests of enforcing alternate dispute resolution agreements and the conservation of judicial resources.

28.    Converse is entitled to temporary and permanent injunctive relief precluding Alon from filing suit in Brazil, Argentina, Paraguay, Uruguay, Florida, or in any other jurisdiction relating to any controversy or claim arising out of or relating directly or indirectly to the Agreement.

29.    Converse is entitled to temporary and permanent injunctive relief requiring Alon to submit to arbitration before the American Arbitration Association in Boston, Massachusetts any and all controversies or claims arising out of or relating directly or indirectly to the Agreement, including collateral matters.

30.    Converse is entitled to temporary and permanent injunctive relief requiring Alon to submit to arbitration before the American Arbitration Association in Boston, Massachusetts the question of whether the dispute between Converse and Alon is arbitrable, including any and all claims or causes of action that Alon may assert in any forum. To the extent that Alon asserts claims against Converse in any forum relating to any controversy or claim arising out of or relating directly or indirectly to the Agreement, including, without limitation, claims of tortious interference with contract, unfair business practices, bad faith, and/or unfair trade practices, the question of whether said claims are actually subject to arbitration must be decided by the American Arbitration Association in Boston, Massachusetts and not a court in a forum such as Brazil.

31.    To the extent that Alon files suit in any forum prior to the granting of

7

temporary or permanent injunctive relief to Converse, Plaintiff is also entitled to an anti-suit injunction requiring Alon to dismiss said suit(s), subject to the penalties of contempt of this Court.

### Count II, Claim For Declaratory Judgment

32.     Plaintiff incorporates Paragraphs 1-24 as if fully set forth herein.

33.     Chapter 231A, § 1 of the Massachusetts General Laws and Title 28, § 2201 of the United States Code, both allow the Court to make "binding declarations of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof has occurred in any case in which an actual controversy has arisen...."

34.     In this case, an actual controversy exists as to whether the dispute between Converse and Alon described herein is subject to arbitration in accordance with Paragraph 33 of the Agreement.

35.     Despite the clear language of the Agreement pertaining to arbitration as aforesaid, Alon intends to force Converse into litigation of claims otherwise subject to arbitration.

36.     Converse is entitled to a declaratory judgment that any and all controversies or claims arising out of or relating directly or indirectly to the Agreement are subject to the arbitration clause set forth in Paragraph 33 of the Agreement.

37.     Converse is entitled to a declaratory judgment requiring Alon to arbitrate any and all controversies or claims arising out of or relating directly or indirectly to the Agreement, as set forth in Paragraph 33 of the Agreement.

38.     Converse is entitled to a declaratory judgment and order compelling Alon to

8

submit to arbitration before the American Arbitration Association in Boston, Massachusetts the question of whether the dispute between Converse and Alon is arbitrable, including any and all claims or causes of action that Alon may assert in any forum. To the extent that Alon asserts claims against Converse in any forum relating to any controversy or claim arising out of or relating directly or indirectly to the Agreement, including, without limitation, claims of tortious interference with contract, unfair business practices, bad faith, and/or unfair trade practices, the question of whether said claims are actually subject to arbitration must be decided by the American Arbitration Association in Boston, Massachusetts and not a court in a forum such as Brazil.

39.    Converse is further entitled to any other declaratory relief deemed appropriate by the Court.

EHG/32913/2/564193v3
12/21/04-BOS/

WHEREFORE, Plaintiff respectfully demands:

1.    As to Count I, temporary and permanent injunctive relief as sought herein, or, on such terms as are deemed appropriate by the Court;

2.    As to Count II, a declaratory judgment as sought herein, or, on such terms as are deemed appropriate by the Court;

3.    Costs;

4.    Attorneys' fees;

5.    Any other relief in law or in equity deemed appropriate by the Court.

CONVERSE INC.
By its attorneys,

Michael C. Gilleran, Esq. (BBO #192210)
PEPE & HAZARD LLP
225 Franklin Street
Boston, Massachusetts 02110
(617) 748-5500
Fax: (617) 748-5555

DATED:  December 21, 2004

10

<u>02/14/02</u>

## <u>MANUFACTURING, DISTRIBUTION AND LICENSE AGREEMENT</u>

### BETWEEN

### CONVERSE INC.

### and

### ALON INTERNATIONAL S.A.

## Table of Contents

I.      INTRODUCTION
1.      Definitions _____ 5
2.      Term of Agreement _____ 6

II.     GRANT OF LICENSE
3.      License _____ 7

III.    LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES
4.      Use of Converse Marks_____ 9
5.      Quality Assurance _____ 11
6.      Licensee's Use of Converse Information and Advice _____ 12
7.      Licensee Sales Program _____ 12
8.      Distribution _____ 14
9.      Licensee's Use of Converse Factories _____ 15
10.     Exportation _____ 17
11.     Government Approval _____ 17

IV.     CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES
12.     Responsibility of Converse _____ 17
13.     Converse's Alteration of Product Design and Specification _____ 18
14.     Converse's Right of Inspection of Licensee Factories_____ 18

V.      ROYALTIES, FEES AND PAYMENTS
15.     Royalties _____ 19
16.     Guaranteed Minimum Sales _____ 22
17.     Royalty Reports _____ 22
18.     Schedule of Royalty Payments and Fees _____ 24
19.     Currency In Which Payments Are To Be Made _____ 26

VI.     INTELLECTUAL PROPERTY
20.     Converse Intellectual Property _____ 27
21.     Territorial Registration of Converse Trademarks _____ 29
22.     Infringement, Counterfeit, Unfair Competition _____ 29
23.     Indemnification for Products Liability Claims _____ 30

VII.    TERMINATION
24.     Right of Termination _____ 31
25.     Effect of Termination or Expiration _____ 33
26.     Final Statement Upon Termination or Expiration _____ 34

VIII.    MISCELLANEOUS
27.    Devaluation _____ 35
28.    Force Majeure _____ 35
29.    Assignment or Sublicense by Licensee _____ 35
30.    Notices _____ 36
31.    No Joint Venture _____ 36
32.    Applicable Law _____ 37
33.    Arbitration _____ 37
34.    Significance of Headings _____ 38
35.    Assignment, Entire Agreement, No Waiver _____ 38

Appendices

A.    Converse Marks
B.    Human Rights Manual
C.    Royalty Report Form

AGREEMENT, made as of this first day of September, 2001 by and between

**CONVERSE INC.**, a Delaware corporation, having its principal place of business at One High

Street, North Andover, Massachusetts 01845 ("Converse") and **ALON INTERNATIONAL**

**S.A.**, a corporation duly registered and existing under the laws of the Republic of Panama and

having its principal office and business at Edificio Magna Corp BCSA Calle 51 y Manuel Maria

Icaza, Piso 4 oficina 410 P, Panama, Republica de Panama ("Licensee").

WHEREAS, Converse is in the business of manufacturing, advertising, distributing and

selling athletic and leisure footwear, activewear and accessories and is the exclusive owner of the

valuable trademarks "CONVERSE", "ALL STAR", "CONVERSE ALL STAR CHUCK

TAYLOR" Ankle Patch and "STAR AND CHEVRON" Design and other trademarks, of certain

trade names, and of various patterns, logos and designs associated therewith; and

WHEREAS, Licensee desires to manufacture and sell in Argentina, Brazil, Paraguay and

Uruguay on an exclusive basis, athletic and leisure footwear, activewear and accessories identical

or substantially identical to the athletic and leisure footwear and activewear and accessories

manufactured for Converse and sold by Converse in the United States of America under the

Converse name and trademarks, and to obtain the advisory services and assistance of Converse in

connection therewith.

NOW THEREFORE, in consideration of the mutual covenants, representations and

promises herein contained, Converse and Licensee agree as follows:

## I.     DEFINITIONS

1.     For purposes of this Agreement, the following definitions shall apply:

(a)  "Contract Period" shall mean that period of time commencing on September 1, 2001 and ending on December 31, 2004.

(b)  "Contract Year" shall mean the twelve calendar months of the year, beginning with January 1.  The first Contract Year shall be the period from September 1, 2001 through December 31, 2002.

(c)  "Contract Year Quarter" shall mean the four (4) three month periods of the calendar year.  The first Contract Year Quarter will commence January 1, 2002 and will include any activities from the commencement date of this Agreement.

(d)  "Converse Factories" shall mean Converse's authorized factories.

(e)  "Converse Marks" shall mean the logos and trademarks set forth in Appendix A.

(f)  "F.O.B. Cost" shall mean the costs of Footwear Licensed Articles purchased by the Licensee directly from Converse Factories as shown on the approved invoice from the factory for each shipment of product, if applicable.

(g)  "Licensed Articles" shall mean the athletic and leisure footwear, activewear and accessories which are set forth more specifically in Paragraph 3(a) below and which are identical or substantially identical to the athletic and leisure footwear, activewear and accessories manufactured for Converse and sold by Converse in the United States. There are three types of Licensed Articles:  Non-Footwear, Footwear and Original Licensed Products as defined below.

(h)  "Net Sales" shall mean the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, trade discounts, volume rebates and any

freight charges and VAT taxes included in the invoice.  No deduction shall be allowed for costs incurred in the manufacture, sale, advertisement (including cooperative and promotional allowances) or distribution of Licensed Articles, nor shall any deductions be allowed for uncollectible accounts or cash discounts.

(i)  "Original Licensed Products" shall mean Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear.  Original Products may also be referred to as "Originals" or "Original Licensed Footwear Products."

(j)     "Publicity Materials" shall include, but not be limited to, any printed advertising, catalogs, brochures, billboards, electronic material, internet technology, and/or wireless network services in any and all manner or medium now known or hereafter devised or any video or printed material bearing the Converse Marks.

(k)  "Territory" shall mean Argentina, Brazil, Paraguay and Uruguay.

2.  <u>Term of Agreement</u>.  In recognition of infrastructure, manufacturing and legal expenditures made by Licensee on Converse's behalf, and Licensee's continuing efforts in these areas, Converse agrees to waive the signing fee of US$28,750.00.  Unless sooner terminated pursuant to the provisions of this Agreement, this Agreement shall remain in effect for the Contract Period.  In the event Licensee wishes to renew this Agreement, it must notify Converse in writing of this decision by or before September 30th of the final Contract Year.  Licensee may renew this Agreement for an additional term of three (3) years ("Option Years" which may be collectively referred to as "Option Period") provided Licensee exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that

Licensee has not breached any of the terms and conditions of this Agreement. The Guaranteed

Minimum Royalty for the first Option Year will be the greater of 25% over the Guaranteed

Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties, increasing

by ten percent (10%) for each subsequent Option Year in the Option Period. The Guaranteed

Minimum Sales for the first Option Year will be the greater of 25% over the Guaranteed

Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales, increasing by 10%

each subsequent Option Year. Any extension of the term of this Agreement shall be effective

only pursuant to a written agreement executed by Converse and Licensee. Such written

agreement shall reflect any new or revised terms or conditions agreed to by the parties.


## II.    GRANT OF LICENSE

3. License.

(a)    Licensed Articles.

    i.    Non-Footwear Licensed Articles is the collective term for activewear and accessories. Activewear shall specifically include: mens' and womens' sportswear and T-shirts. Accessories shall specifically include: bags, socks, caps, watches, backpacks, belts, stationary items (Notebooks and agendas, etc.).

    ii.    Footwear Licensed Articles is the collective term for athletic and leisure footwear.    .

    iii.    Originals Licensed Footwear Products shall be defined as the following models of footwear: Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear.



(b)    Grant of License.  Converse hereby grants to Licensee, subject to the terms and conditions herein, the exclusive right and license to utilize the Converse Marks throughout the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the retail and wholesale trade, subject to the provisions set forth in Section III below.  This license does not authorize, and expressly forbids, Licensee to manufacture, export, cause to export, distribute or sell such Licensed Articles in any other part of the world, unless specifically authorized by Converse in writing.

(c)    Internet.  Licensee is also granted the rights to use the Converse Marks on its Internet site generated out of the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the resale and wholesale trade, subject to the provisions set forth in Section III below.  In the event Licensee has already registered any of Converse's Marks or any name similar to a Converse Mark as a domain name, it shall assign to Converse all its rights, title and interest in such domain name(s) as directed by Converse.  Licensee shall not register a domain name using any of the Converse Marks or any marks to be confused with the Converse marks.

(d)    Non-competition.    Licensee agrees it shall not, during the term of this Agreement, manufacture, export, distribute, advertise, promote or sell any products/licensed articles which are competitive to the Licensed Articles, irrespective of whether said products bear Licensee's trademark or those of a third party, except only in such cases that Converse has given its prior written approval.  Notwithstanding the preceding sentence, in the event Licensee is already under obligation to distribute licensed articles other than those of Converse and/or products of any competitor, Licensee shall provide Converse, prior to the execution of



this Agreement, with a written list of all products it is under obligation to distribute.  The

parties agree that excluded from this paragraph are Licensee's currently held childrens' brands,

such as Disney, Warner, Mattel, and McKids.

(e)    Right to Negotiation.  In the event Converse does not renew license agreements

with its existing licensees in the territories of all of Latin America and Mexico, Licensee shall

have the right to negotiate for these territories.


### III.    LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

4. Use of Converse Marks.

(a)    Territorial.  Licensee agrees to use the Converse Marks only within the Territory

and during the Contract Period, and only with respect to the manufacture, promotion,

advertisement, distribution and sale of the Licensed Articles and only after Licensee has received

the written approval of Converse as to samples of the Licensed Articles intended to be

manufactured and sold by Licensee, the specific Converse Marks Licensee intends to affix to

particular Licensed Articles, Licensee's use of the Marks in Publicity Materials and Licensee's

use of the Marks on Licensee's web site, if applicable.

(b)    Approvals.  Licensee shall provide Converse with a full set of approval samples

and Publicity Materials for each Licensed Article as set forth in Paragraph 2(a) of this Agreement

prior to launch in the market.  Licensee shall provide Converse with designs and/or drawings of

all Licensed Articles, drawings, hang tags and packaging for approval no later than four (4)

months prior to launch in the market.  In the event Licensee wishes to use any of the Converse

Marks on its web site, it shall provide Converse with an opportunity to review the web site no

later than sixty (60) days prior to launch in the market.  Converse shall have fifteen (15) calendar days from receipt to respond, either by refusing such design or requesting any changes to the designs, drawings or contents of web site, or issuing its written approval.  Licensee further agrees to follow the approval guidelines for Licensed Articles, packaging, advertising and promotional materials set forth in Converse's Licensee Handbook.  The license to use the Converse Marks is granted upon the express condition that all Licensed Articles manufactured by Licensee bearing any of the Converse Marks will conform to the standards for grade, quality, and style established from time to time by Converse.  Such standards shall be substantially the same as the standards for the corresponding products manufactured for Converse and distributed by Converse in the United States.  Any Licensed Articles bearing any of the Converse Marks manufactured by Licensee which are seconds or irregulars shall not be sold by Licensee without the prior written consent of Converse.

In addition, all factories at which Licensee desires to have Licensed Articles manufactured shall be approved in writing by Converse in advance of the placement of any orders for or of the manufacture of Licensed Articles.

(c) _Inspection_.  Converse shall at any and all times have the right to inspect the Licensed Articles bearing any of the Converse Marks manufactured by Licensee to determine whether such Licensed Articles in fact conform to the established standards and other terms of this Agreement. If at any time Converse shall be of the opinion that Licensed Articles bearing any of the Converse Marks manufactured by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee.  Licensee shall promptly thereafter remove or cause to be removed any of the Converse Marks from such nonconforming products or web sites, shall cease

to affix the Converse Marks to other Licensed Articles which do not meet the standards, and shall cease thereafter to manufacture, promote, advertise, distribute or offer for sale any such nonconforming Licensed Articles bearing any of the Converse Marks. It is understood and specifically agreed that upon termination of this Agreement, Licensee shall immediately cease using the Converse Marks or any reference thereto, except as otherwise provided in this Agreement.

        5.      Quality Assurance.

        (a)      Licensee shall submit, for the inspection and approval of Converse, samples and comprehensive drawings or prototypes or production models of each style representative of Licensed Articles covered by this Agreement to be manufactured by Licensee. In any event, such drawings and samples shall be submitted to Converse for approval at least four (4) months before any such Licensed Articles are shipped or sold by Licensee. Thereafter, once each six (6) months, and also two (2) weeks prior to any change in the materials, method of manufacture or design of Licensed Articles, Licensee shall submit for inspections and approval by Converse, samples representative of Licensed Articles expected to be manufactured, shipped and sold by Licensee. Additional samples shall also be submitted to Converse at Converse's reasonable request. Converse shall determine whether such samples conform to its standards and shall inform Licensee of its approval or of any deficiencies. Licensed Articles may be manufactured and sold by Licensee only after Converse shall have approved drawings and samples representative of such Licensed Articles in writing or shall have failed to disapprove them within four (4) weeks after receipt of the drawings and samples.

        (b)      All Licensed Articles manufactured or sold hereunder must:



i.    be of first quality and conform to standards, including standards of design, style and quality, approved by Converse in its sole discretion, reasonably exercised;

ii.    be of the grade, quality and style handled by quality departments of quality stores, department stores and better specialty shops in the Territory;

iii.    be similar and at least equal in grade, quality, materials, workmanship, performance and style, to representative comprehensive drawings or production samples of Licensed Articles submitted by Licensee to Converse and approved by Converse; and

iv.    be advertised, marked, labeled and packaged in accordance with this Agreement and not in any manner violative of law or tending to mislead or deceive the public.

6.  Licensee's Use of Converse Information and Advice.

(a)  Licensee agrees that it shall not use, permit the use of, release, give or otherwise distribute or disclose to any third party any of the information, advice, reports, instructions, designs, drawings, specifications, technical knowledge, methods, processes, samples or materials, names and addresses of suppliers of materials, or any other information ("Trade Secrets") furnished to it by Converse or Converse contract manufacturers or other licensees except as necessary and on an as needed basis in the manufacture, distribution, promotion, advertisement, and sale of Licensed Articles bearing the Converse Marks in the Territory pursuant to this Agreement.

(b)  All Trade Secrets shall remain the sole property of Converse and shall be deemed to be strictly confidential and shall be treated accordingly.

7. <u>Licensee Sales Program</u>.

(a)    Licensee shall faithfully, diligently and to the best of its ability endeavor to manufacture, distribute, promote, advertise, market and increase the sales of Licensed Articles bearing the Converse Marks in the Territory.  It shall be the responsibility of Licensee to provide active and continuous sales representation in the Territory by actual salesperson contact with customers, both existing and prospective.  Licensee shall maintain adequate brand and marketing management, manufacturing, sales and service personnel and adequate inventory levels, manage, position and market the brand; conduct advertising and promotional programs and perform such other necessary functions to accomplish maximum sales and distribution of Licensed Articles within the Territory.  Licensee shall not adopt, engage in, permit or otherwise use any pricing policies, advertising campaigns, merchandising techniques or other commercial practices which are illegal under the laws of the Territory or which, in the opinion of Converse, detract from the good will and reputation of Converse.

(b)    Licensee agrees to submit to Converse an annual business plan for the sale of Licensed Articles for each region within the Territory for each Contract Year.  Such annual business plan shall be submitted to Converse no later than September 30th of each Contract Year, and shall be for the next Contract Year.  Licensee also agrees to submit to Converse, a seasonal sales and marketing plan for the sale of Licensed Articles for each region within the Territory for each Contract Year.  Such seasonal sales and marketing plan shall be submitted to Converse no later than June 15th of each Contract Year for the next Spring, and January 15th of each Contract Year for the next Fall.

(c)    Licensee shall use Converse's web-based sales and forecasting application each month to provide Converse with both annual forecasts and actual sales.

(d) During each Contract Year, Licensee shall expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for that Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure"). Such expenditures shall be spread over each current Contract Year in a manner consistent with the overall brand and product marketing and advertising strategies outlined by Converse in the United States market. Licensee agrees to provide Converse with quarterly statements itemizing Licensee's Advertising Expenditure for the preceding Contract Year Quarter on or before the fifteenth (15th) day of April, July, October and January of each Contract Year. Converse agrees to waive its requirement to have Licensee pay a one percent (1%) Regional Marketing Contribution during the Contract Period. Licensee shall keep Converse continually informed as to all advertising programs undertaken pursuant to this Agreement and shall not advertise any of the Licensed Articles without receiving the prior written approval thereof from Converse, which approval shall not be unreasonably withheld or delayed. All advertising copy shall prominently feature Converse logos and Marks used in accordance with the Converse Identity Manual or guidelines provided by Converse from time to time.

(e) Licensee agrees to purchase a representative sample range of each new product line introduced by Converse. The price of such samples shall be factory cost plus fifty percent (50%) plus freight cost to be paid in accordance with Paragraph 18(d) herein.

(f)    Licensee agrees it shall have, at its expense, one or more of its sales management attend Converse's global sales conferences.

8.    Distribution.

(a)  Licensee hereby agrees to market, sell, promote and distribute the Licensed Articles to high end, better quality athletic footwear and sporting goods retailers and specialty shops, department stores and boutiques that are consistent with the Converse brand strategy and will enhance the Converse brand image within the Territory and throughout the world.  Licensee agrees not to market, sell, promote and distribute the Licensed Articles to mass merchants, discount stores and/or chains, flea markets, open air markets, consolidators, diverters or to any distribution channels that are not consistent, in Converse's sole discretion, with the Converse brand strategy.

(b)    Publicity Materials.  All Publicity Materials shall be approved in writing by Converse in advance of any release or distribution.  Converse shall at any and all times have the right to inspect the Publicity Materials developed by Licensee to determine whether they conform to the established standards and other terms of this Agreement.  If at any time Converse shall be of the opinion that the Publicity Materials developed by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee, which shall promptly thereafter remove and shall cease thereafter to use or distribute any such nonconforming Publicity Materials.

9.    Licensee's Use of Converse Factories.

(a)    Licensee must use Converse Factories for the manufacture of regular in-line Footwear Licensed Articles and Originals when manufacturing outside the Territory.  Licensee must submit the orders for such Footwear Licensed Articles and Originals to Converse's Production Department at corporate headquarters for approval  before it can be placed with the

factory and only if placed through the following approved buying agent or such other agent as may be designated by Converse (the "Buying Agent"):

> Twin Dragons
> Pou Yuen Industrial City
> First Industrial Estate
> Shanxiang Town
> Zhongshan City, Guangdong Province, PRC
> China

In the event local production is required due to a tariff prohibition within the Territory, Licensee, upon Converse's prior written approval, may locally produce the Footwear Licensed Articles.

(b)   All such orders are to be placed with the Converse Factory with payment by Letter of Credit, (unless wire transfer payment terms have been negotiated,) terms at sight, from Bill of Lading date with such letters of credit opened so as to arrive at the factory no less than forty-five (45) days prior to the confirmed ship date.

(c)   Licensee shall pay to Converse the Buying Agent's commission upon presentation of the applicable commission invoice at the applicable percentage of the F.O.B. Costs.

(d)   Under no circumstances can Licensee cancel orders contemplated by this Paragraph 9 with Converse Factories without the prior written approval of Converse's corporate office. In the event Converse authorizes such cancellation, Licensee hereby agrees to pay all costs incurred by the Converse Factory for such order and a cancellation charge to Converse equal to five percent (5%) of the combined F.O.B. costs of the order.

(e)    Licensee agrees it shall not approach any third party factories regarding the production of Footwear Licensed Articles, unless having prior written approval from Converse.

10.    Exportation.   Licensee shall manufacture, distribute, promote, advertise and sell Licensed Articles bearing the Converse Marks only within the Territory.  Further, Licensee shall not knowingly export or cause to be exported, and shall use its best efforts to prevent the export of, any products to other countries without the prior express written permission of Converse.  In the event that Licensee exports or causes to be exported Licensed Articles bearing the Converse Marks outside the Territory without written authorization from Converse, Licensee agrees that such action would irreparably harm Converse's business.  A breach of this Paragraph by Licensee may result in termination of this Agreement by Converse pursuant to Paragraph 24 below.

11.  Government Approval.  If applicable, Licensee shall be responsible for obtaining all necessary approvals from the government of any of the countries in the Territory with respect to this Agreement.   In the event that Licensee is unable to obtain all such approvals within one hundred eighty (180) days of the execution of this Agreement, Converse shall have the right to terminate the Agreement immediately upon written notice to Licensee.

## IV.    CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

12.  Responsibility of Converse.  In order to facilitate the manufacture, distribution, promotion, advertisement and sale of Licensed Articles by Licensee under this Agreement, Converse shall use good faith efforts to:  (a)  furnish or cause to be furnished to Licensee such



information and advice, as in the opinion of Converse, is necessary to implement this Agreement. Such information and advice may include, but is not limited to, drawings and specifications of the Licensed Articles, names and addresses of suppliers of materials, copies of advertisements and sale promotional material or such other information reasonably necessary to carry out this Agreement. Licensee shall pay Converse promptly upon billing for any articles supplied under this Paragraph 12(a) in accordance with Paragraph 18(d); (b)  at Converse's discretion, to permit one or more of Licensee's representatives to attend, at Licensee's sole expense, sales conferences or other athletic sales events sponsored or attended by Converse representatives; (c)  make arrangements under which representatives of Licensee may, at their sole expense, visit one or more factories in which products similar to the Licensed Articles are being manufactured by or for Converse bearing the Converse Marks to enable the representatives to study methods of manufacture and related matters.

13.   Converse's Alteration of Product Design and Specification.  Converse reserves the right, upon sixty (60) days notice to Licensee, to modify the design and specifications for any Licensed Article made by Licensee bearing any of the Converse Marks, and any design or text. In that event, Licensee shall not manufacture Licensed Articles in accordance with the prior design or specification, except for the completion of Licensed Articles in the process of manufacture at the time Licensee received the modification.  Licensee agrees not to manufacture, distribute, promote, advertise or sell any product not bearing a Converse Mark which, in the opinion of Converse, by reason of its appearance or design, might tend to be confused by the public with any of the Licensed Articles manufactured under this Agreement bearing Converse Marks, or which in the opinion of Converse infringes in any manner Converse Marks.



14.  Converse's Right of Inspection of Licensee Factories.

(a)  Converse shall have the right at its own expense to have its representatives from time to time, during reasonable business hours, visit and inspect the factory or factories in which Licensee is producing, or having produced, Licensed Articles bearing any of the Converse Marks for the purpose of observing the method of manufacture, quality of materials, products produced, and any other matters relevant to this Agreement.  Included in this inspection shall be the audit of the workers' rights standards pursuant to the Converse Inc. Human Rights Manual which is made part of this Agreement and is attached hereto as Appendix B.

(b)  Licensee shall reimburse Converse for any expense for travel to the Territory or elsewhere which may be incurred by representatives of Converse at the request of Licensee and such payments shall be made by Licensee to Converse in U.S. Funds within thirty (30) days from billing thereof.

## V.    ROYALTIES, FEES AND PAYMENTS

15.  Royalties.  In conjunction with Paragraph 18 below, Licensee shall pay to Converse the following royalties:

(a)      In consideration for the license granted to it by Converse herein, Licensee shall pay Converse a royalty equal to the following percent of the Net Sales made by Licensee of the Licensed Articles (the "Earned Royalties").  The Earned Royalties shall be based upon the Net Sales price for such products sold to the retail or wholesale trade by Licensee.



| EARNED ROYALTIES | | | |
|---|---|---|---|
| CONTRACT YEAR | CALENDAR YEAR | Footwear (including Originals) | Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | 6% | 6% |
| 2 | 2003 | 7% | 6% |
| 3 | 2004 | 8% | 6% |
| Option Years | | To be negotiated | To be negotiated |
| 4 | 2005 | tbd | tbd |
| 5 | 2006 | tbd | tbd |
| 6 | 2007 | tbd | tbd |

The Earned Royalty rate for Licensed Articles for the Option Period will be negotiated prior to the Option Years taking effect.

(b)    Notwithstanding the provisions of Article 15(a), Licensee agrees to pay Converse a guaranteed annual minimum royalty as set forth below for each Contract Year (the "Guaranteed Annual Minimum Royalty").

| CONTRACT YEAR | CALENDAR YEAR | GUARANTEED ANNUAL MINIMUM ROYALTY |
|---|---|---|
| | | Footwear (including Originals) and Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | US$115,000.00 |
| 2 | 2003 | US$160,000.00 |
| 3 | 2004 | US$215,000.00 |
| Option Years | | |

| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties |
| 5 | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

In the event this Agreement is terminated on a date other than the last day of a Contract Year, the Earned Royalties shall be based upon actual Net Sales through the date of termination.

      (c)    <u>Third Parties</u>.

         (i)    With respect to the sale of certain Licensed Articles, Converse has, or may have in the future, an obligation to pay a royalty to an athlete or other third party ("Third Party") in conjunction with the use of the Licensed Articles (the "Third Party Articles"). In the event that Licensee purchases or manufactures, with Converse's prior written consent, any Third Party Articles, Licensee agrees to pay to Converse the amount of any royalty which Converse is obligated to pay to the applicable Third Party (the "Third Party Royalty").

         (ii)    Converse shall advise Licensee, in a timely fashion prior to Converse's approval of Licensee's submission of an order for Licensed Articles, which articles are Third Party Articles and the amount of the Third Party Royalty.

         (iii)    The applicable Third Party Royalty shall be paid by Licensee to Converse along with payment of the Earned Royalties pursuant to Paragraph 18 of this Agreement.

      (d)  Licensee shall remove Converse Marks from any defective products which do not meet Converse standards as set forth in Paragraph 5 of this Agreement entitled Quality Assurance for first quality merchandise and no royalty shall be payable hereunder with respect to the sale of



such substandard products. This requirement to remove all Converse Marks shall be operative irrespective of the fact that such substandard products may be customarily sold in the Territory for the same price as first quality merchandise. Converse shall have the right to prohibit Licensee from selling such substandard products, if, in the opinion of Converse, such products may tend to be confused by the public with any of the Licensed Articles sold under this Agreement bearing Converse Marks, or which, in the opinion of Converse, infringes in any manner the Converse Marks.

16.   <u>Guaranteed Minimum Sales</u>. Notwithstanding the provisions of Paragraphs 15(a) and (b) above, Licensee agrees to sell not less than the following guaranteed minimum sales volume of Licensed Articles during each Contract Year as set forth below (the Guaranteed Minimum Sales Volume"):

| CONTRACT YEAR | CALENDAR YEAR | GUARANTEED MINIMUM SALES VOLUME |
|---|---|---|
| | | Footwear (including Originals) and Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | US$1,917,000.00 |
| 2 | 2003 | US$2,300,000.00 |
| 3 | 2004 | US$2,800,000.00 |
| Option Years | | |
| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales |
| 5 | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

17.     <u>Royalty Reports</u>

(a)     Unless otherwise specified herein, Licensee shall deliver to Converse on or before April 25th, July 25th, October 25th and January 25th of each Contract Year a Royalty report, which shall be a complete and accurate itemized statement, certified by Licensee's chief fiscal officer as being accurate and complete, stating the description by product type, number of pairs or units, gross sales price, itemized deductions from gross sales price and net sales price as well as wholesale sales of the Licensed Articles manufactured, distributed or sold by Licensee during the preceding Contract Year Quarter. Such statements shall be stated in both United States and local currency and submitted in the format set forth in Appendix C, which shall be subject to change without notice. Such quarterly statements shall be furnished to Converse whether or not any Licensed Articles bearing any Converse Marks have been sold or distributed by Licensee during the preceding Contract Year Quarter. Receipt or acceptance by Converse of any statements furnished pursuant to this Agreement or any sums paid hereunder shall not preclude Converse from questioning the accuracy thereof at any time, and in the event that any inconsistency or mistake is discovered in such statement or payments, they shall be rectified immediately and the appropriate payments shall be made by Licensee.

(b)     If applicable, the parties acknowledge that Licensee may be legally required to withhold and remit a portion of the Earned Royalties to the governments of the countries in the Territory on behalf of Converse. It is not the intent of the parties that Licensee pay any part of any tax owed by Converse. Licensee's obligation shall be satisfied if it withholds and remits in accordance with the laws of the countries in the Territory and provides Converse promptly upon



payment, one original counterpart of the certificate issued by the competent tax authorities receiving such payments. These certificates should be forwarded to Converse's Accounting Department at the address set forth in the Notice section of this Agreement. These withholding certificates, if applicable, must accompany quarterly Royalty Reports.

18. <u>Schedule of Royalty Payments and Fees</u>.

The Royalty Payments set forth below shall be paid to Converse on a quarterly basis upon invoice or no later than the end of the month in which the Royalty report was due to be submitted pursuant to Paragraph 17 above. Payments shall be in U.S. Dollars and can be made either by wire transfer in accordance with the instructions set forth in Paragraph 19 below or by check:

(a)    The Earned Royalty or one quarter of the Guaranteed Annual Minimum Royalty set forth herein for each Contract Year Quarter, whichever is greater. Once the Guaranteed Annual Minimum Royalty is satisfied, Licensee is required to pay Earned Royalties only for the remaining quarters;

(b)    The Original Products Royalty;

(c)    The Third Party Royalty, if applicable, shall be paid upon receipt of Converse's invoice;

(d)  In addition to royalties, Licensee shall pay Converse for all materials, samples, and merchandise furnished to Licensee pursuant to Paragraph 12 hereof in an amount equal to the cost of such items to Converse, including Converse's cost of preparing, packing, shipping and transporting such items. All such purchases by Licensee from Converse shall be paid upon receipt of invoice by wire transfer or check.

(e) Licensee shall maintain appropriate books of account and records, including inventory records, in accordance with generally accepted accounting principles, and shall make accurate entries concerning all transactions relevant to this Agreement. Such books of account and records shall be kept separately from those for any merchandise other than the Licensed Articles sold hereunder by Licensee. Licensee shall also, upon request by Converse, provide Converse with a sales report listing year-to-date sales generated by each of Licensee's customers.

(f) Converse shall have the right, at its own expense, during the term hereof and for three (3) years thereafter, or in the event of a dispute involving in any way such books of account and records, until the dispute is resolved, whichever is later, through any authorized representatives of its own choice, on reasonable notice to Licensee and during regular business hours, to examine and take extracts from such books of account and records, and other documents (including but not limited to invoices, vouchers, records, purchase orders, sales orders and reorders) relating to the business hereunder which shall be maintained and kept by Licensee during the term hereof. All such books of account and records shall be kept available by Licensee for three (3) years after the end of the Contract Period, or in the event of a dispute between the parties hereof involving in any way such books of account and records until that dispute is resolved, whichever is later. If upon inspection of the books and records pursuant to this paragraph or otherwise, it is discovered that Converse did not receive the correct and adequate payment, then Licensee shall pay the Company, upon written notice, the difference between what was paid and what should have been paid, within five (5) business days of receipt of said notice. If the aforesaid difference exceeds five percent (5%), then the entire difference is to be paid with interest calculated from the date the payment should have been made to the



actual date of payment at the prime rate in effect on the payment date. If Converse chooses to employ the services of a certified public accounting firm, qualified accounting consultant firm or Converse's internal auditors to conduct an audit and inspection of Licensee's books and records and said audit and inspection results in a balance due for any Contract Year of this Agreement which exceeds by five percent (5%) the payment reported due by Licensee for any such Contract Year, then Licensee shall bear the entire cost including all fees and expenses of said audit and inspection. If it is found that Licensee has made a larger payment than that which was due, said excess will be returned by Converse within five (5) business days of such determination.

19. <u>Currency In Which Payments Are To Be Made</u>.

(a) Unless specifically set forth to the contrary herein, all payments to Converse (except Converse Factories) required to be made by Licensee pursuant to this Agreement shall be made in the currency of the United States of America ("U.S. Funds"), payable to Converse Inc., First Union National Bank, Charlotte, NC, ABA No. 053000219, Account No. 2000011041218, or such other account as may be designated by Converse from time to time (the "Account"). Converse will review the exchange rate received by Licensee in the conversion from Licensee's local currency to U.S. Funds by comparison with the exchange rate published by the Wall Street Journal ("WSJ") two (2) business days prior to the payment due date scheduled in Paragraph 18 of this Agreement. If there is a difference between the exchange rate received by Licensee and the WSJ rate, Converse reserves the right to request such additional funds from Licensee as is required to compensate for the exchange rate deficiency. In cases where payment of the particular royalty due is more than seven (7) calendar days late, Converse reserves the right to request additional funds from Licensee to compensate Converse for any resulting subsequent exchange



rate loss. If required, Licensee agrees it will seek the necessary government approvals to make such payments to Converse in U.S. Funds. Any late payments will be subject to an interest charge of one and one-half percent (1 1/2%) to Converse each month the payments remain unpaid. In the event any such payment exceeds thirty (30) days in arrears, Converse shall have the right, in addition to any and all other remedies available to Converse, to terminate this Agreement pursuant to Paragraph 24.

(b) If the actions of any government or public body make it impossible for Licensee to pay Converse in U.S. Funds, Converse shall have the following options:

     (i)     terminate the Agreement with thirty (30) days written notice to Licensee;

     (ii)     require Licensee to make payment in the currency of any other country selected by Converse by whose currency Licensee may legally pay;

     (iii)     require Licensee to deposit such payment to Converse's account in a bank selected by Converse in or outside the Territory.

If Converse selects option (i) it may nevertheless require Licensee to pay any sums then due or to become due in accordance with options (ii) or (iii).

## VI.   INTELLECTUAL PROPERTY

20. Converse Intellectual Property.

(a) Ownership. Licensee acknowledges that Converse is the exclusive owner of the Converse Marks, Converse patents, and Converse domain names, and covenants that neither it nor any person acting for or under it will ever contest such ownership or the exclusive rights of Converse with respect thereto anywhere in the world.



(b)     In the event that Licensee creates, or assists in the creation of, a design for a Licensed Article or Converse's web site, then such design shall become the property of Converse without any further act required on the part of Converse or Licensee. Licensee shall execute and deliver any document or instrument requested by Converse to confirm exclusive ownership by Converse of any such design. Converse shall have the right to utilize said design itself or provide it for use by any third party.

(c) Infringement. Nothing in this Agreement shall constitute a warranty by Converse that there are currently no infringements of any of the Converse Marks, Converse patents, or Converse domain names within the Territory. Licensee agrees that during the Contract Period it will diligently investigate any infringement or threatened infringement of the Converse patents, trademarks, logos, domain names or trade names within the Territory and shall immediately notify Converse of any such infringement or threatened infringement or of any act or threatened act of unfair competition which may come to Licensee's attention and Licensee shall use its best efforts to prevent such infringement or act of unfair competition. Should litigation become necessary in Converse's sole discretion to protect Converse's interests in this regard, Licensee shall cooperate fully with Converse to the extent requested. Converse shall be responsible for the expense of such litigation.

Converse acknowledges that it is a party to certain litigation in Brazil with All Star Artigos relating to the use and registration of the Chuck Taylor All Star and All Star logos. Converse hereby agrees that it will take the necessary actions as determined by Converse to recover the ownership of said trademarks provided it is in the best interest of Converse.

(d)    Intellectual Property Indemnification.  Licensee shall indemnify and hold Converse harmless from and against any and all claims, demands, losses, damages, liabilities, suits, judgments, and expenses, including incidental costs and attorneys' fees Converse may incur or be liable for arising out of allegations that Licensed Articles, Converse Marks, advertising and/or Publicity Materials used, designed and/or developed by Licensee violates or infringes the copyright, trademarks, service marks, or patent rights of any third party. Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.

21.  Territorial Registration of Converse Trademarks.  Converse has registered or applied for registration of certain of its trademarks and domain names in the Territory.  In this regard, Licensee agrees to take all proper actions requested by Converse to facilitate and expedite the registrations, provided that Converse reimburses Licensee for all reasonable expenses incurred in connection therewith.  If Converse is prevented from registering its trademarks or domain names in the Territory by virtue of the existence of this Agreement, Licensee agrees, at the request of Converse, to seek registration in its own name and convey to Converse all right, title and interest to the trademarks and domain names which Licensee may thereby obtain, provided that Converse shall reimburse Licensee for all reasonable expenses incurred.

22.  Infringement, Counterfeit, Unfair Competition.  Licensee agrees to notify Converse, in writing, of any infringements or counterfeits of, or any unfair competition affecting the trademarks and domain names licensed hereunder immediately upon gaining knowledge thereof and to cooperate fully in any action thereon which Converse may, in its sole discretion, deem appropriate.  Licensee shall not, however, be entitled to take or institute any action thereon,



either by way of informal protest or legal, equitable or criminal proceedings, without express written approval, nor shall Licensee be entitled to call upon Converse to take action thereof; all such matters shall be entirely within the discretion of Converse.

23. <u>Indemnification for Products Liability Claims</u>.

(a)    Licensee agrees to indemnify Converse from any and all claims, demands or judgments, including incidental costs and attorneys' fees incurred in connection therewith against Converse for injuries or damages to purchasers or users of the Licensed Articles manufactured by Licensee.  The foregoing indemnification of Converse by Licensee shall extend to any and all products liability claims arising as a result of Converse's ownership and control of the trademarks under which the Licensed Articles are manufactured and sold by Licensee, including, but not limited to, claims arising out of breach of implied or express warranties, strict tort liability or negligence, or legal claims of a comparable nature for recovery brought by litigants under the laws of the jurisdiction that apply to the Licensee.

(b)    Licensee shall, at its own cost and with Converse's approval, defend against any claims brought or actions filed against Converse on a products liability theory of the Licensed Articles whether such claims or actions are rightfully or wrongfully brought or filed, and Converse shall execute all papers necessary in connection with such suit and shall testify in any such suit whenever required to do so by Licensee all, however, at the expense of Licensee with respect to travel and similar out-of-pocket disbursements.

(c)    Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.



(d)    Licensee shall obtain insurance to the extent of $1,000,000 per occurrence against liability for bodily injury including death resulting therefrom and $1,000,000 per occurrence against liability for damage to property including loss of use thereof, occurring in any way relating to the Licensed Articles. Such insurance policy shall insure Converse and shall name Converse as an additional insured as its interest may appear. Such insurance policy shall be cancelable or materially altered only upon ten (10) days notice to the Licensee and Converse. Licensee shall provide Converse with a certificate of its insurance policy in the amount indicated within ten (10) days of execution of this Agreement.

## VII.    TERMINATION

24. Right of Termination.

(a)    By Converse Immediately. In the event of the occurrence of any one or more of the following, Converse shall have the right to immediately terminate this Agreement by written notice thereof to Licensee but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i) insolvency, bankruptcy, reorganization, suspension of payments, assignment for the benefit of creditors, appointment of a receiver, institution of any proceedings by or against Licensee under bankruptcy laws or other similar laws; or

(ii) the transfer or sale of all or a majority of the voting stock or other equitable ownership of Licensee without the written consent of Converse.

(b)    By Converse Upon Notice of Breach. In the event of the occurrence of any one or more of the following, Converse shall have the right to terminate this Agreement seven (7)

days after giving written notice thereof to Licensee, and Licensee has not remedied the situation within such seven (7) day time period:

(i)  failure of Licensee to pay any royalty or other payment due Converse under this Agreement for a period of thirty (30) days from the date such payment is due and payable;

(ii)  failure of Licensee to pay the Buying Agent's commission ("Buying Agent's Commission") for a period of thirty (30) days from the date such commission is due and payable;

(iii)  pursuant to Paragraph 8 Distribution above, the manufacture, distribution, advertisement or sale of Licensed Articles by Licensee in the Territory other than pursuant to this License Agreement;

(iv)  the sale or shipment of Licensed Articles by Licensee outside of the Territory, as set forth in Paragraph 10 herein;

(v)  the failure of Licensee to comply with the Guaranteed Annual Minimum Royalty or Guaranteed Minimum Net Sales Volume for any Contract Year, as set forth in Paragraphs 15 and 16 herein; or

(vi)  The breach by Licensee of Paragraphs 3(a), 4 and 6 herein.

(c)  <u>By Either Party.</u>  In the event of the occurrence of any one or more of the following, either party shall have the right, after thirty (30) days written notice, to terminate this Agreement by written notice thereof to the other party but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i) liquidation or dissolution of either party or discontinuance of the active operation of the enterprise of either party;

(ii) the breach of or failure by either party to perform or observe any of the other terms and conditions of this Agreement, provided said breach or failure shall continue for a period of thirty (30) days after written notice thereof from the other party.

25. Effect of Termination or Expiration.

(a) From and after the termination of this Agreement, whether by expiration of the Contract Period or termination pursuant to Paragraph 24 or for any other reason, any and all rights acquired by Licensee to the use of the Converse Marks and Trade Secrets, shall terminate and cease absolutely, and except as provided in subsection (b) of this Article, Licensee shall not thereafter manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with Converse Marks.

(b) Any Licensed Articles manufactured or in the process of manufacture by Licensee prior to the expiration or termination of this Agreement and as to which any of the Converse Marks has been attached or affixed may be sold by Licensee, but only during the ninety (90) day period next following the date of expiration or termination, subject to the condition that Licensee pay to Converse all Earned Royalties and other payments due and owing Converse at the date of expiration or termination and to the further condition that Licensee continues to pay to Converse all Earned Royalties accruing during such ninety (90) day period within thirty (30) days following the end of each calendar month and delivers to Converse at the time of such payment an itemized statement in the form required by Paragraph 17 hereof for each such calendar month.



Licensee agrees that the Licensed Articles shall be sold during the ninety (90) day period shall be sold in accordance with the provisions of Paragraph 8 Distribution herein.

Notwithstanding anything to the contrary contained herein, Licensee shall not manufacture, distribute, sell or dispose of any Licensed Articles hereunder after the expiration or earlier termination of this Agreement. Licensee shall, upon termination of this Agreement, promptly assign and transfer to Converse any property rights which Licensee may have acquired in the Converse Marks and shall, within thirty (30) days, destroy or return all drawings, molds, dies and similar equipment or materials in its control or possession used for the production or reproduction or imprinting of the Converse Marks on the Licensed Articles and furnish to Converse satisfactory evidence of such return or destruction. Licensee agrees, subsequent to the expiration of this Agreement, not to register, attempt to register or use, except as provided herein, any Converse Marks and trademarks that are confusingly similar to the Converse Marks.

(c)    In the event Converse terminates this Agreement for breach by Licensee, Licensee will still be liable to Converse for its Minimums for the remainder of the Contract Period.

26. Final Statement Upon Termination or Expiration.

(a) Licensee shall deliver, as soon as practicable but in any event no later than thirty (30) days after expiration or termination of this Agreement, to Converse a statement indicating the number and description of Licensed Articles bearing any of the Converse Marks under this Agreement on hand or in process of manufacture as of (i) sixty (60) days prior to the expiration of the Contract Period; and (ii) thirty (30) days after receipt from Converse of any notice terminating the license granted hereunder or, in the event no such notice is required, thirty (30) days after the occurrence of any event which terminated such license.

(b) Converse shall have the option, at its expense, to have an independent certified public accountant conduct a physical inventory during reasonable business hours of Licensee's manufacturing and distribution facilities in order to ascertain or verify such inventory or statement. In the event Licensee refuses to permit Converse to conduct such physical inventory, Licensee shall forfeit its right hereunder to dispose of such inventory. In addition to such forfeiture, Converse shall have recourse to all other legal remedies available to it.

(c)     Licensee shall have ninety (90) days to dispose of Converse inventory, which disposal shall be consistent with its distribution channels set forth in Paragraph 8 of this Agreement.

## VIII.   MISCELLANEOUS

27.     Devaluation.   In the event devaluation in any of the countries in the Territory increases by more than fifteen percent (15%) in a given year, Licensee may, at Converse's option, have the right to renegotiate its Guaranteed Annual Minimum Royalty and Guaranteed Minimum Sales Volume set forth above for the Contract Period.

28.   Force Majeure.   If either party to this Agreement is temporarily unable to perform its obligations hereunder because of fire, strike, freight embargoes, government restrictions or regulations, war, emergency or any other Act of God, then no liability to the other party or right to terminate shall exist for failure of the one party to perform during such period.

29.   Assignment or Sublicense by Licensee.   None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other 

Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee without the prior written consent of Converse in each instance.

    30.  Notices.  Any written notice authorized or required by this Agreement shall be deemed to be duly given when sent by facsimile, registered mail, postage prepaid, or by express mail or international courier service, addressed to one party or the other, as the case may be, as stated in this Article unless either party shall previously have given to the other party written notice of a change of such address.

CONVERSE INC.

Converse Inc.
One High Street
North Andover, Massachusetts 01845
Fax:  978-983-3547

ATTENTION:        Laura W. Kelley
                  Vice President, Legal

                      c.c.:    Tim Ouellette
                  Vice President, Licensing

ALON INTERNATIONAL S.A.

Mr. Roberto Szerer
Mr. Ronald Durchfort
ALON International
1160 E. Hallandale Beach Boulevard, Suite A
Hallandale, Florida 33009

    31.  No Joint Venture.  Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers and neither party shall have the power to obligate or bind the other in any manner whatsoever.

32.   Applicable Law.   The parties agree that the Commonwealth of Massachusetts, U.S.A. law governs the provisions and interpretation of this Agreement and that the English language version thereof shall be the controlling document.

33.   Arbitration.   The parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly.   Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligations of the parties thereunder, the capacity or authority of the parties thereto, the performance or breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one party to the other setting forth with specificity any such controversy or claim, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association.   The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association.   The parties expressly agree that arbitration shall be held in the offices of the American Arbitration Association, in Boston, Massachusetts, U.S.A., or such other locations within the Commonwealth of Massachusetts as the American Arbitration Association may direct. Such arbitration shall be conducted in the English language and the arbitrators shall apply the laws of the Commonwealth of Massachusetts.   The institution of any arbitration proceeding hereunder shall not relieve the Licensee of its obligation to make payments accrued hereunder to Converse during the continuance of such proceeding.   The decision by the arbitrators shall be binding and conclusive upon the parties, their successors and assigns and the parties shall comply with such decision in good faith, and each party hereby submits itself to the jurisdiction of the courts of the place where the arbitration is held, but only for the entry of judgment with respect

to the decision of the arbitrators hereunder. Notwithstanding the foregoing, judgment upon the award may be entered in any court where the arbitration takes place, or any other court having jurisdiction over the losing party.

34. Significance of Headings. Paragraph headings contained herein are solely for the purpose in aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of the Agreement.

35. Assignment, Entire Agreement, No Waiver. This Agreement and any rights herein granted shall inure to the benefit of and be binding upon the parties hereto and their respective successors or assigns, provided, however, that this Agreement shall be freely assignable by Converse but shall not be assigned, sublicensed or encumbered by Licensee without the prior written consent of Converse. This Agreement constitutes the entire agreement and understanding between the parties hereto and cancels, terminates and supersedes any prior agreement, materials exchanged between the parties, discussions or understanding relating to the subject matter hereof. None of the provisions of this Agreement can be waived or modified except expressly in writing signed by both parties hereto, and there are no representations, promises, agreements, warranties, covenants or undertakings other than those contained herein.

IN WITNESS WHEREOF, each of the parties hereto have executed this Agreement as of the date and year first above written in duplicate originals by its duly authorized representatives.

CONVERSE INC.

By _Laura M Kelly_

Title _VP Legal_

Witness _A LaBell_

ALON INTERNATIONAL S.A.

By _ASTET_  _Roberto Szerer_.

Title _Co-president_

Witness _____

# APPENDIX A

## CONVERSE MARKS

**APPENDIX A**

| BRAZIL | ARGENTINA, PARAGUAY, URUGUAY |
|---|---|





**CONVERSE**





**CONVERSE**















**APPENDIX B**

HUMAN RIGHTS MANUAL

**APPENDIX B**



CONVERSE INC.
One High Street
North Andover, Massachusetts 01845
(978) 983-3300

# LABOR PRACTICES AND HUMAN RIGHTS
BUSINESS POLICY AND AUDIT PROCEDURE
for suppliers and licensees of athletic footwear and apparel to
CONVERSE INC.

Issued to: _____

Date Issued: _____

# 1.0    PURPOSE

As the largest manufacturer of athletic footwear in the United States, Converse Inc. believes it has a responsibility to workers around the world who make product bearing the Converse name. We pledge to uphold internationally recognized labor practices and human rights standards including fair wages, reasonable working hours, no forced or child labor, safe and healthy living and working conditions, and non-discrimination. We believe these workers should be treated with respect and dignity, and not be subjected to any form of harassment or abuse.

Converse will make every effort to insure that proper labor practices and human rights standards are being followed and that continual improvements of living standards are being made.

IT IS CONVERSE'S PRACTICE TO DISCONTINUE ALL BUSINESS DEALINGS WITH ANY FACTORY OR LICENSEE WHO CAN NOT OR WILL NOT ADHERE TO THE GUIDELINES SET FORTH IN THIS POLICY MANUAL.

# 2.0    POLICIES

2.1    LABOR PRACTICES

Converse believes the following guidelines are the minimum standards that must be adhered to by our contract factories and their suppliers, and by our licensees and their factories and suppliers.

- Volunteer labor: All workers must accept their employment voluntarily. No facility will employ forced or prison labor. All employees are free to leave the factory grounds during off hours.

- Child labor: All employees at the factory must have reached the minimum age as prescribed by law in the host country. If no such minimum age is dictated by law, an employee must have reached the age of 16 in order to be employed.

- Minimum wage: All employees must be paid at least the minimum wage plus overtime pay as dictated by the laws of the host country. They must also receive all the benefits required by law.

- Hours of work: All employees are to receive their wages for the basic work week of forty (40) hours. They are to receive overtime pay for all work in excess of forty (40) hours unless a lower number of hours is designated by law or by collective agreement with the employees. Converse prefers to do business with those factories whose standard workweek is forty (40) hours under normal load conditions and who do not require their employees to work more than sixty (60) hours in one (1) week during occasional peak load conditions. Employees are not to be forced to work more than six (6) consecutive days without having a full day off.

- Discrimination: Any acts of discrimination in hiring, advancement, compensation, work assignments or continued employment will not be tolerated.

- Discipline: Discipline of employees, for any reason, is to be done only within the full accordance of local laws and, in no instance, shall involve corporal methods. Any form of physical, sexual, psychological or verbal harassment or abuse will not be tolerated.

- Legal Requirements: Each supplier shall certify that it is in full compliance with all national and local laws, rules and regulations relevant to their business operations, including those which are related to labor practices, human rights, and the environment. Refer to section 3.0.

2.2    MACHINERY SAFETY

All equipment must be properly safeguarded to prevent injury. Converse will not tolerate the intentional disarming of safety devices on any type of machinery or equipment.

2.3    MEDICAL CARE

It is not uncommon for workers to be exposed to risk of injury while working at virtually any task in a manufacturing environment, therefore suitable medical facilities must be available, open and properly staffed whenever the plant is in operation. It is essential that the facility be clean and equipped to deal with any type of injury common to this type of factory. Proper procedures for disposal of medical waste must be followed.

2.4    HYGIENIC ENVIRONMENT

Bathroom facilities, kitchens, dining areas and, if residences are provided, those facilities as well, must be clean and indicate that they are kept that way as a normal practice. Appropriate cleaning schedules, equipment, methods, cleaning agents including disinfectants and hot water should be used.

2.5    FIRE SAFETY

In manufacturing operations a major safety concern is fire. To this end, Converse will insist that proper safety conditions be maintained both in the factory workplace as well as all living, dining, and recreational facilities.

–    Free egress from building: All exits must be kept clear and free from clutter. Aisles must be clear and allow free movement. All exits must be unlocked whenever any employees are in the building. There must be sufficient exits to allow all employees to exit the buildings in a reasonable time span.

–    Crowded work areas: There must be ample room surrounding each work station so that employees can easily move to main aisles and then to exits without hindrance.

–    Fire fighting equipment: Fire extinguishers must be clearly marked, in all the languages represented by the workers, as to the method of operation, the type of fire they should be used on and the schedule for testing and recharging. All workers should be routinely trained in equipment operation.

–    Wiring: All electrical wiring must be properly connected and no circuits should be overloaded.

–    Evacuation plan: Each floor of every building must have an evacuation plan prominently displayed with instructions in all relevant languages. This plan is to be tested at regular intervals, we suggest 4 - 6 times per year.

–    Alarm system: Each building is to be equipped with appropriate smoke and fire alarm systems. These systems must be tested at least once every month.

–    Hazardous and dangerous materials: Appropriate procedures and systems must be in place to protect employees from being exposed to hazardous and dangerous materials and chemicals. Areas where these materials and chemicals are stored must be properly identified and methods of dealing with these materials, and the effects of them, must also be clearly posted. These materials should be stored in an appropriate facility which is separated from all working, living, and warehouse facilities.

All employees must be able to freely report to the factory any noncompliance with the above guidelines and standards without fear of punishment or retribution.

## 3.0   APPROVED LABOR AGREEMENT

It is strongly suggested that each factory have a formal agreement which clearly defines the relations, rights, and obligations of both employer and employees. This agreement might include, but is not limited to, compensation, working hours, rest and vacation, safety, health and welfare, and workers rights and responsibilities.

This agreement should be submitted to the proper local labor bureau or officials for approval and signature. All employees should be thoroughly briefed as to the contents of the agreement. The signed agreement should be openly posted and available to all employees.

Any labor contract signed by individual employees and factory management shall not contain provisions or terms lower than those provided for in the approved agreement.

## 4.0   AUDIT PROCEDURE

All factories that manufacture product for Converse Inc. will be audited for compliance to all Converse Labor Practices and Human Rights policies as well as all National and Local laws and regulations. These audits will be conducted at least two times per calendar year.

Converse is afforded the right, at our discretion, to conduct a comprehensive Labor Practices and Human Rights audit on any of our licensees wholly owned factories, or on any supplier of product, material, or components to any of our licensees; in order to verify compliance with our policies and requirements.

The audit will be conducted by Converse's Senior Vice President Product, or his appointed agent, who will be accompanied by a skilled translator. Others, as deemed necessary and appropriate, may be included on the audit team. At least one member of the audit team will be female to allow respectable access to women's dormitories and toilet/shower facilities.

### 4.1   PRELIMINARY MEETING

The audit will begin with a meeting with appropriate factory management to review the factory's labor practices. This will include obtaining, and possibly verifying, information regarding working hours, salary (including overtime pay and pay deductions), and minimum age of new hires. The attached *AUDIT DATASHEET* will be completed by the Converse auditor at this time. In addition, certain questions regarding living and working conditions, safety, and disciplinary practices will asked. This information will be verified during the walkthru portion of the audit.

### 4.2   WALKTHRU

The walkthru portion of the audit will follow the opening meeting. The Converse auditor(s), along with the appropriate factory management will visit all areas of the factory, including men's and women's dormitories, shower and toilet facilities, kitchen, dining rooms, medical clinic, hazardous/dangerous material storage area, recreational areas, and all factory departments. The attached *AUDIT CHECKLIST* will be used as a guideline to ask questions and to document all findings and observations.

All applicable areas of the audit checklist will be rated using the following scale:
> AD - adequate. The intent of the policy has been met.
> MO - minor observation. Improvement is suggested or recommended.
> MN - major nonconformance. Timely corrective action is mandatory.

Particular attention should be paid to those areas where the factory management has agreed to improvement or corrective action during previous audits.

4.3    WRAP-UP MEETING

Following the walkthru, a wrap-up meeting will be held.  The purpose of this meeting is to communicate the results of the audit to the appropriate factory management.  Using the completed *AUDIT CHECKLIST*, the audit team will detail those areas which stood out as being exceptional, will list and explain all minor observations, and will clearly describe any major nonconformances found during the audit.  FOR ANY MAJOR NONCONFORMANCE FOUND, THE FACTORY MANAGEMENT MUST PROVIDE, IN WRITING, A DETAILED PLAN TO BRING THAT AREA INTO COMPLIANCE WITHIN A REASONABLE AMOUNT OF TIME.

4.4    CORRECTIVE ACTION

The attached *CORRECTIVE ACTION REQUEST* will be used to document the major nonconformance, and the action the factory management has committed to take.  A copy of this signed request is given to the factory manager.  The auditor will keep the original request on file.  The audit is not considered to be completed until the auditor verifies that the corrective action has in fact occurred and the area is in compliance.

4.5    ADDITIONAL CHECKS FOR COMPLIANCE

In addition to these formal audits, Converse associates who visit any facility producing Converse branded product, regardless of their normal assignment(s) will have with them a copy of this document and will, as part of their tour of the factory, check for compliance to all applicable items on the *AUDIT CHECKLIST*, and will, upon their return to their base of operations, include their findings in these areas as part of their trip report.  Should they, during the course of their visit to the manufacturing site,  note an infraction of any areas, they are to  immediately report such infraction to the Converse Production Manager assigned to that facility with a copy to the Vice President Quality, Vice President Human Resources and Sr. Vice President Production.

## 5.0    SUBTIER SUPPLIERS

In addition to assuring that all labor practices and human rights policies (defined in Section 2.0 of this document) are being adhered to at their respective factories; it is also expected that each licensee and each contract factory have a program in place to assure that all of these policies are also being rigorously adhered to by all of the subtier suppliers who provide them with finished product, material, components, chemicals, molds, tooling etc. used in the production of product bearing the Converse name.  This program should include periodic visits by contract factory personnel or licensee personnel to their subtier suppliers for the purpose of verifying compliance.  IT IS CONVERSE'S EXPECTATION THAT ITS LICENSEES AND CONTRACT FACTORIES WILL DISCONTINUE ALL BUSINESS DEALINGS WITH ANY OF THEIR SUBTIER SUPPLIER'S WHO CAN NOT OR WILL NOT ADHERE TO THE GUIDELINES SET FORTH IN THIS POLICY MANUAL.

## 6.0    MEMORANDUM OF UNDERSTANDING

All suppliers and licensees must sign the attached memorandum of understanding (MOU) every year.  This action reaffirms their strong intention to comply with all National and Local laws and with the policies set forth in this manual.  It also reaffirms their commitment to insure all of their subtier suppliers comply with National and Local laws and with the policies set forth in this manual.

# LABOR PRACTICES AND HUMAN RIGHTS
## AUDIT DATASHEET

Date:

Factory:

Address:

Factory representative(s) present:

Converse Auditor(s):

## LABOR AND PAY PRACTICES

|  | during normal load conditions | during peak load conditions |  | Factory's Policy |
|---|---|---|---|---|
| Regular Hours |  |  | Minimum Age of New Hires |  |
| Overtime Hours |  |  | Minimum Wage Paid |  |
| Total Hours |  |  | Overtime Pay |  |

Is there an approved labor agreement, signed by local labor officials?

Is this agreement clearly posted for all employees to see?

Have all employees been advised of the contents of the agreement?

Is there a program in place to insure all subtier suppliers are in compliance?

Has current MOU been signed?

# HUMAN RIGHTS AUDIT CHECKLIST

| DORMITORY ROOMS | AD | MO | MN | COMMENTS |
|---|---|---|---|---|
| Number of people per room | | | | |
| Ventilation | | | | |
| Lighting | | | | |
| Cleanliness | | | | |
| Cleaning schedule/agents | | | | |
| Pest control | | | | |
| Locked closet space available | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **TOILETS AND SHOWERS** | | | | |
| Number of people per toilet | | | | |
| Number of people per shower | | | | |
| Overall Cleanliness | | | | |
| Cleaning schedule/agents | | | | |
| Hot water used for cleaning | | | | |
| Flush system | | | | |
| Trench condition | | | | |
| Smell | | | | |
| Privacy | | | | |
| Trash disposal | | | | |
| Lighting | | | | |
| Hot water for shower | | | | |
| Hours open for use | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **CLINIC** | | | | |
| Hours available | | | | |
| Qualified staff | | | | |
| Sufficient staff | | | | |
| Adequate equip/drugs/space | | | | |
| Appropriate waste disposal | | | | |
| Adequate record keeping | | | | |
| Access to hospital | | | | |
| Overall cleanliness | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

# HUMAN RIGHTS AUDIT CHECKLIST

| KITCHEN/DINING ROOM | AD | MO | MN | COMMENTS |
|---|---|---|---|---|
| Food prep surfaces | | | | |
| Floors | | | | |
| Ventilation | | | | |
| Lighting | | | | |
| Cleaning schedule/agents | | | | |
| Hot water for cleaning | | | | |
| Refrigeration (if required) | | | | |
| Sterilization units | | | | |
| Gloves/hairnets/caps | | | | |
| Policy for clean hands | | | | |
| Proximity to toilets | | | | |
| Food kept off floor | | | | |
| Food baskets/containers cleaned | | | | |
| Nutritional value/amount | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **SAFETY** | | | | |
| Fire extinguishers | | | | |
| Evacuation plan | | | | |
| Fire drills | | | | |
| Clear egress | | | | |
| Emergency lighting | | | | |
| Smoke/fire alarm system | | | | |
| Storage of haz/dangerous mat | | | | |
| Safety devices on machinery | | | | |
| Safe electrical wiring practices | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **RECREATION** | | | | |
| Availability of off time recreational facilities such as library, sports activities, TV, movies, store, music, telephone, barber/beautician, contests, bulletin board, etc. | | | | |
| | | | | |
| | | | | |

# CONVERSE CORRECTIVE ACTION REQUEST

Factory_____        Process/Area Audited:_____

Audited by:_____        Audit Date:_____        SKU:_____

**Details of Nonconformance Found:**

Signed by:_____(Auditor)

**Immediate and Long Term Action Taken (Corrective and Preventative):**

Signed by:_____(Factory Manager)

Target Completion Date:_____        Actual Completion Date:_____

**Verification of Corrective Action Taken:**

Signed by:_____(Auditor)    Date:_____

# MEMORANDUM OF UNDERSTANDING

Converse Inc. is a leading designer, manufacturer and marketer of high quality athletic footwear, and a licensor of sports apparel, accessories and selected footwear. We believe we have a responsibility to workers around the world who make product bearing the Converse name. We pledge to uphold internationally recognized labor practices and human rights standards including fair wages, reasonable working hours, no forced or child labor, safe and healthy living and working conditions, and non-discrimination. We believe these workers should be treated with respect and dignity, and not be subjected to any form of harassment or abuse.

Converse will make every effort to insure that proper labor practices and human rights standards, as well as pertinent national and local laws are being followed; and that continual improvements of living standards are being made.

However, we recognize that we cannot accomplish this alone; we need suppliers and licensees who share our vision and our commitment. Therefore, compliance with these standards and policies is a condition for becoming and remaining a business partner with Converse Inc.

In addition to Converse's semi-annual on-site monitoring system and the approved Labor Agreement, Converse requires all of its suppliers and licensees to sign and return this Memorandum of Understanding every year as a reaffirmation of their intent to comply with the policies and standards set forth in this manual.

CERTIFICATION OF COMPLIANCE

"By my signature, as chief executive officer, and on behalf of my company, I acknowledge receipt of Converse's *LABOR PRACTICES AND HUMAN RIGHTS* Procedure, and do hereby certify and agree that our company, *including all of our subtier suppliers*, will comply with its contents including all pertinent national and local laws. We shall provide Converse, or their agent, access to our factory and to pertinent records to verify conformance to its standards and policies.

_____

*Name and Title*                                    *Date*

_____

*Company Name and Address*

## APPENDIX C

## CONTRACT YEAR ROYALTY REPORT

# Converse Inc.

## Quarterly Royalty Report - Summary

**Licensee Name: Alon International**

**Territory: Brazil**

**Period:**

| | | USD |
|---|---|---|
| Total Footwear Royalty to be Remitted | $ | - |
| Total Originals Royalty to be Remitted | $ | - |
| Total Apparel Royalty to be Remitted | $ | - |
| Total Accessories Royalty to be Remitted | $ | - |
| | | |
| Total Earned Royalty | $ | - |

| | |
|---|---|
| Guaranteed Minimum Royalty (Quarterly) | |

| | |
|---|---|
| GREATER of EARNED Royalty or Guaranteed Minimum Royalty | |

**Total to be Remitted to Converse**

I Certify this Report to be Correct

_____
Chief Fiscal Officer

Date: _____
dd/mm/yyyy

**This Form Must be Completed and Returned to the Converse Office by the 15th day of the month following the end of the quarter being reported**

email completed file to Financial.Licensing@converse.com

**OR MAIL TO:**

Converse Inc. attn: Financial Licensing

One High Street North Andover, MA 01845-2601

# Converse Inc.

## Quarterly Royalty Report

**Licensee Name: Alon International**

**Territory: Brazil**

**Period:**

**Licensed Product: Footwear**

| | |
|---|---|
| 1) Units Sold (A) | |
| 2) Gross Sales, (Local Currency) (A) | |
| 3) Less Discounts/Allowances | |
| 4) Net Sales, (Local Currency) | |
| 5) Royalty Rate % | |
| 6) Royalty Due (Local Currency) | |
| 7) Rate of Exchange | |
| 8) Royalty Due US $ | $               - |
| 9) Guaranteed Minimum US $ | |
| 10) Greater of 8 or 9 | |
| 11) Less Withholding tax (B) | |
| 12) US $ to be Remitted | |

(A) Supporting Schedule Required showing units and net sales by Sku
(B) Withholding tax Receipt to be attached

I Certify this Report to be Correct

_____
Chief Fiscal Officer

Date: _____

dd/mm/yyyy

**This Form Must be Completed and Returned to the Converse Office**
**by the 15th day of the month following the end of the quarter being reported**

email completed file to Financial.Licensing@converse.com

**OR MAIL TO:**
Converse Inc. attn: Financial Licensing
One High Street North Andover, MA 01845-2601

# Converse Inc.

## Quarterly Royalty Report

**Licensee Name: Alon International**

**Territory: Brazil**

**Period:**

**Licensed Product: Originals (All Star, Purcells, Skid Grips & One Star)**

| | |
|---|---|
| 1) Units Sold (A) | |
| 2) Gross Sales, (Local Currency) (A) | |
| 3) Less Discounts/Allowances | |
| 4) Net Sales, (Local Currency) | |
| 5) Royalty Rate % | |
| 6) Royalty Due (Local Currency) | |
| 7) Rate of Exchange | |
| 8) Royalty Due US $ | $                - |
| 9) Guaranteed Minimum US $ | |
| 10) Greater of 8 or 9 | |
| 11) Less Withholding tax (B) | |
| 12) US $ to be Remitted | |

(A) Supporting Schedule Required showing units and net sales by Sku
(B) Withholding tax Receipt to be attached

I Certify this Report to be Correct
_____
Chief Fiscal Officer

Date:  _____
dd/mm/yyyy

**This Form Must be Completed and Returned to the Converse Office
by the 15th day of the month following the end of the quarter being reported**

email completed file to Financial.Licensing@converse.com

**OR MAIL TO:**
Converse Inc. attn: Financial Licensing
One High Street North Andover, MA 01845-2601

# Converse Inc.

## Quarterly Royalty Report

Licensee Name: Alon International

Territory: Brazil

Period:

Licensed Product: Apparel

| | |
|---|---|
| 1) Units Sold (A) | |
| 2) Gross Sales, (Local Currency) (A) | |
| 3) Less Discounts/Allowances | |
| 4) Net Sales, (Local Currency) | |
| 5) Royalty Rate % | |
| 6) Royalty Due (Local Currency) | |
| 7) Rate of Exchange | |
| 8) Royalty Due US $ | $ - |
| 9) Guaranteed Minimum US $ | |
| 10) Greater of 8 or 9 | |
| 11) Less Withholding tax (B) | |
| 12) US $ to be Remitted | |

(A) Supporting Schedule Required showing units and net sales by Sku
(B) Withholding tax Receipt to be attached

I Certify this Report to be Correct

_____
Chief Fiscal Officer

Date: _____

dd/mm/yyyy

**This Form Must be Completed and Returned to the Converse Office
by the 15th day of the month following the end of the quarter being reported**

email completed file to Financial.Licensing@converse.com

**OR MAIL TO:**

Converse Inc. attn: Financial Licensing
One High Street North Andover, MA 01845-2601

# Converse Inc.

## Quarterly Royalty Report

Licensee Name: Alon International

Territory: Brazil

Period:

Licensed Product: Accessories

| | |
|---|---|
| 1) Units Sold (A) | |
| 2) Gross Sales, (Local Currency) (A) | |
| 3) Less Discounts/Allowances | |
| 4) Net Sales, (Local Currency) | |
| 5) Royalty Rate % | |
| 6) Royalty Due (Local Currency) | |
| 7) Rate of Exchange | |
| 8) Royalty Due US $ | $                    - |
| 9) Guaranteed Minimum US $ | |
| 10) Greater of 8 or 9 | |
| 11) Less Withholding tax (B) | |
| 12) US $ to be Remitted | |

(A) Supporting Schedule Required showing units and net sales by Sku
(B) Withholding tax Receipt to be attached

I Certify this Report to be Correct

Chief Fiscal Officer

Date:

dd/mm/yyyy

**This Form Must be Completed and Returned to the Converse Office
by the 15th day of the month following the end of the quarter being reported**

email completed file to Financial.Licensing@converse.com

**OR MAIL TO:**
Converse Inc. attn: Financial Licensing
One High Street North Andover, MA 01845-2601

**MONTHLY BUSINESS REVIEW**
**FORECAST**

Licensee : Alon International
Country  : Brazil

Exchange Rate: _____ = $1 USD          *All Sales numbers in local currenc*

| | Footwear | Originals | Apparel | Accessories | Total |
|---|---|---|---|---|---|
| January Wholesale Forecast Sales   LC | | | | | |
| Royalty rate | | | | | |
| Forecast Royalty                USD | | | | | |
| February Wholesale Forecast Sales  LC | | | | | - |
| Royalty rate | | | | | |
| Forecast Royalty                USD | | | | | |
| March Wholesale Forecast Sales    LC | | | | | - |
| Royalty Rate | | | | | |
| Forecast Royalty                USD | | | | | |
| April Wholesale Forecast Sales      LC | | | | | - |
| Royalty Rate | | | | | |
| Forecast Royalty                USD | | | | | |
| May Wholesale Forecast Sales      LC | | | | | - |
| Royalty Rate | | | | | |
| Forecast Royalty                USD | | | | | |
| June  Wholesale Forecast Sales     LC | | | | | - |
| Royalty Rate | | | | | |
| Forecast Royalty                USD | | | | | |
| July Wholesale Forecast Sales      LC | | | | | - |
| Royalty rate | | | | | |
| Forecast Royalty                USD | | | | | |
| August Wholesale Forecast Sales  LC | | | | | - |
| Royalty rate | | | | | |
| Forecast Royalty                USD | | | | | |
| September Wholesale Forecast Sales  LC | | | | | - |
| Royalty Rate | | | | | |
| Forecast Royalty                USD | | | | | |
| October Wholesale Forecast Sales  LC | | | | | - |
| Royalty rate | | | | | |
| Forecast Royalty                USD | | | | | |
| November Wholesale Forecast Sales  LC | | | | | - |
| Royalty rate | | | | | |
| Forecast Royalty                USD | | | | | |
| December Wholesale Forecast Sales LC | | | | | - |
| Royalty Rate | | | | | |
| Forecast Royalty                USD | | | | | |
| Full Year Sales Forecast            LC | - | - | - | - | - |
| Royalty Rate | | | | | |
| Forecast Royalty                USD | | | | | |

**MONTHLY BUSINESS REVIEW**
**YEAR-TO-DATE Actual Sales and Earned Royalties**

Licensee : Alon International
Country  : Brazil

Exchange Rate: _____ = $1 USD          *All Sales numbers in local currenc*

| | | Footwear | Originals | Apparel | Accessories | Total |
|---|---|---|---|---|---|---|
| January Wholesale Sales | LC | | | | | |
| Royalty rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| February Wholesale Sales | LC | | | | | |
| Royalty rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| March Wholesale Sales | LC | | | | | |
| Royalty Rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| April Wholesale Sales | LC | | | | | |
| Royalty Rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| May Wholesale Sales | LC | | | | | |
| Royalty Rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| June  Wholesale Sales | LC | | | | | |
| Royalty Rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| July Wholesale Sales | LC | | | | | |
| Royalty rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| August Wholesale Sales | LC | | | | | |
| Royalty rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| September Wholesale Sales | LC | | | | | |
| Royalty Rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| October Wholesale Sales | LC | | | | | |
| Royalty rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| November Wholesale Sales | LC | | | | | |
| Royalty rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| December Wholesale Sales | LC | | | | | |
| Royalty Rate | | | | | | |
| Earned Royalty | USD | | | | | |
| | | | | | | |
| Full Year Sales | LC | | | | | |
| Royalty Rate | | | | | | |
| Earned Royalty | USD | | | | | |

| ADVERTISING | SPEND IN LOCAL CURRENCY | USD EXCHANGE RATE | SPEND IN USD |
|---|---|---|---|
| TELEVISION | | | $       - |
| RADIO | | | $       - |
| CINEMA | | | $       - |
| PRESS | | | $       - |
| BILLBOARDS | | | $       - |
| OTHER | | | $       - |
| TOTAL ADVERTISING | | | $       - |

| PROMOTIONS | SPEND IN LOCAL CURRENCY | USD EXCHANGE RATE | SPEND IN USD |
|---|---|---|---|
| TEAM SPONSORSHIP | | | $       - |
| TOURNAMENTS | | | $       - |
| GRASS ROOTS | | | $       - |
| SPECIAL EVENTS | | | $       - |
| OTHERS | | | $       - |
| TOTAL PROMOTIONS | | | $       - |

| IN STORE | SPEND IN LOCAL CURRENCY | USD EXCHANGE RATE | SPEND IN USD |
|---|---|---|---|
| POINT OF SALE | | | $       - |
| PROMOTIONS | | | $       - |
| STAFF INCENTIVE | | | $       - |
| RETAILER INCENTIVE | | | $       - |
| OTHERS | | | $       - |
| TOTAL IN STORE | | | $       - |

| | |
|---|---|
| TOTAL A&P SPEND IN USD: | |
| TOTAL WHOLESALE SALES IN USD: | |
| A&P SPEND AS A PERCENTAGE RATE | |

I CERTIFY THIS INFORMATION TO BE TRUE AND CORRECT
CHIEF FISCAL OFFICER:

## DISTRIBUTION AND COPYRIGHT LICENSING CONTRACT

Through this private agreement, the parties:

1. **ALON INTERNATIONAL S.A.**, based in the United States of America, at 1160 E Hallandale Bch. Blvd. Suite A – Hallandale, FL 33009, hereby represented by its legal representative RONALD NATHAN DURCHFORT – a United States citizen and entrepreneur, married and working at the business address above – and hereinafter referred to as the "**COMPANY**"; and

2. **COOPERSHOES COOPERATIVA DE CALÇADOS E COMPONENTES JOANETENSE LTDA.**, a cooperative with head offices at Rua Vicente Preto, 3767, Vila Joaneta, Municipality of Picada Café, Rio Grande do Sul State, Corporate Tax Payer no. 02.675.611/0001-65 and State Registration no. 388/0002446, hereby represented by its President ALTAMIR ANTONIO BREDA – a Brazilian citizen and footwear manufacturer, married, Tax Payer no. 355.527.510-00 – and its Treasurer PAULO ADEMIR SIDEGUM – a Brazilian citizen and footwear manufacturer, single, Tax Payer no. 641.558.970-91 – both working at the business address above, and hereinafter referred to as the "**DISTRIBUTOR**".

**WHEREAS** the **COMPANY** is an exclusive licensee to Converse Inc. within the Territory, pursuant to the terms of a contract executed on September 9, 2001 in connection with the manufacture, distribution and sale of the Products;

**WHEREAS** the **DISTRIBUTOR** has the technical capabilities required to operate as an exclusive distributor of the Products within the Territory;

**WHEREAS** the **COMPANY** wishes the **DISTRIBUTOR** to distribute and market the Products within the Territory, and the **DISTRIBUTOR** agrees to distribute such Products, the parties hereto have agreed to the following:

## CLAUSE NO. 1 – RIGHTS GRANTED TO THE DISTRIBUTOR

For the purposes of this legal document, the terms listed below shall be defined as follows:

**TERRITORY:** the Federal Republic of Brazil.

**PRODUCTS:** vulcanized "ALL STAR" footwear specified by the **COMPANY**.

**DISTRIBUTION FEE AND COPYRIGHT:** This refers to the amount to be paid for the exclusive right to distribute the Products within the Territory, and for the license to use the copyright over the Product designs.

**GROSS SALES:** Gross sales revenue obtained by the **DISTRIBUTOR** from the Products, i.e. the monthly sum of all the amounts invoiced, net of deductions of any kind.

**CONVERSION RATE:** The commercial asking price for the U.S. dollar, as published in the São Paulo edition of *Gazeta Mercantil* for the business day immediately preceding the payment dates specified herein.

**Paragraph 1 -** The **COMPANY** hereby grants to the **DISTRIBUTOR** exclusive rights to market and distribute the Products within the Territory, as well as the right to use the Product designs so as to accomplish the said distribution.

**Paragraph 2 -** The **DISTRIBUTOR** may only use the Product designs for the purpose of distributing and marketing the Products within the Territory. The Products shall be promoted and distributed in strict compliance with **COMPANY** guidelines.

## CLAUSE NO. 2 – PURCHASING

**Paragraph 1 -** The **DISTRIBUTOR** will purchase finished Products made within the Territory solely and exclusively from companies that have been authorized by the **COMPANY** to manufacture them. Under no circumstances may the **COMPANY** be held liable for freight, delivery, quality control and/or any other responsibility pertaining to Product manufacturing. Payment for the Products will be made directly by the **DISTRIBUTOR** to the manufacturers, and the **COMPANY** is hereby declared exempt from any liability related to such payments.

**Paragraph 2 –** The **DISTRIBUTOR** will be remunerated in accordance with usual trade practices, its markup consisting of the difference between the purchase price obtained by the **DISTRIBUTOR** and the price for which the **DISTRIBUTOR** sells the Products to its clients. Therefore, the **COMPANY** assumes no responsibility or obligation whatsoever with regard to any kind of payment to the **DISTRIBUTOR**, as the latter will be invoicing and charging the credits that it is entitled to directly from its clients.

**Paragraph 3 -** No Product or related printed matter may be manufactured, produced and distributed within the Territory without previous written authorization by the **COMPANY**.

**Paragraph 4 -** The **DISTRIBUTOR** hereby agrees not to purchase, manufacture and/or sell any product that might compete with the **COMPANY**'s Products within the same market segment and price range.

## CLAUSE NO. 3 – SALES TARGETS (biannual)

**Paragraph 1 -** The **DISTRIBUTOR** hereby promises to structure its industrial, commercial and product development facilities and capabilities so as to achieve the following sales targets (expressed in number of pairs of shoes):

|  | July/02 to December/02 | January/03 to June/03 | July/03 to December/03 | January/04 to June/04 | July/04 to December/04 |
|---|---|---|---|---|---|
| Pairs of shoes | 1,900,000 | 2,400,000 | 2,000,000 | 2,700,000 | 2,250,000 |

## CLAUSE NO. 4 – MARKETING OF PRODUCTS WITHIN TERRITORY

The **DISTRIBUTOR** shall spend, in each period and as part of its Promotional Obligations, an average amount equivalent to 3% (three per cent) of its monthly gross revenues from Product sales, in order to divulge and promote the Products within the Territory. This

percentage refers to the budget for communications, participation in trade shows, conventions and/or other marketing initiatives pertaining to the business, which must be undertaken by the **DISTRIBUTOR** with previous written authorization from the **COMPANY**. The latter reserves the right to forward to the **DISTRIBUTOR** certain marketing plans to be implemented by the **DISTRIBUTOR** at its own expense.

## CLAUSE NO. 5 – CONSIDERATION: PAYMENT FOR THE EXCLUSIVE RIGHTS TO DISTRIBUTE THE PRODUCTS AND USE THE PRODUCT DESIGNS

**Paragraph 1** – The **DISTRIBUTOR** will pay to the **COMPANY** a Distribution Fee and Copyright Royalties equivalent to 10% (ten per cent) of its monthly gross revenues from Product sales, in exchange for the rights to distribute the Products within the Territory and to use the Product designs. The Distribution Fee and Copyright Royalties will be paid in two identical installments due on the 15th (fifteenth) and 30th (thirtieth) days of the month following the sales made, through a wire transfer to the **COMPANY**'s checking account or to any other entity indicated by the latter. The **COMPANY** shall inform, in writing, the bank, branch and checking account number to which such amounts must be transferred. All taxes impinging upon these payments shall be deducted from the remittances thereof. Furthermore, the **DISTRIBUTOR** hereby agrees to send to the **COMPANY**, within 10 (ten) days of each remittance, documental evidence that all applicable taxes have been paid.

**Paragraph 2 -** For the purpose of determining the amount due under Paragraph 1, all sales made during any given month will be computed in Brazilian *reais*, and the payment made in U.S. dollars.

**Paragraph 3 -** All sums of money owed by the **DISTRIBUTOR** but left unpaid until the due dates specified herein will be subject to legal interest payments up to the limit permitted by law and/or not forbidden by law, plus a delinquent penalty equivalent to 2% (two per cent) of the amount due, without detriment to applicable damages or losses, if any.

**Paragraph 4** – The **COMPANY** reserves the right to ascertain the performance of this Contract by the **DISTRIBUTOR**, at any moment and by all means available to it, including auditing, examination of books and other forms of verification, on its own account or through its employees or any other person that it has designated for this task. If the **DISTRIBUTOR**'s actual revenues have been falsified or if difficulties are created to hamper the examination and verification of the data pertaining to the relevant sales records by the **COMPANY** or any person that the latter has appointed for this task, the **DISTRIBUTOR** will be liable for all the lawyer's fees and accounting audit costs.

## CLAUSE NO. 6 – MINIMUM REQUIREMENTS

**Paragraph 1 -** The **DISTRIBUTOR** hereby agrees to pay to the **COMPANY**, in any case and as a minimum requirement, a certain minimal amount every six months, corresponding to the minimum number of pairs of shoes sold, as specified below, whether the Products have actually been sold or not, and regardless of the biannual revenue obtained by the **DISTRIBUTOR**.

**Paragraph 2 -** The payment schedule for such minimal amounts is shown below, considering the minimum number of pairs of shoes that the **DISTRIBUTOR** is expected to sell:

|  | July/02 to December/02 | January/03 to June/03 | July/03 to December/03 | January/04 to June/04 | July/04 to December/04 |
|---|---|---|---|---|---|
| Pairs of shoes | 1,000,000 | 1,260,000 | 1,100,000 | 1,380,000 | 1,150,000 |

**Paragraph 3 –** For the purpose of determining the amount due under Paragraphs 1 and 2 above, or in the event of a contract renewal as per Paragraph 1(a) of Clause no. 10, the parties hereto are to consider the difference between the minimum requirement and the number of pairs of shoes actually sold by the **DISTRIBUTOR** in any given semester, multiplied by the average unit selling price of the Products in the last month of that semester. The average unit selling price corresponds to the average unit selling price of the Products invoiced in the last month of the semester in question

**Paragraph 4 -** If the **DISTRIBUTOR** fails to sell the minimum number of pairs of shoes stipulated for the periods above, it will be required to make complementary payments to the **COMPANY** until the sum corresponding to the sale of the number of pairs shown in the schedule above has been fully paid, pursuant to the calculation described in Paragraph 3. This payment is to be made by the 15th (fifteenth) day of the month following the end of the semester under consideration, through a wire transfer to the **COMPANY**'s checking account or to any other entity indicated by the latter. The **COMPANY** shall inform, in writing, the bank, branch and checking account number to which such amounts must be transferred. All taxes impinging upon these payments will be deducted from the remittances thereof. Furthermore, the **DISTRIBUTOR** hereby agrees to send to the **COMPANY**, within 10 (ten) days of each remittance, documental evidence that all applicable taxes have been paid. Should the **DISTRIBUTOR** be prevented from operating due to some court injunction, the sums above will be reduced proportionately to the time that it has actually remained inoperative.

**Paragraph 5 –** For the purpose of determining the amount to be paid under this clause, all the payments made by the **DISTRIBUTOR** to the **COMPANY** shall be taken into consideration.

**Paragraph 6 -** The parties hereby acknowledge that the minimum requirement for the period from July to December 2002 may have to be recalculated if this Contract goes into effect after July 2002, so that the minimum number of pairs is proportionate to the date as of which this legal document begins to produce all of its effects between the parties.

## CLAUSE NO. 7 – REPORTS

**Paragraph 1 -** The **DISTRIBUTOR** hereby agrees to present to the **COMPANY**, by the 10th (tenth) day of every calendar month following the month when the sales were made, a report on the sale and purchase of finished goods, prepared according to a template to be provided by the **COMPANY**.

## CLAUSE NO. 8 – DISTRIBUTOR'S BOOKKEEPING OBLIGATIONS

The **DISTRIBUTOR** will maintain, throughout the term of this Contract and for a period of 5 (five) years after its extinction, all the books and accounting records in its office facilities, as well as all other documents containing information that is necessary and/or useful to support and prepare the reports referred to and required hereunder.

**Sole Paragraph -** During the period established under the heading of this clause, the **COMPANY** will have the right to audit, on its own account or through third parties, all the accounting records and information files mentioned in the foregoing paragraph and related to the subject matter of this Contract, as found in the **DISTRIBUTOR**'s offices or in possession of its agents. The **COMPANY** or any other person designated for this task will be granted full access to the documents as well as the right to make photocopies of any documents deemed to be relevant by the **COMPANY**, at its own discretion.

## CLAUSE NO. 9 – LICENSING AND CONTRACT REGISTRATION

The **DISTRIBUTOR** hereby agrees to obtain, on its own account and at its own expense, i.e. with no further obligation for the **COMPANY**, all the licenses and permits required by the government for a satisfactory performance of this Contract and for the remittance of the payments due hereunder.

## CLAUSE NO. 10 – TERM OF CONTRACT AND RESCISSION

This Contract will go into effect upon the occurrence of the earliest of the following events:

a) termination of the *Trademark Licensing Contract* signed by the **DISTRIBUTOR** with ALL STAR ARTIGOS ESPORTIVOS LTDA. – a company with head offices at Av. Antônio Massa, 300, conj. 01, sala 02, Centro, São Paulo, Brazil, Corporate Tax Payer no. 62.539.960/0001-81 – regardless of the reason for the said termination; or

b) announcement of the judge's decision regarding the appeal filed by ALL STAR ARTIGOS ESPORTIVOS LTDA. for sentence clarification, without any change to the judgement on the merits of the case, in connection with the ongoing lawsuit no. 94.02.22597-8 brought before the 18th Federal Court of Rio de Janeiro against a U.S. company named Converse, Inc.

**Paragraph 1 –** This Contract will be valid until December 31st, 2004 and renewable for identical and successive periods of 6 (six) months each if the **DISTRIBUTOR** has achieved at least 80% (eighty per cent) of the sales target set for the previous semester, pursuant to the sales targets shown in Paragraph 1 of Clause no. 3 and/or in the following schedule:

| | Jan/05 to June/05 | July/05 to Dec/05 | Jan/06 to June/06 | July/06 to Dec/06 | Jan/07 to June/07 | July/07 to Dec/07 |
|---|---|---|---|---|---|---|
| Pairs of shoes | 2,970,000 | 2,475,000 | 3,270,000 | 2,725,000 | 3,600,000 | 3,000,000 |

**Paragraph 2 –** In the event of Contract renewal, the payment schedule for the minimum amounts required is shown below, considering the minimum number of pairs of shoes that the **DISTRIBUTOR** is expected to sell:

| | Jan/05 to June/05 | July/05 to Dec/05 | Jan/06 to June/06 | July/06 to Dec/06 | Jan/07 to June/07 | July/07 to Dec/07 |
|---|---|---|---|---|---|---|
| Pairs of shoes | 1,520,000 | 1,265,000 | 1,670,000 | 1,395,000 | 1,850,000 | 1,530,000 |

**Paragraph 3 -** The parties will negotiate, in mutual accord, the fees to be paid to the **COMPANY** upon every Contract renewal.

**Paragraph 4 -** The **COMPANY** may cancel this Contract through a 60 (sixty)-day advance written notice to the **DISTRIBUTOR** if the latter fails to make any of the payments specified herein and/or if its sales performance falls short of 80% (eighty per cent) of the sales target set for a given semester, as per Paragraph 1 of Clause no. 3, and Paragraph 1 of Clause no. 10.

Likewise, the **COMPANY** may cancel this Contract through a 60 (sixty)-day advance written notice to the **DISTRIBUTOR** if the latter fails to perform any other provision hereof, and if it does not take the necessary corrective measures within 30 (thirty) days of a proper notification by the **COMPANY**.

**Paragraph 5 -** The **COMPANY** will not be liable for any damages, compensation or indemnification of any kind owing to the rescission or termination of this Contract by the **DISTRIBUTOR**, not even if such damages, compensation or indemnification are caused by losses arising from the **DISTRIBUTOR**'s past undertakings, or by the loss of capital investments, profits, goodwill or clients, or by any other loss attendant to the rescission or termination hereof.

**Paragraph 6 -** The **COMPANY** may also cancel this Contract immediately through a written notice to the **DISTRIBUTOR** without, however, generating any right to indemnification for the latter in the following cases: (i) change of control in stock ownership to third parties without the **COMPANY**'s previous consent; (ii) takeover or prohibition of the **DISTRIBUTOR**'s business operations by government authorities; and/or (iii) loss of the rights granted by Converse, Inc.

**Paragraph 7 -** This Contract will be rightfully terminated with or without proper notification to the **DISTRIBUTOR** if the *Professional and Technical Service Contract* signed by the parties on this date is terminated or rescinded.

**Paragraph 8 –** If this Contract is cancelled due to some fault by the **DISTRIBUTOR**, the latter will be held liable for the settlement of all the sums specified herein and overdue, regardless of any other outstanding debt.

**Paragraph 9 –** If this Contract is cancelled by the **COMPANY** without just cause, and if the **DISTRIBUTOR** has honored all of its obligations hereunder, whatever their nature, upon the termination or rescission hereof, the **COMPANY** shall grant the **DISTRIBUTOR** a maximum period of 60 (sixty) days as of the referred termination or rescission, so that the latter may sell off its inventories.

**Paragraph 10 -** The **DISTRIBUTOR** may cancel this Contract through a 120 (one hundred and twenty)-day advance written notice to the **COMPANY** in the event of non-performance and if the **COMPANY** fails to take the necessary corrective measures within 30 (thirty) days of a proper notification by the **DISTRIBUTOR**.

**Paragraph 11 –** Upon termination or rescission of this Contract, the **DISTRIBUTOR** will be required to immediately discontinue the use of the Product designs licensed to it by the **COMPANY**, as well as the utilization of any advertising and sales material or other means of identification that might cause the **DISTRIBUTOR** to be associated to the **COMPANY**. Moreover, the **DISTRIBUTOR** is to remove all inscriptions, signs, posters and displays that are directly or indirectly related to the **COMPANY**.

**Paragraph 12 -** Upon termination of this Contract, the **COMPANY** or any other designated entity will be required to purchase all of the **DISTRIBUTOR**'s inventories for the same price and under the same payment conditions specified on the price list and applied to retailers. All the raw-material, components and packaging materials in excess of those required to cover the orders will be acquired by the **COMPANY** at a cost price that is acceptable to the **DISTRIBUTOR**. Outdated or off-list inventory items will be purchased at 50% (fifty per cent) of their manufacturing cost.

**Paragraph 13 -** The **DISTRIBUTOR** is to surrender immediately to the **COMPANY** all the materials and documents that may be in its possession on account of this Contract or which are related to the distribution or design of the Products.

## CLAUSE NO. 11 – RELATIONSHIP BETWEEN THE PARTIES

The **DISTRIBUTOR** may only present itself or allow itself to be presented as a **DISTRIBUTOR** and/or **BUYER** of the Products. It is not and will not be empowered to bind the **COMPANY** or to assume or create any obligation or responsibility on behalf of the latter, whether expressly and by implication. All purchases of Products by the **DISTRIBUTOR**, as well as all the communications, contracts and agreements entered into by the **DISTRIBUTOR** with any person, corporate entity, agent or government agency with regard to the sale or purchase of the Products will be made by the **DISTRIBUTOR** in its own name and at its own expense. There exists no employment relationship whatsoever between the **DISTRIBUTOR**'s and the **COMPANY**'s employees. Conversely, the **COMPANY** is not and will not be empowered to bind the **DISTRIBUTOR** or to assume or create any obligation or responsibility on its behalf, whether expressly or by implication, save specifications to the contrary contained herein or provided by Law. All purchases of Products by the **COMPANY**, and all the communications, contracts and agreements entered into by the **COMPANY** with any person, corporate entity, agent or government agency with regard to the sale or purchase of the Products will be made by the **COMPANY** in its own name and at its own expense.

## CLAUSE NO. 12 – CONFIDENTIALITY

All the information exchanged between the parties under the terms hereof or otherwise related to the negotiation of the Products must be held in strict confidentiality. The parties hereto agree not to disclose nor to allow their employees and subcontractors to reveal to third parties any of the information related to this Contract or to which they may have

gained access by virtue hereof, without previous written authorization from their counterpart.

## CLAUSE NO. 13 - ASSIGNMENT

The **DISTRIBUTOR** may not assign or otherwise delegate, transfer or pledge any of its rights or obligations hereunder without prior written consent by the **COMPANY**. The latter may assign its rights and delegate the performance of its obligations hereunder to any corporate entity, provided that this Contract is fully honored and that the **DISTRIBUTOR** is in no danger of incurring losses or liabilities of any kind on account of the said assignment or delegation.

## CLAUSE NO. 14 – NOTIFICATIONS

All notifications, requests and communications required hereunder will be in writing and regarded as received when: (i) delivered in person on the date indicated on the receipt; or (ii) transmitted by facsimile, telex or electronically through the Internet, with confirmation of receipt on the business day following their receipt, and provided that they have been forwarded to the addresses below or to any other address indicated by the respective party through some written communication to their counterpart.

COMPANY:

**ALON INTERNATIONAL S.A.**
Mr. RONALD DURCHFORT and/or ROBERTO SZERER
1160 East Hallandale Beach Boulevard Suite A
Hallandale, Florida 33009
USA
Telephone:    (954) 456-2566
Facsimile:    (954) 456-2551
e-mail:        rd@aloninternational.com

DISTRIBUTOR:

**COOPERSHOES COOPERATIVA DE CALÇADOS E COMPONENTES JOANETENSE LTDA.**
ALTAMIR ANTONIO BREDA and PAULO ADEMIR SIDEGUM
Rua Vicente Preto, 3767, Vila Joaneta
Picada Café (RS) – Brasil – 95175-000
Telephone:    (54) 285-1302
Facsimile:    (54) 285-1302
e-mail:        gringo@coopershoes.com.br

**Sole Paragraph -** Should there be any change to the addresses, telephone and facsimile numbers and e-mail addresses above, both the **COMPANY** and the **DISTRIBUTOR** hereby agree to communicate such alterations to the other party within 48 (forty-eight) hours of their occurrence, at the aforementioned addresses or any other one indicated by the respective party through some written notification to its counterpart.

## CLAUSE NO. 15 – GENERAL PROVISIONS

a) This Contract constitutes the full and complete understanding between the parties as regards the subject matter hereof, and it supercedes all other verbal or written agreements or undertakings that may exist as of this date.

b) This Contract may only be amended or otherwise altered in writing, in which case the amendments or alterations must be signed by both parties.

c) The headings of the clauses herein are used merely for the parties' convenience. They do not define, restrict or broaden the scope of the provisions contained in each clause, nor are they to be considered in the interpretation and performance of this Contract.

d) From time to time, the **DISTRIBUTOR** and its suppliers shall allow authorized representatives from Converse, Inc. and/or the **COMPANY** to inspect their activities and facilities, accounting records and invoices related to the distribution and supply of the "Products Approved". Should such examination reveal any difference between the amounts registered therein and the sums actually paid by the **DISTRIBUTOR** to Converse, Inc. and/or to the **COMPANY**, the **DISTRIBUTOR** will be solely and exclusively responsible for settling any such variances immediately.

e) The **COMPANY** may forbid sales to and/or negotiations with clients and/or third parties who are and/or have been engaged in activities that may cause any kind of damage to the Products or materials mentioned herein and/or to the business, in which case the **DISTRIBUTOR** will not be entitled to any form of indemnification on account of the aforementioned cancellation and/or prohibition.

f) Considering the **COMPANY**'s obligation to obtain a prior authorization from Converse, Inc. to market any Product to be sold on the basis of this Contract, the **DISTRIBUTOR** hereby agrees to send to the **COMPANY** one unit of each Product as a sample and free of charge, so that the latter may obtain the required authorization from Converse, Inc. This permission is to be made available by the **COMPANY** to the **DISTRIBUTOR** within 30 (thirty) days of its receipt, at the latest.

## CLAUSE NO. 16 – GRATUITIES

The failure by either party to exercise any of their respective rights under or ensuing from this Contract does not imply that they have relinquished or substituted such rights, which may be exercised at any moment upon demand by the other party.

## CLAUSE NO. 17 – INTERPRETATION AND GAPS

Should the parties ever disagree on the interpretation of the terms hereunder or on the performance of the obligations contemplated herein, or if gaps are found in this Contract, the parties will undertake to resolve their differences of opinion in accordance with the principles of good faith, fairness, reasonableness and thrift, and to close the gaps with stipulations that, presumably, would have reflected their original intent at the time.

## CLAUSE NO. 18 – CASES OF IMPROPER PRODUCT MANUFACTURING AND/OR MARKETING

Should the **DISTRIBUTOR** detect any instance of improper Product manufacturing and/or marketing within the Territory and in violation of its rights hereunder, it is to inform the **COMPANY** thereof so that the latter may take immediate steps with the titleholder of those rights to forbid or inhibit such practices.

## CLAUSE NO. 19 – APPLICABLE LEGISLATION AND VENUE

The parties hereto have chosen the Brazilian Code of Law for the purpose of interpreting any civil, contentious or probate matters attendant to this Contract, and elected the Central Court of the City of Rio de Janeiro as a venue where they may seek clarifications or settle any disputes arising from the provisions hereof, to the exclusion of all others, no matter how privileged, and particularly the courts in their own domiciles. This Contract is binding on and effective for the parties hereto as well as their respective successors and assignees, in whatever capacity.

Having thus agreed to the terms above, the parties have signed this Contract in 3 (three) copies of identical form and content, and in the presence of the undersigned witnesses.

Novo Hamburgo, July 24, 2002

**COMPANY**

--------------------------------------------------------
Signed by:

**DISTRIBUTOR**

--------------------------------------------------------
Signed by:

**Witnesses:**

--------------------------------------------    --------------------------------------------------
Full name:                                      Full name:
Tax Payer no.:                                  Tax Payer no.:

## PROFESSIONAL AND TECHNICAL SERVICE CONTRACT

For the purposes of this private agreement, the parties:

1. **COOPERSHOES COOPERATIVA DE CALÇADOS E COMPONENTES JOANETENSE LTDA.**, a cooperative with head offices at Rua Vicente Preto, 3767, Vila Joaneta, Municipality of Picada Café, Rio Grande do Sul State, Corporate Tax Payer no. 02.675.611/0001-65 and State Registration no. 388/0002446, hereby represented by its President ALTAMIR ANTONIO BREDA – a Brazilian citizen and footwear manufacturer, married, Tax Payer no. 355.527.510-00 – and its Treasurer PAULO ADEMIR SIDEGUM – a Brazilian citizen and footwear manufacturer, single, Tax Payer no. 641.558.970-91 – both working at the business address above, and hereinafter referred to as "**COOPERSHOES**"; and

2. **ALON INTERNATIONAL S.A.**, based in the United States of America, at 1160 E Hallandale Bch. Blvd. Suite A – Hallandale, FL 33009, hereby represented by its legal representative RONALD NATHAN DURCHFORT – a United States citizen and entrepreneur, married and working at the business address above – and hereinafter referred to as "**ALON**".

**WHEREAS COOPERSHOES** and **ALON** have executed a *Distribution and Copyright Licensing Contract* on this date;

**WHEREAS ALON** employs a team of skilled technicians, professionals and experts with years of experience in developing products and marketing & advertising strategies, and in providing commercial & sales advisory;

**WHEREAS COOPERSHOES** wishes to obtain from **ALON** the services specified above in order to promote certain Products within the Territory, and **ALON** agrees to provide such professional services to **COOPERSHOES**;

The parties have decided to execute this Contract under the following provisions and conditions:

For the purposes of this legal document, the terms listed below shall be defined as follows:

**TERRITORY:** Federal Republic of Brazil.

**PRODUCTS:** canvas footwear distributed by **COOPERSHOES**.

**GROSS SALES:** Gross sales revenues obtained by **COOPERSHOES** from the Products, i.e. the monthly sum of all the amounts invoiced, net of deductions of any kind.

## CLAUSE NO. 1 – SUBJECT MATTER

1.1 **ALON** will provide the following services to **COOPERSHOES**:

a) Consulting in Product marketing & advertising, as well as support in the implementation of a sales marketing strategy for the Products distributed by **COOPERSHOES**;

b) Commercial consulting for Product distribution within the Brazilian territory;

c) Research for new product development; and

d) Supervision and advisory related to the sale of the Products distributed by **COOPERSHOES**.

1.2 **ALON** will do its best to render the services retained hereunder, providing supplementary technical and commercial information, as required.

### CLAUSE NO. 2 – CONSIDERATION

2.1 For the services retained hereunder, **COOPERSHOES** will pay to **ALON** a service fee corresponding to the percentages shown in the table below:

| | |
|---|---|
| 2002 | 6% (six per cent) |
| 2003 | 6% (six per cent) |
| 2004 | 7% (seven per cent) |

The service fees will be calculated on the monthly gross revenues from the sale of Products within the Territory. Payments will be made by the 30th (thirtieth) day of the month following the month when the sales were made, through a wire transfer to **ALON**'s checking account or to any other entity indicated by the latter. **ALON** shall inform, in writing, the bank, branch and checking account number to which such sums must be transferred. All taxes impinging upon these payments will be deducted from the remittances thereof.

2.2 All the sums of money owed by **COOPERSHOES** but left unpaid until the due dates specified herein will be subject to legal interest payments up to the maximum rate permitted by law and/or not forbidden by law, plus a delinquent penalty equivalent to 2% (two per cent) of the amount due, without detriment to applicable damages and losses, if any.

2.3 **COOPERSHOES** is hereby required to present to **ALON**, by the 10th (tenth) day of every calendar month subsequent to the months when the sales were made, a report on sales and purchases prepared according to a template to be provided by **ALON**.

2.4 For the purpose of determining the sum due under section 2.1 above, all the sales made during a given month will be computed in Brazilian *reais* and converted into U.S. dollars by the translation rate published in the São Paulo edition of *Gazeta Mercantil* on the last business day of the month when the sales occurred.

2.5 **COOPERSHOES** will be responsible for the payment of all tariffs, taxes, charges and other expenses required by law, and it should effect such payments to the competent government authorities in a timely manner.

## CLAUSE NO. 3 – LABOR CHARGES

3.1 The parties hereto have expressly agreed that no employment relationship will be created between **ALON**'s and **COOPERSHOES**' employees and/or subcontractors. **ALON** will be responsible for covering all the labor charges and social contributions pertaining to its employees and/or subcontractors.

## CLAUSE NO. 4 – TERM OF CONTRACT AND RESCISSION

4.1 This Contract will go into effect upon the occurrence of the earlier of the following events:

    a) termination of the *Trademark Licensing Agreement* signed by **ALON** with ALL STAR ARTIGOS ESPORTIVOS LTDA. – a company with head offices at Av. Antônio Massa, 300, conj. 01, sala 02, Centro, São Paulo, Brazil, Corporate Tax Payer no. 62.539.960/0001-81 – regardless of the reason for the said termination;

    b) announcement of the judge's decision regarding the appeal filed by ALL STAR ARTIGOS ESPORTIVOS LTDA. for sentence clarification, without any alteration to the judgement on the merits of the case, in connection with the ongoing lawsuit no. 94.02.22597-8 brought before the Federal Court of Rio de Janeiro against a U.S. company named Converse, Inc.

4.2 This Contract will be valid until December 31st, 2004 and renewable by mutual accord between the parties.

4.3 The parties will negotiate, in mutual agreement, the fees to be paid to **ALON** in the event of Contract renewal.

4.4 **ALON** may cancel this Contract through a 30 (thirty)-day advance written notice to **COOPERSHOES** if the latter defaults on any of the payments required hereunder.

Likewise, **ALON** may cancel this Contract through a 30 (thirty)-day advance written notice to **COOPERSHOES** if the latter fails to perform any other provision herein, and if it does not take the necessary corrective measures within 30 (thirty) days of a proper notification by **ALON**.

4.5 **ALON** will not be liable for any damages, compensation or indemnification of any kind owing to the rescission or termination of this Contract by **COOPERSHOES**, not even if such damages, compensation or indemnification are caused by losses arising from **COOPERSHOES**' past undertakings, or by the loss of capital investments, profits, goodwill or clients, or by any other loss attendant to the rescission or termination hereof.

4.6 **ALON** may also cancel this Contract immediately through a written notice to **COOPERSHOES** without, however, generating any right to indemnification for the latter in the following cases: (i) change of control in stock ownership to third parties without **ALON**'s previous consent; (ii) takeover or prohibition of **COOPERSHOES**' business operations by government authorities; (iii) loss of the rights granted by Converse, Inc.;

and/or (iv) termination of this Contract by **COOPERSHOES** without prior written consent from **ALON**.

4.7 This Contract will be rightfully terminated with or without written notification to **COOPERSHOES** if the *Distribution and Copyright Licensing Contract* signed by the parties on this date is terminated or rescinded for any reason.

4.8 If this Contract is canceled due to some fault by **COOPERSHOES**, the latter will be liable for the settlement of all the sums specified herein and overdue, regardless of any other outstanding debt.

4.9 If this Contract is cancelled by **ALON** without just cause, and if **COOPERSHOES** has honored all of its obligations hereunder, whatever their nature, upon the termination or rescission hereof, **ALON** shall grant **COOPERSHOES** a maximum period of 60 (sixty) days as of the referred termination or rescission, so that the latter may sell off its inventories.

4.10 **COOPERSHOES** may cancel this Contract through a 120 (one hundred and twenty)-day advance written notice to **ALON** in the event of non-performance and if **ALON** fails to take the necessary corrective measures within 30 (thirty) days of a proper notification by **COOPERSHOES**. The 120-day period stipulated in this paragraph may be reduced by **ALON** at its own discretion.

## CLAUSE NO. 5 – GENERAL PROVISIONS

5.1 Should any of the clauses or terms of this Contract be considered invalid or ineffective, all the remaining clauses and terms will remain in full effect.

5.2 Tolerance towards the infringement of any of the clauses herein will be regarded as a mere gratuity on behalf of one of the parties, and in no way should it be construed as a novation or waiver of the rights granted hereunder.

5.3 Neither party will be responsible for damages or losses attendant to the late performance of or non-compliance with any of the obligations hereunder if such delays or defaults result from some casualty or act of God. Should **ALON** be prevented from discharging its contract obligations for a period equal or superior to 01 (one) year, **COOPERSHOES** will be entitled to rescind this Contract without owing any indemnification to **ALON**.

5.4 All the obligations assumed by the parties and surviving the extinction or termination of this Contract will remain in full effect and produce subsequent effects despite the extinction or termination hereof and until they have been completely discharged.

5.5 All notifications required or permitted hereunder shall be made in writing, and considered duly delivered when received by the other party. They may be sent by telex, facsimile or registered air mail to the following addresses:

For **COOPERSHOES**:

ALTAMIR ANTONIO BREDA and PAULO ADEMIR SIDEGUM
Rua Vicente Preto, 3767, Vila Joaneta
Picada Café (RS) – Brasil – 95175-000
Telephone:        (54) 285-1302
Facsimile: (54) 285-1302
e-mail:        gringo@coopershoes.com.br

For **ALON**:

Mr. RONALD DURCHFORT and/or ROBERTO SZERER
1160 East Hallandale Beach Boulevard Suite A
Hallandale, Florida 33009
USA
Telephone:        (954) 456-2566
Facsimile: (954) 456-2551
e-mail:        rd@aloninternational.com

5.6 This Contract will be governed by the laws of the Federal Republic of Brazil. The parties have elected the Central Court of the City of Rio de Janeiro as the only competent venue where they may seek clarifications or settle any disputes arising from the provisions hereof.

5.7 This Contract has been executed as a definite and irrevocable agreement that is binding on both parties, their subsidiaries, assignees, licensees and successors.

Having thus agreed to the terms above, the parties have signed this Contract in 02 (two copies) of identical form and content, and in the presence of the 02 (two) undersigned witnesses.

Novo Hamburgo, July 24, 2002

Novo Hamburgo, July 24, 2002

**COMPANY**

-----------------------------------------------------
Signed by:

**DISTRIBUTOR**

-----------------------------------------------------
Signed by:

**Witnesses:**

-------------------------------------------------

Full name:

Tax Payer no.:

-------------------------------------------------

Full name:

Tax Payer no.:

## MAIN CONTRACT

Through this private agreement, the parties:

1. **ALON INTERNATIONAL S.A.**, based in the United States of America, at 1160 E Hallandale Bch. Blvd. Suite A – Hallandale, FL 33009, hereby represented by its legal representative RONALD NATHAN DURCHFORT – a United States citizen and entrepreneur, married and working at the business address above – and hereinafter referred to as "**ALON**"; and

2. **COOPERSHOES COOPERATIVA DE CALÇADOS E COMPONENTES JOANETENSE LTDA.**, a cooperative with head offices at Rua Vicente Preto, 3767, Vila Joaneta, Municipality of Picada Café, Rio Grande do Sul State, Corporate Tax Payer no. 02.675.611/0001-65 and State Registration no. 388/0002446, hereby represented by its President ALTAMIR ANTONIO BREDA – a Brazilian citizen and footwear manufacturer, married, Tax Payer no. 355.527.510-00 – and its Treasurer PAULO ADEMIR SIDEGUM – a Brazilian citizen and footwear manufacturer, single, Tax Payer no. 641.558.970-91 – both working at the business address above, and hereinafter referred to as "**COOPERSHOES**".

**WHEREAS** the parties intend to develop a commercial partnership and execute a *Distribution and Copyright Licensing Contract* whereby **COOPERSHOES** will become a manufacturer and distributor of certain products within the Brazilian territory, and obtain a license to use the designs of such products;

**WHEREAS** the parties also plan to execute a *Professional and Technical Service Contract* whereby **ALON** is to provide services related to the development of products and marketing & advertising strategies, as well as commercial & sales advisory to **COOPERSHOES**, as part of the commercial partnership to be established between the parties hereto;

**WHEREAS** this private agreement is intended to set forth the basic rights and obligations pertaining to each party in relation to the proposed commercial partnership for the execution of a *Distribution and Copyright Licensing Contract* and a *Professional and Technical Service Contract*;

The parties have mutually agreed to the following:

1. The *Distribution and Copyright Licensing Contract*, executed between the parties on this date and presented herewith as "Schedule A", is intended to authorize **COOPERSHOES** to manufacture and distribute certain products within the Brazilian territory, as well as to permit the use of the designs of such products by **COOPERSHOES**.

2. The *Professional and Technical Service Contract*, presented herewith as "Schedule B", will in turn serve as a complement to the commercial partnership to be established between the parties, and it should be signed on the same date as the *Distribution and Copyright Licensing Contract*, thus allowing **ALON** to provide services related to the development of products and marketing & advertising strategies, as well as commercial & sales advisory to **COOPERSHOES**.

3. Also as a complement to the commercial partnership to be established between the parties, **ALON** hereby grants to **COOPERSHOES** the right to use, free of charge and on a non-exclusive basis, the trademarks listed in "Schedule C" (hereinafter referred to simply as the "Trademarks") solely and exclusively as a means to designate the products that constitute the object of the *Distribution and Copyright Licensing Contract*.

4. The parties acknowledge the notoriety of ALL STAR as a trademark, its ownership by Converse, Inc. and that this title has been judicially challenged in Brazil through a lawsuit brought forward by **ALON** and its related entities against ALL STAR ARTIGOS ESPORTIVOS LTDA. before the 18th Federal Court as action no. 6109322.

5. The parties hereto also acknowledge that Converse, Inc., which is related to **ALON**, won the said lawsuit, pursuant to the decision published in *DJ* of June 28, 2002. Such is the case now that ALL STAR ARTIGOS ESPORTIVOS LTDA. is left with no other remedy but to appeal to the Supreme Court of Justice, which, under normal circumstances, will not diminish the effectiveness of the favorable decision obtained, but which may have the privilege of reversing the referred decision.

6. **ALON** acknowledges that **COOPERSHOES** has been using the ALL STAR trademark, which has been excluded from Schedule C, and it does not object to such use, provided that it is made in conformity with the standards of quality set by **ALON** and with other requirements stated in the contracts presented herewith as Schedules A and B.

7. **COOPERSHOES** acknowledges that ALL STAR is a trademark belonging to Converse, Inc., and that only **ALON** is authorized to use it within the Brazilian territory. Considering the corollary of this acknowledgement, **COOPERSHOES** hereby promises not to apply for any trademark registration and/or domain appellations for trademarks containing the phrase ALL STAR with any government agency. **COOPERSHOES** also agrees not to contribute, in any manner whatsoever, to the establishment of web sites containing the term ALL STAR, nor to use this or any other similar component in its corporate name.

8. In view of the lawsuit involving the ownership of the trademark ALL STAR in Brazil, and to make the execution of this Contract possible, **ALON** promises not to file any lawsuit and/or extrajudicial charges against **COOPERSHOES** as a means to prevent it from continuing to use the trademark ALL STAR and/or obtain indemnification for losses and damages attendant to this use.

9. This commitment not to sue will only stand if **COOPERSHOES** actually undertakes to manufacture and/or distribute **ALON** footwear under the terms of the *Distribution and Copyright Licensing Contract*. It is certain that no validity will be attached to this commitment if the parties fail to bring to fruition the proposed commercial partnership, in which case **ALON** will be completely free to resort to any legal action deemed fit to safeguard its own rights.

10. The commitment not to sue, as provided in this Contract, will cease automatically and immediately following the rescission of the *Distribution and Copyright Licensing Contract* and/or the *Professional and Technical Service Contract*.

11. **COPPERSHOES** hereby agrees to notify **ALON** immediately of any violation or attempted infringement of its rights over the Trademarks, causing examples of such violations to reach the hands of **ALON**, whenever possible. The latter will then take whatever measures it judges convenient to protect its rights.

12. Upon termination of the *Distribution and Copyright Licensing Contract* and/or the *Professional and Technical Service Contract*, for any reason, **COOPERSHOES** is to stop using the Trademarks immediately and to surrender to **ALON** any material containing references to them.

13. The minimum payments due by **COOPERSHOES** to **ALON**, as per Clause no. 6 of the *Distribution and Copyright Licensing Contract*, will be calculated by taking into account all the sums paid by **COOPERSHOES** by virtue of the *Distribution and Copyright Licensing Contract* and the *Professional and Technical Service Contract* as well.

14. Should **COOPERSHOES** be prevented, at any moment during the lives of the *Distribution and Copyright Licensing Contract* and the *Professional and Technical Service Contract*, from remitting the payments owed to **ALON**, it should provide sufficient and clear evidence of the impediment to **ALON**, and the latter may opt for instructing **COOPERSHOES** to deposit the outstanding amounts in an escrow account managed by a bank selected by **ALON** and for the benefit of **ALON** or any third party that it may have designated for this purpose, until the remittance is allowed. Alternatively, **ALON** may choose to instruct **COOPERSHOES** to deposit the amounts due in the account of any Brazilian company indicated by **ALON**. Once permission has been obtained for the remittance, the total sum deposited by **COOPERSHOES** in the said account will be converted into U.S. dollars and immediately sent to **ALON** or to any other designated company.

15. **COOPERSHOES** acknowledges that cash deposited in an escrow account pursuant to the terms of this Contract does not constitute payment to **ALON**, and it will not discharge **COOPERSHOES** from all of its obligations hereunder. In fact, such cash deposits only serve as a guarantee that the amounts owed and payable will be available and remitted to **ALON** as soon as possible.

16. **COOPERSHOES** will also pay to **ALON**, or to any entity designated by the latter, an amount equivalent to US$ 150,000.00 (one hundred and fifty thousand U.S. dollars) upon the date of execution of this Contract, through a wire transfer to **ALON**'s bank account or to any other designated entity. **ALON** shall inform, in writing, the bank, branch and checking account number to which this sum must be transferred.

17. If the *Distribution and Copyright Licensing Contract* does not go into effect by August 9, 2002, **COOPERSHOES** shall pay to **ALON** an additional amount corresponding to US$ 50,000 (fifty thousand U.S. dollars) per month until the date of effectiveness of the said contract, as a means to secure the commitment between the parties. This sum is to be paid by **COOPERSHOES** before the 5th (fifth) day of each month.

18. The *Distribution and Copyright Licensing Contract* and the *Professional and Technical Service Contract* should be signed by the parties on the same date of execution of this agreement, thus becoming an integral and inseparable part hereof.

19. This Contract will go into effect on the date of its execution and remain valid until December 31st, 2004, whereupon it will be renewable under the terms of Clause no. 10 of the *Distribution and Copyright Licensing Contract.*

20. This Contract will be automatically renewed if the *Distribution and Copyright Licensing Contract* and/or the *Professional and Technical Service Contract* have their terms extended. The latter will be automatically renewed if the *Distribution and Copyright Licensing Contract* is also extended, regardless of the execution of any other written agreement between **ALON** and **COOPERSHOES** in this regard, with the two parties agreeing to renegotiate the fees due on account of each contract.

21. If the *Distribution and Copyright Licensing Contract* is rescinded, for whatever reason, the *Professional and Technical Service Contract* and this agreement will be automatically terminated, with or without any prior notification thereof to **COOPERSHOES**.

22. The parties further promise to maintain all and any information received from the other in absolute secrecy and in strict confidentiality.

23. **COOPERSHOES** will be responsible for obtaining all the authorizations required by the government to execute and maintain in effect the *Distribution and Copyright Licensing Contract* and the *Professional and Technical Service Contract,* as well as this agreement.

24. The parties hereby elect the Central Court of the City of Rio de Janeiro as the only competent venue where they may seek clarifications or settle disputes arising from the provisions hereof.

25. This agreement has been executed as a definite and irrevocable contract, in 02 (two) copies of identical form and content.

Novo Hamburgo, July 24, 2002

**ALON**

---------------------------------------------------
Signed by:

**COOPERSHOES**

---------------------------------------------------
Signed by:

**Witnesses:**

---------------------------------------------------  ---------------------------------------------------
Full name:                                          Full name:
Tax Payer no.:                                      Tax Payer no.: