IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        :
CONVERSE, INC.,                         :
                                        :
            Plaintiff,                  :        Docket No.: 12591-PBS
                                        :
v.                                      :
                                        :
ALON INTERNATIONAL, S.A.,               :
                                        :
            Defendant.                  :
_____:

**DEFENDANT ALON INTERNATIONAL, S.A.'S MEMORANDUM
OF LAW IN OPPOSITION TO PLAINTIFF CONVERSE INC.'S APPLICATION
FOR AN _EX PARTE_ TEMPORARY RESTRAINING ORDER**

## I.    INTRODUCTION

Defendant, Alon International, S.A. ("Alon"), submits this memorandum of law and the affidavits of Roberto Szerer (Ex. "A"), Otto Eduardo Fonseca Lobo (Ex. "B"), Diego César Bunge (Ex. "C") and Cynthia D. Vreeland (Ex. "D")[1] in opposition to Plaintiff Converse Inc.'s ("Converse") application for a foreign anti-suit injunction."[2]

Plaintiff Converse is undeserving of the extraordinary equitable relief it seeks in its application. Converse's motive for seeking this injunction transparent.  Converse already has begun the process of stripping Alon of the guaranteed renewal of its lucrative Licensing Agreement ("the Agreement") with Converse despite pending arbitration between the parties, thereby allowing Converse to take directly (and unfairly) the benefit of the substantial business base generated and developed by Alon over the last three years in Brazil, Argentina, Uruguay

_____

[1] The exhibits referenced herein are contained in an Appendix filed separately with the Court.

[2] Plaintiff converse incorrectly refers to its motion as Fed.R.Civ.P. 65 "Temporary Restraining Order." _See infra,_ § II (A).

and Paraguay.  In fact, Converse *admits* that it has entered into a direct contractual relationship with Alon's business partner, Coopershoes, in an attempt to make it a direct Converse licensee. (Converse Memo. at 4).

The parties, agreed to arbitrate their disputes. Consequently, Defendant Alon has submitted its claims for breaches of the Agreement, for breach of the implied covenant of good faith and fair dealing in the Agreement, and for a declaratory judgment as to the validity of the Agreement to an American Arbitration Association Arbitral Tribunal.  In order to protect its legal right to renew the Agreement for an additional 3-year term, however, Alon obtained injunctions before the courts in Brazil and Argentina to thwart Converse's interim attempts to void the renewal of the Agreement, to oust Alon from its contractual rights, and to enter into other competing contractual arrangements, until such time as the Arbitral Tribunal has the opportunity to issue an Award.  In the absence of the foreign injunctions, Plaintiff Converse could have – and undoubtedly would have – proceeded to continue to take precipitous and prejudicial actions that would have rendered any future arbitral award in Alon's favor moot.

As of this date, the Brazilian and Argentine courts have issued injunctions that simply require Converse to honor (and to cease violating) the terms of the parties' Agreement, *i.e.,* maintain the *status quo*, until the international arbitration has been completed (or, in the case of the Argentine injunction, for 60 days).[3]  Under applicable U.S. federal law, ignored by Converse,

---

[3] Plaintiff Converse is a U.S. corporation ("Amend. Compl." ¶1)), Defendant Alon is a Panamanian corporation (Amend. Compl. ¶2), and the Agreement at issue involves business and services provided in South America. Since the Agreement evidences a transaction in foreign commerce within the  meaning of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 101 *et seq*., the Court's enforcement of the arbitration clause contained in the Agreement is governed by Federal law. *S.A. Mineracao Da Trindade-Samitri v. Utah International, Inc.*, 576 F.Supp. 566, 569 (S.D.N.Y.1983), *aff'd*, 745 F.2d 190 (2d Cir.1984) (*citing Prima Paint Corp. v. Flood & Conklin Mfg*., 388 U.S. 395, 403-405, 87 S.Ct. 1801, 1805-1806, 18 L.Ed.2d 1270 (1967)).

The Federal arbitral laws are divided into three chapters: Chapter One, 9 U.S.C. §§1-16, contains the general provisions; Chapter Two, 9 U.S.C. §§201-208, implements the provisions of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the "New York Convention;" and Chapter Three, 9 U.S.C.

the Brazilian and Argentine courts' actions constitute a proper exercise of those nations' sovereign authority and *must* be respected by this U.S. court, as required by the well-established doctrine of international comity and the controlling legal precedent of this Circuit.[4]

Plaintiff Converse's motion for the extraordinary remedy of a foreign anti-suit injunction wrongly identified as a "temporary restraining order," therefore, must be rejected. Converse has not only failed to articulate the appropriate legal standard for the issuance of an anti-suit injunction, but has failed to meet its heavy burden of proving the threshold requirements for an anti-suit injunction and that the totality of circumstances in this case rebuts the presumption against an anti-suit injunction. Accordingly, Converse's motion for preliminary injunctive relief should be denied.

## II.    FACTUAL BACKGROUND

### A.    The Parties Entered Into A Manufacturing, Distribution and Licensing Agreement.

Defendant Alon is a company in the business of developing, sourcing, and marketing footwear and related accessories in Latin America. (Szerer Aff. ¶ 2). On or about September 1, 2001, Alon entered into a Manufacturing, Distribution and Licensing Agreement ("Agreement" or "Licensing Agreement") with Converse, under which Alon obtained the exclusive rights and license to manufacture, distribute, and utilize Converse marks and related products throughout

---

§§301-307, contains and implements the provisions of the Inter-American Convention on International Commercial Arbitration ("Panama Convention" or "Inter-American Convention"). Because the parties are from the United States and Panama, and both countries are signatories to the Inter-American Convention, see 9 U.S.C. §301, this case involves both Chapter One, the general provisions, and Chapter Three, implementing the Inter-American Convention. *See* 9 U.S.C. § 305; *Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 802 F. Supp. 1069, 1073-74 (S.D.N.Y. 1992), *rev'd and remanded*, 991 F.2d 42 (2d Cir. 1993) (applying Inter-American Convention to international commercial dispute); 9 U.S.C. § 301 (Supp.1992) ("The Inter-American Convention on International Commercial Arbitration of January 30, 1975, shall be enforced in United States courts in accordance with this chapter.").

[4] As we emphasize below, the Brazil and Argentina actions are not "parallel actions" – they are to enforce the *status quo* pending arbitration.

3

Argentina, Brazil, Paraguay and Uruguay ("Mercosur market") for three years. A copy of the Agreement is attached as Exhibit "1" to the Vreeland Affidavit.

From 2001 through December 2004, Alon successfully developed the Converse marks and related products in its assigned territory, and continues to invest heavily in developing the market for these products. (Szerer Aff. ¶ 4). Among other things, Alon rescued the Converse trademarks, including its "ALLSTAR" mark, from a "brand pirate" in Brazil; created markets previously unavailable for the Converse marks and related products; and developed a successful business model for the sale of the Converse marks and products. (Szerer Aff. ¶ 4).

The first term of the Licensing Agreement was set to expire on December 31, 2004. The Agreement provides, however, that Alon has an automatic right of renewal of the Agreement for an additional three year term if certain conditions are satisfied. (Szerer Aff. ¶ 5). Specifically, Alon could renew the Agreement "for an additional term of three (3) years provided [Alon] exceed[ed] the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that [Alon] has not breached any of the terms and conditions of this Agreement." (Licensing Agreement § 2). Alon has complied with these requirements. (Szerer Aff. ¶ 6). Alon exceeded the minimum sales requirements under the Agreement by more than *five times* the guaranteed minimum and exceeded the guaranteed royalty payments by over *six times* the required amount. (Szerer Aff. ¶ 6).

Furthermore, Alon has not materially breached any provision of the Licensing Agreement. At no time during the course of their three-year relationship has Converse ever provided notice to Alon that Alon was in "breach." (Szerer Aff. ¶ 7). Significantly, the first time Alon was put on notice of alleged "breaches" by Converse was on November 30, 2004, one month before the first term of the Licensing Agreement was to expire. (Szerer Aff. ¶ 7).

Prior to the expiration of the Agreement, Alon informed Converse that it was exercising its right to renew the Agreement for an additional term.   (Szerer Aff. ¶ 9)**.**

**B.      Converse's Attempt to Take Over Alon's Market and Business Contacts
By Using Phony Grounds To Void Alon's Automatic Right of Renewal**

Converse has rejected Alon's exercise of the renewal option on the basis that Alon has breached the Agreement.   This has been done after months of good faith negotiations between the parties, which in retrospect, was nothing more than Converse lulling Alon into a false sense of comfort regarding the renewal of the Agreement.   Converse argues that Alon entered into a prohibited sub-licensing agreement with Cooperativa De Calcados E Componentes Joanetense LTDA ("Coopershoes") in violation of the Agreement.   (Converse Memo. at 3-4).   Coopershoes is a Brazilian company in the business of manufacturing shoes and shoe products.   Converse contends that "[d]uring the course of the relationship, Alon concealed from Converse through a variety of means the nature of the illegal and improper sublicensing agreements with Coopershoes." (Converse Memo. at 4).

This simply is not true, and Converse knows it to be untrue.   At all relevant times, Converse was aware of and participated in the organization of the business structure between Coopershoes and Alon, Converse had full knowledge of the Coopershoes arrangement, Converse fully approved of the Coopershoes arrangement, and Converse consented to the Coopershoes arrangement. (Szerer Aff. ¶ 14).   In fact, this structure was designed and arranged with Converse's consent and approval, so that Converse could take royalties out of the country without violating Brazilian regulations, to prevent Coopershoes from producing for the "brand pirate," and to allow the Converse marks and products to enter the market as quickly and efficiently as possible.

For example, in a July 29, 2002 e-mail to Converse's lawyer in Brazil, on which Converse's Vice President of Licensing, Tim Ouellette ("Ouellette") and General Counsel, Laura Kelley ("Kelley") were copied, Alon's Co-President Ronald Durchfort ("Durchfort") states, among other things: *"I want to inform you that we have signed a contract with Coopershoes."* (Szerer Aff. ¶ 15).

But, Alon even went further – it advised Converse of all the details of its arrangements with Coopershoes on multiple occasions. (Szerer Aff. ¶ 16). For example, in 2002 Alon's Co-Presidents Durchfort and Roberto Szerer ("Szerer") flew to Boston and met with Converse representatives. (Szerer Aff. ¶ 17). At that time, Durchfort and Szerer completely explained the Coopershoes arrangement to Ouellette, including all of the functions Coopershoes was to assist with in addition to the manufacturing of the Converse product. As a follow up to the meeting, Ouellette sent an e-mail stating: *"I'm real glad that we were able to this week to both clear the air, as well as reviewing your strategy for moving forward. The presentation was great, and the strategy absolutely on the mark for the market in its current situation."* (Szerer Aff. ¶ 18).

Moreover, Converse even consented to allow Alon to use Converse's lawyers in Brazil to draft the agreements with Coopershoes. (Szerer Aff. ¶ 14).

More importantly, Converse has entered into a direct licensing arrangement with Coopershoes. (Szerer Aff. ¶ 23). Converse made Coopershoes its exclusive licensee effective January 1, 2005. (Converse Memo. at 6). Thus, ironically, Converse now intends to use as its exclusive licensee – in lieu of Alon --the very same company that it claims that Alon did not have the legal right to subcontract with for services during the Agreement.[5]

---

[5] Converse contends that Alon also breached the Agreement by failing to pay royalties, using improper exchange rates to calculate royalty payments, and failing to expend sums required by the Agreement for advertising. These claims are equally spurious. *See* Szerer Aff. ¶¶ 26-38.

### C.     Alon Has Invoked Arbitration For Resolution Of This Dispute

Prior to the institution of the arbitration, Alon used its best efforts to achieve an amicable resolution to this dispute. (Szerer Aff. ¶ 39). As clearly in the written record, Alon has always demonstrated willingness to compromise and negotiate. For instance, on December 15, 2004, Alon sent a letter to Converse's counsel noting in relevant part:

> *To be clear, Alon considers the Agreement renewed by its terms at the 8% royalty rate agreed to by Converse. However, lest you or Converse draw incorrect conclusions from Alon's conduct geared to self-preservation, Alon is, and always will be, interested in amicably resolving this dispute. The Agreement drafted by Converse requires the parties to attempt to settle controversies and disputes arising hereunder "amicably, promptly and fairly." We look forward to hearing from you promptly in this regard as we have heard nothing so far but belligerence, delay and unfairness. Alon stands willing to make a good faith effort to address <u>any</u> concerns Converse may have with regard to how best we can go forward over the next three years to maximize sales and profits but only under the context that Alon has exercised their right of renewal, and not under the threat of termination and / or non – renewal.*               Emphasis in original.

Converse has not responded at all to Alon's attempts to resolve this dispute amicably, fairly and promptly. (Szerer Aff. ¶ 40). On December 16, 2004, after efforts to mutually negotiate a resolution to this dispute failed, Alon commenced arbitration before the American Arbitration Association ("AAA"), pursuant to the procedure set forth in the Licensing Agreement. Alon has filed a Statement of Claim alleging claims against Converse for breach of the Agreement, breach of the implied covenant of good faith and fair dealing in the Agreement and seeking a declaratory judgment on the validity of the renewal of the Agreement. A copy of Alon's Statement of Claim is attached as Exhibit "2" to the Vreeland Affidavit.

### D.     Alon Has Obtained *Status Quo* Injunctions In Brazil And Argentina To Preserve Its Right to Arbitrate and the Arbitral Tribunal's Inevitable Award.

In December of 2004, Alon learned that Converse was attempting to negotiate with Alon's business partner in Brazil, Coopershoes, to make it a direct Converse licensee. (Conv.

Memo. at 4). Faced with the possibility of the irrevocable loss of years of work with irreplaceable relationships as a result of Converse's attempts to block Alon's contractual rights, Alon obtained from a Brazilian and an Argentine court injunctions prohibiting Converse from taking action contrary to Alon's right to renew the Agreement, pending the resolution of the parties disputes in the arbitration (collectively, "the Foreign Injunction Actions") (Lobo Aff. ¶¶ 2-4; Bunge Aff. ¶ 3). The Brazilian injunction was applied for on or about December 21, 2004 and the Argentine on or about December 22, 2004 – before Converse served Alon with its papers seeking an anti-suit injunction in this Court.

### 1.     The Brazilian Injunction

On December 22, 2004, the Brazilian court in the 19th State Court of Porto Alegre, State of Rio Grande do Sul, Brazil entered a *status quo* injunction against Converse, a certified translation of which is Exhibit "3" to the Vreeland Affidavit, ordering that that the Agreement between the parties continue in effect until the termination of the arbitration proceedings already initiated, and enjoining Converse from entering into any contractual arrangements in Brazil contrary to the existing contractual rights of Alon ("Brazilian Injunction.") (Lobo Aff. ¶ 3; Vreeland Aff. Ex. "3"). The Brazilian Injunction provides, in relevant part:

> 2 - The controversy, therefore, that serves as context for the dispute is found in the manifestation of a desire by the Defendant not to renew the Agreement -which is to end in December 31, 2004-, **and whose merit, the Plaintiffs informs, are under examination in an arbitration proceeding**.

> Plaintiffs, when asserting that the institution of an arbitration process does not waive their obligations, would like the interpretation of Clause 33 to also affect the Defendant so that **Defendant will also remain bound to the obligations of the business during the arbitration proceeding**.

> 3 - **This lawsuit is restricted to the examination of those Agreement clauses which deal with the term of the Agreement, its renewal, the resolution and establishment of the arbitration process in order to verify the position of each**

**party at the time the Agreement was signed with regards to the period when arbitration might be started**.

Based on the position taken by the Defendant in notifying its lack of interest in renewal at the same time it made apparent an interest in renewing the Licensing Agreement through arrangements, I understand that this last effort should prevail as a means to preserving good faith and transparency principles in the business relationship.

Thus, having established the risk of damage to the Plaintiffs since their business will be interrupted abruptly, which will have social repercussions, and considering the social interest of the Agreement currently expressed in the Brazilian Civil Code, I hereby GRANT THE RESTRAINING ORDER REQUIRED **in order to determine the maintenance of the effects of the Licensing Agreement during the arbitration process,** as well as to compel the Defendant to abstain from practicing acts that violate the rights according to the Agreement under the penalty of a daily fine of R$100.000,00 (one hundred thousand reais).

Emphasis added.  On December 29, 2004, Alon notified Converse of the Brazilian Injunction upon obtaining official copy of the Order.

## 2.    The Argentine Injunction

On December 30, 2004, the Argentine National Court of First Instance No 22, Clerk's Office No 43 of the City of Buenos Aires, Argentina issued a *status quo* injunction against Converse, a certified translation of which is Exhibit "4" to the Vreeland Affidavit.  (Bunge Aff. ¶ 4; Vreeland Aff. Ex. "3").  The Argentine injunction is for a period of  60 days from December 30, 2004, and enjoins Converse from entering into any contractual arrangements in Argentina adverse to the existing contractual rights of Alon pending a full resolution of the claims in arbitration. ("Argentine Injunction"). (Bunge Aff. ¶ 4).

The Argentine Injunction states, in relevant part:

**I shall begin by stating that the injunction at issue has an explicit finality, that is, to prevent that a currently existing *de facto* or *de jure* situation may be altered in such a manner that it may affect the eventual execution or compliance with the sentence to be issued by the Arbitral Tribunal (whose intervention has already been petitioned)....**

9

**The provisions set forth [in said contract] expressly agreed to *arbitral competency*** to resolve any disputes that might arise between the parties. Clause 33 thereof translated [into Spanish] on page 99 refers to the express will [of the parties thereto], pledging [to submit to arbitration] *"...any dispute of claim arising from this contract, directly or indirectly related [thereto]..."*

....

Nonetheless, as has been accredited in summary at the initiation of the arbitral instance (see page 301/19), reasons of prudence and the danger posed by a delay that becomes highly evident in view of the imminent announcement by Converse, Inc., justify **that we adopt the criterion of the preservation of the *status quo*, although limited in time, so that the interested parties may request the guardianship of their rights before the arbitral body.** This decision is furthermore based on the fact that we cannot perceive in the case at hand that the petition for arbitration has been accompanied by an injunctive measure that would adhere to the claim herein alleged.

**In sum, the determination of the period of time for which this injunctive measure is to be granted is based on the assumption of an overlapping of jurisdictions (arbitral and jurisdictional) and the plaintiffs, within this period of time, may petition whatever they might deem necessary before the arbitral tribunal**.

Consequently, I shall uphold the injunctive measure requested under item II, sections a) and b) of the initial brief, for a period of time of **60 consecutive days** as of today's date. Within this time frame, the interested parties may petition --if they deem it appropriate-- any measures deemed advisable before the Arbitral Tribunal hearing the dispute, posting [a bond] of security interest in property up to the amount of USD $ 300,000.00 to the satisfaction of the court.

Emphasis added. On December 30, 2004, Alon notified Converse of the Argentine Injunction upon obtaining official copy of the Order.

Significantly, Plaintiff Converse incorrectly – if not also deliberately – argues that it is entitled to an anti-suit injunction because Alon is or was seeking foreign injunctions to avoid the arbitration. (Converse Memo. at 6, 8). Obviously such a far-fetched assertion is belied by the clear record evidence. Alon only seeks to maintain the *status quo* between the parties pending the Arbitral Tribunal's Award. (Lobo Aff. ¶ 2; Bunge Aff. ¶ 3). Alon has <u>not</u> sought to have the

merits of its claims, currently pending before the Arbitral Tribunal, decided by the foreign courts in an effort to circumvent the arbitration agreement.[6]

## II.    ARGUMENT

### A.    Plaintiff Has Failed to Meet Its Burden Of Proof To Obtain A Foreign Anti-Suit Injunction And, Therefore, Its Application Must Be Denied.

In its Application for a Temporary Restraining Order, Converse argues that it is entitled to a preliminary injunction enjoining Alon from prosecuting civil litigation in Argentina, Brazil, and elsewhere because it meets the traditional four-part test for injunctive relief as set forth in Rule 65 of the Federal Rules of Civil Procedure. *See* Converse Memo. at 6.[7] Converse is wrong. Converse misstates and, therefore, obviously misapplies the controlling law for the equitable relief which it seeks.

Converse seeks to obtain an *anti-suit injunction*. An anti-suit injunction is an order ordinarily addressed to a party within the personal jurisdiction of the court prohibiting initiation of or participation in contemplated or pending foreign proceedings.[8] Rule 65's requirements do <u>not</u> apply to anti-suit injunctions. *See Stonington Partners, Inc. v. Lernout & Hauspie Speech Products N.V.*, 310 F.3d 118, 129 (3d Cir. 2002) ("We think that if the requirements for an anti-suit injunction are met, these supplant the need for proof under Rule 65."); *In re Mexico Money Transfer Litig.*, 1999 WL 1011788 (N.D. Ill. Oct. 19, 1999) ("Anti-suit injunctions do not have to comply with preliminary injunctions governed by Fed. R. Civ. P. 65. . . . Rule 65 injunctions

---

[6] Neither Converse nor Alon dispute that the arbitrability of the substantive claims of the parties here falls within the broad scope of the arbitration provision and is for the Arbitral Tribunal to decide. *See* Converse Memo. at 2, 5.

[7] Converse cites to the case of *Matrix Group Limited, Inc. v. Rawlings Sporting Goods Co.*, 378 F.3d 29, 33 (1st Cir. 2004), setting forth the four part test as requiring (1) irreparable injury to the Plaintiff, (2) balancing of harms to the defendant, (3) likelihood of success on the merits, and (4) public interest, if any.

[8] George A. Berman, <u>The Use of Anti-suit Injunctions in International Litigation</u>, 28 Colum. J. Transnat'l L. 589, 590 (1990).

differ in purpose from anti-suit injunctions.  Preliminary injunctions under Rule 65 are designed to preserve the *status quo* between the parties before the court pending a decision on the merits of the case at hand.  In contrast, injunctions such as that issued here are needed to prevent third parties from thwarting the court's ability to reach and resolve the merits of the federal suit before it."); *cf. Quaak v. Klynveld Peat Marwick Goerdeler Bedrufsrevisoren*, 361 F.3d 11, 19 (1st Cir. 2004) (holding that "this generic algorithm provides an awkward fit in cases involving international anti-suit injunctions, [and therefore], district courts have *no* obligation to employ it in that context.").  As the D.C. Circuit in the seminal case of *Laker Airways* explained:

> [T]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations.  The interests of both forums are advanced – the foreign court because its laws and policies have been vindicated; the domestic country because international cooperation and ties have been strengthened.  The rule of law is also encouraged, which benefits all nations.

731 F.2d at 937; *see also Goldhammer v. Dunkin' Donuts, Inc.*, 59 F.Supp.2d 248, 251 (D.Mass. 1999)(Saris, J.) ("International comity is a doctrine that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law.").

The First Circuit in *Quaak* recently enunciated a clear test requiring a court to examine the totality of the circumstances in deciding whether a particular case warrants the issuance of an international anti-suit injunction. *Quaak*, 361 F.3d at 18.  This test requires that after a threshold showing of the same parties and issues, the court should consider all of the facts and circumstances in determining whether an injunction is proper.  *Id.*  In this analysis, considerations of international comity are to be given substantial weight and establish a rebuttable presumption <u>against</u> the issuance of an order that has the effect of halting a foreign

judicial proceeding. *Id.* Comity thus dictates that foreign anti-suit injunctions be issued sparingly and only in the rarest of cases. *Id.; see also Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc.,* 412 F.2d 577, 578 (1st Cir.1969) ("[r]estraining a party from pursuing an action in a court of foreign jurisdiction involves delicate questions of comity and therefore 'requires that such action be taken only with care and great restraint."); *Laker Airways*, 731 F.2d at 927. [9]

This presumption may only be rebutted by the facts particular to each case, such as, for instance: the nature of the two actions (*i.e.* whether they are merely parallel or whether the foreign action is more properly classified as interdictory), the posture of the proceedings in the two countries, the conduct of the parties (including their good faith), the importance of the policies at stake in the litigation, and the extent to which the foreign action has the potential to undermine the forum court's ability to reach a just and speedy result. *Quaak,* 361 F.3d at 19. Converse has not – and cannot -- meet the rigorous *Quaak* threshold and secondary requirements for a foreign anti-suit injunction.

### 1.   Converse Cannot Meet the Threshold Requirements for An Anti-Suit Injunction.

#### (a)   Similarity of Parties

Alon does not dispute that the parties before the Argentine and Brazilian courts, Converse and Alon, are the same as the parties before the Arbitral Tribunal and that the threshold similarity of parties requirement is met.

---

[9] *See also China Trade & Dev. Co. v. M.V. Choong Yong*, 837 F.2d 33, 35-36 (2d Cir. 1987) ("anti-foreign-suit injunction should be 'used sparingly', and should be granted 'only with care and great restraint.'"); *Compagnie des Bauxites de Guinea v. Insurance Co. of N. America*, 651 F.2d 877, 887 (3d Cir.1981) (finding "no difference between addressing an injunction to the parties and addressing it to the foreign court itself"); *Stonington Partners, Inc*, 310 F.3d at 125-126 ("The power to enjoin a foreign action should be exercised only in rare cases, and must be premised on a thorough analysis of the interests at stake").

**(b)**    **Similarity of Claims**

The Brazilian and Argentine Injunction Actions, however, do not involve the same issues as those before the Arbitral Tribunal.  As more fully established in the Lobo and Bunge Affidavits, the sole purpose for obtaining the Brazilian and Argentine injunctions was to preserve the *status quo* of the relationship between the parties pending a resolution of the dispute in arbitration.  (Lobo Aff. ¶ 2; Bunge Aff. ¶ 3).  In no way have the Brazilian or Argentine Injunction Actions addressed the merits of the dispute between the parties, and the sole relief the foreign courts have provided is the preservation of the relationship between the parties while Alon's substantive claims are decided in arbitration.  (Lobo Aff. ¶ 2; Bunge Aff. ¶ 3).  Alon has no substantive claims pending before the Argentine or Brazilian courts.

Indeed, the Foreign Injunction Actions -- now completed as to Converse – were ancillary to the arbitration and, therefore, did not involve the "same" claims as a matter of law.  *See Canadian Filters*, 412 F.2d 577, 579 (vacating anti-suit injunction in a case involving an independent foreign patent right); *Microsoft Corporation v. Lindows.com*, 319 F.Supp. 2d 1219, 1222 (W.D. Wash. 2004)(same).

In *Microsoft Corp*., while litigation was pending, the Defendant Lindows appointed local distributors for its products in other countries. The Plaintiff Microsoft then filed trademark infringement actions in those countries. A court in the Netherlands granted Microsoft's request for a preliminary injunction that enjoined the sale and distribution of Lindows products within the Benelux countries.  Lindows moved the court for (i) an anti-suit injunction prohibiting Microsoft from continuing to pursue its foreign litigation, and (ii) a declaration of non-enforceability of the Dutch court's preliminary injunction.  The district court held that an anti-suit injunction was not appropriate due to considerations of comity as well as the fact that the foreign

trademark dispute was ancillary to the original proceedings and, therefore, not the "same issue" for the purpose of an anti-suit injunction.

As the First Circuit held in *Quaak,* "unless [the parallel suits involve the same parties <u>and</u> issues], courts ordinarily should go no further and refuse issuance of an international anti-suit injunction. *Quaak*, 361 F.3d at 18 (internal citations omitted). "If—and only if – this threshold condition is satisfied should the court proceed to consider all the facts and circumstances in order to decide whether an injunction is proper." *Id.* Since Converse cannot show a similarity of claims, this Court's inquiry ends and an anti-suit injunction must be denied to Converse.

Even assuming *arguendo*, however, that Converse can meet its burden of establishing the threshold requirements for an anti-suit injunction, Converse cannot establish sufficient other facts and circumstances that overcome the rebuttable presumption <u>against</u> the issuance of an order that has the effect of nullifying a foreign judicial judgment.

> **2.    Converse Cannot Establish Sufficient Other Facts That Overcome the Rebuttable Presumption of Affording Deference to the Foreign Judicial Proceedings.**

> **(a)    The Foreign Injunction Actions Are Not Interdictory in Nature And Do Not Interfere With the Jurisdiction Of The Arbitrator Or This Court.**

Where a foreign court has not attempted to enjoin a party's participation in a proceeding before a U.S. court, and neither the foreign court nor the domestic defendant/foreign plaintiff has sought to prevent the U.S. court from exercising its jurisdiction over the case, an anti-suit injunction should not be issued. *See e.g. Quaak,* 361 F.3d at 17 (*citing Laker Airways*, 731 F.2d at 926-27); *China Trade*, 837 F.2d at 37 (anti-suit injunction was not justified where the foreign litigation did not threaten the district court's jurisdiction); *Sea Containers, Ltd. v. Stena AB*, 281 U.S. App. D.C. 400 (D.C. Cir. 1989)(parallel proceedings should be allowed to proceed to the

extent that they are not interdictory in nature). In accordance with the "fundamental corollary" to the principle of concurrent jurisdiction stated in *Laker Airways*: "parallel proceedings on the same *in personam* claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as *res judicata* in the other." *Laker Airways*, 731 F.2d at 926-27. Alon does not seek to "hijack" this Court's or the arbitrator's jurisdiction or authority over this dispute – to the contrary – it attorns wholeheartedly to the arbitral process, as it initiated the arbitration claim.

Here, the sole purpose for initiating the Foreign Injunction Actions was to preserve the *status quo* pending the arbitration of the parties' claims and to prove the Arbitral Tribunal with the opportunity to render a meaningful arbitral award. The Foreign Injunction Actions did not address the merits of the parties' claims pending before the Arbitral Tribunal. Both the Brazilian and Argentine injunction orders (a) declare that the Agreement signed between Converse and Alon is in effect until the termination of the arbitration proceedings initiated by Alon (or for sixty days, as in the Argentine Injunction), and (b) enjoin Converse from entering into any contractual arrangements in Brazil and Argentina prejudicial to the existing contractual rights of Alon, prior to a full adjudication of this dispute in arbitration. (Lobo Aff. ¶ 3; Bunge Aff. ¶ 4).

### (b)   The Foreign Injunction Actions Promote, Not Undermine, the Strong Federal Public Policy In Favor Of Arbitration.

The Foreign Injunction Actions, which have the effect of preserving the *status quo* pending arbitration, are in full compliance with federal law favoring the enforceability of arbitration agreements. *See e.g. Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986) ("We hold, therefore, that a district court can grant injunctive relief in an arbitrable dispute pending arbitration.… We believe this approach reinforces rather than detracts from the policy of the [Federal] Arbitration Act".); *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910

F.2d 1049, 1054 (2d Cir. 1990) ("The issuance of an injunction to preserve the *status quo* pending arbitration fulfills the court's obligation under the FAA to enforce a valid agreement to arbitrate."). In *Blumenthal*, for example, the Second Circuit held that preliminary injunctions are appropriate whenever they are necessary to protect the integrity of a pending arbitration: "Arbitration can become a 'hollow formality' if parties are able to alter irreversibly the *status quo* before the arbitrators are able to render a decision in the dispute. A district court must ensure that the parties get what they bargained for – a meaningful arbitration of the dispute." *Id.*

      **(c)**      **Converse Cannot Show That The Foreign Injunction Actions Will Result In Duplicative Costs Or Conflicting Judgments.**

The Foreign Injunction Actions filed against Converse are fully matured. Thus, the Foreign Injunction Actions have not delayed, sidetracked, inconvenienced, provided inconsistent rulings, or altered the arbitral proceeding in any way. Accordingly, Converse did not – and cannot – show that the totality of the circumstances in this case rebuts the presumption against an anti-suit injunction and entitles it to this extraordinary remedy.

      **B.**      **Pursuant To The AAA Procedural Rules, Alon Is Entitled To Injunctive Relief From Any Court With Jurisdiction Over This Dispute Prior To The Appointment Of An Arbitrator.**

Alon's acts of obtaining injunctions in Brazil and Argentina are proper. As noted above, seeking an injunction to preserve the *status quo* between the parties pending the resolution of the parties' dispute is in full compliance with the strong federal policy favoring arbitration. *Teradyne*, 797 F.2d at 51.

Article 21 of the AAA International Arbitration Rules provides that "A request for interim measures addressed by a party to *a judicial authority* shall not be deemed incompatible

with the agreement to arbitrate or a waiver of the right to arbitrate."[10] (Emphasis added). Pursuant to the AAA Rules, therefore, a party "may request an [interim] measure from *any []* *court* with jurisdiction over the dispute" prior to the selection of an arbitrator(s). (emphasis added). Gregoire Marchac, *Interim Measures In International Commercial Arbitration Under* *The ICC, AAA, LCIA and UNCITRAL Rules*, 10 Am. Rev. Int'l Arb. 123, 125, 135 (1999) (Interim relief "may not be available from the arbitrators because the tribunal is not yet constituted…. In such situations, only local courts may grant such measures, assuming that they have the appropriate jurisdiction.").

As established by the Lobo and Bunge Affidavits, Brazilian and Argentine courts have jurisdiction to grant the *status quo* injunction in this case. (Lobo Aff. ¶ 5; Bunge Aff. ¶ 5). As the arbitral process was commenced just two weeks ago there currently is no arbitrator appointed. Any interim relief ultimately awarded has to be confirmed in Argentina and Brazil in order to be enforceable, which takes time, while Alon is working furiously to steal Alon's business. (Lobo Aff. ¶ 6). Thus, the Brazilian and Argentine courts are appropriate fora for expeditiously granting the *status quo* injunctions to prevent Converse from altering upon Alon's contractual rights pending a resolution of this dispute in arbitration.

C. **Even Assuming *Arguendo* That Converse Was Required To Establish Irreparable Harm for an Injunction Pursuant to Fed. R. Civ. Pro. Rule 65, It Cannot.**

Converse argues that it will suffer "irreparable harm" if this Court does not issue the requested "temporary restraining order." (Converse Memo. at 9). Converse is wrong.[11]

---

[10] Similarly, Rule 34 of the AAA Commercial Arbitration Rules states in relevant part: "A request for interim measures addressed by a party to *a judicial authority* shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate." (emphasis added).

[11] Alon does not address the remaining elements for a Rule 65 preliminary injunction as they are inapplicable to the analysis for a foreign anti-suit injunction under the controlling law. *See* Section III(A*), supra.*

Converse bears the burden of demonstrating that a denial of interim relief is likely to cause irreparable harm. *See Charlesbank Equity Fund II v. Blinds To Go, Inc***,** 370 F.3d 151, 162 (1st Cir. 2004); *Ross-Simons of Warwick, Inc., et al. v. Baccaratt, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996)("*Ross-Simons I*"). A finding of irreparable harm "must be grounded on something more than conjecture, surmise, or party's unsubstantiated fears of what future may have in store." *Charlesbank Equity Fund II*, 370 F.3d at 162; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 217 F.3d 8, 13 (1st Cir. 2000) ("*Ross Simons II*"); *Ross-Simons I,* 102 F.3d at 20 ("the plaintiff's showing must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm.").

Converse argues that "[b]y invoking the arbitration clause, while at the same time threatening the litigation is imminent in Brazil and/or Argentina, Alon intends to subject Converse to a multiplicity of claims in a number of forums" and cause it to incur attorneys fees and that this constitutes irreparable harm. (Converse Memo. at 8-9.). This is not what Alon did. Converse has failed to cite any legal authority or provide any proof of the irreparable harm that the Foreign Injunction Actions would cause (or have caused) Converse. Indeed, Converse has not because it cannot. In fact, the Foreign Injunction Actions are already completely mature.

Furthermore, it is well settled that a monetary loss does not amount to irreparable harm when a party, such as Converse here, can be fully compensated for the financial loss by a subsequent money judgment by a court or arbitral tribunal. *Charlesbank Equity Fund II*, 370 F.3d at 162 (potential pecuniary damages did not establish irreparable harm); *Ross-Simons I*, 102 F.3d at 19 (irreparable harm is found where the "plaintiff suffers a substantial injury that is not accurately measured or adequately compensated by money damages).

Finally, Converse also argues that a foreign proceeding creates the possibility of conflicting judgments.    (Converse Memo. at 8-9).  The Foreign Injunction Actions, however, sought to preserve the *status quo* between the parties, nothing more.  (Lobo Aff. ¶ 2; Bunge Aff. ¶ 3).  The Foreign Injunction Actions do not (and did not) involve the claims before the Arbitral Tribunal.   (Lobo Aff. ¶ 2; Bunge Aff. ¶ 3).   As such, there is no possibility of conflicting judgments.

Accordingly, Converse cannot show any irreparable harm that Alon has caused by obtaining the Argentine and Brazilian injunctions.  Should Converse wish to complain about the Foreign Injunction Actions, it should do so before the applicable Argentine and Brazilian courts, to which this Court should properly defer.

## III.    CONCLUSION

For the foregoing reasons, Defendant Alon requests that this Court deny Converse's Application for a foreign anti-suit injunction (or a "Temporary Injunction").

Respectfully Submitted,

/s/ Cynthia D. Vreeland
**WILMER CUTLER PICKERING**
**HALE AND DORR, LLP**
Richard A. Johnston; Cynthia D. Vreeland
60 State Street
Boston, Massachusetts 02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

- and –

**ASTIGARRAGA DAVIS**
Edward H. Davis, Jr. (*pro hac vice* motion pending)
701 Brickell Avenue, 16th Floor
Miami, Florida  33131
Telephone:  (305) 372-8282
Facsimile:  (305) 372-8202

20

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that the foregoing was sent electronically on January 5 2005 to **Michael C. Gilleran, Esq.,** Pepe & Hazard, LLP, 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110-2804.

<u>/s/ Cynthia D. Vreeland</u>_____
Cynthia D. Vreeland