IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Docket No.: 12591-PBS

---

CONVERSE, INC.,                          :
                                         :
                Plaintiff,               :
                                         :
v.                                       :
                                         :
ALON INTERNATIONAL, S.A.,                :
                                         :
                Defendant.               :

---

**DEFENDANT ALON INTERNATIONAL, S.A.'S APPENDIX TO
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF CONVERSE INC.'S
APPLICATION FOR AN *EX PARTE* TEMPORARY RESTRAINING ORDER**

**WILMER CUTLER PICKERING
HALE AND DORR, LLP**
Richard A. Johnston
Cynthia D. Vreeland
60 State Street
Boston, Massachusetts 02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

- and -

**ASTIGARRAGA DAVIS**
Edward H. Davis, Jr.
701 Brickell Avenue, 16th Floor
Miami, Florida  33131
Telephone:  (305) 372-8282
Facsimile:  (305) 372-8202

Date: January 5, 2005                    *Counsel for Defendant Alon International, S.A.*

## TABLE OF CONTENTS

| EXHIBIT | DATE | DESCRIPTION |
|---|---|---|
| A | January 5, 2005 | Affidavit of Roberto Szerer |
| B | January 4, 2005 | Affidavit of Otto Eduardo Fonseca Lobo |
| C | January 4, 2005 | Affidavit of Diego César Bunge |
| D | January 5, 2005 | Affidavit of Cynthia D. Vreeland |
| 1 | September, 1, 2001 | Manufacturing, Distribution and Licensing Agreement between Converse, Inc. and Alon International, S.A. with its Amendments |
| 2 | December 16, 2004 | Notice of Arbitration and Statement of Claim, filed with the American Arbitration Association |
| 3 | December 22, 2004 | Brazilian Order granting an injunction against Converse, Inc. |
| 4 | December 30, 2004 | Argentine Order granting an injunction against Converse, Inc. |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of this Appendix was sent electronically on January 5, 2005 to **Michael C. Gilleran, Esq.,** Pepe & Hazard, LLP, 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110-2804.

/s/Cynthia D. Vreeland
Cynthia D. Vreeland

# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS
#### Docket No.: 12591-PBS

| | |
|---|---|
| CONVERSE, INC., | : |
| Plaintiff, | : |
| v. | : |
| ALON INTERNATIONAL, S.A., | : |
| Defendant. | : |

## AFFIDAVIT OF ROBERTO SZERER

I, Roberto Szerer, being of lawful age, state as follows:

1.      I am Co-President of Alon International, S.A. ("Alon").  I have been Co-President of Alon since December 1997 and make this declaration based upon my personal knowledge.

2.      Alon is a corporation duly registered and organized under the laws of the Republic of Panama, and has its principal office and business at Calle 53 Urbanizacion Obarrio, Torre Swiss Bank, Piso 16, Panama, Republica de Panama.   Alon develops, sources, and markets footwear in Latin America.  Alon has extensive experience in this field, and particular expertise in marketing and developing shoe and shoe products in Latin America.

3.      On or about September 1, 2001, Alon entered into a Manufacturing, Distribution and Licensing Agreement with Converse Inc. ("Converse"), by which Alon gained the exclusive rights and license to manufacture, distribute, and utilize Converse marks and related products throughout Argentina, Brazil, Paraguay and Uruguay ("Licensing Agreement" or "Agreement"). The Licensing Agreement between Alon and Converse is Exhibit "1" to the Vreeland Affidavit.

4.      During the ensuing years, Alon successfully developed the Converse marks and

related products, and continues today to invest heavily in developing the market for these products. Among other things, Alon rescued the Converse trademarks, including its ALLSTAR mark, from a "brand pirate" in the Brazilian market; created the market for the Converse marks and related products in previously non-existent markets; developed a successful business model for the sale of the Converse marks and products; developed and maintained business contacts and business relationships in the region that facilitate the sale of the Converse marks and products; significantly increased the sales for Converse products by over five times higher than the agreed upon minimum guarantees; successfully marketed and created distribution channels for Converse's marks and related products; successfully created the sourcing structure for the Converse products; and successfully positioned the Converse marks for strong growth in future sales.    In sum, Alon established a developed a market for the Converse marks and related products in a market which had been unavailable to Converse for the past seventeen years. Alon's heavy investments in the development of the market were always predicated on a belief that the Licensing Agreement would be in existence for six years and beyond.

5.    The original term of the Licensing Agreement was from September 1, 2001, to December 31, 2004.    However, the Agreement provided that Alon had the option of automatically renewing the Licensing Agreement for a period of three years upon the satisfaction of certain conditions. Specifically, Section 2 of the Licensing Agreement states that Alon could renew the Agreement for an additional term of three (3) years provided Alon exceeded a Guaranteed Minimum Royalty and Sales by twenty-five percent (25%) and further provided that Alon has not breached any of the terms and conditions of this Agreement. Licensing Agreement, §2.

2

## Alon Has Complied With The Terms of the Licensing Agreement

6.    Alon has fully complied with the terms of the Agreement.  Among other things, Alon greatly exceeded the minimum royalty and sales requirement for the third contract year pursuant to the terms of the Agreement.  Under the original terms of the Licensing Agreement, Alon guaranteed Converse minimum sales of $7,017,000 during the first term of the Agreement, and the actual sales through December 31, 2004 were approximately $40 million – more than *five times* the guaranteed minimum.   Similarly, Alon guaranteed Converse a minimum royalty payment over the first term of the Agreement of $490,000 and will actually pay royalties to Converse for sales through December 31, 2004 totaling just over $3 million – more than *six times* the guaranteed minimum.

7.    Moreover, Alon has not materially breached any provision of the Licensing Agreement.    At no time during the course of their three year-relationship did Converse ever put Alon on notice of a breach pursuant to <u>any</u> provision under the Agreement.  Significantly, the first time Alon was put on notice of alleged "breaches" by Converse was on November 30, 2004, one month before the first term of the Licensing Agreement was set to expire.

8.    Based upon the ongoing good faith negotiations between the Parties and the automatic renewal provisions of the Licensing Agreement, Alon invested heavily in advertising, trade shows, outsole models, outsole lasts, infrastructure, personnel, and other raw materials for the continued development of the Converse brand in the Mercosur market for 2005 and beyond.  Alon's investments in the development of the market was always predicated on a belief that the Licensing Agreement would be in existence for six years and beyond.   Converse's affirmative attempts to oppose Alon's automatic renewal of its contractual rights under the Licensing Agreement will result in a significant loss to Alon and a significant windfall to Converse if the

3

Licensing Agreement is not deemed renewed.   In its efforts to serve Converse and fully expand

the market for the Converse marks and related products, Alon has devoted approximately eighty

(80) per cent of its time, energy, resources, and manpower on the Converse marks and products,

letting go of other valuable clients to fully focus on the Converse account in the process.

Converse has used Alon's image, track record and relationships built and developed over many

years for its own gain.

### Converse Is Attempting To Block Alon's Automatic Right of Renewal in Bad Faith And In an Attempt to Usurp Alon's Market

*The Alleged Expiration of the Licensing Agreement*

9.      Alon has exercised its automatic right of renewal.  Throughout the first term of

the Licensing Agreement, Alon has clearly and unequivocally notified Converse of its intent to

exercise their right of renewal pursuant to the terms of the Licensing Agreement. The parties

have been engaged in extended and significant negotiations regarding the renewal of the

Agreement, involving both oral and written communications.  For example:

a)      On or about May 4, 2004, Tim Ouellette, ("Ouellette"), Vice-President of

Licensing at Converse sent me an e-mail indicating that the parties were involved

in negotiations regarding the re-negotiation of the Licensing Agreement:

*Attached please find an analysis of what is on the table.  I would like to reach an agreement on how we plan to move forward as soon as possible.*
*Thanks*

b)      On or about May 19, 2004, I sent to Ouellette an e-mail stating:

*Dear Tim,*
*Based on our telecom and continuing the process for establishing the rationale for the new contract, attached you will find a proposal where we have segmented growth, guarantee and royalty rates per the following periods:*
- *Aggressive 2004/05/06*
- *Medium 2007/08/09/10*
- *Moderate 2011/12/13*

4

*As agreed, we will start from our 2003 actual sales as our base.*

*I believe this will help us reach a fair and **equitable renewal** with a minimum of tension.]*

*Regards,*
*Roberto Szerer*                    (emphasis added).

c)     On or about May 31, 2004, I wrote to Ouellette indicating the renegotiation of the Licensing Agreement.    Attached to the e-mail was a spreadsheet with proposed numbers throughout 2013.

*Dear Tim,*
*As per our telecom, enclosed you will find a spreadsheet with the numbers we agreed. As you can see I modified the royalty rate of Originals to bring it gradually to 10% over the term of the contract.*
*We understand that based on our initial "Big Aggressive Hairy Goal" you would like a growth for this year of 50%. We believe it is to high specially after the growth we had in the last year but anyhow we are evaluating the projections for 2004 taking in to consideration all the variables involved (New company in Argentina, new company in Brazil, new apparel line, etc.) and also including the recent change in the Real which by itself brings the sales numbers in Dollars down by 9.68% (Current exchange rate per dollar of R$ 3.10 vs. initial calculation at R$2.80). I will be traveling all week in Argentina and Brazil but will try to talk to you by Friday.*

*I wish you a good week.*

*Best regards,*
*Roberto Szerer*

d)     On or about June 10, 2004, I sent an e-mail to Ouellette, stating among other things, our intent to seek renewal of the Licensing Agreement:

*Dear Tim,*
*As per our telecom, enclosed you will find our revised forecast for 2004.*

*The main factors that affected the forecast for the year are:*

5

- *Devaluation in the region from our forecast of 2.8 Reais to the Dollar in Brazil to a new reality at 3.10*
- *In Argentina from 2.85 Pesos to the Dollar to 3.00. We don't expect a higher devaluation, but as you know the economy in this part of the world is extremely volatile so we must be attentive to any future changes.*
- *Despite the important legal battles that we have won against the Pirates, we continue having constant problems in the market which show that the growth in the vulcanized product will be 5% instead of our initial projection of 6.59%.*
- *We have revised our sales forecast for the cemented line in Brazil due to a low acceptance of the line in the market plus a higher than expected delay in getting the tech packs.*
- *Introduction of the apparel line increases our forecast.*
- *Argentina has begun well and sales for the year look promising but it took us longer to begin with the new structure and additionally we had delays due to a major strike by Brazilian customs. Instead of our initial projection of sales over 11 months, we expect to have only 7 real months of sales.*
- *Uruguay is affected in the same way as Brazil and Argentina by the devaluation.*

*The projection of total sales for 2004 shows a growth of 16.22 % from US$ 12,649,921 to US$ 14,701,254.*

**I have enclosed the breakdown of the numbers plus our updated proposal for the 5+5 year renewal.**

*I will give you a call to follow up and answer any questions you might have.*

*Best regards,*
*Roberto Szerer* (emphasis added).

10.   As demonstrated by the above quoted communications, Alon and Converse have been involved in extensive negotiations regarding the renewal of the Licensing Agreement, and throughout these communications Alon made clear, in writing, its intent of renewing the Agreement. Therefore, Alon has exercised its absolute right of renewal prior to September 30, 2004, and as such, the Licensing Agreement did not expire on December 31, 2004.

6

11.    In September of 2004, Ouellette verbally communicated to Szerer, that Converse was renewing the Licensing Agreement.

*The Alleged Unauthorized Arrangement With Coopershoes*

12.    Converse is now attempting to block Alon's automatic right of renewal as a way of denying Alon its contractual rights. In order to do so, Converse has used pretextual excuses to oppose in bad faith Alon's right to automatically renew the Licensing Agreement. All such allegations are without merit, and are nothing more than bad faith attempts of usurping Alon's market.

13.    Specifically, Converse alleges that Alon entered into a prohibited sub-licensing agreement with Cooperativa De Calcados E Componentes Joanetense LTDA ("Coopershoes"). Coopershoes is a Brazilian company in the business of manufacturing shoes and shoe products.

14.    Such allegations are disingenuous and factually inaccurate. At all relevant times, Converse has i) been aware of and participated in the organization of the business structure between Coopershoes and Alon; ii) had full knowledge of the Coopershoes Arrangement; iii) fully approved of the Coopershoes Arrangement; and iv) consented to the Coopershoes Arrangement. Among other things: Converse devised, drafted and approved the contracts to be executed between Alon and Coopershoes through its Brazilian legal counsel; Converse visited the Coopershoes factory in Brazil on several occasions; Converse approved the sale of goods, which clearly indicated on the tags that Coopershoes involvement with the production of the products; Converse received wire transfers <u>directly from Coopershoes</u> from October of 2002 to January of 2004; Converse participated and cooperated in legal actions undertaken by Coopershoes in Brazil in order to defend the Converse mark from a "brand pirate"; Converse audited the Coopershoes factory, with a copy of the audit report sent directly to Converse; and

7

Coopershoes paid a bond the equivalent of about $70,000.00 to be paid on behalf of Converse for the protection of the Converse ALL STAR Mark in Brazil.

15.     Specifically, in a July 29, 2002 e-mail to Luiz Henrique O. do Amaral, Converse's lawyer in Brazil, on which Ouellette and Laura Kelley (Converse's General Counsel) were copied, Ronald Durchfort ("Durchfort"), Co-President of Alon, wrote:

> *Dear Luiz,*
> *I want to inform you that we have signed a contract with Coopershoes. With this contract we are achieving:*
> *Elimination of production support to Artigos.*
> *Ready to immediately introduce Converse All-Star.*
> *Elimination of Artigos argument that Converse production/distribution will cause loss of jobs.*
> *Non-traumatic entry of Converse All-Star into the Brazilian market. ....*

16.     Moreover, we advised Converse of all the details of its arrangements with Coopershoes on multiple occasions. On October 10, 2002, Ouellette wrote in an e-mail to Durchfort:

> *Ronald,*
> *Thanks that sounds great. Of course you will also bring the Cooper Shoe Agreement. Let me know when you will be arriving and I will provide transportation.*

17.     In response, Durchfort and I flew to Boston with the Coopershoes contracts in hand to meet with Ouellette and Kelley (among other Converse personnel). At that time, we completely explained the Coopershoes arrangement to Ouellette, including all of the functions Coopershoes was to assist with in addition to the manufacturing of the Converse product. We fully explained the reason for the Coopershoes structure as a means of complying with Brazilian regulations while allowing royalties to be paid to Converse. Otherwise, Converse would have had to take its royalties in Brazilian currency in Brazil – which it did not want to do. It was also explained to Converse that the Coopershoes arrangement was necessary to prevent Coopershoes

from producing for the "brand pirate" while allowing the Converse products to enter the market

as quickly and efficiently as possible.

18.     As a follow up to the meeting, Durchfort wrote in an e-mail on October 24, 2002,

to Ouellette:

> *Dear Tim,*
> *Thanks for the productive meeting with you and your team.*
> *The Mercosur project is up and running.  October shipments in*
> *Brazil are on target and November order placement (Nov.*
> *delivery) is running above forecast.*
> *So that we are all on the same page I have included in this e-mail*
> *the results of our conversations which we are now implementing.*
> *We understand the line being sold is approved with the above*
> *corrections.    We intend to present 03-1 season product for*
> *approval within 60 days.*

19.     Most illuminating is Ouellette's responsive e-mail that same day:

> *Ronald,*
>
> *I'm real glad that we were able to this week to both clear the air,*
> *as well as reviewing your strategy for moving forward. The*
> *presentation was great, and the strategy absolutely on the mark for*
> *the market in it's current situation.  For the time being, I would*
> *like you to run all Approvals through me with a copy to Ava*
> *Lawrence, I frankly do not want to get Marketing/Product*
> *Development involved. They do not always look at projects like*
> *this as business, and tend to get anal. When all product is up to*
> *speed and you are on the same page as our company I will turn*
> *this over. I am now tremendously excited and looking forward to*
> *what we can do.*
> *Please let me know the dates that you want me in Brazil, so I can*
> *plan that trip*
> *Again, Great job!*
> *Thanks*
> *Tim*

20.     At no time, despite having been given a complete and thorough briefing of the

sum and substance of the Coopershoes arrangement did Ouellette object to the Coopershoes

arrangement. In fact, he thanks Durchfort for "clearing the air."

21.    Again, in late 2003, I flew to Boston to discuss ongoing operations in the Mercosur market with Converse and the issue of the Coopershoes arrangement came up. This time I also met directly with Kelley as well. During that meeting, I again completely explained the sum and substance of its arrangements with Coopershoes. I explained to Converse that the structure of the Coopershoes arrangement was not a sub-licensing agreement, but had to be structured the way it was for among other reasons, to comply with Brazilian regulations while allowing royalties to be paid to Converse. Converse was quite happy receiving over $3,000,000 in royalties in this method over the past several years. At no time did Kelley or anyone else from Converse notify me or anyone else at Alon that it had any problems with the arrangement or that it considered the arrangement to be an unapproved sublicense agreement.

22.    A few days later, Converse drafted an amendment to the Agreement and did not even think this issue worthy of addressing in the Amendment.

23.    Alon has now learned that Converse has sought to enter into a direct contractual relationship with Coopershoes, allegedly making Coopershoes the exclusive licensee in the Mercosur area as of January 1, 2005.    This is the same company Converse is now alleging as grounds for usurping Alon's automatic right of renewal pursuant to the terms of the Agreement for Alon's use of that very same company.

24.    Converse also alleges that Alon has entered into unauthorized arrangements with Brazilian entities entitled Filon (apparel), Pucket (socks) and Foroni (notebooks), and the Uruguayan entity Belquis (footwear). (Laganas Affidavit, ¶ 10). Again, these allegations are factually inaccurate. Moreover, any possible arrangement between Alon and these companies was fully known, encouraged, and approved of by Converse. Among other things, Alon had fully explained the terms of possible contracts with these companies to Converse, Alon had

10

submitted for Converse's approval products to be produced by these companies, and Converse had approved said products. For example, on October 11, 2004, Durchfort sent an e-mail to Ouellette stating:

> *Thanks for lunch.*
>
> *Every time after I speak with you I feel confident that we are building the  partnership with you and converse. I guess that my challenge is to keep you up to speed more often and keep our channels open. I felt that I was doing this but the "audit" somehow got away from both of us.*
>
> .....
>
> *I recognize that we shld visit you at converse after the audit to do a "whiteboard" session and [strategize] the best structure given the reality. I will execute the apparel and sock deals as we spoke and include all information concerning them during whiteboard session. Rgds*
> *Rd*

(emphasis added).

25.    In sum, Converse is using our relationship with Coopershoes and others as unfounded grounds for blocking our automatic right of renewal.  However, as reflected in the written record, our arrangements with Coopershoes and others was fully known by, encouraged, and approved of by Converse.  Converse's attempts to usurp our market have not stopped there, however.  Converse has also, among other things, induced us to divulge our strategies, marketing plans and detailed customer information (including names, addresses and phone numbers) by misrepresenting that they intended to abide by the terms of the Licensing Agreement by renewing it for another three years.  In doing so, Converse has misappropriated for its own gain our confidential information, including our business relationships, strategy and customer base.

*The Alleged Failure to Pay Correct Royalties Pursuant to the Licensing Agreement*

26.     Section 15(a) of the Licensing Agreement requires that Alon pay Converse a royalty equal to a specified percentage of the "Net Sales" made by Alon of Converse Licensed Articles. A "Net Sale" is defined in Section 1(h) of the Agreement as "the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, trade discounts, volume rebates and any freight charges *and VAT taxes* included in the invoice." (emphasis added). (Licensing Agreement, § 15(a)).

27.     Alon has always fully complied with this requirement. Although there is no VAT tax in Brazil there is an equivalent tax called an ICMS tax. The ICMS tax was included on the invoices to Converse, but it has not been deducted twice from the sales reported to Converse. In this respect the total royalties earned by Converse for sales through December 31, 2004 is $3,059,000, which is actually just over 7% of the total net sales of $40,663,000 under the Agreement through its first term.

28.     The use of the term VAT Tax in the Licensing Agreement is nothing more than that of a scrivener's error. Converse is now attempting to use this simple drafting mistake as an excuse to block Alon's right of automatic renewal.

*The Alleged Incorrect Use of Exchange Rates to Calculate Royalties Due Under the Licensing Agreement*

29.     Section 19(a) of the Licensing Agreement states that "[u]nless specifically set forth to the contrary herein, all payments to Converse (except Converse Factories) required to by made by [Alon] pursuant to this Agreement shall be made in the currency of the United States of America.....Converse will review the exchange rate received by Licensee in the conversion from [Alon's] local currency to U.S. funds by comparison with the exchange rate published by the

12

Wall Street Journal ("WSJ") two (2) business days prior to the payment due date schedules in paragraph 18 of this Agreement." (Licensing Agreement § 19(a)).

30.    As a means of blocking Alon's automatic right of renewal, Converse alleges that ALON has underpaid the amount of royalties due under the Licensing Agreement due to the incorrect use of exchange rates.

31.    Alon has always used exchange rates identified in good faith from the Wall Street Journal as required by the Licensing Agreement. To the extent that any error has been made, it was made in good faith.

32.    In a good faith attempt to remedy any inconsistency that may have resulted in the payment of the royalties due to Converse as a result of an incorrect exchange rate, Alon sent Converse a wire transfer in the amount of $3,780.75 for the amount still allegedly owed to Converse.

33.    The amount sent to Converse was calculated by deducting from the $16,291.00 alleged as owed by Converse, an amount of $12,510.25, which Alon had previously overpaid to Converse. Converse acknowledged the overpayment of $12,510.25 in a recent audit. There has bee no intent of any kind to short change Converse, and Converse is arguing about a $12,000 differential on total royalty payments that by December 31, 2004, totaled $3,059,000. That is less than a 0.4% error.

34.    To the extent that there are any remaining discrepancies, Alon has paid Converse the amount it is alleging is still outstanding on December 17, 2004. Alon has done this in a good faith effort to resolve this dispute between the parties, and without any admission or consent as to any wrongdoing on Alon's part.

*E.    The Minimum Advertising Requirements*

35.    Section 7(d) of the Licensing Agreement provides that Alon shall "expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for the Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure")." (Licensing Agreement, § 7(d)).

36.    Alon    has    met    this    requirement.    Alon's    annual    expenditure    on advertising/marketing during the initial three-year term of the Licensing Agreement has been 5.2%, which is clearly in excess of the 5% requirement set forth in the Licensing Agreement.

37.    Moreover, Converse alleges as further grounds to block Alon's automatic right of renewal, that Alon was required to expend 5% of Net Sales on *direct advertising*.    The direct advertising requirement is completely without basis in the Agreement between the parties. Advertising Expenditure is nowhere specifically defined in the Licensing Agreement, nor is it limited to direct advertising in the Licensing Agreement.

38.    It is important to re-emphasize that Alon has exceeded their sales requirements under the first term of the Licensing Agreement by more than five times the guaranteed minimum and any attempt by Converse to allege that Alon has not met their advertising requirements under the Licensing Agreement is, yet again, a bad faith attempt to strip Alon of their automatic right of renewal in an effort to usurp the lucrative market Alon has developed as well as the business contacts they have built in the Mercosur region.

## Alon Has Fully Submitted The Merits of This Dispute to Arbitration

39.    Alon has always used its best efforts to achieve an amicable resolution to the dispute at hand. As clearly set forth in the correspondence between the parties, Alon has always demonstrated willingness to compromise, negotiate and amicably resolve this dispute between

14

the parties, which Converse has not reciprocated. For instance, on December 15, 2004, Alon

sent a letter to Converse's counsel noting in relevant part:

> *To be clear, Alon considers the Agreement renewed by its terms at the 8% royalty*
> *rate agreed to by Converse. However, lest you or Converse draw incorrect*
> *conclusions from Alon's conduct geared to self-preservation, Alon is, and always*
> *will be, interested in amicably resolving this dispute. The Agreement drafted by*
> *Converse requires the parties to attempt to settle controversies and disputes*
> *arising hereunder "amicably, promptly and fairly." We look forward to hearing*
> *from you promptly in this regard as we have heard nothing so far but*
> *belligerence, delay and unfairness. Alon stands willing to make a good faith*
> *effort to address any concerns Converse may have with regard to how best we can*
> *go forward over the next three years to maximize sales and profits but only under*
> *the context that Alon has exercised their right of renewal, and not under the*
> *threat of termination and / or non – renewal.*

(emphasis in original).

40.    Converse, however, did not reciprocate. On December 16, 2004, after efforts to

mutually negotiate a resolution to this dispute failed, Alon initiated arbitration pursuant to the

procedure set forth in the Licensing Agreement with the American Arbitration Association

("AAA"). A copy of Alon's Notice of Arbitration and Statement of Claim is attached as Exhibit

"2" to the Vreeland Affidavit.

### Alon Seeks Injunctions in Brazil and Argentina To Preserve The Status Quo Pending A Resolution Of This Dispute During Arbitration

41.    In blatant disregard to the ongoing dispute regarding the continuing validity of the

Licensing Agreement, Converse has sought to strip Alon of their current contractual rights, by

among other things, entering into a contractual relationship with Coopershoes; attempting to

prevent Alon from continuing its obligations under the Licensing Agreement; and using Alon's

confidential business information, strategy and relationships for its own efforts to squeeze Alon

out of the Mercosur market. In a final act of self-preservation, Alon sough injunctions in Brazil

and Argentina, which would prevent Converse from infringing upon Alon's existing contractual

rights in those countries pending the resolution of this dispute in arbitration.

42.    On or about December 22, 2004, the Brazilian court in the 19th State Court of Porto Alegre, State of Rio Grande do Sul, Brazil granted an injunction against Converse which declared that the Agreement between the parties continued in effect until the termination of the arbitration proceedings already initiated and restrained Converse from having any contractual arrangements in Brazil that went against the existing contractual rights of Alon ("Brazilian Injunction"). A certified translation of the Brazilian Injunction is attached as Exhibit "3" to the Vreeland Affidavit. Alon notified Converse of the Brazilian Injunction on December 29, 2004.

43.    On or about December 30, the Argentine National Court of First Instance No 22, Clerk's Office No 43 of the City of Buenos Aires, Argentina, granted a status quo injunction against Converse. The Argentine Injunction declares that the Agreement is in effect during the term of sixty days as from December 30th, 2004 when the Injunction was issued, and orders Converse to restrain from having any contractual arrangements in Argentina that go against the existing contractual rights of Alon during that time ("Argentine Injunction"). A certified translation of the Argentine Injunction is Exhibit "4" to the Vreeland Affidavit. Alon notified Converse of the Argentine Injunction on December 30, 2004.

44.    Converse has sought to portray the Brazilian and Argentine Injunctions as an attempt by Alon to evade the parties' agreement to arbitrate this dispute.    However, such allegations are simply unfounded because Alon has always complied with its agreement to arbitrate this dispute. Alon sought the Brazilian and Argentine Injunctions in an effort to prevent Converse from continuing to misappropriate for its own gain our confidential information, market, business strategy and business relationships pending a final resolution as to the status of the Licensing Agreement in arbitration.  As such, Alon has pursued the Brazilian and Argentine

16

Injunctions with the sole purpose of maintaining the status quo between the parties pending a full resolution of this dispute in arbitration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 5 day of January 2005.

FURTHER AFFIANT SAYETH NOT.

Roberto Szerer

F:\WDOX\CLIENTS\0077\0077\00742253.DOC

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Docket No.: 12591-PBS

CONVERSE, INC.,

      Plaintiff,

vs.

ALON INTERNATIONAL, S.A.,

      Defendant.

_____/

## AFFIDAVIT OF OTTO EDUARDO FONSECA LOBO

I, Otto Eduardo Fonseca Lobo, being of lawful age, declare as follows:

1.     I am an attorney admitted to practice in Brazil, and have been duly licensed for the past 8 years. I am an attorney in the firm of Stroeter & Royster Advogados, located in Rio de Janeiro, Brazil, specializing in commercial and business law. I make this Affidavit based on my own personal knowledge.

2.     My firm represents the Defendant Alon International, S.A. ("Alon") in a judicial proceeding commenced against Converse, Inc. ("Converse") on or about December 21, 2004, in the 19th State Court of Porto Alegre, State of Rio Grande do Sul, Brazil (*19ª Vara Cível do Rio Grande do Sul*). The sole purpose of this proceeding has been to seek an injunction on behalf of Alon in order to preserve the *status quo* between Alon and Converse pending a full adjudication of this dispute in arbitration. The scope of the Brazilian proceeding has been limited to preserving the *status quo* between the parties pending arbitration, and does not seek to adjudicate the commercial relationship between the parties.

3.     On December 22, 2004, the 19th State Court of the State of Porto Alegre, Brazil ("Brazilian Court") entered an order (a) declaring that the Licensing, Manufacturing and

Distribution Agreement ("Agreement") signed between Converse and Alon is in effect until the termination of the arbitration proceedings initiated by Alon, and (b) restraining Converse from having any contractual arrangements in Brazil that went against the existing contractual rights of Alon prior to a full adjudication of this dispute in arbitration.

4.    The grounds set forth by the Brazilian Court for granting the *status quo* injunction include the recognition that the court should uphold the principles of good faith and transparency in contractual relations, as well as recognizing the social role of the Manufacturing, Distribution and Licensing Agreement ("Agreement") within Brazil, since the interruption of the contractual activities by Converse pending the resolution of this dispute in arbitration would generate grave social problems, including lost jobs and investments. Moreover, the Brazilian Court recognized that Alon ran a serious risk of irreparable injury if a *status quo* injunction were not issued, since its business would be interrupted, and thus, immediate relief was required.

5.    The Court in Porto Alegre has jurisdiction and venue to rule on this matter, as provided in Article 88[1] of the Brazilian Civil Procedure Code and Article 12[2] of the Law of Introduction to the Civil Code.  These rules clearly establish that the Brazilian Courts have jurisdiction over this matter since the Agreement between Converse and Alon is to be performed in Brazil.

6.    Moreover, any foreign judgment or order must first be recognized by the Supreme Court of Brazil in order to be enforceable in Brazil.  As such, had Alon sought an injunction in any court other than a Brazilian court, that injunction would have been unenforceable in Brazil

---

[1] Art. 88 - É competente a autoridade brasileira quando: (Brazilian authority is the proper jurisdiction if:)
I - (...)
II - no Brasil tiver que ser cumprida a obrigação. (if the contractual obligation is to be accomplished in Brazil)
III - (...)

unless it was first recognized by the Brazilian Supreme Court. This procedure is time consuming. According to the Brazilian Supreme Court's internal rules, to enforce a foreign judgment or order: 1) a plaintiff must first file a request for the recognition of a foreign ruling ("Suit") with the Supreme Court of Brazil and serve the defendant by letter rogatory (art. 220, §1); 2) after service has been effectuated by letter rogatory, the defendant has fifteen (15) days to contest the Suit (art. 220); 3) after defendant's contest is filed, the plaintiff receives notice to present a reply (art. 221, §2); and 4) after the term to contest and reply, the Federal Attorney's Office will receive notice to present within ten (10) days a possible rejection of the Suit (art. 221, §3). If there is no rejection of the Suit, the President of the Supreme Court will decide on the recognition of the Suit. If recognized, the foreign decision will be sent to the proper jurisdiction, in Porto Alegre, State of Rio Grande do Sul, Brazil to be executed (art.224). Therefore, under a best case scenario, the enforceability of a U.S. injunction by a Court in Brazil would take over three (3) months.

7.    Due to the urgent need to keep in force Alon's rights under the Agreement, as Alon had not been notified of Converse's attempts to not renew the Agreement despite months of prior negotiations until one month before the Agreement was set to expire, this was not a viable option for Alon.

8.    I respectfully submit to this Court that the issues invoked in the Brazilian proceeding do not involve the same issues the parties have agreed to submit to arbitration. The scope of the Brazilian proceeding has been limited to preserving the contractual relationship between the parties pending arbitration, and does not seek to adjudicate the current status of the

---

[2] Art. 12: É competente autoridade judiciária brasileira, quando o réu for domiciliado no Brasil ou aqui tiver de ser cumprida a obrigação. (Brazilian authority is the proper jurisdiction if the defendant is established in Brazil, or if the contractual obligation is to be accomplished in Brazil).

commercial relationship between the parties. As such, Alon's request for injunctive relief in Brazil is not and was never intended to be incompatible with the parties' agreement to arbitrate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 4th day of January 2005.

FURTHER AFFIANT SAYETH NOT.

Otto Eduardo Fonseca Lobo

4

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Docket No.: 12591-PBS

CONVERSE, INC.,

    Plaintiff,

vs.

ALON INTERNATIONAL, S.A.,

    Defendant.

_____/

## AFFIDAVIT OF DIEGO CÉSAR BUNGE

I, Diego César Bunge, being of lawful age, declare as follows:

1.     I am an attorney admitted to practice in Argentina, and have been duly licensed for the past 31 years. I am a partner in the firm Estudio Bunge – Bunge, Smith & Luchía Puig Abogados, located in Buenos Aires Argentina, specializing in commercial and business law. I make this Affidavit based on my own personal knowledge.

2.     My firm represents Alon International, S.A. ("Alon") Alon Argentina, SRL, and Caraval, LLC, which are subsidiaries and affiliates of Alon, in a judicial proceeding commenced against Converse, Inc. ("Converse") on or about December 22nd, 2004, before the National Court of First Instance in Commercial Matters Number 22 of the Federal District ("Capital Federal") of the Argentine Republic.

3.     The sole purpose of this proceeding has been to seek an injunction on behalf of Alon in order to preserve the status quo between Alon and Converse pending a full adjudication of this dispute in arbitration. The scope of the Argentine proceeding has been limited to

preserving the status quo between the parties pending arbitration, and does not seek to adjudicate the status of the commercial relationship between the parties.

4.    On December 30, 2004, the Argentine court granted Alon a temporary *status quo* injunction against Converse which (a) declared that the Licensing, Manufacturing and Distribution Agreement ("Agreement") signed between Converse and Alon continues in effect for a period of 60 days from the issuance of the order, and (b) restrains Converse from having any contractual arrangements in Argentina that go against the existing contractual rights of Alon during that time.

5.    The National Courts of First Instance in Commercial Matters of the Federal District ("Capital Federal") of the Argentine Republic Argentina have jurisdiction and venue in the conflict between Alon and Converse since the Manufacturing, Distribution and Licensing Agreement ("Agreement") has effects in the Argentine territory.

6.    Notwithstanding what has been stated in the previous paragraph, Alon has acknowledged the jurisdiction of the American Arbitration Association. The preliminary injunction has been petitioned due to the urgency of keeping in force the contentious rights of Alon under the Agreement while the arbitration is pending, as Alon was not notified of Converse's attempt to not renew the Agreement, despite months of negotiations, until November 30, 2004.

7.    I respectfully submit to this Court that the issues invoked in the Argentine proceeding do not involve the same issues the parties have agreed to submit to arbitration. The scope of the Argentine proceeding has been limited to preserving the contractual relationship between the parties pending arbitration, and does not seek to adjudicate the current status of the commercial relationship between the parties. As such, Alon's request for injunctive relief in

Argentina should not be deemed incompatible with the parties' agreement to arbitrate the merits of their dispute.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 4th day of January 2005.

FURTHER AFFIANT SAYETH NOT.

_____
Diego César Bunge

F:\WDOX\CLIENTS\1007\1001\00042357.DOC

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CONVERSE, INC., | : | |
| | : | |
| Plaintiff, | : | Docket No.: 12591-PBS |
| | : | |
| v. | : | |
| | : | |
| ALON INTERNATIONAL, S.A., | : | |
| | : | |
| Defendant. | : | |

### AFFIDAVIT OF CYNTHIA D. VREELAND

I, Cynthia D. Vreeland, depose and state as follows:

1.      I am a Senior Partner at Hale and Dorr LLP, and am one of the attorneys representing the defendant Alon International, S.A. ("Alon") in connection with the above-captioned matter.  I file this Affidavit in support of Alon's Memorandum of Law in Opposition to Converse Inc.'s ("Converse") Application For an *Ex Parte* Temporary Restraining Order.

2.      Attached as Exhibit "1" is a true and correct copy of the Manufacturing, Distribution and Licensing Agreement between Alon and Converse.

3.      Attached as Exhibit "2" is a true and correct copy Alon's Notice of Arbitration and Statement of Claim filed with the American Arbitration Association on or about December 16, 2004.

4.      Attached as Exhibit "3" is a true and correct copy of a certified translation of an Order granted by 19th State Court of Porto Alegre, State of Rio Grande do Sul, Brazil, dated December 22, 2004.

5.    Attached as Exhibit "4" is a true and correct copy of a certified translation of an Order granted by the Argentine National Court of First Instance No. 22, Clerk's Office No. 43 of the City of Buenos Aires, dated December 30, 2004.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY this 5th day of January, 2005.

/s/Cynthia D. Vreeland
Cynthia D. Vreeland

C:\Documents and Settings\kelleym\Local Settings\Temporary Internet Files\OLK375\Affidavit of Cynthia Vreeland (00042413).DOC

2

# EXHIBIT "1"

02/14/02

# MANUFACTURING, DISTRIBUTION AND LICENSE AGREEMENT

## BETWEEN

## CONVERSE INC.

### and

## ALON INTERNATIONAL S.A.

Table of Contents

I.      INTRODUCTION
1.      Definitions _____ 5
2.      Term of Agreement _____ 6

II.     GRANT OF LICENSE
3.      License _____ 7

III.    LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES
4.      Use of Converse Marks _____ 9
5.      Quality Assurance _____ 11
6.      Licensee's Use of Converse Information and Advice _____ 12
7.      Licensee Sales Program _____ 12
8.      Distribution _____ 14
9.      Licensee's Use of Converse Factories _____ 15
10.     Exportation _____ 17
11.     Government Approval _____ 17

IV.     CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES
12.     Responsibility of Converse _____ 17
13.     Converse's Alteration of Product Design and Specification _____ 18
14.     Converse's Right of Inspection of Licensee Factories_____ 18

V.      ROYALTIES, FEES AND PAYMENTS
15.     Royalties _____ 19
16.     Guaranteed Minimum Sales _____ 22
17.     Royalty Reports _____ 22
18.     Schedule of Royalty Payments and Fees _____ 24
19.     Currency In Which Payments Are To Be Made _____ 26

VI.     INTELLECTUAL PROPERTY
20.     Converse Intellectual Property _____ 27
21.     Territorial Registration of Converse Trademarks _____ 29
22.     Infringement, Counterfeit, Unfair Competition _____ 29
23.     Indemnification for Products Liability Claims _____ 30

VII.    TERMINATION
24.     Right of Termination _____ 31
25.     Effect of Termination or Expiration _____ 33
26.     Final Statement Upon Termination or Expiration _____ 34

VIII.   MISCELLANEOUS
27.   Devaluation _____ 35
28.   Force Majeure _____ 35
29.   Assignment or Sublicense by Licensee _____ 35
30.   Notices _____ 36
31.   No Joint Venture _____ 36
32.   Applicable Law _____ 37
33.   Arbitration _____ 37
34.   Significance of Headings _____ 38
35.   Assignment, Entire Agreement, No Waiver _____ 38

Appendices

A.   Converse Marks
B.   Human Rights Manual
C.   Royalty Report Form

AGREEMENT, made as of this first day of September, 2001 by and between CONVERSE INC., a Delaware corporation, having its principal place of business at One High Street, North Andover, Massachusetts 01845 ("Converse") and ALON INTERNATIONAL S.A., a corporation duly registered and existing under the laws of the Republic of Panama and having its principal office and business at Edificio Magna Corp BCSA Calle 51 y Manuel Maria Icaza, Piso 4 oficina 410 P, Panama, Republica de Panama ("Licensee").

WHEREAS, Converse is in the business of manufacturing, advertising, distributing and selling athletic and leisure footwear, activewear and accessories and is the exclusive owner of the valuable trademarks "CONVERSE", "ALL STAR", "CONVERSE ALL STAR CHUCK TAYLOR" Ankle Patch and "STAR AND CHEVRON" Design and other trademarks, of certain trade names, and of various patterns, logos and designs associated therewith; and

WHEREAS, Licensee desires to manufacture and sell in Argentina, Brazil, Paraguay and Uruguay on an exclusive basis, athletic and leisure footwear, activewear and accessories identical or substantially identical to the athletic and leisure footwear and activewear and accessories manufactured for Converse and sold by Converse in the United States of America under the Converse name and trademarks, and to obtain the advisory services and assistance of Converse in connection therewith.

NOW THEREFORE, in consideration of the mutual covenants, representations and promises herein contained, Converse and Licensee agree as follows:

## I.    DEFINITIONS

1.    For purposes of this Agreement, the following definitions shall apply:

(a)  "Contract Period" shall mean that period of time commencing on September 1, 2001 and ending on December 31, 2004.

(b)  "Contract Year" shall mean the twelve calendar months of the year, beginning with January 1.  The first Contract Year shall be the period from September 1, 2001 through December 31, 2002.

(c)  "Contract Year Quarter" shall mean the four (4) three month periods of the calendar year.  The first Contract Year Quarter will commence January 1, 2002 and will include any activities from the commencement date of this Agreement.

(d)  "Converse Factories" shall mean Converse's authorized factories.

(e)  "Converse Marks" shall mean the logos and trademarks set forth in Appendix A.

(f)  "F.O.B. Cost" shall mean the costs of Footwear Licensed Articles purchased by the Licensee directly from Converse Factories as shown on the approved invoice from the factory for each shipment of product, if applicable.

(g)  "Licensed Articles" shall mean the athletic and leisure footwear, activewear and accessories which are set forth more specifically in Paragraph 3(a) below and which are identical or substantially identical to the athletic and leisure footwear, activewear and accessories manufactured for Converse and sold by Converse in the United States. There are three types of Licensed Articles:  Non-Footwear, Footwear and Original Licensed Products as defined below.

(h)  "Net Sales" shall mean the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, trade discounts, volume rebates and any

freight charges and VAT taxes included in the invoice.  No deduction shall be allowed for costs incurred in the manufacture, sale, advertisement (including cooperative and promotional allowances) or distribution of Licensed Articles, nor shall any deductions be allowed for uncollectible accounts or cash discounts.

(i) "Original Licensed Products" shall mean Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear.  Original Products may also be referred to as "Originals" or "Original Licensed Footwear Products."

(j) "Publicity Materials" shall include, but not be limited to, any printed advertising, catalogs, brochures, billboards, electronic material, internet technology, and/or wireless network services in any and all manner or medium now known or hereafter devised or any video or printed material bearing the Converse Marks.

(k) "Territory" shall mean Argentina, Brazil, Paraguay and Uruguay.

2.  Term of Agreement.  In recognition of infrastructure, manufacturing and legal expenditures made by Licensee on Converse's behalf, and Licensee's continuing efforts in these areas, Converse agrees to waive the signing fee of US$28,750.00.  Unless sooner terminated pursuant to the provisions of this Agreement, this Agreement shall remain in effect for the Contract Period.  In the event Licensee wishes to renew this Agreement, it must notify Converse in writing of this decision by or before September 30th of the final Contract Year.  Licensee may renew this Agreement for an additional term of three (3) years ("Option Years" which may be collectively referred to as "Option Period") provided Licensee exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that

Licensee has not breached any of the terms and conditions of this Agreement.  The Guaranteed Minimum Royalty for the first Option Year will be the greater of 25% over the Guaranteed Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties, increasing by ten percent (10%) for each subsequent Option Year in the Option Period.  The Guaranteed Minimum Sales for the first Option Year will be the greater of 25% over the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales, increasing by 10% each subsequent Option Year.  Any extension of the term of this Agreement shall be effective only pursuant to a written agreement executed by Converse and Licensee.  Such written agreement shall reflect any new or revised terms or conditions agreed to by the parties.

## II.     GRANT OF LICENSE

3. License.

(a)     Licensed Articles.

      i.     Non-Footwear Licensed Articles is the collective term for activewear and accessories.  Activewear shall specifically include:  mens' and womens' sportswear and T-shirts.  Accessories shall specifically include: bags, socks, caps, watches, backpacks, belts, stationary items (Notebooks and agendas, etc.).

      ii.     Footwear Licensed Articles is the collective term for athletic and leisure footwear.

      iii.     Originals Licensed Footwear Products shall be defined as the following models of footwear:  Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear.

(b)     Grant of License.  Converse hereby grants to Licensee, subject to the terms and conditions herein, the exclusive right and license to utilize the Converse Marks throughout the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the retail and wholesale trade, subject to the provisions set forth in Section III below.  This license does not authorize, and expressly forbids, Licensee to manufacture, export, cause to export, distribute or sell such Licensed Articles in any other part of the world, unless specifically authorized by Converse in writing.

(c)     Internet.  Licensee is also granted the rights to use the Converse Marks on its Internet site generated out of the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the resale and wholesale trade, subject to the provisions set forth in Section III below.  In the event Licensee has already registered any of Converse's Marks or any name similar to a Converse Mark as a domain name, it shall assign to Converse all its rights, title and interest in such domain name(s) as directed by Converse.  Licensee shall not register a domain name using any of the Converse Marks or any marks to be confused with the Converse marks.

(d)     Non-competition.  Licensee agrees it shall not, during the term of this Agreement, manufacture, export, distribute, advertise, promote or sell any products/licensed articles which are competitive to the Licensed Articles, irrespective of whether said products bear Licensee's trademark or those of a third party, except only in such cases that Converse has given its prior written approval.  Notwithstanding the preceding sentence, in the event Licensee is already under obligation to distribute licensed articles other than those of Converse and/or products of any competitor, Licensee shall provide Converse, prior to the execution of



this Agreement, with a written list of all products it is under obligation to distribute. The parties agree that excluded from this paragraph are Licensee's currently held childrens' brands, such as Disney, Warner, Mattel, and McKids.

(e)    <u>Right to Negotiation</u>. In the event Converse does not renew license agreements with its existing licensees in the territories of all of Latin America and Mexico, Licensee shall have the right to negotiate for these territories.

## III.    LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

4. <u>Use of Converse Marks</u>.

(a)    <u>Territorial</u>. Licensee agrees to use the Converse Marks only within the Territory and during the Contract Period, and only with respect to the manufacture, promotion, advertisement, distribution and sale of the Licensed Articles and only after Licensee has received the written approval of Converse as to samples of the Licensed Articles intended to be manufactured and sold by Licensee, the specific Converse Marks Licensee intends to affix to particular Licensed Articles, Licensee's use of the Marks in Publicity Materials and Licensee's use of the Marks on Licensee's web site, if applicable.

(b)    <u>Approvals</u>. Licensee shall provide Converse with a full set of approval samples and Publicity Materials for each Licensed Article as set forth in Paragraph 2(a) of this Agreement prior to launch in the market. Licensee shall provide Converse with designs and/or drawings of all Licensed Articles, drawings, hang tags and packaging for approval no later than four (4) months prior to launch in the market. In the event Licensee wishes to use any of the Converse Marks on its web site, it shall provide Converse with an opportunity to review the web site no

later than sixty (60) days prior to launch in the market. Converse shall have fifteen (15) calendar days from receipt to respond, either by refusing such design or requesting any changes to the designs, drawings or contents of web site, or issuing its written approval. Licensee further agrees to follow the approval guidelines for Licensed Articles, packaging, advertising and promotional materials set forth in Converse's Licensee Handbook. The license to use the Converse Marks is granted upon the express condition that all Licensed Articles manufactured by Licensee bearing any of the Converse Marks will conform to the standards for grade, quality, and style established from time to time by Converse. Such standards shall be substantially the same as the standards for the corresponding products manufactured for Converse and distributed by Converse in the United States. Any Licensed Articles bearing any of the Converse Marks manufactured by Licensee which are seconds or irregulars shall not be sold by Licensee without the prior written consent of Converse.

In addition, all factories at which Licensee desires to have Licensed Articles manufactured shall be approved in writing by Converse in advance of the placement of any orders for or of the manufacture of Licensed Articles.

(c) Inspection. Converse shall at any and all times have the right to inspect the Licensed Articles bearing any of the Converse Marks manufactured by Licensee to determine whether such Licensed Articles in fact conform to the established standards and other terms of this Agreement. If at any time Converse shall be of the opinion that Licensed Articles bearing any of the Converse Marks manufactured by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee. Licensee shall promptly thereafter remove or cause to be removed any of the Converse Marks from such nonconforming products or web sites, shall cease

to affix the Converse Marks to other Licensed Articles which do not meet the standards, and shall cease thereafter to manufacture, promote, advertise, distribute or offer for sale any such nonconforming Licensed Articles bearing any of the Converse Marks. It is understood and specifically agreed that upon termination of this Agreement, Licensee shall immediately cease using the Converse Marks or any reference thereto, except as otherwise provided in this Agreement.

5.     Quality Assurance.

(a)     Licensee shall submit, for the inspection and approval of Converse, samples and comprehensive drawings or prototypes or production models of each style representative of Licensed Articles covered by this Agreement to be manufactured by Licensee.  In any event, such drawings and samples shall be submitted to Converse for approval at least four (4) months before any such Licensed Articles are shipped or sold by Licensee.  Thereafter, once each six (6) months, and also two (2) weeks prior to any change in the materials, method of manufacture or design of Licensed Articles, Licensee shall submit for inspections and approval by Converse, samples representative of Licensed Articles expected to be manufactured, shipped and sold by Licensee.  Additional samples shall also be submitted to Converse at Converse's reasonable request.  Converse shall determine whether such samples conform to its standards and shall inform Licensee of its approval or of any deficiencies.  Licensed Articles may be manufactured and sold by Licensee only after Converse shall have approved drawings and samples representative of such Licensed Articles in writing or shall have failed to disapprove them within four (4) weeks after receipt of the drawings and samples.

(b)     All Licensed Articles manufactured or sold hereunder must:

i.    be of first quality and conform to standards, including standards of design, style and quality, approved by Converse in its sole discretion, reasonably exercised;

ii.    be of the grade, quality and style handled by quality departments of quality stores, department stores and better specialty shops in the Territory;

iii.    be similar and at least equal in grade, quality, materials, workmanship, performance and style, to representative comprehensive drawings or production samples of Licensed Articles submitted by Licensee to Converse and approved by Converse; and

iv.    be advertised, marked, labeled and packaged in accordance with this Agreement and not in any manner violative of law or tending to mislead or deceive the public.

6.  Licensee's Use of Converse Information and Advice.

(a)  Licensee agrees that it shall not use, permit the use of, release, give or otherwise distribute or disclose to any third party any of the information, advice, reports, instructions, designs, drawings, specifications, technical knowledge, methods, processes, samples or materials, names and addresses of suppliers of materials, or any other information ("Trade Secrets") furnished to it by Converse or Converse contract manufacturers or other licensees except as necessary and on an as needed basis in the manufacture, distribution, promotion, advertisement, and sale of Licensed Articles bearing the Converse Marks in the Territory pursuant to this Agreement.

(b)  All Trade Secrets shall remain the sole property of Converse and shall be deemed to be strictly confidential and shall be treated accordingly.

7. <u>Licensee Sales Program</u>.

(a)    Licensee shall faithfully, diligently and to the best of its ability endeavor to manufacture, distribute, promote, advertise, market and increase the sales of Licensed Articles bearing the Converse Marks in the Territory.  It shall be the responsibility of Licensee to provide active and continuous sales representation in the Territory by actual salesperson contact with customers, both existing and prospective.  Licensee shall maintain adequate brand and marketing management, manufacturing, sales and service personnel and adequate inventory levels, manage, position and market the brand; conduct advertising and promotional programs and perform such other necessary functions to accomplish maximum sales and distribution of Licensed Articles within the Territory.  Licensee shall not adopt, engage in, permit or otherwise use any pricing policies, advertising campaigns, merchandising techniques or other commercial practices which are illegal under the laws of the Territory or which, in the opinion of Converse, detract from the good will and reputation of Converse.

(b)    Licensee agrees to submit to Converse an annual business plan for the sale of Licensed Articles for each region within the Territory for each Contract Year.  Such annual business plan shall be submitted to Converse no later than September 30th of each Contract Year, and shall be for the next Contract Year.  Licensee also agrees to submit to Converse, a seasonal sales and marketing plan for the sale of Licensed Articles for each region within the Territory for each Contract Year.  Such seasonal sales and marketing plan shall be submitted to Converse no later than June 15th of each Contract Year for the next Spring, and January 15th of each Contract Year for the next Fall.

(c)     Licensee shall use Converse's web-based sales and forecasting application each month to provide Converse with both annual forecasts and actual sales.

(d)   During each Contract Year, Licensee shall expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for that Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure").   Such expenditures shall be spread over each current Contract Year in a manner consistent with the overall brand and product marketing and advertising strategies outlined by Converse in the United States market. Licensee agrees to provide Converse with quarterly statements itemizing Licensee's Advertising Expenditure for the preceding Contract Year Quarter on or before the fifteenth (15th) day of April, July, October and January of each Contract Year.   Converse agrees to waive its requirement to have Licensee pay a one percent (1%) Regional Marketing Contribution during the Contract Period.   Licensee shall keep Converse continually informed as to all advertising programs undertaken pursuant to this Agreement and shall not advertise any of the Licensed Articles without receiving the prior written approval thereof from Converse, which approval shall not be unreasonably withheld or delayed.   All advertising copy shall prominently feature Converse logos and Marks used in accordance with the Converse Identity Manual or guidelines provided by Converse from time to time.

(e)  Licensee agrees to purchase a representative sample range of each new product line introduced by Converse.   The price of such samples shall be factory cost plus fifty percent (50%) plus freight cost to be paid in accordance with Paragraph 18(d) herein.

(f)     Licensee agrees it shall have, at its expense, one or more of its sales management attend Converse's global sales conferences.

8.    Distribution.

(a)  Licensee hereby agrees to market, sell, promote and distribute the Licensed Articles to high end, better quality athletic footwear and sporting goods retailers and specialty shops, department stores and boutiques that are consistent with the Converse brand strategy and will enhance the Converse brand image within the Territory and throughout the world.  Licensee agrees not to market, sell, promote and distribute the Licensed Articles to mass merchants, discount stores and/or chains, flea markets, open air markets, consolidators, diverters or to any distribution channels that are not consistent, in Converse's sole discretion, with the Converse brand strategy.

(b)    Publicity Materials.  All Publicity Materials shall be approved in writing by Converse in advance of any release or distribution.  Converse shall at any and all times have the right to inspect the Publicity Materials developed by Licensee to determine whether they conform to the established standards and other terms of this Agreement.  If at any time Converse shall be of the opinion that the Publicity Materials developed by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee, which shall promptly thereafter remove and shall cease thereafter to use or distribute any such nonconforming Publicity Materials.

9.    Licensee's Use of Converse Factories.

(a)    Licensee must use Converse Factories for the manufacture of regular in-line Footwear Licensed Articles and Originals when manufacturing outside the Territory.  Licensee must submit the orders for such Footwear Licensed Articles and Originals to Converse's Production Department at corporate headquarters for approval  before it can be placed with the

factory and only if placed through the following approved buying agent or such other agent as may be designated by Converse (the "Buying Agent"):

> Twin Dragons
> Pou Yuen Industrial City
> First Industrial Estate
> Shanxiang Town
> Zhongshan City, Guangdong Province, PRC
> China

In the event local production is required due to a tariff prohibition within the Territory, Licensee, upon Converse's prior written approval, may locally produce the Footwear Licensed Articles.

    (b)    All such orders are to be placed with the Converse Factory with payment by Letter of Credit, (unless wire transfer payment terms have been negotiated,) terms at sight, from Bill of Lading date with such letters of credit opened so as to arrive at the factory no less than forty-five (45) days prior to the confirmed ship date.

    (c)    Licensee shall pay to Converse the Buying Agent's commission upon presentation of the applicable commission invoice at the applicable percentage of the F.O.B. Costs.

    (d)    Under no circumstances can Licensee cancel orders contemplated by this Paragraph 9 with Converse Factories without the prior written approval of Converse's corporate office. In the event Converse authorizes such cancellation, Licensee hereby agrees to pay all costs incurred by the Converse Factory for such order and a cancellation charge to Converse equal to five percent (5%) of the combined F.O.B. costs of the order.

(e)     Licensee agrees it shall not approach any third party factories regarding the production of Footwear Licensed Articles, unless having prior written approval from Converse.

10.     Exportation.   Licensee shall manufacture, distribute, promote, advertise and sell Licensed Articles bearing the Converse Marks only within the Territory.   Further, Licensee shall not knowingly export or cause to be exported, and shall use its best efforts to prevent the export of, any products to other countries without the prior express written permission of Converse.   In the event that Licensee exports or causes to be exported Licensed Articles bearing the Converse Marks outside the Territory without written authorization from Converse, Licensee agrees that such action would irreparably harm Converse's business.   A breach of this Paragraph by Licensee may result in termination of this Agreement by Converse pursuant to Paragraph 24 below.

11.   Government Approval.   If applicable, Licensee shall be responsible for obtaining all necessary approvals from the government of any of the countries in the Territory with respect to this Agreement.   In the event that Licensee is unable to obtain all such approvals within one hundred eighty (180) days of the execution of this Agreement, Converse shall have the right to terminate the Agreement immediately upon written notice to Licensee.

IV.   CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

12.   Responsibility of Converse.   In order to facilitate the manufacture, distribution, promotion, advertisement and sale of Licensed Articles by Licensee under this Agreement, Converse shall use good faith efforts to:  (a)  furnish or cause to be furnished to Licensee such

information and advice, as in the opinion of Converse, is necessary to implement this Agreement. Such information and advice may include, but is not limited to, drawings and specifications of the Licensed Articles, names and addresses of suppliers of materials, copies of advertisements and sale promotional material or such other information reasonably necessary to carry out this Agreement. Licensee shall pay Converse promptly upon billing for any articles supplied under this Paragraph 12(a) in accordance with Paragraph 18(d); (b)  at Converse's discretion, to permit one or more of Licensee's representatives to attend, at Licensee's sole expense, sales conferences or other athletic sales events sponsored or attended by Converse representatives; (c)  make arrangements under which representatives of Licensee may, at their sole expense, visit one or more factories in which products similar to the Licensed Articles are being manufactured by or for Converse bearing the Converse Marks to enable the representatives to study methods of manufacture and related matters.

13.    <u>Converse's Alteration of Product Design and Specification</u>.  Converse reserves the right, upon sixty (60) days notice to Licensee, to modify the design and specifications for any Licensed Article made by Licensee bearing any of the Converse Marks, and any design or text. In that event, Licensee shall not manufacture Licensed Articles in accordance with the prior design or specification, except for the completion of Licensed Articles in the process of manufacture at the time Licensee received the modification.  Licensee agrees not to manufacture, distribute, promote, advertise or sell any product not bearing a Converse Mark which, in the opinion of Converse, by reason of its appearance or design, might tend to be confused by the public with any of the Licensed Articles manufactured under this Agreement bearing Converse Marks, or which in the opinion of Converse infringes in any manner Converse Marks.



14.  **Converse's Right of Inspection of Licensee Factories.**

(a)  Converse shall have the right at its own expense to have its representatives from time to time, during reasonable business hours, visit and inspect the factory or factories in which Licensee is producing, or having produced, Licensed Articles bearing any of the Converse Marks for the purpose of observing the method of manufacture, quality of materials, products produced, and any other matters relevant to this Agreement. Included in this inspection shall be the audit of the workers' rights standards pursuant to the Converse Inc. Human Rights Manual which is made part of this Agreement and is attached hereto as Appendix B.

(b)  Licensee shall reimburse Converse for any expense for travel to the Territory or elsewhere which may be incurred by representatives of Converse at the request of Licensee and such payments shall be made by Licensee to Converse in U.S. Funds within thirty (30) days from billing thereof.

V.  **ROYALTIES, FEES AND PAYMENTS**

15.  **Royalties.** In conjunction with Paragraph 18 below, Licensee shall pay to Converse the following royalties:

(a)  In consideration for the license granted to it by Converse herein, Licensee shall pay Converse a royalty equal to the following percent of the Net Sales made by Licensee of the Licensed Articles (the "Earned Royalties"). The Earned Royalties shall be based upon the Net Sales price for such products sold to the retail or wholesale trade by Licensee.



| EARNED ROYALTIES | | | |
|---|---|---|---|
| **CONTRACT YEAR** | **CALENDAR YEAR** | **Footwear (including Originals)** | **Non-Footwear** |
| 1 | 9/1/01 – 12/31/02 | 6% | 6% |
| 2 | 2003 | 7% | 6% |
| 3 | 2004 | 8% | 6% |
| Option Years | | To be negotiated | To be negotiated |
| 4 | 2005 | tbd | tbd |
| 5 | 2006 | tbd | tbd |
| 6 | 2007 | tbd | tbd |

The Earned Royalty rate for Licensed Articles for the Option Period will be negotiated prior to the Option Years taking effect.

> (b)    Notwithstanding the provisions of Article 15(a), Licensee agrees to pay Converse a guaranteed annual minimum royalty as set forth below for each Contract Year (the "Guaranteed Annual Minimum Royalty").

| **CONTRACT YEAR** | **CALENDAR YEAR** | **GUARANTEED ANNUAL MINIMUM ROYALTY** |
|---|---|---|
| | | Footwear (including Originals) and Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | US$115,000.00 |
| 2 | 2003 | US$160,000.00 |
| 3 | 2004 | US$215,000.00 |
| Option Years | | |

| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties |
| 5 | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

In the event this Agreement is terminated on a date other than the last day of a Contract Year, the

Earned Royalties shall be based upon actual Net Sales through the date of termination.

    (c)    <u>Third Parties.</u>

        (i)    With respect to the sale of certain Licensed Articles, Converse has, or may

have in the future, an obligation to pay a royalty to an athlete or other third party ("Third Party")

in conjunction with the use of the Licensed Articles (the "Third Party Articles").  In the event

that Licensee purchases or manufactures, with Converse's prior written consent, any Third Party

Articles, Licensee agrees to pay to Converse the amount of any royalty which Converse is

obligated to pay to the applicable Third Party (the "Third Party Royalty").

        (ii)    Converse shall advise Licensee, in a timely fashion prior to Converse's

approval of Licensee's submission of an order for Licensed Articles, which articles are Third

Party Articles and the amount of the Third Party Royalty.

        (iii)    The applicable Third Party Royalty shall be paid by Licensee to Converse

along with payment of the Earned Royalties pursuant to Paragraph 18 of this Agreement.

    (d)   Licensee shall remove Converse Marks from any defective products which do not

meet Converse standards as set forth in Paragraph 5 of this Agreement entitled Quality Assurance

for first quality merchandise and no royalty shall be payable hereunder with respect to the sale of



Page 22

such substandard products.  This requirement to remove all Converse Marks shall be operative irrespective of the fact that such substandard products may be customarily sold in the Territory for the same price as first quality merchandise.  Converse shall have the right to prohibit Licensee from selling such substandard products, if, in the opinion of Converse, such products may tend to be confused by the public with any of the Licensed Articles sold under this Agreement bearing Converse Marks, or which, in the opinion of Converse, infringes in any manner the Converse Marks.

16.    <u>Guaranteed Minimum Sales</u>.  Notwithstanding the provisions of Paragraphs 15(a) and (b) above, Licensee agrees to sell not less than the following guaranteed minimum sales volume of Licensed Articles during each Contract Year as set forth below (the Guaranteed Minimum Sales Volume"):

| CONTRACT YEAR | CALENDAR YEAR | GUARANTEED MINIMUM SALES VOLUME |
|---|---|---|
| | | Footwear (including Originals) and Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | US$1,917,000.00 |
| 2 | 2003 | US$2,300,000.00 |
| 3 | 2004 | US$2,800,000.00 |
| Option Years | | |
| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales |
| 5 | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

17.    Royalty Reports

(a)    Unless otherwise specified herein, Licensee shall deliver to Converse on or before April 25th, July 25th, October 25th and January 25th of each Contract Year a Royalty report, which shall be a complete and accurate itemized statement, certified by Licensee's chief fiscal officer as being accurate and complete, stating the description by product type, number of pairs or units, gross sales price, itemized deductions from gross sales price and net sales price as well as wholesale sales of the Licensed Articles manufactured, distributed or sold by Licensee during the preceding Contract Year Quarter. Such statements shall be stated in both United States and local currency and submitted in the format set forth in Appendix C, which shall be subject to change without notice. Such quarterly statements shall be furnished to Converse whether or not any Licensed Articles bearing any Converse Marks have been sold or distributed by Licensee during the preceding Contract Year Quarter. Receipt or acceptance by Converse of any statements furnished pursuant to this Agreement or any sums paid hereunder shall not preclude Converse from questioning the accuracy thereof at any time, and in the event that any inconsistency or mistake is discovered in such statement or payments, they shall be rectified immediately and the appropriate payments shall be made by Licensee.

(b)    If applicable, the parties acknowledge that Licensee may be legally required to withhold and remit a portion of the Earned Royalties to the governments of the countries in the Territory on behalf of Converse. It is not the intent of the parties that Licensee pay any part of any tax owed by Converse. Licensee's obligation shall be satisfied if it withholds and remits in accordance with the laws of the countries in the Territory and provides Converse promptly upon

payment, one original counterpart of the certificate issued by the competent tax authorities receiving such payments. These certificates should be forwarded to Converse's Accounting Department at the address set forth in the Notice section of this Agreement. These withholding certificates, if applicable, must accompany quarterly Royalty Reports.

18. Schedule of Royalty Payments and Fees.

The Royalty Payments set forth below shall be paid to Converse on a quarterly basis upon invoice or no later than the end of the month in which the Royalty report was due to be submitted pursuant to Paragraph 17 above. Payments shall be in U.S. Dollars and can be made either by wire transfer in accordance with the instructions set forth in Paragraph 19 below or by check:

(a) The Earned Royalty or one quarter of the Guaranteed Annual Minimum Royalty set forth herein for each Contract Year Quarter, whichever is greater. Once the Guaranteed Annual Minimum Royalty is satisfied, Licensee is required to pay Earned Royalties only for the remaining quarters;

(b) The Original Products Royalty;

(c) The Third Party Royalty, if applicable, shall be paid upon receipt of Converse's invoice;

(d) In addition to royalties, Licensee shall pay Converse for all materials, samples, and merchandise furnished to Licensee pursuant to Paragraph 12 hereof in an amount equal to the cost of such items to Converse, including Converse's cost of preparing, packing, shipping and transporting such items. All such purchases by Licensee from Converse shall be paid upon receipt of invoice by wire transfer or check.

Page 25

(e)  Licensee shall maintain appropriate books of account and records, including inventory records, in accordance with generally accepted accounting principles, and shall make accurate entries concerning all transactions relevant to this Agreement.  Such books of account and records shall be kept separately from those for any merchandise other than the Licensed Articles sold hereunder by Licensee.  Licensee shall also, upon request by Converse, provide Converse with a sales report listing year-to-date sales generated by each of Licensee's customers.

(f)  Converse shall have the right, at its own expense, during the term hereof and for three (3) years thereafter, or in the event of a dispute involving in any way such books of account and records, until the dispute is resolved, whichever is later, through any authorized representatives of its own choice, on reasonable notice to Licensee and during regular business hours, to examine and take extracts from such books of account and records, and other documents (including but not limited to invoices, vouchers, records, purchase orders, sales orders and reorders) relating to the business hereunder which shall be maintained and kept by Licensee during the term hereof.  All such books of account and records shall be kept available by Licensee for three (3) years after the end of the Contract Period, or in the event of a dispute between the parties hereof involving in any way such books of account and records until that dispute is resolved, whichever is later.  If upon inspection of the books and records pursuant to this paragraph or otherwise, it is discovered that Converse did not receive the correct and adequate payment, then Licensee shall pay the Company, upon written notice, the difference between what was paid and what should have been paid, within five (5) business days of receipt of said notice.  If the aforesaid difference exceeds five percent (5%), then the entire difference is to be paid with interest calculated from the date the payment should have been made to the



actual date of payment at the prime rate in effect on the payment date. If Converse chooses to employ the services of a certified public accounting firm, qualified accounting consultant firm or Converse's internal auditors to conduct an audit and inspection of Licensee's books and records and said audit and inspection results in a balance due for any Contract Year of this Agreement which exceeds by five percent (5%) the payment reported due by Licensee for any such Contract Year, then Licensee shall bear the entire cost including all fees and expenses of said audit and inspection. If it is found that Licensee has made a larger payment than that which was due, said excess will be returned by Converse within five (5) business days of such determination.

19. <u>Currency In Which Payments Are To Be Made.</u>

(a) Unless specifically set forth to the contrary herein, all payments to Converse (except Converse Factories) required to be made by Licensee pursuant to this Agreement shall be made in the currency of the United States of America ("U.S. Funds"), payable to Converse Inc., First Union National Bank, Charlotte, NC, ABA No. 053000219, Account No. 2000011041218, or such other account as may be designated by Converse from time to time (the "Account"). Converse will review the exchange rate received by Licensee in the conversion from Licensee's local currency to U.S. Funds by comparison with the exchange rate published by the Wall Street Journal ("WSJ") two (2) business days prior to the payment due date scheduled in Paragraph 18 of this Agreement. If there is a difference between the exchange rate received by Licensee and the WSJ rate, Converse reserves the right to request such additional funds from Licensee as is required to compensate for the exchange rate deficiency. In cases where payment of the particular royalty due is more than seven (7) calendar days late, Converse reserves the right to request additional funds from Licensee to compensate Converse for any resulting subsequent exchange



rate loss. If required, Licensee agrees it will seek the necessary government approvals to make such payments to Converse in U.S. Funds. Any late payments will be subject to an interest charge of one and one-half percent (1 1/2%) to Converse each month the payments remain unpaid. In the event any such payment exceeds thirty (30) days in arrears, Converse shall have the right, in addition to any and all other remedies available to Converse, to terminate this Agreement pursuant to Paragraph 24.

(b) If the actions of any government or public body make it impossible for Licensee to pay Converse in U.S. Funds, Converse shall have the following options:

(i) terminate the Agreement with thirty (30) days written notice to Licensee;

(ii) require Licensee to make payment in the currency of any other country selected by Converse by whose currency Licensee may legally pay;

(iii) require Licensee to deposit such payment to Converse's account in a bank selected by Converse in or outside the Territory.

If Converse selects option (i) it may nevertheless require Licensee to pay any sums then due or to become due in accordance with options (ii) or (iii).

## VI.    INTELLECTUAL PROPERTY

20. Converse Intellectual Property.

(a) Ownership. Licensee acknowledges that Converse is the exclusive owner of the Converse Marks, Converse patents, and Converse domain names, and covenants that neither it nor any person acting for or under it will ever contest such ownership or the exclusive rights of Converse with respect thereto anywhere in the world.



(b)     In the event that Licensee creates, or assists in the creation of, a design for a Licensed Article or Converse's web site, then such design shall become the property of Converse without any further act required on the part of Converse or Licensee. Licensee shall execute and deliver any document or instrument requested by Converse to confirm exclusive ownership by Converse of any such design. Converse shall have the right to utilize said design itself or provide it for use by any third party.

(c) <u>Infringement</u>. Nothing in this Agreement shall constitute a warranty by Converse that there are currently no infringements of any of the Converse Marks, Converse patents, or Converse domain names within the Territory. Licensee agrees that during the Contract Period it will diligently investigate any infringement or threatened infringement of the Converse patents, trademarks, logos, domain names or trade names within the Territory and shall immediately notify Converse of any such infringement or threatened infringement or of any act or threatened act of unfair competition which may come to Licensee's attention and Licensee shall use its best efforts to prevent such infringement or act of unfair competition. Should litigation become necessary in Converse's sole discretion to protect Converse's interests in this regard, Licensee shall cooperate fully with Converse to the extent requested. Converse shall be responsible for the expense of such litigation.

Converse acknowledges that it is a party to certain litigation in Brazil with All Star Artigos relating to the use and registration of the Chuck Taylor All Star and All Star logos. Converse hereby agrees that it will take the necessary actions as determined by Converse to recover the ownership of said trademarks provided it is in the best interest of Converse.

(d)    Intellectual Property Indemnification. Licensee shall indemnify and hold Converse harmless from and against any and all claims, demands, losses, damages, liabilities, suits, judgments, and expenses, including incidental costs and attorneys' fees Converse may incur or be liable for arising out of allegations that Licensed Articles, Converse Marks, advertising and/or Publicity Materials used, designed and/or developed by Licensee violates or infringes the copyright, trademarks, service marks, or patent rights of any third party. Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.

21.    Territorial Registration of Converse Trademarks. Converse has registered or applied for registration of certain of its trademarks and domain names in the Territory.  In this regard, Licensee agrees to take all proper actions requested by Converse to facilitate and expedite the registrations, provided that Converse reimburses Licensee for all reasonable expenses incurred in connection therewith.  If Converse is prevented from registering its trademarks or domain names in the Territory by virtue of the existence of this Agreement, Licensee agrees, at the request of Converse, to seek registration in its own name and convey to Converse all right, title and interest to the trademarks and domain names which Licensee may thereby obtain, provided that Converse shall reimburse Licensee for all reasonable expenses incurred.

22.    Infringement, Counterfeit, Unfair Competition. Licensee agrees to notify Converse, in writing, of any infringements or counterfeits of, or any unfair competition affecting the trademarks and domain names licensed hereunder immediately upon gaining knowledge thereof and to cooperate fully in any action thereon which Converse may, in its sole discretion, deem appropriate.  Licensee shall not, however, be entitled to take or institute any action thereon,

either by way of informal protest or legal, equitable or criminal proceedings, without express written approval, nor shall Licensee be entitled to call upon Converse to take action thereof; all such matters shall be entirely within the discretion of Converse.

23. Indemnification for Products Liability Claims.

(a)    Licensee agrees to indemnify Converse from any and all claims, demands or judgments, including incidental costs and attorneys' fees incurred in connection therewith against Converse for injuries or damages to purchasers or users of the Licensed Articles manufactured by Licensee.  The foregoing indemnification of Converse by Licensee shall extend to any and all products liability claims arising as a result of Converse's ownership and control of the trademarks under which the Licensed Articles are manufactured and sold by Licensee, including, but not limited to, claims arising out of breach of implied or express warranties, strict tort liability or negligence, or legal claims of a comparable nature for recovery brought by litigants under the laws of the jurisdiction that apply to the Licensee.

(b)    Licensee shall, at its own cost and with Converse's approval, defend against any claims brought or actions filed against Converse on a products liability theory of the Licensed Articles whether such claims or actions are rightfully or wrongfully brought or filed, and Converse shall execute all papers necessary in connection with such suit and shall testify in any such suit whenever required to do so by Licensee all, however, at the expense of Licensee with respect to travel and similar out-of-pocket disbursements.

(c) Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.

(d)     Licensee shall obtain insurance to the extent of $1,000,000 per occurrence against liability for bodily injury including death resulting therefrom and $1,000,000 per occurrence against liability for damage to property including loss of use thereof, occurring in any way relating to the Licensed Articles. Such insurance policy shall insure Converse and shall name Converse as an additional insured as its interest may appear. Such insurance policy shall be cancelable or materially altered only upon ten (10) days notice to the Licensee and Converse. Licensee shall provide Converse with a certificate of its insurance policy in the amount indicated within ten (10) days of execution of this Agreement.

## VII.    TERMINATION

24. Right of Termination.

(a)     By Converse Immediately. In the event of the occurrence of any one or more of the following, Converse shall have the right to immediately terminate this Agreement by written notice thereof to Licensee but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i)     insolvency, bankruptcy, reorganization, suspension of payments, assignment for the benefit of creditors, appointment of a receiver, institution of any proceedings by or against Licensee under bankruptcy laws or other similar laws; or

(ii)    the transfer or sale of all or a majority of the voting stock or other equitable ownership of Licensee without the written consent of Converse.

(b)     By Converse Upon Notice of Breach. In the event of the occurrence of any one or more of the following, Converse shall have the right to terminate this Agreement seven (7)

days after giving written notice thereof to Licensee, and Licensee has not remedied the situation within such seven (7) day time period:

(i)   failure of Licensee to pay any royalty or other payment due Converse under this Agreement for a period of thirty (30) days from the date such payment is due and payable;

(ii)   failure of Licensee to pay the Buying Agent's commission ("Buying Agent's Commission") for a period of thirty (30) days from the date such commission is due and payable;

(iii)   pursuant to Paragraph 8 Distribution above, the manufacture, distribution, advertisement or sale of Licensed Articles by Licensee in the Territory other than pursuant to this License Agreement;

(iv)   the sale or shipment of Licensed Articles by Licensee outside of the Territory, as set forth in Paragraph 10 herein;

(v)   the failure of Licensee to comply with the Guaranteed Annual Minimum Royalty or Guaranteed Minimum Net Sales Volume for any Contract Year, as set forth in Paragraphs 15 and 16 herein; or

(vi)   The breach by Licensee of Paragraphs 3(a), 4 and 6 herein.

(c)   By Either Party.   In the event of the occurrence of any one or more of the following, either party shall have the right, after thirty (30) days written notice, to terminate this Agreement by written notice thereof to the other party but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i) liquidation or dissolution of either party or discontinuance of the active operation of the enterprise of either party;

(ii) the breach of or failure by either party to perform or observe any of the other terms and conditions of this Agreement, provided said breach or failure shall continue for a period of thirty (30) days after written notice thereof from the other party.

25. <u>Effect of Termination or Expiration.</u>

(a) From and after the termination of this Agreement, whether by expiration of the Contract Period or termination pursuant to Paragraph 24 or for any other reason, any and all rights acquired by Licensee to the use of the Converse Marks and Trade Secrets, shall terminate and cease absolutely, and except as provided in subsection (b) of this Article, Licensee shall not thereafter manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with Converse Marks.

(b) Any Licensed Articles manufactured or in the process of manufacture by Licensee prior to the expiration or termination of this Agreement and as to which any of the Converse Marks has been attached or affixed may be sold by Licensee, but only during the ninety (90) day period next following the date of expiration or termination, subject to the condition that Licensee pay to Converse all Earned Royalties and other payments due and owing Converse at the date of expiration or termination and to the further condition that Licensee continues to pay to Converse all Earned Royalties accruing during such ninety (90) day period within thirty (30) days following the end of each calendar month and delivers to Converse at the time of such payment an itemized statement in the form required by Paragraph 17 hereof for each such calendar month.

Licensee agrees that the Licensed Articles shall be sold during the ninety (90) day period shall be sold in accordance with the provisions of Paragraph 8 Distribution herein.

Notwithstanding anything to the contrary contained herein, Licensee shall not manufacture, distribute, sell or dispose of any Licensed Articles hereunder after the expiration or earlier termination of this Agreement. Licensee shall, upon termination of this Agreement, promptly assign and transfer to Converse any property rights which Licensee may have acquired in the Converse Marks and shall, within thirty (30) days, destroy or return all drawings, molds, dies and similar equipment or materials in its control or possession used for the production or reproduction or imprinting of the Converse Marks on the Licensed Articles and furnish to Converse satisfactory evidence of such return or destruction. Licensee agrees, subsequent to the expiration of this Agreement, not to register, attempt to register or use, except as provided herein, any Converse Marks and trademarks that are confusingly similar to the Converse Marks.

(c)      In the event Converse terminates this Agreement for breach by Licensee, Licensee will still be liable to Converse for its Minimums for the remainder of the Contract Period.

26. Final Statement Upon Termination or Expiration.

(a) Licensee shall deliver, as soon as practicable but in any event no later than thirty (30) days after expiration or termination of this Agreement, to Converse a statement indicating the number and description of Licensed Articles bearing any of the Converse Marks under this Agreement on hand or in process of manufacture as of (i) sixty (60) days prior to the expiration of the Contract Period; and (ii) thirty (30) days after receipt from Converse of any notice terminating the license granted hereunder or, in the event no such notice is required, thirty (30) days after the occurrence of any event which terminated such license.

(b) Converse shall have the option, at its expense, to have an independent certified public accountant conduct a physical inventory during reasonable business hours of Licensee's manufacturing and distribution facilities in order to ascertain or verify such inventory or statement. In the event Licensee refuses to permit Converse to conduct such physical inventory, Licensee shall forfeit its right hereunder to dispose of such inventory. In addition to such forfeiture, Converse shall have recourse to all other legal remedies available to it.

(c)     Licensee shall have ninety (90) days to dispose of Converse inventory, which disposal shall be consistent with its distribution channels set forth in Paragraph 8 of this Agreement.

## VIII.   MISCELLANEOUS

27.     Devaluation.   In the event devaluation in any of the countries in the Territory increases by more than fifteen percent (15%) in a given year, Licensee may, at Converse's option, have the right to renegotiate its Guaranteed Annual Minimum Royalty and Guaranteed Minimum Sales Volume set forth above for the Contract Period.

28.  Force Majeure.   If either party to this Agreement is temporarily unable to perform its obligations hereunder because of fire, strike, freight embargoes, government restrictions or regulations, war, emergency or any other Act of God, then no liability to the other party or right to terminate shall exist for failure of the one party to perform during such period.

29.  Assignment or Sublicense by Licensee.   None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other

Page 36

Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee without the prior written consent of Converse in each instance.

30.   Notices.   Any written notice authorized or required by this Agreement shall be deemed to be duly given when sent by facsimile, registered mail, postage prepaid, or by express mail or international courier service, addressed to one party or the other, as the case may be, as stated in this Article unless either party shall previously have given to the other party written notice of a change of such address.

CONVERSE INC.

Converse Inc.
One High Street
North Andover, Massachusetts 01845
Fax:  978-983-3547

ATTENTION:      Laura W. Kelley
Vice President, Legal

c.c.:   Tim Ouellette
Vice President, Licensing

ALON INTERNATIONAL S.A.

Mr. Roberto Szerer
Mr. Ronald Durchfort
ALON International
1160 E. Hallandale Beach Boulevard, Suite A
Hallandale, Florida 33009

31.   No Joint Venture.   Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers and neither party shall have the power to obligate or bind the other in any manner whatsoever.

32.  <u>Applicable Law</u>.  The parties agree that the Commonwealth of Massachusetts, U.S.A. law governs the provisions and interpretation of this Agreement and that the English language version thereof shall be the controlling document.

33.  <u>Arbitration</u>.  The parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly.  Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligations of the parties thereunder, the capacity or authority of the parties thereto, the performance or breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one party to the other setting forth with specificity any such controversy or claim, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association.  The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association.  The parties expressly agree that arbitration shall be held in the offices of the American Arbitration Association, in Boston, Massachusetts, U.S.A., or such other locations within the Commonwealth of Massachusetts as the American Arbitration Association may direct.  Such arbitration shall be conducted in the English language and the arbitrators shall apply the laws of the Commonwealth of Massachusetts.  The institution of any arbitration proceeding hereunder shall not relieve the Licensee of its obligation to make payments accrued hereunder to Converse during the continuance of such proceeding.  The decision by the arbitrators shall be binding and conclusive upon the parties, their successors and assigns and the parties shall comply with such decision in good faith, and each party hereby submits itself to the jurisdiction of the courts of the place where the arbitration is held, but only for the entry of judgment with respect

★converse

VIA U.P.S.

March 12, 2002

Mr. Roberto Szerer
Mr. Ronald Durchfort
ALON International
1160 E. Hallandale Beach Boulevard
Suite A
Hallandale, Florida 33009

> **RE:**   *revised Manufacturing, Distribution and License Agreement between Converse Inc. and Alon International S.A.*

Gentlemen:

As you know, the date of the Agreement was previously changed from July 1, 2001 to September 1, 2001. For consistency, this date change has now been made in other paragraphs: 1(a) and (b), and the charts in 15(a) and (b) and 16. Therefore, enclosed are two originals of the revised above-referenced agreement for your execution. Kindly sign both and return to Laura Kelley for countersignature. A fully executed original will be returned to you.

If you have questions, please contact Tim directly. Thank you.

Very truly yours,

Helene Needham
Contract Attorney

Enclosures.

## SECOND AMENDMENT TO THE
## MANUFACTURING, DISTRIBUTION AND
## LICENSE AGREEMENT
## BY AND BETWEEN

## CONVERSE INC.

### and

## ALON INTERNATIONAL, S.A.

**SECOND AMENDMENT**, made effective as of the 1st day of January, 2004 by and between **CONVERSE INC.**, a Delaware corporation, having its principal place of business at One High Street, North Andover, Massachusetts, 01845 ("Converse") and **ALON INTERNATIONAL S.A.**, a corporation duly registered and existing under the laws of the Republic of Panama and having its principal office and business at Calle 53 Urbanizacion Obarrio, Torre Swiss Bank, Piso 16, Panama, Republica de Panama ("Licensee").

**WHEREAS**, Converse and Licensee entered into a Manufacturing, Distribution and License Agreement dated September 1, 2001 and amended on May 8, 2002 (the "Agreement") with respect to the manufacture and sale of Licensed Articles on an exclusive basis; and

**WHEREAS**, the parties desire to further amend the Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants, representations and promises herein contained, Converse and Licensee agree as follows:

1.    Licensee shall also include its subsidiaries and affiliates, including Camar

Distribution LLC; Carval LLC, AIB Servicos E Comercio Ltd; Alon Brasil Comercio e

Distribuicao Ltd. and Alon Argentina SRL.

2.    As amended hereby, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, each of the parties hereto have executed this Second

Amendment as of the date and year first above written in duplicate originals by its duly

authorized representatives.

ALON INTERNATIONAL S.A.              CONVERSE INC.


By:  _____          By: _____
Title:  _co - president._              Title:  _CEO_____

# EXHIBIT "2"

**AMERICAN ARBITRATION ASSOCIATION**
**INTERNATIONAL DIVISION**
**Case No.:**

In Re:

Alon International, S.A.

      Claimant,

vs.

Converse, Inc.

      Respondent.

_____/

## NOTICE OF ARBITRATION AND STATEMENT OF CLAIM

Claimant, Alon International, S.A. ("Alon"), files this Notice of Arbitration and Statement of Claim against Respondent, Converse, Inc. ("Converse"), and states as follows:

### PARTIES TO THE ARBITRATION

1.      Converse is a Delaware Corporation, having its principal place of business at One High Street, North Andover, Massachusetts 01845. Converse is in the business of manufacturing, advertising, distributing and selling athletic and leisure footwear, activewear and related accessories.

2.      Alon is a corporation duly registered an organized under the laws of the Republic of Panama, and has its principal office and business at Calle 53 Urbanizacion Obarrio, Torre Swiss Bank, Piso 16, Panama, Republica de Panama. Alon develops, sources, and markets footwear throughout Europe and Latin America.

3.      As more fully set forth below, the Parties consented to the jurisdiction of an arbitrator in Boston, Massachusetts, in the Agreement at issue.

## THE MANUFACTURING, DISTRIBUTION AND LICENSING AGREEMENT

4.    On or about July 1, 2001, Alon entered into a Manufacturing, Distribution and Licensing Agreement with Converse.

5.    On or about May 8, 2002, the Parties amended the date of the Manufacturing, Distribution and Licensing Agreement from July 1, 2001 to September 1, 2001.

6.    On or about January 1, 2004, the Parties entered into a Second Amendment to the Manufacturing, Distribution and Licensing Agreement (as amended, hereinafter, collectively, "the Licensing Agreement" or "Agreement"). A copy of the Licensing Agreement as amended is attached hereto and incorporated herein as composite **Exhibit "A."**

7.    This claim arises out of Converse's breach of the Licensing Agreement.

## THE ARBITRAL PROVISION

8.    Section 33 of the Licensing Agreement provides in pertinent part as follows:

> ***The parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly.***  Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligation of the parties thereunder, the capacity or authority of the parties thereto, the performance of breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one party to the other setting forth with specificity any such controversy or claim, ***shall be settled by arbitration in accordance with the rules of the American Arbitration Association.***  The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association.  The parties expressly agree that arbitration shall be held in the offices of the American Arbitration Association, in Boston, Massachusetts, U.S.A., or such other locations within the Commonwealth of Massachusetts as the American Arbitration Association may direct.   Such arbitration shall be conducted in the English language and the arbitrators shall apply the laws of the Commonwealth of Massachusetts.   The institution of any arbitration proceeding hereunder does not relieve the Licensee of its obligation, to make payments accrued hereunder to Converse during the continuance of such proceeding.  The decision by the arbitrators shall be binding and conclusive upon the parties, their successors, and assigns and the parties shall comply with such decision in good faith....
>
> (emphasis added).

9.    Accordingly, the parties to this proceeding have agreed that all controversies with regard to the Licensing Agreement shall be resolved by binding arbitration before the American Arbitration Association ("AAA").

10.    All conditions precedent to the filing of this arbitral proceeding have been met, excused, and/or waived.  Among other things, Alon has endeavored to negotiate a mutually satisfactory solution to this dispute in accordance with Section 33 of the Licensing Agreement. However, Converse has not reciprocated.

## ARBITRAL PROCEDURES

11.    The arbitral proceedings shall take place in Boston, Massachusetts, at the offices of the AAA, or such other locations within the Commonwealth of Massachusetts as the AAA may direct in according with Section 33 of the Licensing Agreement.

12.    Although the Arbitral Provision found in Section 33 of the Licensing Agreement does not specify the AAA Rules applicable to this dispute, Alon requests that the arbitral proceedings proceed under the AAA International Arbitration Rules.

13.    The arbitral proceedings shall proceed in the English language in accordance with Section 33 of the Licensing Agreement.

14.    Alon requests that the arbitral panel consist of a single arbitrator and that this arbitrator be selected in accordance with Rule 6 of the AAA International Arbitration Rules and pursuant to Section 33 of the Licensing Agreement.

15.    Pursuant to section 33 of the Licensing Agreement, the parties have agreed that the "arbitrators shall apply the laws of the Commonwealth of Massachusetts."

16.    The Licensing Agreement contains a specific notice provision.  Section 30 of the Licensing Agreement states that "any written notice authorized or required by this Agreement

3

shall be deemed to be duly given when sent by facsimile, registered mail, postage prepaid, or by express mail or international courier service...." The address listed for Converse is One High Street, North Andover, Massachusetts 01845; Fax: 978-983-3547. The address listed for ALON is 1160 E. Hallandale Beach, Blvd., Suite A, Hallandale, FL 33009.

## DESCRIPTION OF CLAIMS AND RELEVANT FACTS

### Overview

17.     Alon is a company engaged in the business of developing, sourcing, and marketing footwear throughout Europe and Latin America. Alon has extensive experience in this field, and particular expertise in marketing and developing shoe products in Latin America.

18.     On or about September 1, 2001, Alon entered into the Licensing Agreement with Converse, by which Alon gained the exclusive rights and license to manufacture, distribute, and utilize Converse marks and related products throughout Argentina, Brazil, Paraguay and Uruguay.

19.     During the ensuing years, Alon successfully developed the Converse mark and related products, and continues to invest heavily in developing the market for these products. Alon has, among other things:

      a)     Rescued the Converse trademarks, including its ALLSTAR mark, from a "brand pirate" in the Brazilian market;

      b)     Created the market for the Converse marks and related products into previously non-existent markets;

      c)     Developed a successful business model for the sale of the Converse marks and products;

4

d)      Developed and maintained business contacts and business relationships in the region that facilitate the sale of the Converse marks and products;

e)      Significantly increased the sales for Converse products by over five times higher than the agreed upon minimum guarantees;

f)      Successfully marketed and created distribution channels for Converse's marks and related products;

g)      Successfully created the sourcing structure for the Converse products; and

h)      Successfully positioned the Converse marks for strong growth in future sales.

20.      Converse viewed the region covered by the Licensing Agreement as one of the largest market opportunities worldwide for Converse, and one in which Converse had a tremendous untapped opportunity to expand. As explained in further detail below, the timing by which Converse notified Alon of its opposition to the automatic renewal of the Licensing Agreement leaves an undeniable impression that Converse intended to squeeze Alon out of the Mercosur market that Alon developed of its own accord so that Converse could derive even greater profits through the use of Alon's trade secrets and business model in the targeted territory.

21.      This case is about Converse's efforts to push Alon out of out of its lucrative Licensing Agreement in order to take over Alon's share of the Mercosur market, which Alon had developed for Converse's products, as well as about Converse's own breaches of that very same Licensing Agreement.

22.      In their efforts to push Alon out of the Mercosur market, Converse has used pretextual excuses to oppose in bad faith Alon's right to automatically renew of the Licensing

5

Agreement. Each of the excuses alleged by Converse to this effect are explained in further detail below.

23.     Alon's investments in the development of the market were always predicated on a belief that the Licensing Agreement would be in existence for six years.    The affirmative attempts to oppose Alon's automatic renewal of its contractual rights under the Licensing Agreement described below will result in a significant loss to Alon and a significant windfall to Converse if the Licensing Agreement is not deemed renewed.

**Converse Attempts to Take Over Alon's Market and Business Contacts by Using Pretextual Grounds to Usurp Alon's Automatic Right to Renew the Licensing Agreement**

**A.     The Alleged Expiration of the Contract**

24.     The original term of the Licensing Agreement was from September 1, 2001 to December 31, 2004.    However, the Agreement provided that Alon had the option of automatically renewing the Licensing Agreement for a period of three years upon the satisfaction of certain conditions.  Specifically, the Agreement states that Alon could renew the Agreement "for an additional term of three (3) years provided [Alon] exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that [Alon] has not breached any of the terms and conditions of this Agreement."    Licensing Agreement, § 2.

25.     Alon has satisfied the requirements for exercising their automatic right of renewal pursuant to Section 2 of the Licensing Agreement.  Specifically,

   a) Alon has greatly exceeded the minimum royalty and sales requirement for the third contract year.  Under the original terms of the Licensing Agreement, Alon guaranteed Converse minimum sales of $7,017,000 during the first term of the Agreement, and the actual sales through December 31, 2004 were

6

approximately $40 million – more than *five times* the guaranteed minimum. Similarly, Alon guaranteed Converse a minimum royalty payment over the first term of the Agreement of $490,000 and will actually pay royalties to Converse for sales through December 31, 2004 totaling just over $3 million – more than *six times* the guaranteed minimum.

b)  Alon has not materially breached any provision of the Licensing Agreement. At no time during the course of their three year-relationship has Converse ever put Alon on notice of a breach pursuant to <u>any</u> provision under the Agreement. Significantly, the first time Alon was put on notice of alleged "breaches" by Converse was on November 30, 2004, one month before the first term of the Licensing Agreement was set to expire.

26.    Throughout the first term of the Licensing Agreement, Alon has clearly and unequivocally notified Converse of their intent to exercise their right of renewal pursuant to the terms of the Licensing Agreement. The parties have been engaged in extended and significant negotiations regarding the renewal of the Agreement, involving both oral and written communications. For example:

a)    On or about May 4, 2004, Tim Ouellette, ("Ouellette"), Vice-President of Licensing of Marketing at Converse, sent Roberto Szerer ("Szerer"), Co-President of Alon, an e-mail indicating that the parties were involved in negotiations regarding the re-negotiation of the Licensing Agreement:

*Attached please find an analysis of what is on the table. I would like to reach an agreement on how we plan to move forward as soon as possible.*
*Thanks*

b)    On or about May 19, 2004, Szerer sent to Ouellette an e-mail stating:

7

*Dear Tim,*
*Based on our telecom and continuing the process for establishing the rationale for the new contract, attached you will find a proposal where we have segmented growth, guarantee and royalty rates per the following periods:*

- *Aggressive 2004/05/06*
- *Medium 2007/08/09/10*
- *Moderate 2011/12/13*

*As agreed, we will start from our 2003 actual sales as our base.*

*I believe this will help us reach a fair and equitable renewal with a minimum of tension.]*

*Regards,*
*Roberto Szerer*

(emphasis added)


c)    On or about May 31, 2004, Szerer wrote to Ouellette indicating the

renegotiation of the Licensing Agreement.   Attached to the e-mail was a

spreadsheet with proposed numbers throughout 2013.

*Dear Tim,*
*As per our telecom, enclosed you will find a spreadsheet with the numbers we agreed. As you can see I modified the royalty rate of Originals to bring it gradually to 10% over the term of the contract.*
*We understand that based on our initial "Big Aggressive Hairy Goal" you would like a growth for this year of 50%. We believe it is to high specially after the growth we had in the last year but anyhow we are evaluating the projections for 2004 taking in to consideration all the variables involved (New company in Argentina, new company in Brazil, new apparel line, etc.) and also including the recent change in the Real which by itself brings the sales numbers in Dollars down by 9.68% (Current exchange rate per dollar of R$ 3.10 vs. initial calculation at R$2.80). I will be traveling all week in Argentina and Brazil but will try to talk to you by Friday.*

*I wish you a good week.*

*Best regards,*
*Roberto Szerer*

8

c)    On or about June 10, 2004, Szerer sent an e-mail to Ouellette, stating

among other things, their intent to seek renewal of the Licensing

Agreement:

*Dear Tim,*
*As per our telecom, enclosed you will find our revised forecast for*
*2004.*

*The main factors that affected the forecast for the year are:*

- *Devaluation in the region from our forecast of 2.8 Reais to the*
  *Dollar in Brazil to a new reality at 3.10*
- *In Argentina from 2.85 Pesos to the Dollar to 3.00. We don't*
  *expect a higher devaluation, but as you know the economy in*
  *this part of the world is extremely volatile so we must be*
  *attentive to any future changes.*
- *Despite the important legal battles that we have won against*
  *the Pirates, we continue having constant problems in the*
  *market which show that the growth in the vulcanized product*
  *will be 5% instead of our initial projection of 6.59%.*
- *We have revised our sales forecast for the cemented line in*
  *Brazil due to a low acceptance of the line in the market plus a*
  *higher than expected delay in getting the tech packs.*
- *Introduction of the apparel line increases our forecast.*
- *Argentina has begun well and sales for the year look promising*
  *but it took us longer to begin with the new structure and*
  *additionally we had delays due to a major strike by Brazilian*
  *customs. Instead of our initial projection of sales over 11*
  *months, we expect to have only 7 real months of sales.*
- *Uruguay is affected in the same way as Brazil and Argentina*
  *by the devaluation.*

*The projection of total sales for 2004 shows a growth of 16.22 % from*
*US$ 12,649,921 to US$ 14,701,254.*

*I have enclosed the breakdown of the numbers plus our updated*
*proposal for the 5+5 year renewal.*

*I will give you a call to follow up and answer any questions you might*
*have.*

*Best regards,*
*Roberto Szerer*            (emphasis added).

9

27.    As demonstrated by the above quoted communications, the parties were involved in extensive negotiations regarding the renewal of the Licensing Agreement, and throughout these communications Alon made clear, in writing, its intent of renewing the Agreement. Therefore, Alon has exercised their absolute right of renewal prior to September 30, 2004, and as such, the Licensing Agreement is not set to expire on December 31, 2004.

28.    Any prerequisite to renewing the Licensing Agreement for an additional term that has not been pursued by Alon is a direct result of Converse lulling Alon into believing that Alon had already successfully exercised their rights of automatic renewal pursuant to Section 2 of the Licensing Agreement. Converse's course of conduct and written communications to Alon on the subject of renewal of the Agreement demonstrates that Converse in fact lulled Alon into a false sense of comfort regarding the renegotiation of the Agreement while Converse made arrangements to wrongfully appropriate markets which had been developed by Alon and had previously been unavailable to Converse. In this respect, it was only after Converse made efforts to expropriate the market, that Converse notified Alon on or about November 30, 2004 of their alleged "breaches" – a mere month before the automatic renewal date of the Licensing Agreement.

29.    Significantly, in September of 2004, Converse verbally communicated to Alon their intent to renew the Licensing Agreement for a period of five years. Converse is now reneging on this verbal communication, further proof of their bad faith efforts to lull Alon into a false sense of comfort regarding the extension of the Licensing Agreement.

**B.    *The Arrangement With Coopershoes***

30.    Section 29 of the Licensing Agreement states that "[n]one of the Licensee's

10

rights granted by this Agreement for the use of any Converse marks, Licensed Articles, Trade Secrets, or other Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee without the prior written consent of Converse in each instance." Similarly, Section 35 of the Licensing Agreement also states "[t]his Agreement and any rights herein granted shall inure to the benefit to an be binding upon the parties hereto and their respective successors or assigns, provided, however, that this Agreement shall be freely assignable by Converse but shall not be assigned, sublicensed or encumbered by Licensee without the prior written consent of Converse."

31.    Alon has always fully complied with the requirements of Sections 29 and 35 of the Licensing Agreement.

32.    Cooperativa De Calcados E Componentes Joanetense LTDA ("Coopershoes") is a Brazilian company in the business of manufacturing shoes and shoe products.

33.    On or about July 24, 2002, Alon entered into three different contracts with Coopershoes (hereinafter, collectively, "Coopershoes Arrangement"). Pursuant to the Coopershoes Arrangement, Coopershoes would provide Alon with input on research, consulting services and advice on the marketing and advertising strategies to be used by Alon in the targeted territories. In addition, Coopershoes would provide manufacturing and distributing logistics to Alon for the Converse mark and related products in the targeted territories.

34.    The purpose for the structure of the Coopershoes Arrangement was to allow the introduction the Converse products to the market as quickly as possible, to prevent Coopershoes from continuing its relationship with the "brand pirate," and to comply with Brazilian regulatory requirements.

11

35.   Converse has always been fully aware of Alon's relationship with Coopershoes, and has in fact encouraged and helped to develop the business structure with Coopershoes. Among other things:

a)   Converse devised, drafted and approved the contracts to be executed between Alon and Coopershoes through their Brazilian legal counsel;

b)   Converse visited the Coopershoes factory in Brazil on several occasions;

c)   Converse approved the sale of goods, which clearly indicated on the tags that Coopershoes involvement with the production of the products. Specifically, a Converse hangtag explicitly lists both Alon's name as well as Coopershoes';

d)   Converse received wire transfers directly from Coopershoes from October of 2002 to January of 2004;

e)   Converse participated and cooperated in legal actions undertaken by Coopershoes in Brazil in order to defend the Converse mark from a "brand pirate";

f)   Converse audited the Coopershoes factory, with a copy of the audit report sent directly to Converse; and

g)   Coopershoes paid a bond the equivalent of about $70,000.00 to be paid on behalf of Coopershoes for the protection of the Converse ALL STAR Mark in Brazil.

36.   More importantly, as demonstrated by the ensuing written communications between the parties, i) Converse was aware of and participated in the organization of the business structure between Coopershoes and Alon; ii) Converse had full knowledge of the Coopershoes

12

Arrangement; iii) Converse fully approved of the Coopershoes Arrangement; and iv) Converse consented to the Coopershoes Arrangement.

37.    The contractual and payment structure of the Coopershoes Arrangement was designed and effectuated by Converse's Brazilian legal counsel. To this effect, on or about July 12, 2002, Luiz Henrique O. do Amaral ("Amaral"), legal counsel to Converse in Brazil, directly forwarded Alon the contracts he had drafted for Alon and Coopershoes to execute.

38.    Converse also participated in and had input in the negotiations between Alon and Coopershoes. For example, on or about June 7, 2002, Ronald Durchfort ("Durchfort"), Co-President of Alon, sent an e-mail regarding negotiations with Coopershoes to Ouellette at Converse, stating:

> Tim,
> .....
> Coopershoes does not want to lose the business. They have been producing since October and based on what I saw they are not producing any other brands. On the other hand they have a signed contract with Artigos. My job will be to show them that it is in their best interest to jump ship to the good force and abandon the dark side forever. The key is to get this done sooner rather than later.  My leverage will be the threat of:
>
> - Banning them from the empire forever.
> - Making a deal with another factory NOW to begin production.
>
> I would appreciate any tips you might have.
>
> Rgds,
> Ronald

39.    To this e-mail, Ouellette responds that same day:

> Ronald,
> It's clear we are going to winning this outright. This is the only leverage you have and I think you are approaching it the right way. If there is anything that we can do, let us know
> Thanks
> Tim

13

40.    Moreover, Converse had full knowledge of the existence of the Coopershoes Arrangement because Alon informed Converse explicitly and directly of the Agreements with Coopershoes. In his July 29, 2002 e-mail to Amaral, Converse's Attorney in Brazil, on which Ouellette was copied, Durchfort wrote:

> *Dear Luiz,*
> *I want to inform you that we have signed a contract with Coopershoes. With this contract we are achieving:*
> - *Elimination of production support to Artigos.*
> - *Ready to immediately introduce Converse All-Star.*
> - *Elimination of Artigos argument that Converse production/distribution will cause loss of jobs.*
> - *Non-traumatic entry of Converse All-Star into the Brazilian market.*

41.    However, Alon did not stop at informing Converse of their relationship with Coopershoes - Alon went on to explain and further inform Converse on several occasions the full details of the relationship with Coopershoes. On October 10, 2002, Ouellette wrote in an e-mail to Durchfort:

> *Ronald,*
>
> Thanks that sounds great. Of course you will also bring the Cooper Shoe Agreement. Let me know when you will be arriving and I will provide transportation.

42.    In response, Durchfort and Szerer flew to Boston with the Coopershoes Arrangement in hand to meet with Ouellette and Laura Kelley ("Kelley"), Vice-President of the Legal Department at Converse. Kelley did not attend the majority of the meeting. During that meeting Ouellette aggressively questioned Durchfort about the nature of the arrangements between Coopershoes and Alon. At that time, Durchfort completely explained the Coopershoes Arrangement, including all of the functions that Coopershoes were to assist with in addition to the manufacturing of the Converse product. Among other things, Durchfort explained to Ouellette that the Coopershoes Arrangement had to be structured as they was in order to, among

other things, allow the royalties to be taken out of Brazil and paid in dollars to Converse.

Ouellette understood and agreed with Alon's approach.

43.   As a follow up to the meeting, Durchfort wrote in an e-mail to Ouellette on or

about October 24, 2002:

> Dear Tim,
> Thanks for the productive meeting with you and your team.
> The Mercosur project is up and running. October shipments in
> Brazil are on target and November order placement (Nov.
> delivery) is running above forecast. So that we are all on the same
> page I have included in this e-mail the results of our conversations
> which we are now implementing. We understand the line being
> sold is approved with the above corrections. We intend to present
> 03-1 season product for approval within 60 days.

44.   Most illuminating is Ouellette's responsive e-mail that same day:

> Ronald,
> I'm real glad that we were able to this week to both clear the air,
> as well as reviewing your strategy for moving forward. The
> presentation was great, and the strategy absolutely on the mark for
> the market in it's current situation. For the time being, I would like
> you to run all Approvals through me with a copy to Ava Lawrence,
> I frankly do not want to get Marketing/Product Development
> involved. They do not always look at projects like this as business,
> and tend to get anal. When all product is up to speed and you are
> on the same page as our company I will turn this over. I am now
> tremendously excited and looking forward to what we can do.
> Please let me know the dates that you want me in Brazil, so I can
> plan that trip. Again, Great job!
>
> Thanks
> Tim

45.   In late 2003, Szerer again flew to Boston to discuss ongoing operations in the

Mercosur market with Converse.    During this meeting, Szerer met with Converse

representatives, including Kelley.    The parties once again discussed the Coopershoes

arrangement, and fully explained the reason for its structure as a means of complying with

Brazilian regulations while allowing royalties to be paid to Converse.   Otherwise, Converse

would have had to take its royalties in Brazilian currency in Brazil – which it did not want to do. It was also explained to Converse that the Coopershoes arrangement was necessary to prevent Coopershoes from producing for the "brand pirate" while allowing the Converse products to enter the market as quickly and efficiently as possible. At no time did Kelley or anyone else notify Alon that it had any problems with the arrangement with Coopershoes.

46.     A few days later, on or about January 1, 2004, Converse drafted an amendment to the Licensing Agreement and did not address the Coopershoes arrangement in the Amendment.

47.     Also, Converse participated in and helped Coopershoes defend the Converse mark from the "brand pirate" in the Brazil, with the full knowledge of the relationship between Coopershoes and Alon. Among other things:

a)     On or about November 5, 2002, Amaral sent an e-mail to Kelley, in which both Ouellette and Durchfort were copied:

> *Laura,*
> *Further to prior email and phone discussions, we managed to withdraw the case from the judgment session of today. After our interviews with the Justices, we noticed that they considered very important to have more information on the commercial impact of the decision.*
>
> *Based on that, the case will be heard only Thursday and we will have to submit by tomorrow another motion attaching a letter from Coopershoes informing on the total of sales of licensed products, the number of employees as well as other information concerning the size of the operation. Also, a letter from Alon concerning export plans is key. We already requested from Ron such documents.*
>
> *Furthermore, it seems that Artigos is threatening your local distributors with actions and we asked Ron to supply us with documents attesting such threats.*
>
> *Also, since the first decision indicates that Artigos's licensees will suffer irreparable harm, we intend to attach a copy of the executed license agreement between Alon and Coopershoes. Ron, please send us a copy immediately by fax to attach to such motions.*

16

*Our intention is to visit with all Justices again tomorrow with such elements. It is crucial to receive everything they requested by tomorrow.*

b)     On or about December 4, 2002, in an e-mail to Kelley by Amaral in which

Szerer was copied:

*Laura,*

*Further to our prior emails, we would like to report that, despite our efforts and meetings in Brasília to have the Hon. Padua Ribeiro to submit the case for judgment by the panel, the Justice has not presented his opinion.*

*In the meantime, we just learned that Artigos has filed a search and seizure action to prevent manufacture and commercialization of "ALL STAR" by Coopershoes, Alon's licensee. The attorney for Coopershoes has called us and requested our help in defending his client. No injunction has yet been granted, but there is a risk of a decision any time now.*

*In view of the risk, we will assist Coopershoes in their defense and will also go tomorrow to Brasília to tentatively force the case to be submitted to the panel of the Superior Court of Justice.*

*We will keep you informed.*

*Regards,*

*Luiz Henrique O. do Amaral*

c)     On or about December 18, 2002, Kelley e-mailed Amaral and copied both

Ouellette and Durchfort:

*Luiz, thank you for the update. Is there any time frame in which the court is required to decide by? Please continue to keep us informed. We appreciate all your efforts and as always if there is anything additional that the company can do to push this along we will be more than happy. If this matter is pushed over to February, would it be helpful for a company representative to attend the session? Thanks much. Lwk*

17

d)    On or about January 16, 2003, in an e-mail to Kelley from Amaral in

which both Ouellette and Durchfort were copied:

*Dear Laura,*

*Thanks. We will review and come back to this matter.*

*In the meantime, we would confirm a meeting today with Ron and Tim.*

*I explained generally the status of the case and the need to await the courts which are in recess, to open again in February.*

.....

*In relation to the civil court of Poa, which issued the injunction to Artigos determining Coopershoes to deposit the royalties due under the license with Artigos, Coopershoes has filed the response under our revision. Our intention is to go to Poa once the court resumes to vacate the preliminary decision.*

....

*We have been instructed to send cease and desist letters to those known suppliers reporting that Coopershoes is the exclusive licensee of the mark and any production of ALL STAR will be considered infringement and illegal. We will coordinate the strategy with Coopershoes' attorneys.*

*We will keep you posted.*

*Sincerely,*
*Luiz Henrique O. do Amaral*

48.    The above quoted language is just a brief sample of the communications that have

taken place between the parties, and which indicate Converse's full knowledge and approval of

the Coopershoes Arrangement throughout the first term of the Licensing Agreement. To declare

Alon in default of the Licensing Agreement, one month before its first term is set to expire, for

the use of a structure designed, encouraged and approved by Converse, serves as a further

18

example of Converse's bad faith attempt to usurp Alon of their right to automatically renew the Agreement.

### C.    The Payment of Royalties Under the Licensing Agreement

49.    Section 15(a) of the Licensing Agreement requires that Alon pay Converse a royalty equal to a specified percentage of the "Net Sales" made by Alon of Converse Licensed Articles. A "Net Sale" is defined in Section 1(h) of the Agreement as "the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, trade discounts, volume rebates and any freight charges *and VAT taxes* included in the invoice." (emphasis added).

50.    Alon has always fully complied with this requirement. Although there is no VAT tax in Brazil there is an equivalent tax called an ICMS tax. The ICMS tax was included on the invoices to Converse, but it has not been deducted twice from the sales reported to Converse. In this respect the total royalties earned by Converse for sales through December 31, 2004 will be $3,059,000, which is actually just over 7% of the total net sales of $40,663,000 under the Agreement through its first term.

51.    The use of the term VAT Tax in the Licensing Agreement is nothing more than that of a scrivner's error. Converse is now attempting to use this simple drafting mistake as an excuse to block Alon's right of automatic renewal. Again, Converse is attempting to find any pretext to block Alon's automatic right of renewal in a bad faith attempt of usurping Alon's market and business contacts in the targeted region.

### D.    The Alleged Incorrect Use of Exchange Rates to Calculate Royalties Due Under the Licensing Agreement

52.    Section 19(a) of the Licensing Agreement states that "[u]nless specifically set forth to the contrary herein, all payments to Converse (except Converse Factories) required to by

19

made by [Alon] pursuant to this Agreement shall be made in the currency of the United States of America.....Converse will review the exchange rate received by Licensee in the conversion from [Alon's] local currency to U.S. funds by comparison with the exchange rate published by the Wall Street Journal ("WSJ") two (2) business days prior to the payment due date schedules in paragraph 18 of this Agreement."

53.     As a means of blocking Alon's automatic right of renewal, Converse alleges that ALON has underpaid the amount of royalties due under the Licensing Agreement due to the incorrect use of exchange rates.

54.     Alon has always used exchange rates identified in good faith from the Wall Street Journal as required by the Licensing Agreement. To the extent that any error has been made, it was made in good faith.

55.     In a good faith attempt to remedy any inconsistency that may have resulted in the payment of the royalties due to Converse as a result of an incorrect exchange rate, Alon has sent Converse a wire transfer in the amount of $3,780.75 for the amount still owed to Converse.

56.     The amount sent to Converse was calculated by deducting from the $16,291.00 alleged as owed by Converse, an amount of $12,510.25, which Alon had previously overpaid to Converse. Converse acknowledged the overpayment of $12,510.25 in a recent audit. There has bee no intent of any kind to short change Converse, and Converse is arguing about a $12,000 differential on total royalty payments that by December 31, 2004, will total $3,059,000. That is less than a 0.4% error.

57.     To the extent that there are any remaining discrepancies, Alon has paid Converse the amount it is alleging is still outstanding. Alon has done this in a good faith effort to resolve

20

this dispute between the parties, and without any admission or consent as to any wrongdoing on Alon's part.

**E.    The Minimum Advertising Requirements**

58.    Section 7(d) of the Licensing Agreement provides that Alon shall "expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for the Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure")."

59.    Alon    has    met    this    requirement.    Alon's    annual    expenditure    on advertising/marketing during the initial three-year term of the Licensing Agreement has been 5.2%, which is clearly in excess of the 5% requirement set forth in the Licensing Agreement.

60.    Moreover, Converse alleges as further grounds to block Alon's automatic right of renewal, that Alon was required to expend 5% of Net Sales on *direct advertising*.    The direct advertising requirement is completely without basis in the Agreement between the parties. Advertising Expenditure is nowhere specifically defined in the Licensing Agreement, nor is it limited to direct advertising in the Licensing Agreement.

61.    It is important to re-emphasize that Alon has exceeded their sales requirements under the first term of the Licensing Agreement by more than five times the guaranteed minimum and any attempt by Converse to allege that Alon has not met their advertising requirements under the Licensing Agreement is, yet again, a bad faith attempt to strip Alon of their automatic right of renewal in an effort to usurp the lucrative market Alon has developed as well as the business contacts they have built in the Mercosur region.

62.    Based upon the ongoing good faith negotiations between the Parties and the automatic renewal provisions of the Licensing Agreement, Alon invested heavily in advertising,

trade shows, outsole models, outsole lasts, infrastructure, personnel, and other raw materials for the continued development of the Converse brand in the Mercosur market for 2005 and beyond. It is important to emphasize that Alon's investments in the development of the market were always predicated on a belief that the Licensing Agreement would be in existence for six years. The foregoing affirmative attempts to oppose Alon's automatic renewal of its contractual rights under the Licensing Agreement will result in a significant loss to Alon and a significant windfall to Converse if the Licensing Agreement is not deemed renewed.

### Alon Attempts to Negotiate Resolution of This Dispute

63.    On or about December 7, 2004, pursuant to Section 33 of the Agreement, Alon attempted to "amicably, promptly and fairly" settle their controversies and disputes with Converse. Alon sent a letter to Converse outlining their position and requesting a meeting with Converse in order to attempt to resolve this dispute.   Converse rejected Alon's attempt to amicably resolve this dispute in its later dated December 10, 2004.

64.    Alon hereby reserves the right to amend this Notice of Arbitration and Statement of Claim as more facts become available.

### A STATEMENT OF THE RELIEF SOUGHT

### First Claim
### Breach of Contract

65.    The allegations in paragraphs 1 through 64 are re-alleged and incorporated herein by reference.

66.    The Licensing Agreement is a valid and binding contract between the Parties throughout December 31, 2007.

67.    Alon has at all times satisfactorily performed, or stood ready, willing and able to perform under the terms of the Licensing Agreement.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

68. Converse breached its obligations under the Licensing Agreement directly and anticipatorily by, among other things, attempting to oppose Alon's right to renew the terms of the Licensing Agreement.

69. Converse's breaches were material.

70. If Converse continues to oppose Alon's right to renew the Licensing Agreement, Alon will suffer substantial harm and Converse will obtain an improper windfall as a direct and proximate result.

### Second Claim
### Breach of Covenant of Good Faith and Fair Dealing

71. The allegations contained in paragraphs 1 through 64 are re-alleged and incorporated herein by reference.

72. Alon has at all times satisfactorily performed, or stood ready, willing and able to perform, under the terms of the Licensing Agreement.

73. Converse materially breached the Licensing Agreement by failing to perform its express and implied duties and responsibilities under the Licensing Agreement.

74. Inherent in the Licensing Agreement was an implied covenant of good faith and fair dealing.

75. In addition to expressly breaching the terms of the Licensing Agreement, Converse breached its covenant of good faith and fair dealing by, among other things:

    a) Lulling Alon into a false sense of comfort regarding the renegotiation of the Licensing Agreement until it was too late for Alon to do so, while at the same time making arrangements to falsely appropriate the markets developed by Alon;

23

b)    Inducing Alon to divulge its strategies, marketing plans and detailed customer relationships (including names, addresses and phone numbers) by misrepresenting that it intended to abide by the terms of the Licensing Agreement and renew the Agreement for another three years;

c)    Encouraging Alon's development of the Coopershoes business structure, only to later declare that ALON was in breach of the Licensing Agreement for the use of such a structure;

d)    Using Alon's business information for its own purposes; and

e)    Attempting to wrongfully deprive Alon of its rights and benefits under the Licensing Agreement.  Its actions have been in bad faith, and have breached and continue to breach the implied covenant of good faith and fair dealing.

76.    If Converse continues to oppose Alon's right to renew the Licensing Agreement, Alon will suffer substantial harm and Converse will obtain an improper windfall as a direct and proximate result.

### Third Claim
### Declaratory Judgment

77.    The allegations in paragraphs 1 through 64 are re-alleged and incorporated herein by reference.

78.    As a result of Converse's attempts to oppose the renewal of the Licensing Agreement, it is clear that a controversy exists between the parties concerning certain rights, duties and obligations under the Licensing Agreement.

79.    Alon seeks an award from the Arbitral Tribunal for the purpose of determining the existing controversy between the Parties, including specifically a determination that Alon's exercise of its right to automatically renew the Licensing Agreement is effective.

## REQUEST FOR RELIEF

WHEREFORE, Claimant Alon respectfully request that a binding arbitration take place in accordance with the AAA International Arbitration Rules.  In addition, Claimants request a final arbitral award:

a.    Declaring that Converse breached the Licensing Agreement and its duty of good faith and fair dealing with regard to the renewal of the Licensing Agreement; and such further relief as the Arbitrator deems just and proper;

b.    Declaring that that the Licensing Agreement has not expired and will continue until December 31, 2007, and that Alon has rightfully exercised their automatic right of renewal pursuant to the Licensing Agreement.

Dated this _16th_ day of December, 2004.

Respectfully submitted,

**ASTIGARRAGA DAVIS**
Counsel for Claimants
701 Brickell Avenue, 16th Floor
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

Edward H. Davis, Jr.
Florida Bar No.: 704935
Maria Cristina Cárdenas
Florida Bar No.: 0672491

25

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing was sent by facsimile and First Class U.S. Mail postage prepaid on December 16, 2004 to **Michael C. Gilleran, Esq.,** Pepe & Hazard, LLP, 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110-2804; **Laura W. Kelley,** Converse Inc., One High Street, North Andover, Massachusetts 01845.

Edward H. Davis

F:\WDOX\CLIENTS\U0077\1001\00041873.DOC

26

# EXHIBIT "3"

HEADER
Rio Grande do Sul State
JUDICIARY POWER
END HEADER

Examined.

1 – I Denied the requested restraining order to maintain in effect the Licensing Agreement for brand name use signed with **Converse,** as well as the determination that the Defendant should respect the exclusivity obligations assigned in the business, since the desire to renew the Agreement in compliance with Article 2 of the Licensing Agreement was not stated or demonstrated in the proceedings.

In a request for reconsideration, the Plaintiffs attached documents that demonstrate there were abundant negotiations between the contracting parties with regard to the conditions for renewal of the Agreement, all indicating that there was no consensus on said conditions. This is important in as much as it may indicate that the Plaintiffs, in reality, were lead to feel a sense of security where there was none.

2 – The controversy, therefore, that serves as context for the dispute is found in the manifestation of a desire by the Defendant not to renew the Agreement -which is to end in December 31, 2004-, and whose merit, the Plaintiffs informs, are under examination in an arbitration proceeding.

Plaintiffs, when asserting that the institution of an arbitration process does not waive their obligations, would like the interpretation of Clause 33 to also affect the Defendant so that Defendant will also remain bound to the obligations of the business during the arbitration proceeding.

3 – This lawsuit is restricted to the examination of those Agreement clauses which deal with the term of the Agreement, its renewal, the resolution and establishment of the arbitration process in order to verify the position of each party at the time the Agreement was signed with regards to the period when arbitration might be started.

Based on the position taken by the Defendant in notifying its lack of interest in renewal at the same time it made apparent an interest in renewing the Licensing Agreement through arrangements, I understand that this last effort should prevail as a means to preserving good faith and transparency principles in the business relationship.

4 – Thus, having established the risk of damage to the Plaintiffs since their business will be interrupted abruptly, which will have social repercussions, and considering the social interest of the Agreement currently expressed in the Brazilian Civil Code, I hereby GRANT THE RESTRAINING ORDER REQUIRED in order to determine the maintenance of the effects of the Licensing Agreement during the

arbitration process, as well as to compel the Defendant to abstain from practicing acts that violate the rights according to the  Agreement under the penalty of a daily fine of R$100.000,00 (one hundred thousand reais).

5 – Summon and Notify of the terms of this decision.

Porto Alegre, December 22, 2004

(Signed)
Liége Puricelli Pires
Judge

P:\WDOX\CLIENTS\0077\1001\00042281.DOC

### Certificate of Accuracy

I, Giovanna L. Lester, Translator and Interpreter since 1980, hereby declare to be fluent in both the Brazilian Portuguese and the English languages and that this is an accurate translation of the original delivered to me.



**Giovanna L. Lester**
Accredited by the
American Translators Association
**ATA # 221907**
President of the Florida Chapter of ATA – 2002-2003
Assistant Administrator of ATA's Interpreters Division – 2003-2004
Miami, December 29, 2004



ESTADO DO RIO GRANDE DO SUL
PODER JUDICIÁRIO

Vistos.

1 - Indeferi antecipação de tutela - a manutenção da vigência do contrato de licenciamento de exploração de marca firmado com a empresa Converse, bem como a determinação para que a demandada respeite as obrigações de exclusividade consignadas no negócio, porque não foi dito nem ficou demonstrada nos autos a manifestação de vontade de renovação do contrato na forma do art. 2º do Contrato de Licenciamento.

Em pedido de reconsideração, as autoras juntam documentos que demonstram ter havido ampla negociação entre as contratantesquanto às condições da renovação do contrato, tudo indicando que não houve consenso sobre tais condições.   Isso é importante na medida em que pode configurar que as autoras, na verdade, foram induzidas a sentir uma situação de tranqüilidade que não havia.

2 - A controvérsia, portanto, que serve de contexto à lide está na manifestação de vontade da demandada pela não renovação do contrato (com término em 31 de dezembro de 2004), mérito que noticiam as autoras estar em exame em juízo arbitral.

A parte autora pretende que a interpretação da cláusula nº 33, ao afirmar que a instituição de juízo arbitral não as isentará de suas obrigações, tenha reflexos também sobre a demandada, de modo que da mesma forma permaneça esta vinculada às obrigações do negócio durante o trâmite do processo arbitral.

3 - Resume-se a lide ao exame das cláusulas contratuais que tratam do período do contrato, da renovação, da resolução e da instituição do juízo arbitral, a fim de se verificar qual a manifestação das partes, por ocasião da contratação, quanto ao período em que eventualmente houvesse instituição de juízo arbitral.

Diante da postura da demandada em notificar o desinteresse na renovação ao mesmo tempo em que fez transparecer o interesse em renovar o Contrato de Licenciamento com tratativas, tenho que deva prevalecer esse último, como forma de preservar os princípios de boa-fé e de transparência na relação negocial.

4 - Assim, demonstrado o risco de dano às autoras, vez que terão seus negócios interrompidos abruptamente, com reflexos sociais inclusive, considerando o interesse social do contrato, agora expresso no Código Civil, DEFIRO A ANTECIPAÇÃO DE TUTELA para determinar a manutenção dos efeitos do contrato de licenciamento na vigência do procedimento arbitral, bem como para compelir a demandada a abster-se de praticar atos que violem os direitos contratuais pena de multa diária de R$ 100.000,00.

5 - Cite-se, e intime-se do teor da presente decisão.

Porto Alegre, 22 de dezembro de 2004.


Liége Puricelli Pires
Juíza de Direito.

PJ-2

# EXHIBIT "4"

[/illegible signature/]

**329**

# Judicial Branch of the Nation

046062 ALON INTERNATIONAL S.A. ET AL/ v. CONVERSE INC. SENTENCE/INJUNTION
Ruling on Injunctive Measure

Buenos Aires, December 30, 2004

Pursuant to the power-of-attorney hereto attached on page 321/6, the plaintiffs herein are to be considered as the firm *Alon International S.A.*, represented herein by the firm *Alon Argentina SRL*, according to Art. 48 of the Code of Civil Procedure, and are to be considered as domiciled [in this jurisdiction]. **Notify.**

The plaintiffs herein have filed a motion for an injunctive measure —that may be considered as a motion in limine "to not innovate"— so that the firm *Converse Inc.* (domiciled at *One High Street, North Andover, Massachusetts 01845, United States of America*), a) respect and guarantee the rights of the plaintiffs regarding patrimonial rights over certain brands owned by the defendant; and b) refrain from granting to third parties a license to manufacture or market the products covered by said brands, all within the framework of the contracts signed and within the territory of the Republic of Argentina.

[The plaintiffs have referred to] the contractual antecedents binding the parties, as well as the exchange of correspondence that has occurred with respect to the renewal of the terms of the agreement and the alleged breaches that have been propounded as the grounds for denial. I am referring to the facts set forth under section III of the brief submitted, *brevitalis causae.*

Now then, the plaintiffs support their petition based on an analysis of the following issues, to wit:

*Legal Admissibility*

On the one hand, [the plaintiffs] stress the *automatic renewal* of the Licensing Contract as agreed under clause 2 (see translation [into Spanish] on page 87, reverse side), as long as the sales target and minimum royalties have been surpassed (which they affirm have been amply surpassed); the opening of a licensee in the Republic of Argentina (*Alon Argentina SRL*); the alleged notice of their intent to renew the contract; the alleged silence maintained by Converse Inc.; and what they consider as insufficient evidence of the breaches alleged by the licensor who would bear the burden of proof (allegations that are refuted —in their opinion— in the initial brief).

Likewise, [the record] refers to the start of the arbitral proceeding (as provided in the contract) for the purpose of resolving the dispute.

1

[Stamp: /illegible signature/ PABLO CARO, CLERK]

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

[/illegible signature/]

*Danger posed by delay.*

This danger would be configured as of the date of expiration of the Licensing Contract (12/31/04) and, of this date, the alleged claim of depriving and/or restricting *Alon International* and *Alon Argentina SRL* from using the brands under license.

Having made these considerations, I shall now review the admissibility of the injunctive measure requested.

I shall begin by stating that the injunction at issue has an explicit finality, that is, to prevent that a currently existing *de facto* or *de jure* situation may be altered in such a manner that it may affect the eventual execution or compliance with the sentence to be issued by the Arbitral Tribunal (whose intervention has already been petitioned). Thus, we must bear in mind that the plaintiff and the defendant have maintained a business relationship (in keeping with the representations made by the plaintiff) regarding the use of several brands owed by the defendant and that said relationship was planned based on the contract attached hereto as Exhibit I.

The provisions set forth [in said contract] expressly agreed to *arbitral* competency to resolve any disputes that might arise between the parties. Clause 33 thereof translated [into Spanish] on page 99 refers to the express will [of the parties thereto], pledging [to submit to arbitration] *"...any dispute of claim arising from this contract, directly or indirectly related [thereto] ... "*

The categorical meaning of the expression *"...any dispute..."* apparently leaves very little space to admit, under ordinary jurisdiction, the treatment of conflicts derived from a business relationship without being to the detriment of the arbitral competency, especially —as occurs in the case at hand-- that same has been agreed to under the laws of a foreign nation whose scope —in principle— governs said act (Article 8, Civil Code).

Nonetheless, as has been accredited in summary at the initiation of the arbitral instance (see page 301/19), reasons of prudence and the danger posed by a delay that becomes highly evident in view of the imminent announcement by Converse, Inc., justify that we adopt the criterion of the preservation of the *status quo*, although limited in time, so that the interested parties may request the guardianship of their rights before the arbitral body. This decision is furthermore based on the fact that we cannot perceive in the case at hand that the petition for arbitration has been accompanied by an injunctive measure that would adhere to the claim herein alleged.

2

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

[Stamp: /illegible signature/ PABLO CARO, CLERK]

[/illegible signature/]

In sum, the determination of the period of time for which this injunctive measure is to be granted is based on the assumption of an overlapping of jurisdictions (arbitral and jurisdictional) and the plaintiffs, within this period of time, may petition whatever they might deem necessary before the arbitral tribunal.

Consequently, I shall uphold the injunctive measure requested under item II, sections a) and b) of the initial brief, for a period of time of **60 consecutive days** as of today's date. Within this time frame, the interested parties may petition —if they deem it appropriate— any measures deemed advisable before the Arbitral Tribunal hearing the dispute, posting [a bond] of security interest in property up to the amount of **USD $ 300,000.00** to the satisfaction of the court.

**I have so decided.**

**Notify by means of letter rogatory.**

*Margarita R. Braga*
*Judge*

3

[Stamp: /illegible signature/ PABLO CARO, CLERK]

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

# SEVEN LANGUAGES TRANSLATING SERVICES, INC.

## T R A N S L A T O R S  •  I N T E R P R E T E R S

Conferences • Depositions • Documents • Translations • Legal • Commercial • Medical • Technical • U.S. Court Certified Interpreters
Web site: www.sevenlanguages.com • E-mail: sevenlan@gate.net

## CERTIFICATE OF TRANSLATION

STATE OF FLORIDA            }
                           }
COUNTY OF MIAMI-DADE   }

BEFORE ME, on this day, personally appeared JOSEPH RICHARD PEREZ on behalf of

SEVEN LANGUAGES TRANSLATING SERVICES, INC., who being duly sworn,

deposes and says that he is fully versed in both the SPANISH and ENGLISH languages,

that he is a Federal Court certified interpreter in English and Spanish and that he is a

qualified and experienced translator from each of said languages to the other; and that to

the best of his knowledge and belief, the translation attached hereto is a true and accurate

rendition of the original aforesaid, consisting of __3__ pages and that this is the last

of the attached.

JOSEPH RICHARD PEREZ

The foregoing instrument was acknowledged by me on this __04__ day of __January__,
20 __05__. Joseph Richard Perez personally appeared before me at the time of notarization. He is
personally known to me and produced a driver's license as identification and he did take an oath.

Lawrence A. Strauss, Notary Public
State of Florida at Large

Lawrence A. Strauss
Commission # DD 023452
Expires June 21, 2005
Bonded Thru
Atlantic Bonding Co., Inc.

The utmost care has been taken to ensure the accuracy of all translations. Seven Languages Translating Services and its
employees shall not be liable for any damages due to negligence or error in typing or translation.

OFFICES IN MIAMI • FT. LAUDERDALE • ORLANDO • TOKYO
19 W. FLAGLER ST. • SUITE 816 • MIAMI, FLORIDA 33130
DADE (305) 374-6761 • 24 HR. FAX (305) 374-0339 • BROWARD (954) 962-4178 • 1-800-374-6761

SPANISH
FRENCH
HEBREW
CREOLE
DUTCH
PORTUGUESE
GERMAN
CHINESE
JAPANESE
RUSSIAN
SCANDINAVIAN
A S I A N
S L A V I C
& ALL OTHER
LANGUAGES



329

## Poder Judicial de la Nación

046062-ALON INTERNATIONAL SA Y OTRO C/ CONVERSE INC. S/ MEDIDA PRECAUTORIA

Auto sobre la medida cautelar

Buenos Aires,     30     de diciembre de 2004.-

A mérito del poder acompañado a fs 32176, cabe tener a los iniciantes por parte en lo que a la firma *Alon International SA* refiere, así como presentados por el art .48 CProc por la firma *Alon Argentina SRL*. Téngaselos por domiciliados. Notifíquese.

Peticionan los presentantes una medida cautelar -que puede calificarse de modo liminar como de "no innovar"- para que la firma *Converse Inc.* (con domicilio en *One High Street, North Andover, Massachussets, 01845, Estados Unidos*), a) respete y garantice los derechos de las actoras con relación a los derechos patrimoniales sobre ciertas marcas propiedad de la demandada y, b) se abstenga de otorgar a terceros licencia para fabricar o comercializar los productos comprometidos con dichas marcas, todo ello en el marco de los contratos celebrados y el el área de la República Argentina.

Relatan los antecedentes contractuales que vinculan a las partes, así como el intercambio epistolar habido con relación a la renovación de los términos del acuerdo y a los supuestos incumplimientos imputados como causal denegatoria. Me remito a los hechos vertidos en el apartado III de la presentación en despacho, *brevitatis causae*.

Ahora bien, las actoras abonan su pedido en base al análisis de los siguientes aspectos, a saber:

### *Verosimilitud del derecho*

Por un lado, destacan la *renovación automática* del Contrato de Licencia pactada en la cláusula 2 (ver traducción a fs 87 vlta), siempre que se superarán las ventas y regalías mínimas (lo que afirma estaría ampliamente superado); la apertura de una licenciataria en la República Argentina (*Alon Argentina SRL*); la alegada notificación de la voluntad de renovar el contrato; el supuesto silencio guardado por Converse Inc.; y lo que estiman es una insuficiente prueba de los incumplimientos atribuidos por la licenciante cuya carga le correspondería (los que son rebatidos -a su juicio- en la pieza inicial).

Asimismo, da cuenta del inicio del procedimiento Arbitral (previsto

PABLO CAR
SECRETARIO

en el contrato) con el objeto de zanjar la controversia.

*Peligro en la demora.*

Estaría configurado a partir del proximo vencimiento del Contrato de Licencia (31/12/04) y, a partir de alli, la supuesta pretensión de privar y/o restringir a *Alon International y Alon Argentina SRL* el uso de las marcas licenciadas.

Hechas estas consideraciones, cabe expedirse en torno a la procedencia de la medida solicitada.

Comenzaré señalando que la cautelar en cuestión tiene como finalidad explícita, la de impedir que la situación de hecho o de derecho vigente a este momento se altere de manera tal que afecte la eventual ejecución o cumplimiento de la sentencia a dictarse por el Tribunal Arbitral (ante el que ya se ha solicitado su intervención). Así, repárese en que la actora y la demandada mantienen una relación negocial (a juzgar por los dichos de la iniciante) que gira en torno al uso de una licencia de varias marcas propiedad de la accionada, sobre la que planearon la vinculación de que da cuenta el contrato anejo como anexo 1.

Y en dicha estipulación se pactó expresamente la competencia arbitral a los fines de dirimir las controversias que pudieren generarse entre partes. La cláusula 33 (traducida a fs 99 da cuenta de la voluntad puesta de manifiesto en tal sentido, comprometiendo *"...cualquier controversia o reclamo que surja del presente contrato, directa o indirectamente relacionada..."*.

El sentido categórico de la expresión *"...cualquier controversia..."* parece dejar un escaso espacio para admitir, en la jurisdicción ordinaria, el tratamiento de conflictos derivados de la relación negocial sin que ello importe un detrimento de la competencia arbitral, máxime si -como ocurre en la especie- ha sido pactada bajo la legislación de un estado extranjero cuyo imperio rige -en principio- dicho acto (art 8 Cód. Civil).

Sin embargo, y en tanto se ha acreditado sumariamente el inicio de la instancia arbitral (v. fs 301/19), razones de prudencia y el peligro en la demora que se evidencia en grado sumo ante la inminencia del anuncio de Converse Inc., justifican adoptar un criterio de preservación del estado de cosas, mas limitado en el tiempo, y ello con el objeto de que las interesadas puedan solicitar la tutela de sus derechos por ante el órgano arbitral. Tal decisión encuentra fundamento además en el hecho que no se aprecia en la causa que el pedido de intervención arbitral haya sido acompañado de una medida precautoria que

?PABLO

se ajuste a la pretensión aquí insinuada.

Por lo demás, lo acotado del plazo por el que será otorgada la medida encuentra sustento en que podría darse un supuesto de superposición de jurisdicciones (la arbitral y la jurisdiccional) pudiendo las actoras, dentro del mismo, solicitar por ante el tribunal arbitral aquello que estimen menester.

En consecuencia, habré de acceder a la pretensión cautelar requerida en el punto II, apartados a) y b) del escrito inicial, más por el término de 60 días corridos contados a partir del presente, plazo dentro del cual habrán de solicitar las interesadas -de estimarlo así conveniente- las medidas que estimen convenientes por ante el Tribunal Arbitral que entiende en la disputa, ello bajo caución real a prestar a satisfacción del juzgado hasta la suma de u$s 300.000.-

Lo que así decido.

Notifíquese mediante exhorto diplomático.

Margarita R. Braga
Juez