UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONVERSE INC., ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO.: 04-12591-PBS |
| ) | |
| vs. ) | |
| ) | |
| ALON INTERNATIONAL S.A., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## AFFIDAVIT OF MICHAEL C. GILLERAN

Michael C. Gilleran, on oath, deposes and states:

My name is Michael C. Gilleran. I am counsel in this matter to Plaintiff Converse Inc. ("Converse"). Attached under the described exhibit tab are true and accurate copies of the following documents:

### Exhibit

1.    Complaint filed by ALON in Brazil;

2.    Translation of first two requests of relief in Complaint;

3.    Translation of ex parte order granted in Brazil;

4.    Cover letter and motion filed by ALON in Argentina;

5.    Translation of ex parte order granted to ALON in Argentina;

6.    Affidavit of Adriano Kalfelz Martins, counsel to Coopershoes in Brazil, dated January 5, 2005, in English and Portuguese;

7.    Second Affidavit of Chris Laganas;

8.    Proposed order of dismissal of Brazilian action, in English and Portuguese; and

9.    Proposed order of dismissal of Argentinean action, in English and Spanish.

Signed under the penalties of perjury.

Michael C. Gilleran

Dated:  January ⎰⎱, 2005

2

# EXHIBIT 1



# DEMAREST & ALMEIDA
ADVOGADOS

São Paulo
Brasília
Rio de Janeiro
Porto Alegre
Salvador
Maceió
Campinas
Ribeirão Preto
New York

Av. Pedroso de Moraes, 1201
São Paulo, SP - Brasil
05419-001

Phone: +55-11 / 3888-1800
Fax:   +55-11 / 3888-1700

NOTIFICAÇÃO:  Mensagem confidencial destinada ao uso exclusivo do destinatário. Proibidas a revelação, distribuição e feitura de cópias e a prática de qualquer ato com base nas informações aqui contidas. Se recebida por engano, favor informar-nos.

CONFIDENTIALITY NOTICE: Message privileged and confidential intended for the exclusive use of the addressee. Any disclosure, copying, distribution or action in reliance on the contents of this information is prohibited. If received in error, please notify us.

Data/*Date*:      06/01/2005

Pag./*Pages*: 1 +                    **D.A.**

Para/*To*:      **Michael C. Gilleran**

De/*From*:      **Marcelo Junqueira Inglez de Souza**
Demarest e Almeida
São Paulo
Direto/*Direct:* +55-11/3888-1546
*E-Mail: msouza@demarest.com.br*

Fax #:      **00 21 1 617 748-5555**
Cod. Cliente/*Client Code:* 04780 00051

# STROETER & ROYSTER ADVOGADOS

EXCELENTÍSSIMO SENHOR DOUTOR JUIZ DE DIREITO DA    VARA CIVEL DO
FORO CENTRAL DA COMARCA DE PORTO ALEGRE

**CONTRA-FÉ**

AIB SERVIÇOS E COMÉRCIO LTDA., empresa com sede na Rua Coronel
Corte Real, 246, Bairro Petrópolis, cidade de Porto Alegre, Estado do Rio Grande
DO Sul, inscrita no CNPJ/MF sob o nº 006045758/0001-22, **ALON BRASIL
COMÉRCIO E DISTRIBUIÇÃO DE CALÇADOS LTDA.**, empresa com sede na Rua
Vasco da Gama 845, sala nº 202, Rio Branco, cidade de Porto Alegre, Estado do Rio
Grande do Sul, inscrita no CNPJ/MF sob o nº 06332433/0001-20 e **ALON
INTERNATIONAL S.A.**, sociedade devidamente constituída e validamente existente
de acordo com as leis do Panamá, com sede em Calle 53, Urbanizacion Obarrio,
Torre Swiss Bank, Piso 16, Panamá, República do Panamá, vêm, por seus
advogados abaixo-assinados (doc. 1), que recebem notificações na Avenida Padre
Cacique, nº 320, Bloco "b", 5º andar, Porto Alegre, Rio Grande do Sul, propor a
presente **AÇÃO DECLARATÓRIA CUMULADA COM OBRIGAÇÃO DE NÃO
FAZER, COM PEDIDO DE ANTECIPAÇÃO DE TUTELA**, em face de **CONVERSE,
INC.**, sociedade devidamente constituída e validamente existente de acordo com as
leis do Estado de Massachusetts, com sede em One High Street, North Andover,
Massachusetts, 1845, Estados Unidos da América, pelos fatos e fundamentos que
passa a expor:

## STROETER & ROYSTER ADVOGADOS

## DA COMPETÊNCIA DA JUSTIÇA BRASILEIRA PARA O JULGAMENTO DA PRESENTE DEMANDA

Através da presente ação as autoras pleiteiam a declaração judicial de manutenção dos efeitos no Brasil de contrato de licenciamento de exploração de marca (doravante Contrato de Licenciamento, doc 2), assinado nos Estados Unidos da América entre autoras e ré e, consequentemente, que seja a ré impedida de explorar suas marcas no Brasil, em descumprimento ao mencionado contrato.

Através do referido Contrato de Licenciamento, regido pelas leis do Estado de Massachusetts, a ré concedeu licença exclusiva à terceira autora (e depois, em aditamento ao Contrato de Licenciamento, às primeira e segunda autoras) para exploração, no território brasileiro, de marcas de sua propriedade, como a marca "All Star Converse", entre outras (doc 3).

Os direitos decorrentes do Contrato de Licenciamento - uso de marcas para criação, fabricação e distribuição de produtos - são exercidos no Brasil pelas autoras. Em virtude deste contrato, firmaram as autoras um contrato com a empresa Coopershoes - Cooperativa de Calçados e Componentes Joanetense Ltda., de Picada Café (doc. 4), firmando ainda relações comerciais, pagando tributos municipais, estaduais e federais, atuando, por conseguinte, de maneira direta no mercado brasileiro.

Resta indubitável, portanto, que os efeitos e as obrigações decorrentes do Contrato de Licenciamento se operam em território brasileiro, trazendo a competência para o julgamento da presente lide a autoridade judiciária brasileira, na forma do art. 88 do Código de Processo Civil.

Reza o art. 88 do Código de Processo Civil que:

## STROETER & ROYSTER ADVOGADOS

> *"Art. 88. É competente a autoridade judiciária brasileira quando:*
> *I - o réu, qualquer que seja a sua nacionalidade, estiver*
> *domiciliado no Brasil;*
> *II - no Brasil tiver de ser cumprida a obrigação;*
> *III - a ação se originar de fato ocorrido ou de fato praticado no*
> *Brasil."*
> (grifo nosso)

Da mesma forma, prevê o art. 12 da Lei de Introdução ao Código Civil, que:

> *"É competente autoridade judiciária brasileira, quando for o Réu*
> *domiciliado no Brasil, ou aqui tiver de ser cumprida a obrigação"*
> (grifo nosso)

Os artigos acima citados estabelecem os casos em que há competência concorrente ou relativa da autoridade judiciária brasileira. No caso de controvérsia sobre contrato que tenha obrigações a serem cumpridas no Brasil, os artigos 88 do CPC e 12 da LICC são claros ao definir como competente a "autoridade judiciária brasileira". Reitere-se que trata a presente lide de cumprimento de contrato de licenciamento de marca para a fabricação e distribuição de produtos no Brasil (no caso calçados e produtos esportivos em geral, com a logomarca "All Star"), sendo certo que os efeitos do contrato, bem como as obrigações decorrentes deste, como o próprio contrato estabelece, ocorrem e são exercidos no Brasil pelas autoras.

Para a fixação da competência jurisdicional nacional, é necessário apenas que a obrigação tenha que ser cumprida no Brasil, não sendo exigido que o contrato tenha sido celebrado em território nacional.

Este é o entendimento da professora Vera Jatahy[1], que ensina:

> *"Não importa, no caso, o lugar onde a obrigação foi*
> *contraída, mas sim que o Brasil seja o locus destinatae*
> *solutionis, isto é, importa a convenção para que aqui ela*
> *seja cumprida."*

---

[1] JATAHY, Vera Maria Barrera. *Do conflito de jurisdições: competência internacional da Justiça Brasileira.* Ed. Forense: Rio de Janeiro, 2003.

STROETER & ROYSTER ADVOGADOS

Assim, uma vez constatada a efetiva produção de efeitos obrigacionais do Contrato de Licenciamento no Brasil, evidenciada está a competência da justiça brasileira para julgar a presente ação. Este é o entendimento do Tribunal de Justiça do Estado do Rio de Janeiro que, ao julgar caso semelhante, decidiu que:

> "Agravo. Ação ordinária de perdas e danos cumulada com cobrança de apólice de seguro. Garantia de execução das obrigações contratuais "performance bond". Descumprimento de contrato firmado com consórcio de empresas. Formalização de contrato de seguro para efeito de garantir a execução das obrigações contratuais. (...) **Competência concorrente. Competência da autoridade judiciária brasileira. Uma delas com filial no Brasil. Cumprimento da obrigação neste país e ação se origina de fato nele ocorrido. Artigo 88, incisos I, II e III e parágrafo único, do Código de Processo Civil. (...)** Provimento do recurso."
> (TJRJ, Agravo de Instrumento n° 1999.002.01561, Julgamento 07.11.1999)

É este também o entendimento do E. Superior Tribunal de Justiça, conforme se verifica da simples leitura de acórdão da C. Quarta Turma:

> "- Exportação de calçados. Contrato de compra e venda. Ação ordinária de cobrança. Exceção de incompetência da autoridade judiciária brasileira.
> - Na ausência de estipulação em contrato escrito, a questão concernente ao lugar do cumprimento da obrigação, no contrato de exportação, envolve o exame de prova, a cujo respeito é soberano o tribunal local.
> - *Entendendo este que em território nacional deve ser cumprida a obrigação, incidem os artigos 12 da lei de introdução ao código civil e 88, inciso II, do código de processo civil, que consagram a competência da justiça brasileira para os litígios oriundos do negocio jurídico.*
> (...)
> (STJ, Resp n° 19263, Quarta Turma, Rel. Min. Antônio Braz, Julgamento: 19.04.1994)

## STROETER & ROYSTER ADVOGADOS

### DA COMPETÊNCIA DA COMARCA DE PORTO ALEGRE

Delineando os contornos da competência da autoridade judiciária brasileira, deve-se aplicar a norma contida no artigo 94, § 3° do Código de Processo Civil, através da qual são definidas as regras de competência interna aplicáveis, ratificando definitivamente a competência da autoridade judiciária brasileira. Versa o art. 94 do CPC que:

> Artigo 94 - "A ação fundada em direito pessoal e a ação fundada em direito real sobre bens móveis serão propostas, em regra, no foro, do domicílio do réu.
> (...)
> § 3° Quando o réu não tiver domicílio nem residência no Brasil, a ação será proposta no foro do domicílio do autor. Se este também residir fora do Brasil, a ação será proposta em qualquer foro."

Vê-se, portanto, que a regra geral para determinação da competência territorial do juízo, o domicílio do réu, foi excepcionada justamente em hipóteses como a presente, em que a empresa ré tem domicílio fora do país.

Ante a redação do artigo 94 § 3° do CPC, não há qualquer dúvida quanto a competência da Justiça do Estado do Rio Grande do Sul para julgar a presente lide, já que ambas as autoras com domicílio no Brasil têm sua sede na cidade de Porto Alegre, razão pela qual se propõe o feito perante o Juízo da Vara Cível da Comarca de Porto Alegre.

### DOS DOCUMENTOS APRESENTADOS

Face à importância dos fatos adiante narrados e a urgência da providências judiciais aqui reclamados, as autoras estão, neste momento, apresentando cópias simples dos documentos em língua inglesa e sua tradução livre - não juramentada.

06/01 2005 12:11 FAX                                                          ☑007
04. Jan 05 01:55p

## STROETER & ROYSTER ADVOGADOS

A tradução juramentada só poderá ser efetuada com os documentos devidamente consularizados, providência que, devido aos festejos de final de ano, acaba levando mais tempo do que o normal. Assim, a expectativa das autoras quanto ao recebimento destes documentos e, por consequência, a realização da tradução juramentada, aliada, como dito, à urgência da medida, recomendam que os patronos da autora ajuízem o presente feito se responsabilizando pela veracidade do que é ora apresentado, requerendo prazo adicional para apresentação das traduções devidamente juramentadas.

Informam, por fim, que os documentos são apresentados sempre com sua versão em português, acompanhada de sua cópia do documento original em inglês.

Sendo assim, requerem as autoras prazo de 15 dias para a apresentação das procurações originais, e cópias autenticadas e/ou consularizadas e notorizadas.

### DOS FATOS

#### A Finalidade e o Campo de Atuação das Autoras e Empresa Ré

O campo de atuação das empresas autoras é o da prestação de serviços técnicos para criação, comercialização, desenvolvimento, fabricação e distribuição de calçados e artigos esportivos em geral. As autoras são especializadas na abertura e desenvolvimento de mercados para empresas estrangeiras que desejem investir em novos territórios, principalmente através de representação de marcas.

O campo de atuação principal da ré é a produção de calçados e artigos esportivos de um modo geral, sendo conhecida por suas mais famosas marcas de calçados: "All Star Converse" e "All Star Chuck Taylor".

# STROETER & ROYSTER ADVOGADOS

A empresa ré entrou no mercado brasileiro (representada pelas autoras, conforme se verá) há aproximadamente 3 (três) anos. Antes deste período, durante aproximadamente 30 anos, a empresa brasileira chamada "All Star Artigos Esportivos Ltda." produziu de maneira irregular os calçados com a marca "All Star". Com o auxílio e atuação direta da terceira autora, a ré recuperou em 2002 o direito de uso da marca "All Star" no Brasil, podendo assim iniciar a exploração de sua mais famosa marca.

## DO CONTRATO FIRMADO ENTRE AS PARTES

Em 01 de setembro de 2001, a ré, Converse, Inc. e a terceira autora, Alon International S.A, firmaram um contrato denominado "Manufacturing Distribution And Licensing Agreement", com tradução livre "Contrato de Fabricação, Distribuição e Licença" (Contrato de Licenciamento). Através deste Contrato de Licenciamento, a ré Converse, Inc. cedeu à terceira autora licença para exploração, com exclusividade no Brasil e América Latina, de suas marcas "Converse", "All Star", "Converse All Star", "Chuck Taylor" e "Star e Chevron", conforme se pode ler na cláusula 3 (a), "i" , "ii" e "iii", e (b):

Inglês:

"3. License:
a) Licensed articles
i) Non-Footwear Licensed Articles is the collective term for activewear and accessories. Activewear shall specifically include: men's and women's sportswear and T-Shirts. Accessories shall specially include: babes, socks, caps, watches, backpacks, belts, stationary items (Notebooks and agendas, etc.)
ii) Footwear Licensed Articles is the collective term for athletic and leisure footwear
iii) Originals Licensed Footwear Products shall be defined as the following models of footwear: Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear.

b) Grant of License. Converse hereby grants to Licensee, subject to the terms and conditions herein, the exclusive right and license to utilize the Converse Marks throughout the territory (...)"

# STROETER & ROYSTER ADVOGADOS

Português (tradução livre):

3. Licença.
   (a) Artigos Licenciados.
   i. Artigos Licenciados Que Não Incluam Calçados é o termo coletivo para vestuários e acessórios. Vestuário incluirá especificamente: camisetas e roupa esporte feminina e masculina. Acessório incluirá especificamente: sacolas, meias, bonés, relógios, mochilas, cintos, itens de escritório (livros de anotação e agendas, etc.).
   ii. Artigos Licenciados de Calçados é o termo coletivo para calçados de laser e esporte.
   iii. Produtos Originais Licenciados de Calçados serão definidos como os seguintes modelos de calçados: Chuck Taylor All Star, Jack Purcell, Skid Grip e One Star.
   (b) Concessão da Licença. A Converse, pelo presente instrumento, confere à Licenciada, sujeita aos termos e condições aqui previstos, o direito exclusivo e licença para utilizar as Marcas da Converse em todo o Território (...)

O trabalho da terceira autora, na forma contratada, é de desenvolvimento de artigos esportivos, sua fabricação, distribuição, propaganda e venda, com a utilização das marcas licenciadas, trabalho este que permitiu a inclusão da ré de maneira efetiva nos mercados brasileiro e da América Latina.

Nos termos das cláusulas I. 1(a), e "2" o Contrato de Licenciamento tem vigência até 31 de dezembro de 2004, sendo renovado automaticamente por três anos ao final deste prazo, conforme se pode comprovar de sua simples leitura, desde que cumpridas determinadas metas mercadológicas.

A contraprestação da terceira autora na execução do Contrato de Licenciamento, é o pagamento de royalties, na forma prevista na cláusula 15, royalties estes que variam de 6% a 8% sobre os valores de cada produto vendido. Nesta mesma cláusula também é prevista garantia de royalties mínimos nunca inferiores a: (a) no ano de 2002, US$ 115.000.00 (cento e quinze mil dólares), (b) no ano de 2003, US$ 160.000.00 (cento e sessenta mil dólares) e (c) no ano de 2004, US$ 215.000.00 (duzentos e quinze mil dólares).

# STROETER & ROYSTER ADVOGADOS

Em 01 de fevereiro de 2004, as empresas AIB Serviços e Comércio Ltda (primeira autora), Alon Brasil Comércio e Distribuição Ltda. (segunda autora), além da Camar Distribution LLC, Carval LLC. e Alon Argentina SRL, foram incluídas no contrato de licenciamento entre a terceira autora e ré, passando aquelas a deter os mesmos direitos e obrigações da terceira autora no Contrato de Licenciamento, tendo sido todas admitidas na condição de licenciadas.

Na prática, os valores remetidos como royalties pelas autoras à ré, desde o início da operação, foram de aproximadamente US$ 3.059.233,00 (três milhões, cinqüenta e nove mil e duzentos e trinta e três dólares), mais de seis vezes o valor estabelecido como o mínimo no Contrato de Licenciamento. As transferências bancárias do último ano, podem ser comprovadas através do extrato da autora AIB Serviços e Comércio Ltda (doc. 5).

Em virtude de seu direito exclusivo de exploração das marcas licenciadas, as autoras atuaram de maneira contundente para a inclusão dos produtos "Converse" no mercado brasileiro, sempre com sucesso. Dentre as muitas atuações, a terceira autora ficou conhecida principalmente pela recuperação do direito de uso da marca "All Star". Conforme já mencionado, durante aproximadamente 30 (trinta) anos a marca "All Star" foi utilizada indevidamente por um fabricante "pirata" brasileiro, que, ilegalmente, detinha registro da marca junto ao INPI.

As autoras, em suma, desbravaram um mercado novo para a ré, sustentando sua privilegiada participação no mesmo, alcançando vendas muito maiores dos que as previstas pelas partes contratantes, deixando a ré, Converse, Inc. em situação de extremo conforto para investimentos futuros, tanto no Brasil como em toda a América Latina.

Conforme mencionado acima, no que tange a efetiva fabricação dos produtos (calçados e artigos esportivos de modo geral) a terceira autora firmou contrato de licenciamento para fabricação e distribuição com a fábrica Coopershoes, Cooperativa de Calçados e Componentes Joanetense Ltda, conforme contrato em anexo.

# STROETER & ROYSTER ADVOGADOS

A média de produção, até a presente data, foi de 250.000 (duzentos e cinqüenta mil) pares de calçados por mês, tendo sido gerados nada menos do que 1.200 (um mil e duzentos) empregos diretos, além de tantos outros indiretos, tornando a operação que envolve a terceira autora e a Copershoes, Cooperativa de Calçados e Componentes Joanetense Ltda, uma das grandes geradoras de empregos e tributos na região de Picada Café.

As autoras nunca pouparam esforços nem recursos para continuar atuando com sucesso junto ao mercado brasileiro, inserindo, de maneira efetiva, a Converse All Star no cenário de calçados do Brasil, mercado que, por tantos anos, fora tomado pelo pirata "All Star Brasil".

Entretanto, qual não foi a surpresa das autoras quando, em 30 de novembro de 2004, receberam uma notificação da ré nos Estados Unidos da América (doc. 6), informando sua decisão de rescindir o Contrato de Licenciamento, não aplicando a renovação automática prevista na cláusula 2ª, mesmo estando todas as condições mercadológicas devidamente cumpridas – aliás, muito além dos parâmetros estabelecidos.

Dentre os falsos defeitos apresentados, todos devidamente refutados pela primeira Autora em contra-notificação de 7 de dezembro de 2004 (doc. 7), se destacam: I) sub-licenciamento indevido do contrato para a Coopershoes, II) dedução indevida de impostos nos pagamentos de *royalties* ; iii) câmbio realizado de maneira irregular; e iv) não cumprimento de gasto mínimo com marketing.

Após diversas tentativas de diálogo com a ré nos Estados Unidos da América, o que se mostrou ineficaz, as autoras, com base na cláusula 33 do Contrato de Licenciamento (Cláusula Arbitral), iniciaram procedimento de arbitragem em 16 DE DEZEMBRO DE 2004 a fim de questionar a rescisão do Contrato de Licenciamento nos Estados Unidos (doc. 8).

STROETER & ROYSTER ADVOGADOS

É justamente em torno dos efeitos, em território brasileiro, do início da arbitragem e da interpretação de mandamento contido na cláusula arbitral, que gira a presente ação.

## DO DIREITO

### Da Cláusula Arbitral e da Vigência do Contrato de Licenciamento na Pendência de Procedimento Arbitral

O Contrato de Licenciamento firmado entre as partes prevê, como já citado, em sua cláusula 33 (trinta e três), que quaisquer controvérsias dele oriundas serão dirimidas através de arbitragem segundo as regras da *American Arbitration Association* ("AAA"). Nesta mesma cláusula, afere-se que as partes acordaram que tais controvérsias serão solucionadas no escritório da AAA, em Boston, Massachusetts, Estados Unidos da América ou qualquer outra localidade, desde que seja indicada pela AAA.

Todavia, a parte primordial para o correto entendimento desta ação é a disposição que prevê que, instituído um procedimento arbitral, **as autoras (Licenciadas) continuam obrigadas a cumprir sua obrigação de efetuar os pagamentos resultantes do Contrato de Licenciamento à ré, enquanto o procedimento arbitral estiver em prosseguimento.**

Versa a cláusula 33 do Contrato de Licenciamento:

> "33. *Arbitration. The parties shall attempt to settle all controversies and disputes arising hereunder emicably, promptly and fairly. Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligations of the parties thereunder, the capacity or authority of the parties thereto, the performance or breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice*

STROETER & ROYSTER ADVOGADOS

sent by one party to the other setting forth with specificity any such controversy or claim, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association. The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association. The parties expressly agree that arbitration shall be held in the offices of the American Arbitration Association, in Boston, Massachusetts, U.S.A., or such other locations within the Commonwealth of Massachusetts as the American Arbitration Association may direct. Such arbitration shall be conducted in the English language and the arbitrators shall apply the laws of the Commonwealth of Massachusetts. **The institution of any arbitration proceeding hereunder shall not relieve the Licensee of its obligation to make payments accrued hereunder to Converse during the continuance of such proceeding.** The decision by the arbitrators shall be binding and conclusive upon the parties, their successors and assigns and the parties shall comply with such decision in good faith, and each party hereby submits itself to the jurisdiction of the courts of the place where the arbitration is held, but only for the entry of judgment with respect to the decision of the arbitrators hereunder. Notwithstanding the foregoing, judgment upon the award may be entered in any court where the arbitration takes place, or any other court having jurisdiction over the losing party".
(grifo nosso)

Em Português, com tradução livre:

33. *Arbitragem. As partes tentarão chegar a um acordo em relação a todas as controvérsias e disputas decorrentes de forma amistosa, imediata e justa. Qualquer controvérsia ou disputa decorrente ou referente direta ou indiretamente a este Contrato, incluindo, entre outros, transações em conformidade com o mesmo, aos direitos e obrigações das partes envolvidas, à capacidade ou autoridade das partes, ao cumprimento ou violação do mesmo e à **rescisão, renovação ou não-renovação do mesmo, não capaz de uma resolução amistosa satisfatória** dentro de trinta (30) dias após notificação escrita enviada por uma parte à outra declarando com especificidade qualquer controvérsia ou reivindicação, será resolvida por arbitragem em conformidade com as Regras da Associação Americana de Arbitragem. O laudo será feito por um único árbitro, escolhido em conformidade com as regras da Associação Americana de Arbitragem. As partes concordam expressamente que a arbitragem será realizada nos escritórios da Associação Americana de Arbitragem, em Boston,*

## STROETER & ROYSTER ADVOGADOS

> *Massachusetts, EUA, ou em outro local dentro do Commonwealth de Massachusetts conforme determinado pela Associação Americana de Arbitragem. A arbitragem será conduzida no idioma inglês e os árbitros aplicarão as leis do Commonwealth de Massachusetts. **A INSTITUIÇÃO DE QUALQUER JUÍZO ARBITRAL AQUI PREVISTO NÃO ISENTARÁ A LICENCIADA DE SUAS OBRIGAÇÕES PARA EFETUAR PAGAMENTOS ACUMULADOS AQUI PREVISTOS À CONVERSE DURANTE A CONTINUIDADE DESSE JUÍZO.** A decisão dos árbitros será obrigatória e decisiva às partes, seus sucessores e cessionários e as partes cumprirão essa decisão de boa fé, e dada parte, pelo presente instrumento, apresentar-se-á à jurisdição dos tribunais do local onde a arbitragem é realizada, mas apenas para proferir sentença em relação a decisão dos árbitros. Não obstante o precedente, a sentença do laudo pode ser proferida em qualquer tribunal onde ocorrer a arbitragem ou qualquer outro local com jurisdição sobre a parte perdedora.*
> (grifo nosso)

Da análise desta cláusula, conclui-se claramente que:

a) A rescisão, renovação ou não renovação do contrato serão objeto de arbitragem nos Estados Unidos da América, em caso de divergência e, principalmente;

b) A instituição de qualquer juízo arbitral não isenta as autoras (licenciadas) de suas obrigações para efetuar pagamentos à ré, durante a continuidade da Arbitragem.

Como se pode verificar, pendente procedimento arbitral instituído em razão de controvérsias originadas no âmbito do Contrato de Licenciamento, as autoras deverão efetuar, normalmente, os pagamentos devidos em razão do Contrato de Licenciamento.

Percebe-se assim que a própria cláusula arbitral acordada pelas partes contratantes, ao determinar a continuidade dos pagamentos referentes ao Contrato de Licenciamento, enquanto não estiver concluído o procedimento arbitral, determina, explicitamente, a continuidade de vigência deste contrato, possibilitando a perfeita geração de seus efeitos no Brasil.

# STROETER & ROYSTER ADVOGADOS

Isso porque, a manutenção da obrigação de pagamento a ser cumprida pelas autoras denota explicitamente a continuidade do Contrato de Licenciamento, com exclusividade de uso dos direitos de propriedade intelectual às autoras da presente demanda.

A obrigação de pagamento contida na referida cláusula deve ser interpretada à luz do princípio da boa fé contratual, consignado no artigo 422 do Código Civil de 2002, que dispõe:

> *Art. 422. Os contratantes são obrigados a guardar, assim na conclusão do contrato, como em sua execução, os princípios de probidade e boa-fé.*

A boa fé é princípio geral de direito, pairando, destarte, sobre as normas contidas em nosso ordenamento jurídico privado e importando em agir com um padrão de conduta, um proceder retilíneo em todas as etapas do cumprimento do contrato, com probidade, lealdade e honestidade.

Persistindo a obrigação de pagamento, após a instituição do procedimento arbitral, conforme determina o trecho acima destacado da cláusula arbitral, não há como afastar a continuidade de vigência do Contrato de Licenciamento, e conseqüente geração de seus efeitos no Brasil. Caso subsistisse a obrigação de pagamento por parte das autoras sem que o Contrato de Licenciamento continuasse a produzir seus regulares efeitos no Brasil, estaríamos constatando verdadeiro enriquecimento ilícito da ré, indo de encontro ao consagrado princípio da vedação ao enriquecimento sem causa enunciado pela norma do artigo 884 do Código Civil de 2002.

> *"Art. 884. Aquele que, sem justa causa, se enriquecer à custa de outrem, será obrigado a restituir o indevidamente auferido, feita a atualização dos valores monetários".*

## STROETER & ROYSTER ADVOGADOS

Perceba-se que a cláusula arbitral é clara ao estabelecer que casos de rescisão, renovação ou não renovação do contrato, no caso de controvérsia, serão discutidas em sede de juízo arbitral. É clara também ao estabelecer que, qualquer que seja o objeto da arbitragem, uma vez instalada, a força vinculante do contrato permanece, devendo contratado e contratante permanecer sujeitos às obrigações e direitos dele advindos (no caso das aqui autoras, entre outras, o pagamento dos *royalties*) e na posição de desfrutar os direitos conferidos no Contrato de Licenciamento.

Infelizmente, a ré assim não se comportou. Com a notificação de rescisão do Contrato de Licenciamento, tentou a ré furtar das autoras seu legítimo interesse em discutir, via arbitragem, os alegados motivos que levam à sua rescisão: a notificação encaminhada não reclama a apresentação de justificativas aos fatos alegados, mas, simplesmente, dá termo ao ajuste. O objetivo é claro, a ré tem pleno conhecimento de que, se colocasse sua discordância e requeresse a manifestação das autora, as mesmas poderiam reclamar a instalação da arbitragem; fato que levaria à manutenção do contrato, conforme expressamente previsto na cláusula 33, repita-se: *"(...) Qualquer controvérsia ou disputa decorrente ou referente direta ou indiretamente a este Contrato, incluindo, entre outros, transações em conformidade com o mesmo, aos direitos e obrigações das partes envolvidas, à capacidade ou autoridade das partes, ao cumprimento ou violação do mesmo e à rescisão, renovação ou não-renovação do mesmo, não capaz de uma resolução amistosa satisfatória (...)"*. Preferiu a ré se postar de maneira a não formalizar uma possibilidade de arbitragem, emprestando incerteza quanto a força dos comandos contidos na cláusula arbitral.

Ora uma vez que se está instalado o procedimento arbitral, a pretensão da ré de rescindir o contrato é atentatória ao próprio ajuste, para o qual sua vontade contribuiu de forma livre e consciente.

STROETER & ROYSTER ADVOGADOS

Ressalte-se que as autoras continuam e continuarão cumprindo suas obrigações contratuais, efetivando os pagamentos devidos, não havendo elementos que permitam questionar este cumprimento. Uma rápida verificação do histórico dos pagamentos efetivados pelas autores à ré, demonstra, indubitavelmente, o cumprimento tempestivo e estrito das obrigações contratuais de pagamento oriundas do Contrato de Licenciamento, conforme já demonstrado dos demonstrativos de pagamento apresentados.

Poder-se-ia asseverar contra a pretensão autoral que, uma vez rescindido o contrato, não haveria que se falar em continuidade de pagamentos e, portanto, não haveria prejuízo às autoras. Porém, esta é uma visão míope e deturpada de um problema complexo: as autoras tem direito à continuidade do vínculo obrigacional, uma vez que, na própria manifestação de vontade inicial (na formação do instrumento), as partes contratantes anularam que, havendo arbitragem, permaneceriam os efeitos do contrato. Ou seja, permaneceria o vínculo. Ora, o procedimento arbitral se forma diante de várias premissas: uma delas é o consenso mútuo das partes pela sujeição ao mandamento resultante da arbitragem. O que leva à irrefutável conclusão que, mesmo diante de uma vontade de rescisão, **sendo esta passível de análise pelo mecanismo da arbitragem**, como de fato é, enquanto não há tal mandamento arbitral, o vínculo deve ser mantido - repise-se, pois é a solução acordada pelas partes contratantes no momento da formação do vínculo obrigacional.

## DA NECESSIDADE DE DECLARAÇÃO QUANTO A INTERPRETAÇÃO DE CLÁUSULA CONTRATUAL - DO INTERESSE DE AGIR DAS AUTORAS

Pelo que fora acima demonstrado, vige o Contrato de Licenciamento que fixa direitos e obrigações para as autoras e a ré. Neste instrumento encontra-se cláusula arbitral que claramente prevê a plena vigência do Contrato e, por conseqüência, de seus efeitos no Brasil no período em que se encontrar instalada a arbitragem entre as partes contratantes.

# STROETER & ROYSTER ADVOGADOS

Somente com a declaração de validade dos efeitos do Contrato de Licenciamento, confirmando-se a redação da cláusula arbitral, as autoras terão segurança para manter a fabricação, através de sua contratada Coopershoes, dos produtos de marcas licenciadas pela ré. Resta evidente que a notificação encaminhada pela ré imprime um grau de incerteza jurídica que pode levar à uma absurda interrupção das atividades das autoras. Esta interrupção - exclusivamente causada pela nefasta interpretação que tenta imprimir a parte ré ao contrato – importará, de imediato, na dispensa de 1.200 (um mil e duzentos) funcionários da Coopershoes, Cooperativa de Calçados e Componentes Joanetense Ltda., além de substancial diminuição de recolhimento de tributos aos cofres públicos, bem como indesejados impactos sociais no Município de Novo Hamburgo.

Há que se prestigiar judicialmente o interesse das autoras na aplicação dos mandamentos contidos na cláusula arbitral, notadamente, aquele que determina a vigência do ajuste na pendência de arbitragem. Por outro lado, não há como se vendar ao fato de que pretende a ré a rescisão do ajuste, negando o próprio texto do Contrato de Licenciamento e, pior, imprimindo insuportável incerteza quanto à interpretação de cláusula contratual.

Aqui é importante frisar que o judiciário não está sendo, nem será, um simples meio de consulta, mas sim um garantidor da força vinculante das manifestações de vontade que não podem, sob pretexto algum, ceder a um ou outro interesse casuístico. É imperioso que se espanque a incerteza que imprime a ré na aplicação das cláusulas e condições para as quais ela própria concorreu, afirmando-se a força vinculante dos contratos.

Em verdade, como bem explicita a súmula 181 do Superior Tribunal de Justiça,

> *"Súmula 181: é admissível ação declaratória visando a obter certeza quanto à exata interpretação de cláusula contratual."*

## STROETER & ROYSTER ADVOGADOS

Este posicionamento apenas reflete inúmeros julgados (podemos citar os Recursos Especiais 1.644 de 18/04/1990, 2.964 de 09/09/1991, dentre muitos outros), bem como a já antiga lição do Supremo Tribunal Federal no sentido de que *"a interpretação de cláusula contratual pode ser objeto de ação declaratória"* (Recurso Extraordinário número 78.946 de 24/09/1996).

O fato do ajuste ter sido firmado entre as partes aqui litigantes e nenhuma delas dissentir quanto à sua existência não macula o fato - provado pelo notificação encaminhada à autora - de que a ré pretende a rescisão mesmo diante da previsão de arbitragem e, de fato, a mesma já ter sido requerida ao tribunal arbitral competente. Neste sentido, a manifestação da ré, dando por rescindido o contrato, em detrimento da possibilidade contratualmente prevista de arbitragem, e da mesma ter sido instalada, prova cabalmente que as autoras são titulares de interesse de agir, na forma como ensina o Ministro Gueiros Leite:

> *"Arruda Alvim preleciona ser correta a posição que admite a ação declaratória exclusivamente para interpretação de cláusula contratual, desde que se demonstre o interesse de agir. Negar- se o direito à declaração de cláusula contratual, seria fechar as portas do Judiciário e alimentar-se dúvida capaz de continuar ensejando novas demandas"*
> (Recurso Especial 1.644 - RSTJ 2/417)

**Neste sentido, resta evidente o direito das autoras verem declarado a manutenção dos efeitos do Contrato de Licenciamento no Brasil, até o fim da arbitragem instituída em 16 de dezembro de 2004, por estipulação expressa de sua cláusula 33 do Contrato de Licenciamento.**

### DA DISTINÇÃO ENTRE O PLEITO AUTORAL E A ARBITRAGEM INICIADA NOS ESTADOS UNIDOS DA AMÉRICA

O objeto da Arbitragem nos Estados Unidos da América é a legalidade da rescisão unilateral pretendida pela ré do Contrato de Licenciamento assinado pelas partes, providência considerada injustificada pelas Autoras.

STROETER & ROYSTER ADVOGADOS

Será discutido em sede de arbitragem os motivos da rescisão, a validade da rescisão, o cumprimento das metas mercadológicas e, por conseguinte, a possibilidade da renovação do Contrato de Licenciamento.

Estes, no entanto, não são os pedidos, nem o objeto da presente ação.

Através da presente ação, as autoras **não pretendem** discutir a rescisão do contrato, **não estão trazendo à baila o mérito da discussão arbitral**, muito menos a possibilidade da renovação do Contrato de Licenciamento nos Estados Unidos da América. Estas matérias são exclusivas à arbitragem e serão examinadas na forma eleita pelas partes contratantes, aqui litigantes.

A presente ação tem por objetivo a <u>declaração de manutenção dos efeitos do Contrato de Licenciamento no Brasil, enquanto durar a arbitragem nos Estados Unidos da América</u>, com base, exclusivamente, em disposição contratual, conforme acima demonstrado – cláusula 33 do Contrato de Licenciamento.

O que se pede é justamente a declaração de que, enquanto durar a arbitragem, mediante a continuação de pagamento dos *royalties* por parte das autoras, o contrato permaneça válido, mantendo-se seus efeitos entre as partes em território nacional.

## DA OBRIGAÇÃO DE NÃO FAZER

As ações que versam sobre obrigações de não fazer, previstas no art. 287 do CPC, são também conhecidas pela doutrina como Ações Cominatórias.

Versa o art. 287 do CPC que:

> " *Art. 287 (redação de acordo com a Lei 10.444 de 7.5.02) Se o autor pedir que seja imposta ao réu abstenção de prática de algum ato, tolerar alguma atividade, prestar ato ou entregar coisa, poderá requerer cominação de pena pecuniária para o caso de descumprimento da sentença ou da decisão antecipatória de tutela*"

## STROETER & ROYSTER ADVOGADOS

Sobre ações cominatórias, ensinou Pontes de Miranda:

> *"Desde que alguém é prejudicado, em se tratando de direito absoluto ou relativo, por ato positivo ou negativo de outrem, que possa continuar a repetir-se, ou haja receio que tal ato positivo ou negativo se dê, causando prejuízo, nasce a ação cominatória, que é ação irradiada da pretensão à abstenção ou à prática de ato alheio"*[2].

No presente caso, tendo em vista a evidente manutenção dos efeitos do contrato de licenciamento no Brasil (enquanto durar a arbitragem nos Estados Unidos da América), situação que se busca ver reconhecida na presente ação, permanecem as autoras com o direito de explorar <u>com exclusividade no Brasil, as marcas licenciadas pela ré.</u>

Resta evidente, portanto, que, enquanto durar a arbitragem, o direito de exclusividade de exploração pelas autoras dos produtos licenciados pela ré permanecem inalterados. <u>A conseqüência que exsurge deste fato é o evidente impedimento da ré de licenciar a quaisquer outras empresas, os produtos licenciados para as autoras.</u>

<u>Sendo assim, resta claro que enquanto durar a arbitragem, está obrigada a ré a não fazer ou seja, não contratar com quaisquer outras empresas, ou trazer eficácia de contrato assinado no exterior para o Brasil, sobre os direitos licenciados às autoras, respeitando sua exclusividade.</u>

## SOBRE O CABIMENTO DA ANTECIPAÇÃO DA TUTELA ALMEJADA
## E A JUSTIFICATIVA DE SUA CONCESSÃO

Temos, portanto, comprovada a incerteza quanto à interpretação de cláusula contratual, uma vez que a ré pretende rescindir o Contrato de Licenciamento sem atentar para a cláusula 33 do ajuste (o que se demonstra pela notificação); Temos, ainda, a comprovação de que, como determina a referida cláusula 33 do contrato, já

---

[2] MIRANDA, Pontes de. *Comentários ao Código de Processo Civil, vol VI, p41.*

## STROETER & ROYSTER ADVOGADOS

fora instalada a arbitragem. Diante destas premissas, elemento fático (existência da arbitragem) e elemento jurídico (cláusula contratual), se impõe o reconhecimento da verossimilhança do direito alegado pelas autoras – o direito de buscar a manutenção do contrato e, conseqüentemente de seus efeitos no Brasil, enquanto perdurar o procedimento arbitral.

Havendo verossimilhança, *fumus boni juris*, há que investigar se há urgência e perigo iminente que justifique uma interferência judicial de caráter provisório. Neste quesito resta comprovado o *periculum in mora* pela própria ação da ré em notificar as autoras, reclamando a rescisão sem consignar oportunidade para que as mesmas refutassem os argumentos apresentados e/ou requeressem a instalação de procedimento arbitral – como, mesmo sem a ação da ré neste sentido, acabou ocorrendo face à rápida atuação das autoras.

Caso não seja deferida a tutela pretendida, no próximo dia 31 de dezembro de 2004, a ré entenderá que o contrato estará sem efeito e, mesmo que a arbitragem conclua que as razões para a rescisão foram descontextualizadas, as perdas serão irreparáveis para as autoras, que investiram fortunas na consecução das metas mercadológicas (superadas em muito), para a Coopershoes - Cooperativa de Calçados e Componentes Joanetense Ltda., responsável pela fabricação dos calçados, para os seus funcionários e suas famílias, que se encontrarão em situação de extrema dificuldade em pleno período natalino e, até mesmo, para os cofres públicos.

Além dos requisitos reclamados pelo art. 273 do CPC, há que se verificar que não há, no caso, *periculum in mora* reverso, já que, vigente o contrato, as autoras permanecem com o dever de observar todas as suas obrigações, devendo, inclusive, na forma contratual, efetuar os pagamentos dos *royalties* devidos, como vem fazendo regularmente. Uma vez que as autoras superam os parâmetros mercadológicos contratualmente definidos pelas partes como indicadores de sucesso, a permanência de vínculo contratual além de não representar perigo iminente para a ré, representa manutenção do alto padrão de execução contratual que vem sendo impresso pelas autoras.

# STROETER & ROYSTER ADVOGADOS

Assim, estão reunidos os requisitos do artigo 273 c/c art. 461, em especial seu §3º, ambos do CPC, quais sejam: a) verossimilhança das alegações – que se comprova pela leitura da cláusula contratual de número 33 (cláusula arbitral) e do documento que comprova a instalação de procedimento de arbitragem, bem como os argumentos lançados; b) perigo da demora – consubstanciado na própria notificação encaminhada pela ré para as autoras, onde fica claro, a despeito da cláusula arbitral, seu desejo de rescindir o ajuste, ameaçando os investimentos feitos pelas autoras, os trabalhos executados pela cooperativa responsável pela fabricação dos calçados, os empregos de 1.200 (um mil e duzentas pessoas) e a própria arrecadação tributária; c) inexistência de periculum in mora reverso – uma vez que as autoras já provaram, segundo parâmetros do próprio Contrato de Licenciamento, sua competência, bem com o fato irrefutável que, vigente o contrato, estão vigentes não só os direitos das autoras, mas também suas obrigações, dentre elas, o pagamento a ré dos royalties vincendos.

Uma vez presentes os requisitos e demonstrada a possibilidade da medida pleiteada, requer seja deferida a antecipação da tutela pretendida declarando, em exame perfunctório, a validade da cláusula arbitral contratual e sua força obrigatória no sentido de que na vigência de procedimento arbitral, permanecem as partes contratantes sujeitas integralmente às disposições do Contrato de Licenciamento, sobretudo aos direitos e deveres ali acordados. Requer, ainda em sede de antecipação dos efeitos da tutela pretendida, seja compelida a parte ré a se abster da prática de qualquer ato que viole os direitos contratuais das autoras, direitos estes que encontram amparo no Contrato de Licenciamento, sob pena de multa diária no valor de R$ 100.000,00 (cem mil Reais).

# STROETER & ROYSTER ADVOGADOS

## DO PEDIDO

Ante o que fora exposto ao presente juizo, requerem as autoras:

a. seja deferida, como acima requerida, <u>medida antecipatória dos efeitos da sentença</u> declarando-se a eficácia da cláusula arbitral contratual e sua força obrigatória no sentido de que, na vigência de procedimento arbitral, permanecem as partes contratantes sujeitas integralmente às disposições do Contrato de Licenciamento, sobretudo aos direitos e deveres ali acordados;

b. seja, ante a declaração tratada no item anterior, compelida a parte ré a se abster da prática de qualquer ato que viole os direitos contratuais das autoras, direitos estes que encontram amparo no Contrato de Licenciamento, sob pena de multa diária no valor de R$ 100.000,00 (cem mil Reais);

c. seja deferido o pedido de prazo de 30 (trinta) dias para apresentação das cópias devidamente consularizadas, e suas traduções juramentadas, dos documentos apresentados na presente demanda;

d. seja determinada a citação da ré, pela via da carta rogatória, uma vez que a mesma tem estabelecimento no exterior, devendo a mesma contestar a presente ação e, em não o fazendo, estar sujeita aos efeitos da revelia;

e. ao final, seja declarada, em definitivo, a força vinculante da cláusula arbitral no sentido de que enquanto não estiver terminado o procedimento desta natureza, tenha plena vigência o ajuste contratual firmado pelas partes, abstendo-se a ré da prática de qualquer ato atentatório aos direitos contratuais das autoras, sobretudo sua exclusividade de uso das marcas licenciadas no território brasileiro.

# STROETER & ROYSTER ADVOGADOS

Requerem, ainda, sejam deferidos todos os meios de prova em direito admitidos, especialmente testemunhal, documental suplementar e pericial, esperando, com o provimento da pretensão autoral, seja a ré condenada nas custas do processo e honorários sucumbenciais em percentual não inferior a 20% (vinte por cento) do valor da causa.

Requer, por fim, que todas as publicações sejam realizadas em nome do Dr. Francisco Rosito.

Dá-se a causa, o valor meramente fiscal de R$ 10.000,00 (dez mil reais)

Porto Alegre, 21 de dezembro de 2004

Otto Eduardo Fonseca Lobo
OAB/RJ 88.050

Francisco Rosito
OAB/RS 44.307

Gustavo Kishler
OAB/RJ nº 116.923

# EXHIBIT 2

**1.    In Portuguese:**

a) seja deferida, como acima requerida, medida antecipatória dos efeitos da sentença declarando-se a eficácia da cláusula arbitral contratual e sua força obrigatória no sentido de que, na vigência de procedimento arbitral, permanecem as partes contratantes sujeitas integralmente às disposições do contrato de licenciamento, sobretudo aos direitos e deveres ali acordados.

b) seja, ante a declaração tratada no item anterior, compelida a parte ré a se abster da prática de qualquer ato que viole os direitos contratuais das autoras, direitos estes que encontram amparo no contrato de licenciamento, sob pena de multa diária no valor de R$ 100.000,00 (cem mil reais).

**2.    In English:**

a) as above required, be granted a preliminary injunction, declaring the effectiveness of the arbitrational clause and its force in the direction that, during the arbitrational procedure, the parties remain obliged to the terms of the license agreement, over all to the rights and duties arising there out.

b) according to the declaration stated in the previous item, be granted a preliminary injunction to compel the defendant to abstain from practicing any act that violates rights of the plaintiffs arising out of the license agreement, under the penalty of a daily fine of R$ 100,000.00 (one hundred a thousand reais).

4

# EXHIBIT 3

STATE OF RIO GRANDE DO SUL
JUDICIAL BRANCH

Considering:

1. I have not granted anticipated protection– the maintenance of the validity period of the licensing agreement for the commercial use of the trademark signed with the Converse Company, as well as the decision for the defendant to respect the obligations of exclusiveness set forth in the agreement, because it was not expressed in such a manner, nor was any such thing shown in the memoranda expressing the intention to renew the contract in accordance with Article 2 of the Licensing Contract.

    In a request for reconsideration the petitioners offered a collection of documents that demonstrated that there had been ample negotiations between the contractors with regard to the conditions for renewal, everything indicating that there had been no consensus with regard to such conditions. That is important as it shows that the petitioners were really led to experience a false sensation of tranquility that did not exist.

2. The dispute, therefore, that served as a context to the struggle is in the demonstration of the defendant's intention not to renew the contract (which ends on December 32, 2004), reason to note that the plaintiffs are being examined in a court of arbitration.

    The plaintiffs want the interpretation of Clause No. 33, when they claim that the setting up of the Court of Arbitration shall not exempt them from their obligations, must also have implications for the defendant, so that the defendant in the same manner remains tied to the obligations of the agreement while the arbitration process is carried out.

3. The core of the case may be seen by examining the contract clauses that deal with the length of the contract, its renewal, its resolution and with the institution of the Court of Arbitration for the purpose of verifying what the parties said on the occasion of the contracting, with regard to the period in which the Court of Arbitration might possibly be instituted.

    In view of the defendant's posture in notifying his lack of interest in renewal making clear its interest in renewing the Licensing Contract with negotiations, I hold that the latter ought to apply, as a way of preserving the principles of good faith and transparency in the business relationship.

4. Thus, with the risk of damage to the plaintiffs having been demonstrated, since they will have their business interrupted abruptly, with social implications as well, considering the social interest in the contract, as expressed in the Civil Code, I HEREBY GRANT ANTICIPATION OF PROTECTION and order that the effects of the licensing contract remain in effect during the period required by the arbitration procedure, and compel the defendant to abstain from carrying out acts that violate contract rights under liability of a daily fine of R$ 100,000.00.

5. Let notice be given and let the contents of the present decision be made known.

Porto Alegre, December 22, 2004

[s. illegible]
Liége Puricelli Pires
Judge of Law



# bli translations
a division of The Boston Language Institute

I, Muneebur Rahman, certify to the best of
my knowledge and belief that the following is a true
and accurate translation of a document from Portuguese
to English done under my supervision
this 5th day of January, 2005.

648 Beacon Street
Boston, MA 02215
617-262-3500
617-262-3595 Fax
blitranslations.com
info@blitranslations.com

TRANSLATION • INTERPRETING • WEBSITES • DESKTOP PUBLISHING

# EXHIBIT 4

# ESTUDIO BUNGE
### BUNGE, SMITH & LUCHÍA PUIG
#### ABOGADOS

Buenos Aires, January 3rd, 2005.

Pepe & Hazard, LLP
Mr. Michael C. Gilleran
225 Franklin Street, 16th Floor
Boston Massachusetts 02110-2804
Fax: 617-748-5555

Re: Injunction granted by an Argentine Court to ALON International S.A. and ALON Argentina S.A. regarding its Manufacturing, Distribution and Licensing Agreement with Converse, Inc.

Dear Mr. Gilleran:

Following Donaldo Smith Sanchez's letter dated December 30th, please find enclosed the motion filed at court on behalf of ALON International S A. and ALON Argentina S.A. Enclosed is also the December 30th ruling. Both documents are in Spanish.

Sincerely,

Nicolás Repila

## PETICION DE MEDIDA CAUTELAR DE NO INNOVAR

Señor Juez:

             **ALBERTO JOSE BUNGE**, abogado, inscripto al T° 53, F° 46 del Colegio Público de Abogados de la Ciudad de Buenos Aires, y **DONALDO GREGORIO SMITH SANCHEZ**, abogado, inscripto al T° 13 F° 92 de la Corte Suprema de Justicia de la Nación, constituyendo domicilio en Avda. Córdoba 991, 6° piso "A" de Capital Federal (Estudio Bunge – "Bunge, Smith & Luchía Puig" – Abogados; Tel: 5281-6000), a V.S. respetuosamente me presento y digo:

### I

### PERSONERIA

             Teniendo en cuenta la naturaleza de la medida, la necesidad de interponerla en forma urgente de conformidad a lo que continuación se expresa, el poco tiempo con que se ha contado para preparar las medidas, ha impedido a la fecha permitir a mi representada extender a favor de los suscriptos la escritura de poder que permita acreditar la representación que invocamos, por lo que venimos a presentarnos en los términos del art. 48 del Código Procesal Civil y Comercial de la Nación, en representación de **ALON INTERNATIONAL S.A.**, quien tiene domicilio legal en Calle 53 Urbanización Obarrio, Torre Swiss Bank, piso 16, Panamá, República de Panamá (de aquí en adelante Alon), sin perjuicio de acreditar personería u obtener la ratificación de mi representado en el plazo establecido en la citada norma legal.

             Por los mismos motivos que los expresados en el párrafo anterior, naturaleza de la medida, la necesidad de interponerla en forma urgente de conformidad a lo que continuación se expresa, el poco tiempo con que se ha contado para preparar las medidas, ha impedido a la fecha permitir a mi representada extender a favor de los suscriptos la escritura de poder que permita acreditar la representación que invocamos, por lo que venimos a presentarnos en los términos del art. 48 del Código Procesal Civil y Comercial de la Nación, en representación de **ALON ARGENTINA SRL**, que tiene domicilio en la calle Mariscal Sucre 3305 de la ciudad de Buenos Aires, República Argentina (de aquí

en adelante Alon Argentina), sin perjuicio de acreditar personería u obtener la ratificación de mi representado en el plazo establecido en la citada norma legal.

Sin perjuicio de lo expuesto, declaramos bajo juramento que la presente acción ha sido interpuesta siguiendo expresas instrucciones de mis representadas.

## II

### OBJETO

En legal tiempo y forma vengo a solicitar a V.S. dicte una medida cautelar ordenando a Converse Inc., con domicilio en One High Street, North Andover, Massachussets 01845, Estado Unido de América, a:

a) respetar y garantizar los derechos de Alon y de Alon Argentina para el uso pleno de los derechos patrimoniales de las marcas: **"Converse"**, **"All Star"**, **"Converse All Star Chuck Taylor"**, **"Star and Chevron"**, **"Chuck Taylor All Star"**, **"Jack Purcell"**, **"Skid Grips"** y **"One Star"**, ello en los términos y condiciones establecidos en el Contrato de Licencia, y en un todo de acuerdo a la Ley de Marcas, hasta tanto se dicte y queden firme las resoluciones arbitrales y judiciales que zanjen definitivamente las cuestiones controvertidas entre las partes; y

b) (i) a que se abstenga de otorgar a terceros distintos de Alon y Alon Argentina licencia de las marcas **"Converse"**, **"All Star"**, **"Converse All Star Chuck Taylor"**, **"Star and Chevron"**, **"Chuck Taylor All Star"**, **"Jack Purcell"**, **"Skid Grips"** y **"One Star"** para fabricar y/o comercializar productos en el territorio de la República Argentina a partir del 1° de enero de 2005, y para el caso en que haya otorgado licencia para operar en el mercado a partir del 1° de enero de 2005, que Converse se abstenga de proveer al tercero licenciatario en cuestión, productos y accesorios para ser comercializados en el territorio de la República Argentina; y (ii) a que se abstenga de comercializar directamente productos y accesorios con las marcas **"Converse"**, **"All Star"**, **"Converse All Star Chuck Taylor"**, **"Star and Chevron"**, **"Chuck Taylor All Star"**, **"Jack Purcell"**, **"Skid Grips"** y **"One Star"** en el territorio de la República Argentina a partir del 1° de enero de 2005. Asimismo, solicito a V.S. que la

medida cautelar en cuestión esté vigente hasta tanto se dicte el laudo arbitral y la resolución judicial definitiva que zanje definitivamente entre Alon, Alon Argentina y Converse, los derechos litigiosos cuya tutela se describe a lo largo del presente escrito.

## III

## HECHOS

1.- El día 1° de septiembre de 2001 entró en vigencia el contrato de fabricación, distribución y licencia, mediante el cual Converse Inc. (de aquí en adelante Converse) licenció a favor de Alon las marcas "Converse", "All Star", "Converse All Star Chuck Taylor", y "Star and Chevron", con exclusividad para el territorio de Argentina, Brasil, Paraguay y Uruguay, para calzado deportivo y de tiempo libre, ropa y accesorios deportivos (de aquí en adelante el Contrato de Licencia). El Contrato de Licencia redactado en inglés, se adjunta al presente como **Anexo I** junto con la traducción pública efectuada al castellano.

2.- Durante el transcurso de la vigencia del Contrato de Licencia, Alon desarrolló con éxito las marcas y la comercialización de los productos licenciados dentro del mercado que le fue asignado, y continúa al día hoy realizando fuertes inversiones para los productos en el desarrollo del mismo. Además, como hechos relevantes ocurridos durante el primer período de vigencia del Contrato de Licencia, merece destacarse: a) Alon rescató en Brasil la marca "All Star" que estaba siendo explotada por un "pirata marcario"; b) Alon desarrolló mercados inexistentes para las marcas y productos relacionados con Converse; c) Alon desarrolló un modelo comercial exitoso para la venta de las marcas y los productos Converse; d) Alon desarrolló y mantuvo contactos y relaciones comerciales en la región; e) Alon aumentó considerablemente las ventas de los productos Converse, cinco veces más que las garantías mínimas acordadas en el Contrato de Licencia; f) Alon creó exitosamente canales de distribución para las marcas y los productos Converse; y g) Alon posicionó con fuerza las marcas objeto del Contrato de Licencia, para un fuerte crecimiento de las ventas en el futuro.

3.- A partir del 1° de enero de 2004, Alon acordó con Converse incluir sus subsidiarias y afiliadas al Contrato de Licencia, de modo que Alon Argentina pudiera invocar en la República Argentina los derechos de licencia y distribución descriptos en el Contrato de Licencia (ver Second Amendment). En los hechos Alon Argentina se encargó de la comercialización y distribución de los productos con las marcas de Converse en el territorio de la República Argentina.

4.- El plazo original de vigencia del Contrato de Licencia fue fijado desde el 1° de septiembre de 2001 hasta el 31 de diciembre de 2004.

Sin embargo, la cláusula 2 del Contrato de Licencia estipula que Alon tiene la facultad y el derecho de optar por renovar automáticamente el Contrato de Licencia por un plazo de 3 años, siempre que antes del 30 de septiembre de 2004 se cumplieran algunas condiciones. Específicamente, el Contrato de Licencia establece que el mismo puede ser renovado por un período adicional de 3 años, si Alon excede las ventas y garantías mínimas garantizadas para el año 3 del Contrato de Licencia en un 25%, y si Alon no ha violado ninguno de los términos y condiciones del Contrato de Licencia.

Explicado ello, es preciso tener presente que Alon ha superado ampliamente el requisito de regalías y ventas mínimas para el tercer año del Contrato de Licencia. Durante el primer periodo del Contrato de Licencia, Alon garantizó a Converse ventas mínimas de US$ 7.017.000, y las ventas reales hasta el 31 de diciembre de 2004, alcanzarán aproximadamente US$ 40 millones, es decir, más de 5 veces el mínimo contractual garantizado.

Asimismo, Alon le garantizó a Converse al menos alcanzar la suma de US$ 490.000 en concepto de pago de regalías durante el primer período del Contrato de Licencia. Al término del primer período Alon le habrá pagado regalías a Converse por más de US$ 3 millones al 31 de diciembre de 2004, es decir, más de 6 veces el mínimo contractual garantizado.

Se debe tener presente que Alon no ha incumplido el Contrato de Licencia, y además, en ningún momento, durante el transcurso de su relación de 3 años, Converse ha notificado a Alon sobre algún incumplimiento contractual. Es importante destacar que la primera vez que Converse le notificó a Alon sobre

supuestos "incumplimientos" fue el 30 de noviembre de 2004, un mes antes del vencimiento previsto para el primer período del Contrato de Licencia, y con posterioridad a la renovación automática del Contrato de Licencia que operó a favor de Alon y Alon Argentina.

Considerando lo expuesto –el cumplimiento de las garantías contractuales y el hecho de no haber Alon incumplido el Contrato de Licencia- Alon había expresado a Converse, por escrito, verbalmente, y por conductas inequívocas, su decisión de hacer uso de su derecho de renovar automática del Contrato de Licencia. Cabe destacar que esta comunicación fue cursada con anterioridad al 30 de septiembre de 2004 y obviamente a la recepción de la carta de Converse del 30 de noviembre de 2004.

De hecho las partes han mantenido negociaciones prolongadas e importantes con respecto a la renovación del Contrato de Licencia. Las negociaciones en cuestión motivaron escribir e intercambiar muchísimos correos electrónicos, entre los cuales merecen ser destacados los siguientes:

a) Con fecha 4 de mayo de 2004 o alrededor de esa fecha, Tim Ouellette ("Ouellette"), Vicepresidente de Licencia de Comercialización de Converse, envió a Roberto Szerer ("Szerer"), Copresidente de Alon, un mensaje de correo electrónico que indicaba que las partes se encontraban en negociaciones con respecto a la renegociación del Contrato de Licencia (ver **Anexo II**), a saber:

> *Adjunto encontrará un análisis de lo que está siendo tratado. Me gustaría llegar a un acuerdo sobre cómo planificamos avanzar lo antes posible. Gracias.*

b) El 19 de mayo de 2004 o alrededor de esa fecha, Szerer envió a Ouellette un mensaje de correo electrónico expresando (ver **Anexo II**):

> *Estimado Tim:*
>
> *Sobre la base de nuestras comunicaciones telefónicas y continuando el proceso para establecer el fundamento para el nuevo contrato, adjunto encontrará una propuesta donde hemos segmentado las tasas de crecimiento, garantía y regalía para los siguientes períodos:*

- *Agresivo 2004/05/06*
- *Medio 2007/08/09/10*
- *Moderado 2011/12/13*

*Según lo acordado, comenzaremos a partir de nuestras ventas reales de 2003 como nuestra base.*

*Creo que esto nos ayudará a lograr una renovación equitativa y justa con el mínimo de tensión.*

*Saludos.*

*Roberto Szerer*

c) El 31 de mayo de 2004 o alrededor de esa fecha, Szerer escribió a Ouellette indicando la renegociación del Contrato de Licencia. Adjunto al mensaje de correo electrónico había una hoja de cálculos con cifras propuestas hasta el 2013 (ver **Anexo II**):

> *Estimado Tim:*
>
> *Siguiendo nuestra comunicación telefónica, adjunto encontrará una hoja de cálculos con las cifras que acordamos. Como podrá observar he modificado la tasa de regalía de los originales para que llegue gradualmente al 10% durante el plazo del contrato.*
>
> *Comprendemos que sobre la base de nuestro "Gran Difícil Objetivo Agresivo" inicial ustedes quisieran un crecimiento para este año del 50%. Creemos que es demasiado alto especialmente tras el crecimiento que tuvimos en el último año pero de todas formas estamos evaluando las proyecciones para el 2004 teniendo en cuenta todas las variables involucradas (Nueva empresa en la Argentina, nueva empresa en el Brasil, nueva línea de indumentaria, etc.) y también incluso el reciente cambio en el Real que de por sí reduce las cifras de ventas en dólares un 9,68% (el tipo de cambio actual por dólar de R$ 3,10 frente al cálculo*

*inicial a R$ 2,80). Estaré de viaje toda la semana en la Argentina y el Brasil pero trataré de comunicarme con usted el Viernes.*

*Le deseo una buena semana.*

*Saludos.*

*Roberto Szerer*

d) El 10 de junio de 2004 o alrededor de esa fecha, Szerer envío un mensaje de correo electrónico a Ouellette, en el que expresaba, entre otros, su intención de renovar el Contrato de Licencia (ver **Anexo II**):

*Estimado Tim:*

*Siguiendo nuestra comunicación telefónica, adjunto encontrará nuestro pronóstico revisado para el 2004.*

*Los principales factores que influyeron en el pronóstico para dicho año son:*

- *La devaluación en la región de nuestro pronóstico de 2.8 Reais por dólar en el Brasil a una nueva realidad a 3,10.*

- *En la Argentina de 2,85 Pesos por dólar a 3,00. No esperamos una devaluación mayor, pero como ustedes saben la economía en esta parte del mundo es sumamente volátil por lo que debemos estar atentos a cualquier cambio futuro.*

- *A pesar de las importantes batallas legales que hemos ganado contra los Piratas, continuamos teniendo problemas constantes en el mercado que muestran que el crecimiento en el producto vulcanizado será de 5% en vez de nuestra proyección inicial del 6,59%.*

- *Hemos revisado nuestro pronóstico de ventas para la línea cementada en el Brasil debido a una baja*

*aceptación de la línea en el mercado sumado a una demora superior a la esperada para recibir los modelos y sus instrucciones de armado y fabricación.*

- *La introducción de la línea de indumentaria aumenta nuestro pronóstico.*

- *La Argentina tuvo un buen comienzo y las ventas para el año parecen prometedoras pero nos llevó más tiempo comenzar con la nueva estructura y además tuvimos demoras debido a un gran paro por parte de la aduana brasilera. En vez de nuestra proyección inicial de ventas a lo largo de 11 meses, sólo esperamos tener 7 meses reales de ventas.*

- *Uruguay está afectada de la misma manera que el Brasil y la Argentina por la devaluación.*

*La proyección de las ventas totales para el 2004 muestra un crecimiento del 16,22% de US$ 12.649.921 a US$ 14.701.254.*

*Adjunto el desglose de las cifras más nuestra propuesta actualizada para la renovación de 5+5 años.*

*Lo llamaré para continuar y responder cualquier pregunta que pudiera tener.*

*Saludos.*

*Roberto Szerer*

De acuerdo con los correos electrónicos acompañados, surge evidente que Alon y Converse estuvieron involucradas en prolongadas negociaciones con respecto a la renovación del Contrato de Licencia, y que a lo largo de las negociaciones y las comunicaciones que las mismas generaron, Alon dejó en claro y por escrito su intención de renovar el Contrato.

Asimismo, durante el mes de septiembre de 2004, Converse en más de una oportunidad y de un modo elocuente, le comunicó verbalmente a Alon su intención de renovar el Contrato de Licencia por un período de 5 años.

5.- No obstante lo señalado en el punto 4 anterior, y sin mediar justificación alguna, con fecha 30 de noviembre de 2004 Converse remitió a Alon una notificación de vencimiento e incumplimiento al Contrato de Licencia, la cual se encuentra adjuntada al **Anexo III**.

En dicha nota, Converse expresa que no acuerda, ni celebrará, ninguna extensión al plazo original del Contrato de Licencia. Asimismo, Converse expresó su derecho a rescindir el Contrato sobre la base de algunos supuestos incumplimientos de Alon, para el caso en que Alon no subsane dichos incumplimientos, dentro de los períodos de tiempo especificados a tal fin en el Contrato de Licencia.

Converse notificó a Alon los siguientes incumplimientos: a) la suscripción de un contrato prohibido de sublicencia con la compañía brasilera Coopershoes Cooperativa de Calçados E Componentes Joanetense Ltda. (de aquí en adelante Coopershoes), y que en razón de la cesión ilegítima de la licencia Alon le adeudaba a Converse la suma de US$ 4 millones en concepto de regalías calculados sobre una base carente de razonabilidad alguna; b) indebida deducción del IVA sobre las ventas netas, reclamando Converse US$ 438.032; c) una mala liquidación por parte de Alon en el uso del tipo de cambio utilizado para calcular las regalías de Converse, procediendo Converse a reclamar un pago de US$ 16.291; y d) incumplimiento a las pautas de publicidad mínima.

La nota del 30 de noviembre de 2004 es la primera notificación de incumplimiento que remitió Converse a lo largo de todo el vínculo contractual, a pesar de que los incumplimientos que Converse denuncia datan de fechas del año 2002, y llamativamente son expresados luego de haber Alon renovado el Contrato de Licencia, y a un mes de la finalización del primer período de vigencia del mencionado contrato.

6.- La respuesta de Alon a la notificación de Converse no se hizo esperar, y con fecha 7 de diciembre de 2004 se le hizo saber que Alon negaba

haber incurrido en algún incumplimiento contractual, como así también negaba que la vigencia del Contrato de Licencia se extienda solamente hasta el 31 de diciembre de 2004.

Por el contrario, se afirmó que el derecho de Alon a renovar el Contrato de Licencia fue ejercido por Alon con anterioridad al 30 de septiembre de 2004, y por lo tanto, el Contrato de Licencia de ningún modo vence el 31 de diciembre de 2004. Se indicó también que Alon superó los requisitos de venta para la renovación automática del plazo del Contrato de Licencia, y que la conducta de las partes y los registros por escrito entre Alon y Converse sobre el tema de la renovación contractual demuestran claramente que Alon ejerció sus derechos de conformidad con la cláusula 2 del Contrato de Licencia, y que lo que quedaba era celebrar el documento de extensión por un plazo superior a la renovación automática de 3 años. Se manifestó además, que Alon confió en el hecho de que Converse estaba negociando de buena fe, ya que hasta el momento en que se recibió la nota del 30 de noviembre, las partes habían expresado su voluntad de continuar vinculados contractualmente. Se dejó constancia también de que la primera notificación de Alon en cuanto a que Converse no quería extender el plazo del Contrato de Licencia fue la carta del 30 de noviembre de 2004.

En cuanto al supuesto incumplimiento por el otorgamiento de una sublicencia prohibida, tal imputación fue rechazada de plano. En la nota Alon le recordó a Converse que el rol principal y único de Coopershoes era fabricar los productos Converse para Brasil y Argentina. Que la estructura contractual y de pagos del contrato con Coopershoes fue diseñada y llevada a cabo por el asesor brasileño de Converse, y que el objeto de su existencia era el de permitir el envío al exterior de las ganancias de Alon, y el pago de las regalías de Converse en el exterior de Brasil. Converse alentó tenazmente la adopción de la estructura de Coopershoes, siempre como una forma creativa de cumplir con las restricciones normativas brasileras. En este caso, también el registro escrito de pruebas es sumamente claro con respecto al tema, acreditando que Converse tenía conocimiento de todo ello desde el origen de la existencia del contrato. Se rechazó la pretensión de Converse de encuadrar dicho contrato como un incumplimiento

contractual, y ergo, cualquier pretensión dineraria derivado de dicho incumplimiento.

Por otro lado, en lo que al incumplimiento en el pago de regalías derivados por temas vinculados al impuesto al valor agregado en los países del Mercosur ("Value Added Tax"), y fundamentalmente en Brasil, Alon le hizo saber a Converse que el uso del término "VAT" en el contrato se debió a un error de quien lo redactó, ya que los impuestos que se deducen de las ventas netas son los internos de cada país, tal el caso de Brasil donde no existe un "VAT" *per se*, sino que existe una impuesto equivalente conocido con el nombre de "Impuesto ICMS". Ese impuesto es el que se deduce de los pagos. En tal sentido Alon hizo saber que no consideraba que el uso de un término equivoco en el Contrato de Licencia es causal para cancelar el Contrato de Licencia.

Del mismo modo, en lo que se refiere al supuesto incumplimiento en el pago de regalías derivado de la liquidación de divisas a un determinado tipo de cambio, Alon le comunicó a Converse que entendía que, por tratarse de una tema de US$ 16.291 sobre una liquidación total de más de US$ 7 millones, no valía ni discutir ese punto. Sin embargo, para el caso en que hubiera existido una diferencia la misma se habría generado por un error de buena fe. En tal entendimiento, Alon transfirió a la cuenta bancaria de Converse US$ 3.780,75, los cuales representan los US$ 16.291 si Converse tomase en cuenta un pago de regalías en exceso de US$ 12.510,25 reconocido por Converse anteriormente.

En lo que a la inversión en publicidad se refiere, Alon le indicó a Converse que según sus registros, los gastos anuales promedio de Alon en publicidad durante el plazo inicial de 3 años, son de 5,2%, lo que supera el requisito del 5% estipulado en el Contrato de Licencia. Por lo tanto, Alon expresó que no ha existido violación de su parte a las disposiciones de publicidad establecidas contractualmente.

Por último, Alon le advirtió a Converse respecto de su intención de continuar con su actividad comercial en los términos del Contrato de Licencia, de conformidad con la renovación previamente acordada del plazo del Contrato de Licencia, por lo que al no retractar Converse su reclamo de que el Contrato de



<u>Licencia vence el 31 de diciembre de 2004, no otorgaba más alternativa que invocar y defender su derecho a exigir el cumplimiento del Contrato de Licencia en el ámbito de un proceso jurisdiccional.</u>

7.- El día 10 de diciembre de 2004 (ver **Anexo XI**) Converse le comunicó a Alon que no se retractaba de sus afirmaciones expresadas en su carta del 30 de noviembre de 2004, en cuanto a que Alon había incurrido en incumplimiento del Contrato de Licencia, y que el mismo finalizaba el día 31 de diciembre de 2004.

En segundo lugar, Converse expresó que Alon no ofreció prueba de que Coopershoes es "nada más que un fabricante de los productos Converse en Brasil y Argentina", a modo de que Converse reconsidere su opinión sobre este tema.

En tercer lugar explica que con el tema impositivo, Converse entiende que no es un problema de confusión del VAT con el ICMS, sino que Alon está calculando su pago de regalía neta comenzando con una suma que ya es neta de VAT, y que ello genera un pago insuficiente de regalías.

En cuarto lugar, Converse entiende que aun hay pago insuficiente de regalías debido al uso incorrecto del tipo de cambio, ya que no aceptó la compensación de Alon, e insisten en el reclamo del saldo.

En quinto lugar, Converse afirma que Alon no denuncia hechos que le demuestren que Alon cumplió con los requisitos mínimos de gastos de publicidad directa y no gastos en comercialización.

En tales condiciones, Converse manifestó que estaba dispuesto a responder y a considerar los hechos que Alon ponga en su conocimiento, relativos a los temas planteados en la nota del 30 de noviembre de 2004; pero, en los hechos Converse fue renuente a concertar una reunión para tratar y reconsiderar la cuestión

8.- Así las cosas, Alon le hizo saber a Converse que lamentaba que ésta continuara con la controversia basada en hechos inexactos. Atento el tenor de la respuesta brindada por Alon el día 15 de diciembre de 2004 (ver **Anexo XII**),

esta parte considera adecuado transcribir a continuación los términos de dicha
nota:

       *Hemos recibido su carta con fecha del 10 de diciembre de 2004.*
*Desafortunadamente, Converse continua con la controversia basada en hechos*
*inexactos, sin tener en cuenta el curso del acuerdo entre Alon y Converse durante*
*la duración del Contrato y anterior a su celebración. En su carta solicita que*
*demostremos los hechos que comprueban nuestras declaraciones de la carta del 7*
*de diciembre de 2004. A continuación, detallamos algunos de dichos hechos y una*
*aplicación de sentido común de los mismos punto por punto.*

    *1.  <u>Renovación del Contrato de Licencia.</u> Ahora queda claro que la posición*
*de Converse se basa en que su decisión para rescindir el Contrato es que*
*sostiene que Alon supuestamente no cumple con los términos del Contrato.*
*Nos referiremos a estos supuestos incumplimientos en los párrafos*
*siguientes. En primer lugar, sin embargo, es claro que Alon se encontraba*
*negociando desde varios meses con Converse la renovación del Contrato,*
*por lo que Alon notificó a Converse de su intención de renovarlo y*
*Converse reconoció esto en varias cartas. En segundo lugar, Alon*
*claramente cumplió y excedió en gran medida todos sus objetivos de venta*
*durante el primer período del Contrato. Alon le garantizó a Converse unas*
*ventas mínimas de USD 7,017 millones durante el primer período del*
*Contrato y las ventas reales al 31 de diciembre de 2004 alcanzaron los*
*USD 40,663 millones — <u>más del quíntuple del mínimo garantizado</u>. De*
*manera similar, Alon le garantizó a Converse un pago de garantía mínimo*
*durante el primer período del Contrato de USD 490.000 y las regalías que*
*pagará a Converse al 31 de diciembre de 2004 alcanzarán un total de USD*
*3.059.000 — <u>más del séxtuple del mínimo garantizado</u>. No puede haber*
*dudas de que Alon excedió en gran medida sus promesas de ventas y*
*regalías para con Converse. Aquí, el punto principal radica en que*
*Converse estaba perdiendo dinero y no poseía un verdadero mercado en*
*los países del MERCOSUR hasta que Alon construyó dicho mercado para*
*éste. Alon sufrió amenazas a las vidas de sus mandantes (quienes*

*utilizaron la mayor parte del tiempo y esfuerzos en esta relación durante los últimos tres años) y gastó cientos de miles de dólares propios para construir este importante mercado — y explotándolo aún más para Converse — el cual ahora Converse descaradamente reclama para sí. El intento de Converse de robar este mercado ahora en expansión, después de todo el arduo trabajo de Ron Durchfort y Roberto Szerer a través de Alon a fin de desarrollar el mercado para Converse es obvio, vergonzoso y materia de juicio. Alon sufrirá daños y perjuicios por más de USD 8 millones en caso que Converse intente bloquear la renovación automática del Contrato. Converse perderá mucho más que dicha suma ya que será privado de actuar en el mercado del MERCOSUR mientras que se encuentre pendiente su disputa con Alon y tendrá que asumir el riesgo de pagar daños y perjuicios a Alon si su caso se evalúa incorrectamente.*

*De esta manera, el débil fundamento sobre el que Converse basa su decisión de rescindir el Contrato yace en que Alon supuestamente incumplió el Contrato. En primer lugar, prestemos atención a las negociaciones que serán analizadas en cada arbitraje y acción legal que debamos iniciar a fin de proteger los intereses de nuestros clientes. En ningún momento, durante el primer período del Contrato, Converse notificó a Alon de incumplimiento alguno conforme a disposición alguna del Contrato. No le es extraño a Alon que Converse haya alegado en la carta del 30 de noviembre de 2004 dichos supuestos incumplimientos por primera vez — a solo un mes de la renovación automática del Contrato — solo después de considerar la posibilidad de controlar el mercado del MERCOSUR directamente, y después de utilizar una auditoría que era claramente un pretexto para rescindir el Contrato.*

2. *Supuesto Contrato de Sublicencia Prohibido. El primer argumento que Converse utiliza para comprobar que tiene la facultad de rescindir y/o no renovar el Contrato, y que consiste en que Alon ha celebrado un acuerdo de Sublicencia no autorizado con Coopershoes, no es fácticamente preciso. Converse se encontraba completamente al tanto de los detalles de la*

relación entre Alon y Coopershoes y la aprobó aún antes de que se celebrara el acuerdo con Coopershoes.

En su e-mail del 29 de julio de 2002, dirigido a Luiz Enrique O. do Amaral y copiado a Tim Oullette y Laura Kelley (la abogada general de Converse), el abogado de Converse en Brasil, Ron Durchfort escribió:

> "Estimado Luiz,
>
> Quiero informarte que hemos firmado un contrato con Coopershoes. Con este contrato logramos: eliminar el apoyo de producción a Artigos. Estar preparados para introducir inmediatamente a Converse All-Star. Eliminar el argumento de Artigos que la producción/ distribución de Converse acarreará desocupación. Una entrada no traumática de Converse All-Star al mercado brasilero".

Este e-mail muestra claramente que Converse conocía la relación entre Alon y Coopershoes. Además, Converse incluso permitió que Alon utilizara los Abogados de Converse en Brasil a fin de documentar el acuerdo con Coopershoes. El conocimiento de la existencia del acuerdo por parte de Coopershoes es una conclusión obvia.

Sin embargo, Alon no se quedó allí – dio a conocer a Converse los detalles del acuerdo con Coopershoes en varias ocasiones. El 10 de octubre de 2002, Tim Oullette le envió a Ron Durchfort un e-mail:

> "Ronald:
>
> Gracias. Bárbaro. Por supuesto que usted también traerá el Contrato de Coopershoes. Digame cuándo estará llegando así le facilitamos el transporte. Saludos, Tim".

En respuesta, Ron Durchfort y Roberto Szerer volaron a Boston con los contratos de Coopershoes en mano para reunirse con Tim Oullette y Laura Kelley (y demás personal de Converse). Sin embargo, la Srta. Kelley no asistió a la mayoría de las reuniones. Durante dicha reunión, el Sr. Oullette los cuestionó agresivamente sobre la naturaleza del acuerdo entre Coopershoes y Alon. En ese momento, el Sr. Durchfort y el Sr. Szerer explicaron completamente el acuerdo al

*Sr. Oullette, incluyendo todas las funciones con las que Coopershoes debía asistir además de la fabricación de los productos de Converse. También se le explicó que el acuerdo debió estructurarse de dicha manera con el objeto de introducir los productos de Converse en el mercado tan pronto como le era posible, para evitar que Coopershoes continúe su relación con la "Marca Pirata" y a fin de permitir que las regalías salgan de Brasil y sean pagadas en dólares estadounidenses a Converse. El Sr. Oullette comprendió y estuvo de acuerdo con el enfoque de Alon.*

> *Luego de la reunión, Ron Durchfort envió un e-mail a Tim Oullette el 24 de octubre de 2002:*

>> *"Estimado Tim:*

>> *Gracias por la reunión productiva con usted y su equipo. El proyecto del MERCOSUR está en marcha. Los envíos de octubre en Brasil van de acuerdo con lo previsto y las órdenes de noviembre (entrega de noviembre) han superado el pronóstico. Para que estemos todos de acuerdo, he incluido en este mensaje los resultados de nuestras conversaciones que estamos ahora implementando. Comprendemos que la línea que está siendo vendida está aprobada con las correcciones mencionadas. Tenemos la intención de presentar el producto de la temporada 1-03 para su aprobación dentro de los 60 días".*

> *Más clara aun es la respuesta a dicho e-mail ese mismo día:*

>> *"Ronald:*

>> *Estoy muy contento de que pudimos hacer esto esta semana para aclarar las cosas así como también para revisar nuestra estrategia para seguir adelante. La presentación fue muy buena y la estrategia absolutamente de acuerdo con el mercado en su situación actual. Por el momento, quisiera que trate todas las Aprobaciones conmigo con copia a Ava Lawrence, sinceramente no quiero involucrar a Comercialización/ Desarrollo del Producto. No siempre consideran estos proyectos como negocios y tienden a ponerse molestos. Cuando todo el producto esté listo y ustedes estén de acuerdo con*

*nuestra empresa dejaremos esto. Ahora estoy muy interesado y ansioso por lo que podemos hacer. Por favor dígame las fechas cuando quiere que vaya a Brasil así puedo planificar el viaje. Una vez más, ¡buen trabajo!*

*Gracias.*

*Tim"*

En ningún momento, pese a haber explicado completamente la suma y contenido del acuerdo con Coopershoes, el Sr. Oullette se opuso a dicho acuerdo. De hecho, agradeció a Ron Durchfort por haber "aclarado las cosas".

Nuevamente, a fines del 2003, el Sr. Szerer voló a Boston para analizar con Converse las operaciones futuras en el mercado del MERCOSUR y surgió el tema del acuerdo con Coopershoes. Esta vez se reunió directamente con Laura Kelly también. Durante dicha reunión, el Sr. Szerer también explicó por completo la suma y contenido del acuerdo con Coopershoes. El Sr. Szerer explicó a Converse que la estructura del acuerdo con Coopershoes no constituía un Contrato de Sublicencia, pero había tenido que estructurarse de esa manera para, entre otras razones, poder cumplir con las regulaciones brasileras y permitir el pago de las regalías a Converse. De lo contrario, Converse hubiese percibido sus regalías en moneda brasilera en Brasil – lo que no quería. En los últimos años, estuvo contento de recibir más de USD 3.000.000 en concepto de regalías mediante este método. En ningún momento, la Srta. Kelley o algún otro empleado de Converse informó a Alon que había tenido problemas con el acuerdo o que consideraba que el mismo constituía una contrato de sublicencia no autorizado. Unos días más tarde, Converse realizó una modificación al Contrato y ni si quiera consideró contemplar esta cuestión en la Modificación, renunciando así a esta cuestión como base para el incumplimiento, rescisión o rechazo a la renovación del Contrato.

Además, Coopershoes no tiene ningún reclamo conocido en relación a la utilización de la propiedad intelectual de Converse en virtud del acuerdo de Alon con Coopershoes. Asimismo, Coopershoes nunca inició una acción sin la

*supervisión y autorización tanto de Alon como de Converse. El modo en que Alon y Coopershoes han acordado sus términos no esconde un contrato de sublicencia. Sin embargo, sin importar la naturaleza del contrato entre Alon y Coopershoes, Converse lo sancionó. Converse nunca informó a Alon de alguna objeción a su relación con Coopershoes hasta que ello sirvió como fundamento para quitarle a Alon el mercado del MERCOSUR. De esta manera, al informarse a Converse del acuerdo con Coopershoes, al haber éste aceptado los beneficios del mismo y al no haberse opuesto al mismo (pese a haber celebrado una Segunda Modificación al Contrato que no menciona esta cuestión), Converse renunció a toda objeción al acuerdo y actualmente no puede basarse en el mismo a fin de argumentar que Alon no ha cumplido el Contrato. El intentar declarar ahora a Alon en incumplimiento de su Contrato con Converse en virtud del acuerdo de Coopershoes da a Alon la impresión, una vez más (y probablemente también dará la misma impresión a jueces y árbitros) de ser un intento inequívoco y de mala fe de usurpar las oportunidades comerciales de Alon en un mercado no existente para Converse antes del trabajo de Alon.*

*3. Supuesto Incumplimiento de Pago de Regalías Adecuadas Por I.V.A. Sobre este punto, Converse hace la vista gorda. Seamos claros. En Brasil no existe un impuesto al valor agregado. Su funcional equivalente en Brasil es el impuesto ICMS. Coopershoes incluyó en sus facturas el impuesto ICMS, pero no se dedujo dos veces de las ventas informadas a Converse. Hagamos la suma. La regalía total que se le abonará a Converse por las ventas al 31 de diciembre del 2004 será de USD 3.059.000, que es realmente más del 7% del total de las ventas netas de USD 40.663.000, conforme al Contrato durante su primer periodo. En caso de que nos estemos olvidando de algún punto sobre esta cuestión, sólo muéstrenoslo, y si estamos equivocados lo admitiremos. Sin embargo, no lo creemos y consideramos que Converse está siendo mal asesorado por sus auditores y que está equivocado.*

*4. Supuesto Incumplimiento de Pago de Regalías por Tipos de Cambio Incorrectos. Converse se equivoca al intentar argumentar la rescisión*

*sobre esta base, y no lo logrará. No existe ningún intento de cambiar a Converse, y es absurdo argumentar sobre una diferencia de USD 12.000 sobre pagos de regalías totales que para el 31 de diciembre de 2004 alcanzarán los USD 3.059.000. Ello es un error de menos del 0,4%. A fin de olvidar esta tonta cuestión de la ecuación, Alon le está abonando a Converse el saldo que reclama debido sin admitir y consentir que realizó algo de manera incorrecta en primer lugar. Confiamos en que considerarán esto como una solución razonable sobre esta "cuestión".*

5.  *Supuesto Incumplimiento de Publicidad Mínima. En su carta intenta distinguir entre "gastos de publicidad directa" y "gastos de comercialización". Sin embargo, ninguna de estas frases se utilizan o definen en el Contrato. El Contrato se refiere a "Gastos de Publicidad" los que son ampliamente definidos como "sumas razonables de dinero, pero en ningún caso deberán ser menores al cinco por ciento (5%) de las Ventas Netas del Licenciatario para ese Año del Contrato, a fin de publicitar los Artículos Licenciados que lleven las Marcas de Converse..." Debido a que este contrato fue redactado por Converse, toda ambigüedad será interpretada contra éste.*

    *El hecho es que más del 5% de las ventas netas totales se gastó en publicidad /comercialización. El hecho más sobresaliente es que Alon gastó lo suficiente en publicidad y comercialización como para exceder en cinco veces más las ventas mínimas requeridas por Converse conforme al contrato y en seis veces más las regalías mínimas. ¿Realmente Converse considera que quien juzgue las cuestiones de hecho, especialmente un árbitro, no tomará en cuenta que Alon excedió los propios objetivos de Converse por un gran margen, cuando analice si Alon cumplió regularmente con sus obligaciones de publicidad?*

    *Igualmente, a Converse se le consultó regularmente sobre la estrategia de comercialización y publicidad para los mercados del MERCOSUR. La correspondencia sobre este punto es clara y hay mucha. Converse debería leerla nuevamente antes de que un árbitro o juez se la lea. En ningún*

*momento, Converse indicó que no estaba de acuerdo con el monto de gastos de publicidad por parte de Alon o con los resultados que éste estaba obteniendo en el mercado.*

*Converse necesita olvidarse del lenguaje contractual y prestar atención a lo que sucedió entre las partes durante el curso de sus acuerdos y evaluar su argumento en el mundo real. En caso de que fallen todos sus otros argumentos – y lo harán – es éste el argumento que Converse quiere sostener como su último recurso para defender su agresión injustificada contra este mercado lucrativo? En ese caso, Converse tendrá que explicar por qué no definió adecuadamente el término "Gastos de Publicidad" y por qué se lo debe justificar por definirlo estrechamente, pero en la situación de ser acusado de construir un robo indiscutible del mercado luego de haber sido desarrollado por otro y burlándose de su ingenuidad. Alon resaltará que rescató el mercado de una "Marca Pirata" para el beneficio Converse, que tomó el mercado sin nada y logró superar en más del 400% los objetivos de Converse y que abonó a Converse más de USD 3.000.000 en concepto de regalías en sólo dos años de ventas. En lugar de valorar los esfuerzos de Alon, Converse busca usurpar sus derechos conforme al Contrato. Esta no es una buena situación para Converse ni para un arbitraje ni para los tribunales tanto en Brasil como en Argentina.*

*Reconocemos que su carta abre la posibilidad de una reunión en persona entre los directivos de Alon y Converse ya sea para resolver las diferencias como para llegar a una resolución comercial de estas cuestiones pese a que todavía estamos esperando una fecha para esta reunión. Alon agradecería dicha reunión. Sin embargo, le informo que debido al poco tiempo disponible (por los futuros e inminentes feriados y el amenazante límite de fin de año) para que Alon proteja sus derechos frente a la conducta de Converse, Alon ya no puede demorar cualquier acción que deba iniciar para defenderse.*

*Todavía hay tiempo para evitar el precipicio del arbitraje y litigio, pero ese tiempo se acaba rápidamente. Confiamos en que Converse ha realizado el análisis costo/beneficio de los daños que puede llegar a ser responsable en caso*

*que no acierte en esta táctica calculada para robar los mercados del MERCOSUR a Alon y también confiamos en que ha calculado la suma que tendrá el futuro arbitraje y litigio multinacional sobre sus operaciones futuras, su posición en el mercado y el mercado final. Alguien en Converse debe estar preparado para responder al Directorio y los accionistas por qué ha continuado con este curso si no le convenía a Converse. En el momento en que las sociedades pierden sus objetivos y se involucran en el negocio de los litigios – no suceden cosas buenas – existe una legión de estos ejemplos en la historia de sociedades Americana. La estrategia que Converse ha desarrollado para usurpar los mercados del MERCOSUR probablemente se vea bien en los papeles, pero el litigio nunca sigue los papeles. Converse tiene mucho que perder en el arbitraje y el litigio – dinero, prestigio, riesgo de reputación multinacional, mercados compartidos, sanciones gubernamentales, etc. Por otro lado, Alon no tiene nada que perder en este punto.*

*Para ser claro, Alon considera renovado el Contrato por sus términos al 8% de la tasa de regalías ya acordada por Converse. A fin de que Ud. o Converse no lleguen a conclusiones erróneas de la conducta de Alon para su protección propia, Alon se encuentra, y siempre lo estará, interesado en resolver de manera amigable esta disputa. El Contrato preparado por Converse requiere que las partes intenten resolver las controversias y disputas que surjan por el presente "de manera amigable, rápida y justa". Esperamos una rápida respuesta de Uds. debido a que no hemos obtenido más que beligerancia, demora e injusticia. Alon se encuentra predispuesto a realizar esfuerzos de buena fe para solucionar <u>cualquier</u> cuestión que Converse desee en relación a la mejor manera de seguir adelante en los próximos tres años a fin de maximizar las ventas pero sólo conforme al contexto en el que Alon ejerza su derecho de renovación y no bajo la amenaza de rescisión y/ o no renovación.*

*Reiteramos nuevamente que la presente carta es sin perjuicio de los derechos y acciones de Alon conforme al Contrato y las leyes del sistema del Common Law y/ o del Equity, cada uno de los cuales están expresamente reservados por el presente. Tanto la presente carta como las anteriores constituyen una comunicación privilegiada de acuerdos.*

9.- Al 22 de diciembre de 2004, Converse a pesar de haber dicho que estaba dispuesta a responder y a considerar los hechos que Alon puso en su conocimiento, relativos a los temas planteados en la nota del 30 de noviembre, no ha contestado, lamentablemente, ninguno de los planteos y cumplimientos formulados por mis representadas, a pesar de tener —Converse- conocimiento de que Alon está dispuesta y resuelta a continuar con la ejecución del Contrato de Licencia durante todo el período de tiempo que abarca la renovación automática, por cuanto le asiste el derecho, obviamente lo hará si se cuenta con la protección judicial de la medida que se solicita a V.S.

10.- Debido a la intempestiva actitud de Converse, y su negativa a tener por satisfechos los planteos y cumplimientos expresados, Alon se vio forzada a iniciar el día 16 de diciembre de 2004 el proceso de mediación que prevé el Contrato de Licencia, solicitando que el arbitro se expida: a) que declare que Converse ha incurrido en incumplimiento del Contrato de Licencia, y su obligación de buena fe, y negociaciones contractuales de buena fe con respecto a la renovación del Contrato de Licencia; y de cualquier otro reclamo que el Arbitro considere justo y adecuado; y b) Que declare que el Contrato de Licencia no ha vencido y que continuará vigente hasta el 31 de diciembre de 2007,. y que Alon ha legítimamente ejercido su derecho automático de renovación de conformidad con el Contrato de Licencia.

11.- Alon Argentina, también procederá en tiempo oportuno a iniciar contra Converse una demanda por cumplimiento del Contrato de Licencia, ello en la jurisdicción de la República Argentina, por cuanto le es inoponible a ella la prórroga de jurisdicción que prevé el Contrato de Licencia, atendiendo que ella no ha suscripto el Contrato de Licencia, a pesar de que el mismo le reconoce derechos y obligaciones.

12.- Cabe destacar que Alon y Alon Argentina tienen derecho, desean y necesitan continuar con el contrato, pero podrá hacerlo solamente al amparo de la medida cautelar solicitada ut-supra, porque de lo contrario Converse podría intentar que se considere que la conducta adoptada por Alon posee entidad suficiente como para denunciar penalmente a los administradores de Alon y de

Alon Argentina en los términos del 31 de la ley 22.362, así como también generar
la inclusión de un tercero o del mismo Converse en un territorio asignado
exclusivamente a Alon.

## IV

### FUNDAMENTO JURIDICO DE LA PRETENSION

El interés que persiguen mis representadas a través de esta
pretensión, es que se les garantice de la mejor manera posible los intereses
litigiosos que tienen contra Converse, a modo de arbitrar una situación de hecho
previsional sujeto a las resultas del derecho que declare la sentencia definitiva,
previniendo la configuración de un perjuicio real, cierto, actual, grave e irreparable
tanto en las personas de los administradores, como en el patrimonio de Alon y
Alon Argentina.

En atención a lo expuesto, por esta vía mi parte intentará explicarle
a V.S. por qué en el presente caso concurren todos los elementos que la ley de
forma exige[1] para la procedencia de las medidas cautelares solicitadas, a modo de
brindarle a V.S. elementos de juicio suficientes que le permitan justificar el
mantenimiento preventivo de los derechos y garantías que se pretenden proteger a
través de la demanda jurisdiccional ya formulada.

### A. La Verosimilitud del Derecho

Uno de los presupuestos en que se funda cualquier medida cautelar
es la verosimilitud del derecho, entendido como la probabilidad de que exista ese
derecho y no una incontestable realidad, que sólo se logrará al agotarse el trámite
respectivo[2].

De allí que, para obtener el dictado de una resolución que acoja
favorablemente la pretensión cautelar, resulta suficiente la comprobación de la
apariencia o verosimilitud del derecho invocado por el actor (tradicionalmente
llamado *famus boni iuris*), en forma tal que, de conformidad con un cálculo de
probabilidades, sea factible prever que en el proceso principal se declarará la
certeza de ese derecho. Por ello la ley no exige, a los fines de dicha comprobación,

---

[1] Art. 195 del Código Procesal Civil y Comercial de la Nación.
[2] Conf. CNCiv., Sala A, 25-8-83, LL, 1984-A-495.

una prueba plena y concluyente, sino un mero acreditamiento, generalmente realizado a través de un procedimiento informativo[3].

Sólo es necesaria la "apariencia de un buen derecho", lo cual se obtiene analizando los hechos referidos por las partes en la documentación acompañada[4].

Este requisito genérico de la verosimilitud, aceptando por tal la "apariencia de lo verdadero", debe ser demostrado en forma sumaria, juntamente con la necesidad de tutelar anticipadamente el pronunciamiento definitivo del derecho reclamado en la demanda[5], cobrando a tal efecto trascendencia la prueba instrumental[6].

A tal fin, mi parte ha acompañado el Contrato de Licencia y sus modificaciones, los correos electrónicos escritos por funcionarios de ambas partes, y el intercambio de notas formulados entre los abogados de Converse y Alon International en los Estados Unidos de América, así como también la documentación que permite tener por acreditado sumariamente los derechos de Alon y Alon Argentina, todo lo cual nos permite efectuar un análisis general y particular de cada una de las cuestiones que a la fecha se encuentran controvertidas entre las partes.

### 1.-La renovación automática del Contrato de Licencia.

**1.1.- El Contrato de Licencia.** De conformidad con lo que surge de la cláusula 2 del Contrato de Licencia, Alon tiene el derecho a renovar el Contrato por un período adicional de 3 años, sujeto a que Alon excediera en un 25% las ventas y regalías mínimas contractualmente garantizadas para el tercer año del Contrato de Licencia, y no hubiera violado cualquiera de los términos y condiciones del presente contrato.

En tal sentido, en la cláusula 15 del Contrato de Licencia se establece que las regalías mínimas garantizadas para el tercer año del Contrato de

---

[3] Conf. Palacio, Lino Enrique: "Derecho Procesal Civil", t° VIII, pág. 35.
[4] Conf. CNCom., Sala D, 5-11-76, LL, 1977-A-227.
[5] Conf. CNCiv., Sala E, 29-4-80, LL, 1980-D-10.
[6] Conf. CNCiv., Sala C, 28-11-75, LL, 1976-A-491.

Licencia ascienden a la suma de US$ 215.000, tal como está expresado en la tercer columna de la fila quinta del cuadro indicado en el punto b) del aludido contrato.

Del Certificado Contable que se adjunta, así como también de la declaración bajo juramento de decir verdad efectuado por el Sr. Jesús M. Quinteros, en su carácter de Jefe Financiero de Alon (ver **Anexo IX**), queda acreditado que Alon cumplió en exceso el porcentual de regalías por ventas que exige el Contrato, y por ende, que Alon también cumplió con el presupuesto de hecho exigido en el Contrato para que opere automáticamente la renovación del Contrato de Licencia.

Asimismo, de la declaración de Sr. Roberto Szerer (ver **Anexo X**), surge que durante el primer período de vigencia del Contrato de Licencia y hasta el día 30 de septiembre de 2004, mis representadas no incumplieron jamás el Contrato. Tampoco recibieron de Converse, a dicha fecha, algún reclamo por incumplimiento contractual, ni verbal, ni escrito, y esto último, sea en papel o por medio de un correo electrónico.

Así las cosas, en autos se encuentra acreditado la ocurrencia de los hechos que tornaron eficaz la causa de la renovación del Contrato de Licencia, y con ello perfeccionado el derecho de Alon a exigir el cumplimiento de todas y cada una de las obligaciones contractuales asumidas por Converse, por otro período de 3 años a contar a partir del 1° de enero de 2005.

Del intercambio epistolar realizado entre las partes, en ningún momento Converse desconoce o niega que Alon cumplió el presupuesto que habilita su derecho a renovar el Contrato automáticamente, lo cual torna aun más verosímil la versión de los hechos aquí indicada, así como también las declaraciones sumarias acompañadas al presente escrito.

**1.2.- La apertura de la compañía en Buenos Aires y la inclusión de Alon Argentina SRL como licenciatario del Contrato de Licencia.** Tal fue el éxito comercial alcanzado por Alon en la explotación de los productos y marcas licenciadas por Converse y su convencimiento de que el Contrato de Licencia se renovaría hasta el 31 de diciembre de 2007, que Alon resolvió instalar una representación permanente en la República Argentina, e instaló oficinas en la

ciudad de Buenos Aires, con el firme propósito de expandir el negocio en el mediano plazo, considerando siempre la renovación del Contrato de Licencia, atendiendo el cumplimiento de todos y cada uno de los presupuestos previstos para ello.

Fue así que con fecha 5 de diciembre de 2003 se resolvió constituir Alon Argentina SRL, y el 1° de enero de 2004, Alon y Alon Argentina SRL suscribieron el contrato que se adjunta como **Anexo IV**, el cual está vigente al día de esta presentación. En el mencionado Anexo IV se adjunta también el contrato social de Alon Argentina, debidamente inscripto por ante Registro Público de Comercio.

Por supuesto que la apertura de una representación de la compañía en Buenos Aires contó con el beneplácito y conformidad de Converse, quien prestó su conformidad a la operación explicada, incorporando a Alon Argentina al Contrato, ello de conformidad con lo que surge de la segunda modificación al Contrato adjuntada en el **Anexo V**.

La inversión realizada por Alon en diciembre de 2003, con el costo que implica abrir una oficina en Buenos Aires, contratar personal, ocupar una inmueble, adquirir muebles e insumos, no fue ni es realizada con la intención de liquidar en un año la compañía argentina, y cerrar el 31 de diciembre de 2004.

Todo lo hecho en Buenos Aires, ha sido una clara comunicación a Converse sobre la decisión de continuar vinculados a través del Contrato de Licencia, siendo una clara muestra de la conformidad de Converse el hecho de haber incorporado Alon Argentina al Contrato de Licencia.

### 1.3.- La Notificación de la Renovación Automática del Contrato.

Como surge de la lectura de la cláusula 2 del Contrato, mi parte debía notificar a Converse, antes del 30 de septiembre de 2004, su decisión de renovar el Contrato. Es decir, el Contrato le exige a Alon un hecho por el cual Alon debe exteriorizar su decisión de renovar. y esa exteriorización debe consistir al menos en una comunicación escrita, en el sentido amplio de la palabra.

La finalidad de la exigencia de comunicar por escrito la decisión de renovar, no es otra que poner en conocimiento de Converse sobre la extensión de la vigencia del Contrato de Licencia por otro período de 3 años.

Siendo un principio universalmente aceptado que el hombre de negocios se mueve en una atmósfera en la que domina la buena fe[7], Alon - sabiendo que ya tenía asegurado la renovación automática del Contrato- fue en busca de un nuevo contrato con Converse, considerando diferentes variables económicas, nuevos territorios, y plazos más extensos a los originalmente previstos, hechos que surgen acreditados del variado intercambio de correos electrónicos escritos entre las partes, algunos de los cuales se adjuntan como **Anexo II**.

Obsérvese que en el correo electrónico enviado por el Sr. Roberto Szerer enviado el día 10 de junio de 2004, en el escribió: *"La proyección de las ventas totales para el 2004 muestra un crecimiento del 16,22% de US$ 12.649.921 a US$ 14.701.254. Adjunto el desglose de las cifras más nuestra propuesta actualizada para la renovación de 5 + 5 años. Lo llamaré para continuar ..."*.

Queda claro además. que no es obligatorio que Converse tenga conocimiento únicamente por escrito de la decisión de Alon de ejercer la opción de renovar automáticamente el Contrato de Licencia, sino que también Alon puede expresar su voluntad verbalmente, o por cualquier conducta o proceder que, de acuerdo con las circunstancias del caso y apreciadas de buena fe, tengan por efecto permitir persuadir a Converse sobre la voluntad de Alon de continuar obligado contractualmente[8].

---

[7] Conf. CNCiv., Sala C, 1982/06/08, ED 100-409.
[8] Conf. CNCiv., Sala B, 1991/12/27, LL 1992-E-276.

Alon expresó por escrito su decisión de renovar el Contrato en más de una oportunidad. Recuérdese que constituyó una sociedad en Argentina; abrió una compañía en Buenos Aires; firmó con Converse la segunda modificación al Contrato; intercambió una cantidad considerable de correos electrónicos; todo ello con anterioridad al 30 de septiembre de 2004. Es decir, Alon manifestó positivamente por escrito, en forma verbal, y por signos inequívocos, su intención de continuar vinculado contractualmente a Converse, de modo que Converse no puede desconocer éste hecho objetivo de la realidad de como sucedieron los hechos

La cláusula 2 del Contrato de Licencia no exige un texto sacramental especial para comunicar a Converse la decisión que nos ocupa, por lo que resulta suficiente y eficaz que Alon haya expresado por escrito, y por cualquier otro medio, su decisión a Converse a modo que Converse tenga conocimiento de la renovación de la vinculación contractual.

Así las cosas, se debe tener presente que Alon siempre tuvo en consideración que Converse tuviera conocimiento de su decisión de renovar el vínculo contractual, y a consecuencia de ello, y considerando la prueba acompañada al presente expediente, resulta incuestionable que Converse tuvo efectivo conocimiento de la voluntad de Alon en renovar el Contrato de Licencia.

El modo y la forma como las partes ejecutan el contrato es la prueba más concluyente que puede tenerse de la verdadera intención contractual[9], por ello, toda conducta apreciada de buena fe, y de acuerdo a las circunstancias del caso, permite inferir o interpretar una intención o aceptación determinada[10].

La auténtica intención de Alon de continuar vinculado contractualmente a Converse surge evidente de toda la prueba acompañada, y la comunicación por escrito fue formulada en más de una oportunidad, a través de diversos modos y medios, y siempre con anterioridad al 30 de septiembre de 2004.

En lo que se refiere a la conducta seguida por Converse durante todo el período donde existió el intercambio escrito de correos electrónicos,

---

[9] Conf. CNCom., Sala B, 1995/09/28, LL 1996-A-538.
[10] Conf. CNFed.Civ.yCom., Sala II, 1987/12/29, LL 1998-B-465.

Converse nunca cuestionó el derecho de Alon para obtener la renovación automática del Contrato de Licencia; y, además, Converse siempre tuvo cabal conocimiento de la existencia de la decisión en firme de Alon de continuar vinculado contractualmente con Converse. Durante todo ese tiempo la conducta de Converse configuró una aprobación al menos tácita de todo lo que proponía Alon, lo que llevó a ésta a creer, con fundamento, que Alon había comunicado su decisión de renovar el Contrato de Licencia y con ello, que la vigencia del contrato se extendía hasta el 31 de diciembre de 2007.

1.4.- **El silencio guardado por Converse.** Así fue cómo se llegó al día 30 de septiembre de 2004 sin que Converse haya exteriorizado oposición alguna a la renovación automática del Contrato de Licencia, optando por guardar silencio, y continuar cumpliendo normalmente con todas y cada una de las obligaciones previstas en el Contrato de Licencia, y celebrado negociaciones con Alon para extender el plazo de la relación contractual por un tiempo más extenso que el previsto en el Contrato de Licencia.

El silencio guardado por Converse frente a los correos electrónicos y negociaciones celebradas con Alon tendientes a renovar el Contrato de Licencia, se extendió más allá del 30 de septiembre de 2004, y duró hasta el 30 de noviembre de 2004, fecha en que Converse envió la nota que se adjunta al **Anexo III**.

El suceso descripto en el párrafo precedente importa traer a colación la importancia del plazo descripto en la cláusula 2 del Contrato de Licencia, en cuanto a que las partes establecieron el día 30 de septiembre de 2004 como la fecha última para expresar la decisión de notificar la renovación del Contrato. Dicha fecha obró como un plazo esencial para que se cumpla la acción o la inacción de Alon para incorporar los derechos y garantías descriptos en el Contrato de Licencia a su patrimonio por otro período de 3 años. A dicho silencio hay que sumarle las negociaciones antes reconocidas, el tenor de las cuales hicieron creer a Alon que positivamente había comunicado a Converse su decisión de renovar el Contrato de Licencia.

Frente al claro efecto patrimonial que provoca la notificación de la decisión de renovar el Contrato, la alegación de cualquier incumplimiento contractual de Alon, que hubiere habilitado a Converse a oponerse a la renovación automática del Contrato de Licencia, debió necesariamente haber sido invocada con anterioridad a la expiración del plazo previsto para manifestar la decisión de renovar. Sin embargo, Converse al 30 de septiembre de 2004 optó por guardar absoluto silencio, ello a pesar de haber mantenido Alon y Converse infinidad de reuniones e intercambios de correos electrónicos, y sabiendo que el Contrato de Licencia se encontraba en curso de ejecución, y por lo tanto vigentes, todos y cada uno de los derechos y obligaciones allí estipulados.

1.5.- **El efecto del silencio guardado por Converse.** No puede escapar al criterio de V.S. que en derecho, frente a la existencia de un contrato vigente, el silencio vincula y genera obligaciones entre las partes[11].

De acuerdo con lo expuesto, de haber considerado Converse que al 30 de septiembre de 2004 Alon había incumplido el Contrato de Licencia, Converse tenía la obligación de pronunciarse en tal sentido, ya que su silencio ante los supuestos incumplimientos de Alon, necesariamente deben importar una seria presunción de inexistencia de incumplimiento alguno de Alon, por lo menos al 30 de septiembre de 2004.

Por lo tanto, cualquier invocación por parte de Converse de incumplimientos de Alon anteriores al 30 de septiembre de 2004 aparecen como inverosímiles y carentes de fundamento apropiado, por cuanto existía a dicha fecha un plazo contractual perentorio y un interés jurídico de Converse determinante para la continuación del vínculo contractual, y Converse guardó silencio respecto de cualquier incumplimiento pareciendo evidente la inexistencia de los mismos al menos hasta el día 30 de septiembre de 2004.

1.6.- **La oposición tardía.** De conformidad con lo expuesto, cualquier invocación de algún incumplimiento de Alon formulado por Converse con posterioridad al 30 de septiembre de 2004, carece de eficacia y resulta

---

[11] Conf. CNCom., Sala D, 1984/02/20, LL 1984-B-260.

inoponible a Alon, atendiendo que a la fecha de la oposición ya se ha materializado la renovación automática del Contrato de Licencia e incorporado al patrimonio de Alon los créditos que dicho contrato genera, por lo que dicha oposición perdió vigencia y resulta jurídicamente inocua.

Al existir un derecho adquirido e incorporado al patrimonio de Alon, la oposición a la renovación automática con posterioridad a la adquisición, resulta inoperante e imposibilitado de surtir algún tipo de efecto entre las partes.

**1.7.- La carga de la prueba de acreditar el incumplimiento.** A todo evento, para el caso en que se pudiere considerar eficaz la notificación de un incumplimiento anterior al 30 de septiembre, pero comunicado con posterioridad a dicha fecha, se debe tener siempre presente que quien invoca el incumplimiento -- en este caso Converse- debe probar la existencia del mismo, por cuanto la carga de producir la prueba del incumplimiento debe recaer sobre la parte que quiere aprovechar los efectos contractuales que genera el mismo.

Presente ello, debemos recordar que mis representadas expresamente han negado haber incumplido el Contrato, y afirman expresamente que Converse no ha producido prueba alguna que acredite el incumplimiento por ellas denunciado.

**1.8.- Conclusión.** Como ya ha quedado expuesto, y en lo que al tema de la renovación contractual se refiere, Alon no ha tenido una actitud pasiva frente a Converse, y ninguno de los actos ejecutados por aquella admiten presumir que Alon hizo abandono de su derecho a renovar el Contrato.

Por el contrario, las declaraciones y expresiones formuladas verbalmente, por escrito, y por signos inequívocos comunicadas por Alon a Converse, solo pueden ser interpretadas como: comunicaciones dirigidas a Converse a fin de notificar la decisión de Alon de renovar automáticamente el Contrato de Licencia; no pudiendo Converse, bajo ningún concepto, expresar que ella haya tenido alguna duda respecto de la voluntad de Alon de prolongar el vínculo contractual con posterioridad al 31 de diciembre de 2004.

Lo expuesto en el párrafo anterior nos permite concluir que Alon International hizo efectivo su derecho a renovar automáticamente el Contrato de

<u>Licencia</u>, y en razón de ello, los derechos y garantías reconocidos en el Contrato de Licencia han sido incorporados al patrimonio de Alon International, y los compromisos y deudas que el mismo establece quedan incorporados al patrimonio de Converse como deuda perfectamente exigible.

Es decir, una vez reunidos los presupuestos necesarios para que opere y se perfeccione la renovación automática del Contrato de Licencia, sin que al 30 de septiembre de 2004 Converse haya formulado oposición fundada en algún incumplimiento, el Contrato de Licencia pasó a ser un derecho adquirido en cabeza de Alon, y con ello, extinguido el derecho de Converse a oponerse a la renovación automática con fundamento en algún incumplimiento de Alon ocurrido con anterioridad del 30 de septiembre de 2004.

Ergo, cualquiera que sea la postura que adopte Converse con relación a este supuesto, no habría modo lícito de impedir que la renovación del plazo del Contrato de Licencia opere de pleno derecho a favor de Alon, por un período de 3 años a contar a partir del 1° de enero de 2005.

### 2.- Los Pretendidos Incumplimientos.

El día 30 de noviembre de 2004, por primera vez a lo largo de toda la relación contractual, Alon recibe una nota remitida por Converse en donde le imputan una serie de incumplimientos, y asimismo, intima a Alon a que en un plazo perentorio subsane los incumplimientos allí descriptos, bajo apercibimiento de resolver el contrato por culpa de Alon. Conforme surge de la nota en cuestión, Converse se limitó a expresar los incumplimientos, sin acompañar prueba alguna que acredite los mismos.

En tiempo y forma Alon negó la existencia de algún incumplimiento contractual de su parte, y sin perjuicio de ello dio respuesta satisfactoria respecto de todos y cada uno de los incumplimientos que le fueron atribuidos, todo lo cual surge del texto de la nota de fecha 7 de diciembre de 2004, adjuntada al **Anexo VI**. En dicha nota Alon le comunica a Converse su decisión de ejercer sus derechos y continuar ejecutando el Contrato de Licencia, y en tal sentido intima a Converse a que se retracte de los términos de la nota del 30 de

noviembre de 2004, bajo apercibimiento de dar inicio a la acción jurisdiccional oportunamente prevista.

Con fecha 10 de diciembre de 2004, Converse no solo se niega a retractarse sino que reafirma los términos de su nota de fecha 30 de noviembre, indicando que el Contrato de Licencia será rescindido por incumplimiento de Alon el día 31 de diciembre de 2004, además de vencer el plazo de vigencia en dicha fecha.

Así las cosas, Alon se vio obligada a responder la nota de fecha 10 de diciembre, y con fecha 15 de diciembre de 2004 le comunicó a Converse que lamentaba que ella continuara cuestionando la duración del Contrato de Licencia. Asimismo, Alon dio estricto cumplimiento a las intimaciones formuladas a través de la nota de fecha 10 de diciembre. Además Alon le comunicó expresamente a Converse que la interposición de la acción que hace a la protección de sus derechos no podía ser demorada más tiempo, atendiendo la proximidad del vencimiento del período de vigencia original del Contrato de Licencia.

A la fecha de la interposición de la presente medida cautelar, Converse no había dado respuesta a la nota de Alon de fecha 15 de diciembre de 2004.

**2.1.- El contrato de Alon con Coopershoes.** De acuerdo a lo que surge de las comunicaciones intercambiadas entre las partes, existen constancias escritas de que Converse tuvo conocimiento pleno del contrato con Coopershoes desde su existencia, en el año 2002.

En todo momento Converse prestó conformidad al contenido del contrato, sin formular observación de ninguna especie. Asimismo, el Sr. Roberto Szerer declaró que en más de una oportunidad Coopershoes, en representación de Alon, abonó regalías directamente a Converse.

Sin perjuicio de lo expuesto en el párrafo anterior, con fecha 30 de noviembre de 2004 Converse le imputó a Alon un incumplimiento al Contrato de Licencia, fundando dicho incumplimiento en la existencia del contrato suscripto entre Alon y Coopershoes. Sorpresivamente, lo que antes era aceptado por Converse sin reclamo alguno, ahora era convertido por el mismo Converse en un


noviembre de 2004, bajo apercibimiento de dar inicio a la acción jurisdiccional oportunamente prevista.

Con fecha 10 de diciembre de 2004, Converse no solo se niega a retractarse sino que reafirma los términos de su nota de fecha 30 de noviembre, indicando que el Contrato de Licencia será rescindido por incumplimiento de Alon el día 31 de diciembre de 2004, además de vencer el plazo de vigencia en dicha fecha.

Así las cosas, Alon se vio obligada a responder la nota de fecha 10 de diciembre, y con fecha 15 de diciembre de 2004 le comunicó a Converse que lamentaba que ella continuara cuestionando la duración del Contrato de Licencia. Asimismo, Alon dio estricto cumplimiento a las intimaciones formuladas a través de la nota de fecha 10 de diciembre. Además Alon le comunicó expresamente a Converse que la interposición de la acción que hace a la protección de sus derechos no podía ser demorada más tiempo, atendiendo la proximidad del vencimiento del período de vigencia original del Contrato de Licencia.

A la fecha de la interposición de la presente medida cautelar, Converse no había dado respuesta a la nota de Alon de fecha 15 de diciembre de 2004.

**2.1.- El contrato de Alon con Coopershoes.** De acuerdo a lo que surge de las comunicaciones intercambiadas entre las partes, existen constancias escritas de que Converse tuvo conocimiento pleno del contrato con Coopershoes desde su existencia, en el año 2002.

En todo momento Converse prestó conformidad al contenido del contrato, sin formular observación de ninguna especie. Asimismo, el Sr. Roberto Szerer declaró que en más de una oportunidad Coopershoes, en representación de Alon, abonó regalías directamente a Converse.

Sin perjuicio de lo expuesto en el párrafo anterior, con fecha 30 de noviembre de 2004 Converse le imputó a Alon un incumplimiento al Contrato de Licencia, fundando dicho incumplimiento en la existencia del contrato suscripto entre Alon y Coopershoes. Sorpresivamente, lo que antes era aceptado por Converse sin reclamo alguno, ahora era convertido por el mismo Converse en un

acto que importaba lisa y llanamente el incumplimiento del Contrato de Licencia y el ejercicio del derecho a rescindir.

Llama la atención que recién luego de transcurrido más de 2 años de Converse haber tenido conocimiento de la existencia del contrato de Coopershoes, extrañamente dicho contrato cobró virtualidad, y para Converse dicha virtualidad tiene entidad suficiente para justificar la rescisión del Contrato de Licencia.

Lo que le resulta incomprensible a mi parte es el hecho de que Converse convivió dos años con una contrato que mereció las más altas consideraciones de los altos funcionarios ejecutivos de Converse, y luego, repentinamente, y sin mediar aviso de ninguna especie, dicho contrato fue desaprobado a punto tal de servir de fundamento para la rescisión del Contrato de Licencia.

Ahora bien, si es la existencia y el contenido del contrato de Coopershoes el que provoca el incumplimiento que denuncia Converse, no tengo dudas que el incumplimiento existe desde el año 2002, que Converse lo conocía, y que Converse guardó silencio al respecto.

Tampoco pasa inadvertido que Converse también guardó silencio frente al pretendido incumplimiento derivado del contrato de Coopershoes, por cuanto Converse tuvo anteriormente la oportunidad contractual de negarse a la renovación automática del Contrato de Licencia, pudiendo fundar dicha oposición justamente en el mencionado contrato de Coopershoes.

Converse conocía la existencia y contenido del contrato de Coopershoes a la época en que Alon comunicó su decisión de continuar la vinculación contractual que los unía, y también Converse guardó silencio al respecto.

Ahora bien, si Converse conocía la existencia del contrato en el año 2002, si también lo conocía a principios del 2004 cuando junto con Alon celebraron distintas reuniones para renegociar el Contrato de Licencia, y también lo conocía al 30 de septiembre de 2004, la invocación del incumplimiento descripto en la nota de fecha 30 de noviembre de 2004 no parece una conducta coherente.

Asimismo, sin reconocer los hechos ni el derecho que invoca Converse, mi parte considera que cualquier cuestionamiento por parte de Converse vinculado al contrato de Coopershoes, necesariamente tiene que haber precluido en razón de la aceptación tácita del mismo, provocada por la aceptación expresa, y a todo evento por el silencio ininterrumpido guardado por un lapso de tiempo de más de dos años.

El conocimiento y aceptación de la existencia de dicho contrato, admite la aplicación de la <u>doctrina de los propios actos</u>, según la cual es inadmisible la pretensión de fundar un reclamo de hecho y razones de derecho que contravengan los propios actos de Converse, por cuanto ésta ha quedado en contradicción con una conducta anterior propia.

En tal sentido, si Converse tenía pleno conocimiento del contrato de Coopershoes, y no formuló ningún reclamo, ni hizo reserva de especie alguna, mi parte considera que no lo puede objetar dos años después tal como pretende hacer a través de sus notas de fecha 30 de noviembre, y de 10 de diciembre de 2004. El principio de la teoría de los propios actos debe adecuarse a la particulares circunstancias de este reclamo, de modo de exigirle a Converse coherencia entre su comportamiento actual y sus propios actos precedentes, exigencia esta que se enmarca en el postulado más amplio de la buena fe[12].

Tampoco esta parte tiene dudas, considerando que Converse se expresó positivamente del contrato de Coopershoes, que Converse suscitó en Alon una confianza en la que a su vez se basó todo el comportamiento contractual.

A lo ya expuesto, parece oportuno mencionar que todas las causales de incumplimiento alegadas por Converse aparecen abiertamente improcedentes por cuanto ninguna de ellas resulta compatible con una conducta anterior, o coherente. A 30 días de producirse el vencimiento del primer período contractual, se presenta sorpresivamente Converse denunciando una batería de

---

[12]Conf. CNCom, Sala C, 1993/11/22, LL, 1994-E, 320, con nota de Silvia Y. Tanzi - ED, 158-654.

incumplimientos, nunca antes reclamados, sobre conductas que venían ejecutándose por un período de tiempo prolongado, mayor al de 3 años.

No está demás decir además, que el cambio de conducta experimentado por Converse es perjudicial para Alon, por lo que la maliciosa pretensión deberá ser desestimada, por cuanto la actuación de Converse ha implicado un obrar incompatible con la confianza que, merced a su conducta anterior, ha suscitado en Alon. No solo la buena fe, sino también la seguridad jurídica se encontrarían gravemente resentidas si la conducta de Converse goza de tutela judicial[13].

Viene al caso recordar que el negocio jurídico contractual no es solo el instrumento escrito en el que las partes materializan el acuerdo; es mucho más, es el conjunto de conductas anteriores, concomitantes y posteriores a la materialización. De tal modo que si con posterioridad al perfeccionamiento del contrato, por conductas de las partes se modifica su contenido, esas conductas integran el negocio jurídico contractual, aun cuando tal modificación no llegue a materializarse por escrito.

Por todo ello, surge evidente que la causal de incumplimiento alegada por Converse de pretender oponer el contrato de Coopershoes a Alon como un incumplimiento al Contrato de Licencia no es admisible en derecho, y deberá ser rechazada al momento de quedar zanjada definitivamente la cuestión.

**2.2.- Supuesto de incumplimiento de pago de regalías adeudadas por el IVA de los países del Mercosur.**

De la cláusula 15 del Contrato de Licencia, Alon se obligó a pagar a Converse una regalía equivalente al porcentual de ventas netas realizadas de los artículos licenciados, sobre la base de los precios cobrados a los comerciantes minoristas.

Durante toda la existencia del Contrato de Licencia, Alon liquidó las regalías del modo indicado contractualmente, es decir, por más de 3 años.

---

[13] Conf. CNFedCont.Adm., Sala IV, 1997/11/25, DJ, 1998-3-257.

Recuérdese que el Contrato de Licencia entró en vigencia el día 1° de septiembre de 2001.

El 30 de noviembre de 2004 Converse le notifica a Alon que ésta dedujo mal el IVA cada mes durante el plazo de Contrato, comprendiendo por supuesto todas las operaciones de venta correspondientes a Argentina, Brasil, Paraguay y Uruguay. Converse afirma sin ofrecer cálculo alguno que Alon, en sus cálculos de las ventas netas mensuales, dedujo IVA de las ventas de facturación bruta aunque el IVA no fue incluido en los montos de facturación bruta de los productos vendidos.

Al respecto, Alon le efectúa a Converse la suma de la liquidación de las regalías. Le explica que la regalía total que se le abonará a Converse por las ventas del 31 de diciembre de 2004 será de US$ 3.059.000, que es realmente más del 7% total de las ventas netas de US$ 40.663.000 conforme el Contrato de Licencia durante el primer período de vigencia.

Alon le explicó también que el término contractual definido como ventas netas expresamente permite la deducción del IVA. También Alon le explicó que en Brasil no existe el IVA sino un impuesto equivalente conocido como "Impuesto ICMS". Ese impuesto es el que se dedujo de las regalías, pero que de ningún modo se dedujo dos veces.

A cualquier efecto, se le explicó a Converse también que la pretensión económica derivada de esa insostenible postura jurídica alcanzaba al 1,08% de toda la operación, y que el mismo no tenía entidad suficiente para autorizar la rescisión unilateral del Contrato de Licencia.

Tampoco se entiende el motivo por el cual Converse conoce la existencia de un supuesto incumplimiento. Convive con el cumplimiento por más de 3 años. Y de buenas a primeras pretende invocarlo como un incumplimiento.

Mi parte ha afirmado expresamente que la postura de Converse en este rubro es particularmente errada. Sin perjuicio de ello, y asumiendo que efectivamente pudiera haber existido un error en la liquidación, la misma no representa ningún importe significativo.

No todos los incumplimientos importan el incumplimiento en el pago de las regalías. Cualquier afirmación unilateral formulada por Converse, sin acreditar siquiera meridianamente la razonabilidad de sus dichos, no puede importar *per se* un incumplimiento al contrato.

Debo resaltar, que a *prima facie* y en lo que al tema de los impuestos se refiere, la rescisión contractual no podrá aplicarse por cuanto no se encuentran configuradas las circunstancias que lo autorizan, por cuanto es necesario para que opere el pacto comisorio que nos ocupa, que alguna obligación no sea cumplida conforme las modalidades pactadas.

Del incumplimiento señalado por Converse no surge ningún incumplimiento en el pago de las regalías, sino tan solo una simple manifestación de que existe una mala aplicación del sistema que liquida impuestos, que según Converse podría impactar negativamente en el monto a ser liquidado, y así generar un crédito a su favor por regalías impagas.

Consecuentemente, el incumplimiento que denuncia Converse no es uno incumplimiento que autoriza la rescisión del Contrato de Licencia, y en razón de ello, cualquier pretensión en tal sentido no podrá prosperar.

A cualquier evento, ya quedó señalado que Alon viene liquidando las regalías de un mismo modo desde el año 2001, y que jamás a lo largo de todo el período contractual ha existido un solo reclamo al respecto, aceptándose los pagos de los mismos sin efectuar reserva de especie alguna.

Cabe agregar, que aún en el supuesto que dichas circunstancias rescisorias convenidas expresamente se produjeran, no facultan *per se* siempre a la disolución del vínculo, dado que un ejercicio abusivo de la cláusula rescisoria cuestiona su viabilidad ante el incumplimiento mínimo o un cumplimiento algo distinto, puesto que ello importa exceder los límites impuestos por la buena fe, la moral y las buenas costumbres[14].

---

[14] Conf. CNFed.Civ.y.Com., Sala III, "De Benedetti, Egisto c/Radiodifusora del Plata S.A.". 1995/08/31, LL, 1996-A-474, con nota de Noemí Lidia Nicolau.

Para que proceda la resolución por incumplimiento es menester que este sea de suficiente entidad, quedando su aplicación a criterio judicial conforme a los principios de la buena fe y del abuso del derecho[15].

Por ejemplo, en esta materia constituye una típica conducta abusiva el solicitar la resolución del contrato cuando el deudor ha incumplido la mayor partes de las prestaciones a su cargo y solo resta una parte proporcionalmente pequeña respecto de la cual puede pedirse el cumplimiento.

En el caso de autos, a través del presente incumplimiento Converse está reclamando una diferencia en el pago de las regalías. De dicho reclamo se deduce que en el peor de los casos para mis representados —asumiendo que Converse puede acreditar que lo indicado por ella efectivamente impacta en las regalías- habría existido un incumplimiento defectuoso mínimo de su obligación de abonar las regalías.

Por ello, demostrado que mis representados han cumplido con casi la totalidad de las obligaciones a su cargo, estando pendiente de cumplimiento únicamente un mes del período original pactado del Contrato de Licencia, que tuvo una vigencia de más de 3 años y que importó el pago de regalías en más de US$ 3 millones, la pretensión de que el tema de los impuestos importe una causal de rescisión constituye un despropósito que termina por ser irritante, aun para un neófito en materia jurídica, y permite dudar de la buena fe puesta de manifiesto por Converse.

Si el móvil perseguido con el concedente no guarda armonía con el principio de buena fe, sea en lo relativo a la celebración del contrato, como en lo referente al ejercicio de sus facultades, provocando una disociación entre el derecho subjetivo y la buena fe, debe aplicarse el art. 1071 del Código Civil para colocar en su justo lugar las prerrogativas individuales[16].

El derecho de resolver el contrato, cuando el incumplimiento carece de entidad suficiente para continuar un contrato, implica el ejercicio abusivo de un

---

[15] Recomendación formulada por las Sextas Jornadas Nacionales de Derecho Civil reunidos en Santa Fe, año 1977.
[16] Conf. CNCom., Sala B, 1998/08/12, LL, 1999-E-723.

derecho por contrariar los fines que la ley tuvo en miras al reconocerlo, y por exceder los límites impuestos por la buena fe, la moral, y las buenas costumbres[17].

Asimismo, se debe considerar el hecho cierto de que Converse recibió durante más de 3 años seguidos sin formular reserva respecto a como se liquidaban los mismos. Al entender de Converse, Alon no habría abonado regalías del modo exacto en que fue previsto en el Contrato de Licencia. Es decir, habría habido un cumplimiento defectuoso de la obligación de pagar las regalías. Sin embargo, Converse recibió las regalías durante 39 de los 40 meses de vigencia original del Contrato de Licencia y ahora pretende rescindir el Contrato de Licencia por ese motivo.

Por ello, tal como fueron explicadas las cosas, el Contrato de Licencia no prevé que el incumplimiento que denuncia Converse sea causal de rescisión contractual. Asimismo, y para el caso en que se interprete que el incumplimiento puede dar lugar a la rescisión, las circunstancias fácticas que rodean al incumplimiento no admiten que Converse haga uso de dicho derecho, por cuanto el mismo es contrario a la buena fe, la moral y las buenas costumbres. En consecuencia, la pretensión de rescindir el contrato fundado en el incumplimiento objeto del presente punto no puede ni debe prosperar.

**2.3.- Supuesto incumplimiento en el pago de regalías por tipo de cambio incorrectos.** Mi parte ya le advirtió a Converse lo absurdo del reclamo. El mismo representa el 0,04% de los montos involucrados en las transacciones.

Sin perjuicio de que mi parte ya abonó los US$ 16.291 en tiempo y forma, no puede pasar inadvertido a V.S. la actitud combativa y belicosa de Converse, máxime si se advierte que a través de la relación comercial mantenida hasta la fecha Alon le ha abonado a Converse más de US$ 3 millones en regalías.

A cualquier efecto, me remito a lo afirmado por mi parte en el punto 2 anterior, fundamentos que no transcribo en honor al criterio de la economía procesal, sin perjuicio de solicitar que se los tengan por reproducidos en el presente punto 3.

---

[17] Conf. SCBA, 1995/12/27, LL, 1997-C-965.

**2.4.- Supuesto incumplimiento de publicidad mínima.** Es un principio universal que los contratos deben celebrarse, interpretarse y ejecutarse de buena fe, y según lo que las partes verosímilmente entendieron o pudieron entender obrando con cuidado y previsión.

Presente ello, expresamos que Converse le imputa a Alon no haber invertido en publicidad los porcentajes establecidos en el Contrato de Publicidad. Se debe destacar que la expresión formulada por Converse es sin respaldo numérico visible de ningún tipo. Converse se limita tan solo a expresar el incumplimiento.

Alon, le ha comunicado a Converse que ha cumplido con ese requisito, y que lo ha hecho en un 0,02% por encima del porcentaje del 5% de las ventas netas realizadas, superando claramente el requisito contractual previsto, por lo que no cabe admitir responsabilidad contractual de Alon, y ergo, incumplimiento a alguna de las obligaciones exigibles del Contrato de Licencia.

A todo evento, mi parte considera importante destacar que Alon ha superado sus requisitos de ventas durante el primer período de vigencia del Contrato de Licencia en más de 5 veces el mínimo garantizado y cualquier intento de Converse de afirmar que Alon no ha cumplido con sus requisitos de publicidad conforme al Contrato de Licencia, importa un acto de mala fe y, nuevamente, un ejercicio abusivo de los derechos contractuales que tendría de ser cierto lo que alega Converse.

De conformidad con lo expuesto, de ningún modo Alon acepta la responsabilidad contractual que Converse pretende arbitrariamente atribuirle, y por lo tanto Alon niega la existencia del incumplimiento, se remite a los resultados del ejercicio para demostrar la eficiencia y eficacia de las inversiones en publicidad realizadas por Alon durante toda la existencia del Contrato de Licencia. En tal sentido, viene al caso recordar que la ley no da amparo a aquellas conductas como la de Converse que pretende exigir el cumplimiento de una inversión que se utiliza para incentivar la ventas, cuando las misma alcanzaron cifras astronómicas comparándolas con aquella mínimas garantizadas en el Contrato de Licencia.

A los fines de sostener los fundamentos de falta de buena fe y abuso en el ejercicio de los derechos del Contrato de Licencia, mi parte se remite a lo ya expresado en el punto 2, fundamentos que no transcribo en honor al criterio de la economía procesal, sin perjuicio de solicitar que se los tengan por reproducidos en el presente punto 4.

### 3.- El Animo que Persigue Converse

Tal como ya ha sido expresado, la doctrina de los propios actos importa una barrera opuesta a la pretensión judicial, por la cual se impide el obrar incoherente que lesiona la confianza suscitando en la otra parte de la relación e impone a los sujetos un comportamiento probo en las relaciones jurídicas, pues no es posible permitir que se asuman pautas que suscitan expectativas y luego se contradigan al efectuar un reclamo por incumplimiento.

Alon, en todo momento ha cumplido satisfactoriamente todas y cada una de las obligaciones del Contrato de Licencia.

Converse, antes de enviar la notificación de incumplimiento, se encontraba con cargo de cumplimiento de una promesa implícita y en un ámbito de negociaciones contractuales de buena fe.

Analizada la conducta de Converse retrospectivamente, mi parte concluye que Converse es responsable y culpable de: a) inducir a Alon a un falso sentido de tranquilidad respecto de la renegociación del Contrato de Licencia hasta que fue demasiado tarde para que Alon lo hiciera, mientras Converse aparece tomando medidas para apropiarse injustamente de los mercados que desarrolló Alon; b) inducir a Alon a divulgar sus estrategias, planes comerciales y relaciones detalladas con los clientes (incluso nombres, direcciones y números de teléfonos) al declarar falsamente que intentaba regirse en los términos del Contrato de Licencia y renovar el Contrato de Licencia por otros 3 años; c) fomentar el desarrollo de Alon de la estructura comercial de Coopershoes, para declarar después que Alon había incurrido en incumplimiento del Contrato de Licencia por el uso de dicha estructura; d) utilizar información comercial de Alon para sus propios fines; e intentar privar a Alon de sus derechos y beneficios conforme al Contrato de Licencia.

Las conclusiones expuestas en el párrafo anterior son una consecuencia lógica de la adición de todas y cada una de las conductas exhibidas por Converse, por cuanto nada de lo hecho por Converse hasta el 30 de noviembre de 2004 hizo siquiera sospechar a Alon del presente desenlace.

Esta parte entiende que Converse ha visto la región que en exclusividad explota Alon como una de las oportunidades de mercado mundiales más importante para Converse.

Como ya ha quedado demostrado, en sus esfuerzos por sacar a Alon del Mercosur, Converse utilizó excusas de pretexto para oponerse de mala fe al derecho de Alon a la renovación automática del Contrato de Licencia.

Sostenemos que cualquier prerequisito para renovar el Contrato de Licencia por un período adicional que no hubiera sido cumplido por Alon es un resultado directo de la conducta de Converse que indujo a Alon a creer que Alon ya había ejercido exitosamente sus derechos de renovación automática de conformidad con la cláusula 2 del Contrato de Licencia y que Converse no cuestionaba dicha renovación.

La conducta de Converse y las comunicaciones por escrito a Alon sobre el tema de renovación del Contrato de Licencia demuestran que Converse de hecho indujo a Alon a un falso sentido de tranquilidad respecto de la renegociación del Contrato de Licencia mientras Converse tomaba medidas para apropiarse injustamente de los mercados desarrollados por Alon y que no se encontraban disponibles para Converse con anterioridad.

En lo que se refiere al tema de Coopershoes, de la prueba producida aparece evidente: a) Converse tenía conocimiento y participó en la organización de la estructura comercial entre Coopershoes y Alon; b) Converse tenía pleno conocimiento del Contrato de Coopershoes; c) Converse aprobó totalmente el Contrato de Coopershoes; y d) Converse consintió el contrato con Coopershoes.

Por ello, pretender declarar a Alon en incumplimiento del Contrato de Licencia, una mes antes del vencimiento del primer período, por utilizar una estructura diseñada, fomentada y aprobada por Converse, sirve como ejemplo de la

mala fe de Converse en intentar usurparle a Alon su derecho de automáticamente renovar el Contrato.

De conformidad con lo expuesto, la oposición expresada fehacientemente por Converse al derecho de Alon a renovar automáticamente el Contrato de Licencia y frustrar indebidamente el negocio jurídico tenido en vista por Alon; y los demás argumentos utilizados por Converse para declarar a Alon en incumplimiento, importan para esta parte un sustancial incumplimiento de Converse a sus obligaciones, expresas e implícitas, del Contrato de Licencia.

### 4. Reclamo Solicitando la Vigencia del Contrato hasta diciembre de 2007

Como resultado de los intentos de Converse a oponerse a la renovación del Contrato de Licencia, y su intención de rescindir el Contrato de Licencia, importan la existencia de una controversia entre las partes con respecto a ciertos derechos, deberes y obligaciones del Contrato de Licencia.

Sin perjuicio de ello, queda claro que el Contrato de Licencia no vence el 31 de diciembre de 2004, sino que continuará hasta el 31 de diciembre de 2007, atento que Alon ha ejercido su derecho automático de renovación.

Por ello es que Alon ha interpuesto la demanda de arbitraje en los términos del Contrato de Licencia, a fin de que el árbitro dicte un laudo arbitral definitivo sobre los siguientes puntos: a) que declare que Converse ha incurrido en incumplimiento del Contrato de Licencia y su obligación de buena fe y negociaciones contractuales de buena fe con respecto a la renovación del Contrato de Licencia; y b) que declare que el Contrato de Licencia no ha vencido y que continuará hasta el 31 de diciembre de 2007 y que Alon ha legítimamente ejercido su derecho automático de renovación de conformidad con el Contrato de Licencia.

En los mismos términos que los descriptos en el párrafo anterior, Alon Argentina, en tiempo oportuno, interpondrá en la República Argentina una demanda de idéntico o parecido objeto al perseguido por Alon, siempre sobre la base de exigir el cumplimiento del Contrato de Locación, una vez que se hayan agotado los plazos de la mediación.

### B. Peligro en la Demora

Junto con la verosimilitud del derecho, constituye un requisito específico de fundabilidad de la pretensión cautelar el peligro probable de que la tutela jurídica definitiva que el actor aguarda de la sentencia a pronunciarse en el proceso principal no pueda, en los hechos, realizarse (*periculum en la demora*), es decir que, a raíz del transcurso del tiempo, los efectos del fallo final resulten prácticamente inoperantes[18] o contrarios al interés del que los solicita, atendiendo la cadena de sucesos que van ocurriendo a medida que transcurre el tiempo entre la interposición de la acción y el dictado de la resolución que pone fin al pleito.

Conforme ya quedó expuesto, Alon y Alon Argentina consideran que el Contrato de Licencia está debidamente renovado y que, en razón de ello, los derechos y créditos que dicho contrato otorga a los licenciatarios estarían ya incorporados definitivamente a sus respectivos patrimonios, siendo en ambos casos su activo más importante.

También ha quedado patente en autos que Converse está actuando con mala fe, pretendiendo hacer un ejercicio antifuncional de sus derechos, con el objetivo de tomar ilegítimamente para sí el mercado que le fuera asignado en exclusividad a Alon hasta el 31 de diciembre de 2007.

Cabe destacar que, aunque pueda resultar redundante, Converse jamás cuestionó ni objetó el correcto cumplimiento del contrato de licencia fundamentalmente en sus aspectos principales, esto es volúmenes de venta y royalties. Solamente cuestionó en forma arbitraria, extemporánea y maliciosa aspectos accesorios del referido contrato que no hacen al fondo de la cuestión. Se trató de un vano intento para intentar obstaculizar la continuación de la relación que tan excelentes frutos ha dado a ambas partes. Converse se movió impulsada por la codicia al pretender conservar para si todos los frutos del negocio desarrollado con tan esmero y esfuerzo por Alon.

En el caso concreto de autos el peligro en la demora está plenamente justificado en varios aspectos.

---

[18] Conf. Palacio, Lino Enrique.

**1.- Pretensión de Converse de privar a Alon y Alon Argentina del uso legítimo de la marcas licenciadas.** De las consultas realizadas por Alon Argentina ante el Instituto Nacional de la Propiedad Industrial, actualmente Converse es titular de los siguientes registros marcarios (ver **Anexo VII**). Todos los derechos de uso de las marcas mencionadas, reitero, han sido transferidos por licencia a Alon y Alon Argentina hasta el 31 de diciembre de 2007, conforme se acreditó en autos.

En virtud de la competencia especial que V.S. tiene en la materia, no escapa a vuestro conocimiento que Converse, con el fin de apoderarse del mercado que explota Alon con licencia exclusiva, es capaz de pretender considerar los productos licenciados a favor de Alon como mercadería en infracción a la Ley de Marcas, y bajo tales argumentos solicitar Converse a partir del 1º de enero de 2005, algunas de las medidas precautorias que prevé el art. 38 —embargo, secuestro de mercadería y cese de uso marcario-, así como también la denuncia penal que prevé el art. 31 de la ley 22.362, con ribetes patrimoniales y procesales injustificados atendiendo los derechos de mis representadas.

El uso de los derechos y facultades que otorga la Ley de Marcas a Converse como titular del registro de las marcas **"Converse"**, **"All Star"**, **"Converse All Star Chuck Taylor"**, **"Star and Chevron"**, **"Chuck Taylor All Star"**, **"Jack Purcell"**, **"Skid Grips"** y **"One Star"**, importa para Alon un seria limitación a su derecho a hacer uso de las licencias objeto del Contrato de Cesión, y para el caso en que Converse obtenga alguna medida como las descriptas, Alon quedaría virtualmente imposibilitado de actuar con la marca All Star, Converse, etc. en el mercado, por lo menos hasta que se dicte una resolución que zanje definitivamente la controversia sucitada entre las partes, generándosele de ese modo un grave perjuicio patrimonial, atendiendo la actividad que ha venido desarrollando hasta la fecha.

El proceso arbitral que ha puesto en funcionamiento Alon en legítima defensa de sus intereses, no tendrá un laudo arbitral antes del mes de junio de 2005, por lo que de ocurrir lo previsto en el párrafo anterior Alon y Alon Argentina estarán fuera del mercado por un plazo aproximado de 6 meses o más.

La desaparición durante 6 meses de un competidor del mercado de la República Argentina, es sencillamente un certificado de defunción para Alon Argentina, puesto que esta compañía no está en condiciones, ni tiene por objeto estar inactiva durante tanto tiempo y fundamentalmente porque no tiene otro contrato ni actividad distinta que la referida a las marcas de Converse. Su suerte estaría echada, y con la de Alon Argentina, la de todos sus empleados que no tendrán actividad para hacer, perdiendo sus empleos.

A todo evento, y asumiendo por un momento que la exclusión de Alon Argentina del mercado por el plazo de tiempo que transcurra hasta que en arbitraje se le reconozcan los derechos que pretende aquí proteger, quizás le resulte imposible reinsertarse atento que el espacio o la porción del mercado que le pertenece y que quede desocupado, probablemente sea utilizado por un reemplazante, ya sea Converse a título personal, o a través del otorgamiento por parte de Converse de una licencia similar a la dada a mis representadas.

Asimismo, de obtener Converse las medidas cautelares antes indicadas, Converse obtendría en sede judicial el fin por ella buscado, cual es la frustración de los derechos de licencia de Alon, y la apropiación del mercado que le pertenece a Alon hasta el año 2007. De más está decir, que Alon y Alon Argentina precisamente tienen por objetivo evitar tener sufrir el despojo al que Converse los quiere someter, intentando ambas accionantes impedirlo por todos los medios, atendiendo la mala fe, el descrédito, y el abuso del derecho que ha caracterizado a Converse en esta última etapa del primer período de vigencia del Contrato de Licencia.

Converse ha puesto en evidencia su maniobra maliciosa, no se ha guardado ningún elemento que permita suponer que existirá alguna otra alegación distintas a las ya formuladas.

Por supuesto que la medida que aquí se solicita es con cargo a favor de Alon y Alon Argentina de continuar dando cumplimiento a todos y cada uno de las obligaciones que le exige el Contrato de Licencia, ello en un todo de acuerdo a cómo se ha venido desarrollando la relación hasta estos días. No puede pasar inadvertido para V.S. que Alon ya le abonó a Converse regalías por más de US$ 3

millones, y su aspiración es continuar operando las licencias en el mercado que le pertenece hasta el 2007, y abonar cantidad de regalías que por contrato está obligada a abonar, tal fue el espíritu de Alon durante la relación contractual.

El peligro en la demora está plenamente justificado por cuanto Converse ya ha expresado de un modo fehaciente e indubitable su oposición maliciosa al derecho de Alon de continuar en el uso de la licencia contratada, afirmando además, que la controversia queda abierta a partir del 1° de enero de 2005, es decir, dentro de 9 días. Además, el solo riesgo de poder quedar privado del ejercicio de los derechos económicos que Alon reclama como titular de los derechos patrimoniales de las marcas licenciadas –con los límites temporales que otorga el Contrato de Licencia-, otorgan fundamento suficiente para el dictado de la medida solicitada, y así expresamente esta parte lo solicita.

Por todo ello, en los términos del art. 9 de la Ley de Marcas, y el carácter de licenciatario que tienen Alon y Alon Argentina, es que vengo a solicitar a V.S. se dicte contra Converse una medida cautelar de no innovar a modo de que queden garantizados los derechos de Alon y de Alon Argentina para el uso pleno de los derechos patrimoniales de las marcas **"Converse"**, **"All Star"**, **"Converse All Star Chuck Taylor"**, **"Star and Chevron"**, **"Chuck Taylor All Star"**, **"Jack Purcell"**, **"Skid Grips"** y **"One Star"**, ello en los términos y condiciones establecidos en el Contrato de Licencia, y en un todo de acuerdo a la Ley de Marcas, hasta tanto se dicte y quede firme el laudo arbitral donde se zanjará de manera definitiva las cuestiones controvertidas entre las partes.

**2.- Pretensión de Converse de restringir el uso legítimo de la marcas licenciadas a Alon y Alon Argentina.** Continuando con lo señalado en el punto 1 anterior, en cuanto a que Converse ha dado muestras evidentes de pretender ocupar para sí, o para un tercero, el mercado en el actúa Alon y Alon Argentina como licenciatarios, no resulta inverosímil considerar que Converse o el tercero licenciado, estén interesados en no respetar la Cláusula 3 del Contrato de Licencia de exclusividad en el territorio de la República Argentina, a modo de restringir y socavar el derecho patrimonial de propiedad temporal del que gozan mis representadas.

Es decir, habiendo quedado acreditado los intereses ilegítimos de Converse, su mala fe, y el abuso del derecho, aparece incuestionable el peligro en la demora, por cuanto el hecho de no respetar a favor de Alon y Alon Argentina la exclusividad que reconoce el Contrato de Licencia, y permitir la incorporación de competencia ilegítima, restringe notoriamente el derecho del uso pleno de los derechos patrimoniales de las marcas obtenidos a través del Contrato de Licencia, los cuales mis representados están interesados en proteger.

Lo mencionado en el párrafo anterior es también un modo de obtener por Converse, aunque de manera incompleta, parte del objetivo planteado, cual es quedarse indebidamente con el mercado desarrollado por Alon y Alon Argentina, ya que obtiene parcialmente su objetivo, generando además un daño importante e irreparable al patrimonio de mis representadas.

Además, nadie le garantiza a Alon y Alon Argentina que Converse vaya a permitir que Alon y Alon Argentina compitan en las mismas condiciones económicas, que el tercero licenciatario, o la propia Converse. La competencia ilegítima también es un modo de lesionar los derechos patrimoniales de Alon y Alon Argentina, por cuanto en un escenario de depreciación de precios, el hilo se cortaría por la parte más delgada, tornando Converse a Alon y Alon Argentina en licenciatario no competitivos.

Por ello, resulta pertinente y necesario solicitar a V.S. se dicte una medida cautelar ordenando a Converse: a) que se abstenga de otorgar a terceros distintos de Alon y Alon Argentina licencia de las marcas **"Converse"**, **"All Star"**, **"Converse All Star Chuck Taylor"**, **"Star and Chevron"**, **"Chuck Taylor All Star"**, **"Jack Purcell"**, **"Skid Grips"** y **"One Star"** para comercializar productos en el territorio de la República Argentina a partir del 1° de enero de 2005, y para el caso en que haya otorgado licencia para operar en el mercado a partir del 1° de enero de 2005, que Converse se abstenga de proveer al tercero licenciatario en cuestión, productos y accesorios para ser comercializados en el territorio de la República Argentina; y b) a que se abstenga de comercializar directamente productos y accesorios con las marcas **"Converse"**, **"All Star"**, **"Converse All Star Chuck Taylor"**, **"Star and Chevron"**, **"Chuck Taylor All**

Star", "Jack Purcell", "Skid Grips" y "One Star" en el territorio de la República Argentina a partir del 1° de enero de 2005. Asimismo, solicito a V.S. que la medida cautelar en cuestión esté vigente hasta tanto se dicte el laudo arbitral zanjando definitivamente entre Alon, Alon Argentina y Converse, los derechos litigios descriptos a lo largo del presente escrito.

Por lo expuesto, mi parte entiende que en autos se encuentran reunidos los requisitos exigidos para tener por configurado el peligro en la demora y por lo tanto, corresponde hacer lugar a la medida requerida, lo que así se solicita.

### C.- Conclusión

De acuerdo a todos los fundamentos expuestos en el presente capítulo, mi parte considera que en autos se ha expresado los derechos que se pretenden asegurar, la medida que se pide, las disposiciones de la ley en que se funda la petición y la verosimilitud de su derecho, como así también que se ha dado cumplimiento a todos los requisitos que corresponden a la medida cautelar peticionada, por lo que vengo a solicitar a V.S. se haga lugar a la misma, con expresa imposición de costas en caso de oposición.

## V

## COMPETENCIA CAUTELAR

**1.- El Proceso Arbitral y continuidad de obligaciones.** Conforme surge de la documentación que se adjunta al **Anexo VIII**, con fecha 16 de diciembre de 2004, Alon solicitó, en los términos del art. 33 del Contrato de Licencia, ante el Centro Internacional para la Resolución de Conflictos de la Asociación de Arbitraje de los Estados Unidos, el dictado de un laudo arbitral indicando específicamente que existe una controversia fundada en los intentos de Converse de oponerse a la renovación del Contrato de Licencia, a efectos de que se expida sobre: a) que declare que Converse ha incurrido en incumplimiento del Contrato de Licencia, y su obligación de buena fe, y negociaciones contractuales de buena fe con respecto a la renovación del Contrato de Licencia; y de cualquier otro reclamo que el Arbitro considere justo y adecuado; y b) Que declare que el Contrato de Licencia no ha vencido y que continuará vigente hasta el 31 de

diciembre de 2007,. y que Alon ha legítimamente ejercido su derecho automático de renovación de conformidad con el Contrato de Licencia.

La prórroga de la jurisdicción de V.S. fue incorporado al Contrato de Licencia por Converse, y le es oponible a Alon por haber firmado el Contrato de Licencia.

De conformidad a lo expuesto, Alon ha expresado el objeto de su reclamo en la jurisdicción pactada en el Contrato de Licencia del cual es suscriptor.

Pero, del análisis de la cláusula 33 del contrato resulta que:

a) Todo lo concerniente a la rescisión y renovación del contrato será objeto de arbitraje en Estados Unidos de América;

b) La promoción de un proceso arbitral no libera a las licenciatarias del cumplimiento de sus obligaciones de efectuar pagos durante el trámite de ese proceso.

Esto significa que, si las licenciatarias deben continuar cumpliendo el contrato, aún durante el trámite de un proceso arbitral, entonces el contrato continua vigente en todos su términos, es decir con todos los derechos y obligaciones para ambas partes, por lo menos hasta que el tribunal arbitral dirima la cuestión y, en ese caso, si fuera contraria a la posición de la licenciataria. Porque si por el contrario, resultara favorable, entonces el contrato continuará vigente hasta el 31 de diciembre de 2007, tal como lo sostiene la licenciataria.

Si la interpretación no fuera la que se desarrolla precedentemente, entonces tendríamos que las licenciatarias continuarían obligadas a efectuar pagos en base a un contrato inexistente sin contrapartida alguna a favor de aquellas y sin obligaciones por parte de Converse; y, esta situación constituiría un enriquecimiento sin causa, lo que esta expresamente vedado por ley.

Se expresó anteriormente que, durante el trámite del proceso arbitral, el contrato continua vigente y que por lo tanto las parte continúan sujetas a todos lo derechos y obligaciones. Pero, Converse ostensiblemente no lo ha entendido de esa manera porque soslayó el mecanismo de soluciones de conflictos previsto en el contrato y, sin fundamento legal ni contractual alguno, comunicó a

las licenciatarias que no continuará con el contrato. La actitud de Converse deja desprotegida y sin defensa alguna a Alon ya que no puede continuar con su actividad lícita, y se ve en la necesidad de desactivar un negocio que le llevó años poner en régimen. Por eso, la única solución que existe para minimizar el daño que se le podría ocasionar a Alon, en caso de discontinuar ilegítimamente el contrato, es la medida cautelar que se solicita a V.S.

Debe quedar bien en claro que con esta presentación no se pretende discutir la procedencia o no de la rescisión ni la renovación del contrato. Lo que aquí se pretende es que V.S. orden mantener el statu quo actual, esto disponer que los efectos del contrato deben continuar por lo menos hasta que se expida el tribunal arbitral.

Para terminar este acápite debemos decir que, sin perjuicio de lo expuesto precedentemente, consideramos de gran importancia tener en cuenta que está fuera de discusión que los efectos y las obligaciones del Contrato de Licencia que vincula a Converse y a Alon se operan en el territorio de la República Argentina, por lo que V.S. es competente para resolver sobre la medida cautelar que se solicita en esta presentación. Esto necesariamente deber ser como se expresó anteriormente, porque son competentes los tribunales del lugar donde debe ejecutarse la obligación, y, en nuestro caso, es la República Argentina.

**2.- Imposibilidad de obtener cautela jurisdiccional en tiempo oportuno y la urgencia de las medidas.** Conforme ya fuera expresado, el día 30 de noviembre de 2004, de manera artera y sin precedentes que los justificaran, Converse le notificó Alon que había incurrido en incumplimientos al Contrato de Licencia, todos los cuales daban fundamento a la rescisión contractual por culpa de Alon, y que asimismo, Converse se oponía a la renovación del Contrato de Licencia, y que no iba a efectuar ni prestar conformidad a la misma. Que en razón de ello, el Contrato de Licencia se rescindía además el 31 de diciembre de 2004, por vencimiento del plazo original establecido.

Lamentablemente, antes de poder iniciar cualquier tipo de acción derivado de la improcedencia y malicia de la conducta ejercida por Converse, Alon se vio obligado a poner en conocimiento de Converse que la postura de ésta, le

exigía a Alon iniciar una acción a efectos de proteger sus legítimos derechos. Así fue que con fecha 7 de diciembre de 2004, se puso en aviso a Converse, y se la intimó para que ratificara o rectificase la inexistencia de incumplimiento de Alon al Contrato de Licencia, bajo apercibimiento ya sí, de dar inicio a las acciones que por derecho correspondieren.

El 10 de diciembre de 2004, Converse ratificó las denuncias de incumplimiento, y que el contrato quedaba rescindido por el vencimiento del plazo el día 31 de diciembre de 2004.

En un último intento por evitar las acciones judiciales, con fecha 15 de diciembre de 2004, Alon envió una nueva intimación a Converse a efectos de que reconsideren su situación en forma inmediata por cuanto, resultaba insostenible no recurrir al arbitraje a defender los derechos de Alon, atendiendo la lo exiguo del plazo de vigencia que Converse le reconocía al Contrato de Licencia, y la proximidad del 31 de diciembre de 2004. .

Así fue que el 16 de diciembre de 2004, en el Estado de Massachussetts, Estados Unidos de América, Alon interpuso la demanda de arbitraje contra converse, tal fue explicado en el punto anterior.

El grave problema judicial que se le presenta a Alon, es que la acción solicitando el cumplimiento del Contrato de Locación, por convención contractual, debía ser interpuesta en el Estado de Massachussetts, Estados Unidos de América, donde solicitaba como objeto de su pretensión, el reconocimiento de sus derechos sobre el Contrato de Licencia hasta el 31 de diciembre de 2007, a efectos de continuar en el ejercicio de sus derechos.

Lamentablemente para la situación de Alon, los derechos que Alon pretende proteger en Massachussetts deben ser ejercitados en el territorio de la República Argentina, que es uno de los mercados que Converse quiere apropiarse, mediante medios ilegítimos y abusivos.

Atendiendo tal particularidad, y la necesidad de proteger cautelarmente los derechos cuya protección se ha solicitado en la causa principal, a efectos de poder ejercer plenamente los derechos patrimoniales que el Contrato de Licencia le otorga, Alon solo encuentra posible recurrir a la jurisdicción de V.S.

atendiendo el exiguo plazo de tiempo existente entre el tiempo que se contó para presentar la demanda, la medida cautelar, y la fecha en que vence el primer plazo de vigencia del Contrato de Licencia.

No está de más mencionar, que de haber Alon solicitado una medida cautelar en la jurisdicción de Massachussetts, dicha medida le sería inoponible a Converse en la República Argentina, hasta tanto dicha sentencia no sea reconocida judicialmente. No existe el tiempo material suficiente para que ello ocurra, ya que a la fecha ni siquiera se ha formado el tribunal arbitral y esto sucederá indefectiblemente con posterioridad al 31 de diciembre de 2004.

Así las cosas, mi parte considera que Alon ha justificado uno de los requisitos que exige la ley, el cual es la imposibilidad de obtener la tutela en debido tiempo, en la jurisdicción que va a entender la cuestión principal de Alon.

Por ello, vale decir que Alon ha procedido a explicar en detalle la verosimilitud del derecho y el peligro en la demora, en los cuales se motivó la petición cautelar, ello en el conocimiento pleno de que un juez notoriamente incompetente, puede decretar medidas precautorias urgentes, sin que ello implique asumir jurisdicción en el proceso, siempre que se exhiban los requisitos de admisibilidad y fundabilidad previstos en el Código de Forma.

La urgencia de contar con una medida cautelar está fundado en la ostensible conducta maliciosa, arbitraria, desconsiderada y desleal de Converse, quien ha demostrado una clara intención de dañar a Alon, sin que haya mostrado ningún tipo de limitación o razonabilidad a la fecha, en una estrategia de despojar a Alon de lo que por Contrato de Licencia vigente le pertenece.

Se debe tener presente que Alon en todo momento ha dado cumplimiento a sus obligaciones, y las viene cumpliendo todas en tiempo y forma, y si a ello le agregamos que verosímilmente posee el derecho que Alon reclama en la acción principal, todos los daños que cause la conducta ilegítima de Converse, serán injustos, y como tales mi parte pretenden que sean evitados a través de las medidas solicitadas.

Ya se explicó también los efectos perniciosos que puede sufrir el patrimonio de Alon (cierre del negocio por tratarse de la única actividad en la

República Argentina con los consiguientes gastos e indemnizaciones que deberá afrontar) en la medida que no se obtengan las medidas cautelares solicitadas, y la imposibilidad que se pueda obtener respuesta satisfactorias a los requerimiento al Árbitro, si después del 1° de enero de 2005 Alon se ve privado o restringido su derecho de propiedad.

La urgencia en tomar la medida existe, los derechos que se pretenden proteger son reales, ciertos, y actuales, y el daño que se pretende evitar es injusto y falto de justificación en derecho.

La urgencia está dada efectivamente en que de no obtenerse la medida en forma inmediata, Alon y Alon Argentina quedan, dentro del territorio de la República Argentina, a merced de la conducta maliciosa y abusiva demostrada por Converse, con el efecto nocivo que puede importar la pérdida o la restricción de los derechos patrimoniales de licencia que Alon y Alon Argentina pretenden proteger y que desde la jurisdicción del arbitraje no se puede evitar en tiempo oportuno.

Si bien es cierto también que está vigente el principio por el cual los jueces deberán abstenerse de decretar medidas cautelares cuando el conocimiento de la causa no fuese de su competencia, dicho principio cede cuando en los casos como el de autos, el dictado de las medidas es la única solución posible para la tutela cautelar solicitada, y la situación no ha sido provocada por Alon, sino que fue provocada por Converse, quien ha demostrado y actuado con un obrar antijurídico evidente, en perjuicio de derechos cuyo ejercicio opera en la República Argentina, lugar dónde se pretende su protección.

3.- **La situación de Alon Argentina.** Como podrá observar V.S., Alon Argentina no ha suscripto el Contrato de Licencia, del cual son parte Alon y Converse. Sin perjuicio de ello, Converse reconoció derechos a favor de Alon Argentina, ello sin condicionamiento de ninguna especie.

Así las cosas, Alon Argentina rechaza la jurisdicción que ofrece el Contrato de Licencia, y se remite a lo establecido en el Código Procesal Civil y

Comercial de la Nación[19], en cuanto a que establece que la competencia se determinará el lugar donde deban cumplirse las prestaciones, y atendiendo que el domicilio de la sede social de Alon Argentina SRL es la ciudad de Buenos Aires, por lo que V.S. tiene competencia territorial, y lo es en razón de la materia al estar involucrado cuestiones que hacen a la aplicación de la Ley de Marcas.

En razón e lo expuesto, V.S. es competente en razón de la materia y el territorio, recordando que el Contrato de Licencia tiene efectos en la República Argentina, más precisamente en la ciudad de Buenos Aires, atendiendo el domicilio de Alon Argentina y demás cuestiones mencionadas a lo largo del presente escrito

**4.- Facultad de dictar medidas cautelares.** Está dicho que debe darse preeminencia a la urgencia que justifica una medida por sobre las normas rituales que imponen al juez abstenerse de emitir pronunciamiento en juicios que no corresponden a su órbita jurisdiccional, sin perjuicio de la inmediata remisión a quien resulte competente[20].

El juez, aún notoriamente incompetente, puede decretar medidas precautorias urgentes sin que ello implique asumir jurisdicción en el proceso, medidas que deberán hallarse sujetas a la circunstancia de que exhiban los requisitos de admisibilidad y fundabilidad previstos en el Código Procesal.

La prerrogativa descripta resulta admisible cuando las medidas, con el presente caso, siempre que concurran situaciones extremas que revelen una imposibilidad de hecho de obtener la intervención jurisdiccional de quien es competente en razón de la materia, turno, o territorio.

En el caso de autos, atendiendo las características particulares del presente proceso, mi parte entiende que están dadas todas y cada una de las condiciones necesarias para dictar las medidas cautelares solicitadas, solicitando encarecidamente que asuma la competencia solicitada, y haga lugar a las medidas solicitadas en forma urgente.

---

[19] Art. 5.
[20] Conf. CACC de Mar del Plata, 2002/04/02, LLBA, 2002-835.

## VI
### SOLICITA

Atendiendo el interés de rango constitucional que mi mandante pretende proteger, y la verosimilitud del derecho a *prima facie* invocado, el suscripto viene a dar caución juratoria por todas las costas y daños y perjuicios que pudiera ocasionar en los supuestos previstos por el art. 208 del Código Procesal Civil y Comercial de la Nación.

## VII
### DERECHO

Mi mandante funda la pretensión deducida en lo establecido en el art. 14, 16, 17, 18 y 42 de la Constitución Nacional; arts. 196 y ccdtes. del Código Procesal Civil y Comercial de la Nación; art. 1197, 1071 y ccdtes. del Código Civil; y en la doctrina y jurisprudencia aplicable.

## VIII
### PRUEBA

A los fines de acreditar los extremos invocados, mi mandante viene a ofrecer la siguiente prueba documental:

**1.- Documental**: Se acompaña al presente escrito en carácter de prueba documental la siguiente:

a) **Anexo I**: El Contrato de Licencia redactado en inglés junto con la traducción pública efectuada al castellano;

b) **Anexo II:** Correos Electrónicos intercambiados entre Alon y Converse junto con la traducción pública efectuada en castellano;

c) **AnexoIII:** Notificación de vencimiento e incumplimiento al Contrato de Licencia remitida por Converse a Alon en fecha 30 de noviembre de 2004;

d) **Anexo IV:** Contrato celebrado en fecha 1 de enero de 2004 entre Alon y Alon Argentina S.R.L. y Contrato Social de Alon Argentina S.R.L.;

e) **Anexo V:** Segunda modificación al contrato celebrado entre Alon y Converse de fecha 1 de enero de 2004;

f) **Anexo VI:** Nota de fecha 7 de diciembre de 2004 mediante la cual Alon le comunica a Converse su decisión de ejercer sus derechos de continuar

ejecutando el Contrato de Licencia junto con su traducción al idioma castellano;

g) **Anexo VII:** Constancias de Registros Marcarios de consultas realizadas por ante el Instituto Nacional de Propiedad Intelectual (INPI);

h) **Anexo VIII:** Solicitud efectuada por Alon por ante la Asociación de Arbitraje de los Estados Unidos;

i) **Anexo IX:** Certificado Contable y declaración bajo juramento de decir la verdad efectuado por el Sr. Jesús M. Quinteros;

j) **Anexo X:** Declaración del Sr. Roberto Szerer;

k) **Anexo XI:** Nota remitida por Converse a Alon en fecha 10 de diciembre de 2004 junto con su traducción al idioma castellano;

l) **Anexo XII:** Nota remitida por Alon a Converse en fecha 15 de diciembre de 2004 junto con su traducción al idioma castellano.

En virtud de que la documentación señalada precedentemente reviste carácter original, solicito a V.S. ordene reservar la misma bajo sobre en la caja fuerte del Juzgado.

## IX
## AUTORIZACIONES

Vengo a solicitar se autorice a tomar vista del presente expediente, retirar oficios, cédulas (por el régimen de la ley 22.172) y efectuar desgloses en general (por los que el suscripto quedará notificado) al Dr. Orlando Pulvirenti y/o a la Dr. Nicolás Repila y/o Dr. Javier Saravia y/o Dr. Franco Rodríguez Vázquez y/o Dr. Sebastián Torres y/o al Sr. Adolfo Gonzáles Chaves y/o al Sr. Andrés Estrade y/o al Sr. Félix Bunge .

## X
## ACOMPAÑA BONO

Conforme lo establece el art. 51 inc. d) de la ley 21.839, vengo a acompañar el bono de derecho fijo del Colegio Público de Abogados de la Capital Federal.

## XI
### TASA DE JUSTICIA

Por tratarse la presente actuación de un acción sin contenido pecuniario, vengo a adjuntar el comprobante que acredita haber abonado la suma de pesos setenta ($ 70) en concepto de tasa de justicia en los términos del art. 6 de la ley 23.896.

## XII
### PETITORIO

En virtud de todo lo hasta aquí expuesto, vengo a solicitar a V.S.:

1) Se tenga al suscripto por presentado, por parte, por denunciado el domicilio real, y por constituido el domicilio legal indicado;

2) Se tenga presente todo lo expuesto;

3) Se tenga presente la prueba ofrecida;

4) Se tenga presente las autorizaciones conferidas,

5) Se tenga por acompañado el bono de derecho fijo;

6) Se tenga por abonada la tasa de justicia;

7) Se haga lugar a la medida cautelar solicitada con carácter de urgente.

Proveer de conformidad que,

**SERA JUSTICIA**.

ALBERTO JOSE BUNGE
ABOGADO
C.P.A.C.F. T° 53  F° 46
C.A.S.I. T° XXV  F° 369
C.U.I.T. 20-18788739-1

DONALDO G. SMITH SANCHEZ
ABOGADO
C.S.J.N. T° 13  F° 92
C.N.T.A. 414751559
C.A.S.I. Pcia. de Bs. As. T° XIV  F° 87

## Poder Judicial de la Nación



**329**

046062 ALON INTERNATIONAL SA Y OTRO C/ CONVERGE INC. S/ MEDIDA PRECAUTORIA
Auto sobre la medida cautelar

Buenos Aires,    30    de diciembre de 2004.-

A mérito del poder acompañado a fs 321/6, cabe tener a los iniciantes por parte en lo que a la firma *Alon International SA* refiere, así como presentados por el art 48 CProc por la firma *Alon Argentina SRL*. Téngaselos por domiciliados. **Notifíquese.**

Peticionan los presentantes una medida cautelar -que puede calificarse de modo liminar como de "no innovar"- para que la firma *Converse Inc.* (con domicilio en *One High Street, North Andover, Massachussets, 01845, Estados Unidos*), a) respete y garantice los derechos de las actoras con relación a los derechos patrimoniales sobre ciertas marcas propiedad de la demandada y, b) se abstenga de otorgar a terceros licencia para fabricar o comercializar los productos comprometidos con dichas marcas, todo ello en el marco de los contratos celebrados y el el área de la República Argentina.

Relatan los antecedentes contractuales que vinculan a las partes, así como el intercambio epistolar habido con relación a la renovación de los términos del acuerdo y a los supuestos incumplimientos imputados como causal denegatoria. Me remito a los hechos vertidos en el apartado III de la presentación en despacho, *brevitatis causae.*

Ahora bien, las actoras abonan su pedido en base al análisis de los siguientes aspectos, a saber:

*Verosimilitud del derecho*

Por un lado, destacan la *renovación automática* del Contrato de Licencia pactada en la cláusula 2 (ver traducción a fs 87 vlta), siempre que se superaran las ventas y regalías mínimas (lo que afirma estaría ampliamente superado); la apertura de una licenciataria en la República Argentina (*Alon Argentina SRL*); la alegada notificación de la voluntad de renovar el contrato; el supuesto silencio guardado por Converse Inc.; y lo que estiman es una insuficiente prueba de los incumplimientos atribuídos por la licenciante cuya carga le correspondería (los que son rebatidos -a su juicio- en la pieza inicial).

Asimismo, da cuenta del inicio del procedimiento Arbitral (previsto

1

PABLO CAR.
SECRETARIO

en el contrato) con el objeto de zanjar la controversia.

*Peligro en la demora.*

Estaría configurado a partir del proximo vencimiento del Contrato de Licencia (31/12/04) y, a partir de allí, la supuesta pretensión de privar y/o restringir a *Alon International y Alon Argentina SRL* el uso de las marcas licenciadas.

Hechas estas consideraciones, cabe expedirse en torno a la procedencia de la medida solicitada.

Comenzaré señalando que la cautelar en cuestión tiene como finalidad explícita, la de impedir que la situación de hecho o de derecho vigente a este momento se altere de manera tal que afecte la eventual ejecución o cumplimiento de la sentencia a dictarse por el Tribunal Arbitral (ante el que ya se ha solicitado su intervención). Así, repárese en que la actora y la demandada mantienen una relación negocial (a juzgar por los dichos de la iniciante) que gira en torno al uso de una licencia de varias marcas propiedad de la accionada, sobre la que planearon la vinculación de que da cuenta el contrato anejo como anexo I.

Y en dicha estipulación se pactó expresamente la competencia *arbitral* a los fines de dirimir las controversias que pudieren generarse entre partes. La cláusula 33 traducida a fs 99 da cuenta de la voluntad puesta de manifiesto en tal sentido, comprometiendo "*...cualquier controversia o reclamo que surja del presente contrato, directa o indirectamente relacionado...*".

El sentido categórico de la expresión "*...cualquier controversia...*" parece dejar un escaso espacio para admitir, en la jurisdicción ordinaria, el tratamiento de conflictos derivados de la relación negocial sin que ello importe un detrimento de la competencia arbitral, máxime si -como ocurre en la especie- ha sido pactada bajo la legislación de un estado extranjero cuyo imperio rige -en principio- dicho acto (art 8 Cód. Civil).

Sin embargo, y en tanto se ha acreditado sumariamente el inicio de la instancia arbitral (v fs 301/19), razones de prudencia y el peligro en la demora que se evidencia en grado sumo ante la inminencia del anuncio de Converse Inc., justifican adoptar un criterio de preservación del estado de cosas, mas limitado en el tiempo, y ello con el objeto de que las interesadas puedan solicitar la tutela de sus derechos por ante el órgano arbitral. Tal decisión encuentra fundamento además en el hecho que no se aprecia en la causa que el pedido de intervención arbitral haya sido acompañado de una medida precautoria que

se ajuste a la pretensión aquí insinuada.

Por lo demás, lo acotado del plazo por el que será otorgada la medida encuentra sustento en que podría darse un supuesto de superposición de jurisdicciones (la arbitral y la jurisdiccional) pudiendo las actoras, dentro del mismo, solicitar por ante el tribunal arbitral aquello que estimen menester.

En consecuencia, habré de acceder a la pretensión cautelar requerida en el punto II, apartados a) y b) del escrito inicial, más por el término de **60 días corridos** contados a partir del presente, plazo dentro del cual habrán de solicitar las interesadas –de estimarlo así conveniente- las medidas que estimen convenientes por ante el Tribunal Arbitral que entiende en la disputa, ello bajo caución real a prestar a satisfacción del juzgadohasta la suma de u$s **300.000.-**

**Lo que así decido.**

**Notifíquese mediante exhorto diplomático.**

*Margarita R. Braga*

*Juez*

3

# EXHIBIT 5

Copy

**329**

National Judicial Branch

046062 ALON INTERNATIONAL S.A. ET AL vs. CONVERSE INC. With No PREVENTIVE MEASURE

Hearing with regard to preventive measure

Buenos Aires, December 30, 2004

The petitioners are duly accepted on behalf of the firm *Alon International S.A.* and its representation by virtue of the power of attorney attached at folio 321/6, and in accordance with Article 48 of the Civil Procedures they also represent the firm *Alon Argentina SRL.* Accept them as domiciled here..

Those present petition an injunction that may be qualified in a preliminary manner as "not to change" to order the firm *Converse, Inc.* (with domicile at *One High Street, North Andover, Massachusetts, 01845, U.S.A.*), a) to respect and guarantee the rights of the petitioners in relation to copyrights on certain trademarks the property of the defendant and, b) to abstain from granting license(s) to third parties to manufacture or commercialize the products protected by the aforesaid trademarks, within the framework of contracts Converse enters into within the area of the Republic of Argentina.

The contractual background the binds the parties is related, as well as the exchange of letters that took place in relation to the renewal of terms of the agreement and the supposed breaches of contract that were imputed as cause of the denial. I refer to the facts related in paragraph III of the present in the file, *brevitatis causae.*

The plaintiffs support their petition on the basis of an analysis of the following aspects, to wit:

*Probability of the right*

On the one hand, they emphasize the *automatic renewal* of the License Contract agreed to in Clause 2 (see the translation at folio 87 reverse) so long as they surpassed the minimal sales and royalties (which they state were far surpassed); the opening of a franchise in the Argentine Republic (*Alon Argentina SRL*); the alleged notification of intention to renew the contract; the supposed silence from Converse Inc.; and what they find to be insufficient proof of breaches attributed by the licensor which would make the accusation (which they refuted – in their judgment – in the initial writ).

Also, they take notice of the initiation of the Arbitration procedure (provided for in the contract) with the object of clearing up the dispute.

1                    [s. illegible]

**PABLO CAR**

SECRETARY

Copy

*Danger in delay.*

It would occur as of the next due date of the Licensing Agreement (December 31, 2004) and, as of that date, the supposed intention of depriving and/or restricting *Alon International* and *Alon Argentina SRL* in the use of the licensed trademarks.

These considerations having been put forth, it is appropriate to deal with the appropriateness of the measure requested.

I shall begin stating that the purpose of the injunction in question is to prevent the alteration of the situation of fact and of law in effect at this time in such a manner as to affect the possible execution and compliance with the sentence to be issued by the Court of Arbitration (whose involvement has already been petitioned). Thus it should be noted that the petitioner and the defendant maintain a business relationship (to judge by to the statements of the petitioner) that revolves around the use of a license to use various trademarks the property of the defendant, on which they planned the relationship set forth in the contract annexed as Annex I.

And in the aforesaid stipulation it was expressly agreed to accept the jurisdiction of the Court of Arbitration for the purposes of settling disputes that might arise between the parties. Clause 33 translated on folio page 99 gives notice of the will expressed their commitment along those lines, "...*any dispute or complaint that arises from the present contract, directly or indirectly related...*"

The categorical nature of the expression "...*any dispute...*" appears to leave little room to admit, in the court of regular jurisdiction, the treatment of conflicts derived from the business relationship without such a procedure becoming a detriment to the jurisdiction of the Court of Arbitration, even more so if – as occurs in the case before us – it has been agreed to under the legislation of a foreign State which has dominion—in principle—over that act (Article 8, Civil Code).

Nevertheless, and insofar as the filing before the Court of Arbitration has been admitted initially (see folio page 301/19), reasons of prudence and the danger of delay that is very obvious in view of the imminence of the announcement of Converse Inc., justify our adopting as a criterion the preservation of the status quo, but limited in time, and that with the object of allowing the interested parties to request the protection of their rights before the Court of Arbitration. Such decision is also founded on the fact it is not apparent in the case that the petition for arbitration has been accompanied by an injunction suited to the claim being made here. .

Otherwise, placing a limit on the time for which the injunction shall be granted is supported by the fact that such a measure could give rise to a situation of overlapping jurisdiction (the Court of

2

[s. illegible]

**PABLO CAR**
**SECRETARY**

Copy

Arbitration vs. the Civil Court System), the petitioners being able, within such overlapping, , to request what they find necessary from the Court of Arbitration.

In consequence, I shall have to accede to the request for the restraining orded requested in point II, paragraphs a) and b) of the initial writ, but for the term of **60 calendar days** counted from this date. Within that period of time the interested parties shall have to request – if they judge it appropriate – the measures that they find appropriate of the Court of Arbitration that is hearing their dispute, that under the real pledge of paying the court the amount of **US$300,000.**

**That is what I decide.**

**Notify by means of a diplomatic letter rogatory.**

*Margarita R. Braga*

*Judge*

3          [s. illegible]
**PABLO CAR**
**SECRETARY**

# bli translations
a division of The Boston Language Institute

I, Muneebur Rahman, certify to the best of
my knowledge and belief that the following is a true
and accurate translation of a contract from Spanish
to English done under my supervision
this 5th day of January, 2005.

648 Beacon Street
Boston, MA 02215
617-262-3500
617-262-3595 Fax
blitranslations.com
info@blitranslations.com

TRANSLATION • INTERPRETING • WEBSITES • DESKTOP PUBLISHING

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CONVERSE INC.,                          )
                                        )
             Plaintiff,                 )        DOCKET NO.: 04-12591-PBS
                                        )
vs.                                     )
                                        )
ALON INTERNATIONAL S.A.,                )
                                        )
             Defendant.                 )
                                        )
                                        )

## AFFIDAVIT OF ADRIANO KALFELZ MARTINS

I, Adriano Kalfelz Martins, depose and attest under oath what follows:

1.     I am a lawyer and was appointed attorney-in-fact of Coopershoes Cooperativa de
Calçados e Componentes Joanetense Ltda., to defend the interests of this company in the
termination of the distribution and licensing agreement executed with Alon International S.A., as
well as in the entering into of a manufacturing, distribution and licensing agreement executed
with Converse Inc..

2.     It is incumbent upon me to inform that, after entering into the manufacturing, distribution
and licensing agreement with a Converse, Coopershoes was notified by the Court of the 19th
Civil Court of the Judicial District of Porto Alegre, Rio Grande do Sul, that Alon filed a judicial
proceeding against Converse (copy attached), requesting the maintenance of the distribution and
licensing agreement executed between them, namely Alon and Converse.

3.     Likewise, Coopershoes was notified by the Court of the 19th Civil Court of the Judicial
District of Porto Alegre, that under referred proceeding a preliminary injunction to keep the

SP# 333854 v1

distribution agreement between Alon and Converse in force was granted (copy attached), whereby Converse was not allowed to execute any other distribution agreements in Brazil.

4.    Moreover, Coopershoes was directly notified by Alon to renew the distribution and licensing agreement between them, Alon and Coopershoes (copy attached).

5.    In addition to that, Alon initiated a rumor on the market, saying that, in the event Coopershoes does not renew distribution and licensing agreement that existed between them, Alon will take judicial measures to prevent Coopershoes from using the Converse brands in Brazil, especially at the International Footwear Fair - COUROMODA, which will be held next week.

6.    It should be clarified that in order to obtain the preliminary injunction, Alon alleged in the proceeding that it was essential to keep the distribution agreement that existed between Alon and Converse in force, so as to enable Alon to fulfill its obligations with Coopershoes, thereby preventing the stoppages in the manufacture of the goods and 1,200 Coopershoes' employees from being laid-off.

7.    However, it was not mentioned in said proceeding that Coopershoes did not renew the distribution and licensing agreement that it had with Alon.

8.    The same way, said proceeding does not have any mention concerning a new manufacturing, distribution and licensing that Coopershoes executed with Converse, whereupon Coopershoes would no longer depend on any relationship with Alon to keep its 1,200 employees.

9.    The truth is that, in light of this situation, especially the order by the Court of the 19th Civil Court of the Judicial District of Porto Alegre, there is a concern that Alon may attempt to prevent Coopershoes from participating in the International Footwear Fair, to be held next week.

2

SP# 333854 v1

10.    Therefore, Coopershoes fears being prevented from representing Converse in referred International Footwear Fair. Should it occur, this event will certainly impact the estimated sales for the current year, jeopardizing Coopershoes' business and its 1,200 employees.

11.    Under these terms, I do understand that, if the preliminary injunction granted by the Court of the 19th Civil Court of the Judicial District of Porto Alegre is not reversed, there is a serious risk of Coopershoes being hindered from fulfilling the agreement executed with Converse.

With nothing further to report, I hereby sign this statement under the penalties of perjury.

January 5, 2005

Adriando Kalfelz Martins

3                              SP# 333854 v1

CORTE DISTRITAL DOS ESTADOS UNIDOS

DISTRITO DE MASSACHUSETTS

| | |
|---|---|
| CONVERSE INC., ) | |
| ) | |
| autor, ) | AUTOS NO. 04-12591-PBS |
| ) | |
| vs. ) | |
| ) | |
| ALON INTERNATIONAL S.A., ) | |
| ) | |
| Réu ) | |
| ) | |

## DECLARAÇÃO DE ADRIANO KALFELZ MARTINS

Eu, Adriano Kalfelz Martins, sob juramento, deponho e afirmo o quanto segue:

1.      Sou advogado e fui nomeado procurador da Coopershoes Cooperativa de Calçados e Componentes Joanetense Ltda., para defender os interesses dessa empresa na não renovação do contrato de distribuição e licença firmado com Alon International S.A., bem como na celebração de contrato de fabricação, distribuição e licença firmado com Converse Inc..

2.      Cumpre-me informar que, após celebrar o contrato de fabricação, distribuição e licença com a Converse, a Coopershoes foi notificada pelo Juízo da 19ª Vara Cível da Comarca de Porto Alegre, no Rio Grande do Sul, que a Alon ajuizou demanda judicial em face da Converse (cópia anexa), pleiteando a manutenção de contrato de distribuição e licença firmado entre elas, Alon e Converse.

3.      Outrossim, a Coopershoes foi notificada pelo Juízo da 19ª Vara Cível da Comarca de Porto Alegre, que na aludida demanda foi deferida medida liminar para manter vigente o

SP# 332824 v1

contrato de distribuição existente entre a Alon e a Converse (cópia anexa), estando a Converse proibida de firmar outros contratos de distribuição no Brasil.

4.      No mais, a Coopershoes foi notificada diretamente pela Alon, para renovação do contrato de distribuição e licença que existia entre elas, Alon e Coopershoes (cópia anexa).

5.      Por fim, a Alon consignou no mercado que, se a Coopershoes não renovar o contrato de distribuição e licença que existia entre elas, a Alon tomará medidas judiciais para impedir que a Coopershoes faça uso das marcas Converse no Brasil, em especial na Feira Internacional de Calçados - COUROMODA, que será realizada na próxima semana.

6.      Importa esclarecer que, para obtenção da medida liminar, foi alegado na ação proposta pela Alon que seria imprescindível manter vigente o contrato de distribuição que existia entre Alon e a Converse, para que a Alon pudesse cumprir suas obrigações frente à Coopershoes, evitando a paralisação da fabricação de produtos e a dispensa de 1.200 funcionários da Coopershoes.

7.      Ocorre que não foi mencionado naquela ação que a Coopershoes não renovou o contrato de distribuição e licença que mantinha com a Alon.

8.      Igualmente, não foi mencionado naquela ação que a Coopershoes firmou novo contrato de fabricação, distribuição e licença com a Converse, não dependendo mais a Coopershoes de qualquer relacionamento com a Alon para manutenção de seus 1.200 funcionários.

9.      Fato é que, diante desta situação, em especial diante da decisão do Juízo da 19ª Vara Cível da Comarca de Porto Alegre, existe o receio de que a Alon tente impedir a Coopershoes de participar da Feira Internacional de Calçados a ser realizada na próxima semana.

10.     Assim, a Coopershoes teme ser impedida de representar a Converse na aludida Feira Internacional de Calçados, fato que, se ocorrer, certamente impactará nas vendas programadas para este ano, pondo em risco sua operação e seus 1.200 empregados.

2

SP# 332824 v1

11.     Nestes termos, entendo que, exceto se afastada a medida liminar deferida pelo Juízo da 19ª Vara Cível da Comarca de Porto Alegre, existe sério risco de a Coopershoes ser impedida de cumprir o contrato firmado com a Converse.

Sendo o que me cumpria relatar, assino a presente declaração sob pena de perjúrio.

5 de Janeiro de 2005

Adriando Kalfelz Martins

3                                                    SP# 332824 v1

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CONVERSE INC., )
)
)
Plaintiff, )
)
vs. )
)
ALON INTERNATIONAL S.A., )
)
Defendant. )
)
)

DOCKET NO.: 04-12591-PBS

## SECOND AFFIDAVIT OF CHRIS LAGANAS

Chris Laganas, on oath, deposes and states:

1.  My name is Chris Laganas. I am Director of International and Licensing at Plaintiff Converse Inc. ("Converse"). I am responsible at Converse for the reporting and planning of the worldwide licensing activities of Converse and resulting royalty revenue to Converse. I am also manager for Converse of the Latin American territory. I make this affidavit in part based upon facts of my own personal knowledge.

2.  I negotiated the new licensing agreement between Converse and Coopershoes and I am familiar with its terms and the expected royalties to be earned by under it by Converse. Taking a conservative forecast of royalties to be paid by Coopershoes to Converse for 2005 of $4.5 million, the loss to Converse for every business day that it is barred from receiving royalties under its contract with Coopershoes is approximately $18,000.00.

Signed under the penalties of perjury.

Chris Laganas

Dated: January $\underline{6}$, 2005

2

# EXHIBIT 8

THE HONORABLE JUDGE OF THE 19TH CIVIL COURT OF THE CENTRAL COURTS OF THE JUDICIAL DISTRICT OF PORTO ALEGRE, RIO GRANDE DO SUL.

DOCKET No. 119153659

ALON INTERNATIONAL S.A., ALON BRASIL COMÉRCIO E DISTRIBUIÇÃO DE CALÇADOS LTDA. and AIB SERVIÇOS E COMÉRCIO LTDA., herein represented by their attorneys, in the records of the DECLARATORY PROCEEDING filed against CONVERSE INC., respectfully come before your Honor to inform that the Brazilian Jurisdiction has been waived, as for hearing and decision on the present dispute, in compliance with the order rendered by the District Court of the State of Massachusetts, United States of America, in the proceeding filed by Converse Inc., docket no. 04-12591-PBS, whose copy is attached hereto.

Therefore, plaintiffs request the discontinuance of this lawsuit, with the consequent revocation of the preliminary injunction granted thereto and the dismissal of the case under a judgment of merits, according to article 269, item III, of the Civil Procedure Code.

Plaintiffs request that the final and unappealable decision be recorded upon dismissal of the present case, and relinquish the right to file any further appeals.

SP# 332851 v1

Under these terms, expect to receive granting.

São Paulo January 6, 2005.


**ALON INTERNATIONAL S.A.**


**AIB SERVIÇOS E COMERCIO LTDA.**


**ALON BRASIL COMÉRCIO E DISTRIBUIÇÃO DE CALCADOS LTDA.**


**FRANCISCO ROSITO**                    **OTTO EDUARDO FONSECA LOBO**
**OAB/RS 44.307**                       **OAB/RJ 80.050**
(Plaintiffs' attorney)                  (Plaintiffs' attorney)


**CONVERSE INC.**
(Consenting Party)


**MARCELO JUNQUEIRA INGLEZ DE SOUZA**
**OAB/SP 182.514**
(Consenting Party's Attorney)

**EXCELENTÍSSIMO SENHOR DOUTOR JUIZ DE DIREITO DA 19ª VARA CÍVEL DO FORO CENTRAL DA COMARCA DE PORTO ALEGRE, RIO GRANDE DO SUL.**

**AUTOS Nº 119153659**

ALON INTERNATIONAL S.A., ALON BRASIL COMÉRCIO E DISTRIBUIÇÃO DE CALÇADOS LTDA. e AIB SERVIÇOS E COMÉRCIO LTDA., por seus advogados, nos autos da **AÇÃO DECLARATÓRIA** que movem em face de **CONVERSE INC.**, vêm, respeitosamente, à presença de Vossa Excelência, informar que renunciaram à jurisdição brasileira para apreciação e solução do presente litígio, em cumprimento à decisão proferida pela Corte Distrital do Estado de Massachusetts, Estados Unidos, nos autos da ação movida pela Converse Inc., autos nº 04-12591PBS, cuja cópia segue anexa.

Assim sendo, as autoras requerem a desistência da presente demanda, com a conseqüente revogação da medida liminar aqui deferida e extinção do processo, com julgamento de mérito, conforme artigo 269, inciso III, do Código de Processo Civil.

Uma vez declarada a extinção do presente processo, requerem as autoras seja imediatamente certificado o trânsito em julgado da respectiva decisão, renunciando as autoras ao direito de interposição de recursos de qualquer natureza.

SP# 332810 v1

2

Termos em que, pedem deferimento.

São Paulo, 6 de janeiro de 2005.


**ALON INTERNATIONAL S.A.**


**AIB SERVIÇOS E COMERCIO LTDA.**


**ALON BRASIL COMÉRCIO E DISTRIBUIÇÃO DE CALCADOS LTDA.**


**FRANCISCO ROSITO**                         **OTTO EDUARDO FONSECA LOBO**
**OAB/RS 44.307**                                **OAB/RJ 80.050**
(advogado pelas autoras)                    (advogado pelas autoras)


**CONVERSE INC.**
(anuente)


**MARCELO JUNQUEIRA INGLEZ DE SOUZA**
**OAB/SP 182.514**
(advogado pela anuente)

# EXHIBIT 9

**DESISTIMOS – FORMULAMOS RENUNCIA**

Señor Juez:

        **ALBERTO JOSÉ BUNGE**, abogado inscripto al Tº 53 Fº 46 del Colegio Público de Abogados de la Ciudad de Buenos Aires, y **DONALDO GREGORIO SMITH SANCHEZ**, abogado inscripto al Tº 13 Fº 92 de la Corte Suprema de Justicia de la Nación, constituyendo domicilio en Avda. Córdoba 991, Piso 6º "A" de Capital Federal (Estudio Bunge – "Bunge, Smith & Luchia Puig" - Abogados; Te: 5281-6000), en nombre y representación de **ALON INTERNATIONAL S.A.** y **ALON ARGENTINA S.R.L.**, en los autos caratulados: "**ALON INTERNATIONAL S.A. y Ot. c/ CONVERSE INC. s/ Medida Precautoria**", a V.S. decimos:

        Que siguiendo expresas instrucciones de nuestros mandantes, venimos a desistir de la medida precautoria dispuesta por V.S. en este proceso.

        Asimismo, renunciamos a solicitar nuevamente esta medida en el futuro o cualquier otra relacionada al contrato celebrado entre **Alon Internacional S.A.** y **Converse Inc**.

        Proveer de conformidad,

        **SERÁ JUSTICIA**

## WE RATIFY ACTION – VOLUNTARY WITHDRAWAL – WE EXPRESS WAIVER

To Your Honor,

ALBERTO JOSÉ BUNGE, lawyer registered in Vol. 53 Page 46 of the Buenos Aires Lawyers Association, and DONALDO GREGORIO SMITH SANCHEZ, lawyer registered in Vol.13 Page 92 of the National Supreme Court of Justice, domiciled at Avda. Córdoba 991, Piso 6º "A" Capital Federal (Estudio Bunge – "Bunge, Smith & Luchia Puig" - Abogados; Te: 5281-6000), in the name and on behalf of ALON INTERNATIONAL S.A. and ALON ARGENTINA S.R.L., in the case entitled: "ALON INTERNA-TIONAL S.A. and Other. Vs. CONVERSE INC. on Preventive Measure", express the foregoing to Your Honor:

### I.- LEGAL CAPACITY

That with the simple copy of the general power attached hereto, we demonstrate our character of judicial agents of Alon Argentina S.R.L., domiciled at Mariscal Sucre 3305 of the City of Buenos Aires.

We ask Your Honor to consider evidenced the before mentioned agency and ratify our acts in this record, according to sections 48 and 49 of the Code of Procedure.

### II.- VOLUNTARY WITHDRAWAL- WAIVER

Pursuant to express instructions of our principals, we hereby withdraw the preventive measure granted by Your Honor in this process.

Moreover, we waive this measure in the future or any other related to the agreement executed between Alon Internacional S.A. and Converse Inc.

May Your Honor grant what is herein requested, for in doing so, JUSTICE SHALL BE DONE

## RATIFICAMOS GESTIÓN - DESISTIMOS – FORMULAMOS RENUNCIA

Señor Juez:

**ALBERTO JOSÉ BUNGE**, abogado inscripto al T°
53 F° 46 del Colegio Público de Abogados de la Ciudad de Buenos
Aires, y **DONALDO GREGORIO SMITH SANCHEZ**, abogado ins-
cripto al T° 13 F° 92 de la Corte Suprema de Justicia de la Nación,
constituyendo domicilio en Avda. Córdoba 991, Piso 6° "A" de Capi-
tal Federal (Estudio Bunge – "Bunge, Smith & Luchia Puig" - Abo-
gados; Te: 5281-6000), en nombre y representación de **ALON IN-
TERNATIONAL S.A. y ALON ARGENTINA S.R.L.**, en los autos
caratulados: **"ALON INTERNATIONAL S.A. y Ot. c/ CONVERSE
INC. s/ Medida Precautoria"**, a V.S. decimos:

### I.- PERSONERÍA

Que con la copia simple del poder general que
acompañamos junto con este escrito, acreditamos nuestro carácter de
mandatarios judiciales de **Alon Argentina S.R.L.**, con domicilio en
la calle Mariscal Sucre 3305 de la Ciudad de Buenos Aires.

Solicitamos a V.S. que tenga por acreditada la
representación invocada y por ratificada nuestra actuación en este
expediente, de conformidad con las previsiones de los artículos 48 y
49 del Código Procesal.

### II.- DESISTIMOS - RENUNCIAMOS

Siguiendo expresas instrucciones de nuestros
mandantes, en nombre y representación de **Alon Internacional S.A.
y Alon Argentina S.A.** venimos a desistir de la medida precautoria
dispuesta por V.S. en este proceso.

Asimismo, renunciamos a solicitar nuevamente
esta medida en el futuro o cualquier otra relacionada al contrato
celebrado entre **Alon Internacional S.A. y Converse Inc.**

Proveer de conformidad,
### SERÁ JUSTICIA

## VOLUNTARY WITHDRAWAL – WE EXPRESS OUR WAIVER

To Your Honor,

**ALBERTO JOSÉ BUNGE**, lawyer registered in Vol. 53 Page 46 of the Buenos Aires Lawyers Association, and **DONALDO GREGORIO SMITH SANCHEZ**, lawyer registered in Vol.13 Page 92 of the National Supreme Court of Justice, domiciled at Avda. Córdoba 991, Piso 6° "A" Capital Federal (Estudio Bunge – "Bunge, Smith & Luchia Puig" - Abogados; Te: 5281-6000), in the name and on behalf of **ALON INTERNATIONAL S.A.** and **ALON ARGENTINA S.R.L.**, in the case entitled: "**ALON INTERNA-TIONAL S.A. and Other. Vs. CONVERSE INC. on Preventive Measure**", express the foregoing to Your Honor:

That following express instructions of our principals, we hereby withdraw the preventive measure granted by Your Honor in this process.

Moreover, we waive this measure in the future or any other related to the agreement executed between **Alon Internacional S.A.** and **Converse Inc**.

May Your Honor grant what is herein requested, for in doing so, **JUSTICE SHALL BE DONE**