IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|                                       |   |                           |
|---------------------------------------|---|---------------------------|
| CONVERSE, INC.,                       : |   |                           |
|     Plaintiff,    : |   |                           |
|                                       : |   |                           |
| v                                     : |   | Docket No.: 04-12591-PBS |
|                                       : |   |                           |
| ALON INTERNATIONAL, S.A.,             : |   |                           |
|     Defendant.    : |   |                           |

**ALON INTERNATIONAL, S.A.'S MEMORANDUM OF LAW IN SUPPORT
OF ITS EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION**

I. **INTRODUCTION**

Defendant Alon International, S.A. ("Alon") submits this memorandum of law and the affidavits of Roberto Szerer ("Szerer") (Exhibits "A"[1] and "B")[2] in support of its Emergency Motion for a Preliminary Injunction.

Converse and Alon are commercial parties that agreed to arbitrate claims arising out the parties' Licensing Agreement, including the issue of renewal. Converse unexpectedly notified Alon that it was rejecting Alon's ability to automatically renew the Licensing Agreement -- a mere thirty days before its expiration and during the holiday season. Alon exercised its right to submit the dispute to arbitration before the International Center for Dispute Resolution ("ICDR") of the American Arbitration Association ("AAA"). Alon submitted the dispute to the AAA / ICDR for a determination of whether the Licensing Agreement was renewed. Alon also obtained *status quo* injunctions pending arbitration from Brazilian and Argentine courts.[3] Despite the

---

[1] The First Szerer Affidavit was originally submitted in opposition to Plaintiff's Application for a Temporary Restraining Order. This Court denied that Application.

[2] The exhibits referenced herein are contained in an Appendix filed separately with the Court.

[3] The Argentine Injunction is of limited duration and only ensures the *status quo* for a period of sixty days. (Second Szerer Aff. ¶ 6). Alon has sought to lengthen the duration of this injunction through appeal; however, such a result is uncertain. Moreover, although the Licensing Agreement covers Argentina, Brazil, Uruguay and Paraguay, Alon has not sought or obtained injunctions in either Paraguay or Uruguay. (Second Szerer Aff. ¶ 6).

pendency of arbitration and the *status quo injunctions,* Converse has frustrated Alon's attempts to expeditiously proceed with arbitration while simultaneously engaging in outrageous conduct to further its unrelenting efforts to capture for itself Alon's business and relationships in Brazil, Argentina, Uruguay and Paraguay ("Mercosur Market").

Converse has interfered with the arbitration by raising specious procedural objections to the arbitral forum's jurisdiction. Simultaneously, Converse has sought to position itself in Alon's market territory, destroy Alon's contractual rights and relationships, income, and otherwise alter the *status quo* to its favor. Without intervention by this Court, Converse's scheme will -- as it is designed to -- render any arbitral award in Alon's favor moot.

Accordingly, Alon requests that this Court enter a preliminary injunction enjoining Converse from taking any action in the United States or elsewhere, pending confirmation of the arbitral award, that is inconsistent with the *status quo* at the time of the request for arbitration.

## II.   FACTUAL BACKGROUND

### A.   The Underlying Dispute

#### 1.   The Parties Enter Into A Licensing Agreement

Alon develops footwear and related accessories in Latin America. (First Szerer Aff. ¶ 2). On September 1, 2001, Alon entered into a Manufacturing, Distribution and Licensing Agreement ("Licensing Agreement") with Converse, by which Alon obtained the exclusive rights to utilize the Converse marks in the Mercosur Market. (First Szerer Aff. ¶ 3).

The first term of the Licensing Agreement expired on December 31, 2004. The Licensing Agreement provides, however, that Alon had an automatic right of renewal for an additional three-year term if it satisfied certain conditions. (First Szerer Aff. ¶ 5). Alon could renew the Licensing Agreement for an additional term of three years provided it exceeded the

Guaranteed Minimum Royalty and Sales for the third contract year by twenty-five percent and further provided that Alon had not breached any of the terms of the Licensing Agreement. (Licensing Agreement § 2). Alon complied with these requirements. (First Szerer Aff. ¶¶ 6, 9).

### 2. Converse Attempts To Void Alon's Contractual Rights

Converse rejected Alon's exercise of the automatic renewal option after months of negotiations between the parties about the renewal, which in retrospect were nothing more than a ploy by Converse to lull Alon into a false sense of comfort regarding an extension. Converse asserts that Alon was not entitled to renewal because Alon allegedly breached the Licensing Agreement by entering into a "sub-licensing" agreement with Cooperativa De Calcados E Componentes Joanetense LTDA ("Coopershoes") in violation of the Licensing Agreement. Coopershoes is a Brazilian company that manufactures shoes. Converse has always been fully aware of and encouraged Alon's relationship with Coopershoes. (First Szerer Aff. ¶ 14).[4]

### B. Alon Initiates Arbitration Pursuant To The Arbitration Agreement

Paragraph 33 of the Licensing Agreement contains an arbitration clause that states:

> The parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly. Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligation of the parties thereunder, the capacity or authority of the parties thereto, the performance or breach thereof, and the termination, **renewal or non-renewal thereof**....**shall be settled by arbitration in accordance with the rules of the American Arbitration Association. The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association.....** (emphasis added).

In their agreement to arbitrate, the parties designated the AAA as the appropriate arbitral

---

[4] Converse has also contended that Alon breached the Licensing Agreement by allegedly failing to pay royalties (which position it has now retracted), using improper exchange rates to calculate royalty payments (which Converse now admits Alon cured), and failing to expend sums required by the Agreement for advertising. These grounds were and remain equally without merit. (First Szerer Aff. ¶¶ 29 – 38; Second Szerer Aff. ¶¶ 26-28).

institution without specifying the applicable rules. However, this is clearly an international dispute, as defined by the Inter-American Convention on International Commercial Arbitration ("Panama Convention") through its implementation in the Federal Arbitration Act. Thus, this dispute is governed by the AAA' international division, the ICDR. Panama Convention, OAS SER A20 (SEPEF), *reprinted in* 9 US.C.A. § 301, *et seq*. (Second Szerer Aff.; Ex. 4; Ex. 6).

On December 16, 2004, Alon initiated arbitration by filing its Statement of Claim with the AAA / ICDR, in full compliance with the parties' agreement to arbitrate.

C. **Alon Obtains *Status Quo* Injunctions in Brazil and Argentina**

In late December of 2004, Alon learned that Converse has been negotiating with Alon's business partner in Brazil, Coopershoes, to make it a direct Converse licensee despite the ongoing dispute over the status of the Licensing Agreement. Faced with the possibility of the loss of years of work with irreplaceable relationships, Alon obtained injunctions in Brazil and Argentina prohibiting Converse from taking action contrary to Alon's contractual rights, pending arbitration (collectively, "the Foreign Injunction Actions"). The injunction obtained in Argentina is only valid for a period of 60 days and is based on the assumption that an arbitrator would be appointed during that time period.[5] (Second Szerer Aff. ¶ 6). Alon has not sought or obtained *status quo* injunctions in either Uruguay or Paraguay. (Second Szerer Aff. ¶ 6).

D. **This Court Denies Converse's Application For A Restraining Order**

On December 21, 2004, Converse filed an Application For A Temporary Restraining Order ("Application") with this Court to enjoin Alon from proceeding with the Foreign Injunction Actions. On January 13, 2005, this Court denied the Application. A copy of the transcript of the hearing on Converse's Application is Exhibit "1" and a copy of the Order denying Converse's Application is Exhibit "2" to the Second Szerer Affidavit.

---

[5] *See* fn. 3, *supra*.

4

At the hearing on Converse's Application, this Court remarked:

> Let me just say, now that I've seen that the issues are joined, I might have likely have done the same thing the Argentinean and Brazilian courts did, which is, just hold it even until the arbitration is complete. I don't know why—I'm inclined to just do that now….
>
> I'm not going to enjoin [Alon] from maintaining those suits [in Argentina and Brazil]. I might feel differently if I though that they were acting in a way which thwarted the very purpose of having an arbitration, which is to settle these things through an arbitrator. That is a strong federal policy here….and I believe in it. *I would have done this. Frankly, I probably would have done the same thing, which is freeze until the arbitrator can act*. (Hearing Transcript, pp. 5, 13).

### E.   Converse Refuses To Proceed With A Provisional Agreement

Following denial of its Application, **Converse proposed** that the parties enter into a standstill agreement ("Provisional Agreement"). The Provisional Agreement would have frozen the parties' contractual relationship as effective December 31, 2004. (Second Szerer Aff. ¶ 9).

However, as **originally drafted by Converse**, the Provisional Agreement would have allowed Converse to alter the *status quo* of the parties' contractual relationship while at the same time preventing Alon from protecting its interests. (Second Szerer Aff. ¶¶ 10, 11). In essence, Converse drafted the Provisional Agreement so that Alon had to agree to be a "punching bag" for Converse's attempts to strip it of its contractual rights. Converse indicated that any provision in the Provisional Agreement requiring Converse to maintain the *status quo* in the injunction litigation was a "deal breaker." (Second Szerer Aff. ¶¶ 10, 11). Nonetheless, Alon proposed balanced changes to the Provisional Agreement, which would have had the effect of creating an actual standstill pending arbitration. (Second Szerer Aff. ¶¶ 10, 11). Despite repeated requests to Converse's counsel, Converse failed to respond in any way to Alon's proposed changes. (Second Szerer Aff. ¶¶ 10, 11).

Establishing the *status quo* pending arbitration is the proper thing to do, and is supported by the terms of the Licensing Agreement. Specifically, the agreement to arbitrate states: "The

5

institution of any arbitration proceeding hereunder **shall not relieve the Licensee of its obligation to make payments accrued hereunder to Converse during the continuance of such proceeding."** Emphasis added. As correctly noted by this Court:

> [Converse] put [it]self in this bind by having the renewal provision have all these sorts of this presumptive renewal unless these conditions were met and then making that subject to arbitration. [Converse]…put itself in that position. (Hearing Transcript, p. 14)

### F.   Converse Delays The Start Of Arbitration

Despite Converse's professions to this Court of its intent to expedite the arbitral proceedings [Hearing Transcript, pp. 16, 18-19, 22; Ex. "1"], Converse has sought to delay and impede them by raising procedural objections. On January 13, 2005, Converse filed a Motion to Dismiss or Transfer to the Appropriate Office of the AAA ("Motion to Dismiss"). Converse sought to avoid the AAA / ICDR's jurisdiction by charging that this is a domestic dispute. As fully set forth in Alon's Memorandum of Law in Opposition to Converse's Motion to Dismiss, this is an international dispute between parties of differing nationalities regarding an international licensing agreement. (Second Szerer Aff. Ex. "3"). Thus, this case is appropriately within the jurisdiction of the AAA / ICDR and governed by the International Arbitration Rules of the AAA / ICDR. Any allegations to the contrary are simply without merit.

Converse has insisted on using additional delay tactics to postpone the arbitration. For example, Converse insisted on filing a Reply to Alon's Response to its Motion to Dismiss. (Second Szerer Aff. ¶ 14). Despite this insistence, however, Converse delayed submitting a Reply.[6] (Second Szerer Aff. ¶ 14). Converse's insistence on filing a Reply, contrary to the parties' original agreement, served to delay the arbitral proceedings by several weeks.

---

[6] Throughout this time, Alon repeatedly inquired over the status of the Reply to no avail. On January 29, 2005, Alon wrote to Converse, "Alon demands that you file your Reply before the AAA / ICDR. As you know, there was to be no Reply and you have now asked for this right once again seeking to delay the start of the arbitration." (Second Szerer Aff ¶¶ 11, 14; Ex. "4"). Again, on February 4, 2005, Alon wrote to Converse, "We welcome your comments

6

Similarly, Converse sought to delay the arbitration by alleging that Alon had purportedly agreed to a Massachusetts admitted arbitrator from the AAA commercial panel. In fact, Alon had repeatedly and unequivocally expressed its position to the contrary.[7]

As a result of Converse's tactics, almost three months have passed since commencing arbitration and the parties have yet to select an arbitrator. (Second Szerer Aff. ¶ 16). On February 4, 2005, after receiving a list of candidates from the AAA / ICDR, Alon suggested the names of three arbitrators, to which Converse never responded. (Second Szerer Aff. ¶ 14).

On February 24, 2005, the AAA / ICDR determined that this was an international dispute, to be administered by the AAA / ICDR, and an arbitrator appointed from the AAA / ICDR international panel. A copy of the AAA / ICDR's decision is attached as Exhibit "6" to the Second Szerer Affidavit. On March 8, 2005, Converse finally agreed on a method for the selection of an arbitrator -- nearly **three months after** Alon initiated arbitration. Despite Alon's expeditious efforts, Converse has succeeded in delaying the arbitration, and it now appears unlikely that the arbitrator will be selected prior to the expiration of the Argentine Injunction.

G. <u>Converse Fails To Cooperate With Alon During The Standstill Period</u>

Following the Foreign Injunction Actions, Converse refused to cooperate with the functional operations of the parties' business, despite Alon's repeated requests for Converse to do so. (Second Szerer Aff. ¶ 20). Alon sent numerous e-mails and telephone calls to Converse, to no avail. For example, on February 17, 2005, Szerer wrote to Linda McCabe at Converse:

---

on these proposed arbitrators, and hope that Alon and Converse may come to an expeditious and satisfactory resolution of this issue. To that end, when can we expect to see your reply to our memorandum in response to Converse's Motion to Dismiss or Transfer?" (Second Szerer Aff ¶ 14,; Ex. "5").

[7] On February 4, 2005, Alon wrote to Converse: "As you know, Alon's position with respect to potential arbitrators has always been that it was willing to look at arbitrators with Massachusetts experience, but only if they were from the AAA International Panel. Alon has never agreed to arbitrators from the AAA Commercial Panel. Further to our goal of expediting the arbitration, Alon would like to tender the following names from the AAA International Panel as potential arbitrators….." (Second Szerer Aff ¶ 17; Ex. "5").

7

> Dear Linda:
> We are not being able to go in to media bin.
> Please let us know if the login has changed.
> Regards,
> Roberto Szerer

After having received no response, on February 21, 2005 Szerer again wrote:

> Dear Linda,
> Can you please let us know.
> Regards,
> Roberto Szerer

Converse never responded in this or in any other related matter. (Second Szerer Aff. ¶ 21). Thus, on February 23, 2005 Alon wrote:

> ….[Y]our February 15, 2005 letter purports to set forth a procedure under which Alon and Converse can conduct operations pending a final resolution of this dispute in arbitration. In order for Alon to operate the business in the Mercosur countries, it is imperative that it be able to have operational conversations with your client. Nonetheless, to date Alon has received nothing but unresponsiveness from <u>all</u> Converse employees, including those you have listed in your February 15 letter as contact personnel during the standstill period. Such behavior makes it very difficult (if not impossible) for Alon to continue developing the Converse marks and related products. It demonstrates that Converse is in fact impeding Alon from proceeding in its efforts to develop the Converse marks and related products pending a final resolution of the parties' dispute in arbitration.
>
> Moreover, Alon has been unable to access the media bin internet tool. In this respect, it seems as though Converse has changed the login and password to prevent Alon's access. Repeated requests by Alon to Linda McCabe at Converse regarding its inability to access the media bin and its need for samples have gone unanswered. Ex. "7;" Second Szerer Aff.

### H. <u>Converse Attempts To Alter *Status Quo* Despite The Pending Arbitration</u>

#### 1. <u>Converse Seeks To Overturn The Brazilian Injunction</u>

On February 24, 2005, while the original judge who issued the Brazilian Injunction was on vacation, Converse secretly and *ex parte* (notwithstanding that it was well aware that an inter-party hearing was required), obtained an order from a substitute judge setting aside the

injunction. The substitute Brazilian judge based its decision on the pending arbitration between the parties. (Second Szerer Affidavit, ¶ 22). The court states:

> The plaintiffs do not discuss the legality of the Clause and acknowledge as legitimate the Arbitration Panel, as they admit having <u>opened an arbitration proceeding</u> to settle the conflicts arising from termination of contract. All issues involving termination must be settled in the <u>Arbitration Proceeding already opened by the plaintiffs</u>, and the question is one of closing the case, pursuant to the rule of article 267, sub-item VII, of the Code of Civil Procedure.

The substitute judge clearly based his decision on the existence of the pending arbitration, which due to Converse's dilatory tactics, had remained stagnant for well over two months. The substitute judge impliedly conceded that the issues needed to be resolved in arbitration.

### 2. Converse Seeks To Destroy Alon's Contractual Relationships

Converse has engaged in a campaign to destroy Alon's contractual rights, business relationships and income. (Second Szerer Aff. ¶ 24). Converse has undertaken this outrageous course of action while simultaneously seeking to impede the arbitral proceedings in order to obtain a setting aside of the Brazilian Injunction and allow the Argentine Injunction to expire.

For example, Alon recently obtained and reviewed the contract between Converse and Coopershoes, which was signed while Converse still had a contract with Alon. Amazingly, in paragraph 38 of said contract, Converse directs Coopershoes to pay Converse money rightfully due and owing to Alon. The contract is attached as Exhibit "8" to the Second Szerer Affidavit. Alon has also learned through Coopershoes that Converse has verbally directed Coopershoes to withhold payment to Alon under the threat of future retaliation (Second Szerer Aff. ¶ 23). This is in conflict with a letter Alon received from Converse on February 1, 2005, where counsel for Converse states: "[Alon's] statement that ALON has not been paid by Coopershoes because of instructions that Converse has given to Coopershoes is untrue." (Second Szerer Aff. ¶ 23).

Case No. 12591-PBS

Moreover, as a result of this behavior, Coopershoes has failed to pay Alon for the months of January and February, 2005. (Second Szerer Aff. ¶ 25).

Converse's outrageous conduct did not stop there. In disregard for the pending arbitration over the status of the Licensing Agreement, on March 1, 2005, Alon received a letter from Converse purporting to be a Notice of Termination. Converse wrote:

> As of December 31, 2004….any and all rights of Licensee to use the Converse Marks and Trade Secrets terminated and ceased absolutely. Licensee, after December 31, 2004, shall not manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with the Converse Marks…..Also, Converse advises Licensee that all costs, charges and expenses incurred by Converse in connection with enforcement of the obligations and in connection with enforcement of the obligations and in connection with the exercise of its rights and remedies, together with interest thereon, shall become additional indebtedness owed by Licensee to Converse. Ex. "9;" Second Szerer Affidavit.

The next day, Alon received another letter from Converse purporting to be an "Amended Notice of Expiration." In this letter, Converse alleged additional grounds for Alon's purported "breaches." Alon **never received notice** of these alleged breaches nor did it ever have the **opportunity to cure** said breaches, as required by paragraph 24 of the Licensing Agreement, prior to the expiration of the first term of the Licensing Agreement. (Second Szerer Affidavit, ¶ 25). Converse's after-the-fact, unfounded and baseless allegations thus serve as further proof of Converse's bad faith, outrageous and continued attempts to infringe upon Alon's contractual rights. A copy of Converse's letter is attached as Exhibit "10" to the Second Szerer Affidavit.

On March 3, 2005, Alon received a letter from Coopershoes, sent by Converse to Coopershoes on March 2, 2005. The Letter is Exhibit "11" to the Second Szerer Affidavit. Not only did Converse direct Coopershoes to withhold payments owed to Alon, it also infringed upon Alon's existing contractual rights by purporting to effectuate its contract with Coopershoes despite the ongoing dispute over the Licensing Agreement with Alon. Converse wrote:

> This is to notify Coopershoes….that the Manufacturing, Distribution and Trademark License Agreement entered into between Converse Inc… and Coopershoes, dated as of December 16, 2004….[is] no longer subject to a force majeure and [is] restored to effectiveness between the parties…. Converse hereby requires and demands payment to it by Coopershoes, pursuant to the terms of the License Agreement…., of all royalties for sales made by Coopershoes on and after January 1, 2005.

On March 8, 2005, Converse sent a letter Alon's business partner in Argentina, with whom Alon was engaged in negotiations over the management of Alon Argentina. Converse's letter purported to claim that Alon has no right to utilize the Converse marks, that the Licensing Agreement is null and void, despite the Argentine injunction, and that said company faced **criminal** charges if it continued to negotiate with Alon. (Second Szerer Aff. ¶ 29; Ex. 12).

Despite interfering with Alon's business and income, Converse has been hypocritically emphatic about its right to receive money from Alon. Converse has sought to retain the benefits of the Licensing Agreement while destroying Alon's ability to perform under the Agreement and make payments to Converse. (Second Szerer Aff. ¶ 30).

### III.    ARGUMENT

#### A.    Applicable Legal Standards

To obtain a preliminary injunction a moving party must show: (1) a likelihood of success on the merits; (2) the likelihood of irreparable harm if the injunction is denied; (3) the balance of relevant impositions; and (4) the effect of the court's ruling on the public interest. *See e.g. Charlesbank Equity Fund II v. Blinds To Go, Inc*, 370 F.3d 151, 162 (1st Cir. 2004)**.**

The issuance of a preliminary injunction is an appropriate equitable remedy to preserve the *status quo* pending arbitration. *See Teradyne, Inc. v. Mostek Corp*., 797 F.2d. 43, 51 (1st Cir. 1986) ("We hold, therefore, that a district court can grant injunctive relief in an arbitrable dispute pending arbitration.… We believe this approach reinforces rather than detracts from the policy of the [FAA]."); *Doe v. Weld*, 954 F. Supp. 425, 429 (D. Mass. 1996)(Saris, J.) ("The purpose of a

preliminary injunction is to preserve the *status quo* freezing an existing situation so as to permit the trial court [or arbitral panel], upon full adjudication of the case's merits, more effectively to remedy the discerned wrongs."); *Blumenthal v. Merrill Lynch*, 910 F.2d 1049, 1053 (2d Cir. 1990) ("[a]rbitration can become a hollow formality if parties are able to alter irreversibly the *status quo* before the arbitrators are able to render a decision in the dispute. A district court must ensure that the parties get what they bargained for – a meaningful arbitration of the dispute."); Order Denying Converse's Application ("….injunctions pending arbitration are not only reasonable, but also consistent with the strong policy in favor of resolving disputes via arbitration.") (Saris, J.).

### B. Alon Is Likely To Prevail In Its Arbitral Claims Against Converse

Alon's Statement of Claim includes claims for breaches of the Licensing Agreement, for breach of the implied covenant of good faith and fair dealing, and for a declaratory judgment. Alon need only show a probability of prevailing on the merits of these claims, not that it is certain to win. *Massachusetts Federation of Nursing Homes, Inc. v. The Commonwealth of Massachusetts, et al*, 772 F.Supp. 31, 37 (D. Mass. 1991) (a party "need not prove that he or she is certain to win" to satisfy the likelihood of success requirement); *Federal Deposit Ins. Corp. v. Cafritz*, 762 F.Supp. 1503, 1506 (D.D.C. 1991) ("All courts agree that plaintiff must present a *prima facie* case but need not show that he is certain to win."). Alon meets this requirement.

#### 1. The Record Evidence Demonstrates That Converse Has Breached The Licensing Agreement by Refusing Alon's Rightful Renewal

The record evidence is clear that Alon (a) expressed its intent to renew the Licensing Agreement, and (b) is entitled to renew because it has complied with the terms of the Agreement. Alon unequivocally give Converse notice of its intent to renew the Licensing Agreement. (First Szerer Aff. ¶¶ 9-11). Alon also satisfied the requirements for renewal by exceeding the

minimum sales requirements by more than *five times* the guaranteed minimum and exceeded the guaranteed royalty payments by over *six times* the required amount. (First Szerer Aff. ¶ 6).

Nonetheless, Converse refused to honor Alon's rightful and automatic renewal. Converse's course of conduct and written communications to Alon on the subject of renewal of the Agreement demonstrates that Converse lulled Alon into a false sense of comfort regarding renewal while Converse made arrangements to wrongfully appropriate markets which had been developed by Alon and had previously been unavailable to Converse. (First Szerer Aff. ¶ 8, 12).

It was only after Converse began appropriating Alon's business contacts that Converse notified Alon on November 30, 2004, of its alleged "breaches" – a mere month before the automatic renewal date of the Licensing Agreement. (First Szerer Aff. ¶ 7); *see Rex Lumber Co. v. Action Block Co, Inc*., 29 Mass. App. Ct. 510, 562 N.E.2d 845 (Mass. App. Ct. 1990) (in a contract regarding the extension of a closing date, the Defendant's course of conduct and repeated assurances that the agreement between the parties had been renewed, "lulled" the Plaintiff into a false sense of comfort regarding renewal); Brazilian Order (Alon has "attached documents that demonstrate that there [were] abundant negotiations between the contracting parties with regard to the conditions for renewal of the Agreement, all indicating that there was no consensus on said conditions. This is important in as much as it may indicate that [Alon], in reality, [was] lead to feel a sense of security where there was none."); Argentine Order (taking into account "the automatic renewal of the Licensing Agreement under clause 2 [of the Licensing Agreement], as long as the sales target and minimum royalties have been surpassed….; the alleged notice of [Alon's] intent to renew the contract; the alleged silence maintained by Converse Inc.; and….insufficient evidence of the breaches alleged by the licensor who would bear the burden of proof….").

Case No. 12591-PBS

It is also clear that Converse's notice to Alon of its alleged "breaches" was timed so that Alon would not have an effective opportunity to cure, and even though it is crystal clear that each of the so called "breaches" had been known to Converse for some time, some even as long as a year prior. As noted by this Court,

> [Converse] should have moved in for arbitration when it knew [it was not] going to be renewing and [it] knew there was a dispute before all this happened…. [I]n some ways you can view what Converse was trying to do as an end run around the arbitration clause by not litigating the disputes [it] had.   (Hearing Transcript, p. 17).

The record evidence further establishes that Alon's alleged "breaches" of the Licensing Agreement are meritless. The record evidence establishes that Converse was aware of, and approved and consented, to the Coopershoes arrangement. (First Szerer Aff. ¶ 14). This structure was designed and arranged with Converse's involvement in order to prevent Coopershoes from producing for a competitor "brand pirate," to allow the Converse marks and products to enter the market as efficiently as possible, and to allow Converse to take royalties out of the country without violating Brazilian regulations.[8]   (First Szerer Aff. ¶ 17).

For example, in a July 29, 2002 e-mail to Converse's lawyer in Brazil, on which Converse's Vice President of Licensing, Tim Ouellette ("Ouellette") and General Counsel, Laura Kelley ("Kelley") were copied, Alon's Co-President Ronald Durchfort ("Durchfort") states: *"I want to inform you that we have signed a contract with Coopershoes."*   (First Szerer Aff. ¶ 15).

Alon even went further – it advised Converse of all the details of its arrangement with Coopershoes on multiple occasions. (First Szerer Aff. ¶ 16). For example, in 2002 Alon's Co-Presidents Durchfort and Szerer flew to Boston and met with Converse representatives. (First Szerer Aff. ¶ 17). At that time, Durchfort and Szerer explained the Coopershoes arrangement to

---

[8] Converse also contends that Alon breached the Agreement by failing to pay correct royalties (which position it has now retracted), using improper exchange rates to calculate royalty payments (which Converse now admits was cured), and failing to expend sums required by the Agreement for advertising. These claims were, and remain, spurious. *See* First Szerer Aff. ¶¶ 12-38; Second Szerer Aff. ¶ 13).

14

Ouellette. As a follow up, Ouellette sent an e-mail stating: *"I'm real glad that we were able to this week to both clear the air, as well as reviewing your strategy for moving forward. The presentation was great, and the strategy absolutely on the mark for the market in its current situation."* (First Szerer Aff. ¶ 18).

Significantly, Converse has entered into a licensing arrangement with Coopershoes. (First Szerer Aff. ¶ 23). Converse made Coopershoes its licensee effective January 1, 2005. (First Szerer Aff. ¶ 23). Converse now intends to use as its licensee – in lieu of Alon --the very same company it claims Alon did not have the legal right to subcontract with. This clearly unmasks Converse's strategy, founded on greed and deceit, to steal the benefit of Alon's work.

Without conceding that Converse was correct, Alon cured at least one of the alleged "breaches" by paying Converse $12,510.25 dollars on December 17, 2004. (First Szerer Aff. ¶ 34). Converse has also since withdrawn its VAT / ICMS tax issue. (Second Szerer Aff. ¶ 13; *see also* First Szerer Aff. ¶¶ 26-28;).

Alon can thus establish that it is likely to succeed on its breach of contract claim.

    **2.**    <u>**The Record Evidence Shows That Converse Violated The Implied Covenant Of Good Faith And Fair Dealing**</u>

It is well-settled that every contract includes a covenant of good faith and fair dealing. *See e.g. Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 583 N.E.2d 806, 820 (1991) ("Every contract implies good faith and fair dealing between the parties to it."). Such a covenant requires that neither party do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Id.; Learning Express, Inc. v. Ray-Matt Enterprises, Inc.,* 74 F.Supp.2d 79, 84 (D. Mass. 1999). Accordingly, "to show breach of the covenant, the plaintiff must show that there existed an enforceable contract between the two

parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *Id*.

The record evidence establishes that Converse has breached its covenant of good faith and fair dealing by:

1.  Lulling Alon into a false sense of comfort regarding the renegotiation of the Licensing Agreement until it was too late for Alon to do so, while at the same time making arrangements to falsely appropriate the markets developed by Alon;

2.  Inducing Alon to divulge its strategies, marketing plans and detailed customer relationships (including names, addresses and phone numbers) by misrepresenting that it intended to abide by the terms of the Licensing Agreement;

3.  Encouraging Alon's development of the Coopershoes business structure, only to later declare that Alon was in breach of the Licensing Agreement for its use;

4.  Using Alon's business information for its own purposes;

5.  Making Coopershoes its licensee even before the alleged end of its contract with Alon and despite Alon's own ongoing relationship with Coopershoes, and

6.  Wrongfully depriving Alon of its rights and benefits under the Licensing Agreement, including depriving Alon of its income and interfering with its business partners. (First Szerer Aff. ¶ 8, 12, 14, 25; Second Szerer Aff. ¶ 22-30).

Thus, Converse has breached its covenant of good faith and fair dealing.

**C.  Alon Faces Immediate Harm If Converse Is Not Restrained From Pursuing Its Efforts To Alter The *Status Quo* Pending Arbitration**

**1.  Alon Will Be Deprived Of Its Right To A Meaningful Arbitration**

The right of a party to meaningfully arbitrate its claims is a right protected by international, federal and state law, the deprivation of which constitutes irreparable harm. *See Reliance Nat. Ins. Co. v. Seismic Risk Ins. Service, Inc.*, 962 F.Supp. 385, 391 (S.D.N.Y. 1997), *citing Olde Discount Corp. v. Tupman*, 805 F.Supp. 1130, 1135 (D.Del. 1992), *aff'd*, 1 F.3d 202, 213 (3d Cir. 1993) ("loss of [plaintiff's] federal substantive right to arbitrate, should injunctive relief be denied, constitutes irreparable harm clearly distinguishable from purely economic

loss"); *see also Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 826 (2d 1990) (New York Convention does not preclude injunctions in aid of arbitration).

The record evidence shows that Converse has attempted to delay the arbitration while at the same time trying to strong arm a contract with Coppershoes to takeover Alon's contractual rights. It is transparent that Converse has been seeking to alter the *status quo* to such an extent that, even should the arbitrator rule in Alon's favor, the award will be meaningless. Accordingly, a preliminary injunction should be granted to preserve the *status quo*.

### 2. <u>Alon Will Suffer Damage To Its Business, Reputation, And Goodwill</u>

It is well settled that a substantial loss of business constitutes irreparable injury. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 45 L. Ed. 2d 648, 95 S. Ct. 2561 (1975) ("As required to support such relief, these respondents alleged (and petitioner did not deny) that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."); *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995) (Major disruption of a business can be as harmful as its termination, thereby constitute irreparable injury".); *Automotive Elec. Serv. Corp. v. Association of Automotive Aftermarket Distribs.*, 747 F. Supp. 1483, 1513-14 (E.D.N.Y. 1990) (Injunction issued where loss of one-third of sales from termination would threaten business' existence).

Moreover, "by its very nature, injury to goodwill and reputation is not easily measured or fully compensable in damages. This kind of harm is often held to be irreparable." *Ross-Simons of Warwick, Inc., et al. v. Baccaratt, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996) (dealer would suffer irreparable harm to its business if it were not granted an injunction compelling distributor to continue selling its lead crystal to dealer after dealer refused to sign proposed agreement); *K-*

*Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) ("harm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages -- and for that reason, more likely to be found 'irreparable.'); *Blue Sky Entertainment, Inc. v. Town of Gardiner*, 711 F.Supp. 678, 697 (N.D.N.Y. 1989) ("monetary damages would be difficult to measure in any related action for loss to business reputation").

Losing the right to utilize the Converse marks will result in approximately an 90% reduction of Alon's operations, signifying a drastic reduction in revenues and necessitating dramatic changes in the company's operations. (Second Szerer Aff. ¶ 32). In more concrete terms, should a *status quo* injunction not be granted, Alon estimates losses of over $20 million over the next three years, layoffs of most, if not all, of its employees, and the looming specter of bankruptcy. (Second Szerer Aff. ¶ 33). Alon is faced with a concrete and very real possibility of irreparable harm, both to itself and the lives of the people it employs. (Second Szerer Aff. ¶¶ 32, 33).

This result will also cause immeasurable damage to Alon's reputation and goodwill in the marketplace. (Second Szerer Aff. ¶ 34). Alon's business Mercosur Market has been built around Alon's reputation in the market. (Second Szerer Aff. ¶ 34). This dispute will cause significant irreparable harm and tarnishing of Alon's reputation, which is impossible to quantify.

Accordingly, Alon has established irreparable harm.

D. **Alon's Threatened Injury Is Greater Than Any Potential Damage Converse May Incur If An Injunction Is Entered**

Under the balancing of hardship test, Alon is entitled to relief. Failing to maintain the *status quo* here will allow Converse to complete its planned maneuver of moving into the Mercosur Market and infringing upon Alon's contractual rights (including entering into a contract with Coopershoes), and thus presenting Alon with a *fait accompli*. In this respect,

18

arbitration unassisted by an injunction will be nothing more than "a hollow formality." *Blumenthal*, 910 F. 2d at 1053; *Teradyne,* 97 F.2d at 51; *Inverness Medical Switzerland GmbH v. Acon Laboratories, Inc*. 323 F.Supp.2d 227, 252 (D. Mass. 2004) (Taking into account a party's loss of business due to the infringing parties behavior in the balancing of hardships); *Organizing Comm. for 1998 Goodwill Games v. Goodwill Games Inc*., 919 F. Supp. 21, 27 (D.D.C. 1995).

In the absence of an injunction, Converse will unjustly profit from the reputation, goodwill, market strategy, business relationships, and customers developed by Alon, while Alon will be squeezed out of the market it created with no adequate legal remedies in sight. In striking contrast, the impact upon Converse from the issuance of the injunction will be but negligible and justified. The only impact on Converse is that it cannot contract with a new licensee pending the completed arbitration. Converse's business will continue as usual through Alon and its products and marks will continue to be developed.

An injunction is thus justified.

### E. Enjoining Converse Serves The Public Interest

It is axiomatic that requiring parties to adhere to their contractual obligations, including obligations to arbitrate disputes, is in the public interest. Even a cursory examination of Converse's conduct reveals that its obvious goal was, and is, to capitalize upon Alon's goodwill, reputation, client base and contacts and thereby profit improperly; Converse has thwarted the arbitration process in support of its goal. Since no public benefit supports such a goal, or such conduct, this Court should grant Alon's request for a preliminary injunction pending arbitration.

### F. The Waiver Of Or The Imposition Of A Reduced Bond Is Warranted

Although Federal Rule of Civil Procedure 65(c) generally requires the posting of security bond, this rule is not absolute. "[W]here the balance of the equities weighs overwhelmingly in

…

Case No. 12591-PBS

favor of the party seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond requirement." *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996); *Crowley v. Local No. 82,* 679 F.2d 978, 999-1000 (1st Cir.1982), *rev'd on other grounds,* 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). This case involves a clear-cut example of a bad faith calculated breach of contract. The equities weigh in favor of protecting Alon's contractual rights while no equities favor Converse's position. Accordingly, the Court should exercise its discretion and waive or impose a significantly reduced bond in that Converse gets exactly what it has contracted for during the imposition of a *status quo* injunction.

### IV.   CONCLUSION

For the foregoing reasons, Defendant Alon International, S.A. requests that the Court grant its Motion For A Preliminary Injunction In Aid Of Arbitration in the form attached.

Dated: March 14, 2005.

Respectfully submitted,

      /s/ Cynthia D. Vreeland
**WILMER CUTLER PICKERING
HALE AND DORR, LLP**
Cynthia D. Vreeland
Richard A. Johnston
60 State Street
Boston, Massachusetts 02109
Telephone:  (617) 526-6000

- and -

**ASTIGARRAGA DAVIS**
Edward H. Davis, Jr. (admitted *pro hac vice*)
M. Cristina Cárdenas
701 Brickell Avenue, 16th Floor
Miami, Florida  33131
Telephone:  (305) 372-8282

*Counsel for Defendant Alon International, S.A.*

Case No. 12591-PBS

favor of the party seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond requirement." *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996); *Crowley v. Local No. 82,* 679 F.2d 978, 999-1000 (1st Cir.1982), *rev'd on other grounds,* 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). This case involves a clear-cut example of a bad faith calculated breach of contract. The equities weigh in favor of protecting Alon's contractual rights while no equities favor Converse's position. Accordingly, the Court should exercise its discretion and waive or impose a significantly reduced bond in that Converse gets exactly what it has contracted for during the imposition of a *status quo* injunction.

**IV.   CONCLUSION**

For the foregoing reasons, Defendant Alon International, S.A. requests that the Court grant its Motion For A Preliminary Injunction In Aid Of Arbitration in the form attached.

Dated: March 14, 2005.

Respectfully submitted,

      /s/ Cynthia D. Vreeland
**WILMER CUTLER PICKERING
HALE AND DORR, LLP**
Cynthia D. Vreeland
Richard A. Johnston
60 State Street
Boston, Massachusetts 02109
Telephone:  (617) 526-6000

- and -

**ASTIGARRAGA DAVIS**
Edward H. Davis, Jr. (admitted *pro hac vice*)
M. Cristina Cárdenas
701 Brickell Avenue, 16th Floor
Miami, Florida  33131
Telephone:  (305) 372-8282

*Counsel for Defendant Alon International, S.A.*