**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

|  |  |
|---|---|
| CONVERSE, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :  **Docket No.: 04-12591-PBS** |
| | : |
| ALON INTERNATIONAL, S.A., | : |
| | : |
| Defendant. | : |

---

**ALON INTERNATIONAL, S.A.'S APPENDIX TO THE MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION**

**WILMER CUTLER PICKERING**
**HALE AND DORR, LLP**
Cynthia D. Vreeland
Richard A. Johnston
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

- and -

**ASTIGARRAGA DAVIS**
Edward H. Davis, Jr.
M. Cristina Cárdenas
701 Brickell Avenue, 16th Floor
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

Date: March 14, 2005          *Counsel for Defendant Alon International, S.A.*

## TABLE OF CONTENTS

| EXHIBIT | DATE | DESCRIPTION |
|---|---|---|
| A | January 5, 2005 | Affidavit of Roberto Szerer |
| B | January 4, 2005 | Second Affidavit Roberto Szerer |
| 1 | January 6, 2005 | Transcript of the Hearing on Converse Inc.'s Application For a Temporary Restraining Order |
| 2 | January 13, 2005 | Order denying Converse Inc.'s Application For a Temporary Restraining Order |
| 3 | January 21, 2005 | Memorandum of Law in Opposition to Respondent Converse Inc.'s Motion to Dismiss or Transfer |
| 4 | January 29, 2005 | Letter dated January 29, 2005, sent to Converse, Inc. by Alon International, S.A. |
| 5 | February 4, 2005 | Letter dated February 4, 2005, sent to Converse, Inc. by Alon International, S.A. |
| 6 | February 24, 2005 | Letter dated February 24, 2005 sent to Converse, Inc. and Alon International, S.A. by the AAA / ICDR |
| 7 | February 23, 2005 | Letter dated February 23, 2005 sent to Converse, Inc. by Alon International, S.A. |
| 8 | December 16, 2004 | Contract between Converse, Inc. and Coopershoes |
| 9 | March 1, 2005 | Letter dated March 1, 2005 received by Alon International, S.A. from Converse, Inc. |
| 10 | March 1, 2005 | Letter dated March 1, 2005 received by Alon International, S.A. from Converse, Inc. |
| 11 | March 2, 2005 | Letter dated March 2, 2005 sent by Converse, Inc. to Coopershoes |
| 12 | March 8, 2005 | Letter dated March 8, 2005 sent by Converse, Inc. to Indular, S.A. |

# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### Docket No.: 12591-PBS

CONVERSE, INC.,

                Plaintiff,

v.

ALON INTERNATIONAL, S.A.,

                Defendant.

## AFFIDAVIT OF ROBERTO SZERER

I, Roberto Szerer, being of lawful age, state as follows:

1.      I am Co-President of Alon International, S.A. ("Alon"). I have been Co-President of Alon since December 1997 and make this declaration based upon my personal knowledge.

2.      Alon is a corporation duly registered and organized under the laws of the Republic of Panama, and has its principal office and business at Calle 53 Urbanizacion Obarrio, Torre Swiss Bank, Piso 16, Panama, Republica de Panama. Alon develops, sources, and markets footwear in Latin America. Alon has extensive experience in this field, and particular expertise in marketing and developing shoe and shoe products in Latin America.

3.      On or about September 1, 2001, Alon entered into a Manufacturing, Distribution and Licensing Agreement with Converse Inc. ("Converse"), by which Alon gained the exclusive rights and license to manufacture, distribute, and utilize Converse marks and related products throughout Argentina, Brazil, Paraguay and Uruguay ("Licensing Agreement" or "Agreement"). The Licensing Agreement between Alon and Converse is Exhibit "1" to the Vreeland Affidavit.

4.      During the ensuing years, Alon successfully developed the Converse marks and

related products, and continues today to invest heavily in developing the market for these products. Among other things, Alon rescued the Converse trademarks, including its ALLSTAR mark, from a "brand pirate" in the Brazilian market; created the market for the Converse marks and related products in previously non-existent markets; developed a successful business model for the sale of the Converse marks and products; developed and maintained business contacts and business relationships in the region that facilitate the sale of the Converse marks and products; significantly increased the sales for Converse products by over five times higher than the agreed upon minimum guarantees; successfully marketed and created distribution channels for Converse's marks and related products; successfully created the sourcing structure for the Converse products; and successfully positioned the Converse marks for strong growth in future sales. In sum, Alon established a developed a market for the Converse marks and related products in a market which had been unavailable to Converse for the past seventeen years. Alon's heavy investments in the development of the market were always predicated on a belief that the Licensing Agreement would be in existence for six years and beyond.

5.    The original term of the Licensing Agreement was from September 1, 2001, to December 31, 2004. However, the Agreement provided that Alon had the option of automatically renewing the Licensing Agreement for a period of three years upon the satisfaction of certain conditions. Specifically, Section 2 of the Licensing Agreement states that Alon could renew the Agreement for an additional term of three (3) years provided Alon exceeded a Guaranteed Minimum Royalty and Sales by twenty-five percent (25%) and further provided that Alon has not breached any of the terms and conditions of this Agreement. Licensing Agreement, §2.

2

## Alon Has Complied With The Terms of the Licensing Agreement

6.      Alon has fully complied with the terms of the Agreement.  Among other things, Alon greatly exceeded the minimum royalty and sales requirement for the third contract year pursuant to the terms of the Agreement.  Under the original terms of the Licensing Agreement, Alon guaranteed Converse minimum sales of $7,017,000 during the first term of the Agreement, and the actual sales through December 31, 2004 were approximately $40 million – more than *five times* the guaranteed minimum.   Similarly, Alon guaranteed Converse a minimum royalty payment over the first term of the Agreement of $490,000 and will actually pay royalties to Converse for sales through December 31, 2004 totaling just over $3 million – more than *six times* the guaranteed minimum.

7.      Moreover, Alon has not materially breached any provision of the Licensing Agreement.     At no time during the course of their three year relationship did Converse ever put Alon on notice of a breach pursuant to any provision under the Agreement.  Significantly, the first time Alon was put on notice of alleged "breaches" by Converse was on November 30, 2004, one month before the first term of the Licensing Agreement was set to expire.

8.      Based upon the ongoing good faith negotiations between the Parties and the automatic renewal provisions of the Licensing Agreement, Alon invested heavily in advertising, trade shows, outsole models, outsole lasts, infrastructure, personnel, and other raw materials for the continued development of the Converse brand in the Mercosur market for 2005 and beyond. Alon's investments in the development of the market was always predicated on a belief that the Licensing Agreement would be in existence for six years and beyond.   Converse's affirmative attempts to oppose Alon's automatic renewal of its contractual rights under the Licensing Agreement will result in a significant loss to Alon and a significant windfall to Converse if the

3

Licensing Agreement is not deemed renewed.   In its efforts to serve Converse and fully expand

the market for the Converse marks and related products, Alon has devoted approximately eighty

(80) per cent of its time, energy, resources, and manpower on the Converse marks and products,

letting go of other valuable clients to fully focus on the Converse account in the process.

Converse has used Alon's image, track record and relationships built and developed over many

years for its own gain.

**Converse Is Attempting To Block Alon's Automatic Right of Renewal in Bad Faith And In an Attempt to Usurp Alon's Market**

*The Alleged Expiration of the Licensing Agreement*

9.    Alon has exercised its automatic right of renewal.  Throughout the first term of

the Licensing Agreement, Alon has clearly and unequivocally notified Converse of its intent to

exercise their right of renewal pursuant to the terms of the Licensing Agreement. The parties

have been engaged in extended and significant negotiations regarding the renewal of the

Agreement, involving both oral and written communications.  For example:

a)    On or about May 4, 2004, Tim Ouellette, ("Ouellette"), Vice-President of
Licensing at Converse sent me an e-mail indicating that the parties were involved
in negotiations regarding the re-negotiation of the Licensing Agreement:

*Attached please find an analysis of what is on the table.  I would
like to reach an agreement on how we plan to move forward as
soon as possible.*
*Thanks*

b)    On or about May 19, 2004, I sent to Ouellette an e-mail stating:

*Dear Tim,*
*Based on our telecom and continuing the process for establishing
the rationale for the new contract, attached you will find a
proposal where we have segmented growth, guarantee and royalty
rates per the following periods:*
- *Aggressive 2004/05/06*
- *Medium 2007/08/09/10*
- *Moderate 2011/12/13*

4

*As agreed, we will start from our 2003 actual sales as our base.*

*I believe this will help us reach a fair and **equitable renewal** with a minimum of tension.]*

*Regards,*
*Roberto Szerer*                    (emphasis added).

c)        On or about May 31, 2004, I wrote to Ouellette indicating the renegotiation of the Licensing Agreement.    Attached to the e-mail was a spreadsheet with proposed numbers throughout 2013.

*Dear Tim,*
*As per our telecom, enclosed you will find a spreadsheet with the numbers we agreed. As you can see I modified the royalty rate of Originals to bring it gradually to 10% over the term of the contract.*
*We understand that based on our initial "Big Aggressive Hairy Goal" you would like a growth for this year of 50%. We believe it is to high specially after the growth we had in the last year but anyhow we are evaluating the projections for 2004 taking in to consideration all the variables involved (New company in Argentina, new company in Brazil, new apparel line, etc.) and also including the recent change in the Real which by itself brings the sales numbers in Dollars down by 9.68% (Current exchange rate per dollar of R$ 3.10 vs. initial calculation at R$2.80). I will be traveling all week in Argentina and Brazil but will try to talk to you by Friday.*

*I wish you a good week.*

*Best regards,*
*Roberto Szerer*

d)        On or about June 10, 2004, I sent an e-mail to Ouellette, stating among other things, our intent to seek renewal of the Licensing Agreement:

*Dear Tim,*
*As per our telecom, enclosed you will find our revised forecast for 2004.*

*The main factors that affected the forecast for the year are:*

5

- *Devaluation in the region from our forecast of 2.8 Reais to the Dollar in Brazil to a new reality at 3.10*
- *In Argentina from 2.85 Pesos to the Dollar to 3.00. We don't expect a higher devaluation, but as you know the economy in this part of the world is extremely volatile so we must be attentive to any future changes.*
- *Despite the important legal battles that we have won against the Pirates, we continue having constant problems in the market which show that the growth in the vulcanized product will be 5% instead of our initial projection of 6.59%.*
- *We have revised our sales forecast for the cemented line in Brazil due to a low acceptance of the line in the market plus a higher than expected delay in getting the tech packs.*
- *Introduction of the apparel line increases our forecast.*
- *Argentina has begun well and sales for the year look promising but it took us longer to begin with the new structure and additionally we had delays due to a major strike by Brazilian customs. Instead of our initial projection of sales over 11 months, we expect to have only 7 real months of sales.*
- *Uruguay is affected in the same way as Brazil and Argentina by the devaluation.*

*The projection of total sales for 2004 shows a growth of 16.22 % from US$ 12,649,921 to US$ 14,701,254.*

**I have enclosed the breakdown of the numbers plus our updated proposal for the 5+5 year renewal.**

*I will give you a call to follow up and answer any questions you might have.*

*Best regards,*
*Roberto Szerer*                                    (emphasis added).

10.    As demonstrated by the above quoted communications, Alon and Converse have been involved in extensive negotiations regarding the renewal of the Licensing Agreement, and throughout these communications Alon made clear, in writing, its intent of renewing the Agreement. Therefore, Alon has exercised its absolute right of renewal prior to September 30, 2004, and as such, the Licensing Agreement did <u>not</u> expire on December 31, 2004.

6

11.    In September of 2004, Ouellette verbally communicated to Szerer, that Converse was renewing the Licensing Agreement.

*The Alleged Unauthorized Arrangement With Coopershoes*

12.    Converse is now attempting to block Alon's automatic right of renewal as a way of denying Alon its contractual rights. In order to do so, Converse has used pretextual excuses to oppose in bad faith Alon's right to automatically renew the Licensing Agreement. All such allegations are without merit, and are nothing more than bad faith attempts of usurping Alon's market.

13.    Specifically, Converse alleges that Alon entered into a prohibited sub-licensing agreement with Cooperativa De Calcados E Componentes Joanetense LTDA ("Coopershoes"). Coopershoes is a Brazilian company in the business of manufacturing shoes and shoe products.

14.    Such allegations are disingenuous and factually inaccurate. At all relevant times, Converse has i) been aware of and participated in the organization of the business structure between Coopershoes and Alon; ii) had full knowledge of the Coopershoes Arrangement; iii) fully approved of the Coopershoes Arrangement; and iv) consented to the Coopershoes Arrangement. Among other things: Converse devised, drafted and approved the contracts to be executed between Alon and Coopershoes through its Brazilian legal counsel; Converse visited the Coopershoes factory in Brazil on several occasions; Converse approved the sale of goods, which clearly indicated on the tags that Coopershoes involvement with the production of the products; Converse received wire transfers directly from Coopershoes from October of 2002 to January of 2004; Converse participated and cooperated in legal actions undertaken by Coopershoes in Brazil in order to defend the Converse mark from a "brand pirate"; Converse audited the Coopershoes factory, with a copy of the audit report sent directly to Converse; and

7

Coopershoes paid a bond the equivalent of about $70,000.00 to be paid on behalf of Converse for the protection of the Converse ALL STAR Mark in Brazil.

15.    Specifically, in a July 29, 2002 e-mail to Luiz Henrique O. do Amaral, Converse's lawyer in Brazil, on which Ouellette and Laura Kelley (Converse's General Counsel) were copied, Ronald Durchfort ("Durchfort"), Co-President of Alon, wrote:

> Dear Luiz,
> I want to inform you that we have signed a contract with Coopershoes. With this contract we are achieving:
> Elimination of production support to Artigos.
> Ready to immediately introduce Converse All-Star.
> Elimination of Artigos argument that Converse production/distribution will cause loss of jobs.
> Non-traumatic entry of Converse All-Star into the Brazilian market. ....

16.    Moreover, we advised Converse of all the details of its arrangements with Coopershoes on multiple occasions.  On October 10, 2002, Ouellette wrote in an e-mail to Durchfort:

> Ronald,
> Thanks that sounds great. Of course you will also bring the Cooper Shoe Agreement. Let me know when you will be arriving and I will provide transportation.

17.    In response, Durchfort and I flew to Boston with the Coopershoes contracts in hand to meet with Ouellette and Kelley (among other Converse personnel).  At that time, we completely explained the Coopershoes arrangement to Ouellette, including all of the functions Coopershoes was to assist with in addition to the manufacturing of the Converse product.  We fully explained the reason for the Coopershoes structure as a means of complying with Brazilian regulations while allowing royalties to be paid to Converse.  Otherwise, Converse would have had to take its royalties in Brazilian currency in Brazil – which it did not want to do.  It was also explained to Converse that the Coopershoes arrangement was necessary to prevent Coopershoes

8

from producing for the "brand pirate" while allowing the Converse products to enter the market as quickly and efficiently as possible.

18.    As a follow up to the meeting, Durchfort wrote in an e-mail on October 24, 2002, to Ouellette:

> *Dear Tim,*
> *Thanks for the productive meeting with you and your team.*
> *The Mercosur project is up and running. October shipments in Brazil are on target and November order placement (Nov. delivery) is running above forecast.*
> *So that we are all on the same page I have included in this e-mail the results of our conversations which we are now implementing. We understand the line being sold is approved with the above corrections. We intend to present 03-1 season product for approval within 60 days.*

19.    Most illuminating is Ouellette's responsive e-mail that same day:

> *Ronald,*
>
> *I'm real glad that we were able to this week to both clear the air, as well as reviewing your strategy for moving forward. The presentation was great, and the strategy absolutely on the mark for the market in it's current situation. For the time being, I would like you to run all Approvals through me with a copy to Ava Lawrence, I frankly do not want to get Marketing/Product Development involved. They do not always look at projects like this as business, and tend to get anal. When all product is up to speed and you are on the same page as our company I will turn this over. I am now tremendously excited and looking forward to what we can do.*
> *Please let me know the dates that you want me in Brazil, so I can plan that trip*
> *Again, Great job!*
> *Thanks*
> *Tim*

20.    At no time, despite having been given a complete and thorough briefing of the sum and substance of the Coopershoes arrangement did Ouellette object to the Coopershoes arrangement. In fact, he thanks Durchfort for "clearing the air."

21.    Again, in late 2003, I flew to Boston to discuss ongoing operations in the Mercosur market with Converse and the issue of the Coopershoes arrangement came up. This time I also met directly with Kelley as well. During that meeting, I again completely explained the sum and substance of its arrangements with Coopershoes. I explained to Converse that the structure of the Coopershoes arrangement was not a sub-licensing agreement, but had to be structured the way it was for among other reasons, to comply with Brazilian regulations while allowing royalties to be paid to Converse. Converse was quite happy receiving over $3,000,000 in royalties in this method over the past several years. At no time did Kelley or anyone else from Converse notify me or anyone else at Alon that it had any problems with the arrangement or that it considered the arrangement to be an unapproved sublicense agreement.

22.    A few days later, Converse drafted an amendment to the Agreement and did not even think this issue worthy of addressing in the Amendment.

23.    Alon has now learned that Converse has sought to enter into a direct contractual relationship with Coopershoes, allegedly making Coopershoes the exclusive licensee in the Mercosur area as of January 1, 2005. This is the same company Converse is now alleging as grounds for usurping Alon's automatic right of renewal pursuant to the terms of the Agreement for Alon's use of that very same company.

24.    Converse also alleges that Alon has entered into unauthorized arrangements with Brazilian entities entitled Filon (apparel), Pucket (socks) and Foroni (notebooks), and the Uruguayan entity Belquis (footwear). (Laganas Affidavit, ¶ 10). Again, these allegations are factually inaccurate. Moreover, any possible arrangement between Alon and these companies was fully known, encouraged, and approved of by Converse. Among other things, Alon had fully explained the terms of possible contracts with these companies to Converse, Alon had

10

submitted for Converse's approval products to be produced by these companies, and Converse

had approved said products.  For example, on October 11, 2004, Durchfort sent an e-mail to

Ouellette stating:

> *Thanks for lunch.*
>
> *Every time after I speak with you I feel confident that we are building the  partnership with you and converse. I guess that my challenge is to keep you up to speed more often and keep our channels open. I felt that I was doing this but the "audit" somehow got away from both of us.*
>
> .....
>
> *I recognize that we shld visit you at converse after the audit to do a "whiteboard" session and [strategize] the best structure given the reality.* **I will execute the apparel and sock deals as we spoke and include all information concerning them during whiteboard session.** *Rgds*
> *Rd*

(emphasis added).

25.    In sum, Converse is using our relationship with Coopershoes and others as

unfounded grounds for blocking our automatic right of renewal.  However, as reflected in

the written record, our arrangements with Coopershoes and others was fully known by,

encouraged, and approved of by Converse.  Converse's attempts to usurp our market

have not stopped there, however.  Converse has also, among other things, induced us to

divulge our strategies, marketing plans and detailed customer information (including

names, addresses and phone numbers) by misrepresenting that they intended to abide by

the terms of the Licensing Agreement by renewing it for another three years.  In doing so,

Converse has misappropriated for its own gain our confidential information, including

our business relationships, strategy and customer base.

*The Alleged Failure to Pay Correct Royalties Pursuant to the Licensing Agreement*

26.     Section 15(a) of the Licensing Agreement requires that Alon pay Converse a royalty equal to a specified percentage of the "Net Sales" made by Alon of Converse Licensed Articles. A "Net Sale" is defined in Section 1(h) of the Agreement as "the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, trade discounts, volume rebates and any freight charges *and VAT taxes* included in the invoice." (emphasis added). (Licensing Agreement, § 15(a)).

27.     Alon has always fully complied with this requirement. Although there is no VAT tax in Brazil there is an equivalent tax called an ICMS tax. The ICMS tax was included on the invoices to Converse, but it has not been deducted twice from the sales reported to Converse. In this respect the total royalties earned by Converse for sales through December 31, 2004 is $3,059,000, which is actually just over 7% of the total net sales of $40,663,000 under the Agreement through its first term.

28.     The use of the term VAT Tax in the Licensing Agreement is nothing more than that of a scrivener's error. Converse is now attempting to use this simple drafting mistake as an excuse to block Alon's right of automatic renewal.

*The Alleged Incorrect Use of Exchange Rates to Calculate Royalties Due Under the Licensing Agreement*

29.     Section 19(a) of the Licensing Agreement states that "[u]nless specifically set forth to the contrary herein, all payments to Converse (except Converse Factories) required to by made by [Alon] pursuant to this Agreement shall be made in the currency of the United States of America.....Converse will review the exchange rate received by Licensee in the conversion from [Alon's] local currency to U.S. funds by comparison with the exchange rate published by the

Wall Street Journal ("WSJ") two (2) business days prior to the payment due date schedules in paragraph 18 of this Agreement."  (Licensing Agreement § 19(a)).

30.    As a means of blocking Alon's automatic right of renewal, Converse alleges that ALON has underpaid the amount of royalties due under the Licensing Agreement due to the incorrect use of exchange rates.

31.    Alon has always used exchange rates identified in good faith from the Wall Street Journal as required by the Licensing Agreement.  To the extent that any error has been made, it was made in good faith.

32.    In a good faith attempt to remedy any inconsistency that may have resulted in the payment of the royalties due to Converse as a result of an incorrect exchange rate, Alon sent Converse a wire transfer in the amount of $3,780.75 for the amount still allegedly owed to Converse.

33.    The amount sent to Converse was calculated by deducting from the $16,291.00 alleged as owed by Converse, an amount of $12,510.25, which Alon had previously overpaid to Converse.  Converse acknowledged the overpayment of $12,510.25 in a recent audit.  There has bee no intent of any kind to short change Converse, and Converse is arguing about a $12,000 differential on total royalty payments that by December 31, 2004, totaled $3,059,000.  That is less than a 0.4% error.

34.    To the extent that there are any remaining discrepancies, Alon has paid Converse the amount it is alleging is still outstanding on December 17, 2004.  Alon has done this in a good faith effort to resolve this dispute between the parties, and without any admission or consent as to any wrongdoing on Alon's part.

13

*E.    The Minimum Advertising Requirements*

35.    Section 7(d) of the Licensing Agreement provides that Alon shall "expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for the Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure")." (Licensing Agreement, § 7(d)).

36.    Alon has met this requirement.    Alon's annual expenditure on advertising/marketing during the initial three-year term of the Licensing Agreement has been 5.2%, which is clearly in excess of the 5% requirement set forth in the Licensing Agreement.

37.    Moreover, Converse alleges as further grounds to block Alon's automatic right of renewal, that Alon was required to expend 5% of Net Sales on *direct advertising*.    The direct advertising requirement is completely without basis in the Agreement between the parties. Advertising Expenditure is nowhere specifically defined in the Licensing Agreement, nor is it limited to direct advertising in the Licensing Agreement.

38.    It is important to re-emphasize that Alon has exceeded their sales requirements under the first term of the Licensing Agreement by more than five times the guaranteed minimum and any attempt by Converse to allege that Alon has not met their advertising requirements under the Licensing Agreement is, yet again, a bad faith attempt to strip Alon of their automatic right of renewal in an effort to usurp the lucrative market Alon has developed as well as the business contacts they have built in the Mercosur region.

## Alon Has Fully Submitted The Merits of This Dispute to Arbitration

39.    Alon has always used its best efforts to achieve an amicable resolution to the dispute at hand.  As clearly set forth in the correspondence between the parties, Alon has always demonstrated willingness to compromise, negotiate and amicably resolve this dispute between

the parties, which Converse has not reciprocated. For instance, on December 15, 2004, Alon

sent a letter to Converse's counsel noting in relevant part:

> *To be clear, Alon considers the Agreement renewed by its terms at the 8% royalty rate agreed to by Converse. However, lest you or Converse draw incorrect conclusions from Alon's conduct geared to self-preservation, Alon is, and always will be, interested in amicably resolving this dispute. The Agreement drafted by Converse requires the parties to attempt to settle controversies and disputes arising hereunder "amicably, promptly and fairly." We look forward to hearing from you promptly in this regard as we have heard nothing so far but belligerence, delay and unfairness. Alon stands willing to make a good faith effort to address any concerns Converse may have with regard to how best we can go forward over the next three years to maximize sales and profits but only under the context that Alon has exercised their right of renewal, and not under the threat of termination and / or non – renewal.*
>
> (emphasis in original).

40.     Converse, however, did not reciprocate. On December 16, 2004, after efforts to

mutually negotiate a resolution to this dispute failed, Alon initiated arbitration pursuant to the

procedure set forth in the Licensing Agreement with the American Arbitration Association

("AAA"). A copy of Alon's Notice of Arbitration and Statement of Claim is attached as Exhibit

"2" to the Vreeland Affidavit.

### Alon Seeks Injunctions in Brazil and Argentina To Preserve The Status Quo Pending A Resolution Of This Dispute During Arbitration

41.     In blatant disregard to the ongoing dispute regarding the continuing validity of the

Licensing Agreement, Converse has sought to strip Alon of their current contractual rights, by

among other things, entering into a contractual relationship with Coopershoes; attempting to

prevent Alon from continuing its obligations under the Licensing Agreement; and using Alon's

confidential business information, strategy and relationships for its own efforts to squeeze Alon

out of the Mercosur market. In a final act of self-preservation, Alon sough injunctions in Brazil

and Argentina, which would prevent Converse from infringing upon Alon's existing contractual

rights in those countries pending the resolution of this dispute in arbitration.

42.    On or about December 22, 2004, the Brazilian court in the 19th State Court of Porto Alegre, State of Rio Grande do Sul, Brazil granted an injunction against Converse which declared that the Agreement between the parties continued in effect until the termination of the arbitration proceedings already initiated and restrained Converse from having any contractual arrangements in Brazil that went against the existing contractual rights of Alon ("Brazilian Injunction"). A certified translation of the Brazilian Injunction is attached as Exhibit "3" to the Vreeland Affidavit. Alon notified Converse of the Brazilian Injunction on December 29, 2004.

43.    On or about December 30, the Argentine National Court of First Instance No 22, Clerk's Office No 43 of the City of Buenos Aires, Argentina, granted a status quo injunction against Converse. The Argentine Injunction declares that the Agreement is in effect during the term of sixty days as from December 30th, 2004 when the Injunction was issued, and orders Converse to restrain from having any contractual arrangements in Argentina that go against the existing contractual rights of Alon during that time ("Argentine Injunction"). A certified translation of the Argentine Injunction is Exhibit "4" to the Vreeland Affidavit. Alon notified Converse of the Argentine Injunction on December 30, 2004.

44.    Converse has sought to portray the Brazilian and Argentine Injunctions as an attempt by Alon to evade the parties' agreement to arbitrate this dispute.    However, such allegations are simply unfounded because Alon has always complied with its agreement to arbitrate this dispute. Alon sought the Brazilian and Argentine Injunctions in an effort to prevent Converse from continuing to misappropriate for its own gain our confidential information, market, business strategy and business relationships pending a final resolution as to the status of the Licensing Agreement in arbitration. As such, Alon has pursued the Brazilian and Argentine

Injunctions with the <u>sole</u> purpose of maintaining the status quo between the parties pending a full resolution of this dispute in arbitration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 5 day of January 2005.


FURTHER AFFIANT SAYETH NOT.

_____
Roberto Szerer


F:\WDOX\CLIENTS\1007\1001\W1\062253.DOC

# EXHIBIT "B"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### Docket No.: 12591-PBS

| | |
|---|---|
| CONVERSE, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v | : |
| | : |
| ALON INTERNATIONAL, S.A., | : |
| | : |
| Defendant. | : |
| | : |

### SECOND AFFIDAVIT OF ROBERTO SZERER

I, Roberto Szerer, being of lawful age, state as follows:

1.      I am Co-President of Alon International, S.A. ("Alon"). I have been Co-President of Alon since December 1997 and make this declaration based upon my personal knowledge.

2.      Alon is a corporation duly registered and organized under the laws of the Republic of Panama, and has its official office at Calle 53 Urbanizacion Obarrio, Torre Swiss Bank, Piso 16, Panama, Republica de Panama.

3.      On or about September 1, 2001, Alon entered into a Manufacturing, Distribution and Licensing Agreement ("Licensing Agreement") with Converse Inc. ("Converse").

4.      Despite Alon's full compliance with the terms of the Licensing Agreement, Converse has sought in bad faith to refuse Alon's automatic right of renewal of the Licensing Agreement.

5.      Consequently, on December 16, 2004, Alon filed a Notice of Arbitration and Statement of Claim with the International Center for Dispute Resolution ("ICDR") of the American Arbitration Association ("AAA").

6.     Following Alon's initiation of Arbitration, Alon sought *status quo* injunctions in Brazil and Argentina, which were granted. The Argentine injunction, however, is of limited duration and is only valid for a period of sixty (60) days. Moreover, although the Licensing Agreement covers Argentina, Paraguay, Brazil and Uruguay (the "Mercosur Market"), Alon has not sought or obtained *status quo* injunctions in Uruguay or Paraguay.

7.     On December 21, 2004, Converse filed an Application For a Temporary Restraining Order ("Application") in this Court to restrain Alon from pursuing the *status quo* injunctions in those countries.    This Court denied Converse's Application in an Order dated January 13, 2005.  A true and correct copy of the transcript of the hearing on Converse's Application is attached as **Exhibit "1."**     A true and correct copy of the Order denying Converse's Application is attached as **Exhibit "2."**

Converse Has Delayed and Impeded The Arbitration Between The Parties

8.     Since its Application before this Court was denied, Converse has undertaken a dilatory course of action aimed at delaying and postponing the arbitration of the parties' dispute. Alon now believes that Converse is intentionally impeding the arbitral proceedings in order to permit it to position itself throughout the Mercosur Market and alter the *status quo* to its favor and to Alon's detriment.  Among other things, Alon believes Converse has sought to delay the arbitral proceedings while the Argentine Injunction expires by its own terms, allowing Converse to seek an alteration of the *status quo* there.  Converse has also threatened retaliatory action against Cooperativa De Calcados E Componentes Joanetense LTDA ("Coopershoes"), the same company Converse has sought to make its Licensee in the Mercosur Market despite Alon's contractual relationship with both Converse and Coopershoes, should said company sign a provisional agreement to continue working with Alon pending a final confirmation of an arbitral

2

award. This behavior by Converse is clearly indicative of an intent to alter the *status quo* prior to a final confirmation of an arbitral award rendered in this case.

9.    Among other things, Converse has frustrated Alon's attempts to have the arbitration proceed forward in a timely fashion by raising a myriad of specious procedural objections to the arbitral forum's jurisdiction and its procedural rules, which have no legal or factual basis. Specifically, on December 21, 2004, Converse filed a Motion to Dismiss or Transfer to the Appropriate Office of American Arbitration Association with the AAA / ICDR ("Motion to Dismiss"). In its Motion to Dismiss, Converse sought to avoid, among other things, the AAA / ICDR's jurisdiction and the application of its procedural rules by charging that this case is a purely domestic dispute. As more fully set forth in Alon's Response to Converse's Motion to Dismiss or Transfer, the arbitration is an international dispute because Alon is a Panamanian corporation, Converse is an American corporation, and the dispute involves an international Licensing Agreement for the manufacture and sale of marks and products throughout South America. A true and correct copy of Alon's Response to Converse's Motion to Dismiss or Transfer is attached hereto as **Exhibit "3."**

10.    In an effort to meet Converse half-way and proceed with the arbitration in a timely fashion, Alon noted in its Response to Converse's Motion to Dismiss that it would be willing to apply the AAA's Commercial Arbitration Rules so long as the arbitrator was selected from the AAA / ICDR approved list of arbitrators and was administered by the AAA / ICDR.

11.    Following Alon's Response, the parties agreed on an informal procedure for the selection of an arbitrator. Nonetheless, Converse failed to comply with the deadlines set by the parties for the selection of an arbitrator, and moreover, continued to use additional delay tactics to postpone the arbitration. (*See* Ex. "4"). For instance, Converse insisted on filing a Reply to

3

Alon's Response to its Motion to Dismiss. This procedure was never contemplated in the parties' original agreement in this regard. Despite Converse's insistence over the last weeks that it would be filing a Reply, and despite Alon's repeated requests to Converse on the status of the reply,[1] Converse delayed issuing its reply. Converse's insistence on filing a reply, despite not being contemplated in the parties' original agreement, has significantly delayed the arbitration.

12.    On January 29, 2005, Alon sent a letter to Converse, indicating, among other things, that Alon believed that Converse was delaying the arbitral proceedings so it could put into effect a scheme to irrevocably alter the *status quo* prior to the completion of arbitration. Among other things, in this letter Alon states:

> *The totality of the conduct by Converse set forth above belies any claims on your part that Converse is serious about moving these issues along. Converse is clearly stalling. Alon believes that this is because Converse is attempting to gain some sort of unfair and improper tactical advantage by dragging its feet on all of these issues while simultaneously delaying the arbitration with its specious position that it is not an international dispute .... and by not responding with regard to the arbitrators off the list supplied by the AAA/ICDR last Monday evening. All of this conduct also calls into question Converse's constant bemoaning about how long this arbitration is going to take.*

A true and correct copy of this letter is attached as **Exhibit "4."**

13.    Converse responded on February 1, 2005 to Alon's letter. Among other things, Converse stated that it was dropping its allegation that Alon had double deducted VAT or ICMS taxes from the sales reported to Converse. Nonetheless, Converse made no reference to complying with the deadlines set by the parties for the selection of an arbitrator or otherwise.

---

[1] On January 29, 2005, Alon wrote to Converse, "Alon demands that you file your Reply before the AAA / ICDR. As you know, there was to be no Reply and you have now asked for this right once again seeking to delay the start of the arbitration." (Ex. "4").

Again, on February 4, 2005, Alon wrote to Converse, "We welcome your comments on these proposed arbitrators, and hope that Alon and Converse may come to an expeditious and satisfactory resolution of this issue. To that end, when can we expect to see your reply to our memorandum in response to Converse's Motion to Dismiss or Transfer?" (Ex. "5").

14.    On February 4, 2005, Alon again wrote Converse, seeking to expedite and move the arbitration forward.   Among other things, Alon proposed the names of three arbitrators from a list provided by the ICDR / AAA.  In its letter, Alon noted:

> As you know, Alon's position with respect to potential arbitrators has always been that it was willing to look at arbitrators with Massachusetts experience, but only if they were from the AAA International Panel. Alon has never agreed to arbitrators from the AAA Commercial Panel. Further to the goal of expediting the arbitration, Alon would like to tender the following names from the AAA International Panel as potential arbitrators:
>
> [names omitted from affidavit]
>
> We welcome your comments on these proposed arbitrators, and hope that Alon and Converse may come to an expeditious and satisfactory resolution of this issue.

To date, Converse has not responded to the names proposed by Alon.  A true and correct copy of this letter is attached as **Exhibit "5."**

15.    On February 24, 2005, the AAA / ICDR issued its decision regarding the international nature of this dispute.   In its decision, the AAA / ICDR agreed with Alon and determined that the arbitration would be administered by the AAA / ICDR, an arbitrator appointed from the AAA / ICDR international panel, and governed by the AAA / ICDR International Rules. A copy of the AAA / ICDR's decision is attached as **Exhibit "6."**

16.    In large part due to Converse's delay tactics, almost three months have passed since Alon initiated arbitration, and the parties have yet to select an arbitrator.[2]

17.    Converse has also used other delay tactics. For instance, Converse has refused to negotiate a standstill agreement, which it had initially proposed and drafted (the "Provisional Agreement"). According to Converse, the alleged purpose for the Provisional Agreement was to freeze the contractual relationship between the parties as effective December 31, 2004, prior to

---

[2] On March 8, 2005, Converse finally agreed on a method for the selection of an arbitrator. This is nearly **three months after** Alon initiated arbitration.

5

the expiration of the first term of the Agreement and provide for the *status quo* pending a final resolution of the parties' dispute in arbitration.

18.    However, I am informed that as originally drafted by Converse, the Provisional Agreement would have allowed Converse to irrevocably alter the *status quo* of the parties' contractual relationship while at the same time preventing Alon from instituting any actions to protect its interests.    Specifically, Converse indicated that any provision in the Provisional Agreement preventing Converse from attempting to overturn the Brazilian or Argentine injunctions until the arbitration was completed was a "deal breaker" for Converse.

19.    Nonetheless, Alon proposed fair and balanced changes to the Provisional Agreement, which would have had the effect of creating an effective and actual stand still during the pendency of the arbitration.    Despite numerous and repeated requests to Converse's counsel, however, Converse has failed to respond in any way to Alon's proposed changes. .

### Converse Refuses To Cooperate With Alon During The Standstill Period Pending A Resolution Of The Parties' Dispute In The Arbitration

20.    Converse has also refused to cooperate with the functional operations of the parties' business, despite Alon's repeated requests for Converse to do so.    Alon has sent numerous e-mails and telephone calls to Converse, all to no avail. For example, on February 17, 2005, I wrote to Linda McCabe at Converse:

> Dear Linda:
> We are not being able to go in to media bin.
> Please let us know if the login has changed.
> Regards,
> Roberto Szerer

After having received no response, on February 21, 2005 I followed up by writing:

> Dear Linda,
> Can you please let us know.
> Regards,
> Roberto Szerer

6

21.    Converse never responded in this or in any other related matter with respect to the

functioning of our business. Thus, on February 23, 2005 Alon wrote to Converse:

> ....[Y]our February 15, 2005 letter purports to set forth a procedure under which
> Alon and Converse can conduct operations pending a final resolution of this dispute
> in arbitration. In order for Alon to operate the business in the Mercosur countries, it
> is imperative that it be able to have operational conversations with your client.
> Nonetheless, to date Alon has received nothing but unresponsiveness from all
> Converse employees, including those you have listed in your February 15 letter as
> contact personnel during the standstill period. Such behavior makes it very difficult
> (if not impossible) for Alon to continue developing the Converse marks and related
> products. It demonstrates that Converse is in fact impeding Alon from proceeding in
> its efforts to develop the Converse marks and related products pending a final
> resolution of the parties' dispute in arbitration.
>
> Moreover, Alon has been unable to access the media bin internet tool. In this
> respect, it seems as though Converse has changed the login and password to prevent
> Alon's access. Repeated requests by Alon to Linda McCabe at Converse regarding
> its inability to access the media bin and its need for samples have gone unanswered.

A true and correct copy of this letter is attached as **Exhibit "7."**

### Converse Seeks To Alter The *Status Quo* Despite The Pending Arbitration

22.    I am advised that on February 24, 2005, while the judge who issued the injunction

was on vacation, Converse secretly and on an *ex parte* basis obtained an order from a substitute

Brazilian judge setting aside the *status quo* injunction. The substitute Brazilian judge based its

decision on the pending arbitration between the parties. The substitute Brazilian judge stated:

> The plaintiffs do not discuss the legality of the Clause and acknowledge as legitimate
> the Arbitration Panel, as they admit having opened an arbitration proceeding to settle
> the conflicts arising from termination of contract. All issues involving termination
> must be settled in the Arbitration Proceeding already opened by the plaintiffs, and
> the question is one of closing the case, pursuant to the rule of article 267, sub-item
> VII, of the Code of Civil Procedure.

23.    The substitute judge based its decision on the existence of a pending arbitration,

which due to Converse's dilatory tactics, had remained stagnant for close to three months.

7

24.    Converse has concurrently engaged in a campaign to destroy Alon's contractual rights, relationships, business and income. Converse has undertaken this outrageous course of action while simultaneously seeking to delay and impede the arbitral proceedings with the goal of seeking to set aside the Brazilian Injunction and the expiration of the Argentine Injunction prior to the initiation of the arbitration.

25.    For instance, Alon has reviewed the contract between Converse and Coopershoes. In paragraph 38 of said contract, Converse directs Coopershoes to pay Converse money rightfully due and owing to Alon. A copy of this contract is attached hereto as **Exhibit "8."** Alon has also learned through Coopershoes that Converse has verbally directed Coopershoes to withhold payment to Alon under the threat of future retaliation. This is in direct conflict with a letter Alon received from Converse on February 1, 2005, where counsel for Converse states "[Alon's] statement that ALON has not been paid by Coopershoes because of instructions that Converse has given to Coopershoes is untrue."    Moreover, as a result of this behavior, Coopershoes has failed to pay Alon for the months of January and February, 2005.

26.    Converse outrageous conduct, however, has not stopped there. In complete disregard for the pending arbitration over the validity of the Licensing Agreement, on March 1, 2005, Alon received a letter from Converse purporting to be a Notice of Termination. A true and correct copy of this letter is attached as **Exhibit "9."** Converse wrote:

> As of December 31, 2004....any and all rights of Licensee to use the Converse Marks and Trade Secrets terminated and ceased absolutely. Licensee, after December 31, 2004, shall not manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with the Converse Marks..... Also, Converse advises Licensee that all costs, charges and expenses incurred by Converse in connection with enforcement of the obligations and in connection with enforcement of the obligations and in connection with the exercise of its rights and remedies, together with interest thereon, shall become additional indebtedness owed by Licensee to Converse.

27.   The next day, Alon received yet another letter from Converse purporting to be an "Amended Notice of Expiration."  In this letter, Converse alleges additional grounds for Alon's purported "breaches."   Alon **never received notice** of these alleged "breaches" nor did it ever have the **opportunity to cure** said "breaches" prior to Converse's notification that it was refusing to renew the Licensing Agreement, as required by paragraph 24 of the Licensing Agreement.  A true and correct copy of this letter is attached as **Exhibit "10."**

28.   On March 3, 2005, Alon received a letter from Coopershoes, sent by Converse to Coopershoes on March 2, 2005.  A true and correct copy of this letter is attached as **Exhibit "11."** Not only does Converse direct Coopershoes to withhold payments owed to Alon, it also infringes upon Alon's existing contractual rights by purporting to effectuate its contract with Coopershoes, despite the ongoing dispute with Alon over the continuing validity of the Licensing Agreement.   Converse wrote:

> This is to notify Coopershoes....that the Manufacturing, Distribution and Trademark License Agreement entered into between Converse Inc... and Coopershoes, dated as of December 16, 2004....[is] no longer subject to a force majeure and [is] restored to effectiveness between the parties.... Converse hereby requires and demands payment to it by Coopershoes, pursuant to the terms of the License Agreement...., of all royalties for sales made by Coopershoes on and after January 1, 2005.

29.   On March 8, 2005, Converse sent a letter to one of Alon's business partners in Argentina, with whom Alon was engaged in negotiations over the management of Alon Argentina, S.A. (Alon's related company).  Converse's letter strongly alleged that Alon has no right to utilize the Converse marks, that the Licensing Agreement is null and void, despite the Argentine injunction currently in place, and that said company faces **criminal** charges if it continues to negotiate with Alon.  A true and correct copy of this letter is attached as **Exhibit "12."** Attached with this letter is a certified translation.

30.    Despite directing Coopershoes to withhold Alon's payment, interfering with Alon's business ventures, and moreover, refusing to cooperate with the daily functioning of the parties' business, Converse has been hypocritically emphatic about receiving full payment from Alon. In essence, Converse has sought to retain the benefits of the Licensing Agreement while destroying Alon's ability to perform under the Agreement and make payments to Converse.

### Alon Faces Irreparable Harm If An Injunction Is Not Issued

31.    It has become clear to Alon that Converse has been intentionally impeding the arbitral proceedings in order to permit it time to position itself in Alon's market territory and to alter the *status quo* to its favor and to the detriment of Alon prior to the initiation of the arbitration. Without an injunction, Converse's scheme -- as it is designed to -- render any eventual arbitral award in Alon's favor meaningless and moot.

32.    If an injunction is not issued, Alon faces the possibility of losing the right to manufacture and distribute the Converse marks and related products throughout the Mercosur Market even before a final arbitral award is issued. This will result in approximately a ninety (90) percent reduction in operations at Alon, which signifies a drastic reduction in revenues, necessitating dramatic changes in Alon's operations.

33.    In more concrete terms, should a *status quo* injunction not be granted, Alon estimates losses of over $20 million over the next three years, layoffs of most, if not all, of its employees, and the looming specter of bankruptcy. Thus, Alon is faced with a concrete and very real possibility of irreparable harm, both to itself and the lives of the people it employs.

34.    Moreover, such a result will also end in immeasurable damage to Alon's reputation and goodwill in the marketplace, both with its current and prospective clientele. Alon's business in the Mercosur Market is in large part based on Alon's reputation. If an

10

injunction is not issued, this will result in damaging our previously untarnished reputation in the area. Even if Alon eventually wins this dispute on the merits, there will be no way to compensate Alon for the losses it would have already suffered in this respect.

35.    Accordingly, if an injunction is not entered, Converse will continue in its efforts to irrevocably alter the *status quo* prior to the initiation of arbitration. Without intervention, any eventual arbitral award rendered in Alon's favor will be meaningless and moot. Converse will have by that time succeeded in stealing Alon's customers and business partners and have caused the destruction of Alon's business operations as well as depriving Alon of its rightfully earned commissions in the meantime.

**I declare under penalties of perjury pursuant to 28 U.S.C. § 1746 and ALM GL ch. 268, § 1 that I have read the foregoing affidavit and that the facts stated herein are true.**

FURTHER AFFIANT SAYETH NOT.
Executed on this 11th day of March 2005.

Roberto Szerer
*Co-President of Alon International, S.A.*

F:\WDOX\CLIENTS\10077\1001\00043101.DOC

11

EXHIBIT "1"

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

4    CONVERSE, INC.,                    )
                        Plaintiff,      )
5                                       )
                                        )
6    vs.                                ) CA No. 04-12591-PBS
                                        )
7                                       )
     ALON INTERNATIONAL S.A.,           )
8                       Defendant.      )

9

10   BEFORE:  The Honorable Patti B. Saris

11

12   HEARING ON MOTION FOR TEMPORARY RESTRAINING ORDER

13

14

15        John Joseph Moakley United States Courthouse
                        Courtroom No. 19
16                       One Courthouse Way
                         Boston, MA 02210
17             Thursday, January 6, 2005
                         2:24 P.M.
18

19

20

                        Cheryl Dahlstrom, RPR, RMR
21                      Official Court Reporter
          John Joseph Moakley United States Courthouse
22             One Courthouse Way, Room 3209
                         Boston, MA 02210
23        Mechanical Steno - Transcript by Computer

24

25

```
1    APPEARANCES:

2         PEPE & HAZARD LLP
          By: Michael C. Gilleran, Esq.
3         225 Franklin Street
          Boston, Massachusetts 02110
4         On Behalf of the Plaintiff.

5         ALSO PRESENT:  Laura Kelly, Esq.

6         WILMER CUTLER PICKERING HALE and DOOR LLP
          By: Richard A. Johnston, Esq., and
7             Cynthia Vreeland, Esq.
          60 State Street
8         Boston, Massachusetts 02109
          - and -
9         ASTIGARRAGA DAVIS
          By: Edward H. Davis, Jr., Esq.
10        701 Brickell Avenue
          16th Floor
11        Miami, Florida 33131-2847
          On Behalf of the Defendant.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1
2          THE CLERK:  The case of Converse, Inc. vs. Alon
3     International SA, Civil Action No. 04-12591, will now be heard
4     before this Court.  Will counsel please identify themselves
5     for the record.
6          MR. GILLERAN:  Your Honor, Michael Gilleran for
7     Converse, Inc.  With me is Laura Kelly, vice president of
8     legal for Converse.
9          MR. JOHNSTON:  Your Honor, my name is Richard
10    Johnston for the defendant.  I have with me my partner, Cindy
11    Vreeland; Ed Davis from Miami, Florida, who has a motion for
12    application pro hac vice, which, I believe, is assented to.
13          MR. GILLERAN:  It is not objected to.
14          THE COURT:  Let me start off by apologizing.  I know
15    this was set for 2, and it's now half past.  I got out of
16    trial around 1:20, and I was supposed to be at a luncheon.
17    I've been trying to catch up with everything, so we got going
18    late.
19          What do we have on today?
20          MR. GILLERAN:  Your Honor, we filed, before
21    Christmas -- on the 21st of December, we filed -- previously,
22    we filed a suit in this court anticipating that the -- Alon
23    would file suits in South America, Brazil and Argentina.  And
24    we filed then a motion for TRO on the 21st indicating that
25    there were threats from employees of Alon, the defendant, that

1  they would, in fact, file such suits.  All we had at that

2  point were indications that they might do this.  Your Honor

3  denied that motion for TRO and then set the matter down for a

4  hearing on TRO on notice for today.  Since that time, in fact,

5  those lawsuits have been filed.

6        THE COURT:  Two injunctions have issued, right?

7        MR. GILLERAN:  Yes, your Honor.

8        THE COURT:  But unlike what you were worried about,

9  they were just basically hold-even suits until the arbitration

10  could be completed, isn't that right?

11        MR. GILLERAN:  Not precisely.  They construe our

12  contract and they order us not to -- what happened, also, in

13  the meantime was we entered into a contract with another

14  company down there, Cooper Shoes, effective -- we entered into

15  that contract on December 17th.  It became effective on

16  January 1st of this year.  Essentially, what the orders down

17  there now do -- require us to now do, is we cannot honor that

18  contract.  Essentially, it requires us to breach it.

19        THE COURT:  Quite candidly, if you had come to me

20  initially -- I never issue these things ex parte.  I look at

21  them almost with a jaundiced eye, I think.  There was nothing

22  at stake here that was irreparable.  I didn't even get a sense

23  of the full interplay here as to why it could possibly be

24  granted ex parte, and I certainly wasn't going to do it.

25        Let me just say, now that I've seen that the issues

1  are joined, I might likely have done the same thing that the

2  Argentinian and Brazilian courts did, which is, just hold it

3  even until the arbitration is complete.  I don't know why --

4  I'm inclined to just do that now, and I'll see you in 60 days.

5       MR. GILLERAN:  What happens in the meantime, your

6  Honor, is -- I'd like to make my argument, if I might.

7       THE COURT:  That's what I do all the time if there

8  are American arbitration issues.  You know, the two parties

9  have agreed to arbitrate disputes over the contract.  There's

10  a contract.  There's a dispute as to whether or not, as I see

11  it, Alon was justifiably not renewed because they claim they

12  met these conditions.  You say they haven't, I mean, and

13  everyone's agreed to arbitrate.  So that's the kind of thing I

14  would say, fine, well, arbitrate it.

15       MR. GILLERAN:  What happens in the meantime, your

16  Honor, is that they have a contract with us.  Their contract

17  requires them to arbitrate any dispute, any dispute.  What

18  they've now done is -- and we now have a contract with

19  somebody else.  And the courts in South America have,

20  essentially, as -- you've seen our papers.  Perhaps you

21  haven't seen them in that much detail.  The courts in South

22  America have ordered us, not knowing about our contract --

23  they didn't tell them about it.  Perhaps they didn't know

24  about it.  I don't know.  -- ordered us not to enter into any

25  contract with anybody else.

1            THE COURT:  Go back to them.  I'm just not going to

2    interfere with their proceedings.  There's a little confusion.

3    I had, actually, the KPMG case.  That was my baby, the one

4    involving Belgium.

5            It's very complicated and disfavored to enjoin a

6    foreign proceeding.  And, truthfully, if I thought there was

7    some gross injustice being done, maybe I would, or if I

8    thought, as I did in KPMG when they filed a suit for

9    injunction on Thanksgiving Day, trying to deprive me of

10   jurisdiction over a securities fraud action when millions of

11   our people here in our country had bought that stock, I wasn't

12   going to let it happen.

13           But here it's just two private companies with a

14   contract.  They've agreed to arbitrate.  I don't see that your

15   holding on to that for another two months is irreparable even

16   if I were to apply the Rule 65 cases.  You may be right.  You

17   may win.  Maybe you have a right to breach it.

18           Why should I interfere with Argentina and Brazil?

19           MR. GILLERAN:  Since I'm on -- the Court has placed

20   the burden on me --

21           THE COURT:  Yes.  Why?

22           MR. GILLERAN:  -- I'd like to respond.  The KPMG

23   case, your Honor, there was no arbitration clause.

24           THE COURT:  Right.

25           MR. GILLERAN:  That's a wholly different case.

1    That's what they say.  They want you to look at KPMG and apply

2    the standard there, which is the presumption of no anti-suit

3    injunction.  That's what KPMG says.

4              THE COURT:  I actually issued the injunction.

5              MR. GILLERAN:  But the First Circuit in KPMG says

6    exactly that.  But there's one radical, critical difference

7    which KPMG doesn't deal with and doesn't even discuss, where

8    there is a contract, a contract between the parties, to

9    arbitrate all disputes.  The KPMG ruling has nothing to do

10   with that.

11             THE COURT:  As I understand it, you are arbitrating,

12   right?

13             MR. GILLERAN:  Yes.  They filed an arbitration

14   demand.  But they are -- as soon as they did that, they turned

15   around and are litigating in South America right now.

16             THE COURT:  They just got a hold-steady order until

17   the arbitration is complete.  That's just a status-quo order.

18             MR. GILLERAN:  They're getting sanctions against us

19   in the amount of $36,000 a day.  We can't -- we're forced to

20   breach our contracts.  And those courts have construed our

21   contracts and issued orders telling us what they mean.

22             THE COURT:  They're just staying this pending

23   arbitration.

24             MR. GILLERAN:  Your Honor, may I show you what they

25   ordered?

1          THE COURT:  Have you submitted them?  You're welcome

2     to submit them.

3          MR. GILLERAN:  I have, your Honor.

4          THE COURT:  Excuse me.

5          MR. GILLERAN:  My main point, which I ask you to

6     consider --

7          THE COURT:  When have you submitted them?  Because

8     I --

9          MR. GILLERAN:  They submitted ones in their papers

10    and they submitted translations of the orders.  And we also

11    submitted, in the last two hours, copies of the orders

12    themselves.  I have a set here.

13         THE COURT:  Well, in the original?  In Spanish or

14    Portuguese?

15         MR. GILLERAN:  English and Spanish.

16         THE COURT:  I haven't seen those but I'm happy to

17    take those, of course.

18         MR. GILLERAN:  What they've done -- what they've

19    managed to accomplish, your Honor, in spite of this

20    arbitration clause, is to litigate and win constructions of

21    our contract, get orders where the courts down there

22    obliterate our arbitration rights.  They're required to take

23    any dispute to arbitration; and, again, as I said, sanctions.

24         THE COURT:  Pending the arbitration or 60 days,

25    right?

1          MR. GILLERAN:  One of them is permanent.

2          THE COURT:  I thought it was pending the arbitration.

3          MR. GILLERAN:  One is 60 days.  You're right, your

4    Honor.  The other one is 60 days.  The other one is pending

5    the arbitration, that is correct.

6          THE COURT:  Doesn't that have to be done, under the

7    terms of the contract, during a certain period of time?

8          MR. GILLERAN:  Right now there is a dispute.  They

9    are trying to have the case -- it's a long story.  But if it

10   was done in four or five months, I would be surprised.

11         THE COURT:  Let me just say this.  I think the

12   arbitration agreement -- am I right?  If there's a challenge

13   to the arbitration, does it come in Boston?

14         MR. GILLERAN:  We have jurisdiction here.  The

15   arbitration is scheduled to be on Federal Street at the AAA.

16         THE COURT:  If there's a challenge to the outcome of

17   the arbitration, the Federal Arbitration Act, I'm assuming it

18   comes here, right?

19         MR. GILLERAN:  The arbitration contract says -- the

20   arbitration clause says that we have jurisdiction in any court

21   where the arbitration takes place to enforce the arbitration,

22   which would be here.

23         THE COURT:  All right.  So I'll just hold this till

24   you've reached a resolution, and then I'll be willing to issue

25   an anti-injunction suit if you win and they keep the

1    injunction going.

2              MR. GILLERAN:  What happens as a result --

3              THE COURT:  I assume you would say I have

4    jurisdiction to do that, right?  If you lose in this

5    arbitration and they keep the injunctions going, don't I have

6    jurisdiction to do something under the suit despite the

7    anti-suit injunction provisions?

8              MR. JOHNSTON:  I think, your Honor, that you would

9    have jurisdiction for enforcement of the arbitration itself,

10   whether you would have per se jurisdiction to issue --

11             THE COURT:  Right.

12             MR. JOHNSTON:  -- an injunction at that point is a

13   separate issue, I think.

14             THE COURT:  You can't do an end run on what you agree

15   to in the arbitration by going to Argentina and Brazil.  At

16   that point I feel a lot more strongly about my powers with

17   respect to enforcing my jurisdiction.

18             But as I understand it -- I'll read the orders

19   again -- that's not what the South American courts have done.

20   They've just created the status quo.

21             MR. GILLERAN:  Yeah.  They're fining us $36,000 a day

22   and construing our contracts, which they then can go to

23   arbitration and say --

24             THE COURT:  Have you already been fined $36,000?

25             MR. GILLERAN:  The order says, unless we don't -- if

1  we contract with somebody else, which we've done, long ago,

2  back in December, we are fined $36,000 a day.  The order is

3  right here in the papers.

4          THE COURT:  I think you've got to go back and explain

5  you already entered into the contract before you knew about

6  this order.

7          MR. GILLERAN:  But the problem is we have an

8  arbitration agreement where we shouldn't have to do that.  We

9  are entitled to have that issue arbitrated.  We've got to go

10 down there and tell them --

11         THE COURT:  I understand the complication.  Let me

12 just -- in good faith they must have not known about this when

13 they entered into the contract.  Are you pressing for $36,000

14 a day?

15         MR. JOHNSTON:  What the Brazilian court did, your

16 Honor, was to say that if our client was deprived of the

17 contract during the pendency of the arbitration that there

18 would be a fine upon Converse as a penalty for violating the

19 terms of the stay.

20         THE COURT:  They entered into the contract not

21 knowing about the order, as I understand it, right?  Are you

22 looking for the penalty?

23         MR. JOHNSTON:  We don't really know when they entered

24 into the contract.

25         THE COURT:  Are you looking for the penalty?  I might

1    deny the request without prejudice because if you're starting

2    to look to penalize them for doing something that happened

3    before they knew about it -- you know, you can't have your

4    cake and eat it, too, here.  All that's happening here is the

5    status quo is being maintained.  You cannot go forward with a

6    contract with somebody.  That's according, to my

7    understanding, to the South American thing.  The fact they

8    entered into a contract which has now been stayed, as I

9    understand it, is fine.  But if they're penalized by having

10   entered into a contract before they knew about the order,

11   that's a problem.

12        MR. JOHNSTON:  Your Honor, not having been involved

13   in the Brazilian proceedings, I'll speak about my own sense of

14   it without having complete understanding.  But if what happens

15   is that by having that contract in place Converse refuses to

16   allow us to continue to proceed as its distributor in Brazil,

17   then there would be an effort to enforce the penalty.  If all

18   that happens is that that contract stays in place as a piece

19   of paper pending the outcome of the arbitration, and there's

20   no effort by Cooper Shoes and by Converse to interfere with

21   our rights to remain as the distributor, then that shouldn't

22   be a problem.

23        THE COURT:  All right.  That seems fair.

24        MR. GILLERAN:  Your Honor, that's words.  But

25   tomorrow -- I suppose if they go down and seek these sanctions

1    against us --

2             THE COURT:  You come back to me.  I'll be sitting

3    here.  I don't go anywhere.  I'm very boring.

4             MR. GILLERAN:  Two last points, your Honor.

5             THE COURT:  The issue is -- I'm not going to enjoin

6    them from -- first of all, the injunctions have already

7    issued.  I'm not going to enjoin them from maintaining those

8    suits.  I might feel differently if I thought that they were

9    acting in a way which thwarted the very purpose of having an

10   arbitration, which is to settle these things through an

11   arbitrator.  That is a strong federal policy here as are --

12   and I believe in it.  I would have done this.  Frankly, I

13   probably would have done the same thing, which is freeze it

14   until the arbitrator can act.

15            MR. GILLERAN:  Two points, your Honor.  We're not

16   getting the benefit of our contract as a result of this order.

17   They were required to arbitrate.  They're litigating instead

18   in South America.

19            THE COURT:  Are you saying they're not proceeding to

20   arbitration?  They're not acting in good faith in arbitration?

21            MR. GILLERAN:  Yes.  It's a clever tactic.  They

22   filed an arbitration claim and they litigate at the same time,

23   so they get to get us both ways.  Instead, we sit back and our

24   rights are lost.  Well, they win.  And there's a Federal

25   Arbitration Act that requires them, federal policy --

1      THE COURT:  Right.  They filed it and they're

2  litigating it, and you'll fight about it right here on Federal

3  Street.  And then, if you win, I'm here.

4      MR. GILLERAN:  Right now they've won.  They've won in

5  litigation.

6      THE COURT:  They've won for two months.  They've

7  created a status-quo situation.

8      MR. GILLERAN:  Another point, your Honor, as I said,

9  we had this contract with the Brazilian entity, Cooper Shoes.

10  1,200 employees.  It's a substantial organization down there.

11  They are our licensee right now, and they have a contract with

12  us.  Yes -- and there is no injunction against them in South

13  America.  No injunction against them but there's one against

14  us.  So we are in a situation where they can't do business for

15  us.

16      THE COURT:  Didn't you put yourself in this bind by

17  having the renewal provision have all these sorts of this

18  presumptive renewal unless these conditions were met and then

19  making that subject to arbitration?  Your company put -- not

20  you personally, but the company put itself in that position.

21      MR. GILLERAN:  But the problem there, your Honor, is

22  that's the merits.  Those are the arbitration issues that

23  they're supposed to arbitrate.  Instead, they litigated them

24  in South America.

25      THE COURT:  I do not find, whether it's under Rule 65

1    or under the principles of international commodity, that I am

2    going to enjoin them from maintaining the suit.  I am not

3    going to say -- they start acting unreasonably there, not, for

4    example, pressing fines and it's supposed to be a status quo

5    and that sort of thing, or whether it's not proceeding in good

6    faith through arbitration, unfair litigation, I'm here as a

7    backstop.

8              But right now I just view this as a matter for

9    arbitration.  And if this company has to wait 60 days, so be

10   it.  They haven't had it, ever.  So this is just a new thing.

11   Companies deal with these risks all the time.  And I'm sure,

12   since they know everyone, they knew this was coming down the

13   pike.  This is not a shockaruny, right?  They're in the middle

14   of this.  They've always been in the middle of it.  They know

15   the dynamics here.  They didn't gin up for this or hire people

16   up.  Weren't these people who are your business joint

17   venturers anyway?

18             MR. JOHNSTON:  That's correct, your Honor.  They

19   complained that we used them as our subcontractors and

20   sublicensees even though they knew full well -- full well knew

21   it.  And now they're using as a substitute for us the same

22   company.

23             THE COURT:  Aren't you still going to be using them?

24             MR. JOHNSTON:  We would intend to, yes.

25             THE COURT:  It's not like some hardship to a third

1    party here.

2            MR. GILLERAN:  Your Honor, I guess I make my point

3    about the contracts and our rights are lost as a result of it.

4    We don't get our contract.

5            THE COURT:  For 60 days.  Then maybe you'll win.

6    Don't be so pessimistic.

7            MR. GILLERAN:  I don't have that faith, your Honor.

8    I've never seen an arbitration of this scale take place in

9    that time period.

10           THE COURT:  I don't know enough about it.  If it's

11    that complicated, I don't know that I'd even find a likelihood

12    of success anyway.

13           MR. GILLERAN:  I'm not addressing the merits of the

14    arbitration issues.  They're not appropriate for this Court.

15           THE COURT:  That's right.  That's what I think.  I

16    agree.

17           MR. GILLERAN:  I agree.

18           THE COURT:  But for me to enjoin a suit abroad, I

19    would have to take that into account.  When I saw the back and

20    forth here, I wasn't sure.  You both have different points of

21    view as to the merits of the case.

22           MR. GILLERAN:  The merits are irrelevant in this

23    proceeding.  We're going to get an injunction.  All that's

24    relevant is the arbitration clause.

25           THE COURT:  I think we're saying the same thing.

1    You're stayed pending the arbitration.  When the arbitration

2    happens, then you can come back to me, and they'll be

3    maintaining any contrary suit down there.

4           MR. GILLERAN:  I guess, your Honor, the arbitration

5    clauses aren't what they're written down to be.  I accept the

6    fact that you have issued your ruling here.  But then what

7    will be the result of this is that Massachusetts businesses

8    that enter into arbitration clauses will expect and will

9    receive --

10           THE COURT:  To arbitrate.

11           MR. GILLERAN:  No.  They'll receive litigation all

12    over the world and have their rights tied up and even

13    determined.  And then they will get at the back end a chance

14    to come back.

15           THE COURT:  Your company should have moved in for

16    arbitration when you knew you weren't going to be renewing and

17    you knew there was a dispute before all this happened.  I

18    think in some ways you can view what Converse was trying to do

19    as an end run around the arbitration clause by not litigating

20    the disputes you had.  The way the contract was written was

21    that they had a right to renewal unless they didn't do certain

22    conditions, as I understand it.  I'm assuming you're taking

23    the position they breached it, and they're taking the position

24    they didn't.  For you to essentially cancel the contract and

25    not renew without seeking arbitration puts you into this bind.

1          MR. GILLERAN:  We did.  Under our contract, we were

2     required to send them a notice and wait 30 days.  We sent the

3     notice.

4          THE COURT:  Then they filed a notice of arbitration.

5          MR. GILLERAN:  Right.

6          THE COURT:  Then you have to arbitrate it.  See,

7     that's where you and I are disagreeing.

8          MR. GILLERAN:  I'm sorry, your Honor.  I disagree

9     with you, that I think our contract rights as a result of this

10    are lost and that's the result.

11         THE COURT:  They're lost for 60 days anyways.  That's

12    all.  If it goes longer, then it's six months.  But it's not

13    forever.  If you win under this contract, you have a right to

14    do whatever you want, right?

15         MR. GILLERAN:  We thought we did with this contract,

16    but I guess that's not the case.

17         THE COURT:  No, you didn't under this contract

18    because you gave -- because you agreed to arbitrate on the

19    renewal.

20         MR. GILLERAN:  They agreed to arbitrate and we --

21         THE COURT:  I understand that.  Anyway, that's where

22    I'm going right now.  I'm going to stay this case -- he keeps

23    saying it's not going to happen in 60 days.

24         Let me put it this way:  From your point of view,

25    you, obviously, have a very uncomfortable relationship.

1    They're not required to give you anything.   It's basically a

2    hold even, and it's a bad position for your company to be in

3    as well because you may well lose the arbitration.

4              MR. JOHNSTON:   Your Honor, we noticed the arbitration

5    as quickly as we could.   We are attempting to come to an

6    agreement with Mr. Gilleran on the rules for the arbitration.

7    We believe that the international rules apply.   He's been

8    disputing that.   If he continues to dispute, it will hold

9    things up, but we're ready to move forward with the

10   arbitration.

11             THE COURT:   What is the difference between the

12   international and the --

13             MR. GILLERAN:   Your Honor, the difference is that the

14   arbitration clause says arbitration on Federal Street in

15   Boston.   And they claim that the international rules apply

16   which allows them to appoint an arbitrator from a distant

17   land.   And we say, no, it should be administered as well as

18   arbitrated on Federal Street in Boston, and we're entitled to

19   appoint --

20             THE COURT:   What does it say in the contract?

21             MR. JOHNSTON:   What the contract says, your Honor, is

22   that there will be arbitration according to the AAA.   The way

23   the AAA operates is that it has a domestic arm in Providence

24   for this region.   It has an international arm which is

25   administered out of New York.   The international rules apply

1     under AAA rules to situations --

2             THE COURT:  Whatever they decide.  Have they decided

3     that?  AAA has decided it's international?

4             MR. GILLERAN:  We'll be filing a motion on that point

5     shortly, your Honor.  They get a response.  Then we decide --

6             MR. JOHNSTON:  My understanding, there was a

7     conference yesterday to discuss that, and the issue will be

8     resolved quickly.

9             THE COURT:  Okay.  So they will decide it.

10             MR. GILLERAN:  That's the case, your Honor.

11             MR. JOHNSTON:  Then the arbitration will move

12     forward.

13             THE COURT:  What's really at issue here?  What do you

14     think the breach was?  How long will it take?

15             MR. GILLERAN:  It's hard to say exactly.

16             THE COURT:  Why didn't you want to renew with them?

17     What is the breach of the contract you say that they didn't

18     fulfill?

19             MR. GILLERAN:  Your Honor, it goes this way.  Our

20     contract says there should be no subassignments and no

21     sublicensing.  They told us that they had entered into a

22     manufacturing arrangement with Cooper Shoes in Brazil, which

23     is a substantial factory.  And they told us that they were the

24     -- as they are required to be -- they are the active licensee.

25     They're the one promoting our product, making the investments,

1    in control of the license.

2           And what they had done is, unbeknownst to us, they

3    entered into a contract with Cooper Shoes that gave the

4    license, our trademarks, to Cooper Shoes, and then Cooper

5    Shoes did all the work, did all the investment, had all the

6    employees.  And they were down there in Florida essentially

7    getting their checks.  They weren't the party doing the work.

8    They then charged a substantial increase in the license

9    royalties to Cooper Shoes.

10          THE COURT:  They gave me all these emails that said

11   you knew about most, if not all, of this.

12          MR. GILLERAN:  No, your Honor, that's not the case.

13   They case is, they brought one of these contracts to Converse

14   at one point and they -- in Portuguese, which Ms. Kelly

15   couldn't read, and they whited out these provisions and said

16   these are confidential.  You can't see these.  But in any

17   event, your Honor --

18          THE COURT:  I see.  That's really what the dispute

19   is.

20          MR. GILLERAN:  We happened is -- we demanded for the

21   longest time -- we wanted an audit.  We want to know what's

22   happening.  We engaged a lawyer, too, to go look at this

23   stuff.  Went down there.  We finally got the contracts in

24   November of this year, read them, and they are direct

25   sublicenses.  We found out from people down there doing the

1    work --

2              THE COURT:  You have an express provision in the

3    contract saying you can't do that?

4              MR. GILLERAN:  Yes.

5              THE COURT:  Why does it take more than 60 days to

6    litigate that?

7              MR. GILLERAN:  Just the process, your Honor.  You've

8    got to get an arbitrator appointed.  You've got to exchange

9    documents.  You've got to set up a hearing date.  Often in

10   these arbitrations, I'll give you a date here, I'll give you a

11   date there.  You don't get a full trial like in this court.

12   So the time period becomes scattered.  Then you've got to wait

13   for a decision.  The time line, I would say, would be at least

14   April 1 or May 1 before we have a decision.

15             THE COURT:  Actually, that's pretty quick.

16             MR. GILLERAN:  That's not too bad.  In the meantime,

17   we don't get the benefit of our arbitration clause.

18             THE COURT:  All right.  What should I do with this

19   case?  You want me to stay pending the arbitration?  And then,

20   of course, this is without prejudice to them doing

21   something --

22             MR. GILLERAN:  Does it matter?  I want the

23   opportunity -- if they're going to be using what you've done

24   here to club us down there, which I fully expect --

25             THE COURT:  You can use it to club them back if they

1    do something unfair.

2         MR. GILLERAN:  They're going to do that.  I wanted

3    the opportunity to come back here as quick as I can.

4         THE COURT:  I'll stay the case pending the

5    arbitration.  If you want to reopen it, you can do that.

6         MR. JOHNSTON:  That's agreeable to Alon.

7         THE COURT:  If you need to reopen it, if you think

8    something has happened down there -- my full intent here is to

9    essentially have this arbitrated.  That exact issue you were

10   talking about there, was there fraud on their part,

11   misrepresentation on their part, or was there latches,

12   estoppel on your part, that's really a pretty narrow issue.

13        Hopefully -- I know that usually you don't get much

14   discovery other than document exchanges.  You should be able

15   to do it pretty fast.  Let an arbitrator decide it, and then

16   I'm assuming I will have jurisdiction to enforce this

17   arbitration agreement one way or another.  Hopefully, you --

18   if you win and the injunction remains and stays in Latin

19   America, at that point I think there might very well be a good

20   suit.

21        I'm going to stay it but you can reopen it.

22        MR. GILLERAN:  Thank you, your Honor.

23   (Whereupon, at 2:50 p.m. the hearing concluded.)

24

25

1                    C E R T I F I C A T E

2

3

4          I, Cheryl Dahlstrom, RPR, RMR, and Official Reporter

5     of the United States District Court, do hereby certify that

6     the foregoing transcript, from Page 1 to Page 23, constitutes,

7     to the best of my skill and ability, a true and accurate

8     transcription of my stenotype notes taken in the matter of

9     Civil Action No. 04-12591, Converse, Inc. vs. Alon

10    International S.A.

11

12

13

14

15

16                    *Cheryl Dahlstrom*
                      _____

17                    Cheryl Dahlstrom, RPR, RMR

18                    Official Court Reporter

19

20

21

22

23

24

25

# EXHIBIT "2"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<table>
<tr><td>CONVERSE, INC.<br>        Plaintiff,</td><td>)<br>)<br>)<br>)</td><td></td></tr>
<tr><td>        v.</td><td>)<br>)</td><td>CIVIL ACTION NO. 04-12591-PBS</td></tr>
<tr><td>ALON INTERNATIONAL, S.A.,<br>        Defendants.</td><td>)<br>)<br>)<br>)</td><td></td></tr>
</table>

## ORDER

January 13, 2005

Saris, U.S.D.J.

Plaintiff, Converse, Inc., ("Converse") has filed an
application for a temporary restraining order pursuant to Fed. R.
Civ. P. 65(b) to prevent Alon International, S.A. ("Alon") from
filing or maintaining a suit in any forum relating to a
manufacturing, distribution, and license agreement between
Converse and Alon dated September 1, 2001. Alon, which has filed
a request for arbitration over Converse's alleged breach of
contract in refusing to renew this agreement, has obtained
injunctions in the courts in Brazil and Argentina maintaining the
status quo until the international arbitration has been completed
(or, in the case of the Argentina injunction, for 60 days).

This action is properly characterized as a request for an
anti-suit injunction. See Stonington Partners, Inc. v. Lernout &
Hauspie Speech Products N.V., 310 F.3d 118, 129 (3d Cir. 2002)

("We think that if the requirements for an anti-suit injunction
are met, these supplant the need for proof under Rule 65.");
Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361
F.3d 11, 19 (1st Cir. 2004) (holding that district courts have no
obligation to employ Rule 65 standard in cases involving
international anti-suit injunctions).  Such actions raise
considerations of international comity.  See Goldhammer v.
Dunkin' Donuts, Inc., 59 F.Supp.2d 248, 252 (D. Mass. 1999)
("International comity is a doctrine that counsels voluntary
forbearance when a sovereign which has a legitimate claim to
jurisdiction concludes that a second sovereign also has a
legitimate claim to jurisdiction under principles of
international law.") (quoting United States v. Nippon Paper
Indus. Co., Ltd., 109 F.3d 1, 8 (1st Cir. 1997)).

Here, the foreign courts maintained the status quo pending
the arbitration.  Converse complains that one court improperly
imposed a penalty on it for entering into a contract with another
entity, but Alon has agreed not to press for the sanctions.
These foreign injunctions pending arbitration are not only
reasonable, but also consistent with the strong policy in favor
of resolving disputes via arbitration.

In light of the fact that Converse has failed to demonstrate
a likelihood of success, irreparable harm, or harm to third-party
entities, and in light of the principles of international comity,

2

I **DENY** the application for an anti-suit injunction.

                              **S/PATTI B. SARIS**
                              United States District Judge

3

# EXHIBIT "3"

**AMERICAN ARBITRATION ASSOCIATION**
**INTERNATIONAL DIVISION**
**Case No.: 50-133-T-00579-04**

| | |
|---|---|
| Alon International, S.A.,<br>    a Panamanian Corporation, | :<br>:<br>: |
| Claimant, | :<br>: |
| v. | :<br>:<br>: |
| Converse Inc.<br>    a Delaware Corporation, | :<br>:<br>: |
| Respondent. | :<br>:<br>: |

**CLAIMANT ALON INTERNATIONAL, S.A.'S MEMORANDUM**
**OF LAW IN OPPOSITION TO RESPONDENT CONVERSE INC.'S MOTION**
**TO DISMISS OR TRANSFER**

## I.    INTRODUCTION

Claimant Alon International, S.A. ("Alon"), submits this memorandum of law and the affidavit of Ronald Durchfort in response to Respondent Converse, Inc.'s ("Converse") Motion to Dismiss or Transfer to the Appropriate Office of the American Arbitration Association ("Motion to Dismiss").

Converse and Alon are two parties which agreed to arbitrate any controversy or claim arising out of or relating directly or indirectly to the parties' business relationship. After disputes arose, on December 16, 2004, Alon initiated arbitration by filing a Notice of Arbitration and Statement of Claim with the International Center for Dispute Resolution of the American Arbitration Association ("ICDR"), in full compliance with the parties' agreement to arbitrate. Alon submitted claims for breaches of the Licensing Agreement between Alon and Converse, for breach of the implied covenant of good faith and fair dealing, and for a declaratory judgment as

to the continued validity of the Licensing Agreement.

Converse now seeks to avoid this forum's jurisdiction and the application of its procedural rules by charging that this case is a purely domestic dispute. Converse is wrong. This case is an international dispute between parties of differing nationalities regarding an international licensing agreement and centered around purported "breaches" that allegedly occurred throughout Latin America. Thus, this case is appropriately within the jurisdiction of the ICDR and governed by the International Arbitration Rules ("International Rules") of the American Arbitration Association ("AAA").

## II.    FACTS

Claimant Alon is a Panamanian company in the business of developing, sourcing, and marketing footwear and related accessories in Latin America. (Durchfort Aff. ¶¶ 3,4). On or about September 1, 2001, Alon entered into a Manufacturing, Distribution and Licensing Agreement ("Agreement" or "Licensing Agreement") with Converse, under which Alon obtained the exclusive rights and license to manufacture distribute, and utilize Converse marks and related products throughout Argentina, Brazil, Paraguay and Uruguay (the "Mercosur Region") for three years. (Durchfort Aff. ¶ 5; Ex. B).

Paragraph 33 of the Licensing Agreement contains a mandatory arbitration clause, which requires that all disputes between the parties be submitted and finally settled by arbitration. The Licensing Agreement states, in relevant part:

> The parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly. Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligation of the parties thereunder, the capacity or authority of the parties thereto, the performance of breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one party to

2

> the other setting forth with specificity any such controversy or claim, **shall be settled by arbitration in accordance with the rules of the American Arbitration Association. The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association.....**

Emphasis added.

From 2001 onward, Alon successfully developed the Converse marks and related products throughout the Mercosur Region, and continues to invest heavily in developing the market for these products throughout the region. (Durchfort Aff. ¶ 8). Among other things, Alon rescued the Converse trademarks, including its "ALLSTAR" mark, from a Brazilian "brand pirate" in Brazil; created markets previously unavailable for the Converse marks and related products in Argentina and Brazil; and developed a successful business model for the sale of the Converse marks and products throughout the targeted Latin American countries. (Durchfort Aff. ¶ 8).

The first term of the Licensing Agreement was set to expire on December 31, 2004. The Agreement provides, however, that Alon had an automatic right of renewal of the Agreement for an additional three-year term if it satisfied certain conditions. (Durchfort Aff. ¶ 6). Specifically, Alon could renew the Agreement "for an additional term of three (3) years provided [Alon] exceed[ed] the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that [Alon] has not breached any of the terms and conditions of this Agreement." (Licensing Agreement § 2). Alon complied with each of these requirements. (Durchfort Aff. ¶ 7).

In an effort to block Alon's automatic right of renewal pursuant to the terms of the Licensing Agreement, Converse has contrived several alleged "breaches." Primarily, Converse complains that Alon entered into a sub-licensing agreement with Cooperativa De Calcados E

3

Componentes Joanetense LTDA ("Coopershoes") in Brazil in alleged violation of the Agreement. (Motion to Dismiss, p. 5; Laganas Aff. ¶¶ 7-9). Coopershoes is a Brazilian company in the business of manufacturing shoes and shoe products throughout Brazil. (Durchfort Aff. ¶ 10; Laganas Aff. ¶ 7). Converse contends that during the course of the relationship, Alon concealed from Converse through a variety of means the nature of the supposedly illegal and improper sublicensing agreement in Brazil with Coopershoes. (Motion to Dismiss, p. 4).

Converse's allegations are simply not true, and Converse knows them to be untrue. As established in the written record between the parties, Converse was aware of and participated in the organization of the business structure between Coopershoes and Alon in Brazil, had full knowledge of the Coopershoes arrangement, and fully approved of and consented to the Coopershoes arrangement. (Durchfort Aff. ¶ 11). In fact, this structure was designed and arranged with Converse's consent and approval, so that Converse could deter Coopershoes from producing for the Brazilian "brand pirate," allow the Converse marks and products to enter the Brazilian market as quickly and efficiently as possible, and take royalties out of the country without violating Brazilian regulations. (Durchfort Aff. ¶ 11).

Ironically, in December of 2004, Converse appointed Coopershoes as its exclusive licensee for the Brazilian territory effective January 1, 2005, after sending a termination letter to Alon. (Durchfort Aff. ¶ 13). Thus, Converse now intends to use as its exclusive licensee in Brazil, in lieu of Alon, the very same company that it claims Alon did not have the legal right to subcontract with for services during the Agreement.[1]

---

[1] Converse also contends that Alon breached the Agreement by failing to pay correct royalties, using improper exchange rates to calculate royalty payments, and failing to expend sums required by the Agreement for advertising. These claims are equally spurious. *See* Durchfort Aff. ¶ 15, fn 1.

4

## III.    ARGUMENT

### A.    The Panama Convention And The Federal Arbitration Act Define An Arbitration Between Parties of Differing Countries As An International Arbitration, Thus Bringing This Proceeding Within The Jurisdiction Of The ICDR And The AAA International Rules.

In its Motion to Dismiss, Converse argues that this dispute is improperly before the ICDR and that the International Rules are inapplicable because the dispute between the parties is not international in nature.  (Motion to Dismiss, p. 1).  In doing so, Converse misstates and misinterprets the nature of the parties' relationship, the citizenship of Alon, and the law governing international arbitrations.

On the face of the Licensing Agreement, the ICDR has jurisdiction over this dispute, which is thus properly governed by the International Rules of the AAA.    Article 1 of International Rules states:

> Where parties have agreed in writing to arbitrate disputes under these International Arbitration Rules **or have provided for arbitration of an international dispute** by the International Centre for Dispute Resolution **or the American Arbitration Association without designating particular rules, the arbitration shall take place in accordance with these rules,** as in effect at the date of commencement of the arbitration, subject to whatever modifications the parties may adopt in writing.[2]

Emphasis added.

Here, the parties designated the AAA as the appropriate arbitral institution without specifying the applicable rules.    Licensing Agreement, ¶ 33.  However, this case is clearly an international dispute, as defined by the Inter-American Convention on International Commercial

---

[2] Similarly, the AAA Commercial Arbitration Rules state: "The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules **or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules.** These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA.  The parties, by written agreement, may vary the procedures set forth in these rules.  After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator." Emphasis added.

Arbitration ("Panama Convention" or "Inter-American Convention") through its implementation in the Federal Arbitration Act ("FAA"), and is thus properly governed by the ICDR and its International Rules. Panama Convention, *opened for signature*, Jan. 30, 1975, OAS SER A20 (SEPEF), 14 I.L.M. 336 (1975), *reprinted in* 9 U.S.C.A. § 301, *et seq.*[3]

Pursuant to the Panama Convention and its implementing legislation in the FAA, there are only two determinations that must be made in deciding whether a matter is properly the subject of an international arbitration: (1) whether the parties are citizens of different signatory States to the Convention, and (2) whether the subject matter of the dispute relates to international commerce. *See* 9 U.S.C. § 202; *see also* Frank-Bernd Weigand, *in* Practitioner's Handbook on International Arbitration, 4 (2002) (an international commercial contract is a commercial "contract[] where there are at least two parties from different jurisdictions."); Thomas E. Carbonneau, *in* Practitioner's Handbook on International Arbitration, 1091 (2002) ("FAA Chapter Two, Sect. 202 contains a definition of international arbitration. That definition combines two elements: **nationality** of the parties and **subject matter** of the transaction.") (emphasis in original). Both requirements clearly are met in this case.

If the arbitral agreement at issue evidences a transaction in foreign commerce within the meaning of the FAA, *see* 9 U.S.C. § 1, it is governed by Federal law. *S.A. Mineracao Da Trindade-Samitri v. Utah International, Inc.*, 576 F.Supp. 566, 569 (S.D.N.Y.1983), *aff'd*, 745

---

[3] The UNCITRAL Model Law on International Commercial Arbitration also provides some guidance. Article 1(3) of these rules states in relevant part:

3.    An arbitration is international if:

    a.    the parties to an arbitration agreement have, at the time of the conclusion of the agreement, their places of business in different states; or

    b.    one of the following places is situated outside the State in which the parties have their place of business:

        ....

    ii.    any place where a **substantial part of the obligations of the commercial relationship is to be performed** or the place in which the **subject-matter of the dispute is most closely connected**.....

Emphasis added. Alon also satisfies these requirements. *See infra*, §§ (B)(2), (C)(3).

6

F.2d 190 (2d Cir.1984) (*citing Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403-405, 87 S.Ct. 1801, 1805-1806, 18 L.Ed.2d 1270 (1967)). Federal laws regarding arbitration are divided into three chapters: Chapter One, 9 U.S.C. §§1-16, contains the general provisions; Chapter Two, 9 U.S.C. §§201-208, implements the provisions of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the "New York Convention;" and Chapter Three, 9 U.S.C. §§301-307, contains and implements the provisions of the Panama Convention. Because the parties are from the United States and Panama, and both countries are signatories to the Panama Convention, *see* 9 U.S.C. §301, this case involves Chapter One, the general provisions, and Chapter Three, implementing the Panama Convention. *See* 9 U.S.C. § 301 ("The Inter-American Convention on International Commercial Arbitration of January 30, 1975, shall be enforced in United States courts in accordance with this chapter.").

The Panama Convention, however, does not expressly define its field of application. In the United States, this definition is furnished by Section 202 of the FAA (applicable to the Panama Convention through incorporation into Chapter 3 by Section 302) and Section 305 (providing for recognition and enforcement on the basis of reciprocity of arbitral awards made in a foreign state). *See* John P. Bowman, *The Panama Convention and its Implementation Under the Federal Arbitration Act*, 11 Am. R. Int'l Arb. 1, fn. 189 (2000) ("the implementing legislation for the Panama Convention does include § 202.").

Specifically, Section 202 of the FAA states in relevant part:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between **citizens** of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, **envisages performance or enforcement abroad,**

7

**or has some other reasonable relation with one or more foreign states.** [4]

9 U.S.C. § 202 (Emphasis added).

In a formula frequently repeated by federal courts, Section 202 of the FAA thus applies to "to any commercial arbitral agreement, unless it is between two United States **citizens**, involves property located in the United States, and has **no reasonable relationship** with one or more foreign states...." *Jain v. de Mere*, 51 F.3d 686, 689 (7th Cir. 1995) (emphasis added); *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir.1983) (awards rendered in the United States fall within the Convention where "foreign contacts are substantial, *i.e.*, 'where a foreign person or corporation is a party to an agreement involving foreign performance, or where the business deal has some other 'reasonable relation with one or more foreign states.'") (internal citations omitted); *Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 44 (2d Cir. 1994). In this respect, Bowman teaches:

> Pursuant to Section 202, as interpreted by American courts, virtually all arbitration agreements and arbitral awards relating to international commercial transactions fall under [the New York and Panama] Conventions. In fact, Section 202 appears to go further than enforcement of arbitration agreements and awards involving international commerce, making enforceable agreements and awards **concerning transactions entirely domestic in nature, so long as the parties are not all American citizens....**

Emphasis added. Bowman, *supra,* at 75; *see also* Carbonneau, *supra* at 1091 (the definition for international arbitration "combines two elements: **nationality** of the parties and **subject matter** of the transaction.") (Emphasis in original).

---

[4] Accordingly, a **domestic** arbitration is defined implicitly in the FAA as one which involves "an agreement or transaction that includes **no** foreign or transborder element." Emphasis added. Carbonneau, *supra*, at 1091; 9 U.S.C. § 202. This case is clearly not a domestic dispute. Even if Alon were deemed a U.S. citizen, *arguendo*, this case still could be an international arbitration due to the substantial and pervasive relationship of this dispute with the Mercosur Region.

**B.    This Dispute Meets The Requirements Of An International Arbitration.**

### 1.    The Parties Are Citizens Of Countries That Are Signatories To The Panama Convention.

Here, Claimant Alon is a Panamanian corporation and Respondent Converse is a Delaware corporation. (Durchfort Aff. ¶ 3; Ex. A). These facts are in and of themselves sufficient to qualify this case as an international arbitration. *See* Bowman, *supra,* at 75. Both the United States and Panama are signatories to the Panama Convention. The United States signed the Panama Convention in 1975, later codifying it into law in 1990, and Panama signed it in 1975, implementing into law that same year. Accordingly, this dispute falls squarely within the ambit of the Panama Convention, and is thus, an international arbitration within the proper jurisdiction of the ICDR. *See* 9 U.S.C. § 202 ("For the purpose of this section a corporation is a citizen of the United States if it is incorporated ....in the United States."); *c.f. Banco de Seguros del Estado v. Mutual Marine Offices,* 230 F.Supp. 2d 362, 363 (S.D.N.Y. 2002) ("This arbitration is also subject to the [Panama] Convention because it arises from a commercial relationship **between citizens** of signatory nations.") (emphasis added); *Progressive Casualty Ins. Co.* 802 F. Supp. at 1074 (dispute between an American corporation and Venezuelan corporation was governed by the Panama Convention, irrespective of the parties' principal place of business); *Productos Mercantiles E Industriales, S.A.* 23 F.3d at 4 (dispute between a foreign corporation and a domestic corporation over the parties' obligations under an agreement for the licensing of trademarks in Central America but arbitrated in the United States was governed by the Panama Convention).

9

2.    **The Fact That Alon Does Some Business In The United States And Has Officers Who Reside In The United States Does Not Affect Its Panamanian Citizenship.**

Converse also argues that Alon's presence in the United States renders this arbitration a domestic arbitration rather than an international one. Converse is wrong.

Transacting business in Florida and having officers who reside in Florida does not vitiate Alon's Panamanian citizenship.    Indeed, Converse is a Delaware corporation with its headquarters in Massachusetts and many of its officers reside in Massachusetts. However, merely because Converse is headquartered in Massachusetts and transacts business in other States or countries does not make Converse any less of a Delaware corporation. Converse is, for the purpose of establishing its citizenship, a Delaware corporation.

3.    **The Subject Matter Of This Dispute Relates To International Commerce.**

In its efforts to argue that this case is a purely domestic dispute, Converse claims that Alon renders its performance to Converse in the United States. (Motion to Dismiss, p. 19). To support this contention, Converse points to the facts that Alon representatives have traveled to Massachusetts, that Alon sends product approvals and product and marketing approaches to Converse in Massachusetts, and that the parties communicate in English. *Id.*

Such contentions are misplaced. As stated above, the applicable standard for determining whether this case is an international arbitration is whether the parties have engaged in international commerce within the meaning of the FAA. The FAA covers any transaction involving commerce "among the several states or with foreign nations..."  9 U.S.C. § 1. Contracts that involve international commerce fall within the definition of commerce under the

10

FAA.[5]  *See Weight Watchers of Quebec Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1057,

1058 (E.D.N.Y. 1975) (commercial dealings between the parties across international boundaries,

including, *inter alia*, the granting of franchises by a New York corporation to foreign

corporations, to be exercised in the foreign jurisdiction, fell within the definition of FAA's

definition of commerce).

Undeniably, Alon on occasion has traveled to Massachusetts and has interacted with

Converse representatives in Massachusetts. However, these factors in no way detract from either

the international nature of the parties' relationship or the subsequent dispute over their contract

for the international distribution of goods.  Among other things,

a.  The Agreement between Alon and Converse is an international licensing
    agreement, pursuant to which Section 3(b) "grants to [Alon].... The exclusive
    right to and license to utilize the Converse Marks throughout [the Mercosur
    Region] during the Contract Period in connection with the manufacture,
    advertisement, promotion, distribution and sale of Licensed Articles....";

b.  The Agreement between the parties envisages Alon manufacturing, advertising,
    distributing, promoting and exporting the Converse marks and related products
    throughout the Mercosur Region;

c.  Alon did in fact manufacture, sell, distribute, advertise, promote and export the
    Converse marks and related products throughout the Mercosur Region;[6] and

d.  One of the primary "breaches" alleged by Converse arises out of perceived
    relationship between Alon and a Brazilian company in Brazil.  Thus, the subject
    matter of this dispute, *i.e.* whether Alon entered into a prohibited sub-licensing
    agreement with the Brazilian company in Brazil, involves events,
    communications, interactions and contracts effectuated in Brazil.

---

[5] Article 1(1) of the UNCITRAL Model Arbitration Law provides further guidance: "The term 'commercial' should
be given a wide interpretation so as to cover matters arising from all relationships of a commercial nature, whether
contractual or not. Relationships of a commercial nature include, but are not limited to, the following transactions:
any trade transaction for the supply or exchange of goods or services; **distribution agreement**; commercial
representation or agency; factoring; leasing; construction of works; consulting; engineering; **licensing**; investment;
financing; banking; insurance; exploitation agreement or concession; joint venture and other forms of industrial or
business co-operation; carriage of goods or passengers by air, sea, rail or road." Emphasis added.

[6] For example, Alon ordered products and received samples from Converse's factories in China that were sold and
distributed throughout the Mercosur Region.

Accordingly, the central and most integral part of this dispute involves conduct, communications, relationships and contracts throughout the Mercosur Region relating to the manufacturing, distribution and licensing of the Converse marks and related products throughout those countries. This action involves a dispute arising from an international commercial agreement for the provision of business and services in Latin America, involving international commerce within the meaning of the FAA, and thus qualifying as an international dispute.

**C.** **Converse's Alternative Arguments Are Equally Devoid Of Merit.**

    **1.** **An Arbitral *Situs* In The United States Does Not Detract From the International Nature of this Arbitration.**

It is well settled that a contractual agreement to arbitrate within the United States or an arbitral award rendered in the United States may qualify as an international agreement / award for the purposes of falling under the New York[7] or Panama Conventions.   *Productos Mercantiles E Industriales*, 23 F.3d at 44 (Court had jurisdiction pursuant to the Panama Convention to enforce an arbitral award between a domestic and foreign corporation rendered in the United States); *Bergesen*, 710 F.2d at 933 (Court had jurisdiction pursuant to the New York Convention to enforce an arbitral award rendered in the United States between foreign parties).

Accordingly, Converse did not – and cannot – show that the selection of Massachusetts

---

[7] The legislative history of the Panama Convention's implementing statute demonstrates that Congress intended the Panama Convention to reach the same results as those reached under the New York Convention:

> The New York Convention and the [Panama] Convention are intended to achieve the same results, and their key provisions adopt the same standards, phrased in the legal style appropriate for each organization. It is the Committee's expectation, in view of that fact and the parallel legislation under the Federal Arbitration Act that would be applied to the Conventions, that courts in the United States would achieve a general uniformity of results under the two conventions.

H.R.Rep. No. 501, 101st Cong., 2d Sess. 4 (1990), *reprinted in* 1990 U.S.C.C.A.N. 675, 678; *see also* President's Message to the Senate Transmitting the Inter-American Convention on Commercial Arbitration, 1981 Pub. Papers 517 (June 15, 1981) ("This Convention is similar in purpose and effect to the New York Convention ...."); *Productos Mercantiles E Industriales*, 23 F.3d at 44.

as the arbitral *situs* renders this case a domestic dispute requiring divestiture of the ICDR and the International Rules. In fact, such an argument is contrary to well-established jurisprudence and accepted arbitral practice.

### 2. Any Arbitrator Appointed By The Parties May Apply Massachusetts Law, As Well As Both Federal and International Law.

In support of its Motion to Dismiss, Converse also alleges that this case is improperly before the ICDR because the arbitral proceedings are to be governed by Massachusetts law. (Motion to Dismiss, p. 9-12). According to Converse, an ICDR arbitrator appointed pursuant to the AAA International Rules allegedly only would be able to apply foreign law. (Motion to Dismiss, p. 9-12). Such allegations are, once again, simply devoid of merit.

As a practical matter, arbitrators are commonly asked to apply another State's or Country's laws. Converse has presented no evidence that an ICDR arbitrator appointed in this case would be unable or unwilling to apply Massachusetts law.

Moreover, by virtue of the supremacy clause of the U.S. Constitution, Massachusetts law incorporates both federal and international law. *See* I(A), *infra*. Accordingly, Converse's arguments that only Massachusetts law governs this dispute are disingenuous, and more importantly, indicative of a fundamental misunderstanding of the law. The supremacy clause of the U.S. Constitution establishes federal law, including international treaties, to be the "supreme law of the land," superseding State law.[8]   Massachusetts law may also include

---

8 U.S. Const. art. VI, Paragraph 2: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the contrary notwithstanding;" *see also* Restatement 3d of the Foreign Relations Law of the U.S., § 111 ("International law and international agreements of the United States are law of the United States and supreme over the law of the several States"); *c.f. Southland Corp. v. Keating*, 465 U.S. 1 (1984) (California's franchise law, as interpreted by the state supreme court, violated the Supremacy Clause, and thus could not be applied to frustrate the purpose and objective of the FAA); *S+L+H S.p.A. v. Miller-St. Nazianz, Inc.*, 988 F.2d 1518,

13

customary international law.  *See* <u>Restatement 3d of the Foreign Relations Law of the U.S.</u>, §

111 comment d (customary international law has the domestic legal effect of federal common

law, superior to State law); *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44

L.Ed. 320 (1900) ("International law is part of our law, and must be ascertained and

administered by the courts of justice of appropriate jurisdiction, as often as questions of right

depending upon it are duly presented for their determination.").

Thus, any arbitrator can and will apply the applicable law, be it Massachusetts law, federal

common law or international law.   To allege that only an AAA domestic arbitrator appointed

pursuant to the Commercial Arbitration Rules is equipped to apply the governing law to this

dispute is simply untenable.

### 3.    Alon Conducts Its Business Throughout The Mercosur Region.

Converse confuses the analysis for determining personal jurisdiction and minimum

contacts and / or *forum non conveniens* with the applicable test for determining the jurisdiction

of this forum.  As noted above, the applicable test for qualifying as an international arbitration

under the Panama Convention as implemented by the FAA is whether a party i) is a citizen of a

signatory state, and ii) has a dispute involving international commerce.  *See e.g.* Carbonneau,

Weigand, *infra*, III(A).  Both of these requirements are met here.  Converse's allegations

regarding Alon's alleged contacts throughout the United States and Massachusetts are simply

irrelevant.

Alon conducts its business by advertising, selling, negotiating, producing and

manufacturing in each relevant market where it manufactures and distributes the Licensed

---

1525 (7th Cir. 1993) (dispute between an Italian manufacturer and domestic distributor over legality of nonrenewal
of agreement under Wisconsin Fair Dealership Law was preempted by the FAA).

14

product. (Durchfort Aff. ¶ 16). Accordingly, Alon conducts its business, and sales throughout the Mercosur Region, both by constant travel to those countries and through its local affiliates and related entities. (Durchfort Aff. ¶ 16). Among other things,

a.  At all relevant times, Alon has conducted a majority of its business through its affiliates and related entities, including AIB Servicios E Comercio Ltd, Alon Brasil Comercio e Distribuicao Ltd. and Alon Argentina SRL, which are foreign companies incorporated under the laws of either Argentina or Brazil;

b.  At all relevant times, Alon has advertised and solicited customers throughout the Mercosur Region;

c.  At all relevant times, Alon has maintained offices, employees and personal property in Argentina and Brazil; and

d.  At all relevant times, Alon has purchased goods and services throughout the Mercosur Region.

(Durchfort Aff. ¶ 19). Accordingly, Converse's contentions that this dispute is not international in nature because Alon conducts some business in the United States, communicates with Converse in English, and has on occasion traveled to Massachusetts are, once again, without merit. *See infra*, § B(2).

## IV.   CONCLUSION

Alon has sought to comply in good faith with the terms of the parties' agreement to arbitrate. This dispute involves a Panamanian and American corporation in a dispute over an international licensing agreement for services to be provided and goods to be sold throughout the Mercosur Region. Thus, this arbitration is within the plenary jurisdiction of the ICDR, and is properly governed by the AAA International Rules.[9]

---

[9] However, as stated in the administrative conference held on January 4, 2005, Alon has been and remains willing to meet Converse halfway and have the AAA Commercial Arbitration Rules apply to the procedural aspects of this dispute, so long as the arbitration is administered by the ICDR and the arbitrator is appointed from the ICDR list of arbitrators.

15

For the foregoing reasons, Alon respectfully requests that Converse's Motion To Dismiss be denied in all respects.

Dated: January 21, 2005

Respectfully Submitted,

**ASTIGARRAGA DAVIS**
Edward H. Davis, Jr.
M. Cristina Cárdenas
701 Brickell Avenue, 16th Floor
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

- and –

**WILMER CUTLER PICKERING
HALE & DORR, LLP**
Richard A. Johnston
Cynthia D. Vreeland
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing was sent by facsimile and First Class U.S. Mail postage prepaid on January 21, 2005 to **Michael C. Gilleran, Esq.,** Pepe & Hazard, LLP, 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110-2804.

Edward H. Davis, Jr.

F:\WDOX\CLIENTS\1007\1001\00042786.DOC

16

# EXHIBIT "4"

# ASTIGARRAGA DAVIS

701 Brickell Avenue · 16th Floor
Miami, Florida 33131-2847

January 29, 2005

**<u>Via Facsimile and Regular Mail</u>**

Michael C. Gilleran, Esq.
Pepe & Hazard LLP
225 Franklin Street, 16th Floor
Boston, Massachusetts  02110-2804

RE:    <u>Manufacturing, Distribution and Licensing Agreement between Converse,
Inc. ("Converse") and ALON International S.A ("Alon") dated as of
September 1, 2001 (as amended, the "Licensing Agreement")</u>

Dear Michael:

As you know, we spoke on Monday of this week, January 24, 2005 at your instigation regarding the possibility of trying to select an arbitrator from the AAA International Panel without prejudice to your position that the arbitration should be treated as a domestic arbitration. We agreed that we would engage in this discussion with an understanding that we would attempt to try to select an arbitrator off the AAA International Panel by Friday, January 28, 2005.

This Friday, January 28, 2005 has now come and gone without a word from you on this topic despite my calls to you on Tuesday, Wednesday and Thursday of this week.  As you know, we spoke at length about limiting this first attempt to select an arbitrator to those arbitrators on the AAA International Panel with Massachusetts experience.

Alon again reiterated its position that it had no objection to trying to use an arbitrator with international experience off the AAA International Panel without limiting itself to a Massachusetts admitted practitioner.  You have repeatedly attempted to re-characterize Alon's position as an agreement that the arbitrator must be a Massachusetts admitted practitioner.  Let me be clear this time, in writing, Alon is not agreeing and has never agreed that the arbitrator has to be a Massachusetts admitted practitioner -- whether selected from the International list or otherwise -- only that Alon had no objection to trying to do so in order to avoid a dispute on this issue.  Obviously, arbitrators and Judges apply Massachusetts law every day to disputes in this country in places outside of the Commonwealth of Massachusetts.  Alon

has also agreed to allow the AAA Domestic Rules to apply to the actual conduct of the arbitration in a good faith effort to meet Converse half-way on this point.

As stated above, Alon agreed in good faith to try to select an arbitrator off of the AAA International List of those who had Massachusetts experience (which list was provided to us on Monday evening by the AAA ICDR administrator) by yesterday. However, you said in our call on Thursday that your client was still reviewing its position on the arbitrator selection issue, but that you would definitely call me back on Friday morning. You did not call, write or e-mail me on this point or any other for that matter on Friday despite me leaving a message with your office.

Likewise, we sent you our comments on the Provisional Agreement (which was suggested and proposed by Converse) on the afternoon of Wednesday, January 19, 2005, over 10 days ago, and we have yet to receive a response from you despite at least four conversations with you in which you said that it was coming the next day. This will confirm, however, that you did state to me that an agreement by Converse "to not challenge the status quo injunctions in Brazil and Argentina was a deal breaker for Converse." Notwithstanding that disturbing news I urged you to let us see your response so that Alon could evaluate such a position in the context of the totality of Converse's counter-proposal, however, Alon has yet to see anything from you.

Additionally, I also called you on Tuesday and asked for guidance from you on whether and how our clients could restart their necessary and long overdue operational conversations with your client's employees so that they could operate the business in the Mercosur countries during the standstill period (i.e., while we are arbitrating whether the Licensing Agreement was renewed or not). Alon has yet to hear from you on this point even though I called and asked again on Wednesday and Thursday.

We also informed you that Coopershoes has not paid Alon all it owes for the 4th Quarter 2004 and that they indicated that they had not paid those funds to Alon pursuant to instructions from Converse. This is outrageous behavior on Converse's part. Alon has since received some of the funds from Coopershoes and wants to make a partial royalty payment to Converse with those funds.

However, Alon will not be able to pay all of the royalties owed to Converse for the 4th Quarter of 2004 until Converse retracts its instructions to Coopershoes (which we have been told was actually a provision in the purported new contract Converse signed with Coopershoes that is now in abeyance) which have tortiously interfered with Alon's contract with Coopershoes in Brazil. Converse must mitigate its damages by instructing Coopershoes to release those funds. Otherwise, Alon cannot pay, and cannot be held responsible for not paying, all of the 4th Quarter royalty payments owed to Converse.

Lastly, I told you that my clients did not want to pay the royalties for the 4th Quarter, 2004 without receiving clarification of your client's allegation that Alon had been underpaying royalties to Converse due to a claim that it was double-deducting VAT/ICMS. I told you that while my clients think that your client's position on this is absolutely wrong, Alon was interested in making the correct payment. We asked you for support on Converse's position, including a

copy of the Deloitte & Touche audit report, which allegedly flags this issue. You still did not call me. So, I called you back on Thursday and you stated that at least you had news on this issue, but that Converse would not provide any support for its position. You nonetheless indicated that Converse "would waive its position with regard to any royalty payments during this provisional period." I responded that was not good enough in that if you were correct (again, we don't think Converse is correct on this point) then all Alon was doing was adding to its damages and you were leading us into error and preventing us from mitigating. Alon is either right or it is wrong. You indicated that Converse is waiving any claim for a royalty underpayment during the provisional period and was seriously reconsidering its position overall on the VAT/ICMS issue, but that it was still under review. With that understanding, my client will be making partial royalty payments to Converse for the 4th Quarter 2004.

The totality of the conduct by Converse set forth above belies any claims on your part that Converse is serious about moving these issues along. Converse is clearly stalling. Alon believes that this is because Converse is attempting to gain some sort of unfair and improper tactical advantage by dragging its feet on all of these issues while simultaneously delaying the arbitration with its specious position that it is not an international dispute -- which is as plain as the nose on your face -- and by not responding with regard to the arbitrators off the list supplied by the AAA/ICDR last Monday evening. All of this conduct also calls into question Converse's constant bemoaning about how long this arbitration is going to take.

Accordingly, Alon demands that you file your Reply before the AAA/ICDR. As you know, there was to be no Reply and you have now asked for this right once again seeking to delay the start of the arbitration. Accordingly, Alon has asked for and has been granted the right to file a Sur-Reply within five (5) business days of receipt of Converse's Reply.

Alon still has no objection to trying to select an arbitrator off the AAA International List, but due to the foregoing and the passage of time we must double track these efforts or we will have lost over two months before this issue is resolved and we can get on with selecting an arbitrator. Finally, in light of Converse's stalling Alon shall feel free to take whatever actions it deems necessary to move the arbitration along, protect the status quo and otherwise.

Sincerely,

ASTIGARRAGA DAVIS

Edward H. Davis, Jr.

cc:    Richard Johnston, Esq. Wilmer Cutler Hale & Dorr (Boston)
       Clients
       Cristina Cárdenas, Esq.

# EXHIBIT "5"

# ASTIGARRAGA DAVIS

701 Brickell Avenue • 16th Floor
Miami, Florida 33131-2847

February 4, 2005

**Via Facsimile and Regular Mail**

Michael C. Gilleran, Esq.
Pepe & Hazard LLP
225 Franklin Street, 16th Floor
Boston, Massachusetts  02110-2804

RE:    **Manufacturing, Distribution and Licensing Agreement between Converse, Inc.
("Converse") and ALON International S.A ("Alon") dated as of September 1, 2001 (as
amended, the "Licensing Agreement")**

Dear Mr. Gilleran:

We are in receipt of your February 1, 2005 letter.  Once again, you are wrong, and more
importantly, you are attempting to manipulate the facts for your client's own purpose or gain.

In your letter, you state that Alon has received over $1,000,000.00 dollars in 4th Quarter
payments from Coopershoes, and that accordingly, Alon should immediately make its payments
in full to Converse.  As a preliminary matter, not only do you have no way of knowing what
Alon has to date received from Coopershoes, you have misstated the facts.  In fact, Alon is still
waiting to receive approximately forty (40) per cent of the money due to it from Coopershoes for
December 2004.  If you have been told otherwise, you have not been told the truth.  Please rest
assured that once Alon receives its payment in full from Coopershoes, it will proceed to make
the full royalty payments to Converse.

Alon has not yet paid royalties on apparel sales because due to the dispute that arose
between Converse and Alon throughout the month of December, no contracts were ever signed
with any apparel entities, despite Converse's authorization to do so.   Upon Converse's
notification to Alon of its alleged non-renewal of the Licensing Agreement, Alon instructed said
entities to cease all production immediately.  Production and sales of apparel had already begun
in anticipation of the execution of contracts, which were in the final stages of negotiation and
which execution never happened. It is Alon's understanding that apparel sales have been made
nonetheless, but Alon has not received *any* proceeds from these sales.    At this point, Alon is
unsure on how to proceed with the apparel situation, in large part because Converse has refused
to respond to Alon's repeated requests for operational discussions on this and other related

issues, and because Alon has since learned that Converse has directly contacted said companies. Alon remains willing to discuss with Converse how it would like to proceed on this point and invites such a discussion, as the benefits will inure to Converse whether it wins or loses in the arbitration.

Pursuant to your last letter, Alon acknowledges that Converse has withdrawn in full its claim that Alon has allegedly unpaid royalties because it double deducted VAT or ICMS taxes. Additionally, Alon confirms that no longer at issue in this case are Converse's allegations regarding Alon's alleged failure to notify Converse of its intent to renew the Licensing Agreement and Alon's alleged failure to make royalties payments due to the exchange rate calculation.

As you know, Alon's position with respect to potential arbitrators has always been that it was willing to look at arbitrators with Massachusetts experience, but only if they were from the AAA International Panel. Alon has never agreed to arbitrators from the AAA Commercial Panel. Further to the goal of expediting the arbitration, Alon would like to tender the following names from the AAA International Panel as potential arbitrators:

> Natasha C. Lisman;
> John Fellas; and
> Cynthia C. Lichtenstein

We welcome your comments on these proposed arbitrators, and hope that Alon and Converse may come to an expeditious and satisfactory resolution of this issue. To that end, when can we expect to see your reply to our memorandum in response to Converse's Motion to Dismiss or Transfer?

Respectfully,

ASTIGARRAGA DAVIS

Edward H. Davis, Jr.

cc:    Richard Johnston, Esq.
       Cristina Cárdenas, Esq.
       Clients

F:\WDOX\CLIENTS\10077\1001\00043540.DOC

# EXHIBIT "6"



**International Centre**
**for Dispute Resolution**

Thomas Ventrone
Vice President

Steve Kim
Assistant Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

February 24, 2005

### VIA FACSIMILE ONLY

Edward M. Davis, Jr., Esq.
Astigarraga Davis
701 Brickell Avenue
16th Floor
Miami, FL 33131

Michael C. Gilleran, Esq.
Pepe & Hazard, LLP
225 Franklin Street, 16th Floor
Boston, MA 02110

Re: 50 133 T 00579 04
   Alon International, S.A.
      vs
   Converse Inc.

Dear Counsel:

After careful consideration of the comments submitted by both sides and a careful examination of the documents in our possession, the ICDR, has determined that the above matter will be administered out of the International Centre for Dispute Resolution. Should the Parties wish to revisit the issue of place of administration and jurisdiction, you may do so following the appointment of the Arbitrator.

Pursuant to the Arbitration Clause, the above matter will be heard in Boston, Massachusetts. Should the Parties not agree on the place of arbitration, pursuant to article 13.1 of the International Arbitration Rules, the administrator may initially determine the place of arbitration, subject to the power of the tribunal to determine finally the place of arbitration within 60 days after its constitution.

In addition, the Parties are requested to confer and confirm, in writing, how you wish to proceed with respect to the appointment of the Arbitrator by close of business March 2, 2005. Should the Parties not agree on a method of selecting the Arbitrator, the Parties are requested to confirm your conference call availability for the week beginning March 7, 2005 by close of business March 3, 2005, to discuss same.

At this stage we will be moving the matter forward.

Sincerely,

Karen Ponce
International Case Manager
212 484 4029
PonceK@adr.org

# EXHIBIT "7"

# ASTIGARRAGA DAVIS

701 Brickell Avenue • 16th Floor
Miami, Florida 33131-2847

February 23, 2005

*Via Facsimile and Regular Mail*

Michael C. Gilleran, Esq.
Pepe & Hazard LLP
225 Franklin Street, 16th Floor
Boston, Massachusetts 02110-2804

RE:    **Manufacturing, Distribution and Licensing Agreement between Converse, Inc.
("Converse") and ALON International S.A ("Alon") dated as of September 1, 2001 (as
amended, the "Licensing Agreement")**

Dear Mr. Gilleran:

We are in receipt of your letters dated February 9, 2005, February 11, 2005 and February 15, 2005. This letter serves to confirm that Alon made its payment in full to Converse for the 4th Quarter on February 17, 2005.

Alon has yet to receive the FW/05 shoe samples from Converse. In your February 15, 2005 letter, you state that Converse is holding the samples as "security." As Converse knows, the samples are absolutely vital for Alon to continue developing the Converse marks and products during the standstill period (*i.e.*, while the parties are arbitrating the status of the Licensing Agreement). Alon has paid Converse in full for the 4th Quarter and is expecting receipt of said samples immediately.

Additionally, your February 15, 2005 letter purports to set forth a procedure under which Alon and Converse can conduct operations pending a final resolution of this dispute in arbitration. In order for Alon to operate the business in the Mercosur countries, it is imperative that it be able to have operational conversations with your client. Nonetheless, to date Alon has received nothing but unresponsiveness from <u>all</u> Converse employees, including those you have listed in your February 15 letter as contact personnel during the standstill period. Such behavior makes it very difficult (if not impossible) for Alon to continue developing the Converse marks and related products. It demonstrates that Converse is in fact impeding Alon from proceeding in its efforts to develop the Converse marks and related products pending a final resolution of the parties' dispute in arbitration.

February 23, 2005
Page 2

Moreover, Alon has been unable to access the media bin internet tool. In this respect, it seems as though Converse has changed the login and password to prevent Alon's access. Repeated requests by Alon to Linda McCabe at Converse regarding its inability to access the media bin and its need for samples have gone unanswered. Again, such behavior by Converse is impeding Alon from its continuing efforts to develop the Converse marks and products during the standstill period.

Lastly, we note the language you have used in the last paragraph of your last three letters, and could not disagree more.    As three different courts have already found, the Licensing Agreement between Converse and Alon remains in place until such time as the current status of the Agreement is finally and conclusively determined in arbitration. Accordingly, the existing terms of the Licensing Agreement continue to prevail. Until such time as a final and conclusive determination is made of Alon's contractual rights under the Licensing Agreement in the arbitration, Alon will continue to function within the terms of said Agreement and expects Converse to do the same.

Respectfully,

**ASTIGARRAGA DAVIS**

M. Cristina Cárdenas

cc:    Richard A. Johnston, Esq.
       Edward H. Davis, Jr., Esq.
       Clients

F:\WDOX\CLIENTS\1007\1001\00044522.DOC

# EXHIBIT "8"

## MANUFACTURING, DISTRIBUTION AND TRADEMARK LICENSE AGREEMENT

BETWEEN

CONVERSE INC.

and

COOPERSHOES – Cooperativa de Calcados Joanetense



Page 2

## Table of Contents

| | | Page |
|---|---|---|
| I. | **INTRODUCTION** | |
| 1. | Definitions | 4 |
| 2. | Term of Agreement | 5 |
| | | |
| II. | **GRANT OF LICENSE** | |
| 3. | License | 3 |
| | | |
| III. | **LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES** | |
| 4. | Use of Converse Marks | 9 |
| 5. | Quality Assurance | 10 |
| 6. | Licensee's Use of Converse Information and Advice | 12 |
| 7. | Licensee Sales Program | 12 |
| 8. | Distribution | 15 |
| 9. | Liquidated Damages | 15 |
| 10. | Government Approval | 15 |
| 11. | Pan Regional Accounts | |
| | | |
| IV. | **CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES** | |
| 12. | Responsibility of Converse | 16 |
| 13. | Converse's Alteration of Product Design and Specification | 16 |
| 14. | Converse's Right of Inspection of Licensee Factories | 16 |
| | | |
| V. | **ROYALTIES, FEES AND PAYMENTS** | |
| 15. | Royalties and Commitment Fee | 17 |
| 16. | Guaranteed Minimum Sales | 19 |
| 17. | Royalty Reports | 20 |
| 18. | Schedule of Royalty Payments and Fees | 21 |
| 19. | Currency In Which Payments Are To Be Made | 23 |
| | | |
| VI. | **INTELLECTUAL PROPERTY** | |
| 20. | Converse Intellectual Property | 24 |
| 21. | Territorial Registration of Converse Trademarks | 26 |
| 22. | Protection of Trademarks | 27 |
| 23. | Indemnification for Products Liability Claims; Insurance Requirements | 28 |
| | | |
| VII. | **TERMINATION** | |
| 24 | Right of Termination | 29 |
| 25. | Effect of Termination or Expiration | 31 |
| 26. | Final Statement Upon Termination or Expiration | |
| | | |
| VIII. | **MISCELLANEOUS** | |

|  |  | Page 3 |
|---|---|---|
| 27. | Force Majeure | 33 |
| 28. | Assignment or Sublicense by Licensee | 33 |
| 29. | Notices | 33 |
| 30. | No Joint Venture | 34 |
| 31. | Applicable Law | 34 |
| 32. | Arbitration | 34 |
| 33. | Significance of Headings | 35 |
| 34. | Entire Agreement, No Waiver | 35 |
| 35. | Confidentiality of Agreement | 36 |
| 36. | Conduct of Business | 36 |
| 37. | Limitation of Liability | 36 |

Appendices

| A. | Converse Marks |
| B. | Human Rights Manual |
| C. | Royalty Report Form |
| D. | Licensee's Pre-Existing Obligations |



AGREEMENT, made this 16th day of December, 2005 by and between CONVERSE INC., a Delaware corporation, having its principal place of business at One High Street, North Andover, Massachusetts 01845 ("Converse") and, COOPERSHOES -Cooperativa de Calcados Joanetense , a corporation duly registered and existing under the laws of _Federal Republic of Brazil and having its principal office and business at Rua Vicente Prieto, 3767, Picada Café, Rio Grande do Sul, Brazil CEP 95175-000 ("Licensee").

WHEREAS, Converse is in the business of manufacturing, advertising, distributing and selling athletic and leisure footwear, activewear and accessories and is the exclusive owner the owner of the trademarks, trademark registrations and applications set forth in Appendix A, attached hereto and incorporated herein, and the trademarks covered by said registrations and applications; and

WHEREAS, Licensee desires to manufacture, market and sell in the Territory, footwear under the Converse name and trademarks, and to obtain the advisory services and assistance of Converse in connection therewith.

NOW THEREFORE, in consideration of the mutual covenants, representations and promises herein contained, Converse and Licensee agree as follows:

## I.     DEFINITIONS

1. For purposes of this Agreement, the following definitions shall apply:

(a) "Contract Period" shall mean that period of time commencing on January 1, 2005 and ending on December 31, 2007.

(b) "Contract Year" shall mean the twelve calendar months of the year, beginning with January 1, 2005.

(c) "Contract Year Month" shall mean the twelve (12) monthly periods of the calendar year, beginning on January 1 of each year,

(d) "Contract Year Quarter" shall mean the four (4) three month periods of the calendar year, beginning on January 1, April 1, July 1 and October 1 of each year,.

(d) "Converse Factories" shall mean factories approved by Converse to produce the Licensed Articles.

(e) "Converse Marks" shall mean the logos and trademarks set forth in Appendix A



Page 5

(f) "F.O.B. Cost" shall mean the costs of Footwear Licensed Articles purchased by the Licensee directly from factories approved by Converse to produce the Licensed Articles, as shown on the approved invoice from the factory for each shipment of product, if applicable.

(g) "Licensed Articles" shall mean the athletic and leisure footwear, identical or substantially identical to the athletic and leisure footwear, manufactured for Converse and sold by Converse in the United States. There are three types of Licensed Articles: Vulcanized Construction Footwear, Cement Construction Footwear and Imported Footwear as defined below. Vulcanized Construction Footwear shall mean footwear manufactured using the vulcanized process, by way of example the Chuck Taylor All Star, Jack Purcell and One Star shoes are Vulcanized Construction Footwear. Cement Construction Footwear shall mean footwear manufactured using the cold cement process, by way of example the Weapon and Nylon Trainer shoes are Cement Construction Footwear. Imported Footwear shall mean any type of footwear purchased from any Converse Factory outside of the Territory.

(h) "Net Sales" shall mean the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, and VAT/Sales taxes included and separately itemized in the invoice. No deduction shall be allowed for costs incurred in the manufacture, sale, advertisement (including cooperative and promotional allowances) or distribution of Licensed Articles, nor shall any deductions be allowed for uncollectible accounts or cash discounts.

(i) "Publicity Materials" shall mean publicity materials for the Licensed Articles, including, but not be limited to, any printed advertising, catalogs, brochures, billboards, electronic material, internet technology, television, press releases, and/or wireless network services in any and all manner or medium now known or hereafter devised or any video or printed material bearing the Converse Marks.

(j) "Territory" shall mean The Federal Republic of Brazil.

2. Term of Agreement. Unless sooner terminated pursuant to the provisions of this Agreement, this Agreement shall commence on and remain in effect for the Contract Period. Any extension of the term of this Agreement shall be effective only pursuant to a written agreement executed by Converse and Licensee. Such written agreement shall reflect any mutually revised terms



or conditions agreed to by the parties, if applicable. The Contract Period, together with any mutually agreed extension period(s), shall constitute the "Term" of this Agreement.

## II:    GRANT OF LICENSE

3. License.

(a)    Licensed Articles. Footwear Licensed Articles is the collective term for athletic and leisure footwear.

(b)    Grant of License. Converse hereby grants to Licensee, subject to the terms and conditions herein, and subject to the provisions set forth in Section III below, the revocable, non-transferable, exclusive and non-sublicenseable right and license to utilize the Converse Marks during the Term of this Agreement in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the retail and wholesale trade, as set forth in Section III below. The License is limited to distribution and sale of the Licensed Articles in high-end, better-quality athletic footwear and sporting goods retailers and in specialty shops, department stores and boutiques that are consistent with the Converse brand strategy and will enhance the Converse brand image within the Territory and throughout the world ("Licensed Channels"). Without limiting the foregoing, the Licensed Channels exclude mass merchants, discount stores, discount store chains, flea markets, open air markets, consolidators, diverters, catalogue sales, mail-order sales, online sales, direct response sales, lotteries, premiums, commercial tie-ups, give-aways, bundled merchandise, co-branded or other marketing arrangement not approved by Converse, or any distribution channels that are not consistent, in Converse's sole discretion, with the Converse brand strategy. This license does not authorize, and expressly forbids, Licensee to manufacture, export, cause to export, distribute or sell such Licensed Articles outside the Licensed Channels or Territory, or to any person or entity that Licensee has reason to know may sell such Licensed Articles outside the Licensed Channels or Territory, unless specifically authorized by Converse in writing. In all respects Licensee's exercise of the License shall be consistent with, and limited to, the use of the Converse Marks to manufacture Licensed Articles of the highest quality and to position, market and sell the Licensed Articles as a high-end, industry leading premium offering,

and any conduct by Licensee that is inconsistent with the foregoing shall be deemed to be outside the scope of the License.

(c)    Internet.    Licensee is also granted a nonexclusive, revocable, non-transferable, non-sublicenseable right and license to use the Converse Marks on its Internet site that is hosted on servers located in   the Territory during the Term of this Agreement in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the resale and wholesale trade and not directed at consumers or offering the Licensed Articles for sale to consumers on the Internet site, subject to the provisions set forth in Section III below.  In the event Licensee has already applied for or registered any of Converse's Marks or any name similar to a Converse Mark as a domain name or as part of a domain name, it shall assign to Converse all its rights, title and interest in such domain name(s) as directed by and at no cost to Converse.  If Licensee fails to execute any such transfer in a timely manner, Licensee hereby appoints Converse its attorney-in-fact for such purpose, which appointment shall be irrevocable and shall be deemed a power coupled with an interest.  Licensee shall not register a domain name using any of the Converse Marks or any marks to be confused with the Converse Marks.

(d)    Reservation of Rights.    Converse reserves all rights not expressly granted to Licensee hereunder including, without limitation, all uses of the Converse Marks other than those expressly granted to the Licensee under this Agreement.  Nothing in this Agreement shall be construed to prevent Converse from granting any licenses for the use of the Converse Marks other than as provided herein, or from utilizing the Converse Marks in any manner whatsoever other than as provided herein.

(e)    Non-competition.  Licensee agrees it shall not, during the term of this Agreement, manufacture, export, distribute, advertise, promote or sell any products/licensed articles which are competitive to the Licensed Articles, irrespective of whether said products bear Licensee's trademark or those of a third party, except only in such cases that Converse has given its prior written approval.  Notwithstanding the preceding sentence, in the event Licensee is already under obligation to distribute licensed articles other than those of Converse and/or products of any competitor, Licensee shall provide Converse, prior to the execution of this Agreement, with a written list of all products it is under obligation to distribute, and the duration of such obligations, which shall be attached hereto as Appendix D.  Licensee shall

obligations or enter into any other arrangement to extend the duration of such obligations, and if Licensee has the right to terminate any such obligations, Licensee will exercise such rights at its earliest opportunity and notify Converse of such action.

### III.    LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

4. Use of Converse Marks.

(a)    Territorial. Licensee agrees to use the Converse Marks only within the Territory and during the Term of this Agreement, and only with respect to the manufacture, promotion, advertisement, distribution and sale of the relevant Licensed Articles and only after Licensee has received the written approval of Converse as to samples of the Licensed Articles intended to be manufactured and sold by Licensee, the specific Converse Marks Licensee intends to affix to particular Licensed Articles, Licensee's use of the Converse Marks in Publicity Materials and Licensee's use of the Converse Marks on Licensee's web site, if applicable.

(b)    Approvals. Pursuant to Paragraph 5(a) below, Licensee shall provide Converse with a full set of approval samples and Publicity Materials for each Licensed Article set forth in Paragraph 3(a) of this Agreement prior to launch in the market. Licensee shall provide Converse with designs and/or drawings of all Licensed Articles, drawings, hang tags and packaging for approval no later than four (4) months prior to launch in the market. In the event Licensee wishes to use any of the Converse Marks on its web site, it shall provide Converse with an opportunity to review the web site no later than sixty (60) days prior to launch in the market. Converse shall endeavor to respond within fifteen (15) calendar days from receipt, either by refusing such design or requesting any changes to the designs, drawings or contents of web site, or issuing its written approval. Failure to respond will be deemed disapproval. Licensee further agrees to follow the approval guidelines for Licensed Articles, packaging, advertising and promotional materials set forth in Converse's Licensee Handbook, as such handbook may be updated by Converse from time to time. The license to use the Converse Marks is granted upon the express condition that all Licensed Articles manufactured by Licensee bearing any of the Converse Marks will conform to the standards for grade, quality, and style established from time to time by Converse. Such standards shall be substantially the same as the standards for the corresponding products manufactured for Converse and distributed by Converse in the United States. Without limiting the

Licensed Articles shall at all times reflect the standards and reputation embodied in the Converse Marks, which articles bearing the Converse Marks have come to represent in the minds of the trade and the public.

(c)    Approval of Manufacturers.  In addition, all manufacturers and all factory locations at which Licensee desires to have Licensed Articles manufactured shall be approved in writing by Converse ninety (90) days in advance of the placement of any orders for or of the manufacture of Licensed Articles.  Licensee further guarantees the performance of its approved manufacturers and shall indemnify and hold Converse harmless from and against all losses, costs, liabilities and expenses arising out of or relating to any breach or default of the terms of this Agreement by any such approved manufacturer.

(d)    Approval of Product Designs.  Except for those products in Converse's existing product line, Licensee is responsible for the design and manufacture of the Licensed Articles, including without limitation all concepts, sketches, artwork, specifications, materials, designs and prototypes (collectively, "Licensee Designs") and all Collateral Materials (as defined in Paragraph 5(c) below), and shall bear all expenses and costs associated therewith.  All product lines and styles designed by Licensee shall be submitted to Converse for approval prior to manufacture pursuant to Paragraph 5 below, and shall be solely owned by Converse pursuant to Paragraph 20 below.  Converse may require a development schedule to ensure that product design is conducted in a timely manner.  All product design and development conducted by Licensee shall be at its sole cost and expense, and Licensee shall make all expenditures reasonably necessary to ensure the design and development of innovative, technically advanced products to performance, quality, and pricing standards of the highest quality, commensurate with the market leadership and recognition that Converse has established in its existing product categories.

(e)    Inspection.  Converse shall at any and all times have the right to inspect the Licensed Articles bearing any of the Converse Marks manufactured by Licensee to determine whether such Licensed Articles in fact conform to the established standards and other terms of this Agreement.  If at any time Converse shall be of the opinion that Licensed Articles bearing any of the Converse Marks manufactured by Licensee do not conform to the established standards, it may give notice of the deficiency to Licensee.  Licensee shall promptly thereafter cause to be

removed any of the Converse Marks from such nonconforming products or web sites, shall cease to affix the Converse Marks to other Licensed Articles which do not meet the standards, and shall cease thereafter to manufacture, promote, advertise, distribute or offer for sale any such nonconforming Licensed Articles bearing any of the Converse Marks.

(f)    __Substandard Products.__  Licensee shall remove Converse Marks from any defective products which do not meet Converse standards as set forth in Paragraph 5 of this Agreement for first-quality merchandise, including without limitation, "seconds" and "irregulars" ("Substandard Products"). This requirement to remove all Converse Marks shall be operative irrespective of the fact that such Substandard Products may be customarily sold in the Territory for the same price as first-quality merchandise.  Converse shall have the right to prohibit Licensee from selling such Substandard Products, if, in the opinion of Converse, such products may tend to be confused by the public with any of the Licensed Articles sold under this Agreement bearing Converse Marks, or which, in the opinion of Converse, infringes in any manner the Converse Marks or Converse's trade dress, design rights or other intellectual property rights.  Any Substandard Products bearing any of the Converse Marks shall not be sold by Licensee without the prior written consent of Converse.  In the event that Converse grants such consent, such Substandard Products may only be sold as follows: (i) through those distribution channels and in those quantities or lot sizes as may be determined by Converse in its sole discretion, and (ii) marked as "seconds" by clearly and permanently "redlining" in indelible ink (or equivalent permanent marking) to indicate second-grade quality the labels, hang-tags, and other identifying wrapping materials and related materials of such Substandard Products.  Licensee shall cause its distributors and all retail customers to which Licensee or its distributors sells any Substandard Products to refrain from advertising or promoting such Substandard Products.

5.    __Quality Assurance.__

(a)    Licensee shall submit, for the inspection and approval of Converse, samples and comprehensive drawings or prototypes or production models of each style representative of Licensed Articles covered by this Agreement to be manufactured by Licensee.  In any event, such drawings and samples shall be submitted to Converse for approval four (4) months prior to market launch each Contract Year before any such Licensed Articles are shipped or sold by Licensee. Converse shall have ten (10) days from receipt of the submission in writing to approve by

Converse to respond shall be deemed disapproval. Thereafter, Licensee shall submit to Converse for approvals 1st prototypes and confirmation samples four (4) months prior to market launch each Contract Year. Converse shall have ten (10) days to respond to these submissions as well. Additional samples shall also be submitted to Converse at Converse's reasonable request. Failure by Converse to respond shall be deemed disapproval. Converse shall determine whether such samples conform to its standards and shall inform Licensee of its approval or of any deficiencies. Licensed Articles may be manufactured and sold by Licensee only after Converse shall have approved drawings and samples representative of such Licensed Articles in writing.

    (b)    All Licensed Articles manufactured or sold hereunder must:

        i.    be of first or high-end quality in design, fabrication and workmanship and conform to standards, including standards of design, style and quality, approved by Converse in its sole discretion;

        ii.    be of the grade, quality and style handled by quality departments of quality stores, department stores and better specialty shops in the Territory;

        iii.    be similar and at least equal in grade, quality, materials, workmanship, performance and style, to representative comprehensive drawings or production samples of Licensed Articles submitted by Licensee to Converse and approved by Converse; and

        iv.    be advertised, marked, labeled and packaged in accordance with this Agreement and not in any manner violative of law or tending to mislead or deceive the public.

    (c)    All packaging, hang tags, labels, press releases, advertising, promotions, display fixtures or other materials of any and all types prepared in connection with the Licensed Products (collectively, the "Collateral Materials") shall be of the highest standard of such style, appearance and quality as shall be adequate and suitable in all respects to their promotion, distribution and sale to the best advantage of Converse and the Converse Marks.

    (d)    Licensee shall ensure that all Licensed Articles and the manufacture, distribution, sale, promotion and advertisement thereof comply with all foreign, federal, state and local laws and regulations of the countries of the Territory in which the Licensed Articles are manufactured or sold.

6. Licensee's Use of Converse Information and Advice.

(a) Converse may supply Licensee with certain designs, plans, artwork or other materials relating to the design, manufacture, sale, advertising and promotion of the Licensed Articles ("Converse Designs") for Licensee's use in the Licensed Articles or in the Collateral Materials. Licensee agrees that it shall not use, permit the use of, release, give or otherwise distribute or disclose to any third party any of the Converse Designs, or any other information, advice, reports, instructions, designs, drawings, specifications, technical knowledge, methods, processes, samples or materials, names and addresses of suppliers of materials, or any other information ("collectively, Trade Secrets") furnished to it by Converse or Converse contract manufacturers or other licensees except as necessary and on an as needed basis under a nondisclosure agreement acceptable to Converse in the manufacture, distribution, promotion, advertisement, and sale of Licensed Articles bearing the Converse Marks in the Territory pursuant to this Agreement.

(b) All Trade Secrets shall remain the sole property of Converse and shall be deemed to be strictly confidential and shall be treated accordingly. Licensee shall use the Trade Secrets solely in connection with performance of this Agreement and will not disclose the Trade Secrets to any third party other than as expressly permitted by this Agreement. Licensee will maintain the confidentiality of the Trade Secrets in the same manner that it maintains its own most confidential information but in no event with less than reasonable care.

7. Licensee Sales Program.

(a)    Licensee shall faithfully, diligently and to the best of its ability endeavor to manufacture, distribute, promote, advertise, market and increase the sales of Licensed Articles bearing the Converse Marks in the Territory. It shall be the responsibility of Licensee to provide active and continuous sales representation in the Territory by actual salesperson contact with customers, both existing and prospective. Licensee shall maintain adequate brand and marketing management, manufacturing, sales and service personnel and adequate inventory levels, manage, position and market the brand; conduct advertising and promotional programs and perform such other necessary functions to accomplish maximum sales and distribution of Licensed Articles within the Territory. Licensee shall not adopt, engage in, pursue or otherwise use any pricing policies, advertising campaigns, merchandising techniques or other commercial practices which are illegal under the laws of the Territory or which, in the opinion of Converse, detract from the

good will and reputation of Converse. Licensee shall maintain a net worth and working capital sufficient, in Converse's judgment, to allow Licensee to perform fully and faithfully its obligations under this Agreement, and Licensee shall devote sufficient financial resources and qualified personnel to fulfill its responsibilities under this Agreement.

(b)      As a condition to the License, Licensee shall at all times during the Term of this Agreement actively present, position, promote and display the Licensed Articles in a manner that is at least as favorable as the presentation, positioning, promotion and display of high-end, industry-leading, premium products, including without limitation in all of the Licensed Channels utilized for similar premium products in the Territory. Licensee shall at all times during the Term of this Agreement offer for sale in substantial commercial quantities consistent with the Guaranteed Minimum Sales Volume set forth in Paragraph 15 Licensed Articles for the applicable sales season through all Licensed Channels. During the Term of this Agreement, and subject to the terms and conditions hereof, Licensee shall (i) continue to diligently and continuously advertise, promote, distribute, ship and sell the Licensed Articles in the Territory, and (ii) use its best efforts to make and maintain adequate arrangements for the distribution, shipment and sale necessary to meet the demand for the Licensed Articles in the Territory.

(c)      Licensee agrees to submit to Converse, an annual business plan for the sale of Licensed Articles for each region within the Territory for each Contract Year. Such annual business plan shall be submitted to Converse no later than September 30th of each Contract Year, and shall be for the next Contract Year. Licensee also agrees to submit to Converse, a seasonal sales and marketing plan, including seasonal price lists, for the sale of Licensed Articles for each region within the Territory for each Contract Year. Such seasonal sales and marketing plan shall be submitted to Converse no later than June 15th of each Contract Year for the next Spring, and January 15th of each Contract Year for the next Fall.

(d)      Licensee shall use Converse's web-based sales and forecasting application each month to provide Converse with both annual forecasts and actual sales.

(e)      During each Contract Year, Licensee shall expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for that Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure"). Such expenditures shall be spread over each current Contract Year in a manner consistent with the overall



brand and product marketing and advertising strategies outlined by Converse in the United States market. Licensee agrees to provide Converse with semi-annual statements itemizing Licensee's Advertising Expenditure for the preceding Contract Year semester on or before the fifteenth (15th) day of July and January of each Contract Year.   Licensee shall keep Converse continually informed as to all advertising programs undertaken pursuant to this Agreement and shall not advertise any of the Licensed Articles without receiving the prior written approval thereof from Converse. Licensee shall submit advertisements to Converse for its approval forty five (45) days prior to any use of advertisements, and Converse shall endeavor to respond within fifteen (15) calendar days from receipt. All advertising copy shall prominently feature the Converse Marks used in accordance with the Converse Identity Manual or guidelines provided by Converse from time to time.

(f)   Licensee agrees to purchase a representative sample range of each new product line introduced by Converse.

(g)   Licensee agrees it shall have, at its expense, one or more of its sales management attend Converse's two global sales conferences each Contract Year.

8.   Distribution.

(a)   Licensee hereby agrees to market, sell, promote and distribute the Licensed Articles solely in the Licensed Channels in the Territory, except as authorized by Converse in writing.

(b)   Publicity Materials.   All Publicity Materials, including any and all advertising, shall be approved in writing by Converse sixty (60) days in advance of any release or distribution.    Licensee agrees that any one appearing in any Publicity Materials or Advertisements wearing athletic apparel must wear Converse apparel, with the Converse Mark visible. Also, Converse shall at any and all times have the right to inspect the Publicity Materials developed by Licensee to determine whether they conform to the established standards and other terms of this Agreement.  If at any time Converse shall be of the opinion that the Publicity Materials developed by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee, which shall promptly thereafter remove and shall cease thereafter to use or distribute any such nonconforming Publicity Materials.

9.   Liquidated Damages.  Licensee shall manufacture, distribute, promote, advertise and sell Licensed Articles bearing the Converse Marks only within the Licensed Channels in the Territory and shall not export or cause to be exported any of the Licensed Articles to other countries



without the prior express written permission of Converse. In the event that Licensee distributes or sells the Licensed Articles outside the Licensed Channels, or exports or causes to be exported Licensed Articles bearing the Converse Marks outside the Territory without written authorization from Converse, or otherwise violates the terms of the license set forth in Paragraph 3 above or the terms relating to Converse's Trade Secrets as set forth in Paragraph 6 above, Licensee agrees that such action would irreparably harm Converse's business. Licensee further agrees that it would be difficult for Converse to determine actual damages in such circumstances. Therefore, in good faith estimate of actual damages and not as a penalty, in such circumstances Licensee agrees to pay to Converse Five Hundred Thousand Dollars (US$500,000.00) as liquidated damages in each instance for any of the foregoing breaches of this Agreement within seven (7) days after receiving written notice from Converse. The breach conditions set forth below shall not be construed to limit Converse's other rights and remedies with respect to any such breach of this Agreement. Breach conditions for which Licensee will be liable for liquidated damages: (i) in the event that Licensee distributes or sells the Licensed Articles outside the Licensed Channels, or exports or causes to be exported Licensed Articles bearing the Converse Marks outside the Territory without written authorization from Converse, or otherwise violates the terms of the license set forth in Paragraph 3 above; (ii) or violation of the territorial use of Converse Marks as set forth in Paragraph 4(a) above; (iii) violation of the terms relating to Converse's Trade Secrets as set forth in Paragraph 6 above; or (iv) violation of Paragraph 8 Distribution.

10.    Government Approval. Licensee shall be responsible for obtaining all necessary approvals from each sovereign government in the Territory with respect to this Agreement. In the event that Licensee is unable to obtain all such approvals within one hundred eighty (180) days of the execution of this Agreement, Converse shall have the right to terminate the Agreement immediately upon written notice to Licensee.

11.    Pan Regional Accounts. Pan Regional Accounts ("PR Accounts") shall mean accounts which are based in the Territory and which have an outlet in one or more additional countries outside the Territory. Licensee agrees that it will service the PR Accounts in all necessary and appropriate ways, including but not limited to, sales, marketing, promotion and customer service. Converse shall participate with Licensee in the seasonal planning of sales



presentations to the PR Accounts, and in such other manner as Converse desires. Converse shall have the right to participate in all of Licensee's meetings with the PR Accounts related to pricing, brand position, product presentation and the execution of the agreed commercial strategies. Licensee shall provide Converse with a semi-annual Business Plan for each PR Account on May 1 (for the subsequent July 1 to December 31 period) and November 1 (for the subsequent calendar year period) of each Contract Year (the "PR Plans"). The PR Plans shall include, but not be limited to, proposed pricing, discount structure, projected sales and margins by product line and season, co-operative advertising plans and any other marketing initiatives to be undertaken with respect to the PR Accounts. The PR Plans shall be approved in writing by Converse prior to their implementation. It is understood that the servicing of the PR Accounts are critical to Converse's worldwide reputation and brand image. Thus, in the event that Licensee does not service any PR Account in a manner satisfactory to Converse, as solely determined by Converse, Converse shall provide Licensee with written notice of such failure. If Licensee does not cure such failure within thirty (30) days to Converse's satisfaction, then Converse may remove the applicable PR Account from the Territory and subsequently service said account directly itself.

IV.   CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

12.   Responsibility of Converse. In order to facilitate the manufacture, distribution, promotion, advertisement and sale of Licensed Articles by Licensee under this Agreement, Converse shall use good faith efforts to: (a) furnish or cause to be furnished to Licensee such information and advice, as in the opinion of Converse, is necessary to implement this Agreement. Such information and advice may include, but is not limited to, drawings and specifications of the Licensed Articles, names and addresses of suppliers of materials, copies of advertisements and sale promotional material or such other information reasonably necessary to carry out this Agreement. Licensee shall pay Converse promptly upon billing for any articles supplied under this Paragraph 12(a) in accordance with Paragraph 18(c); and (b) at Converse's discretion, to permit one or more of Licensee's representatives to attend, at Licensee's sole expense, sales conferences or other athletic sales events sponsored or attended by Converse representatives.

13.    <u>Converse's Alteration of Product Design and Specification</u>.  Converse reserves the right, upon sixty (60) days notice to Licensee, to modify the design and specifications for any Licensed Article made by Licensee bearing any of the Converse Marks, and any design or text.  In that event, Licensee shall not manufacture Licensed Articles in accordance with the prior design or specification, except for the completion of Licensed Articles in the process of manufacture at the time Licensee received the modification.  Licensee agrees not to manufacture, distribute, promote, advertise or sell any product not bearing a Converse Mark which, in the opinion of Converse, by reason of its appearance or design, might tend to be confused by the public with any of the Licensed Articles manufactured under this Agreement bearing Converse Marks, or which in the opinion of Converse infringes in any manner Converse Marks or other Converse intellectual property rights.

14.  <u>Converse's Right of Inspection and Audit of Licensee Factories</u>.

(a)  Converse shall have the right at its own expense to have its representatives from time to time, during reasonable business hours, visit and inspect the factory or factories in which Licensee is producing, or having produced, Licensed Articles bearing any of the Converse Marks for the purpose of observing the method of manufacture, quality of materials, products produced, and any other matters relevant to this Agreement.  Additionally, Licensee must also submit, at its expense, to an audit of the workers' rights standards pursuant to the Converse Inc. Human Rights Manual which is made part of this Agreement and is attached hereto as Appendix B.

(b)    Licensee shall reimburse Converse for any expense for travel to the Territory or elsewhere which may be incurred by representatives of Converse at the request of Licensee and such payments shall be made by Licensee to Converse in U.S. Funds within thirty (30) days from billing thereof.



## V.    ROYALTIES, FEES AND PAYMENTS

15.    <u>Royalties and Commitment Fee</u>.  In conjunction with Paragraph 18 below, Licensee shall pay to Converse the following non-refundable amounts:

(a)    <u>Initial Commitment Payment</u>.  Upon execution of this Agreement, Licensee shall pay Converse the sum of Six Hundred Seventy Five Thousand and Four Hundred Dollars (USD$675,400.00) representing an advance payment made by Licensee that will be credited against Licensee's Earned Royalty payments pursuant to Article 18 of this Agreement.

(b)    In consideration for the license granted to it by Converse herein, Licensee shall pay Converse a royalty equal to the following percentages of the Net Sales made by Licensee of the Licensed Articles (the "Earned Royalties").  The Earned Royalties shall be based upon the Net Sales price for such products sold to the retail or wholesale trade by Licensee.

| | |
|---|---|
| Vulcanized Footwear Licensed Articles | Fifteen Percent (15%) |
| Cement Footwear  Licensed Articles | Twelve Percent (12%) |
| Imported Footwear | Eight Percent ( 8 %) |
| Children's    Footwear    (Vulcanized    &    Cement) | Twelve Percent (12%) |

(c)    Notwithstanding the provisions of Article 15(b), Licensee agrees to pay Converse a guaranteed annual minimum royalty as set forth below for each Contract Year (the "Guaranteed Annual Minimum Royalty").  The Minimum Royalties set forth below are separate payments for each Contract Year and do not represent cumulative payment amounts.  The Earned Royalties for any Contract Year in excess of the Guaranteed Annual Minimum Royalty may not be carried forward or carried back to any other Contract Year for the purpose of earning out the Guaranteed Annual Minimum Royalty for such other Contract Year.

**Guaranteed Annual Minimum Royalty (USD Dollars)**

| Contract Year | Calendar Year | Vulcanized Footwear | Cement Footwear | |
|---|---|---|---|---|
| 1 | 2005 | $    3,000,000.00 | $    312,000.00 | 49,000.00 |
| 2 | 2006 | $    3,300,000.00 | $    720,000.00 | 000.00 |
| 3 | 2007 | $    3,750,000.00 | $    900,008.00 | 000.00 |



In the event this Agreement is terminated on a date other than the last day of a Contract Year, the Earned Royalties shall be based upon actual Net Sales through the date of termination.

    (d)    <u>Third Parties.</u>

        (i)    With respect to the sale of certain Licensed Articles, Converse has, or may have in the future, an obligation to pay a royalty to an athlete or other third party ("Third Party") in conjunction with the manufacture and sale of the Licensed Articles (the "Third Party Articles"). In the event that Licensee purchases or manufactures, with Converse's prior written consent, any Third Party Articles, Licensee agrees to pay to Converse the amount of any royalty which Converse is obligated to pay to the applicable Third Party (the "Third Party Royalty").

        (ii)    Converse shall advise Licensee, in a timely fashion with Converse's approval of Licensee's submission of samples and other Licensee Designs pursuant to Articles 4 (b) and 4 (d) of Licensed Articles, which Articles are Third Party Articles and, if Converse has provided its written consent to Licensee's request to manufacture any Articles that are Third Party Articles, the amount of the Third Party Royalty and any third-party approval or other requirements relating to the manufacture of such Third Party Article.

        (iii)    The applicable Third Party Royalty shall be paid by Licensee to Converse along with payment of the Earned Royalties pursuant to Paragraph 18 of this Agreement and shall not be creditable against Guaranteed Minimum Annual Royalty payments hereunder.

    (e)    No Royalty shall be payable hereunder with respect to the sale of any substandard products from which all Converse Marks have been removed, as set forth in Paragraph 4(f) above.

    16.    <u>Guaranteed Minimum Sales.</u> Notwithstanding the provisions of Paragraphs 15(b) and (c) above, Licensee agrees to sell, in the Territory only, not less than the following guaranteed minimum sales volume of Licensed Articles during each Contract Year as set forth below (the Guaranteed Minimum Sales Volume"):

**Guaranteed Minimum Sales Volume (USD Dollars)**

| Contract Year | Calendar Year | Vulcanized Footwear | Cement Footwear | Imported Footwear |
|---------------|---------------|---------------------|-----------------|-------------------|
| 1 | 2005 | $ 20,000,000.00 | $ 3,000,000.00 | $ 800,000.00 |

| 2 | 2006 | $ 22,000,000.00 | $ 6,000,000.00 | $ 1,000,000.00 |
| 3 | 2007 | $ 25,000,000.00 | $ 7,500,000.00 | $ 1,500,000.00 |

The Guaranteed Minimum Sales Volume set forth above are separate amounts for each Contract Year and do not represent cumulative sales volumes. Sales volume in any Contract Year in excess of the Guaranteed Minimum Sales Volume may not be carried forward or carried back to any other Contract Year for the purpose of earning out the Guaranteed Minimum Sales Volume for such other Contract Year

17.    Royalty Reports

(a)    Unless otherwise specified herein, Licensee shall deliver to Converse on or before the 15th of each month of each Contract Year a Royalty report, which shall be a complete and accurate itemized statement, certified by Licensee's chief fiscal officer as being accurate and complete, number of pairs or units, gross sales price, itemized deductions from gross sales price and net sales price as well as wholesale sales of the Licensed Articles manufactured, distributed or sold by Licensee during the preceding Contract Year Month, on a country-by-country basis if more than one country is included in the Territory. Such statements shall be stated in local currency and converted into U.S. Dollars at the exchange rate pursuant to Article 19 (a) below and submitted in the format set forth in Appendix C which shall be subject to change without notice. Such monthly statements shall be furnished to Converse whether or not any Licensed Articles bearing any Converse Marks have been sold or distributed by Licensee during the preceding Contract Year Month. Receipt or acceptance by Converse of any statements furnished pursuant to this Agreement or any sums paid hereunder shall not preclude Converse from questioning the accuracy thereof at any time, and in the event that any inconsistency or mistake is discovered in such statement or payments, they shall be rectified immediately and the appropriate payments shall be made by Licensee.

(b)    The parties acknowledge that Licensee may be legally required to withhold and remit a portion of the Earned Royalties to the sovereign government in the country or countries comprising the Territory on behalf of Converse. It is not the intent of the parties that Licensee pay any part of any tax owed by Converse. Licensee's obligation shall be satisfied if it withholds the amount required by law and remits the withheld amount in a manner according to applicable law to the appropriate taxing authority in such form as the respective government taxing authority

requires. Licensee shall then deliver to Converse a copy of each tax payment made, as well as the corresponding receipt issued by the competent tax authorities receiving such payment, promptly upon payment or, if the receipt is not available at that time, the receipt must be submitted to Converse no later than thirty (30) days after Licensee has made any such payments. These certificates should be forwarded to Converse's Accounting Department at the address set forth in the Notice paragraph of this Agreement. Licensee shall make all such declarations and provide all such information and assistance as Converse may reasonably require to enable Converse to obtain all applicable double taxation convention reliefs or exemptions from the relevant withholding obligation and/or to enable Converse to reclaim or claim a credit for such taxes as may have been withheld in accordance with this Paragraph.

(c)    In conjunction with Paragraph (b) above, Licensee shall pay, and hold Converse forever harmless from, all taxes, customs, duties, levies, impost or any other charges, including any fines or penalties, now or hereafter imposed or based upon the manufacture, delivery, license, sale, possession or use hereunder to or by Licensee of the Licensed Articles (including, but not limited to sales, use, inventory, income and value added taxes on sales of Licensed Articles), which charges shall not be deducted from Converse's Earned Royalties or the Guaranteed Minimum Annual Royalties under this Agreement. Without limiting the foregoing, all Royalties payable hereunder are net amounts, and no taxes paid by Licensee, except withholding taxes as set forth in Article 17 (b) above, shall be withheld or deducted by Licensee from any Royalty payments made from jurisdictions outside of the United States.

18.  Schedule of Royalty Payments and Fees.

The Royalty Payments set forth below shall be paid to Converse on a monthly basis upon invoice and no later than thirty (30) days after the end of the Contract Year Month. Payments shall be in U.S. Dollars and can be made by wire transfer in accordance with the instructions set forth in Paragraph 19 below.  (a)    Licensee shall remit the Earned Royalty for each type of Licensed Article for each Contract Year Month. At the end of each Contract Year Quarter, Licensee shall pay Converse the greater of one quarter of the Guaranteed Annual Minimum Royalty for each type of Licensed Article or the cumulative Earned Royalties for each type of Licensed Article earned in the three (3) Contract Year Months of the Contract Year Quarter, less the Commitment Payment and less any payments made to Converse within the Contract Year Quarter since the

Guaranteed Annual Minimum Royalty for each type of Licensed Article is satisfied, Licensee is required to pay only Earned Royalties for such Licensed Article for the remaining Contract Year Months.;

(b)    The Third Party Royalty, if applicable, shall be paid upon receipt of Converse's invoice;

(c)    In addition to royalties, Licensee shall pay Converse for all materials, samples, and merchandise furnished to Licensee pursuant to Paragraph 12 hereof in an amount equal to the cost of such items to Converse, including Converse's cost of preparing, packing, shipping and transporting such items. All such purchases by Licensee from Converse shall be paid upon receipt of invoice by wire transfer or check.

(d)    All Royalties and other amounts payable hereunder shall be made without set-off of any amount whatsoever, whether based upon any claimed debt or liability of Converse to Licensee.

(e)    Licensee shall maintain appropriate books of account and records, including inventory records, in accordance with generally accepted accounting principles, and shall make accurate entries concerning all transactions relevant to this Agreement. Such books of account and records shall be kept separately from those for any merchandise other than the Licensed Articles sold hereunder by Licensee. Licensee shall also, upon request by Converse, provide Converse with Licensee's then current annual Balance Sheet, Profit and Loss Statement, as well as a sales report listing year-to-date sales generated by each of Licensee's customers. Such reports shall be kept confidential.

(f)    Converse shall have the right, at its own expense, during the term hereof and for three (3) years thereafter, or in the event of a dispute involving in any way such books of account and records, until the dispute is resolved, whichever is later, through any authorized representatives of its own choice, on reasonable notice to Licensee and during regular business hours, to examine and take extracts from such books of account and records, and other documents (including but not limited to invoices, vouchers, records, purchase orders, sales orders and reorders) relating to the business hereunder which shall be maintained and kept by Licensee during the term hereof. All such books of account and records shall be kept available by Licensee for three (3) years after the end of the Contract Period, or in the event of a dispute between the parties or involving in any

Page 23

way such books of account and records until that dispute is resolved, whichever is later. If upon inspection of the books and records pursuant to this paragraph or otherwise, it is discovered that Converse did not receive the correct and adequate payment, then Licensee shall pay Converse, upon written notice, the difference between what was paid and what should have been paid, within five (5) business days of receipt of said notice. If the aforesaid difference is five percent (5%) or more for any Contract Year of this Agreement, then the entire difference is to be paid with interest calculated from the date the payment should have been made to the actual date of payment at the prime interest rate in effect on the payment date. If Converse chooses to employ the services of a certified public accounting firm, qualified accounting consultant firm or Converse's internal auditors to conduct an audit and inspection of Licensee's books and records and said audit and inspection results in a balance due for any Contract Year of this Agreement which is five percent (5%) or more of the payment reported due by Licensee for any such Contract Year, then Licensee shall bear the entire cost including all fees and expenses of said audit and inspection. In calculating costs for an internal auditor to perform such audit, Converse shall bill its personnel costs incurred in performing such audit on an hourly basis at the hourly salaried rate of the personnel performing such services multiplied by a factor of 1.75. If the balance due for any Contract Year of this Agreement is twenty percent (20%) or more of the payment reported due by Licensee for such Contract Year, then in addition to the above, Converse may, at its sole option, immediately terminate the Agreement upon notice to Licensee, even if Licensee tenders the audit deficiency and associated costs and expenses to Converse.

19. <u>Currency In Which Payments Are To Be Made.</u>

(a)  Unless specifically set forth to the contrary herein, all payments to Converse (except Converse Factories) required to be made by Licensee pursuant to this Agreement shall be made in the currency of the United States of America ("U.S. Funds"), by wire transfer to Converse Inc., First Union National Bank, Charlotte, NC, ABA No. 053000219, Account No. 2000011041218, or such other account as may be designated by Converse from time to time (the "Account"). Converse will review the exchange rate received by Licensee in the conversion from Licensee's local currency to U.S. Funds by comparison with the exchange rate published by the Wall Street Journal ("WSJ") two (2) business days prior to the payment due date scheduled of this Agreement. If there is a difference between the exchange rate received and the WSJ rate, Converse

Page 24

reserves the right to request such additional funds from Licensee from Licensee as is required to compensate for the exchange rate deficiency. In cases where payment of the particular royalty due is more than seven (7) calendar days late, Converse reserves the right to request additional funds from Licensee to compensate Converse for any resulting subsequent exchange rate loss. If required, Licensee agrees it will seek the necessary government approvals to make such payments to Converse in U.S. Funds.

(b)    Late Payments. Without prejudice to any other rights of Converse hereunder, time is of the essence regarding all payments due hereunder and Licensee shall pay interest on all delinquent Royalty payments or Minimum Royalty payments hereunder, as well as on any deficiency amounts disclosed as a result of audit, at 1.5% per month or the maximum legal rate, whichever is less, compounded annually at the rate from time to time in effect and calculated from the date on which such payment was due. In the event any such payment exceeds thirty (30) days in arrears, Converse shall have the right, in addition to any and all other remedies available to Converse, to terminate this Agreement pursuant to Paragraph 24.

(c) If the actions of any government or public body make it impossible for Licensee to pay Converse in U.S. Funds, Converse shall have the following options:

(i)    terminate the Agreement with thirty (30) days written notice to Licensee;

(ii)    require Licensee to make payment in the currency of any other country selected by Converse by whose currency Licensee may legally pay;

(iii)    require Licensee to deposit such payment to Converse's account in a bank selected by Converse in or outside the Territory.

If Converse selects option (i) it may nevertheless require Licensee to pay any sums then due or to become due in accordance with options (ii) or (iii).


VI.    INTELLECTUAL PROPERTY

20. Converse Intellectual Property.

(a)    Ownership. Licensee acknowledges that Converse is the exclusive owner of the Converse Marks, Converse domain names, and covenants that neither it nor any person acting for or under it will ever contest such ownership or the exclusive rights of Converse with respect thereto anywhere in the world. In the event that Licensee creates, or assists in the creation of, a design,

enhancement, modification or improvement, for a Licensed Article or Converse's web site, then such design, enhancement, modification or improvement, and all sketches, drawings, prototypes, proposals, plans and other materials relating thereto ("Product Developments") shall be the sole property of Converse and Licensee hereby irrevocably transfers and assigns to Converse any and all right, title and interest of Licensee in and to the Product Developments, including without limitation all copyrights, inventions and other intellectual property rights therein and thereto. Licensee shall execute and deliver any document or instrument requested by Converse to confirm exclusive ownership by Converse of any such Product Developments.    Converse shall have the right to utilize said Product Developments itself or provide it for use by any third party.    The Product Developments shall be used by Licensee solely for the purposes authorized by this Agreement and may not be used by Licensee in any way adverse to Converse's interest. Without limiting the foregoing, Licensee will not deliver, reproduce, or in any way allow such documents or things to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of Converse.    During the term of this Agreement and thereafter, Licensee will not publish, release, or otherwise make available to any third parties any information describing the Product Developments without the prior written consent of Converse.

(b) Infringement. Nothing in this Agreement shall constitute a warranty by Converse that there are currently no infringements of any of the Converse Marks or Converse domain names within the Territory, that the use of the Converse Marks throughout the Territory will not infringe the rights of any third party or that there are no prior or other legal users of the Converse Marks in addition to Converse throughout the Territory, or that trademark registrations shall be secured in the Converse Marks throughout the Territory.  Licensee agrees that during the Contract Period it will diligently investigate any infringement or threatened infringement of the Converse trademarks, logos, domain names or trade names within the Territory and shall immediately notify Converse of any such infringement or threatened infringement or of any act or threatened act of unfair competition which may come to Licensee's attention and Licensee agrees to cooperate fully in any action thereon which Converse may, in its sole discretion, deem appropriate. In the event that Converse elects to pursue litigation, Converse shall have sole control of any such litigation, including without limitation the decision to settle or compromise such litigation, and Licensee shall cooperate fully with Converse to the extent requested by Converse and Licensee

shall be equally responsible for the expense of such litigation. Licensee shall not, however, be entitled to take or institute any action thereon, either by way of informal protest or legal, equitable or criminal proceedings, without express written approval, nor shall Licensee be entitled to call upon Converse to take action thereof; all such matters shall be entirely within the discretion of Converse.

(c)    Intellectual Property Indemnification.  Licensee shall indemnify and hold Converse and its subsidiaries, directors, affiliates, officers, employees, representatives and agents harmless from and against any and all claims, demands, losses, damages, liabilities, suits, judgments, and expenses, including incidental costs and attorneys' fees Converse may incur or be liable for arising out of allegations that Licensed Articles, Collateral Materials, Converse Marks, advertising and/or Publicity Materials used, designed and/or developed by Licensee violates or infringes the copyright, trademarks, service marks, or patent rights of any third party.  Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.  Licensee shall, at its own cost and with Converse's approval, defend against any such claims; provided that Converse will provide reasonable assistance at Licensee's expense in connection with the defense and settlement of any such claim and Licensee may not settle any such claim or make any admission adverse to Converse's interests without Converse's prior written consent.

21.  Territorial Registration of Converse Trademarks.    Licensee shall assist Converse, at Converse's request and expense, in the procurement and maintenance of Converse's intellectual property rights in the Converse Marks.  In connection therewith, Licensee shall, without limitation, execute and deliver to Converse in such form as it may reasonably request, all instruments necessary to (i) effectuate copyright and trademark protection, (ii) record Licensee as a registered user of any trademarks pursuant to this Agreement, or (iii) cancel any such registration.  Such registration shall be handled by attorneys selected or approved by Converse.  With respect to any registrations or applications for registration of Converse Marks in the Territory, Licensee agrees to take all proper actions requested by Converse to facilitate and expedite the registrations, provided that Converse reimburses Licensee for all reasonable expenses incurred in connection therewith.  If Converse is prevented from registering its trademarks or domain names in the Territory by virtue of the existence of this Agreement, Licensee agrees, at the request of Converse, to seek registration in

its own name under Converse's direction and promptly convey to Converse at no cost all right, title and interest to the trademarks and domain names which Licensee may thereby obtain, provided that Converse shall reimburse Licensee for all reasonable expenses incurred.    If Licensee fails to execute any such transfer in a timely manner, Licensee hereby appoints Converse its attorney-in-fact for such purpose, which appointment shall be irrevocable and shall be deemed a power coupled with an interest.

22. Protection of Trademarks.

(a)    Licensee shall not use Converse's name, or the Converse Marks, other than as permitted hereunder and, in particular, shall not incorporate Converse's name, or the Converse Marks, in the Licensee's corporate or business name in any manner whatsoever.  Licensee agrees that in using the Converse Marks it will in no way represent that it has any rights, title and/or interest in or to the Converse Marks other than those expressly granted under the terms of this Agreement.  Licensee further agrees that it will not use or authorize the use, either during or after the Term, of any configuration, trademark, trade name, or other designation identical or similar to the Converse Marks, or any element thereof.

(b)    Licensee will use the Converse Marks in compliance with all applicable legal requirements, and Licensee shall cause to appear on all Licensed Articles, and all materials, such legends, markings and notices as may be required by applicable law.  Converse may withdraw or modify any elements of the Converse Marks from the scope of the License for any country or countries in the Territory if Converse determines that the exploitation thereof would or might violate or infringe the trademark or other rights of third parties, or subject Converse to any liability or violate any law, court order, government regulation or other ruling of any governmental agency, or if Converse determines that it cannot adequately protect its rights in the Converse Marks under the trademark or other laws of the applicable country or countries in the Territory.

(c)    Licensee's use of the Converse Marks shall inure exclusively to the benefit of Converse, and Licensee shall not acquire or assert any rights therein.  Licensee recognizes the value of the goodwill associated with the Converse Marks, and that the Converse Marks have acquired secondary meaning in the minds of the public.  Licensee shall not contest Converse's ownership of or the validity of the Converse Marks or any application or registration thereof

throughout the world. Licensee agrees that it shall not during the License Period or thereafter, register or apply to register any of the Converse Marks, or any similar or derivative mark, anywhere in the world. Licensee agrees, during the License Period and thereafter, never to contest the rights of Converse in the Converse Marks or the validity of the license herein granted to it.

23. Indemnification for Products Liability Claims; Insurance Requirements.

(a) Licensee agrees to indemnify and hold Converse, subsidiaries, affiliates, its directors, officers, employees, representatives and agents, harmless from any and all claims, demands, losses, damages, liabilities, suits, judgments and expenses, including incidental costs and attorneys' fees incurred in connection therewith against Converse for injuries or damages to purchasers or users of the Licensed Articles manufactured by or for Licensee, including without limitation death, bodily injury and property damage. The foregoing indemnification of Converse by Licensee shall extend to any and all products liability claims arising as a result of Converse's ownership and control of the trademarks under which the Licensed Articles are manufactured and sold by Licensee, including, but not limited to, claims arising out of breach of implied or express warranties, strict tort liability or negligence, or legal claims of a comparable nature for recovery brought by litigants under the laws of the jurisdiction that apply to the Licensee. Converse shall provide Licensee with prompt written notice of any claims against Converse with respect to the subject of indemnity hereunder. Licensee shall, at its own cost and with Converse's approval, defend against any such claims; provided that Converse will provide reasonable assistance at Licensee's expense in connection with the defense and settlement of any such claim and Licensee may not settle any such claim or make any admission adverse to Converse's interests without Converse's prior written consent.

(b)   Insurance Requirements.    For the Term of this Agreement and for three (3) years thereafter, Licensee shall obtain insurance from a qualified insurance carrier with a Best rating of at least "A", insurance that covers liability for bodily injury including death and property damage including loss of use, advertising, and contractual liability coverage, including without limitation liability arising out of Licensee's obligations under this Agreement. The amount of coverage shall be not less than One Million Dollars ($1,000,000) combined single limit (with no deductible amount) for each single occurrence. Such insurance policy shall name Converse and shall name Converse and its subsidiaries, affiliates, officers, directors, representatives and agents

Page 29

as additional insureds and shall not include any "other insurance" or similar provision that would cause such policy not to be solely responsible for the covered liability. Such insurance policy shall be cancelable or materially altered only upon thirty (30) days notice to the Licensee and Converse. Licensee shall provide Converse with a certificate of its insurance policy in the amount indicated with the required additional insured endorsements within ten (10) days of execution of this Agreement. Prior to execution of this Agreement, Licensee will provide Converse with a copy of such insurance policy for review.

## VII.  TERMINATION

24. Right of Termination

(a)    By Converse Immediately. In the event of the occurrence of any one or more of the following, Converse shall have the right to immediately terminate this Agreement by written notice thereof to Licensee but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i) insolvency, bankruptcy, reorganization, suspension of payments, assignment for the benefit of creditors, appointment of a receiver, institution of any proceedings by or against Licensee under bankruptcy laws or other similar laws; or

(ii)    the transfer or sale of all or a majority of the voting stock or other equitable ownership of Licensee without the written consent of Converse; or

(iii)    breach of Paragraph 3(e) Non-competition; or

(iv)    breach of Paragraph 4(a) Territorial, upon which event Converse shall be entitled to Liquidated Damages as set forth in Paragraph 9 herein; or

(v)    breach of Paragraphs 8 Distribution (a) or (b), upon which event Converse shall be entitled to Liquidated Damages as set forth in Paragraph 9 herein; or

(vi)    breach by Licensee of Paragraph 28 (Assignment); or

(vii)    breach by Licensee of Paragraph 35 (Confidentiality of Agreement); or

(viii)    the failure of Licensee to comply with the Guaranteed Annual Minimum Royalty or Guaranteed Minimum Sales Volume for any Contract Year, as set forth in Paragraphs 15 and 16 herein..

(b)    By Converse Upon Notice of Breach. In the event of the occurrence of any one or more of the following, Converse shall have the right to terminate this Agreement seven (7) days after giving written notice thereof to Licensee, and Licensee has not remedied the situation to Converse's reasonable satisfaction within such seven (7) day time period:

(i)    breach by Licensee of Paragraphs 3(b) Grant of License or (c) Internet and 6 Confidentiality herein, upon which event Converse shall be entitled to Liquidated Damages as set forth in Paragraph 9 herein.

(ii)   breach of Paragraph 4(b) and 4(d) Approvals and 4(f) Substandard Products; or

(iii)  breach of Paragraph 4(c) Approval of Manufacturers and 4 (e) Inspection; or

(iv)   breach of Paragraph 5 Quality Assurance; or

(v)    breach of Paragraph 7(a) with respect to Licensee's commercial practices or 7(e) with respect to the Advertising Expenditure; or

(vi)   breach of Paragraph 7(b) and 7(c) with respect to first shipping date and submission of the annual business plan; or

(vii)  breach of Paragraph 7(c) with respect to submission of a seasonal sales and marketing plan; or

(viii) breach of Paragraph 17 Royalty Reports; or

(ix)   breach of Paragraph 18(e) with respect to provision of Balance Sheets, Profit and Loss Statement and sales report or breach of Paragraph 18 (f) Audits; or

(x)    breach by Licensee of Paragraphs 20 (a) and (b) (Converse Intellectual Property) and 22 (Protection of Trademarks); or

(xi)   failure of Licensee to pay any royalty or other payment due Converse under this Agreement for a period of thirty (30) days from the date such payment is due and payable; or

(xii)  breach by Licensee of Paragraph 23(b) regarding insurance coverage; or

(xiv)  breach by Licensee of Paragraph 19 (b) Late Payment



(c)   By Either Party.  In the event of the occurrence of any one or more of the following, and without limiting Converse's other termination rights under this Agreement, either party shall have the right, after thirty (30) days written notice, to terminate this Agreement by written notice thereof to the other party but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i)   liquidation or dissolution of either party or discontinuance of the active operation of the enterprise of either party; or

(ii)   the breach of or failure by either party to perform or observe any of the other terms and conditions of this Agreement, provided said breach or failure shall continue for a period of thirty (30) days after written notice thereof from the other party.

25.  Effect of Termination or Expiration.

(a)  From and after the termination of this Agreement, whether by expiration of the Contract Period or termination pursuant to Paragraph 24 or for any other reason, any and all rights acquired by Licensee to the use of the Converse Marks and Trade Secrets, shall terminate and cease absolutely, and except as provided in subsection (b) of this Article, Licensee shall not thereafter manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with Converse Marks.  It is understood and specifically agreed that upon termination of this Agreement, Licensee shall immediately cease using the Converse Marks or any reference thereto, except as otherwise provided in this Paragraph 25.

(b)  Provided that this Agreement has not been terminated by Converse for any reason,  any Licensed Articles manufactured or in the process of manufacture by Licensee prior to the expiration or termination of this Agreement and as to which any of the Converse Marks has been attached or affixed may be sold by Licensee, but only during the ninety (90) day period next following the date of expiration or termination, subject to the condition that Licensee pay to Converse all Earned Royalties and other payments due and owing Converse at the date of expiration or termination and to the further condition that Licensee continues to pay to Converse all Earned Royalties accruing during such ninety (90) day period within thirty (30) days following the end of each calendar month and delivers to Converse at the time of such payment an itemized statement in the form required by Paragraph 18 hereof for each such calendar month.  Licensee agrees that such Licensed Articles shall

Page 32

be sold during the ninety (90) day period shall be sold in accordance with the provisions of Paragraph 8 Distribution herein.

Notwithstanding anything to the contrary contained herein, Licensee shall not manufacture, distribute, sell or dispose of any Licensed Articles hereunder after the expiration or earlier termination of this Agreement. Licensee shall, upon termination of this Agreement, promptly assign and transfer to Converse any property rights which Licensee may have acquired in the Converse Marks and shall, within thirty (30) days, at Converse's election either destroy or return all drawings, molds, dies and similar equipment or materials in its control or possession used for the production or reproduction or imprinting of the Converse Marks on the Licensed Articles and furnish to Converse satisfactory evidence of such return or destruction. Licensee agrees, subsequent to the expiration of this Agreement, not to register, attempt to register or use, except as provided herein, any Converse Marks and trademarks that are confusingly similar to the Converse Marks.

(c)     Any Paragraphs which by their nature should survive, will survive any termination or expiration of this Agreement.

26. Final Statement Upon Termination or Expiration.

(a) Licensee shall deliver, as soon as practicable but in any event no later than thirty (30) days after expiration or termination of this Agreement, to Converse a statement indicating the number and description of Licensed Articles bearing any of the Converse Marks under this Agreement on hand or in process of manufacture as of (i) sixty (60) days prior to the expiration of the Contract Period; and (ii) thirty (30) days after receipt from Converse of any notice terminating the license granted hereunder or, in the event no such notice is required, thirty (30) days after the occurrence of any event which terminated such license.

(b) Converse shall have the option, at its expense, to have an independent certified public accountant conduct a physical inventory during reasonable business hours of Licensee's manufacturing and distribution facilities in order to ascertain or verify such inventory or statement. In the event Licensee refuses to permit Converse to conduct such physical inventory, Licensee shall forfeit its right hereunder to dispose of such inventory. In addition to such forfeiture, Converse shall have recourse to all other legal remedies available to it.

(c)     Licensee shall have ninety (90) days to dispose of Converse inventory in accordance with Paragraph 25(b), which disposal shall be consistent with its distribution channels set forth in Paragraph 8 of this Agreement.

## VIII.    MISCELLANEOUS

27. Force Majeure.  Except for payment obligations hereunder, and Licensee's minimum guaranteed royalty and sales volume obligations, if either party to this Agreement is temporarily unable to perform its obligations hereunder because of fire, strike, freight embargoes, government restrictions or regulations, war, emergency or any other Act of God, then no liability to the other party or right to terminate shall exist for failure of the one party to perform during such period.

28. No Assignment or Sublicense by Licensee.  None of Licensee's rights or obligations under this Agreement, including without limitation any rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee, whether by operation of law or otherwise, without the prior written consent of Converse in each instance, and, without limiting the foregoing, the change of control, merger, acquisition or reorganization of Licensee shall be deemed a prohibited assignment hereunder.  Any attempt to assign this Agreement or any rights hereunder without Converse's prior written consent shall be void.  This Agreement shall be freely assignable by Converse.  Subject to the foregoing, this Agreement and any rights herein granted shall inure to the benefit of and be binding upon the parties hereto and their permitted successors or assigns.

29. Notices.  Any written notice authorized or required by this Agreement shall be deemed to be duly given when sent by facsimile, registered mail, postage prepaid, or by express mail or international courier service, addressed to one party or the other, as the case may be, as stated in this Article unless either party shall previously have given to the other party written notice of a change of such address.

### CONVERSE

Converse Inc.
One High Street
North Andover, Massachusetts 01845
Fax:  978-983-3547



**Page 34**

ATTENTION: Laura W. Kelley
Vice President, Legal

c.c.:    Tim Ouellette
        Vice President, Licensing

LICENSEE
Altamir A. Breda
Diretor Presidente
Coopershoe – Cooperativa de Calcados Joantense
Rua Vicente Prieto, 3767
Picada Café, Rio Grande do Sul CEP 95175-000
Brazil
Fax: (55)54-285-1302

30.  No Joint Venture.  The parties hereto are independent contractors and nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers and neither party shall have the power to obligate or bind the other in any manner whatsoever.

31.  Applicable Law.  The parties agree that the laws of the Commonwealth of Massachusetts, U.S.A. governs the provisions and interpretation of this Agreement, without reference to conflict of law principles, and that the English language version thereof shall be the controlling document.

32.  Arbitration.  The parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly.  Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligations of the parties thereunder, the capacity or authority of the parties thereto, the performance or breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one party to the other setting forth with specificity any such controversy or claim, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association.  The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association.  The parties expressly agree that arbitration shall be held in the offices of the American Arbitration Association, in Boston, Massachusetts, U.S.A., or such other locations within the Commonwealth of Massachusetts as the American Arbitration Association may direct.

conducted in the English language and the arbitrators shall apply the laws of the Commonwealth of Massachusetts. The institution of any arbitration proceeding hereunder shall not relieve the Licensee of its obligation to make payments accrued hereunder to Converse during the continuance of such proceeding. The decision by the arbitrators shall be binding and conclusive upon the parties, their successors and assigns and the parties shall comply with such decision in good faith, and each party hereby submits itself to the jurisdiction of the courts of the place where the arbitration is held, but only for the entry of judgment with respect to the decision of the arbitrators hereunder; provided, however, that judgment upon the award may be entered in any court where the arbitration takes place, or any other court having jurisdiction over the losing party. Notwithstanding the foregoing, Converse may take action in any court of competent jurisdiction without availing itself of the foregoing process to protect and enforce its rights in the Converse Marks and other intellectual property rights, including without limitation in connection with any violation or threatened violation of the terms of the license granted in this Agreement. Licensee acknowledges that its failure to comply with the terms of the license granted in this Agreement shall result in immediate and irreparable damage to Converse. Licensee also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof, Converse shall be entitled to equitable relief in the nature of an injunction and to all other available relief, at law or in equity.

33.  Significance of Headings.  Paragraph headings contained herein are solely for the purpose in aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of the Agreement.

34.  Entire Agreement, No Waiver.  This Agreement constitutes the entire agreement and understanding between the parties hereto and cancels, terminates and supersedes any prior agreement, materials exchanged between the parties, discussions or understanding relating to the subject matter hereof. None of the provisions of this Agreement can be waived or modified except expressly in writing signed by both parties hereto, and there are no representations, promises, agreements, warranties, covenants or undertakings other than those contained herein. Any provision of this Agreement that shall be or is determined to be invalid shall be ineffective and the parties agree to insert in the place thereof such other provisions as shall be lawful and shall approximate as nearly as possible the intent of the severed words and that such invalidity shall not affect

the remaining provisions of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same agreement.

35.    Confidentiality of Agreement. Licensee may not make any public announcement or public comment regarding the relationship between the parties or otherwise relating to Converse without the prior written consent of Converse, and Licensee will refer any press or similar inquiries regarding the same to Converse. Licensee agrees that the terms and conditions of this Agreement shall be treated as the confidential information of Converse and that no reference to the existence or terms and conditions of this Agreement or to activities pertaining thereto can be made by Licensee in any form of public disclosure without the prior written consent of Converse; provided, however, that Licensee may disclose the terms and conditions of this Agreement: (i) as required by any court, administrative agency or other governmental body; provided that Converse shall be given reasonable advance notice to obtain a protective order or other confidential treatment; (ii) as otherwise required by law, provided, that Converse shall be given reasonable advance notice to obtain a protective order or other confidential treatment; (iii) to legal counsel of the Licensee; (iv) in confidence, to accountants, banks, and financing sources and their advisors; (v) in confidence, in connection with the enforcement of this Agreement or rights under this Agreement; or (vi) in confidence, in connection with a merger or acquisition or proposed merger or acquisition, or the like.

36.    Conduct of Business. Licensee shall at all times conduct its business in the Territory in an ethical manner in compliance with all applicable laws and regulations and Converse's corporate policies regarding foreign business practices. Without limiting the foregoing, Licensee and its employees and agents shall not directly or indirectly make any offer, payment, or promise to pay; authorize payment; nor offer a gift, promise to give, or authorize the giving of anything of value for the purpose of influencing any act or decision of an official of any government within the Territory (including a decision not to act) or inducing such a person to use his or her influence to affect any such governmental act or decision in order to assist Licensee or Converse in the conduct of its business.

37.    Limitation of Liability. IN NO EVENT SHALL CONVERSE'S LIABILITY HEREUNDER EXCEED THE AMOUNTS PAID BY LICENSEE HEREUNDER. IN THE

TWELVE-MONTH PERIOD PRIOR TO THE CLAIM OCCURS. IN NO EVENT SHALL CONVERSE BE LIABLE TO LICENSEE FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR RELIANCE DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF CONTRACT, NEGLIGENCE OR UNDER ANY OTHER LEGAL THEORY, WHETHER FORESEEABLE OR NOT AND WHETHER OR NOT CONVERSE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL CONVERSE BE LIABLE FOR LOST PROFITS OR OTHER DAMAGES RELATING TO TERMINATION OF THIS AGREEMENT. LICENSEE AGREES THAT THESE LIMITATIONS OF LIABILITY ARE AGREED ALLOCATIONS OF RISK AND ARE REFLECTED IN THE FINANCIAL TERMS AGREED UPON BY THE PARTIES.

38.    Escrow.

(a)    Upon execution of this Agreement, Licensee shall wire to Converse the amounts currently due and to become due, representing royalties and other amounts claimed directly by Converse in a demand letter sent by Converse to Licensee. Converse shall place these funds into an interest-bearing escrow account (the "Escrow Funds"). As long as the Escrow Funds are held in the escrow account, and no longer, Converse shall indemnify and hold harmless the Licensee with respect to a claim by ALON International that the Escrow Funds are the property of ALON International ("ALON") and should be paid to ALON. The indemnity extends only to the amount of the Escrow Funds held in the escrow account, and does not extend to any other costs or claims, including, without limitation, to any interest on the Escrow Funds claimed by ALON over and above the amount of the Escrow Funds, or to any legal fees or costs claimed by ALON against Licensee, or to any legal fees or other costs incurred by Licensee in responding to any demand or claim by ALON whatsoever with respect to the Escrow Funds.

(b)    Converse or Licensee shall commence an interpleader action in connection with the Escrow Funds in the United States District Court for the District of Massachusetts ("District Court"). When and if the District Court issues an order the effect of which is to bar Licensee from being liable to both Converse and ALON for the Escrow Funds, the indemnification given by Converse in sub-paragraph (a) above shall immediately lapse and shall become void. If Converse fails to obtain a judgment awarding it the Escrow Funds or judgment is entered in

**Page 38**

Brazil or the United States specifically awarding the Escrow Funds to ALON, Converse shall transmit the Escrow Funds to ALON.

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the date and year first above written in duplicate originals by its duly authorized representatives.

CONVERSE INC.

By _____

Title _Attorny for Comvers Inc._

COOPERSHOES – Cooperativa de Calcados Joanetense

By _____

Title _PRESIDENT_



# EXHIBIT "9"

# PEPE&HAZARD LLP

**A BUSINESS LAW FIRM**

225 FRANKLIN STREET, 16TH FLOOR
BOSTON, MASSACHUSETTS 02110-2804
617.748.5500 FACSIMILE: 617.748.5555

MICHAEL C. GILLERAN
Attorney At Law
Direct: 617.748.5511
mgilleran@pepehazard.com

March 1, 2005

**Via Overnight Mail**

Mr. Roberto Szerer
Mr. Ronald Durchfort
ALON International
1160 Hallandale Beach Boulevard
Hallandale, Florida 33009

       Re:   **Notice of Termination and Expiration of Manufacturing, Distribution and Licensing Agreement Between Converse Inc, and ALON International S.A. dated September 1, 2001**

Dear Messrs. Szerer and Durchfort:

       This office represents Converse Inc., a licensor to Alon International S.A. ("ALON") and a party with ALON to the above-referenced Manufacturing, Distribution and Licensing Agreement (the "Agreement"; other capitalized terms herein shall have the same meaning as given to those terms in the Agreement). In a document entitled Second Amendment to the Agreement, entered into between Converse and ALON as of January 1, 2004, the Licensee under the Agreement was identified to include not only ALON but also, Camar Distribution LLC, Carval LLC, AIB Sevicos E Comercio Ltd, ALON Brasil Comercio e Distribuicao Ltd, and Alon Argentina SRL, and as used herein the term Licensee shall include the additional entities named in the Second Amendment.

       Converse hereby notifies Licensee that the Agreement and its amendments are terminated as of December 31, 2004 due to Licensee's breaches of the terms of the Agreement. Converse also hereby notifies Licensee that the Agreement and its amendments expired on December 31, 2004 of their own terms and have not been extended by a written agreement executed by Converse and Licensee.

       As of December 31, 2004, as specified in paragraph 25 of the Agreement, any and all rights of Licensee to use the Converse Marks and Trade Secrets terminated and ceased absolutely. Licensee, after December 31, 2004, shall not manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with the Converse Marks. Licensee shall promptly assign and transfer to Converse any property rights which Licensee may have acquired in the Converse Marks and shall within thirty (30) days, destroy or return all drawings, molds, dies and

MCG/32913/2/564414v1
03/01/05-BOS/      BOSTON         HARTFORD         SOUTHPORT
www.pepehazard.com

March 1, 2005                                                PEPE HAZARD LLP
Page 2

similar equipment or materials in its possession used for the production or reproduction or imprinting of Converse Marks on Licensed Articles and furnish to Converse satisfactory evidence of such return or destruction.  Also, Licensee shall not register, attempt to register or use, any Converse Marks and trademarks that are confusingly similar to the Converse Marks.

Converse hereby reserves all of its rights and remedies contained in or relating to the Agreement and its amendments and such other agreements related thereto, including, without limitation the right to monies due or to become due under the Agreement.  Also, Converse advises Licensee that all costs, charges and expenses incurred by Converse in connection with enforcement of the obligations and in connection with the exercise of its rights and remedies, together with interest thereon, shall become additional indebtedness owed by Licensee to Converse.

Reference in Converse's letter of November 30, 2004 to certain breaches of the Agreement is not intended as a waiver of any others.  Licensee is hereby notified that any failure of Converse to exercise any right or remedy under the Agreement and its amendments referred to above, or provided by statute or law or in equity, or otherwise, is not intended to, and shall not impair or operate as a waiver of any such right or remedy or be construed as a waiver of any breach or as an acquiescence therein.  Further, additional breaches may exist of which Converse has not yet given notice or of which Converse is not yet aware.  Converse reserves all rights with regard to such additional breaches.

Very truly yours,

Michael C. Gilleran
Counsel for Converse Inc.

cc: Edwin H. Davis, Esq. (By fax and overnight mail)

MCG/32913/2/564414v1
03/01/05-BOS/

# EXHIBIT "10"

# PEPE&HAZARD LLP

### A BUSINESS LAW FIRM

225 FRANKLIN STREET, 16TH FLOOR
BOSTON, MASSACHUSETTS 02110-2804
617.748.5500 FACSIMILE: 617.748.5555

MICHAEL C. GILLERAN
Attorney At Law
Direct: 617.748.5511
mgilleran@pepehazard.com

March 1, 2005

**VIA FACSIMILE
AND OVERNIGHT MAIL**

Edwin H. Davis, Jr., Esq.
Astigarraga Davis
701 Brickell Avenue
Miami, Florida 33131-2847

Re:  Amended Notice of Expiration and Breach of Manufacturing, Distribution and
Licensing Agreement Between Converse Inc, and ALON International S.A.
dated September 1, 2001.

Dear Mr. Davis:

As you know, this office represents Converse Inc. ("Converse"). Your client, Alon
International S.A. ("ALON") entered into the above-referenced Manufacturing, Distribution and
Licensing Agreement (the "Agreement"), in which Converse was a licensor and ALON was a
licensee. This letter is an amended notice of breach and of additional claims of Converse against
ALON. The breaches and claims set forth herein are in addition to, and not in substitution for, the
breaches and claims set forth in Converse's First Notice of Breach letter, dated November 30, 2004.

1.  **Breach by additional sublicensing.**

The Agreement, at paragraphs 29 and 35, prohibits the assignment or sublicensing or other
disposition by ALON of any of ALON's rights granted by the Agreement, without the prior written
consent of Converse. ALON has, without the written consent of Converse, entered into
sublicensing agreements or arrangements with Gatic, ALON Argentina, Belquis, Filon, Puket,
Supreme, Formiga and Foroni. These sublicensing arrangements all constitute breaches of the
Agreement. Also, Converse will also seek a declaration that all of these sublicenses are invalid.

2.  **Breach by improper deduction of Brazilian "social taxes".**

ALON deducted from royalties paid to Converse Brazilian "social taxes", namely, PIS
(Employees' Profit Participation Program), Coffins (Tax for Social Security Financing or Social
Contribution on Billings), and CPMF (Provisional Contribution on Financial Activities). Paragraph
15(a) of the Agreement only permits a deduction from Net Sales of VAT-type taxes such as the

MCG/32913/2/565496v1
03/01/05-BOS/

PEPE&HAZARD LLP

Edwin H. Davis, Jr., Esq.
March 1, 2005
Page 2

Brazilian ICMS tax.  No deduction is permitted for social taxes such as PIS, Coffins, or CPMF.
ALON has deducted these social taxes from Net Sales, and thus ultimately from royalties paid to
Converse, at the rate of 4.03%.  Converse's information is that the deduction taken by ALON for
these social taxes through Q3 2004 is about $103,650.  Converse estimates that the total deduction
taken by ALON through year-end 2004 is about $128,970.  Thus, ALON owes Converse about
$128,970 for the improper deduction of Brazilian social taxes from royalties paid to Converse.

3.    **Breach by improper deduction of CIDE tax from royalty payments.**

ALON has improperly deducted from the royalties it remits to Converse a Brazilian tax
called the CIDE tax (Economic Intervention Contribution).  This is a 10% tax charged by the
Brazilian government on the remittance of royalties abroad.  As ¶ 17(b) of the Agreement states,
"...the parties acknowledge that Licensee may be legally required to withhold and remit a portion of
the Earned Royalties to the governments of the countries in the Territory on behalf of Converse.  It
is not the intent of the parties that Licensee pay any part of any tax owed by Converse." Converse
learned as part of the D&T audit that the CIDE tax is not a tax "paid on behalf of Converse."  As
noted above, it is a tax charged on Brazilian companies who remit royalties abroad.  Converse also
confirmed with D&T that this tax does not qualify for the U.S. foreign tax credit and thus it is not,
as required by ¶ 17(b) of the Agreement, a "tax owed by Converse."  This tax is owed purely by
ALON or Coopershoes to the Brazilian government and therefore is not deductible under the
Agreement from Earned Royalties due from ALON to Converse.  The amount of the deduction is
about $125,000 through year-end 2004.    Thus, ALON owes Converse about $125,000 for
improperly deducting CIDE taxes from royalties paid to Converse.

4.    **Breach by competing with Converse.**

The Agreement, at ¶ 3(d), prohibits ALON from, among other things, promoting or
distributing products competitive with those of Converse, unless Converse has given its prior
written approval.  ALON has been promoting or distributing the competitive products of Miss Sixty
and Superga without the prior written consent of Converse.  Thus, ALON has violated the non-
competition clause and is liable to Converse for the losses caused thereby, which may be equal to
the profits made by ALON on the unauthorized competing sales.

5.    **Damages for ALON's failure to meet advertising minimums.**

The Agreement, at ¶ 7(d), provides that ALON shall expend not less than 5% of its Net
Sales for any year for advertising Licensed Articles bearing the Converse Marks.  Converse
understands that for the years 2002 and 2003 ALON did not meet the minimum 5% advertising
expenditure threshold.  Converse has documented the underpayment for 2002 at $108,044, and for
2003 at $361,574.  Converse believes that the underpayment for 2004, assuming that ALON's

PEPE&HAZARD LLP

Edwin H. Davis, Jr., Esq.
March 1, 2005
Page 3

expenditures for advertising in 2004 continued at the prior rate of about 2.5%, will be in the range of $650,000.  Thus, the total amount of actual and estimated underpayment of advertising expenses through year-end 2004 is about $1,120,000.  ALON is liable to Converse for the amount of $1,120,000, or for the consequential damages of lost sales, and resulting lost royalties, caused by the underpayment.

   6.   **Claim for interference with Converse's contract with Coopershoes.**

   Converse, on December 16, 2004, entered into a contract with Coopershoes to become effective on January 1, 2005.  ALON, either having actual or constructive knowledge of this contract, sought injunctions in the courts of Brazil and Argentina, compelling Converse to continue to treat the Agreement with ALON as effective after it expired of its own terms on December 31, 2004.  In obtaining these injunctions, ALON did not tell the courts that Converse already had a contract with Coopershoes.  Therefore, the "social argument" advanced by ALON in the Brazilian courts that workers at Coopershoes would lose their jobs if the injunction was not granted was untrue.  Also, ALON did not tell the courts that Converse had made it clear that there would be no contract renewal if ALON did not pass the audit, and that ALON had resisted the audit until Converse claimed that Alton's conduct constituted a contract breach.  Thus, ALON, through improper means and improper motives interfered in the contract of Converse with Coopershoes resulting in damages to Converse for lost royalties from the contract with Coopershoes and legal fees in attempting to reverse the injunctions obtained by ALON.  Converse cannot yet clearly quantify the amount of these damages.

   7.   **Claim for violation of U. S. copyright and trademark law, and common law unfair competition.**

   The federal copyright laws proscribe any unauthorized copying of an owner's copyrighted works.  17 U. S. C. § 501(a), incorporating by reference, 17 U. S. C. § 106.  Converse is the "exclusive owner" of its Marks, as specified in the Agreement.  ALON permitted the copying of the Marks without Converse's approval.  This permission for copying without written approval constituted a violation of U.S. trademark infringement laws.  15 U. S. C. § 1114(1).  Also, that same conduct establishes that ALON committed common law trademark infringement and unfair competition.  A licensee who has failed to satisfy a condition of a license, or has materially breached the licensing contract, has no rights to give to a sublicensee, and the licensee is liable for permitting use and copying without authorization and thereby for infringing the licensor's copyright and trademark.

   ALON entered into numerous sublicenses without written approval from Converse.  Those unauthorized sublicensees included at least Gatic, ALON Argentina, Belquis, Filon, Puket, Supreme, Formiga and Foroni.

MCG/32913/2/565496v1
03/01/05-BOS/

PEPE&HAZARD LLP

Edwin H. Davis, Jr., Esq.
March 1, 2005
Page 4

Converse estimates that the amount of net actual damages suffered by Converse for ALON's violations of copyright, trademark and unfair competition laws though year-end 2004 is at least $4.2 million. This claim covers not only violations by ALON up to December 31, 2004, but also violations after that date based on any further royalties paid by any unauthorized sublicensee to ALON with resulting additional damages suffered by Converse. Damages for this claim after December 31, 2004, may in part overlap with Converse's claim for interference with contract.

8.    Claim for unjust enrichment.

The factual basis for this claim is already set forth in the First Notice of Breach and letter of Converse, dated November 30, 2004. ALON has been unjustly enriched by charging license fees to its sublicensees when such conduct was expressly prohibited by the Agreement. ALON has been unjustly enriched by the amount of the license fees it charged its sublicensees.

Converse estimates the amount of the unjust enrichment of ALON for its conduct in violations of copyright, trademark and unfair competition laws to at least $4.2 million through year-end 2004. This claim covers not only unjust enrichment of ALON up to December 31, 2004, but also unjust enrichment after that date based on any further royalties paid by any sublicensee to ALON. Damages for this claim are duplicative of those for copyright infringement, trademark infringement, and unfair competition.

9.    Claim for violation of Massachusetts General Law Chapter 93A.

ALON entered into the Agreement with Converse while never intending to perform according to the terms of the Agreement prohibiting sublicensing without the written agreement of Converse. ALON also breached the Agreement by engaging in unauthorized sublicensing in order obtain benefits for itself not provided for in the Agreement. Such conduct constitutes violations of Massachusetts General Law Chapter 93A, § 11, subjecting ALON to liability to Converse for actual damages, multiple damages up to three times actual damages, and an award of reasonable attorney's fees. Some or all of the actual damages under this claim may be duplicative of those under other claims.

Converse hereby reserves all of its rights and remedies contained in or relating to the Agreement and such other agreements related thereto. Also, Converse advises ALON that all costs, charges and expenses incurred by Converse in connection with enforcement of the obligations and in connection with the exercise of its rights and remedies, together with interest thereon, shall become additional indebtedness owed by ALON to Converse.

MCG/32913/2/565496v1
03/01/05-BOS/

MAR. 1. 2005  5:47PM    PEPE & HAZARD 617-748-5555                    NO. 5258    P. 6

PEPE&HAZARD LLP

Edwin H. Davis, Jr., Esq.
March 1, 2005
Page 5

Reference in this letter to certain breaches of the Agreement is not intended as a waiver of any others. ALON should be aware that any failure of Converse to exercise any right or remedy under the Agreement referred to above, or provided by statute or law or in equity, or otherwise, is not intended to, and shall not impair or operate as a waiver of any such right or remedy or be construed as a waiver of any breach or as an acquiescence therein. Further, additional breaches may exist of which Converse has not yet given notice or of which Converse is not yet aware. Converse reserves all rights with regard to such additional breaches.

Very truly yours,

Michael C. Gilleran

# EXHIBIT "11"

Attorney At Law
Direct: 617.748.5511
mgilleran@pepehazard.com

617.748.5500 FACSIMILE: 617.748.5555

March 2, 2005

<u>Via Facsimile</u>

Altimir A. Breda, Director Presidente
Coopershoe – Coopertiva de Calcados Joanetense
Rua Vicente Prieto 3767
Picada Café, Rio Grande do Sul CEP 95175-000
Brazil

Re:    <u>Restoration of Contract/ Demand for Payments</u>

Dear Mr. Breda:

This is to notify Coopershoes – Coopertiva de Calcados Joanetense ("Coopershoes") that the Manufacturing, Distribution and Trademark License Agreement entered into between Converse Inc. ("Converse") and Coopershoes, dated as of December 16, 2004 (the "License Agreement"), and the First Amendment to the Manufacturing, Distribution and Trademark License Agreement ("First Amendment"), dated as of December 21, 2005, are no longer subject to a force majeure and are restored to effectiveness between the parties.  The License Agreement and First Amendment, pursuant to the definition of the term Contract Period as set forth in ¶ 1(a) of the License Agreement and ¶ 2 of the First Amendment, were to become effective on January 1, 2005.  The Brazilian court order requiring Converse to maintain the contract rights of ALON has been dissolved by further court order before Coopershoes has made any royalty payment to ALON for sales in the year 2005. Therefore, the starting date for the License Agreement and First Amendment of January 1, 2005, as defined by the term Contract Period in the License Agreement and First Amendment, is retained.

Converse hereby requires and demands payment to it by Coopershoes, pursuant to the terms of the License Agreement and First Amendment, of all royalties for sales made by Coopershoes on and after January 1, 2005.

Very truly yours,

Michael C. Gilleran,
Attorney for Converse Inc.

MCG/32913/2/566378v1
03/02/05-BOS/

BOSTON          HARTFORD          SOUTHPORT

www.pepehazard.com

03 Mar 05 02:51p

# EXHIBIT "12"

[TRANSLATION]

MARVAL, O'FARRELL & MAIRAL

[address, phone, fax
& e-mail address in Argentina]

[NOTARY STAMP]

Buenos Aires, March 8, 2005

Messrs.
Indular S.A.
Av. Roque Saenz Peña 832, 3rd Floor
City of Buenos Aires

Present

Dear Sirs:

I am writing to you following instructions received from Converse Inc., domiciled at One High Street, North Andover, Massachusetts, United States of America.

Converse Inc. has been informed that Indular S.A. and Alon International S.A. or Alon Argentina S.R.L. may be negotiating an agreement which involves the assignment of the licensing agreement for the use of the trademarks *"Converse"*, *"All Star"*, *"Converse All Star Chuck Taylor"* and *"Star and Chevron"*, all of which are registered in Argentina in the name of Converse Inc. under Nos. 1.579.128, 1.582.654, 1.944.809, 1.796.328, 1.582.732, among others, to identify class 25 products, which makes them the exclusive property of Converse Inc.

In this regard, and as instructed by Converse Inc., we must inform you that neither Alon International S.A., nor Alon Argentina S.R.L. have the right to assign the licensing agreement and/or to authorize the use of the trademarks *"Converse"*, *"All Star"*, *"Converse All Star Chuck Taylor"* and *"Star and Chevron"* to any third party, under whichever contractual manner used.

The trademark licensing agreement between Converse Inc. and Alon International S.A., of which Alon Argentina S.R.L. was a sub-licensee, ended on December 31, 2004, as decided by Converse Inc. The decision to terminate the trademark licensing agreement was communicated in a certified manner on November 30, 2004, thus neither Alon International S.A. nor Alon Argentina S.R.L. currently have the right to use the above-mentioned trademarks, and much less to assign the licensing agreement that linked them to Converse Inc.

Additionally, we should also inform Indular that, in accordance with the terms and conditions of said contract, which governed the relationship between Alon International S.A., Alon Argentina S.R.L. and Converse Inc., in order to perform the assignment of the license, it would have been necessary to obtain the approval of Converse Inc. We hereby inform you that in any event, Converse Inc. does not give its approval.

In view of this and of the reasons briefly stated above, we ask that you abstain from entering into any type of agreement with Alon International S.A. and/or Alon Argentina S.R.L. regarding the trademarks "Converse", "All Star", "Converse All Star Chuck Taylor" and "Star and Chevron", and to abstain from using any of these trademarks.

Otherwise, Converse Inc. will be forced to initiate whatever legal actions are applicable, including a criminal complaint for the possible commission of a crime as stipulated in law 22.362.

We remain sincerely,

(illegible signature)
Martin Campbell

Notification carried out with the assistance of a Notary on March 8, 2005. Certified.

                    (illegible signature)
                    [NOTARY SEAL]

**AFFIDAVIT**

STATE OF FLORIDA        )
                        ) SS
COUNTY OF MIAMI-DADE    )

BEFORE ME, A NOTARY PUBLIC IN AND FOR THE STATE OF FLORIDA AT LARGE, PERSONALLY APPEARED MRS. GUADALUPE GUTIERREZ, A CERTIFIED TRANSLATOR FOR AND ON BEHALF OF A TO Z TRANSLATIONS & PROFESSIONAL SERVICES CORP., WHO, AFTER BEING DULY SWORN, DEPOSES AND SAYS THAT SHE IS VERSED IN THE SPANISH AND THE ENGLISH LANGUAGES, AND THAT THE PRECEDING IS A TRUE AND CORRECT TRANSLATION INTO THE ENGLISH LANGUAGE OF THE ATTACHED DOCUMENT(S) IN SPANISH.



Guadalupe Gutierrez

SWORN TO AND SUBSCRIBED BEFORE ME BY GUADALUPE GUTIERREZ, WHO IS PERSONALLY KNOWN TO ME, THIS 11th DAY OF March, 2005.

NOTARY PUBLIC, STATE OF FLORIDA
AT LARGE
Name: Maritza S. de Puzo
Commission No. DD 128775
Expires: August 27, 2006

MARITZA S. de PUZO
Notary Public, State of Florida
Commission No. DD 128775
My Commission Expires 8/27/06
1-800-3-NOTARY   FL Notary Service & Bonding, Inc.



**MARVAL, O'FARRELL & MAIRAL**

Av. Leandro N. Alem 928
1001 Buenos Aires
Argentina
Teléfono (54 11) 4310-0100
Fax (54 11) 4310-0200
E-mail:
marval@marval.com.ar
www.marval.com.ar



Buenos Aires, 8 de marzo de 2005

Señores
INDULAR S.A.
Av. Roque Saenz Peña 832, 3° piso
Ciudad de Buenos Aires

**PRESENTE**

De mi consideración:

Me dirijo a Uds. en cumplimiento de instrucciones recibidas de Converse Inc., con domicilio en One High Street, North Andover, Massachusetts, Estados Unidos de Norteamérica.

Ha llegado a conocimiento de Converse Inc., que Indular S.A. y Alon International S.A. o Alon Argentina S.R.L. estarían negociando un acuerdo que involucra la cesión del contrato de licencia de las marcas "Converse", "All Star", "Converse All Star Chuck Taylor" y "Star and Chevron", todas ellas registradas en la Argentina a nombre de Converse Inc. bajo los Nros. 1.579.128, 1.582.654, 1.944.809, 1.796.328, 1.582.732, entre otros, para distinguir productos de la clase 25, por lo que son de exclusiva propiedad de Converse Inc..

Al respecto, por instrucciones de Converse Inc., debemos informar a Uds. que ni Alon International S.A. ni Alon Argentina S.R.L. tienen derecho a ceder el contrato de licencia y/o autorizar el uso de las marcas "Converse", "All Star", "Converse All Star Chuck Taylor" y "Star and Chevron" a ningún tercero, cualquiera fuera la forma contractual adoptada.

El contrato de licencia de marca que unía a Converse Inc. con Alon International S.A., y del cual Alon Argentina S.R.L. era una sublicenciataria, finalizó el 31 de diciembre del 2004 por decisión de Converse Inc. La decisión de terminar el contrato de licencia de marca fue notificada por medio fehaciente con fecha 30 de noviembre de 2004, por lo que ni Alon International S.A. ni Alon Argentina S.R.L. tienen en la actualidad derecho a usar las marcas mencionadas y menos aún, a ceder el contrato de licencia que las vinculaba con Converse Inc.

Además, también debemos informar a Indular que, conforme a los términos y condiciones de ese contrato que regía las relaciones entre Alon International S.A., Alon Argentina S.R.L. y Converse Inc., para proceder a la cesión de la licencia era necesario el consentimiento de Converse Inc. Notificamos a Uds. que en cualquier caso Converse Inc. no presta su conformidad.

Atento a ello y por las razones brevemente expuestas, solicitamos a Uds. se abstengan de celebrar con Alon International S.A. y/o Alon Argentina S.R.L. cualquier tipo de convenio con relación a las marcas "Converse", "All Star", "Converse All Star Chuck Taylor" y "Star and Chevron" y se abstengan de usar cualquiera de estas marcas.



MARVAL, O'FARRELL & MAIRAL

Caso contrario, Converse Inc. se verá en la obligación de iniciar las acciones judiciales que correspondan, incluyendo denuncia penal por la posible comisión del delito penal tipificado en la ley 22.362.

Saludamos a Uds. atentamente.

MARTÍN CAMPBELL

Notificación realizada con intervención Notarial con fecha 8 de marzo de 2005. CONSTE.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**Docket No.: 04-12591-PBS**

|                              |     |
| ---------------------------- | --- |
|                              | :   |
| **CONVERSE, INC.,**          | :   |
|                              | :   |
| **Plaintiff,**               | :   |
|                              | :   |
| **v.**                       | :   |
|                              | :   |
| **ALON INTERNATIONAL, S.A.,**| :   |
|                              | :   |
| **Defendant.**               | :   |
|                              | :   |

## ORDER GRANTING PRELIMINARY INJUNCTION
## PROTECTING *STATUS QUO* DURING ARBITRATION

Upon consideration of Defendant Alon International S.A.'s ("Alon") Emergency Motion

for a Preliminary Injunction and its accompanying affidavits, and it appearing to the Court, on

the basis of these filings that a preliminary injunction should be issued in order to prevent the

Plaintiff Converse, Inc. ("Converse") from altering the *status quo* of the parties' contractual

relationship as effective December 31, 2004 in any way pending a final confirmation of an

arbitral award;

And it appearing to the Court, that Defendant Alon will suffer immediate and irreparable

harm, injury and loss by any change, modification or alteration to the *status quo* of the parties'

contractual relationship as effective December 31, 2004, before the merits of the parties' dispute

may be fully adjudicated in the arbitration and a final arbitral award is confirmed;

And upon consideration that Defendant Alon has shown a likelihood of success in its

arbitral claims against Plaintiff Converse;

And the Court being of the opinion that the Defendant Alon does not have an adequate

remedy at law, that greater injury will be inflicted upon Defendant Alon by a denial of a

preliminary injunction than will be inflicted upon Plaintiff Converse, and that the public interest will be served by granting of a preliminary injunction;

### IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    Defendant Alon's Emergency Motion For A Preliminary Injunction is hereby GRANTED.

2.    Plaintiff Converse and its officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with them are **HEREBY ENJOINED AND RESTRAINED**, under Federal Rule of Civil Procedure 65, from taking any steps in the United States or elsewhere that would hinder, interfere with or obstruct the timely arbitration of the contractual disputes between the parties and altering the status of the parties' contractual relationship as effective December 31, 2004 pending a final confirmation of an arbitral award.

3.    The purpose and intent of this preliminary injunction is to maintain the *status quo* of the parties' contractual relationship as effective December 31, 2004 pending a final confirmation of an arbitral award.

4.    A violation of this Order may result in the imposition of sanctions against the violator, including an assessment of fees and costs.

5.    Defendant Alon is not required to post bond or other security at this time.


DATE: _____

HOUR: _____

_____
Hon. Patti B. Saris
United States District Judge


Conformed copies furnished to:
Edward H. Davis, Jr. Esq.
Richard A. Johnston, Esq.
Michael C. Gilleran, Esq.


C:\Documents and Settings\jonstn\Local Settings\Temporary Internet Files\Order on Alon's motion for a preliminary injunction (00043100).DOC