## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **CONVERSE, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Docket No.: 12591-PBS** |
| **v** | : | |
| | : | |
| **ALON INTERNATIONAL, S.A.,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT ALON INTERNATIONAL, S.A.'S NOTICE OF THE FILING OF THE ORIGINAL AFFIDAVITS OF ROBERTO SZERER DATED JANUARY 5, 2005 AND MARCH 11, 2005

Defendant Alon International, S.A. hereby gives notice of the filing of (1) the original Affidavit of Roberto Szerer dated January 5, 2005 and (2) the original Second Affidavit of Roberto Szerer dated March 11, 2005.

Dated: March 28, 2005.

Respectfully submitted,

        /s/ Richard A. Johnston
**WILMER CUTLER PICKERING**
**HALE AND DORR, LLP**
Richard A. Johnston
Cynthia D. Vreeland
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

- and -

**ASTIGARRAGA DAVIS**
Edward H. Davis, Jr. (admitted *pro hac vice*)
M. Cristina Cárdenas
701 Brickell Avenue, 16th Floor
Miami, Florida 33131
Telephone: (305) 372-8282

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing was sent electronically on March 28, 2005, to

**Michael C. Gilleran, Esq,** Pepe & Hazard, LLP, 225 Franklin Street, 16th Floor, Boston,

Massachusetts 02110-2804.

                                              /s/ Richard A. Johnston
                                             Richard A. Johnston

C:\Documents and Settings\irens\Desktop\Notice of the Filing of the Original Szerer Affidavits.DOC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### Docket No.: 12591-PBS

| | |
|---|---|
| CONVERSE, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ALON INTERNATIONAL, S.A., | : |
| | : |
| Defendant. | : |

### AFFIDAVIT OF ROBERTO SZERER

I, Roberto Szerer, being of lawful age, state as follows:

1.     I am Co-President of Alon International, S.A. ("Alon"). I have been Co-President of Alon since December 1997 and make this declaration based upon my personal knowledge.

2.     Alon is a corporation duly registered and organized under the laws of the Republic of Panama, and has its principal office and business at Calle 53 Urbanizacion Obarrio, Torre Swiss Bank, Piso 16, Panama, Republica de Panama.   Alon develops, sources, and markets footwear in Latin America. Alon has extensive experience in this field, and particular expertise in marketing and developing shoe and shoe products in Latin America.

3.     On or about September 1, 2001, Alon entered into a Manufacturing, Distribution and Licensing Agreement with Converse Inc. ("Converse"), by which Alon gained the exclusive rights and license to manufacture, distribute, and utilize Converse marks and related products throughout Argentina, Brazil, Paraguay and Uruguay ("Licensing Agreement" or "Agreement"). The Licensing Agreement between Alon and Converse is Exhibit "1" to the Vreeland Affidavit.

4.     During the ensuing years, Alon successfully developed the Converse marks and

related products, and continues today to invest heavily in developing the market for these products. Among other things, Alon rescued the Converse trademarks, including its ALLSTAR mark, from a "brand pirate" in the Brazilian market; created the market for the Converse marks and related products in previously non-existent markets; developed a successful business model for the sale of the Converse marks and products; developed and maintained business contacts and business relationships in the region that facilitate the sale of the Converse marks and products; significantly increased the sales for Converse products by over five times higher than the agreed upon minimum guarantees; successfully marketed and created distribution channels for Converse's marks and related products; successfully created the sourcing structure for the Converse products; and successfully positioned the Converse marks for strong growth in future sales. In sum, Alon established and developed a market for the Converse marks and related products in a market that had been unavailable to Converse for the past seventeen years. Alon's heavy investments in the development of the market were always predicated on a belief that the Licensing Agreement would be in existence for six years and beyond.

5.      The original term of the Licensing Agreement was from September 1, 2001, to December 31, 2004. However, the Agreement provided that Alon had the option of automatically renewing the Licensing Agreement for a period of three years upon the satisfaction of certain conditions. Specifically, Section 2 of the Licensing Agreement states that Alon could renew the Agreement for an additional term of three (3) years provided Alon exceeded a Guaranteed Minimum Royalty and Sales by twenty-five percent (25%) and further provided that Alon has not breached any of the terms and conditions of this Agreement. Licensing Agreement, §2.

2

## Alon Has Complied With The Terms of the Licensing Agreement

6.      Alon has fully complied with the terms of the Agreement. Among other things, Alon greatly exceeded the minimum royalty and sales requirement for the third contract year pursuant to the terms of the Agreement. Under the original terms of the Licensing Agreement, Alon guaranteed Converse minimum sales of $7,017,000 during the first term of the Agreement, and the actual sales through December 31, 2004 were approximately $40 million – more than *five times* the guaranteed minimum. Similarly, Alon guaranteed Converse a minimum royalty payment over the first term of the Agreement of $490,000 and will actually pay royalties to Converse for sales through December 31, 2004 totaling just over $3 million – more than *six times* the guaranteed minimum.

7.      Moreover, Alon has not materially breached any provision of the Licensing Agreement. At no time during the course of their three year-relationship did Converse ever put Alon on notice of a breach pursuant to any provision under the Agreement. Significantly, the first time Alon was put on notice of alleged "breaches" by Converse was on November 30, 2004, one month before the first term of the Licensing Agreement was set to expire.

8.      Based upon the ongoing good faith negotiations between the Parties and the automatic renewal provisions of the Licensing Agreement, Alon invested heavily in advertising, trade shows, outsole models, outsole lasts, infrastructure, personnel, and other raw materials for the continued development of the Converse brand in the Mercosur market for 2005 and beyond. Alon's investments in the development of the market was always predicated on a belief that the Licensing Agreement would be in existence for six years and beyond. Converse's affirmative attempts to oppose Alon's automatic renewal of its contractual rights under the Licensing Agreement will result in a significant loss to Alon and a significant windfall to Converse if the

Licensing Agreement is not deemed renewed.    In its efforts to serve Converse and fully expand

the market for the Converse marks and related products, Alon has devoted approximately eighty

(80) per cent of its time, energy, resources, and manpower on the Converse marks and products,

letting go of other valuable clients to fully focus on the Converse account in the process.

Converse has used Alon's image, track record and relationships built and developed over many

years for its own gain.

## Converse Is Attempting To Block Alon's Automatic Right of Renewal in Bad Faith And In an Attempt to Usurp Alon's Market

### *The Alleged Expiration of the Licensing Agreement*

9.    Alon has exercised its automatic right of renewal.   Throughout the first term of

the Licensing Agreement, Alon has clearly and unequivocally notified Converse of its intent to

exercise their right of renewal pursuant to the terms of the Licensing Agreement. The parties

have been engaged in extended and significant negotiations regarding the renewal of the

Agreement, involving both oral and written communications.  For example:

a)    On or about May 4, 2004, Tim Ouellette, ("Ouellette"), Vice-President of

Licensing at Converse sent me an e-mail indicating that the parties were involved

in negotiations regarding the re-negotiation of the Licensing Agreement:

*Attached please find an analysis of what is on the table.  I would*
*like to reach an agreement on how we plan to move forward as*
*soon as possible.*
*Thanks*

b)    On or about May 19, 2004, I sent to Ouellette an e-mail stating:

*Dear Tim,*
*Based on our telecom and continuing the process for establishing*
*the rationale for the new contract, attached you will find a*
*proposal where we have segmented growth, guarantee and royalty*
*rates per the following periods:*
- *Aggressive 2004/05/06*
- *Medium 2007/08/09/10*
- *Moderate 2011/12/13*

*As agreed, we will start from our 2003 actual sales as our base.*

*I believe this will help us reach a fair and **equitable renewal** with a minimum of tension.]*

*Regards,*
*Roberto Szerer*                    (emphasis added).

c)      On or about May 31, 2004, I wrote to Ouellette indicating the renegotiation of the Licensing Agreement.    Attached to the e-mail was a spreadsheet with proposed numbers throughout 2013.

*Dear Tim,*
*As per our telecom, enclosed you will find a spreadsheet with the numbers we agreed. As you can see I modified the royalty rate of Originals to bring it gradually to 10% over the term of the contract.*
*We understand that based on our initial "Big Aggressive Hairy Goal" you would like a growth for this year of 50%. We believe it is to high specially after the growth we had in the last year but anyhow we are evaluating the projections for 2004 taking in to consideration all the variables involved (New company in Argentina, new company in Brazil, new apparel line, etc.) and also including the recent change in the Real which by itself brings the sales numbers in Dollars down by 9.68% (Current exchange rate per dollar of R$ 3.10 vs. initial calculation at R$2.80). I will be traveling all week in Argentina and Brazil but will try to talk to you by Friday.*

*I wish you a good week.*

*Best regards,*
*Roberto Szerer*

d)      On or about June 10, 2004, I sent an e-mail to Ouellette, stating among other things, our intent to seek renewal of the Licensing Agreement:

*Dear Tim,*
*As per our telecom, enclosed you will find our revised forecast for 2004.*

*The main factors that affected the forecast for the year are:*

- *Devaluation in the region from our forecast of 2.8 Reais to the Dollar in Brazil to a new reality at 3.10*
- *In Argentina from 2.85 Pesos to the Dollar to 3.00. We don't expect a higher devaluation, but as you know the economy in this part of the world is extremely volatile so we must be attentive to any future changes.*
- *Despite the important legal battles that we have won against the Pirates, we continue having constant problems in the market which show that the growth in the vulcanized product will be 5% instead of our initial projection of 6.59%.*
- *We have revised our sales forecast for the cemented line in Brazil due to a low acceptance of the line in the market plus a higher than expected delay in getting the tech packs.*
- *Introduction of the apparel line increases our forecast.*
- *Argentina has begun well and sales for the year look promising but it took us longer to begin with the new structure and additionally we had delays due to a major strike by Brazilian customs. Instead of our initial projection of sales over 11 months, we expect to have only 7 real months of sales.*
- *Uruguay is affected in the same way as Brazil and Argentina by the devaluation.*

*The projection of total sales for 2004 shows a growth of 16.22 % from US$ 12,649,921 to US$ 14,701,254.*

***I have enclosed the breakdown of the numbers plus our updated proposal for the 5+5 year renewal.***

*I will give you a call to follow up and answer any questions you might have.*

*Best regards,*
*Roberto Szerer*                                        (emphasis added).

10.    As demonstrated by the above quoted communications, Alon and Converse have been involved in extensive negotiations regarding the renewal of the Licensing Agreement, and throughout these communications Alon made clear, in writing, its intent of renewing the Agreement. Therefore, Alon has exercised its absolute right of renewal prior to September 30, 2004, and as such, the Licensing Agreement did <u>not</u> expire on December 31, 2004.

6

11.    In September of 2004, Ouellette verbally communicated to Szerer, that Converse was renewing the Licensing Agreement.

**The Alleged Unauthorized Arrangement With Coopershoes**

12.    Converse is now attempting to block Alon's automatic right of renewal as a way of denying Alon its contractual rights. In order to do so, Converse has used pretextual excuses to oppose in bad faith Alon's right to automatically renew the Licensing Agreement. All such allegations are without merit, and are nothing more than bad faith attempts of usurping Alon's market.

13.    Specifically, Converse alleges that Alon entered into a prohibited sub-licensing agreement with Cooperativa De Calcados E Componentes Joanetense LTDA ("Coopershoes"). Coopershoes is a Brazilian company in the business of manufacturing shoes and shoe products.

14.    Such allegations are disingenuous and factually inaccurate. At all relevant times, Converse has i) been aware of and participated in the organization of the business structure between Coopershoes and Alon; ii) had full knowledge of the Coopershoes Arrangement; iii) fully approved of the Coopershoes Arrangement; and iv) consented to the Coopershoes Arrangement. Among other things: Converse devised, drafted and approved the contracts to be executed between Alon and Coopershoes through its Brazilian legal counsel; Converse visited the Coopershoes factory in Brazil on several occasions; Converse approved the sale of goods, which clearly indicated on the tags that Coopershoes involvement with the production of the products; Converse received wire transfers <u>directly from Coopershoes</u> from October of 2002 to January of 2004; Converse participated and cooperated in legal actions undertaken by Coopershoes in Brazil in order to defend the Converse mark from a "brand pirate"; Converse audited the Coopershoes factory, with a copy of the audit report sent directly to Converse; and

Coopershoes paid a bond the equivalent of about $70,000.00 to be paid on behalf of Converse for the protection of the Converse ALL STAR Mark in Brazil.

15.    Specifically, in a July 29, 2002 e-mail to Luiz Henrique O. do Amaral, Converse's lawyer in Brazil, on which Ouellette and Laura Kelley (Converse's General Counsel) were copied, Ronald Durchfort ("Durchfort"), Co-President of Alon, wrote:

> *Dear Luiz,*
> *I want to inform you that we have signed a contract with Coopershoes. With this contract we are achieving:*
> *Elimination of production support to Artigos.*
> *Ready to immediately introduce Converse All-Star.*
> *Elimination of Artigos argument that Converse production/distribution will cause loss of jobs.*
> *Non-traumatic entry of Converse All-Star into the Brazilian market. ....*

16.    Moreover, we advised Converse of all the details of its arrangements with Coopershoes on multiple occasions.  On October 10, 2002, Ouellette wrote in an e-mail to Durchfort:

> *Ronald,*
> *Thanks that sounds great. Of course you will also bring the Cooper Shoe Agreement.  Let me know when you will be arriving and I will provide transportation.*

17.    In response, Durchfort and I flew to Boston with the Coopershoes contracts in hand to meet with Ouellette and Kelley (among other Converse personnel).  At that time, we completely explained the Coopershoes arrangement to Ouellette, including all of the functions Coopershoes was to assist with in addition to the manufacturing of the Converse product.  We fully explained the reason for the Coopershoes structure as a means of complying with Brazilian regulations while allowing royalties to be paid to Converse.  Otherwise, Converse would have had to take its royalties in Brazilian currency in Brazil – which it did not want to do.  It was also explained to Converse that the Coopershoes arrangement was necessary to prevent Coopershoes

from producing for the "brand pirate" while allowing the Converse products to enter the market

as quickly and efficiently as possible.

18.     As a follow up to the meeting, Durchfort wrote in an e-mail on October 24, 2002,

to Ouellette:

> *Dear Tim,*
> *Thanks for the productive meeting with you and your team.*
> *The Mercosur project is up and running. October shipments in*
> *Brazil are on target and November order placement (Nov.*
> *delivery) is running above forecast.*
> *So that we are all on the same page I have included in this e-mail*
> *the results of our conversations which we are now implementing.*
> *We understand the line being sold is approved with the above*
> *corrections. We intend to present 03-1 season product for*
> *approval within 60 days.*

19.     Most illuminating is Ouellette's responsive e-mail that same day:

> *Ronald,*
>
> *I'm real glad that we were able to this week to both clear the air,*
> *as well as reviewing your strategy for moving forward. The*
> *presentation was great, and the strategy absolutely on the mark for*
> *the market in it's current situation. For the time being, I would*
> *like you to run all Approvals through me with a copy to Ava*
> *Lawrence, I frankly do not want to get Marketing/Product*
> *Development involved. They do not always look at projects like*
> *this as business, and tend to get anal. When all product is up to*
> *speed and you are on the same page as our company I will turn*
> *this over. I am now tremendously excited and looking forward to*
> *what we can do.*
> *Please let me know the dates that you want me in Brazil, so I can*
> *plan that trip*
> *Again, Great job!*
> *Thanks*
> *Tim*

20.     At no time, despite having been given a complete and thorough briefing of the

sum and substance of the Coopershoes arrangement did Ouellette object to the Coopershoes

arrangement. In fact, he thanks Durchfort for "clearing the air."

21.    Again, in late 2003, I flew to Boston to discuss ongoing operations in the Mercosur market with Converse and the issue of the Coopershoes arrangement came up.   This time I also met directly with Kelley as well.  During that meeting, I again completely explained the sum and substance of its arrangements with Coopershoes.  I explained to Converse that the structure of the Coopershoes arrangement was not a sub-licensing agreement, but had to be structured the way it was for among other reasons, to comply with Brazilian regulations while allowing royalties to be paid to Converse.  Converse was quite happy receiving over $3,000,000 in royalties in this method over the past several years.  At no time did Kelley or anyone else from Converse notify me or anyone else at Alon that it had any problems with the arrangement or that it considered the arrangement to be an unapproved sublicense agreement.

22.    A few days later, Converse drafted an amendment to the Agreement and did not even think this issue worthy of addressing in the Amendment.

23.    Alon has now learned that Converse has sought to enter into a direct contractual relationship with Coopershoes, allegedly making Coopershoes the exclusive licensee in the Mercosur area as of January 1, 2005.    This is the same company Converse is now alleging as grounds for usurping Alon's automatic right of renewal pursuant to the terms of the Agreement for Alon's use of that very same company.

24.    Converse also alleges that Alon has entered into unauthorized arrangements with Brazilian entities entitled Filon (apparel), Pucket (socks) and Foroni (notebooks), and the Uruguayan entity Belquis (footwear).  (Laganas Affidavit, ¶ 10).  Again, these allegations are factually inaccurate.  Moreover, any possible arrangement between Alon and these companies was fully known, encouraged, and approved of by Converse.  Among other things, Alon had fully explained the terms of possible contracts with these companies to Converse, Alon had

submitted for Converse's approval products to be produced by these companies, and Converse

had approved said products. For example, on October 11, 2004, Durchfort sent an e-mail to

Ouellette stating:

> *Thanks for lunch.*
>
> *Every time after I speak with you I feel confident that we are building the partnership with you and converse. I guess that my challenge is to keep you up to speed more often and keep our channels open. I felt that I was doing this but the "audit" somehow got away from both of us.*
>
> .....
>
> *I recognize that we shld visit you at converse after the audit to do a "whiteboard" session and [strategize] the best structure given the reality.* ***I will execute the apparel and sock deals as we spoke and include all information concerning them during whiteboard session.*** *Rgds* *Rd*

(emphasis added).

25.    In sum, Converse is using our relationship with Coopershoes and others as

unfounded grounds for blocking our automatic right of renewal. However, as reflected in

the written record, our arrangements with Coopershoes and others was fully known by,

encouraged, and approved of by Converse. Converse's attempts to usurp our market

have not stopped there, however. Converse has also, among other things, induced us to

divulge our strategies, marketing plans and detailed customer information (including

names, addresses and phone numbers) by misrepresenting that they intended to abide by

the terms of the Licensing Agreement by renewing it for another three years. In doing so,

Converse has misappropriated for its own gain our confidential information, including

our business relationships, strategy and customer base.

*The Alleged Failure to Pay Correct Royalties Pursuant to the Licensing Agreement*

26.    Section 15(a) of the Licensing Agreement requires that Alon pay Converse a royalty equal to a specified percentage of the "Net Sales" made by Alon of Converse Licensed Articles. A "Net Sale" is defined in Section 1(h) of the Agreement as "the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, trade discounts, volume rebates and any freight charges *and VAT taxes* included in the invoice." (emphasis added). (Licensing Agreement, § 15(a)).

27.    Alon has always fully complied with this requirement. Although there is no VAT tax in Brazil there is an equivalent tax called an ICMS tax. The ICMS tax was included on the invoices to Converse, but it has not been deducted twice from the sales reported to Converse. In this respect the total royalties earned by Converse for sales through December 31, 2004 is $3,059,000, which is actually just over 7% of the total net sales of $40,663,000 under the Agreement through its first term.

28.    The use of the term VAT Tax in the Licensing Agreement is nothing more than that of a scrivener's error. Converse is now attempting to use this simple drafting mistake as an excuse to block Alon's right of automatic renewal.

*The Alleged Incorrect Use of Exchange Rates to Calculate Royalties Due Under the Licensing Agreement*

29.    Section 19(a) of the Licensing Agreement states that "[u]nless specifically set forth to the contrary herein, all payments to Converse (except Converse Factories) required to by made by [Alon] pursuant to this Agreement shall be made in the currency of the United States of America…..Converse will review the exchange rate received by Licensee in the conversion from [Alon's] local currency to U.S. funds by comparison with the exchange rate published by the

Wall Street Journal ("WSJ") two (2) business days prior to the payment due date schedules in paragraph 18 of this Agreement."  (Licensing Agreement § 19(a)).

30.    As a means of blocking Alon's automatic right of renewal, Converse alleges that ALON has underpaid the amount of royalties due under the Licensing Agreement due to the incorrect use of exchange rates.

31.    Alon has always used exchange rates identified in good faith from the Wall Street Journal as required by the Licensing Agreement.  To the extent that any error has been made, it was made in good faith.

32.    In a good faith attempt to remedy any inconsistency that may have resulted in the payment of the royalties due to Converse as a result of an incorrect exchange rate, Alon sent Converse a wire transfer in the amount of $3,780.75 for the amount still allegedly owed to Converse.

33.    The amount sent to Converse was calculated by deducting from the $16,291.00 alleged as owed by Converse, an amount of $12,510.25, which Alon had previously overpaid to Converse.  Converse acknowledged the overpayment of $12,510.25 in a recent audit.  There has bee no intent of any kind to short change Converse, and Converse is arguing about a $12,000 differential on total royalty payments that by December 31, 2004, totaled $3,059,000.  That is less than a 0.4% error.

34.    To the extent that there are any remaining discrepancies, Alon has paid Converse the amount it is alleging is still outstanding on December 17, 2004.  Alon has done this in a good faith effort to resolve this dispute between the parties, and without any admission or consent as to any wrongdoing on Alon's part.

### E.    The Minimum Advertising Requirements

35.    Section 7(d) of the Licensing Agreement provides that Alon shall "expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for the Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure")." (Licensing Agreement, § 7(d)).

36.    Alon has met this requirement. Alon's annual expenditure on advertising/marketing during the initial three-year term of the Licensing Agreement has been 5.2%, which is clearly in excess of the 5% requirement set forth in the Licensing Agreement.

37.    Moreover, Converse alleges as further grounds to block Alon's automatic right of renewal, that Alon was required to expend 5% of Net Sales on *direct advertising*. The direct advertising requirement is completely without basis in the Agreement between the parties. Advertising Expenditure is nowhere specifically defined in the Licensing Agreement, nor is it limited to direct advertising in the Licensing Agreement.

38.    It is important to re-emphasize that Alon has exceeded their sales requirements under the first term of the Licensing Agreement by more than five times the guaranteed minimum and any attempt by Converse to allege that Alon has not met their advertising requirements under the Licensing Agreement is, yet again, a bad faith attempt to strip Alon of their automatic right of renewal in an effort to usurp the lucrative market Alon has developed as well as the business contacts they have built in the Mercosur region.

### Alon Has Fully Submitted The Merits of This Dispute to Arbitration

39.    Alon has always used its best efforts to achieve an amicable resolution to the dispute at hand. As clearly set forth in the correspondence between the parties, Alon has always demonstrated willingness to compromise, negotiate and amicably resolve this dispute between

the parties, which Converse has not reciprocated. For instance, on December 15, 2004, Alon sent a letter to Converse's counsel noting in relevant part:

> *To be clear, Alon considers the Agreement renewed by its terms at the 8% royalty rate agreed to by Converse. However, lest you or Converse draw incorrect conclusions from Alon's conduct geared to self-preservation, Alon is, and always will be, interested in amicably resolving this dispute. The Agreement drafted by Converse requires the parties to attempt to settle controversies and disputes arising hereunder "amicably, promptly and fairly." We look forward to hearing from you promptly in this regard as we have heard nothing so far but belligerence, delay and unfairness. Alon stands willing to make a good faith effort to address <u>any</u> concerns Converse may have with regard to how best we can go forward over the next three years to maximize sales and profits but only under the context that Alon has exercised their right of renewal, and not under the threat of termination and / or non – renewal.*
>
> (emphasis in original).

40.    Converse, however, did not reciprocate. On December 16, 2004, after efforts to mutually negotiate a resolution to this dispute failed, Alon initiated arbitration pursuant to the procedure set forth in the Licensing Agreement with the American Arbitration Association ("AAA"). A copy of Alon's Notice of Arbitration and Statement of Claim is attached as Exhibit "2" to the Vreeland Affidavit.

### Alon Seeks Injunctions in Brazil and Argentina To Preserve The Status Quo Pending A Resolution Of This Dispute During Arbitration

41.    In blatant disregard to the ongoing dispute regarding the continuing validity of the Licensing Agreement, Converse has sought to strip Alon of their current contractual rights, by among other things, entering into a contractual relationship with Coopershoes; attempting to prevent Alon from continuing its obligations under the Licensing Agreement; and using Alon's confidential business information, strategy and relationships for its own efforts to squeeze Alon out of the Mercosur market. In a final act of self-preservation, Alon sought injunctions in Brazil and Argentina, which would prevent Converse from infringing upon Alon's existing contractual rights in those countries pending the resolution of this dispute in arbitration.

42.    On or about December 22, 2004, the Brazilian court in the 19th State Court of Porto Alegre, State of Rio Grande do Sul, Brazil granted an injunction against Converse which declared that the Agreement between the parties continued in effect until the termination of the arbitration proceedings already initiated and restrained Converse from having any contractual arrangements in Brazil that went against the existing contractual rights of Alon ("Brazilian Injunction"). A certified translation of the Brazilian Injunction is attached as Exhibit "3" to the Vreeland Affidavit. Alon notified Converse of the Brazilian Injunction on December 29, 2004.

43.    On or about December 30, the Argentine National Court of First Instance No 22, Clerk's Office No 43 of the City of Buenos Aires, Argentina, granted a status quo injunction against Converse. The Argentine Injunction declares that the Agreement is in effect during the term of sixty days as from December 30th, 2004 when the Injunction was issued, and orders Converse to restrain from having any contractual arrangements in Argentina that go against the existing contractual rights of Alon during that time ("Argentine Injunction"). A certified translation of the Argentine Injunction is Exhibit "4" to the Vreeland Affidavit. Alon notified Converse of the Argentine Injunction on December 30, 2004.

44.    Converse has sought to portray the Brazilian and Argentine Injunctions as an attempt by Alon to evade the parties' agreement to arbitrate this dispute.    However, such allegations are simply unfounded because Alon has always complied with its agreement to arbitrate this dispute. Alon sought the Brazilian and Argentine Injunctions in an effort to prevent Converse from continuing to misappropriate for its own gain our confidential information, market, business strategy and business relationships pending a final resolution as to the status of the Licensing Agreement in arbitration. As such, Alon has pursued the Brazilian and Argentine

Injunctions with the <u>sole</u> purpose of maintaining the status quo between the parties pending a full resolution of this dispute in arbitration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 5 day of January 2005.

FURTHER AFFIANT SAYETH NOT.

_____
Roberto Szerer

F:\WDOX\CLIENTS\10077\1001\00042253.DOC

17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Docket No.: 12591-PBS**

| | |
|---|---|
| CONVERSE, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v | : |
| | : |
| ALON INTERNATIONAL, S.A., | : |
| | : |
| Defendant. | : |

## SECOND AFFIDAVIT OF ROBERTO SZERER

I, Roberto Szerer, being of lawful age, state as follows:

1.    I am Co-President of Alon International, S.A. ("Alon"). I have been Co-President of Alon since December 1997 and make this declaration based upon my personal knowledge.

2.    Alon is a corporation duly registered and organized under the laws of the Republic of Panama, and has its official office at Calle 53 Urbanizacion Obarrio, Torre Swiss Bank, Piso 16, Panama, Republica de Panama.

3.    On or about September 1, 2001, Alon entered into a Manufacturing, Distribution and Licensing Agreement ("Licensing Agreement") with Converse Inc. ("Converse").

4.    Despite Alon's full compliance with the terms of the Licensing Agreement, Converse has sought in bad faith to refuse Alon's automatic right of renewal of the Licensing Agreement.

5.    Consequently, on December 16, 2004, Alon filed a Notice of Arbitration and Statement of Claim with the International Center for Dispute Resolution ("ICDR") of the American Arbitration Association ("AAA").

6.      Following Alon's initiation of Arbitration, Alon sought *status quo* injunctions in Brazil and Argentina, which were granted. The Argentine injunction, however, is of limited duration and is only valid for a period of sixty (60) days. Moreover, although the Licensing Agreement covers Argentina, Paraguay, Brazil and Uruguay (the "Mercosur Market"), Alon has not sought or obtained *status quo* injunctions in Uruguay or Paraguay.

7.      On December 21, 2004, Converse filed an Application For a Temporary Restraining Order ("Application") in this Court to restrain Alon from pursuing the *status quo* injunctions in those countries. This Court denied Converse's Application in an Order dated January 13, 2005. A true and correct copy of the transcript of the hearing on Converse's Application is attached as **Exhibit "1."**  A true and correct copy of the Order denying Converse's Application is attached as **Exhibit "2."**

### Converse Has Delayed and Impeded The Arbitration Between The Parties

8.      Since its Application before this Court was denied, Converse has undertaken a dilatory course of action aimed at delaying and postponing the arbitration of the parties' dispute. Alon now believes that Converse is intentionally impeding the arbitral proceedings in order to permit it to position itself throughout the Mercosur Market and alter the *status quo* to its favor and to Alon's detriment. Among other things, Alon believes Converse has sought to delay the arbitral proceedings while the Argentine Injunction expires by its own terms, allowing Converse to seek an alteration of the *status quo* there. Converse has also threatened retaliatory action against Cooperativa De Calcados E Componentes Joanetense LTDA ("Coopershoes"), the same company Converse has sought to make its Licensee in the Mercosur Market despite Alon's contractual relationship with both Converse and Coopershoes, should said company sign a provisional agreement to continue working with Alon pending a final confirmation of an arbitral

2

award. This behavior by Converse is clearly indicative of an intent to alter the *status quo* prior to a final confirmation of an arbitral award rendered in this case.

9.    Among other things, Converse has frustrated Alon's attempts to have the arbitration proceed forward in a timely fashion by raising a myriad of specious procedural objections to the arbitral forum's jurisdiction and its procedural rules, which have no legal or factual basis.  Specifically, on December 21, 2004, Converse filed a Motion to Dismiss or Transfer to the Appropriate Office of American Arbitration Association with the AAA / ICDR ("Motion to Dismiss").  In its Motion to Dismiss, Converse sought to avoid, among other things, the AAA / ICDR's jurisdiction and the application of its procedural rules by charging that this case is a purely domestic dispute.  As more fully set forth in Alon's Response to Converse's Motion to Dismiss or Transfer, the arbitration is an international dispute because Alon is a Panamanian corporation, Converse is an American corporation, and the dispute involves an international Licensing Agreement for the manufacture and sale of marks and products throughout South America.  A true and correct copy of Alon's Response to Converse's Motion to Dismiss or Transfer is attached hereto as **Exhibit "3."**

10.    In an effort to meet Converse half-way and proceed with the arbitration in a timely fashion, Alon noted in its Response to Converse's Motion to Dismiss that it would be willing to apply the AAA's Commercial Arbitration Rules so long as the arbitrator was selected from the AAA / ICDR approved list of arbitrators and was administered by the AAA / ICDR.

11.    Following Alon's Response, the parties agreed on an informal procedure for the selection of an arbitrator.  Nonetheless, Converse failed to comply with the deadlines set by the parties for the selection of an arbitrator, and moreover, continued to use additional delay tactics to postpone the arbitration.  (*See* Ex. "4").  For instance, Converse insisted on filing a Reply to

3

Alon's Response to its Motion to Dismiss. This procedure was never contemplated in the parties' original agreement in this regard. Despite Converse's insistence over the last weeks that it would be filing a Reply, and despite Alon's repeated requests to Converse on the status of the reply,[1] Converse delayed issuing its reply. Converse's insistence on filing a reply, despite not being contemplated in the parties' original agreement, has significantly delayed the arbitration.

12.    On January 29, 2005, Alon sent a letter to Converse, indicating, among other things, that Alon believed that Converse was delaying the arbitral proceedings so it could put into effect a scheme to irrevocably alter the *status quo* prior to the completion of arbitration. Among other things, in this letter Alon states:

> *The totality of the conduct by Converse set forth above belies any claims on your part that Converse is serious about moving these issues along. Converse is clearly stalling. Alon believes that this is because Converse is attempting to gain some sort of unfair and improper tactical advantage by dragging its feet on all of these issues while simultaneously delaying the arbitration with its specious position that it is not an international dispute .... and by not responding with regard to the arbitrators off the list supplied by the AAA/ICDR last Monday evening. All of this conduct also calls into question Converse's constant bemoaning about how long this arbitration is going to take.*

A true and correct copy of this letter is attached as **Exhibit "4."**

13.    Converse responded on February 1, 2005 to Alon's letter. Among other things, Converse stated that it was dropping its allegation that Alon had double deducted VAT or ICMS taxes from the sales reported to Converse. Nonetheless, Converse made no reference to complying with the deadlines set by the parties for the selection of an arbitrator or otherwise.

---

[1] On January 29, 2005, Alon wrote to Converse, "Alon demands that you file your Reply before the AAA / ICDR. As you know, there was to be no Reply and you have now asked for this right once again seeking to delay the start of the arbitration." (Ex. "4").

Again, on February 4, 2005, Alon wrote to Converse, "We welcome your comments on these proposed arbitrators, and hope that Alon and Converse may come to an expeditious and satisfactory resolution of this issue. To that end, when can we expect to see your reply to our memorandum in response to Converse's Motion to Dismiss or Transfer?" (Ex. "5").

14.    On February 4, 2005, Alon again wrote Converse, seeking to expedite and move the arbitration forward.  Among other things, Alon proposed the names of three arbitrators from a list provided by the ICDR / AAA.  In its letter, Alon noted:

> *As you know, Alon's position with respect to potential arbitrators has always been that it was willing to look at arbitrators with Massachusetts experience, but only if they were from the AAA International Panel.  Alon has never agreed to arbitrators from the AAA Commercial Panel.  Further to the goal of expediting the arbitration, Alon would like to tender the following names from the AAA International Panel as potential arbitrators:*
>
> *[names omitted from affidavit]*
>
> *We welcome your comments on these proposed arbitrators, and hope that Alon and Converse may come to an expeditious and satisfactory resolution of this issue.*

To date, Converse has not responded to the names proposed by Alon.  A true and correct copy of this letter is attached as **Exhibit "5."**

15.    On February 24, 2005, the AAA / ICDR issued its decision regarding the international nature of this dispute.   In its decision, the AAA / ICDR agreed with Alon and determined that the arbitration would be administered by the AAA / ICDR, an arbitrator appointed from the AAA / ICDR international panel, and governed by the AAA / ICDR International Rules.  A copy of the AAA / ICDR's decision is attached as **Exhibit "6."**

16.    In large part due to Converse's delay tactics, almost three months have passed since Alon initiated arbitration, and the parties have yet to select an arbitrator.[2]

17.    Converse has also used other delay tactics.  For instance, Converse has refused to negotiate a standstill agreement, which it had initially proposed and drafted (the "Provisional Agreement").  According to Converse, the alleged purpose for the Provisional Agreement was to freeze the contractual relationship between the parties as effective December 31, 2004, prior to

---

[2] On March 8, 2005, Converse finally agreed on a method for the selection of an arbitrator.  This is nearly **three months after** Alon initiated arbitration.

the expiration of the first term of the Agreement and provide for the *status quo* pending a final resolution of the parties' dispute in arbitration.

18.    However, I am informed that as originally drafted by Converse, the Provisional Agreement would have allowed Converse to irrevocably alter the *status quo* of the parties' contractual relationship while at the same time preventing Alon from instituting any actions to protect its interests.    Specifically, Converse indicated that any provision in the Provisional Agreement preventing Converse from attempting to overturn the Brazilian or Argentine injunctions until the arbitration was completed was a "deal breaker" for Converse.

19.    Nonetheless, Alon proposed fair and balanced changes to the Provisional Agreement, which would have had the effect of creating an effective and actual stand still during the pendency of the arbitration.  Despite numerous and repeated requests to Converse's counsel, however, Converse has failed to respond in any way to Alon's proposed changes. .

### Converse Refuses To Cooperate With Alon During The Standstill Period Pending A Resolution Of The Parties' Dispute In The Arbitration

20.    Converse has also refused to cooperate with the functional operations of the parties' business, despite Alon's repeated requests for Converse to do so.    Alon has sent numerous e-mails and telephone calls to Converse, all to no avail.  For example, on February 17, 2005, I wrote to Linda McCabe at Converse:

> Dear Linda:
> We are not being able to go in to media bin.
> Please let us know if the login has changed.
> Regards,
> Roberto Szerer

After having received no response, on February 21, 2005 I followed up by writing:

> Dear Linda,
> Can you please let us know.
> Regards,
> Roberto Szerer

6

21.    Converse never responded in this or in any other related matter with respect to the

functioning of our business. Thus, on February 23, 2005 Alon wrote to Converse:

> ....[Y]our February 15, 2005 letter purports to set forth a procedure under which
> Alon and Converse can conduct operations pending a final resolution of this dispute
> in arbitration. In order for Alon to operate the business in the Mercosur countries, it
> is imperative that it be able to have operational conversations with your client.
> Nonetheless, to date Alon has received nothing but unresponsiveness from all
> Converse employees, including those you have listed in your February 15 letter as
> contact personnel during the standstill period. Such behavior makes it very difficult
> (if not impossible) for Alon to continue developing the Converse marks and related
> products. It demonstrates that Converse is in fact impeding Alon from proceeding in
> its efforts to develop the Converse marks and related products pending a final
> resolution of the parties' dispute in arbitration.
>
> Moreover, Alon has been unable to access the media bin internet tool. In this
> respect, it seems as though Converse has changed the login and password to prevent
> Alon's access. Repeated requests by Alon to Linda McCabe at Converse regarding
> its inability to access the media bin and its need for samples have gone unanswered.

A true and correct copy of this letter is attached as **Exhibit "7."**

### Converse Seeks To Alter The *Status Quo* Despite The Pending Arbitration

22.    I am advised that on February 24, 2005, while the judge who issued the injunction

was on vacation, Converse secretly and on an *ex parte* basis obtained an order from a substitute

Brazilian judge setting aside the *status quo* injunction. The substitute Brazilian judge based its

decision on the pending arbitration between the parties. The substitute Brazilian judge stated:

> The plaintiffs do not discuss the legality of the Clause and acknowledge as legitimate
> the Arbitration Panel, as they admit having opened an arbitration proceeding to settle
> the conflicts arising from termination of contract.  All issues involving termination
> must be settled in the Arbitration Proceeding already opened by the plaintiffs, and
> the question is one of closing the case, pursuant to the rule of article 267, sub-item
> VII, of the Code of Civil Procedure.

23.    The substitute judge based its decision on the existence of a pending arbitration,

which due to Converse's dilatory tactics, had remained stagnant for close to three months.

24.    Converse has concurrently engaged in a campaign to destroy Alon's contractual rights, relationships, business and income.  Converse has undertaken this outrageous course of action while simultaneously seeking to delay and impede the arbitral proceedings with the goal of seeking to set aside the Brazilian Injunction and the expiration of the Argentine Injunction prior to the initiation of the arbitration.

25.    For instance, Alon has reviewed the contract between Converse and Coopershoes. In paragraph 38 of said contract, Converse directs Coopershoes to pay Converse money rightfully due and owing to Alon.  A copy of this contract is attached hereto as **Exhibit "8."** Alon has also learned through Coopershoes that Converse has verbally directed Coopershoes to withhold payment to Alon under the threat of future retaliation.  This is in direct conflict with a letter Alon received from Converse on February 1, 2005, where counsel for Converse states "[Alon's] statement that ALON has not been paid by Coopershoes because of instructions that Converse has given to Coopershoes is untrue."    Moreover, as a result of this behavior, Coopershoes has failed to pay Alon for the months of January and February, 2005.

26.    Converse outrageous conduct, however, has not stopped there.   In complete disregard for the pending arbitration over the validity of the Licensing Agreement, on March 1, 2005, Alon received a letter from Converse purporting to be a Notice of Termination.  A true and correct copy of this letter is attached as **Exhibit "9."** Converse wrote:

> As of December 31, 2004....any and all rights of Licensee to use the Converse Marks and Trade Secrets terminated and ceased absolutely.   Licensee, after December 31, 2004, shall not manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with the Converse Marks….. Also, Converse advises Licensee that all costs, charges and expenses incurred by Converse in connection with enforcement of the obligations and in connection with enforcement of the obligations and in connection with the exercise of its rights and remedies, together with interest thereon, shall become additional indebtedness owed by Licensee to Converse.

27.     The next day, Alon received yet another letter from Converse purporting to be an "Amended Notice of Expiration." In this letter, Converse alleges additional grounds for Alon's purported "breaches." Alon **never received notice** of these alleged "breaches" nor did it ever have the **opportunity to cure** said "breaches" prior to Converse's notification that it was refusing to renew the Licensing Agreement, as required by paragraph 24 of the Licensing Agreement. A true and correct copy of this letter is attached as **Exhibit "10."**

28.     On March 3, 2005, Alon received a letter from Coopershoes, sent by Converse to Coopershoes on March 2, 2005. A true and correct copy of this letter is attached as **Exhibit "11."** Not only does Converse direct Coopershoes to withhold payments owed to Alon, it also infringes upon Alon's existing contractual rights by purporting to effectuate its contract with Coopershoes, despite the ongoing dispute with Alon over the continuing validity of the Licensing Agreement. Converse wrote:

> This is to notify Coopershoes....that the Manufacturing, Distribution and Trademark License Agreement entered into between Converse Inc... and Coopershoes, dated as of December 16, 2004....[is] no longer subject to a force majeure and [is] restored to effectiveness between the parties.... Converse hereby requires and demands payment to it by Coopershoes, pursuant to the terms of the License Agreement...., of all royalties for sales made by Coopershoes on and after January 1, 2005.

29.     On March 8, 2005, Converse sent a letter to one of Alon's business partners in Argentina, with whom Alon was engaged in negotiations over the management of Alon Argentina, S.A. (Alon's related company). Converse's letter strongly alleged that Alon has no right to utilize the Converse marks, that the Licensing Agreement is null and void, despite the Argentine injunction currently in place, and that said company faces **criminal** charges if it continues to negotiate with Alon. A true and correct copy of this letter is attached as **Exhibit "12."** Attached with this letter is a certified translation.

30.    Despite directing Coopershoes to withhold Alon's payment, interfering with Alon's business ventures, and moreover, refusing to cooperate with the daily functioning of the parties' business, Converse has been hypocritically emphatic about receiving full payment from Alon. In essence, Converse has sought to retain the benefits of the Licensing Agreement while destroying Alon's ability to perform under the Agreement and make payments to Converse.

## Alon Faces Irreparable Harm If An Injunction Is Not Issued

31.    It has become clear to Alon that Converse has been intentionally impeding the arbitral proceedings in order to permit it time to position itself in Alon's market territory and to alter the *status quo* to its favor and to the detriment of Alon prior to the initiation of the arbitration. Without an injunction, Converse's scheme – as it is designed to – render any eventual arbitral award in Alon's favor meaningless and moot.

32.    If an injunction is not issued, Alon faces the possibility of losing the right to manufacture and distribute the Converse marks and related products throughout the Mercosur Market even before a final arbitral award is issued. This will result in approximately a ninety (90) percent reduction in operations at Alon, which signifies a drastic reduction in revenues, necessitating dramatic changes in Alon's operations.

33.    In more concrete terms, should a *status quo* injunction not be granted, Alon estimates losses of over $20 million over the next three years, layoffs of most, if not all, of its employees, and the looming specter of bankruptcy. Thus, Alon is faced with a concrete and very real possibility of irreparable harm, both to itself and the lives of the people it employs.

34.    Moreover, such a result will also end in immeasurable damage to Alon's reputation and goodwill in the marketplace, both with its current and prospective clientele. Alon's business in the Mercosur Market is in large part based on Alon's reputation. If an

injunction is not issued, this will result in damaging our previously untarnished reputation in the area.    Even if Alon eventually wins this dispute on the merits, there will be no way to compensate Alon for the losses it would have already suffered in this respect.

35.    Accordingly, if an injunction is not entered, Converse will continue in its efforts to irrevocably alter the *status quo* prior to the initiation of arbitration.  Without intervention, any eventual arbitral award rendered in Alon's favor will be meaningless and moot.  Converse will have by that time succeeded in stealing Alon's customers and business partners and have caused the destruction of Alon's business operations as well as depriving Alon of its rightfully earned commissions in the meantime.

**I declare under penalties of perjury pursuant to 28 U.S.C. § 1746 and ALM GL ch. 268, § 1 that I have read the foregoing affidavit and that the facts stated herein are true.**

FURTHER AFFIANT SAYETH NOT.

Executed on this 11th day of March 2005.

Roberto Szerer
*Co-President of Alon International, S.A.*

F:\WDOX\CLIENTS\10077\1001\00043101.DOC