UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONVERSE INC.,<br><br>   Plaintiff,<br><br>vs.<br><br>ALON INTERNATIONAL S.A.,<br><br>   Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    CIVIL ACTION NO.: 04-12591-PBS |

## CONVERSE INC.'S OPPOSITION TO ALON INTERNATIONAL S.A.'S EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION

### Introduction

Alon, Converse's former licensee in South America, improperly seeks a duplicative mandatory injunction granting it the ultimate monetary relief it seeks in the parties' separate arbitration – continued payments under the parties' License Agreement – even though it already has obtained almost identical orders from Brazil and Argentine courts and previously argued successfully to this Court that it should not interject itself into the parties' foreign disputes.  In addition to the fact that Alon does not even come close to establishing the elements for a traditional injunction, much less the higher standard for a mandatory injunction, principles of comity, judicial estoppel, and related traditional principles of Federal courts concerning injunctions and arbitration matters warrant denial of Alon's motion.  Finally, should this Court nonetheless issue an injunction, then Alon must be required to post a bond equal to all amounts paid by Converse could expect to pay to Alon under the injunction, which would be very close to $1.8 million.

### Relevant Factual Background[1]

*The License Agreement Between Converse and Alon*

On September 1, 2001, Converse and Alon entered into a Manufacturing, Distribution and License Agreement (the "License Agreement"), attached as Exhibit A. The License Agreement, at ¶ 3, granted Alon the right to use the trademarks of Converse for the sale of approved Converse products ("Licensed Products") to be sold in Brazil, Argentina, Paraguay and Uruguay. In return, Alon agreed to pay Converse a percentage of its net sales as a royalty, with guaranteed minimum sales and guaranteed minimum royalties. ¶ 15. The term of the Agreement was September 1, 2001 - December 31, 2004. ¶ 1(a).

The License Agreement contained a conditional option for Alon to renew it:

> Licensee may renew this Agreement for an additional term of three (3) years ("Option Years" which may collectively be referred to as "Option Period") provided Licensee exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that Licensee has not breached any of the terms and conditions of this Agreement.

¶ 2. This paragraph also sets forth certain formulas for calculation of the guaranteed minimum sales and royalties for the Option Years. Id. The License Agreement also explicitly states that "[t]he Earned Royalty rate for Licensed Articles for the Option Period *will be negotiated* prior to the Option Years taking effect." ¶ 15(a) (emphasis added). The License Agreement also requires the parties to execute a new and separate written agreement. Id.

The License Agreement, at ¶¶ 29 & 35, prohibited Alon from sublicensing without the express written consent of Converse in each instance. It also required Alon to make certain marketing expenditures. ¶ 7(d).

---

[1]     The facts set forth in this section are taken from and restated in the accompanying Affidavits of Timothy Ouellette (Exhibit B), Chris Laganas (Exhibit C), Frank Quijada (Exhibit D) and Altamir Breda (Exhibit E).

*Unsuccessful Negotiations for a Possible Renewal of the Licensing Agreement*

Beginning in late March 2004, Alon began contacting Converse about the option to renew. Ex. B, ¶ 6. As a starting point for these discussions, Alon prepared and sent to Timothy Ouellette, Converse's Vice President of Licensing, a forecast of full-year 2004 sales, which estimated sales to be $19,485,296.00. Id. Based on this 2004 forecast, the License Agreement, ¶ 2, required that the guaranteed minimum sales for the first option year, 2005, had to be at 80% of the 2004 actual sales, which would be $15,584,000.00. Ex. B, ¶ 6.

On April 28, 2004, even though sales were on an upward trend, Alon suddenly dropped its full-year 2004 forecast by almost 1/3 – from $19,485,296.00 to $13,300,000.00. Ex. B, ¶ 7. This lowered Alon's 2005 minimum guaranteed sales figures by the same margin. Id. Alon also proposed royalty rates of 8% for originals and 6% on non-footwear, 2% lower than Converse's standard rates. Id. Alon also proposed an increased option term of 4 years. Id. On April 29th Mr. Ouellette rejected these proposals. Id.

Through May and early June 2004, Mr. Szerer, Alon's other Co-President, continued to send Mr. Ouellette renewal proposals containing minimum guaranteed sales figures which were at least $5 million or more less than what the License Agreement would have required Alon to meet based upon Converse's projection of actual 2004 sales. Ex. B, ¶ 8. Alon also repeatedly offered royalty rates far below Converse's standard minimums. Id.

On May 19, 2004, Mr. Szerer proposed an entirely new contract with an initial period five years, with an option to renew for another five years (a "5+5" proposal). Id.

By mid-June 2004, Mr. Ouellette told Mr. Durchfort that negotiations were going nowhere. Ex. B, ¶ 10. On June 28, 2004, Mr. Durchfort sent Mr. Ouellette a comparison of the option terms in the License Agreement versus Alon's proposal. Id. Again, Alon offered

significantly lower guaranteed sales figures than the License Agreement required (70% vs. 80% of projected 2004 sales – approximately a $6 million reduction), as well as a significantly lower royalty rate for original Converse products (8% vs. 10%) with no increase over time, and a longer term (5 years). Id.  Mr. Ouellette rejected that proposal. Id.

The June 28th proposal was the last proposal made by Alon. Ex. B, ¶ 11.  The parties never reached an agreement as to any key terms, including 2005 guaranteed minimum sales, royalty rates and term of the new/renewed agreement. Ex. B, ¶ 14.  Nor did they ever execute a new written agreement. Id.

### Converse's Discovery of Alon's Breaches of the License Agreement, Termination of that Agreement, and New Agreement with Coopershoes

In August 2004, Converse first obtained copies of the contracts between Alon and Coopershoes, an entity Converse believed was one of Alon's suppliers. Ex. B, ¶ 16.  The copies were in Portuguese and were not translated until early November 2004. Id.  The contracts contained terms whereby Alon purported to grant a license to Coopershoes to market Converse trademarked products. Ex. B, ¶ 2.  Alon never sought or obtained Converse's permission, written or otherwise, to grant such a sublicense to Coopershoes. Ex. B, ¶ 16.  In fact, Alon had a strategy of trying to conceal the true nature of its sublicensing arrangements with Coopershoes and others. Ex. D, ¶ 2.  Alon's contract with Coopershoes, therefore, constituted an express breach of Alon's obligations under the License Agreement.[2]

---

[2]    In the field of licensing of global brands, like Converse, sublicensing is almost universally prohibited without express written permission.  The reasons for this are that: (1) the licensor suffers a loss of visibility; (2) the licensor does not have "brand control"; and (3) the licensor loses management control.  A licensor like Converse wants its licensee to be directly in control of marketing, advertising, and sales within the territory, but not necessarily strict manufacturing.  Where sublicensing occurs, the licensor loses control and has no direct contract with the sublicensee performing these functions.  Alon had much experience as a licensee and, therefore, was aware of this sublicensing prohibition in the trade.  In fact, a licensor of a different global brand previously had terminated Alon when it discovered that Alon was engaging in sublicensing.

4

Converse conducted an audit of Alon in November 2004. Ex. B, ¶ 17.  As a result of this audit, which was conducted by the accounting firm of Deloitte & Touche, Converse discovered that all, or almost all, of the product development, marketing and sales of Converse products – the heart of the licensee function – was being done by Coopershoes, *not Alon*.[3]  Id.

On November 30, 2004, upon obtaining clear evidence of Alon's breach, Converse terminated the License Agreement.  Id.  On December 17, 2004, Converse entered into a License Agreement with Coopershoes effective January 1, 2005.  Ex. B, ¶ 18.

Alon brought suit in Brazil and Argentina and Converse initiated this action.[4]

<u>Argument</u>

I.    **THIS COURT SHOULD DENY ALON'S MOTION UNDER THE DOCTRINES OF COMITY AND JUDICIAL ESTOPPEL.**

As a threshold matter, this Court should deny Alon's Motion under the doctrine of comity because Alon already has pending two actions in Argentina and Brazil, and courts in both jurisdictions already have ruled on the same issues presented by Alon here.

As set forth in Alon's Notice of Filing, filed with this Court on March 28, 2005, both the Brazilian and Argentine courts have previously ruled on these same issues and the cases are proceeding in those forums.  If Alon believes that Converse has violated those orders, its remedy is to seek redress from the Court that issued the order, not to come into this Court seeking an order that is identical to those it already obtained in the foreign jurisdictions.  See Pilkington Brothers P.L.C. v. AFG Industries Inc., 581 F. Supp. 1039, 1043, 1045-46 (D. De. 1984) (refusing to enter injunction where party already obtain injunction in England

---

[3]    *See* Affidavit of Altamir Breda (Ex. E), which details Coopershoes' work under its contract with Alon.
[4]    The complicated procedural history of these actions is set forth in a chart attached as Exhibit F.

KPC/32913/2/567204v1
03/30/05-BOS/KPC

because "principles of international comity . . . militate against, the issuance of a duplicative order that would interject this Court" into the English proceedings).

Alternatively, this Court should refuse to involve itself in the Brazil and Argentine matters under the doctrine of judicial estoppel. "[J]udicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." Alternative System Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 32-33 (1st Cir. 2004) (judicial estoppel should be applied when litigant is "playing fast and loose with the courts"); Patriot Cinemas v. General Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987). Judicial estoppel is applied to protect the integrity of the courts, to prevent inconsistent decisions, and to prevent parties from misleading the judiciary. Alternative System Concepts, 374 F.3d at 32-34; Patriot Cinemas, 834 F.2d at 212-14. Two conditions must be satisfied: (1) the positions must be directly inconsistent and mutually exclusive; and (2) the responsible party must have been successful in persuading the Court to accept its prior position. Alternative System Concepts, 374 F.3d at 33.

When Converse previously petitioned this Court to interfere with the Brazilian proceedings and order the parties to submit their disputes to arbitration, Alon argued that this Court should refuse to act because of the pending matter in Brazil. Applying principles of comity articulated by this Court and affirmed by the 1st Circuit in Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11 (1st Cir. 2004), this Court accepted Alon's argument and refused to interfere in the Brazilian proceedings, noting to Converse that the proper forum to litigate its requested preliminary injunction was in Brazil.

Now, Alon has committed an "about face" and seeks to have this Court interfere with the Brazil and Argentine proceedings on its behalf. Alon cannot have it both ways. Based

6

upon Alon's previous argument that this Court should not act, this Court previously decided that, under principles of comity, it should defer and the parties should fight this battle in Brazil. Alon should not be allowed to "play fast and loose" with this Court and now reverse its previous argument to obtain the relief it now seeks.

Finally, as a factual matter, Converse vehemently denies that it has violated any court order and takes issue with the misleading and incomplete statements made in Alon's moving papers, especially the March 28th filing. In particular, the Argentine order referenced in Alon's papers is not yet in effect because Alon must post a bond as a precondition to the order taking effect and Alon has not done so. The Brazilian order was issued late last week and, under Brazilian law, is not yet effective on Converse until Converse is "summoned", which Converse's Brazil counsel expects to occur in the next few days. Alon also neglects to inform this Court that: (1) Coopershoes is not subject to any court order or contract that requires it to pay Alon anything, and (2) to avoid being caught in the middle of Alon and Converse, Coopershoes successfully obtained an order from the Brazil court to pay the money allegedly owed Alon for January and February 2005 into that Court pending a resolution on the merits in an action akin to an interpleader. These omissions in Alon's papers demonstrate why, as a practical matter, this Court should defer to the courts that actually issued the orders, know the specifics of their orders and the procedures of their courts firsthand, and are in the best position to interpret the orders and adjudicate any alleged violations of the orders.

## II.    ALON CANNOT MEET THE REQUIRED ELEMENTS FOR IMPOSITION OF A PRELIMINARY INJUNCTION PENDING ARBITRATION.

Substantively, Alon cannot satisfy the requirements for injunctive relief. In order to obtain a preliminary injunction pending arbitration, Alon must establish that: (1) it will suffer

irreparable injury if the injunction is not granted; (2) such injury outweighs any harm which granting injunctive relief would inflict upon Converse; (3) it has a likelihood of success on the merits; and (4) the public interest will not be adversely affected. Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 51-52 (1986). Alon cannot satisfy any of these elements.

**A.     Alon Does Not Have A Reasonable Likelihood of Success on the Merits.**

**1.     The License Agreement Does Not Provide for Automatic Renewal and Was Not Renewed in A Separate Writing As Required.**

It is clear from the face of the License Agreement that it is not automatically renewable by Alon because it requires Alon to negotiate with Converse to agree upon certain open key issues and then to memorialize that agreement in a separate writing signed by both Alon and Converse. Ex. A, ¶¶ 2, 15. As set forth above, Converse and Alon neither reached agreement on the open issues, nor memorialized any agreement in a separate writing.

The License Agreement grants Alon merely an "option to renew," which requires a further agreement by both parties on certain key terms of their ongoing relationship before a renewal occurs. See, e.g., Qureshi v. Fiske Capital Management, Inc., 59 Mass. App. Ct. 463, 461, rev. denied, 440 Mass. 1108 (2003) ("an option to renew contemplates the execution of a new lease, a process that may introduce new terms and conditions on which the parties must agree or there will be no new lease."); HLM Realty Corp. v. Morreale, 394 Mass. 714, 716 (1985) ("The important point is whether some new agreement or some additional act is necessary in order to make the exercise of the option effective, in which event the exercise of the option, without more, does not continue the lease relationship."). Further, the License Agreement's "invalidating clause", which requires any extension to be in a further written agreement containing all necessary terms and signed by both parties, is valid and enforceable.

8

Restatement (Second) of Contracts, § 21 ("Neither real nor apparent intention that a promise be legally binding is essential to the formation of a contract, but a manifestation of intention that a promise shall not affect legal relations may prevent the formation of a contract."); *see* Goren v. Royal Investments Inc., 25 Mass. App. Ct. 137, 142-43 (1987), rev. denied, 401 Mass. 1104 (1988), citing Restatement (Second) of Contracts, § 21.

Here, the License Agreement expressly left the royalty rate for the option years to be negotiated at a later date. It is undisputed that Converse and Alon did not reach an agreement as to that key term with respect to any renewal of the License Agreement. Ex. B, ¶¶ 6-10, 14. Converse had offered 10% for original and 8% for non-footwear (which were its standard percentages), while Alon never offered more than 8% for originals and 8% for non-footwear. Ex. B, ¶¶ 7, 10. It is likewise undisputed that the parties never executed a separate document for a renewal, as required by the License Agreement. Ex. B, ¶ 14. Accordingly, the License Agreement expired on December 31, 2004, and Alon has no further rights thereunder.

### 2. Even if the License Agreement is Automatically Renewable, Alon Lost Its Rights When it Proposed New Renewal Terms Which Converse Rejected.

An optionee such as Alon makes a counteroffer and loses the benefit of the previously-stated option terms when "it introduce[s] commercial terms that had not been part of either the proffered lease or the lease under which the parties had previously operated." Qureshi, 59 Mass. App. at 467. An optionee does so at its peril, because once a counter-offer is made, the party who has given the option "is not bound to accept the new terms . . ." Id.[5]

---

[5] This doctrine is consistent with the common law "mirror image rule". See Moss v. Old Colony Trust, 246 Mass. 139, 148 (1923) ("It is elementary law that an offer must be accepted in the terms in which it is made in order to become a binding contract, and that a conditional acceptance or one that varies from the offer in any substantial respect is in effect a rejection and is the equivalent of a new proposition."); see also Commerce & Indus. Ins. Co. v. Bayer Corp., 433 Mass. 388, 392 (2001); Peretz v. Watson, 3 Mass. App. 727, 728 (1975).

9

Here, even if the License Agreement was automatically renewable, Alon lost that right by making several counter-offers with lower minimum guaranteed sales and royalties, and a longer option term than set forth in the License Agreement. Ex. B, ¶¶ 6-10. Converse specifically rejected these counter-offers in their entirety. Ex. B, ¶¶ 6-10, 14. As a result, Alon lost its rights to the terms for the option years specified in the Agreement. See Qureshi, 59 Mass. App. at 462 ("[w]hen a tenant has the benefit of an option to extend, the tenant initiates negotiation of new business points at its peril that the negations will not end in agreement."). Because these un-agreed items were all material – indeed, they governed the compensation each party was to receive under the renewed agreement – there was no legally enforceable new agreement between ALON and Converse for renewal of the License Agreement.[6] Accordingly, even if the License Agreement was automatically renewable, it terminated on December 31, 2004.

### 3.    Alon Materially Breached the License Agreement.

Alon is not entitled to any relief under the License Agreement because it materially breached that agreement by entering into a sublicense arrangement with Coopershoes without Converse's consent, and deceiving Converse about the true nature of that relationship.

It is hornbook law that a material breach of a contract by one party excuses the other party from performance. E.g., Ward v. American Mutual Liability Insurance Co., 15 Mass. App. Ct. 98, 100 (1983); Quintin Vespa Co. v. Construction Serv. Co., 343 Mass. 547, 554 (1962); Restatement (Second) of Contracts § 237 (1981). A breach of a clause in a licensing

---

[6]    For contract negotiations to be binding there must be an agreement on all material terms. Situation Management Systems, Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000) ("It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of the contract"); see Fontneau v. Town of Sandwich, 251 F. Supp. 2d 994, 1002 (D. Mass. 2003) (holding no contract where "several material terms are absent. One such term is the duration of the supposedly renewable lease.").

KPC/32913/2/567204v1
03/30/05-BOS/KPC

agreement prohibiting sublicensing occurs where the licensee simply grants the license to another party. Archway Cookies v. Smith Cookies Co., 2004 U.S. Dist. LEXIS 21839 (D. Ore. 2004) (holding licensee breached license agreement where it "does not employ workers and owns no plants or tools. . . [and] transferred or assigned its rights and interests as a licensee under the License Agreement" to another party without consent.); Major League Baseball Promotion Corp. v. Colour-Tex, Inc., 729 F. Supp. 1035, 1042-43 (D.N.J. 1990), (holding that licensee who sublicensed without licensor's written consent not only breached agreement but committed copyright and trademark infringement).

Here, the License Agreement, Ex. A, expressly prohibited Alon from sublicensing without the advance written consent of Converse in each instance:

> 29.   Assignment or Sublicense by Licensee.   None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licenses without the prior written consent of Converse in each instance.

Alon breached the Licensing Agreement by entering into sublicensing agreements with Coopershoes in which Alon expressly granted to Coopershoes *a license* to use Converse trademarks and market Converse products. Ex. C, ¶ 2. Alon cannot produce any advance written consent by Converse to such sublicensing because none exists. Ex. B, ¶ 16.

Alon claims that it did not breach the License Agreement because Converse knew about its relationship with Coopershoes. This assertion is disingenuous. Alon told Converse it was doing business with Coopershoes, but *never* that Coopershoes was *a sublicensee*. Ex. C, ¶¶ 4-6. Alon led Converse to believe that Coopershoes was merely one of its suppliers and refused to allow Converse to review its agreement with Coopershoes until it was forced to do so in the fall of 2004, which is when Converse first learned about the breach. Ex. B, ¶ 17.

11

Alon also materially breached the License Agreement by repeatedly failing to meet the required minimum expenditures for advertising Converse's products. In 2003, this shortfall was at least $361,500. In 2004, Converse believes this shortfall to be $650,000. Alon also undertook to market footwear products competing directly with Converse products, namely, the Miss Sixty and Superga brands. Ex. C, ¶ 8.

### B.    Alon Cannot Establish Irreparable Harm.

Alon cannot show irreparable harm because its sole remedy is monetary damages. "Irreparable harm exists when remedies at law are inadequate." Costello, Erdlen & Co., Inc. v. Wilson, King Richards & Co., 797 F.Supp. 1054, 1065 (D. Mass. 1992). "As a general rule, the possibility of monetary injury does not constitute irreparable harm." Micro Networks, Corp. v. HIG Hightech, Inc., 188 F.Supp.2d 18, 22 (D. Mass. 2002); see also Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 161 (1st Cir. 2004) (denying a preliminary injunction where plaintiff "ultimately seeks an award of pecuniary damages and, in the best case scenario, that is all it will be entitled to receive"). A substantial injury suffered by the plaintiff that is nevertheless accurately measurable or adequately compensable by money damages likewise does not constitute irreparable harm. See, e.g., Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996). The vast majority of cases providing for an injunction where the plaintiff seeks monetary damages involve defendants on the brink of insolvency. Id., citing Teradyne, Inc., 797 F.2d at 53.

Significantly, *monetary damages are the sole remedy afforded to a party, such as Alon, that claims a breach of a standard licensing agreement*. There is substantial case law holding that specific performance should not be granted where, as here, it would harness parties to work with each other where there was no longer any trust. E.g., Lawless v.

12

Melone, 350 Mass. 440, 443 (1966) (affirming the trial court's refusal to order specific performance of a joint venture between parties in litigation because it "would be likely to result in an unsatisfactory and probably unworkable arrangement"); Westinghouse v. New England Patriots, 10 Mass. App. Ct. 70, 74 (1980) (affirming denial of specific performance to renew a broadcasting contract ruling that courts should be reluctant "to order the plaintiff and defendant into an uneasy harness"); Dunkin' Donuts of America v. Minerva, Inc., 956 F. 2d 1566, 1571-73 (11th Cir. 1992) (applying Massachusetts law) (holding that "a franchise contract is a personal services contract and may not be specifically enforced, [franchisee] could not as a matter of law sought to have the franchise contracts extended since [franchisor] was no longer willing to deal with her" and further that "[t]here is absolutely no precedent for granting specific performance of a franchise contract"); Thayer Plymouth Center v. Chrysler Motors, 63 Cal. Rptr. 148, 150 (1967) ("A contract which requires a continuing series of acts and demands cooperation between the parties . . . is not subject to specific performance.").

Alon also cannot show irreparable harm because *its sole remedy is monetary damages*. Given Alon's repeated deception of Converse concerning its sublicensing arrangements, Converse has lost all trust in Alon and the case law support not forcing Converse to continue using Alon as a licensee, which would require the disclosure of proprietary Converse information, where there is no longer any trust. Ex. C, ¶¶ 9-10. Thus, Alon's remaining relief is money damages under the License Agreement, which militates against injunctive relief. Alon purports to cite cases finding that a "substantial loss of business" constitutes irreparable harm. (Alon's Brief p.17). The cases do not, however, support Alon's assertion that it is entitled to injunctive relief. In fact, the cases simply demonstrate the general rule – that an injunction is appropriate where monetary damages are inadequate and, consequently,

13

either specific performance or a permanent injunction is an available remedy. See, e.g., Doran v. Salem Inn, Inc., 422 U.S. 922, 931-33 (1975) (constitutionality of a town ordinance); Ross-Simons, 102 F.3d at 15 (enforcement of a settlement agreement); K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989) (real estate interests).

### C.    The Balance of Harms Favors Converse.

If the Court orders Alon to be restored as Converse's licensee during the pendency of the arbitration then Converse would have to do the following: (1) suspend its current license agreement with Coopershoes; (2) operate without any actual written agreement *or decided key compensation terms* for the 2005 option year; (3) potentially tolerate Alon's continuing breach of the former License Agreement, which prohibits sublicensing; (4) suffer loss of reputation and goodwill in the "Mercosur" market of Brazil, Argentina, Paraguay and Uruguay through Alon's continued sublicensing, which Converse will not be able to supervise or control; (5) suffer the risk that Alon will further sublicense or sell the license to others without Converse's knowledge or assent;[7] (6) suffer the risk that Alon, which will gain access to Converse's confidential and proprietary product development and marketing plans for 2005 and beyond if an injunction issues, will use those plans to go into competition with Converse or sell them to Converse's competitors if Alon does not prevail in the arbitration; and (7) work with officers of Alon whom Converse believes have engaged in a prolonged deception in claiming that its arrangements with Coopershoes and others were not sublicenses, and made outright false statements to Converse when confronted about the sublicensing.

---

[7]    Converse has learned that Alon recently tried to sell the Converse license in Brazil to a company called Indular, again without Converse's knowledge or assent.

14

Conversely, Alon's harm if an injunction does not issue is minimal: it merely will have to wait to receive the payments it claims to be do until it obtains a final judgment in its favor, and there is no issue here of Converse's inability to pay if Alon prevails.

### D.    The Public Interest Would Be Harmed if an Injunction Were to Issue.

Converse is a publicly-held company. Should an injunction issue, Converse will be forced to pay *millions* to Alon before a judgment is issued in the arbitration, and may be unable to recoup that money if it ultimately prevails. This will negatively affect Converse's shareholders and the exchanges on which its stock is traded. Additionally, the countries covered by the License Agreement will be negatively affected if an injunction issues because Alon, which has no operations itself and which is prohibited from sublicensing, will not be able to introduce Converse products into those markets, which also would harm shareholders.[8]

## III.   ALON CANNOT MEET ITS HIGHER BURDEN FOR ISSUANCE OF A "MANDATORY" INJUNCTION.

Although Alon carefully styles its request as a "status quo" injunction, when one examines the actual relief Alon is seeking – a continuation of the License Agreement with the resultant obligation upon Converse to make monthly payments to Alon in advance of a judgment – it is clear that what Alon really seeks is a "mandatory" injunction. Alon cannot meet its heightened burden to obtain such a mandatory injunction.

A mandatory injunction is an order that requires a party to affirmatively act, as opposed to an order that requires a party to refrain from acting. See UMass Memorial Health Care, Inc., v. U.S. Life Ins. Co., 2000 U.S. Dist. LEXIS 5888, at *5-6 (D. Mass. 2000); Automatic

---

[8]      Conversely, the public interest would not be harmed if an injunction did not issue. Converse has an existing agreement with Coopershoes – the entity that actually did the work all along – to sell into the same markets covered by the previous License Agreement with Alon. Therefore, those markets will have the same access to Converse products as they did prior to December 31, 2004.

15

Radio Mfg. Co., Inc. v. Ford Motor Co., 272 F. Supp. 744, 749 (D. Mass. 1967), aff'd, 390 F.2d 113 (1st Cir. 1968); Clune v. Publishers' Ass'n of New York City, 214 F. Supp. 520, 531 (S.D.N.Y.), aff'd, 314 F.2d 343 (2nd Cir 1963). Parties seeking a mandatory injunction must meet a higher burden of proof: mandatory injunctions are disfavored and will not be granted "unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." Id. Further, "[p]reliminary injunctions of a mandatory nature are particularly disfavored when their effect would be to grant the ultimate relief sought by the moving party." SW Industries, Inc. v. Aetna Casualty & Surety Co., 646 F. Supp. 819, 823 (D.R.I. 1986), citing Crowley v. Local No. 82, 679 F.2d 978, 997-98 (1st Cir. 1982), rev'd on other grounds, 467 U.S. 526 (1984) ("The accepted doctrine is that a mandatory injunction – the equivalent of the 'ultimate relief' . . . – shall not issue before a final hearing.").

The UMass Memorial Health Care case is factually on point. In that case, an insurance agency sought a preliminary injunction against U.S. Life requiring it to reinstate the parties' rights under a General Agent Agreement to their status immediately prior to U.S. Life's termination of those contracts. 2000 U.S. Dist. LEXIS 5888, at *2-5.

This Court (Gorton, J.) classified this requested relief – an injunction ordering U.S. Life to reinstate an agreement that it had allegedly terminated – as a "mandatory injunction." Id. at *5-6. In denying the motion, the Court concluded that the agency did not have a likelihood of success on its contract argument because it had not put forth any evidence showing that U.S. Life had subsequently rescinded the termination. Id. at *6-7. The Court also rejected the agency's irreparable harm argument that it "may be unable to pay its employees and may have to lay a majority of them off" if it failed to receive the full amount it

16

claimed, finding that the principal's statement to this effect and implication that the company may go out of business was insufficient to compel an injunction. Id. at *9-10. The Court also held that, even if the potential irreparable harm was substantial (i.e., failure of a business), it did not outweigh the agency's failure to show a likelihood of success on the merits. Id. at *10.

Here, as demonstrated above, Alon likewise cannot show a likelihood of success on the merits or that it will suffer irreparable harm since all it really seeks are money damages and its speculative argument concerning its business viability is insufficient, particularly in light of its failure on the merits factor. In addition, the remaining factors – balance of harms and public interest – weigh in Converse's favor. Where Alon's case is doubtful at best, and where Alon seeks only money damages, a mandatory injunction is not allowed and should not issue. See, e.g., UMass Memorial Health Care, 2000 U.S. Dist. LEXIS 5888, at *5-6. Finally, even if Alon could meet all of the necessary elements, an injunction should not issue because it would grant Alon the ultimate relief it seeks.

## IV.    THE REQUESTED INJUNCTION IS BEYOND THE COURT'S AUTHORITY AND IS TOO DIFFICULT TO ENFORCE.

It is well-settled that the authority of Federal Courts to grant preliminary relief under Fed. R. Civ. P. 65 is limited to the injunctive power existing under English common law at the time of the Federal Judiciary Act of 1789. Grupo Mexicano De DesArrollo v. Alliance Bond Fund, Inc., 527 U.S. 308, 318-23 (1999). English common law at that time required a creditor to obtain a final judgment on the merits before a court of equity would interfere with a debtor's use of its property. Id. at 319-21, 327-28. Here, the effect of Alon's requested injunction is that Converse essentially will have to make payments to Alon before Alon obtains

a final judgment.  This is exactly the type of "interference" with property that the English common law would not sanction and Federal courts have traditionally rejected.  See id.

Further, "[d]ifficulty of enforcement may itself constitute a sufficient reason for denying injunctive relief."  Automatic Radio, 272 F. Supp. at 49; see The Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd., 970 F.2d 273, 277 (7th Cir. 1992).  Alon's requested injunction requiring Converse to continue the parties' business relationship is exactly the type of order that imposes such difficulties.  See River Valley Cookies, 970 F.2d at 277 (injunction requiring parties to continue to maintain a cooperative relationship "imposes a continuing duty of supervision on the issuing court, and this can be a drain on scarce judicial resources.").  Those difficulties are exacerbated where, as here, the relationship would continue in several foreign jurisdictions

## V.      THIS COURT SHOULD NOT INTERFERE IN THE PARTIES' ARBITRATION.

A court has authority to decide arbitration-related matters only in very limited circumstances, such as the validity of an arbitration agreement or whether an arbitration clause applies to a certain type of controversy.  Federal Arbitration Act, 9 U.S.C.A. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement."); Green Tree Financial Corp. v. Bazzle, 539 U.S. 444, 452-53 (2003); Trafalgar Shipping Co., Ltd. v. International Milling Co., 401 F.2d 568, 571 n.3 (2nd Cir. 1968) (remedies under § 4 are only available after a demand to arbitrate and a refusal to comply).[9]

---

[9]      There may come a time when Converse seeks such an order from this Court to compel Alon to arbitrate certain issues, including whether or not it can sublicense to various entities in the South America markets.

18

Here, there is no refusal to arbitrate.[10]   Converse and Alon are proceeding with arbitration before the ICDR.  Alon's motion improperly asks this Court to extend its power into the realm of the day-to-day issues of the arbitration.  Issues regarding whether either party is engaging in dilatory tactics and the consequences of such actions are, and should be, reserved for the arbitrators, and not the subject of a status quo injunction from this Court.

## VI.   IF AN INJUNCTION ISSUES, ALON MUST POST A BOND EQUAL TO ALL AMOUNTS CONVERSE MUST PAY IN ADVANCE OF A JUDGMENT.

Fed. R. Civ. P. 65 dictates that the party obtaining an injunction posts a bond as security to the party being enjoined.  The 1st Circuit, like many other Federal Circuits, draws a distinction between commercial and non-commercial (constitutional/statutory rights) cases.  In Crowley, the 1st Circuit recognized that in commercial cases, Federal courts generally required a bond where the injunction exposed the defendant to a risk of monetary loss and the failure to impose a bond in that case would be reversible error.  679 F.2d at 999-1000.  Other Federal courts since Crowley have recognized that the bond requirement is "strictly interpreted", Elliott v. Kiesewetter, 98 F.3d 47, 59-60 (3rd Cir. 1996), and that the applicant's "financial inability to post security would increase the risk of loss to defendant [] [and, thus,] is appropriately considered in weighing competing harms."  Sierra Club v. Marsh, 701 F. Supp. 886, 899 n.21 (D. Me. 1988).

---

[10]   Alon's claims that Converse has improperly delayed the arbitration are wrong and misleading.  All Converse has done is to attempt to require Alon to comply with its previously-agreed-to contractual terms concerning arbitration.  Ironically, after filing this motion, Alon further delayed the arbitration.  On March 8, 2005, the parties participated in a teleconference with two ICDR administrators and agreed on a procedure that would have unequivocally appointed an arbitrator on March 24, 2005.  Alon thereafter refused to participate in the agreed-upon procedure.  In a subsequent call on March 21, 2005, Alon made several demands that resulted in new arbitrators being appointed to the panel.  Converse suggested the parties proceed submit their choices to the ICDR on March 29, 2005.  Claiming to have "too much on its plate" *Alon* requested a delay until April 1, 2005.

Alon asks this Court, without citing any supporting authority, to waive the bond requirement based upon "the equities." Quite simply, there is absolutely no justification for waiving Alon's bond requirement. This is the epitome of a commercial case and the injunction Alon seeks would have a direct and significant monetary impact on Converse. Alon seeks to require Converse to pay it *$1.8 million,* Ex. C, ¶ 11-14, over the first eight months of 2005 in advance of a judgment without any security – and if Alon's claims of financial instability are accurate – little or no ability to recoup those funds if Converse is ultimately successful. The only adequate protection for Converse is if this Court imposes a bond equal to all amounts Converse must pay Alon under the injunction, which would be $1.8 million. Ex. C, ¶ 14.

## Conclusion

WHEREFORE, for the foregoing reasons, Converse Inc. respectfully requests that this Court deny Alon's Motion for a Preliminary Injunction in its entirety.

**CONVERSE INC.**
By its attorney,

/s/ Michael C. Gilleran
Michael C. Gilleran (BBO# 192210)
Katharine Pacella Costello (BBO# 634583)
Christine N. Parise (BBO# pending)
PEPE & HAZARD LLP
225 Franklin Street
Boston, Massachusetts 02110
(617) 748-5500

Dated: March 30, 2005

## Certificate of Service

The undersigned hereby certifies that he today served by electronic means a copy of the foregoing on counsel for Alon International S.A.

/s/ Michael C. Gilleran
Michael C. Gilleran

20

# EXHIBIT A
# to Converse's Opposition

<u>02/14/02</u>

# <u>MANUFACTURING, DISTRIBUTION AND LICENSE AGREEMENT</u>

**BETWEEN**

**CONVERSE INC.**

**and**

**ALON INTERNATIONAL S.A.**

Table of Contents

I.      INTRODUCTION
1.      Definitions _____ 5
2.      Term of Agreement _____ 6

II.     GRANT OF LICENSE
3.      License _____ 7

III.    LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES
4.      Use of Converse Marks_____ 9
5.      Quality Assurance _____ 11
6.      Licensee's Use of Converse Information and Advice _____ 12
7.      Licensee Sales Program _____ 12
8.      Distribution _____ 14
9.      Licensee's Use of Converse Factories _____ 15
10.     Exportation _____ 17
11.     Government Approval _____ 17

IV.     CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES
12.     Responsibility of Converse _____ 17
13.     Converse's Alteration of Product Design and Specification _____ 18
14.     Converse's Right of Inspection of Licensee Factories_____ 18

V.      ROYALTIES, FEES AND PAYMENTS
15.     Royalties _____ 19
16.     Guaranteed Minimum Sales _____ 22
17.     Royalty Reports _____ 22
18.     Schedule of Royalty Payments and Fees _____ 24
19.     Currency In Which Payments Are To Be Made _____ 26

VI.     INTELLECTUAL PROPERTY
20.     Converse Intellectual Property _____ 27
21.     Territorial Registration of Converse Trademarks _____ 29
22.     Infringement, Counterfeit, Unfair Competition _____ 29
23.     Indemnification for Products Liability Claims _____ 30

VII.    TERMINATION
24.     Right of Termination _____ 31
25.     Effect of Termination or Expiration _____ 33
26.     Final Statement Upon Termination or Expiration _____ 34

VIII.    <u>MISCELLANEOUS</u>

27.    Devaluation _____ 35
28.    Force Majeure _____ 35
29.    Assignment or Sublicense by Licensee _____ 35
30.    Notices _____ 36
31.    No Joint Venture _____ 36
32.    Applicable Law _____ 37
33.    Arbitration _____ 37
34.    Significance of Headings _____ 38
35.    Assignment, Entire Agreement, No Waiver _____ 38

<u>Appendices</u>

A.    Converse Marks
B.    Human Rights Manual
C.    Royalty Report Form

AGREEMENT, made as of this first day of September, 2001 by and between

**CONVERSE INC.**, a Delaware corporation, having its principal place of business at One High

Street, North Andover, Massachusetts 01845 ("Converse") and **ALON INTERNATIONAL**

**S.A.**, a corporation duly registered and existing under the laws of the Republic of Panama and

having its principal office and business at Edificio Magna Corp BCSA Calle 51 y Manuel Maria

Icaza, Piso 4 oficina 410 P, Panama, Republica de Panama ("Licensee").

WHEREAS, Converse is in the business of manufacturing, advertising, distributing and

selling athletic and leisure footwear, activewear and accessories and is the exclusive owner of the

valuable trademarks "CONVERSE", "ALL STAR", "CONVERSE ALL STAR CHUCK

TAYLOR" Ankle Patch and "STAR AND CHEVRON" Design and other trademarks, of certain

trade names, and of various patterns, logos and designs associated therewith; and

WHEREAS, Licensee desires to manufacture and sell in Argentina, Brazil, Paraguay and

Uruguay on an exclusive basis, athletic and leisure footwear, activewear and accessories identical

or substantially identical to the athletic and leisure footwear and activewear and accessories

manufactured for Converse and sold by Converse in the United States of America under the

Converse name and trademarks, and to obtain the advisory services and assistance of Converse in

connection therewith.

NOW THEREFORE, in consideration of the mutual covenants, representations and

promises herein contained, Converse and Licensee agree as follows:

## I.    DEFINITIONS

1.    For purposes of this Agreement, the following definitions shall apply:

(a) "Contract Period" shall mean that period of time commencing on September 1, 2001 and ending on December 31, 2004.

(b) "Contract Year" shall mean the twelve calendar months of the year, beginning with January 1.    The first Contract Year shall be the period from September 1, 2001 through December 31, 2002.

(c) "Contract Year Quarter" shall mean the four (4) three month periods of the calendar year.    The first Contract Year Quarter will commence January 1, 2002 and will include any activities from the commencement date of this Agreement.

(d) "Converse Factories" shall mean Converse's authorized factories.

(e) "Converse Marks" shall mean the logos and trademarks set forth in Appendix A.

(f) "F.O.B. Cost" shall mean the costs of Footwear Licensed Articles purchased by the Licensee directly from Converse Factories as shown on the approved invoice from the factory for each shipment of product, if applicable.

(g) "Licensed Articles" shall mean the athletic and leisure footwear, activewear and accessories which are set forth more specifically in Paragraph 3(a) below and which are identical or substantially identical to the athletic and leisure footwear, activewear and accessories manufactured for Converse and sold by Converse in the United States. There are three types of Licensed Articles:  Non-Footwear, Footwear and Original Licensed Products as defined below.

(h) "Net Sales" shall mean the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, trade discounts, volume rebates and any

freight charges and VAT taxes included in the invoice. No deduction shall be allowed for costs incurred in the manufacture, sale, advertisement (including cooperative and promotional allowances) or distribution of Licensed Articles, nor shall any deductions be allowed for uncollectible accounts or cash discounts.

(i)    "Original Licensed Products" shall mean Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear. Original Products may also be referred to as "Originals" or "Original Licensed Footwear Products."

(j)    "Publicity Materials" shall include, but not be limited to, any printed advertising, catalogs, brochures, billboards, electronic material, internet technology, and/or wireless network services in any and all manner or medium now known or hereafter devised or any video or printed material bearing the Converse Marks.

(k)    "Territory" shall mean Argentina, Brazil, Paraguay and Uruguay.

2.    <u>Term of Agreement</u>. In recognition of infrastructure, manufacturing and legal expenditures made by Licensee on Converse's behalf, and Licensee's continuing efforts in these areas, Converse agrees to waive the signing fee of US$28,750.00. Unless sooner terminated pursuant to the provisions of this Agreement, this Agreement shall remain in effect for the Contract Period. In the event Licensee wishes to renew this Agreement, it must notify Converse in writing of this decision by or before September 30th of the final Contract Year. Licensee may renew this Agreement for an additional term of three (3) years ("Option Years" which may be collectively referred to as "Option Period") provided Licensee exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that

Licensee has not breached any of the terms and conditions of this Agreement. The Guaranteed Minimum Royalty for the first Option Year will be the greater of 25% over the Guaranteed Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties, increasing by ten percent (10%) for each subsequent Option Year in the Option Period. The Guaranteed Minimum Sales for the first Option Year will be the greater of 25% over the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales, increasing by 10% each subsequent Option Year. Any extension of the term of this Agreement shall be effective only pursuant to a written agreement executed by Converse and Licensee. Such written agreement shall reflect any new or revised terms or conditions agreed to by the parties.

## II.    GRANT OF LICENSE

3. <u>License</u>.

(a)    <u>Licensed Articles</u>.

     i.    Non-Footwear Licensed Articles is the collective term for activewear and accessories. Activewear shall specifically include: mens' and womens' sportswear and T-shirts. Accessories shall specifically include: bags, socks, caps, watches, backpacks, belts, stationary items (Notebooks and agendas, etc.).

     ii.    Footwear Licensed Articles is the collective term for athletic and leisure footwear.

     iii.    Originals Licensed Footwear Products shall be defined as the following models of footwear: Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear.

(b)    <u>Grant of License</u>.  Converse hereby grants to Licensee, subject to the terms and conditions herein, the exclusive right and license to utilize the Converse Marks throughout the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the retail and wholesale trade, subject to the provisions set forth in Section III below.  This license does not authorize, and expressly forbids, Licensee to manufacture, export, cause to export, distribute or sell such Licensed Articles in any other part of the world, unless specifically authorized by Converse in writing.

(c)    <u>Internet</u>.  Licensee is also granted the rights to use the Converse Marks on its Internet site generated out of the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the resale and wholesale trade, subject to the provisions set forth in Section III below.  In the event Licensee has already registered any of Converse's Marks or any name similar to a Converse Mark as a domain name, it shall assign to Converse all its rights, title and interest in such domain name(s) as directed by Converse.  Licensee shall not register a domain name using any of the Converse Marks or any marks to be confused with the Converse marks.

(d)    <u>Non-competition</u>.    Licensee agrees it shall not, during the term of this Agreement, manufacture, export, distribute, advertise, promote or sell any products/licensed articles which are competitive to the Licensed Articles, irrespective of whether said products bear Licensee's trademark or those of a third party, except only in such cases that Converse has given its prior written approval.  Notwithstanding the preceding sentence, in the event Licensee is already under obligation to distribute licensed articles other than those of Converse and/or products of any competitor, Licensee shall provide Converse, prior to the execution of



this Agreement, with a written list of all products it is under obligation to distribute. The parties agree that excluded from this paragraph are Licensee's currently held childrens' brands, such as Disney, Warner, Mattel, and McKids.

    (e)    <u>Right to Negotiation</u>. In the event Converse does not renew license agreements with its existing licensees in the territories of all of Latin America and Mexico, Licensee shall have the right to negotiate for these territories.

### III.    <u>LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES</u>

4.  <u>Use of Converse Marks</u>.

    (a)    <u>Territorial</u>. Licensee agrees to use the Converse Marks only within the Territory and during the Contract Period, and only with respect to the manufacture, promotion, advertisement, distribution and sale of the Licensed Articles and only after Licensee has received the written approval of Converse as to samples of the Licensed Articles intended to be manufactured and sold by Licensee, the specific Converse Marks Licensee intends to affix to particular Licensed Articles, Licensee's use of the Marks in Publicity Materials and Licensee's use of the Marks on Licensee's web site, if applicable.

    (b)    <u>Approvals</u>. Licensee shall provide Converse with a full set of approval samples and Publicity Materials for each Licensed Article as set forth in Paragraph 2(a) of this Agreement prior to launch in the market. Licensee shall provide Converse with designs and/or drawings of all Licensed Articles, drawings, hang tags and packaging for approval no later than four (4) months prior to launch in the market. In the event Licensee wishes to use any of the Converse Marks on its web site, it shall provide Converse with an opportunity to review the web site no

later than sixty (60) days prior to launch in the market. Converse shall have fifteen (15) calendar days from receipt to respond, either by refusing such design or requesting any changes to the designs, drawings or contents of web site, or issuing its written approval. Licensee further agrees to follow the approval guidelines for Licensed Articles, packaging, advertising and promotional materials set forth in Converse's Licensee Handbook. The license to use the Converse Marks is granted upon the express condition that all Licensed Articles manufactured by Licensee bearing any of the Converse Marks will conform to the standards for grade, quality, and style established from time to time by Converse. Such standards shall be substantially the same as the standards for the corresponding products manufactured for Converse and distributed by Converse in the United States. Any Licensed Articles bearing any of the Converse Marks manufactured by Licensee which are seconds or irregulars shall not be sold by Licensee without the prior written consent of Converse.

In addition, all factories at which Licensee desires to have Licensed Articles manufactured shall be approved in writing by Converse in advance of the placement of any orders for or of the manufacture of Licensed Articles.

(c) Inspection. Converse shall at any and all times have the right to inspect the Licensed Articles bearing any of the Converse Marks manufactured by Licensee to determine whether such Licensed Articles in fact conform to the established standards and other terms of this Agreement. If at any time Converse shall be of the opinion that Licensed Articles bearing any of the Converse Marks manufactured by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee. Licensee shall promptly thereafter remove or cause to be removed any of the Converse Marks from such nonconforming products or web sites, shall cease

to affix the Converse Marks to other Licensed Articles which do not meet the standards, and shall cease thereafter to manufacture, promote, advertise, distribute or offer for sale any such nonconforming Licensed Articles bearing any of the Converse Marks. It is understood and specifically agreed that upon termination of this Agreement, Licensee shall immediately cease using the Converse Marks or any reference thereto, except as otherwise provided in this Agreement.

     5.    <u>Quality Assurance</u>.

    (a)    Licensee shall submit, for the inspection and approval of Converse, samples and comprehensive drawings or prototypes or production models of each style representative of Licensed Articles covered by this Agreement to be manufactured by Licensee. In any event, such drawings and samples shall be submitted to Converse for approval at least four (4) months before any such Licensed Articles are shipped or sold by Licensee. Thereafter, once each six (6) months, and also two (2) weeks prior to any change in the materials, method of manufacture or design of Licensed Articles, Licensee shall submit for inspections and approval by Converse, samples representative of Licensed Articles expected to be manufactured, shipped and sold by Licensee. Additional samples shall also be submitted to Converse at Converse's reasonable request. Converse shall determine whether such samples conform to its standards and shall inform Licensee of its approval or of any deficiencies. Licensed Articles may be manufactured and sold by Licensee only after Converse shall have approved drawings and samples representative of such Licensed Articles in writing or shall have failed to disapprove them within four (4) weeks after receipt of the drawings and samples.

    (b)    All Licensed Articles manufactured or sold hereunder must:



   i.  be of first quality and conform to standards, including standards of design, style and quality, approved by Converse in its sole discretion, reasonably exercised;

   ii.  be of the grade, quality and style handled by quality departments of quality stores, department stores and better specialty shops in the Territory;

   iii.  be similar and at least equal in grade, quality, materials, workmanship, performance and style, to representative comprehensive drawings or production samples of Licensed Articles submitted by Licensee to Converse and approved by Converse; and

   iv.  be advertised, marked, labeled and packaged in accordance with this Agreement and not in any manner violative of law or tending to mislead or deceive the public.

  6. <u>Licensee's Use of Converse Information and Advice.</u>

  (a) Licensee agrees that it shall not use, permit the use of, release, give or otherwise distribute or disclose to any third party any of the information, advice, reports, instructions, designs, drawings, specifications, technical knowledge, methods, processes, samples or materials, names and addresses of suppliers of materials, or any other information ("Trade Secrets") furnished to it by Converse or Converse contract manufacturers or other licensees except as necessary and on an as needed basis in the manufacture, distribution, promotion, advertisement, and sale of Licensed Articles bearing the Converse Marks in the Territory pursuant to this Agreement.

  (b) All Trade Secrets shall remain the sole property of Converse and shall be deemed to be strictly confidential and shall be treated accordingly.

7. <u>Licensee Sales Program.</u>

(a)     Licensee shall faithfully, diligently and to the best of its ability endeavor to manufacture, distribute, promote, advertise, market and increase the sales of Licensed Articles bearing the Converse Marks in the Territory.  It shall be the responsibility of Licensee to provide active and continuous sales representation in the Territory by actual salesperson contact with customers, both existing and prospective.  Licensee shall maintain adequate brand and marketing management, manufacturing, sales and service personnel and adequate inventory levels, manage, position and market the brand; conduct advertising and promotional programs and perform such other necessary functions to accomplish maximum sales and distribution of Licensed Articles within the Territory.  Licensee shall not adopt, engage in, permit or otherwise use any pricing policies, advertising campaigns, merchandising techniques or other commercial practices which are illegal under the laws of the Territory or which, in the opinion of Converse, detract from the good will and reputation of Converse.

(b)     Licensee agrees to submit to Converse an annual business plan for the sale of Licensed Articles for each region within the Territory for each Contract Year.  Such annual business plan shall be submitted to Converse no later than September 30th of each Contract Year, and shall be for the next Contract Year.  Licensee also agrees to submit to Converse, a seasonal sales and marketing plan for the sale of Licensed Articles for each region within the Territory for each Contract Year.  Such seasonal sales and marketing plan shall be submitted to Converse no later than June 15th of each Contract Year for the next Spring, and January 15th of each Contract Year for the next Fall.

(c)    Licensee shall use Converse's web-based sales and forecasting application each month to provide Converse with both annual forecasts and actual sales.

(d)  During each Contract Year, Licensee shall expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for that Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure").  Such expenditures shall be spread over each current Contract Year in a manner consistent with the overall brand and product marketing and advertising strategies outlined by Converse in the United States market. Licensee agrees to provide Converse with quarterly statements itemizing Licensee's Advertising Expenditure for the preceding Contract Year Quarter on or before the fifteenth (15th) day of April, July, October and January of each Contract Year.  Converse agrees to waive its requirement to have Licensee pay a one percent (1%) Regional Marketing Contribution during the Contract Period.  Licensee shall keep Converse continually informed as to all advertising programs undertaken pursuant to this Agreement and shall not advertise any of the Licensed Articles without receiving the prior written approval thereof from Converse, which approval shall not be unreasonably withheld or delayed.  All advertising copy shall prominently feature Converse logos and Marks used in accordance with the Converse Identity Manual or guidelines provided by Converse from time to time.

(e)  Licensee agrees to purchase a representative sample range of each new product line introduced by Converse.  The price of such samples shall be factory cost plus fifty percent (50%) plus freight cost to be paid in accordance with Paragraph 18(d) herein.

(f)    Licensee agrees it shall have, at its expense, one or more of its sales management attend Converse's global sales conferences.

8.    <u>Distribution.</u>

(a)  Licensee hereby agrees to market, sell, promote and distribute the Licensed Articles to high end, better quality athletic footwear and sporting goods retailers and specialty shops, department stores and boutiques that are consistent with the Converse brand strategy and will enhance the Converse brand image within the Territory and throughout the world.  Licensee agrees not to market, sell, promote and distribute the Licensed Articles to mass merchants, discount stores and/or chains, flea markets, open air markets, consolidators, diverters or to any distribution channels that are not consistent, in Converse's sole discretion, with the Converse brand strategy.

(b)    <u>Publicity Materials</u>.  All Publicity Materials shall be approved in writing by Converse in advance of any release or distribution.  Converse shall at any and all times have the right to inspect the Publicity Materials developed by Licensee to determine whether they conform to the established standards and other terms of this Agreement.  If at any time Converse shall be of the opinion that the Publicity Materials developed by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee, which shall promptly thereafter remove and shall cease thereafter to use or distribute any such nonconforming Publicity Materials.

9.    <u>Licensee's Use of Converse Factories.</u>

(a)    Licensee must use Converse Factories for the manufacture of regular in-line Footwear Licensed Articles and Originals when manufacturing outside the Territory.  Licensee must submit the orders for such Footwear Licensed Articles and Originals to Converse's Production Department at corporate headquarters for approval  before it can be placed with the

factory and only if placed through the following approved buying agent or such other agent as

may be designated by Converse (the "Buying Agent"):

> Twin Dragons
> Pou Yuen Industrial City
> First Industrial Estate
> Shanxiang Town
> Zhongshan City, Guangdong Province, PRC
> China

In the event local production is required due to a tariff prohibition within the Territory,

Licensee, upon Converse's prior written approval, may locally produce the Footwear Licensed

Articles.

(b)    All such orders are to be placed with the Converse Factory with payment by

Letter of Credit, (unless wire transfer payment terms have been negotiated,) terms at sight,

from Bill of Lading date with such letters of credit opened so as to arrive at the factory no less

than forty-five (45) days prior to the confirmed ship date.

(c)    Licensee shall pay to Converse the Buying Agent's commission upon

presentation of the applicable commission invoice at the applicable percentage of the F.O.B.

Costs.

(d)    Under no circumstances can Licensee cancel orders contemplated by this

Paragraph 9 with Converse Factories without the prior written approval of Converse's

corporate office.  In the event Converse authorizes such cancellation, Licensee hereby agrees

to pay all costs incurred by the Converse Factory for such order and a cancellation charge to

Converse equal to five percent (5%) of the combined F.O.B. costs of the order.

Page 17

(e)     Licensee agrees it shall not approach any third party factories regarding the production of Footwear Licensed Articles, unless having prior written approval from Converse.

10.     <u>Exportation</u>.     Licensee shall manufacture, distribute, promote, advertise and sell Licensed Articles bearing the Converse Marks only within the Territory.  Further, Licensee shall not knowingly export or cause to be exported, and shall use its best efforts to prevent the export of, any products to other countries without the prior express written permission of Converse.  In the event that Licensee exports or causes to be exported Licensed Articles bearing the Converse Marks outside the Territory without written authorization from Converse, Licensee agrees that such action would irreparably harm Converse's business.  A breach of this Paragraph by Licensee may result in termination of this Agreement by Converse pursuant to Paragraph 24 below.

11.  <u>Government Approval</u>.  If applicable, Licensee shall be responsible for obtaining all necessary approvals from the government of any of the countries in the Territory with respect to this Agreement.  In the event that Licensee is unable to obtain all such approvals within one hundred eighty (180) days of the execution of this Agreement, Converse shall have the right to terminate the Agreement immediately upon written notice to Licensee.

IV.    <u>CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES</u>

12.  <u>Responsibility of Converse</u>.  In order to facilitate the manufacture, distribution, promotion, advertisement and sale of Licensed Articles by Licensee under this Agreement, Converse shall use good faith efforts to:  (a)  furnish or cause to be furnished to Licensee such



information and advice, as in the opinion of Converse, is necessary to implement this Agreement. Such information and advice may include, but is not limited to, drawings and specifications of the Licensed Articles, names and addresses of suppliers of materials, copies of advertisements and sale promotional material or such other information reasonably necessary to carry out this Agreement. Licensee shall pay Converse promptly upon billing for any articles supplied under this Paragraph 12(a) in accordance with Paragraph 18(d); (b) at Converse's discretion, to permit one or more of Licensee's representatives to attend, at Licensee's sole expense, sales conferences or other athletic sales events sponsored or attended by Converse representatives; (c) make arrangements under which representatives of Licensee may, at their sole expense, visit one or more factories in which products similar to the Licensed Articles are being manufactured by or for Converse bearing the Converse Marks to enable the representatives to study methods of manufacture and related matters.

13.    Converse's Alteration of Product Design and Specification. Converse reserves the right, upon sixty (60) days notice to Licensee, to modify the design and specifications for any Licensed Article made by Licensee bearing any of the Converse Marks, and any design or text. In that event, Licensee shall not manufacture Licensed Articles in accordance with the prior design or specification, except for the completion of Licensed Articles in the process of manufacture at the time Licensee received the modification. Licensee agrees not to manufacture, distribute, promote, advertise or sell any product not bearing a Converse Mark which, in the opinion of Converse, by reason of its appearance or design, might tend to be confused by the public with any of the Licensed Articles manufactured under this Agreement bearing Converse Marks, or which in the opinion of Converse infringes in any manner Converse Marks.

14. <u>Converse's Right of Inspection of Licensee Factories.</u>

(a)  Converse shall have the right at its own expense to have its representatives from time to time, during reasonable business hours, visit and inspect the factory or factories in which Licensee is producing, or having produced, Licensed Articles bearing any of the Converse Marks for the purpose of observing the method of manufacture, quality of materials, products produced, and any other matters relevant to this Agreement.  Included in this inspection shall be the audit of the workers' rights standards pursuant to the Converse Inc. Human Rights Manual which is made part of this Agreement and is attached hereto as Appendix B.

(b)  Licensee shall reimburse Converse for any expense for travel to the Territory or elsewhere which may be incurred by representatives of Converse at the request of Licensee and such payments shall be made by Licensee to Converse in U.S. Funds within thirty (30) days from billing thereof.

## V.    ROYALTIES, FEES AND PAYMENTS

15. <u>Royalties.</u>  In conjunction with Paragraph 18 below, Licensee shall pay to Converse the following royalties:

(a)     In consideration for the license granted to it by Converse herein, Licensee shall pay Converse a royalty equal to the following percent of the Net Sales made by Licensee of the Licensed Articles (the "Earned Royalties").  The Earned Royalties shall be based upon the Net Sales price for such products sold to the retail or wholesale trade by Licensee.



| EARNED ROYALTIES | | | |
|---|---|---|---|
| **CONTRACT YEAR** | **CALENDAR YEAR** | **Footwear (including Originals)** | **Non-Footwear** |
| 1 | 9/1/01 – 12/31/02 | 6% | 6% |
| 2 | 2003 | 7% | 6% |
| 3 | 2004 | 8% | 6% |
| Option Years | | To be negotiated | To be negotiated |
| 4 | 2005 | tbd | tbd |
| 5 | 2006 | tbd | tbd |
| 6 | 2007 | tbd | tbd |

The Earned Royalty rate for Licensed Articles for the Option Period will be negotiated prior to the Option Years taking effect.

(b)    Notwithstanding the provisions of Article 15(a), Licensee agrees to pay Converse a guaranteed annual minimum royalty as set forth below for each Contract Year (the "Guaranteed Annual Minimum Royalty").

| **CONTRACT YEAR** | **CALENDAR YEAR** | **GUARANTEED ANNUAL MINIMUM ROYALTY** |
|---|---|---|
| | | Footwear (including Originals) and Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | US$115,000.00 |
| 2 | 2003 | US$160,000.00 |
| 3 | 2004 | US$215,000.00 |
| Option Years | | |

| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties |
| 5 | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

In the event this Agreement is terminated on a date other than the last day of a Contract Year, the Earned Royalties shall be based upon actual Net Sales through the date of termination.

(c)  <u>Third Parties</u>.

(i)  With respect to the sale of certain Licensed Articles, Converse has, or may have in the future, an obligation to pay a royalty to an athlete or other third party ("Third Party") in conjunction with the use of the Licensed Articles (the "Third Party Articles").  In the event that Licensee purchases or manufactures, with Converse's prior written consent, any Third Party Articles, Licensee agrees to pay to Converse the amount of any royalty which Converse is obligated to pay to the applicable Third Party (the "Third Party Royalty").

(ii)  Converse shall advise Licensee, in a timely fashion prior to Converse's approval of Licensee's submission of an order for Licensed Articles, which articles are Third Party Articles and the amount of the Third Party Royalty.

(iii)  The applicable Third Party Royalty shall be paid by Licensee to Converse along with payment of the Earned Royalties pursuant to Paragraph 18 of this Agreement.

(d)  Licensee shall remove Converse Marks from any defective products which do not meet Converse standards as set forth in Paragraph 5 of this Agreement entitled Quality Assurance for first quality merchandise and no royalty shall be payable hereunder with respect to the sale of



such substandard products. This requirement to remove all Converse Marks shall be operative irrespective of the fact that such substandard products may be customarily sold in the Territory for the same price as first quality merchandise. Converse shall have the right to prohibit Licensee from selling such substandard products, if, in the opinion of Converse, such products may tend to be confused by the public with any of the Licensed Articles sold under this Agreement bearing Converse Marks, or which, in the opinion of Converse, infringes in any manner the Converse Marks.

16.    <u>Guaranteed Minimum Sales</u>. Notwithstanding the provisions of Paragraphs 15(a) and (b) above, Licensee agrees to sell not less than the following guaranteed minimum sales volume of Licensed Articles during each Contract Year as set forth below (the "Guaranteed Minimum Sales Volume"):

| CONTRACT YEAR | CALENDAR YEAR | GUARANTEED MINIMUM SALES VOLUME |
|---|---|---|
| | | <u>Footwear (including Originals) and Non-Footwear</u> |
| 1 | 9/1/01 – 12/31/02 | US$1,917,000.00 |
| 2 | 2003 | US$2,300,000.00 |
| 3 | 2004 | US$2,800,000.00 |
| Option Years | | |
| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales |
| 5 | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

17.    <u>Royalty Reports</u>

(a)    Unless otherwise specified herein, Licensee shall deliver to Converse on or before April 25th, July 25th, October 25th and January 25th of each Contract Year a Royalty report, which shall be a complete and accurate itemized statement, certified by Licensee's chief fiscal officer as being accurate and complete, stating the description by product type, number of pairs or units, gross sales price, itemized deductions from gross sales price and net sales price as well as wholesale sales of the Licensed Articles manufactured, distributed or sold by Licensee during the preceding Contract Year Quarter.  Such statements shall be stated in both United States and local currency and submitted in the format set forth in Appendix C, which shall be subject to change without notice.  Such quarterly statements shall be furnished to Converse whether or not any Licensed Articles bearing any Converse Marks have been sold or distributed by Licensee during the preceding Contract Year Quarter. Receipt or acceptance by Converse of any statements furnished pursuant to this Agreement or any sums paid hereunder shall not preclude Converse from questioning the accuracy thereof at any time, and in the event that any inconsistency or mistake is discovered in such statement or payments, they shall be rectified immediately and the appropriate payments shall be made by Licensee.

(b)    If applicable, the parties acknowledge that Licensee may be legally required to withhold and remit a portion of the Earned Royalties to the governments of the countries in the Territory on behalf of Converse.  It is not the intent of the parties that Licensee pay any part of any tax owed by Converse.  Licensee's obligation shall be satisfied if it withholds and remits in accordance with the laws of the countries in the Territory and provides Converse promptly upon



payment, one original counterpart of the certificate issued by the competent tax authorities receiving such payments. These certificates should be forwarded to Converse's Accounting Department at the address set forth in the Notice section of this Agreement. These withholding certificates, if applicable, must accompany quarterly Royalty Reports.

18. <u>Schedule of Royalty Payments and Fees</u>.

The Royalty Payments set forth below shall be paid to Converse on a quarterly basis upon invoice or no later than the end of the month in which the Royalty report was due to be submitted pursuant to Paragraph 17 above. Payments shall be in U.S. Dollars and can be made either by wire transfer in accordance with the instructions set forth in Paragraph 19 below or by check:

(a) The Earned Royalty or one quarter of the Guaranteed Annual Minimum Royalty set forth herein for each Contract Year Quarter, whichever is greater. Once the Guaranteed Annual Minimum Royalty is satisfied, Licensee is required to pay Earned Royalties only for the remaining quarters;

(b) The Original Products Royalty;

(c) The Third Party Royalty, if applicable, shall be paid upon receipt of Converse's invoice;

(d) In addition to royalties, Licensee shall pay Converse for all materials, samples, and merchandise furnished to Licensee pursuant to Paragraph 12 hereof in an amount equal to the cost of such items to Converse, including Converse's cost of preparing, packing, shipping and transporting such items. All such purchases by Licensee from Converse shall be paid upon receipt of invoice by wire transfer or check.

Page 25

(e)  Licensee shall maintain appropriate books of account and records, including inventory records, in accordance with generally accepted accounting principles, and shall make accurate entries concerning all transactions relevant to this Agreement.    Such books of account and records shall be kept separately from those for any merchandise other than the Licensed Articles sold hereunder by Licensee.    Licensee shall also, upon request by Converse, provide Converse with a sales report listing year-to-date sales generated by each of Licensee's customers.

(f)  Converse shall have the right, at its own expense, during the term hereof and for three (3) years thereafter, or in the event of a dispute involving in any way such books of account and records, until the dispute is resolved, whichever is later, through any authorized representatives of its own choice, on reasonable notice to Licensee and during regular business hours, to examine and take extracts from such books of account and records, and other documents (including but not limited to invoices, vouchers, records, purchase orders, sales orders and reorders) relating to the business hereunder which shall be maintained and kept by Licensee during the term hereof.    All such books of account and records shall be kept available by Licensee for three (3) years after the end of the Contract Period, or in the event of a dispute between the parties hereof involving in any way such books of account and records until that dispute is resolved, whichever is later.    If upon inspection of the books and records pursuant to this paragraph or otherwise, it is discovered that Converse did not receive the correct and adequate payment, then Licensee shall pay the Company, upon written notice, the difference between what was paid and what should have been paid, within five (5) business days of receipt of said notice.    If the aforesaid difference exceeds five percent (5%), then the entire difference is to be paid with interest calculated from the date the payment should have been made to the



actual date of payment at the prime rate in effect on the payment date. If Converse chooses to

employ the services of a certified public accounting firm, qualified accounting consultant firm or

Converse's internal auditors to conduct an audit and inspection of Licensee's books and records

and said audit and inspection results in a balance due for any Contract Year of this Agreement

which exceeds by five percent (5%) the payment reported due by Licensee for any such Contract

Year, then Licensee shall bear the entire cost including all fees and expenses of said audit and

inspection. If it is found that Licensee has made a larger payment than that which was due, said

excess will be returned by Converse within five (5) business days of such determination.

    19. <u>Currency In Which Payments Are To Be Made</u>.

    (a) Unless specifically set forth to the contrary herein, all payments to Converse (except

Converse Factories) required to be made by Licensee pursuant to this Agreement shall be made

in the currency of the United States of America ("U.S. Funds"), payable to Converse Inc., First

Union National Bank, Charlotte, NC, ABA No. 053000219, Account No. 2000011041218, or

such other account as may be designated by Converse from time to time (the "Account").

Converse will review the exchange rate received by Licensee in the conversion from Licensee's

local currency to U.S. Funds by comparison with the exchange rate published by the Wall Street

Journal ("WSJ") two (2) business days prior to the payment due date scheduled in Paragraph 18

of this Agreement. If there is a difference between the exchange rate received by Licensee and

the WSJ rate, Converse reserves the right to request such additional funds from Licensee as is

required to compensate for the exchange rate deficiency. In cases where payment of the particular

royalty due is more than seven (7) calendar days late, Converse reserves the right to request

additional funds from Licensee to compensate Converse for any resulting subsequent exchange



rate loss. If required, Licensee agrees it will seek the necessary government approvals to make such payments to Converse in U.S. Funds. Any late payments will be subject to an interest charge of one and one-half percent (1 1/2%) to Converse each month the payments remain unpaid. In the event any such payment exceeds thirty (30) days in arrears, Converse shall have the right, in addition to any and all other remedies available to Converse, to terminate this Agreement pursuant to Paragraph 24.

(b) If the actions of any government or public body make it impossible for Licensee to pay Converse in U.S. Funds, Converse shall have the following options:

      (i)    terminate the Agreement with thirty (30) days written notice to Licensee;

      (ii)    require Licensee to make payment in the currency of any other country selected by Converse by whose currency Licensee may legally pay;

      (iii)    require Licensee to deposit such payment to Converse's account in a bank selected by Converse in or outside the Territory.

If Converse selects option (i) it may nevertheless require Licensee to pay any sums then due or to become due in accordance with options (ii) or (iii).

## VI.    INTELLECTUAL PROPERTY

20. Converse Intellectual Property.

(a) Ownership. Licensee acknowledges that Converse is the exclusive owner of the Converse Marks, Converse patents, and Converse domain names, and covenants that neither it nor any person acting for or under it will ever contest such ownership or the exclusive rights of Converse with respect thereto anywhere in the world.



(b)    In the event that Licensee creates, or assists in the creation of, a design for a Licensed Article or Converse's web site, then such design shall become the property of Converse without any further act required on the part of Converse or Licensee. Licensee shall execute and deliver any document or instrument requested by Converse to confirm exclusive ownership by Converse of any such design.  Converse shall have the right to utilize said design itself or provide it for use by any third party.

(c) Infringement.  Nothing in this Agreement shall constitute a warranty by Converse that there are currently no infringements of any of the Converse Marks, Converse patents, or Converse domain names within the Territory.  Licensee agrees that during the Contract Period it will diligently investigate any infringement or threatened infringement of the Converse patents, trademarks, logos, domain names or trade names within the Territory and shall immediately notify Converse of any such infringement or threatened infringement or of any act or threatened act of unfair competition which may come to Licensee's attention and Licensee shall use its best efforts to prevent such infringement or act of unfair competition.  Should litigation become necessary in Converse's sole discretion to protect Converse's interests in this regard, Licensee shall cooperate fully with Converse to the extent requested.  Converse shall be responsible for the expense of such litigation.

Converse acknowledges that it is a party to certain litigation in Brazil with All Star Artigos relating to the use and registration of the Chuck Taylor All Star and All Star logos. Converse hereby agrees that it will take the necessary actions as determined by Converse to recover the ownership of said trademarks provided it is in the best interest of Converse.

(d)    Intellectual Property Indemnification.  Licensee shall indemnify and hold Converse harmless from and against any and all claims, demands, losses, damages, liabilities, suits, judgments, and expenses, including incidental costs and attorneys' fees Converse may incur or be liable for arising out of allegations that Licensed Articles, Converse Marks, advertising and/or Publicity Materials used, designed and/or developed by Licensee violates or infringes the copyright, trademarks, service marks, or patent rights of any third party. Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.

21.  Territorial Registration of Converse Trademarks.  Converse has registered or applied for registration of certain of its trademarks and domain names in the Territory.  In this regard, Licensee agrees to take all proper actions requested by Converse to facilitate and expedite the registrations, provided that Converse reimburses Licensee for all reasonable expenses incurred in connection therewith.  If Converse is prevented from registering its trademarks or domain names in the Territory by virtue of the existence of this Agreement, Licensee agrees, at the request of Converse, to seek registration in its own name and convey to Converse all right, title and interest to the trademarks and domain names which Licensee may thereby obtain, provided that Converse shall reimburse Licensee for all reasonable expenses incurred.

22.  Infringement, Counterfeit, Unfair Competition.  Licensee agrees to notify Converse, in writing, of any infringements or counterfeits of, or any unfair competition affecting the trademarks and domain names licensed hereunder immediately upon gaining knowledge thereof and to cooperate fully in any action thereon which Converse may, in its sole discretion, deem appropriate.  Licensee shall not, however, be entitled to take or institute any action thereon,



either by way of informal protest or legal, equitable or criminal proceedings, without express written approval, nor shall Licensee be entitled to call upon Converse to take action thereof; all such matters shall be entirely within the discretion of Converse.

23. <u>Indemnification for Products Liability Claims</u>.

(a)   Licensee agrees to indemnify Converse from any and all claims, demands or judgments, including incidental costs and attorneys' fees incurred in connection therewith against Converse for injuries or damages to purchasers or users of the Licensed Articles manufactured by Licensee.   The foregoing indemnification of Converse by Licensee shall extend to any and all products liability claims arising as a result of Converse's ownership and control of the trademarks under which the Licensed Articles are manufactured and sold by Licensee, including, but not limited to, claims arising out of breach of implied or express warranties, strict tort liability or negligence, or legal claims of a comparable nature for recovery brought by litigants under the laws of the jurisdiction that apply to the Licensee.

(b)   Licensee shall, at its own cost and with Converse's approval, defend against any claims brought or actions filed against Converse on a products liability theory of the Licensed Articles whether such claims or actions are rightfully or wrongfully brought or filed, and Converse shall execute all papers necessary in connection with such suit and shall testify in any such suit whenever required to do so by Licensee all, however, at the expense of Licensee with respect to travel and similar out-of-pocket disbursements.

(c)   Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.



(d)    Licensee shall obtain insurance to the extent of $1,000,000 per occurrence against liability for bodily injury including death resulting therefrom and $1,000,000 per occurrence against liability for damage to property including loss of use thereof, occurring in any way relating to the Licensed Articles.  Such insurance policy shall insure Converse and shall name Converse as an additional insured as its interest may appear.  Such insurance policy shall be cancelable or materially altered only upon ten (10) days notice to the Licensee and Converse. Licensee shall provide Converse with a certificate of its insurance policy in the amount indicated within ten (10) days of execution of this Agreement.

## VII.    TERMINATION

24.  Right of Termination.

(a)    By Converse Immediately.  In the event of the occurrence of any one or more of the following, Converse shall have the right to immediately terminate this Agreement by written notice thereof to Licensee but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i)  insolvency, bankruptcy, reorganization, suspension of payments, assignment for the benefit of creditors, appointment of a receiver, institution of any proceedings by or against Licensee under bankruptcy laws or other similar laws; or

(ii)  the transfer or sale of all or a majority of the voting stock or other equitable ownership of Licensee without the written consent of Converse.

(b)    By Converse Upon Notice of Breach.  In the event of the occurrence of any one or more of the following, Converse shall have the right to terminate this Agreement seven (7)

days after giving written notice thereof to Licensee, and Licensee has not remedied the situation within such seven (7) day time period:

(i)   failure of Licensee to pay any royalty or other payment due Converse under this Agreement for a period of thirty (30) days from the date such payment is due and payable;

(ii)   failure of Licensee to pay the Buying Agent's commission ("Buying Agent's Commission") for a period of thirty (30) days from the date such commission is due and payable;

(iii)   pursuant to Paragraph 8 Distribution above, the manufacture, distribution, advertisement or sale of Licensed Articles by Licensee in the Territory other than pursuant to this License Agreement;

(iv)   the sale or shipment of Licensed Articles by Licensee outside of the Territory, as set forth in Paragraph 10 herein;

(v)   the failure of Licensee to comply with the Guaranteed Annual Minimum Royalty or Guaranteed Minimum Net Sales Volume for any Contract Year, as set forth in Paragraphs 15 and 16 herein; or

(vi)    The breach by Licensee of Paragraphs 3(a), 4 and 6 herein.

(c)    By Either Party.  In the event of the occurrence of any one or more of the following, either party shall have the right, after thirty (30) days written notice, to terminate this Agreement by written notice thereof to the other party but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

Page 33

(i)  liquidation or dissolution of either party or discontinuance of the active operation of the enterprise of either party;

(ii)  the breach of or failure by either party to perform or observe any of the other terms and conditions of this Agreement, provided said breach or failure shall continue for a period of thirty (30) days after written notice thereof from the other party.

25.  Effect of Termination or Expiration.

(a)  From and after the termination of this Agreement, whether by expiration of the Contract Period or termination pursuant to Paragraph 24 or for any other reason, any and all rights acquired by Licensee to the use of the Converse Marks and Trade Secrets, shall terminate and cease absolutely, and except as provided in subsection (b) of this Article, Licensee shall not thereafter manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with Converse Marks.

(b)  Any Licensed Articles manufactured or in the process of manufacture by Licensee prior to the expiration or termination of this Agreement and as to which any of the Converse Marks has been attached or affixed may be sold by Licensee, but only during the ninety (90) day period next following the date of expiration or termination, subject to the condition that Licensee pay to Converse all Earned Royalties and other payments due and owing Converse at the date of expiration or termination and to the further condition that Licensee continues to pay to Converse all Earned Royalties accruing during such ninety (90) day period within thirty (30) days following the end of each calendar month and delivers to Converse at the time of such payment an itemized statement in the form required by Paragraph 17 hereof for each such calendar month.



Licensee agrees that the Licensed Articles shall be sold during the ninety (90) day period shall be sold in accordance with the provisions of Paragraph 8 Distribution herein.

Notwithstanding anything to the contrary contained herein, Licensee shall not manufacture, distribute, sell or dispose of any Licensed Articles hereunder after the expiration or earlier termination of this Agreement. Licensee shall, upon termination of this Agreement, promptly assign and transfer to Converse any property rights which Licensee may have acquired in the Converse Marks and shall, within thirty (30) days, destroy or return all drawings, molds, dies and similar equipment or materials in its control or possession used for the production or reproduction or imprinting of the Converse Marks on the Licensed Articles and furnish to Converse satisfactory evidence of such return or destruction. Licensee agrees, subsequent to the expiration of this Agreement, not to register, attempt to register or use, except as provided herein, any Converse Marks and trademarks that are confusingly similar to the Converse Marks.

(c)    In the event Converse terminates this Agreement for breach by Licensee, Licensee will still be liable to Converse for its Minimums for the remainder of the Contract Period.

26. Final Statement Upon Termination or Expiration.

(a) Licensee shall deliver, as soon as practicable but in any event no later than thirty (30) days after expiration or termination of this Agreement, to Converse a statement indicating the number and description of Licensed Articles bearing any of the Converse Marks under this Agreement on hand or in process of manufacture as of (i) sixty (60) days prior to the expiration of the Contract Period; and (ii) thirty (30) days after receipt from Converse of any notice terminating the license granted hereunder or, in the event no such notice is required, thirty (30) days after the occurrence of any event which terminated such license.

(b)  Converse shall have the option, at its expense, to have an independent certified public accountant conduct a physical inventory during reasonable business hours of Licensee's manufacturing and distribution facilities in order to ascertain or verify such inventory or statement.  In the event Licensee refuses to permit Converse to conduct such physical inventory, Licensee shall forfeit its right hereunder to dispose of such inventory.  In addition to such forfeiture, Converse shall have recourse to all other legal remedies available to it.

(c)    Licensee shall have ninety (90) days to dispose of Converse inventory, which disposal shall be consistent with its distribution channels set forth in Paragraph 8 of this Agreement.

### VIII.   MISCELLANEOUS

27.    Devaluation.  In the event devaluation in any of the countries in the Territory increases by more than fifteen percent (15%) in a given year, Licensee may, at Converse's option, have the right to renegotiate its Guaranteed Annual Minimum Royalty and Guaranteed Minimum Sales Volume set forth above for the Contract Period.

28.  Force Majeure.  If either party to this Agreement is temporarily unable to perform its obligations hereunder because of fire, strike, freight embargoes, government restrictions or regulations, war, emergency or any other Act of God, then no liability to the other party or right to terminate shall exist for failure of the one party to perform during such period.

29.  Assignment or Sublicense by Licensee.  None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other

Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee without the prior written consent of Converse in each instance.

30. <u>Notices</u>. Any written notice authorized or required by this Agreement shall be deemed to be duly given when sent by facsimile, registered mail, postage prepaid, or by express mail or international courier service, addressed to one party or the other, as the case may be, as stated in this Article unless either party shall previously have given to the other party written notice of a change of such address.

<u>CONVERSE INC.</u>

Converse Inc.
One High Street
North Andover, Massachusetts 01845
Fax: 978-983-3547

ATTENTION:    Laura W. Kelley
Vice President, Legal

c.c.:   Tim Ouellette
Vice President, Licensing

<u>ALON INTERNATIONAL S.A.</u>

Mr. Roberto Szerer
Mr. Ronald Durchfort
ALON International
1160 E. Hallandale Beach Boulevard, Suite A
Hallandale, Florida 33009

31. <u>No Joint Venture</u>. Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers and neither party shall have the power to obligate or bind the other in any manner whatsoever.

32.  Applicable Law.  The parties agree that the Commonwealth of Massachusetts, U.S.A. law governs the provisions and interpretation of this Agreement and that the English language version thereof shall be the controlling document.

33.  Arbitration.  The parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly.  Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligations of the parties thereunder, the capacity or authority of the parties thereto, the performance or breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one party to the other setting forth with specificity any such controversy or claim, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association.  The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association.  The parties expressly agree that arbitration shall be held in the offices of the American Arbitration Association, in Boston, Massachusetts, U.S.A., or such other locations within the Commonwealth of Massachusetts as the American Arbitration Association may direct.  Such arbitration shall be conducted in the English language and the arbitrators shall apply the laws of the Commonwealth of Massachusetts.  The institution of any arbitration proceeding hereunder shall not relieve the Licensee of its obligation to make payments accrued hereunder to Converse during the continuance of such proceeding.  The decision by the arbitrators shall be binding and conclusive upon the parties, their successors and assigns and the parties shall comply with such decision in good faith, and each party hereby submits itself to the jurisdiction of the courts of the place where the arbitration is held, but only for the entry of judgment with respect

to the decision of the arbitrators hereunder. Notwithstanding the foregoing, judgment upon the award may be entered in any court where the arbitration takes place, or any other court having jurisdiction over the losing party.

34. <u>Significance of Headings</u>. Paragraph headings contained herein are solely for the purpose in aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of the Agreement.

35. <u>Assignment, Entire Agreement, No Waiver</u>. This Agreement and any rights herein granted shall inure to the benefit of and be binding upon the parties hereto and their respective successors or assigns, provided, however, that this Agreement shall be freely assignable by Converse but shall not be assigned, sublicensed or encumbered by Licensee without the prior written consent of Converse. This Agreement constitutes the entire agreement and understanding between the parties hereto and cancels, terminates and supersedes any prior agreement, materials exchanged between the parties, discussions or understanding relating to the subject matter hereof. None of the provisions of this Agreement can be waived or modified except expressly in writing signed by both parties hereto, and there are no representations, promises, agreements, warranties, covenants or undertakings other than those contained herein.

IN WITNESS WHEREOF, each of the parties hereto have executed this Agreement as of the date and year first above written in duplicate originals by its duly authorized representatives.

CONVERSE INC.

By _Laura M Kelley_

Title _VP Legal_

Witness _J. LaBelle_

ALON INTERNATIONAL S.A.

By _[signature]_ Roberto Szerer

Title _Co-president_

Witness _____

# EXHIBIT B
# to Converse's Opposition

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CONVERSE INC., | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: 04-12591-PBS |
| vs. | ) | |
| ALON INTERNATIONAL S.A., | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF TIMOTHY OUELLETTE

Timothy Ouellette, on oath, deposes and states:

### Background and Knowledge of Ouellette

1.     My name is Timothy Ouellette.  I am Vice President - Licensing at Plaintiff Converse Inc. ("Converse").  I am responsible at Converse for international and domestic licensing business.  I am the employee of Converse who has had the most day to day contact with Converse's licensee, ALON International S.A. ("Alon").

2.     I have known one Co-President of Alon, Ronald Durchfort since he was a licensee of Donnay S.A., where I began working in 1988.  I have traveled several times to the offices of Alon in Hallandale, Florida.  I have at times over the past three years had very frequent email and phone communications with Durchfort and the other Co-President of Alon, Roberto Szerer.  I have in the last three years had meetings with one or the other of them at offices of Converse in North Andover, Massachusetts.  I make this affidavit in part based upon

facts of my own personal knowledge and in part based on information which I have heard from

third parties and which I believe to be true.

### Merits of ALON's Claim: Automatic Contract Renewal

3.      A licensor, like Converse, grants a license for a licensee to market its

trademarked products in return for payment by the licensee of a royalty. In order to have

some minimum standard of performance which the licensee must meet, the licensor always

requires that the licensee guarantee a minimum amount of sales of the licensor's products

("guaranteed minimum sales").   Also, the licensor requires an agreement on a royalty

percentage to be paid to the licensor.  Only with an agreed royalty percentage, the percentage

share of sales owed by the licensee to the licensor, and to be multiplied against actual sales,

can the actual total amount of money to be owed by the licensee to the licensor be determined.

4.      Alon claims that it was entitled to an automatic renewal of its contract with

Converse, which otherwise contained a term clause providing that the contract would expire on

December 31, 2004.  For this conclusion, Alon points to the Manufacturing, Distribution and

License Agreement between Converse and Alon, dated as of September 1, 2001 ("License

Agreement"), at ¶ 2:

> In the event Licensee wishes to renew this Agreement, it must notify Converse
> in writing of this decision by or before September 30th of the final Contract Year.
> Licensee may renew this Agreement for an additional term of three (3) years ("Option
> Years" which may be collectively referred to as the "Option Period") provided
> Licensee exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by
> twenty-five percent (25%) and further provided that Licensee has not breached any of
> the terms and conditions of this Agreement.

5.      The License Agreement contains the following clauses which also bear on

Alon's claim of automatic renewal:

2

    (a)    The term clause of the License Agreement, ¶ 2, goes on to say, "The Guaranteed Minimum Sales for the First Option Year will be the greater of 25% for the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales, increasing by 10% each subsequent Option Year." [Underscore added.]

    (b)    The royalties clause of the License Agreement, ¶ 15, says in part that "The Earned Royalty rate for the Licensed Articles for the Option Period will be negotiated prior to the Option Years taking effect." In a chart on that page of the Agreement the royalty rates for various items for the Option Years are shown as "tbd [to be decided]." [Underscore added.]

    (c)    The term clause of the License Agreement, ¶ 2, goes on to say that, "Any extension of this Agreement shall be effective only pursuant to a written agreement executed by Converse and Licensee. Such written agreement shall reflect any new or revised terms of conditions agreed to be the parties." [Underscore added.]

6.    In late March of 2004 the officers of Alon, namely, Ronald Durchfort and Roberto Szerer, both Co-Presidents of Alon, approached me about the subject of renewal of Alon's License Agreement with Converse. As noted above, the License Agreement stated, at ¶ 2, that "guaranteed minimum sales", that is, the minimum amount of sales of Converse products that Alon had to contractually guarantee to Converse, for the first year of the renewal contract, which would be the year 2005, had to be at 80% of the level of actual sales for the last year of the term of the License Agreement, that is, 2004. As a starting point for these discussions, Alon prepared and sent to me in late March 2004, and in preparation for a March 31, 2004 meeting with me, a forecast of full-year 2004 sales of $19,485,296.00, a copy of which is attached as Exhibit "A". Based on this forecast (if it turned about to correct for full-year 2004 sales), Alon was required under the License Agreement to agree to guaranteed sales for 2005 (at 80% of actual sales for 2004) of $15,584,000.00. As of late March 2004, Alon's projection of full-year 2004 sales of over $19 million seemed realistic because Converse had a forecast at the time of just below $19 million.

MCG/32913/2/566893v1
03/26/05-BOS/

7.    However, by late April 2004, even though 2004 sales were on an upward trend,
Alon suddenly dropped its full-year 2004 forecast by almost 1/3, from $19,485,296.00, down
to $13,300,000.00.  This projection by Alon of 2004 sales at $13,300,000 is shown on the
chart directly under the number "2004" and across to the right from the word "Sales."
Durchfort of Alon sent me this new forecast in an email dated April 28, 2004, a copy of which
is attached as Exhibit "B".  This new 2004 forecast of $13,300,000.00 is $6,185,000 less than
the Alon forecast of a month earlier, made just prior to the March 31st meeting between Alon
and me.  Also, while Alon knew that Converse's standard royalty rates were 10% for original
Converse-developed footwear and 8% for non-footwear (apparel), Alon proposed royalty rates
of 8% for footwear in general (appearing three quarters of the way down the first page and just
under the word "Footwear"), and 6% on non-footwear (appearing two-thirds of the way down
the first page and just under the word "Non footwear.").   Alon also proposed a 4-year
extension term (the projected sales include the years 2005 through 2008) instead of the 3-year
extension term called for by the Agreement (the years 2005-2007, as set forth in ¶¶ 2 and 15(a)
of the License Agreement: "an additional term of three (3) years").  I responded in an email
the next day, April 29th, (Exhibit "B" hereto; at the top of the first page), saying: "At first
glance, all of these numbers appear very low.  Your contract is pretty clear in it's renewal
terms.  To propose a longer extension, at lower numbers doesn't make a lot of sense."

8.    Through May and early June, Szerer of Alon continued to send me proposals
for renewal of the License Agreement which were all based on full-year 2004 forecasts, and
hence guaranteed sales for 2005, which were $5 million or more less than was then justified by
full-year 2004 forecasts based on a projection of actual 2004 sales to date.   Also, in its

4

proposals, Alon kept offering royalty rates far below what Converse was requesting. Alon was offering royalty rates for footwear, including originals, of only 8%, and non-footwear of 6%. In an email dated May 19, 2004, a copy of which is attached as Exhibit "C", Szerer sent me a proposal for an entirely new contract with a first renewal period to be five years, with an option to renew for another period of four or five years (until 2013). I never agreed to any of these proposals or to any limitations on the renewal terms stated in the License Agreement.

9.      On May 31, 2004 Szerer sent me an email, a copy of which is attached as Exhibit "D", in which he stated, "We understand that based on our initial 'Big Aggressive Hairy Goal' you would like a growth for this year of 50%. We believe it is to [sic] high specially after the growth we had in the last year . . ." What Szerer was now calling Alon's "Big Aggressive Hairy Goal" was Alon's own 2004 full-year sales projection of late March 2004 (Exhibit "A" hereto) of $19,485,296.

10.      By mid-June, I told Durchfort of Alon that the negotiations were getting no where. Szerer then stopped being the negotiator for Alon and was replaced by Durchfort. Durchfort sent me an email dated June 28, 2004, a copy of which is attached as Exhibit "E", forwarding a comparison of the extension terms required by the License Agreement versus Alon's then proposal. Durchfort first set out the extension terms called for by the License Agreement (under the phrase "Contract Extension Terms"), based on projected sales for full-year 2004 of $19,500 (in thousands). He then shows contract-required guaranteed sales of 80% of 2004 at $15,600 (in thousands). The bottom half of the document is the renewal offer then being made by Alon, which Durchfort had proposed at one or more sales meetings with me in June. In the Alon proposal section of the document, and to the right, Durchfort

5

projected 2004 actual sales of $20,000 (in thousands). He then offered guaranteed sales for 2005 at 70% of the 2004 projection, which was $14,000 (in thousands). He only offered a royalty rate for original Converse products of 8% with no increase over the term of the renewal. The royalty for non-footwear was brought up to 8%, the Converse target. The term was only 5 years and not 5 plus an additional period. My response to this proposal was, among other things, that it did not make sense because the guaranteed sales were lower than what were called for in the License Agreement (70% of 2004 sales was being offered for 2005, instead of the 80% required by the License Agreement), and the royalty rate for original footwear was still below the Converse target of 10%. Also, by this time, it looked like full-year 2004 sales (the base for determining guaranteed sales for 2005) were running way above $20 million, as then projected by Alon.

11.    This was the last proposal made by Alon prior to the audits of Alon conducted in July and November 2004, and the notice of breach letter sent by Converse to Alon on November 30, 2004.

12.    By August 2004, based on ever-increasing actual sales in 2004, Converse was forecasting full-year 2004 sales by Alon of $23,505,182. This forecast was based on actual sales through July 2004 of about $11.6 million, with second quarter actual sales increasing to $6.4 million. Actual sales for the Territory for full-year 2004 came in at $26,108,266. Sales for the fourth quarter 2004 were $9,963,143. The pace of sales in October, November and December 2004 was about $3 million each month. Since the License Agreement specified that guaranteed sales for 2005, the first year of the Option Period, would be at 80% of actual sales for 2004, the License Agreement specified guaranteed sales for 2005 of $20,886,612. Alon's

6

highest offer for 2005 guaranteed sales came in its June 28th email to me (Exhibit "E" hereto),

which offer was $14,000,000. That offer was $6,886,612 less than the License Agreement

ultimately required.

13. Alon claimed in its Statement of Claim in the arbitration proceeding that, "in

September 2004, Converse verbally communicated to Alon their intent to renew the License

Agreement for a period of five years." This is patently false and provably so. On Sept. 23,

2004 Szerer of Alon sent an email to me, a copy of which is attached as Exhibit "F" (along

with my response), in which Szerer, on page 2, about one third of the way down the page,

said, "I have been puzzled with the request of Converse auditors to review the books of

Coopershoes and the delay in sending us our 5 year contract renewal especially after you called

and informed that it was approved by the board." On Sept. 24th I emailed back to Szerer

saying (see Exhibit "F", at the top of the first page), "I understand that this is a difficult

period, however, let's keep facts as facts. The below quote is untrue. It was made clear to

you, from the beginning, that no decision on any contract renewal would be forthcoming until

a successful audit has been accomplished. This is yet to be completed. While your contract

has been discussed with the Board, we have yet to offer our terms to you, and will not until the

aforementioned audit has been successfully completed and it is the determination of the Board

that this is appropriate. Let's please at least keep all facts straight. [followed by quote from

Szerer email of Sept. 23rd beginning with "I have been puzzled with the request of Converse .

. ."]

14. Converse and Alon remained at least $5 million or so apart on the most basic

renewal term which was the guaranteed sales for 2005, the formula for which was stated right

MCG/32913/2/566893v1
03/26/05-BOS/

in the License Agreement. Alon repeatedly made offers for renewal terms which varied from those contained in the License Agreement: the guaranteed sales were far lower, and the length of the term was far longer. Also, Converse and Alon never agreed on other basic terms which were the royalty rates for the option years, which were left unspecified in the License Agreement. These terms, guaranteed sales and royalty rates, are fundamental terms in any licensing agreement for a global brand such as Converse. Partly as a result of this disagreement over price terms (and partly as a result of breaches discovered by Converse as a result of the audit), Converse and Alon never entered into any agreement, let alone a written agreement, for a renewal of the License Agreement.

### ALON Breached the Contract: Sublicensing

15.     A sublicense exists where a licensee, like Alon, grants a subcontractor the right to use the trademarks of the licensor, like Converse, and a royalty (a percentage of sales by the subcontractor) is paid back to by the subcontractor to the licensee. In the field of licensing of global brands, like Converse, sublicensing without permission is almost universally prohibited, without express written permission. The reasons for this are that: (a) the licensor suffers a loss of visibility; (b) the licensor does not have "brand control" or control over who has rights to use the trademarks; and (c) the licensor loses management control. A licensor like Converse wants its licensee to be directly in control of ownership rights, marketing, advertising, and sales within the territory, but not necessarily strict manufacturing. Where sublicensing occurs, the licensor loses control and has no direct contract with the sublicense, who not only has rights to use the trademarks, but also performs the marketing, advertising and sales functions. It is a fair assumption that the management of Alon, which had much experience as a licensee,

was aware of the trade practice strongly prohibiting sublicensing. In fact, I learned in late 2004 from Alon itself that anther licensor of a global brand terminated Alon when it discovered that Alon was engaging in sublicensing. Also, a prohibition against sublicensing was expressly stated in the License Agreement itself, at ¶¶ 29 and 35.

16.     Converse first obtained copies, in Portuguese, of the contracts between Alon and Coopershoes in late August 2004. These contracts were translated by early November 2004. The contracts contained terms whereby Alon granted to Coopershoes a license to distribute Converse trademarked products, in return for royalty payments to be paid by Coopershoes to Alon. Alon never sought or received permission, written or otherwise, to grant such a sublicense to Coopershoes.

17.     Converse conducted an audit of Alon in November 2004. Converse first attempted to do this at the offices of Alon in Hallandale, Florida, in late July 2004. However, Converse discovered at that time that most of the records in connection with product development, manufacturing, marketing and sales of Converse products in Brazil were maintained at the offices of Coopershoes in Brazil. As a result of the November audit, conducted by the accounting firm of Deloitte & Touch, Converse discovered that almost all or all of the product development, marketing and sales of Converse products, the heart of the licensee function (not manufacturing, which is typically subcontracted), was being done in Brazil by Coopershoes, and not Alon. Upon obtaining clear evidence of all of these facts, Converse made the decision to terminate Alon.

9

<u>**Converse Would Suffer Harm If Alon Is Kept In Place**</u>

18.    If the Court orders Alon to be restored as Converse's licensee during the pendency of the arbitration then Converse would have to do the following: (a) suspend its current license agreement with Coopershoes; (2) operate without any actual written agreement or decided terms for the option years, including 2005; (3) tolerate the continuing breach of the former License Agreement, which prohibits sublicensing; (4) suffer loss of reputation and goodwill in the marketplace; (5)  suffer the risk that Alon will further sublicense or sell the license to others; (6) suffer the risk that Alon, which will gain access to Converse's product development and marketing plans for 2005 and beyond, will use those plans to go into competition with Converse if Alon does not prevail in the arbitration or sell them to Converse's competitors; and (7) Converse will have to work with officers of Alon whom Converse believes have repeatedly made false statements to Converse and whom Converse does not trust.

First, Converse will be forced to suspend its current license agreement with Coopershoes.  Converse entered into a License Agreement with Coopershoes on December 17, 2004, to become effective on January 1, 2005.

Second, Converse would have to operate without any agreement with Alon and the Court would have to make up the terms of a new agreement between Converse and Alon. Converse is entitled to an agreement for higher guaranteed minimum sales and an agreement for royalty rates for 2005 and beyond, but no such agreement exists.

Third, the Court would have to force Converse to tolerate the continuing breach of the former License Agreement, which prohibits sublicensing.  It is also now clear to me and others

10

at Converse that Alon does nothing but sublicense, and cannot operate without granting sublicenses to sublicensees.  Such sublicensees would have no contractual obligation to Converse.

Fourth, the continued sublicensing would cause harm to Converse's goodwill and reputation in the "Mercosur" market of Brazil, Argentina, Paraguay and Uruguay.

Fifth, the Court would have to force Converse to suffer the risk that Alon would sell the court-ordered license to others.  Alon has recently tried to sell the Converse license in Brazil to a company called Indular.

Sixth, Converse would have to suffer the risk that Alon, which will gain access to Converse's product development and marketing plans for 2005 and beyond, will use that information eventually, if Alon does not prevail in the arbitration, to go into direct competition with Converse or to sell the information to Converse's competitors.  If Alon is kept in place and Converse must restore Alon's contract rights then Converse must share all of its marketing and product plans with Alon.  Such exposure of those plans would put Converse at great risk if Alon does not prevail in the arbitration.  Alon could then use the product and marketing plans of Converse to begin competing with Converse in the Mercosur market or sell the plans to Converse's competitors.

Seventh, the Court will have to force Converse to work with officers of Alon whom Converse no longer trusts.  It is now clear that Alon engaged in a prolonged deception in claiming that its arrangements with Coopershoes and others were not sublicenses, and that Alon made outright false statements to me and others at Converse when confronted over the sublicensing.

11

Signed under the penalties of perjury.

Timothy Ouellette

Dated: March **30**, 2005

12

MCG/32913/2/566893v1
03/26/05-BOS/

# EXHIBIT A
# to Ouellette Affidavit

★ CONVERSE

# Regional Total by Country

## 2003

| Country | | Sales US$ | Pairs | Royalty US$ | US$ Per pair |
|---|---|---|---|---|---|
| Brazil | Actual | 11,829,176 | 1,947,700 | 828,042 | 6.07 |
| Argentina | Actual | 636,627 | 45,164 | 44,564 | 14.10 |
| Uruguay | Actual | 184,118 | 35,800 | 14,168 | 5.14 |
| TOTAL | Actual | 12,649,921 | 2,028,664 | 886,774 | 6.24 |

## 2004

| Country | | Sales US$ | Pairs | Royalty US$ | US$ Per pair |
|---|---|---|---|---|---|
| Brazil | Frcst | 15,416,096 | 2,196,100 | 1,233,288 | 7.02 |
| Argentina | Frcst | 3,788,400 | 231,000 | 303,072 | 16.40 |
| Uruguay | Frcst | 280,800 | 40,000 | 22,464 | 7.02 |
| TOTAL | Frcst | 19,485,296 | 2,467,100 | 1,558,824 | 7.90 |

ALON INTERNACIONAL

CONV 000204

# EXHIBIT B
# to Ouellette Affidavit

**From:** Ouellette, Timothy [mailto:TOuellette@converse.com]
**Sent:** Thursday, April 29, 2004 9:59 PM
**To:** R Durchfort
**Subject:** RE: Converse Mercosul Renewal

Ronald,
I am currently in Hong Kong, returning this weekend. I will review and respond.
At first glance, all of these numbers appear very low. Your contract is pretty clear in it's renewal terms. To propose a longer extension, at lower numbers doesn't make a lot of sense.
As I said, I will, however, review more thoroughly when I am back next week
Thanks

-----Original Message-----
**From:** Durchfort, Ronald
**Sent:** Wednesday, April 28, 2004 6:25 PM
**To:** Ouellette, Timothy; Laganas, Chris
**Cc:** Szerer, Roberto
**Subject:** Converse Mercosul Renewal

Dear Tim,
Further to our meeting and the renewal of our contract.
These enclosed projections represent the continuation of re-introducing Converse into the market and reflect the business projections that we envisage for inclusion in the contract.

| US$ | Actual 2003 | Projected 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| Sales | 12,650,000 | 13,300,000 | 14,000,000 | 14,700,000 | 15,400,000 | 16,100,000 |
| Royalty | 886,774 | 1,044,000 | 1,081,000 | 1,117,000 | 1,170,000 | 1,224,000 |
| Minimum Guarantee Royalty | 215,000 | 620,000 | 730,000 | 757,000 | 782,000 | 820,000 |

## Notes:

### Non footwear
6% on net wholesale sales.
Only in Januray/04 was the Artigos registration for the All Star brand annulled by the INPI.
The Artigos registration has proved to be an impediment in developing non-footwear business.
We expect to begin delivering socks and bags by the end of August/04.
We are currently developing a Mercosur apparel line geared exclusively to boutiques and opinion-maker retail throughout the region that will be available to retail in September/04.
Apparel will require large investments in resources (design, marketing, sales force and manufacture) to get off the ground.
Overall these additional businesses are strengthening the brand as we expand into new retail outlets.
They will enhance brand equity and help us grow the non-vulcanized business.

### Footwear
8% on net wholesale sales.
In 2003, our first full year with the All Star name, we sold aprox. 2 million pairs.
In Brazil, we own market share larger than Nike as reported by the Brazilian "Gazeta Mercantil".
We are in a transition process of aligning the Converse name to All Star.
We continue, to this day, battling pirated products in the market.
Early 2004 we introduced a cemented line with the Nylon Trainer and the Quick Start. We are adding the Weapon for mid-year launch.
Despite the difficulties (pirated product and lack of consumer recognition of cemented product for Converse) we believe in this category and are committed to its success.
Furthermore we are launching a sandal collection for late 04.

CONV 000338

Imports.

We will further enhance the Converse brand image to our consumers by importing select high end product that cannot be made locally.

For apparel we would like to import some of the Italian designed line.

In footwear, due to high duties and an unfavorable exchange rate we will import components to reach sensitive price points that our competitors are obtaining.

To assure Converse quality standards we will need Tec Packs as we have received in the past.

Basketball footwear with technology supports increased costs and consequently we will import directly from Twin Dragons.

Mercosur is historically a volatile market concerning inflation, exchange rates and overall economic conjuncture.

Jointly we have the required knowledge to continue to be successful.

The most important element to this business has been the successful partnership between Converse and Alon.

We both believed in each other and the results were excellent for all. We are certain that we can continue on this course with your support.

Best regards,
Roberto/Ronald

CONV 000339

# EXHIBIT C
# to Ouellette Affidavit

b)    On or about May 19, 2004, Szerer sent to Ouellette an e-mail stating:

*Dear Tim,*
*Based on our telecom and continuing the process for establishing*
*the rationale for the new contract, attached you will find a*
*proposal where we have segmented growth, guarantee and royalty*
*rates per the following periods:*
- *Aggressive 2004/05/06*
- *Medium 2007/08/09/10*
- *Moderate 2011/12/13*

*As agreed, we will start from our 2003 actual sales as our base.*

*I believe this will help us reach a fair and equitable renewal with a*
*minimum of tension.]*

*Regards,*
*Roberto Szerer*

                                                    (emphasis added)

CONV 000062

Converse / Alon Mercosur Renewal

| | Actual/Base 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Growth Mode | | | | | | | | | | | |
| Sales Goal | 12,650 | | | | | | | | | | |
| Sales Guarantee | | | | | | | | | | | |
| Loyalty Rate | 6.0% | | | | | | | | | | |
| Non-footwear | 8.0% | | | | | | | | | | |
| Originals | 8.0% | | | | | | | | | | |
| Footwear | | | | | | | | | | | |

# EXHIBIT D
# to Ouellette Affidavit

c).    On or about May 31, 2004, Szerer wrote to Ouellette indicating the

renegotiation of the Licensing Agreement. Attached to the e-mail was a

spreadsheet with proposed numbers throughout 2013.

*Dear Tim,*

*As per our telecom, enclosed you will find a spreadsheet with the numbers we agreed. As you can see I modified the royalty rate of Originals to bring it gradually to 10% over the term of the contract.*

*We understand that based on our initial "Big Aggressive Hairy Goal" you would like a growth for this year of 50%. We believe it is to high specially after the growth we had in the last year but anyhow we are evaluating the projections for 2004 taking in to consideration all the variables involved (New company in Argentina, new company in Brazil, new apparel line, etc.) and also including the recent change in the Real which by itself brings the sales numbers in Dollars down by 9.68% (Current exchange rate per dollar of R$ 3.10 vs. initial calculation at R$2.80). I will be traveling all week in Argentina and Brazil but will try to talk to you by Friday.*

*I wish you a good week.*

*Best regards,*
*Roberto Szerer*

# EXHIBIT E
# to Ouellette Affidavit

## Ouellette, Timothy

| | |
|---|---|
| **From:** | Durchfort, Ronald |
| **Sent:** | Monday, June 28, 2004 11:59 AM |
| **To:** | Ouellette, Timothy |
| **Subject:** | FW: TO-RD Meeting Jun 2004.xls |
| **Attachments:** | TO-RD Meeting Jun 2004.xls |

Tim,
These are the numbers that I recall from our meeting.

I am busy preparing a new line of footwear to accompany the "hooker" line of apparel.
We'll call it the street walker's line.☺
We have a lot of work to do.
Rgds,
Ron

Converse / Alon Mercosur Renewal

|  | 2004 | 1 2005 | 2 2006 | 3 2007 | 4 2008 | 5 2009 |
|---|---|---|---|---|---|---|
| **Contract extension terms** | | | | | | |
| Sales | 19,500 | | | | | |
| Guaranteed Sales @ 80% | | 15,600 | 17,160 | 18,876 | | |
| Guaranteed Royalty @ 70% | | 1,091 | 1,200 | 1,320 | | |
| Royalty rates | | | | | | |
| Originals | 8% | | | | | |
| Footwear | 8% | | | | | |
| Non-Footwear | 6% | | | | | |
| | | | | | | |
| **RD/TO @ June/04 sales meeting** | | | | | | |
| Sales | | 20,000 | 22,000 | 23,100 | 24,255 | 25,468 |
| Guaranteed Sales @ 70% | | 14,000 | 15,400 | 16,170 | 16,979 | 17,827 |
| Guaranteed Royalty @ 70 % | | 1,120 | 1,232 | 1,294 | 1,358 | 1,425 |
| Royalty rates | | | | | | |
| Originals | | 8% | | | | |
| -Footwear | | 8% | | | | |
| Non-footwear | | 8% | | | | |
| | | | | | | |
| Non Brazil % of total | | 15% | 18% | 20% | 23% | 25% |
| Apparel % of total | | 10% | 10% | 10% | 10% | 10% |

CONV 000070

# EXHIBIT F
# to Ouellette Affidavit

## Ouellette, Timothy

**From:** Ouellette, Timothy
**Sent:** Friday, September 24, 2004 9:02 AM
**To:** Szerer, Roberto
**Subject:** RE: Converse Alon partnership

Roberto,
I understand that this is a difficult period, however, let's keep facts as facts. The below quote is untrue. It has been made clear to you, from the beginning, that no decision on any contract renewal would be forthcoming until a scuccessful audit has been accomplished. This is yet to be completed. While your contract has been discussed with the Board, we have yet to offer our terms to you, and will not until the aforementioned audit is completed successfully, and it is the determination of the Board that this is appropriate. Let's please at least keep all facts straight
"I have been puzzled with the request of Converse auditors to review the books of Coopershoes and the delay in sending us our 5 year contract renewal especially after you called and informed that it was approved by the board."
Thanks

**From:** Szerer, Roberto
**Sent:** Thursday, September 23, 2004 7:04 PM
**To:** Ouellette, Timothy
**Subject:** Converse Alon partnership
**Importance:** High

Tim,
I am not comfortable with the current situation we are having with Converse. It doesn't feel right.

We have been working together for 3 years always in good faith. We have worked hard, investing heavily to be able to reach a point today where the business is in a positive growth path.

As per the forecast that we have shared with you, we should be arriving to sales of over US$ 23,000,000 for 2004 and will generate Royalty for Converse close to US$ 2,000,000 ......... Pretty good if we consider that Converse didn't own the All Star rights in Brazil for the last 17 years and that through our effort we were able to regain these rights for Converse and grow the business.

Converses has visited our offices and the Coopershoes factory, have attended sales meetings, trade shows, met with retailers, approved all products, POP and boxes, etc. At every event, in all name tags, shoe boxes and royalty wire transfers you have seen that we use Coopershoes to outsource the operations and logistics of our business.

On November 12, 2003 we met with Laura, Chris and you in Boston and made a plan to modify the structure as follows:

- Opened AIB - Alon Brasil and Alon Argentina.
- Ammended the Converse / Alon contract to include all companies.
- Beginning 2004 all royalty payments to Converse to been done by AIB - Alon Brasil and Alon Argentina
- All future distribution or manufacturing contracts to be approved by Converse.

CONV 000318

12/8/2004

As you know all sales in Argentina are being invoiced by Alon Argentina, all boutique sales in Brazil are being invoiced by Alon Brasil and our on time goal is that beginning 2005 all sales in Brazil will be invoiced by Alon Brasil.

Michael Hoffman (Converse Controller) came to audit our books and as per my several meetings, e-mails and telecoms, received every single document he requested that was available based on the way the operations of the business have been conducted.

Further to this he requested information from the Coopershoes accounting which we were able to provide him including their General Ledger.
Michael Hoffman discussed with us the idea of auditing the Coopershoes accounting which we have discouraged on the basis that it is not our books and we have no control over how they manage internally their affairs.

I have been puzzled with the request of Converse auditors to review the books of Coopershoes and the delay in sending us our 5 year contract renewal especially after you called and informed that it was approved by the board.

We have shown dedication and passion to the Converse business and our track record shows that what we commit to, gets done.

In an effort to continue our work without these needless distractions we can agree on Converse auditing the Coopershoes factory books with a third party firm.

Please let us know if there is anything in our business model that you feel we should fine tune or modify to be able to continue growing the business without causing an interruption in the work we have achieved in our partnership with Converse.

Regards,
Roberto Szerer
Phone 954 456 2566 x 105
Fax    954 456 4114

CONV 000319

12/8/2004

Alon International- Brazil/Argentina
USD$

| Reported Sales 2004 | Footwear | Originals | Apparel | Accessories | Total | Exchange Rate | | |
|---|---|---|---|---|---|---|---|---|
| Q1 | 58,490 | 3,262,672 | - | - | 3,321,162 | 2.884 | 2.89 | - |
| Q2 | 291,338 | 6,097,252 | - | - | 6,388,590 | 2.995 | 3.04 | - |
| Q3 | 331,820 | 6,418,306 | 14,245 | - | 6,764,372 | 2.945 | 2.83 | 2.86 |
| Q4 | 363,147 | 9,270,996 | - | - | 9,634,143 | 2.842 | 2.69 | - |
| | 1,044,795 | 25,049,226 | 14,245 | - | 26,108,266 | | | |

| Reported Royalty 2004 | Footwear | Originals | Apparel | Accessories | Total |
|---|---|---|---|---|---|
| Q1 | 4,679 | 260,614 | - | - | 265,293 |
| Q2 | 23,308 | 487,517 | - | - | 510,825 |
| Q3 | 26,546 | 514,299 | 855 | - | 541,700 |
| Q4 | 29,049 | 741,817 | - | - | 770,866 |
| | 83,582 | 2,004,247 | 855 | - | 2,088,684 |

# EXHIBIT C
# to Converse's Opposition


UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONVERSE INC., | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    CIVIL ACTION NO.: 04-12591-PBS |
| | ) |
| ALON INTERNATIONAL S.A., | ) |
| Defendant. | ) |
| | ) |

## THIRD AFFIDAVIT OF CHRIS LAGANAS

Chris Laganas, on oath, deposes and states:

1.    My name is Chris Laganas. I am Director of International and Licensing at Plaintiff Converse Inc. ("Converse"). I am responsible at Converse for the reporting and planning of the worldwide licensing activities of Converse and resulting royalty revenue to Converse. I am also manager for Converse of the Latin American territory. I am fluent in Spanish and Portuguese. I make this affidavit based upon facts of my own personal knowledge.

### Alon's Breach of Contract: Sublicensing

2.    In part, based on my personal knowledge, in part based on contracts of Alon that I have seen, and in part based on a newspaper article I have seen, Alon sublicenses in South America all of the work its was supposed to do it itself for Converse. Alon was sublicensing with Coopershoes. I have seen the contracts between Alon and Coopershoes and in them Alon grants a license to use the Converse trademarks to Coopershoes in return for a payment of a percentage of the sales, which is referred in to in the contracts as a royalty (sometimes Alon tries to disguise a sub-royalty payment by calling it "margin"). In addition, of my personal

knowledge, Alon sublicenses or was about to sublicense the Converse work to the following South American companies: Filon in Brazil (apparel) and IMB Puket in Brazil (socks). With these two companies, I have either seen the contracts themselves or spoken to a representative of the company. Furthermore, I have a very strong belief that Alon also engaged in or was about to engage in sublicensing with Gatic in Argentina, Belquis in Uruguay and Paraguay, Formiga in Brazil, Foroni in Brazil (notebooks), and Supreme in Brazil (bags and backpacks). I have this belief because these companies have (or had; Gatic went out of business) the capacity to both manufacture and a sales force with which to sell products, which together are the hallmark of a sublicensee. Many of the facts about Alon's practice of sublicensing all of its work for Converse are set forth in an October 27, 2004 article in Portuguese in the Brazilian newspaper, Gazeta Marcantil, a copy of which is attached as Exhibit "A". The second paragraph of the article starts as follows: "The terms negotiated are kept secret. 'We divide the profit margins and I pay the royalties to Converse,' says Durchfort." Skipping down four lines from there, the article continues, "Alon contracted with Redibra, an agency specializing in licensing, that on its own found the local companies." Next to the picture of the woman, the first bullet point to the right states, "The licensing is by Alon, which holds the brand All Star in Mercosul." The next bullet point down states that, "They already have tennis shoes manufactured by Coopershoes, the brand will be in apparel (Filon), socks (Puket), bags and backpacks (Supreme), and notebooks (Foroni)."

3.     Alon has no operating companies in South America. It does have subsidiaries that exist solely for the purpose of wiring money out of South America.

### Alon's Course of Deception About the Sublicensing

2

4.    When Alon contracted with Coopershoes in July, 2002 Converse only thought that the arrangement between Alon and Coopershoes was a classic licensee/factory relationship. Converse did not see the ALON/Coopershoes contracts at that time.

5.    On about October 22, 2002 Durchfort and Szerer flew to Boston and attended a meeting at Converse. At that meeting Durchfort said that Coopershoes manufactured and invoiced and nothing more. I asked Durchfort at that meeting if Durchfort was "comfortable" with the sublicensing language in the Converse's contract with Alon. Szerer and Durchfort made no verbal response to my questions and Durchfort crossed his arms and pushed back from the table. The main purpose of the meeting was "product-focused" and included review of samples and sales schedules.

6.    There was another meeting between Alon and Converse at Converse's office in North Andover, Massachusetts on November 12, 2003. I was present along with Tim Ouellette of Converse and Laura Kelley, Vice President – Legal of Converse. Szerer brought to the meeting the contracts between Alon and Coopershoes and between Alon and Gatic, an Argentine apparel manufacturer. However, the Coopershoes contract was in Portuguese and the Gatic contract was in Spanish, not English, and some parts in both contracts were whited out. At that meeting, I, who am fluent in Portuguese, was allowed a brief look at the Alon/Coopershoes contracts and saw the words "royalty rates" and "sales minimums" and pronounced to the group that these were license agreements. Szerer adamantly denied the contracts were licensing agreements.

7.    The decision eventually to conduct an audit of Alon was based on the doubts about the actual nature of Alon's contracts with others coming out of the November 12, 2003 meeting.

3

## Alon Is a Licensee of a Competitor of Converse

8.     Last year I learned that Alon had obtained a license to distribute footwear from of a competitor of Converse, namely, an Italian company called Superga. Superga licenses the sale of vulcanized tennis shoes that are very similar to the Jack Purcell's model licensed by Converse. The License Agreement between Converse and Alon, at ¶ 3(d), prohibits Alon from distributing or promoting any products that are competitive with the products Converse already licensed to Alon. I was told by the management of Coopershoes that Alon offered a sublicense for Superga shoes to Coopershoes. Also, I bought a pair of Superga shoes with the Alon label on it in Mexico. I do not know if Alon is selling competing Superga shoes in the territory granted by Converse to Alon (Brazil, Argentina, Paraguay and Uruguay), but I know Alon is selling these shoes in territories where Converse operates, namely, Mexico. This is not only a breach of the License Agreement, but also results in lack of trust by Converse of Alon.

## No Longer Any Trust by Converse of Alon

9.     A licensing arrangement for a global brand requires the licensor and licensee to work cooperatively and with trust on a number of critical ongoing business issues. Such points of necessary cooperation, which are all specified in the former License Agreement between Converse and Alon, include: (i) approval by Converse of all proposals by Alon for the products to be developed and/or sold in the territory (License Agreement, ¶¶ 4(b), 5(a)); (ii) approval by Converse of all marketing campaigns and actual advertising by Alon (License Agreement, ¶¶ 4(b), 7(d), 8(b)); (iii) attendance by Alon's sales managers at annual and other sales meetings with other licensees where Converse sets forth its worldwide and regional marketing and sales strategies (License Agreement, ¶ 7(f)); (iv) access by Alon to samples of new products that Converse has developed and intends to promote (License Agreement, ¶ 7(e)); and (v) access by

4

Alon to the trade secrets of Converse, which Alon agrees to keep "strictly confidential", and which would be very valuable to a competitor of Converse (License Agreement, ¶ 6(a and b).

10.    Access by Alon to Converse's trade secrets, new products and marketing strategies, and Converse's approvals of the marketing and advertising campaigns of Alon, all require cooperation and trust between Converse and Alon. I can say absolutely, as a result of Alon's deceptions about the sublicensing and arrangement to distribute the shoes of a competitor of Converse, that Converse no longer trusts the management of Alon.

### Monetary Harm to Converse if Court Restores Alon

11.    Converse would suffer substantial monetary harm (among other types of harms) if Alon's contract rights are restored while the arbitration is pending. I am projecting full-year 2005 sales by Coopershoes in Brazil of about $30 million. This projection is based on actual, booked, and projected sales by Coopershoes through the first quarter of about $7 million. I expect sales to at least be steady throughout the year (about $7 million per quarter) and then in the fourth quarter 2005 (Christmas sales) to reach the level of $9 million, just as they did in 2004. If Converse could operate in Argentina without the cloud of court orders, then full-year 2005 sales generated there could be at least $8 million. In fourth quarter 2004, sales in Argentina were $2.4 million. Converse's current standard royalty rate with Coopershoes for both the Brazil and Argentina territories is 15%. Thus, if Converse could operate without any court order requiring it to provide rights to Alon, based on projected total sales in Brazil and Argentina of about $38 million, Converse would earn royalties of about $5.7 million, or about $475,000 per month.

12.    I have been told that the current estimate for completion of the arbitration, including confirmation of an award in court, would be about August 31, 2005, that is eight

5

months into 2005. Losses of eight months of royalties at $475,000 per month would be $3,800,000.

13.   If the contract rights of Alon were restored, this $3,800,000 would presumably go directly to Alon and not to Converse. Alon presumably would then pay Converse some royalties under the old terms of the Licensing Agreement, which would be at a rate of about half of what Alon would get under its old terms with Coopershoes. Converse might be paid about the rate of 8% of total sales of $38,000,000, which would be $3,040,000 for 12 months, or $2,026,000 for 8 months. Alon would keep the balance of the royalties of about $1,800,000 for that 8 month period.

14.   I understand from Alon's own affidavits in this matter that it has no other substantial business other than acting as a licensee for Converse. If Alon receives the $1,800,000 in royalties stated above pending the arbitration, and then Alon were not to prevail in the arbitration and thus owe that money back to Converse, I believe that there is almost no prospect that Alon would be able to pay that money back to Converse. In my opinion, Alon should be forced to post a bond, in order to fully to protect Converse from the risk that Alon will have wrongfully received that money, in the amount of $1,800,000.

Signed under the penalties of perjury.

Chris Laganas

Dated: March 29, 2005

MCG/32913/2/566911v1
03/29/05-BOS/

# EXHIBIT A
# to Laganas Affidavit

# MÍDIA & MARKETING

## ESTRATÉGIA

# All Star vai dos pés ao corpo todo

Marca ícone de tênis streetwear lança de roupas a relógios em campanha de R$ 5 milhões

Fabiana Gitsio
de São Paulo

Uma ofensiva para muito além do tênis da marca americana **All Star** foi deflagrada no País. A partir de novembro, o consumidor brasileiro terá à disposição muito mais que os famosos calçados de canvas. Serão produzidos aqui roupas, bolsas, mochilas e cadernos. Em 2005, será a vez de óculos e relógios. "Queremos que a All Star seja uma marca de moda e estilo de vida, presente da cabeça aos pés", afirma Ronald Durchfort, responsável pela Alon, empresa com sede em Miami e detentora dos direitos da Converse All Star para os países do Mercosul.

As cifras da negociação são mantidas em segredo. "Dividimos a margem de lucro e em pago royalties para a Converse", diz Durchfort. Por causa da pirataria na década de 80, a marca esteve fora do mercado brasileiro por 18 anos. Agora, vem com força. A Alon contratou a **Redibra**, agência especializada em licenciamentos, que por sua vez, prospectou as empresas locais. Foram escolhidas a dedo pela prioridade de distribuição que dariam à marca. "Todas têm produção de qualidade, capacidade produtiva e desenvolvimento de design, além claro, de solidez financeira", enumera David Diesendruck, da Redibra.

As empresas **Filon** (especializada em roupas esportivas), **IMB** (fabricante da marca de meias Puket), **Foroni** (indústria gráfica) e **Supreme** (acessórios) serão as fabricantes e distribuidoras de uma vasta gama de produtos. No Brasil, a divulgação será em outdoors, revistas e na MTV. O investimento inicial em marketing é da ordem de R$ 5 milhões. É mais do que o destinado à Argentina, país que vendeu quase 500 mil pares de tênis desde março, quando a começou a distribuição arquitetada pela Alon. Os fabricantes locais também farão suas próprias ações.

Há alguns meses, a All Star foi comprada pela Nike, por US$ 305 milhões. Foi o encontro de uma gigante, especialista em tênis de alta performance, e uma marca de streetwear, irreverente e democrática. E de características muito pró-



### Guarda-roupa completo

- O licenciamento é da Alon, empresa detentora da marca All Star no Mercosul

- Além dos tênis fabricados pela Copershoes, a marca estará em roupas (Filon), meias (Puket), bolsas e mochilas (Supreme) e cadernos (Foroni)

- No Brasil os tênis (fabricados pela Copershoes) estão em quase 5 mil pontos

- A Alon investe R$ 5 milhões/ano em marketing. Cada fabricante-distribuidor fará também ações de mídia

- Estão previstas parcerias da Alon com fabricantes de óculos e relógios

- Mais de 750 milhões de pares de All Star já foram vendidos no mundo desde seu lançamento em 1923

- A Converse foi comprada pela Nike por US$ 305 milhões

Fonte: Empresa

prias: apesar de não ser cara, é ícone aspiracional. Recentemente, a top Gisele Bündchen foi fotografada pedalando ao lado do namorado Leonardo di Caprio – os dois usavam All Star.

As roupas, fabricadas nos Estados Unidos desde a década de 60, são importantíssimas para pontuar a nova fase brasileira. Embora a Filon seja fabricante de **Topper, Rainha, Diadora, Finta** e **NBA**, entre outras, a estratégia na parceria com a All Star é atingir o público de moda. "Começamos agora a viver um pouco este mundo fashion", admite seu diretor de marketing João Augusto Simoni.

Ao contrário dos tênis, fabricados aqui pela Copershoes e presentes em quase 5 mil pontos, de sapatarias a lojas conceituais, a distribuição das roupas será seletiva. A coleção de verão começa com 30 mil peças e não ultrapassará 80 pontos de venda do Sudeste. "Queremos ser populares, não popularescos", diz Simoni. "Não vamos trabalhar com auto-serviço. Magazines e supermercados estão fora. Este tipo de cliente não nos interessa para construir uma marca forte", afirma Simoni. Estão previstas redes de esporte como Bayard e Track & Field e lojas coladas como Doc Dog e Colcci. E até mesmo a Daslu.

"Tende a ser um de nossos melhores licenciamentos", acredita o empresário Cláudio Bobrow, da IMB, que além da Puket, produz meias das marcas Wilson, Barbie e Bad Boy. Procurado pela Redibra,

Bobrow não pensou duas vezes. Afinal, os tênis estão presentes na vitrine de todo calçadista. "É uma espécie de Havaianas", compara.

A produção inicial será de 500 mil pares e contempla o público juvenil e adulto (o infantil virá depois). A distribuição será por todo o território e atingirá 4 mil dos 7 mil pontos da Puket. Bobrow está ciente de que mais empresas integrarão a marca, o que aumenta sua visibilidade. Mas tem ressalvas. "É ótimo, desde que façam um bom trabalho. Às vezes, uma única pode estragar o esforço das outras", analisa o empresário.

Na vida de um adolescente, caderno tem quase o status de um acessório. O contrato com a Alon é uma oportunidade de upgrade para a **Gráfica Foroni**. "No segmento de cadernos, é enorme a disputa por licenciamentos. Quando uma empresa consegue marcas e personagens pode cobrar mais e colocar no mercado um produto diferenciado", diz Marici Campanello, sócia da empresa que já tem Meninas Superpoderosas e Turma da Mônica.

Os cadernos da All Star foram lançados na Feira Escolar em setembro e estão longe de ser cadernos-commodities. Marici tentava negociar com a All Star desde o início do ano. As exigências fizeram com que recuasse. "Queriam que eu vendesse mais de R$ 1 milhão por ano", conta. "Se não cair pela metade, depois chegamos a um valor razoável." O ano letivo de 2005 começa com 6.400 pontos de venda por todo o Brasil.

Quando em 1908 Marquis M. Converse abriu as portas da Converse, uma pequena indústria de sapatos de borracha encravada em Malden, no estado de Massachussets, não tinha idéia de que iria fabricar o que se tornaria um ícone americano, comparado ao jeans e à Coca-Cola — o All Star revolucionou o basquete, pateou e se usado por astros ainda na década de 40 e testemunhou o nascimento do rock & roll. Desde 1923, quando a empresa ligou inexoravelmente seu nome ao jogador e treinador Chuck Taylor (mais conhecido por "Mr Basketball), mais de 750 milhões de pares já foram vendidos no mundo.



# EXHIBIT D
## to Converse's Opposition

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CONVERSE INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: 04-12591-PBS |
| | ) | |
| vs. | ) | |
| | ) | |
| ALON INTERNATIONAL S.A., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT OF FRANK QUIJADA

Frank S. Quijada, on oath, deposes and states:

1.      My name is Frank S. Quijada. I am employed by Deloitte & Touche LLP ("Deloitte"). I am responsible at Deloitte for Forensic & Dispute Services (F&DS) in Latin America and the Caribbean. I make this affidavit based upon facts of my own personal knowledge.

2.      I met with Roberto Szerer of Alon International as part of the audit undertaken by Deloitte on behalf of Converse. That meeting took place on or about November 4, 2004 at Picada Café, Brazil. During that meeting Mr. Szerer told me his business strategy is to keep Coopershoes in the dark about Alon's relationship with Converse and to keep Converse in the dark about its (Alon's) business relationship with Coopershoes. I reported Mr. Szerer's statement to Converse in my audit.

Signed under the penalties of perjury.

Frank S. Quijada

Dated: March 23, 2005

MCG/32913/2/566916v1
03/18/05-BOS/

# EXHIBIT E
# to Converse's Opposition

**coopershoes** - Coop. de Calç. e Comp. Joanetense Ltda.
Rua Vicente Prieto, 3767 - Bairro Joaneta - CEP: 95175-000 - Picada Café - RS
CNPJ: 02.675.611/0002-46  -  INSC. EST.: 388/0003027

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONVERSE INC., ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO.: 04-12591-PBS |
| ) | |
| vs. ) | |
| ) | |
| ALON INTERNATIONAL S.A., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## AFFIDAVIT OF ALTAMIR BREDA

Altamir Breda, on oath, deposes and states:

### Background and Knowledge of Altamir Breda

1.      My name is Altamir Breda.  I am President of Coopershoes Cooperativa De

Calcados E Componentes Joanetense LTDA ("Coopershoes").  Coopershoes is a cooperative

business association owned by its employees and engaged in the business of developing,

manufacturing, marketing and selling footwear in the territory of Brazil.  Coopershoes is located

in the municipality of Picade Café, in the state of Rio Grande do Sul, near Porto Alegre, Brazil.  I

am responsible at Coopershoes for I am Director President at Coopershoes.  I make this affidavit

on facts of my own personal knowledge and about which I would be competent to testify.

### Contracts between Coopershoes and Alon

2.      Coopershoes entered into three contracts with Alon International, S.A. in July,

2002.  Under these contracts Alon gave a license to Coopershoes to market products with the



**coopershoes** - Coop. de Calç. e Comp. Joanetense Ltda.

Rua Vicante Prieto, 3767 - Bairro Joaneta - CEP: 95175-000 - Picada Café - RS
CNPJ: 02.675.611/0002-46  -  INSC. EST.: 388/0003027

Converse trademarks. We never saw the contracts between Alon and Converse, and Alon told us almost nothing about its dealings with Converse. When we entered into the contracts with Alon, we did not know that Alon had not told Converse that Alon was entering into a license arrangement with Coopershoes. Also, at that time, we did not know that Alon, under the Converse/Alon contract, needed written permission to issue a sublicense and that Alon did not have such permission.

3.    Over the course of the license agreements between Coopershoes and Alon, Coopershoes paid, U\$ 7,233,275.00 royalties to Alon of about

4.    At one point during the contracts, Alon made an offer to Coopershoes that Coopershoes would sublicense the brands of Miss Sixty and Superga. These brands compete with Converse and Coopershoes did not agree to sublicense these brands.

### Coopershoes Almost Solely Conducts the Business

5.    Contrary to claims that Alon has made to Converse, all design and development of footwear bearing Converse trademarks, is handled by employees of Coopershoes. Our product development manager is Alexander Carlos Zink, who is a full-time employee of Coopershoes. In addition, all tooling costs for the footwear are paid by Coopershoes. Attached as Exhibit "A" are some invoices for the cost of tooling directed to Coopershoes. ALON has made tooling requests of Converse just to make it appear that ALON is working on product development and that the tooling is part of ALON's inventory but, in fact, the tooling is the property of Coopershoes.

COOPERSHOES - Coop. de Calç. e Comp. Joanetense Ltda.
Rua Vicente Prieto, 3767 - Bairro Joaneta - CEP: 95175-000 - Picada Café - RS
CNPJ: 02.675.611/0002-46  -  INSC. EST.: 388/0003027

6.      Alon does not claim otherwise, but Coopershoes does all the manufacturing of footwear bearing Converse trademarks through its manufacturing facility in Picade Café. Coopershoes has 1200 employees engaged in assembly workers in the manufacture of footwear. Coopershoes is a major employer in the region around Porto Alegre.

7.      Coopershoes conducts all of the marketing and promotion of Converse footwear products and Alon has no role. Our marketing manager is Luciano Ferrari, who is a full-time employee of Coopershoes. All of the advertising through television, magazines, outdoor companies, and publicity agencies is conducted directly by Coopershoes. Copies of some of the marketing contracts of Coopershoes are attached hereto as Exhibit "B". The contracts are all signed by me as President of Coopershoes. Alon is not mentioned as a contracting party or in any other capacity in any of these marketing contracts. Ferrari does all the marketing analysis to establish product pricing and this was done without Alon's input.

8.      My management team and I at Coopershoes have assembled the sales force and we have worked with some of the sales representatives for more than 15 years. Coopershoes has 32 sales representatives selling Converse products. These sales representatives are not employees of Coopershoes but have contracts with Coopershoes, not Alon, that outline their responsibilities. The contracts between the sales representatives and Coopershoes indicate that they receive a 5% commission on sales and have specific quotas to meet. Copies of some of the contracts, with Coopershoes as the contracting party and not Alon, are attached as Exhibit "C". Our Sales Manager is Ricardo Nunes and he is one of the 32 sales representatives on contract. Nunes was suggested to Coopershoes by Ronald Durchfort of Alon.

3

MCG/32913/2/566907v1
03/19/05-BOB/

coopershoes - Coop. de Calç. e Comp. Joanetense Ltda.
Rua Vicente Prieto, 3767 - Bairro Joaneta - CEP: 95175-000 - Picada Café - RS
CNPJ: 02.675.611/0002-46  -  INSC. EST.: 388/0003027

9.    All financial activities, such as cash management, bookkeeping, payroll, accounts receivable and accounts payable, supporting the sale of Converse products in Brazil are handled by Coopershoes. Our Treasurer and Finance Director is Paulo Sidegum, a full-time employee of Coopershoes. Coopershoes banks with Banco de Brazil and finances its own operations without any help from Alon. All banking and loan arrangements are signed by me on behalf of Coopershoes.

10.    All Converse products manufactured by Coopershoes are owned by Coopershoes and are the inventory of Coopershoes. Alon has never owned footwear manufactured by Coopershoes and all the risk with respect to inventory is carried by Coopershoes.

### The Court Would Also Have to Order Coopershoes to Work for Alon

11.    If the Court orders restoration of the contract rights of Alon with Converse, the only way Alon can perform any such rights in Brazil would be through working with Coopershoes. Alon has no distribution network or sales force in Brazil, while Coopershoes has all those things. However, right now Coopershoes has no contract with Alon; the prior contract of Coopershoes with Alon expired on December 31, 2004. In order for Coopershoes to work with Alon after December 31, 2004 the court would have to order Coopershoes to work with Alon, and would also have to order the terms of a contract between Coopershoes and Alon. Such a contract would have to grant Converse license rights to Coopershoes (because the registered rights under Brazilian law to sell Converse products belong to Coopershoes and not Alon). It would also have to include royalty rates, guaranteed minimum sales amounts, royalty reporting requirements, product review requirements, marketing approval requirements, advertising

4

 **coopershoes** - Coop. de Calç. e Comp. Joanetense Ltda.
Rua Vicante Prieto, 3767 - Bairro Joaneta - CEP: 95175-000 - Picada Café - RS
CNPJ: 02.675.611/0002-46  -  INSC. EST.: 388/0003027

minimums, and many other terms.  Coopershoes will not work with Alon unless ordered by the

court to do so, and even then Coopershoes would not do so willingly and only under protest.

### Coopershoes Could Suffer Tremendous Harm

12.    If Alon tried to work without Coopershoes, and tried to work with somebody else,

then Coopershoes would be greatly harmed.  Coopershoes would likely lose 1200 jobs, which

would be devastating to the workers and to the entire region.

Signed under the penalties of perjury.

_____
Altamir Breda

Dated:  March 28/2005

# EXHIBIT A
# to Breda Affidavit

# 2D Service Serviços em Matrizes Ltda.

*Solv molds*

**NOTA FISCAL** Nº .11/2004
820

Fone: (51) 9998-5220

☒ SAÍDA   ☐ ENTRADA

1.ª VIE - DESTINATARIO REMETENTE

Rua Gualba, 475 - Fundos - B. São Jorge - CEP 93332-020 - NOVO HAMBURGO - RS

| NATUREZA DA OPERAÇÃO | C.F.O.P. | INSCR. ESTADUAL DO SUBSTITUTO TRIBUTÁRIO | INSCRIÇÃO ESTADUAL | DATA LIMITE PARA EMISSÃO |
|---|---|---|---|---|
| Retorno Conserto | 5916 | | 086/0344754 | 00.00.00 |

CNPJ 05.621.309/0001-12

**DESTINATÁRIO/REMETENTE**

| NOME/RAZÃO SOCIAL | CNPJ/C.P.F. | DATA DA EMISSÃO |
|---|---|---|
| COOPERSHOES - Coop. Calç. e Comp. Joane kense Ltda. | 02.675.611/0002-46 | 3411104. |

| ENDEREÇO | BAIRRO/DISTRITO | CEP | DATA DA SAÍDA/ENTRADA |
|---|---|---|---|
| Rua Vicente Prieto, nº 140 | Centro | 95175-000 | |

| MUNICÍPIO | FONE/FAX | U.F. | INSCRIÇÃO ESTADUAL | HORA DA SAÍDA |
|---|---|---|---|---|
| Picada Café | (54) 285 1235 | RS | 388/000.3027. | |

**FATURA**

**DADOS DOS PRODUTOS**

| CÓD. PROD. | DESCRIÇÃO DOS PRODUTOS | CL. FISC. | SIT. TRIBUT. | UNID. | QUANT. | VALOR UNITÁRIO | VALOR TOTAL | ALÍQUOTAS ICM... | IPI | VALOR DO I.P.I. |
|---|---|---|---|---|---|---|---|---|---|---|
| | Matriz Dupla Converse Premium nº 35 e 40 | | 051 | Un | 02 | 4000,00 | 8000,00 | — | — | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | * Retorno total de sua NF. 006024 de 16.11.2004. | | | | | | | | | |

**CÁLCULO DO IMPOSTO**

| BASE DE CÁLCULO DO ICMS | VALOR DO ICMS | BASE DE CÁLC. ICMS SUBSTITUIÇÃO | VALOR DO ICMS SUBSTITUIÇÃO | VALOR TOTAL DOS PRODUTOS |
|---|---|---|---|---|
| | | | | 8.000,00 |
| VALOR DO FRETE | VALOR DO SEGURO | OUTRAS DESPESAS ACESSÓRIAS | VALOR TOTAL DO IPI | VALOR TOTAL DA NOTA |
| | | | | 8.000,00 |

**TRANSPORTADOR / VOLUMES TRANSPORTADOS**

| NOME/RAZÃO SOCIAL | FRETE POR CONTA 1. EMITENTE 2. DESTINATÁRIO | PLACA DO VEÍCULO | UF | CNPJ/CPF |
|---|---|---|---|---|
| Demitente | | | | |

| ENDEREÇO | | MUNICÍPIO | UF | INSCRIÇÃO ESTADUAL |
|---|---|---|---|---|
| | | | | |

| QUANTIDADE | ESPÉCIE volumes | MARCA SIM | NÚMERO SINº | PESO BRUTO | PESO LÍQUIDO |
|---|---|---|---|---|---|
| | | | | | |

**DADOS ADICIONAIS**

ICMS Diferido cfe. Livro m. Art. 1.º, Dec. 37.699/97

Gráfica GAM Ltda. - Fone (51) 593-3022 - Novo Hamburgo - RS - CNPJ 04.855.876/0001-70 - Inscr. Est. 086/0319253 - 08 Us. 4x25 - 801 a 1.000 -10/2004 - AIDF Nº50001030287

**FORMAS KONRATH LTDA.**

EST. RS 115, 6115 - BAIRRO CENTRO
IGREJINHA - RS - CEP 95650-000
FONE: (51) 545.5397 - FAX: (51) 545.5710
E-mail: konrath@sinos.net

**NOTA FISCAL-FATURA**

Nº

00166B

| | | |
|---|---|---|
| X SAÍDA | | ENTRADA |

1ª VIA
DESTINATÁRIO/
REMETENTE

CNPJ **88.060.801/0001-93**

INSCRIÇÃO ESTADUAL **161/0049605**

DATA LIMITE P/ EMISSÃO
00.00.00

NATUREZA DA OPERAÇÃO
**RETORNO DE CONSERTO**

CFOP **5.916**

CNPJ/CPF **02.675.611/0002-46**

DATA DA EMISSÃO
**07/12/2004**

DESTINATÁRIO / REMETENTE
NOME / RAZÃO SOCIAL **COOPERSHOES COOP CAL C JOAN LTDA    111**

BAIRRO / DISTRITO **CENTRO**

CEP **95.175-000**

DATA DA SAÍDA/ENTRADA
**07/12/04**

ENDEREÇO **RUA VICENTE PRIETO,140    FILIAL 1**

FONE / FAX **(54) 285-1235**

UF **RS**

INSCRIÇÃO ESTADUAL **388/0003027**

HORA DA SAÍDA
**14:60**

MUNICÍPIO **PICADA CAFE**

FATURA / DUPLIC. VALOR

Nº DE ORDEM

VENCIMEN

FATURA

| FATURA / DUPLIC. VALOR | Nº DE ORDEM | VENCIMENTO | FATURA / DUPLIC. VALOR | Nº DE ORDEM | VENCIMENTO | FATURA / DUPLIC. VALOR | Nº DE ORDEM | VENCIMEN |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |

"ESTA NOTA FISCAL-FATURA FOI EMITIDA POR PROCESSAMENTO DE DADOS E SUBSTITUI A FATURA CONFORME A LEGISLAÇÃO EM VIGOR. A IMPORTÂNCIA DESTA, CORRESPON
À SUA COMPRA CONFORME DESCRITO ABAIXO, EM COBERTURA DA QUAL EMITIMOS DUPLICATA(S) PARA PAGAMENTO À FORMAS KONRATH LTD
OU À SUA ORDEM, NA PRAÇA E VENCIMENTO(S) INDICADOS."

| DADOS DO PRODUTO | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| COD.PRODUTO | DESCRIÇÃO DOS PRODUTOS | C.F. | S.T. | UNID. | QUANT. | VALOR UNITÁRIO | VALOR TOTAL | |
| 1 | FORMAS PLASTICAS TF 2006<br>35/51 36/25 38/45 39/94 | A | 041 | PR | 215 | 32,00 | 6.880,00 | |

| CÁLCULO DO IMPOSTO | | | | | | |
|---|---|---|---|---|---|---|
| BASE DE CÁLCULO DO ICMS | VALOR DO ICMS | BASE DE CÁLCULO ICMS SUBSTITUIÇÃO | VALOR DO ICMS SUBSTITUIÇÃO | VALOR TOTAL DOS PRODUTOS | | 6.880,00 |
| 0,00 | 0,00 | 0,00 | 0,00 | VALOR TOTAL DA NOTA | | 6.880,00 |
| VALOR DO FRETE | VALOR DO SEGURO | OUTRAS DESPESAS ACESSÓRIAS | VALOR TOTAL DO IPI | | | |
| 0,00 | 0,00 | 0,00 | 0,00 | | | |

| TRANSPORTADOR / VOLUMES TRANSPORTADOS | | | | | |
|---|---|---|---|---|---|
| NOME / RAZÃO SOCIAL **COOPERSHOES COOP CAL C JOAN LTDA** | FRETE POR CONTA<br>1 - EMITENTE<br>2 - DESTINATÁRIO **2** | PLACA DO VEÍCULO **IKX 8751** | UF **RS** | CNPJ/CPF **02.675.611/0002-** | |
| ENDEREÇO **RUA VICENTE PRIETO,140    FILIAL 1** | MUNICÍPIO **PICADA CAFE** | | | INSCRIÇÃO ESTADUAL **388/0003027** | |
| | NÚMERO | | | PESO BRUTO **215,00** | PESO LÍQUIDO **215,0** |
| QUANTIDADE | ESPÉCIE **SACOS PLAS** | MARCA **konrath** | | | |

| DADOS ADICIONAIS | |
|---|---|
| INFORMAÇÕES COMPLEMENTARES<br>Pedido: 1662<br>A-3926909001<br>DEVOLUCAO TOTAL DE SUA NOTA FISCAL 16651 DO DIA 07/12<br>ICMS NAO INCIDE CFE. LIVRO I,ART. 11 INC. XV DECRETO 37699/97 | RESERVADO AO FISCO |

NÚMERO DE CONTROLE
DO FORMULÁRIO

MOORE BRASIL LTDA - RUA NISSIN CASTIEL, 378 - GRAVATAÍ - RS - CNPJ 02.004.305/0061-48 - INSC. EST. 057/0058317 - 11/04 - 001.000 X 05 - NUMERAÇÃO DE 001.601 À 002.500 - AIDF(RS) 5000165128B

"A assinatura do canhoto de recebimento das mercadorias é o reconhecimento do destinatário de que recebeu na quantidade e qualidade combinadas os produtos descritos nesta Nota Fisca

# EXHIBIT B
# to Breda Affidavit

Case 1:04-cv-02504-PBG Document 26 Filed 03/30/2005 Page 112 of 126

# TRINDADE INDÚSTRIA GRÁFICA LTDA.

**TRINDADE**
GRÁFICA

RUA SANTA REGINA, DOCUMENT 26 - RS
FONE: (51) 3341.2077 - FAX: (51) 3361.1697
CEP 91030-330 - graficatrindade@graficatrindade.com.br

SÉRIE - 1

| | | | INSCRIÇÃO NO CNPJ | |
|---|---|---|---|---|
| | | | 88.749.312/0001-43 | 3ª VIA FISCO |

| NATUREZA DA OPERAÇÃO | CFOP | INSCR. ESTADUAL DO SUBSTITUTO TRIBUTÁRIO | INSCRIÇÃO ESTADUAL | DATA LIMITE PARA EMISSÃO |
|---|---|---|---|---|
| VENDA CONS. FINAL | 5101 | | 096/0531556 | 00.00.00 |

## DESTINATÁRIO / REMETENTE

| NOME / RAZÃO SOCIAL | CNPJ / CPF | DATA DA EMISSÃO |
|---|---|---|
| COOPERSHOES - COOP. DE CALC. E COMP. JOANETENSE LTDA. | 02.875.911/0001-45 | 15/12/2003 |

| ENDEREÇO | BAIRRO / DISTRITO | CEP | DATA DA SAÍDA / ENTRADA |
|---|---|---|---|
| RUA VICENTE PRIETO, 3767 | | 95175-000 | |

| MUNICÍPIO | FONE / FAX | UF | INSCRIÇÃO ESTADUAL | HORA DA SAÍDA |
|---|---|---|---|---|
| PICADA CAFE | | RS | 088/0002446 | |

## FATURA

| DUPLICATA Nº 23484 | PORTADOR / BANCO | | | |
|---|---|---|---|---|
| | | VENCIMENTO | 12/01/04 | A ... B ... C |
| | | VALOR | 7.500,00 | |

ENDEREÇO DE COBRANÇA / PRAÇA DE PAGAMENTO

RUA VICENTE PRIETO, 3767. PICADA CAFE. RS. 95175-000

## DADOS DO PRODUTO

| COD. PROD. | DESCRIÇÃO DOS PRODUTOS | CL. FISC. | SIT. TRIB. | UNID. | QUANTIDADE | VALOR UNIT. | VALOR TOTAL | ALÍQUOTAS ICMS | ALÍQUOTAS IPI | VALOR DO IPI |
|---|---|---|---|---|---|---|---|---|---|---|
| | CONJUNTO DE LAMINAS C/ENC. EM PASTA FORNECIDA PARA CATALOGO COMERCIAL | | | UN | 100 | 75,0000 | 7.500,00 | 6 | 0 | 0,00 |

## PRESTAÇÃO DE SERVIÇOS

| DESCRIÇÃO DOS SERVIÇOS | QUANTIDADE | VALOR UNITÁRIO | VALOR TOTAL |
|---|---|---|---|
| | | | |

| BASE DE CÁLCULO DO ISSQN | ALÍQUOTA | VALOR DO ISSQN | INSCR. MUNICIPAL | VALOR TOTAL DOS SERVIÇOS |
|---|---|---|---|---|
| 7.500,00 | 5,0 | 375,00 | 020.314.2.6 | 0,00 |

## CÁLCULO DO IMPOSTO

| BASE DE CÁLCULO DO ICMS | VALOR DO ICMS | BASE DE CÁLCULO ICMS SUBSTITUIÇÃO | VALOR DO ICMS SUBSTITUIÇÃO | VALOR TOTAL DOS PRODUTOS |
|---|---|---|---|---|
| | 0,00 | | | 7.500,00 |

| VALOR DO FRETE | VALOR DO SEGURO | OUTRAS DESPESAS ACESSÓRIAS | VALOR TOTAL DO IPI | VALOR TOTAL DA NOTA |
|---|---|---|---|---|
| | | | 0,00 | 7.500,00 |

## TRANSPORTADOR / VOLUMES TRANSPORTADOS

| NOME/RAZÃO SOCIAL | | FRETE POR CONTA 1 - EMITENTE 2 - DESTINATÁRIO | PLACA DO VEÍCULO | UF | CNPJ / CPF |
|---|---|---|---|---|---|
| ENDEREÇO | | MUNICÍPIO | | UF | INSCRIÇÃO ESTADUAL |
| QUANTIDADE | ESPÉCIE | MARCA | NÚMERO | PESO BRUTO | PESO LÍQUIDO |

## DADOS ADICIONAIS

INFORMAÇÕES COMPLEMENTARES
ICMS SUSPENSO CONF. DECRETO 30597

A/C CODIGO, REF.OC.000571, ENTREGAR
NA AV. GOETHE, 260 - PORTO ALEGRE

O.S.15167

RESERVADO AO FISCO

Nº DE CONTROLE DO FORMULÁRIO

023484

PRINT PRESS FORMULÁRIOS LTDA. RUA GASPAR MARTINS, 202/204 - FONE: 0800 510 7890 - CNPJ 94.990.839/0001-90 - INSCR. EST. 096/2328771 - 4 e 2.000 - DE 032.301 A 025.000 - 09/2003 - AIDF (RS) 50008743434 - AIDF (PMPA) 743864

RECEBEMOS DE TRINDADE INDÚSTRIA GRÁFICA LTDA., OS PRODUTOS CONSTANTES DA NOTA FISCAL SÉRIE 1, INDICADA AO LADO. — **NOTA FISCAL FATURA Nº**

| DATA DO RECEBIMENTO | IDENTIFICAÇÃO E ASSINATURA DO RECEBEDOR | |
|---|---|---|
| 17/12/2003 | Alex Blos Vos | 023484 |

SÉRIE - 1

# ADVERSITE

COMUNICAÇÃO

Adversite Comunicação Integrada Ltda.
CNPJ: 03.384.833/0001-91  INSCR. MUN.: SS114.
Rua Flores da Cunha, 642/128
CEP: 93410-110 – Novo Hamburgo – RS
Fone/Fax: (51) 582.8765
e-mail: adversh@terra.com.br

## NOTA FISCAL DE SERVIÇOS SÉRIE "T"

1.a VIA         Nº 140

Natureza da Operação: PREST. GERN.

Data da operação: 03.05.04

### DESTINATÁRIO

Nome: COOPER SHOES COOP. CALÇ. COMP. LTDA
Endereço: Av. Vicente Pietia, 3767
Cidade: Picoda Café        UF: RS
CNPJ: 02.675.611/0001-65
Inscr. Estadual: 388/0002446

| Descrição do Serviço | Total |
|---|---|
| Assessoria de Moda e imprensa | 2.500 — |
| 1% CONT. SOCIAL | — 25,00 |
| 3% COFINS | — 75,00 |
| 0,65% PIS | — 16,25 |
| PGTO  07/05 | 2.383,75 |
| ITAÚ | |
| AG. 0293 | |
| CONTA : 75450-3 | |

IMPOSTO SOBRE SERVIÇO INCLUÍDO NO PREÇO A ALÍQUOTA DE        %        **TOTAL R$  2.383,75**

MONOGRAF - Osvaldo Artbel Wartz, 611 - Fone/Fax 156-3156 - I.E. 0860/275443 - CNPJ 95.121.956/0001-97 OZ Th. - 4x35 - 151 a 150 - 03x03 - Série T - OS : 22968 - Autorização de Impressão 1402/0174/83.

---

# ADVERSITE

COMUNICAÇÃO

Recebemos de Adversite Comunicação Integrada Ltda
os serviços descritos na Nota Fiscal.

Em ___/___/200___        Nº 140

Ass.: _____



**DIGITIPO EDITORA E PUBLICIDADE LTDA.**

Rua Júlio Adams, 237
Bairro Guarani
Cep 93520-410
Novo Hamburgo - RS
Fone/Fax: 594-2522

NOTA FISCAL DE
SERVIÇOS SÉRIE "T"



**5115**

CNPJ 92.353.184/0001-91 • Inscr. Municipal 30208
Inscr. Estadual: 088/0161030

NAT. DA OPERAÇÃO: _____

DATA DE EMISSÃO: 27/08/02

**DESTINATÁRIO**
NOME DA FIRMA: Cooper. de Cal. Comp. Jeametense Ltda.
ENDEREÇO: Rua Vicente Prieto _____ Nº 3767 - B. Jeanete
MUNICÍPIO: Picada Café _____ ESTADO: RS
CNPJ: 02.675.611/0001-65 _____ INSCR. EST. 388/0002446

| UND. | QTD. | DISCRIMINAÇÃO DOS SERVIÇOS PRESTADOS | PR. UNIT. | TOTAL R$ |
|------|------|--------------------------------------|-----------|----------|
|      | 01   | Barmex 4,50 x 11,0 - 04 core |  | 53500 |
|      |      | All Star. |  |  |
|      |      |  |  |  |
|      |      |  |  |  |
|      |      |  |  |  |
|      |      |  |  |  |
|      |      |  |  |  |
|      |      |  |  |  |
|      |      |  |  |  |
|      |      | Vendo! 20/09/02 |  |  |
|      |      |  |  |  |
|      |      |  |  |  |

IMPOSTO SOBRE SERVIÇO INCLUÍDO NO PREÇO A ALÍQUOTA DE _____%    TOTAL R$   53500

VALLUP ARTES GRÁFICAS LTDA. Fone: 0**51 586-3741 • RS • I.E.1240087996 • CNPJ 91.927.996/0001-49
20 Tb. - 41ZS • 5101 a 5900 - 08/2002 • AIDF nº 2226/OTM/02

RECEBI(EMOS) DE DIGITIPO EDITORA E PUBLICIDADE LTDA.
Os serviços constantes da NOTA FISCAL DE SERVIÇO SÉRIE "T"

Em _____ / _____ / _____    Ass.: _____

**5115**

# EXHIBIT C
# to Breda Affidavit

# CONTRATO DE PRESTAÇÃO DE SERVIÇOS

**S. SAPATUS REPRESENTAÇÕES LTDA.**, localizada a AV. Nossa Senhora Aparecida, nº 226, Bloco 03, conjunto 21, CEP 18245-000, com seu contrato social de constituição registrado e arquivado no 5º Oficio de Registo de pessoas Jurídicas sob N.º 9.920 de 24 de 01 de 1990 e ultima alteração de contrato social registrada no Registro Civil das Pessoas Jurídicas da Comarca de Angatuba sob nº 265, livro A-5. fls. 048, em sessão de 28/06/2000 e com cadastro no Conselho Regional dos Representantes Comerciais do Estado de São Paulo, neste ato representado por seu sócio gerente RICARDO RODRIGUES NUNES, representante comercial, brasileiro, separado judicialmente, CPF n.º 034242338-03, com domicilio em São Paulo, Capital, na Rua Congonhal, nº 28 Apto 41, Agua Raza CEP 03180-150, identidade RG n.º 7756906, expedida em São Paulo pela SSP, doravante denominado simplesmente **CONTRATADA**; e

**COOPERSHOES – COOPERATIVA DE CALCADOS E COMPONENTES JOANETENSE LTDA, SOCIEDADE COOPERATIVA**, localizada na Rua Vicente Pinto, nº 3767, Bairro Joaneta, no municipio de Picada Café e inscrita no CNPJ nº 02.675.611/0001-65, e registro na Junta Comercial do Estado do Rio Grande do Sul sob o nº 43400.013.636, neste ato representada por seu presidente ALTAMIR ANTONIO BREDA, brasileiro, casado, calçadista, residente e domiciliado a Rua Tarso Dutra, 104, Novo Hamburgo – RS, CPF 355.527.510-00, e seu tesoureiro Sr. Paulo Ademir Sidegum, brasileiro, solteiro, calçadista, residente a Rua João Jacob Wolff, s/n, Picada Café-RS, CPF 641558970/91,neste ato denominada simplesmente **CONTRATANTE**, têm justo e contratado o seguinte:

**1.** A CONTRATANTE contrata a CONTRATADA para a prestação de serviços na área de vendas, atuando como assessor comercial, com o objetivo de que sejam adotadas medidas que incrementem a comercialização dos produtos com a marca CONVERSE/ALLSTAR comercializados pela CONTRATANTE.

**2.** Os serviços ora contratados serão prestados tanto na sede da CONTRATANTE quanto na sede da CONTRATADA, dependendo da conveniência das partes para melhor permitir a concretização do objeto deste contrato.

Página 1 de 2

## CONTRATO DE REPRESENTANTE COMERCIAL

Pelo presente instrumento particular, **COOPERSHOES** — **COOPERATIVA DE CALÇADOS E COMPONENTES LTDA.**, sociedade cooperativa de direito privado, com sede em Picada Café/RS, na Av. Vicente Prieto, n° 3767, bairro Joaneta, inscrita no CNPJ sob o n° 02.675.611/0001-65, neste ato presentada por seu Presidente, Sr. Altamir Antonio Breda, brasileiro, casado, residente e domiciliado na Rua Tarso Dutra, 104, Novo Hamburgo/RS, portador do CPF n° 355527510/00 e seu tesoureiro SR. Paulo Ademir Sidegum, brasileiro, solteiro, residente e domiciliado na rua João Jaco Wolf, s/n, Picada Café/RS, portador do CPF n. 641558970/91, doravante denominada **REPRESENTADA**, e DAMASCO REPRESENTÇÕES LTDA, estabelecida na Rua Aejlino Diniz Moreira, n° 053, LT A, bairro Fonte Grande 2. seção, na cidade de Contagem/MG, inscrita no CNPJ sob o n° 64.238.686/0001-36, com Registro no COREMINAS sob n° 22.943, presentada neste ato por seu sócio gerente Sr. ARNALDO ANTONIO DOS SANTOS ELIZEU, brasileiro, casado sob o regime de comunhão parcial de bens, empresário, nascido em 22/10/1961, residente e domiciliado à Rua Peru, 238, apartamento 101, bairro da Gloria, na cidade de Contagem/MG, portador do CPF n° 483.630.576/49, doravante denominada **REPRESENTANTE**, ambas corporações existentes e registradas, operando conforme as Leis do País, tem justo e acordado a Representação Comercial, sob as cláusulas e condições que abaixo elencadas.

## CLÁUSULA ESPECIAL:

O presente instrumento consolida e ratifica a relação jurídica contratual anteriormente existente na modalidade verbal e desde a data de 02/01/2004, passando a vigorar as regras a seguir.

## CLÁUSULA PRIMEIRA - DOS PRODUTOS

A REPRESENTADA, fabricante e distribuidora exclusiva dos calçados Marca CONVERSE/ALL STAR, confere sem exclusividade à REPRESENTANTE, o direito de exercer a representação comercial dos produtos por ela fabricados e exclusivamente os relacionados no **Anexo I — parte integrante deste contrato** - para vendas na área prevista na Cláusula Segunda, dentro das condições abaixo estipuladas.

**Parágrafo Primeiro:** Toda alteração, inclusão ou exclusão de produtos e/ou modelos dos calçados CONVERSE/ALL STAR, fabricados e distribuídos pela REPRESENTADA e, ora dados em representação, dar-se-á por nova lista descritiva (Tabela de preços) que será considerada **parte integrante do Anexo I, revogando automaticamente a relação anterior**, e será enviada a REPRESENTANTE, com antecedência de dez dias.

**Parágrafo Segundo:** A REPRESENTANTE receberá da REPRESENTADA sempre que necessário (lançamentos) ou que solicitar, mostruários dos produtos indicados no Anexo I, pelo preço de custo de cada produto, autorizando desde já a emissão de boleto bancário para cobrança ou compensação nos valores das comissões.

## CLÁUSULA SEGUNDA - DA ÁREA DE ATUAÇÃO

A REPRESENTANTE desempenhará suas atividades de representação comercial unicamente nas cidades/estados, constantes da anexa relação -**Anexo II – parte integrante deste contrato** - promovendo a venda dos produtos da REPRESENTADA, sendo-lhe conferida exclusividade nas regiões constantes do Anexo II.

**Parágrafo Primeiro:** Sempre que a REPRESENTANTE COMERCIAL, ainda que por motivos alheios a sua vontade, deixar de atender a qualquer cliente da REPRESENTADA, antigo ou futuro, será notificada a fazê-lo com prazo de três dias. Inalterada a situação, a REPRESENTADA resguarda-se o direito de enviar outro Representante Comercial, ou diretamente atender referido cliente, hipóteses que não incidirá a exclusividade concedida no caput desta cláusula.

**Parágrafo Segundo:** A inclusão ou exclusão de área de atuação dar-se-á por novas listas descritivas, convencionada pelas partes, revogando automaticamente a relação anterior, passando a ser parte integrante do Anexo II.

**Parágrafo Terceiro:** É vedado à REPRESENTANTE intermediar vendas dos produtos fabricados pela REPRESENTADA em áreas ajustadas com outras REPRESENTANTES, ou atendidos diretamente pela REPRESENTADA, sob pena de, em o fazendo, não ter direito a comissões pelas vendas assim intermediadas.

## CLÁUSULA TERCEIRA - DAS OBRIGAÇÕES

A REPRESENTANTE obriga-se:

**a** - se necessário, contratar sob sua inteira e exclusiva responsabilidade, todo o pessoal para a intermediação das vendas, pagando-lhe a respectiva remuneração e arcando exclusiva e pontualmente com todos os ônus e encargos trabalhistas, sociais, fiscais, tributários, previdenciárias e do FGTS; inclusive de acidente de trabalho, e de quaisquer adicionais que sejam ou venham a ser devidos ao seu pessoal, em decorrência do presente contrato, ou incidentes sobre a atividade e serviços prestados pela REPRESENTANTE, bem como sobre seu próprio pessoal, do qual manterá relação empregatícia ou outra vinculação cabível por lei. Deverá, ainda, fornecer cópia para a REPRESENTADA dos pagamento dos salários e dos encargos, caso venha a contratar, podendo inclusive a REPRESENTANTE estabelecer Prepostos, sob sua responsabilidade, conforme estabelecido nesta cláusula.

**b** - efetuar seguro de acidentes pessoais de seus funcionários e seguro dos equipamentos de sua propriedade utilizados na execução dos serviços contratados;

**c** - arcar com toda e qualquer despesa de seu pessoal, inclusive alimentação e transporte, bem como de seus veículos, suportando todos os custos de abastecimento de combustível e de manutenção dos mesmos.

**d** — manter em dia seu Registro no CORE, apresentando anualmente à Representada, a guia de quitação da anuidade em até cinco dias após o vencimento.

## CLÁUSULA QUARTA - DA CESSÃO

Fica vedado à REPRESENTANTE transferir, ceder ou alienar a terceiros, no todo ou em parte, a qualquer título, os direitos e obrigações assumidos através deste instrumento, sem a concordância prévia e por escrito da REPRESENTADA.

## CLÁUSULA QUINTA - DA NÃO EXCLUSIVIDADE DA REPRESENTANTE

A REPRESENTANTE desempenhará suas atividades de representação comercial promovendo a venda dos produtos da REPRESENTADA SEM EXCLUSIVIDADE, podendo ter a representação de outras empresas, desde que se trate de produtos não concorrentes direta ou indiretamente com as linhas de produtos fabricados e/ou distribuídos pela REPRESENTADA.

## CLÁUSULA SEXTA - DA TABELA DE PREÇOS

A REPRESENTANTE obedecerá e aplicará as tabelas de preço e condições gerais de venda, bem como, as respectivas alterações supervenientes que lhe serão comunicadas pela REPRESENTADA por escrito, via fax ou e-mail.

## CLÁUSULA DÉCIMA-OITAVA – DO FORO

As partes elegem o Foro da cidade de Nova Petrópolis, como único competente para dirimir toda e qualquer dúvida emergente deste contrato, bem como, das questões dele decorrentes, renunciando a qualquer outro por mais privilegiado que seja.

E, estando assim acordados as partes firmam o presente em 3 (três) vias de igual teor e forma, na presença de 02 (duas) testemunhas instrumentárias.

Picada Café, 02 de janeiro de 2004.

REPRESENTADA

REPRESENTANTE

TESTEMUNHAS: Nome:..............................., 
Nome ..............................., 

CPF/MF:.....................................
CPF/MF:.....................................

# EXHIBIT F
# to Converse's Opposition

| Date | D. Mass. Proceedings | Arbitration Proceedings | Argentine Proceedings | Brazilian Proceedings |
|---|---|---|---|---|
| December 16, 2004 | | Alon filed a Demand for Arbitration and statement of claim in New York City in contravention of the Arbitration Clause, which indicated that any demand must be filed in Boston, Massachusetts. | | Alon sent a notice to Coopershoes demanding that Coopershoes agree to extend their sublicensing agreement beyond the impending December 31st deadline. |
| December 22, 2004 | | | | Alon obtained an *ex parte* order stating that Converse must maintain Alon's contract rights beyond the January 1st, 2005 termination date pending the resolution of the arbitration proceeding. |
| December 30, 2004 | | | Alon obtained an *ex parte* order stating that Converse must maintain Alon's contract rights beyond the January 1, 2005 termination date. The order, effective through February 28th, required that Alon pay a $300,000 bond. Alon did not pay the bond. | |
| January 6, 2005 | This Court denied Converse Motion for an Anti-suit Injunction in which it sought both to bar Alon from seeking relief in international courts and to compel arbitration. This Court instructed Converse to litigate those matters in Brazil and Argentina. | | | |

| Date | D. Mass. Proceedings | Arbitration Proceedings | Argentine Proceedings | Brazilian Proceedings |
|---|---|---|---|---|
| January 13, 2005 | | Converse filed a Motion to Dismiss or Transfer the arbitration proceedings. The Motion contested the jurisdiction of the ICDR to administer the arbitration in lieu of the AAA. Upon filing this Motion the matter went into abeyance. The time period afforded Converse to Answer Alon's claims would not begin to run until the Motion was decided. | | |
| February 22, 2005 | | | | Converse filed an *ex parte* Motion for Reconsideration seeking to overturn the Court's issuance of a status quo injunction. |
| February 24, 2005 | | ICDR denied Converse Motion to Dismiss or Transfer the arbitration to the AAA. ICDR directed the parties to discuss the procedure that ICDR should implement to select an arbitrator. The ICDR scheduled a teleconference for the first week of March in order to reach an agreement as to the procedure that would be used to select an arbitrator, set the date that Converse's Answer would be due and answer any technical questions the parties may have. | | The Court issued a detailed decision overturning the previous status quo injunction. It dismissed Alon's suit and directed Alon to pursue its remedies in the arbitration proceeding. |
| March 1, 2005 | | | | Notwithstanding the denial of its injuncation, Alon sent notice to Coopershoes demanding Coopershoes to send royalty payments to Alon, not Converse. |

| Date | D. Mass Proceedings | Arbitration Proceedings | Argentine Proceedings | Brazilian Proceedings |
|---|---|---|---|---|
| March 2, 2005 | | | | Relying on the Court's February 24, 2005 order overturning the injunction, Converse sent a notice to Coopershoes restoring its contractual licensing agreement with Converse. |
| March 3, 2005 | | | | To avoid further dispute forcing Coopershoes to litigate, Coopershoes filed an interpleader action in Brazil. |
| March 8, 2005 | | ICDR held a telephone conference in which it established a process for selecting the arbitrator, per the parties' agreement, and set the due date for arbitrator selection and Converse's Answer for March 24. | | |
| March 10, 2005 | | ICDR sent a list of 29 potential arbitrators to the parties. In accord with the agreement each party was required to use no more than 7 strikes and then rank the remaining arbitrators in order of preference. | | As a result of Coopershoes interpleader action, the Court ordered Coopershoes to deposit the January and February 2005 royalty payments into the registry of the Court pending the outcome of the arbitration. |
| March 14, 2005 | Alon filed an Emergency Motion for a Preliminary Injunction both to preserve the status quo pending the outcome of arbitration and to compel arbitration. | | | |

| Date | D. Mass. Proceedings | Arbitration Proceedings | Argentine Proceedings | Brazilian Proceedings |
|---|---|---|---|---|
| March 15, 2005 | | | | Alon filed a Motion for Reconsideration fo the February 24th order overturning the injunction and dismissing the case. Alon's Motion was Denied. Alon appealed the Court's denial of its Motion for Reconsideration. |
| March 18, 2005 | | Alon reneged on its previous agreement to an arbitrator selection process, alleging that the ICDR had not complied with its understanding of the agreement. It demanded that Converse either agree to re-do the process or that ICDR select the arbitrator independent of the parties involvement. For the first time since the arbitration began, Alon demanded an arbitrator from outside of the United States. | The court issued a sixty (60) day status quo injuncation. The order requires that Alon pay a bond in order for the injunction to become final. Alon has not paid the bond. | Granting Alon's appeal, the Court re-issued the status quo injuncation. |
| March 21, 2005 | | ICDR conducted a telephone conference with the parties to again agree upon a process for appointing an arbitrator. Converse agreed to Alon's unimely demands to remove certain arbitrators and replace them with new candidates. Alon thereafter requested an extension to submit the strike and rank until April 1st. Converse agreed to the extension. | | |

| Date | D. Mass. Proceedings | Arbitration Proceedings | Argentine Proceedings | Brazilian Proceedings |
|---|---|---|---|---|
| March 23, 2005 | | Converse requested an extension to file its Answer on April 1st in order to coincide with the selection of the arbitrator. Alon agreed and reserved its right to further amend its Statement of Claim. | | |