UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CONVERSE INC., | ) | |
| | ) | |
| Plaintiff, | ) | DOCKET NO.: 04-12591-PBS |
| | ) | |
| vs. | ) | |
| | ) | |
| ALON INTERNATIONAL S.A., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CONVERSE'S EMERGENCY MOTION TO PROTECT ARBITRATOR AUTHORITY TO PRESERVE CONVERSE'S DAMAGES REMEDY

### Introduction

Plaintiff Converse Inc. ("Converse") hereby moves this Court for an emergency order to protect the authority of the arbitrator in a pending arbitration in the United States to decide Converse's pending motion in the arbitration to preserve Converse's damages remedy (the "Motion"). Alon International S.A. ("Alon") has obtained an ex parte order permitting it to obtain about $300,000 which was to be deposited into an existing interpleader action in Brazil, where Alon and Converse are the interpleader defendants, and is expected to file a further motion to obtain another $1.6 million already deposited into that interpleader. Converse's Motion,[1] which was to be heard yesterday but was not since the existing arbitrator withdrew yesterday morning, sought an order preserving the interpleader funds and requiring that they be paid into the ICDR and held in escrow until a further or final order of the arbitrator at the

---

[1] A copy of the Motion, without exhibits, is attached as Ex. A. Converse will tomorrow morning file a copy of Alon's opposition to the Motion which Alon filed in the arbitration .

conclusion of the arbitration regarding the ultimate disposition of those funds.   Converse requests an order from this Court enjoining Alon from filing a further motion to obtain the $1.6 million approximately already deposited into that interpleader, and further ordering Alon to deposit any funds it does receive into the ICDR or the registry of this Court until a new arbitrator is appointed in the arbitration matter and can rule on the Motion.

The arbitration pending before the ICDR concerns claims by Converse that it rightfully terminated and let expire on December 31, 2004 its contract with Along, its licensee in Brazil, Argentina, Uruguay, and Paraguay.  As part of its basis for terminating Along, Converse says that Alon, without permission, violated the anti-sublicensing clauses in the contract between Converse and Alon, and engaged a Brazilian entity as its sublicense, called Cooper shoes Cooperative De Calvados E Components Joan tense LTDA ("Cooper shoes").   Converse believes the evidence is that Alon granted a prohibited contractual sublicense to Coopershoes such that Coopershoes had the right use and sell Converse's trademarks, use and sell Converse's licensed products, and Coopershoes was conducting the product development, marketing, advertising, and sales of Converse's licensed products while also paying Alon royalty payments consisting of a percentage of Coopershoes' net sales.  Alon contests whether it engaged in subliscensing and whether its contract with Converse expired of its own terms on December 31, 2004.

On or about December 16, 2004 Converse entered into a licensing agreement with Coopershoes to appoint Coopershoes its licensee in the territory, which agreement became effective on January 1, 2005.  Alon, in December 2004, long before an arbitrator was appointed in the arbitration on April 6, 2005, sought and obtained various injunctions against

2

Coopershoes and Converse in Brazil.[2]  Coopershoes filed two interpleader actions in Porto Alegre, Brazil, which were both granted, allowing it to pay the monthly royalties after December 31, 2004 claimed by both Converse and Alon.  The amount of funds thus far deposited by Coopershoes into the interpleader actions is approximately $1.6 million, with new monthly deposits by Coopershoes scheduled in the amounts of $300,000 to $500,000.

The Motion was scheduled to be heard yesterday, May 24, at 2:30 pm, before the arbitrator, Attorney Eugene Theroux of the Washington D.C. law firm of Baker & McKenzie, in an arbitration between Converse and Alon before the International Center for Dispute Resolution ("ICDR"), case no. 50 133 T 00579 04.  Arbitrator Theroux was appointed by the ICDR to serve as arbitrator on April 6, 2005.  On May 6, 2005, Arbitrator Theroux already issued an order, a copy of which is attached as Ex. B, granting the partial relief sought by Converse barring Alon from terminating or threatening to terminate the current Converse licensee in Brazil, Coopershoes[3], which Alon had threatened to due unless Coopershoes paid contested royalty payment to Alon and not into a pending interpleader action in a court in Porto Alegre, Brazil.

However, before that hearing could be held yesterday, the ICDR issued an order, a copy of which is attached as Ex. C, removing Arbitrator Theroux and the suspending all of the proceedings, including the hearing on the Motion, until a new arbitrator could be appointed.[4]

---

[2]     Converse sought an anti-suit injunction in this case against those actions, before any arbitrator was appointed in this matter.  The Court denied Converse's anti-suit injunction, but indicated strongly that the parties were to maintaint the status quo pending resoluion of the arbitration proceeding Alon had filed with the ICDR on about December 16, 2004.  The Court denied Converse's motion on the basis that Converse had not made the requisite showing for anti-suit injunction under the standard laid down by the First Circuit in Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11, 16 (1st Cir. 2004).  Converse says that under the current circumstances, the pending Motion and no abitrator to decide the Motion, an ani-suit injunction is justified.

[3]     Alon asserts that Coopershoes is still its authorized manufacturer (not sublicensee) in Brazil.

[4]     Arbitrator Theroux was removed on challenge by Alon.  It turned out that Mr. Theroux' law firm, Baker & MeKenzie, where he formerly served as a partner but is now retired and serves in a "part-time advisory role as

3

After Arbitrator Theroux was removed yesterday by the ICDR, the ICDR immediately began the process of selecting a substitute arbitrator. Converse's counsel understands that the ICDR is going to select a new arbitrator from a previous list of 29 names of potential arbitrators that the ICDR had submitted to the parties, to which the parties had each then responded by engaging in a "rank and strike" preference ranking.[5]  Converse's counsel further understands that a new arbitrator may be in place by sometime the week of May 30th.

Converse also learned yesterday, while the Motion was pending and about to heard by Arbitrator Theroux, that Alon had taken action in an interpleader proceeding in Porto Alegre Brazil to prevent any more contested royalty payments from being paid by Coopershoes into that interpleader and to force Coopershoes to make those contested royalty payments directly to Alon.  Alon's counsel, Mr. Astigarraga, sent an email to Converse's counsel, a copy of which is attached as Ex. E, stating in part that "we have recently been informed that the Brazilian judge in Porto Alegre presiding over the interpleader deposits has held that such deposits are no longer authorized."  Converse has now obtained a copy of the Brazilian court order, a copy of which is attached in regrettably unreadable form as Ex. F, and a rough translation of which is attached as Ex. G, Converse believes that the action by the Porto Alegre judge was not sua sponte, but was taken by the judge in response to some ex parte pleading filed by Alon, at or about the same time, Friday, May 20, 2005, that Alon's counsel first communicated to the ICDR its challenge to Arbitrator Theroux.  Alon succeeded by acting in Brazil without notice

---

Senior Counsel to the Firm", has represeted Converse's parent company, Nike.  See email from Arbitrator Theroux to artbitration parties dated Sunday, May 22, 2005 at 8:15 p.m., a copy of which is attached as Ex. D. Arbitrator Theroux had done no work for Nike, did not know that Nike was a clinet of another office of his firm, found himself to be impartial, but still offered to withdraw.  In his email he mentions that resolution of the issue "may obviate the need for my role in any further proceedings, including the hearing by teleconference that has been scheduled on Tuesday, May 24, 2005."

[5]    Converse now understands that Alon may contest use of the next name on the rank and srtike lists

4

and by achieving the removal of the arbitrator in the U.S. arbitration, such that Converse is left without an effective forum to hear its Motion or to preserve its damages remedy.

## Argument

**1.    The presumption against anti-suit injunctions does not apply where the relief sought is to prevent foreign interdictory action of the type sought by Alon preempting a decision on a pending matter in a U.S. arbitration to which Alon is a party.**

First, under the authority of the First Circuit decision in Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11, 16 (1st Cir. 2004), anti-suit injunctions can be granted where the injunction is meant to "preserve the court's ability to adjudicate claims before it according to the law of the United States."[6] The First Circuit in Quaak, at 19, in articulating the standard governing anti-suit injunctions, stated that courts can weigh (against the rebuttable presumption against anti-suit injunctions) "the conduct of the parties (including their good faith or lack thereof) . . . and . . . the extent to which the foreign action has the potential to undermine the forum court's ability to reach a just and speedy result." The First Circuit in Quaak, at 20, also said that courts can consider whether the party against whose foreign action and order is sought "had available other options for seeking resolution of its clients . . . concerns. The most obvious choice was to pursue and exhaust its position in the federal judicial system before attempting to sidetrack that system." These issues weighed heavily in the decision of the First Circuit in Quaak, at 21, to uphold the anti-suit injunction issued by this Court in that matter. Id. ("[KPMG-B] eschewed these options. Having called the tune, it hardly seems inequitable that KPMG-B must now pay the piper.") The same considerations in favor of anti-suit injunctions to protect the ability of a United States court to

---

previously submitted by Converes and Alon to the ICDR.
[6]      Under Quaak, at 19-20, Converse need not present a standard four-part argument that has a reasonable

decide a pending matter should apply to protect a pending United States arbitration, being held under the authority of the Federal Arbitration Act.

Here, these considerations weighing in favor of anti-suit injunction weigh in favor of the relief sought by Converse. Alon sought and obtained an order in Brazil barring payments into the interpleader such that Coopershoes would be forced to make the payments to Alon. Alon sought and obtained such an order at the same time it knew that Converse's Motion, which concerns precisely preservation of those same funds, was scheduled to be heard before the arbitrator within a business day or two. Thus, Alon attempted to preempt a decision by the arbitrator. Alon did not exhaust its remedies in front of the arbitrator by waiting for a denial of the Motion by the arbitrator, or by filing its own motion to be awarded the funds with the arbitrator. Finally, Alon made sure that Converse would have no recourse to an arbitrator by launching its challenge to the arbitrator at what must have been about the same time it was taking action in the Brazilian courts, so as to preclude any arbitrator from hearing the matter. In Alon's challenge to Arbitrator Theroux filed late in the day on Friday, May 20th, a copy of which is attached as Ex. H, Alon said, "Given the significance of the matter, Alon respectfully requests that no further action be taken on any of the currently pending matters until the matter had been addressed and resolved."[7]

### Certification

Pursuant to Local Rule 7.1(A)(2), counsel for Converse has contacted counsel for Alon and asked Alon to assent to the relief sought in this motion, and counsel for Alon has not

---

likelihood of success before an international anti-suit injunction can be granted. However, alternatively, Converse makes the four-part argument in its Motion, a copy of which is attached as Ex. A.

[7]    This request by Alon in itself was not unreasonable in itself. However, when seen as done by Alon at about the same time as its action in the Brazilian court to obtian the interpleader funds, and with a pending motion before the Arbitrator Theroux to preserve those same funds, Alon's actions do not look benign.

MCG/32913/2/568521v1
05/25/05-BOS/

agreed.

## Conclusion

Based on the foregoing arguments and authorities, Converse respectfully requests that Converse's current motion be allowed in all respects and that the Court grant Converse the following relief:

(1)     Order that Alon International S.A. be restrained and enjoined from filing or seeking any further order(s) from the 12th Civil Court of Porto Alegre, Brazil, to obtain any of the funds deposited in an interpleader-type action pending before the Civil Court, until a new arbitrator is appointed in Alon International, S.A v. Converse Inc., International Center for Dispute Resolution ("ICDR"), Case No. 50 133 T 00579 04, and rules on Converse's Motion;

(2)     Order that Alon International S.A., within three business days after receipt of any funds from Coopershoes, deposit those funds into the ICDR or into the registry of this Court, with the funds to remain as deposited pending an order or award as to the disposition of the funds of the newly appointed arbitrator in Alon International, S.A v. Converse Inc., International Center for Dispute Resolution ("ICDR"), Case No. 50 133 T 00579 04; and

(3)     Order such other and further relief for Converse as this Court deems just and equitable.

MCG/32913/2/568521v1
05/25/05-BOS/

**CONVERSE INC.**
By its attorneys,


_/s/ Michael C. Gilleran_____
Michael C. Gilleran, Esq. (BBO #192210)
PEPE & HAZARD LLP
225 Franklin Street
Boston, Massachusetts 02110
(617) 748-5500
DATED:  May 25, 2005                          Fax:  (617) 748-5555

## Certificate of Service

I hereby certify that I have today served the above motion upon counsel for the opposing party by electronic means.

_/s/ Michael C. Gilleran_____

DATED:  May 25, 2005

MCG/32913/2/568521v1
05/25/05-BOS/

# EXHIBIT A

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION
Case No. 50-133-T-00579-04

|  |  |
|---|---|
| ALON INTERNATIONAL S.A., | ) |
| | ) |
| Claimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| CONVERSE INC., | ) |
| | ) |
| Respondent. | ) |
| | ) |

## EMERGENCY MOTION OF CONVERSE TO PRESERVE ITS DAMAGES REMEDY AND TO RATIONALIZE THE LITIGATION

**I.     Introduction.**

Now comes the Respondent Converse Inc. ("Converse") and respectfully moves for an order from this Tribunal that (1) preserves Converse's damages remedy and (2) rationalizes the multiple South American litigations which involve the same parties and the same issues as in this Arbitration.  Further, through this Motion, Converse seeks to enjoin Claimant Alon International S.A. ("Alon") from engaging another manufacturer (which would in effect be a sublicensee, as discussed in detail below) in South America, as it has threatened to do by Thursday, May 5, 2005.

As for the request to preserve Converse's remedy, unless the Tribunal orders protection of royalties (which Converse says are exclusively its property after Alon's License Agreement expired of its own terms on December 31, 2004, and Converse also

formally terminated Alon for various contract breaches), Alon will be paid the royalties, which is the ultimate relief sought by Alon if that happens, Converse will be left without a damages remedy.

As for the request to rationalize the South American litigation, currently there is litigation pending in three trial courts and two appellate courts in Brazil; and there is litigation pending in one trial court and one appellate court in Argentina. The results in each of those courts have been inconsistent and confusing, causing chaos not only amongst the parties, but also among Converse's existing licensee in the territory (Coopershoes) and in the marketplace.

Adding to the chaos is the fact that despite the South American courts' best efforts, their orders are often ineffective and lack teeth, as evidenced most recently by Alon's threats to Coopershoes to pay it royalties in the amount of $400,000 to $500,000 per month, even though the court in Porto Alegre, Brazil has ordered that Coopershoes may pay the royalties into that court. As discussed below, those threats are driven by Alon's desperation to receive that money to fund, among other things, this Arbitration; money that Alon would not be able to repay to Converse should Converse prevail in this Arbitration.

Accordingly, through this Motion, Converse seeks to bring rationality to a process that is currently out-of-control. This Tribunal has the authority to issue and enforce interim orders and injunctive relief to stabilize the situation. The Tribunal should exercise that authority because when the criteria for injunctive relief are considered, they are clearly met. In particular, the Tribunal should order that:

2

1. It has authority to issue enforceable, interim final orders that supercede any order of the South American courts;

2. Upon entry of this Order, Converse shall work with Coopershoes under a license agreement entered into between them on December 16, 2004;

3. Alon cannot terminate Coopershoes, Converse's selected licensee;

4. Alon cannot engage another manufacturer or licensee (aside from Coopershoes), for the production of Converse's products since Converse has not given its written consent to do so;[1]

5. Alon cannot engage another sublicensee;

6. The royalty payments to date that have been paid into court in Porto Alegre, Brazil, and future royalty payments, shall be paid to the ICDR and held in escrow until further order of the Tribunal;

7. Such further relief as the Tribunal deems necessary and appropriate.[2]

## II.    Factual and Procedural Background.[3]

### The License Agreement Between Converse and Alon

On September 1, 2001, Converse and Alon entered into a Manufacturing, Distribution and License Agreement (the "License Agreement"), attached to the Materials as Exhibit A. The License Agreement, at ¶ 3, granted Alon the right to use the trademarks of Converse for the sale of approved Converse products ("Licensed

---

[1] In light of the fact that Alon has threatened to engage another sublicensee or manufacturer immediately which would result in irreparable harm to Converse, Coopershoes, and the marketplace (as discussed in detail below), Converse is filing concomitantly herewith an *Emergency Motion for an Expedited Decision* relative to the relief requested in this paragraph and paragraph nos. 5-6. Alon has advised Coopershoes that it will act on its threats unless Coopershoes voluntarily agrees to disregard the Brazilian court orders and pay the royalties to Alon **by Thursday, May 5, 2005.**

[2] Notably, Converse is not seeking to avoid the *status quo* or act inconsistent with it. Rather, Converse merely wants all activities regarding the terminated License Agreement and the relationship amongst itself, Alon, and Coopershoes to be monitored and controlled by one tribunal only, and this Tribunal should be that tribunal (since the parties agreed to that in the License Agreement).

[3] The facts set forth in this section are taken from the accompanying Affidavits of Timothy Ouellette (Exhibit B), Chris Laganas (Exhibit C), Frank Quijada (Exhibit D) and Altamir Breda (Exhibit E), along *with other affidavits, which are attached to the accompanying Converse's Materials In Support of Motion to Preserve Damages Remedy and Rationalize Litigation* (the "Materials").

3

Products") to be sold in Brazil, Argentina, Paraguay and Uruguay. In return, Alon

agreed to pay Converse a percentage of its net sales as a royalty, with guaranteed

minimum sales and guaranteed minimum royalties. Ex. A, ¶ 15. The term of the

Agreement was September 1, 2001 - December 31, 2004. Ex. A, ¶ 1(a).

> The License Agreement contained a conditional option for Alon to renew it:

> Licensee may renew this Agreement for an additional term of three (3)
> years ("Option Years" which may collectively be referred to as "Option
> Period") provided Licensee exceeds the Guaranteed Minimum Royalty
> and Sales for Contract Year 3 by twenty-five percent (25%) and further
> provided that Licensee has not breached any of the terms and conditions
> of this Agreement.

Ex. A, ¶ 2. This paragraph also sets forth certain formulas for calculation of the

guaranteed minimum sales and royalties for the Option Years. Id. The License

Agreement also explicitly states that "[t]he Earned Royalty rate for Licensed Articles

for the Option Period *will be negotiated* prior to the Option Years taking effect." ¶

15(a) (emphasis added). The License Agreement also requires the parties to execute a

new and separate written agreement. Id.

> The License Agreement, at ¶¶ 29 & 35, prohibited Alon from sublicensing

without the express written consent of Converse in each instance. It also required Alon

to make certain marketing expenditures. ¶ 7(d).

*Unsuccessful Negotiations for a*
*Possible Renewal of the Licensing Agreement*

> Beginning in late March 2004, Alon began contacting Converse about the option

to renew. Ex. B, ¶ 6. As a starting point for these discussions, Alon prepared and sent

to Timothy Ouellette, Converse's Vice President of Licensing, a forecast of full-year

4

2004 sales, which estimated sales to be $19,485,296.00. Id. Based on this 2004 forecast, the License Agreement, ¶ 2, required that the guaranteed minimum sales for the first option year, 2005, had to be at 80% of the 2004 actual sales, which would be $15,584,000.00. Ex. B, ¶ 6.

On April 28, 2004, even though sales were on an upward trend, Alon suddenly dropped its full-year 2004 forecast by almost 1/3 – from $19,485,296.00 to $13,300,000.00. Ex. B, ¶ 7. This lowered Alon's 2005 minimum guaranteed sales figures by the same margin. Id. Alon also proposed royalty rates of 8% for originals and 6% on non-footwear, 2% lower than Converse's standard rates. Id. Alon also proposed an increased option term of 4 years. Id. On April 29, 2004, Mr. Ouellette rejected these proposals. Id.

Through May and early June 2004, Mr. Szerer, Alon's other Co-President, continued to send Mr. Ouellette renewal proposals containing minimum guaranteed sales figures which were at least $5 million or more less than what the License Agreement would have required Alon to meet based upon Converse's projection of actual 2004 sales. Ex. B, ¶ 8. Alon also repeatedly offered royalty rates far below Converse's standard minimums. Id.

On May 19, 2004, Mr. Szerer proposed an entirely new contract with an initial period five years, with an option to renew for another five years (a "5+5" proposal). Id.

By mid-June 2004, Mr. Ouellette told Mr. Durchfort that negotiations were going nowhere. Ex. B, ¶ 10. On June 28, 2004, Mr. Durchfort sent Mr. Ouellette a

DRS/32913/2/567939v1
05/03/05-BOS/

comparison of the option terms in the License Agreement versus Alon's proposal. Id. Again, Alon offered significantly lower guaranteed sales figures than the License Agreement required (70% vs. 80% of projected 2004 sales – approximately a $6 million reduction), as well as a significantly lower royalty rate for original Converse products (8% vs. 10%) with no increase over time, and a longer term (5 years). Id. Mr. Ouellette rejected that proposal. Id.

The June 28th proposal was the last proposal made by Alon. Ex. B, ¶ 11. The parties never reached an agreement as to any key terms, including 2005 guaranteed minimum sales, royalty rates and term of the new/renewed agreement. Ex. B, ¶ 14. Nor did they ever execute a new written agreement. Id.

*Converse's Discovery of Alon's Breaches of the License Agreement,*
*Termination of that Agreement, and New Agreement with Coopershoes*

In August 2004, Converse first obtained copies of the contracts between Alon and Coopershoes, an entity Converse believed was one of Alon's suppliers. Ex. B, ¶ 16. The copies were in Portuguese and were not translated until early November 2004. Id. The contracts contained terms whereby Alon purported to grant a license to Coopershoes to market Converse trademarked products. Ex. B, ¶ 2. Alon never sought or obtained Converse's permission, written or otherwise, to grant such a sublicense to Coopershoes. Ex. B, ¶ 16. In fact, Alon had a strategy of trying to conceal the true nature of its sublicensing arrangements with Coopershoes and others.

DRS/32913/2/567939v1
05/03/05-BOS/

Ex. D, ¶ 2. Alon's contract with Coopershoes, therefore, constituted an express breach of Alon's obligations under the License Agreement.[4]

Converse conducted an audit of Alon in November 2004. Ex. B, ¶ 17. As a result of this audit, which was conducted by the accounting firm of Deloitte & Touche, Converse discovered that all, or almost all, of the product development, marketing and sales of Converse products – the heart of the licensee function – was being done by Coopershoes, *not Alon*.[5] Id.

On November 30, 2004, upon obtaining clear evidence of Alon's breach, Converse declared that the License Agreement would expire of its own terms on December 31, 2004, and also terminated the License Agreement for various breaches. Id. On December 17, 2004, Converse entered into a License Agreement with Coopershoes effective January 1, 2005. Ex. B, ¶ 18. Converse did not enter into any contract with Alon for extension of the License Agreement, and currently there exists no contract between Converse and Alon of any kind covering the period after December 31, 2004.

Alon brought suit in Brazil and Argentina seeking, among other things, to keep the License Agreement in place, even though it has expired and also Converse had

---

[4] In the field of licensing of global brands, like Converse, sublicensing is almost universally prohibited without express written permission. The reasons for this, as set forth in the Ouellette Affidavit, ¶ __, are that: (1) the licensor suffers a loss of visibility; (2) the licensor does not have "brand control"; and (3) the licensor loses management control. A licensor like Converse wants its licensee to be directly in control of marketing, advertising, and sales within the territory, but not necessarily strict manufacturing. Where sublicensing occurs, the licensor loses control and has no direct contract with the sublicensee performing these functions. Alon had much experience as a licensee and, therefore, was aware of this sublicensing prohibition in the trade. In fact, a licensor of a different global brand previously had terminated Alon when it discovered that Alon was engaging in sublicensing.

[5] *See* Affidavit of Altamir Breda (Ex. E), which details Coopershoes' work under its contract with Alon.

7

terminated it.    On or about December 16, 2004, Alon also filed its Notice of

Arbitration and Statement of Claim, commencing this Arbitration.[6]

*The South American Court Orders and*
*Alon's Threats to Coopershoes to Disregard those Orders*

      1.    **The Brazilian Proceedings.**

      In the Brazilian proceedings, Alon obtained an *ex parte* injunction in the Civil

Court of Porto Alegre stating that Converse must maintain Alon's contract rights

pursuant to the License Agreement pending resolution of this Arbitration. Ex. I. Upon

hearing Converse's side of the story, the Brazilian court that issued that order reversed

itself and dismissed Alon's lawsuit. Ex. I.

      Notwithstanding the fact that there was no injunction in place in Brazil, Alon

sent notice to Coopershoes demanding that it send royalty payments directly to it, not to

Converse.    Converse advised Coopershoes that it should send royalty payments to it,

pursuant to Coopershoes' agreement with Converse.    Seeking guidance, Coopershoes

filed an interpleader action in Porto Alegre, Brazil. Ex. I. page 2.    The Brazilian court

ordered that Coopershoes may deposit the royalty payments into the court pending the

outcome of this Arbitration.

      Meanwhile, Alon sought to reinstate the status quo injunction that the Brazilian

court had ordered and then vacated. Ex. I, page 1.    Alon was unsuccessful at the trial

level, but the appellate court re-issued the status quo injunction pending Alon's appeal.

Ex. I, page 1; see also Ex. F.

---

[6] The complicated procedural history of these actions is set forth in a chart attached as Exhibit F, including the action that Converse brought in United States District Court for the District of Massachusetts.

DRS/32913/2/567939v1
05/03/05-BOS/

### 2.    The Argentine Proceedings.

Like in Brazil, Alon originally obtained an *ex parte* injunction stating that Converse must maintain Alon's contract rights pursuant to the License Agreement pending resolution of this Arbitration. Ex. J. However, the Argentine order required that Alon pay a $300,000 bond as security for the injunction, which Alon has not paid. Ex. J, page 2. The deadline for Alon to have posted the bond has passed, so the injunction has expired on its own terms. Ex. J, page 2. To be safe, Converse's Argentine counsel is about to file papers confirming that the injunction "has been abandoned." Ex. J, page 2.

### 3.    Alon's Demands to Coopershoes
### that Coopershoes Ignore the Brazilian Court Order.

In light of the fact that Alon is not receiving any royalty payments because the Brazilian court has ordered that Coopershoes deposit those payments with the court, Alon is desperate. Thus, on April 29, 2005, Alon demanded of the President of Coopershoes, Altamir Breda (who refers to himself as "Gringo") that Coopershoes immediately start paying the monthly royalties to it and not the court, or Alon will go to Joaneta, another major Brazilian factory near Coopershoes, and manufacture Converse-branded shoes there. Ex. N. Alon has made those threats despite the court order for Coopershoes to pay the royalties into court, and despite the fact that the License Agreement (under which Alon claims rights even though Converse terminated it) prohibits appointment of other sublicensees or manufacturers without advance written permission in each instance. Ex. A, ¶¶ 29, 35, 4(b).

9

If Alon does in fact retain Joaneta (or any other manufacturer) to manufacture Converse-branded shoes instead of Coopershoes, in addition to the damage and confusion to the Converse brand, 1,200 employees of Coopershoes will likely lose their jobs. Ex. N.

III.    **Argument.**

The Tribunal has authority to issue interim final orders that supercede the South American *status quo* injunctions. To avoid further chaos, to move this matter toward an efficient and prompt resolution, and to safeguard the interests of both parties, of Coopershoes, and of the marketplace, the Tribunal should exercise that authority.

   A.    **The Tribunal Has Authority to Issue an Enforceable, Interim Final Order.**

Procedural rules which govern the arbitration and which provide for interim measures of protection unequivocally empower arbitrators to order interim equitable relief. *E.g. Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022-23 (9th Cir. 1991) (affirming an interim order pursuant to the AAA Commercial Arbitration Rules requiring a party to place a sum of money in escrow pending the arbitrator's decision concerning the validity of certain agreements); *Island Creek Coal Sales Company v. City of Gainsville*, 729 F.2d 1046, 1049 (6th Cir. 1984) (abrogated on different grounds) (affirming an interim order pursuant to the AAA Commercial Arbitration Rules requiring a party to perform its contract during the pendency of the arbitration proceedings); *see also CRS Sirrine Engineers, Inc. v. AETNA Casualty and Surety Co.*, 1997 WL 136335 * 3 (D.Mass. Feb. 24, 1997) (finding that the procedures governing arbitration issues were governed by the AAA

10

Rules referenced by the parties in their arbitration agreement); *Charles Construction Co. v. Derderian*, 412 Mass. 14, 18-19 (Mass. 1992) ("Parties agreeing to arbitration implicitly intended that the arbitration not be fruitless and that interim orders to preserve the *status quo* or to make meaningful relief possible would be proper.  In such a circumstance, the arbitrator's authority to act would reasonably be implied from the agreement to arbitrate itself.").

Article 21 of the International Dispute Resolution Procedures ("International Rules"), which govern this arbitration,[7] provides that the arbitrator "may take whatever interim measures it deems necessary, including injunctive relief and measures for the protection or conservation of property."  Article 21 thus explicitly grants this Tribunal broad power to issue injunctive relief.  *See Interim Measures in International Commercial Arbitration under the ICC, AAA, LCIA AND UNCITRAL Rules*, 10 AM. REV. INT'L ARB. 123, 128 (noting that the International Rules provide for *any* measure of injunctive relief, "without any express reference to the subject matter of the dispute"); *compare Charles Construction Co.*, 412 Mass. at 18-19 (refusing to allow arbitrator to issue interim measure for security of a breach of contract claim where construction industry arbitration rules refer only to the property that is the subject matter of the arbitration; noting that if the AAA wished to permit broader preliminary powers the rules would not have been drafted narrowly).

Further, an arbitrator's interim order, even though temporary in nature, is recognized as a **final** arbitral award that is enforceable by the courts.  *Publics Communication v. True North Communications, Inc.*, 206 F.3d 725, 729 (7th Cir.

---

[7] Sse Order of the ICDR, dated March 24, 2005.

DRS/32913/2/567939v1
05/03/05-BOS/

2000); *Pacific Reinsurance Mgmt. Corp.*, 935 F.2d at 1022-23 ("Courts that have been faced with arbitrators' temporary equitable awards have not characterized them as non-final awards on the merits which can only be reviewed in extreme cases. Rather, they have characterized them as confirmable, *final* awards on an issue distinct from the controversy on the merits." (emphasis in the original)); *Island Creek Coal Sales Co.*, 729 F.2d at 1049; *Sperry Int'l Trade v. Israel*, 689 F.2d 301, 304 n.3 (2nd Cir. 1982) (not considering the issue itself, but noting that the district court confirmed the interim order as a final award and was subject to confirmation by the appeals court); *also see Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 233-234 (1st Cir. 2001) (confirming an interim award and though the court confines its holding to the facts of the case it notes its general agreement with the "several circuits" permitting confirmation of an interim award).

Courts have determined that the type of interim arbitration order that is subject to judicial enforcement includes those that are separate, discrete, independent and severable. *Pacific Reinsurance Mgmt. Corp.*, 935 F.2d at 1022-23 (enforcing an interim final order creating an escrow account to hold disputed funds whose proper distribution is dependent upon a determination as to the validity of an agreement); *Island Creek Coal Sales Co.*, 729 F.2d at 1049 (enforcing an interim final order requiring a party to perform the contract pending the outcome of the arbitration proceedings).

Converse does not contest that courts maintain jurisdiction to compel arbitration and to issue injunctive relief that is necessary to maintain the *status quo* pending

12

arbitration.[8]  The constitution of an arbitration panel, however, diminishes the necessity

of judicial intrusion in the arbitration process.  Stated succinctly:

> [I]t is one thing to apply to a court to preserve the status quo until a duly
> constituted arbitrator can act; but it is quite another thing to consciously avoid
> taking steps that would give the arbitrator the ability to act and, instead to apply
> to another court for relief.  Given the modern preference for international
> arbitration, such bootstraps are no longer fashionable.

*Al Nawasi Trading Co. v. BP AMOCO Corp.*, 191 F.R.D. 57, 59 (S.D.N.Y. 2000);

*see also James Associates (USA) Ltd. v. Anhui Machinery & Equipment Import and

Export Co.*, 171 F.Supp.2d 1146, 1150 (D. Colo. 2001) (affirming a *status quo*

preliminary injunction that terminated upon the commencement of arbitration).  In fact,

Alon persuaded the United States District Court for the District of Massachusetts to

deny Converse's motion to dismiss the South American injunction actions by pointing

out that no arbitrator had yet been appointed and arguing that the International Rules

permitted Alon to petition a judicial authority to protect its damage remedies "prior to

the selection of an arbitrator." (Alon brief 17-18, submitted January 5, 2005).[9]  The

Brazilian and Argentine *status quo* orders direct the parties to maintain their contractual

relationship, but they do not contain any indication as to how Converse and Alon, two

parties involved in contentious litigation and who have no current contract with one

---

[8] In fact, Article 21 of the International Rules clearly permits the parties to seek judicial interim relief that "shall not be deemed incompatible with the agreement to arbitrate."

[9] After citing to Article 21 of the International Rules, Alon stated, "[p]ursuant to the AAA Rules, therefore, a party 'may request an [interim] measure from *any court* with jurisdiction over the dispute' prior to the selection of an arbitrator(s). (emphasis added).  George Marchac, *Interim Measures in International Commercial Arbitration Under the ICC, AAA, LCIA and UNCINTRAL Rules*, 10 Am. Rev. Int'l Arb. 123, 125, 135 (1999) (Interim relief 'may not be available from the arbitrators because the tribunal is not yet constituted …. In such situations, only local courts may grant such measures, assuming that they have the appropriate jurisdiction.')…. Brazilian and Argentine courts have jurisdiction to grant status quo injunction in this case. … As the arbitral process was commenced just two weeks ago there currently is no arbitrator appointed."

DRS/32913/2/567939v1
05/03/05-BOS/

another and no agreement on major business terms, are to work with each other throughout the pendency of arbitration proceedings that will not even commence until the end of October. While Alon consistently points out that *status quo* injunctions pending arbitration are permitted, it has never specifically defined the contours of what the *status quo* should or does entail.

A true definition of the status quo protects Converse's damages remedy. In *Danieli & C. Officine Meccaniche v. Morgan Construction Co.*, the plaintiff commenced an action in U.S. District Court in Massachusetts seeking to obtain delivery of bearings that the defendant had manufactured and the plaintiff had paid for in full. 190 F.Supp. 2d 148, 151-153 (D. Mass. 2002). The plaintiff argued that if it did not receive the bearings its contracts with third parties would be irrefutably jeopardized. *Id.* at 155. The Court found that "[t]he *status quo* in the instant case consists of the defendant's withholding of goods from the plaintiff ...." *Id.* It went on to note that "[i]n a literal sense, requiring the defendant to transfer to the plaintiff possession of steel bearings would disturb that *status quo*." *Id.* However, in an effort to avoid causing the plaintiff irreparable harm that would result from adhering to a "literal" definition of the *status quo*, the Court held that "[t]he principle underlying the authority of a district court to preserve the *status quo* pending arbitration is the moving party's right to retain its remedies during such proceedings." *Id.* In light of this principle, the Court directed the defendant to deliver the bearings and required that the plaintiff post a bond in order to safeguard defendant's remedies pending arbitration. *Id.* The Court's decision illustrates the need for this Tribunal to define the *status quo* in a manner that

14

protects the parties' damages remedies. The *status quo* between Converse and Alon entails Coopershoes depositing royalty payments into an escrow account with the ICDR that will be payable to Alon only if it prevails in this Arbitration.

Moreover, the Brazilian and Argentine orders are orders for the specific performance of a contract providing for an ongoing business relationship, and are not appropriate pre-judgment remedies. Such orders are rarely issued. In fact, there is substantial case law showing that specific performance should not be granted where it would harness parties to work with each other where there is no longer any trust. *E.g.* *Lawless v. Malone*, 350 Mass. 440, 443 (1966) (affirming the trial court's refusal to order specific performance of a joint venture because where the parties had been involved in litigation it "would be likely to result in an unsatisfactory and probably unworkable relationship"); *Westinghouse v. New England Patriots*, 10 Mass. App. Ct. 70, 74 (1980) (affirming the trial court's denial of specific performance to renew a broadcasting contract ruling that courts should be reluctant "to order the plaintiff and defendant into an uneasy harness"); *Dunkin' Donuts of America v. Minerva, Inc.*, 956 F. 2d 1566, 1571-1573 (11th Cir. 1992) (applying Massachusetts law) (affirming the trial judge's order awarding only monetary damages consisting of lost profits or future lost profits to a franchisee related to franchisee's ongoing operation of the franchise where franchisor breached the franchise agreement holding that "a franchise contract is a personal services contract and may not be specifically enforced, [franchisee] could not as a matter of law sought to have the franchise contracts extended since [franchisor] was no longer willing to deal with her" and further that "[t]here is absolutely no

15

precedent for granting specific performance of a franchise contract"); *Thayer Plymouth Center v. Chrysler Motors*, 63 Cal. Rptr. 148, 150 (1967) ("A contract which requires a continuing series of acts and demands cooperation between the parties for the successful performance of those acts is not subject to specific performance.") Notwithstanding this substantial case law, and the utter lack of trust that Converse has for Alon, Ex. B, ¶ 18, page 11, Ex. C, ¶ 9-10, and the lack of any new contract between Converse and Alon setting forth material terms, Ex. B, ¶ 18, page 10, the parties have been directed by the South American courts to maintain their contract.

Should this Tribunal agree with Converse that it is practical and efficient to exercise its authority to issue interim measures of protection, it is highly probable that a court would confirm rather than vacate such an award. It is "beyond cavil" that the judiciary's role in arbitration is limited when it is reviewing a final arbitral award such as the interim final order sought pursuant to this motion. E.g. *Sperry Int'l Trade*, 689 F.2d at 304; *also Wonderland Greyhound Park, Inc. v. Autotote Systems, Inc.*, 274 F.3d 34, 35 (1st Cir. 2001) ("Judicial review of the arbitrator's decision is extremely narrow and exceedingly deferential."), *citing Bull HN Info. Sys., Inc. v. Hutson*, 229 F.3d 321, 330 (1st Cir.2000). The First Circuit has recently held that "[a]n arbitrator's award must be enforced if it is in any way plausible, *even if [the court] think[s][the arbitrator] committed serious error." Gupta v. Cisco Sys., Inc.*, 274 F.3d 1, 3 (1st Cir.2001) (emphasis added). Section 10 of the Federal Arbitration Act permits a court to vacate an arbitration award only in very rare circumstances such as where the award was procured by corruption, fraud, or undue means or where the arbitrator is guilty of

16

misconduct such that the rights of a party have been prejudiced or where the arbitrator

exceeded his power. *Wonderland Greyhound Park, Inc.*, 274 F.3d at 35; *Bull HN Info.*

*Sys. Inc.*, 229 F.3d at 330-31; *see* 9 U.S.C. § 10 (2000). An arbitration award may

also be vacated when it is rendered in manifest disregard of the law presupposing

"something beyond and different from a mere error in the law or failure on the part of

the arbitrators to understand and apply the law." *Sperry Int'l Trade*, 689 F.2d at 304-

305 (internal citations omitted); *also Wonderland Greyhound Park, Inc.*, 274 F.3d at

35.

Accordingly, there can be no dispute that the Tribunal has the authority to issue

enforceable, interim final orders.

### B.  The Tribunal Should Exercise Its Authority and Issue Enforceable, Interim, Final Orders.

Upon consideration of the standard for injunctive relief, it is clear that the

Tribunal should exercise its authority and issue enforceable, interim, final orders that

supercede the South American *status quo* injunctions.[10]

### 1.  The Injunction Standard.

In order to establish entitlement to injunctive relief, the moving party must show

that (1) it has a likelihood of success on the merits of its claim; (2) it will suffer

irreparable injury if the injunction is not granted; (3) such injury outweighs any harm

which granting injunctive relief would inflict upon the other party; and (4) the public

interest will not be adversely affected. *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43,

---

[10] It bears repeating from above that Converse is not seeking to avoid the *status quo* or act inconsistent with it. Rather, Converse merely wants to have one tribunal direct the activities and relationships among itself, Alon, and Coopershoes.

17

51-52 (1986). Here, upon consideration of those factors, it is clear that this Tribunal

should issue an order superceding the South American *status quo* injunctions.

### 2.    Converse Has a Strong Likelihood of Success on the Merits.

#### a.    The License Agreement Does Not Provide for Automatic Renewal and Was Not Renewed in A Separate Writing As Required.

It is clear from the face of the License Agreement that it is not automatically

renewable by Alon because it requires Alon to negotiate with Converse to agree upon

certain open key issues and then to memorialize that agreement in a separate writing

signed by both Alon and Converse. Ex. A, ¶¶ 2, 15. As set forth above, Converse

and Alon neither reached agreement on the open issues, nor memorialized any

agreement in a separate writing.

The License Agreement grants Alon merely an "option to renew," which

requires a further agreement by both parties on certain key terms of their ongoing

relationship before a renewal occurs. *See, e.g., Qureshi v. Fiske Capital Management,*

*Inc.*, 59 Mass. App. Ct. 463, 461, *rev. denied*, 440 Mass. 1108 (2003) ("an option to

renew contemplates the execution of a new lease, a process that may introduce new

terms and conditions on which the parties must agree or there will be no new lease.");

*HLM Realty Corp. v. Morreale*, 394 Mass. 714, 716 (1985) ("The important point is

whether some new agreement or some additional act is necessary in order to make the

exercise of the option effective, in which event the exercise of the option, without

more, does not continue the lease relationship."). Further, the License Agreement's

"invalidating clause", which requires any extension to be in a further written agreement

containing all necessary terms and signed by both parties, is valid and enforceable. Restatement (Second) of Contracts, § 21 ("Neither real nor apparent intention that a promise be legally binding is essential to the formation of a contract, but a manifestation of intention that a promise shall not affect legal relations may prevent the formation of a contract."); *see Goren v. Royal Investments Inc.*, 25 Mass. App. Ct. 137, 142-43 (1987), *rev. denied*, 401 Mass. 1104 (1988), citing Restatement (Second) of Contracts, § 21.

Here, the License Agreement expressly left the royalty rate for the option years to be negotiated at a later date. It is undisputed that Converse and Alon did not reach an agreement as to that key term with respect to any renewal of the License Agreement. Ex. B, ¶¶ 6-10, 14. Converse had offered 10% for original and 8% for non-footwear (which were its standard percentages), while Alon never offered more than 8% for originals and 8% for non-footwear. Ex. B, ¶¶ 7, 10. It is likewise undisputed that the parties never executed a separate document for a renewal, as required by the License Agreement. Ex. B, ¶ 14. Accordingly, because the License Agreement was not renewed, that Agreement expired on December 31, 2004, and Alon has no further rights thereunder.

      **b.**     **Even if the License Agreement is Automatically Renewable, Alon Lost Its Rights When it Proposed New Renewal Terms Which Converse Rejected.**

An optionee such as Alon makes a counteroffer and loses the benefit of the previously-stated option terms when "it introduce[s] commercial terms that had not been part of either the proffered lease or the lease under which the parties had

previously operated." _Qureshi_, 59 Mass. App. at 467. An optionee does so at its peril, because once a counter-offer is made, the party who has given the option "is not bound to accept the new terms . . ." _Id_.[11]

Here, even if the License Agreement was automatically renewable, Alon lost that right by making several counter-offers with lower minimum guaranteed sales and royalties, and a longer option term than set forth in the License Agreement. Ex. B, ¶¶ 6-10. Converse specifically rejected these counter-offers in their entirety. Ex. B, ¶¶ 6-10, 14. As a result, Alon lost its rights to the terms for the option years specified in the Agreement. _See Qureshi_, 59 Mass. App. at 462 ("[w]hen a tenant has the benefit of an option to extend, the tenant initiates negotiation of new business points at its peril that the negations will not end in agreement."). Because these un-agreed items were all material – indeed, they governed the compensation each party was to receive under the renewed agreement – there was no legally enforceable new agreement between ALON and Converse for renewal of the License Agreement.[12] Accordingly, even if the License Agreement was automatically renewable, it terminated on December 31, 2004.

---

[11] This doctrine is consistent with the common law "mirror image rule". _See Moss v. Old Colony Trust_, 246 Mass. 139, 148 (1923) ("It is elementary law that an offer must be accepted in the terms in which it is made in order to become a binding contract, and that a conditional acceptance or one that varies from the offer in any substantial respect is in effect a rejection and is the equivalent of a new proposition."); _see also Commerce & Indus. Ins. Co. v. Bayer Corp._, 433 Mass. 388, 392 (2001); _Peretz v. Watson_, 3 Mass. App. 727, 728 (1975).

[12] For contract negotiations to be binding there must be an agreement on all material terms. _Situation Management Systems, Inc. v. Malouf, Inc._, 430 Mass. 875, 878 (2000) ("It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of the contract"); _see Fontneau v. Town of Sandwich_, 251 F. Supp. 2d 994, 1002 (D. Mass. 2003) (holding no contract where "several material terms are absent. One such term is the duration of the supposedly renewable lease.").

20

c.    **Alon Materially Breached the License Agreement.**

Alon is not entitled to <u>any</u> relief under the License Agreement because it materially breached that agreement by entering into a sublicense arrangement with Coopershoes without Converse's consent, and deceiving Converse about the true nature of that relationship.

It is hornbook law that a material breach of a contract by one party excuses the other party from performance. *E.g., Ward v. American Mutual Liability Insurance Co.,* 15 Mass. App. Ct. 98, 100 (1983); *Quintin Vespa Co. v. Construction Serv. Co.,* 343 Mass. 547, 554 (1962); Restatement (Second) of Contracts § 237 (1981). A breach of a clause in a licensing agreement prohibiting sublicensing occurs where the licensee simply grants the license to another party. *Archway Cookies v. Smith Cookies Co.,* 2004 U.S. Dist. LEXIS 21839 (D. Ore. 2004) (holding licensee breached license agreement where it "does not employ workers and owns no plants or tools. . . [and] transferred or assigned its rights and interests as a licensee under the License Agreement" to another party without consent.); *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.,* 729 F. Supp. 1035, 1042-43 (D.N.J. 1990), (holding that licensee who sublicensed without licensor's written consent not only breached agreement but committed copyright and trademark infringement).

Here, the License Agreement, Ex. A, expressly prohibited Alon from sublicensing without the advance written consent of Converse in each instance:

29.    <u>Assignment or Sublicense by Licensee</u>.    None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other Converse property may be

21

> assigned, transferred, sold, sublicensed or otherwise disposed of by
> Licenses without the prior written consent of Converse in each instance.

Alon breached the License Agreement by entering into sublicensing agreements with
Coopershoes in which Alon expressly granted to Coopershoes *a license* to use Converse
trademarks and market Converse products. Ex. C, ¶ 2. Alon cannot produce any
advance written consent by Converse to such sublicensing because none exists. Ex. B,
¶ 16.

Alon claims that it did not breach the License Agreement because Converse
knew about its relationship with Coopershoes. This assertion is disingenuous. Alon
told Converse it was doing business with Coopershoes, but *never* that Coopershoes was
*a sublicensee*. Ex. C, ¶¶ 4-6. Alon led Converse to believe that Coopershoes was
merely one of its suppliers and refused to allow Converse to review its agreement with
Coopershoes until it was forced to do so in the fall of 2004, which is when Converse
first learned about the breach. Ex. B, ¶ 17.

Alon also materially breached the License Agreement by repeatedly failing to
meet the required minimum expenditures for advertising Converse's products. In 2003,
this shortfall was at least $361,500. In 2004, Converse believes this shortfall to be
$650,000. Alon also undertook to market footwear products competing directly with
Converse products, namely, the Miss Sixty and Superga brands. Ex. C, ¶ 8.

      **3.**    **The Balance of Harms as Well as Policy Considerations Favor
Issuing a Pre-Arbitration Order Protecting Converse's
Damages Remedy by Preserving the Royalties, Permitting
Converse to Work with Coopershoes, and Prohibiting
Interference by Alon.**

a. **Alon in Brazil is Threatening Immediately to Appoint Sublicensees and/or New Manufacturers and to Terminate Coopershoes (the Existing Manufacturer), All Without Converse's Approval, In an Effort to Force Alon to be Paid Pending Arbitration.**

As of Friday, April 29, 2005 Alon in Brazil began threatening to appoint new sublicensees and/or manufacturers, and to terminate the existing manufacturer (Coopershoes), all without Converse's approval. Ex. N. Since Friday, Ronald Durchfort and Roberto Szerer, the two Co-Presidents of Alon, have been calling Altamir Breda, the President of Coopershoes. Ex. N. During these conversations Durchfort and Szerer threatened Coopershoes as follows: unless Coopershoes starts making the royalty payments to Alon immediately, and stops making the payments into court, Alon will stop working with Coopershoes; Alon will start working with another company to produce and sell in Brazil, like the Joaneta factory; Alon says it does not matter if this does not conform to the existing court orders in Brazil, because it has nothing left to lose; Alon says it wants to cause confusion in the market, like with the Artigos (the current brand pirate of Converse marks); Alon also says it will inform the market that Coopershoes no longer has any right to work with the Converse brand. Ex. N.

Converse understands that Alon has given Coopershoes a deadline to respond favorably to Alon's threats by Thursday, May 5, 2005.

The actions Alon is threatening immediately completely violate the former contract between Converse and Alon (the License Agreement), which contract is at the core of Alon's claim since Alon argues that it is still effective and compels Converse to

23

maintain Alon as the licensee.  Under that contract, Alon can neither appoint any manufacturers of Converse-branded products, nor any sublicensees, without the advance written approval of Converse in each instance. Ex. A, ¶¶ 4(b) ("all factories at which Licensee desires to have Licensed Articles manufactured shall be approved in writing by Converse in advance of the placement of any orders"); and 29 ("None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee without the prior written consent of Converse in each instance").  Moreover, under the License Agreement, Ex. A, at ¶ 9(e), Alon agreed: "that it shall not approach any third party factories regarding the production of Footwear Licensed Articles, unless having prior written consent from Converse."[13]  Alon has acknowledged that Converse's right to require advance written consent is absolute.  Letter of Edward Davis, dated April 8, 2005, page 2: "Alon is fully aware that pursuant to the Licensing Agreement, it needs Converse's approval to use the Indular factory."[14]

Alon's threat to go to the Joaneta factory is a threat to appoint new manufacturers and/or sublicensees without Converse's approval.  Obviously terminating

---

[13]  The term "third party factories" means factories not owned by the Licensee and factories not already approved for manufacturing by Converse for itself or another licensee.

[14]  The requirement that Converse approve in writing any new factory or manufacturer, even if such approval is unreasonably withheld, is consistent with Massachusetts caselaw.  In *21 Merchants Row Corp. v. Merchants Row, Inc.*, 412 Mass. 204 (1992), the Massachusetts Supreme Judicial Court held that when a lease required the commercial landlord's consent to a sublease or assignment, the commercial landlord could withhold his consent, even if it was unreasonable to do so.  Like the commercial landlord who has a strong interest in protecting his property (which forms the basis for his ability to withhold consent even if unreasonable), Converse has an equally strong interest in protecting its property (ie, its trademarks).  Accordingly, Converse is completely justified in requiring advance written approval of a new factory or manufacturer, even if it withholds that approval unreasonably.

24

Coopershoes and going to Joaneta (or a like factory) would be the appointment of a new manufacturer without Converse's consent. The appointment of a new manufacturer would be a direct violation of the prohibition in the License Agreement against appointment of new factories without Converse's advance consent, which consent Converse has a right to withhold. Ex. A, ¶ 4(b); Ex. M. In this case, Converse also has good reason to withhold its consent because the Joaneta factory is the very factory that is manufacturing and selling the brand pirate knockoffs of Converse's shoes, under the name of the brand pirate, Artigos.[15] Ex. M, ¶ 3. Also, making an arrangement for either Joaneta or someone else to then sell the shoes would be in the nature of a sublicense because that distributor would need to have the right to sell products with the Converse trademarks. Ex. M, ¶ 2. This would be the appointment of a new sublicensee without Converse's consent. Ex. M, ¶ 2. Appointment of a new sublicensee is extremely dangerous because Converse loses control of its trademark, as with Artigos, and litigation to stop the new sublicensee from using the Converse trademarks could go on for years. Ex. M, ¶ 2. (Converse has already been litigating with Artigos for many years). Ex. M, ¶ 2.

---

[15] In his *Affidavit Regarding the Joaneta Factory* (attached as Ex. M), Chris Laganas explains why it would be devastating to Converse for Joaneta to manufacture Converse-branded footware. Those reasons include, but are not limited to, the fact that appointing Joaneta as manufacturer would also mean that Joaneta is a new sublicensee because Joaneta would be selling the shoes in its own name with its own sales force. Joaneta would be selling Converse's trademarks with no contract between Converse and Joaneta, and, thus, Joaneta would be pirating Converse's brands; Converse would lose control over the quality of the product, the manufacturing conditions, marketing and advertising; and Joaneta has for some time been manufacturing counterfeit Converse brands.

DRS/32913/2/567939v1
05/03/05-BOS/

Alon is also making such threats to appoint new manufacturers and sublicensees knowing that Converse has a long-term contract with Coopershoes which Converse expects to be in place after this Arbitration is concluded.

Alon is threatening to outright violate the contract and become an outlaw, all for the purpose of threatening the business of Coopershoes, and by extension Converse, to force Coopershoes to pay Alon the royalties pending a decision in this Arbitration.

> **b.    Alon in Brazil is Also Sowing Havoc, Confusion and Rumor, to Damage Coopershoes (and By Extension Converse), All in an Effort to Force Alon to be Paid Pending Arbitration.**

As stated in the email of Altamir Breda of May 2, 2005, Alon is sowing havoc and rumor in Brazil to damage the existing manufacturer, Coopershoes. Alon says it will tell the market (the retailers) throughout Brazil that Coopershoes has no right to work with the Converse brand. Ex. N. Alon will deceitfully tell the market that it has terminated Coopershoes. Ex. N. Alon will damage the credibility of the Converse brand with the market in Brazil. Ex. N. There will be confusion in the Brazilian market caused not only by Artigos (the current brand pirate of Converse marks), but now also by Alon. Ex. N; see Ex. M, ¶ 3.

Coopershoes legitimately fears the loss of 1,200 jobs for its factory workers. Also, Coopershoes fears the social harm caused by such lost employment to the surrounding community of Picade Café. Ex. N.

Alon has engaged in all of this activity in an effort to force it to be paid pending the Arbitration.

DRS/32913/2/567939v1
05/03/05-BOS/

c.    **Converse is Entitled to an Injunction to Protect its Damages Remedy, Which Remedy Will Be Lost If the Royalties During the Arbitration are Paid to Alon.**

Injunctions can issue to protect a party's damages remedy. *Teradyne, Inc.*, 797 F.2d at 52-53. In *Teradyne*, the First Circuit Court of Appeals stated:

> a preliminary injunction, designed to freeze the status quo and protect the damages remedy is an appropriate form of relief when it is shown that the defendant is likely to be insolvent at the time of judgment.

*Id.* (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940); *see Unisys Corp. v. Dataware Pruducts, Inc.*, 848 F.2d 311 (1st Cir. 1988) (injunction was necessary to preserve presence of adequate legal remedy); *Micro Networks Corp. v HIGH Hightec, Inc.*, 188 F.Supp.2d 18 (D.Mass.2002) (courts' primary effort is to preserve a damages remedy and to freeze the status quo); *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (injunction warranted if damages will be seriously deficient as a remedy for the harm suffered because the defendant may become insolvent before final judgment can be entered and collected); *Productos Carnic S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980) (even where plaintiff's remedy is limited to damages, injunction may issue to protect that remedy). In order for such an injunction to issue, the moving party has to show the elements for injunctive relief, including an inadequate remedy at law. In *Teradyne*, the First Circuit held that the injunction was necessary because the defendant could not provide adequate assurances that it would be able to pay an adverse judgment to the plaintiff. *Teradyne, Inc.*, 797 F.2d at 53; *see Micro*

27

*Networks Corp.*, 188 F.Supp.2d at 22 (movant must show that it will be unable to recover damages).

Here, Converse's argument is that as of December 31, 2004, its License Agreement with Alon expired of its own terms, it was not renewed, and Converse terminated Alon. As a result, no royalties on sales of Converse-branded shoes or other products after December 31, 2004 are the property of Alon; instead, they are the property of Converse. Therefore, if the royalties paid by Coopershoes into court in the Porto Alegre interpleader action are in fact paid to Alon pending the Arbitration (as Alon wants), those royalties will be unrecoverable (since by Alon's own admission, it is near insolvency). If Converse ultimately prevails in this Arbitration and thus has a direct contractual right to the royalties based upon its relationship with Coopershoes, Converse will be bereft of a remedy.

If the royalties are paid to Alon, Converse in all likelihood will have lost any ability to be paid on its contract claim for royalties it has earned under its current contract with Coopershoes. Alon said at the hearings on April 26th and May 2nd that it was desperate to receive the royalty payments paid into the interpleader action in Porto Alegre. If Alon is as desperate for those funds as it says, then it will not be able to repay those funds if Converse prevails in this matter and the post-December 31, 2004 royalties are the legitimate property of Converse and not Alon. Ex. C, ¶ 14; see Ex. K, ¶ 32-33.

The amount of the funds paid into the interpleader in Porto Alegre over the entire course of this Arbitration through November 2005 (until the Tribunal renders a

28

decision) will total approximately $5.2 million. See Ex. C, ¶ 11-13. That number is based upon a royalty rate paid by Coopershoes in the interpleader of about $475,000 per month, and the timeframe spans from January 2005 through November 2005, for a total of $5.2 million. Ex. C, ¶ 11-13.

Unless the Tribunal grants relief preserving the interpleader funds, Converse's damages remedy with respect to those funds will be lost. Converse will suffer an irremediable loss with respect to its claims of as much as $5.2 million. Thus, the Tribunal should, where Converse has shown a reasonable likelihood of success on the merits, protect Converse's damages remedy by preserving the interpleader funds and not allowing them to be paid to Alon.[16]

> **d.** **Alon's Remedy in This Matter, If It Prevails, Will be Damages and Not Specific Performance; Therefore It Cannot be Awarded Pre-Judgment Specific Performance Whereby It Remains as the Licensee and Receives Payment.**

As discussed above, there is substantial case law holding that specific performance should not be granted where, as here, it would harness parties to work with each other where there was no longer any trust. (*See* II.A., supra, regarding Tribunal's Authority to Issue Enforceable, Interim, Final Orders). Thus, even if Alon prevails in the Arbitration, at most its remedy will be damages, not specific

---

[16] Should this Tribunal order that the monthly royalties be paid to the ICDR and held in escrow, Converse expects that Coopershoes will voluntarily comply, eliminating any potential issue regarding the Tribunal's authority over Coopershoes.

DRS/32913/2/567939v1
05/03/05-BOS/

performance of the License Agreement. It defies logic for Alon to obtain pre-judgment specific performance when it will be unable to obtain it post-judgment.[17]

> e.    **Alon Has Not and Does Not Perform the Work of a Licensee, Coopershoes Does; Therefore Alon Should Not Receive the Royalties and There is No Business Reason to Keep Alon in Place as the Licensee Pending Arbitration.**

Alon has not and does not perform the work of a licensee in Brazil. A licensee of a global shoe brand like Converse must do the following (all of which are specified in the License Agreement): (a) develop products for sale in local markets; (b) develop a marketing plan for such products; (c) purchase advertising for such products; and (d) actually distribute and sell the products through a sales force. Alon has not and does not do any of these things. Ex. E, ¶ 5-10.

In Brazil, all of this activity has been and is performed by Coopershoes. Ex. E, ¶ 5-10. As set forth in the Affidavit of Altamir Breda, President of Coopershoes, Coopershoes performs all of these functions to the almost total exclusion of Alon. First, Coopershoes performs all of the product development for the Brazilian market through its product development manager, Alexander Carlos Zink. Ex. E, ¶ 5. All tooling costs for shoe manufacturing are paid for by Coopershoes. Ex. E, ¶ 5. Second, Coopershoes conducts all of the marketing and promotion of Converse footwear products and Alon has no role. Ex. E, ¶ 7. Third, all of the sales force selling Converse shoes to retailers are contracted to Coopershoes. Ex. E, ¶ 8. Fourth, financial activities including banking and loan arrangements supporting the sale of

---

[17] Recognizing this issue, Alon, through counsel, has indicated that Alon will be amending its claim in this Arbitration to seek a damages remedy.

DRS/32913/2/567939v1
05/03/05-BOS/

Converse shoes in Brazil is handled by Coopershoes. Ex. E, ¶ 9. Fifth, all Converse

footwear manufactured by Coopershoes are owned by Coopershoes and are the

inventory of Coopershoes. Ex. E, ¶ 10.

Since all of the required activity of a licensee in Brazil is performed by

Coopershoes, it would be disruptive and detrimental to maintain Alon as the licensee

pending an Arbitration decision, when it performs no work and would only be acting as

a go-between.

> **f.**  **Alon in Argentina is Making Almost No Sales and is Therefore Damaging the Market, and It Has Attempted to Sell the License Without Converse's Approval.**

Alon has no injunction in force in Argentina compelling Converse to maintain

any claimed contract rights of Alon. Ex. J. Alon is currently making very few sales in

Argentina. Alon has no manufacturer in Argentina. Alon cannot obtain credit from

Coopershoes to buy shoes from Coopershoes and try to re-sell them in Argentina.

Lack of sales in Argentina in the interim means less royalty profits, regardless

of who eventually prevails in this Arbitration.

Alon has tried to sell its license rights in Argentina, which it has absolutely no

right to do. Ex. L.

> **g.**  **In Both Brazil and Argentina There is a Labyrinth of Litigation, Brought and Largely Maintained by Alon, Which Damages Confidence in the Market and In the Sales Effort, All in an Attempt to Force Alon to be Paid Pending Arbitration.**

31

In Brazil there has been litigation before three first instance courts (trial courts) and two appellate courts, and the orders of these courts have swung back and forth. Ex. I.

In the Civil Court of Porto Alegre, in mid-December, 2004, Alon's initial request for an injunction to maintain the License Agreement was denied. Ex. I, page 1. On December 24th, after Alon filed a motion for reconsideration of the denial of the injunction, the court granted it. Ex. I, page 1. Then, on February 24, 2005, after Converse responded to the Civil Court of Porto Alegre, the court revoked the injunction which had kept the License Agreement in place and dismissed the case completely. Ex. I, page 1. Alon filed another motion for reconsideration, which in early March was denied. Ex. I, page 1. Alon filed an immediate interlocutory appeal from the denial of its motion for reconsideration to the Appellate Court of the Rio Grande do Sul (Porto Alegre), which was granted by a single justice on March 18, 2005. Ex. I, page 1; Ex. G. Converse filed a motion for reconsideration of the single justice order, which the single justice referred to a three-judge panel of the Appellate Court. Ex. I, page 1. On April 26th, the three-judge panel upheld the decision of the single justice. Ex. I, page 1. Converse expects to file shortly a further appeal of the decision of the three-judge panel to the Superior Court of Justice of Brazil, which is also known as the third instance court. Ex. I, page 1.

Coopershoes filed in February, 2005 an interpleader suit in the Civil Court of Porto Alegre, seeking authority to pay into court the royalty payments for the months of January and February 2005. Ex. I, page 2. The court permitted payment into court

DRS/32913/2/567939v1
05/03/05-BOS/

for payments for those two months. Ex. I, page 1; Ex. H. Coopershoes filed a second interpleader action in the Civil Court of Porto Alegre to allow it to pay subsequent royalty payments into the court. Ex. I, page 2. The court also allowed payment into court for these later payments.[18] Ex. I, page 2.

In early April, 2005 Alon filed suit for specific performance of contract in the Business Court of Rio de Janeiro, Brazil. Ex. I, page 2. In that action, Alon requested a court order to keep in effect its contract with Coopershoes (which by its terms had expired on December 31, 2004) and to require that Coopershoes make direct payment of the royalties to Alon. Ex. I, page 2. On April 5, 2005 the Rio court granted the injunction sought by Alon ordering that Coopershoes directly pay the monthly royalties to Alon. Ex. H. Coopershoes presented its defense that, among other things, it was already subject to the order of the Civil Court of Porto Alegre to pay the monthly royalties into an interpleader and that Converse was a necessary party to any decision of the court. Ex. I, page 2. The reply of Alon is pending. Ex. I, page 2. Coopershoes has also filed an appeal of the original order of the Business Court of Rio de Janeiro to the Appellate Court of Rio de Janeiro, and a decision of the Appellate Court of Rio de Janeiro is awaited. Ex. I, page 3.

In Argentina, there has been litigation in one first instance court and one appellate court. Ex. J, page 1. On December 30, 2004 the City of Buenos Aires National Commercial Court issued an order in favor of Alon keeping the License

---

[18] Alon's counsel statement to the Tribunal on May 2, 2005 that Coopershoes is under no court order to pay the royalties into court, while technically accurate, is misleading. Coopershoes sought a court order to release its competing obligations to both Converse and Alon. The court granted that order, determining that payments were to be made into court so that Coopershoes' respective obligations to Converse and Alon could be released.

33

Agreement in place for a period of 60 days and ordering that Alon furnish a $300,000 bond for the order to take effect.  Ex. J, page 1.  Alon appealed that order to the appellate court.  Ex. J, page 1.  On March 17, 2005 the appellate court upheld the injunction, extended the 60 day period from the date of the appellate court's decision, but did not reduce the $300,000 bond requirement.  Ex. J, page 1.  On March 23, 2005 Converse filed a presentation seeking to reverse the injunction.  Ex. J, page 1.  On or about April 20, 2005, the appellate court ordered that Alon needed to post the $300,000 bond before it would decide any of the issues pending before it.  Ex. J, page 1.  On April 22nd, at Alon's request, the court granted Alon an extension to post the bond until April 29th.  Ex. J, page 1-2.  The court then further extended the deadline until May 2nd.  Ex. J, page 2.  As of May 2nd Alon has not posted the bond.  Ex. J, page 2.

The numerous actions and seesaw orders have created confusion and doubt in the marketplace and in the sales effort.  There are competing orders as to whether Converse must treat Alon as its licensee.  This is so even though it is undisputed that there is no contract between Converse and Alon setting forth the 2005 royalty rates, minimum guaranteed sales, minimum guaranteed royalties, and the term of the agreement.

All of these judicial proceedings in Brazil and Argentina show that Alon's goal has always been (and continues to be) payment of the royalties to it pending Arbitration.

### C.    This Tribunal's Interim Final Order Subject to Confirmation by the United States District Court Does Not Necessitate (or Amount to) an Anti-Suit Injunction.

DRS/32913/2/567939v1
05/03/05-BOS/

Converse is not seeking any form of an anti-suit injunction. The foregoing arguments show that a duly constituted arbitrator is empowered to issue an interim order to prevent the final award from becoming meaningless. *Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022-23 (9th Cir. 1991) ("[T]emporary equitable relief in arbitration may be essential to preserve assets or enforce performance which, if not preserved or enforced, may render a final award meaningless."). Under Section 9 of the Federal Arbitration Act, a district court is empowered to confirm or vacate a final interim arbitration award. *Id.* at 1023; *see* 9 U.S.C. § 9. The grounds for vacating such an award are extremely limited. *See* 9 U.S.C. § 10. Since the order of the Tribunal binds the parties, it is subject to judicial confirmation; hence, the South American *status quo* injunctions automatically terminate upon the decision of this Tribunal.

## IV.    Conclusion.

For the foregoing reasons, Converse respectfully requests that its *Emergency Motion to Preserve its Damages Remedy and to Rationalize the Litigation* be granted. Specifically, Converse requests that the accompanying *Proposed Order* be adopted by this Tribunal.

DRS/32913/2/567939v1
05/03/05-BOS/

Respectfully submitted,
**CONVERSE INC.**
By its attorneys

Michael C. Gilleran (BBO# 192210)
David P. Russman (BBO# 567796)
Christine N. Parise (BBO# pending)
PEPE & HAZARD LLP
225 Franklin Street
Boston, Massachusetts 02110
(617) 748-5500

Dated: May 3, 2005

36

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION
Case No. 50-133-T-00579-04

| | |
|---|---|
| ALON INTERNATIONAL S.A., | ) |
| | ) |
| Claimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| CONVERSE INC., | ) |
| | ) |
| Respondent. | ) |
| | ) |

**MATERIALS OF CONVERSE IN SUPPORT OF EMERGENCY MOTION
TO PRESERVE DAMAGES REMEDY AND RATIONALIZE LITIGATION**

A.   Manufacturing, Distribution and License Agreement

B.   Affidavit of Timothy Ouellette

C.   Third Affidavit of Chris Laganas

D.   Affidavit of Frank Quijada

E.   Affidavit of Altamir Breda

F.   Chart and Timeline of Litigation of Brazil and Argentina

G.   Decision of Single Justice of Appeals Court of Rio Grande Do Sul, dated
      March 18, 2005

H.   Decision of Commercial Court of Rio De Janeiro, dated April 5, 2005

I.   Reports on lawsuits in Brazil, dated April 29, 2005

J.   Reports on lawsuit in Argentina. dated May 2, 2005

K.     Second Affidavit of Roberto Szerer

L.     Affidavit of Chris Laganas, dated March 31, 2005

M.     Affidavit of Chris Lagana regarding the Joaneta Factory, dated May 3, 2005

N.     Email of Gringo (Altamir Breda) dated May 2, 2005

Respectfully submitted,
CONVERSE INC.
By its attorneys,

Michael C. Gilleran (BBO# 192210)
David P. Russman (BBO# 567796)
Christine N. Parise (BBO# pending)
PEPE & HAZARD LLP
225 Franklin Street
Boston, Massachusetts 02110
(617) 748-5500

Dated: May 3, 2005

MCG/32913/2/567944v1
05/03/05-BOS/

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION
Case No. 50-133-T-00579-04

ALON INTERNATIONAL S.A.,                    )
                                            )
               Claimant,                    )
                                            )
vs.                                         )
                                            )
CONVERSE INC.,                              )
                                            )
               Respondent.                  )
                                            )

## Proposed Interim Final Order

After consideration of all of the Parties' submissions relative to the *Motion of Converse to Preserve its Damages Remedy and to Rationalize the Litigation*, and after hearing, I hereby find and order as follows:

1. The Arbitral Tribunal has authority to issue enforceable, interim final orders that supercede any order of the South American courts;

2. Upon entry of this Order, Converse shall work with Coopershoes under a licensing agreement entered into between them on December 16, 2004;

3. Alon cannot terminate Coopershoes, Converse's selected licensee;

4. Alon cannot engage another manufacturer or licensee (aside from Coopershoes), for the production of Converse's products since Converse has not given its written consent to do so;

5. Alon cannot engage another sublicensee;

6. The royalty payments to date that have been paid into court in Porto Alegre, Brazil, and future royalty payments, shall be paid to the ICDR and held in escrow until further order of the Tribunal.

IT IS SO ORDERED.

_____

Arbitrator

Dated:_____

DRS/32913/2/567951v1
05/03/05-BOS/

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION
Case No. 50-133-T-00579-04

| | |
|---|---|
| ALON INTERNATIONAL S.A., | ) |
| | ) |
| Claimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| CONVERSE INC., | ) |
| | ) |
| Respondent. | ) |
| | ) |

## CERTIFICATE OF SERVICE

I, David Russman, hereby certify that I served a true and accurate copy of the
following documents:

1. Emergency Motion of Converse for An Expedited Decision;
2. Emergency Motion of Converse to Preserve its Damages Remedy and to
   Rationalize the Litigation;
3. Materials of Converse in Support of Emergency Motion to Preserve its Damages
   Remedy and to Rationalize the Litigation;
4. Proposed Interim Final Order,

upon the following persons via email and overnight mail, postage prepaid, on May 3,
2005:

Edwin H. Davis, Jr.
Astigarraga Davis
701 Brickell Avenue
Miami, FL 33131-2847

Eugene A. Theroux, Esq.
Baker & McKenzie LLP
815 Connecticut Avenue N.W.
Washington, DC 20006

David Russman, Esq.

# EXHIBIT B

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION
Case No. 50-133-T-00579-04

|  |  |
|---|---|
| ALON INTERNATIONAL S.A., | ) |
| | ) |
| Claimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| CONVERSE INC., | ) |
| | ) |
| Respondent. | ) |
| | ) |

On this 6th day of May, 2005, submissions in response to the Arbitrator's Order in this case dated May 5, 2005, made by email both by Counsel for the Claimant and by Counsel for the Respondent, have been received, accepted as timely filed (*nun pro tunc* in the case of a submission by the Claimant), and carefully considered by the Arbitrator, following which the following Order is issued.

## **ORDER**

1.     Respondent Converse Inc. ("Converse") has filed a Motion of Converse to Preserve its Damages Remedy and to Rationalize the Litigation ("the Motion"), which in part seeks emergency relief enjoining Claimant Alon International S.A. ("Alon") from engaging a new manufacturer or licensee in South America, as it has reportedly proposed to do by May 5, 2005; and (2) to enjoin Alon from engaging another sublicense.

I now grant the emergency relief sought.  Alon shall be and hereby is restrained and enjoined from taking any action to appoint a new sublicensee and/or manufacturer involving or concerning Converse, Inc. or the products, trademarks or good will of

Converse, Inc., in the territory of Brazil, or otherwise from threatening Coopershoes that Alon will do so, until Alon has filed its brief in response to the Converse Motion to Preserve its Damages Remedy and Rationalize Litigation, and the Arbitrator has rendered a decision on the Motion.

2.     The Claimant will file a response to the Motion by May 17, 2005, and a Hearing on the Motion will be held at 2:00 p.m. on Monday, May 23, 2005 by teleconference.

So Ordered.

_____
Eugene Theroux, Esq.
Arbitrator

Dated: May 6, 2005

MCG/32913/2/568038v1
05/06/05-BOS/

# EXHIBIT C



**International Centre
for Dispute Resolution**

Thomas Ventrone
Vice President

Steve Kim
Assistant Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

May 24, 2005

## VIA FACSIMILE ONLY

Edward M. Davis, Jr., Esq.
Astigarraga Davis
701 Brickell Avenue
16th Floor
Miami, FL 33131

Michael C. Gilleran, Esq.
Pepe & Hazard, LLP
225 Franklin Street, 16th Floor
Boston, MA 02110

Re: 50 133 T 00579 04
    Alon International, S.A.
       vs
    Converse Inc.

Dear Counsel:

After careful review of the comments submitted by the parties and pursuant to our authority under Article 9 of the International Arbitration Rules, the ICDR has determined that the challenge is hereby sustained and Arbitrator Eugene A. Theroux, Esq. is therefore removed.

Please note that all proceedings for the above matter have been suspended until the appointment of the new Arbitrator.

We will proceed to invite the next mutually acceptable Arbitrator from the Arbitrators list that was returned by the Parties. We will confirm the name of the Arbitrator shortly.

Please contact the undersigned should you have any questions.

Sincerely,

Karen Ponce
International Case Manager
212 484 4029
PonceK@adr.org

Sara Matathias
ICDR Team Leader
212 484 4077
MatathiasS@adr.org

*A Division of the American Arbitration Association*

# EXHIBIT D

## Gilleran, Michael

| | |
|---|---|
| **From:** | Theroux, Gene [Gene.Theroux@BAKERNET.com] |
| **Sent:** | Sunday, May 22, 2005 8:15 PM |
| **To:** | Jose Astigarraga |
| **Cc:** | Edward Davis; Cristina Cardenas; Gilleran, Michael; Parise, Christine N.; Russman, David; Paul Capua; Poncek@adr.org |
| **Subject:** | Alon International, S.A. v. Converse, Inc: (Arbitration # 50 133 T 00579 04) |
| **Importance:** | High |

Dear Mr. Astigarraga,

This refers to your May 20, 2005 letter on behalf of your client, Alon International, S.A., the Claimant in this arbitration. Your letter, which I received by email late on Friday afternoon, May 20, 2005, raises a very significant issue.

A copy of your letter is reproduced below for the convenient reference of yourself, Karen Ponce, Esq., the International Case Manager in this arbitration, and others who were also copied on your letter, including Counsel for the Respondent, Converse, Inc. Also reproduced below is a copy of Ms. Ponce's email message of May 20, 2005 on the same subject.

Having completed over the weekend a further check of the Baker & McKenzie's client list, I can confirm your information that Nike, Inc. is a client of Baker & McKenzie.

I have not yet had an opportunity to complete a further conflicts check of additional companies (Cole Haan, Exeter Brands Group, Bauer Nike Hockey, Nike IHM, Inc., Hurley International), as requested by your email message sent in the early evening of Friday, May 20, 2005, and received by me the following morning, May 21st. However, in light of the facts and circumstances outlined in this message, it appears to me that such a further conflicts check may not be warranted.

Mindful of my obligation as an arbitrator for absolute impartiality, and my duty to ensure that no circumstances exist that could create or contribute to any appearance of a want of impartiality on my part, I do very much understand and appreciate the concerns of your client, Alon International, S.A., the Claimant in this arbitration, over the fact that Nike, Inc., the parent company of the Respondent Converse, Inc. in this arbitration, is a client of Baker & McKenzie.

At the time I considered and accepted appointment as sole arbitrator in this case in early April, 2005, I was not aware that Converse, Inc. was a subsidiary of Nike, Inc., and the conflicts checks of Converse, Inc. that I undertook prior to my appointment did not reveal that Converse, Inc. was a subsidiary of Nike, Inc. Likewise, at the time I received and replied to your letter dated April 13, 2005, referred to in your emailed letter received on May 20, 2005, I was not aware that Converse, Inc. was a subsidiary of Nike, Inc.

There are client registrations for Nike, Inc. at various Baker & McKenzie offices throughout the world, although my most recent conflicts check has turned up no such registrations at the Washington Office. In more than 30 years of law practice at Baker & McKenzie, I performed no legal services for Nike, Inc. at the Washington Office where I have been based, or anywhere else in the world. I formally retired as a Partner of Baker & McKenzie on June 30, 2002 . Beginning July 1, 2002, I discontinued all legal work for clients of Baker & McKenzie, and accepted a part-time advisory role as Senior Counsel to the Firm.

In light of the fact that Nike, Inc., the parent company of the Respondent in this arbitration, is a Baker & McKenzie client, and notwithstanding my good faith belief and assurances that I can be fair and impartial as an arbitrator in this case should I continue as arbitrator, and that I am willing to do so, I am also, naturally,

prepared under the circumstances to withdraw forthwith as the arbitrator in this case upon the request of either the Claimant or the Respondent.

I think that Counsel for both sides, and the ICDR, can agree that this issue should be resolved on Monday, May 23, 2005, inasmuch as a resolution may obviate the need for my role in any further proceedings, including the hearing by teleconference that has been schedule for 2:30 p.m. on Tuesday, May 24, 2005.

Should there be a need for selection of a new arbitrator, I sincerely regret inconveniences caused to the parties and their counsel.

Very truly yours,

Gene Theroux

-----Original Message-----
**From:** Karen Ponce [mailto:Poncek@adr.org]
**Sent:** Friday, May 20, 2005 4:39 PM
**To:** Jose Astigarraga; Theroux, Gene
**Cc:** Edward Davis; Cristina Cardenas; Gilleran, Michael; Parise, Christine N.; Russman, David; Paul Capua
**Subject:** RE: Alon International, S.A. v. Converse, Inc: (Arbitration # 50 133 T 00579 04)

Dear Counsel,

This will serve to acknowledge receipt of an electronic mail from Claimant, a copy of which we note was sent to Respondent and the Arbitrator.

This will also serve to advise the Parties of telephone conversation between the ICDR and the Arbitrator, wherein the Arbitrator advised that he is running another conflicts check within his firm and will confirm the results as soon as possible.

Please contact the undersigned should you have any questions.

Regards,

Karen Ponce
International Case Manager
International Centre for Dispute Resolution
The International Division of the American Arbitration Association
1633 Broadway, 10th Floor
New York, NY 10019
USA
+01 (212) 484.4029 (telephone)
+01 (212) 246.7274 (facsimile)
PonceK@adr.org (e-mail)
www.adr.org/ICDR (website)

This e-mail communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the content of this communication to others. Please notify the sender that you have received this e-mail in error by replying to the e-mail or by telephoning 212 484-4181 during the hours of 8:00 A.M.-8:00 P.M. (EST). Please then delete the e-mail and any copies of it. Thank you.

-----Original Message-----
**From:** Jose Astigarraga [mailto:jastigarraga@astidavis.com]
**Sent:** Friday, May 20, 2005 4:23 PM

# EXHIBIT E

**Gilleran, Michael**

| | |
|---|---|
| **From:** | Jose Astigarraga [jastigarraga@astidavis.com] |
| **Sent:** | Tuesday, May 24, 2005 2:09 PM |
| **To:** | Parise, Christine N. |
| **Cc:** | Gilleran, Michael; Russman, David; Paul Capua; Cristina Cardenas; Edward Davis |
| **Subject:** | RE: Alon/ Converse Arbitration |

Dear Ms. Parise:

We received your e-mail of earlier today regarding Mr. Theroux's Order dated May 6, 2005.

We are prepared to discuss the effect that the removal of Mr. Theroux will have on this case in the short-term and, in particular, on the Order of Mr. Theroux dated May 6, 2005 ("Order"). We understand your desire to confirm the effectiveness of that Order pending the appointment of a new arbitrator.

The relief granted by the Order is extraordinary and improper, as Alon demonstrated in its memorandum of law in opposition to Converse's motion to "rationalize," and is of limited duration. In fact, it was set to expire today.

Moreover, we have recently been informed that the Brazilian judge in Porto Alegre presiding over Coopershoes' interpleader deposits has held that such deposits are no longer authorized. Obviously, this new development moots much of the argument and relief requested by Converse in its motion to "rationalize" upon which the Order was based.

That said, Alon makes clear that regardless of whether the Order is or isn't valid, binding, or in effect, it is prepared to agree to abide by the Order thus mooting any need to engage in a legal debate or litigation over the Order pending the appointment of a new arbitrator.

However, what's good for one is good for the other.

Alon would expect that Converse shall abide by the injunction(s) entered against it in Brazil.

While there may be legal questions relating to the continuing effectiveness of Mr. Theroux's order, there is, of course, **_nothing_** that calls into question the validity and effectiveness of the Brazil injunction(s) entered against Converse.

Similarly, we would expect Converse to honor and respect the Brazil court injunctions and orders entered against Coopershoes, and that Converse shall cease and desist from its actions in interfering with such orders and its attempts to induce Coopershoes to violate such orders.

In sum we likewise ask Converse to confirm in writing, just as you have asked Alon to confirm, that it shall uphold and not interfere with the outstanding Brazilian court orders, until such time as such orders are respectively validly overturned or modified, and in particular, that Converse shall rescind any instructions to Coopershoes contrary to the Orders of the courts of Brazil.

Please let us hear from you.


José I. Astigarraga
Astigarraga Davis
701 Brickell Avenue
16th Floor
Miami, Florida 33131
Tel: 305-372-8282
Fax: 305-372-8202
Email: jia@astidavis.com

-----Original Message-----
**From:** Parise, Christine N. [mailto:CPARISE@PepeHazard.com]
**Sent:** Tuesday, May 24, 2005 10:53 AM
**To:** Jose Astigarraga; Edward Davis
**Cc:** Gilleran, Michael; Russman, David; Paul Capua; Cristina Cardenas
**Subject:** Alon/Converse Arbitration

Dear Mr. Astigarraga & Mr. Davis,

As you are well aware, today the ICDR has assented to your challenge to remove Mr. Theroux as the arbitrator in the *Alon vs. Converse* arbitration.

Given that Mr. Theroux is no longer the arbitrator, Converse requests that Alon affirm that it does not intend to violate the Order that Mr. Theroux issued on May 6, 2005 in that Alon agrees to the following:

Alon shall be and hereby is restrained and enjoined from taking any action to appoint a new sublicensee and/or manufacturer involving or concerning Converse, Inc. or the products, trademarks or good will of Converse, Inc., in the territory of Brazil, or otherwise from threatening Coopershoes that Alon will do so, until Alon has filed its brief in response to the Converse Motion to Preserve its Damages Remedy and Rationalize Litigation, and the Arbitrator has rendered a decision on the Motion.

Arbitration Order, May 6, 2005, at # 1 ¶ 2.

The ICDR has indicated that it will promptly select another mutually agreeable arbitrator from our strike and rank lists that had been previously submitted. Evidently, a new hearing to determine the merits of Converse's Motion to Rationalize the Litigation will be scheduled promptly and, therefore, there is no reason why the Order should not remain in place until such hearing will take place and the new arbitrator will have rendered a decision.

We do not expect that the Astigarraga Davis Law Firm will seek to violate the Arbitration Order. As you can understand, however, we must assure our client that this unfortunate set-back in the progress of the arbitration will not result in further disruptive litigation. Converse, therefore, respectfully requests that Alon confirm that it will abide by the Order as indicated above until a new arbitrator has been appointed and has had an opportunity to render a decision on Converse's Motion. Should Alon refuse to enter into such an agreement, or should Alon fail to respond to this correspondence by 3 p.m. today, May 24, 2005; Converse will have no choice other than to file an Emergency Motion in U.S. District Court for the District of Massachusetts to Enforce the Arbitration Order.

Respectfully,

# EXHIBIT F

# EXHIBIT G

**Gilleran, Michael**

*Through the recourse of an instrument of claim to Civil Chamber of the Judical Tribunal it was determined that Converse Inc should abstain from the practice of any act that violates the contractual rights of the companies AIB/ALON, specified in the Licensing Contract signed between the parties.*

*In the 8th Business District in the Capital of the State of Rio de Janiero, the plaintiffs of the Action to Oblige the Completion decided to Not Require the obligation, in an ordinary way, that Judge deferring to the pending action, determined that the company Coopershoes, here a plaintiff, is to suspend any direct obligation to Converse, as well it is determined that Coopershoes should not produce any footwear without direct payments to the companies AIB/ALON of the corresponding royalties as shown in the contract between other determinations.*

*More recently, Coopershoes itself acknowledged that these parties had received an email sent by the North American arbitrator responsible for the arbitration pending between the companies AIB/ALON and Converse, in the sense that AIB/ALON is not able to contract another manufacturer of footwear in Brazil, preserving the exclusivity of Coopershoes, while there is no other arbitral order.*

*In these terms, there is no longer a judicial reason for the plantiffs Coopershoes to continue to deposit the amount of royalties in this interpleader (consignation action). This should be completed, from this point forward, the decision decided in Rio de Janeiro, as I understand it.*

*The deadline for a response is certified in the Accession of Incompetence, return for consideration along with the facts.*

# EXHIBIT H

## Gilleran, Michael

| | |
|---|---|
| **From:** | Jose Astigarraga [jastigarraga@astidavis.com] |
| **Sent:** | Friday, May 20, 2005 4:23 PM |
| **To:** | Karen Ponce; Eugene Theroux (E-mail) |
| **Cc:** | Edward Davis; Cristina Cardenas; Gilleran, Michael; Parise, Christine N.; Russman, David; Paul Capua |
| **Subject:** | RE: Alon International, S.A. v. Converse, Inc: (Arbitration # 50 133 T 00579 04) |

Dear Ms. Ponce:

Pursuant to my conversation with you this afternoon, this will confirm that you authorized me to communicate this message directly to Mr. Theroux, with a copy to the other side.

Dear Mr. Theroux:

We write respectfully to request information regarding an apparent conflict of interest of which we have been become aware.

As you know, our client, the Claimant, Alon International, S.A. ("Alon") has brought this proceeding against the Respondent, Converse, Inc.  Converse is owned 100% by Nike, Inc.  Any award rendered in this dispute between Alon and Converse will invariably affect Nike, and Nike is involved in the facts of the case.

By letter dated April 13, 2005, Alon asked the AAA/ICDR whether your disclosure revealed any conflicts.  On April 14, 2005, the AAA/ICDR advised the parties that no potential conflicts had been identified.

We are informed that Nike, Converse's owner, is a client of Baker & McKenzie.  As you might appreciate, that naturally raises a concern on Alon's part.

Alon respectfully requests that you inform us of all pertinent information in that regard, including whether Baker & McKenzie has represented Nike or any of Nike's subsidiaries.

Given the significance of the matter, Alon respectfully requests that no further action be taken on any of the currently pending matters until the matter has been addressed and resolved.

We thank you in advance for your prompt attention to this matter.

Jose Astigarraga