UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CONVERSE INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. NO. 04-12591-PBS |
| | ) | |
| vs. | ) | |
| | ) | |
| ALON INTERNATIONAL S.A., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CONVERSE INC.'S EMERGENCY MOTION
## TO ENFORCE THE INTERIM FINAL ARBITRATION ORDER
## PENDING APPOINTMENT AND DECISION BY NEW ARBITRATOR

### Introduction

Now comes the Plaintiff, Converse, Inc. ("Converse") and respectfully files this *Emergency Motion*[1], which seeks to enforce the interim, final order of the first, mutually selected Arbitrator dated May 6, 2005 (the "Standstill Order").[2] The Standstill Order enjoins and restrains the Defendant, Alon International, S.A. ("Alon") from taking action to appoint a new sublicensee and/or manufacturer involving Converse, or the products, trademarks or good will of Converse, in the territory of Brazil or otherwise threatening Coopershoes (the current manufacturer) that Alon will do so, pending a further decision by the arbitrator.

---

[1] On May 25, 2005, Converse filed an *Emergency Motion to Protect Arbitrator Authority to Preserve Converse's Damages Remedy*. That Emergency Motion is pending.

[2] A true and accurate copy of the Standstill Order along with the cover email from the International Centre for Dispute Resolution (the "ICDR") is attached hereto as Exhibit 1. The copy that is attached is not executed, but it is the exact order that was in fact forwarded to the parties from the ICDR.

As more fully discussed below, upon receipt of the ICDR's decision to accept Alon's challenge to the arbitrator, Converse immediately sought Alon's assurance that it would not violate the Standstill Order until a new arbitrator could be appointed and render a decision on Converse's pending Motion to Rationalize (defined below) the litigation taking place in South America. (A copy of the email is attached hereto as Exhibit 2.) Alon responded stating that it would only agree not to violate the Standstill Order if Converse agreed not to interfere in Alon's relationship with Coopershoes in South America. (A copy of the email that contains Alon's response is attached hereto as Exhibit 3.) On May 25, 2005 in a telephone conversation with Alon's local counsel Cynthia Vreeland, Converse stated that it would not agree to condition the Arbitrator's *unconditional* Standstill Order in accord with Alon's offer. Ms. Vreeland indicated that she would communicate Converse's position to Alon's counsel at Astigarraga Davis. Converse has not received any response or assurance from Alon that it will not violate the Arbitrator's Standstill Order.

## Relevant Factual and Procedural Background[3]

### *The License Agreement and the Parties' Respective Positions*

On September 1, 2001, Converse and Alon entered into a Manufacturing, Distribution and License Agreement (the "License Agreement"), attached as Exhibit 4. The License Agreement, at ¶ 3, granted Alon the right to use the trademarks of Converse for the sale of approved Converse products ("Licensed Products") to be sold

---

[3] The facts set forth in this section are taken from affidavits that are already before this Court, in support of Converse's *Opposition to Alon International S.A.'s Emergency Motion for a Preliminary Injunction.* Accordingly, they are not reproduced here. Similarly, the exhibits referenced in this section are the exhibits that are contained in the materials submitted with Converse's *Opposition to Alon International S.A.'s Emergency Motion for a Preliminary Injunction.*

in Brazil, Argentina, Paraguay and Uruguay. In return, Alon agreed to pay Converse a percentage of its net sales as a royalty, with guaranteed minimum sales and guaranteed minimum royalties. ¶ 15. The term of the Agreement was September 1, 2001 - December 31, 2004. ¶ 1(a).

Paragraph 2 of the License Agreement contained a conditional option for Alon to renew:

> Licensee may renew this Agreement for an additional term of three (3) years ("Option Years" which may collectively be referred to as "Option Period") provided Licensee exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that Licensee has not breached any of the terms and conditions of this Agreement.

### The Various Lawsuits and the Arbitration

A dispute arose as to whether the License Agreement was renewed and as to whether Alon breached the License Agreement. Alon brought suit in Brazil and Argentina seeking, amongst other things, to keep the License Agreement in place, despite Converse's position that it had expired and Converse had terminated it.

On or about December 10, 2004, Converse commenced this action and sought, amongst other things, to enjoin the Brazil and Argentina actions. On January 13, 2005, this Court denied that motion. Further, on or about December 16, 2004, Alon filed a Notice of Arbitration and Statement of Claim, commencing the arbitration (AAA, International Division, Case No. 50-133-T-00579-04). Thereafter, both Alon and Converse agreed upon Eugene Theroux, Esq., as Arbitrator, and he was formally appointed on or about April 1, 2005.

The arbitration is on an accelerated timeline, with discovery already underway and a hearing date scheduled for October 2005. Further, the Arbitrator has been called upon by the parties to resolve issues that have arisen during the course of the arbitration.

### The Motion to Rationalize, the Standstill Order, and Alon's Motion to Disqualify the Arbitrator

On or about May 3, 2005, Converse filed an *Emergency Motion to Preserve its Damages Remedy and to Rationalize the Litigation* ("Motion to Rationalize"). Amongst other things, in the Motion to Rationalize Converse sought to enjoin Alon from engaging another manufacturer or licensee or sublicensee (aside from Converse's current licensee, Coopershoes) for the production of Converse's products.[4] Since Alon was threatening to engage another manufacturer or licensee or sublicensee immediately, Converse sought the injunction in the Motion to Rationalize on an emergency basis. On May 6, 2005, the Arbitrator issued the Standstill Order, effectively granting the injunction until "Alon has filed its brief in response to the [Motion to Rationalize] and the Arbitrator has rendered a decision on the Motion." A hearing on the Motion to Rationalize was scheduled for May 24, 2005.

Then, late in the day on Friday, May 20, 2005, for the first time, Alon raised the issue of a purported conflict of interest on the Arbitrator's behalf based upon the fact that the Arbitrator's firm, Baker & McKenzie, has done legal work for Nike, Inc., Converse's parent. Despite the fact that the Arbitrator stated that he has been and could remain impartial; despite the fact that the Arbitrator retired as a partner from Baker &

---

[4] A true and accurate copy of the Motion to Rationalize is attached hereto as Exhibit 5.

McKenzie on June 30, 2002; despite the fact that in 30 years of practice the Arbitrator never worked on a Nike matter; despite the fact that Nike is not a party to the arbitration and a parent and subsidiary are different clients for conflicts purposes; and despite the fact that Alon was raising the issue months after the Arbitrator was appointed and after the Arbitrator rendered a decision adverse to Alon; the Arbitrator withdraw from the arbitration on May 24, 2005.  A new arbitrator has yet to be appointed.

Converse is now fearful that Alon will take advantage of the absence of an arbitrator and disregard the Standstill Order.  Further, to justify its disregard of the Standstill Order, Converse expects Alon to try to argue that the Standstill Order is somehow void *ab initio*.  Accordingly, through this Motion, Converse seeks an Order declaring the Standstill Order an enforceable order of this Court.

## ARGUMENT

I.    **This Court has authority to enforce an Arbitration Award.**

Pursuant to Section 9 of the Federal Arbitration Act ("FAA"), "any party to the arbitration may apply to [this Court] ... for an order confirming the award, and thereupon [this Court] *must* grant such an order unless the award is vacated, modified, or corrected as prescribed in Section 10." 9 U.S.C.A. § 9.  Section 10 permits a court to vacate an arbitration award *only in very rare circumstances* such as where the award was procured by corruption, fraud, or undue means or where there was evident partiality in the arbitrator or where the arbitrator is guilty of misconduct such that the rights of a party have been prejudiced or where the arbitrator exceeded his power.

*Wonderland Greyhound Park, Inc. v. Autotote Systems, Inc.*, 274 F.3d 34, 35 (1st Cir. 2001); *Bull HN Info. Sys., Inc. v. Hutson*, 229 F.3d 321, 330 (1st Cir.2000); *see* 9 U.S.C. § 10 (2000). An arbitration award may also be vacated when it is rendered in manifest disregard of the law presupposing "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand and apply the law." *Sperry Int'l Trade*, 689 F.2d at 304-305 (internal citations omitted); *also Wonderland Greyhound Park, Inc.*, 274 F.3d at 35.

It is "beyond cavil" that the judiciary's role in arbitration is limited when it is reviewing a final arbitral award such as the interim final Standstill Order. *E.g. Sperry Int'l Trade*, 689 F.2d at 304; *also Wonderland Greyhound Park, Inc.*, 274 F.3d at 35 ("Judicial review of the arbitrator's decision is extremely narrow and exceedingly deferential."), *citing Bull HN Info. Sys., Inc.*, 229 F.3d at 330. The First Circuit has recently held that "[a]n arbitrator's award must be enforced if it is in any way plausible, *even if [the court] think[s][the arbitrator] committed serious error.*" *Gupta v. Cisco Sys., Inc.*, 274 F.3d 1, 3 (1st Cir.2001) (emphasis added).

a.    **The Standstill Order is an Interim Final Arbitration Order and is, therefore, subject to this Court's enforcement power.**

An arbitrator's interim order, even though temporary in nature, is recognized as a *final* arbitral award that is enforceable by this Court. *Publics Communication v. True North Communications, Inc.*, 206 F.3d 725, 729 (7th Cir. 2000); *Pacific Reinsurance Mgmt. Corp.*, 935 F.2d at 1022-23 ("Courts that have been faced with arbitrators' temporary equitable awards have not characterized them as non-final awards on the merits which can only be reviewed in extreme cases. Rather, they have characterized

them as confirmable, *final* awards on an issue distinct from the controversy on the merits." (emphasis in the original)); *Island Creek Coal Sales Co.*, 729 F.2d at 1049; *Sperry Int'l Trade v. Israel*, 689 F.2d 301, 304 n.3 (2nd Cir. 1982) (not considering the issue itself, but noting that the district court confirmed the interim order as a final award and was subject to confirmation by the appeals court); *also see Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 233-234 (1st Cir. 2001) (confirming an interim award and though the court confines its holding to the facts of the case it notes its general agreement with the "several circuits" permitting confirmation of an interim award).

Courts have determined that the type of interim arbitration order that is subject to judicial enforcement includes those that are separate, discrete, independent and severable. *Pacific Reinsurance Mgmt. Corp.*, 935 F.2d at 1022-23 (enforcing an interim final order creating an escrow account to hold disputed funds whose proper distribution is dependent upon a determination as to the validity of an agreement); *Island Creek Coal Sales Co.*, 729 F.2d at 1049 (enforcing an interim final order requiring a party to perform the contract pending the outcome of the arbitration proceedings).[5]

---

[5] In fact, at the hearing before this Court on Convere's Motion to Dismiss the South American injunction actions, Alon stated, "[p]ursuant to the AAA Rules, therefore, a party 'may request an [interim] measure from *any court* with jurisdiction over the dispute' prior to the selection of an arbitrator(s). (emphasis added). George Marchac, *Interim Measures in International Commercial Arbitration Under the ICC, AAA, LCIA and UNCINTRAL Rules*, 10 Am. Rev. Int'l Arb. 123, 125, 135 (1999) (Interim relief 'may not be available from the arbitrators because the tribunal is not yet constituted .... In such situations, only local courts may grant such measures, assuming that they have the appropriate jurisdiction.').... Brazilian and Argentine courts have jurisdiction to grant status quo injunction in this case. ... As the arbitral process was commenced just two weeks ago there currently is no arbitrator appointed."

The Standstill Order pertains to a separate, discrete and severable issue requiring that Alon refrain from terminating Coopershoees as their exclusive licensee in South America and, further requiring that Alon refrain from appointing any other manufacturer, distributor or sublicense without Converse's approval for a definite period of time until the Arbitrator has had an opportunity to render a decision on Converse's Motion currently pending before the ICDR. The Standstill Order is distinct from the controversy on the merits and effectively prevents either party from taking any action in relation to the parties' licensing relationship that would result in diminishing either party's damage remedy.

Converse was obliged to seek such relief, notwithstanding the *status quo* injunctions that are currently in force in South America, when Alon choose to selectively construe the *status quo* injunctions as applicable to Converse and Coopershoes, but inapplicable to Alon. Accordingly, on the eve of the issuance of the Standstill Order, Alon continued to threaten Coopershoes that if Coopershoes did not pay Alon certain royalty payments – the same royalty payments that Coopershoes was legally paying into a court in Brazil – Alon would terminate Coopershoes as its sublicensee and appoint a new entity to take over Coopershoes's business. Such threats are presumptively in violation of the *status quo* order in Brazil both because Coopershoes' relationship to Alon is part of the *status quo* and any appointment of a new distributor, manufacturer or sublicensee without Converse's approval is in further breach of the Licensing Agreement, which Alon maintains is still effective. Because the Arbitrator was duly appointed, it was the proper forum from which to seek relief.

Converse's requested relief was granted in the form of a final interim final order that expressly remains in effect until a decision is rendered by the Arbitrator.

**II.    This Court *must* enforce the Standstill Order because Alon cannot show any grounds for vacating the Interim Final Order.**

  **a.    The first-selected arbitrator had authority to issue the Standstill Order.**

Procedural rules governing the arbitration provide for interim measures of protection that unequivocally empower arbitrators to order interim equitable relief. *E.g. Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022-23 (9th Cir. 1991) (affirming an interim order pursuant to the AAA Commercial Arbitration Rules requiring a party to place a sum of money in escrow pending the arbitrator's decision concerning the validity of certain agreements); *Island Creek Coal Sales Company v. City of Gainsville*, 729 F.2d 1046, 1049 (6th Cir. 1984) (abrogated on different grounds) (affirming an interim order pursuant to the AAA Commercial Arbitration Rules requiring a party to perform its contract during the pendency of the arbitration proceedings); *see also CRS Sirrine Engineers, Inc. v. AETNA Casualty and Surety Co.*, 1997 WL 136335 * 3 (D.Mass. Feb. 24, 1997) (finding that the procedures governing arbitration issues were governed by the AAA Rules referenced by the parties in their arbitration agreement); *Charles Construction Co. v. Derderian*, 412 Mass. 14, 18-19 (Mass. 1992) ("Parties agreeing to arbitration implicitly intended that the arbitration not be fruitless and that interim orders to preserve the *status quo* or to make meaningful relief possible would be proper. In such a circumstance, the arbitrator's authority to act would reasonably be implied from the agreement to arbitrate itself.").

Article 21 of the International Dispute Resolution Procedures ("International Rules"), which govern the arbitration, provide that the arbitrator "may take whatever interim measures it deems necessary, including injunctive relief and measures for the protection or conservation of property." Article 21 thus explicitly grants the Arbitrator broad power to issue injunctive relief. *See Interim Measures in International Commercial Arbitration under the ICC, AAA, LCIA AND UNCITRAL Rules*, 10 AM. REV. INT'L ARB. 123, 128 (noting that the International Rules provide for *any* measure of injunctive relief, "without any express reference to the subject matter of the dispute"); *compare Charles Construction Co.,* 412 Mass. at 18-19 (refusing to allow arbitrator to issue interim measure for security of a breach of contract claim where construction industry arbitration rules refer only to the property that is the subject matter of the arbitration; noting that if the AAA wished to permit broader preliminary powers the rules would not have been drafted narrowly).

**b.    The first-selected arbitrator was not evidently partial when he issued the                    Standstill Order.**

Even if Alon is correct and the Arbitrator was partial (which Converse disputes), more than mere partiality alone is required to vacate the order. Rather, Alon must show that the Arbitrator displayed "evident partiality." 9 U.S.C.A. § 10(2). Alon cannot meet that burden.

The First Circuit Court of Appeals has stated:

> Under the FAA, an arbitral award may be vacated on grounds of "evident partiality" of the arbitrators. . . . Evident partiality is more than just the appearance of possible bias. Rather, evident partiality means a situation in which a "reasonable person would have to conclude that an arbitrator was partial to one party to an arbitration."

*JCI Communications, Inc. v. International Broth. of Elec. Workers*, 324 F.3d 42, 51 (1st Cir. 2003). "There must be some actual evidence of bias." *Nationwide Mut. Ins. Co. v. First State Ins. Co.* 213 F.Supp.2d 10, 17 (D. Mass. 2002); *see Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 626 (6th Cir. 2002) ("The alleged partiality must be direct, definite, and capable of demonstration, and the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator").[6]

The Fourth Circuit has stated that a court should examine four factors to determine if the challenging party has shown evident partiality:

> (1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceeding; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship and the arbitration proceeding; and (4) the proximity in time between the relationship and the arbitration proceedings.

*See ANR Coal Co.*, 173 F.3d at 500. The burden is on the party challenging the award, and the burden is onerous. *Id.* Here, there is no way that Alon can meet that burden.

As detailed in the email exchanges among the parties and the Arbitrator dated May 20, 2005 through May 23, 2005 (a true and accurate copy of which is attached hereto as Exhibit 6), the Arbitrator's connection to Converse was tenuous, at best. Baker & McKenzie, the Arbitrator's prior place of employment from which he had retired on June 30, 2002, had performed legal services for Nike, which is not a party to the arbitration but rather is Converse's parent and a separate legal entity. *See Six West Retail Acquisition Inc. v. Sony Theatre Management Corp.*, 2003 WL 282187

---

[6] Even if the Arbitrator somehow violated the ICDR rules, which he did not, such a violation would not give this court license to vacate the award. Rather, the only bases to vacate an arbitral award are those articulated in the FAA. See *ANR Coal Co. v. Cogentrix of North Carolina, Inc.*, 173 F.3d 493, 499 (4th Cir. 1999).

(S.D.N.Y.), aff'd 2005 WL 714747 (2d Cir. 2005) ("for conflict purposes, representation of one corporate affiliate does not necessarily constitute representation of that entity's parent, subsidiary or sister corporation").[7] For the duration of his entire thirty year career with Baker & McKenzie, the Arbitrator had never worked on a Nike matter. Such a remote connection, if even a connection at all, cannot rise to the level of evident impartiality.[8]

In light of the remoteness of the Arbitrator's connection to Converse, there was no partiality, let alone direct and definite partiality. *See Al-Harbi v. Citibank N.A.*, 85 F.3d 680 (D.C. Cir. 1996) (no evident partiality when arbitrator's former law firm had represented one party on unrelated matters and arbitrator did not know of the representation at time of arbitration); *United States Wrestling Federation v. Wrestling Division of AAU, Inc.* 605 F.2d 313 (7th Cir. 1979) (upholding award even though neutral failed to disclose relationship of his law firm with one of the parties); *see also Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, 690 F.2d 1157 (5th Cir. 1982) (district judge did not need to disqualify himself from a case where the defendant was a corporation that the judge had represented in private practice six years earlier).

---

[7] In *Six West*, the Judge's husband's law firm represented Sony Music Entertainment Inc. and Sony Computer Entertainment Inc., while the defendant in the case was Sony Theatre Management Corp., corporate affiliates. In addition to finding no conflict, the Judge also found that the plaintiff was judge-shopping, based upon the timing of the motion to recuse and based upon the fact that the Judge had issued rulings that were adverse to the plaintiff. Despite the similarity between this matter and *Six West*, the ICDR accepted Alon's challenge to the Arbitrator.

[8] The fact that the Arbitrator withdrew should be enough to overcome any suggestion that he was partial towards Converse. Rather, if he were in fact partial, he would have remained in the arbitration to aid Converse.

## Certification

Pursuant to Local Rule 7.1(A)(2), counsel for Converse has contacted counsel for Alon in an effort to resolve the dispute that is the subject of this motion, to no avail.

## Conclusion

Since the Standstill Order is an enforceable, interim final order, and since there is no question that the Arbitrator did not offend any of the grounds upon which this Court may vacate the arbitration award, this Court must order that the Standstill Order remain in effect, consistent with its terms, until further order of this Court or further order of the second-selected arbitrator.

Respectfully submitted,
**CONVERSE INC.**
By its attorneys,

/s/ David P. Russman

Michael C. Gilleran (BBO# 192210)
David P. Russman (BBO# 567796)
Christine N. Parise (BBO# pending)
PEPE & HAZARD LLP
225 Franklin Street
Boston, Massachusetts 02110
(617) 748-5500

Dated: May 26, 2005

## Certificate of Service

I hereby certify that I have today served the above motion upon counsel for the opposing party by electronic means.

/s/ David P. Russman

David P. Russman

Dated:  May 26, 2005

**Exhibit 1**

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION
Case No. 50-133-T-00579-04

|  |  |
|---|---|
| ALON INTERNATIONAL S.A., | ) ) ) |
| Claimant, | ) ) ) |
| vs. | ) ) |
| CONVERSE INC., | ) ) |
| Respondent. | ) ) ) ) |

On this 6th day of May, 2005, submissions in response to the Arbitrator's Order in this case dated May 5, 2005, made by email both by Counsel for the Claimant and by Counsel for the Respondent, have been received, accepted as timely filed (*nun pro tunc* in the case of a submission by the Claimant), and carefully considered by the Arbitrator, following which the following Order is issued.

## ORDER

1.    Respondent Converse Inc. ("Converse") has filed a Motion of Converse to Preserve its Damages Remedy and to Rationalize the Litigation ("the Motion"), which in part seeks emergency relief enjoining Claimant Alon International S.A. ("Alon") from engaging a new manufacturer or licensee in South America, as it has reportedly proposed to do by May 5, 2005; and (2) to enjoin Alon from engaging another sublicense.

I now grant the emergency relief sought. Alon shall be and hereby is restrained and enjoined from taking any action to appoint a new sublicensee and/or manufacturer involving or concerning Converse, Inc. or the products, trademarks or good will of

Converse, Inc., in the territory of Brazil, or otherwise from threatening Coopershoes that Alon will do so, until Alon has filed its brief in response to the Converse Motion to Preserve its Damages Remedy and Rationalize Litigation, and the Arbitrator has rendered a decision on the Motion.

      2.    The Claimant will file a response to the Motion by May 17, 2005, and a Hearing on the Motion will be held at 2:00 p.m. on Monday, May 23, 2005 by teleconference.

      So Ordered.

_____

Eugene Theroux, Esq.

Arbitrator

Dated: May 6, 2005

MCG/32913/2/568038v1
05/06/05-BOS/

## Parise, Christine N.

| | |
|---|---|
| **From:** | Karen Ponce [Poncek@adr.org] |
| **Sent:** | Friday, May 06, 2005 2:39 PM |
| **To:** | Theroux, Gene |
| **Cc:** | Edward Davis; Cristina Cardenas; Jose Astigarraga; Russman, David; Parise, Christine N.; Gilleran, Michael; Paul Capua |

**Subject:** Alon International, S.A. v. Converse, Inc: (Arbitration # 50 133 T 00579 04)

Dear Counsel,

This will serve to acknowledge receipt on May 6, 2005 of the Arbitrator's Order of same date, a copy of which is set forth below for the Parties' review.

Per the Arbitrator's Order, a conference call for the above matter has been scheduled for **May 23, 2005** at **2:00 PM Eastern**.

The call will be initiated by Conference America. Should you need to dial in to said call, please use the following phone number and security code: (877) 270-2157, Ponce.

Please contact the undersigned should you have any questions.

Karen Ponce
International Case Manager
International Centre for Dispute Resolution
The International Division of the American Arbitration Association
1633 Broadway, 10th Floor
New York, NY 10019
USA
+01 (212) 484.4029 (telephone)
+01 (212) 246.7274 (facsimile)
PonceK@adr.org (e-mail)
www.adr.org/ICDR (website)
This e-mail communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the content of this communication to others. Please notify the sender that you have received this e-mail in error by replying to the e-mail or by telephoning 212 484-4181 during the hours of 8:00 A.M.-8:00 P.M. (EST). Please then delete the e-mail and any copies of it. Thank you.

**Exhibit 2**

## Russman, David

**From:**    Parise, Christine N.
**Sent:**    Tuesday, May 24, 2005 10:53 AM
**To:**    Jose Astigarraga; Edward Davis
**Cc:**    Gilleran, Michael; Russman, David; Paul Capua; Cristina Cardenas
**Subject:** Alon/Converse Arbitration

Dear Mr. Astigarraga & Mr. Davis,

As you are well aware, today the ICDR has assented to your challenge to remove Mr. Theroux as the arbitrator in the *Alon vs. Converse* arbitration.

Given that Mr. Theroux is no longer the arbitrator, Converse requests that Alon affirm that it does not intend to violate the Order that Mr. Theroux issued on May 6, 2005 in that Alon agrees to the following:

> Alon shall be and hereby is restrained and enjoined from taking any action to appoint a new sublicensee and/or manufacturer involving or concerning Converse, Inc. or the products, trademarks or good will of Converse, Inc., in the territory of Brazil, or otherwise from threatening Coopershoes that Alon will do so, until Alon has filed its brief in response to the Converse Motion to Preserve its Damages Remedy and Rationalize Litigation, and the Arbitrator has rendered a decision on the Motion.

Arbitration Order, May 6, 2005, at # 1 ¶ 2.

The ICDR has indicated that it will promptly select another mutually agreeable arbitrator from our strike and rank lists that had been previously submitted. Evidently, a new hearing to determine the merits of Converse's Motion to Rationalize the Litigation will be scheduled promptly and, therefore, there is no reason why the Order should not remain in place until such hearing will take place and the new arbitrator will have rendered a decision.

We do not expect that the Astigarraga Davis Law Firm will seek to violate the Arbitration Order. As you can understand, however, we must assure our client that this unfortunate set-back in the progress of the arbitration will not result in further disruptive litigation. Converse, therefore, respectfully requests that Alon confirm that it will abide by the Order as indicated above until a new arbitrator has been appointed and has had an opportunity to render a decision on Converse's Motion. Should Alon refuse to enter into such an agreement, or should Alon fail to respond to this correspondence by 3 p.m. today, May 24, 2005; Converse will have no choice other than to file an Emergency Motion in U.S. District Court for the District of Massachusetts to Enforce the Arbitration Order.

Respectfully,

Christine N. Parise, Esq.
Pepe & Hazard LLP

225 Franklin Street; 16th Floor
Boston, MA 02110
Ph.617.748.5583
Fax.617.748.5555
************************************************************

THE INFORMATION CONTAINED IN THIS ELECTRONIC MESSAGE AND ANY ATTACHED DOCUMENT(S) IS INTENDED ONLY FOR THE
PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS NAMED ABOVE. THIS MESSAGE MAY BE AN ATTORNEY-
CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE
INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, AND THAT ANY
REVIEW, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (860) 522-5175 OR BY ELECTRONIC MAIL
(postmaster@pepehazard.com) IMMEDIATELY. THANK YOU.

**Exhibit 3**

## Russman, David

| | |
|---|---|
| **From:** | Jose Astigarraga [jastigarraga@astidavis.com] |
| **Sent:** | Tuesday, May 24, 2005 2:09 PM |
| **To:** | Parise, Christine N. |
| **Cc:** | Gilleran, Michael; Russman, David; Paul Capua; Cristina Cardenas; Edward Davis |
| **Subject:** | RE: Alon/ Converse Arbitration |

Dear Ms. Parise:

We received your e-mail of earlier today regarding Mr. Theroux's Order dated May 6, 2005.

We are prepared to discuss the effect that the removal of Mr. Theroux will have on this case in the short-term and, in particular, on the Order of Mr. Theroux dated May 6, 2005 ("Order"). We understand your desire to confirm the effectiveness of that Order pending the appointment of a new arbitrator.

The relief granted by the Order is extraordinary and improper, as Alon demonstrated in its memorandum of law in opposition to Converse's motion to "rationalize," and is of limited duration. In fact, it was set to expire today.

Moreover, we have recently been informed that the Brazilian judge in Porto Alegre presiding over Coopershoes' interpleader deposits has held that such deposits are no longer authorized. Obviously, this new development moots much of the argument and relief requested by Converse in its motion to "rationalize" upon which the Order was based.

That said, Alon makes clear that regardless of whether the Order is or isn't valid, binding, or in effect, it is prepared to agree to abide by the Order thus mooting any need to engage in a legal debate or litigation over the Order pending the appointment of a new arbitrator.

However, what's good for one is good for the other.

Alon would expect that Converse shall abide by the injunction(s) entered against it in Brazil.

While there may be legal questions relating to the continuing effectiveness of Mr. Theroux's order, there is, of course, ***nothing*** that calls into question the validity and effectiveness of the Brazil injunction(s) entered against Converse.

5/26/2005

Similarly, we would expect Converse to honor and respect the Brazil court injunctions and orders entered against Coopershoes, and that Converse shall cease and desist from its actions in interfering with such orders and its attempts to induce Coopershoes to violate such orders.

In sum we likewise ask Converse to confirm in writing, just as you have asked Alon to confirm, that it shall uphold and not interfere with the outstanding Brazilian court orders, until such time as such orders are respectively validly overturned or modified, and in particular, that Converse shall rescind any instructions to Coopershoes contrary to the Orders of the courts of Brazil.

Please let us hear from you.

José I. Astigarraga
Astigarraga Davis
701 Brickell Avenue
16th Floor
Miami, Florida 33131
Tel: 305-372-8282
Fax: 305-372-8202
Email: jia@astidavis.com

-----Original Message-----
**From:** Parise, Christine N. [mailto:CPARISE@PepeHazard.com]
**Sent:** Tuesday, May 24, 2005 10:53 AM
**To:** Jose Astigarraga; Edward Davis
**Cc:** Gilleran, Michael; Russman, David; Paul Capua; Cristina Cardenas
**Subject:** Alon/Converse Arbitration

Dear Mr. Astigarraga & Mr. Davis,

As you are well aware, today the ICDR has assented to your challenge to remove Mr. Theroux as the arbitrator in the *Alon vs. Converse* arbitration.

Given that Mr. Theroux is no longer the arbitrator, Converse requests that Alon affirm that it does not intend to violate the Order that Mr. Theroux issued on May 6, 2005 in that Alon agrees to the following:

Alon shall be and hereby is restrained and enjoined from taking any action to appoint a new sublicensee and/or manufacturer involving or concerning Converse, Inc. or the products, trademarks and/or good will of Converse, Inc., in the territory of Brazil, or otherwise from threatening Coopershoes that Alon will do so, until Alon has filed its brief in response to the Converse Motion to Preserve its Damages Remedy and Rationalize Litigation, and the Arbitrator has rendered a decision on the Motion.

Arbitration Order, May 6, 2005, at # 1 ¶ 2.

The ICDR has indicated that it will promptly select another mutually agreeable arbitrator from our strike and rank lists that had been previously submitted. Evidently, a new hearing to determine the merits of Converse's Motion to Rationalize the Litigation will be scheduled promptly and, therefore, there is no reason why the Order should not remain in place until such hearing will take place and the new arbitrator will have rendered a decision.

We do not expect that the Astigarraga Davis Law Firm will seek to violate the Arbitration Order. As you can understand, however, we must assure our client that this unfortunate set-back in the progress of the arbitration will not result in further disruptive litigation. Converse, therefore, respectfully requests that Alon confirm that it will abide by the Order as indicated above until a new arbitrator has been appointed and has had an opportunity to render a decision on Converse's Motion. Should Alon refuse to enter into such an agreement, or should Alon fail to respond to this correspondence by 3 p.m. today, May 24, 2005; Converse will have no choice other than to file an Emergency Motion in U.S. District Court for the District of Massachusetts to Enforce the Arbitration Order.

Respectfully,


Christine N. Parise, Esq.
Pepe & Hazard LLP
225 Franklin Street; 16th Floor
Boston, MA 02110
Ph.617.748.5583
Fax.617.748.5555
**************************************************

THE INFORMATION CONTAINED IN THIS ELECTRONIC MESSAGE AND ANY ATTACHED DOCUMENT(S) IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS NAMED ABOVE. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (860) 522-5175 OR BY ELECTRONIC MAIL (postmaster@pepehazard.com) IMMEDIATELY. THANK YOU.

**Exhibit 4**

02/14/02

# MANUFACTURING, DISTRIBUTION AND LICENSE AGREEMENT

BETWEEN

CONVERSE INC.

and

ALON INTERNATIONAL S.A.

## Table of Contents

I.   INTRODUCTION
1.   Definitions _____ 5
2.   Term of Agreement _____ 6

II.  GRANT OF LICENSE
3.   License _____ 7

III. LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES
4.   Use of Converse Marks _____ 9
5.   Quality Assurance _____ 11
6.   Licensee's Use of Converse Information and Advice ___ 12
7.   Licensee Sales Program _____ 12
8.   Distribution _____ 14
9.   Licensee's Use of Converse Factories _____ 15
10.  Exportation _____ 17
11.  Government Approval _____ 17

IV.  CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES
12.  Responsibility of Converse _____ 17
13.  Converse's Alteration of Product Design and Specification ___ 18
14.  Converse's Right of Inspection of Licensee Factories ___ 18

V.   ROYALTIES, FEES AND PAYMENTS
15.  Royalties _____ 19
16.  Guaranteed Minimum Sales _____ 22
17.  Royalty Reports _____ 22
18.  Schedule of Royalty Payments and Fees _____ 24
19.  Currency In Which Payments Are To Be Made _____ 26

VI.  INTELLECTUAL PROPERTY
20.  Converse Intellectual Property _____ 27
21.  Territorial Registration of Converse Trademarks _____ 29
22.  Infringement, Counterfeit, Unfair Competition _____ 29
23.  Indemnification for Products Liability Claims _____ 30

VII. TERMINATION
24.  Right of Termination _____ 31
25.  Effect of Termination or Expiration _____ 33
26.  Final Statement Upon Termination or Expiration _____ 34

VIII.   MISCELLANEOUS
27.   Devaluation _____ 35
28.   Force Majeure _____ 35
29.   Assignment or Sublicense by Licensee _____ 35
30.   Notices _____ 36
31.   No Joint Venture _____ 36
32.   Applicable Law _____ 37
33.   Arbitration _____ 37
34.   Significance of Headings _____ 38
35.   Assignment, Entire Agreement, No Waiver _____ 38

Appendices

A.   Converse Marks
B.   Human Rights Manual
C.   Royalty Report Form

AGREEMENT, made as of this first day of September, 2001 by and between

CONVERSE INC., a Delaware corporation, having its principal place of business at One High

Street, North Andover, Massachusetts 01845 ("Converse") and ALON INTERNATIONAL

S.A., a corporation duly registered and existing under the laws of the Republic of Panama and

having its principal office and business at Edificio Magna Corp BCSA Calle 51 y Manuel Maria

Icaza, Piso 4 oficina 410 P., Panama, Republica de Panama ("Licensee").

WHEREAS, Converse is in the business of manufacturing, advertising, distributing and

selling athletic and leisure footwear, activewear and accessories and is the exclusive owner of the

valuable trademarks "CONVERSE", "ALL STAR", "CONVERSE ALL STAR CHUCK

TAYLOR" Ankle Patch and "STAR AND CHEVRON" Design and other trademarks, of certain

trade names, and of various patterns, logos and designs associated therewith; and

WHEREAS, Licensee desires to manufacture and sell in Argentina, Brazil, Paraguay and

Uruguay on an exclusive basis, athletic and leisure footwear, activewear and accessories identical

or substantially identical to the athletic and leisure footwear and activewear and accessories

manufactured for Converse and sold by Converse in the United States of America under the

Converse name and trademarks, and to obtain the advisory services and assistance of Converse in

connection therewith.

NOW THEREFORE, in consideration of the mutual covenants, representations and

promises herein contained, Converse and Licensee agree as follows:

## I.     DEFINITIONS

1.     For purposes of this Agreement, the following definitions shall apply:

(a)  "Contract Period" shall mean that period of time commencing on September 1, 2001 and ending on December 31, 2004.

(b)  "Contract Year" shall mean the twelve calendar months of the year, beginning with January 1.   The first Contract Year shall be the period from September 1, 2001 through December 31, 2002.

(c)  "Contract Year Quarter" shall mean the four (4) three month periods of the calendar year.   The first Contract Year Quarter will commence January 1, 2002 and will include any activities from the commencement date of this Agreement.

(d)  "Converse Factories" shall mean Converse's authorized factories.

(e)  "Converse Marks" shall mean the logos and trademarks set forth in Appendix A.

(f)  "F.O.B. Cost" shall mean the costs of Footwear Licensed Articles purchased by the Licensee directly from Converse Factories as shown on the approved invoice from the factory for each shipment of product, if applicable.

(g)  "Licensed Articles" shall mean the athletic and leisure footwear, activewear and accessories which are set forth more specifically in Paragraph 3(a) below and which are identical or substantially identical to the athletic and leisure footwear, activewear and accessories manufactured for Converse and sold by Converse in the United States. There are three types of Licensed Articles: Non-Footwear, Footwear and Original Licensed Products as defined below.

(h)  "Net Sales" shall mean the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, trade discounts, volume rebates and any

freight charges and VAT taxes included in the invoice. No deduction shall be allowed for costs incurred in the manufacture, sale, advertisement (including cooperative and promotional allowances) or distribution of Licensed Articles, nor shall any deductions be allowed for uncollectible accounts or cash discounts.

(i) "Original Licensed Products" shall mean Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear. Original Products may also be referred to as "Originals" or "Original Licensed Footwear Products."

(j) "Publicity Materials" shall include, but not be limited to, any printed advertising, catalogs, brochures, billboards, electronic material, internet technology, and/or wireless network services in any and all manner or medium now known or hereafter devised or any video or printed material bearing the Converse Marks.

(k) "Territory" shall mean Argentina, Brazil, Paraguay and Uruguay.

2. <u>Term of Agreement</u>. In recognition of infrastructure, manufacturing and legal expenditures made by Licensee on Converse's behalf, and Licensee's continuing efforts in these areas, Converse agrees to waive the signing fee of US$28,750.00. Unless sooner terminated pursuant to the provisions of this Agreement, this Agreement shall remain in effect for the Contract Period. In the event Licensee wishes to renew this Agreement, it must notify Converse in writing of this decision by or before September 30th of the final Contract Year. Licensee may renew this Agreement for an additional term of three (3) years ("Option Years" which may be collectively referred to as "Option Period") provided Licensee exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that

Licensee has not breached any of the terms and conditions of this Agreement. The Guaranteed Minimum Royalty for the first Option Year will be the greater of 25% over the Guaranteed Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties, increasing by ten percent (10%) for each subsequent Option Year in the Option Period. The Guaranteed Minimum Sales for the first Option Year will be the greater of 25% over the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales, increasing by 10% each subsequent Option Year. Any extension of the term of this Agreement shall be effective only pursuant to a written agreement executed by Converse and Licensee. Such written agreement shall reflect any new or revised terms or conditions agreed to by the parties.

## II.    GRANT OF LICENSE

3. <u>License</u>.

(a)    Licensed Articles.

i.    Non-Footwear Licensed Articles is the collective term for activewear and accessories. Activewear shall specifically include: mens' and womens' sportswear and T-shirts. Accessories shall specifically include: bags, socks, caps, watches, backpacks, belts, stationary items (Notebooks and agendas, etc.).

ii.    Footwear Licensed Articles is the collective term for athletic and leisure footwear.

iii.    Originals Licensed Footwear Products shall be defined as the following models of footwear: Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear.

(b)    Grant of License.  Converse hereby grants to Licensee, subject to the terms and conditions herein, the exclusive right and license to utilize the Converse Marks throughout the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the retail and wholesale trade, subject to the provisions set forth in Section III below.  This license does not authorize, and expressly forbids, Licensee to manufacture, export, cause to export, distribute or sell such Licensed Articles in any other part of the world, unless specifically authorized by Converse in writing.

(c)    Internet.  Licensee is also granted the rights to use the Converse Marks on its Internet site generated out of the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the resale and wholesale trade, subject to the provisions set forth in Section III below.  In the event Licensee has already registered any of Converse's Marks or any name similar to a Converse Mark as a domain name, it shall assign to Converse all its rights, title and interest in such domain name(s) as directed by Converse.  Licensee shall not register a domain name using any of the Converse Marks or any marks to be confused with the Converse marks.

(d)    Non-competition.  Licensee agrees it shall not, during the term of this Agreement, manufacture, export, distribute, advertise, promote or sell any products/licensed articles which are competitive to the Licensed Articles, irrespective of whether said products bear Licensee's trademark or those of a third party, except only in such cases that Converse has given its prior written approval.  Notwithstanding the preceding sentence, in the event Licensee is already under obligation to distribute licensed articles other than those of Converse and/or products of any competitor, Licensee shall provide Converse, prior to the execution of

this Agreement, with a written list of all products it is under obligation to distribute. The parties agree that excluded from this paragraph are Licensee's currently held childrens' brands, such as Disney, Warner, Mattel, and McKids.

(e)    <u>Right to Negotiation</u>. In the event Converse does not renew license agreements with its existing licensees in the territories of all of Latin America and Mexico, Licensee shall have the right to negotiate for these territories.

## III.    LICENSEE OBLIGATIONS: RIGHTS AND RESPONSIBILITIES

4. <u>Use of Converse Marks</u>.

(a)    <u>Territorial</u>. Licensee agrees to use the Converse Marks only within the Territory and during the Contract Period, and only with respect to the manufacture, promotion, advertisement, distribution and sale of the Licensed Articles and only after Licensee has received the written approval of Converse as to samples of the Licensed Articles intended to be manufactured and sold by Licensee, the specific Converse Marks Licensee intends to affix to particular Licensed Articles, Licensee's use of the Marks in Publicity Materials and Licensee's use of the Marks on Licensee's web site, if applicable.

(b)    <u>Approvals</u>. Licensee shall provide Converse with a full set of approval samples and Publicity Materials for each Licensed Article as set forth in Paragraph 2(a) of this Agreement prior to launch in the market. Licensee shall provide Converse with designs and/or drawings of all Licensed Articles, drawings, hang tags and packaging for approval no later than four (4) months prior to launch in the market. In the event Licensee wishes to use any of the Converse Marks on its web site, it shall provide Converse with an opportunity to review the web site no

later than sixty (60) days prior to launch in the market. Converse shall have fifteen (15) calendar days from receipt to respond, either by refusing such design or requesting any changes to the designs, drawings or contents of web site, or issuing its written approval. Licensee further agrees to follow the approval guidelines for Licensed Articles, packaging, advertising and promotional materials set forth in Converse's Licensee Handbook. The license to use the Converse Marks is granted upon the express condition that all Licensed Articles manufactured by Licensee bearing any of the Converse Marks will conform to the standards for grade, quality, and style established from time to time by Converse. Such standards shall be substantially the same as the standards for the corresponding products manufactured for Converse and distributed by Converse in the United States. Any Licensed Articles bearing any of the Converse Marks manufactured by Licensee which are seconds or irregulars shall not be sold by Licensee without the prior written consent of Converse.

In addition, all factories at which Licensee desires to have Licensed Articles manufactured shall be approved in writing by Converse in advance of the placement of any orders for or of the manufacture of Licensed Articles.

(c) Inspection. Converse shall at any and all times have the right to inspect the Licensed Articles bearing any of the Converse Marks manufactured by Licensee to determine whether such Licensed Articles in fact conform to the established standards and other terms of this Agreement. If at any time Converse shall be of the opinion that Licensed Articles bearing any of the Converse Marks manufactured by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee. Licensee shall promptly thereafter remove or cause to be removed any of the Converse Marks from such nonconforming products or web sites, shall cease

to affix the Converse Marks to other Licensed Articles which do not meet the standards, and shall cease thereafter to manufacture, promote, advertise, distribute or offer for sale any such nonconforming Licensed Articles bearing any of the Converse Marks. It is understood and specifically agreed that upon termination of this Agreement, Licensee shall immediately cease using the Converse Marks or any reference thereto, except as otherwise provided in this Agreement.

5. <u>Quality Assurance</u>.

(a)    Licensee shall submit, for the inspection and approval of Converse, samples and comprehensive drawings or prototypes or production models of each style representative of Licensed Articles covered by this Agreement to be manufactured by Licensee. In any event, such drawings and samples shall be submitted to Converse for approval at least four (4) months before any such Licensed Articles are shipped or sold by Licensee. Thereafter, once each six (6) months, and also two (2) weeks prior to any change in the materials, method of manufacture or design of Licensed Articles, Licensee shall submit for inspections and approval by Converse, samples representative of Licensed Articles expected to be manufactured, shipped and sold by Licensee. Additional samples shall also be submitted to Converse at Converse's reasonable request. Converse shall determine whether such samples conform to its standards and shall inform Licensee of its approval or of any deficiencies. Licensed Articles may be manufactured and sold by Licensee only after Converse shall have approved drawings and samples representative of such Licensed Articles in writing or shall have failed to disapprove them within four (4) weeks after receipt of the drawings and samples.

(b)    All Licensed Articles manufactured or sold hereunder must:

    i.    be of first quality and conform to standards, including standards of design, style and quality, approved by Converse in its sole discretion, reasonably exercised;

    ii.    be of the grade, quality and style handled by quality departments of quality stores, department stores and better specialty shops in the Territory;

    iii.    be similar and at least equal in grade, quality, materials, workmanship, performance and style, to representative comprehensive drawings or production samples of Licensed Articles submitted by Licensee to Converse and approved by Converse; and

    iv.    be advertised, marked, labeled and packaged in accordance with this Agreement and not in any manner violative of law or tending to mislead or deceive the public.

6. Licensee's Use of Converse Information and Advice.

(a) Licensee agrees that it shall not use, permit the use of, release, give or otherwise distribute or disclose to any third party any of the information, advice, reports, instructions, designs, drawings, specifications, technical knowledge, methods, processes, samples or materials, names and addresses of suppliers of materials, or any other information ("Trade Secrets") furnished to it by Converse or Converse contract manufacturers or other licensees except as necessary and on an as needed basis in the manufacture, distribution, promotion, advertisement, and sale of Licensed Articles bearing the Converse Marks in the Territory pursuant to this Agreement.

(b) All Trade Secrets shall remain the sole property of Converse and shall be deemed to be strictly confidential and shall be treated accordingly.

7.  Licensee Sales Program.

(a)    Licensee shall faithfully, diligently and to the best of its ability endeavor to manufacture, distribute, promote, advertise, market and increase the sales of Licensed Articles bearing the Converse Marks in the Territory. It shall be the responsibility of Licensee to provide active and continuous sales representation in the Territory by actual salesperson contact with customers, both existing and prospective. Licensee shall maintain adequate brand and marketing management, manufacturing, sales and service personnel and adequate inventory levels, manage, position and market the brand; conduct advertising and promotional programs and perform such other necessary functions to accomplish maximum sales and distribution of Licensed Articles within the Territory. Licensee shall not adopt, engage in, permit or otherwise use any pricing policies, advertising campaigns, merchandising techniques or other commercial practices which are illegal under the laws of the Territory or which, in the opinion of Converse, detract from the good will and reputation of Converse.

(b)    Licensee agrees to submit to Converse an annual business plan for the sale of Licensed Articles for each region within the Territory for each Contract Year. Such annual business plan shall be submitted to Converse no later than September 30th of each Contract Year, and shall be for the next Contract Year. Licensee also agrees to submit to Converse, a seasonal sales and marketing plan for the sale of Licensed Articles for each region within the Territory for each Contract Year. Such seasonal sales and marketing plan shall be submitted to Converse no later than June 15th of each Contract Year for the next Spring, and January 15th of each Contract Year for the next Fall.

(c)    Licensee shall use Converse's web-based sales and forecasting application each month to provide Converse with both annual forecasts and actual sales.

(d)  During each Contract Year, Licensee shall expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for that Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure").  Such expenditures shall be spread over each current Contract Year in a manner consistent with the overall brand and product marketing and advertising strategies outlined by Converse in the United States market. Licensee agrees to provide Converse with quarterly statements itemizing Licensee's Advertising Expenditure for the preceding Contract Year Quarter on or before the fifteenth (15th) day of April, July, October and January of each Contract Year.  Converse agrees to waive its requirement to have Licensee pay a one percent (1%) Regional Marketing Contribution during the Contract Period.  Licensee shall keep Converse continually informed as to all advertising programs undertaken pursuant to this Agreement and shall not advertise any of the Licensed Articles without receiving the prior written approval thereof from Converse, which approval shall not be unreasonably withheld or delayed.  All advertising copy shall prominently feature Converse logos and Marks used in accordance with the Converse Identity Manual or guidelines provided by Converse from time to time.

(e)  Licensee agrees to purchase a representative sample range of each new product line introduced by Converse.  The price of such samples shall be factory cost plus fifty percent (50%) plus freight cost to be paid in accordance with Paragraph 18(d) herein.

(f).    Licensee agrees it shall have, at its expense, one or more of its sales management attend Converse's global sales conferences.

8.    Distribution.

(a)  Licensee hereby agrees to market, sell, promote and distribute the Licensed Articles to high end, better quality athletic footwear and sporting goods retailers and specialty shops, department stores and boutiques that are consistent with the Converse brand strategy and will enhance the Converse brand image within the Territory and throughout the world. Licensee agrees not to market, sell, promote and distribute the Licensed Articles to mass merchants, discount stores and/or chains, flea markets, open air markets, consolidators, diverters or to any distribution channels that are not consistent, in Converse's sole discretion, with the Converse brand strategy.

(b)    Publicity Materials.  All Publicity Materials shall be approved in writing by Converse in advance of any release or distribution.  Converse shall at any and all times have the right to inspect the Publicity Materials developed by Licensee to determine whether they conform to the established standards and other terms of this Agreement.  If at any time Converse shall be of the opinion that the Publicity Materials developed by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee, which shall promptly thereafter remove and shall cease thereafter to use or distribute any such nonconforming Publicity Materials.

9.    Licensee's Use of Converse Factories.

(a)    Licensee must use Converse Factories for the manufacture of regular in-line Footwear Licensed Articles and Originals when manufacturing outside the Territory.  Licensee must submit the orders for such Footwear Licensed Articles and Originals to Converse's Production Department at corporate headquarters for approval  before it can be placed with the

factory and only if placed through the following approved buying agent or such other agent as may be designated by Converse (the "Buying Agent"):

> Twin Dragons
> Pou Yuen Industrial City
> First Industrial Estate
> Shanxiang Town
> Zhongshan City, Guangdong Province, PRC
> China

In the event local production is required due to a tariff prohibition within the Territory, Licensee, upon Converse's prior written approval, may locally produce the Footwear Licensed Articles.

(b)    All such orders are to be placed with the Converse Factory with payment by Letter of Credit, (unless wire transfer payment terms have been negotiated,) terms at sight, from Bill of Lading date with such letters of credit opened so as to arrive at the factory no less than forty-five (45) days prior to the confirmed ship date.

(c)    Licensee shall pay to Converse the Buying Agent's commission upon presentation of the applicable commission invoice at the applicable percentage of the F.O.B. Costs.

(d)    Under no circumstances can Licensee cancel orders contemplated by this Paragraph 9 with Converse Factories without the prior written approval of Converse's corporate office. In the event Converse authorizes such cancellation, Licensee hereby agrees to pay all costs incurred by the Converse Factory for such order and a cancellation charge to Converse equal to five percent (5%) of the combined F.O.B. costs of the order.

(e)   Licensee agrees it shall not approach any third party factories regarding the production of Footwear Licensed Articles, unless having prior written approval from Converse.

10.   <u>Exportation</u>.   Licensee shall manufacture, distribute, promote, advertise and sell Licensed Articles bearing the Converse Marks only within the Territory.   Further, Licensee shall not knowingly export or cause to be exported, and shall use its best efforts to prevent the export of, any products to other countries without the prior express written permission of Converse.   In the event that Licensee exports or causes to be exported Licensed Articles bearing the Converse Marks outside the Territory without written authorization from Converse, Licensee agrees that such action would irreparably harm Converse's business.   A breach of this Paragraph by Licensee may result in termination of this Agreement by Converse pursuant to Paragraph 24 below.

11.   <u>Government Approval</u>.   If applicable, Licensee shall be responsible for obtaining all necessary approvals from the government of any of the countries in the Territory with respect to this Agreement.   In the event that Licensee is unable to obtain all such approvals within one hundred eighty (180) days of the execution of this Agreement, Converse shall have the right to terminate the Agreement immediately upon written notice to Licensee.

IV.   <u>CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES</u>

12.   <u>Responsibility of Converse</u>.   In order to facilitate the manufacture, distribution, promotion, advertisement and sale of Licensed Articles by Licensee under this Agreement, Converse shall use good faith efforts to:   (a)   furnish or cause to be furnished to Licensee such

information and advice, as in the opinion of Converse, is necessary to implement this Agreement. Such information and advice may include, but is not limited to, drawings and specifications of the Licensed Articles, names and addresses of suppliers of materials, copies of advertisements and sale promotional material or such other information reasonably necessary to carry out this Agreement. Licensee shall pay Converse promptly upon billing for any articles supplied under this Paragraph 12(a) in accordance with Paragraph 18(d); (b) at Converse's discretion, to permit one or more of Licensee's representatives to attend, at Licensee's sole expense, sales conferences or other athletic sales events sponsored or attended by Converse representatives; (c) make arrangements under which representatives of Licensee may, at their sole expense, visit one or more factories in which products similar to the Licensed Articles are being manufactured by or for Converse bearing the Converse Marks to enable the representatives to study methods of manufacture and related matters.

13.    Converse's Alteration of Product Design and Specification. Converse reserves the right, upon sixty (60) days notice to Licensee, to modify the design and specifications for any Licensed Article made by Licensee bearing any of the Converse Marks, and any design or text. In that event, Licensee shall not manufacture Licensed Articles in accordance with the prior design or specification, except for the completion of Licensed Articles in the process of manufacture at the time Licensee received the modification. Licensee agrees not to manufacture, distribute, promote, advertise or sell any product not bearing a Converse Mark which, in the opinion of Converse, by reason of its appearance or design, might tend to be confused by the public with any of the Licensed Articles manufactured under this Agreement bearing Converse Marks, or which in the opinion of Converse infringes in any manner Converse Marks.

14. Converse's Right of Inspection of Licensee Factories.

(a) Converse shall have the right at its own expense to have its representatives from time to time, during reasonable business hours, visit and inspect the factory or factories in which Licensee is producing, or having produced, Licensed Articles bearing any of the Converse Marks for the purpose of observing the method of manufacture, quality of materials, products produced, and any other matters relevant to this Agreement. Included in this inspection shall be the audit of the workers' rights standards pursuant to the Converse Inc. Human Rights Manual which is made part of this Agreement and is attached hereto as Appendix B.

(b) Licensee shall reimburse Converse for any expense for travel to the Territory or elsewhere which may be incurred by representatives of Converse at the request of Licensee and such payments shall be made by Licensee to Converse in U.S. Funds within thirty (30) days from billing thereof.

## V.     ROYALTIES, FEES AND PAYMENTS

15. Royalties. In conjunction with Paragraph 18 below, Licensee shall pay to Converse the following royalties:

(a)     In consideration for the license granted to it by Converse herein, Licensee shall pay Converse a royalty equal to the following percent of the Net Sales made by Licensee of the Licensed Articles (the "Earned Royalties"). The Earned Royalties shall be based upon the Net Sales price for such products sold to the retail or wholesale trade by Licensee.

| EARNED ROYALTIES | | | |
|---|---|---|---|
| CONTRACT YEAR | CALENDAR YEAR | Footwear (including Originals) | Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | 6% | 6% |
| 2 | 2003 | 7% | 6% |
| 3 | 2004 | 8% | 6% |
| Option Years | | To be negotiated | To be negotiated |
| 4 | 2005 | tbd | tbd |
| 5 | 2006 | tbd | tbd |
| 6 | 2007 | tbd | tbd |

The Earned Royalty rate for Licensed Articles for the Option Period will be negotiated prior to the Option Years taking effect.

(b)    Notwithstanding the provisions of Article 15(a), Licensee agrees to pay Converse a guaranteed annual minimum royalty as set forth below for each Contract Year (the "Guaranteed Annual Minimum Royalty").

| CONTRACT YEAR | CALENDAR YEAR | GUARANTEED ANNUAL MINIMUM ROYALTY |
|---|---|---|
| | | Footwear (including Originals) and Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | US$115,000.00 |
| 2 | 2003 | US$160,000.00 |
| 3 | 2004 | US$215,000.00 |
| Option Years | | |

| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties |
| 5. | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

In the event this Agreement is terminated on a date other than the last day of a Contract Year, the Earned Royalties shall be based upon actual Net Sales through the date of termination.

    (c)    <u>Third Parties</u>:

        (i)    With respect to the sale of certain Licensed Articles, Converse has, or may have in the future, an obligation to pay a royalty to an athlete or other third party ("Third Party") in conjunction with the use of the Licensed Articles (the "Third Party Articles"). In the event that Licensee purchases or manufactures, with Converse's prior written consent, any Third Party Articles, Licensee agrees to pay to Converse the amount of any royalty which Converse is obligated to pay to the applicable Third Party (the "Third Party Royalty").

        (ii)    Converse shall advise Licensee, in a timely fashion prior to Converse's approval of Licensee's submission of an order for Licensed Articles, which articles are Third Party Articles and the amount of the Third Party Royalty.

        (iii)    The applicable Third Party Royalty shall be paid by Licensee to Converse along with payment of the Earned Royalties pursuant to Paragraph 18 of this Agreement.

    (d)    Licensee shall remove Converse Marks from any defective products which do not meet Converse standards as set forth in Paragraph 5 of this Agreement entitled Quality Assurance for first quality merchandise and no royalty shall be payable hereunder with respect to the sale of

such substandard products. This requirement to remove all Converse Marks shall be operative irrespective of the fact that such substandard products may be customarily sold in the Territory for the same price as first quality merchandise. Converse shall have the right to prohibit Licensee from selling such substandard products, if, in the opinion of Converse, such products may tend to be confused by the public with any of the Licensed Articles sold under this Agreement bearing Converse Marks, or which, in the opinion of Converse, infringes in any manner the Converse Marks.

16.    Guaranteed Minimum Sales. Notwithstanding the provisions of Paragraphs 15(a) and (b) above, Licensee agrees to sell not less than the following guaranteed minimum sales volume of Licensed Articles during each Contract Year as set forth below (the "Guaranteed Minimum Sales Volume"):

| CONTRACT YEAR | CALENDAR YEAR | GUARANTEED MINIMUM SALES VOLUME |
|---|---|---|
| | | Footwear (including Originals) and Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | US$1,917,000.00 |
| 2 | 2003 | US$2,300,000.00 |
| 3 | 2004 | US$2,800,000.00 |
| Option Years | | |
| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales |
| 5 | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

17.    Royalty Reports

(a)    Unless otherwise specified herein, Licensee shall deliver to Converse on or before April 25th, July 25th, October 25th and January 25th of each Contract Year a Royalty report, which shall be a complete and accurate itemized statement, certified by Licensee's chief fiscal officer as being accurate and complete, stating the description by product type, number of pairs or units, gross sales price, itemized deductions from gross sales price and net sales price as well as wholesale sales of the Licensed Articles manufactured, distributed or sold by Licensee during the preceding Contract Year Quarter. Such statements shall be stated in both United States and local currency and submitted in the format set forth in Appendix C, which shall be subject to change without notice. Such quarterly statements shall be furnished to Converse whether or not any Licensed Articles bearing any Converse Marks have been sold or distributed by Licensee during the preceding Contract Year Quarter. Receipt or acceptance by Converse of any statements furnished pursuant to this Agreement or any sums paid hereunder shall not preclude Converse from questioning the accuracy thereof at any time, and in the event that any inconsistency or mistake is discovered in such statement or payments, they shall be rectified immediately and the appropriate payments shall be made by Licensee.

(b)    If applicable, the parties acknowledge that Licensee may be legally required to withhold and remit a portion of the Earned Royalties to the governments of the countries in the Territory on behalf of Converse. It is not the intent of the parties that Licensee pay any part of any tax owed by Converse. Licensee's obligation shall be satisfied if it withholds and remits in accordance with the laws of the countries in the Territory and provides Converse promptly upon

payment, one original counterpart of the certificate issued by the competent tax authorities receiving such payments.   These certificates should be forwarded to Converse's Accounting Department at the address set forth in the Notice section of this Agreement.  These withholding certificates, if applicable, must accompany quarterly Royalty Reports.

18.  Schedule of Royalty Payments and Fees.

The Royalty Payments set forth below shall be paid to Converse on a quarterly basis upon invoice or no later than the end of the month in which the Royalty report was due to be submitted pursuant to Paragraph 17 above.  Payments shall be in U.S. Dollars and can be made either by wire transfer in accordance with the instructions set forth in Paragraph 19 below or by check:

(a)      The Earned Royalty or one quarter of the Guaranteed Annual Minimum Royalty set forth herein for each Contract Year Quarter, whichever is greater.   Once the Guaranteed Annual Minimum Royalty is satisfied, Licensee is required to pay Earned Royalties only for the remaining quarters;

(b)     The Original Products Royalty;

(c)      The Third Party Royalty, if applicable, shall be paid upon receipt of Converse's invoice;

(d)  In addition to royalties, Licensee shall pay Converse for all materials, samples, and merchandise furnished to Licensee pursuant to Paragraph 12 hereof in an amount equal to the cost of such items to Converse, including Converse's cost of preparing, packing, shipping and transporting such items.  All such purchases by Licensee from Converse shall be paid upon receipt of invoice by wire transfer or check.

(e) Licensee shall maintain appropriate books of account and records, including inventory records, in accordance with generally accepted accounting principles, and shall make accurate entries concerning all transactions relevant to this Agreement. Such books of account and records shall be kept separately from those for any merchandise other than the Licensed Articles sold hereunder by Licensee. Licensee shall also, upon request by Converse, provide Converse with a sales report listing year-to-date sales generated by each of Licensee's customers.

(f) Converse shall have the right, at its own expense, during the term hereof and for three (3) years thereafter, or in the event of a dispute involving in any way such books of account and records, until the dispute is resolved, whichever is later, through any authorized representatives of its own choice, on reasonable notice to Licensee and during regular business hours, to examine and take extracts from such books of account and records, and other documents (including but not limited to invoices, vouchers, records, purchase orders, sales orders and reorders) relating to the business hereunder which shall be maintained and kept by Licensee during the term hereof. All such books of account and records shall be kept available by Licensee for three (3) years after the end of the Contract Period, or in the event of a dispute between the parties hereof involving in any way such books of account and records until that dispute is resolved, whichever is later. If upon inspection of the books and records pursuant to this paragraph or otherwise, it is discovered that Converse did not receive the correct and adequate payment, then Licensee shall pay the Company, upon written notice, the difference between what was paid and what should have been paid, within five (5) business days of receipt of said notice. If the aforesaid difference exceeds five percent (5%), then the entire difference is to be paid with interest calculated from the date the payment should have been made to the

actual date of payment at the prime rate in effect on the payment date. If Converse chooses to employ the services of a certified public accounting firm, qualified accounting consultant firm or Converse's internal auditors to conduct an audit and inspection of Licensee's books and records and said audit and inspection results in a balance due for any Contract Year of this Agreement which exceeds by five percent (5%) the payment reported due by Licensee for any such Contract Year, then Licensee shall bear the entire cost including all fees and expenses of said audit and inspection. If it is found that Licensee has made a larger payment than that which was due, said excess will be returned by Converse within five (5) business days of such determination.

19.  <u>Currency In Which Payments Are To Be Made</u>.

(a)  Unless specifically set forth to the contrary herein, all payments to Converse (except Converse Factories) required to be made by Licensee pursuant to this Agreement shall be made in the currency of the United States of America ("U.S. Funds"), payable to Converse Inc., First Union National Bank, Charlotte, NC, ABA No. 053000219, Account No. 2000011041218, or such other account as may be designated by Converse from time to time (the "Account"). Converse will review the exchange rate received by Licensee in the conversion from Licensee's local currency to U.S. Funds by comparison with the exchange rate published by the Wall Street Journal ("WSJ") two (2) business days prior to the payment due date scheduled in Paragraph 18 of this Agreement. If there is a difference between the exchange rate received by Licensee and the WSJ rate, Converse reserves the right to request such additional funds from Licensee as is required to compensate for the exchange rate deficiency. In cases where payment of the particular royalty due is more than seven (7) calendar days late, Converse reserves the right to request additional funds from Licensee to compensate Converse for any resulting subsequent exchange

rate loss. If required, Licensee agrees it will seek the necessary government approvals to make such payments to Converse in U.S. Funds. Any late payments will be subject to an interest charge of one and one-half percent (1 1/2%) to Converse each month the payments remain unpaid. In the event any such payment exceeds thirty (30) days in arrears, Converse shall have the right, in addition to any and all other remedies available to Converse, to terminate this Agreement pursuant to Paragraph 24.

(b) If the actions of any government or public body make it impossible for Licensee to pay Converse in U.S. Funds, Converse shall have the following options:

(i)    terminate the Agreement with thirty (30) days written notice to Licensee;

(ii)   require Licensee to make payment in the currency of any other country selected by Converse by whose currency Licensee may legally pay;

(iii)  require Licensee to deposit such payment to Converse's account in a bank selected by Converse in or outside the Territory.

If Converse selects option (i) it may nevertheless require Licensee to pay any sums then due or to become due in accordance with options (ii) or (iii).

## VI.    INTELLECTUAL PROPERTY

20. Converse Intellectual Property.

(a) Ownership.  Licensee acknowledges that Converse is the exclusive owner of the Converse Marks, Converse patents, and Converse domain names, and covenants that neither it nor any person acting for or under it will ever contest such ownership or the exclusive rights of Converse with respect thereto anywhere in the world.

(b)    In the event that Licensee creates, or assists in the creation of, a design for a Licensed Article or Converse's web site, then such design shall become the property of Converse without any further act required on the part of Converse or Licensee. Licensee shall execute and deliver any document or instrument requested by Converse to confirm exclusive ownership by Converse of any such design. Converse shall have the right to utilize said design itself or provide it for use by any third party.

(c)    Infringement. Nothing in this Agreement shall constitute a warranty by Converse that there are currently no infringements of any of the Converse Marks, Converse patents, or Converse domain names within the Territory. Licensee agrees that during the Contract Period it will diligently investigate any infringement or threatened infringement of the Converse patents, trademarks, logos, domain names or trade names within the Territory and shall immediately notify Converse of any such infringement or threatened infringement or of any act or threatened act of unfair competition which may come to Licensee's attention and Licensee shall use its best efforts to prevent such infringement or act of unfair competition. Should litigation become necessary in Converse's sole discretion to protect Converse's interests in this regard, Licensee shall cooperate fully with Converse to the extent requested. Converse shall be responsible for the expense of such litigation.

Converse acknowledges that it is a party to certain litigation in Brazil with All Star Artigos relating to the use and registration of the Chuck Taylor All Star and All Star logos. Converse hereby agrees that it will take the necessary actions as determined by Converse to recover the ownership of said trademarks provided it is in the best interest of Converse.

(d)    Intellectual Property Indemnification.  Licensee shall indemnify and hold Converse harmless from and against any and all claims, demands, losses, damages, liabilities, suits, judgments, and expenses, including incidental costs and attorneys' fees Converse may incur or be liable for arising out of allegations that Licensed Articles, Converse Marks, advertising and/or Publicity Materials used, designed and/or developed by Licensee violates or infringes the copyright, trademarks, service marks, or patent rights of any third party. Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.

21.  Territorial Registration of Converse Trademarks.  Converse has registered or applied for registration of certain of its trademarks and domain names in the Territory.  In this regard, Licensee agrees to take all proper actions requested by Converse to facilitate and expedite the registrations, provided that Converse reimburses Licensee for all reasonable expenses incurred in connection therewith.  If Converse is prevented from registering its trademarks or domain names in the Territory by virtue of the existence of this Agreement, Licensee agrees, at the request of Converse, to seek registration in its own name and convey to Converse all right, title and interest to the trademarks and domain names which Licensee may thereby obtain, provided that Converse shall reimburse Licensee for all reasonable expenses incurred.

22.  Infringement, Counterfeit, Unfair Competition.  Licensee agrees to notify Converse, in writing, of any infringements or counterfeits of, or any unfair competition affecting the trademarks and domain names licensed hereunder immediately upon gaining knowledge thereof and to cooperate fully in any action thereon which Converse may, in its sole discretion, deem appropriate.  Licensee shall not, however, be entitled to take or institute any action thereon,

either by way of informal protest or legal, equitable or criminal proceedings, without express written approval, nor shall Licensee be entitled to call upon Converse to take action thereof; all such matters shall be entirely within the discretion of Converse.

23. Indemnification for Products Liability Claims.

(a) Licensee agrees to indemnify Converse from any and all claims, demands or judgments, including incidental costs and attorneys' fees incurred in connection therewith against Converse for injuries or damages to purchasers or users of the Licensed Articles manufactured by Licensee. The foregoing indemnification of Converse by Licensee shall extend to any and all products liability claims arising as a result of Converse's ownership and control of the trademarks under which the Licensed Articles are manufactured and sold by Licensee, including, but not limited to, claims arising out of breach of implied or express warranties, strict tort liability or negligence, or legal claims of a comparable nature for recovery brought by litigants under the laws of the jurisdiction that apply to the Licensee.

(b) Licensee shall, at its own cost and with Converse's approval, defend against any claims brought or actions filed against Converse on a products liability theory of the Licensed Articles whether such claims or actions are rightfully or wrongfully brought or filed, and Converse shall execute all papers necessary in connection with such suit and shall testify in any such suit whenever required to do so by Licensee all, however, at the expense of Licensee with respect to travel and similar out-of-pocket disbursements.

(c) Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.

(d)    Licensee shall obtain insurance to the extent of $1,000,000 per occurrence against liability for bodily injury including death resulting therefrom and $1,000,000 per occurrence against liability for damage to property including loss of use thereof, occurring in any way relating to the Licensed Articles.  Such insurance policy shall insure Converse and shall name Converse as an additional insured as its interest may appear.   Such insurance policy shall be cancelable or materially altered only upon ten (10) days notice to the Licensee and Converse. Licensee shall provide Converse with a certificate of its insurance policy in the amount indicated within ten (10) days of execution of this Agreement.

## VII.   TERMINATION

24.  Right of Termination.

(a)    By Converse Immediately.  In the event of the occurrence of any one or more of the following, Converse shall have the right to immediately terminate this Agreement by written notice thereof to Licensee but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i)  insolvency, bankruptcy, reorganization, suspension of payments, assignment for the benefit of creditors, appointment of a receiver, institution of any proceedings by or against Licensee under bankruptcy laws or other similar laws; or

(ii)  the transfer or sale of all or a majority of the voting stock or other equitable ownership of Licensee without the written consent of Converse.

(b)    By Converse Upon Notice of Breach.  In the event of the occurrence of any one or more of the following, Converse shall have the right to terminate this Agreement seven (7)

days after giving written notice thereof to Licensee, and Licensee has not remedied the situation within such seven (7) day time period:

    (i) failure of Licensee to pay any royalty or other payment due Converse under this Agreement for a period of thirty (30) days from the date such payment is due and payable;

    (ii) failure of Licensee to pay the Buying Agent's commission ("Buying Agent's Commission") for a period of thirty (30) days from the date such commission is due and payable;

    (iii) pursuant to Paragraph 8 Distribution above, the manufacture, distribution, advertisement or sale of Licensed Articles by Licensee in the Territory other than pursuant to this License Agreement;

    (iv) the sale or shipment of Licensed Articles by Licensee outside of the Territory, as set forth in Paragraph 10 herein;

    (v) the failure of Licensee to comply with the Guaranteed Annual Minimum Royalty or Guaranteed Minimum Net Sales Volume for any Contract Year, as set forth in Paragraphs 15 and 16 herein; or

    (vi) The breach by Licensee of Paragraphs 3(a), 4 and 6 herein.

    (c) By Either Party. In the event of the occurrence of any one or more of the following, either party shall have the right, after thirty (30) days written notice, to terminate this Agreement by written notice thereof to the other party but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i)  liquidation or dissolution of either party or discontinuance of the active operation of the enterprise of either party;

(ii)  the breach of or failure by either party to perform or observe any of the other terms and conditions of this Agreement, provided said breach or failure shall continue for a period of thirty (30) days after written notice thereof from the other party.

25.  <u>Effect of Termination or Expiration.</u>

(a)  From and after the termination of this Agreement, whether by expiration of the Contract Period or termination pursuant to Paragraph 24 or for any other reason, any and all rights acquired by Licensee to the use of the Converse Marks and Trade Secrets, shall terminate and cease absolutely, and except as provided in subsection (b) of this Article, Licensee shall not thereafter manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with Converse Marks.

(b)  Any Licensed Articles manufactured or in the process of manufacture by Licensee prior to the expiration or termination of this Agreement and as to which any of the Converse Marks has been attached or affixed may be sold by Licensee, but only during the ninety (90) day period next following the date of expiration or termination, subject to the condition that Licensee pay to Converse all Earned Royalties and other payments due and owing Converse at the date of expiration or termination and to the further condition that Licensee continues to pay to Converse all Earned Royalties accruing during such ninety (90) day period within thirty (30) days following the end of each calendar month and delivers to Converse at the time of such payment an itemized statement in the form required by Paragraph 17 hereof for each such calendar month.

Licensee agrees that the Licensed Articles shall be sold during the ninety (90) day period shall be sold in accordance with the provisions of Paragraph 8 Distribution herein.

Notwithstanding anything to the contrary contained herein, Licensee shall not manufacture, distribute, sell or dispose of any Licensed Articles hereunder after the expiration or earlier termination of this Agreement. Licensee shall, upon termination of this Agreement, promptly assign and transfer to Converse any property rights which Licensee may have acquired in the Converse Marks and shall, within thirty (30) days, destroy or return all drawings, molds, dies and similar equipment or materials in its control or possession used for the production or reproduction or imprinting of the Converse Marks on the Licensed Articles and furnish to Converse satisfactory evidence of such return or destruction. Licensee agrees, subsequent to the expiration of this Agreement, not to register, attempt to register or use, except as provided herein, any Converse Marks and trademarks that are confusingly similar to the Converse Marks.

(c)    In the event Converse terminates this Agreement for breach by Licensee, Licensee will still be liable to Converse for its Minimums for the remainder of the Contract Period.

26.  <u>Final Statement Upon Termination or Expiration.</u>

(a)  Licensee shall deliver, as soon as practicable but in any event no later than thirty (30) days after expiration or termination of this Agreement, to Converse a statement indicating the number and description of Licensed Articles bearing any of the Converse Marks under this Agreement on hand or in process of manufacture as of (i) sixty (60) days prior to the expiration of the Contract Period; and (ii) thirty (30) days after receipt from Converse of any notice terminating the license granted hereunder or, in the event no such notice is required, thirty (30) days after the occurrence of any event which terminated such license.

(b)  Converse shall have the option, at its expense, to have an independent certified public accountant conduct a physical inventory during reasonable business hours of Licensee's manufacturing and distribution facilities in order to ascertain or verify such inventory or statement.  In the event Licensee refuses to permit Converse to conduct such physical inventory, Licensee shall forfeit its right hereunder to dispose of such inventory.  In addition to such forfeiture, Converse shall have recourse to all other legal remedies available to it.

(c)    Licensee shall have ninety (90) days to dispose of Converse inventory, which disposal shall be consistent with its distribution channels set forth in Paragraph 8 of this Agreement.

## VIII.  MISCELLANEOUS

27.    Devaluation.  In the event devaluation in any of the countries in the Territory increases by more than fifteen percent (15%) in a given year, Licensee may, at Converse's option, have the right to renegotiate its Guaranteed Annual Minimum Royalty and Guaranteed Minimum Sales Volume set forth above for the Contract Period.

28.  Force Majeure.  If either party to this Agreement is temporarily unable to perform its obligations hereunder because of fire, strike, freight embargoes, government restrictions or regulations, war, emergency or any other Act of God, then no liability to the other party or right to terminate shall exist for failure of the one party to perform during such period.

29.  Assignment or Sublicense by Licensee.  None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other

Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee without the prior written consent of Converse in each instance.

30.  Notices.  Any written notice authorized or required by this Agreement shall be deemed to be duly given when sent by facsimile, registered mail, postage prepaid, or by express mail or international courier service, addressed to one party or the other, as the case may be, as stated in this Article unless either party shall previously have given to the other party written notice of a change of such address.

### CONVERSE INC.

Converse Inc.
One High Street
North Andover, Massachusetts 01845
Fax:  978-983-3547

ATTENTION:      Laura W. Kelley
                Vice President, Legal

            c.c.:   Tim Ouellette
                    Vice President, Licensing

### ALON INTERNATIONAL S.A.

Mr. Roberto Szerer
Mr. Ronald Durchfort
ALON International
1160 E. Hallandale Beach Boulevard, Suite A
Hallandale, Florida 33009

31.  No Joint Venture.  Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers and neither party shall have the power to obligate or bind the other in any manner whatsoever.

32.  Applicable Law.   The parties agree that the Commonwealth of Massachusetts, U.S.A. law governs the provisions and interpretation of this Agreement and that the English language version thereof shall be the controlling document.

33.  Arbitration.  The parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly.  Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligations of the parties thereunder, the capacity or authority of the parties thereto, the performance or breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one party to the other setting forth with specificity any such controversy or claim, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association.  The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association.  The parties expressly agree that arbitration shall be held in the offices of the American Arbitration Association, in Boston, Massachusetts, U.S.A., or such other locations within the Commonwealth of Massachusetts as the American Arbitration Association may direct.  Such arbitration shall be conducted in the English language and the arbitrators shall apply the laws of the Commonwealth of Massachusetts.  The institution of any arbitration proceeding hereunder shall not relieve the Licensee of its obligation to make payments accrued hereunder to Converse during the continuance of such proceeding.  The decision by the arbitrators shall be binding and conclusive upon the parties, their successors and assigns and the parties shall comply with such decision in good faith, and each party hereby submits itself to the jurisdiction of the courts of the place where the arbitration is held, but only for the entry of judgment with respect

to the decision of the arbitrators hereunder. Notwithstanding the foregoing, judgment upon the award may be entered in any court where the arbitration takes place, or any other court having jurisdiction over the losing party.

34. <u>Significance of Headings</u>. Paragraph headings contained herein are solely for the purpose in aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of the Agreement.

35. <u>Assignment, Entire Agreement, No Waiver</u>. This Agreement and any rights herein granted shall inure to the benefit of and be binding upon the parties hereto and their respective successors or assigns, provided, however, that this Agreement shall be freely assignable by Converse but shall not be assigned, sublicensed or encumbered by Licensee without the prior written consent of Converse. This Agreement constitutes the entire agreement and understanding between the parties hereto and cancels, terminates and supersedes any prior agreement, materials exchanged between the parties, discussions or understanding relating to the subject matter hereof. None of the provisions of this Agreement can be waived or modified except expressly in writing signed by both parties hereto, and there are no representations, promises, agreements, warranties, covenants or undertakings other than those contained herein.

IN WITNESS WHEREOF, each of the parties hereto have executed this Agreement as of the date and year first above written in duplicate originals by its duly authorized representatives.

CONVERSE INC.

By _____

Title: _____

Witness _____

ALON INTERNATIONAL S.A.

By _____

Title _____

Witness _____



VIA U.P.S.

March 12, 2002

Mr. Roberto Szerer
Mr. Ronald Durchfort
ALON International
1160 E. Hallandale Beach Boulevard
Suite A
Hallandale, Florida 33009

> RE:   *revised Manufacturing, Distribution and License Agreement between Converse Inc. and Alon International S.A.*

Gentlemen:

As you know, the date of the Agreement was previously changed from July 1, 2001 to September 1, 2001. For consistency, this date change has now been made in other paragraphs: 1(a) and (b), and the charts in 15(a) and (b) and 16. Therefore, enclosed are two originals of the revised above-referenced agreement for your execution. Kindly sign both and return to Laura Kelley for countersignature. A fully executed original will be returned to you.

If you have questions, please contact Tim directly. Thank you.

Very truly yours,

Helene Needham
Contract Attorney

Enclosures

## SECOND AMENDMENT TO THE MANUFACTURING, DISTRIBUTION AND LICENSE AGREEMENT BY AND BETWEEN

### CONVERSE INC.

### and

### ALON INTERNATIONAL, S.A.

**SECOND AMENDMENT,** made effective as of the 1st day of January, 2004 by and between **CONVERSE INC.**, a Delaware corporation, having its principal place of business at One High Street, North Andover, Massachusetts, 01845 ("Converse") and **ALON INTERNATIONAL S.A.**, a corporation duly registered and existing under the laws of the Republic of Panama and having its principal office and business at Calle 53 Urbanizacion Obarrio, Torre Swiss Bank, Piso 16, Panama, Republica de Panama ("Licensee").

WHEREAS, Converse and Licensee entered into a Manufacturing, Distribution and License Agreement dated September 1, 2001 and amended on May 8, 2002 (the "Agreement") with respect to the manufacture and sale of Licensed Articles on an exclusive basis; and

WHEREAS, the parties desire to further amend the Agreement.

NOW THEREFORE, in consideration of the mutual covenants, representations and promises herein contained, Converse and Licensee agree as follows:

1.    Licensee shall also include its subsidiaries and affiliates, including Camar Distribution LLC, Carval LLC, AIB Servicos E Comercio Ltd, Alon Brasil Comercio e Distribuicao Ltd. and Alon Argentina SRL.

2.    As amended hereby, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, each of the parties hereto have executed this Second Amendment as of the date and year first above written in duplicate originals by its duly authorized representatives.

**ALON INTERNATIONAL S.A.**          **CONVERSE INC.**

By: _____          By: _____

Title: Robert Szejer                 Title: _____
       co-president                          CEO

**Exhibit 5**

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION
Case No. 50-133-T-00579-04

ALON INTERNATIONAL S.A.,                    )
                                            )
                        Claimant,           )
                                            )
vs.                                         )
                                            )
CONVERSE INC.,                              )
                                            )
                        Respondent.         )
                                            )

## EMERGENCY MOTION OF CONVERSE TO PRESERVE ITS DAMAGES REMEDY AND TO RATIONALIZE THE LITIGATION

**I.     Introduction.**

Now comes the Respondent Converse Inc. ("Converse") and respectfully moves

for an order from this Tribunal that (1) preserves Converse's damages remedy and (2)

rationalizes the multiple South American litigations which involve the same parties and

the same issues as in this Arbitration. Further, through this Motion, Converse seeks to

enjoin Claimant Alon International S.A. ("Alon") from engaging another manufacturer

(which would in effect be a sublicensee, as discussed in detail below) in South

America, as it has threatened to do by Thursday, May 5, 2005.

As for the request to preserve Converse's remedy, unless the Tribunal orders

protection of royalties (which Converse says are exclusively its property after Alon's

License Agreement expired of its own terms on December 31, 2004, and Converse also

formally terminated Alon for various contract breaches), Alon will be paid the royalties, which is the ultimate relief sought by Alon if that happens, Converse will be left without a damages remedy.

As for the request to rationalize the South American litigation, currently there is litigation pending in three trial courts and two appellate courts in Brazil; and there is litigation pending in one trial court and one appellate court in Argentina. The results in each of those courts have been inconsistent and confusing, causing chaos not only amongst the parties, but also among Converse's existing licensee in the territory (Coopershoes) and in the marketplace.

Adding to the chaos is the fact that despite the South American courts' best efforts, their orders are often ineffective and lack teeth, as evidenced most recently by Alon's threats to Coopershoes to pay it royalties in the amount of $400,000 to $500,000 per month, even though the court in Porto Alegre, Brazil has ordered that Coopershoes may pay the royalties into that court. As discussed below, those threats are driven by Alon's desperation to receive that money to fund, among other things, this Arbitration; money that Alon would not be able to repay to Converse should Converse prevail in this Arbitration.

Accordingly, through this Motion, Converse seeks to bring rationality to a process that is currently out-of-control. This Tribunal has the authority to issue and enforce interim orders and injunctive relief to stabilize the situation. The Tribunal should exercise that authority because when the criteria for injunctive relief are considered, they are clearly met. In particular, the Tribunal should order that:

2

1.  It has authority to issue enforceable, interim final orders that supercede any order of the South American courts;

2.  Upon entry of this Order, Converse shall work with Coopershoes under a license agreement entered into between them on December 16, 2004;

3.  Alon cannot terminate Coopershoes, Converse's selected licensee;

4.  Alon cannot engage another manufacturer or licensee (aside from Coopershoes), for the production of Converse's products since Converse has not given its written consent to do so;[1]

5.  Alon cannot engage another sublicensee;

6.  The royalty payments to date that have been paid into court in Porto Alegre, Brazil, and future royalty payments, shall be paid to the ICDR and held in escrow until further order of the Tribunal;

7.  Such further relief as the Tribunal deems necessary and appropriate.[2]

## II.     Factual and Procedural Background.[3]

### *The License Agreement Between Converse and Alon*

On September 1, 2001, Converse and Alon entered into a Manufacturing, Distribution and License Agreement (the "License Agreement"), attached to the Materials as Exhibit A.  The License Agreement, at ¶ 3, granted Alon the right to use the trademarks of Converse for the sale of approved Converse products ("Licensed

---

[1] In light of the fact that Alon has threatened to engage another sublicensee or manufacturer immediately which would result in irreparable harm to Converse, Coopershoes, and the marketplace (as discussed in detail below), Converse is filing concomitantly herewith an *Emergency Motion for an Expedited Decision* relative to the relief requested in this paragraph and paragraph nos. 5-6.  Alon has advised Coopershoes that it will act on its threats unless Coopershoes voluntarily agrees to disregard the Brazilian court orders and pay the royalties to Alon **by Thursday, May 5, 2005.**

[2] Notably, Converse is not seeking to avoid the *status quo* or act inconsistent with it.  Rather, Converse merely wants all activities regarding the terminated License Agreement and the relationship amongst itself, Alon, and Coopershoes to be monitored and controlled by one tribunal only, and this Tribunal should be that tribunal (since the parties agreed to that in the License Agreement).

[3] The facts set forth in this section are taken from the accompanying Affidavits of Timothy Ouellette (Exhibit B), Chris Laganas (Exhibit C), Frank Quijada (Exhibit D) and Altamir Breda (Exhibit E), along *with other affidavits, which are attached to the accompanying Converse's Materials In Support of Motion to Preserve Damages Remedy and Rationalize Litigation* (the "Materials").

3

Products") to be sold in Brazil, Argentina, Paraguay and Uruguay. In return, Alon agreed to pay Converse a percentage of its net sales as a royalty, with guaranteed minimum sales and guaranteed minimum royalties. Ex. A, ¶ 15. The term of the Agreement was September 1, 2001 - December 31, 2004. Ex. A, ¶ 1(a).

> The License Agreement contained a conditional option for Alon to renew it:

> Licensee may renew this Agreement for an additional term of three (3) years ("Option Years" which may collectively be referred to as "Option Period") provided Licensee exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that Licensee has not breached any of the terms and conditions of this Agreement.

Ex. A, ¶ 2. This paragraph also sets forth certain formulas for calculation of the guaranteed minimum sales and royalties for the Option Years. Id. The License Agreement also explicitly states that "[t]he Earned Royalty rate for Licensed Articles for the Option Period *will be negotiated* prior to the Option Years taking effect." ¶ 15(a) (emphasis added). The License Agreement also requires the parties to execute a new and separate written agreement. Id.

The License Agreement, at ¶¶ 29 & 35, prohibited Alon from sublicensing without the express written consent of Converse in each instance. It also required Alon to make certain marketing expenditures. ¶ 7(d).

*Unsuccessful Negotiations for a
Possible Renewal of the Licensing Agreement*

Beginning in late March 2004, Alon began contacting Converse about the option to renew. Ex. B, ¶ 6. As a starting point for these discussions, Alon prepared and sent to Timothy Ouellette, Converse's Vice President of Licensing, a forecast of full-year

4

2004 sales, which estimated sales to be $19,485,296.00. Id. Based on this 2004 forecast, the License Agreement, ¶ 2, required that the guaranteed minimum sales for the first option year, 2005, had to be at 80% of the 2004 actual sales, which would be $15,584,000.00. Ex. B, ¶ 6.

On April 28, 2004, even though sales were on an upward trend, Alon suddenly dropped its full-year 2004 forecast by almost 1/3 – from $19,485,296.00 to $13,300,000.00. Ex. B, ¶ 7. This lowered Alon's 2005 minimum guaranteed sales figures by the same margin. Id. Alon also proposed royalty rates of 8% for originals and 6% on non-footwear, 2% lower than Converse's standard rates. Id. Alon also proposed an increased option term of 4 years. Id. On April 29, 2004, Mr. Ouellette rejected these proposals. Id.

Through May and early June 2004, Mr. Szerer, Alon's other Co-President, continued to send Mr. Ouellette renewal proposals containing minimum guaranteed sales figures which were at least $5 million or more less than what the License Agreement would have required Alon to meet based upon Converse's projection of actual 2004 sales. Ex. B, ¶ 8. Alon also repeatedly offered royalty rates far below Converse's standard minimums. Id.

On May 19, 2004, Mr. Szerer proposed an entirely new contract with an initial period five years, with an option to renew for another five years (a "5+5" proposal). Id.

By mid-June 2004, Mr. Ouellette told Mr. Durchfort that negotiations were going nowhere. Ex. B, ¶ 10. On June 28, 2004, Mr. Durchfort sent Mr. Ouellette a

5

comparison of the option terms in the License Agreement versus Alon's proposal.  Id.
Again, Alon offered significantly lower guaranteed sales figures than the License
Agreement required (70% vs. 80% of projected 2004 sales – approximately a $6
million reduction), as well as a significantly lower royalty rate for original Converse
products (8% vs. 10%) with no increase over time, and a longer term (5 years).  Id.
Mr. Ouellette rejected that proposal.  Id.

The June 28th proposal was the last proposal made by Alon.  Ex. B, ¶ 11.  The
parties never reached an agreement as to any key terms, including 2005 guaranteed
minimum sales, royalty rates and term of the new/renewed agreement.  Ex. B, ¶ 14.
Nor did they ever execute a new written agreement.  Id.

### Converse's Discovery of Alon's Breaches of the License Agreement, Termination of that Agreement, and New Agreement with Coopershoes

In August 2004, Converse first obtained copies of the contracts between Alon
and Coopershoes, an entity Converse believed was one of Alon's suppliers.  Ex. B, ¶
16.  The copies were in Portuguese and were not translated until early November 2004.
Id.  The contracts contained terms whereby Alon purported to grant a license to
Coopershoes to market Converse trademarked products.  Ex. B, ¶ 2.  Alon never
sought or obtained Converse's permission, written or otherwise, to grant such a
sublicense to Coopershoes.  Ex. B, ¶ 16.  In fact, Alon had a strategy of trying to
conceal the true nature of its sublicensing arrangements with Coopershoes and others.

6

Ex. D, ¶ 2. Alon's contract with Coopershoes, therefore, constituted an express breach of Alon's obligations under the License Agreement.[4]

Converse conducted an audit of Alon in November 2004. Ex. B, ¶ 17. As a result of this audit, which was conducted by the accounting firm of Deloitte & Touche, Converse discovered that all, or almost all, of the product development, marketing and sales of Converse products – the heart of the licensee function – was being done by Coopershoes, *not Alon*.[5] Id.

On November 30, 2004, upon obtaining clear evidence of Alon's breach, Converse declared that the License Agreement would expire of its own terms on December 31, 2004, and also terminated the License Agreement for various breaches. Id. On December 17, 2004, Converse entered into a License Agreement with Coopershoes effective January 1, 2005. Ex. B, ¶ 18. Converse did not enter into any contract with Alon for extension of the License Agreement, and currently there exists no contract between Converse and Alon of any kind covering the period after December 31, 2004.

Alon brought suit in Brazil and Argentina seeking, among other things, to keep the License Agreement in place, even though it has expired and also Converse had

---

[4] In the field of licensing of global brands, like Converse, sublicensing is almost universally prohibited without express written permission. The reasons for this, as set forth in the Ouellette Affidavit, ¶ __, are that: (1) the licensor suffers a loss of visibility; (2) the licensor does not have "brand control"; and (3) the licensor loses management control. A licensor like Converse wants its licensee to be directly in control of marketing, advertising, and sales within the territory, but not necessarily strict manufacturing. Where sublicensing occurs, the licensor loses control and has no direct contract with the sublicensee performing these functions. Alon had much experience as a licensee and, therefore, was aware of this sublicensing prohibition in the trade. In fact, a licensor of a different global brand previously had terminated Alon when it discovered that Alon was engaging in sublicensing.

[5] *See* Affidavit of Altamir Breda (Ex. E), which details Coopershoes' work under its contract with Alon.

terminated it.   On or about December 16, 2004, Alon also filed its Notice of Arbitration and Statement of Claim, commencing this Arbitration.[6]

### The South American Court Orders and Alon's Threats to Coopershoes to Disregard those Orders

1.      **The Brazilian Proceedings.**

In the Brazilian proceedings, Alon obtained an *ex parte* injunction in the Civil Court of Porto Alegre stating that Converse must maintain Alon's contract rights pursuant to the License Agreement pending resolution of this Arbitration. Ex. I. Upon hearing Converse's side of the story, the Brazilian court that issued that order reversed itself and dismissed Alon's lawsuit. Ex. I.

Notwithstanding the fact that there was no injunction in place in Brazil, Alon sent notice to Coopershoes demanding that it send royalty payments directly to it, not to Converse. Converse advised Coopershoes that it should send royalty payments to it, pursuant to Coopershoes' agreement with Converse. Seeking guidance, Coopershoes filed an interpleader action in Porto Alegre, Brazil. Ex. I. page 2. The Brazilian court ordered that Coopershoes may deposit the royalty payments into the court pending the outcome of this Arbitration.

Meanwhile, Alon sought to reinstate the status quo injunction that the Brazilian court had ordered and then vacated. Ex. I, page 1. Alon was unsuccessful at the trial level, but the appellate court re-issued the status quo injunction pending Alon's appeal. Ex. I, page 1; see also Ex. F.

---

[6] The complicated procedural history of these actions is set forth in a chart attached as Exhibit F, including the action that Converse brought in United States District Court for the District of Massachusetts.

8

2.    **The Argentine Proceedings.**

Like in Brazil, Alon originally obtained an *ex parte* injunction stating that Converse must maintain Alon's contract rights pursuant to the License Agreement pending resolution of this Arbitration. Ex. J. However, the Argentine order required that Alon pay a $300,000 bond as security for the injunction, which Alon has not paid. Ex. J, page 2. The deadline for Alon to have posted the bond has passed, so the injunction has expired on its own terms. Ex. J, page 2. To be safe, Converse's Argentine counsel is about to file papers confirming that the injunction "has been abandoned." Ex. J, page 2.

3.    **Alon's Demands to Coopershoes**
      **that Coopershoes Ignore the Brazilian Court Order.**

In light of the fact that Alon is not receiving any royalty payments because the Brazilian court has ordered that Coopershoes deposit those payments with the court, Alon is desperate. Thus, on April 29, 2005, Alon demanded of the President of Coopershoes, Altamir Breda (who refers to himself as "Gringo") that Coopershoes immediately start paying the monthly royalties to it and not the court, or Alon will go to Joaneta, another major Brazilian factory near Coopershoes, and manufacture Converse-branded shoes there. Ex. N. Alon has made those threats despite the court order for Coopershoes to pay the royalties into court, and despite the fact that the License Agreement (under which Alon claims rights even though Converse terminated it) prohibits appointment of other sublicensees or manufacturers without advance written permission in each instance. Ex. A, ¶¶ 29, 35, 4(b).

9

If Alon does in fact retain Joaneta (or any other manufacturer) to manufacture Converse-branded shoes instead of Coopershoes, in addition to the damage and confusion to the Converse brand, 1,200 employees of Coopershoes will likely lose their jobs. Ex. N.

## III.    Argument.

The Tribunal has authority to issue interim final orders that supercede the South American *status quo* injunctions.  To avoid further chaos, to move this matter toward an efficient and prompt resolution, and to safeguard the interests of both parties, of Coopershoes, and of the marketplace, the Tribunal should exercise that authority.

### A.    The Tribunal Has Authority to Issue an Enforceable, Interim Final Order.

Procedural rules which govern the arbitration and which provide for interim measures of protection unequivocally empower arbitrators to order interim equitable relief.  *E.g. Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022-23 (9th Cir. 1991) (affirming an interim order pursuant to the AAA Commercial Arbitration Rules requiring a party to place a sum of money in escrow pending the arbitrator's decision concerning the validity of certain agreements); *Island Creek Coal Sales Company v. City of Gainsville*, 729 F.2d 1046, 1049 (6th Cir. 1984) (abrogated on different grounds) (affirming an interim order pursuant to the AAA Commercial Arbitration Rules requiring a party to perform its contract during the pendency of the arbitration proceedings); *see also CRS Sirrine Engineers, Inc. v. AETNA Casualty and Surety Co.*, 1997 WL 136335 * 3 (D.Mass. Feb. 24, 1997) (finding that the procedures governing arbitration issues were governed by the AAA

10

Rules referenced by the parties in their arbitration agreement); *Charles Construction Co. v. Derderian*, 412 Mass. 14, 18-19 (Mass. 1992) ("Parties agreeing to arbitration implicitly intended that the arbitration not be fruitless and that interim orders to preserve the *status quo* or to make meaningful relief possible would be proper. In such a circumstance, the arbitrator's authority to act would reasonably be implied from the agreement to arbitrate itself.").

Article 21 of the International Dispute Resolution Procedures ("International Rules"), which govern this arbitration,[7] provides that the arbitrator "may take whatever interim measures it deems necessary, including injunctive relief and measures for the protection or conservation of property." Article 21 thus explicitly grants this Tribunal broad power to issue injunctive relief. *See Interim Measures in International Commercial Arbitration under the ICC, AAA, LCIA AND UNCITRAL Rules*, 10 AM. REV. INT'L ARB. 123, 128 (noting that the International Rules provide for *any* measure of injunctive relief, "without any express reference to the subject matter of the dispute"); *compare Charles Construction Co.*, 412 Mass. at 18-19 (refusing to allow arbitrator to issue interim measure for security of a breach of contract claim where construction industry arbitration rules refer only to the property that is the subject matter of the arbitration; noting that if the AAA wished to permit broader preliminary powers the rules would not have been drafted narrowly).

Further, an arbitrator's interim order, even though temporary in nature, is recognized as a **final** arbitral award that is enforceable by the courts. *Publics Communication v. True North Communications, Inc.*, 206 F.3d 725, 729 (7th Cir.

---

[7] Sse Order of the ICDR, dated March 24, 2005.

DRS/32913/2/567939v1
05/03/05-BOS/

2000); *Pacific Reinsurance Mgmt. Corp.*, 935 F.2d at 1022-23 ("Courts that have been faced with arbitrators' temporary equitable awards have not characterized them as non-final awards on the merits which can only be reviewed in extreme cases. Rather, they have characterized them as confirmable, *final* awards on an issue distinct from the controversy on the merits." (emphasis in the original)); *Island Creek Coal Sales Co.,* 729 F.2d at 1049; *Sperry Int'l Trade v. Israel*, 689 F.2d 301, 304 n.3 (2nd Cir. 1982) (not considering the issue itself, but noting that the district court confirmed the interim order as a final award and was subject to confirmation by the appeals court); *also see Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 233-234 (1st Cir. 2001) (confirming an interim award and though the court confines its holding to the facts of the case it notes its general agreement with the "several circuits" permitting confirmation of an interim award).

Courts have determined that the type of interim arbitration order that is subject to judicial enforcement includes those that are separate, discrete, independent and severable. *Pacific Reinsurance Mgmt. Corp.*, 935 F.2d at 1022-23 (enforcing an interim final order creating an escrow account to hold disputed funds whose proper distribution is dependent upon a determination as to the validity of an agreement); *Island Creek Coal Sales Co.*, 729 F.2d at 1049 (enforcing an interim final order requiring a party to perform the contract pending the outcome of the arbitration proceedings).

Converse does not contest that courts maintain jurisdiction to compel arbitration and to issue injunctive relief that is necessary to maintain the *status quo* pending

12

arbitration.[8]  The constitution of an arbitration panel, however, diminishes the necessity

of judicial intrusion in the arbitration process.  Stated succinctly:

> [I]t is one thing to apply to a court to preserve the status quo until a duly
> constituted arbitrator can act; but it is quite another thing to consciously  avoid
> taking steps that would give the arbitrator the ability to act and, instead to apply
> to another  court for relief.   Given the modern preference for international
> arbitration, such bootstraps are no longer fashionable.

*Al Nawasi Trading Co. v. BP AMOCO Corp.*, 191 F.R.D. 57, 59 (S.D.N.Y. 2000);

*see also James Associates (USA) Ltd. v. Anhui Machinery & Equipment Import and*

*Export Co.*, 171 F.Supp.2d 1146, 1150 (D. Colo. 2001) (affirming a *status quo*

preliminary injunction that terminated upon the commencement of arbitration).  In fact,

Alon persuaded the United States District Court for the District of Massachusetts to

deny Converse's motion to dismiss the South American injunction actions by pointing

out that no arbitrator had yet been appointed and arguing that the International Rules

permitted Alon to petition a judicial authority to protect its damage remedies "prior to

the selection of an arbitrator." (Alon brief 17-18, submitted January 5, 2005).[9]  The

Brazilian and Argentine *status quo* orders direct the parties to maintain their contractual

relationship, but they do not contain any indication as to how Converse and Alon, two

parties involved in contentious litigation and who have no current contract with one

---

[8] In fact, Article 21 of the International Rules clearly permits the parties to seek judicial interim relief that "shall not be deemed incompatible with the agreement to arbitrate."

[9] After citing to Article 21 of the International Rules, Alon stated, "[p]ursuant to the AAA Rules, therefore, a party 'may request an [interim] measure from *any court* with jurisdiction over the dispute' prior to the selection of an arbitrator(s). (emphasis added).  George Marchac, *Interim Measures in International Commercial Arbitration Under the ICC, AAA, LCIA and UNCINTRAL Rules*, 10 Am. Rev. Int'l Arb. 123, 125, 135 (1999) (Interim relief 'may not be available from the arbitrators because the tribunal is not yet constituted .... In such situations, only local courts may grant such measures, assuming that they have the appropriate jurisdiction.').... Brazilian and Argentine courts have jurisdiction to grant status quo injunction in this case. ... As the arbitral process was commenced just two weeks ago there currently is no arbitrator appointed."

DRS/32913/2/567939v1
05/03/05-BOS/

another and no agreement on major business terms, are to work with each other throughout the pendency of arbitration proceedings that will not even commence until the end of October. While Alon consistently points out that *status quo* injunctions pending arbitration are permitted, it has never specifically defined the contours of what the *status quo* should or does entail.

A true definition of the status quo protects Converse's damages remedy. In *Danieli & C. Officine Meccaniche v. Morgan Construction Co.*, the plaintiff commenced an action in U.S. District Court in Massachusetts seeking to obtain delivery of bearings that the defendant had manufactured and the plaintiff had paid for in full. 190 F.Supp. 2d 148, 151-153 (D. Mass. 2002). The plaintiff argued that if it did not receive the bearings its contracts with third parties would be irrefutably jeopardized. *Id.* at 155. The Court found that "[t]he *status quo* in the instant case consists of the defendant's withholding of goods from the plaintiff ...." *Id.* It went on to note that "[i]n a literal sense, requiring the defendant to transfer to the plaintiff possession of steel bearings would disturb that *status quo.*" *Id.* However, in an effort to avoid causing the plaintiff irreparable harm that would result from adhering to a "literal" definition of the *status quo*, the Court held that "[t]he principle underlying the authority of a district court to preserve the *status quo* pending arbitration is the moving party's right to retain its remedies during such proceedings." *Id.* In light of this principle, the Court directed the defendant to deliver the bearings and required that the plaintiff post a bond in order to safeguard defendant's remedies pending arbitration. *Id.* The Court's decision illustrates the need for this Tribunal to define the *status quo* in a manner that

14

protects the parties' damages remedies.  The *status quo* between Converse and Alon

entails Coopershoes depositing royalty payments into an escrow account with the ICDR

that will be payable to Alon only if it prevails in this Arbitration.

Moreover, the Brazilian and Argentine orders are orders for the specific

performance of a contract providing for an ongoing business relationship, and are not

appropriate pre-judgment remedies.  Such orders are rarely issued.  In fact, there is

substantial case law showing that specific performance should not be granted where it

would harness parties to work with each other where there is no longer any trust.  *E.g.*

*Lawless v. Malone*, 350 Mass. 440, 443 (1966) (affirming the trial court's refusal to

order specific performance of a joint venture because where the parties had been

involved in litigation it "would be likely to result in an unsatisfactory and probably

unworkable relationship"); *Westinghouse v. New England Patriots*, 10 Mass. App. Ct.

70, 74 (1980) (affirming the trial court's denial of specific performance to renew a

broadcasting contract ruling that courts should be reluctant "to order the plaintiff and

defendant into an uneasy harness"); *Dunkin' Donuts of America v. Minerva, Inc.*, 956

F. 2d 1566, 1571-1573 (11th Cir. 1992) (applying Massachusetts law) (affirming the

trial judge's order awarding only monetary damages consisting of lost profits or future

lost profits to a franchisee related to franchisee's ongoing operation of the franchise

where franchisor breached the franchise agreement holding that "a franchise contract is

a personal services contract  and may not be specifically enforced, [franchisee] could

not as a matter of law sought to have the franchise contracts extended since [franchisor]

was no longer willing to deal with her" and further that "[t]here is absolutely no

15

precedent for granting specific performance of a franchise contract"); *Thayer Plymouth Center v. Chrysler Motors*, 63 Cal. Rptr. 148, 150 (1967) ("A contract which requires a continuing series of acts and demands cooperation between the parties for the successful performance of those acts is not subject to specific performance.") Notwithstanding this substantial case law, and the utter lack of trust that Converse has for Alon, Ex. B, ¶ 18, page 11, Ex. C, ¶ 9-10, and the lack of any new contract between Converse and Alon setting forth material terms, Ex. B, ¶ 18, page 10, the parties have been directed by the South American courts to maintain their contract.

Should this Tribunal agree with Converse that it is practical and efficient to exercise its authority to issue interim measures of protection, it is highly probable that a court would confirm rather than vacate such an award. It is "beyond cavil" that the judiciary's role in arbitration is limited when it is reviewing a final arbitral award such as the interim final order sought pursuant to this motion. E.g. *Sperry Int'l Trade*, 689 F.2d at 304; *also Wonderland Greyhound Park, Inc. v. Autotote Systems, Inc.*, 274 F.3d 34, 35 (1st Cir. 2001) ("Judicial review of the arbitrator's decision is extremely narrow and exceedingly deferential."), *citing Bull HN Info. Sys., Inc. v. Hutson*, 229 F.3d 321, 330 (1st Cir.2000). The First Circuit has recently held that "[a]n arbitrator's award must be enforced if it is in any way plausible, *even if [the court] think[s][the arbitrator] committed serious error." Gupta v. Cisco Sys., Inc.*, 274 F.3d 1, 3 (1st Cir.2001) (emphasis added). Section 10 of the Federal Arbitration Act permits a court to vacate an arbitration award only in very rare circumstances such as where the award was procured by corruption, fraud, or undue means or where the arbitrator is guilty of

16

misconduct such that the rights of a party have been prejudiced or where the arbitrator exceeded his power. *Wonderland Greyhound Park, Inc.*, 274 F.3d at 35; *Bull HN Info. Sys. Inc.*, 229 F.3d at 330-31; *see* 9 U.S.C. § 10 (2000). An arbitration award may also be vacated when it is rendered in manifest disregard of the law presupposing "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand and apply the law." *Sperry Int'l Trade*, 689 F.2d at 304-305 (internal citations omitted); *also Wonderland Greyhound Park, Inc.*, 274 F.3d at 35.

Accordingly, there can be no dispute that the Tribunal has the authority to issue enforceable, interim final orders.

**B.      The Tribunal Should Exercise Its Authority
           and Issue Enforceable, Interim, Final Orders.**

Upon consideration of the standard for injunctive relief, it is clear that the Tribunal should exercise its authority and issue enforceable, interim, final orders that supercede the South American *status quo* injunctions.[10]

**1.      The Injunction Standard.**

In order to establish entitlement to injunctive relief, the moving party must show that (1) it has a likelihood of success on the merits of its claim; (2) it will suffer irreparable injury if the injunction is not granted; (3) such injury outweighs any harm which granting injunctive relief would inflict upon the other party; and (4) the public interest will not be adversely affected. *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43,

---

[10] It bears repeating from above that Converse is not seeking to avoid the *status quo* or act inconsistent with it. Rather, Converse merely wants to have one tribunal direct the activities and relationships among itself, Alon, and Coopershoes.

51-52 (1986). Here, upon consideration of those factors, it is clear that this Tribunal

should issue an order superceding the South American *status quo* injunctions.

> ## 2.   Converse Has a Strong Likelihood of Success on the Merits.
>
> ### a.   The License Agreement Does Not Provide for Automatic Renewal and Was Not Renewed in A Separate Writing As Required.

It is clear from the face of the License Agreement that it is not automatically

renewable by Alon because it requires Alon to negotiate with Converse to agree upon

certain open key issues and then to memorialize that agreement in a separate writing

signed by both Alon and Converse. Ex. A, ¶¶ 2, 15. As set forth above, Converse

and Alon neither reached agreement on the open issues, nor memorialized any

agreement in a separate writing.

The License Agreement grants Alon merely an "option to renew," which

requires a further agreement by both parties on certain key terms of their ongoing

relationship before a renewal occurs. *See, e.g., Qureshi v. Fiske Capital Management,

Inc.*, 59 Mass. App. Ct. 463, 461, *rev. denied*, 440 Mass. 1108 (2003) ("an option to

renew contemplates the execution of a new lease, a process that may introduce new

terms and conditions on which the parties must agree or there will be no new lease.");

*HLM Realty Corp. v. Morreale*, 394 Mass. 714, 716 (1985) ("The important point is

whether some new agreement or some additional act is necessary in order to make the

exercise of the option effective, in which event the exercise of the option, without

more, does not continue the lease relationship."). Further, the License Agreement's

"invalidating clause", which requires any extension to be in a further written agreement

DRS/32913/2/567939v1
05/03/05-BOS/

containing all necessary terms and signed by both parties, is valid and enforceable. Restatement (Second) of Contracts, § 21 ("Neither real nor apparent intention that a promise be legally binding is essential to the formation of a contract, but a manifestation of intention that a promise shall not affect legal relations may prevent the formation of a contract."); *see Goren v. Royal Investments Inc.*, 25 Mass. App. Ct. 137, 142-43 (1987), *rev. denied*, 401 Mass. 1104 (1988), citing Restatement (Second) of Contracts, § 21.

Here, the License Agreement expressly left the royalty rate for the option years to be negotiated at a later date. It is undisputed that Converse and Alon did not reach an agreement as to that key term with respect to any renewal of the License Agreement. Ex. B, ¶¶ 6-10, 14. Converse had offered 10% for original and 8% for non-footwear (which were its standard percentages), while Alon never offered more than 8% for originals and 8% for non-footwear. Ex. B, ¶¶ 7, 10. It is likewise undisputed that the parties never executed a separate document for a renewal, as required by the License Agreement. Ex. B, ¶ 14. Accordingly, because the License Agreement was not renewed, that Agreement expired on December 31, 2004, and Alon has no further rights thereunder.

### b. Even if the License Agreement is Automatically Renewable, Alon Lost Its Rights When it Proposed New Renewal Terms Which Converse Rejected.

An optionee such as Alon makes a counteroffer and loses the benefit of the previously-stated option terms when "it introduce[s] commercial terms that had not been part of either the proffered lease or the lease under which the parties had

19

previously operated." _Qureshi_, 59 Mass. App. at 467. An optionee does so at its

peril, because once a counter-offer is made, the party who has given the option "is not

bound to accept the new terms . . ." Id.[11]

Here, even if the License Agreement was automatically renewable, Alon lost

that right by making several counter-offers with lower minimum guaranteed sales and

royalties, and a longer option term than set forth in the License Agreement. Ex. B, ¶¶

6-10. Converse specifically rejected these counter-offers in their entirety. Ex. B, ¶¶ 6-

10, 14. As a result, Alon lost its rights to the terms for the option years specified in the

Agreement. _See Qureshi_, 59 Mass. App. at 462 ("[w]hen a tenant has the benefit of an

option to extend, the tenant initiates negotiation of new business points at its peril that

the negations will not end in agreement."). Because these un-agreed items were all

material – indeed, they governed the compensation each party was to receive under the

renewed agreement – there was no legally enforceable new agreement between ALON

and Converse for renewal of the License Agreement.[12] Accordingly, even if the

License Agreement was automatically renewable, it terminated on December 31, 2004.

---

[11] This doctrine is consistent with the common law "mirror image rule". _See Moss v. Old Colony Trust_, 246 Mass. 139, 148 (1923) ("It is elementary law that an offer must be accepted in the terms in which it is made in order to become a binding contract, and that a conditional acceptance or one that varies from the offer in any substantial respect is in effect a rejection and is the equivalent of a new proposition."); _see also Commerce & Indus. Ins. Co. v. Bayer Corp._, 433 Mass. 388, 392 (2001); _Peretz v. Watson_, 3 Mass. App. 727, 728 (1975).

[12] For contract negotiations to be binding there must be an agreement on all material terms. _Situation Management Systems, Inc. v. Malouf, Inc._, 430 Mass. 875, 878 (2000) ("It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of the contract"); _see Fontneau v. Town of Sandwich_, 251 F. Supp. 2d 994, 1002 (D. Mass. 2003) (holding no contract where "several material terms are absent. One such term is the duration of the supposedly renewable lease.").

20

### c.    Alon Materially Breached the License Agreement.

Alon is not entitled to <u>any</u> relief under the License Agreement because it materially breached that agreement by entering into a sublicense arrangement with Coopershoes without Converse's consent, and deceiving Converse about the true nature of that relationship.

It is hornbook law that a material breach of a contract by one party excuses the other party from performance. *E.g., Ward v. American Mutual Liability Insurance Co.,* 15 Mass. App. Ct. 98, 100 (1983); *Quintin Vespa Co. v. Construction Serv. Co.,* 343 Mass. 547, 554 (1962); Restatement (Second) of Contracts § 237 (1981). A breach of a clause in a licensing agreement prohibiting sublicensing occurs where the licensee simply grants the license to another party. *Archway Cookies v. Smith Cookies Co.,* 2004 U.S. Dist. LEXIS 21839 (D. Ore. 2004) (holding licensee breached license agreement where it "does not employ workers and owns no plants or tools. . . [and] transferred or assigned its rights and interests as a licensee under the License Agreement" to another party without consent.); *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.,* 729 F. Supp. 1035, 1042-43 (D.N.J. 1990), (holding that licensee who sublicensed without licensor's written consent not only breached agreement but committed copyright and trademark infringement).

Here, the License Agreement, Ex. A, expressly prohibited Alon from sublicensing without the advance written consent of Converse in each instance:

> 29.    <u>Assignment or Sublicense by Licensee.</u>   None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other Converse property may be

21

> assigned, transferred, sold, sublicensed or otherwise disposed of by Licenses without the prior written consent of Converse in each instance.

Alon breached the License Agreement by entering into sublicensing agreements with Coopershoes in which Alon expressly granted to Coopershoes *a license* to use Converse trademarks and market Converse products. Ex. C, ¶ 2. Alon cannot produce any advance written consent by Converse to such sublicensing because none exists. Ex. B, ¶ 16.

Alon claims that it did not breach the License Agreement because Converse knew about its relationship with Coopershoes. This assertion is disingenuous. Alon told Converse it was doing business with Coopershoes, but *never* that Coopershoes was *a sublicensee*. Ex. C, ¶¶ 4-6. Alon led Converse to believe that Coopershoes was merely one of its suppliers and refused to allow Converse to review its agreement with Coopershoes until it was forced to do so in the fall of 2004, which is when Converse first learned about the breach. Ex. B, ¶ 17.

Alon also materially breached the License Agreement by repeatedly failing to meet the required minimum expenditures for advertising Converse's products. In 2003, this shortfall was at least $361,500. In 2004, Converse believes this shortfall to be $650,000. Alon also undertook to market footwear products competing directly with Converse products, namely, the Miss Sixty and Superga brands. Ex. C, ¶ 8.

3. **The Balance of Harms as Well as Policy Considerations Favor Issuing a Pre-Arbitration Order Protecting Converse's Damages Remedy by Preserving the Royalties, Permitting Converse to Work with Coopershoes, and Prohibiting Interference by Alon.**

22

a.    **Alon in Brazil is Threatening Immediately to Appoint Sublicensees and/or New Manufacturers and to Terminate Coopershoes (the Existing Manufacturer), All Without Converse's Approval, In an Effort to Force Alon to be Paid Pending Arbitration.**

As of Friday, April 29, 2005 Alon in Brazil began threatening to appoint new sublicensees and/or manufacturers, and to terminate the existing manufacturer (Coopershoes), all without Converse's approval. Ex. N. Since Friday, Ronald Durchfort and Roberto Szerer, the two Co-Presidents of Alon, have been calling Altamir Breda, the President of Coopershoes. Ex. N. During these conversations Durchfort and Szerer threatened Coopershoes as follows: unless Coopershoes starts making the royalty payments to Alon immediately, and stops making the payments into court, Alon will stop working with Coopershoes; Alon will start working with another company to produce and sell in Brazil, like the Joaneta factory; Alon says it does not matter if this does not conform to the existing court orders in Brazil, because it has nothing left to lose; Alon says it wants to cause confusion in the market, like with the Artigos (the current brand pirate of Converse marks); Alon also says it will inform the market that Coopershoes no longer has any right to work with the Converse brand. Ex. N.

Converse understands that Alon has given Coopershoes a deadline to respond favorably to Alon's threats by Thursday, May 5, 2005.

The actions Alon is threatening immediately completely violate the former contract between Converse and Alon (the License Agreement), which contract is at the core of Alon's claim since Alon argues that it is still effective and compels Converse to

maintain Alon as the licensee.  Under that contract, Alon can neither appoint any manufacturers of Converse-branded products, nor any sublicensees, without the advance written approval of Converse in each instance.  Ex. A, ¶¶ 4(b) ("all factories at which Licensee desires to have Licensed Articles manufactured shall be approved in writing by Converse in advance of the placement of any orders"); and 29 ("None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee without the prior written consent of Converse in each instance").  Moreover, under the License Agreement, Ex. A, at ¶ 9(e), Alon agreed: "that it shall not approach any third party factories regarding the production of Footwear Licensed Articles, unless having prior written consent from Converse."[13]  Alon has acknowledged that Converse's right to require advance written consent is absolute.  Letter of Edward Davis, dated April 8, 2005, page 2: "Alon is fully aware that pursuant to the Licensing Agreement, it needs Converse's approval to use the Indular factory."[14]

   Alon's threat to go to the Joaneta factory is a threat to appoint new manufacturers and/or sublicensees without Converse's approval.  Obviously terminating

---

[13]  The term "third party factories" means factories not owned by the Licensee and factories not already approved for manufacturing by Converse for itself or another licensee.

[14]  The requirement that Converse approve in writing any new factory or manufacturer, even if such approval is unreasonably withheld, is consistent with Massachusetts caselaw.  In *21 Merchants Row Corp. v. Merchants Row, Inc.*, 412 Mass. 204 (1992), the Massachusetts Supreme Judicial Court held that when a lease required the commercial landlord's consent to a sublease or assignment, the commercial landlord could withhold his consent, even if it was unreasonable to do so.  Like the commercial landlord who has a strong interest in protecting his property (which forms the basis for his ability to withhold consent even if unreasonable), Converse has an equally strong interest in protecting its property (ie, its trademarks).  Accordingly, Converse is completely justified in requiring advance written approval of a new factory or manufacturer, even if it withholds that approval unreasonably.

DRS/32913/2/567939v1
05/03/05-BOS/

Coopershoes and going to Joaneta (or a like factory) would be the appointment of a new manufacturer without Converse's consent. The appointment of a new manufacturer would be a direct violation of the prohibition in the License Agreement against appointment of new factories without Converse's advance consent, which consent Converse has a right to withhold. Ex. A, ¶ 4(b); Ex. M. In this case, Converse also has good reason to withhold its consent because the Joaneta factory is the very factory that is manufacturing and selling the brand pirate knockoffs of Converse's shoes, under the name of the brand pirate, Artigos.[15] Ex. M, ¶ 3. Also, making an arrangement for either Joaneta or someone else to then sell the shoes would be in the nature of a sublicense because that distributor would need to have the right to sell products with the Converse trademarks. Ex. M, ¶ 2. This would be the appointment of a new sublicensee without Converse's consent. Ex. M, ¶ 2. Appointment of a new sublicensee is extremely dangerous because Converse loses control of its trademark, as with Artigos, and litigation to stop the new sublicensee from using the Converse trademarks could go on for years. Ex. M, ¶ 2. (Converse has already been litigating with Artigos for many years). Ex. M, ¶ 2.

---

[15] In his *Affidavit Regarding the Joaneta Factory* (attached as Ex. M), Chris Laganas explains why it would be devastating to Converse for Joaneta to manufacture Converse-branded footware. Those reasons include, but are not limited to, the fact that appointing Joaneta as manufacturer would also mean that Joaneta is a new sublicensee because Joaneta would be selling the shoes in its own name with its own sales force. Joaneta would be selling Converse's trademarks with no contract between Converse and Joaneta, and, thus, Joaneta would be pirating Converse's brands; Converse would lose control over the quality of the product, the manufacturing conditions, marketing and advertising; and Joaneta has for some time been manufacturing counterfeit Converse brands.

DRS/32913/2/567939v1
05/03/05-BOS/

Alon is also making such threats to appoint new manufacturers and sublicensees knowing that Converse has a long-term contract with Coopershoes which Converse expects to be in place after this Arbitration is concluded.

Alon is threatening to outright violate the contract and become an outlaw, all for the purpose of threatening the business of Coopershoes, and by extension Converse, to force Coopershoes to pay Alon the royalties pending a decision in this Arbitration.

      **b.** **Alon in Brazil is Also Sowing Havoc, Confusion and Rumor, to Damage Coopershoes (and By Extension Converse), All in an Effort to Force Alon to be Paid Pending Arbitration.**

As stated in the email of Altamir Breda of May 2, 2005, Alon is sowing havoc and rumor in Brazil to damage the existing manufacturer, Coopershoes. Alon says it will tell the market (the retailers) throughout Brazil that Coopershoes has no right to work with the Converse brand. Ex. N. Alon will deceitfully tell the market that it has terminated Coopershoes. Ex. N. Alon will damage the credibility of the Converse brand with the market in Brazil. Ex. N. There will be confusion in the Brazilian market caused not only by Artigos (the current brand pirate of Converse marks), but now also by Alon. Ex. N; see Ex. M, ¶ 3.

Coopershoes legitimately fears the loss of 1,200 jobs for its factory workers. Also, Coopershoes fears the social harm caused by such lost employment to the surrounding community of Picade Café. Ex. N.

Alon has engaged in all of this activity in an effort to force it to be paid pending the Arbitration.

DRS/32913/2/567939v1
05/03/05-BOS/

      c.     **Converse is Entitled to an Injunction to Protect its Damages Remedy, Which Remedy Will Be Lost If the Royalties During the Arbitration are Paid to Alon.**

Injunctions can issue to protect a party's damages remedy. *Teradyne, Inc.*, 797

F.2d at 52-53. In *Teradyne*, the First Circuit Court of Appeals stated:

> a preliminary injunction, designed to freeze the status quo and protect the damages remedy is an appropriate form of relief when it is shown that the defendant is likely to be insolvent at the time of judgment.

*Id.* (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940); *see Unisys*

*Corp. v. Dataware Pruducts, Inc.*, 848 F.2d 311 (1st Cir. 1988) (injunction was

necessary to preserve presence of adequate legal remedy); *Micro Networks Corp. v*

*HIGH Hightec, Inc.*, 188 F.Supp.2d 18 (D.Mass.2002) (courts' primary effort is to

preserve a damages remedy and to freeze the status quo); *Roland Machinery Co. v.*

*Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (injunction warranted if

damages will be seriously deficient as a remedy for the harm suffered because the

defendant may become insolvent before final judgment can be entered and collected);

*Productos Carnic S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d

683, 686 (5th Cir. 1980) (even where plaintiff's remedy is limited to damages,

injunction may issue to protect that remedy).  In order for such an injunction to issue,

the moving party has to show the elements for injunctive relief, including an inadequate

remedy at law.  In *Teradyne*, the First Circuit held that the injunction was necessary

because the defendant could not provide adequate assurances that it would be able to

pay an adverse judgment to the plaintiff.  *Teradyne, Inc.*, 797 F.2d at 53; *see Micro*

27

*Networks Corp.*, 188 F.Supp.2d at 22 (movant must show that it will be unable to recover damages).

Here, Converse's argument is that as of December 31, 2004, its License Agreement with Alon expired of its own terms, it was not renewed, and Converse terminated Alon. As a result, no royalties on sales of Converse-branded shoes or other products after December 31, 2004 are the property of Alon; instead, they are the property of Converse. Therefore, if the royalties paid by Coopershoes into court in the Porto Alegre interpleader action are in fact paid to Alon pending the Arbitration (as Alon wants), those royalties will be unrecoverable (since by Alon's own admission, it is near insolvency). If Converse ultimately prevails in this Arbitration and thus has a direct contractual right to the royalties based upon its relationship with Coopershoes, Converse will be bereft of a remedy.

If the royalties are paid to Alon, Converse in all likelihood will have lost any ability to be paid on its contract claim for royalties it has earned under its current contract with Coopershoes. Alon said at the hearings on April 26th and May 2nd that it was desperate to receive the royalty payments paid into the interpleader action in Porto Alegre. If Alon is as desperate for those funds as it says, then it will not be able to repay those funds if Converse prevails in this matter and the post-December 31, 2004 royalties are the legitimate property of Converse and not Alon. Ex. C, ¶ 14; see Ex. K, ¶ 32-33.

The amount of the funds paid into the interpleader in Porto Alegre over the entire course of this Arbitration through November 2005 (until the Tribunal renders a

28

decision) will total approximately $5.2 million. See Ex. C, ¶ 11-13. That number is based upon a royalty rate paid by Coopershoes in the interpleader of about $475,000 per month, and the timeframe spans from January 2005 through November 2005, for a total of $5.2 million. Ex. C, ¶ 11-13.

Unless the Tribunal grants relief preserving the interpleader funds, Converse's damages remedy with respect to those funds will be lost. Converse will suffer an irremediable loss with respect to its claims of as much as $5.2 million. Thus, the Tribunal should, where Converse has shown a reasonable likelihood of success on the merits, protect Converse's damages remedy by preserving the interpleader funds and not allowing them to be paid to Alon.[16]

> **d.    Alon's Remedy in This Matter, If It Prevails, Will be Damages and Not Specific Performance; Therefore It Cannot be Awarded Pre-Judgment Specific Performance Whereby It Remains as the Licensee and Receives Payment.**

As discussed above, there is substantial case law holding that specific performance should not be granted where, as here, it would harness parties to work with each other where there was no longer any trust. (*See* II.A., supra, regarding Tribunal's Authority to Issue Enforceable, Interim, Final Orders). Thus, even if Alon prevails in the Arbitration, at most its remedy will be damages, not specific

---

[16] Should this Tribunal order that the monthly royalties be paid to the ICDR and held in escrow, Converse expects that Coopershoes will voluntarily comply, eliminating any potential issue regarding the Tribunal's authority over Coopershoes.

DRS/32913/2/567939v1
05/03/05-BOS/

performance of the License Agreement.  It defies logic for Alon to obtain pre-judgment specific performance when it will be unable to obtain it post-judgment.[17]

          e.      **Alon Has Not and Does Not Perform the Work of a Licensee, Coopershoes Does; Therefore Alon Should Not Receive the Royalties and There is No Business Reason to Keep Alon in Place as the Licensee Pending Arbitration.**

Alon has not and does not perform the work of a licensee in Brazil.  A licensee of a global shoe brand like Converse must do the following (all of which are specified in the License Agreement): (a) develop products for sale in local markets; (b) develop a marketing plan for such products; (c) purchase advertising for such products; and (d) actually distribute and sell the products through a sales force.  Alon has not and does not do any of these things.  Ex. E, ¶ 5-10.

In Brazil, all of this activity has been and is performed by Coopershoes.  Ex. E, ¶ 5-10.  As set forth in the Affidavit of Altamir Breda, President of Coopershoes, Coopershoes performs all of these functions to the almost total exclusion of Alon.  First, Coopershoes performs all of the product development for the Brazilian market through its product development manager, Alexander Carlos Zink.  Ex. E, ¶ 5.  All tooling costs for shoe manufacturing are paid for by Coopershoes.  Ex. E, ¶ 5.  Second, Coopershoes conducts all of the marketing and promotion of Converse footwear products and Alon has no role.  Ex. E, ¶ 7.  Third, all of the sales force selling Converse shoes to retailers are contracted to Coopershoes.  Ex. E, ¶ 8.  Fourth, financial activities including banking and loan arrangements supporting the sale of

---

[17] Recognizing this issue, Alon, through counsel, has indicated that Alon will be amending its claim in this Arbitration to seek a damages remedy.

30

Converse shoes in Brazil is handled by Coopershoes. Ex. E, ¶ 9. Fifth, all Converse footwear manufactured by Coopershoes are owned by Coopershoes and are the inventory of Coopershoes. Ex. E, ¶ 10.

Since all of the required activity of a licensee in Brazil is performed by Coopershoes, it would be disruptive and detrimental to maintain Alon as the licensee pending an Arbitration decision, when it performs no work and would only be acting as a go-between.

  f.   **Alon in Argentina is Making Almost No Sales and is Therefore Damaging the Market, and It Has Attempted to Sell the License Without Converse's Approval.**

Alon has no injunction in force in Argentina compelling Converse to maintain any claimed contract rights of Alon. Ex. J. Alon is currently making very few sales in Argentina. Alon has no manufacturer in Argentina. Alon cannot obtain credit from Coopershoes to buy shoes from Coopershoes and try to re-sell them in Argentina.

Lack of sales in Argentina in the interim means less royalty profits, regardless of who eventually prevails in this Arbitration.

Alon has tried to sell its license rights in Argentina, which it has absolutely no right to do. Ex. L.

  g.   **In Both Brazil and Argentina There is a Labyrinth of Litigation, Brought and Largely Maintained by Alon, Which Damages Confidence in the Market and In the Sales Effort, All in an Attempt to Force Alon to be Paid Pending Arbitration.**

31

In Brazil there has been litigation before three first instance courts (trial courts) and two appellate courts, and the orders of these courts have swung back and forth. Ex. I.

In the Civil Court of Porto Alegre, in mid-December, 2004, Alon's initial request for an injunction to maintain the License Agreement was denied. Ex. I, page 1. On December 24th, after Alon filed a motion for reconsideration of the denial of the injunction, the court granted it. Ex. I, page 1. Then, on February 24, 2005, after Converse responded to the Civil Court of Porto Alegre, the court revoked the injunction which had kept the License Agreement in place and dismissed the case completely. Ex. I, page 1. Alon filed another motion for reconsideration, which in early March was denied. Ex. I, page 1. Alon filed an immediate interlocutory appeal from the denial of its motion for reconsideration to the Appellate Court of the Rio Grande do Sul (Porto Alegre), which was granted by a single justice on March 18, 2005. Ex. I, page 1; Ex. G. Converse filed a motion for reconsideration of the single justice order, which the single justice referred to a three-judge panel of the Appellate Court. Ex. I, page 1. On April 26th, the three-judge panel upheld the decision of the single justice. Ex. I, page 1. Converse expects to file shortly a further appeal of the decision of the three-judge panel to the Superior Court of Justice of Brazil, which is also known as the third instance court. Ex. I, page 1.

Coopershoes filed in February, 2005 an interpleader suit in the Civil Court of Porto Alegre, seeking authority to pay into court the royalty payments for the months of January and February 2005. Ex. I, page 2. The court permitted payment into court

32

for payments for those two months.  Ex. I, page 1; Ex. H.  Coopershoes filed a second

interpleader action in the Civil Court of Porto Alegre to allow it to pay subsequent

royalty payments into the court.  Ex. I, page 2.  The court also allowed payment into

court for these later payments.[18]  Ex. I, page 2.

In early April, 2005 Alon filed suit for specific performance of contract in the

Business Court of Rio de Janeiro, Brazil.  Ex. I, page 2.  In that action, Alon requested

a court order to keep in effect its contract with Coopershoes (which by its terms had

expired on December 31, 2004) and to require that Coopershoes make direct payment

of the royalties to Alon.  Ex. I, page 2.  On April 5, 2005 the Rio court granted the

injunction sought by Alon ordering that Coopershoes directly pay the monthly royalties

to Alon.  Ex. H.  Coopershoes presented its defense that, among other things, it was

already subject to the order of the Civil Court of Porto Alegre to pay the monthly

royalties into an interpleader and that Converse was a necessary party to any decision

of the court.  Ex. I, page 2.  The reply of Alon is pending.  Ex. I, page 2.

Coopershoes has also filed an appeal of the original order of the Business Court of Rio

de Janeiro to the Appellate Court of Rio de Janeiro, and a decision of the Appellate

Court of Rio de Janeiro is awaited.  Ex. I, page 3.

In Argentina, there has been litigation in one first instance court and one

appellate court.  Ex. J, page 1.  On December 30, 2004 the City of Buenos Aires

National Commercial Court issued an order in favor of Alon keeping the License

---

[18] Alon's counsel statement to the Tribunal on May 2, 2005 that Coopershoes is under no court order to pay
the royalties into court, while technically accurate, is misleading.  Coopershoes sought a court order to
release its competing obligations to both Converse and Alon.  The court granted that order, determining
that payments were to be made into court so that Coopershoes' respective obligations to Converse and Alon
could be released.

33

Agreement in place for a period of 60 days and ordering that Alon furnish a $300,000 bond for the order to take effect. Ex. J, page 1. Alon appealed that order to the appellate court. Ex. J, page 1. On March 17, 2005 the appellate court upheld the injunction, extended the 60 day period from the date of the appellate court's decision, but did not reduce the $300,000 bond requirement. Ex. J, page 1. On March 23, 2005 Converse filed a presentation seeking to reverse the injunction. Ex. J, page 1. On or about April 20, 2005, the appellate court ordered that Alon needed to post the $300,000 bond before it would decide any of the issues pending before it. Ex. J, page 1. On April 22nd, at Alon's request, the court granted Alon an extension to post the bond until April 29th. Ex. J, page 1-2. The court then further extended the deadline until May 2nd. Ex. J, page 2. As of May 2nd Alon has not posted the bond. Ex. J, page 2.

The numerous actions and seesaw orders have created confusion and doubt in the marketplace and in the sales effort. There are competing orders as to whether Converse must treat Alon as its licensee. This is so even though it is undisputed that there is no contract between Converse and Alon setting forth the 2005 royalty rates, minimum guaranteed sales, minimum guaranteed royalties, and the term of the agreement.

All of these judicial proceedings in Brazil and Argentina show that Alon's goal has always been (and continues to be) payment of the royalties to it pending Arbitration.

**C.    This Tribunal's Interim Final Order Subject
to Confirmation by the United States District Court
Does Not Necessitate (or Amount to) an Anti-Suit Injunction.**

34

Converse is not seeking any form of an anti-suit injunction. The foregoing arguments show that a duly constituted arbitrator is empowered to issue an interim order to prevent the final award from becoming meaningless. *Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022-23 (9th Cir. 1991) ("[T]emporary equitable relief in arbitration may be essential to preserve assets or enforce performance which, if not preserved or enforced, may render a final award meaningless."). Under Section 9 of the Federal Arbitration Act, a district court is empowered to confirm or vacate a final interim arbitration award. *Id.* at 1023; *see* 9 U.S.C. § 9. The grounds for vacating such an award are extremely limited. *See* 9 U.S.C. § 10. Since the order of the Tribunal binds the parties, it is subject to judicial confirmation; hence, the South American *status quo* injunctions automatically terminate upon the decision of this Tribunal.

## IV.    Conclusion.

For the foregoing reasons, Converse respectfully requests that its *Emergency Motion to Preserve its Damages Remedy and to Rationalize the Litigation* be granted. Specifically, Converse requests that the accompanying *Proposed Order* be adopted by this Tribunal.

35

Respectfully submitted,
**CONVERSE INC.**
By its attorneys,

Michael C. Gilleran (BBO# 192210)
David P. Russman (BBO# 567796)
Christine N. Parise (BBO# pending)
PEPE & HAZARD LLP
225 Franklin Street
Boston, Massachusetts 02110
(617) 748-5500

Dated: May 3, 2005

36

**Exhibit 6**

## Russman, David

**To:**   Theroux, Gene

**Cc:**   Edward Davis; Cristina Cardenas; Gilleran, Michael; Parise, Christine N.; Paul Capua; Poncek@adr.org; Jose Astigarraga

**Subject:** RE: Alon International, S.A. v. Converse, Inc: (Arbitration # 50 133 T 00579 04)

Dear Mr. Theroux:

On behalf of Converse, Inc., we are writing in response to the below email string.

Converse respectfully objects to Alon's request that you withdraw from your role as arbitrator in this matter. Accordingly, pursuant to Article 9 of the International Rules governing this proceeding, Converse requests that the ICDR hold a hearing on this issue and render a decision.

The reasons that Converse objects to Alon's request are as follows. First, the intent behind the rules governing arbitrator challenges is to ensure impartiality or independence on the arbitrator's behalf. In your email below, you state that you indeed can be fair and impartial as an arbitrator in this case should you continue in that role.

Second, you are no longer a partner at Baker & McKenzie. While practicing at Baker & McKenzie, you stated that you never performed legal services for Nike, Inc.

Third, while Baker & McKenzie may represent or have represented Nike, that is not the same as representing Converse. In fact, in a case with similar facts, Judge Preska of the United States District Court for the Southern District of New York denied the motion of the plaintiff, Six West Retail Acquisition, to recuse and disqualify her based upon the fact that her husband's law firm represented Sony Music Entertainment Inc. and Sony Computer Entertainment Inc while the defendant in the case was Sony Theatre Management Corp., corporate affiliates. *Six West Retail Acquisition Inc. v. Sony Theatre Management Corp.*, 2003 WL 282187 (S.D.N.Y.), aff'd, 2005 WL 714747 (2d Cir. 2005). Judge Preska expressly stated, "for conflict purposes, representation of one corporate affiliate does not necessarily constitute representation of that entity's parent, subsidiary or sister corporation." *Id.,* at *6, citing ABA Standing Committee on Ethics and Professional Responsiblity, Formal Opinion 95-930 (Jan. 25, 1995) ("the fact of corporate affiliation, without more, does not make all of a corporate client's affiliates into clients as well").

Judge Preska also stated that the Court of Appeals has cautioned that "the grounds asserted in a recusal motion must be scrutinized with care, and judges shold not recuse themselves solely because a party claims an appearance of partiality. . . . The test to be applied is an objective one: whether a reasaonble person, *who knows and understands all the relevant facts,* would conclude that the court's impartiality might reasonably be questioned. . . . Where a case, by contrast, involves more remote, contingent, indirect or speculative interests, disqualification is not required. . . . Furthermore, a judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *Id., *5 (internal quotations and citations omitted) (emphasis in original).

Fourth, Alon's request is untimely. Article 8 of the International Rules dictates that a party shall challenge the arbitrator within 15 days after notice of the arbitrator's appointment or within 15 days

after circumstances giving rise to the challenge became known to that party. Clearly, Alon did not challenge you within 15 days of appointment. Presumably the circumstances giving rise to the challenge were known or should have been know to Alon for more than 15 days.

Again, the *Six West* case is instructive. "It is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Id.*, *2. The Second Circuit has stated that various factors should be weighed in considering the timeliness of such motions, including whether the movant has participated in pre-trial proceedings, whether granting the motion would waste resources, and whether the movant can show good cause for the delay. *Id.* In considering the good cause factor, Judge Preska was concerned that the movant was really "judge-shopping," especially since she had issued rulings that were adverse to the movant and the movant may have been seeking a "second bite at the apple regarding some of my prior rulings in this action." *Id.*, at *7.

In light of the absence of a direct conflict; in light of the fact that you have stated that you can be impartial; in light of the fact that this case is well-underway and Alon's timing appears strategic; and in light of the fact that there are critical issues with which you are familiar that you have already decided and there are critical issues that you are scheduled to decide (as early as tomorrow, perhaps), Converse does not agree to the challenge. Accordingly, Converse respectfully requests that a hearing on this matter be held with the ICDR. Converse suggests that the hearing occur either this afternoon or tomorrow morning.

Respectfully submitted,

David Russman

-----Original Message-----
**From:** Jose Astigarraga [mailto:jastigarraga@astidavis.com]
**Sent:** Monday, May 23, 2005 8:11 AM
**To:** Theroux, Gene
**Cc:** Edward Davis; Cristina Cardenas; Gilleran, Michael; Parise, Christine N.; Russman, David; Paul Capua; Poncek@adr.org
**Subject:** RE: Alon International, S.A. v. Converse, Inc: (Arbitration # 50 133 T 00579 04)

Dear Mr. Theroux:

Thank you for your prompt response to our correspondence. In light of the circumstances, Claimant Alon does wish to request that you withdraw and that the ICDR appoint a new arbitrator in your place. As demonstrated by our own prompt response, we agree fully on the importance of resolving this quickly, and will work with the ICDR and Converse to minimize any delay. Thank you.

Sincerely,

José I. Astigarraga
Astigarraga Davis

701 Brickell Avenue
16th Floor
Miami, Florida 33131
Tel: 305-372-8282
Fax: 305-372-8202
Email: jia@astidavis.com

## STATEMENT OF CONFIDENTIALITY

The information in this E-mail is confidential and may be legally privileged. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate, maintain, save or otherwise use this transmission. Delivery of this message to any person other than the intended recipient(s) is not intended in any way to waive privilege or confidentiality. Although this E-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Astigarraga Davis Mullins & Grossman, P.A. for damage arising in any way from its use.

-----Original Message-----
**From:** Theroux, Gene [mailto:Gene.Theroux@BAKERNET.com]
**Sent:** Sunday, May 22, 2005 8:15 PM
**To:** Jose Astigarraga
**Cc:** Edward Davis; Cristina Cardenas; Gilleran, Michael; Parise, Christine N.; Russman, David; Paul Capua; Poncek@adr.org
**Subject:** Alon International, S.A. v. Converse, Inc: (Arbitration # 50 133 T 00579 04)
**Importance:** High

Dear Mr. Astigarraga,

This refers to your May 20, 2005 letter on behalf of your client, Alon International, S.A., the Claimant in this arbitration. Your letter, which I received by email late on Friday afternoon, May 20, 2005, raises a very significant issue.

A copy of your letter is reproduced below for the convenient reference of yourself, Karen Ponce, Esq., the International Case Manager in this arbitration, and others who were also copied on your letter, including Counsel for the Respondent, Converse, Inc. Also reproduced below is a copy of Ms. Ponce's email message of May 20, 2005 on the same subject.

Having completed over the weekend a further check of the Baker & McKenzie's client list, I can confirm your information that Nike, Inc. is a client of Baker & McKenzie.

I have not yet had an opportunity to complete a further conflicts check of additional companies (Cole Haan, Exeter Brands Group, Bauer Nike Hockey, Nike IHM, Inc., Hurley International), as requested by your email message sent in the early evening of Friday, May 20, 2005, and received by me the following morning, May 21st. However, in light of the facts and circumstances outlined in this message, it appears to me that such a further conflicts check may not be warranted.

Mindful of my obligation as an arbitrator for absolute impartiality, and my duty to ensure that no circumstances exist that could create or contribute to any

appearance of a want of impartiality on my part, I do very much understand and appreciate the concerns of your client, Alon International, S.A., the Claimant in this arbitration, over the fact that Nike, Inc., the parent company of the Respondent Converse, Inc. in this arbitration, is a client of Baker & McKenzie.

At the time I considered and accepted appointment as sole arbitrator in this case in early April, 2005, I was not aware that Converse, Inc. was a subsidiary of Nike, Inc., and the conflicts checks of Converse, Inc. that I undertook prior to my appointment did not reveal that Converse, Inc. was a subsidiary of Nike, Inc. Likewise, at the time I received and replied to your letter dated April 13, 2005, referred to in your emailed letter received on May 20, 2005, I was not aware that Converse, Inc. was a subsidiary of Nike, Inc.

There are client registrations for Nike, Inc. at various Baker & McKenzie offices throughout the world, although my most recent conflicts check has turned up no such registrations at the Washington Office. In more than 30 years of law practice at Baker & McKenzie, I performed no legal services for Nike, Inc. at the Washington Office where I have been based, or anywhere else in the world. I formally retired as a Partner of Baker & McKenzie on June 30, 2002 . Beginning July 1, 2002, I discontinued all legal work for clients of Baker & McKenzie, and accepted a part-time advisory role as Senior Counsel to the Firm.

In light of the fact that Nike, Inc., the parent company of the Respondent in this arbitration, is a Baker & McKenzie client, and notwithstanding my good faith belief and assurances that I can be fair and impartial as an arbitrator in this case should I continue as arbitrator, and that I am willing to do so, I am also, naturally, prepared under the circumstances to withdraw forthwith as the arbitrator in this case upon the request of either the Claimant or the Respondent.

I think that Counsel for both sides, and the ICDR, can agree that this issue should be resolved on Monday, May 23, 2005, inasmuch as a resolution may obviate the need for my role in any further proceedings, including the hearing by teleconference that has been schedule for 2:30 p.m. on Tuesday, May 24, 2005.

Should there be a need for selection of a new arbitrator, I sincerely regret inconveniences caused to the parties and their counsel.

Very truly yours,

Gene Theroux

-----Original Message-----
**From:** Karen Ponce [mailto:Poncek@adr.org]
**Sent:** Friday, May 20, 2005 4:39 PM
**To:** Jose Astigarraga; Theroux, Gene
**Cc:** Edward Davis; Cristina Cardenas; Gilleran, Michael; Parise, Christine N.; Russman, David; Paul Capua
**Subject:** RE: Alon International, S.A. v. Converse, Inc: (Arbitration # 50 133 T 00579 04)

Dear Counsel,

This will serve to acknowledge receipt of an electronic mail from Claimant, a copy of which we note was sent to Respondent and the Arbitrator.

This will also serve to advise the Parties of telephone conversation between the ICDR and the Arbitrator, wherein the Arbitrator advised that he is running another conflicts check within his firm and will confirm the results as soon as possible.

Please contact the undersigned should you have any questions.

Regards,


Karen Ponce
International Case Manager
International Centre for Dispute Resolution
The International Division of the American Arbitration Association
1633 Broadway, 10th Floor
New York, NY 10019
USA
+01 (212) 484.4029 (telephone)
+01 (212) 246.7274 (facsimile)
PonceK@adr.org (e-mail)
www.adr.org/ICDR (website)
This e-mail communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the content of this communication to others. Please notify the sender that you have received this e-mail in error by replying to the e-mail or by telephoning 212 484-4181 during the hours of 8:00 A.M.-8:00 P.M. (EST). Please then delete the e-mail and any copies of it. Thank you.

-----Original Message-----
**From:** Jose Astigarraga [mailto:jastigarraga@astidavis.com]
**Sent:** Friday, May 20, 2005 4:23 PM
**To:** Karen Ponce; Eugene Theroux (E-mail)
**Cc:** Edward Davis; Cristina Cardenas; Gilleran, Michael; Parise, Christine N.; Russman, David; Paul Capua
**Subject:** RE: Alon International, S.A. v. Converse, Inc: (Arbitration # 50 133 T 00579 04)

Dear Ms. Ponce:

Pursuant to my conversation with you this afternoon, this will confirm that you authorized me to communicate this message directly to Mr. Theroux, with a copy to the other side.

Dear Mr. Theroux:

We write respectfully to request information regarding an apparent conflict of interest of which we have been become aware.

As you know, our client, the Claimant, Alon International, S.A. ("Alon") has brought this proceeding against the Respondent, Converse, Inc.  Converse is owned 100% by Nike, Inc.  Any award rendered in this

dispute between Alon and Converse will invariably affect Nike, and Nike is involved in the facts of the case.

By letter dated April 13, 2005, Alon asked the AAA/ICDR whether your disclosure revealed any conflicts. On April 14, 2005, the AAA/ICDR advised the parties that no potential conflicts had been identified.

We are informed that Nike, Converse's owner, is a client of Baker & McKenzie.  As you might appreciate, that naturally raises a concern on Alon's part.

Alon respectfully requests that you inform us of all pertinent information in that regard, including whether Baker & McKenzie has represented Nike or any of Nike's subsidiaries.

Given the significance of the matter, Alon respectfully requests that no further action be taken on any of the currently pending matters until the matter has been addressed and resolved.

We thank you in advance for your prompt attention to this matter.


Jose Astigarraga

# PEPE&HAZARD LLP

A BUSINESS LAW FIRM

225 FRANKLIN STREET, 16TH FLOOR
BOSTON, MASSACHUSETTS 02110-2804
617.748.5500  FACSIMILE: 617.748.5555

DAVID P. RUSSMAN
Attorney At Law
Direct: 617.748.5571
drussman@pepehazard.com

May 26, 2005

United States District Court
1 Courthouse Way
Boston, MA 02210

> Re:    *Converse, Inc., vs. Alon International S.A.*
> <u>U.S. District Court, Docket No. 2004-12591-PBS</u>

Dear Sir or Madam:

In regard to the above-referenced matter, enclosed please find for filing and docketing:

> 1. *Converse Inc.'s Emergency Motion to Enforce the Interim Final Arbitration Order Pending Appointment and Decision by New Arbitrator.*

Please be advised that yesterday we also filed *Converse's Emergency Motion to Protect Arbitrator Authority to Preserve Converse's Damages Remedy.*

In light of the emergent nature of both of these motions, please bring them to the Court's attention as soon as possible. Also, Converse respectfully requests a hearing on these motions, as it believes that a hearing will assist the Court in rendering a decision.

Thank you for your attention in this matter.

Very truly yours,

David P. Russman

Enclosure

DPR/ah

Cc:    Counsel of record