**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CONVERSE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 04-12591-PBS |
| | : | |
| ALON INTERNATIONAL, S.A., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW OF DEFENDANT ALON**
**INTERNATIONAL, S.A. IN OPPOSITION TO EMERGENCY**
**MOTION OF PLAINTIFF CONVERSE, INC. TO PROTECT ARBITRATOR**
**AUTHORITY TO PRESERVE CONVERSE'S DAMAGES REMEDY**

Alon International, S.A. ("Alon") submits this response to Converse, Inc.'s ("Converse")

Emergency Motion to Protect Arbitrator Authority to Preserve Converse's Damages Remedy

("Motion").

## INTRODUCTION

In a pending arbitration between the parties, Alon contends that a contract to manufacture

and sell shoes for Converse in Latin America (the "Contract") was renewed, and Converse

contends it was terminated. Multiple courts in Brazil and Argentina have, after evaluating the

facts, ruled that the Contract should be honored while Alon and Converse are arbitrating in

Massachusetts over the Contract, and specifically that Alon is entitled to collect the sales

proceeds from its shoe sales during the arbitration.

Through its Motion, Converse is asking this Court to overturn those foreign court rulings,

and hold that instead of the Contract being performed during the pendency of arbitration as the

Brazilian and Argentinean courts ordered, the monies for Alon's performance should be held in escrow.

The issue is straightforward. For reasons set forth below, Converse's motion must be denied.

Specifically, under the rubric of its "Emergency Motion to Protect Arbitrator Authority to Preserve Converse's Damages Remedy," Converse is:

- Violating a direct order of a Brazilian court ordering it to perform the terms of its Contract with Alon during the pendency of the arbitration;

- Violating a direct order of a Brazilian court ordering it not to interfere with Alon's contract with a third party in Brazil, Coopershoes, during the pendency of the arbitration;

- Seeking an anti-suit injunction previously denied by this Court, which declared: "These [Brazilian] foreign injunctions pending arbitration are not only reasonable, but also consistent with the strong policy in favor of resolving disputes pending arbitration";

- Seeking an anti-suit injunction to enjoin Alon from prosecuting litigation against a third party (Coopershoes) under a contract to which Converse is not a party;

- Seeking essentially to countermand a ruling of a Brazil court that has rejected a third party's (Coopershoes') efforts to "interplead" monies;

- Asking this Court for relief that it has consciously chosen not to ask directly of the Brazilian Court that has entered the order to which Converse is objecting (that is, do an end-run); and

- Seeking to deprive Alon of its source of funds needed to pay its operating expenses, including its taxes under Brazilian law, all as part of a broader litigation strategy to choke Alon into submission.

Converse is attempting all of the above despite the fact that multiple courts have already ruled that Converse must honor its agreement with Alon during the pendency of the arbitration.

## Key Facts

The pertinent facts, a number of which Converse has not disclosed to this Court, are as follows:

US1DOCS 5127237v1

A.    Converse granted Alon an exclusive contract to manufacture and market Converse brand shoes in Brazil, Argentina and elsewhere in Latin America.

B.    The Contract, effective beginning September 1, 2001, provided for an initial term through December 31, 2004, and granted _Alon_ an option to renew it for a 3-year term.

C.    Coopershoes is the Brazilian company that physically made the shoes for Alon, with Converse's full knowledge and approval.

D.    Alon has a separate contract with Coopershoes (the manufacturer/distributor), to which Converse is not a party.

E.    Alon contends it validly exercised the renewal option of its Converse Contract, and therefore that the Contract is still in force through December 31, 2007.

F.    Converse disputes that, and contends that it validly terminated its Contract with Alon so that the Contract is not in effect.

G.    Until November 30, 2004, when the dispute erupted, Alon had used Coopershoes to make and sell the shoes, and would receive payment from Coopershoes and then pay Converse under the Contract now in dispute.

H.    Independently of the dispute between the parties that will be arbitrated about whether the Contract has been renewed (as Alon contends) or whether it has been terminated (as Converse contends), three different courts, two in Brazil and one in Argentina, including the Supreme Court of State of Rio de Janeiro, have each ruled that Converse must continue to honor the Contract during the arbitration.

I.    Converse also has been restrained from interfering with Alon's contract with Coopershoes.

J.    Thus, multiple courts in Brazil and Argentina have ruled that until the arbitration is over, the parties should continue performing as they were when the dispute arose:  that is, observe the status quo as of the end of 2004, namely with the parties performing under their contract and with Coopershoes paying Alon.

K.    In denying Converse's previous motion, this Court stated: "These [Brazilian] foreign injunctions pending arbitration are not only reasonable, but also consistent with the strong policy in favor of resolving disputes pending arbitration."

L.    Coopershoes continues to make and sell shoes under Alon's direction and supervision and generate the revenues that are accumulating.

M.    However, at the direction of Converse, and in the violation of Brazilian court orders to the contrary, Coopershoes has been seeking to "interplead" the monies in Brazil, filing suit against Converse and Alon because of the allegedly conflicting claims to the money.

US1DOCS 5127237v1

N.    The intepleader court in Brazil <u>has ruled</u>: it has determined that Coopershoes may not continue to deposit the monies into the registry of the court in light of the rulings of the Rio court that held, among other things, that the Coopershoes and Alon contract must be honored during the pendency of the arbitration.

O.    Although it is named as a party and is fully aware of the interpleader action filed by Coopershoes and is in constant continuing business communication with Coopershoes, Converse has not appeared in that action and has yet to be "served" by Coopershoes.

P.    Converse instead is trying to litigate the interpleader action in this Court or in the arbitration by having this Court grant what the Brazil court has denied: namely, to have the funds Coopershoes is obligated to pay placed in this Court's or the AAA's registry, even though the Brazil courts have ruled that such funds are ***not*** to be interpleaded.

Q.    Instead of asking the Brazilian courts for the relief in question (namely, "please change your orders, don't require Converse to perform the Alon contract pending the arbitration, and in order "to preserve our damages remedy in the arbitration," don't give the money to Alon during the arbitration), Converse is:

    a.    Violating the Brazilian court injunctions that ordered it to honor its contract with Alon (therefore allow Alon to be paid by Coopershoes); and

    b.    Asking this Court to de facto ***overrule*** the Brazil courts.

R.    To date, in direct violation of Brazilian court orders, Converse has succeeded for months in depriving Alon from receiving any money from Coopershoes, all as part of a litigation strategy designed to win this dispute through attrition of the resources of its smaller counterparty.

S.    Converse will suffer no irreparable harm if the injunction is denied: its only damage (assuming it has any entitlement) would be an alleged inability to collect on a judgment or award.  As a matter of law, that is not irreparable harm.

T.    Without the injunction, the parties will simply continue in the same mode they were in when the dispute arose, namely, with Coopershoes making the shoes, Alon overseeing their sales and marketing, revenues being generated, and Coopershoes making payments to Alon.

U.    In contrast, if Converse succeeds, it will effectively choke off Alon's revenues, including revenues it needs for its operation, including the payment of taxes.  The Brazil court observed that Coopershoes has not paid Alon its fees "for three consecutive months, [which] endangers [Alon's] economic viability and may require [Alon] to shut down their operations in Brazil."

## PROCEDURAL BACKGROUND

### The *Status Quo* Injunctions In Brazil Pending Against Converse and Coopershoes

Alon initiated arbitration pursuant to the Contract.  Because of the time delay in having

an arbitrator selected, Alon also filed actions in the national courts of Brazil seeking to obtain

*status quo* injunctions against Converse and Coopershoes prohibiting them from taking action

contrary to Alon's rights under their respective separate agreements pending the outcome of the

parties' disputes in arbitration.  (Lobo Decl. ¶¶ 3-4, 18-24).[1]  Alon commenced the injunction

action against Converse on or about December 21, 2004, and the injunction action against

Coopershoes on or about March 31, 2005.

### The Converse Injunction

On December 22, 2004, the Brazilian court in the 19th State Court of Porto Alegre, State

of Rio Grande do Sul, Brazil entered a *status quo* injunction against Converse (the "Converse

Injunction").  The injunction orders that that the parties continue to perform their contract until

the termination of the arbitration proceedings already initiated, and enjoined Converse from

entering into any contractual arrangements in Brazil contrary to the contract with Alon.  (Lobo

Decl. ¶ 4).

The Converse Injunction provides, in relevant part:

2 - The controversy, therefore, that serves as context for the dispute is found in
the manifestation of a desire by the Defendant not to renew the Agreement -which
is to end in December 31, 2004, and whose merit, the Plaintiffs informs, are under
examination in an arbitration proceeding.

Plaintiffs, when asserting that the institution of an arbitration process does not
waive their obligations, would like the interpretation of Clause 33 to also affect

---

[1]    Alon is filing with this Memorandum a copy of the Memorandum of Law it filed in the arbitration in
opposition to the similar relief that Converse is seeking there.  (Although Converse filed its own memorandum of
law in the arbitration, Converse did not attach a copy of Alon's memorandum, stating that it would file it a day
later).  The exhibit references in this Memorandum are to the exhibits to the memorandum that Alon filed in the
arbitration.

US1DOCS 5127237v1

the Defendant so that Defendant will also remain bound to the obligations of the business during the arbitration proceeding.

3 - **This lawsuit is restricted to the examination of those Agreement clauses which deal with the term of the Agreement, its renewal, the resolution and establishment of the arbitration process in order to verify the position of each party at the time the Agreement was signed with regards to the period when arbitration might be started.**

Based on the position taken by the Defendant in notifying its lack of interest in renewal at the same time it made apparent an interest in renewing the Licensing Agreement through arrangements, I understand that this last effort should prevail as a means to preserving good faith and transparency principles in the business relationship.

Thus, having established the risk of damage to the Plaintiffs since their business will be interrupted abruptly, which will have social repercussions, and considering the social interest of the Agreement currently expressed in the Brazilian Civil Code, I hereby GRANT THE RESTRAINING ORDER REQUIRED **in order to determine the maintenance of the effects of the Licensing Agreement during the arbitration process,** as well as **to compel the Defendant [Converse] to abstain from practicing acts that violate the rights according to the Agreement** under the penalty of a daily fine of R$100.000,00 (one hundred thousand reais).

Id. (emphasis added).

On February 24, 2005, while the judge who had originally entered the injunction was on vacation, Converse obtained a favorable *ex parte* order from a temporary judge substituting for the original judge. (Lobo Decl. ¶ 5).

Alon appealed the *ex parte* order over-turning the Converse Injunction to the Supreme Court of the State of Rio Grande do Sul (*Tribunal de Justicia, Estado Do Rio Grande Do Sul*). (Lobo Decl. ¶ 6). On March 18, 2005, a judge of the 3d Chamber of the Supreme Court of the Rio Grande do Sul re-instated the Converse Injunction pending completion of the parties' arbitration and ordering, in pertinent part:

. . .

. . . I uphold the appeal, to grant the advancement of protection sought by the plaintiffs, determining that the defendant [Converse] refrain from practicing any act which violates the contractual right of the plaintiffs specified in the Licensing Agreement signed between the parties.

(Emphasis added) (Lobo Decl. ¶ 7).

Converse then appealed the Converse Injunction again to the remaining judges of this 3[d] chamber of the Supreme Court of the State of Rio Grande do Sul.  (Lobo Decl. ¶ 8).

On April 20, 2005, a three-judge panel of that Court **unanimously affirmed** in all respects the original Converse Injunction maintaining the validity of the Agreement between the parties pending arbitration, as set forth above.  (Lobo Decl. ¶¶ 8-9).  The Court also subsequently reinstated daily sanctions for non-compliance.

In keeping with its style, Converse did not discuss this key ruling in its papers to this Court or to the arbitral tribunal in its Motion to Preserve Damages and Rationalize Litigation. (Lobo Decl. ¶ 11).[2]

Converse's motion would have this Court overturn that ruling of a foreign court by permitting Converse to take actions directly in violation of the "the contractual right of the plaintiffs specified in the Licensing Agreement signed between the parties," namely by precluding Alon from receiving its monies from Coopershoes during the arbitration.

### The Coopershoes Injunction

As noted, Alon has its own contract with Coopershoes.  Although the Converse Injunction entitled Alon to receive its payments during the pendency of this arbitration, Converse evidently – **in violation of the Converse Injunction** – asserted that the Agreement was

---

2       Converse's only mention of the ruling is buried at the bottom of the second page of Exhibit I to Exhibit A to Converse's Motion to Preserve Damages and Rationalize Litigation.

terminated and demanded that Coopershoes pay Alon's monies directly to Converse. Thus

Coopershoes, which is now cooperating fully with Converse, has refused to pay Alon and, as

discussed below, has "interpleaded" the monies into a Brazilian court instead.

Faced with Converse's breach of the Agreement and its interference with Coopershoes,

and Coopershoes' collaboration with Converse, Alon filed suit against Coopershoes in the Eighth

Business Court of Rio De Janeiro (*Ottava Vara Empresarial de Comarca Da Capital Do Estado*

*Do Rio De Janeiro*) seeking an order to direct Coopershoes to comply with the terms of ***its***

contract with Alon, which is not subject to arbitration, including paying Alon its royalties. (Lobo

Decl. ¶ 18).

By Order dated April 5, 2005, that court issued an injunction in favor of Alon and against

Coopershoes entitling Alon to its payment from Coopershoes pending the outcome of arbitration

("Coopershoes Injunction"). A true copy of the Coopershoes Injunction along with its certified

translation is marked as **Exhibit "2".** (Lobo Decl. ¶ 18).

The Brazilian court ruled that Coopershoes must:

i) cease and desist from taking any acts which are violative of Alon's contractual rights under the agreements signed with Coopershoes;

ii) cease and desist from acting under any obligation to Converse;

iii) produce the Converse products solely for Alon **and make payment directly to Alon**; and

iv) deliver sales reports and follow up of production directly to Alon.

v) In the event of non-compliance, Coopershoes faces a daily fine of fifty thousand (50,000) reais. (Lobo Decl. ¶ 20).

In granting the Coopershoes Injunction, the court recognized that the Supreme Court of

Rio Grande do Sul had issued a *status quo* injunction in favor of Alon "that shall remain in effect

[for the period in which] arbitration in the United States is pending." The court further

US1DOCS 5127237v1

recognized that Coopershoes "had assumed the obligation of paying [Alon]," that Coopershoes

"continues to produce tennis shoes [using] the brand [names] licensed by [Alon]," and that

Coopershoes has not paid Alon its fees "for three consecutive months, [which] endangers

[Alon's] economic viability and may require [Alon] to shut down their operations in Brazil."

(Lobo Decl. ¶ 21; Coopershoes Injunction pp. 2, 3).

To date, Coopershoes continues to refuse to pay Alon and to perform in accordance with

the terms of the parties' contract, even though Alon has continued to work in good faith under

the terms of its agreements with both Converse and Coopershoes and in accordance with the

Converse Injunction and Coopershoes Injunction.

Given Coopershoes' continuing defiance of the injunction, Alon filed a request in the

Eighth Business Court of Rio De Janeiro seeking to compel Coopershoes to comply with the

Coopershoes Injunction. (Lobo Decl. ¶ 23).

### Coopershoes' Interpleader

On March 4, 2005, before entry of the Coopershoes Injunction, Coopershoes filed a

permissive interpleader action with the Twelfth Civil Court of Porto Alegre to deposit the money

it owed Alon into a judicial escrow account. (Lobo Decl. 12). By Order dated March 10, 2005,

the court allowed Coopershoes to deposit money it owed to Alon into a judicial escrow account.

(Lobo Decl. ¶ 12).

It is important to note that this deposit was made during the brief window during which

Converse improperly set aside the Converse Injunction by obtaining an *ex parte* order from the

interim judge while the assigned judge was on vacation. As previously noted, on March 18,

2005, the Supreme Court of Porto Alegre immediately re-issued a *status quo* injunction in favor

of Alon ordering the continued validity of the Agreement between Alon and Converse pending completion of this arbitration. (Lobo Decl. ¶ 6).

On April 1, 2005, while Converse's appeal of the Converse Injunction was pending, Coopershoes again applied to the Twelfth Civil Court of Porto Alegre for permission to make a second deposit of royalties owed to Alon into a judicial escrow account. (Lobo Decl. ¶ 14). By Order dated April 4, 2005, that court, despite the decision by the Judge of the 3d Chamber of Supreme Court of Rio Grande do Sul ordering the continued observance of the Agreement, again allowed Coopershoes to deposit funds owed to Alon into a judicial escrow account. (Lobo Decl. ¶ 14). The second interpleader deposit was allowed before entry of the Coopershoes Injunction and before the full 3-Judge panel of the $3^d$ chamber of the Supreme Court of the State of Rio Grande do Sul affirmed the decision of the single Judge. (Lobo Decl. ¶ 15).[3]

Alon is informed that last Friday, the interpleader court held that Coopershoes should **no longer deposit** any more monies in the intepleader account and Coopershoes should abide by the decision of the Rio Court, which enjoined Coopershoes and directed it to comply with its contract with Alon. This ruling is the one that Converse refers to in its Emergency Motion, page 4.

Accordingly, there is no court anywhere presently authorizing Coopershoes to do anything other than perform its contract with Alon (and therefore pay Alon), there are two courts in Brazil (Rio trial and appellate courts) ordering Coopershoes to perform its contract with Alon

---

3       As recently as May 6, 2005, Coopershoes, again ex parte and without permission, deposited additional royalty payments owed to Alon in the interpleader court. The amount of Alon's royalties unlawfully deposited into the interpleader court now total $1,400,000.00 as of May 16, 2005.

(including to pay Alon), and there are three courts ordering Converse to abide by its contract with Alon and not interfere with its Coopershoes contract (two in Brazil and one in Argentina).[4]

Despite all that, Converse seeks to have this Court order directly the opposite: have the monies interpleaded, and permit Converse, under this Court's sanction, to defy the Brazilian injunctions requiring it to respect Alon's contracts with it and Coopershoes.

Converse argues that all it seeks is to keep its damages remedy before the arbitrator from becoming moot, but in fact Converse is asking the arbitrator to do the same thing it is asking this Court: namely, to overturn the rulings of the courts in Brazil, which were made in support of, and only for the duration of, the arbitration, and to take away rights that Alon has already been granted by the Brazilian courts. In effect Converse is trying to use the arbitrator to appeal the Brazilian court orders.

**APPLICABLE LAW**

**I.      The Court Should Grant Comity to the Decisions of the National Courts of Brazil.**

As noted, the injunction sought by Converse would directly conflict with national court orders of Brazil. The equitable principles of *res judicata,* collateral estoppel, and international comity all are relevant as a result of the extensive procedural history of this dispute in foreign tribunals and should properly be considered. See e.g., Telephone Workers Union of New Jersey, Local 827, International Brotherhood of Electrical Workers v. New Jersey Bell Tel. Co., 584 F.2d 31, 33 (3d Cir.1978). While *res judicata* in the context of international law does not operate in the "rigid" sense as it does to domestic judgments, the equitable principles underlying the doctrine are nonetheless applicable to the consideration of granting comity.

---

4      The court in Argentina issued an injunction against Converse. However, as Converse has succeeded in shutting off most of Alon's cash flow, Alon was unable to post the bond required to sustain the injunction, and the injunction in Argentina lapsed.

This Court has held that "[i]nternational comity is a doctrine that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." Goldhammer v. Dunkin' Donuts, Inc., 59 F. Supp. 2d 248, 251 (D.Mass. 1999) (Saris, J.).

Courts generally evaluate three factors in determining whether to grant international comity: "(1) whether the foreign court was competent and used 'proceedings consistent with civilized jurisprudence,' (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just." See e.g., Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1238 (11th Cir. 2004).

In its Motion, Converse has not and cannot establish any one factor as grounds why this Court should refuse to grant comity to the decisions of the Brazilian courts. Converse does not allege that the courts of Brazil lacked competence to enter the injunctions at issue. Nor can it because Converse was granted complete due process throughout the proceedings of the Converse Injunction, which was devoid of any fraud or impropriety whatsoever. Moreover, Converse cannot establish that the foreign injunctions were prejudicial and violated American policy. Indeed, the District Court, after studying the Brazilian and Argentine injunctions, held; "[t]hese foreign injunctions pending arbitration are not only reasonable, but also consistent with the strong policy in favor of resolving disputes via arbitration."

The Brazilian injunctions should not be disturbed or abrogated in any manner. The injunction sought by Converse here would directly undermine and contravene such orders.

US1DOCS 5127237v1

## II.     Converse Has Failed to Meet Its Burden Of Proof To Obtain A Foreign Anti-Suit Injunction And, Therefore, Its Motion Must Be Denied.

The relief that Converse seeks here is an anti-suit injunction, as Converse admits in footnote 2 of its Motion, among other places. (" . . . under the current circumstances, . . . an anti-suit injunction is justified"). In this Court, Converse previously sought an order enjoining Alon from participating in the foreign proceedings and, once the foreign injunctions issued, requiring it to dismiss them with prejudice. (Application for *Ex Parte* Restraining Order pp. 1,5; Reply in support thereof pp. 2, 15-20). Although Converse is trying to give its new application here a new name, it is not much different. By asking this Court to "restrain[] and enjoin[] [Alon] from filing or seeking any further order(s) from the [Brazil court] to obtain any of the funds deposited in an interpleader-type action pending before the [Brazil] Civil Court . . .," and "order that Alon . . . deposit those funds" into a registry of this Court or the AAA, Converse actually is seeking to have this Court issue a countermanding order that would invade the jurisdiction of the Brazilian courts and their rulings and orders and that would enjoin Alon from enforcing its rights under the Converse and Coopershoes Injunctions.

An anti-suit injunction "is an instrument by which a court of one jurisdiction seeks to restrain the conduct of litigation in another jurisdiction" and to "affect the course and significance of litigation abroad."[5] As the D.C. Circuit in the seminal case of Laker Airways explained:

> [T]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations. The interests of both forums are advanced – the foreign court because its laws and policies have been vindicated; the domestic country because international

---

5     George A. Berman, The Use of Anti-suit Injunctions in International Litigation, 28 Colum. J. Transnat'l L. 589, 590 (1990).

US1DOCS 5127237v1

cooperation and ties have been strengthened.  The rule of law is also encouraged, which benefits all nations.

731 F.2d at 937; see also Goldhammer v. Dunkin' Donuts, Inc., 59 F. Supp. 2d at 251 (D.Mass. 1999) (Saris, J.) ("International comity is a doctrine that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law"); and also Compagnie des Bauxites de Guinea v. Insurance Co. of N. America, 651 F.2d 877, 887 (3d Cir. 1981) (noting presumption against issuance of anti-suit injunction because there is "no difference between addressing an injunction to the parties and addressing it to the foreign court itself"); Stonington Partners, Inc. v. Lernout & Hauspie Speech Products, N.V., 310 F.3d 118, 125 (3d Cir. 2002) ("enjoining a party from resorting to a foreign court is equivalent to enjoining foreign proceedings").

The First Circuit in Quaak v. Klynveld Peat Marwick Goerdeler Bedrufsrevisoren, 361 F.3d 11, 19 (1st Cir. 2004), recently enunciated a clear test for the issuance of an international anti-suit injunction. Quaak, 361 F.3d at 18.  *Only after a threshold showing that the parties and issues are the same*, can a court proceed to consider the issuance of an anti-suit injunction.  Once the movant makes the threshold showing, the court should consider all of the facts and circumstances in determining whether an injunction is proper.  Id.

In this analysis, there exists a presumption against the issuance of an order that has an effect on a foreign judicial proceeding or judgment.  Id.  Considerations of international comity are to be given substantial weight.  Id.  Comity thus dictates that foreign anti-suit injunctions be issued sparingly and only in the rarest of cases.  Id.; see also Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc., 412 F.2d 577, 578 (1st Cir.1969) ("[r]estraining a party from pursuing an action in a court of foreign jurisdiction involves delicate questions of comity and therefore

'requires that such action be taken only with care and great restraint"); Laker Airways, 731 F.2d at 927.[6]

This presumption may only be rebutted by the facts particular to each case, such as, for instance: the nature of the two actions (*i.e.* whether they are merely parallel or whether the foreign action is more properly classified as interdictory), the posture of the proceedings in the two countries, the conduct of the parties (including their good faith), the importance of the policies at stake in the litigation, and the extent to which the foreign action has the potential to undermine the forum court's ability to reach a just and speedy result. Quaak, 361 F.3d at 19. Converse has not – and cannot – meet the rigorous Quaak threshold and secondary requirements for a foreign anti-suit injunction.

## A. Converse Cannot Meet the Threshold Showing of the Same Parties and Issues.

As noted above, Converse is avoiding participation in the Coopershoes interpleader, despite being a named party and in constant direct contact with the plaintiff in that case, Coopershoes.[7]  As noted, the petition that Converse makes to this Court, namely, that Alon is not entitled to receive the Coopershoes' payments pending arbitration and therefore Alon should be enjoined from asking for them in the Brazil case or else require Coopershoes to deposit these Brazilian payments in a court registry, should be directed to the Brazilian interpleader court that has made the ruling to which Converse objects.

---

6       See also China Trade & Dev. Co. v. M.V. Choong Yong, 837 F.2d 33, 35-36 (2d Cir. 1987) ("anti-foreign-suit injunction should be 'used sparingly', and should be granted 'only with care and great restraint'"); Stonington Partners, Inc., 310 F.3d at 125-126 ("The power to enjoin a foreign action should be exercised only in rare cases, and must be premised on a thorough analysis of the interests at stake").

7       In fact, Converse and Coopershoes have entered into a Manufacturing, Licensing, and Distribution Agreement dated December 16, 2004, which remains in violation of the Converse Injunction in Brazil.

But by choice, Converse is not even participating in that litigation, despite being named as a party and despite being in close regular business contact with Coopershoes. Converse has chosen not to appear in that case and apparently Coopershoes has not "served" Converse.

On that account alone, Converse's petition fails since there in no identity between this action and the parties that are parties to the interpleader action that Converse is trying to enjoin. Under the applicable law, the Court may not enjoin that Brazil interpleader litigation (by entering an order prohibiting Alon from petitioning the Brazil court for relief).

As the First Circuit held in Quaak, "unless [the parallel suits involve the same parties and issues], courts ordinarily should go no further and refuse issuance of an international anti-suit injunction. Quaak, 361 F.3d at 18 (internal citations omitted). "If – and only if – this threshold condition is satisfied should the court proceed to consider all the facts and circumstances in order to decide whether an injunction is proper." Id.

Because Converse cannot show the identity of parties, this Court's inquiry ends and Converse's request for an anti-suit injunction must be denied.

### B. Converse Cannot Establish Sufficient Other Facts That Overcome the Presumption Mandating Deference to the National Courts of Brazil.

Beyond that, Converse cannot establish the sufficient other facts and circumstances required by Quaak to overcome the presumption against the issuance of an order that has the effect of undermining a foreign judicial order or judgment.

### 1. The Foreign Injunctions Do Not Interfere With the Jurisdiction of the Tribunal.

When a foreign court has not attempted to interfere in a proceeding before a domestic tribunal or sought to prevent the domestic tribunal from exercising its jurisdiction over the case, an anti-suit injunction should not be issued. See e.g. Quaak, 361 F.3d at 17 (citing Laker

-16-

Airways, 731 F.2d at 926-27); China Trade, 837 F.2d at 37 (international anti-suit injunction was not justified where the foreign litigation did not threaten the domestic court's jurisdiction). In accordance with the "fundamental corollary" to the principle of concurrent jurisdiction stated in Laker Airways: "parallel proceedings on the same *in personam* claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as *res judicata* in the other." Laker Airways, 731 F.2d at 926-27.

The Brazil interpleader does not interfere with this court's or the arbitrator's jurisdiction to decide the merits of the claims brought before it, nor the relief that the arbitrator can grant (an award for damages, specific performance, etc.): The Brazilian courts have expressly declared that the injunctions remain in place (and therefore that the payments should be made to Alon) only during the pendency of the arbitration. Such rulings in no way impede the effectiveness of this arbitrator's ultimate ruling on the merits.

Thus, Alon does not seek to "hijack" the arbitrator's jurisdiction or authority over this dispute. To the contrary, Alon adheres wholeheartedly to the arbitral process, as it is Alon that initiated arbitration and pressed for prompt commencement of arbitration proceedings. Here, the purpose for initiating the injunctions in Brazil was to preserve the *status quo* and contractual rights of the parties pending the outcome of arbitration and to provide the Court with the opportunity to render a meaningful arbitral award. Again, both Brazilian injunctions declare that the agreements signed between Alon and Converse and Coopershoes should be observed until the outcome of this Arbitration.

*In contrast*, if this Court were to grant the anti-suit injunction sought by Converse, even on a temporary basis, it would be a direct interference with the jurisdiction of the Brazilian courts that have ruled that Alon is entitled to have the two contracts honored during the

-17-

arbitration and not to have the money interpleaded, but rather paid directly to Alon.  The relief requested by Converse is in direct contravention of such orders.[8]

**2.    The Brazilian Injunctions Promote, Not Undermine, the Strong Federal Public Policy In Favor Of Arbitration.**

The Brazilian injunctions, which are the basis of the Brazilian order that Converse is attacking here denying Coopershoes' petition to interplead its payment to Alon, are *status quo* injunctions that promote the strong public policy favoring arbitration.  This Court already has considered the Brazilian injunctions and held that they do favor public policy.  Order p. 2 **("These [Brazilian] foreign injunctions pending arbitration are not only reasonable, but also consistent with the strong policy in favor of resolving disputes pending arbitration"**) (emphasis added).

**III.    Pursuant To The Agreement, The Law, And Common Sense Status Quo Means That The Agreement Remains In Effect and Both Converse and Alon Are Entitled to The Respective Payments Earned Under the Agreement.**

There is no "irreparable" harm to Converse if Alon is paid the monies that Coopershoes owes it.  Converse's only risk is that it ultimately wins the arbitration and Alon is unable to pay back that amount.

The inability to collect a money judgment does not constitute irreparable harm under the law.  A damages remedy is not rendered inadequate because of the ultimate uncollectibility of the judgment.  See e.g. CVD, Inc. v. Raytheon Co., 1981 WL 2162, 2 (D.Mass. 1981) (denying defendant's requested to order the deposit of amounts due under the licensing agreement into an escrow account to collect upon any judgment rendered in their favor and holding:  "the mere

---

8    The AAA/ICDR's International Rules expressly contemplate that parties shall be free to seek relief from courts during the pendency of an arbitration and that such relief is in no way in violation of an arbitral agreement:  "A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate."  Article 21(3).

-18-

possibility that defendant will not be able to collect a judgment is not the type of irreparable harm required by Rule 65 to support an injunction").

In addition, Converse's premise assumes that if Converse wins the arbitration ultimately and the arbitrator orders that the Contract between Converse and Alon is terminated as of December 31, 2004, Alon would be required to disgorge the monies it earned for its performance under the Agreement during the pendency of the arbitration. This argument is a red-herring. Alon has been granted the right under the Brazilian court decisions to have that Contract observed during the pendency, and Converse is receiving the benefit of Alon's performance: namely shoe sales (and increasing shoe sales at that). As such, because Alon is performing and is entitled to payment for its efforts, Converse never will be entitled to receive Alon's <u>pro rata</u> share of the monies paid by Coopershoes.

By obstructing Alon's right to the monies, Alon is being thwarted by Converse from performing further, and is has long been the law that a party cannot prevent another from rendering its performance and then complain that it breached. <u>See</u> <u>United States v. Peck</u>, 102 U.S. 64 (1880) (where one party is prevented from performing his part of the contract by the conduct of the other party to the contract, the former cannot be held liable for its nonperformance); <u>Amoco Oil Co. v. Gomez</u>, 125 F. Supp. 2d 492, 498 (S.D. Fla. 2000) ("[h]e who prevents a thing being done cannot avail himself of the nonperformance which he has occasioned."); <u>Nitram, Inc. v. Cretan Life</u>, 599 F.2d 1359, 1371 (5th Cir. 1979) ("If one party to a contract prevents or makes impossible performance by the other party, the latter's failure to perform will be excused and the offending party will not be permitted to recover damages for nonperformance").

US1DOCS 5127237v1

A.     **The Law Supports Maintaining the Status Quo Pending the Outcome of Arbitration As Defined by the Brazilian Courts.**

Converse claims that *"status quo"* actually means preserving Converse's damages remedy by requiring Alon to deposit into an escrow or registry monies that Coopershoes has been paying Alon for three years. This argument makes no sense.  As multiple courts have ruled in this case, *status quo* means "the 'last peaceable uncontested status existing between the parties before the dispute developed." Select Milk Producers, Inc. v. Johanns, 400 F.3d 939, 961 (D.C. Cir. 2005); American Hospital Ass'n v. Harris, 625 F.2d 1328, 1332 (7th Cir. 1980) ("the status quo is considered to be the last uncontested status, which preceded the lawsuit"); Matos ex rel. Matos v. Clinton School Dist., 367 F.3d 68, 72 (1st cir. 2004) (defining *status quo* as "freezing an existing situation"); Doe v. Weld, 954 F. Supp. 425, 429 (D. Mass. 1996) (Saris, J.) (same).

Converse cannot dispute that the parties were operating peaceably pursuant to the Contract through November 29, 2004, the day before Converse attempted to wrongfully terminate the Contract and alleged pre-textual grounds for termination.  At that moment, Alon was receiving its payments from Coopershoes and paying Converse its share of those proceeds. Alon even continued to receive some payments after the Converse notice of termination. Preserving the status quo means maintaining those payments to Alon.

Finally, Converse has no damages to preserve.  Alon has continued to excel in the work it does for Converse.  As proof, and as admitted by Converse, the Converse business has flourished in Latin America due to Alon's perseverance, guidance, and hard work.  Alon will continue to do so pending completion of this arbitration.

In conclusion, it is important to bear in mind that Converse is seeking to have this Court ***take away*** a right that Alon has already been given by several courts of law, namely to be paid

the monies due from Coopershoes, and to ***alter*** the *status quo* in a manner inconsistent with a prior decision of this Court, the courts of Brazil, and common sense.

## **CONCLUSION**

This memorandum has been prepared under exigent circumstances immediately upon evening receipt of Converse's self-styled "emergency" Motion. Alon takes issue with the multitude of characterizations made by Converse in its Motion, but lacks time to detail them all here.[9]

Nevertheless, on the basis of Judge Saris' earlier decision and the arguments herein, Converse's motion should be denied.

Respectfully submitted,

_____/s/ Cynthia D. Vreeland_____
Richard A. Johnston (BBO # 253420)
Cynthia D. Vreeland (BBO #635143)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone:     (617) 526-6000
Facsimile:     (617) 526-5000

---

9       With respect to Converse's implication that something underhanded occurred with respect to the arbitrator's removal, three things should be made clear:

    A.       The AAA/ICDR removed the arbitrator. It would not have done so unless it felt the removal was required and warranted.

    B.       Nike, which owns 100% of Converse and a potential party to the arbitration, has a broad relationship with the arbitrator's law firm. Despite that, Converse allowed the arbitration to proceed and never divulged that fact to the AAA/ICDR nor Alon.

    C.       The US arbitrator disqualification issue and the Brazil interpleader ruling proceeded independently, without coordination between Alon's US and Brazilian counsels.

US1DOCS 5127237v1

- and -

Edward H. Davis, Jr. (admitted *pro hac vice*)
ASTIGARRAGA DAVIS
701 Brickell Avenue, 16th Floor
Miami, Florida  33131
Telephone:    (305) 372-8282
Facsimile:      (305) 372-8202

*Counsel for Defendant Alon International, S.A.*

US1DOCS 5127237v1

# EXHIBIT A

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION

Case No.: 50-133-T-00579-04

|  |  |
|---|---|
| Alon International, S.A., | : |
| Claimant, | : |
| v. | : |
| Converse Inc. | : |
| Respondent. | : |

## ALON INTERNATIONAL'S MEMORANDUM OF LAW IN OPPOSITION TO CONVERSE'S EMERGENCY MOTION TO PRESERVE ITS REMEDY AND RATIONALIZE THE LITIGATION

Claimant, Alon International, S.A. ("Alon"), files this memorandum of law in opposition to Converse's Emergency Motion to Preserve its Remedy and Rationalize the Litigation ("Motion to Rationalize" or "Motion"). For the reasons set forth below, the Tribunal should deny the Motion.

### INTRODUCTION

The motion to "preserve the damages remedy" and "rationalize the litigation" filed by Respondent Converse, Inc. ("Converse") is deceptively mislabeled. It should be called for what it is: a motion to:

a) prejudge the merits of this dispute;

b) have Alon pre-pay alleged "damages" claimed by Converse (claimed under the old adage that the best defense is a good offense);

c) enjoin, in violation of established U.S. law, foreign courts from exercising their jurisdiction;

d) overturn the denial of Converse's very same petition by a U.S. federal judge who declared: "These [Brazilian] foreign injunctions pending arbitration are not only reasonable, but also consistent with the strong policy in favor of resolving disputes pending arbitration;"

e) take an "appeal" before this U.S. tribunal of orders of foreign courts, and

f) have this Tribunal overturn and disregard binding court orders that have expressly ruled that while this arbitration goes on, the parties must observe the terms of the contract.

Converse's motion is infected with an epidemic of mischaracterizations of the facts and misstatements of the law in an improper attempt to do an end-run around the decisions of five courts that already have decided this issue. Converse's motion, while disguised under a plaintive plea to "rationalize chaos," expresses nothing more than Converse's disagreement with the decisions of these courts. Ironically, Converse's legally invalid and factually unsupported arguments do not seek to rationalize anything; they seek to turn harmony on its head.

To say it again, this case is simple: Alon rescued Converse from the bog in which it had been mired for years in Brazil. After being shut out of the lucrative Brazilian market for years by a brand pirate, Converse was at a total loss. It had tried litigation and other tactics and failed, while the pirate successfully sold "ALL STAR" shoes and frustrated Converse's every move. While it was shut out of the Brazil market for 17 years, Converse lost millions of dollars of revenues and potential sales.

Along came Alon. With extensive experience and expertise in footwear sourcing, developing, and marketing, especially in emerging markets, Alon offered to help Converse. As Converse well knew, Alon had no manufacturing plants. But Alon had two key assets: Roberto Szerer and Ronald Durchfort. Messrs. Szerer and Durchfort had what Converse lacked: deep expertise and experience in the Latin American shoe business and an outstanding reputation as solid, reputable and key players in the business.

And in less than 12 months, Alon managed to do what Converse had failed to do in years: rescue the Converse brand and put the brand pirate out of the business of selling "ALL STAR" shoes.

Converse was ecstatic. (Durchfort Decl. ¶ 18).

Converse very gladly granted Alon an exclusive Manufacturing, Distribution and License Agreement on September 1, 2001, for a three-plus year period in the territories of Argentina, Brazil, Paraguay and Uruguay (the "Mercosur market"). But that's not all: The Contract gave Alon, not Converse, the unilateral right to extend the term for 3 years more. It states: "***Licensee*** may renew this Agreement for an additional term of three (3) years . . ., provided Licensee exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent

(25%) and further provided Licensee has not breached any of the terms of and conditions of this Agreement." Agreement ¶ 2 (emphasis added).

The Contract set minimum sales quotas of $1,917,000, $2,300,000, and $2,800,000 for the first, second, and third years, respectively. (Alon exceeded the quotas by miles: it sold $3,407,000 in year one, $12,649,000 in year 2, and by 2004, it sold $24,605,000)

Perhaps because it had been so defeated in the Brazilian marketplace for so many years, or perhaps because Szerer and Durchfort are good negotiators, Converse set the royalty rates in the Agreement starting at 6% and ending at 8%. (Agreement ¶ 15 (a)).

Converse was ecstatic. In the first year it received royalties of $204,476.000 when the minimum was $115,000.00. In the second year it received royalties of $886,341.000 when the minimum was only $160,000.00, and Converse's royalties grew exponentially thereafter. Alon and Converse had a constant and continuing communication and exchange regarding the business, including sales, marketing, artwork, product design and all other aspects of the business. There are literally hundreds [thousands] of emails, and many meetings between Converse and Alon to work on the business.

Converse was fully aware that Alon had contracted with Coopershoes. Converse fully knew that Alon had no manufacturing plants -- the contract itself expressly states that Converse has the right to inspect the factories in which Alon "is producing, or ***having produced***" the shoes. (Agreement ¶ 14(a)) (emphasis added).

As well, Converse was fully aware of Alon's relationship with Coopershoes. Among other things, in November 2003, Alon met with Converse in Boston. They specifically showed Converse a copy of Alon's contract with Coopershoes. Among the Converse personnel present were Timothy Ouellette, Laura Kelley, and Chris Laganas. Laganas, who is fluent in Portuguese, specifically read the contract and discussed the relationship with Coopershoes and Alon. Converse admits to this and other meetings with Alon in which the nature of Coopershoes relationship and responsibilities towards Alon were discussed. Based on this and Converse's dealings with Alon during the life of the Agreement, Converse has at all times been fully aware of the nature of the relationship between Alon and Coopershoes.

After signing the Contract, Alon and Converse engaged in discussions for an even broader relationship. (Durchfort Decl. ¶ 17).

3

Alon's renewal option under the Contract was only for 3 additional years and only for the territories covered by the Agreement. (Agreement ¶ 1(k), 2). In the negotiations over an expanded relationship, Converse and Alon discussed a longer relationship (up to 5 and 10 years, for example) and expanding it to other territories (including Venezuela, Colombia, Peru, Ecuador, Puerto Rico, Venezuela, and Russia).

Roberto and Ronald are not experts in a tough business like shoe sales by being naïve, certainly not when dealing with a the licensing department of a company known for its tough and aggressive culture: they fully expected that if Converse realized the "spread" of profit that Alon was making between the rates it had to pay to Converse and the amount it was making from its contract with Coopershoes, Converse would try to cut them out once Alon had cleared the way for Converse sales in the Brazilian market. So the only aspect of the Coopershoes contract that they declined to share with Converse was the amount that they were getting from Coopershoes, a question that Converse would ask repeatedly over the course of the first 3 years, and the method by which Alon was able to remit royalties out of Brazil.

Their instincts were exactly right: Converse eventually realized that through its expertise and experience, Alon was able to produce and sell shoes at a handsome profit, *too* handsome, as far as Converse was concerned. And along the way, after Alon had successfully reclaimed the Brazilian territory for Converse, Converse set out to cut Alon, a now-unneeded "middleman," out of the picture.

Literally, Tim Ouellette said to Mr. Durchfort: You [Alon] had better not be making higher fees than us [Converse]."

Never mind that Alon had a contractual right to extend the term. And never mind that Converse was now receiving royalties for sales of Converse brand shoes in Brazil for the first time ever. (Converse received royalties of $1,968,000 in 2004, when the Contract required only 214,000). Converse wanted more.

Ultimately, Converse devised a series of contrived reasons for terminating the contract, including an "audit" by a forensic accountant (not simply a regular accountant, but one expert in litigation) and embarked on a course to crush these two businessmen. Depending on the outcome, Converse may succeed in using this litigation as its last nail in Alon's coffin, hammered in through sheer force of economic power.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

In order to "rationalize" anything, it is necessary first to establish rationality. Rationality is defined by five realities:

First, Alon has a separate contract with Coopershoes. Converse is not a party to it. This tribunal does not have jurisdiction over that contract. That contract does not contain an arbitration clause, much less a AAA arbitration clause. Without oral argument, this Tribunal has entered an injunction forbidding Alon from terminating that contract, over which this forum has no jurisdiction.

Second, there is no allegation that the shoes being manufactured under the current Alon-Coopershoes Agreement are somehow inferior or deficient. The shoes being sold in Brazil now are being manufactured by Coopershoes, the same manufacturer that was making them pre-December 2004. Better still, Coopershoes is the very manufacturer with which Converse intends to work as soon as it can gut Alon. So there is no fear of damage to the Converse brand from inferior manufacturing, and Converse has never once had any significant complaint about Coopershoes manufacturing during the time that Coopershoes has manufactured for Alon. Certainly to the extent that Converse had any legitimate concerns over product quality, that could be easily solved by having Converse visit the factory with Alon and identifying any issues. Converse has not identified any.

Third, royalties are accruing in favor of Converse. This is not a situation in which Alon is out there manufacturing or selling Converse shoes and pocketing Converse's royalties. Converse, through its intimidation and machinations, has induced Coopershoes to deposit Converse's own royalties into interpleader. But for Converse's actions, Converse would be receiving its royalties routinely from the sale of shoes in Brazil, just as it had handsomely collected far above what it expected to receive under the terms of the contract during the Agreement's first term.

Fourth, the gist of the foreign court injunctions is that pending the arbitration, and specifically, pending a determination of Converse's contention that the contract has expired, the parties should continue to perform exactly as was occurring previously. No more and no less. So this is not a situation in which Converse is somehow being forced to do something it had not already been doing for years or that it had not previously done. The main issue here is whether it terminated the contract, and pending the determination of that issue, the courts have ruled that the parties should continue to perform. That is all.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Converse is a party only to one lawsuit in Brazil and one lawsuit in Argentina. In both Brazil and Argentina, the courts agreed that Alon was entitled to an injunction requiring the parties to perform during the pendency of the arbitration.[1]

Converse is not a party to any other litigation abroad. The only other suits are:

- One filed by Alon against Coopershoes in Rio to enforce the separate contract that Alon has with Coopershoes to which Converse is not a party and over which this Tribunal lacks jurisdiction. That Brazil Court has entered an injunction, which orders Coopershoes to continue to perform its contract with Alon during the pendency of the arbitration, including paying Alon the monies in accordance with its contract with Coopershoes. Coopershoes is defying the injunction with Converse's full knowledge and has informed Alon it is doing so at Converse's request. The Rio Sate Supreme Court affirmed that injunction on appeal.

- The other litigation, essentially two identical petitions, was filed by <u>Coopershoes</u> against Alon, and pretextually against Converse, in Porto Alegre (Brazil) to "interplead" the payments due to Alon under its contract with Coopershoes (again to which Converse is not a party). Even though Converse is fully aware of the suits and Coopershoes is in constant contact with Converse, Converse has neither appeared nor been served, thereby successfully thwarting the progress of those suits. As a result, the monies are languishing in Porto Alegre court. Converse, of course, is perfectly content to have the monies languish in a registry since it has no cash need. It is no different than Solomon's false mother who would just as soon see the baby perish, in this case, the money languish, than have the true mother get it. Were Converse's true concern the monies, it would have appeared in the interpleader action and sought to have the monies turned over. It hasn't done that because its strategy, as the party with greater reassures, is essentially a war of attrition.

That is the only litigation that is pending abroad.

Fifth and finally, not just foreign courts, but a United States federal judge has already denied Converse what it seeks here, declaring:

---

[1] Unfortunately for Alon, Converse has succeeded in shutting off its flow of funds by having Coopershoes "interplead" the payments owed to Alon and, as a result, Alon has been unable to post the US$300,000 bond required by the court for the Argentine injunction, resulting in the injunction's expiration.

"These [Brazilian] foreign injunctions pending arbitration are not only reasonable, but also consistent with the strong policy in favor of resolving disputes pending arbitration."

Order p. 2 (emphasis added).

Converse would have this Tribunal overrule the federal judge.

## FACTUAL BACKGROUND

### The Manufacturing, Distribution and Licensing Agreement

Alon is in the business of developing, sourcing, and marketing footwear and related accessories in Latin America. (Durchfort Decl. ¶ 4). Specifically, Alon builds market share for global brands throughout Latin American countries by building and tailoring local networks for the supply, distribution, and sales of shoes, apparel, and accessories. (Id.)

That is precisely why Converse hired Alon. Converse needed an expert partner as its exclusive licensee for its troubled territories of Argentina, Brazil, Paraguay, and Uruguay (the "Mercosur market"). When Converse's Vice President of Licensing, Timothy Ouellette, hired Alon, he told Mr. Durchfort: "If there's anyone who can build this business [in the Mercosur market] it's you; you're the best in the world for this job." Ouellette knew Mr. Durchfort's abilities well because Ouellette used to work for Mr. Durchfort in the early 1990s when Mr. Durchfort was President of Pagoda International, a division of Brown Group.

At the time, Converse had seemingly insurmountable obstacles in Brazil, the largest territory covered by the Agreement: a "brand pirate" that controlled the esteemed "ALL STAR" mark; a consumer accustomed to a poor quality knock-off of Converse's Chuck Taylor design sneaker at extremely low prices; a local production, distribution, and sales network loyal to and historically dependent on the "brand pirate"; and strict governmental regulations that significantly restricted a company's ability to export royalties out of Brazil.

In fact, during contract negotiations between Converse and Alon early 2001, Ouellette expressed serious doubt that anyone could overcome even the singular obstacle of annulling the "brand pirates" registration of the ALL STAR mark in Brazil. Ouellette promised that Converse would appoint Alon as its exclusive licensee for Converse shoes in **all** of Latin America, as the markets became available.

On July 1, 2001, Alon and Converse entered into a Manufacturing, Distribution and Licensing Agreement ("Agreement") dated September 1, 2001, under which Alon obtained the

7

exclusive rights and license to manufacture, distribute, and utilize Converse marks and related products throughout the "Mercosur market". A copy of the Agreement is attached as **Exhibit "1"** to the Durchfort Decl. ¶ 5.

Alon delivered in spades. Alon formulated a winning legal strategy that recaptured Converse's rights to the pirated "ALL STAR" mark in Brazil and simultaneously eliminated a 17-year threat by the "brand pirate." From the outset, this strategy included Coopershoes (short for "Cooperativa De Calcados E Componentes Joanetense LTDA").

Coopershoes was the manufacturer and distributor for the "brand pirate" in Brazil at the time and, thus, capable of producing vulcanized shoes, the manufacturing process used for the Chuck Taylor ALL STAR shoe. There are only a few manufacturers in Brazil capable of producing quality vulcanized shoes in volume production. Moreover, Coopershoes was a distributor that handled its own invoicing for the "brand pirate," which meant that Coopershoes already had in place the platform to immediately implement Alon's production, distribution, and sales strategy – a key element for Alon's strategy to work.

Alon's strategy was to nullify the "brand pirate's" registration of the "ALL STAR" mark with the Brazilian government and convince Coopershoes to leave the "brand pirate" and manufacturer and assist Alon in the distribution and sale of the authentic Converse ALL STAR shoes. Timing was important. If successful, Alon would be positioned to put the "brand pirate" out of business on the same day that the Brazilian courts cleared the way for Alon to sell legitimate Converse brand shoes.

Alon's strategy with Coopershoes was fully understood, consented to, and specifically approved Converse. It cannot be overemphasized that both **Ouellette and Converse – from the outset – were intimately familiar with all the facts and circumstances surrounding the plan, business strategy and structure between Alon and Coopershoes**. For example, as early as July 29, 2002, 28 days after signing the Agreement, Alon sent Converse's lawyer in Brazil, Ouellette, and Converse's General Counsel, Laura Kelley ("Kelley"), an e-mail stating: "I want to inform you that we have signed a contract with Coopershoes." Converse fully knew that Coopershoes was the manufacturer/distributor for the pirate that had bedeviled Converse for years. Incredibly, Converse – 5 years after receiving this e-mail – would have this Tribunal believe it was kept in the dark about Coopershoes.

8

Alon's plan was wildly successfully. Among other things, Alon rescued the Converse "ALLSTAR" mark from the "brand pirate" in Brazil; created markets previously unavailable for the Converse marks and related products; developed a successful business model for the sale of the Converse marks and products; and far exceeded the sales and royalty expectations under the Agreement. (Durchfort Decl. ¶ 16). Until it fell into Converse's and Coopershoes' monetary chokehold via the Coopershoes "interpleader" action that Converse is not appearing in, Alon continued to invest heavily in developing the market for these products. Id.

The Agreement provides for an initial 3-year term (September 1, 2001, through December 31, 2004), which automatically renews into another 3-year term (January 1, 2005, through December 31, 2007) provided certain conditions are satisfied. (Durchfort Decl. ¶ 6). Specifically, *Alon* could renew the Agreement "for an additional term of three (3) years provided [Alon] exceed[ed] the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that [Alon] has not breached any of the terms and conditions of this Agreement." (Agreement § 2).

Alon far surpassed these requirements. Alon exceeded the minimum sales requirements under the Agreement by more than **five times** the guaranteed minimum and exceeded the guaranteed royalty payments by over **six times** the required amount. As a result of Alon's success, Alon notified Converse in 2004 of its intent to continue the Agreement into its next term. (Durchfort Decl. ¶ 8).

Furthermore, Alon did not breach any provision of the Agreement. Significantly, the first time[2] Alon was put on notice of alleged "breaches" by Converse was on November 30, 2004 – just 30 days before the second 3-year term was set to begin. (Durchfort Decl. ¶ 20)

### Converse's Pretextual Termination To Misappropriate Alon's Market and Business

Through the efforts and accomplishments of Alon, Converse came to view the Mercosur market as one of the largest growth opportunities worldwide for Converse. As Ouellette predicted, Mr. Durchfort knew how to build Converse's business. Yet, Ouellette became preoccupied with Alon's startling success and increasingly attempted to ascertain the terms of compensation that Alon negotiated with Coopershoes. Ouellette soon began threatening Messrs.

---

[2]    Other than an October 1, 2004, letter alleging breach for failure to provide "information customarily reviewed during an audit." Tellingly, the first category of documents listed by Converse was a request for the terms of compensation between Alon and Coopershoes. Alon surrendered to the pressure and complied.

9

Durchfort and Szerer regarding how much Alon was making –*e.g.*, "You [Alon] had better not be making higher fees than us [Converse]" – and repeatedly demanded that Alon disclose their compensation with Coopershoes.    As Alon repeatedly informed Ouellette, however, its compensation with Coopershoes was propriety financial information.

In a meeting held in November 2003, Alon provided Converse with a complete copy of its contract with Coopershoes with only the compensation terms redacted.    Senior Converse executives read the Agreement.    Converse admits this.    <u>See</u> Transcript of April 25, 2005, Preliminary Hearing ("Hearing Transcript"), pp. 49-50, attached as **Exhibit "4"** to the Notice of Filing served contemporaneously.    (The contract is in Portuguese.    However, at least one of the Converse executives who read it, Laganas, is fluent in Portuguese).

Ouellette, Laganas, and other Converse personnel already knew the structure and the respective responsibilities of Alon and Coopershoes.    At the meeting, Alon went on to explain in detail to others on Ouellette's team the structure and the respective responsibilities of Alon and Coopershoes.

In July 2004, during the parties' negotiations of a possible, different 5-year contract,[3] Converse demanded a version of the Coopershoes contract with the terms of Alon's compensation unredacted and, Alon still resisting, soon learned that Ouellette improperly sought to use what Converse was calling a "perfunctory audit" as a ruse to obtain the Alon-Coopershoes Agreement's compensation terms.    For this "perfunctory" audit, Converse hired a ***forensic*** accountant.

Ouellette was driven by his desire to find out how much money Alon was making through Alon's agreement with Coopershoes.    During the course of the perfunctory "audit," which Converse took over four months to complete, Ouellette mounted increasing pressure to discover Alon's spread.    At one point while one of Converse's internal auditors was at Alon's offices in Florida, Ouellette pretended that the auditor was sending back negative reports to intimidate Alon into disclosing how much money it was making.

On October 1, 2004, Converse sent Alon a notice of default letter alleging that Alon was in breach of the Agreement by supposedly failing to cooperate with Converse's audit and purportedly refusing to produce certain "information customarily reviewed during an audit."

---

[3] Ouellette always was promising Alon longer commitments and, in mid-2004, was negotiating with Alon for a longer 5-year contract beginning January 1, 2005.

Tellingly, the first category of documents listed by Converse in the appendix to this default letter was a request for the terms of compensation between Alon and Coopershoes: "Copies of all 'non-redacted' agreements between Alon International and Coopershoes related to the Converse brand business in Brazil . . ."

On or around October 11, 2004, Mr. Durchfort traveled to Boston to meet personally with Ouellette. By this time Alon had invested **almost all of its resources and time** into building the Converse brand in the Mercosur market **to the exclusion of all other profitable business lines**. Converse's threat to terminate the Agreement, although baseless, placed Alon in a precarious and vulnerable position of losing everything, not just Converse's business. Ouellette knew this and exploited Alon's vulnerability.

At this meeting, Ouellette yet again asked Mr. Durchfort to tell him the "amount of fees" Alon was receiving from its contract with Coopershoes. Mr. Durchfort expressed his concern that the information was confidential and in his opinion Converse was attempting to use this information to cut a deal directly with Coopershoes. **Ouellette responded: "I would like you to think that I am enough of a man that would tell you directly if we intended to sign a deal with Coopershoes cutting you out."**

In reliance on Ouellette's promises not to terminate Alon and "sign a deal" directly with Coopershoes, Mr. Durchfort disclosed to Ouellette the spread it had negotiated with Coopershoes. Shortly thereafter, on November 30, 2004, Converse sent Alon a 30-day notice of intent to terminate the Agreement, unilaterally repudiated the next 3-year term of the Agreement, and soon did exactly what Ouellette had assured Alon he wouldn't do: signed a deal directly with Coopershoes and cut Alon out.

Alon has since discovered that Converse entered into a manufacturing, distribution and trademark license agreement directly with Coopershoes (the "Converse-Coopershoes agreement") on December 16, 2004 – before the expiration of the Agreement's original 3-year term. Tellingly, Coopershoes is the same company with which Converse now claims that Alon had an "illegal sublicense.". Attorney Michael Gilleran executed the Converse-Coopershoes agreement. Converse negotiated a 15% royalty rate on net sales under the Converse-Coopershoes agreement – nearly 2 times the amount it was receiving and had negotiated in the Agreement with Alon. A copy of the Converse-Coopershoes agreement is attached to the Notice of Filing as **Exhibit "4."**

As Alon has said, that's what this lawsuit is about: Converse simply concluded that Alon was making too much profit, which Converse wanted for itself for the second term, and simply cut Alon out, thereby doubling its profit. It really is that simple and that gross. It kept the same manufacturer in place (Coopershoes), Alon's distribution in place and Alon's market strategy in place. It is hard to conceive of a set of facts in which a manufacturer has more brazenly run roughshod over its distributor, especially the very distributor which in fact rescued and developed the market beyond all expectations.

Converse's termination letter alleged that Converse "does not agree to any extension of the Agreement" and notified Alon that it was in breach of the Agreement allegedly due to 1) a prohibited sublicensing arrangement with Coopershoes, 2) a failure to pay fully royalty owed by incorrect deduction of VAT tax, 3) a failure to pay full royalty by use of incorrect exchange rates; and 4) a failure to meet advertising minimums.[4]

When Messrs. Durchfort and Szerer received Converse's letter, it was inconceivable to them that Converse and Ouellette, in particular, would claim that the structure and relationship between Coopershoes and Alon was unfamiliar to Converse and an "improper" sublicense – that structure was the very hallmark of Converse's and Alon's strategy and triumph in Brazil. In late December of 2004, Alon learned that Converse had been secretly negotiating directly with Alon's manufacturer/distributor, Coopershoes, to cut-out Alon. Faced with these bad-faith allegations and the prospect of losing not only the thriving market that Alon developed in Brazil for the Converse brand and local networks with which to sell Converse products, but Alon's very existence, Alon initiated this arbitration and took immediate action to protect itself in the courts of Brazil and Argentina.

## PROCEDURAL BACKGROUND

### The *Status Quo* Injunctions In Brazil Pending Against Converse and Coopershoes

Alon initiated this Arbitration and filed actions in the national courts of Brazil seeking to obtain *status quo* injunctions against Converse and Coopershoes prohibiting them from taking action contrary to Alon's rights under their respective agreements pending the outcome of the parties' disputes in arbitration. (Lobo Decl. ¶¶ 3-4, 18-24). Alon commenced the injunction

---

[4] Converse has since withdrawn alleged breaches "2" and "3" because it was wrong about both the incorrect VAT tax deduction and the exchange rates. As for the exchange rates, Alon simply offset an overpayment by Alon in order to avoid even the appearance of a breach with Converse.

action against Converse on or about December 21, 2004, and the injunction action against Coopershoes on or about March 31, 2005.

### The Converse Injunction

On December 22, 2004, the Brazilian court in the 19th State Court of Porto Alegre, State of Rio Grande do Sul, Brazil entered a *status quo* injunction against Converse (the "Converse Injunction"). The injunction orders that that the parties continue to perform their contract until the termination of the arbitration proceedings already initiated, and enjoined Converse from entering into any contractual arrangements in Brazil contrary to the contract with Alon. (Lobo Decl. ¶ 4).

The Converse Injunction provides, in relevant part:

2 - The controversy, therefore, that serves as context for the dispute is found in the manifestation of a desire by the Defendant not to renew the Agreement -which is to end in December 31, 2004, **and whose merit, the Plaintiffs informs, are under examination in an arbitration proceeding.**

Plaintiffs, when asserting that the institution of an arbitration process does not waive their obligations, would like the interpretation of Clause 33 to also affect the Defendant so that **Defendant will also remain bound to the obligations of the business during the arbitration proceeding.**

3 - **This lawsuit is restricted to the examination of those Agreement clauses which deal with the term of the Agreement, its renewal, the resolution and establishment of the arbitration process in order to verify the position of each party at the time the Agreement was signed with regards to the period when arbitration might be started.**

Based on the position taken by the Defendant in notifying its lack of interest in renewal at the same time it made apparent an interest in renewing the Licensing Agreement through arrangements, I understand that this last effort should prevail as a means to preserving good faith and transparency principles in the business relationship.

Thus, having established the risk of damage to the Plaintiffs since their business will be interrupted abruptly, which will have social repercussions, and considering the social interest of the Agreement currently expressed in the Brazilian Civil Code, I hereby GRANT THE RESTRAINING ORDER REQUIRED **in order to determine the maintenance of the effects of the Licensing Agreement during the arbitration process,** as well as to compel the Defendant to abstain from practicing acts that violate the rights according to the  Agreement under the penalty of a daily fine of R$100.000,00 (one hundred thousand reais).

13

Id. (emphasis added).

On February 24, 2005, while the judge who had originally entered the injunction was on vacation, Converse obtained an *ex parte* order from a temporary judge substituting for original the judge. (Lobo Decl. ¶ 5). Thus Converse is fully adept and capable of defending itself in the courts of Brazil.

Alon appealed the *ex parte* order over-turning of the Converse Injunction to the Supreme Court of the State of Rio Grande do Sul (*Tribunal de Justicia, Estado Do Grande Do Sul*). (Lobo Decl. ¶ 6). On March 18, 2005, a judge of the 3[d] Chamber of the Supreme Court of the Rio Grande do Sul re-instated the Converse Injunction pending completion of the parties' arbitration and ordering, in pertinent part:

. . .

. . . I uphold the appeal, to grant the advancement of protection sought by the plaintiffs, determining that the defendant refrain from practicing any act which violates the contractual right of the plaintiffs specified in the Licensing Agreement signed between the parties.

(Lobo Decl. ¶ 7).

**Converse then appealed the Converse Injunction** again to the remaining judges of this 3[d] chamber of the Supreme Court of the State of Rio Grande do Sul. (Lobo Decl. ¶ 8). On April 20, 2005, a three-judge panel of **that Court unanimously affirmed** in all respects the original Converse Injunction maintaining the validity of the Agreement between the parties pending arbitration, as set forth above. (Lobo Decl. ¶¶ 8-9). In keeping with its style, Converse did not disclose this key ruling to this Tribunal at all in the body of its Motion (either in its description of the "the Brazilian Proceedings" [pp. 8-9] or otherwise) and its only mention of it is literally buried in Exhibit I at the bottom of the second page thereof. (Lobo Decl. ¶ 11).

Converse's motion would have this Tribunal overturn that ruling by a foreign court.

### The Coopershoes Injunction

As noted, Alon has its own contract with Coopershoes. Although the Converse Injunction entitled Alon to receive its payments during the pendency of this arbitration, Converse evidently – **in violation of the Converse Injunction** – asserted that **the Agreement was terminated** and demanded that Coopershoes pay Alon's monies directly to Converse. Thus

14

Coopershoes, which is now cooperating fully with Converse, has refused to pay Alon and, as discussed below, has "interpleaded" the monies into a Brazilian court instead.

Faced with Converse's breach of the Agreement and its interference with Coopershoes, and Coopershoes' collaboration with Converse, Alon filed suit against Coopershoes in the Eighth Business Court of Rio De Janeiro *(Ottava Vara Empresarial de Comarca Da Capital Do Estado Do Rio De Janeiro)* seeking an order to direct Coopershoes to comply with the terms of *its* contract with Alon including paying Alon its royalties. (Lobo Decl. ¶ 18).

By Order dated April 5, 2005, that court issued an injunction in favor of Alon and against Coopershoes entitling Alon to its payment from Coopershoes pending the outcome of arbitration ("Coopershoes Injunction"). A true copy of the Coopershoes Injunction along with its certified translation is attached hereto and marked as **Exhibit "2."** (Lobo Decl. ¶ 18).

The Brazilian court ruled that Coopershoes must: i) cease and desist from taking any acts which are violative of Alon's contractual rights under the agreements signed with Coopershoes; ii) cease and desist from acting under any obligation to Converse; iii) produce the Converse products solely for Alon **and make payment directly to Alon**; and iv) deliver sales reports and follow up of production directly to Alon. In the event of non-compliance, Coopershoes faces a daily fine of fifty thousand (50,000) reais. (Lobo Decl. ¶ 20).

In granting the Coopershoes Injunction, the court recognized that the Supreme Court of Rio Grande do Sul had issued a *status quo* injunction in favor of Alon "that shall remain in effect [for the period in which] arbitration in the United States is pending." The court further recognized that Coopershoes "had assumed the obligation of paying [Alon]," that Coopershoes "continues to produce tennis shoes [using] the brand [names] licensed by [Alon]," and that Coopershoes has not paid Alon its fees "for three consecutive months, [which] endangers [Alon's] economic viability and may require [Alon] to shut down their operations in Brazil." (Lobo Decl. ¶ 21; Coopershoes Injunction pp. 2,3).

To date, Coopershoes continues to refuse to pay Alon and to perform in accordance with the terms of the parties' contract, even though Alon has continued to work in good faith under the terms of its agreements with both Converse and Coopershoes and in accordance with the Converse Injunction and Coopershoes Injunction.

15

Given Coopershoes' continuing defiance of the injunction, Alon filed a request in the Eighth Business Court of Rio De Janeiro seeking to compel Coopershoes to comply with the Coopershoes Injunction. (Lobo Decl. ¶ 23).

## Coopershoes' Interpleader

On March 4, 2005, before entry of the Coopershoes Injunction, Coopershoes filed a permissive interpleader action with the Twelfth Civil Court of Porto Alegre to deposit the money it owed Alon into a judicial escrow account. (Lobo Decl. 12). By Order dated March 10, 2005, the court allowed Coopershoes to deposit money it owed to Alon into a judicial escrow account. (Lobo Decl. ¶ 12). **It is important to note that** this deposit was made during the brief window during which Converse improperly set aside the Converse Injunction by obtaining an *ex parte* order from the interim judge while the assigned judge was on vacation. As previously noted, on March 18, 2005, the Supreme Court of Porto Alegre immediately re-issued a *status quo* injunction in favor of Alon ordering the continued validity of the Agreement between Alon and Converse pending completion of this arbitration. (Lobo Decl. ¶ 6).

On April 1, 2005, while Converse's appeal of the Converse Injunction was pending, Coopershoes again applied to the Twelfth Civil Court of Porto Alegre for permission to make a second deposit of royalties owed to Alon into a judicial escrow account. (Lobo Decl. ¶ 14). By Order dated April 4, 2005, that court, despite the decision by the Judge of the 3d Chamber of Supreme Court of Rio Grande do Sul ordering the continued observance of the Agreement, again allowed Coopershoes to deposit funds owed to Alon into a judicial escrow account. (Lobo Decl. ¶ 14). The second interpleader deposit was allowed before entry of the Coopershoes Injunction and before the full 3-Judge panel of the 3$^d$ chamber of the Supreme Court of the State of Rio Grande do Sul affirmed the decision of the single Judge. (Lobo Decl. ¶ 15).[5]

In its Motion, Converse tries to create the impression that the Brazilian courts are disorganized by claiming that two different Brazilian courts have entered "injunctions" directing Coopershoes to pay royalties into a court fund in Porto Alegre. Converse is wrong. What

---

[5] Alon also has learned that, as recently as May 6, 2005, Coopershoes, again *ex parte* and without permission, deposited additional royalty payments owed to Alon in the interpleader court. The amount of Alon's royalties unlawfully deposited into the interpleader court now total $1,400,000.00 as of May 16, 2005. Of this, Alon intends to pay over $500,000 to Converse for royalties under the Agreement.

16

Converse claims are two different injunctions are merely two permissive interpleader deposits into the <u>same</u> court? (Lobo Decl. ¶ 12, 14).

Alon has filed a request to receive the second interpleader deposit. The request primarily raises two grounds: 1) that on April 5, 2005 – the day after the second interpleader deposit – Alon obtained an injunction against Coopershoes **directing payment directly to Alon.** Converse concedes this point (Motion, Exhibit I, p. 3 at #5); and 2) the recent decision of the full panel of the 3d chamber of the Supreme Court of the State of Rio Grande do Sul dated April 21, 2005, affirming the *status quo* injunction in all respects.

## ARGUMENT

Converse's Motion is predicated on a threshold premise that this Tribunal has the "authority" and "power" to issue an enforceable, interim order granting Converse the injunction it seeks and that this Tribunal should find comfort in those cases holding that there are limited grounds to challenge arbitral awards. (Motion, pp. 10-17). Converse misses the mark by a wide margin.

But the question now is not whether the Tribunal has authority to grant interim or conservatory relief. The question is whether well-established principles or doctrines of domestic or international law proscribe or limit this Tribunal from exercising such authority. They do.

**I.     The Tribunal Should Grant Comity to the Decisions of the
The National Courts of Brazil.**

The circumstances particular to the procedural history of these proceedings counsel against the use of such authority for a number of reasons, not the least of which is maintaining respect for earlier decisions of tribunals deciding the same issue. Cf. <u>Cherokee Exp., Inc. v. Cherokee Exp., Inc.</u>, 924 F.2d 603, 607 (6th Cir. 1991) (applying *res judicata* to bar consideration of earlier, untimely appeal by the defendant of plaintiff's preliminary injunction: "[u]nder general *res judicata* principles, the judgment imposing the preliminary injunction became final with the dismissal of that untimely appeal, and any later attempt to contest its validity would be barred"); <u>Maulick v. Murray</u>, 818 F.2d 29, 1 (4th Cir. 1987) ("Plaintiffs' request for a temporary restraining order was repetitive of his first such request, denied on August 19, 1986, and therefore barred by res judicata principles").

The injunction sought by Converse would directly conflict with national court orders of Brazil. The equitable principles of *res judicata*, collateral estoppel, and international comity all are relevant as a result of the extensive procedural history of this dispute in foreign tribunals and should properly be considered. See e.g., Telephone Workers Union of New Jersey, Local 827, International Brotherhood of Electrical Workers v. New Jersey Bell Tel. Co., 584 F.2d 31, 33 (3d Cir.1978) (refusing to confirm arbitral award on *res judicata* and collateral estoppel grounds where arbitrator's determination on the arbitrability of an issue was contrary to a previous judicial decision on the same issue). While *res judicata* in the context of international law does not operate in the "rigid" sense as it does to domestic judgments, the equitable principles underlying the doctrine are nonetheless applicable to the consideration of granting comity. It is without question a doctrine applicable to arbitration. See e.g., Aircraft Braking Systems Corp. v. Local 856, Intern., 97 F.3d 155, 159 (6th Cir. 1996) (**vacating arbitral award** where arbitrator failed to consider *res judicata* and or collateral estoppel); John Morrell & Co. v. Local Union 304A of the United Food and Commercial Workers, AFL-CIO, 913 F.2d 544, 562-63 (8th Cir. 1990) (**vacating arbitral award** involving an interpretation of a no-strike clause in the parties' agreement contrary to a previous jury determination of the same issue in litigation between the same parties on the ground that consideration of the issue was barred by collateral estoppel principles); Telephone Workers Union of New Jersey, Local 827, International Brotherhood of Electrical Workers v. New Jersey Bell Tel. Co., 584 F.2d 31, 33 (3d Cir.1978) (**refusing to confirm arbitral award** on *res judicata* and collateral estoppel grounds where arbitrator's determination on the arbitrability of an issue was contrary to a previous judicial decision on the same issue).

Because Converse's Motion to Rationalize seeks adjudication by the Tribunal on the same facts, issues, and claims that Converse already has raised and litigated in the national courts of Brazil, Alon requests that this Tribunal defer to the final orders entered in those courts. Contrary to Converse's arguments, the proceedings in Brazil and the U.S. are in sync with one another and do not require intervention by this Tribunal.

## Converse is Wrong on the Facts and Law

Converse argues that it is entitled to injunctive relief that supersedes and invalidates the orders of the national courts of Brazil because the Brazilian courts are disorganized and "lack

teeth."[7]  The record of the Brazilian proceedings belies such an assertion.  The decisions of the national courts of Brazil consistently have upheld the *status quo* between the parties pending the outcome of arbitration, and only one single judge, the one in Coopershoes' ex parte interpleader action and now being appealed, has ignored the *status quo* injunction, authorizing Coopershoes to deposit Alon's monies in interpleader despite the outstanding injunctions to the contrary.  Yet, under Brazilian law even that judge is now required to dissolve the interpleader account and order disbursement of the funds directly to Alon.

The Converse Injunction ordered the parties to comply with the terms of their agreements with Alon **pending the outcome of Arbitration.**  As noted above, the Converse Injunction orders that the parties continue to respect the Agreement until the termination of these arbitration proceedings, and enjoins Converse from entering into any contractual arrangements in Brazil contrary to the existing contractual rights of Alon during the arbitration.  Such an order must be respected under Massachusetts law.[8]

As noted, Converse is not a party to the agreement between Coopershoes and Alon, and such agreement is not within the jurisdiction of this Tribunal.  Through its petition with respect to the Coopershoes injunction and litigation, Converse is seeking to have this Tribunal adjudicate

---

[7]    It is ironic that Converse, which is defying a Brazilian court injunction and which is encouraging Coopershoes to defy the other Brazilian court injunction, would bemoan that the Brazilian courts "lack teeth."  Whatever the state of the Brazilian courts' dentures, Converse is taking full advantage of the fact of the alleged "toothlessness" by brazenly violating the courts' orders.  As well, these are the same national courts that adjudicated the ALL STAR trademark litigation in Converse's favor, which cleared the way for Converse, through its licensing with Alon, to profit handsomely from the sale of shoes in Brazil.  Converse certainly wasn't complaining about the Brazilian courts then, as evidenced by the e-mail attached to Durchfort Decl. ¶ 18.

[8]    See Currie v. Group Ins. Com'n, 290 F.3d 1, 16 (1st Cir. 2002) ("Massachusetts courts, following the majority view, must accord res judicata effect despite the pendency of any appeal"); O'Brien v. Hanover Ins. Co., 427 Mass. 194, 200-01 (1998) ("The Federal rule, followed by a majority of the States, is that a trial court judgment is final and has preclusive effect regardless of the fact that it is on appeal"); Taunton Gardens Co. v. Hills, 557 F.2d 877, 879, fn 2 (1st Cir. 1977) ("it is well settled that in the federal courts the pendency of an appeal does not destroy the res judicata effect of a judgment even if it has been stayed pending appeal"); see also Restatement (Second) of Judgments § 13, comment f (1982)) ("The better view is that a judgment otherwise final remains so despite the taking of an appeal unless what is called an appeal actually consists of a trial de novo").  Here, the appeal taken by Converse to the Supreme Court of Rio Grande do Sul is not a *de novo* appeal and Converse has a limited chance of prevailing. (Lobo Decl. ¶ 11).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Alon's rights *vis a vis* Coopershoes and to have this Tribunal annul *de facto* a Brazil court's ruling in a case to which Converse is not even a party.

Yet, Converse would have this Tribunal arbitrarily abrogate these injunctions by declaring the precise opposite of the principal relief they grant, namely that the Converse Agreement and the Coopershoes Agreement may be terminated immediately. The principles of international comity counsel that this Tribunal should not abrogate such orders, but instead should give full effect to these foreign tribunals to the same extent that they have recognized and respected the validity of this Tribunal.

There are number of reasons why this Tribunal should not intervene. The District Court of Massachusetts that denied Converse's injunction, under similar circumstances, noted that the equitable doctrine of *res judicata* serves numerous important interests – both public and private – including finality, repose, efficiency, maintaining respect for the judgments of the courts, and avoiding the imposition of inconsistent obligations on parties. See State Police for Automatic Retirement Ass'n v. Difava, 164 F. Supp. 2d 141, 148 (D.Mass 2001) (Saris, J.).[9]

The District Court, which has exclusive jurisdiction to enforce an award stemming from this Arbitration, already has held that "[i]nternational comity is a doctrine that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." Goldhammer v. Dunkin' Donuts, Inc., 59 F. Supp. 2d 248, 251 (D.Mass. 1999) (Saris, J.).

Since Hilton, courts generally evaluate three factors in determining whether to grant international comity: "(1) whether the foreign court was competent and used 'proceedings consistent with civilized jurisprudence,' (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just." See e.g., Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1238 (11th Cir. 2004).

In its Motion, Converse has not and cannot establish any one factor as grounds why this Tribunal should refuse to grant comity to the decisions of the Brazilian courts. Although Converse complains, albeit without any factual or legal support, that the Brazilian courts are

---

[9] See also Bay State HMO Mgmt., Inc. v. Tingley Sys., Inc., 181 F.3d 174, 181 (1st Cir. 1999) ("The policy behind res judicata is to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication").

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

"ineffective" and "lack teeth," it does not allege that the courts of Brazil lacked competence to enter the injunctions at issue. Nor can it because Converse was granted complete due process throughout the trial and appellate proceedings of the Converse Injunction, which was devoid of any fraud or impropriety whatsoever. Moreover, Converse cannot establish that the foreign injunctions were prejudicial and violated American policy. Indeed, the District Court, after studying the Brazilian and Argentine injunctions, held; "[t]hese foreign injunctions pending arbitration are not only reasonable, but also **consistent** with the strong policy in favor of resolving disputes via arbitration."

Applying these principles, international arbitral tribunals time and again have refused to interfere with the decisions of foreign tribunals granting preliminary injunctive relief in aid of arbitration. See e.g. Final Award in ICC Case 7536 (1996) (published in 11 Int'l Ct. Arb. Bull. 1, 54 (2000) (The tribunal was asked to determine if the attachment obtained from the local court had a continued *"raison d'etre"* in light of newly discovered evidence, and the Arbitral Tribunal held that it "has no jurisdiction to draw the consequences of that situation on the maintenance of the Attachment, a power which lies within the jurisdiction of the Italian courts."); Final Award in ICC Case 7589 (1994) (published in 11 Int'l Ct. Arb. Bull. 1, 60 (2000) (the Tribunal was "reluctant" to impose damages for a decision rendered by a competent State court, given that the "state court is ordinarily the best judge of its own jurisdiction and the determination of whether conservatory measures are appropriate," and "[n]o evidence has been submitted by [respondent] showing abuse of the judicial process by [claimant], or otherwise rebutting the *prima facie* validity of [claimant's] action").

Alon cannot overemphasize the impropriety of Converse's Motion to "rationalize". Its very name is deceptive in that it attempts to convey the impression that this Tribunal can "blue pencil" the decisions of foreign tribunals without regard for well established principles of international comity, collateral estoppel and *res judicata*. Converse further tries to spin its Motion as seeking something less than what it really does, but it is clear that its Motion is nothing less than an anti-suit injunction that seeks usurp the jurisdiction of the courts of Brazil,[10]

---

[10]  Quaak v. Klynveld Peat Marwick Goerdeler Bedrufsrevisoren, 361 F.3d 11, 18 (a foreign anti - suit injunction "has the effect of halting foreign judicial proceedings," thereby mandating a "rebuttable presumption" against the issuance of such an order); Compagnie des Bauxites de Guinea v. Insurance Co. of N. America, 651 F.2d 877, 887 (3d Cir. 1981) (finding "no difference between addressing an injunction to the parties and addressing it to the foreign court itself");

enjoin Alon from enforcing its rights under the Converse Injunction in Brazil, enjoin Alon from enforcing its rights under the Coopershoes injunction and a *de-facto* declaration that the Converse Alon Agreement is unenforceable.

The Brazilian Injunctions should not be disturbed or abrogated in any manner.

## II.    The Doctrine of Collateral Estoppel Bars Converse's Claim for Relief

Although the notion is not "comity" in the sense applicable to the foreign court decisions, parallels exist that require this Tribunal to recognize and respect the January 13, 2005, Order of the District Court denying Converse its anti-suit injunction.  See Keystone Shipping Co. v. New England Power Co, 109 F.3d 46, 51 (1st Cir. 1997) (collateral estoppel, or issue preclusion, "bars relitigation of any factual or legal issue that was *actually* decided in previous litigation 'between the parties, whether on the same or a different claim").

Here, the District Court already determined that Converse was not likely to succeed on the merits of this very same injunction and further held that Converse failed to demonstrate irreparable harm on the same set of facts.  By Order dated January 13, 2005, the District Court held:

> In light of the fact that Converse **has failed to demonstrate the likelihood of success, irreparable harm,** or harm to third-party entities, and in light of the principles of international comity, I DENY the application for an anti-suit injunction.

This Order was interlocutory and Converse had the right to immediately appeal the decision.  It did not.  In Brazil, Converse did appeal the Converse Injunction, but lost, and is now threatening to appeal the most recent decision of the 3-judge panel of the 3d chamber of the Supreme Court of Rio Grande do Sul.  To appeal a judicial order of a national or domestic court, or not, is Converse's right.  But Converse does not have the right to prosecute legal strategies that turn the policies and principals of well-founded doctrines on their head.  Converse should not use this Tribunal as an "appellate" body and file injunctions until it obtains the results it seeks.

---

Stonington Partners, Inc. v. Lernout & Hauspie Speech Products, N.V., 310 F.3d 118, 125 (3d Cir. 2002) ("enjoining a party from resorting to a foreign court is equivalent to enjoining foreign proceedings"); Laker Airways Ltd. v. Pan American World Airways, 559 F. Supp. 1124, 1128, fn 14 (D.C.D.C. 1983) ("as the Supreme Court held over a century ago, there is no difference between addressing an [anti suit] injunction to the parties and addressing it to the foreign court itself").

Because these issues already were decided by the District Court, the equitable principles underlying the doctrine of collateral estoppel should preclude Converse from relitigation them again here. Converse is not entitled to any injunctive relief and its Motion should be denied.

## III. Converse Has Failed to Meet Its Burden Of Proof To Obtain A Foreign Anti-Suit Injunction And, Therefore, Its Motion Must Be Denied.

As shown above, the relief that Converse seeks here is the same relief that it sought in the District Court and is properly considered an anti-suit injunction. In the District Court, Converse sought an order enjoining Alon from participating in the foreign proceedings and, once the foreign injunctions issued, requiring it to dismiss them with prejudice. (Application for *Ex Parte* Restraining Order pp. 1,5; Reply in support thereof pp. 2, 15-20). Although Converse is trying to give its application before this Tribunal a new name, it is actually the same one. By asking this Tribunal to "supercede" the "interim final orders" of the foreign tribunals, allow Converse to "work with Coopershoes under a license agreement," (which can happen only in contravention of the foreign court orders), prohibit Alon from terminating Coopershoes (under a contract within the jurisdiction of the Brazilian court), or engaging another manufacturer, and prohibiting Alon from receiving its payments from Coopershoes (in direct contravention of the Brazil injunction), Converse actually is seeking to have this Tribunal interfere with the jurisdiction of the Brazilian courts and their rulings and orders, enjoin Alon from proceeding with the Brazilian lawsuits, and in particular from enforcing its rights under the Converse and Coopershoes Injunctions. That, by any other name, is an anti-suit injunction.

An anti-suit injunction "is an instrument by which a court of one jurisdiction seeks to restrain the conduct of litigation in another jurisdiction" and to "affect the course and significance of litigation abroad."[11] The elements of Converse's injunction as set forth in its Motion are identical to its Rule 65 injunction that it sought in the District Court. That is not the standard for anti-suit injunctions. As the D.C. Circuit in the seminal case of <u>Laker Airways</u> explained:

> [T]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations. The

---

[11] George A. Berman, <u>The Use of Anti-suit Injunctions in International Litigation,</u> 28 Colum. J. Transnat'l L. 589, 590 (1990).

23

interests of both forums are advanced – the foreign court because its laws and policies have been vindicated; the domestic country because international cooperation and ties have been strengthened. The rule of law is also encouraged, which benefits all nations.

731 F.2d at 937; see also Goldhammer v. Dunkin' Donuts, Inc., 59 F. Supp. 2d at 251 (D.Mass. 1999) (Saris, J.) ("International comity is a doctrine that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law"); and also Compagnie des Bauxites de Guinea v. Insurance Co. of N. America, 651 F.2d 877, 887 (3d Cir. 1981) (noting presumption against issuance of anti-suit injunction because there is "no difference between addressing an injunction to the parties and addressing it to the foreign court itself"); Stonington Partners, Inc. v. Lernout & Hauspie Speech Products, N.V., 310 F.3d 118, 125 (3d Cir. 2002) ("enjoining a party from resorting to a foreign court is equivalent to enjoining foreign proceedings").

The First Circuit in Quaak v. Klynveld Peat Marwick Goerdeler Bedrufsrevisoren, 361 F.3d 11, 19 (1st Cir. 2004), recently enunciated a clear test for the issuance of an international anti-suit injunction. Quaak, 361 F.3d at 18.

*Only after a threshold showing that the parties and issue are the same,* can a court proceed to consider the issuance of an anti-suit injunction. Once the movant makes the threshold showing, the court should consider all of the facts and circumstances in determining whether an injunction is proper. Id.

In this analysis, there exists a presumption against the issuance of an order that has an effect on a foreign judicial proceeding or judgment. Id. Considerations of international comity are to be given substantial weight. Id. Comity thus dictates that foreign anti-suit injunctions be issued sparingly and only in the rarest of cases. Id.; see also Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc., 412 F.2d 577, 578 (1st Cir.1969) ("[r]estraining a party from pursuing an action in a court of foreign jurisdiction involves delicate questions of comity and therefore requires that such action be taken only with care and great restraint."); Laker Airways, 731 F.2d at 927.[12]

---

[12] See also China Trade & Dev. Co. v. M.V. Choong Yong, 837 F.2d 33, 35-36 (2d Cir. 1987) ("anti-foreign-suit injunction should be 'used sparingly', and should be granted 'only with care and great restraint.'"); Stonington Partners, Inc, 310 F.3d at 125-126 ("The power to enjoin a

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

This presumption may only be rebutted by the facts particular to each case, such as, for instance: the nature of the two actions (*i.e.* whether they are merely parallel or whether the foreign action is more properly classified as interdictory), the posture of the proceedings in the two countries, the conduct of the parties (including their good faith), the importance of the policies at stake in the litigation, and the extent to which the foreign action has the potential to undermine the forum court's ability to reach a just and speedy result. Quaak, 361 F.3d at 19. Converse has not – and cannot -- meet the rigorous Quaak threshold and secondary requirements for a foreign anti-suit injunction.

### A.    Converse Cannot Meet the Threshold Showing of the Same Parties and Issues.

Certainly, Converse cannot meet the same parties requirement with respect to the Coopershoes lawsuit and injunction. Converse is not even a party to that litigation, and Coopershoes is not a party to this arbitration. On that account alone, Converse's petition fails with respect to the Coopershoes case and injunction. Simply, this Tribunal may not enjoin that litigation.

Second, neither the Converse Injunction nor the Coopershoes Injunction cases have the requisite "identicality" of issues with the issues before this Tribunal. As the record establishes and as held by the District Court, the sole purpose of the foreign injunctions was to preserve the *status quo* of the relationship between the parties *pending a resolution of the dispute in arbitration.* The question to be adjudicated in this arbitration is the *merits* of Alon's claim that Converse breached the agreement, and vice versa for Converse. The foreign injunctions have not addressed the merits of the dispute between the parties – the relief that the Brazilian courts have provided is that the parties respect the contractual relationship *status quo* while the Alon's and Converse's substantive claims are decided in arbitration. Alon has no substantive claims pending before the Brazilian courts. The foreign injunctions determine simply the separate question of a conservatory measure, namely what happens during the pendency of the arbitration; they are, thus, ancillary to the arbitration and as a matter of law, do not involve the "same" claims as the merits that this Tribunal is asked to decide. See Canadian Filters, 412 F.2d 577,

---

foreign action should be exercised only in rare cases, and must be premised on a thorough analysis of the interests at stake").

# EXHIBIT A
# (continued)

579 (1st Cir. 1969); Microsoft Corp. v. Lindows, 319 F. Supp. 2d 1219, 1222 (W.D. Wash. 2004) (same).

In Microsoft, the defendant Lindows appointed local distributors for its products in other countries while litigation was pending. Microsoft then filed trademark infringement actions in those countries. A court in the Netherlands thereafter granted Microsoft's request for a preliminary injunction that enjoined the sale and distribution of Lindows products within the Benelux countries. Lindows moved the court for (i) an anti-suit injunction prohibiting Microsoft from continuing to pursue its foreign litigation, and (ii) a declaration of non-enforceability of the Dutch court's preliminary injunction. The district court held that an anti-suit injunction was not appropriate due to considerations of comity as well as the fact that the foreign trademark dispute was ancillary to the original proceedings and, therefore, not the "same issue" for the purpose of an anti-suit injunction.

As the First Circuit held in Quaak, "unless [the parallel suits involve the same parties and issues], courts ordinarily should go no further and refuse issuance of an international anti-suit injunction. Quaak, 361 F.3d at 18 (internal citations omitted). "If—and only if – this threshold condition is satisfied should the court proceed to consider all the facts and circumstances in order to decide whether an injunction is proper." Id. Because Converse cannot show the identity of claims (and with respect to the Coopershoes injunction, of parties), this Tribunal's inquiry ends and Converse's anti-suit injunction must be denied.

## B. Converse Cannot Establish Sufficient Other Facts That Overcome the Presumption Mandating Deference to the National Courts of Brazil.

Beyond that, Converse cannot establish the sufficient other facts and circumstances required by Quaak to overcome the presumption against the issuance of an order that has the effect of undermining a foreign judicial order or judgment.

### 1. The Foreign Injunctions Do Not Interfere With the Jurisdiction of the Tribunal's.

When a foreign court has not attempted to interfere in a proceeding before a domestic tribunal or sought to prevent the domestic tribunal from exercising its jurisdiction over the case, an anti-suit injunction should not be issued. See e.g. Quaak, 361 F.3d at 17 (citing Laker Airways, 731 F.2d at 926-27); China Trade, 837 F.2d at 37 (international anti-suit injunction was not justified where the foreign litigation did not threaten the domestic court's jurisdiction). In

26

accordance with the "fundamental corollary" to the principle of concurrent jurisdiction stated in Laker Airways: "parallel proceedings on the same *in personam* claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as *res judicata* in the other." Laker Airways, 731 F.2d at 926-27.

The Brazil injunctions do not interfere with this Tribunal's jurisdiction to decide the merits of the claims brought before it: the Brazil courts have expressly declared that the injunctions remain in place only during the pendency of the arbitration, namely such rulings in no way impede the effectiveness of this Tribunal's ultimate ruling on the merits. Thus, Alon does not seek to "hijack" the arbitrator's jurisdiction or authority over this dispute — to the contrary — it attorns wholeheartedly to the arbitral process, as it is Alon that initiated arbitration. Here, the purpose for initiating the injunctions in Brazil was to preserve the *status quo* and contractual rights of the parties pending the outcome of arbitration and to provide the Tribunal with the opportunity to render a meaningful arbitral award. Again, both Brazilian injunctions declare that the agreements signed between Alon and Converse and Coopershoes should be observed until the outcome of this Arbitration.

Certainly the AAA / ICDR's International Rules expressly contemplate that parties shall be free to seek relief from courts during the pendency of an arbitration and that such relief is in no way in violation of an arbitral agreement: "A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate." Article 21(3).

The Brazilian Injunctions thus solely maintain the *status quo* and do not address the merits of the parties' claims in this Tribunal.

      2.    **The Brazilian Injunctions Promote, Not Undermine, the Strong Federal Public Policy In Favor Of Arbitration.**

The Brazilian Injunctions are *status quo* injunctions that promote the strong public policy favoring arbitration because the District Court already has considered the injunctions and held that they do. Order p. 2 (**"These [Brazilian] foreign injunctions pending arbitration are not only reasonable, but also consistent with the strong policy in favor of resolving disputes pending arbitration"**)(emphasis added).

      3.    **Converse Cannot Show That The Foreign Injunction Actions Will Result In Conflicting Judgments.**

27

The Brazilian Injunctions have proceeded to judgment, and have not delayed, sidetracked, inconvenienced, provided inconsistent rulings, or altered the arbitral proceeding in any way. The Brazilian injunctions in no way hinder or impair this Tribunal's ultimate ruling on the merits of this dispute. As noted, they are in effect during the pendency of these proceedings and this Tribunal is not constrained by such injunctions in rendering its ultimate and final ruling on the merits. So there is no risk of any judgments "conflicting" with this tribunal's final award.

To the extent that Converse claims that there is a risk that the Brazilian courts will issue conflicting judgments among themselves, then: a) Converse should not be heard to complain when it is deliberately refusing to appear in the interpleader actions; b) that is a plea it should make to the Brazilian courts, not to this Tribunal, and c) the Brazilian Supreme Court of Rio has already ruled otherwise.

In sum, Converse is simply to take before this Tribunal a further appeal of an injunction issued by a Brazilian court over which this Tribunal has no jurisdiction and which it has already appealed and lost.

Accordingly, under the law applicable to anti-suit injunctions, this Tribunal must deny Converse's application.

## IV. Pursuant To The Agreement, The Law, And Common Sense *Status Quo* Means That The Agreement Remains In Effect and Both Converse and Alon Are Entitled to Payments Earned Under the Agreement.

As noted, Alon maintains that this Tribunal ought not even reach the merits of Converse's motion, as the issues are beyond the Tribunal's jurisdiction, have also already been adjudicated, and are protected from scrutiny by comity and the rigorous standards against anti-suit injunctions.

However, even if this Tribunal were to decide to look beyond the preclusive effect of those doctrines, it would find that Converse's injunction must still be denied. At bottom, Converse's Motion asks this Tribunal to change the *status quo* fixed by the Brazilian courts and for that matter by the parties' own agreement.

The case of Guinness-Harp Corp. v. Schlitz Brewing Co., 613 F.2d 468 (2nd Cir. 1980), is instructive. In that case, the parties entered into a distributorship agreement under which the plaintiff Guinness became the exclusive distributor for Schlitz throughout most of New York City. Id. at 469-70. Schlitz could terminate the distributorship agreement in certain specific

situations, which included unsatisfactory sales performance by Guinness. Id. Claiming Guinness' performance was unsatisfactory, Schlitz informed Guinness, after a prescribed cure period, that the agreement would be terminated by a date certain. Id. at 470. Guinness, insisting that it had performed its obligations, demanded arbitration and sought a *status quo* injunction in the Supreme Court of New York restraining Schlitz from terminating the agreement until arbitration had been conducted. Id. The district granted the injunction preventing Schlitz from terminating the agreement and ordered it to continue performing its obligations including shipping products and goods for distribution. Id. at 571.

Schlitz appealed the *status quo* injunction and the Second Circuit affirmed. As a threshold matter, the court acknowledged that injunctions against termination of a disputed contract pending the outcome of arbitration are entirely proper. Id. at 72. The court went to hold that there are two primary considerations in considering the appropriateness of an injunction against termination during arbitration: 1) the language of the parties' agreement; and 2) the relative risk of injury to plaintiff if the injunction is denied. Id. 471-72. The Court observed the following:

> Here, Guinness has no adequate remedy at law and has sufficiently demonstrated that the equities entitled it to an injunction. <u>Losing the Schlitz distributorship for the period pending completion of arbitration is likely to disrupt Guinness' business and injure its reputation, consequences for which compensation would be difficult, if not impossible, to determine</u>. . . the Schlitz distributorship was a basic element of Guinness' business and represented a business relationship of long-standing duration.

Id. at 473 (emphasis added).    Based on these reasons, the Court affirmed in all respects the *status quo* injunction against termination of the agreement pending the outcome of arbitration.

Here, as in Guinness, the Brazilian Converse Injunction simply requires the parties to continue to adhere to very contract they had been performing exactly on the terms agreed upon. Just as in Guinness, the risk of injury to Alon is considerably greater if the *status quo* injunctions are altered. If Converse's motion is granted, Alon will be put out of business. The consequences aren't high – they are fatal for Alon. Converse knows this, and that's why it is so desperate to overturn the Brazil court orders and is pressuring Coopershoes not to pay Alon. To paraphrase Guinness, "losing the . . . distributorship for the period pending completion of arbitration is likely to disrupt [Alon's] business and injure its reputation, consequences for which compensation would be difficult, if not impossible, to determine . . . . . ."

Just as the distributor in <u>Guinness</u>, Alon had a long-standing and successful relationship with Converse, which "was a basic element of [Alon's] business". If Converse's motion is granted, this Tribunal will in effect take away Alon's injunctions, and in that event, "the relative risk of injury to plaintiff" is devastating. As the Converse agreement represents 90% of Alon's business, the compensation for losing the distributorship, namely its very existence, its future, its ability to implement its market strategy and its reputation in the marketplace is impossible to determine.

If Converse's motion is granted, this Tribunal will be predetermining that in fact the Converse-Alon Agreement has been terminated by Converse. Alon asserts ownership of the *exclusive* right to the Mercosur territory. It is not simply a matter of damages, since Alon is entitled to be the one to develop the market, use the exclusive license to the mark, and expand its sales as it sees best, earning its reputation in the marketplace. If the *status quo* is changed, and Converse is permitted to wrest away control of the territory, market as it sees fit, sell as it sees fit, and manufacture as it sees fit, Alon will be irrevocably and irreparably deprived of its exclusive right to the territory for the next three years. And as in <u>Guinness</u>, the deprivation will "disrupt [Alon's] business and injure its reputation, consequences for which compensation would be difficult, if not impossible, to determine."

In contrast, the counter risk is that the Converse continues to receive its royalties just as it has for the past three years at a time when sales are increasing.

From the quality standpoint, as noted, Coopershoes is the very factory that Converse itself has contracted with, so there is no risk that the quality of the product will be affected. Certainly to the extent that Coopershoes and Converse continue to deny Alon access to the monies due to it while it is performing and Coopershoes continues in breach of its Agreement with Alon, Alon needs to find some other way to perform the Alon-Converse Agreement pending the arbitration as it is entitled to do under the several court orders.

But for the order of this Tribunal that prohibits Alon from discharging Coopershoes under the separate Coopershoes/Alon Agreement, despite the lack of jurisdiction, Alon would need to explore other options consistent with the Alon/Converse Agreement. Coopershoes is not named in the Alon/Converse Agreement as "the" or even "an" approved manufacturer. Certainly if for any reason, say a strike or a fire, Coopershoes had not been able to manufacture shoes to supply Alon under the Converse/Alon Agreement, then Alon would have been entitled to find

30

another factory, and in accordance with the terms of the Alon Converse Agreement, proceed to produce the shoes through such new factory, all with the understanding that in keeping with the terms of the Agreement, Converse would, for example, have the right to inspect the factory.

Converse is creating a hysteria to make it appear that Alon is going to be producing cheap products at some rogue fly-by-night operation. The Agreement protects Converse against that risk, giving it the right to inspect the factory, *etc.*, and more importantly, it is Alon that has the outstanding reputation in the marketplace – which Alon fully intends to protect and has protected by assuring manufacturing of first-rate shoes.

As far as the marketing, Alon throughout the Contract worked with Converse in all marketing moves and strategies, all of which Converse approved and benefited from. The mark is protected, and Converse cannot point anything to suggest that its mark is at risk or that Alon was not diligent in protecting the mark during the first term of the Agreement.

Finally, there is no "irreparable" harm to Converse if Alon is paid the monies that Coopershoes owes it. For one, Alon has no objection to having Coopershoes pay Converse directly (as it did often during the first term, by the way) the royalty amount that Alon would pay Converse under the terms of their Agreement (notwithstanding that Converse has breached the agreement and has damaged and is damaging Alon through its actions). Thus the only amount that would be in play would be the amount of the spread that Alon makes between the amount it pays under its Converse Agreement and the amount it makes under its Coopershoes Agreement. Of the current $1,400,000 that is on deposit, Converse would receive approximately $500,000.

Converse's only risk is that it ultimately wins this arbitration and Alon is unable to pay back that amount.

To begin with, the inability to collect a money judgment does not constitute irreparable harm under the law. A damages remedy is not rendered inadequate because of the ultimately uncollectibility of the judgment. See e.g. CVD, Inc. v. Raytheon Co., 1981 WL 2162, 2 (D.Mass. 1981) (denying defendant's requested to order the deposit of amounts due under the licensing agreement into an escrow account to collect upon any judgment rendered in their favor and holding: "the mere possibility that defendant will not be able to collect a judgment is not the type of irreparable harm required by Rule 65 to support an injunction").

But more importantly, Converse's premise assumes that if Converse wins the arbitration ultimately and this Tribunal rules that the Agreement is terminated as of December 31, 2004,

Alon would be required to disgorge the monies it earned for its performance under the Agreement during the pendency of the arbitration. Alon has been granted the right under the Brazilian court decisions to have that Agreement observed during the pendency, and Converse is receiving the benefit of Alon's performance: namely shoe sales, and increasing shoe sales at that. Alon is being thwarted by Converse from performing further, and is has long been the law that a party cannot prevent another from rendering its performance and then complain that it breached. See <u>United States v. Peck</u>, 102 U.S. 64 (1880) (Where defendant is prevented from performing his part of the contract by the conduct of plaintiff, the other party to the contract, the former cannot be held liable for its nonperformance); <u>Amoco Oil Co. v. Gomez</u>, 125 F. Supp. 2d 492, 498 (S.D. Fla. 2000) ("[h]e who prevents a thing being done cannot avail himself of the nonperformance which he has occasioned."); <u>Nitram, Inc. v. Cretan Life</u>, 599 F.2d 1359, 1371 (5th Cir. 1979) ("If one party to a contract prevents or makes impossible performance by the other party, the latter's failure to perform will be excused and the offending party will not be permitted to recover damages for nonperformance").

Moreover, Converse is trying to escape the legally operative terms of the very Agreement it drafted. As discussed below, the Agreement expressly contemplated that the parties would have to arbitrate any claims over termination and non-renewal, and that royalties would continue to be due during the pendency of the arbitration. The Tribunal's inquiry should end there.

A.     **The Agreement Defines *Status Quo* As Preserving Rights to Royalty Payments Pending Outcome of Arbitration.**

The arbitral clause of the Agreement provides, in pertinent part:

> Any controversy or claim arising out of or relating directly or indirectly to this Agreement, **including** but not limited to . . . the performance or breach thereof, and the **termination, renewal or non-renewal thereof** . . . shall be settled by arbitration . . . . **The institution of any arbitration proceeding hereunder shall not relieve the Licensee of its obligation to make payments accrued hereunder to Converse during the continuance of such proceeding.**

Agreement ¶ 33 (emphasis supplied). The Agreement expressly contemplates that the status quo "during the continuance" of "any arbitration proceeding" relating to "termination, [or] renewal" requires Alon to continue making royalty payments to Converse. While the agreement states that Licensee [Alon] shall continue to pay royalties, obviously royalties can be due only if the parties contemplated that the Agreement would continue, that is, that the parties would continue to

32

perform while controversies including ones over "termination" and "non-renewal" were arbitrated. Under Massachusetts law courts are required to interpret the language of a contract consistent with logic and reason and the intent of the parties. See e.g., City of Haverhill v. George Brox, Inc., 47 Mass. App. Ct. 717, 720 (1999) ("Justice, common sense, and the probable intention of the parties are guides to construction of a written instrument."); JRY Corp. v. LeRoux, 18 Mass. App. Ct. 153, 161 (1984) (construction of agreement leading to unreasonable conclusion is not to be adopted where agreement's language is fairly susceptible of construction that would lead to logical and sensible result); New England Foundation Co. v. Com., 327 Mass. 587, 596 (1951) ("Courts always avoid, if possible, any construction of a contract that is unreasonable or inequitable.").

Presumably, Converse will argue that the clause requiring the continuing payment of royalties, and therefore performance, during the pendency of arbitration does not apply to an arbitration over "termination" or "non-renewal". Yet, Converse drafted the Agreement. The Agreement must be construed against it. Fenoglio v. Augat, Inc., 50 F.Supp.2d 46, 57 (D.Mass. 1999) ("Massachusetts law construes ambiguous contractual language against the drafter," and further noting that the "drafter of an ambiguous contractual term is generally held to any reasonable interpretation attributed to it by the nondrafting party"); Paul Revere Variable Annuity Ins. Co. v. Thomas, 66 F. Supp. 2d 217, 226 (D.Mass.1999) (construing ambiguous contractual term against the drafter). The Agreement does not exclude certain types of arbitrations from the duty to pay royalties. Had it wanted to so provide, it should have done so.

To order Coopershoes to pay Alon's royalties into an escrow account would be interpreting the Agreement to mean that, during any arbitral proceeding over a dispute regarding renewal in which Converse claimed the Agreement terminated, as here, Alon would be required to continue making royalty payments to Converse from monies **unrelated** to the sale of Converse shoes. Not only is that illogical and inconsistent with the plain language of the Agreement, but also Alon never would have agreed to such a provision as it would be penal in nature. See e.g., E. L. Du Pont De Nemours & Co. v. Lyles & Lang Const Co., 219 F.2d 328, 338 (4th Cir. 1955) ("a punitive interpretation of the contract should not be adopted if a fair interpretation is possible"); JRY Corp. v. LeRoux, 18 Mass. App. Ct. 153, 161 (1984) (construction of agreement leading to unreasonable conclusion is not to be adopted where agreement's language is fairly susceptible of construction that would lead to logical and sensible

result); New England Foundation Co. v. Com., 327 Mass. 587, 596 (1951) ("Courts always avoid, if possible, any construction of a contract that is unreasonable or inequitable").[13]

Finally, Alon reiterates, even if this Tribunal were inclined to interpret the clause as Converse seeks, that issue has already been litigated several times, with finality – the Argentina court so ruled, the Converse Injunction Court so ruled, and the Coopershoes Court also read the clause in the same way. Thus, we are not here on some new question over which to begin a debate – the issue has already been decided – in Alon's favor – repeatedly.

### B.    The Law Supports Maintaining the *Status Quo* Pending the Outcome of Arbitration As Defined by the Brazilian Courts.

Converse complains that the foreign *status quo* injunctions enjoining termination of a contract and requiring ongoing business relationships pending litigation are "not appropriate" and "rarely issued." Motion p. 15. That is simply not true. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996) (preliminary injunction ordering specific performance of parties' agreement *pendente lite*); Sauer-Getriebe KG v. White Hydraulics, Inc., 715 F.2d 348, 349-350 (7th Cir. 1983) (directing the "district court to enjoin the [manufacturer] from repudiating the . . . contract and from transferring any of [the licensee's] claimed contractual rights to a third party until the London arbitration requested by [the licensee] is completed and this lawsuit (including any appeals) is terminated"); Cramer Products, Inc. v. International Comfort Products, 931 F.2d 900, 5 (10th Cir. 1991) (preliminary injunction granting specific performance of distribution agreement pending resolution of dispute). In fact, the Commonwealth of Massachusetts is one of the more liberal jurisdictions with respect to the availability of specific performance as a remedy in contract disputes. See In re Aerovox, Inc., 281 B.R. 419, 434 (Bkrtcy.D.Mass. 2002) ("Whereas in many jurisdictions the legal remedies of damages and restitution are the preferred method of redressing breaches of contract, and specific performance is a remedy limited to real estate, Massachusetts law is more liberal with respect to the availability of specific performance").[14]

---

[13] Stone v. Golden Wexler & Sarnese, P.C., 341 F.Supp.2d 189, 197 (E.D.N.Y. 2004) ("Where a contract admits of two constructions, the general rule is that the court ought to adopt that which is most equitable and which will not give an unconscionable advantage to one party over the other"); Matter of Community Medical Center, 623 F.2d 864, 866 (3d Cir. 1980) (same).

[14] See also Massachusetts General Laws c. 214, § 1A ("The fact that the plaintiff has a remedy in damages shall not bar an action for specific performance of a contract, other than one for purely

34

Moreover, Converse's assertion that the constitution of an arbitral panel diminishes the necessity of judicial intrusions is also out of context. As shown herein, the decisions of the courts of Brazil are not intruding on this arbitration. It is further well established that interim relief awarded by courts prior to the initiation of arbitration do not expire upon the appointment of a tribunal. See e.g.,Sauer-Getriebe KG, 715 F.2d at 349-350 (vacating judgment of district court denying licensee's *status quo* injunction and directing the "district court to enjoin the [manufacturer] from repudiating the . . . contract and from transferring any of [the licensee's] claimed contractual rights to a third party until the London arbitration requested by [the licensee] is completed and this lawsuit (including any appeals) is terminated").

The Ninth Circuit, citing Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 51 (1st Cir. 1986) – a case heavily relied on by Converse – held that the Federal Arbitration Act does not strip a court of power to grant injunctive pending the final outcome of arbitration. PMS Distributing Co., Inc. v. Huber & Suhner, A.G., 863 F.2d 639, 642 (9th Cir.1988).

Thus, even if this Court had the authority to alter, abrogate, or modify the *status quo* injunctions currently in effect in Brazil, there simply is no law, rule, or legitimate reason for doing so. All of Converse's arguments rest on unfounded grounds.

Converse finally claims that *"status quo"* actually means preserving Converse's damages remedy by requiring Coopershoes to pay royalties – that it has been paying Alon for **three years** – into an escrow account. This argument makes no sense. *Status quo* means "the 'last peaceable uncontested status existing between the parties before the dispute developed." Select Milk Producers, Inc. v. Johanns, 400 F.3d 939, 961 (D.C. Cir. 2005); American Hospital Ass'n v. Harris, 625 F.2d 1328, 1332 (7th Cir. 1980) ("the status quo is considered to be the last uncontested status, which preceded the lawsuit"); Matos ex rel. Matos v. Clinton School Dist., 367 F.3d 68, 72 (1st cir. 2004) (defining *status quo* as "freezing an existing situation"); Doe v. Weld, 954 F. Supp. 425, 429 (D. Mass. 1996) (Saris, J.) (same).

Converse cannot dispute that the last peaceable, uncontested moment between Converse and Alon was November 29, 2004, the day before Converse attempted to wrongfully terminate

---

personal services, if the court finds that no other existing remedy, or the damages recoverable thereby is in fact the equivalent of the performance promised by the contract relied on by the plaintiff, and the court may order specific performance if it finds such remedy to be practicable").

the Agreement and alleged pre-textual grounds for termination. **At that moment,** Alon was receiving its royalties from Coopershoes and paying Converse its share of those proceeds.

Converse cites to <u>Danieli v. Morgan Constr'n Co.</u>, 190 F. Supp. 2d 148 (D. Mass. 2002) for support. <u>Danieli</u> is wholly inapplicable to this case. In <u>Danieli</u> the plaintiff distributor, not the defendant, sought to alter the *status quo*. The court altered the *status quo* to avoid causing irreparable harm to the distributor's business that would inevitably result if the manufacturer refused to ship the distributor its bearings. There, the court recognized: "[I]n a literal sense, requiring the [manufacturer] to transfer to the plaintiff possession of the steel bearings would disturb that status quo." And because the distributor's request for an injunction had the "literal" effect of "disturb[ing]" the *status quo*, the court imposed a condition on the distributor for granting the injunction –*i.e.*, a guarantee to make the manufacturer whole if it prevailed. <u>Id</u>. at 155.

Here, unlike in <u>Danieli</u>, Alon is not seeking to alter the *status quo*, ***Converse*** is. Thus, <u>Danieli</u> actually hurts Converse's position: there is no reason to impose a condition on Alon to preserve Converse's damages because Alon is not seeking to alter the *status quo*, ***Converse*** is. In fact, Alon has brought a claim against Converse in this arbitration for interfering with the *status quo* and the contractual rights of Alon in Brazil. Alon has suffered serious damages from Converse's conduct in that regard.

Additionally, in <u>Danieli</u>, the manufacturer/licensor was being required to take action, namely deliver goods. Here, Converse collects royalties, all it has to do is sit back and allow Alon to perform under the Agreement.

Finally, Converse has no damages to preserve. Alon has continued to excel in the work it does for Converse. As proof, and as admitted by Converse, the Converse business has flourished in Latin America due to Alon's perseverance, guidance and hard work. Alon will continue to do so pending completion of this arbitration.

In conclusion, it is important to bear in mind that Alon is not petitioning this Tribunal for an injunction to preserve the *status quo* or to keep Converse from terminating the Alon Converse Agreement. Alon already won that. It is Converse that is seeking to have this Tribunal ***take away*** that right, which Alon has already been given by a court of law.

36

## V.    This Tribunal Should Deny Converse's Injunction.

### A.    This Tribunal Should Not Consider the Merits of Converse's Injunction Because It Improperly Requires the Tribunal to Pre-Judge the Merits of the Parties Dispute.

Before even reaching the merits, however, this Tribunal should refrain from deciding Converse's request for an injunction. The reason is that the fundamental predicate for injunctive relief under the <u>Teradyne</u> injunction standard, which Converse claims is applicable, is that Converse must show a *__likelihood of success on the merits__*. Alon is not concerned that Converse has met or can meet this standard. The District Court in Massachusetts already has rejected Converse's arguments. Rather, by considering the merits of the injunction, this Tribunal will be delving into the substance of the parties' dispute, into which it should not delve until sometime in October 2005, after the parties and Alon, particularly, have had a full opportunity to prepare and present its case on the merits of Converse's claims and defenses. Any decision by this Tribunal on the merits of the ultimate dispute between Converse and Alon at this stage of the proceedings will irreparably prejudice these proceedings.

It is well settled that "[i]n dealing with a request for an interim measure, an arbitral tribunal must refrain from pre-judging the merits of the case." Julian D.M. Lew, <u>Commentary on Interim and Conservatory Measures in ICC Arbitration Cases</u>, 11 ICC Bull. 1, 27 (2000); <u>see also</u> Ali Yesilirmak, <u>Interim and Conservative Measures in ICC Arbitral Practice</u>, 11 ICC Bull. 1, 32 (2000) ("[I]f a tribunal cannot grant an interim measure or conservatory measure without examining the merits of the case, it may refrain from doing so, in order not to pre-judge the merits of the case."). The reason underlying this established rule is articulated by Yves Derains, a noted scholar of international arbitration, as based in the lack of review afforded to arbitral awards. For example,

> "[w]hen interim relief is requested … from a court…. [the court will] adress not only the relief itself and its effects on the position of each party, but also the merits of the case…. [Accordingly, therefore] interim relief orders are subject to appeal and the rule that the same judge that may not grant interim relief and decide the merits of the case. In arbitration proceedings, the situation is completely different. Decisions by arbitrators are subject to limited grounds for appeal. Moreover, the same tribunal that grants [the] interim relief will also decide the merits of the case. Thus, the protections existing in many national procedural laws applicable to courts do not exist in the field of arbitration."

Yves Derains, <u>The View Against Arbitral <i>Ex Parte</i> Interim Relief</u>, Dispute Resolution Journal (2003); <u>cf.</u> Laurence Craig, <u>Some Trends and Developments in The Laws and Practice of International Commercial Arbitration</u>, 30 Tex. Int'l L.J. 1, 44 (1995) (<i>quoting International Elec. Standard Corp. v. Bridas</i>, 745 F. Supp. 172, 176 (S.D.N.Y. 1990)) ("[t]he whole point of arbitration is that the merits of the dispute will not be reviewed in the courts, wherever they be located.").

In accordance with the above principles, international arbitral tribunals will deny interim relief requested on the grounds that it requires the tribunal to "pre-judge" the merits of the case. <u>See</u> Partial Award in ICC Case 8113 (1995) (<u>published in</u> 11 ICC Bull. 1, 65 (2000)) ("apart from the fact that **the grant of the measure requested by the Claimant implies a pre-judgment of the dispute**, the Tribunal is of the opinion that the Claimant would not incur any grave and irreparable harm if not granted the sought provisional measure before the final award expected to issued within 1995").

Alon has the burden of proof on its claims sued upon and Converse, as the respondent, obtains an unfair advantage by front-loading the litigation of this dispute before Alon has had an opportunity to obtain the Converse documents and establish the necessary fact issues. In arbitration, interim measures that require a decision on the merits of the dispute are better left for evidentiary hearing. For example, the Arbitral Tribunal in ICC Case No. 8894 stated:

> The facts underlying Claimant's request for interim relief pertaining to Section 16 of the . . . Agreement do not permit the Tribunal, at this time, to grant such relief. Discussion at the preliminary hearing evidenced considerable confusion and uncertainty regarding the [issue in dispute]. We perceive at lease some genuine issues of material fact will appear in the presentation of proof underlying Claimant's request for equable relief in support of its Section 16 rights. Accordingly, we leave determination of this matter for reconsideration at the evidentiary hearing.

First Interim Award in ICC Case 8894 (1997) (<u>published in</u> 11 ICC Bull. 1, 94 (2000)).

Alon thus requests that the Tribunal <u>not</u> consider Converse's Motion on the merits and Alon only briefs the remaining issues in the event that the Tribunal does not accept the authority or reasoning of the above as persuasive.

38

**B.    Assuming the Tribunal Considers the Merits of Converse's Injunction, It Should Be Denied Because Converse Cannot Meet Even a Single Element of the Four-Part Test Converse Claims is Applicable.**

1.    <u>Alon, not Converse, Has a Strong Likelihood of Success on the Merits.</u>

Converse has asserted five grounds as support for its position that it will succeed on the merits: 1) the Agreement was not renewed; 2) Alon "lost its rights" to renewal when it proposed new terms that Converse rejected; 3) Alon entered into a sublicensing agreement without Converse's consent; 4) Alon failed to meet the required minimum expenditures for advertising Converse's products; and 5) Alon undertook to market products competitive with Converse.  To support these claims, Converse cites to the Agreement and the affidavits of Ouellette, Laganas, Quijada, and Breda.  These are the same arguments and affidavits that Converse filed in support of its injunction in the District Court, which the District Court rejected holding: **"Converse has failed to demonstrate the likelihood of success."**  Order p. 2 (emphasis added).  Undeterred, Converse raises these same arguments again.

a).    **The Record Evidence Demonstrates That The Agreement Renewed Automatically into its Next Term, and That Converse, Not Alon, Has Breached The Agreement by Terminating the In Bad Faith.**

As a threshold matter, the evidence establishes that, although Alon satisfied all conditions precedent to renewal and exercised its right to renew.  Converse attempted to prematurely terminate the Agreement on November 30, 2004, without negotiating.

The record evidence is clear that Alon (a) expressed its intent to renew the Licensing Agreement, and (b) is entitled to renew because it has complied with the terms of the Agreement. (Durchfort Decl. ¶ 8).  Alon also satisfied the requirements for renewal by exceeding the minimum sales requirements by more than *five times* the guaranteed minimum and exceeded the guaranteed royalty payments by over *six times* the required amount.

Converse's belief that it will succeed on the merits is predicated on the erroneous assumption both that renewal was not automatic and required a separate writing.  Converse is wrong on both counts.

First, Converse claims that the Agreement is not automatically renewable is inconsistent with the plain language of the Agreement.  The Agreement provides that, "*Licensee* may renew this Agreement for an additional term of three (3) years . . ., **provided** Licensee exceeds the

39

Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided Licensee has not breached any of the terms of and conditions of this Agreement." Agreement ¶ 2 (emphasis added). Thus, the clause was very precise in setting the specific numerical values that Alon had to achieve. Converse concedes that Alon satisfied these requirements.

Moreover, the Agreement did not leave open "certain key issues." The Agreement is a 38-page document and the **only** information "to be decided" was the "earned royalty" rates for the renewal term for footwear and non-footwear. Agreement ¶ 15(a). That section states, "[t]he Earned Royalty rate for Licensed Articles for the Option Period **will be negotiated prior to the Option Years taking effect.**" Id. (emphasis added). *All* other terms were fixed and defined.

What Converse fails to inform the Tribunal with respect to the two royalty rates in question is that the parties essentially had agreed upon the earned royalty rates for renewal term back in June 2001, when the Agreement was negotiated. At that time, Converse sent Alon an e-mail stating:

> Second Term Royalties would be:
>
> Original – 10%
> Footwear – 8%
> Non Footwear – 7%
>
> Can you draft an "Intent" Letter based on these Terms?

(Durchfort Decl. ¶ 19). There was no question by either Converse or Alon that these were the maximum rates that would apply to the **three-year renewal term**, if other rates weren't agreed upon. Id. In fact these rates are Converse's standard rates. (Ouellette Aff. ¶ 7; Converse's Motion to Rationalize, p. 19).

It is important to note that the discussions and negotiations in 2004 related to a new, expanded and extended contract between the parties, in some cases for expanded territory – **not the renewal term**. Alon always was prepared to use the percentages established by Ouellette in his June 2001 e-mail above should the parties not reach agreement on the expanded relationship. Converse and Ouellette had repeatedly solicited Alon to give Converse proposals and terms for a new relationship much longer than 6 years, independent of the Agreement, extending far into the future. There are substantial e-mail and documents that support this fact.

40

Again, the parties never "negotiated" the royalty rates for the *renewal* term. These rates already were assented to.

Surely it is strange that there were no negotiations or communications trying to negotiate the allegedly missing two rates as the end of the first was approaching nor any written communications about them. While there were documents about the *expanded* relationship, Converse and Alon did not try to negotiate the allegedly missing two rates. That's because at all times *it was a given* – if the parties failed to reach the broader, expanded agreement, then Alon would simply have only its second term option. (Durchfort ¶ __). Surely, two businessmen who expected to make more than $20 Million over the second term would not ignore it, if they believed, or Converse had in any way indicated, that the second term was at risk. Essentially, Converse did a trick "gotcha" maneuver by lulling them into thinking they were going to have an expanded relationship and then pulling the rug out from under them.

Clear evidence of this trickery is the fact that Converse's notice to Alon of its alleged "breaches" was strategically timed so that Alon would **not** have an effective opportunity to cure.

Section 24(c) of the Agreement, which applies to Converse's asserted breaches justifying termination, states:

> In the event of the occurrence of any one or more of the following, either party shall have the right, **after thirty (30) days written notice**, to terminate this Agreement by written notice thereof to the other party . . .
>
> . . .
>
> (ii)  the breach of or failure by either party to perform or observe any of the other terms and conditions of this Agreement, **provided said breach or failure shall continue for a period of thirty (30) days after written notice thereof from the other party.**

Pursuant to this provision, Converse had the right to terminate the Agreement only after "written notice thereof" and the alleged breach "**continued for a period of (30) days after such notice.**" That is clear evidence of its bad faith.[15]

---

[15]    As discussed below, under Massachusetts law, parties to a contract must give each other reasonable opportunities to cure. Point Productions A.G. v. Sony Music Entertainment, Inc., F. Supp. 2d, 2000 WL 1006236, 4 (S.D.N.Y. 2000) (refusing to find that defendant had breached the parties' agreement by entering into an allegedly 'unauthorized sublicensing" arrangement where plaintiff had failed to give defendant notice and opportunity to cure alleged breach as required by the agreement); Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 518 (2d Cir.1989) (failure to explicitly give contractually-secured opportunity to cure

41

Converse, instead of performing the second term as required once the parties failed to reach agreement on the expanded relationship, simply tried to terminate the Agreement on November 30, 2004, and repudiated the second term. (Durchfort Decl. ¶ 20). Even if the second Term Royalty Rate was still to be agreed upon (it wasn't), the parties had at a minimum contractually bound themselves to negotiate in good faith the royalty rates for the renewal term before December 31, 2004, and, contrary to Converse's arguments, such an agreement is binding and enforceable under Massachusetts' law. See e.g., Fickes v. Sun Expert, Inc., 762 F. Supp. 998, 1000-01 (D.Mass. 1991) (a binding agreement is found where the parties have a "mutual commitment to negotiate together in good faith in an effort to reach final agreement", and one of the parties "renounc[es] the deal, abandon[s] the negotiations, or insist[s] on conditions that do not conform to it").[16] All of the terms for the Second Period are defined in the Agreement, which *Licensee* has the option to renew for a second term – at most, only the royalty rate applicable during the second term remained to be agreed upon. Thus at a minimum Converse had a duty to negotiate with Alon in good faith over the sole remaining [allegedly] "to-be-

---

in accordance with the guidelines set forth in the parties' agreement constituted "fatal defect" of contract termination). The "concept of cure implies that once notified of an alleged breach, the party having allegedly breached the agreement will have an opportunity, *unfettered by the injured party*, to properly fulfill its obligations thereunder." American Seating Co. v. Transportation Seating, Inc. 220 F. Supp. 2d 845, 848 (W.D. Mich. 2002) ("notice is 'effective' and, therefore, proper only if affords Defendant a reasonable opportunity to cure").

[16]    See also Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987) ("preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated," in the sense that they "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement"); Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401, 407 (4th Cir. 2002) (a binding preliminary agreement "commit[s] the parties to negotiate the open issues in good faith in an attempt to reach the contractual objective within the agreed framework" and prevents the parties from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement" in accordance with covenant of good faith and fair dealing; L-3 Communications Corp. v. OSI Systems, Inc., 2005 WL 712232, 5 (S.D.N.Y. March. 28, 2005) ("parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement" and this "bar[s] a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement").

42

decided" term. Instead, Converse anticipatorily breached the Agreement by ~~wrongfully trying to~~ terminate. Converse openly breached its duty to negotiate under Massachusetts law.

Thus, Converse, not Alon, breached the Agreement by repudiating the second automatic term and trying to terminate prematurely. By attempting to terminate early, Converse at a minimum prevented Alon from negotiating the renewal royalty rate and then used that supposed failure as grounds to try to terminate the Agreement. As Converse knows, good faith negotiation requires "a give and take, a discussion of problems, real or perceived, and their potential solutions. It means an honest attempt on both sides to reach an accord." In re Gray Line of Boston, Inc. 62 B.R. 811, 816 (Bkrtcy.D.Mass. 1986) (Party failed to negotiate in good faith where it never intended to negotiate a renewal and did not negotiate in good faith before notifying the other party that lease would not be renewed).[17] Because Converse did not negotiate a renewal, tried to terminated 30 days prematurely before notifying Alon of any concerns it had about renewal, and has since not performed, it materially breached the Agreement.

At worst, the Agreement is ambiguous on the issue of renewal and the two rates and thus parole evidence is permissible to prove the intent of the parties. See e.g., Den Norske Bank AS v. First Nat. Bank of Boston, 75 F.3d 49, 52 (1st Cir. 1996) ("Although not admissible either to contradict or alter express terms, extrinsic evidence is admissible to assist the factfinder in ascertaining the intent of the parties as imperfectly expressed in ambiguous contract language"); Robert Indus., Inc. v. Spence, 362 Mass. 751, 753-754 (1973) ("When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating....its terms").

Looking beyond the four-corners of the Agreement, immediately it is clear that both parties intended renewal to be automatic. In e-mail to Ouellette dated June 21, 2001, Alon confirmed the terms of the Agreement including renewal: "*Renewal*: *Automatic* 3 year extension if 3rd year royalty minimums reach more that $280,000 (125% of 3rd year)." (Durchfort Decl. ¶ 7). On June 26, 2001, a formal Letter of Intent was ratified between the parties with the same terms. (Id.).

---

[17] See also School Committee of Newton v. Labor Relations Commission, 388 Mass. 557, 572, 447 N.E.2d 1201 (1983) (good faith negotiation "implies an open and fair mind as well as a sincere effort to reach a common ground").

Converse's assertions that the Agreement was not automatically renewable and required a separate writing are irreconcilable with the facts and a red herring to disguise its bad faith. Converse used Alon's good faith negotiations and proposal over a broadened business relationship with Converse into the future, in some cases as far as the year 2013, to lull Alon into a false sense of comfort regarding renewal while Converse made arrangements to wrongfully appropriate markets that had been developed by Alon and had previously been unavailable to Converse. (Durchfort Decl. ¶ 19). See Rex Lumber Co. v. Action Block Co, Inc., 29 Mass. App. Ct. 510, 520 (1990) (in a contract regarding the extension of a closing date, the Defendant's course of conduct and repeated assurances that the agreement between the parties had been renewed, "lulled" the Plaintiff into a false sense of comfort regarding renewal). Then, it was only after Converse began appropriating Alon's business contacts that Converse notified Alon on November 30, 2004, of its alleged "breaches" – a month before the renewal was to take effect. (Durchfort Decl. ¶ 20).

The separate writing requirement that Converse calls the "invalidating clause" also is inapplicable to renewal. The language of the Agreement that Converse uses to support this argument is found at the end of paragraph 2, which states: "Any **extension of the term of this Agreement** shall be effective only pursuant to a written agreement executed by Converse and Licensee. **Such written agreement** shall reflect any **new or revised terms or conditions agreed to by the parties.**" Agreement, ¶ 2 (emphasis supplied).

It is clear that this language applies only to new agreements extending the term of Agreement beyond its term contemplated in the Agreement (namely the two 3-year terms) and does not apply to the 3-year renewal term or "Option Period" of the Agreement, as it is referred to. If the parties intended that the Option Period had to be reduced to a separate writing they simply would have said so: "The Option Period shall be effective only pursuant to a written agreement." The Agreement defines the Option Period as an "additional term of three (3) years," not as an "extension." Agreement, Section 2.

Moreover, the Agreement states that the "*Licensee*" (that is, Alon) has the right to renew the term. A contract interpretation that says that *Licensee* has the option to "renew" (doesn't say "extend") for an additional 3-year term but not if Converse doesn't agree "in writing" renders the option superfluous since parties are always free to modify their contracts. There would be no purpose to referring to an "option" in favor of "Licensee" to "renew" for the *specific period* of 3

44

years. A contract will not be interpreted in a way that renders one of its terms null – where an interpretation can be given that renders all terms operative, that interpretation is favored. See New Valley Corp. v. U.S., 119 F.3d 1576, 1580 ▓▓▓▓) (contract "interpretation that gives a reasonable meaning to all of its parts is preferred to one which leaves a portion of the [contract] inoperative, void, meaningless, or superfluous"); U.S. v. Brye, 146 F.3d 1207, 1211 (10th Cir. 1998) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").

Here, Converse's interpretation renders the option right granted to Licensee null and ineffective – in contrast, Alon's interpretation that the alleged invalidating clause writing refers to changes not already built into in the Agreement such as an expanded scope of the territory or extensions of the term different from that built into the Agreement (for example, a change from two 3-year terms to something else) renders both clauses operative.

Converse claims "Alon lost its rights when it proposed new renewal terms which Converse rejected." Motion p. 19. As shown, however, the alleged "invalidating clause" specifically authorizes "new and revised terms or conditions agreed to by the parties." Id at ¶2. Converse's positions are irreconcilable. Thus, the logical interpretation of the Agreement is that the "extension of the agreement" and, thus, the new writing requirement, applied to a contract period different from the Agreement's original two 3-year terms.

**b).     Converse, Not Alon, Breached the Agreement By Improperly Trying to Terminate Based on a Supposed Sub-Licensing With Coopershoes When Coopershoes Was Not a Sublicensee, Converse Consented to Coopershoes, and Converse Failed to Provide Alon with any Reasonable Opportunity to Cure the Supposed Sub-License with Coopershoes.**

Coopershoes was not a sublicense. The sole evidentiary and factual basis to support Converse's claim that Coopershoes was a sub-licensee are the conclusory affidavits of Ouellette and Laganas who are neither experts nor lawyers in the field of sub-licensing and, ironically, are the two executives at Converse that knew the most about Coopershoes, visited the Coopershoes facility in Brazil, and specifically approved of its relationship with Alon.

Coopershoes **manufactures, distributes,** and **invoices** for Alon. But Alon controls its own business. As many businesses do nowadays, Alon outsources some functions while

45

retaining the high-value functions that give Alon its competitive advantage, namely, Messrs. Durchfort and Szerer's strategy and marketing expertise and experience accumulated from years in the shoe business in merging markets. Alon didn't clear the way for Converse shoes in Brazil because they had an infrastructure of bookkeepers, clerks, shoe salesmen or cobblers. They managed to defeat the pirate and take the market by storm, where Converse had utterly failed, because of their knowledge of strategic issues and the marketplace.

Alon informed Converse of the full nature of its relationship with Coopershoes from the beginning. (Durchfort ¶ 12). Indeed, Laganas admits in his affidavit (attached as Exhibit "C" to Converse's Motion) that during "on our about October 22, 2002 Durchfort and Szerer flew to Boston and attended a meeting at Converse" in which "Durchfort said that Coopershoes **manufactured and invoiced**" for Alon. (Laganas Aff. ¶ 5). As further proof of Converse's knowledge, Converse concedes that it received payment **directly from Coopershoes** for its royalties under the Agreement. Id.

While Alon has outsourced certain low-value functions to Coopershoes, Alon itself is responsible for building market share for the Converse brand throughout Latin American countries by building and tailoring local networks for the supply, distribution, and sales of shoes, apparel, and accessories. (Durchfort ¶ 9). Specifically, Alon builds and creates market share for Converse shoes, apparel, and accessories in the Mercosur market. This includes managing the sales operations at Coopershoes; building and managing the local sales networks in each community; developing and maintaining the third party contacts and relationships to ensure the growth of the business; designing and managing the advertising and marketing strategies; creating and building the design of the Converse products through focus group research; managing the quality control standards and upgrading the Converse product line produced by Coopershoes to match Converse global brand quality, such as designing and implementing changes in the last, outsole, material components, as well as packaging; managing litigation and tirelessly fighting the "brand pirates" in Brazil; marketing and creating both the sourcing structure and distribution channels for Converse's marks and related products throughout the Mercosur market. (Durchfort ¶ 9).

To these ends, Mr. Durchfort traveled extensively throughout Brazil and the Mercosur market each year; hired the Coopershoes sales manager; managed the sales operations on an ongoing basis; frequently attended sales meetings and other strategy meetings in Brazil at

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Coopershoes and other locations including at Converse's headquarters in Boston; met extensively with the local sales networks in Brazil; communicated by thousands of phone conversations and e-mail on an ongoing basis with Coopershoes, its principals, and employees, and other activities too numerous too mention. (Durchfort ¶ 14). Indeed, Alon was dedicating approximately 90 percent of its time to its Converse business in the Mercosur market. The extent of written documentation supporting these facts is extensive and will be submitted as proof during the evidentiary hearing of this matter.

At all times Coopershoes worked solely for Alon with respect to the production, distribution, and invoicing of Converse shoes and products. Coopershoes manufactured and invoiced exclusively for and on behalf of Alon and its Agreement with Converse. In relation to Converse business, Coopershoes did not and could not produce, distribute, or invoice for anyone other than Alon. (Durchfort ¶ 11). Alon managed, supervised, and enforced these limitations vigorously. Thus, it cannot be said that Coopershoes was a sublicensee of Alon in any technical or literal sense.

It is also clear Converse failed to give Alon an opportunity to cure any purported sublicensing with Coopershoes in violation of the Agreement's default clause. In fact, Converse's notice to Alon of its alleged "breaches" was strategically timed so that Alon would not have an effective opportunity to cure, even though Converse evidently admits that it believed Coopershoes was Alon's sublicensee back in November 2003 – one year before Converse terminated. (Hearing Transcript, pp. 48-51).

As noted, Section 24(c) of the Agreement, which applies to Converse's asserted breach for improper sublicensing, states:

> In the event of the occurrence of any one or more of the following, either party shall have the right, **after thirty (30) days written notice**, to terminate this Agreement by written notice thereof to the other party . . .
> . . .
>
> (ii) the breach of or failure by either party to perform or observe any of the other terms and conditions of this Agreement, **provided said breach or failure shall continue for a period of thirty (30) days after written notice thereof from the other party**.

Pursuant to this provision, Converse only had the right to terminate the Agreement for improper sublicensing **after** "written notice thereof" and the alleged improper sublicensing "**continued for a period of (30) days after such notice.**"

It is well established that parties to a contract must give each other reasonable opportunities to cure. Point Productions A.G. v. Sony Music Entertainment, Inc., F. Supp. 2d, 2000 WL 1006236, 4 (S.D.N.Y. 2000) (refusing to find that defendant had breached the parties' agreement by entering into an allegedly 'unauthorized sublicensing" arrangement where plaintiff had failed to give defendant notice and opportunity to cure alleged breach as required by the agreement); Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 518 (2d Cir.1989) (failure to explicitly give contractually-secured opportunity to cure in accordance with the guidelines set forth in the parties' agreement constituted "fatal defect" of contract termination).[18]  The "concept of cure implies that once notified of an alleged breach, the party having allegedly breached the agreement will have an opportunity, *__unfettered by the injured party__*, to properly fulfill its obligations thereunder."); American Seating Co. v. Transportation Seating, Inc. 220 F. Supp. 2d 845, 848 (W.D. Mich. 2002) ("notice is 'effective' and, therefore, proper only if affords Defendant a reasonable opportunity to cure").

Converse breached the default clause. On November 30, 2004, Converse informed Alon that it was _not_ renewing the Agreement on the same day that it advised Alon of its objection to the so-called sublicense with Coopershoes. Moreover, Converse then immediately entered into negotiations with Coopershoes and finalized that agreement only 16 days into Alon's "cure" period. This is _not_ reasonable as a matter of law. Converse should lose its claims based on these acts alone. Alon should prevail on its claims on these facts alone.

Most perplexing is that Converse consented to Coopershoes in all respects and now is feigning ignorance of these details to supports its ill-conceived termination decision. The record evidence establishes that Converse was aware of, and approved and consented, to the Coopershoes arrangement. (Durchfort ¶ 12). This structure was designed and arranged with Converse's involvement in order to prevent Coopershoes from producing for a competitor "brand pirate," to allow the Converse marks and products to enter the market as efficiently as possible,

---

[18] In re Colony Square Co. 843 F.2d 479, 481 (11th Cir. 1988) (If the party giving notice and "opportunity to cure" does not strictly comply with the requirements of the contract's default clause, it forfeits its rights to termination").

48

and to allow Converse to take royalties out of the country without violating Brazilian regulations. [19] (Durchfort ¶ 13).

For example, in a July 29, 2002, e-mail to Converse's lawyer in Brazil and Converse's Kelley and Ouellette, Durchfort states: "I want to inform you that we have signed a contract with Coopershoes."

Alon even went further – it advised Converse of details of its arrangement with Coopershoes on multiple occasions. In 2002, Messrs. Durchfort and Szerer flew to Boston and met with Converse representatives. At that time, Durchfort and Szerer explained the Coopershoes arrangement to Ouellette and others.

Significantly, Converse has entered into a licensing arrangement with Coopershoes on December 16, 2004. A copy of the Converse/Coopershoes Agreement is attached to the Notice of Filing as **Exhibit "4."** Converse made Coopershoes its licensee effective January 1, 2005. Id. Tellingly, Coopershoes is the **same** company with which Converse now claims that Alon had an "illegal sublicense." If nothing else, this clearly unmasks Converse's strategy, founded on corporate greed, to cut-out Alon and steal the benefit of Alon's work.

Converse is now estopped from asserting that Alon's use of Coopershoes is a breach.

Converse also summarily concludes that Alon breached the Agreement by "repeatedly failing to meet the required minimum expenditures for advertising Converse's products" and "undertook to market footwear products competing with Converse." Motion p. 22. As a preliminary matter, Converse never notified Alon that it was improperly competing with Converse, as required by the default clause, and thus Alon cannot be held to have breached the Agreement in this regard. See Points Productions and Filmline, supra. Moreover, Converse admits that Alon did not compete in the Mercosur market – the only territory covered by the plain language of the Agreement. As for whether Superga is competitive with Converse, it is not, and Alon will prove it at the evidentiary hearing.

Converse's allegation that Alon breached the minimum advertising expenditures of the Agreement is also without merit. Moreover, the Agreement does not support Converse's

---

[19] Converse also contends that Alon breached the Agreement by failing to pay correct royalties (which position Converse evidently has now withdrawn), using improper exchange rates to calculate royalty payments (which Converse now admits was cured), and failing to expend sums required by the Agreement for advertising. These claims were, and remain, spurious.

position that minimum expenditures were based on the "gross" sales of products or only qualified if such expenses were "direct" expenses. Id.

Converse does not have a likelihood of success on the merits, Alon does.

### 2.   Alon, Not Converse, Will Suffer Damage To Its Business, Reputation, And Goodwill If the Tribunal Abrogates the Status Quo Injunctions.

In its Motion, Converse alleges a myriad of reasons why it will suffer harm if its injunction is not grated. These grounds including harm alleged harm relating to the proceedings in Brazil, preserving its damages remedy, improper sublicensing, etc., are all discussed extensively above and demonstrate that Converse's complaints of injury and harm are illusory. On the other hand, a decision by the Tribunal abrogating the Converse and Coopershoes Injunctions will result in severe and irreparable harm to Alon.

It is well settled that a substantial loss of business constitutes irreparable injury. Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 45 L. Ed. 2d 648, 95 S. Ct. 2561 (1975) ("As required to support such relief, these respondents alleged (and petitioner did not deny) that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."); Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1186 (2d Cir. 1995) (Major disruption of a business can be as harmful as its termination, thereby constitute irreparable injury"); Automotive Elec. Serv. Corp. v. Association of Automotive Aftermarket Dist., 747 F. Supp. 1483, 1513-14 (E.D.N.Y. 1990) (Injunction issued where loss of one-third of sales from termination would threaten business' existence).[20]

Moreover, "by its very nature, injury to goodwill and reputation is not easily measured or fully compensable in damages. This kind of harm is often held to be irreparable." Ross-Simons of Warwick, Inc., et al. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996) (dealer would suffer irreparable harm to its business if it were not granted an injunction compelling distributor to continue selling its lead crystal to dealer after dealer refused to sign proposed agreement); K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989) ("harm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages –

---

[20] In contrast, Converse, a global multi-billion dollar business, will not suffer a major disruption if it fails to collect whatever monies Alon is paid during the pendency of the arbitration. Non-collection and disruption are two different things.

- and for that reason, more likely to be found 'irreparable.'); <u>Blue Sky Entertainment, Inc. v. Town of Gardiner</u>, 711 F. Supp. 678, 697 (N.D.N.Y. 1989) ("monetary damages would be difficult to measure in any related action for loss to business reputation").

Losing the right to receive payment under the Agreement and continued ability to utilize the Converse marks and sell Converse shoes will result in approximately a 90 percent reduction of Alon's operations, signifying a drastic reduction in revenues and necessitating dramatic changes in the company's operations and significant damage to Alon's reputation in the marketplace. (Durchfort Decl. ¶ 21). Alon will lose all of its contacts, sources, networks and infrastructure in Brazil for the sale of Converse shoes. In more concrete terms, should the Tribunal alter the *status quo* injunction, Alon estimates losses of over $21 million over the next three years and the looming specter of bankruptcy. <u>Id.</u> Alon is faced with a concrete and very real possibility of irreparable harm.

This result will also cause immeasurable damage to Alon's reputation and goodwill in the marketplace. (Durchfort Decl. ¶ 21-22). Alon's business in the Mercosur Market has been built around Alon's reputation in the market. <u>Id.</u> This dispute will cause significant irreparable harm and tarnishing of Alon's reputation, which is impossible to quantify.

Accordingly, Alon, not Converse, has established irreparable harm if any part of the Converse and Coopershoes injunctions is abrogated.

### 3. Alon's Threatened Injury Is Greater Than Any Potential Damage Converse May Incur If An Injunction Is Entered.

Under the balancing of hardship test, Alon – not Converse – is entitled to relief from the Converse and Coopershoes Injunctions. Failing to maintain the status quo here will allow Converse to complete its attempted takeover of the Mercosur market and infringe upon Alon's contractual rights, and thus presenting Alon with a *fait accompli*. In this respect, arbitration unassisted by an injunction will be nothing more than "a hollow formality." <u>Blumenthal</u>, 910 F. 2d at 1053; <u>Teradyne</u>, 97 F.2d at 51; <u>Inverness Medical Switzerland GmbH v. Acon Laboratories, Inc.</u>, 323 F. Supp. 2d 227, 252 (D. Mass. 2004) (taking into account a party's loss of business due to the infringing parties behavior in the balancing of hardships); <u>Organizing Comm. for 1998 Goodwill Games v. Goodwill Games Inc.</u>, 919 F. Supp. 21, 27 (D.D.C. 1995) (same).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing was sent by E-mail on May 18, 2005, and overnight mail postage prepaid on May 19, 2005, to **Michael C. Gilleran, Esq.,** Pepe & Hazard, LLP, 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110-2804.

Paul A. Capua

F:\WDOX\CLIENTS\10077\1001\00046763.DOC

53

# EXHIBIT B

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION
Case No.: 50-133-T-00579-04

Alon International, S.A.,                               :
                                                       :
                        Claimant,                      :
                                                       :
v.                                                     :
                                                       :
Converse Inc.                                          :
                                                       :
                        Respondent.                    :
                                                       :

ALON INTERNATIONAL, S.A.'S NOTICE OF FILING EXHIBITS IN SUPPORT OF
ITS MEMORANDUM OF LAW IN OPPOSITION TO CONVERSE'S EMERGENCY
MOTION TO PRESERVE ITS REMEDY AND RATIONALIZE THE LITIGATION

Claimant Alon International, S.A. hereby gives notice of the filing of:

1     Declaration of Ronald Durchfort, dated May 18, 2005.

2.    Declaration of Otto Eduardo Fonseca Lobo, dated May 18, 2005.

3.    Transcript of the April 25, 2005, Preliminary Hearing.

4.    Manufacturing, Distribution and Trademark License Agreement Between
      Converse, Inc. and Coopershoes, dated January 16, 2005.

                                    Respectfully Submitted,

                                    ASTIGARRAGA DAVIS
                                    José I. Astigarraga
                                    Edward H. Davis, Jr.
                                    Paul A. Capua
                                    M. Cristina Cárdenas
                                    701 Brickell Avenue, 16th Floor
                                    Miami, Florida 33131
                                    Telephone:  (305) 372-8282
                                    Facsimile:  (305) 372-8202

Date: May 18, 2005                  *Counsel for Claimant Alon International, S.A.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of this Appendix was sent by e-mail and overnight mail on

May 18, 2005, to **Michael C. Gilleran, Esq.,** Pepe & Hazard, LLP, 225 Franklin Street, 16th

Floor, Boston, Massachusetts 02110-2804.

Paul A. Capua

F:\WDOX\CLIENTS\1007\1001\00046786.DOC

# EXHIBIT "1"

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION
Case No.: 50-133-T-00579-04

Alon International, S.A.,                    :
                                            :
                                            :
              Claimant,                     :
                                            :
v.                                          :
                                            :
Converse Inc.                               :
                                            :
                                            :
              Respondent.                   :
                                            :

## DECLARATION OF RONALD DURCHFORT

I, Ronald Durchfort, being of lawful age, state as follows:

1.      I am Co-President of Alon International, S.A. ("Alon").  I have been Co-President of Alon since December of 1997.

2.      I make this Affidavit based on my own personal knowledge.

3.      Alon is a corporation duly registered and organized under the laws of the Republic of Panama.

4.      Alon develops, sources, and markets footwear in Latin America.  Alon has extensive experience in this field, and particular expertise building market share for global brands throughout Latin American countries by building and tailoring local networks for the supply, distribution, and sales of shoes, apparel, and accessories.

5.      On or about September 1, 2001, Alon entered into a Manufacturing, Distribution and Licensing Agreement (the "Agreement") with Converse Inc. ("Converse"), by which Alon gained the exclusive rights and license to manufacture, distribute, and utilize Converse brand shoes and related products throughout Argentina, Brazil, Paraguay and Uruguay ("Mercosur market").  A copy of the Agreement is attached as **Exhibit "A."**

6.      The initial term of the Agreement was from September 1, 2001, to December 31, 2004.  However, the Agreement provided that Alon, not Converse, had the option of automatically renewing the Agreement for a period of three years upon the satisfaction of certain

conditions. Pursuant to paragraph 2 of the Agreement, Alon could renew the Agreement for an additional term of three (3) years provided Alon exceeded a Guaranteed Minimum Royalty and Sales by twenty-five percent (25%) and further provided that Alon has not breached any of the terms and conditions of this Agreement. Agreement, ¶ 2.

7.    Throughout the negotiations of the Agreement and the course of Alon's business relationship with Converse, it was always understood that the Agreement automatically renewed into its next term if Alon satisfied the conditions in paragraph 6 above. I attach a true and correct copy of e-mail dated June 21, 2001, evidencing the intent of the parties regarding automatic renewal. I also attach a formal "Letter of Intent" agreed to between the parties, which provides: *__Renewal Option__: __Automatic__* three (3) year extension provided Alon exceeds the third year Guaranteed Minimum Royalty by twenty-five percent (25%)." A copy of the June 26, 2001, e-mail and June 26, 2001, Letter of Intent, are attached as **Exhibit "B."**

8.    Alon complied with all the conditions of renewal before December 31, 2004, and exercised its right to renew the Agreement. Accordingly, the Agreement between Alon and Converse is renewed.

9.    Alon builds market share for Converse brand shoes, apparel, and accessories, throughout the Mercosur market by building and tailoring local networks for the supply, distribution, and sales of these items. This includes, among other things, structuring, overseeing, and managing, as appropriate, the local sales networks in each market; developing and maintaining third party contacts and relationships with retailers, suppliers, and marketing service and media providers to ensure the growth and credibility of the business; developing, briefing and implementing all marketing strategies and actions in conjunction with Converse; conducting and managing focus group research to help plot market strategy; establishing and approving quality control standards of product and marketing; upgrading the Mercosur product line to match Converse global brand standards and image, such as assuring correct last, outsole, material components, and packaging; taking lead in driving the litigation and strategies against the "brand pirates" for final solution; marketing and creating both the sourcing structure and distribution channels for Converse's marks and related products throughout the Mercosur market.

10.    The Agreement does not require Alon to have its own factories. Alon manufactures Converse shoes, as contemplated by the Agreement, by "having [them] produced" at a factory, specifically at Coopershoes' factory. Agreement ¶ 14(a). Precisely one of the important aspects

of Alon's strategy and success in Brazil was its structure and relationship with Coopershoes in Brazil. Among other things, Coopershoes was manufacturing for the pirate that had been thwarting Converse in the Mercosur market for 17 years. Part of Alon's strategy to recapture the market for Converse was to hire Coopershoes away from the pirate. Alon managed to do it, and Converse was fully informed of the fact that Alon had hired Coopershoes.

11.     Specifically, Alon engaged Coopershoes to handle manufacturing and logistical functions, while maintaining for itself all brand management, commercial, product, and strategic functions as well as close oversight over Coopershoes' performance. So, while Coopershoes physically manufactured the actual "shoe", it was Alon that directed, among other things, the specifications, quality, content, and volume. Similarly, while the shoe salesmen were independent representatives for Converse footwear, Alon at all times maintained and exercised control and direction of the sales campaigns, strategy, and direction, including training, sales and marketing meetings with the sales personnel. Alon had direction and control over the Converse line, implementing, directing, and managing, as appropriate, product development, sales, and marketing operations at Coopershoes.

12. All this was done with the full knowledge and consent of Converse from the outset of the relationship. At all times Converse was informed of the precise nature of the dealings between Coopershoes and Alon. The structure and division of responsibility between Alon and Coopershoes were very clear, and communicated to, understood, known by and consented to by Converse.

13.     The structure was strategically designed to, among other things, build the credibility of the Converse ALL STAR brand in the eyes of the consumer, eliminate competition from the "brand pirate," immediately implement Alon's production, distribution, and sales strategy, and remit royalties out of Brazil.

14.     Alon, its principals, and employees have traveled extensively in Brazil (and Mercosur) and managed the day-to-day services rendered by Coopershoes in person, by phone, e-mail and by other means. My co-partner, Roberto Szerer, and I, visited Coopershoes and Brazil regularly and traveled extensively throughout Brazil and the Mercosur market; Alon installed and managed the current sales manager at Coopershoes; installed and managed sales representatives; managed the sales operations on an ongoing basis; scheduled and ran sales meetings and other strategy meetings with Coopershoes; regularly scheduled strategy and sales

3

meetings with sales representatives and held numerous product development and marketing meetings with Coopershoes and sales representatives; met extensively with the local retailers and marketing suppliers in Brazil; communicated on an ongoing basis with Coopershoes, directing and managing the employees of Coopershoes in relation to all aspects of the Converse business.

15.     The extent and nature of Alon's day-to-day management, oversight, and direction of Coopershoes is evidenced by thousands of conversations by phone, e-mail, MSN messenger, and direct in-person contact and meetings. The quality and extent of this evidence is substantial and will be submitted as proof during the evidentiary hearing of this matter. Alon dedicated at least 90 percent of its time to its Converse business in the Mercosur market including managing and directing Coopershoes on such business.

16.     As a result of Alon's management and oversight of Coopershoes, among other things, Alon established in Brazil unparalleled levels of performance and consumer and retail recognition for the Converse ALL STAR brand as the legitimate ALL STAR brand while marginalizing knock-off products being produced and sold by brand pirates that previously had occupied the premier position in the market.

17.     Before and during the Agreement, Converse promised that it would appoint Alon as its key licensee for Converse shoes in all of Latin America, as the markets became available. After signing the Agreement and during the life of the Agreement, I engaged in numerous discussions with Converse for an even broader relationship.

18.     Converse was ecstatic over the success of Alon's strategy of eliminating the "brand pirate" in Brazil. A copy of a sample of e-mails among Converse and Alon are attached as **Exhibit "C."**

19.     In 2004, Alon engaged in detailed discussions and negotiations with Converse over an expanded relationship, with terms extending through 2013 in some cases. I attach true and correct copies of a few such e-mails as **Exhibit "D"** hereto. Converse, not Alon, initiated the negotiations over an expanded relationship. Alon did not negotiate the royalty rates for the second 3-year term of the Agreement in 2004. The rates for the second 3-year term were a given in the sense that Converse and Alon already had agreed, among other things, on the maximum rates for the second term. This Converse confirmed in e-mail dated June 18, 2001, which I attach as **Exhibit "D."** That e-mail states: "Second Term Royalties would be: Originals – 10%; Footwear – 8%; and Non Footwear –7%. In any event, Converse wrongfully attempted to

4

terminate the Agreement thirty days before the second term began and so Converse did not give Alon any opportunity to go back and discuss those rates.

20.    On November 30, 2004, Converse informed Alon that it was not renewing the Agreement, wrongfully terminated the Agreement, and notified Alon of its alleged breaches of the Agreement.  Alon also has learned that Converse had entered into a direct contractual relationship with Coopershoes on December 16, 2005, making Coopershoes its exclusive licensee in the Mercosur market beginning January 1, 2005.  Alon had no opportunity to cure any of the alleged breaches.

21.    The failure of Converse to continue to perform its obligations under the Agreement and in good faith including, without interfering with Coopershoes, pending the outcome of Arbitration will have devastating and irreversible consequences on Alon.  If the contractual rights of the parties are not preserved pending arbitration, Alon will suffer a 90 percent or so reduction in operations, it will lose most, if not all, of the goodwill and networks it created in Brazil, and experience a nearly absolute elimination of revenues.  In particular, Alon estimates its losses at over $21 million over the next three years and the looming specter of bankruptcy.

22.    Moreover, such a result will also end in immeasurable damage to Alon's reputation and goodwill in the marketplace, both with its current and prospective clientele. Alon's business in the Mercosur market is in large part based on Alon's reputation.  If the Agreement is not preserved, this will result in damaging our previously untarnished reputation in the area.

Under penalties of perjury pursuant to 28 U.S.C. § 1746 and section 92.525 of the Florida Statutes, I declare that I have read the foregoing affidavit and that the facts stated herein are true.

FURTHER AFFIANT SAYETH NOT

Dated this _____18th_____ day of May 2005.

Ronald Durchfort
Co-President of Alon International, S.A.

5

# EXHIBIT "A"
# TO THE DURCHFORT DECLARATION

02/14/02

# MANUFACTURING, DISTRIBUTION AND LICENSE AGREEMENT

BETWEEN

CONVERSE INC.

and

ALON INTERNATIONAL S.A.

## Table of Contents

I.   **INTRODUCTION**
1.   Definitions _____ 5
2.   Term of Agreement _____ 6

II.  **GRANT OF LICENSE**
3.   License _____ 7

III. **LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES**
4.   Use of Converse Marks _____ 9
5.   Quality Assurance _____ 11
6.   Licensee's Use of Converse Information and Advice _____ 12
7.   Licensee Sales Program _____ 12
8.   Distribution _____ 14
9.   Licensee's Use of Converse Factories _____ 15
10.  Exportation _____ 17
11.  Government Approval _____ 17

IV.  **CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES**
12.  Responsibility of Converse _____ 17
13.  Converse's Alteration of Product Design and Specification _____ 18
14.  Converse's Right of Inspection of Licensee Factories _____ 18

V.   **ROYALTIES, FEES AND PAYMENTS**
15.  Royalties _____ 19
16.  Guaranteed Minimum Sales _____ 22
17.  Royalty Reports _____ 22
18.  Schedule of Royalty Payments and Fees _____ 24
19.  Currency In Which Payments Are To Be Made _____ 26

VI.  **INTELLECTUAL PROPERTY**
20.  Converse Intellectual Property _____ 27
21.  Territorial Registration of Converse Trademarks _____ 29
22.  Infringement, Counterfeit, Unfair Competition _____ 29
23.  Indemnification for Products Liability Claims _____ 30

VII. **TERMINATION**
24.  Right of Termination _____ 31
25.  Effect of Termination or Expiration _____ 33
26.  Final Statement Upon Termination or Expiration _____ 34

VIII.  MISCELLANEOUS
27.  Devaluation _____ 35
28.  Force Majeure _____ 35
29.  Assignment or Sublicense by Licensee _____ 35
30.  Notices _____ 36
31.  No Joint Venture _____ 36
32.  Applicable Law _____ 37
33.  Arbitration _____ 37
34.  Significance of Headings _____ 38
35.  Assignment, Entire Agreement, No Waiver _____ 38

Appendices

A.  Converse Marks
B.  Human Rights Manual
C.  Royalty Report Form

AGREEMENT, made as of this first day of September, 2001 by and between CONVERSE INC., a Delaware corporation, having its principal place of business at One High Street, North Andover, Massachusetts 01845 ("Converse") and ALON INTERNATIONAL S.A., a corporation duly registered and existing under the laws of the Republic of Panama and having its principal office and business at Edificio Magna Corp BCSA Calle 51 y Manuel Maria Icaza, Piso 4 oficina 410 P, Panama, República de Panama ("Licensee").

WHEREAS, Converse is in the business of manufacturing, advertising, distributing and selling athletic and leisure footwear, activewear and accessories and is the exclusive owner of the valuable trademarks "CONVERSE", "ALL STAR", "CONVERSE ALL STAR CHUCK TAYLOR" Ankle Patch and "STAR AND CHEVRON" Design and other trademarks, of certain trade names, and of various patterns, logos and designs associated therewith; and

WHEREAS, Licensee desires to manufacture and sell in Argentina, Brazil, Paraguay and Uruguay on an exclusive basis, athletic and leisure footwear, activewear and accessories identical or substantially identical to the athletic and leisure footwear and activewear and accessories manufactured for Converse and sold by Converse in the United States of America under the Converse name and trademarks, and to obtain the advisory services and assistance of Converse in connection therewith.

NOW THEREFORE, in consideration of the mutual covenants, representations and promises herein contained, Converse and Licensee agree as follows:

# I.    DEFINITIONS

1.    For purposes of this Agreement, the following definitions shall apply:

(a)    "Contract Period" shall mean that period of time commencing on September 1, 2001 and ending on December 31, 2004.

(b)    "Contract Year" shall mean the twelve calendar months of the year, beginning with January 1.  The first Contract Year shall be the period from September 1, 2001 through December 31, 2002.

(c)    "Contract Year Quarter" shall mean the four (4) three month periods of the calendar year.  The first Contract Year Quarter will commence January 1, 2002 and will include any activities from the commencement date of this Agreement.

(d)    "Converse Factories" shall mean Converse's authorized factories.

(e)    "Converse Marks" shall mean the logos and trademarks set forth in Appendix A.

(f)    "F.O.B. Cost" shall mean the costs of Footwear Licensed Articles purchased by the Licensee directly from Converse Factories as shown on the approved invoice from the factory for each shipment of product, if applicable.

(g)    "Licensed Articles" shall mean the athletic and leisure footwear, activewear and accessories which are set forth more specifically in paragraph 3(a) below and which are identical or substantially identical to the athletic and leisure footwear, activewear and accessories manufactured for Converse and sold by Converse in the United States. There are three types of Licensed Articles: Non-Footwear, Footwear and Original Licensed Products as defined below.

(h)    "Net Sales" shall mean the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, trade discounts, volume rebates and any

freight charges and VAT taxes included in the invoice.   No deduction shall be allowed for

costs incurred in the manufacture, sale, advertisement (including cooperative and promotional

allowances) or distribution of Licensed Articles, nor shall any deductions be allowed for

uncollectible accounts or cash discounts.

      (i)   "Original Licensed Products" shall mean Chuck Taylor All Star, Jack Purcell, Skid

Grip, and One Star footwear.   Original Products may also be referred to as "Originals" or

"Original Licensed Footwear Products."

      (j)     "Publicity Materials" shall include, but not be limited to, any printed advertising,

catalogs, brochures, billboards, electronic material, internet technology, and/or wireless network

services in any and all manner or medium now known or hereafter devised or any video or

printed material bearing the Converse Marks.

      (k)   "Territory" shall mean Argentina, Brazil, Paraguay and Uruguay.


      2.   Term of Agreement.   In recognition of infrastructure, manufacturing and legal

expenditures made by Licensee on Converse's behalf, and Licensee's continuing efforts in these

areas, Converse agrees to waive the signing fee of US$28,750.00.   Unless sooner terminated

pursuant to the provisions of this Agreement, this Agreement shall remain in effect for the

Contract Period.   In the event Licensee wishes to renew this Agreement, it must notify Converse

in writing of this decision by or before September 30th of the final Contract Year.   Licensee may

renew this Agreement for an additional term of three (3) years ("Option Years" which may be

collectively referred to as "Option Period") provided Licensee exceeds the Guaranteed Minimum

Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that

Licensee has not breached any of the terms and conditions of this Agreement. The Guaranteed Minimum Royalty for the first Option Year will be the greater of 25% over the Guaranteed Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties, increasing by ten percent (10%) for each subsequent Option Year in the Option Period. The Guaranteed Minimum Sales for the first Option Year will be the greater of 25% over the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales, increasing by 10% each subsequent Option Year. Any extension of the term of this Agreement shall be effective only pursuant to a written agreement executed by Converse and Licensee. Such written agreement shall reflect any new or revised terms or conditions agreed to by the parties.

## II.    GRANT OF LICENSE

3. License.

(a)    Licensed Articles.

i.    Non-Footwear Licensed Articles is the collective term for activewear and accessories. Activewear shall specifically include: mens' and womens' sportswear and T-shirts. Accessories shall specifically include: bags, socks, caps, watches, backpacks, belts, stationary items (Notebooks and agendas, etc.).

ii.    Footwear Licensed Articles is the collective term for athletic and leisure footwear.

iii.    Originals Licensed Footwear Products shall be defined as the following models of footwear: Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear.

(b)     Grant of License.  Converse hereby grants to Licensee, subject to the terms and conditions herein, the exclusive right and license to utilize the Converse Marks throughout the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the retail and wholesale trade, subject to the provisions set forth in Section III below.  This license does not authorize, and expressly forbids, Licensee to manufacture, export, cause to export, distribute or sell such Licensed Articles in any other part of the world, unless specifically authorized by Converse in writing.

(c)     Internet.  Licensee is also granted the rights to use the Converse Marks on its Internet site generated out of the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the resale and wholesale trade, subject to the provisions set forth in Section III below.  In the event Licensee has already registered any of Converse's Marks or any name similar to a Converse Mark as a domain name, it shall assign to Converse all its rights, title and interest in such domain name(s) as directed by Converse.  Licensee shall not register a domain name using any of the Converse Marks or any marks to be confused with the Converse marks.

(d)     Non-competition.  Licensee agrees it shall not, during the term of this Agreement, manufacture, export, distribute, advertise, promote or sell any products/licensed articles which are competitive to the Licensed Articles, irrespective of whether said products bear Licensee's trademark or those of a third party, except only in such cases that Converse has given its prior written approval.  Notwithstanding the preceding sentence, in the event Licensee is already under obligation to distribute licensed articles other than those of Converse and/or products of any competitor, Licensee shall provide Converse, prior to the execution of

this Agreement, with a written list of all products it is under obligation to distribute. The parties agree that excluded from this paragraph are Licensee's currently held childrens' brands, such as Disney, Warner, Mattel, and McKids.

(e)    Right to Negotiation.  In the event Converse does not renew license agreements with its existing licensees in the territories of all of Latin America and Mexico, Licensee shall have the right to negotiate for these territories.

## III.    LICENSEE OBLIGATIONS; RIGHTS AND RESPONSIBILITIES

4.  Use of Converse Marks.

(a)    Territorial.  Licensee agrees to use the Converse Marks only within the Territory and during the Contract Period, and only with respect to the manufacture, promotion, advertisement, distribution and sale of the Licensed Articles and only after Licensee has received the written approval of Converse as to samples of the Licensed Articles intended to be manufactured and sold by Licensee, the specific Converse Marks Licensee intends to affix to particular Licensed Articles, Licensee's use of the Marks in Publicity Materials and Licensee's use of the Marks on Licensee's web site, if applicable.

(b)    Approvals.  Licensee shall provide Converse with a full set of approval samples and Publicity Materials for each Licensed Article as set forth in Paragraph 2(a) of this Agreement prior to launch in the market.  Licensee shall provide Converse with designs and/or drawings of all Licensed Articles, drawings, hang tags and packaging for approval no later than four (4) months prior to launch in the market.  In the event Licensee wishes to use any of the Converse Marks on its web site, it shall provide Converse with an opportunity to review the web site no

later than sixty (60) days prior to launch in the market. Converse shall have fifteen (15) calendar days from receipt to respond, either by refusing such design or requesting any changes to the designs, drawings or contents of web site, or issuing its written approval. Licensee further agrees to follow the approval guidelines for Licensed Articles, packaging, advertising and promotional materials set forth in Converse's Licensee Handbook. The license to use the Converse Marks is granted upon the express condition that all Licensed Articles manufactured by Licensee bearing any of the Converse Marks will conform to the standards for grade, quality, and style established from time to time by Converse. Such standards shall be substantially the same as the standards for the corresponding products manufactured for Converse and distributed by Converse in the United States. Any Licensed Articles bearing any of the Converse Marks manufactured by Licensee which are seconds or irregulars shall not be sold by Licensee without the prior written consent of Converse.

In addition, all factories at which Licensee desires to have Licensed Articles manufactured shall be approved in writing by Converse in advance of the placement of any orders for or of the manufacture of Licensed Articles.

(c) Inspection. Converse shall at any and all times have the right to inspect the Licensed Articles bearing any of the Converse Marks manufactured by Licensee to determine whether such Licensed Articles in fact conform to the established standards and other terms of this Agreement. If at any time Converse shall be of the opinion that Licensed Articles bearing any of the Converse Marks manufactured by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee. Licensee shall promptly thereafter remove or cause to be removed any of the Converse Marks from such nonconforming products or web sites, shall cease

to affix the Converse Marks to other Licensed Articles which do not meet the standards, and shall cease thereafter to manufacture, promote, advertise, distribute or offer for sale any such nonconforming Licensed Articles bearing any of the Converse Marks. It is understood and specifically agreed that upon termination of this Agreement, Licensee shall immediately cease using the Converse Marks or any reference thereto, except as otherwise provided in this Agreement.

5.    <u>Quality Assurance</u>.

(a)    Licensee shall submit, for the inspection and approval of Converse, samples and comprehensive drawings or prototypes or production models of each style representative of Licensed Articles covered by this Agreement to be manufactured by Licensee.  In any event, such drawings and samples shall be submitted to Converse for approval at least four (4) months before any such Licensed Articles are shipped or sold by Licensee.  Thereafter, once each six (6) months, and also two (2) weeks prior to any change in the materials, method of manufacture or design of Licensed Articles, Licensee shall submit for inspections and approval by Converse, samples representative of Licensed Articles expected to be manufactured, shipped and sold by Licensee.  Additional samples shall also be submitted to Converse at Converse's reasonable request.  Converse shall determine whether such samples conform to its standards and shall inform Licensee of its approval or of any deficiencies.  Licensed Articles may be manufactured and sold by Licensee only after Converse shall have approved drawings and samples representative of such Licensed Articles in writing or shall have failed to disapprove them within four (4) weeks after receipt of the drawings and samples.

(b)    All Licensed Articles manufactured or sold hereunder must:

i.    be of first quality and conform to standards, including standards of design, style and quality, approved by Converse in its sole discretion, reasonably exercised;

ii.    be of the grade, quality and style handled by quality departments of quality stores, department stores and better specialty shops in the Territory;

iii.    be similar and at least equal in grade, quality, materials, workmanship, performance and style, to representative comprehensive drawings or production samples of Licensed Articles submitted by Licensee to Converse and approved by Converse; and

iv.    be advertised, marked, labeled and packaged in accordance with this Agreement and not in any manner violative of law or tending to mislead or deceive the public.

6.    Licensee's Use of Converse Information and Advice.

(a)    Licensee agrees that it shall not use, permit the use of, release, give or otherwise distribute or disclose to any third party any of the information, advice, reports, instructions, designs, drawings, specifications, technical knowledge, methods, processes, samples or materials, names and addresses of suppliers of materials, or any other information ("Trade Secrets") furnished to it by Converse or Converse contract manufacturers or other licensees except as necessary and on an as needed basis in the manufacture, distribution, promotion, advertisement, and sale of Licensed Articles bearing the Converse Marks in the Territory pursuant to this Agreement.

(b)    All Trade Secrets shall remain the sole property of Converse and shall be deemed to be strictly confidential and shall be treated accordingly.

7. Licensee Sales Program.

(a)    Licensee shall faithfully, diligently and to the best of its ability endeavor to manufacture, distribute, promote, advertise, market and increase the sales of Licensed Articles bearing the Converse Marks in the Territory.  It shall be the responsibility of Licensee to provide active and continuous sales representation in the Territory by actual salesperson contact with customers, both existing and prospective.  Licensee shall maintain adequate brand and marketing management, manufacturing, sales and service personnel and adequate inventory levels, manage, position and market the brand; conduct advertising and promotional programs and perform such other necessary functions to accomplish maximum sales and distribution of Licensed Articles within the Territory.  Licensee shall not adopt, engage in, permit or otherwise use any pricing policies, advertising campaigns, merchandising techniques or other commercial practices which are illegal under the laws of the Territory or which, in the opinion of Converse, detract from the good will and reputation of Converse.

(b)    Licensee agrees to submit to Converse an annual business plan for the sale of Licensed Articles for each region within the Territory for each Contract Year.  Such annual business plan shall be submitted to Converse no later than September 30th of each Contract Year, and shall be for the next Contract Year.  Licensee also agrees to submit to Converse a seasonal sales and marketing plan for the sale of Licensed Articles for each region within the Territory for each Contract Year.  Such seasonal sales and marketing plan shall be submitted to Converse no later than June 15th of each Contract Year for the next Spring, and January 15th of each Contract Year for the next Fall.

Page 14

(c)    Licensee shall use Converse's web-based sales and forecasting application each month to provide Converse with both annual forecasts and actual sales.

(d)    During each Contract Year, Licensee shall expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for that Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure"). Such expenditures shall be spread over each current Contract Year in a manner consistent with the overall brand and product marketing and advertising strategies outlined by Converse in the United States market. Licensee agrees to provide Converse with quarterly statements itemizing Licensee's Advertising Expenditure for the preceding Contract Year Quarter on or before the fifteenth (15th) day of April, July, October and January of each Contract Year. Converse agrees to waive its requirement to have Licensee pay a one percent (1%) Regional Marketing Contribution during the Contract Period. Licensee shall keep Converse continually informed as to all advertising programs undertaken pursuant to this Agreement and shall not advertise any of the Licensed Articles without receiving the prior written approval thereof from Converse, which approval shall not be unreasonably withheld or delayed. All advertising copy shall prominently feature Converse logos and Marks used in accordance with the Converse Identity Manual or guidelines provided by Converse from time to time.

(e)    Licensee agrees to purchase a representative sample range of each new product line introduced by Converse. The price of such samples shall be factory cost plus fifty percent (50%) plus freight cost to be paid in accordance with Paragraph 18(d) herein.

(f)    Licensee agrees it shall have, at its expense, one or more of its sales management attend Converse's global sales conferences.

Page 15

8.    Distribution.

(a)  Licensee hereby agrees to market, sell, promote and distribute the Licensed Articles to high end, better quality athletic footwear and sporting goods retailers and specialty shops, department stores and boutiques that are consistent with the Converse brand strategy and will enhance the Converse brand image within the Territory and throughout the world.  Licensee agrees not to market, sell, promote and distribute the Licensed Articles to mass merchants, discount stores and/or chains, flea markets, open air markets, consolidators, diverters or to any distribution channels that are not consistent, in Converse's sole discretion, with the Converse brand strategy.

(b)  Publicity Materials.  All Publicity Materials shall be approved in writing by Converse in advance of any release or distribution.  Converse shall at any and all times have the right to inspect the Publicity Materials developed by Licensee to determine whether they conform to the established standards and other terms of this Agreement.  If at any time Converse shall be of the opinion that the Publicity Materials developed by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee, which shall promptly thereafter remove and shall cease thereafter to use or distribute any such nonconforming Publicity Materials.

9.    Licensee's Use of Converse Factories.

(a)    Licensee must use Converse Factories for the manufacture of regular in-line Footwear Licensed Articles and Originals when manufacturing outside the Territory.  Licensee must submit the orders for such Footwear Licensed Articles and Originals to Converse's Production Department at corporate headquarters for approval before it can be placed with the

factory and only if placed through the following approved buying agent or such other agent as may be designated by Converse (the "Buying Agent"):

> Twin Dragons
> Pou Yuen Industrial City
> First Industrial Estate
> Shanxiang Town
> Zhongshan City, Guangdong Province, PRC
> China

In the event local production is required due to a tariff prohibition within the Territory, Licensee, upon Converse's prior written approval, may locally produce the Footwear Licensed Articles.

(b)    All such orders are to be placed with the Converse Factory with payment by Letter of Credit, (unless wire transfer payment terms have been negotiated;) terms at sight, from Bill of Lading date with such letters of credit opened so as to arrive at the factory no less than forty-five (45) days prior to the confirmed ship date.

(c)    Licensee shall pay to Converse the Buying Agent's commission upon presentation of the applicable commission invoice at the applicable percentage of the F.O.B. Costs.

(d)    Under no circumstances can Licensee cancel orders contemplated by this Paragraph 9 with Converse Factories without the prior written approval of Converse's corporate office. In the event Converse authorizes such cancellation, Licensee hereby agrees to pay all costs incurred by the Converse Factory for such order and a cancellation charge to Converse equal to five percent (5%) of the combined F.O.B. costs of the order.

(c)    Licensee agrees it shall not approach any third party factories regarding the production of Footwear Licensed Articles, unless having prior written approval from Converse.

10.    Exportation.    Licensee shall manufacture, distribute, promote, advertise and sell Licensed Articles bearing the Converse Marks only within the Territory.  Further, Licensee shall not knowingly export or cause to be exported, and shall use its best efforts to prevent the export of, any products to other countries without the prior express written permission of Converse.  In the event that Licensee exports or causes to be exported Licensed Articles bearing the Converse Marks outside the Territory without written authorization from Converse, Licensee agrees that such action would irreparably harm Converse's business.  A breach of this Paragraph by Licensee may result in termination of this Agreement by Converse pursuant to Paragraph 24 below.

11.    Government Approval.  If applicable, Licensee shall be responsible for obtaining all necessary approvals from the government of any of the countries in the Territory with respect to this Agreement.  In the event that Licensee is unable to obtain all such approvals within one hundred eighty (180) days of the execution of this Agreement, Converse shall have the right to terminate the Agreement immediately upon written notice to Licensee.

IV.    CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

12.  Responsibility of Converse.  In order to facilitate the manufacture, distribution, promotion, advertisement and sale of Licensed Articles by Licensee under this Agreement, Converse shall use good faith efforts to:  (a)  furnish or cause to be furnished to Licensee such

information and advice, as in the opinion of Converse, is necessary to implement this Agreement. Such information and advice may include, but is not limited to, drawings and specifications of the Licensed Articles, names and addresses of suppliers of materials, copies of advertisements and sale promotional material or such other information reasonably necessary to carry out this Agreement. Licensee shall pay Converse promptly upon billing for any articles supplied under this Paragraph 12(a) in accordance with Paragraph 18(d); (b) at Converse's discretion, to permit one or more of Licensee's representatives to attend, at Licensee's sole expense, sales conferences or other athletic sales events sponsored or attended by Converse representatives; (c) make arrangements under which representatives of Licensee may, at their sole expense, visit one or more factories in which products similar to the Licensed Articles are being manufactured by or for Converse bearing the Converse Marks to enable the representatives to study methods of manufacture and related matters.

13.   _Converse's Alteration of Product Design and Specification_.   Converse reserves the right, upon sixty (60) days notice to Licensee, to modify the design and specifications for any Licensed Article made by Licensee bearing any of the Converse Marks, and any design or text. In that event, Licensee shall not manufacture Licensed Articles in accordance with the prior design or specification, except for the completion of Licensed Articles in the process of manufacture at the time Licensee received the modification. Licensee agrees not to manufacture, distribute, promote, advertise or sell any product not bearing a Converse Mark which, in the opinion of Converse, by reason of its appearance or design, might tend to be confused by the public with any of the Licensed Articles manufactured under this Agreement bearing Converse Marks, or which in the opinion of Converse infringes in any manner Converse Marks.

14.  Converse's Right of Inspection of Licensee Factories.

(a)  Converse shall have the right at its own expense to have its representatives from time to time, during reasonable business hours, visit and inspect the factory or factories in which Licensee is producing, or having produced, Licensed Articles bearing any of the Converse Marks for the purpose of observing the method of manufacture, quality of materials, products produced, and any other matters relevant to this Agreement.  Included in this inspection shall be the audit of the workers' rights standards pursuant to the Converse Inc. Human Rights Manual which is made part of this Agreement and is attached hereto as Appendix B.

(b)  Licensee shall reimburse Converse for any expense for travel to the Territory or elsewhere which may be incurred by representatives of Converse at the request of Licensee and such payments shall be made by Licensee to Converse in U.S. Funds within thirty (30) days from billing thereof.

## V.  ROYALTIES, FEES AND PAYMENTS

15.  Royalties.  In conjunction with Paragraph 18 below, Licensee shall pay to Converse the following royalties:

(a)    In consideration for the license granted to it by Converse herein, Licensee shall pay Converse a royalty equal to the following percent of the Net Sales made by Licensee of the Licensed Articles (the "Earned Royalties").  The Earned Royalties shall be based upon the Net Sales price for such products sold to the retail or wholesale trade by Licensee.

| EARNED ROYALTIES | | | |
|---|---|---|---|
| CONTRACT YEAR | CALENDAR YEAR | Footwear (including Originals) | Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | 6% | 6% |
| 2 | 2003 | 7% | 6% |
| 3 | 2004 | 8% | 6% |
| Option Years | | To be negotiated | To be negotiated |
| 4 | 2005 | tbd | tbd |
| 5 | 2006 | tbd | tbd |
| 6 | 2007 | tbd | tbd |

The Earned Royalty rate for Licensed Articles for the Option Period will be negotiated prior to the Option Years taking effect.

(b)    Notwithstanding the provisions of Article 15(a), Licensee agrees to pay Converse a guaranteed annual minimum royalty as set forth below for each Contract Year (the "Guaranteed Annual Minimum Royalty").

| CONTRACT YEAR | CALENDAR YEAR | GUARANTEED ANNUAL MINIMUM ROYALTY |
|---|---|---|
| | | Footwear (including Originals) and Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | US$115,000.00 |
| 2 | 2003 | US$160,000.00 |
| 3 | 2004 | US$215,000.00 |
| Option Years | | |

| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties |
| 5. | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

In the event this Agreement is terminated on a date other than the last day of a Contract Year, the Earned Royalties shall be based upon actual Net Sales through the date of termination.

(c)    Third Parties:

(i)    With respect to the sale of certain Licensed Articles, Converse has, or may have in the future, an obligation to pay a royalty to an athlete or other third party ("Third Party") in conjunction with the use of the Licensed Articles (the "Third Party Articles"). In the event that Licensee purchases or manufactures, with Converse's prior written consent, any Third Party Articles, Licensee agrees to pay to Converse the amount of any royalty which Converse is obligated to pay to the applicable Third Party (the "Third Party Royalty").

(ii)    Converse shall advise Licensee, in a timely fashion prior to Converse's approval of Licensee's submission of an order for Licensed Articles, which articles are Third Party Articles and the amount of the Third Party Royalty.

(iii)    The applicable Third Party Royalty shall be paid by Licensee to Converse along with payment of the Earned Royalties pursuant to Paragraph 18 of this Agreement.

(d)    Licensee shall remove Converse Marks from any defective products which do not meet Converse standards as set forth in Paragraph 5 of this Agreement entitled Quality Assurance for first quality merchandise and no royalty shall be payable hereunder with respect to the sale of

such substandard products. This requirement to remove all Converse Marks shall be operative irrespective of the fact that such substandard products may be customarily sold in the Territory for the same price as first quality merchandise. Converse shall have the right to prohibit Licensee from selling such substandard products, if, in the opinion of Converse, such products may tend to be confused by the public with any of the Licensed Articles sold under this Agreement bearing Converse Marks, or which, in the opinion of Converse, infringes in any manner the Converse Marks.

16.    <u>Guaranteed Minimum Sales</u>. Notwithstanding the provisions of Paragraphs 15(a) and (b) above, Licensee agrees to sell not less than the following guaranteed minimum sales volume of Licensed Articles during each Contract Year as set forth below (the "Guaranteed Minimum Sales Volume"):

| CONTRACT YEAR | CALENDAR YEAR | GUARANTEED MINIMUM SALES VOLUME Footwear (including Originals) and Non-Footwear |
|---|---|---|
| 1 | 9/1/01 – 12/31/02 | US$1,917,000.00 |
| 2 | 2003 | US$2,300,000.00 |
| 3 | 2004 | US$2,800,000.00 |
| Option Years | | |
| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales |
| 5 | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

17.   Royalty Reports

(a)     Unless otherwise specified herein, Licensee shall deliver to Converse on or before April 25th, July 25th, October 25th and January 25th of each Contract Year a Royalty report, which shall be a complete and accurate itemized statement, certified by Licensee's chief fiscal officer as being accurate and complete, stating the description by product type, number of pairs or units, gross sales price, itemized deductions from gross sales price and net sales price as well as wholesale sales of the Licensed Articles manufactured, distributed or sold by Licensee during the preceding Contract Year Quarter. Such statements shall be stated in both United States and local currency and submitted in the format set forth in Appendix C, which shall be subject to change without notice. Such quarterly statements shall be furnished to Converse whether or not any Licensed Articles bearing any Converse Marks have been sold or distributed by Licensee during the preceding Contract Year Quarter. Receipt or acceptance by Converse of any statements furnished pursuant to this Agreement or any sums paid hereunder shall not preclude Converse from questioning the accuracy thereof at any time, and in the event that any inconsistency or mistake is discovered in such statement or payments, they shall be rectified immediately and the appropriate payments shall be made by Licensee.

(b)    If applicable, the parties acknowledge that Licensee may be legally required to withhold and remit a portion of the Earned Royalties to the governments of the countries in the Territory on behalf of Converse. It is not the intent of the parties that Licensee pay any part of any tax owed by Converse. Licensee's obligation shall be satisfied if it withholds and remits in accordance with the laws of the countries in the Territory and provides Converse promptly upon

payment, one original counterpart of the certificate issued by the competent tax authorities receiving such payments.   These certificates should be forwarded to Converse's Accounting Department at the address set forth in the Notice section of this Agreement.   These withholding certificates, if applicable, must accompany quarterly Royalty Reports.

18.  Schedule of Royalty Payments and Fees.

The Royalty Payments set forth below shall be paid to Converse on a quarterly basis upon invoice or no later than the end of the month in which the Royalty report was due to be submitted pursuant to Paragraph 17 above.  Payments shall be in U.S. Dollars and can be made either by wire transfer in accordance with the instructions set forth in Paragraph 19 below or by check:

(a)    The Earned Royalty or one quarter of the Guaranteed Annual Minimum Royalty set forth herein for each Contract Year Quarter, whichever is greater.   Once the Guaranteed Annual Minimum Royalty is satisfied, Licensee is required to pay Earned Royalties only for the remaining quarters;

(b)    The Original Products Royalty;

(c)    The Third Party Royalty, if applicable, shall be paid upon receipt of Converse's invoice;

(d)  In addition to royalties, Licensee shall pay Converse for all materials, samples, and merchandise furnished to Licensee pursuant to Paragraph 12 hereof in an amount equal to the cost of such items to Converse, including Converse's cost of preparing, packing, shipping and transporting such items.  All such purchases by Licensee from Converse shall be paid upon receipt of invoice by wire transfer or check.

(e)  Licensee shall maintain appropriate books of account and records, including inventory records, in accordance with generally accepted accounting principles, and shall make accurate entries concerning all transactions relevant to this Agreement.  Such books of account and records shall be kept separately from those for any merchandise other than the Licensed Articles sold hereunder by Licensee.  Licensee shall also, upon request by Converse, provide Converse with a sales report listing year-to-date sales generated by each of Licensee's customers.

(f)  Converse shall have the right, at its own expense, during the term hereof and for three (3) years thereafter, or in the event of a dispute involving in any way such books of account and records, until the dispute is resolved, whichever is later, through any authorized representatives of its own choice, on reasonable notice to Licensee and during regular business hours, to examine and take extracts from such books of account and records, and other documents (including but not limited to invoices, vouchers, records, purchase orders, sales orders and reorders) relating to the business hereunder which shall be maintained and kept by Licensee during the term hereof.  All such books of account and records shall be kept available by Licensee for three (3) years after the end of the Contract Period, or in the event of a dispute between the parties hereof involving in any way such books of account and records until that dispute is resolved, whichever is later.  If upon inspection of the books and records pursuant to this paragraph or otherwise, it is discovered that Converse did not receive the correct and adequate payment, then Licensee shall pay the Company, upon written notice, the difference between what was paid and what should have been paid, within five (5) business days of receipt of said notice.  If the aforesaid difference exceeds five percent (5%), then the entire difference is to be paid with interest calculated from the date the payment should have been made to the

actual date of payment at the prime rate in effect on the payment date. If Converse chooses to employ the services of a certified public accounting firm, qualified accounting consultant firm or Converse's internal auditors to conduct an audit and inspection of Licensee's books and records and said audit and inspection results in a balance due for any Contract Year of this Agreement which exceeds by five percent (5%) the payment reported due by Licensee for any such Contract Year, then Licensee shall bear the entire cost including all fees and expenses of said audit and inspection. If it is found that Licensee has made a larger payment than that which was due, said excess will be returned by Converse within five (5) business days of such determination.

19. Currency In Which Payments Are To Be Made.

(a) Unless specifically set forth to the contrary herein, all payments to Converse (except Converse Factories) required to be made by Licensee pursuant to this Agreement shall be made in the currency of the United States of America ("U.S. Funds"), payable to Converse Inc., First Union National Bank, Charlotte, NC, ABA No. 053000219, Account No. 2000011041218, or such other account as may be designated by Converse from time to time (the "Account"). Converse will review the exchange rate received by Licensee in the conversion from Licensee's local currency to U.S. Funds by comparison with the exchange rate published by the Wall Street Journal ("WSJ") two (2) business days prior to the payment due date scheduled in Paragraph 18 of this Agreement. If there is a difference between the exchange rate received by Licensee and the WSJ rate, Converse reserves the right to request such additional funds from Licensee as is required to compensate for the exchange rate deficiency. In cases where payment of the particular royalty due is more than seven (7) calendar days late, Converse reserves the right to request additional funds from Licensee to compensate Converse for any resulting subsequent exchange

# EXHIBIT B
# (continuation 1)

rate loss. If required, Licensee agrees it will seek the necessary government approvals to make such payments to Converse in U.S. Funds. Any late payments will be subject to an interest charge of one and one-half percent (1 1/2%) to Converse each month the payments remain unpaid. In the event any such payment exceeds thirty (30) days in arrears, Converse shall have the right, in addition to any and all other remedies available to Converse, to terminate this Agreement pursuant to Paragraph 24.

(b) If the actions of any government or public body make it impossible for Licensee to pay Converse in U.S. Funds, Converse shall have the following options:

    (i) terminate the Agreement with thirty (30) days written notice to Licensee;

    (ii) require Licensee to make payment in the currency of any other country selected by Converse by whose currency Licensee may legally pay;

    (iii) require Licensee to deposit such payment to Converse's account in a bank selected by Converse in or outside the Territory.

If Converse selects option (i) it may nevertheless require Licensee to pay any sums then due or to become due in accordance with options (ii) or (iii).

## VI.    INTELLECTUAL PROPERTY

### 20. Converse Intellectual Property.

(a) Ownership. Licensee acknowledges that Converse is the exclusive owner of the Converse Marks, Converse patents, and Converse domain names, and covenants that neither it nor any person acting for or under it will ever contest such ownership or the exclusive rights of Converse with respect thereto anywhere in the world.

(b)     In the event that Licensee creates, or assists in the creation of, a design for a Licensed Article or Converse's web site, then such design shall become the property of Converse without any further act required on the part of Converse or Licensee. Licensee shall execute and deliver any document or instrument requested by Converse to confirm exclusive ownership by Converse of any such design.  Converse shall have the right to utilize said design itself or provide it for use by any third party.

(c) Infringement.  Nothing in this Agreement shall constitute a warranty by Converse that there are currently no infringements of any of the Converse Marks, Converse patents, or Converse domain names within the Territory.  Licensee agrees that during the Contract Period it will diligently investigate any infringement or threatened infringement of the Converse patents, trademarks, logos, domain names or trade names within the Territory and shall immediately notify Converse of any such infringement or threatened infringement or of any act or threatened act of unfair competition which may come to Licensee's attention and Licensee shall use its best efforts to prevent such infringement or act of unfair competition.  Should litigation become necessary in Converse's sole discretion to protect Converse's interests in this regard, Licensee shall cooperate fully with Converse to the extent requested.  Converse shall be responsible for the expense of such litigation.

Converse acknowledges that it is a party to certain litigation in Brazil with All Star Artigos relating to the use and registration of the Chuck Taylor All Star and All Star logos. Converse hereby agrees that it will take the necessary actions as determined by Converse to recover the ownership of said trademarks provided it is in the best interest of Converse.

(d)    Intellectual Property Indemnification.  Licensee shall indemnify and hold Converse harmless from and against any and all claims, demands, losses, damages, liabilities, suits, judgments, and expenses, including incidental costs and attorneys' fees Converse may incur or be liable for arising out of allegations that Licensed Articles, Converse Marks, advertising and/or Publicity Materials used, designed and/or developed by Licensee violates or infringes the copyright, trademarks, service marks, or patent rights of any third party. Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.

21.  Territorial Registration of Converse Trademarks.  Converse has registered or applied for registration of certain of its trademarks and domain names in the Territory.  In this regard, Licensee agrees to take all proper actions requested by Converse to facilitate and expedite the registrations, provided that Converse reimburses Licensee for all reasonable expenses incurred in connection therewith.  If Converse is prevented from registering its trademarks or domain names in the Territory by virtue of the existence of this Agreement, Licensee agrees, at the request of Converse, to seek registration in its own name and convey to Converse all right, title and interest to the trademarks and domain names which Licensee may thereby obtain, provided that Converse shall reimburse Licensee for all reasonable expenses incurred.

22.  Infringement, Counterfeit, Unfair Competition.  Licensee agrees to notify Converse, in writing, of any infringements or counterfeits of, or any unfair competition affecting the trademarks and domain names licensed hereunder immediately upon gaining knowledge thereof and to cooperate fully in any action thereon which Converse may, in its sole discretion, deem appropriate.  Licensee shall not, however, be entitled to take or institute any action thereon,

Page 30

either by way of informal protest or legal, equitable or criminal proceedings, without express written approval, nor shall Licensee be entitled to call upon Converse to take action thereof; all such matters shall be entirely within the discretion of Converse.

23. Indemnification for Products Liability Claims.

(a)    Licensee agrees to indemnify Converse from any and all claims, demands or judgments, including incidental costs and attorneys' fees incurred in connection therewith against Converse for injuries or damages to purchasers or users of the Licensed Articles manufactured by Licensee. The foregoing indemnification of Converse by Licensee shall extend to any and all products liability claims arising as a result of Converse's ownership and control of the trademarks under which the Licensed Articles are manufactured and sold by Licensee, including, but not limited to, claims arising out of breach of implied or express warranties, strict tort liability or negligence, or legal claims of a comparable nature for recovery brought by litigants under the laws of the jurisdiction that apply to the Licensee.

(b)    Licensee shall, at its own cost and with Converse's approval, defend against any claims brought or actions filed against Converse on a products liability theory of the Licensed Articles whether such claims or actions are rightfully or wrongfully brought or filed, and Converse shall execute all papers necessary in connection with such suit and shall testify in any such suit whenever required to do so by Licensee all, however, at the expense of Licensee with respect to travel and similar out-of-pocket disbursements.

(c)    Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.

Page 31

(d)   Licensee shall obtain insurance to the extent of $1,000,000 per occurrence against liability for bodily injury including death resulting therefrom and $1,000,000 per occurrence against liability for damage to property including loss of use thereof, occurring in any way relating to the Licensed Articles.  Such insurance policy shall insure Converse and shall name Converse as an additional insured as its interest may appear.  Such insurance policy shall be cancelable or materially altered only upon ten (10) days notice to the Licensee and Converse.  Licensee shall provide Converse with a certificate of its insurance policy in the amount indicated within ten (10) days of execution of this Agreement.

## VII.   TERMINATION

24.   Right of Termination.

(a)    By Converse Immediately.  In the event of the occurrence of any one or more of the following, Converse shall have the right to immediately terminate this Agreement by written notice thereof to Licensee but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i)   insolvency, bankruptcy, reorganization, suspension of payments, assignment for the benefit of creditors, appointment of a receiver, institution of any proceedings by or against Licensee under bankruptcy laws or other similar laws; or

(ii)  the transfer or sale of all or a majority of the voting stock or other equitable ownership of Licensee without the written consent of Converse.

(b)    By Converse Upon Notice of Breach.  In the event of the occurrence of any one or more of the following, Converse shall have the right to terminate this Agreement seven (7)

Page 32

days after giving written notice thereof to Licensee, and Licensee has not remedied the situation within such seven (7) day time period:

(i)   failure of Licensee to pay any royalty or other payment due Converse under this Agreement for a period of thirty (30) days from the date such payment is due and payable;

(ii)   failure of Licensee to pay the Buying Agent's commission ("Buying Agent's Commission") for a period of thirty (30) days from the date such commission is due and payable;

(iii)   pursuant to Paragraph 8 Distribution above, the manufacture, distribution, advertisement or sale of Licensed Articles by Licensee in the Territory other than pursuant to this License Agreement;

(iv)   the sale or shipment of Licensed Articles by Licensee outside of the Territory, as set forth in Paragraph 10 herein;

(v)   the failure of Licensee to comply with the Guaranteed Annual Minimum Royalty or Guaranteed Minimum Net Sales Volume for any Contract Year, as set forth in Paragraphs 15 and 16 herein; or

(vi)   The breach by Licensee of Paragraphs 3(a), 4 and 6 herein.

(c)   By Either Party   In the event of the occurrence of any one or more of the following, either party shall have the right, after thirty (30) days written notice, to terminate this Agreement by written notice thereof to the other party but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i) liquidation or dissolution of either party or discontinuance of the active operation of the enterprise of either party;

(ii) the breach of or failure by either party to perform or observe any of the other terms and conditions of this Agreement, provided said breach or failure shall continue for a period of thirty (30) days after written notice thereof from the other party.

25. Effect of Termination or Expiration.

(a) From and after the termination of this Agreement, whether by expiration of the Contract Period or termination pursuant to Paragraph 24 or for any other reason, any and all rights acquired by Licensee to the use of the Converse Marks and Trade Secrets, shall terminate and cease absolutely, and except as provided in subsection (b) of this Article, Licensee shall not thereafter manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with Converse Marks.

(b) Any Licensed Articles manufactured or in the process of manufacture by Licensee prior to the expiration or termination of this Agreement and as to which any of the Converse Marks has been attached or affixed may be sold by Licensee, but only during the ninety (90) day period next following the date of expiration or termination, subject to the condition that Licensee pay to Converse all Earned Royalties and other payments due and owing Converse at the date of expiration or termination and to the further condition that Licensee continues to pay to Converse all Earned Royalties accruing during such ninety (90) day period within thirty (30) days following the end of each calendar month and delivers to Converse at the time of such payment an itemized statement in the form required by Paragraph 17 hereof for each such calendar month.

Licensee agrees that the Licensed Articles shall be sold during the ninety (90) day period shall be sold in accordance with the provisions of Paragraph 8 Distribution herein.

Notwithstanding anything to the contrary contained herein, Licensee shall not manufacture, distribute, sell or dispose of any Licensed Articles hereunder after the expiration or earlier termination of this Agreement. Licensee shall, upon termination of this Agreement, promptly assign and transfer to Converse any property rights which Licensee may have acquired in the Converse Marks and shall, within thirty (30) days, destroy or return all drawings, molds, dies and similar equipment or materials in its control or possession used for the production or reproduction or imprinting of the Converse Marks on the Licensed Articles and furnish to Converse satisfactory evidence of such return or destruction. Licensee agrees, subsequent to the expiration of this Agreement, not to register, attempt to register or use, except as provided herein, any Converse Marks and trademarks that are confusingly similar to the Converse Marks.

(c)    In the event Converse terminates this Agreement for breach by Licensee, Licensee will still be liable to Converse for its Minimums for the remainder of the Contract Period.

26.  **Final Statement Upon Termination or Expiration.**

(a)  Licensee shall deliver, as soon as practicable but in any event no later than thirty (30) days after expiration or termination of this Agreement, to Converse a statement indicating the number and description of Licensed Articles bearing any of the Converse Marks under this Agreement on hand or in process of manufacture as of (i) sixty (60) days prior to the expiration of the Contract Period; and (ii) thirty (30) days after receipt from Converse of any notice terminating the license granted hereunder or, in the event no such notice is required, thirty (30) days after the occurrence of any event which terminated such license.

(b) Converse shall have the option, at its expense, to have an independent certified public accountant conduct a physical inventory during reasonable business hours of Licensee's manufacturing and distribution facilities in order to ascertain or verify such inventory or statement. In the event Licensee refuses to permit Converse to conduct such physical inventory, Licensee shall forfeit its right hereunder to dispose of such inventory. In addition to such forfeiture, Converse shall have recourse to all other legal remedies available to it.

(c) Licensee shall have ninety (90) days to dispose of Converse inventory, which disposal shall be consistent with its distribution channels set forth in Paragraph 8 of this Agreement.

## VIII. MISCELLANEOUS

27. <u>Devaluation</u>. In the event devaluation in any of the countries in the Territory increases by more than fifteen percent (15%) in a given year, Licensee may, at Converse's option, have the right to renegotiate its Guaranteed Annual Minimum Royalty and Guaranteed Minimum Sales Volume set forth above for the Contract Period.

28. <u>Force Majeure</u>. If either party to this Agreement is temporarily unable to perform its obligations hereunder because of fire, strike, freight embargoes, government restrictions or regulations, war, emergency or any other Act of God, then no liability to the other party or right to terminate shall exist for failure of the one party to perform during such period.

29. <u>Assignment or Sublicense by Licensee</u>. None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other

Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee without the prior written consent of Converse in each instance.

30. Notices. Any written notice authorized or required by this Agreement shall be deemed to be duly given when sent by facsimile, registered mail, postage prepaid, or by express mail or international courier service, addressed to one party or the other, as the case may be, as stated in this Article unless either party shall previously have given to the other party written notice of a change of such address.

CONVERSE INC.

Converse Inc.
One High Street
North Andover, Massachusetts 01845
Fax: 978-983-3547

ATTENTION:     Laura W. Kelley
               Vice President, Legal

        c.c.:   Tim Ouellette
                Vice President, Licensing

ALON INTERNATIONAL S.A.

Mr. Roberto Szerer
Mr. Ronald Durchfort
ALON International
1160 E. Hallandale Beach Boulevard, Suite A
Hallandale, Florida 33009

31. No Joint Venture. Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers and neither party shall have the power to obligate or bind the other in any manner whatsoever.

32.  Applicable Law.  The parties agree that the Commonwealth of Massachusetts, U.S.A. law governs the provisions and interpretation of this Agreement and that the English language version thereof shall be the controlling document.

33.  Arbitration.  The parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly.  Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligations of the parties thereunder, the capacity or authority of the parties thereto, the performance or breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one party to the other setting forth with specificity any such controversy or claim, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association.  The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association.  The parties expressly agree that arbitration shall be held in the offices of the American Arbitration Association, in Boston, Massachusetts, U.S.A., or such other locations within the Commonwealth of Massachusetts as the American Arbitration Association may direct.  Such arbitration shall be conducted in the English language and the arbitrators shall apply the laws of the Commonwealth of Massachusetts.  The institution of any arbitration proceeding hereunder shall not relieve the Licensee of its obligation to make payments accrued hereunder to Converse during the continuance of such proceeding.  The decision by the arbitrators shall be binding and conclusive upon the parties, their successors and assigns and the parties shall comply with such decision in good faith, and each party hereby submits itself to the jurisdiction of the courts of the place where the arbitration is held, but only for the entry of judgment with respect

Page 38

to the decision of the arbitrators hereunder. Notwithstanding the foregoing, judgment upon the award may be entered in any court where the arbitration takes place, or any other court having jurisdiction over the losing party.

34. Significance of Headings. Paragraph headings contained herein are solely for the purpose in aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of the Agreement.

35. Assignment, Entire Agreement, No Waiver. This Agreement and any rights herein granted shall inure to the benefit of and be binding upon the parties hereto and their respective successors or assigns, provided, however, that this Agreement shall be freely assignable by Converse but shall not be assigned, sublicensed or encumbered by Licensee without the prior written consent of Converse. This Agreement constitutes the entire agreement and understanding between the parties hereto and cancels, terminates and supersedes any prior agreement, materials exchanged between the parties, discussions or understanding relating to the subject matter hereof. None of the provisions of this Agreement can be waived or modified except expressly in writing signed by both parties hereto, and there are no representations, promises, agreements, warranties, covenants or undertakings other than those contained herein.

IN WITNESS WHEREOF, each of the parties hereto have executed this Agreement as of the date and year first above written in duplicate originals by its duly authorized representatives.

CONVERSE INC.

By _____

Title: VP Legal

Witness _____

ALON INTERNATIONAL S.A.

By _____

Title: Co-President

Witness _____



VIA U.P.S.

March 12, 2002

Mr. Roberto Szerer
Mr. Ronald Durchfort
ALON International
1160 E. Hallandale Beach Boulevard
Suite A
Hallandale, Florida 33009

      RE:    *revised Manufacturing, Distribution and License Agreement between Converse Inc. and Alon International S.A.*

Gentlemen:

As you know, the date of the Agreement was previously changed from July 1, 2001 to September 1, 2001. For consistency, this date change has now been made in other paragraphs: 1(a) and (b), and the charts in 15(a) and (b) and 16. Therefore, enclosed are two originals of the revised above-referenced agreement for your execution. Kindly sign both and return to Laura Kelley for countersignature. A fully executed original will be returned to you.

If you have questions, please contact Tim directly. Thank you.

Very truly yours,

Helene Needham
Contract Attorney

Enclosures.

<u>SECOND AMENDMENT TO THE</u>
<u>MANUFACTURING, DISTRIBUTION AND</u>
<u>LICENSE AGREEMENT</u>
<u>BY AND BETWEEN</u>

<u>CONVERSE INC.</u>

and

<u>ALON INTERNATIONAL, S.A.</u>

**SECOND AMENDMENT**, made effective as of the 1st day of January, 2004 by and between **CONVERSE INC.**, a Delaware corporation, having its principal place of business at One High Street, North Andover, Massachusetts, 01845 ("Converse") and **ALON INTERNATIONAL S.A.**, a corporation duly registered and existing under the laws of the Republic of Panama and having its principal office and business at Calle 53 Urbanizacion Obarrio, Torre Swiss Bank, Piso 16, Panama, Republica de Panama ("Licensee").

**WHEREAS**, Converse and Licensee entered into a Manufacturing, Distribution and License Agreement dated September 1, 2001 and amended on May 8, 2002 (the "Agreement") with respect to the manufacture and sale of Licensed Articles on an exclusive basis; and

**WHEREAS**, the parties desire to further amend the Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants, representations and promises herein contained, Converse and Licensee agree as follows:

1.    Licensee shall also include its subsidiaries and affiliates, including Camar Distribution LLC, Carval LLC, AIB Servicos E Comercio Ltd, Alon Brasil Comercio e Distribuicao Ltd. and Alon Argentina SRL.

2.    As amended hereby, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, each of the parties hereto have executed this Second Amendment as of the date and year first above written in duplicate originals by its duly authorized representatives.

ALON INTERNATIONAL S.A.          CONVERSE INC.

By: _____          By: _____

Title: _____          Title: _____

# EXHIBIT "B"
## TO THE DURCHFORT DECLARATION



<u>Via Facsimile Transmission (954) 456-2151</u>

June 25, 2001

Mr. Ronald Durchfort
Mr. Roberto Szerer
ALON International
1160 E. Hallandale Beach Boulevard
Suite A
Hallandale, Florida 33009

     **RE:**    *Manufacturing, Distribution and License Agreement between Converse Inc. and Alon International*

Dear Ronald and Roberto:

     It is Converse's present intent to enter into an exclusive Manufacturing, Distribution and License Agreement ("Agreement") with Alon for the manufacturing, distribution and sale of Converse footwear and accessories provided Converse and Alon mutually agree upon the terms of the Agreement. Based on previous discussions between the parties, the essential terms of the Agreement are set forth below.

| | |
|---|---|
| Signing Fee: | US$23,750.00 shall be paid by Alon upon execution of the Agreement. |
| Territory: | Brazil, Argentina, Uruguay and Paraguay |
| Licensed Articles: | Footwear, Bags, Socks, Hats, T-Shirts, Apparel and Watches |
| Term: | July 1, 2001 to December 31, 2004. (July 1, 2001 through December 31, 2002 shall be considered the First Contract Year). |

Royalty Rate:

| Year | Footwear | Non-Footwear |
|---|---|---|
| 2001-02 | 6% | 6% |
| 2003 | 7% | 6% |

**CONVERSE INC.**

One Fordham Road
North Reading, MA 01864-2619
978-664-1100 TEL
www.converse.com



|  | 2004 | 8% | 6% |
|---|---|---|---|

**Guaranteed Minimum Royalty:**

| Year | Footwear & Non-Footwear |
|---|---|
| 2001-02 | US$ 115,000.00 |
| 2003 | US$ 160,000.00 |
| 2004 | US$ 215,000.00 |

**Guaranteed Minimum Sales:**

| Year | Footwear & Non-Footwear |
|---|---|
| 2001-02 | US$ 1,917,000.00 |
| 2003 | US$ 2,360,000.00 |
| 2004 | US$ 2,800,000.00 |

**Renewal Option:** Automatic three (3) year extension provided Alon exceeds the third year Guaranteed Minimum Royalty by twenty-five percent (25%).

**Renewal Option Royalty Rate:** To be determined.

**Renewal Option Licensed Articles:** Footwear, Bags, Socks, Hats, T-Shirts, Apparel and Watches

**Renewal Option Guaranteed Minimum Royalty:** Seventy Percent (70%) of the third year Guaranteed Minimum Royalty increasing by ten percent (10%) each year.

**Renewal Option Guaranteed Minimum Sales:** Seventy Percent (70%) of the third year Guaranteed Minimum Sales increasing by ten percent (10%) each year.

**Right to First Negotiation:** In the event, Converse does not renew agreements with its existing licensees in the territories of Colombia, Peru and Mexico, Converse shall grant Alon the right of first negotiation only for such territories.

The terms contained in this letter shall not be binding upon either party until such time that a mutually agreed upon Agreement is executed by both parties.



We look forward to seeing you at the sales meeting and to finalizing the Agreement. Kindly indicate your agreement to the above by signing below and returning to my attention via facsimile transmission at (978) 664-7579. Thank you.

Very truly yours,

Laura W. Kelley
Vice President, Legal

AEON INTERNATIONAL

By: _____

Title: _President_

Date: _5/24/01_



TRANSMISSION VERIFICATION REPORT

TIME : 06/26/2001 15:43
NAME :
FAX :
TEL :

| | |
|---|---|
| DATE,TIME | 06/26 15:42 |
| FAX NO./NAME | 19786543573 |
| DURATION | 00:00:55 |
| PAGE(S) | 04 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

----Original Message-----
From: Ronald Durchfort [mailto:rd@aloninternational.com]
Sent: Thursday, June 21, 2001 1:04 PM
To: Tim Ouellette
Subject: Converse / Alon
Importance: High


Dear Tim

We are very happy to have reached a final agreement with you.

Please see below the details for the Letter of Intent:

Converse / Alon

| Year | Royalty | Royalty | Agreed guarantee | Sales | |
|------|---------|---------|------------------|-------|--|
| | Footwear | | Non-Footwear 06/20/01 | | 06/20/01 |
| 2001/2002 | 6% | 6% | 115 | 1,917 | |
| 2003 | 7% | 6% | 175 | 2,500 | |
| 2004 | 8% | 6% | 230 | 2,875 | |
| Total | | | 520 | 7,292 | |

First term
Territory:    Brazil, Argentina, Uruguay, Paraguay, Peru and Colombia.
Product:     Footwear, Bags, Socks, Hats and T-Shirts.
Term:  July 1, 2001 to Dec 31, 2004
Guarantee:   $520,000   7/1/01 through 12/31/04

Extension
Territory:    Brazil, Argentina, Uruguay, Paraguay, Peru and Colombia.
Product:     Footwear, Bags, Socks, Hats, T-Shirts and Apparel.
Term:  Jan 1, 2005 to Dec 31, 2007
Renewal:      Automatic 3 year extension if 3rd year royalty minimums reach more
than $280,000 (125% of 3rd year)

Guarantee:    70% of previous year actual


We are very excited to be part of the new Converse family.

Best regards,

Ronald / Roberto
Alon International

# Converse / Alon

## First term

Territory: Brazil, Argentina, Uruguay, Paraguay, Peru and Colombi
Product: Footwear, Bags, Socks, Hats and T-Shirts.
Term: July 1, 2001 to Dec 31, 2004
Guarantee: $520,000   7/1/01 through 12/31/04

| Year | Royalty | | Agreed g |
|------|---------|--|----------|
| | Footwear | Non-Footwear | Royalty |
| | | | 06/20/01 |
| 2001/2002 | 6% | 6% | 115 |
| 2003 | 7% | 6% | 175 |
| 2004 | 8% | 6% | 230 |
| **Total** | | | **520** |

## Extension

Territory: Brazil, Argentina, Uruguay, Paraguay, Peru and Colombi
Product: Footwear, Bags, Socks, Hats, T-Shirts and Apparel.
Term: Jan 1, 2005 to Dec 31, 2007
Renewal: Automatic 3 year extension if 3rd year royalty minimums
(125% of 3rd year)
Guarantee: 70% of previous year actual

# EXHIBIT "C"
## TO THE DURCHFORT DECLARATION

**From:** Cason, Mardy
**Sent:** Wednesday, November 28, 2001 11:15 AM
**To:** Szerer, Roberto
**Subject:** RE: Meeting

Hey Roberto: Thanks for the note. We are excited what you are doing. Tim thinks you guys walk on water. Have Ronald and Agustin look me up and I will work some time around there schedule. Thanks Mardy

From: Kelley, Laura [mailto:LKELLEY@converse.com]
Sent: Thursday, May 16, 2002 11:53 AM
To: R Durchfort; R Szerer; Ouellette, Timothy
Cc: Boys, Jack; Cason, Mardy; Simon, William
Subject: FW: Court rejects appeals

Plz read below; this is great news!!!!! We won!!!!

-----Original Message-----
From: Monique de Castro Smith [mailto:MCSmith@leonardos.com.br]
Sent: Thursday, May 16, 2002 11:04 AM
To: ksolomon@thompsoncoburn.com; Kelley, Laura; Bornstein, Julie;
Ferreira, Paulo Roberto; rov@peixotoecury.com.br
Subject: Court rejects appeals


Atencao: Por favor responda para momsen@leonardos.com.br e nao deixe de mencionar
a nossa referencia (F003630).
Attention: Please reply to momsen@leonardos.com.br and do not fail do quote our
reference (F003630) in your answer.

TO:  Mr. KENNETH SOLOMON   (Your ref: 58010-8851 (Old ref: 8010-8851))

REF: CONVERSE INC. - Court Action

With further reference, specially to our fax of February 22, this is to inform you that in its
session on May 9, the Federal Court of Appeals for the 2nd Circuit following the opinion
by Judge Tania Heine finally rejected the appeals by ALL STAR ARTIGOS
ESPORTIVOS LTDA. and BROCHIER S.A. IND. DE SALTOS E CALÇADOS and
accepted our own appeal, that is, the Court sustained the annulment of the trademark
registrations of ALL STAR ARTIGOS... as well as ordered them to change their name.
To this effect, the Judges, who had not yet given their opinion, followed the opinion of
Judge Heine while the three of the Judges, who had formerly voted for ALL STAR
ARTIGOS... modified their opinions in view of the vote of Judge Heine.

This decision shall still be officially published and may be subject to two types of further
appeals, namely, an appeal for clarification directed to the same Court and appeals to the
High Court of Justice, as far as any violation of a Federal Law is found, and/or to the
Supreme Court in case of any issue on constitutionality.  However, any of such appeals
have scarce chances of being accepted.

The advantage of the decision now rendered is that it is possible to carry it out, as soon as
it is officially published.

Sincerely,

LUIZ LEONARDOS
Momsen, Leonardos & Cia.
Tel: 55-21-2518 2264
Fax: 55-21-2518 3152

**From:** Cason, Mardy [mailto:MCason@converse.com]
**Sent:** Wednesday, February 05, 2003 2:48 PM
**To:** R Szerer
**Cc:** Boys, Jack; Simon, William; Ouellette, Timothy; Kelley, Laura
**Subject:** RE: We WON!!

Roberto: What a great victory. You deserve it. Let's make sure we are very aggressive in cease and desist activities against the Pirate. The pirate will go away if it now cost him lots of money to continue the stealing. Anything we can do just call. This victory could not happen to a better organization than yours. Thanks Mardy

**From:** Simon, William [mailto:WSimon@converse.com]
**Sent:** Thursday, February 06, 2003 2:26 PM
**To:** R Szerer
**Subject:** RE: Congratulations

Dear Roberto,

I just returned to Boston and heard the good news directly form Laura.  Congratulations!!   It appears that all your hard work has been rewarded.  Please let us know if therre is any we can do to assist you.

Thanks again,
Bill

-----Original Message-----
**From:** Szerer, Roberto
**Sent:** Wednesday, February 05, 2003 2:32 PM
**To:** Simon, William; Cason, Mardy
**Cc:** Boys, Jack
**Subject:** We WON!!
**Importance:** High

Dear Bill, Mardy and Jack,

GOOD NEWS!! We WON yesterday in the Supreme Court in Brasilia 4 to 1.
Ronald and Laura attended the session.
Today Ronald is still in Brazil coordinating all the information to the press/customers, etc.
Let's hope the Pirate goes away.

Best regards to all the Converse family,
Roberto Szerer
Phone 954 456 2566 x 105
Fax    954 456 4114

From: Ouellette, Timothy [mailto:TOuellette@converse.com]
Sent: Tuesday, July 20, 2004 5:12 PM
To: Joaquim Eugenio G. S. G. Pereira
Cc: R Durchfort
Subject: RE: Converse x All Star - J008282

This was a tremendous victory...you should send this to John Grisham!

    -----Original Message-----
From: Joaquim Eugenio G. S. G. Pereira [mailto:jgoulart@dannemann.com.br]
Sent: Tuesday, July 20, 2004 4:58 PM
To: Kelley, Laura; Ouellette, Timothy
Cc: Durchfort, Ronald; Szerer, Roberto; Luiz Henrique O. do Amaral; Sonia Lopes de Lacerda
Subject: ENC: Converse x All Star - J008282

  Dear All,

    As we have already informed to Ronald, we had a major victory against Artigos last week before both the Court of São Paulo and the Superior Court of Justice. In order to update you on the events of the last week, we would like to provide you with a detailed summary of the developments of the case, on a day-by-day basis.

    Friday (July 09th, 2004).

    As you may be aware of, we proceed with a daily checking in the Superior Court of Justice's database. On July 09, 2004 (Friday), around 11:00 am (local time), we verified that Artigos had filed a preliminary injunction action in the previous day, probably seeking an injunctive relief to allow it to exhibit in the FRANCAL (the trade show, which would take place in the city of São Paulo from July 13th to 16th).

    Immediately, we asked for our local associate in Brasília to go to the Superior Court of Justice in order to verify what was going on at that Court. We were informed on that, since the Superior Court of Justice was in recess, Artigos' new action was referred to the Chief Justice of the Court, Justice Edson Vidigal. The dockets were with him in order to decide on Artigos' request. At that time, we had not access to the dockets.

    We contacted another attorney in Brasília and asked his help to avoid a quick decision from Justice Edson Vidigal, since we would like to schedule a hearing with him before he decides on the injunctive claim (it was around 2:00 pm and, due to the bad weather and the fly distance from Rio to Brasília, it was impossible to send one of our litigators to have a hearing with the Justice at that very day). Our new contact in Brasília was indeed very helpful. He managed to talk to Justice Vidigal, who promised him not rendering a decision on Friday. In view of this, we managed to schedule a special hearing with Justice Vidigal on Monday.

    Saturday (July 10th, 2004)

On Saturday, we had a meeting with our "litigation task force" in our firm. Our plan was to simultaneously strike against Artigos in three different fronts:

a)   the first group of litigators would go to Brasília in order to avoid the granting of the injunctive relief requested by Artigos;

b)   the second group, would go to São Paulo in order to obtain a search and seizure order from the Judge of the 13th Civil Court of São Paulo to seize all products containing the trademark ALL STAR in Artigos' stall at FRANCAL; and

c)   the third group, would also go to São Paulo in order to obtain a police order to stop Artigos from displaying its products at FRANCAL, since Artigos was not complying with a court order (which is a criminal offense) and there were blatant acts of trademark and trade dress violations by Artigos (in Brazil, trademark and trade dress violations are both a tort and a criminal offense). The criminal action was a back-up strategy if the other two failed.

Sunday (July 11th, 2004)

Our litigators drafted three motions to be submitted before the courts:

a)   a motion to prevent the Justice from the Superior Court of Justice to grant the injunctive relief;
b)   a motion requesting the search and seizure of all Artigos' products containing the trademark ALL STAR in FRANCAL; and

c)   a criminal motion requesting the search and seizure of Artigos' infringing products in FRANCAL.

Monday (July 12th, 2004).

The first group traveled to Brasília and the second one, to São Paulo.

a) São Paulo.

Our São Paulo's group arrived in town around midday. They met with our litigation group from the São Paulo's office and went to the Court. It is important to call your attention to the fact that the clerks from the Courts of São Paulo are on strike. In view of this, the judicial proceedings are with a major delay.

We managed to file our motion with great effort due to the strike. At the same day, we had a special hearing with the Judge from the 13th Civil Court. She promised us to analyze our request for the search and seizure. Our litigators stayed all day long waiting for a decision that did not come up at that day.

b) Brasília.

In Brasília, our litigators met with Adriano Martins from Coopershoes. Justice Vidigal wasn't scheduling hearings at that day. Therefore, we had to wait to be called by him. In the afternoon, for our surprise, we were informed that Artigos filed a petition requesting the withdrawal of its preliminary injunction action.

However, we found out that Artigos have filed another preliminary injunction action, five minutes later from the time its attorneys requested the withdrawal of the first one. In fact, we verified that the first injunction was to suspend the effects of São Paulo's decision that demand Artigos to stop the use of the trademark ALL STAR. The second injunction, by its turn, was to restore Artigos' registrations for the trademark ALL STAR, cancelled by the decision from the Federal Court of Rio de Janeiro. If Artigos prevailed on this injunction, their attorneys would be able to overturn both decisions from Rio and São Paulo.

In view of these facts, we drafted a new motion to be submitted before the Superior Court of Justice.

After awaiting 8 hours, Justice Vidigal decided to talk to us. We presented our motion and we briefly explained the situation. He promised us to thoroughly analyze the case.

We took a flight to São Paulo around 09:00 pm and, at 11:30 pm, we met our colleagues in São Paulo in order to discuss the strategy for the next day.

Tuesday (July 13th, 2004).

The three groups had breakfast together around 07:00 am in São Paulo. Since the Judge from the 13th Civil Court had not rendered a decision yet, we decided to move on with the criminal motion. Meanwhile, our associate lawyer in Brasília was in the Superior Court of Justice to inform us as soon as a decision was rendered by Justice Vidigal.

In São Paulo, we split again in two groups. The first group went to the Police Department to obtain a decision from the Chief Commissioner. The second one went to the 13th Civil Court to have a new hearing with the Judge.

After a very stressing hearing with the Judge from the 13th Civil Court (since Artigos' attorneys were there trying to avoid the granting of the search and seizure order), the Judge granted our request. At the same moment, the Chief Commissioner ordered to a police force to go to FRANCAL and stop the violation.

When both groups arrived at FRANCAL, the employees from Artigos ran away and locked the stall with all the products inside. The stall was basically made of glass, therefore, the ALL STAR trademark was displayed everywhere and the products were easily visible to the public.

After another stressing meeting with Artigos' attorneys at FRANCAL, we managed to obtain an order from the Civil Court to cover the stall in order to hide the trademark ALL STAR (please, see the pictures bellow). We knew it wasn't the best measure but, at that time (almost 10:00 pm), it was the only feasible one.

Around 10:30 pm, our associate lawyer in Brasília informed us that Justice Vidigal had not rendered a decision at that day.

Wednesday (July 14th, 2004).

Early in the morning we had another hearing with the Judge from the 13th Civil Court. We requested a judicial order to either break into the stall or to seal it until the end of FRANCAL. The Judge ordered the seal of the stall.

In spite of the strike, we managed to convince two clerks from the Court to proceed with the seal of the stall. The funny story is that all Artigos' employees left their personal belongings inside the stall (including: bags, pursues, money, documents, etc.). As we were informed, only on Friday (July 16th), they got their personal stuff from the stall.

Once again, Justice Vidigal did not decide on the injunction requested by Artigos.

Thursday (July 15th, 2004).

The good news comes from Brasília: Justice Vidigal denied Artigos' preliminary injunction request.

Artigos' employees initiated a protest during the FRANCAL. They were complaining about the Court decision. The manager of FRANCAL stopped the "public manifestation".

Friday (July 16th, 2004).

FRANCAL was over and Artigos did not resume its exhibition.

Today (July 20th, 2004)

In view of our success in this stage, we had a hearing with the Judge from Nova Petrópolis and we requested him to grant a search and seizure in Joaneta's premises. He promised to analyze our claim until the end of this week.

If we obtain this injunction in Nova Petrópolis, Artigos will have serious trouble to keep infringing the Courts' orders, since they will no longer have a factory to manufacturer its ALL STAR tennis shoes.

As soon as any news comes-up, we will immediately contact you again. Meanwhile, we remain at your entire disposal for any further clarification you may need on this matter.

Sincerely yours,

Joaquim Eugenio Goulart

Dannemann Siemsen Advogados

jgoulart@dannemann.com.br

# EXHIBIT B
# (continuation 2)

# EXHIBIT "D"
# TO THE DURCHFORT DECLARATION

## R Durchfort

| | |
|---|---|
| **From:** | Ouellette, Timothy [TOuellette@converse.com] |
| **Sent:** | Tuesday, May 04, 2004 3:06 PM |
| **To:** | R Durchfort; R Szerer |
| **Cc:** | Laganas, Chris |
| **Subject:** | Mercosul Extension |

Attached please find an analysis of what is on the table. I would like to reach an agreement on how we plan to move forward as soon as possible

Thanks
<<Mercosul Analysis 050404.xls>>

4/14/2005

## Converse - Mercosul

### Contract Extension Terms

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| Sales | 19,500 G-Sales | 15,600 | 17,160 | 18,876 | | |
| Royalty | 1,560 G-Royalty | 1,091 | 1,200 | 1,320 | | |

### Alon Proposal

|  | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Sales | 13,300 G-Sales | 14,000 | 14,700 | 15,400 | 16,100 |
| Royalty | 1,044 G-Royalty | 730 | 757 | 782 | 820 |

Royalty Rates
Footwear - 8%.
Apparel - 6%

### Converse Target

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Guaranteed Sales | 17,500 | 21,000 | 25,200 | 30,240 | 36,300 |
| Guaranteed Royalty | 1,575 | 1,890 | 2,268 | 2,720 | 3,267 |

Royalty Rates
Originals - 10%
Footwear - 8%
Apparel - 8%

### Other Contractual Issues

1. Sales outside of Brazil must be at a minimum of 25% of total
2. Apparel & Accessories must be 30% of total turnover
3. Non-vulcanized products must account for 20% of total sales
4. Imported products must be no less than 5% of total sales.
5. Marketing Expenditure - 5%
6. Regional Marketing Contribution - .05%

Note: Target Royalty Rates and other contractual issues will be incorporated into any form of extension

**From:** R Szerer
**Sent:** Monday, May 31, 2004 5:15 PM
**To:** TOuellette@converse.com
**Cc:** R Durchfort
**Subject:** Proposal

Dear Tim,

As per our telecom, enclosed you will find a spreadsheet with the numbers we agreed.

As you can see I modified the royalty rate of Originals to bring it gradually to 10% over the term of the contract.

We understand that based on our initial "Big Aggressive Hairy Goal" you would like a growth for this year of 50%.

We believe it is to high specially after the growth we had in the last year but anyhow we are evaluating the projections for 2004 taking in to consideration all the variables involved (New company in Argentina, new company in Brazil, new apparel line, etc.) and also including the recent change in the Real which by itself brings the sales numbers in Dollars down by 9.68% (Current exchange rate per dollar of R$ 3.10 vs. initial c    lation at R$2.80)

I will be traveling all week in Argentina and Brazil but will try to talk to you by Friday.

I wish you a good week.

Best regards,
Roberto Szerer
Phone 954 456 2566 x 105
Fax    954 456 4114

| Converse / Alon Mercosur Renewal | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** |
| **Growth Mode** | Actual/Base | Aggressive | | | Medium | | | | Moderate | | |
| **Sales Goal** | 12,650 | | 10% | 10% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| **Sales Guarantee** | | 70% | 70% | 70% | 65% | 65% | 65% | 65% | 65% | 65% | 65% |
| **Royalty Rate** | | | | | | | | | | | |
| Non- | 6.0% | 6.00% | 6.00% | 6.00% | 7.00% | 7.00% | 7.00% | 8.00% | 8.00% | 8.00% | 8.00% |

| footwear | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Originals | 8.0% | 8.00% | 8.00% | 8.25% | 8.50% | 8.75% | 9.00% | 9.25% | 9.50% | 9.75% | 10.00% |
| Footwear | 8.0% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% |

-----Original Message-----
From: Ouellette, Timothy [mailto:TOuellette@converse.com]
Sent: Tuesday, June 19, 2001 5:59 PM
To: 'rd@aloninternational.com'
Subject: FW: Brazil & Argentina

Ron,
This where we are at, and I cannot get anyone too excited. I'm pushing on
this end, and have a meeting with Bill and Jack at 8:00am tomorrow morning.
This is at the top of the list
Let me know your thoughts

Tim Ouellette
Vice President Licensing
Converse, Inc.
978 664 7527
978 664 7529 fax
508 284 2294 mobile
touellette@converse.com

> -----Original Message-----
> From: Ouellette, Timothy
> Sent: Monday, June 18, 2001 7:04 PM
> To:   Kelley, Laura
> Cc:   Boys, Jack; Kempa, Lisa; Simon, William; Cason, Mardy
> Subject:     Brazil & Argentina
>
> Laura,
> I have been negotiating with this group for a couple of weeks now, and the
> following is where I'd like to see this at.
>
> Territory: Brazil, Argentina, Uraguay, Paraguay, Peru, Columbia
> Products: Footwear, Bags, Socks and Hats (Would move into full apparel in
> extension)
> Term: 2002, 2003, 2004 - Agreement would start immediately in 2001 with
> first year bridging 01 & 02
>
> Royalty Rate: Footwear
> 2001/2002 - 6%
> 2003 - 7%
> 2004 -8%
> Non Footwear - 6%
>
> Guaranteed Minimum Sales:
> 2001/02 - $2m
> 2003 - $3.5m
> 2004 - $5m
>
> Guaranteed Minimum Royalty
> 2001/02 - $140,000
> 2003 - $245,000
> 2004 - $350,000
>
> 3 Year extension would be based on achieving 125% of 3rd year minimums,
> and agreeing to extended sales and royalty minimums

> 
> Second Term Royalties would be:
> Originals – 10%
> Footwear – 8%
> Non Footwear – 7%
> 
> Can you draft an "Intent" Letter based on these Terms?
> 
> 
> Thanks
> Tim

## R Durchfort

**From:** R Durchfort

**Sent:** Monday, June 28, 2004 5:27 PM

**To:** Ouellette, Timothy

**Subject:** RE: TO-RD Meeting Jun 2004.xls

Moving the 20 million sales from budget to actual was your biggest point…you got it!!
I understood we agreed on the 8% across the board … ………. ditto the apparel.
70% is high given the economic situation (devaluation) and the continued piracy.
You know I felt 60% was more appropriate.
Lets come to closure…there's a lot of work to be done.
rgds

-----Original Message-----
**From:** Ouellette, Timothy [mailto:TOuellette@converse.com]
**Sent:** Monday, June 28, 2004 4:23 PM
**To:** R Durchfort
**Subject:** RE: TO-RD Meeting Jun 2004.xls

As discussed, the area's that will be difficult are
1. 70% vs. 80% on Guarantee
2. 8% vs. 10% on Originals
3. 10% of overall sales in Apparel
I will advise
Thanks

-----Original Message-----
**From:** Durchfort, Ronald
**Sent:** Monday, June 28, 2004 11:59 AM
**To:** Ouellette, Timothy
**Subject:** FW: TO-RD Meeting Jun 2004.xls

Tim,
These are the numbers that I recall from our meeting.

I am busy preparing a new line of footwear to accompany the "hooker" line of apparel.
We'll call it the street walker's line.☺
We have a lot of work to do.
Rgds,
Ron

12/1/2004

## Converse / Alon Mercosur Renewal

|  | 2004 | 1 2005 | 2 2006 | 3 2007 | 4 2008 | 5 2009 |
|---|---|---|---|---|---|---|
| **Contract extension terms** | | | | | | |
| Sales | 19,500 | | | | | |
| Guaranteed Sales @ 80% | | 15,600 | 17,160 | 18,876 | | |
| Guaranteed Royalty @ 70% | | 1,091 | 1,200 | 1,320 | | |
| | | | | | | |
| Royalty rates | | | | | | |
| Originals | 8% | | | | | |
| Footwear | 8% | | | | | |
| Non-footwear | 6% | | | | | |
| | | | | | | |
| **RD/TO @ June/04 sales meeting** | | | | | | |
| Sales | | 20,000 | 22,000 | 23,100 | 24,255 | 25,468 |
| Guaranteed Sales @ 70% | | 14,000 | 15,400 | 16,170 | 16,979 | 17,827 |
| Guaranteed Royalty @ 70 % | | 1,120 | 1,232 | 1,294 | 1,358 | 1,426 |
| | | | | | | |
| Royalty rates | | | | | | |
| Originals | | 8% | | | | |
| Footwear | | 8% | | | | |
| Non-footwear | | 8% | | | | |
| | | | | | | |
| Non Brazil % of total | | 15% | 18% | 20% | 23% | 25% |
| Apparel % of total | | 10% | 10% | 10% | 10% | 10% |

# EXHIBIT "2"

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL DIVISION

Case No.: 50-133-T-00579-04

Alon International, S.A.,                          :

                    Claimant,                     :
                                                  :
v.                                                :
                                                  :
Converse Inc.                                     :
                                                  :
                    Respondent.                   :
                                                  :

### DECLARATION OF OTTO EDUARDO FONSECA LOBO

I, Otto Eduardo Fonseca Lobo, being of lawful age, declare as follows:

1.      I am an attorney admitted to practice law in Brazil, and have been duly licensed for the past 9 years.  I am an attorney in the firm of Stroeter & Royster Advogados, located in Rio de Janeiro, Brazil, specializing in commercial and business law.  I make this Declaration based on my own personal knowledge.

2.      My firm represents Alon International, S.A. ("Alon") in the judicial proceedings commenced against Converse, Inc. ("Converse") and Cooperativa De Calcados E Componentes Joanetense LTDA ("Coopershoes") in Brazil, as set forth in detail below.

### The *Status Quo* Injunction Obtained By Alon
### Against Converse Pending Completion Of This Arbitration

3.      On or about December 21, 2004, Alon filed suit against Converse in the 19th State Court of Porto Alegre, State of Rio Grande do Sul, Brazil (*19ª Vara Cível do Rio Grande do Sul*) seeking injunctive relief.  Alon's sole purpose in that proceeding was to seek an injunction preserving the *status quo* between Alon and Converse pending a full adjudication of the parties' dispute in this arbitration.

4.      By order dated December 22, 2004, the 19th State Court of the State of Porto Alegre, Brazil granted a *status quo* injunction ordering the following relief: (a) it declared that the Licensing, Manufacturing and Distribution Agreement ("Agreement") between Converse and

Alon is in effect until the termination of the arbitration proceedings initiated by Alon; and (b) restrained Converse from having any contractual arrangements in Brazil that interfered with the existing contractual rights of Alon prior to a full adjudication of the parties' dispute in arbitration. A true and correct copy of the Order dated December 22, 2004, in Portuguese and a certified English translation, is attached hereto and marked as **Exhibit "A."**

5.      On February 24, 2005, Converse over-turned the Order dated December 22, 2004, by obtaining an *ex parte* order from a temporary judge substituting for the judge who had originally entered the injunction, and now was on vacation ("*Ex Parte* Order"). A true and correct copy of the *Ex Parte* Order, in Portuguese and a certified English translation, is attached hereto and marked as **Exhibit "B."**

6.      Alon appealed the *Ex Parte* Order to the Supreme Court of the State of Rio Grande do Sul (*Tribunal de Justicia, Estado Do Rio Grande Do Sul*). On March 18, 2005, a judge from the $3^d$ chamber of the Supreme Court of Rio Grande do Sul reversed the interim's judges *Ex Parte* Order and properly reinstated the *status quo* injunction pending completion of the parties' arbitration. A true and correct copy of the Order dated March 18, 2005, issued by the Supreme Court of Rio Grande do Sul, in Portuguese and a certified English translation, is attached hereto and marked as **Exhibit "C."**

7.      The Order dated March 18, 2005, granted by the Supreme Court of Rio Grande do Sul states in relevant part:

> This is the proper solution for the case, since the allegation from the appellants is likely, and there is the risk of irreparable damages.
>
> In fact, the appellants are not seeking to flee the arbitration panel they freely elected, in agreement with the appellees in the contract entered into, as competent to determine termination of the contract. **On the contrary, they intend to see a declaration of the effectiveness of this arbitration clause, which determines, according to them, that only the arbitration panel can declare the termination of the contract and that, until this happens, the defendant is bound to performance of the contractual stipulations.**
>
> **On the other hand, breach of the contractual rights may bring serious consequences for the financial health of the defendant companies, including undesirable social reflexes, and which must therefore be avoided.**
>
> For these reasons, I uphold the appeal, to grant the advancement of protection sought by the plaintiffs, determining that the defendant refrain from practicing

2

> any act which violates the contractual right of the plaintiffs specified in the Licensing Agreement signed between the parties.

Order, p. 3 (emphasis added). This decision has been published by the Supreme Court of Rio Grande do Sul and is binding upon the parties.

8.      Converse appealed this decision to the remaining judges of the 3[d] chamber of the Supreme Court of the State of Rio Grande do Sul. As recently as April 20, 2005, a three-judge panel of that Court unanimously affirmed in all respects the *status quo* injunction, and ordered the continued validity of the Manufacturing, Distribution and Licensing Agreement ("Agreement") between Alon and Converse pending completion of this arbitration, as set forth in paragraph 4 above.

9.      The Supreme Court of Rio Grande do Sul has not yet published a written order reflecting their unanimous decision. Nonetheless, a true and correct printout of the Court's website reflecting its decision to uphold Alon's *status quo* injunction along with my translation is attached hereto and marked as **Exhibit "D."** The website states in pertinent part: "The granting of the appeal [by Converse] is denied. [Alon's] motion for clarification is granted. Unanimous." I certify that this is a true and accurate translation of the Court's website entry pertaining to its decision rendered in Court on April 20, 2005.

10.     Under Brazilian law, Converse has the right to appeal this decision to the Superior Court of Justice and to the Federal Supreme Court, which are Brazil's courts of last resort for infra-constitutional and constitutional questions, respectively. However, appeals to both courts do not, except in rare circumstances, have the effect of suspending the implementation of the decision being appealed, particularly decisions granting *status quo* injunctions.

11.     In Exhibit "T" to Converse's Motion to "rationalize" this litigation, Converse's Brazilian counsel, Marcelo de Souza, states at page 2 in item #2: "Converse appealed from that decision. However, the panel of judges of the Appellate Court of Rio Grande do Sul ratified the decision by the reporting judge. Now Converse will file a special appeal to the Superior Court of Justice." The reference by attorney de Souza is to the decision by the three judge panel of the Supreme Court of Rio Grande do Sul on April 20, 2005, affirming the *status quo* injunction which, as noted above, is the most recent pronouncement of the national courts of Brazil in relation to the *status quo* injunction, as reflected in **Exhibit "D."** To date, Converse has not

3

appealed this decision.    As I stated, Converse's likelihood of suspending the injunction or otherwise succeeding on any appeal of this decision is *de minimis*.[1]

### The Permissive Interpleader Actions Initiated By Coopershoes

12.    In papers submitted by Coopershoes with the court in Porto Alegre, Coopershoes has indicated that Converse has requested that it directly pay Converse the fees that Coopershoes was previously paying Alon.  On March 4, 2005, Coopershoes filed an interpleader action with the Twelfth Civil Court of Porto Alegre (*12a Vara Cível Comarca do Porto Alegre do Rio Grande do Sul*) to deposit fees owed to Alon into a judicial escrow account.   By Order dated March 10, 2005, that court allowed Coopershoes to deposit these funds into a judicial escrow account.   A true and correct copy of this Order dated March 10, 2005, in Portuguese and a certified English translation, is attached hereto and marked as **Exhibit "E."**

13.    As previously noted, the Converse Injunction was temporarily suspended from February 24, 2005, when Converse obtained the *Ex Parte* Order, until March 18, 2005, when the judge of the Supreme Court of Rio Grande do Sul granted Alon a new *status quo* injunction and ordered the continued validity of the Agreement between Alon and Converse pending completion of this arbitration.

14.    On April 1, 2005, while Converse's appeal of the March 18, 2005, decision by the Supreme Court of Rio Grande do Sul was pending, Coopershoes again applied to the Twelfth Civil Court of Porto Alegre for permission to deposit additional monies owed to Alon into a judicial escrow account.  By Order dated April 4, 2005, that court, despite the March 18, 2005, decision by the Supreme Court of Rio Grande do Sul, again allowed Coopershoes to deposit funds owed to Alon into a judicial escrow account.   A true and correct copy of this Order, in Portuguese and a certified English translation, is attached as **Exhibit "F."**

15.    At the time that Coopershoes requested permission for the second deposit of funds into the judicial escrow account, the only injunction in place was the March 18, 2005, decision by the judge of the Supreme Court of Rio Grande do Sul, which was on appeal by Converse.

16.    In its motion to "rationalize" this litigation, Converse states that the Brazilian courts are "ineffective," "lack teeth," and contributing to "a process that is currently out-of-

---

[1] I will hereinafter refer to the above decisions of the courts of Brazil dated December 22, 2004, March 18, 2005, and April 21, 2005, granting and affirming the *status quo* injunction between Converse and Alon collectively as the "Converse Injunction."

control." Based on my experience practicing law in Brazil generally and in these proceedings, in particular, I respectfully disagree. The national courts of Brazil are not ineffective and the proceedings in Brazil are not "out-of-control." Five judges have held that the Converse Injunction is proper pending the completion of this arbitration. Only one judge -- the judge allowing Coopershoes to deposit funds in the escrow account -- has refused to recognize the current status of the Agreement entered into between Alon and Converse as determined by the Supreme Court to Rio Grande do Sul. A request is pending for this singular judge to reconsider the validity of the interpleader deposits based on subsequent court developments including the affirmation of the Converse Injunction by the three judge panel of the 3d chamber of the Supreme Court of Rio Grande do Sul and subsequent entry of the Coopershoes Injunction, as I describe below.

### The *Status Quo* Injunction Obtained By Alon Against Coopershoes

17.    Despite the Converse Injunction and the March 18, 2005, decision by the Supreme Court of Rio Grande do Sul, in particular, Coopershoes refuses to pay Alon pursuant to the terms of its contract with Alon and continues to deposit such payments into the judicial escrow account of the Brazilian court in Porto Alegre. Coopershoes has indicated that it will continue depositing the funds owed to Alon into the judicial escrow account and will disregard any decision by the Supreme Court of Rio Grande do Sul.

18.    Accordingly, Alon filed suit against Coopershoes in the Eighth Business Court of Rio De Janeiro *(Ottava Vara Empresarial de Comarca Da Capital Do Estado Do Rio De Janeiro)* on March 31, 2005, against Coopershoes seeking an injunction directing Coopershoes to comply with the terms of its agreement with Alon including paying Alon its fees until the merits of Alon's dispute with Converse is resolved in arbitration. By Order dated April 5, 2005, the Rio de Janeiro court issued an injunction against Coopershoes ("Coopershoes Injunction"). A true and correct copy of the Coopershoes Injunction, in Portuguese and a certified English translation, is attached hereto and marked as **Exhibit "G."**

19.    It is important to note that the Coopershoes Injunction was issued on April 5, 2005, the day <u>after</u> Coopershoes received the Order dated April 4, 2005 from the Porto Alegre court, allowing it to make a second deposit of funds due to Alon into an escrow account.

20.    Pursuant to the Coopershoes Injunction, Coopershoes must: i) cease and desist from taking any acts which are violative of Alon's contractual rights under the agreements

signed with Coopershoes; ii) cease and desist from acting under any obligation to Converse; iii) produce the Converse products solely for Alon and make payment directly to Alon; and iv) deliver sales reports and follow up of production directly to Alon. In the event of non-compliance, the Coopershoes Injunction provides that Coopershoes may have to pay a daily fine of fifty thousand (50,000) reais.

21.    In granting the Coopershoes Injunction, the court recognized that the Supreme Court of Rio Grande do Sul had issued a *status quo* injunction in favor of Alon that "shall remain in effect [for the period in which] arbitration in the United States is pending." The court further recognized that Coopershoes had "assumed the obligation of paying [Alon] [] starting as of December 31, 2004," that Coopershoes "continues to produce tennis shoes [using] the brand [names] licensed by [Alon]," and that defendant has not paid Alon "for three consecutive months, [which] endangers their economic viability and may require the plaintiffs to shut down their operations in Brazil." In concluding, the court held:

> Advanced protection may be issued if the allegation is credible and there is a well-founded fear of damage [that is] irreparable or difficult to remedy (Article 273 of the [Brazilian] Code of Civil Procedure). It is true that the decision is not issued based on certainty, but rather on the probability of the existence of the right alleged.

> In the case at issue, there exists a probability of the existence of the plaintiff's right, [which is] a conclusion [that is] reached through evidence filed in court documents, as well as by the credibility of the allegations.

> The plaintiffs exclusively represent the brands, which the defendant knows and must respect.

> Likewise, there exists *periculum in mora* [danger in delay], and it is certain that the breach of the referenced exclusivity, along with a breach of [the parties'] agreement, brings about a serious risk [that is] difficult to remedy for the plaintiff companies, which may even have to close down their activities in the country because of such [situation].

> Given the social interest [in enforcing the] contract, and in the light of the foregoing, **ADVANCED PROTECTION IS GRANTED...**"

Coopershoes Injunction at 2,3 (emphasis in original).

22.    Coopershoes has not complied with the terms of the Coopershoes Injunction. Rather, Coopershoes has continued both to refuse to pay Alon and ship products to Alon

Argentina in fulfillment of its obligations to Alon. Nonetheless, Alon has continued to work in good faith under the terms of its agreements with both Converse and Coopershoes and in accordance with the Orders issued by the Supreme Court of Rio Grande do Sul and the Eighth Business Court of Rio de Janeiro.

23.     On May 9, 2005, Alon filed a petition in the Eighth Business Court of Rio De Janeiro seeking sanctions against Coopershoes for its failure to comply with the Coopershoes Injunction, which motion currently is pending decision.

24.     Alon has learned that, as recently as May 6, 2005, Coopershoes deposited additional funds into the judicial escrow account in Porto Alegre in derogation of the Coopershoes Injunction. Coopershoes has informed Alon that it will continue depositing these funds into the escrow account in contempt of the injunction issued by the Eighth Business Court of Rio de Janeiro directing otherwise.

25.     To date, there are only two injunctions in Brazil – both in favor of Alon's rights to continue working under its Agreements with both Converse and Coopershoes and to continue receiving the benefits of those Agreements – pending a final resolution of this arbitration.

I declare under penalties of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 18th day of May 2005.

Otto Eduardo Fonseca Lobo

# EXHIBIT "A"
# TO THE LOBO DECLARATION

HEADER
Coat of Arms of Rio Grande do Sul State
Rio Grando do Sul State
JUDICIARY POWER
END HEADER


Examined.

1 – Denied acceleration of guardianship – the maintenance of the term of the Licensing Agreement for brand name use signed with **Converse**, as well as the determination that the Defendant respect the exclusivity obligations assigned in the business because the desire to renew the Agreement in compliance with Article 2 of the Licensing Agreement was not said or shown in the proceedings.

In a request for reconsideration, the Plaintiffs attached documents that show there were ample negotiations between the contracting parties with regards to the conditions for renewal of the Agreement, all indicating that there was no consensus on said conditions. This is important in as much as it may indicate that the Plaintiffs, in reality, were lead to feel a sense of security where there was none.

2 – The controversy, therefore, that serves as context for the dispute is found in the manifestation of a desire by the Defendant not to renew the Agreement –which is to end in December 31, 2004–, and whose merit, the Plaintiffs inform, are under examination in an arbitration proceeding.

Plaintiffs, when asserting that the institution of an arbitration process does not waive their obligations, would like the interpretation of Clause 33 to also affect the Defendant so that Defendant will also remain bound to the obligations of the business during the arbitration process proceedings.

3 – This lawsuit is restricted to the examination of those Agreement clauses which deal with the term of the Agreement, its renewal, the resolution and establishment of the arbitration process in order to verify the position of each party at the time the Agreement was signed with regards to the period when arbitration might be started.

Based on the position taken by the Defendant in notifying its lack of interest in renewal at the same time it made apparent an interest in renewing the Licensing Agreement through arrangements, I understand that this last effort should prevail as a means to preserving good faith and transparency principles in the business relationship.

4 – Thus, having established the risk of damage to the Plaintiffs since their business will be interrupted abruptly, which will have social repercussions, and considering the social interest of the Agreement currently expressed in the Brazilian Civil Code, I hereby GRANT ACCELERATION OF THE GUARDIANSHIP in order to

determine the maintenance of the effects of the Licensing Agreement during the arbitration process, as well as how to compel the Defendant to abstain from practicing acts that violate the Agreementual rights under penalty of daily fine of R$100.000,00 (one hundred thousand reals).

5 – Be hereby served and notified of the terms of this decision.

Porto Alegre, December 22, 2004

(Signed)
Liége Puricelli Pires
Judge

F:\WDOX\CLIENTS\10077\1001\00042281.DOC

**Certificate of Accuracy**

I, Giovanna L. Lester, Translator and Interpreter since 1980, hereby declare to be fluent in both the Brazilian Portuguese and the English languages and that this is an accurate translation of the original delivered to me.



**Giovanna L. Lester**
Accredited by the
American Translators Association
ATA # 221907
President of the Florida Chapter of ATA – 2002-2003
Assistant Administrator of ATA's Interpreters Division – 2003-2004
Miami, December 29, 2004



ESTADO DO RIO GRANDE DO SUL

PODER JUDICIÁRIO

Vistos.

1 – Indeferi antecipação de tutela – a manutenção da vigência do contrato de licenciamento de exploração de marca firmado com a empresa Converse, bem como a determinação para que a demandada respeite as obrigações de exclusividade consignadas no negócio, porque não foi dito nem ficou demonstrada nos autos a manifestação de vontade de renovação do contrato na forma do art. 2º do Contrato de Licenciamento.

Em pedido de reconsideração, as autoras juntam documentos que demonstram ter havido ampla negociação entre as contratantesquanto às condições da renovação do contrato, tudo indicando que não houve consenso sobre tais condições.   Isso é importante na medida em que pode configurar que as autoras, na verdade, foram induzidas a sentir uma situação de tranquilidade que não havia.

2 – A controvérsia, portanto, que serve de contexto à lide está na manifestação de vontade da demandada pela não renovação do contrato (com término em 31 de dezembro de 2004), mérito que noticiam as autoras estar em exame em juízo arbitral.

A parte autora pretende que a interpretação da cláusula nº 33, ao afirmar que a instituição de juízo arbitral não as isentará de suas obrigações, tenha reflexos também sobre a demandada, de modo que da mesma forma permaneça esta vinculada às obrigações do negócio durante o trâmite do processo arbitral.

3 – Resume-se a lide ao exame das cláusulas contratuais que tratam do período do contrato, da renovação, da resolução e da instituição do juízo arbitral, a fim de se verificar qual a manifestação das partes, por ocasião da contratação, quanto ao período em que eventualmente houvesse instituição de juízo arbitral.

Diante da postura da demandada em notificar o desinteresse na renovação ao mesmo tempo em que fez transparecer o interesse em renovar o Contrato de Licenciamento com tratativas, tenho que deva prevalecer esse último, como forma de preservar os princípios de boa-fé e de transparência na relação negocial.

4 – Assim, demonstrado o risco de dano às autoras, vez que terão seus negócios interrompidos abruptamente, com reflexos sociais inclusive, considerando o interesse social do contrato, agora expresso no Código Civil, DEFIRO A ANTECIPAÇÃO DE TUTELA para determinar a manutenção dos efeitos do contrato de licenciamento na vigência do procedimento arbitral, bem como para compelir a demandada a abster-se de praticar atos que violem os direitos contratuais pena de multa diária de R$ 100.000,00.

5 – Cite-se, e intime-se do teor da presente decisão.

Porto Alegre, 22 de dezembro de 2004.

Liège Puricelli Pires
Juíza de Direito.

PJ-2

# EXHIBIT "B"
# TO THE LOBO DECLARATION

STATE OF RIO GRANDE DO SUL
JUDICIAL BRANCH

JUDGMENT NUMBER 106-05
CASE NUMBER    001/1.05.0545042-2
PLAINTIFF:        AIB Serviços e Comércio LTDA.
                  Alon Brasil Comércio e Distribuição de Calçados LTDA; and
                  Alon Internacional S.A.
DEFENDANT:    Converse Inc.
NATURE:          Ordinary action
COURT:            19th Civil Court - 1st Division
COUNTY:          Porto Alegre - Central Court
DATE:              February 24, 2005
JUDGE:            Sandro Silva Sanchotene

[Having] reviewed [the court documents,] etc.

AIB SERVIÇOS E COMÉRCIO LTDA., ALON BRASIL COMÉRCIO E
DISTRIBUIÇÃO DE CALÇADOS LTDA. and ALON INTERNACIONAL S.A.
filed this ORDINARY ACTION against CONVERSE INC.

[The aforementioned plaintiffs] describe a licensing agreement with the defendant and
that the defendant expressed its intention to renew the agreement at such time.

However, [the defendant] did the opposite and failed to renew [the agreement].

The plaintiffs initiated an arbitration proceeding in order to discuss the agreement's
rescission and seek [to have the agreement be deemed] valid during such proceeding.

They request that advanced protected [antecipação de tutela] be granted and that the
action be decided by having the licensing agreement be declared valid until the
arbitration proceeding in the United States has concluded.

The documents on pages 26/174 were submitted with the complaint [inicial].

Advanced protection was rejected (page 176).

The plaintiffs asked for reconsideration [reconsideração] (pages 177/183), and the
Acting Judge granted advanced protection (page 200).

The plaintiffs requested that Coopershoes be "notified" regarding the contents of the
decision (pages 202/203), [and such request for notification] was granted (page 209).

The plaintiffs [presented] new statements providing information about new facts (pages
212/216 and 366/367).

*Coopershoes Cooperativa de Calçados e Componentes Joanetense LTDA.* submitted a
statement regarding legal notice [intimação] and declared that on the date on which the

1

action was filed, it was already Converse's licensee [*licenciada da Converse*] and its name was improperly used by the plaintiffs in order to demonstrate *'periculum in mora'* [danger in delay] (pages 369/370).

The defendant filed court documents seeking **access** to the case records (page 372) and **reconsideration** of the order granting the preliminary order [*medida antecipatória*] (pages 402/409).

THESE ARE THE FACTS.

I DECIDE [AS FOLLOWS]:

The case must be **dismissed,** without [reaching a] judgment on the merits.

The case involves a dispute arising from a licensing agreement signed by the parties, which provides in Section 33 for initiating <u>arbitration proceedings</u> regarding any controversy or dispute arising directly or indirectly from the agreement, particularly as regards <u>*"its rescission, renewal or non-renewal"*</u> (page 86).

The plaintiffs do not dispute the [referenced] section's legality, and recognize the arbitration court as legitimate. They admit having <u>filed an arbitration proceeding</u> in order to settle the conflicts arising from the agreement's rescission.

All issues involving rescission must be resolved at the <u>Arbitration Proceeding [that was]</u> <u>already filed by the plaintiffs</u>, and the question [at issue] involves dismissal of the case, pursuant to the rule [set forth in] article 267, paragraph VII, of the [Brazilian] Code of Civil Procedure.

Revocation of <u>advanced protection</u> is a natural consequence of dismissing the case.

However, it is not excessive to give certain reasons that would also lead to revoking this measure.

Because the contract did not provide for obligatory renewal, it was not likely (but rather a <u>mere possibility</u>) that the contract [would be renewed] pursuant to the parties' intention and compliance with the established conditions.

The countless letters exchanged by the parties were mere negotiations [and did not result in] the defendant's agreement to contract.

It is worth noting that the defendant was quite clear about the <u>non-compliance with the</u> <u>[established] conditions,</u> including the failure to undertake an audit and the unauthorized transfer of obligations to Coopershoes.

The plaintiffs could not suppose otherwise.
The <u>document on page 459</u>, among so many others, leaves no [such] doubts.

It is also worth pointing out that the plaintiffs admitted that they could <u>not ensure</u> that the sub-licensee [*sub-licenciada*] *"maintains the level and the types of records"* required, and that <u>the *"current structure" may "not be the structure to which Converse is accustomed"*</u> (page 477).

These facts are sufficient in order to demonstrate the reasons why the agreement was not renewed and thus why the plaintiffs are wrong.

As notified by the interested third party, when the action was filed, another agreement had already been signed.

Thus, the discussion must remain focused on losses and damages because there is no legal provision obligating a party to contract.

Although incorrect, the allegations [set forth] in the complaint do not characterize the defendant's litigation as motivated by bad faith.

BASED ON THE FOREGOING, [and] pursuant to article 267, paragraph VII of the [Brazilian] Code of Civil Procedure, I order the case **DISMISSED**, without a judgment [reaching] the merits, and revoke the advanced protection [*antecipação de tutela*].

[Furthermore, I order that] court costs and fees [incurred by] the defendant's counsel [shall] be assumed by the plaintiffs, [and shall be] set at 20% of the updated value of the case, pursuant to article 20, section 4 of the [Brazilian] Code of Civil Procedure.

Based on this dismissal, no response may be filed, even if [such request for payment of fees] is justified based on the extensive request for reconsideration.

<u>Notice of this decision shall be given</u> to *Coopershoes*, [and] the defendant shall have the option of sending correspondence.

It shall be recorded and notice shall be given.

Porto Alegre, February 24, 2005

[*signature*]

SANDRO SILVA SANCHOTENE
Substitute Judge

[*illegible stamp*: February 24, 2005]

[*signature*]

3



# Saccani Legal and Business Translations

STATE OF FLORIDA        )
                                  )

COUNTY OF MIAMI-DADE    )

I, the undersigned, Zel Saccani of Saccani Legal and Business Translations, being duly sworn, hereby declare and state that I am fluent in the Portuguese and English languages and have rendered a complete and accurate English translation of the attached Portuguese-language documents.

By: _____

     Zel Saccani
     President

Sworn to and subscribed before me this __11__ day of __May__, 2005.

_____
Notary's Signature

☑    Personally known to me.

☐    Produced identification.

> Official Notary Seal
> Ariel Silva
> Notary Public Seal of Florida
> Commission No. DD123323
> My Commission Exp. June 9, 2006

If so, type of identification produced: _____

1172 South Dixie Highway, PMB 473
Coral Gables, Florida 33146
zelsaccani@aol.com

Tel: (305) 860-1462
Fax: (305) 667-4151
http://www.zeltran.com

FEB-24-05 19:52   LIPPERT E CIA ADVOGADOS                    TEL:32317988                    P:01



ESTADO DO RIO GRANDE DO SUL

PODER JUDICIÁRIO

SENTENÇA Nº:        *106-05*
PROCESSO Nº: 001/1.05.0545042-2
AUTOR:              AIB Serviços e Comércio LTDA.,
                    Alon Brasil Comércio e Distribuição de Calçados
                    LTDA., e
                    Alon Internacional S.A.
RÉU:                Converse Inc.
NATUREZA:           Ação Ordinária
VARA:               19ª Vara Cível – 1º Juizado –
COMARCA:            Porto Alegre – Foro Central –
DATA:               24.02.05.
JUIZ:               Sandro Silva Sanchotene

Vistos etc.

AIB SERVIÇOS E COMÉRCIO LTDA., ALON
BRASIL COMÉRCIO E DISTRIBUIÇÃO DE CALÇADOS LTDA., e
ALON INTERNACIONAL S.A. ajuizaram contra CONVERSE INC. a
presente AÇÃO ORDINÁRIA.

Narram a contratação de licenciamento com a ré e
por ocasião de sua renovação a demandada demonstrou intenção
neste sentido.

No entanto, agiu de forma contrária deixando de
renová-lo.

As autoras instauraram procedimento de arbitragem
para discutir a rescisão do contrato e pretendem a vigência do
contrato durante aquele procedimento.

Requerem o deferimento de antecipação de tutela
declarando a vigência do contrato, bem como a final procedência da
ação declarando a validade do contrato de licenciamento até o
término do procedimento de arbitragem nos Estados Unidos.

Com a inicial vieram os documentos de fls. 26/174.

A antecipação de tutela foi indeferida (fl. 176).

PJ-2

FEB-24-05 19:52    LIPPERT E CIA ADVOGADOS                    TEL:32317989                      P:02



ESTADO DO RIO GRANDE DO SUL
PODER JUDICIÁRIO

As autoras pediram reconsideração (fls. 177/183) e a Juíza Titular deferiu a antecipação de tutela (fl. 200).

As autoras requereram a "notificação" da Coopershoes do teor da decisão (fls. 202/203), o que foi deferido (fl. 209).

Novas manifestações das autoras noticiando novos fatos (fls. 212/216 e 366/367).

A Coopershoes Cooperativa de Calçados e Componentes Joanetense LTDA. manifestou-se acerca da intimação dizendo que na data da propositura da ação já era licenciada da Converse e que seu nome foi usado de forma indevida para demonstrar o 'periculum in mora' pelas autoras (fls. 369/370).

A ré veio aos autos postulando a carga dos autos (fl. 372) e a reconsideração do despacho que deferiu a medida antecipatória (fls. 402/429).

É O RELATÓRIO.
DECIDO.

O processo deve ser extinto, sem julgamento do mérito.

Cuida-se de demanda decorrente do contrato de licenciamento firmado entre as partes, o qual prevê em sua Cláusula 33 a instituição de juízo arbitral para qualquer controvérsia ou disputa oriunda direta ou indiretamente do contrato, em especial quanto "*à rescisão, renovação ou não-renovação do mesmo*"(fl. 86).

As autoras não discutem a legalidade da Cláusula e reconhecem como legítimo o Juízo Arbitral, pois admitem que instauraram procedimento de arbitragem para dirimir os conflitos decorrentes da rescisão contratual.

Todas as questões referentes à rescisão devem ser solucionadas no Juízo Arbitral já instaurado pelas autoras e a hipótese é de extinção do processo por força da regra do artigo 267, inciso VII, do Código de Processo Civil.



ESTADO DO RIO GRANDE DO SUL
PODER JUDICIÁRIO

A revogação da antecipação de tutela é consequência natural da extinção do processo.

No entanto, não é exagero fazer algumas considerações que também conduziriam à revogação desta medida.

Manifesta a inexistência da verossimilhança por que o contrato não previa a renovação obrigatória, mas mera possibilidade conforme a intenção das partes e atendimento às condições estabelecidas.

As inúmeras correspondências havidas entre as partes eram apenas tratativas e não promessa de contratar de parte da ré.

Vale ressaltar que a ré era clara quanto ao não atendimento das condições, inclusive quanto à não realização de auditoria e transferência indevida de obrigações para a Coopershoes.

As autoras não poderiam supor o contrário.

Dentre outros tantos, o documento de fl. 459 não deixa dúvidas.

Também é digna de nota a admissão pelas autoras quanto ao fato de não poder assegurar que a sub-licenciada "mantém o nível e os tipos de registros" exigidos e que a "estrutura atual" pode "não ser a estrutura que a Converse está acostumada" (fl. 477).

Estes fatos são suficientes para demonstrar os motivos da não renovação do contrato e a total falta de razão às autoras.

Conforme informado pela terceira interessada, por ocasião do ajuizamento da ação outro contrato já havia sido firmado.

Assim, a discussão deve ficar no âmbito das perdas e danos, inexistindo dispositivo legal obrigando a contratar.

Embora sem razão, as alegações da inicial não caracterizam a litigância de má-fé pretendida pela ré.

ANTE O EXPOSTO, com base no artigo 267, inciso VII, do Código de Processo Civil, julgo **EXTINTO** o processo, sem julgamento do mérito, e revogo a antecipação de tutela.

Custas e honorários do patrono da ré pelas autoras, estes fixados em 20% sobre o valor da causa atualizado, nos termos do artigo 20, parágrafo 4º, do Código de Processo Civil.

Em razão da extinção, fica prejudicada a apresentação de contestação, embora justificada a sucumbência em razão do extenso pedido de reconsideração.

N-2



ESTADO DO RIO GRANDE DO SUL

PODER JUDICIÁRIO

Oficie-se à Coopershoes comunicando esta decisão, possibilitando à ré o envio da correspondência.
Registre-se e intimem-se.
Porto Alegre, 24 de fevereiro de 2005.

SANDRO SILVA SANCHOTENE,
Juiz de Direito Substituto.

TJ-2

# EXHIBIT "C"
# TO THE LOBO DECLARATION

State of Rio Grande Do Sul
JUDICIAL BRANCH
Court of Justice

MBB
Number 70011180023
2005/Civil

## CIVIL PROCEDURE: ADVANCED PROTECTION [ANTECIPAÇÃO DE TUTELA] REVOCATION OF THE JUDGMENT. EFFECTS OF THE APPEAL. ADVANCED PROTECTION BY THE COURT WHILE THE APPEAL IS PENDING. POSSIBILITY [OF GRANTING ADVANCED PROTECTION].

If the judge chooses in [his] own judgment to revoke advanced protection, a possible appeal's dual effect will not suspend revocation.

However, nothing shall prevent the court from granting advanced protection because it may be granted or revoked at any time, as long as the requirements of Article 273 of the [Brazilian] Code of Civil Procedure are met. A hypothesis [set forth] in the court record verifies the presence of a credible right alleged and the danger of irreparable damage. Advanced protection is granted for the appeal.

### INTERLOCUTORY APPEAL

| | |
|---|---|
| INTERLOCUTORY APPEAL [AGRAVO DE INSTRUMENTO] | NINTH CIVIL DIVISION |
| Number 70011180023 | PORTO ALEGRE DISTRICT |
| AIB SERVICOS E COMERCIO LTDA. | APPELLANT |
| ALON BRASIL COMERCIO E DISTRIBUICAO DE CALCADOS LTDA. | APPELLANT |
| ALON INTERNATIONAL | APPELLANT |
| CONVERSE INC. | APPELLEE |

1

## DECISION BY A SINGLE JUDGE

Whereas:

The appellants seek to maintain (while the filed appeal of the judgment is pending) the effects of advanced protection preliminarily granted and subsequently revoked in the judgment based on the argument that granting the suspending effect [*efeito suspensivo*] would lead to suspension of the revocation ordered in the judgment.

Teori Albino Zavascki, in his [scholarly] work regarding advanced protection[1], expressly disagrees with the appellants' thesis and refers to the "severe requirements for granting advanced [protection] which] make [us] assume that, if they are observed as they should be, cases of revocation [of judgments] shall be infrequent. Furthermore, when [such cases] occur, effectiveness shall be immediate because an interlocutory appeal [*agravo*] will not have a suspending effect. The same thing shall occur if the revocation shall result (either expressly or implicitly) from a judgment dismissing the case without reaching the merits or deeming the request to be unfounded. Here, the appeal, even with its suspending event, shall not in and of itself *suspend* the revocation." (emphasis added)

SERGIO BERMUDES, whose position is a bit different, nonetheless reaches the same conclusion for this case by arguing that if the appeal only results in remanding the case [*efeito devolutivo*], the judgment shall prevail over and substitute for [advanced] protection. If the appeal produces a dual effect, the judgment in and of itself does not revoke advanced protection, unless the judge so decides in his own judgment or separately, as he is allowed [to do] or [pursuant to] §4[2].

In the case at issue, as is seen, the judge expressly revoked advanced protection and, when subsequently challenged by the party, reaffirmed that, regardless of the appeal's suspending effect, advanced protection would not prevail.

However, nothing stops this court from granting advanced protection because it can be granted or revoked at any time, as long as the requirements of article 273 of the [Brazilian] Code of Civil Procedure are met.

According to Teori Albino Zavascki[3], if it is proved that an advanced measure is absolutely necessary in order to avoid the danger of irreparable damage to the affirmed right and the judge finds [such danger] to be credible, it would be illogical and contrary to the [legal] system to deny such a request just because the trial court has issued a judgment.

---

[1] 2nd edition, Sao Paulo, Saraiva, 1999, page 101.
[2] *A reforma do Código de Processo Civil* [Amendment of the Code of Civil Procedure], Rio de Janeiro, Forense, 1995, page 30.
[3] Op. cit., page 119.

2

And this is the adequate solution for the case because the appellants' allegation is credible and there is a danger of irreparable damage.

In fact, the appellants are not seeking to flee the arbitration panel they freely elected, in agreement with the appellees in the contract entered into, as competent to determine termination of the contract. On the contrary, they seek to have the arbitration clause be declared effective which, according to them, provides that only the arbitration panel may declare the contract rescinded and as long as that does not happen, the defendant shall be required to abide by the contract's terms.

On the other hand, the breach of contractual rights can bring about severe consequences for the defendant companies' financial health, including [the creation of] unwanted social effects that must therefore be avoided.

For these reasons, I grant the appeal approving the advanced protection sought by the plaintiffs [*autores*], and order the defendant to cease and desist from any act that may violate the plaintiffs' contractual rights set forth in the Licensing Agreement signed by the parties.

It shall be urgently communicated.

It shall be ordered.

Porto Alegre, March 18, 2005

[*signature*]

DESA MARILENE BONZANINI BERNARDI

3



# Saccani Legal and Business Translations

STATE OF FLORIDA                    )
                                    )
COUNTY OF MIAMI-DADE                )

I, the undersigned, Zel Saccani of Saccani Legal and Business Translations, being duly sworn, hereby declare and state that I am fluent in the Portuguese and English languages and have rendered a complete and accurate English translation to the best of my ability of the attached Portuguese-language document.



By: _____
        Zel Saccani

Sworn to and subscribed before me this  23  day of  March , 2005.

_____
Notary's Signature

☑    Personally known to me.

☐    Produced identification.

> Official Notary Seal
> Ariel Silva
> Notary Public Seal of Florida
> Commission No. DD123323
> My Commission Exp. June 9, 2006

If so, type of identification produced: _____

1172 South Dixie Highway, PMB 473        Tel: (305) 860-1462
Coral Gables, Florida  33146             Fax: (305) 667-4151
zelsaccani@aol.com                       http://www.zeltran.com

# EXHIBIT B
# (continuation 3)



ESTADO DO RIO GRANDE DO SUL
**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA



MBB
Nº 70011180023
2005/CÍVEL

**PROCESSUAL CIVIL. ANTECIPAÇÃO DE TUTELA. REVOGAÇÃO EM SENTENÇA. EFEITOS DA APELAÇÃO. ANTECIPAÇÃO DA TUTELA PELO TRIBUNAL. QUANDO EM CURSO APELAÇÃO. POSSIBILIDADE.**

Se o juiz, na própria sentença, decide pela revogação da antecipação de tutela, eventual apelação recebida no duplo efeito não terá o condão de suspender a revogação.

Nada impede, contudo, que o Tribunal conceda a antecipação de tutela, já que esta pode ser deferida ou revogada a qualquer tempo, desde que presentes os requisitos do art. 273 do CPC. Hipótese dos autos em que verifica a presença da verossimilhança do direito alegado e o perigo de dano irreparável. Antecipação de Tutela deferida na apelação.

**AGRAVO PROVIDO DE PLANO.**

AGRAVO DE INSTRUMENTO                             NONA CÂMARA CÍVEL

Nº 70011180023                                   COMARCA DE PORTO ALEGRE

AIB SERVICOS E COMERCIO LTDA                     AGRAVANTE

ALON   BRASIL   COMERCIO   E
DISTRIBUICAO DE CALCADOS LTDA                    AGRAVANTE

ALON INTERNATIONAL S A                           AGRAVANTE

CONVERSE INC                                     AGRAVADO

# DECISÃO MONOCRÁTICA

Vistos.

Buscam os agravantes a manutenção - na pendência de julgamento da apelação interposta - dos efeitos da antecipação de tutela



ESTADO DO RIO GRANDE DO SUL
PODER JUDICIÁRIO
TRIBUNAL DE JUSTIÇA

MBB
Nº 70011180023
2005/CÍVEL



argumento de que o recebimento do recurso também no efeito suspensivo, motivaria a suspensão da revogação determinada em sentença.

Teori Albino Zavascki, em sua obra 'Antecipação da Tutela', discorda expressamente da tese dos agravantes, referindo que "as severas exigências para a concessão da antecipação fazem supor que, se observadas como devem, serão infreqüentes os casos de revogação. Porém, quando ocorrer, a eficácia será imediata, pois o recurso de agravo não terá efeito suspensivo. O mesmo se dará se a revogação provier – expressa ou implicitamente – da sentença que extinguir o processo sem exame de mérito, ou que julgar improcedente o pedido. Aqui, o recurso de apelação, mesmo com efeito suspensivo, não terá, por si só, o condão de suspender a revogação" (grifei).

SÉRGIO BERMUDES, com posição um pouco diversa, alcança, contudo, a mesma solução para o presente caso, ao argumentar que se a apelação só produzir o efeito devolutivo, a sentença prevalece sobre a tutela substituindo-a. Se a apelação produzir o duplo efeito, a sentença, só por si, não revoga a tutela antecipada, ao menos que o juiz assim decida, na própria sentença ou em separado, como lhe permite o §4º.

No caso vertente, como se vê, o juiz expressamente revogou a antecipação de tutela e, posteriormente, provocado pela parte reafirmou que, independente do efeito suspensivo atribuído ao recurso, a antecipação de tutela não preponderaria.

Nada impede, contudo, que o Tribunal conceda a antecipação de tutela, já que esta pode ser deferida ou revogada a qualquer tempo, desde que presentes os requisitos do art. 273 do CPC.





ESTADO DO RIO GRANDE DO SUL.
PODER JUDICIÁRIO
TRIBUNAL DE JUSTIÇA

MBB
Nº 70011180023
2005/CÍVEL

Como refere Teori Albino Zavascki, se ficar evidenciado que a medida antecipatória é indispensável para afastar perigo de dano irreparável ao direito afirmado e tido pelo julgador como verossímil, seria ilógico e contrário ao sistema negar a sua concessão, apenas pela razão de já ter sido proferida sentença em primeiro grau.

E esta é a solução adequada ao caso, já que é verossimilhante a alegação dos agravantes e há perigo de danos irreparáveis.

De fato, não pretendem os agravantes fugir ao juízo arbitral que livremente elegeram, em concordância com os agravados, no contrato celebrado, como competente para determinar a rescisão contratual. Ao revés, pretendem ver declarada a eficácia desta cláusula arbitral que determina, segundo eles, que apenas o juízo arbitral pode declarar rescindido o contrato e que enquanto isso não ocorrer, seja a parte ré compelida ao cumprimento das estipulações contratuais.

Por outro lado, a violação dos direitos contratuais pode trazer severas conseqüências para a saúde financeira das empresas rés, inclusive com reflexos sociais não desejados e que devem, por isso, ser evitados.

Por tais razões, dou provimento ao recurso para deferir a antecipação da tutela postulada pelos autores, determinando que se abstenha a parte ré da prática de qualquer ato que viole os direitos contratuais das autoras especificados no Contrato de Licenciamento firmado entre as partes.

Comunique-se com urgência.

Intime-se.

Porto Alegre, 18 de março de 2005.

DESA. MARILENE BONZANINI BERNARDI,

concedida liminarmente e posteriormente revogada em sentença, sob o

[1] 2ª ed., São Paulo, Saraiva, 1999, p. 101
[2] A reforma do Código de Processo Civil, Rio de Janeiro, Forense, 1995, p. 30.

2

[3] Op. cit., p. 118.

# EXHIBIT "D"
# TO THE LOBO DECLARATION



**Poder Judiciário**
**Tribunal de Justiça**
do Estado do Rio Grande do Sul

**Consulta de 2º Grau**
Poder Judiciário do Estado do Rio Grande do Sul
Número do Processo: 70011345154


Imprimir

**Último Julgamento:**
20/04/2005    "NEGARAM PROVIMENTO AO AGRAVO INTERNO E ACOLHERAM OS EMBARGOS DECLARATÓRIOS. UNÂNIME."

Copyright © 2003 - Tribunal de Justiça do Estado do Rio Grande do Sul - Departamento de Informática

**Final Judgment:**

20 / 04 / 2005          "THE GRANTING OF THE APPEAL [BY CONVERSE] IS DENIED.
[ALON'S] MOTION FOR CLARIFICATION IS GRANTED.
UNANIMOUS."

# EXHIBIT "E"
# TO THE LOBO DECLARATION

STATE OF RIO GRANDE DO SUL
JUDICIAL BRANCH

[*stamp*: JUDICIAL BRANCH RS]

**CERTIFICATE**

**I CERTIFY** that I issued a Notice [*Nota de Expediente*] ordering the parties under number **160/2005**, [with such notice] to be published in the Judicial Gazette. I so certify.

Porto Alegre, March 10, 2005

Clerk/Judicial Assistant

001/1.05.2165609-9 - Coopershoes Cooperativa de Calçados e Componentes Joanetense Ltda. (Adriano Kalfelz Martins) X AIB Serviços e Comércio Ltda. and Conserve, Inc. (not in court documents). "I GRANT THE REQUESTS SET FORTH IN THE COMPLAINT (ITEMS "A" AND "B" [ON] PAGE 06). THE DEPOSIT [WITH THE COURT] SHALL BE MADE WITHIN FIVE DAYS. ONCE THE FIRST DEPOSIT HAS BEEN MADE, ALON AND CONVERSE SHALL BE SERVED BY LETTERS ROGATORY. IT SHALL BE SO ORDERED."

**CERTIFICATE**

I CERTIFY that the Notice under number **160/2005** was published in the Judicial Gazette on [*blank*] [and] filed at the court records office. Such notice [was also] placed in a customary place. I so certify.

Porto Alegre, [*blank*]

Clerk/Judicial Assistant



# Saccani Legal and Business Translations

STATE OF FLORIDA       )
                          )

COUNTY OF MIAMI-DADE    )

I, the undersigned, Zel Saccani of Saccani Legal and Business Translations, being duly sworn, hereby declare and state that I am fluent in the Portuguese and English languages and have rendered a complete and accurate English translation of the attached Portuguese-language documents.

By: _____
      Zel Saccani
      President

Sworn to and subscribed before me this __11__ day of __May__, 2005.

_____
Notary's Signature

☑    Personally known to me.

☐    Produced identification.

Official Notary Seal
Ariel Silva
Notary Public Seal of Florida
Commission No. DD123323
My Commission Exp. June 9, 2006

If so, type of identification produced: _____

1172 South Dixie Highway, PMB 473
Coral Gables, Florida  33146
zelsaccani@aol.com

Tel: (305) 860-1462
Fax: (305) 667-4151
http://www.zeltran.com



... DO SUL
...JUDICIÁRIO ...

CERTIDÃO

Porto Alegre, 10 de março de 2005

Escrivão(a) / Oficial Ajudante

...OS 2165609-9
...ativa de Calçados e Componentes ...
...(pp. Adriano Kalfelz Martins) ...
...e e Comércio Ltda e Conserve ...
...entação nos autos). "DEFIRO OS PEDIDOS
...FORMULADOS NA INICIAL(ITENS "A" E "B". FL. ...)
...NHA O DEPÓSITO NO PRAZO DE CINCO DIAS. EFETUADO
...MEIRO DEPÓSITO, CITEM-SE, SENDO AS ...
...CONVERSE POR CARTA ROGATÓRIA. INTIME-SE"

CERTIDÃO

CERTIFICO que a Nota de Expediente sob n° ...
publicada no Diário da Justiça de / / arquivada em ...
nota afixada no local de costume. Dou fé.

Porto Alegre,

Escrivão(a) / Oficial Ajudante

caubolek
66-3

# EXHIBIT "F"
# TO THE LOBO DECLARATION

## CONCLUSION

*[illegible]*

April 4, 2005

*[signature]*

Judgment of the Honorable Court of Rio Grande do Sul [*TJRS*] in an interlocutory appeal [*agravo de instrumento*] [regarding the] guarantee [made] to the AIB/Alon companies regarding the continued use of brands of footwear in Brazil as long as the arbitration proceeding lasts in the United States of America.

However, that interlocutory appeal solely refers to the effects of the advanced protection [*antecipação de tutela*], inasmuch as the respective declaratory action that was pending in the 19th Civil Court was dismissed without [reaching] judgment on the merits (decision on pages 9 through 11). For now, no notice exists about an appeal having been filed.

Furthermore, on December 16, 2004, the current plaintiff and the co-defendant Converse signed a direct licensing agreement for use of such brands, [which is] valid until December 2007.

In such terms, I understand that the plaintiff is seeking recourse based on Article 895 of the [Brazilian] Code of Civil Procedure.

Based on the foregoing, I approve the requested deposits, with the first [such deposit being due] no later than five days.

Notice shall be given and it shall be so ordered [based on these] legal proceedings.

[Issued on] April 4, 2005

*[signature]*

Elizabete Corrêa Hoeveler
Judge



# Saccani Legal and Business Translations

STATE OF FLORIDA              )
                              )
COUNTY OF MIAMI-DADE          )

I, the undersigned, Zel Saccani of Saccani Legal and Business Translations, being duly sworn, hereby declare and state that I am fluent in the Portuguese and English languages and have rendered a complete and accurate English translation of the attached Portuguese-language documents.

By: _____
       Zel Saccani
       President

Sworn to and subscribed before me this ___11___ day of __May__, 2005.

_____
Notary's Signature

☑   Personally known to me.

☐   Produced identification.

> Official Notary Seal
> Ariel Silva
> Notary Public Seal of Florida
> Commission No. DD123323
> My Commission Exp. June 9, 2006

If so, type of identification produced: _____

1172 South Dixie Highway, PMB 473        Tel: (305) 860-1462
Coral Gables, Florida  33146             Fax: (305) 667-4151
zelsaccani@aol.com                       http://www.zeltran.com

CONCLUSÃO

_(illegible)_

... de Direito da ...

04 04 ... 05

Acórdão do egrégio TJRS, em agravo de instrumento, garantiu às empresas AIB/Adon a continuação da exploração das marcas de calçados no Brasil enquanto perdurar o Juízo Arbitral nos Estados Unidos da América.

Todavia, esse agravo de instrumento refere-se apenas aos efeitos da antecipação de tutela, porquanto a respectiva ação declaratória que tramitava na 19ª. Vara Cível foi extinta sem julgamento de mérito (acórdão de fls.09 a 11). Por ora, não se tem notícias de interposição de recurso de apelação.

Outrossim, em 16/12/2004 a ora autora e a co-ré Converse firmaram contrato direto de licenciamento de exploração das mesmas marcas, com vigência até dezembro de 2007.

Nesses termos, entendo que a empresa autora encontra amparo no artigo 895 do Código de Processo Civil.

Ante o exposto, defiro os depósitos postulados, sendo que o primeiro no prazo máximo de cinco dias.

Citem-se. Int-se. Dils.legais.

Em 04/04/2005.

Elisabete Corrêa Hoeveler.
Juíza de Direito.

# EXHIBIT "G"
# TO THE LOBO DECLARATION

STATE OF RIO DE JANEIRO
JUDICIAL BRANCH

EIGHTH COMMERCIAL COURT OF THE COUNTY
OF THE CAPITAL OF THE STATE OF RIO DE JANEIRO

Case Number: 2005.001.035.557-0
Plaintiffs:     AIB SERVIÇOS E COMÉRCIO LTDA and ALON INTERNATIONAL
                S.A.
Defendant:      COOPERSHOES – Cooperativa de Calçados e Componentes Joanetense
                Ltda.

DECISION

At issue is an ordinary action [enforcing] an affirmative obligation, combined with [an action enforcing] a negative obligation and a request for advanced protection [*antecipação de tutela*].

We shall proceed to rule on this last request [regarding the negative obligation], which consists of the "defendant's being required to refrain from undertaking any act that violates the plaintiffs' contractual rights and obligations, as set forth in the contracts executed in July 2002 [and] renewed on February 5, 2002, [THE DEFENDANT SHALL] ALSO BE REQUIRED TO: I) SUSPEND COMPLIANCE WITH AND/OR ASSUMPTION [OF] ANY OBLIGATION DIRECTLY WITH CONVERSE INC. [THE DEFENDANT SHALL] BE REQUIRED NOT TO PRODUCE ANY FOOTWEAR UNLESS IT PAYS THE PLAINTIFFS THE CONTRACTUALLY AGREED-UPON ROYALTY [AMOUNTS]; AND II) [THE DEFENDANT SHALL] BE REQUIRED TO ACT (BECAUSE IT IS OBLIGATED TO PAY THE ROYALTIES SET FORTH IN THE CONTRACTS EXECUTED WITH THE PLAINTIFFS) GIVEN THAT IT CONTINUES TO PRODUCE LICENSED FOOTWEAR, BY FULLY ABIDING BY THE CONTRACT, INCLUDING ITS OBLIGATIONS TO PROVIDE SALES REPORTS AND PRODUCTION FOLLOW-UP." [The plaintiffs] also requested a daily fine in the amount of R$100,000.00 (one hundred thousand reals) if the defendant breaches the preliminary order [*liminar*] and "if the payments due are not made, then the defendant shall be required to halt [its] production of footwear until the payments due to the plaintiffs have been made."

As the basis for their requests, the plaintiff companies **AIB SERVIÇOS E COMÉRCIO LTDA.** and **ALON INTERNACIONAL S.A.** state that, based on the venue clause, the [courts in the] County of the Capital of the State of Rio de Janeiro shall have jurisdiction [over this matter]. [The plaintiffs] render technical services for creating, selling, developing, manufacturing and distributing footwear and sporting goods in general. [The plaintiffs] are the exclusive licensees of the company [known as] **CONVERSE INC.**, [which is based] in the United States of America, for manufacturing and distributing footwear under the brands [known as] "All Star Converse" and "All Star Chuck Taylor", among others, in Brazil and in other Latin American countries. It [*sic*] contracted with the defendant company, [which is] a cooperative specializing in footwear manufacturing, in order to manufacture the

footwear licensed to the plaintiffs. Because they [the plaintiffs] had no interest in renewing the Licensing Agreement with CONVERSE INC. (the "Manufacturing, Distribution, and Licensing Agreement"), [the plaintiffs] filed an arbitration proceeding in the United States pursuant to section 33 [of such agreement]. On December 21, 2004, they filed a declaratory action coupled with a negative obligation [and a] request for advanced protection vis-à-vis CONVERSE INC. before the Porto Alegre County [Court in] Rio Grande do Sul (19th Civil Court). In this action, a preliminary order [*liminar*] ordered on December 22, 2004, that the aforementioned Licensing Agreement shall remain in effect in Brazil during the period in which arbitration in the United States of America is pending. [Furthermore,] a negative obligation was imposed upon CONVERSE INC., which was not allowed to contract with any [other] company in Brazil [regarding] the rights [that were] exclusively licensed to the plaintiffs. On February 24, 2005, the case was dismissed without reaching a judgment on the merits. On March 18, 2005, in [the court's] ruling on an appeal, a new preliminary order [*liminar*] was issued that ordered that the licensing agreement in Brazil between the plaintiffs and CONVERSE INC. shall remain in effect [for the period in which] arbitration in the United States is pending. Based on the Licensing Agreement, and in order to effectively manufacture the footwear, the plaintiffs and the defendant COOPERSHOES executed contracts entitled "Agreement for Distribution and Copyright License," "Main Agreement," "Agreement for the Rendering of Professional Technical Services," and "Copyrights." The defendant did not renew the referenced contracts and deemed them to be rescinded for all legal intents and purposes. While its contract with the plaintiffs remained in effect, the defendant executed a manufacturing contract directly with CONVERSE INC. for the manufacture of footwear. On February 4, 2005, the plaintiffs and the defendant formalized the renewal of the contracts. For such renewal, the defendant assumed the obligation of paying the plaintiffs the amounts related to the royalties due and unpaid starting as of December 31, 2004. In a lawsuit for payment through the court [*consignação em pagamento*] filed on March 4, 2005, the defendant requested a judicial deposit [*depósito judicial*] of the referenced outstanding payments due exclusively for the months of January and February 2005. The referenced payment through the court does not cover the installment payments due after the judgment dismissing the suit filed before [the court in] Porto Alegre county. The defendant continues to produce tennis shoes [using] the brand [names] licensed by the plaintiffs. The right alleged [herein] is credible and "*periculum in mora* [danger in inaction] is unquestionable given that the defendant has not paid the plaintiffs their royalty payments for three consecutive months, [which] endangers their economic viability and may require the plaintiffs to shut down their operations in Brazil".

In an amendment to the initial petition, the plaintiffs request the issuance of advanced protection [*antecipação da tutela*] to be granted ex parte [*inaudita altera parte*].

These are the facts. [Having] examined [such facts], we decide [as follows]:

Advanced protection may be issued if the allegation is credible and there is a well-founded fear of damage [that is] irreparable or difficult to remedy (article 273 of the [Brazilian] Code of Civil Procedure). It is true that the decision is not issued based on certainty, but rather on the probability of the existence of the right alleged.

In the case at issue, there exists a probability of the existence of the plaintiff's right, [which is] a conclusion [that is] reached through evidence filed in court documents, as well as by the credibility of the allegations.

The plaintiffs exclusively represent the brands, which the defendant knows and must respect.

Likewise, there exists *periculum in mora* [danger in delay], and it is certain that the breach of the referenced exclusivity, along with a breach of [the parties'] agreement, brings about a serious risk [that is] difficult to remedy for the plaintiff companies, which may even have to close down their activities in the country because of such [situation].

Given the social interest [in enforcing the] contract, and in the light of the foregoing, **ADVANCED PROTECTION IS GRANTED ex parte [*inaudita alter parte*] and IT IS DECIDED that the defendant cooperative, COOPERSHOES - Cooperativa de Calçados e Componentes Joatenense Ltda.,** shall be: **i)** required to refrain from undertaking any act that violates the plaintiffs' contractual rights and obligations, as set forth in the contracts executed in July 2002 [and] renewed on February 5, 2005; **ii)** obligated to suspend performance of any obligation directly with the company [known as] CONVERSE INC., **iii)** required not to produce any footwear, unless payment [is rendered] directly to the plaintiffs regarding the contractually agreed-upon royalties; and **iv)** obligated to deliver the reports on sales and production follow-up within fifteen days. I set a daily fine in the amount of R$50,000.00 (fifty thousand reals) in the event of [the defendant's] non-compliance with this decision.

Letters rogatory regarding [effectuating] service and notice shall be issued for Picada Café/Rio Grande do Sul.

Rio de Janeiro, April 5, 2005

[*signature*]

**ALEXANDER DOS SANTOS MACEDO**
**Judge**

**EIGHTH COMMERCIAL COURT OF LAW**
**COUNTY OF THE CAPITAL**
Av. Erasmo Braga, Number 115, Corridor C,
Room 108, Center/RJ, Zip Code: 20026-900

**LETTER ROGATORY**

<u>Period for Compliance: 30 Days</u>

| | |
|---|---|
| CASE [NUMBER]: | 2005.001.035557-0 |
| COURT REPORTER: | COMPLETE TRANSCRIPT |
| ACTION: | AFFIRMATIVE OBLIGATION AND ADVANCED PROTECTION [*ANTECIPAÇÃO DE TUTELA*] |
| Plaintiff: | AIB SERVIÇOS E COMÉRCIO LTDA. AND ALON INTERNATIONAL S/A |
| Defendant: | COOPERSHOES COOPERATIVA DE CALÇADOS E COMPONENTES JOANETENSE LTDA. |

PURPOSE:   To have the Judge SUMMON the defendant through its legal
representative to respond to this action within the legal[ly established]
period, as well as NOTIFY IT regarding the ex parte granting of advanced
protection, pursuant to the copy of the decision attached hereto.

LOCATION OF THE PROCEEDINGS:      3767 Vicente Prieto Street, Vila Joaneta,
Picada Café, Rio Grande do Sul

SPACE RESERVED FOR THE REQUESTED COURT

| FILING | ORDER |
|---|---|
| | |

**DR. ALEXANDER DOS SANTOS MACEDO, THE JUDGE, HEREBY INFORMS**
the Honorable Judge of the County of **PORTO ALEGRE/RS** or his or her substitute,
that this letter rogatory was taken from the records of the above-referenced court case so
that Your Honor may order the requested proceeding(s) in accordance with the
documents [that have been] faithfully transcribed [and that are] an integral part of this
letter [rogatory]. It is further requested that this [letter rogatory] be returned within the
indicated time period for all legal purposes.

Rio de Janeiro, April 6, 2005        I, Nilo Fragoso Leal, the Clerk, had [the foregoing
document] typed and I sign below.

[*signature*]                        [*signature*]

NILO FRAGOSO LEAL, CLERK    JUDGE ALEXANDER DOS SANTOS MACEDO



# Saccani Legal and Business Translations

STATE OF FLORIDA                    )
                                    )
COUNTY OF MIAMI-DADE                )

I, the undersigned, Zel Saccani of Saccani Legal and Business Translations, being duly sworn, hereby declare and state that I am fluent in the Portuguese and English languages and have rendered a complete and accurate English translation of the attached Portuguese-language documents.

By: _____

Zel Saccani
President

Sworn to and subscribed before me this ___11___ day of ___May___, 2005.

_____
Notary's Signature

☑    Personally known to me.

☐    Produced identification.

> Official Notary Seal
> Ariel Silva
> Notary Public Seal of Florida
> Commission No. DD123323
> My Commission Exp. June 9, 2006

If so, type of identification produced: _____

1172 South Dixie Highway, PMB 473
Coral Gables, Florida 33146
zelsaccani@aol.com

Tel: (305) 860-1462
Fax: (305) 667-4151
http://www.zeltran.com



JUÍZO DE DIREITO DA OITAVA VARA EMPRESARIAL DA
CAPITAL DO ESTADO DO RIO DE JANEIRO

Processo nº.: 2005.001.035.557-0
Autores: AIB SERVIÇOS E COMÉRCIO LTDA. e ALON INTERNACIONAL S.A.
Réu: COOPERSHOES – Cooperativa de Calçados e Componentes Joanetenses

### DECISÃO

Trata-se de ação de obrigação de fazer cumulada com indenização
ordinário, com pedido de antecipação de tutela.

Passa-se a decidir quanto a este último pedido, que consiste em que seja a
"ré obrigada a não fazer, no sentido de se abster da prática de qualquer ato que viole os
direitos e obrigações contratuais das autoras, previstos nos contratos assinados em julho
de 2002, renovados em 05 de fevereiro de 2005, SENDO AINDA OBRIGADA A I)
SUSPENDER O ADIMPLEMENTO DE QUALQUER E/OU ASSUMIR QUALQUER
OBRIGAÇÃO DIRETAMENTE COM A CONVERSE, INC., SENDO OBRIGADA A
NÃO PRODUZIR QUALQUER CALÇADO, SENÃO SOB PAGAMENTO,
DIRETAMENTE ÀS AUTORAS, REFERENTES AOS ROYALTES PREVISTOS
CONTRATUALMENTE; E, II) SENDO OBRIGADA A FAZER, NO SENTIDO DE
ESTAR OBRIGADA A REALIZAR OS PAGAMENTOS DOS ROYALTES
PREVISTOS NOS CONTRATO ASSINADOS COM AS AUTORAS, UMA VEZ QUE
PERMANECE      PRODUZINDO      CALÇADOS      LICENCIADOS,      DANDO
CUMPRIMENTO INTEGRAL AO CONTRATO, INCLUSIVE QUANTO ÀS
OBRIGAÇÕES DE ENTREGA DE RELATÓRIOS DE VENDAS E DE
ACOMPANHAMENTO DE PRODUÇÃO". Requereram, ainda, a fixação de multa
diária no valor de R$100.000,00 (cem mil reais) para o caso de descumprimento da
liminar por parte da ré e , "caso não sejam realizados os pagamentos devidos, seja a ré
obrigada a interromper a produção de calçados, até a regularização dos pagamentos
devidos às autoras".

Como fundamento de seus pedidos, narraram as empresas autoras AIB
SERVIÇOS E COMÉRCIO LTDA. e ALON INTERNACIONAL S.A. que, em
virtude de cláusula de eleição de foro, é competente a comarca da Capital do Estado do
Rio de Janeiro; que têm como campo de atuação o da prestação de serviços técnicos para
criação, comercialização, desenvolvimento, fabricação e distribuição de calçados e
artigos esportivos em geral; que são licenciadas exclusivas da empresa CONVERSE,
INC. dos Estados Unidos da América, para fabricação e distribuição dos calçados das
marcas 'All Star Converse' e All Star Chuck Taylor', entre outras, no Brasil e em outros
países da América Latina; que contratou a empresa ré, cooperativa especializada na

fábri[...]
por[...]
INC. ('Contrato de Fabricação, Distribuição e Licença'), iniciaram[...]
nos Estados Unidos, na forma da cláusula 33; que ajuizaram, em[...]
2004, ação declaratória cumulada com obrigação de não fazer[...]
antecipação de tutela, em face da CONVERSE, INC., perante a Co[...]
Alegre, Rio Grande do Sul (19ª Vara Cível); que, nesta ação, por lim[...]
22 de dezembro de 2004, foi declarada a manutenção dos efeitos do re[...]
Licenciamento no Brasil, enquanto durar a arbitragem nos Estados Uni[...]
tendo sido a CONVERSE, INC. obrigada a não fazer, no sentido de[...]
contratar com qualquer empresa no Brasil, os direitos licenciados com[...]
autoras; que, em 24 de fevereiro de 2005, o processo foi extint[...]
mérito; que, em 18 de março de 2005, em julgamento de recur[...]
concedida nova liminar determinando a manutenção dos efei[...]
licenciamento no Brasil, mantido entre as autoras e a CONVERSE, INC[...]
a arbitragem nos Estados Unidos; que, em virtude do Contrato de Licen[...]
efetiva fabricação dos calçados, as autoras firmaram com a ré, COOPER[...]
contratos denominados 'Contrato de Distribuição e Licença de Direito[...]
'Contrato Principal', 'Contrato de Prestação de Serviços Técnicos Profis[...]
'Direitos Autorais'; que a ré não renovou os referidos contratos, conside[...]
rescindidos de pleno direito; que a ré, ainda na vigência de seu contrato com[...]
assinou contrato de fabricação diretamente com a CONVERSE INC., para fabri[...]
calçados; que, em 04 de fevereiro de 20005, as autoras e a ré formalizaram a reno[...]
dos contratos; que, nesta renovação, a ré assumiu a obrigação de pagar às autoras os[...]
valores referentes aos royalties devidos e não pagos a partir de 31/12/2004; que, a[...]
de consignação em pagamento, proposta em 04 de março de 2005, a ré[...]
depósito judicial dos pagamentos vencidos referentes, exclusivamente, ao[...]
janeiro e fevereiro de 2005; que a referida consignação não cuida das parcelas vincen[...]
posteriores à sentença que extinguiu a ação movida perante a comarca de Porto Alegre;
que a ré continua a produzir os tênis das marcas licenciadas pelas autoras; que há
verossimilhança do direito alegado e que "resta indubitável o *periculum in mora*, uma
vez que o não pagamento por três meses consecutivos dos *royalties* por parte da ré às
autoras, coloca em risco sua viabilidade econômica, podendo fazer com que as autoras
sejam obrigadas a encerrar suas atividades no Brasil".

Em aditamento à petição inicial, as autoras requerem que a antecipação da
tutela fosse concedida *inaudita altera parte*.

É o breve relatório. Examinados, decide-se.

São requisitos para a antecipação da tutela a verossimilhança da alegação
e o fundado receio de dano irreparável ou de difícil reparação (art. 273 do CPC), sendo



certo que a decisão não é procedida com juízo de certeza, mas existência do direito alegado.

No caso em exame, existe probabilidade da existência do direito com a ilação que se faz pelas provas trazidas aos autos e pela verossimilhança das alegações.

Há uma exclusividade na representação das marcas por parte das autoras que é de conhecimento da ré e que deve ser respeitada.

Por sua vez, está presente o *periculum in mora*, sendo certo que a violação da referida exclusividade, cumulada ao não cumprimento do contrato, acarreta sério risco de difícil reparação para as empresas autoras que poderão, em razão disso, ter que cessar suas atividades no país.

Observado o interesse social do contrato e nos termos do acima exposto, **DEFERE-SE A TUTELA ANTECIPADA REQUERIDA**, *inaudita altera parte*, e **DETERMINA-SE** que a cooperativa ré, **COOPERSHOES** – Cooperativa de Calçados e Componentes Joatenense Ltda., fique i) obrigada a se abster da prática de qualquer ato que viole os direitos e obrigações contratuais das autoras previstos nos contratos assinados em julho de 2002, renovados em 05 de fevereiro de 2004; ii) obrigada a suspender o adimplemento de qualquer obrigação diretamente com a empresa CONVERSE, INC.; iii) obrigada a não produzir qualquer calçado, senão sob pagamento diretamente às autoras, referentes aos *royalties* previstos contratualmente e iv) obrigada a entregar os relatórios de vendas e acompanhamento de produção, no prazo de quinze dias. Fixo multa diária no valor de R$50.000,00 (cinqüenta mil reais) para o caso de descumprimento desta decisão.

Expeça-se carta precatória de citação e intimação para Picada Café/Rio Grande do Sul.

P.I.

Rio de Janeiro, 05 de abril de 2005.

ALEXANDER DOS SANTOS MACEDO
Juiz de Direito

## JUÍZO DE DIREITO DA 8ª VARA EMPRESARIAL
## COMARCA DA CAPITAL
Av. Erasmo Braga, nº 115, corredor C, sala 108, Centro/RJ, CEP: 20026-900

### CARTA PRECATÓRIA
**PRAZO PARA CUMPRIMENTO: 30 DIAS**

PROCESSO: 2005.001.035557-0
ESCREVENTE: PROCESSAMENTO INTEGRADO
AÇÃO: OBRIGAÇÃO DE FAZER C/C PEDIDO DE ANTECIPAÇÃO DE TUTELA
Autor: AIB SERVIÇOS E COMÉRCIO LTDA E ALON INTERNATIONAL S/A
Réu: COOPERSHOES-COOPERATIVA DE CALÇADOS E COMPONENTES
JOANETENSE LTDA

**FINALIDADE:** Que o Sr. Oficial de Justiça proceda a **CITAÇÃO** da ré, na pessoa
do seu representante legal para responder a presente ação, no prazo legal, bem
como **INTIMÁ-LA** do deferimento da tutela antecipada, inaudita altera parte,
conforme cópia da decisão que segue em anexo.
**LOCAL DA DILIGÊNCIA:** Rua Vicente Prieto nº 3767, Vila Joaneta, Picada Café, Rio
Grande do Sul

ESPAÇO RESERVADO AO JUÍZO DEPRECADO

| DISTRIBUIÇÃO | DESPACHO |
|---|---|
|  |  |

O DOUTOR ALEXANDER DOS SANTOS MACEDO - JUIZ DE DIREITO,

**FAZ SABER** ao Excelentíssimo Senhor Juiz de Direito da Comarca de **PORTO
ALEGRE/RS**, ou a quem o substituir, que dos autos do processo acima referido foi
extraída a presente carta precatória a fim de que V.Exª. se digne ordenar a
realização da(s) diligência(s) ora deprecada(s), nos termos e de acordo com a(s)
peças(s) fielmente transcrita(s) em folha(s) devidamente autenticada(s), que fica(m)
fazendo parte integrante desta carta. Encarece ademais a devolução da presente no
prazo marcado, para os fins de direito.

Rio de Janeiro, 06 de abril de 2005

Eu, _____ João Fragoso Leal, Escrivão, mandei digitar e o subscrevo.

ALEXANDER DOS SANTOS MACEDO
JUIZ DE DIREITO

# EXHIBIT "3"

48

1   in May to work on it.  All right.  And you'll
2   agree that unless you have an objection,
3   Mr. Davis, on the 16th we'll have a response to
4   the amended claim and a possible reply to your
5   answer to the counterclaim.
6           MR. DAVIS:  Could you say that again,
7   Mr. Theroux, our response?
8           MR. THEROUX:  You're going to file
9   your amended claim and an answer to the
10  counterclaim on May 4th.
11          MR. DAVIS:  Yes.
12          MR. THEROUX:  Wednesday.  And
13  Mr. Gilleran would then respond to your amended
14  claim and any reply he may want to make to your
15  answer to the counterclaim on May 16th, Monday.
16          MR. DAVIS:  That's perfectly
17  acceptable to us.
18          MR. THEROUX:  Okay.  Well, that's
19  progress.  Mr. Gilleran, did you want to comment
20  in the same way that Mr. Davis has about your
21  overview of the controversy as a whole?
22          MR. GILLERAN:  Yes, I would.  First of
23  all, let me say I think it's a misfortune to
24  start out by already saying that Converse is
25  going to hide documents, Converse is going to

49

1    prevent discovery. That's not the approach

2    we're going to take, and that's not how we're

3    going to characterize the other side's counsel

4    or their -- or their arbitration conduct, and we

5    would wish that that kind of allegation, which

6    is completely without any factual basis, not

7    persist and not happen again.

8                First of all, let me say that the way

9    these facts line up goes this way. Yes, there

10   was a meeting in November 2003 consisting of the

11   principals of the Alon firm and some senior

12   officers of Converse. But contrary to what

13   Mr. Davis has said there was no translated

14   contract provided.

15               Here's the background. The principals

16   of Converse, including Mr. Oullette, who is our

17   vice president of licensing asks for this

18   contract with Coopershoes to be brought to the

19   meeting. The contract with Coopershoes had been

20   in place since sometime in 2002. This was a

21   very important contract. This contract, as we

22   were told prior to this November 2003 meeting,

23   Converse was told provided that Coopershoes was

24   merely a manufacturer in the Brazil territory

25   and that Alon was the licensee. Alon was

50

1   responsible for product development, Alon was

2   responsible for marketing, Alon was responsible

3   for advertising, and the entire sales force in

4   Brazil were the employees or at least the direct

5   contractors of Alon.  That's what Converse

6   understood.

7         So it was important to see this

8   contract, which for roughly a year and a

9   quarter, a year and a half Converse had not

10   seen.  So the contract is brought to the

11   meeting.  And the contract, instead of being

12   translated, as Mr. Davis said, is in Portugese.

13   Not only that, the key provisions were whited

14   out so that the Converse employees there could

15   not read them.  There was one Converse employee

16   there, Mr. Lagainis, who could read Portuguese.

17   And he noticed some terms in there that said

18   something like a license was given by Alon to

19   Coopershoes.  He said this is a license

20   agreement.  At that point, therefore, in

21   violation of a contractual provision against

22   sublicensing, which I'll explain in a minute,

23   and at that point, the principals of Alon, Mr.

24   Durchfort and Sharir (phonetic), vehemently

25   denied that this was so and took back the

51

1    contracts when they left, and they were never

2    seen again.

3                Okay.   Then Converse takes note of

4    this.   What do these contracts say.   Are these,

5    in fact, sublicensing agreements in violation of

6    the prohibition against sublicensing?   And in

7    the spring of 2004, Converse asks, we want to do

8    an audit.   We want to know what's going on

9    between you and Coopershoes.   We want to know

10   the facts.   And it takes months and months for

11   an audit to be set up.   It's negotiated much

12   like the hearing date for this proceeding;

13   negotiated on an extreme basis and is fought at

14   every step and finally takes place in July.   At

15   that point, still no contracts are seen with

16   Coopershoes.   In fact, Converse learned that all

17   of the records, or virtually all the records

18   regarding Coopershoes are in Brazil.

19                So after further resistance of an

20   extreme nature to the point where Laura Kelly

21   had to write a letter to Converse -- I'm sorry,

22   to Alon, saying, if you don't let us have this

23   audit, we're going to terminate you because

24   you're required to have an audit and we're

25   entitled to an audit, and you are prohibiting us

# EXHIBIT "4"

# MANUFACTURING, DISTRIBUTION AND TRADEMARK LICENSE AGREEMENT

BETWEEN

CONVERSE INC.

and

COOPERSHOES – Cooperativa de Calcados Joanetense



Page 2

## Table of Contents

|   |   | Page |
|---|---|---|
| **I.** | **INTRODUCTION** | |
| 1. | Definitions | 4 |
| 2. | Term of Agreement | 5 |
| **II.** | **GRANT OF LICENSE** | |
| 3. | License | 3 |
| **III.** | **LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES** | |
| 4. | Use of Converse Marks | 9 |
| 5. | Quality Assurance | 10 |
| 6. | Licensee's Use of Converse Information and Advice | 12 |
| 7. | Licensee Sales Program | 12 |
| 8. | Distribution | 15 |
| 9. | Liquidated Damages | 15 |
| 10. | Government Approval | 15 |
| 11. | Pan Regional Accounts | |
| **IV.** | **CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES** | |
| 12. | Responsibility of Converse | 16 |
| 13. | Converse's Alteration of Product Design and Specification | 16 |
| 14. | Converse's Right of Inspection of Licensee Factories | 16 |
| **V.** | **ROYALTIES, FEES AND PAYMENTS** | |
| 15. | Royalties and Commitment Fee | 17 |
| 16. | Guaranteed Minimum Sales | 19 |
| 17. | Royalty Reports | 20 |
| 18. | Schedule of Royalty Payments and Fees | 21 |
| 19. | Currency In Which Payments Are To Be Made | 23 |
| **VI.** | **INTELLECTUAL PROPERTY** | |
| 20. | Converse Intellectual Property | 24 |
| 21. | Territorial Registration of Converse Trademarks | 26 |
| 22. | Protection of Trademarks | 27 |
| 23. | Indemnification for Products Liability Claims; Insurance Requirements | 28 |
| **VII.** | **TERMINATION** | |
| 24 | Right of Termination | 29 |
| 25. | Effect of Termination or Expiration | 31 |
| 26. | Final Statement Upon Termination or Expiration | |
| **VIII.** | **MISCELLANEOUS** | |

# EXHIBIT B
# (continuation 4)

|  |  | Page 3 |
|---|---|---|
| 27. | Force Majeure | 33 |
| 28. | Assignment or Sublicense by Licensee | 33 |
| 29. | Notices | 33 |
| 30. | No Joint Venture | 34 |
| 31. | Applicable Law | 34 |
| 32. | Arbitration | 34 |
| 33. | Significance of Headings | 35 |
| 34. | Entire Agreement, No Waiver | 35 |
| 35. | Confidentiality of Agreement | 36 |
| 36. | Conduct of Business | 36 |
| 37. | Limitation of Liability | 36 |

Appendices

| A. | Converse Marks |
| B. | Human Rights Manual |
| C. | Royalty Report Form |
| D. | Licensee's Pre-Existing Obligations |



Page 4

AGREEMENT, made this 16th day of December, 2005  by and between CONVERSE INC., a Delaware corporation, having its principal place of business at One High Street, North Andover, Massachusetts 01845 ("Converse") and,   COOPERSHOES -Cooperativa de Calcados Joanetense , a corporation duly registered and existing under the laws of _Federal Republic of Brazil and having its principal office and business at  Rua Vicente Prieto, 3767, Picada Café, Río Grande do Sul, Brazil CEP 95175-000 ("Licensee").

WHEREAS, Converse is in the business of manufacturing, advertising, distributing and selling athletic and leisure footwear, activewear and accessories and is the exclusive owner the owner of the trademarks, trademark registrations and applications set forth in Appendix A, attached hereto and incorporated herein, and the trademarks covered by said registrations and applications; and

WHEREAS, Licensee desires to manufacture, market and sell in the Territory, footwear under the Converse name and trademarks, and to obtain the advisory services and assistance of Converse in connection therewith.

NOW THEREFORE, in consideration of the mutual covenants, representations and promises herein contained, Converse and Licensee agree as follows:

## I.   DEFINITIONS

1. For purposes of this Agreement, the following definitions shall apply:

(a) "Contract Period" shall mean that period of time commencing on January 1, 2005 and ending on December 31, 2007.

(b) "Contract Year" shall mean the twelve calendar months of the year, beginning with January 1, 2005.

(c) "Contract Year Month" shall mean the twelve (12) monthly periods of the calendar year, beginning on January 1 of each year,

(d) "Contract Year Quarter" shall mean the four (4) three month periods of the calendar year, beginning on January 1, April 1, July 1 and October 1 of each year,

(d) "Converse Factories" shall mean factories approved by Converse to produce the Licensed Articles.

(e) "Converse Marks" shall mean the logos and trademarks set forth in Appendix A,



Page 5

(f)  "F.O.B. Cost" shall mean the costs of Footwear Licensed Articles purchased by the Licensee directly from factories approved by Converse to produce the Licensed Articles, as shown on the approved invoice from the factory for each shipment of product, if applicable.

(g)  "Licensed Articles" shall mean the athletic and leisure footwear, identical or substantially identical to the athletic and leisure footwear, manufactured for Converse and sold by Converse in the United States. There are three types of Licensed Articles: Vulcanized Construction Footwear, Cement Construction Footwear and Imported Footwear as defined below.  Vulcanized Construction Footwear shall mean footwear manufactured using the vulcanized process, by way of example the Chuck Taylor All Star, Jack Purcell and One Star shoes are Vulcanized Construction Footwear.  Cement Construction Footwear shall mean footwear manufactured using the cold cement process, by way of example the Weapon and Nylon Trainer shoes are Cement Construction Footwear.  Imported Footwear shall mean any type of footwear purchased from any Converse Factory outside of the Territory.

(h)  "Net Sales" shall mean the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, and VAT/Sales taxes included and separately itemized in the invoice.  No deduction shall be allowed for costs incurred in the manufacture, sale, advertisement (including cooperative and promotional allowances) or distribution of Licensed Articles; nor shall any deductions be allowed for uncollectible accounts or cash discounts.

(i)  "Publicity Materials" shall mean publicity materials for the Licensed Articles, including, but not limited to, any printed advertising, catalogs, brochures, billboards, electronic material, internet technology, television, press releases, and/or wireless network services in any and all manner or medium now known or hereafter devised or any video or printed material bearing the Converse Marks.

(j)  "Territory" shall mean The Federal Republic of Brazil.

2.  Term of Agreement.   Unless sooner terminated pursuant to the provisions of this Agreement, this Agreement shall commence on and remain in effect for the Contract Period;   Any extension of the term of this Agreement shall be effective only pursuant to a written agreement executed by Converse and Licensee. Such written agreement shall reflect any and all revised terms

or conditions agreed to by the parties, if applicable. The Contract Period, together with any mutually agreed extension period(s), shall constitute the "Term" of this Agreement.

## II.   GRANT OF LICENSE

3. License:

(a)   Licensed Articles. Footwear Licensed Articles is the collective term for athletic and leisure footwear.

(b)   Grant of License. Converse hereby grants to Licensee, subject to the terms and conditions herein, and subject to the provisions set forth in Section III below, the revocable, non-transferable, exclusive and non-sublicenseable right and license to utilize the Converse Marks during the Term of this Agreement in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the retail and wholesale trade, as set forth in Section III below. The License is limited to distribution and sale of the Licensed Articles in high-end, better-quality athletic footwear and sporting goods retailers and in specialty shops, department stores and boutiques that are consistent with the Converse brand strategy and will enhance the Converse brand image within the Territory and throughout the world ("Licensed Channels"). Without limiting the foregoing, the Licensed Channels exclude mass merchants, discount stores, discount store chains, flea markets, open air markets, consolidators, diverters, catalogue sales, mail-order sales, online sales, direct response sales, lotteries, premiums, commercial tie-ups, give-aways, bundled merchandise, co-branded or other marketing arrangement not approved by Converse, or any distribution channels that are not consistent, in Converse's sole discretion, with the Converse brand strategy. This license does not authorize, and expressly forbids, Licensee to manufacture, export, cause to export, distribute or sell such Licensed Articles outside the Licensed Channels or Territory, or to any person or entity that Licensee has reason to know may sell such Licensed Articles outside the Licensed Channels or Territory, unless specifically authorized by Converse in writing. In all respects Licensee's exercise of the License shall be consistent with, and limited to, the use of the Converse Marks to manufacture Licensed Articles of the highest quality and to position, market and sell the Licensed Articles as a high-end, industry-leading, quality offering,

and any conduct by Licensee that is inconsistent with the foregoing shall be deemed to be outside the scope of the License.

(c)   Internet.   Licensee is also granted a nonexclusive, revocable, non-transferable, non-sublicenseable right and license to use the Converse Marks on its Internet site that is hosted on servers located in the Territory during the Term of this Agreement in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the resale and wholesale trade and not directed at consumers or offering the Licensed Articles for sale to consumers on the Internet site, subject to the provisions set forth in Section III below. In the event Licensee has already applied for or registered any of Converse's Marks or any name similar to a Converse Mark as a domain name or as part of a domain name, it shall assign to Converse all its rights, title and interest in such domain name(s) as directed by and at no cost to Converse. If Licensee fails to execute any such transfer in a timely manner, Licensee hereby appoints Converse its attorney-in-fact for such purpose, which appointment shall be irrevocable and shall be deemed a power coupled with an interest. Licensee shall not register a domain name using any of the Converse Marks or any marks to be confused with the Converse Marks.

(d)   Reservation of Rights.   Converse reserves all rights not expressly granted to Licensee hereunder including, without limitation, all uses of the Converse Marks other than those expressly granted to the Licensee under this Agreement. Nothing in this Agreement shall be construed to prevent Converse from granting any licenses for the use of the Converse Marks other than as provided herein, or from utilizing the Converse Marks in any manner whatsoever other than as provided herein.

(e)   Non-competition.   Licensee agrees it shall not, during the term of this Agreement, manufacture, export, distribute, advertise, promote or sell any products/licensed articles which are competitive to the Licensed Articles, irrespective of whether said products bear Licensee's trademark or those of a third party, except only in such cases that Converse has given its prior written approval. Notwithstanding the preceding sentence, in the event Licensee is already under obligation to distribute licensed articles other than those of Converse and/or products of any competitor, Licensee shall provide Converse, prior to the execution of this Agreement, with a written list of all products it is under obligation to distribute, and the duration of such obligations, which shall be attached hereto as Appendix D. Licensee shall

obligations or enter into any other arrangement to extend the duration of such obligations, and if Licensee has the right to terminate any such obligations, Licensee will exercise such rights at its earliest opportunity and notify Converse of such action.

### III.   LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

#### 4. Use of Converse Marks.

(a)   Territorial.  Licensee agrees to use the Converse Marks only within the Territory and during the Term of this Agreement, and only with respect to the manufacture, promotion, advertisement, distribution and sale of the relevant Licensed Articles and only after Licensee has received the written approval of Converse as to samples of the Licensed Articles intended to be manufactured and sold by Licensee, the specific Converse Marks Licensee intends to affix to particular Licensed Articles, Licensee's use of the Converse Marks in Publicity Materials and Licensee's use of the Converse Marks on Licensee's web site, if applicable.

(b)   Approvals.  Pursuant to Paragraph 5(a) below, Licensee shall provide Converse with a full set of approval samples and Publicity Materials for each Licensed Article set forth in Paragraph 3(a) of this Agreement prior to launch in the market.  Licensee shall provide Converse with designs and/or drawings of all Licensed Articles, drawings, hang tags and packaging for approval no later than four (4) months prior to launch in the market.  In the event Licensee wishes to use any of the Converse Marks on its web site, it shall provide Converse with an opportunity to review the web site no later than sixty (60) days prior to launch in the market.  Converse shall endeavor to respond within fifteen (15) calendar days from receipt, either by refusing such design or requesting any changes to the designs, drawings or contents of web site, or issuing its written approval.  Failure to respond will be deemed disapproval.  Licensee further agrees to follow the approval guidelines for Licensed Articles, packaging, advertising and promotional materials set forth in Converse's Licensee Handbook, as such handbook may be updated by Converse from time to time.  The license to use the Converse Marks is granted upon the express condition that all Licensed Articles manufactured by Licensee bearing any of the Converse Marks will conform to the standards for grade, quality, and style established from time to time by Converse.  Such standards shall be substantially the same as the standards for the corresponding products manufactured for Converse and distributed by Converse in the United States.  Without notifying the

Licensed Articles shall at all times reflect the standards and reputation embodied in the Converse Marks, which articles bearing the Converse Marks have come to represent in the minds of the trade and the public.

(c)    Approval of Manufacturers.  In addition, all manufacturers and all factory locations at which Licensee desires to have Licensed Articles manufactured shall be approved in writing by Converse ninety (90) days in advance of the placement of any orders for or of the manufacture of Licensed Articles.  Licensee further guarantees the performance of its approved manufacturers and shall indemnify and hold Converse harmless from and against all losses, costs, liabilities and expenses arising out of or relating to any breach or default of the terms of this Agreement by any such approved manufacturer.

(d)    Approval of Product Designs.  Except for those products in Converse's existing product line, Licensee is responsible for the design and manufacture of the Licensed Articles, including without limitation all concepts, sketches, artwork, specifications, materials, designs and prototypes (collectively, "Licensee Designs") and all Collateral Materials (as defined in Paragraph 5(c) below), and shall bear all expenses and costs associated therewith.  All product lines and styles designed by Licensee shall be submitted to Converse for approval prior to manufacture pursuant to Paragraph 5 below, and shall be solely owned by Converse pursuant to Paragraph 20 below.   Converse may require a development schedule to ensure that product design is conducted in a timely manner.  All product design and development conducted by Licensee shall be at its sole cost and expense, and Licensee shall make all expenditures reasonably necessary to ensure the design and development of innovative, technically advanced products to performance, quality, and pricing standards of the highest quality, commensurate with the market leadership and recognition that Converse has established in its existing product categories.

(e)    Inspection.  Converse shall at any and all times have the right to inspect the Licensed Articles bearing any of the Converse Marks manufactured by Licensee to determine whether such Licensed Articles in fact conform to the established standards and other terms of this Agreement.  If at any time Converse shall be of the opinion that Licensed Articles bearing any of the Converse Marks manufactured by Licensee do not conform to such standards, it may give notice of the deficiency to Licensee.  Licensee shall promptly thereafter cause to be

removed any of the Converse Marks from such nonconforming products or web sites, shall cease to affix the Converse Marks to other Licensed Articles which do not meet the standards, and shall cease thereafter to manufacture, promote, advertise, distribute or offer for sale any such nonconforming Licensed Articles bearing any of the Converse Marks.

(f)    Substandard Products.    Licensee shall remove Converse Marks from any defective products which do not meet Converse standards as set forth in Paragraph 5 of this Agreement for first-quality merchandise, including without limitation, "seconds" and "irregulars" ("Substandard Products"). This requirement to remove all Converse Marks shall be operative irrespective of the fact that such Substandard Products may be customarily sold in the Territory for the same price as first-quality merchandise.   Converse shall have the right to prohibit Licensee from selling such Substandard Products, if, in the opinion of Converse, such products may tend to be confused by the public with any of the Licensed Articles sold under this Agreement bearing Converse Marks, or which, in the opinion of Converse, infringes in any manner the Converse Marks or Converse's trade dress, design rights or other intellectual property rights.  Any Substandard Products bearing any of the Converse Marks shall not be sold by Licensee without the prior written consent of Converse. In the event that Converse grants such consent, such Substandard Products may only be sold as follows: (i) through those distribution channels and in those quantities or lot sizes as may be determined by Converse in its sole discretion, and (ii) marked as "seconds" by clearly and permanently "redlining" in indelible ink (or equivalent permanent marking) to indicate second-grade quality the labels, hang-tags, and other identifying wrapping materials and related materials of such Substandard Products.  Licensee shall cause its distributors and all retail customers to which Licensee or its distributors sells any Substandard Products to refrain from advertising or promoting such Substandard Products.

5.    Quality Assurance.

(a)    Licensee shall submit, for the inspection and approval of Converse, samples and comprehensive drawings or prototypes or production models of each style representative of Licensed Articles covered by this Agreement to be manufactured by Licensee.  In any event, such drawings and samples shall be submitted to Converse for approval four (4) months prior to market launch each Contract Year before any such Licensed Articles are shipped or sold by Licensee. Converse shall have ten (10) days from receipt of the submission in which to respond in writing by

Converse to respond shall be deemed disapproval. Thereafter, Licensee shall submit to Converse for approvals 1st prototypes and confirmation samples four (4) months prior to market launch each Contract Year. Converse shall have ten (10) days to respond to these submissions as well. Additional samples shall also be submitted to Converse at Converse's reasonable request. Failure by Converse to respond shall be deemed disapproval. Converse shall determine whether such samples conform to its standards and shall inform Licensee of its approval or of any deficiencies. Licensed Articles may be manufactured and sold by Licensee only after Converse shall have approved drawings and samples representative of such Licensed Articles in writing.

(b)    All Licensed Articles manufactured or sold hereunder must:

i.    be of first or high-end quality in design, fabrication and workmanship and conform to standards, including standards of design, style and quality, approved by Converse in its sole discretion;

ii.    be of the grade, quality and style handled by quality departments of quality stores, department stores and better specialty shops in the Territory;

iii.    be similar and at least equal in grade, quality, materials, workmanship, performance and style, to representative comprehensive drawings or production samples of Licensed Articles submitted by Licensee to Converse and approved by Converse; and

iv.    be advertised, marked, labeled and packaged in accordance with this Agreement and not in any manner violative of law or tending to mislead or deceive the public.

(c)    All packaging, hang tags, labels, press releases, advertising, promotions, display fixtures or other materials of any and all types prepared in connection with the Licensed Products (collectively, the "Collateral Materials") shall be of the highest standard of such style, appearance and quality as shall be adequate and suitable in all respects to their promotion, distribution and sale to the best advantage of Converse and the Converse Marks.

(d)    Licensee shall ensure that all Licensed Articles and the manufacture, distribution, sale, promotion and advertisement thereof comply with all foreign, federal, state and local laws and regulations of the countries of the Territory in which the Licensed Articles are manufactured or sold.

6. Licensee's Use of Converse Information and Advice.

(a) Converse may supply Licensee with certain designs, plans, artwork or other materials relating to the design, manufacture, sale, advertising and promotion of the Licensed Articles ("Converse Designs") for Licensee's use in the Licensed Articles or in the Collateral Materials. Licensee agrees that it shall not use, permit the use of, release, give or otherwise distribute or disclose to any third party any of the Converse Designs, or any other information, advice, reports, instructions, designs, drawings, specifications, technical knowledge, methods, processes, samples or materials, names and addresses of suppliers of materials, or any other information ("collectively, Trade Secrets") furnished to it by Converse or Converse contract manufacturers or other licensees except as necessary and on an as needed basis under a nondisclosure agreement acceptable to Converse in the manufacture, distribution, promotion, advertisement, and sale of Licensed Articles bearing the Converse Marks in the Territory pursuant to this Agreement.

(b) All Trade Secrets shall remain the sole property of Converse and shall be deemed to be strictly confidential and shall be treated accordingly. Licensee shall use the Trade Secrets solely in connection with performance of this Agreement and will not disclose the Trade Secrets to any third party other than as expressly permitted by this Agreement. Licensee will maintain the confidentiality of the Trade Secrets in the same manner that it maintains its own most confidential information but in no event with less than reasonable care.

7. Licensee Sales Program.

(a) Licensee shall faithfully, diligently and to the best of its ability endeavor to manufacture, distribute, promote, advertise, market and increase the sales of Licensed Articles bearing the Converse Marks in the Territory. It shall be the responsibility of Licensee to provide active and continuous sales representation in the Territory by actual salesperson contact with customers, both existing and prospective. Licensee shall maintain adequate brand and marketing management, manufacturing, sales and service personnel and adequate inventory levels, manage, position and market the brand; conduct advertising and promotional programs and perform such other necessary functions to accomplish maximum sales and distribution of Licensed Articles within the Territory. Licensee shall not adopt, engage in or otherwise use any pricing policies, advertising campaigns, merchandising techniques or other commercial practices which are illegal under the laws of the Territory or which, in the opinion of Converse, detract from the

good will and reputation of Converse. Licensee shall maintain a net worth and working capital sufficient, in Converse's judgment, to allow Licensee to perform fully and faithfully its obligations under this Agreement, and Licensee shall devote sufficient financial resources and qualified personnel to fulfill its responsibilities under this Agreement.

(b)    As a condition to the License, Licensee shall at all times during the Term of this Agreement actively present, position, promote and display the Licensed Articles in a manner that is at least as favorable as the presentation, positioning, promotion and display of high-end, industry-leading, premium products, including without limitation in all of the Licensed Channels utilized for similar premium products in the Territory. Licensee shall at all times during the Term of this Agreement offer for sale in substantial commercial quantities consistent with the Guaranteed Minimum Sales Volume set forth in Paragraph 15 Licensed Articles for the applicable sales season through all Licensed Channels. During the Term of this Agreement, and subject to the terms and conditions hereof, Licensee shall (i) continue to diligently and continuously advertise, promote, distribute, ship and sell the Licensed Articles in the Territory, and (ii) use its best efforts to make and maintain adequate arrangements for the distribution, shipment and sale necessary to meet the demand for the Licensed Articles in the Territory.

(c)    Licensee agrees to submit to Converse, an annual business plan for the sale of Licensed Articles for each region within the Territory for each Contract Year. Such annual business plan shall be submitted to Converse no later than September 30th of each Contract Year, and shall be for the next Contract Year. Licensee also agrees to submit to Converse, a seasonal sales and marketing plan, including seasonal price lists, for the sale of Licensed Articles for each region within the Territory for each Contract Year. Such seasonal sales and marketing plan shall be submitted to Converse no later than June 15th of each Contract Year for the next Spring, and January 15th of each Contract Year for the next Fall.

(d)    Licensee shall use Converse's web-based sales and forecasting application each month to provide Converse with both annual forecasts and actual sales.

(e)    During each Contract Year, Licensee shall expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for that Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure"). Such expenditures shall be spread over each current Contract Year in a manner consistent with the overall

brand and product marketing and advertising strategies outlined by Converse in the United States market. Licensee agrees to provide Converse with semi-annual statements itemizing Licensee's Advertising Expenditure for the preceding Contract Year semester on or before the fifteenth (15th) day of July and January of each Contract Year. Licensee shall keep Converse continually informed as to all advertising programs undertaken pursuant to this Agreement and shall not advertise any of the Licensed Articles without receiving the prior written approval thereof from Converse. Licensee shall submit advertisements to Converse for its approval forty five (45) days prior to any use of advertisements, and Converse shall endeavor to respond within fifteen (15) calendar days from receipt. All advertising copy shall prominently feature the Converse Marks used in accordance with the Converse Identity Manual or guidelines provided by Converse from time to time.

(f) Licensee agrees to purchase a representative sample range of each new product line introduced by Converse.

(g) Licensee agrees it shall have, at its expense, one or more of its sales management attend Converse's two global sales conferences each Contract Year.

8. **Distribution.**

(a) Licensee hereby agrees to market, sell, promote and distribute the Licensed Articles solely in the Licensed Channels in the Territory, except as authorized by Converse in writing.

(b) **Publicity Materials.** All Publicity Materials, including any and all advertising, shall be approved in writing by Converse sixty (60) days in advance of any release or distribution. Licensee agrees that any one appearing in any Publicity Materials or Advertisements wearing athletic apparel must wear Converse apparel, with the Converse Mark visible. Also, Converse shall at any and all times have the right to inspect the Publicity Materials developed by Licensee to determine whether they conform to the established standards and other terms of this Agreement. If at any time Converse shall be of the opinion that the Publicity Materials developed by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee, which shall promptly thereafter remove and shall cease thereafter to use or distribute any such nonconforming Publicity Materials.

9. **Liquidated Damages.** Licensee shall manufacture, distribute, promote, advertise and sell Licensed Articles bearing the Converse Marks only within the Licensed Channels in the Territory and shall not export or cause to be exported any of the Licensed Articles to other countries

without the prior express written permission of Converse. In the event that Licensee distributes or sells the Licensed Articles outside the Licensed Channels, or exports or causes to be exported Licensed Articles bearing the Converse Marks outside the Territory without written authorization from Converse, or otherwise violates the terms of the license set forth in Paragraph 3 above or the terms relating to Converse's Trade Secrets as set forth in Paragraph 6 above, Licensee agrees that such action would irreparably harm Converse's business. Licensee further agrees that it would be difficult for Converse to determine actual damages in such circumstances. Therefore, in good faith estimate of actual damages and not as a penalty, in such circumstances Licensee agrees to pay to Converse Five Hundred Thousand Dollars (US$500,000.00) as liquidated damages in each instance for any of the foregoing breaches of this Agreement within seven (7) days after receiving written notice from Converse. The breach conditions set forth below shall not be construed to limit Converse's other rights and remedies with respect to any such breach of this Agreement. Breach conditions for which Licensee will be liable for liquidated damages: (i) in the event that Licensee distributes or sells the Licensed Articles outside the Licensed Channels, or exports or causes to be exported Licensed Articles bearing the Converse Marks outside the Territory without written authorization from Converse, or otherwise violates the terms of the license set forth in Paragraph 3 above; (ii) or violation of the territorial use of Converse Marks as set forth in Paragraph 4(a) above; (iii) violation of the terms relating to Converse's Trade Secrets as set forth in Paragraph 6 above; or (iv) violation of Paragraph 8 Distribution.

10.    Government Approval.  Licensee shall be responsible for obtaining all necessary approvals from each sovereign government in the Territory with respect to this Agreement. In the event that Licensee is unable to obtain all such approvals within one hundred eighty (180) days of the execution of this Agreement, Converse shall have the right to terminate the Agreement immediately upon written notice to Licensee.

11.    Pan Regional Accounts.  Pan Regional Accounts ("PR Accounts") shall mean accounts which are based in the Territory and which have an outlet in one or more additional countries outside the Territory. Licensee agrees that it will service the PR Accounts in all necessary and appropriate ways, including but not limited to, sales, marketing, promotion and customer service. Converse shall participate with Licensee in the scanning

presentations to the PR Accounts, and in such other manner as Converse desires. Converse shall have the right to participate in all of Licensee's meetings with the PR Accounts related to pricing, brand position, product presentation and the execution of the agreed commercial strategies. Licensee shall provide Converse with a semi-annual Business Plan for each PR Account on May 1 (for the subsequent July 1 to December 31 period) and November 1 (for the subsequent calendar year period) of each Contract Year (the "PR Plans"). The PR Plans shall include, but not be limited to, proposed pricing, discount structure, projected sales and margins by product line and season, co-operative advertising plans and any other marketing initiatives to be undertaken with respect to the PR Accounts. The PR Plans shall be approved in writing by Converse prior to their implementation. It is understood that the servicing of the PR Accounts are critical to Converse's worldwide reputation and brand image. Thus, in the event that Licensee does not service any PR Account in a manner satisfactory to Converse, as solely determined by Converse, Converse shall provide Licensee with written notice of such failure. If Licensee does not cure such failure within thirty (30) days to Converse's satisfaction, then Converse may remove the applicable PR Account from the Territory and subsequently service said account directly itself.

## IV.   CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

12. Responsibility of Converse. In order to facilitate the manufacture, distribution, promotion, advertisement and sale of Licensed Articles by Licensee under this Agreement, Converse shall use good faith efforts to: (a) furnish or cause to be furnished to Licensee such information and advice, as in the opinion of Converse, is necessary to implement this Agreement. Such information and advice may include, but is not limited to, drawings and specifications of the Licensed Articles, names and addresses of suppliers of materials, copies of advertisements and sale promotional material or such other information reasonably necessary to carry out this Agreement. Licensee shall pay Converse promptly upon billing for any articles supplied under this Paragraph 12(a) in accordance with Paragraph 18(c); and (b) at Converse's discretion, to permit one or more of Licensee's representatives to attend, at Licensee's sole expense, sales conferences or other athletic sales events sponsored or attended by Converse representatives.

13.    Converse's Alteration of Product Design and Specification:  Converse reserves the right, upon sixty (60) days notice to Licensee, to modify the design and specifications for any Licensed Article made by Licensee bearing any of the Converse Marks, and any design or text.  In that event, Licensee shall not manufacture Licensed Articles in accordance with the prior design or specification, except for the completion of Licensed Articles in the process of manufacture at the time Licensee received the modification.  Licensee agrees not to manufacture, distribute, promote, advertise or sell any product not bearing a Converse Mark which, in the opinion of Converse, by reason of its appearance or design, might tend to be confused by the public with any of the Licensed Articles manufactured under this Agreement bearing Converse Marks, or which in the opinion of Converse infringes in any manner Converse Marks or other Converse intellectual property rights.

14.    Converse's Right of Inspection and Audit of Licensee Factories.

(a)  Converse shall have the right at its own expense to have its representatives from time to time, during reasonable business hours, visit and inspect the factory or factories in which Licensee is producing, or having produced, Licensed Articles bearing any of the Converse Marks for the purpose of observing the method of manufacture, quality of materials, products produced, and any other matters relevant to this Agreement.  Additionally, Licensee must also submit, at its expense, to an audit of the workers' rights standards pursuant to the Converse Inc. Human Rights Manual which is made part of this Agreement and is attached hereto as Appendix B.

(b)    Licensee shall reimburse Converse for any expense for travel to the Territory or elsewhere which may be incurred by representatives of Converse at the request of Licensee and such payments shall be made by Licensee to Converse in U.S. Funds within thirty (30) days from billing thereof.



## V. ROYALTIES, FEES AND PAYMENTS

15. Royalties and Commitment Fee. In conjunction with Paragraph 18 below, Licensee shall pay to Converse the following non-refundable amounts:

(a) Initial Commitment Payment. Upon execution of this Agreement, Licensee shall pay Converse the sum of Six Hundred Seventy Five Thousand and Four Hundred Dollars (USD$675,400.00) representing an advance payment made by Licensee that will be credited against Licensee's Earned Royalty payments pursuant to Article 18 of this Agreement.

(b) In consideration for the license granted to it by Converse herein, Licensee shall pay Converse a royalty equal to the following percentages of the Net Sales made by Licensee of the Licensed Articles (the "Earned Royalties"). The Earned Royalties shall be based upon the Net Sales price for such products sold to the retail or wholesale trade by Licensee.

| | |
|---|---|
| Vulcanized Footwear Licensed Articles | Fifteen Percent (15%) |
| Cement Footwear Licensed Articles | Twelve Percent (12%) |
| Imported Footwear | Eight Percent ( 8 %) |
| Children's Footwear (Vulcanized & Cement) | Twelve Percent (12%) |

(c) Notwithstanding the provisions of Article 15(b), Licensee agrees to pay Converse a guaranteed annual minimum royalty as set forth below for each Contract Year (the "Guaranteed Annual Minimum Royalty"). The Minimum Royalties set forth below are separate payments for each Contract Year and do not represent cumulative payment amounts. The Earned Royalties for any Contract Year in excess of the Guaranteed Annual Minimum Royalty may not be carried forward or carried back to any other Contract Year for the purpose of earning out the Guaranteed Annual Minimum Royalty for such other Contract Year.

### Guaranteed Annual Minimum Royalty (USD Dollars)

| Contract Year | Calendar Year | Vulcanized Footwear | Cement Footwear |
|---|---|---|---|
| 1 | 2005 | $ 3,000,000.00 | $ 312,000.00 |
| 2 | 2006 | $ 3,300,000.00 | $ 720,000.00 |
| 3 | 2007 | $ 3,750,000.00 | $ 900,000.00 |

In the event this Agreement is terminated on a date other than the last day of a Contract Year, the Earned Royalties shall be based upon actual Net Sales through the date of termination.

    (d)    <u>Third Parties</u>.

        (i)    With respect to the sale of certain Licensed Articles, Converse has, or may have in the future, an obligation to pay a royalty to an athlete or other third party ("Third Party") in conjunction with the manufacture and sale of the Licensed Articles (the "Third Party Articles"). In the event that Licensee purchases or manufactures, with Converse's prior written consent, any Third Party Articles, Licensee agrees to pay to Converse the amount of any royalty which Converse is obligated to pay to the applicable Third Party (the "Third Party Royalty").

        (ii)    Converse shall advise Licensee, in a timely fashion with Converse's approval of Licensee's submission of samples and other Licensee Designs pursuant to Articles 4 (b) and 4 (d) of Licensed Articles, which Articles are Third Party Articles and, if Converse has provided its written consent to Licensee's request to manufacture any Articles that are Third Party Articles, the amount of the Third Party Royalty and any third-party approval or other requirements relating to the manufacture of such Third Party Article.

        (iii)    The applicable Third Party Royalty shall be paid by Licensee to Converse along with payment of the Earned Royalties pursuant to Paragraph 18 of this Agreement and shall not be creditable against Guaranteed Minimum Annual Royalty payments hereunder.

    (e)    No Royalty shall be payable hereunder with respect to the sale of any substandard products from which all Converse Marks have been removed, as set forth in Paragraph 4(f) above.

    16.    <u>Guaranteed Minimum Sales</u>.  Notwithstanding the provisions of Paragraphs 15(b) and (c) above, Licensee agrees to sell, in the Territory only, not less than the following guaranteed minimum sales volume of Licensed Articles during each Contract Year as set forth below (the "Guaranteed Minimum Sales Volume"):

### Guaranteed Minimum Sales Volume (USD Dollars)

| Contract Year | Calendar Year | Vulcanized Footwear | Cement Footwear | Imported Footwear |
|---|---|---|---|---|
| 1 | 2005 | $ 20,000,000.00 | $ 2,000,000.00 | $ 800,000.00 |

| 2 | 2006 | $ 22,000,000.00 | $ 6,000,000.00 | $ 1,000,000.00 |
| 3 | 2007 | $ 25,000,000.00 | $ 7,500,000.00 | $ 1,500,000.00 |

The Guaranteed Minimum Sales Volume set forth above are separate amounts for each Contract Year and do not represent cumulative sales volumes. Sales volume in any Contract Year in excess of the Guaranteed Minimum Sales Volume may not be carried forward or carried back to any other Contract Year for the purpose of earning out the Guaranteed Minimum Sales Volume for such other Contract Year.

17. Royalty Reports

(a)    Unless otherwise specified herein, Licensee shall deliver to Converse on or before the 15th of each month of each Contract Year a Royalty report, which shall be a complete and accurate itemized statement, certified by Licensee's chief fiscal officer as being accurate and complete, number of pairs or units, gross sales price, itemized deductions from gross sales price and net sales price as well as wholesale sales of the Licensed Articles manufactured, distributed or sold by Licensee during the preceding Contract Year Month, on a country-by-country basis if more than one country is included in the Territory. Such statements shall be stated in local currency and converted into U.S. Dollars at the exchange rate pursuant to Article 19 (a) below and submitted in the format set forth in Appendix C which shall be subject to change without notice. Such monthly statements shall be furnished to Converse whether or not any Licensed Articles bearing any Converse Marks have been sold or distributed by Licensee during the preceding Contract Year Month. Receipt or acceptance by Converse of any statements furnished pursuant to this Agreement or any sums paid hereunder shall not preclude Converse from questioning the accuracy thereof at any time, and in the event that any inconsistency or mistake is discovered in such statement or payments, they shall be rectified immediately and the appropriate payments shall be made by Licensee.

(b)    The parties acknowledge that Licensee may be legally required to withhold and remit a portion of the Earned Royalties to the sovereign government in the country or countries comprising the Territory on behalf of Converse. It is not the intent of the parties that Licensee pay any part of any tax owed by Converse. Licensee's obligation shall be satisfied if it withholds the amount required by law and remits the withheld amount in accordance with applicable law to the appropriate taxing authority in such form as the respective government taxing authority

requires. Licensee shall then deliver to Converse a copy of each tax payment made, as well as the corresponding receipt issued by the competent tax authorities receiving such payment, promptly upon payment or, if the receipt is not available at that time, the receipt must be submitted to Converse no later than thirty (30) days after Licensee has made any such payments. These certificates should be forwarded to Converse's Accounting Department at the address set forth in the Notice paragraph of this Agreement. Licensee shall make all such declarations and provide all such information and assistance as Converse may reasonably require to enable Converse to obtain all applicable double taxation convention reliefs or exemptions from the relevant withholding obligation and/or to enable Converse to reclaim or claim a credit for such taxes as may have been withheld in accordance with this Paragraph.

(c)    In conjunction with Paragraph (b) above, Licensee shall pay, and hold Converse forever harmless from, all taxes, customs, duties, levies, impost or any other charges, including any fines or penalties, now or hereafter imposed or based upon the manufacture, delivery, license, sale, possession or use hereunder to or by Licensee of the Licensed Articles (including, but not limited to sales, use, inventory, income and value added taxes on sales of Licensed Articles), which charges shall not be deducted from Converse's Earned Royalties or the Guaranteed Minimum Annual Royalties under this Agreement. Without limiting the foregoing, all Royalties payable hereunder are net amounts, and no taxes paid by Licensee, except withholding taxes as set forth in Article 17 (b) above, shall be withheld or deducted by Licensee from any Royalty payments made from jurisdictions outside of the United States.

18.  Schedule of Royalty Payments and Fees.

The Royalty Payments set forth below shall be paid to Converse on a monthly basis upon invoice and no later than thirty (30) days after the end of the Contract Year Month. Payments shall be in U.S. Dollars and can be made by wire transfer in accordance with the instructions set forth in Paragraph 19 below.    (a)    Licensee shall remit the Earned Royalty for each type of Licensed Article for each Contract Year Month. At the end of each Contract Year Quarter, Licensee shall pay Converse the greater of one quarter of the Guaranteed Annual Minimum Royalty for each type of Licensed Article or the cumulative Earned Royalties for each type of Licensed Article earned in the three (3) Contract Year Months of the Contract Year Quarter, less the Commitment Payment and less any payments made to Converse within the Contract Year Quarter since the

Guaranteed Annual Minimum Royalty for each type of Licensed Article is satisfied, Licensee is required to pay only Earned Royalties for such Licensed Article for the remaining Contract Year Months.;

(b)   The Third Party Royalty, if applicable, shall be paid upon receipt of Converse's invoice;

(c)   In addition to royalties, Licensee shall pay Converse for all materials, samples, and merchandise furnished to Licensee pursuant to Paragraph 12 hereof in an amount equal to the cost of such items to Converse, including Converse's cost of preparing, packing, shipping and transporting such items. All such purchases by Licensee from Converse shall be paid upon receipt of invoice by wire transfer or check.

(d)   All Royalties and other amounts payable hereunder shall be made without set-off of any amount whatsoever, whether based upon any claimed debt or liability of Converse to Licensee.

(e)   Licensee shall maintain appropriate books of account and records, including inventory records, in accordance with generally accepted accounting principles, and shall make accurate entries concerning all transactions relevant to this Agreement. Such books of account and records shall be kept separately from those for any merchandise other than the Licensed Articles sold hereunder by Licensee. Licensee shall also, upon request by Converse, provide Converse with Licensee's then current annual Balance Sheet, Profit and Loss Statement, as well as a sales report listing year-to-date sales generated by each of Licensee's customers. Such reports shall be kept confidential.

(f)   Converse shall have the right, at its own expense, during the term hereof and for three (3) years thereafter, or in the event of a dispute involving in any way such books of account and records, until the dispute is resolved, whichever is later, through any authorized representatives of its own choice, on reasonable notice to Licensee and during regular business hours, to examine and take extracts from such books of account and records, and other documents (including but not limited to invoices, vouchers, records, purchase orders, sales orders and reorders) relating to the business hereunder which shall be maintained and kept by Licensee during the term hereof. All such books of account and records shall be kept available by Licensee for three (3) years after the end of the Contract Period, or in the event of a dispute between the parties, until settling in any

Page 23

way such books of account and records until that dispute is resolved, whichever is later. If upon inspection of the books and records pursuant to this paragraph or otherwise, it is discovered that Converse did not receive the correct and adequate payment, then Licensee shall pay Converse, upon written notice, the difference between what was paid and what should have been paid, within five (5) business days of receipt of said notice. If the aforesaid difference is five percent (5%) or more for any Contract Year of this Agreement, then the entire difference is to be paid with interest calculated from the date the payment should have been made to the actual date of payment at the prime interest rate in effect on the payment date. If Converse chooses to employ the services of a certified public accounting firm, qualified accounting consultant firm or Converse's internal auditors to conduct an audit and inspection of Licensee's books and records and said audit and inspection results in a balance due for any Contract Year of this Agreement which is five percent (5%) or more of the payment reported due by Licensee for any such Contract Year, then Licensee shall bear the entire cost including all fees and expenses of said audit and inspection. In calculating costs for an internal auditor to perform such audit, Converse shall bill its personnel costs incurred in performing such audit on an hourly basis at the hourly salaried rate of the personnel performing such services multiplied by a factor of 1.75. If the balance due for any Contract Year of this Agreement is twenty percent (20%) or more of the payment reported due by Licensee for such Contract Year, then in addition to the above, Converse may, at its sole option, immediately terminate the Agreement upon notice to Licensee, even if Licensee tenders the audit deficiency and associated costs and expenses to Converse.

19. **Currency In Which Payments Are To Be Made.**

(a) Unless specifically set forth to the contrary herein, all payments to Converse (except Converse Factories) required to be made by Licensee pursuant to this Agreement shall be made in the currency of the United States of America ("U.S. Funds"), by wire transfer to Converse Inc., First Union National Bank, Charlotte, NC, ABA No. 053000219, Account No. 2000011041218, or such other account as may be designated by Converse from time to time (the "Account"). Converse will review the exchange rate received by Licensee in the conversion from Licensee's local currency to U.S. Funds by comparison with the exchange rate published by the Wall Street Journal ("WSJ") two (2) business days prior to the payment due date scheduled pursuant of this Agreement. If there is a difference between the exchange rate received by Licensee and the WSJ rate, Converse

reserves the right to request such additional funds from Licensee as is required to compensate for the exchange rate deficiency. In cases where payment of the particular royalty due is more than seven (7) calendar days late, Converse reserves the right to request additional funds from Licensee to compensate Converse for any resulting subsequent exchange rate loss. If required, Licensee agrees it will seek the necessary government approvals to make such payments to Converse in U.S. Funds.

(b)    Late Payments.  Without prejudice to any other rights of Converse hereunder, time is of the essence regarding all payments due hereunder and Licensee shall pay interest on all delinquent Royalty payments or Minimum Royalty payments hereunder, as well as on any deficiency amounts disclosed as a result of audit, at 1.5% per month or the maximum legal rate, whichever is less, compounded annually at the rate from time to time in effect and calculated from the date on which such payment was due. In the event any such payment exceeds thirty (30) days in arrears, Converse shall have the right, in addition to any and all other remedies available to Converse, to terminate this Agreement pursuant to Paragraph 24.

(c)  If the actions of any government or public body make it impossible for Licensee to pay Converse in U.S. Funds, Converse shall have the following options:

(i)    terminate the Agreement with thirty (30) days written notice to Licensee;

(ii)    require Licensee to make payment in the currency of any other country selected by Converse by whose currency Licensee may legally pay;

(iii)    require Licensee to deposit such payment to Converse's account in a bank selected by Converse in or outside the Territory.

If Converse selects option (i) it may nevertheless require Licensee to pay any sums then due or to become due in accordance with options (ii) or (iii).

## VI.    INTELLECTUAL PROPERTY

20. Converse Intellectual Property.

(a)    Ownership.  Licensee acknowledges that Converse is the exclusive owner of the Converse Marks, Converse domain names, and covenants that neither it nor any person acting for or under it will ever contest such ownership or the exclusive rights of Converse with respect thereto anywhere in the world. In the event that Licensee creates, or assists in the creation of, a design,

enhancement, modification or improvement, for a Licensed Article or Converse's web site, then such design, enhancement, modification or improvement, and all sketches, drawings, prototypes, proposals, plans and other materials relating thereto ("Product Developments") shall be the sole property of Converse and Licensee hereby irrevocably transfers and assigns to Converse any and all right, title and interest of Licensee in and to the Product Developments, including without limitation all copyrights, inventions and other intellectual property rights therein and thereto. Licensee shall execute and deliver any document or instrument requested by Converse to confirm exclusive ownership by Converse of any such Product Developments. Converse shall have the right to utilize said Product Developments itself or provide it for use by any third party. The Product Developments shall be used by Licensee solely for the purposes authorized by this Agreement and may not be used by Licensee in any way adverse to Converse's interest. Without limiting the foregoing, Licensee will not deliver, reproduce, or in any way allow such documents or things to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of Converse. During the term of this Agreement and thereafter, Licensee will not publish, release, or otherwise make available to any third parties any information describing the Product Developments without the prior written consent of Converse.

(b) Infringement. Nothing in this Agreement shall constitute a warranty by Converse that there are currently no infringements of any of the Converse Marks or Converse domain names within the Territory, that the use of the Converse Marks throughout the Territory will not infringe the rights of any third party or that there are no prior or other legal users of the Converse Marks in addition to Converse throughout the Territory, or that trademark registrations shall be secured in the Converse Marks throughout the Territory. Licensee agrees that during the Contract Period it will diligently investigate any infringement or threatened infringement of the Converse trademarks, logos, domain names or trade names within the Territory and shall immediately notify Converse of any such infringement or threatened infringement or of any act or threatened act of unfair competition which may come to Licensee's attention and Licensee agrees to cooperate fully in any action thereon which Converse may, in its sole discretion, deem appropriate. In the event that Converse elects to pursue litigation, Converse shall have sole control of any such litigation, including without limitation the decision whether or not to settle such litigation, and Licensee shall cooperate fully with Converse to the extent requested by Converse and Licensee

shall be equally responsible for the expense of such litigation. Licensee shall not, however, be entitled to take or institute any action thereon, either by way of informal protest or legal, equitable or criminal proceedings, without express written approval, nor shall Licensee be entitled to call upon Converse to take action thereof; all such matters shall be entirely within the discretion of Converse.

(c) **Intellectual Property Indemnification.** Licensee shall indemnify and hold Converse and its subsidiaries, directors, affiliates, officers, employees, representatives and agents harmless from and against any and all claims, demands, losses, damages, liabilities, suits, judgments, and expenses, including incidental costs and attorneys' fees Converse may incur or be liable for arising out of allegations that Licensed Articles, Collateral Materials, Converse Marks, advertising and/or Publicity Materials used, designed and/or developed by Licensee violates or infringes the copyright, trademarks, service marks, or patent rights of any third party. Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein. Licensee shall, at its own cost and with Converse's approval, defend against any such claims; provided that Converse will provide reasonable assistance at Licensee's expense in connection with the defense and settlement of any such claim and Licensee may not settle any such claim or make any admission adverse to Converse's interests without Converse's prior written consent.

21. **Territorial Registration of Converse Trademarks.** Licensee shall assist Converse, at Converse's request and expense, in the procurement and maintenance of Converse's intellectual property rights in the Converse Marks. In connection therewith, Licensee shall, without limitation, execute and deliver to Converse in such form as it may reasonably request, all instruments necessary to (i) effectuate copyright and trademark protection, (ii) record Licensee as a registered user of any trademarks pursuant to this Agreement, or (iii) cancel any such registration. Such registration shall be handled by attorneys selected or approved by Converse. With respect to any registrations or applications for registration of Converse Marks in the Territory, Licensee agrees to take all proper actions requested by Converse to facilitate and expedite the registrations, provided that Converse reimburses Licensee for all reasonable expenses incurred in connection therewith. If Converse is prevented from registering its trademarks or domain name in the Territory by virtue of the existence of this Agreement, Licensee agrees, at the request of Converse, to apply for registration in

its own name under Converse's direction and promptly convey to Converse at no cost all right, title and interest to the trademarks and domain names which Licensee may thereby obtain, provided that Converse shall reimburse Licensee for all reasonable expenses incurred.   If Licensee fails to execute any such transfer in a timely manner, Licensee hereby appoints Converse its attorney-in-fact for such purpose, which appointment shall be irrevocable and shall be deemed a power coupled with an interest.

22.  Protection of Trademarks.

(a)     Licensee shall not use Converse's name, or the Converse Marks, other than as permitted hereunder and, in particular, shall not incorporate Converse's name, or the Converse Marks, in the Licensee's corporate or business name in any manner whatsoever.  Licensee agrees that in using the Converse Marks it will in no way represent that it has any rights, title and/or interest in or to the Converse Marks other than those expressly granted under the terms of this Agreement.  Licensee further agrees that it will not use or authorize the use, either during or after the Term, of any configuration, trademark, trade name, or other designation identical or similar to the Converse Marks, or any element thereof.

(b)     Licensee will use the Converse Marks in compliance with all applicable legal requirements, and Licensee shall cause to appear on all Licensed Articles, and all materials, such legends, markings and notices as may be required by applicable law.  Converse may withdraw or modify any elements of the Converse Marks from the scope of the License for any country or countries in the Territory if Converse determines that the exploitation thereof would or might violate or infringe the trademark or other rights of third parties, or subject Converse to any liability or violate any law, court order, government regulation or other ruling of any governmental agency, or if Converse determines that it cannot adequately protect its rights in the Converse Marks under the trademark or other laws of the applicable country or countries in the Territory.

(c)     Licensee's use of the Converse Marks shall inure exclusively to the benefit of Converse, and Licensee shall not acquire or assert any rights therein.  Licensee recognizes the value of the goodwill associated with the Converse Marks, and that the Converse Marks have acquired secondary meaning in the minds of the public.  Licensee agrees not to challenge Converse's ownership of or the validity of the Converse Marks or any application for registration thereof

throughout the world. Licensee agrees that it shall not during the License Period or thereafter, register or apply to register any of the Converse Marks, or any similar or derivative mark, anywhere in the world. Licensee agrees, during the License Period and thereafter, never to contest the rights of Converse in the Converse Marks or the validity of the license herein granted to it.

23. Indemnification for Products Liability Claims; Insurance Requirements.

(a) Licensee agrees to indemnify and hold Converse, subsidiaries, affiliates, its directors, officers, employees, representatives and agents, harmless from any and all claims, demands, losses, damages, liabilities, suits, judgments and expenses, including incidental costs and attorneys' fees incurred in connection therewith against Converse for injuries or damages to purchasers or users of the Licensed Articles manufactured by or for Licensee, including without limitation death, bodily injury and property damage. The foregoing indemnification of Converse by Licensee shall extend to any and all products liability claims arising as a result of Converse's ownership and control of the trademarks under which the Licensed Articles are manufactured and sold by Licensee, including, but not limited to, claims arising out of breach of implied or express warranties, strict tort liability or negligence, or legal claims of a comparable nature for recovery brought by litigants under the laws of the jurisdiction that apply to the Licensee. Converse shall provide Licensee with prompt written notice of any claims against Converse with respect to the subject of indemnity hereunder. Licensee shall, at its own cost and with Converse's approval, defend against any such claims; provided that Converse will provide reasonable assistance at Licensee's expense in connection with the defense and settlement of any such claim and Licensee may not settle any such claim or make any admission adverse to Converse's interests without Converse's prior written consent.

(b) Insurance Requirements. For the Term of this Agreement and for three (3) years thereafter, Licensee shall obtain insurance from a qualified insurance carrier with a Best rating of at least "A", insurance that covers liability for bodily injury including death and property damage including loss of use, advertising, and contractual liability coverage, including without limitation liability arising out of Licensee's obligations under this Agreement. The amount of coverage shall be not less than One Million Dollars ($1,000,000) combined single limit (with no deductible amount) for each single occurrence. Such insurance policy shall name Converse and shall name Converse and its subsidiaries, affiliates, officers, directors, representatives and agents

as additional insureds and shall not include any "other insurance" or similar provision that would cause such policy not to be solely responsible for the covered liability. Such insurance policy shall be cancelable or materially altered only upon thirty (30) days notice to the Licensee and Converse. Licensee shall provide Converse with a certificate of its insurance policy in the amount indicated with the required additional insured endorsements within ten (10) days of execution of this Agreement. Prior to execution of this Agreement, Licensee will provide Converse with a copy of such insurance policy for review.

## VII.    TERMINATION

24. Right of Termination

(a)    By Converse Immediately.    In the event of the occurrence of any one or more of the following, Converse shall have the right to immediately terminate this Agreement by written notice thereof to Licensee but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i) insolvency, bankruptcy, reorganization, suspension of payments, assignment for the benefit of creditors, appointment of a receiver, institution of any proceedings by or against Licensee under bankruptcy laws or other similar laws; or

(ii) the transfer or sale of all or a majority of the voting stock or other equitable ownership of Licensee without the written consent of Converse; or

(iii) breach of Paragraph 3(e) Non-competition; or

(iv) breach of Paragraph 4(a) Territorial, upon which event Converse shall be entitled to Liquidated Damages as set forth in Paragraph 9 herein; or

(v) breach of Paragraphs 8 Distribution (a) or (b), upon which event Converse shall be entitled to Liquidated Damages as set forth in Paragraph 9 herein; or

(vi) breach by Licensee of Paragraph 28 (Assignment); or

(vii) breach by Licensee of Paragraph 35 (Confidentiality of Agreement); or

(viii) the failure of Licensee to comply with the Guaranteed Annual Minimum Royalty or Guaranteed Minimum Sales Volume for any Contract Year, as set forth in Paragraphs 15 and 16 herein.

(b)    <u>By Converse Upon Notice of Breach.</u>  In the event of the occurrence of any one or more of the following, Converse shall have the right to terminate this Agreement seven (7) days after giving written notice thereof to Licensee, and Licensee has not remedied the situation to Converse's reasonable satisfaction within such seven (7) day time period:

(i)     breach by Licensee of Paragraphs 3(b) Grant of License or (c) Internet and 6 Confidentiality herein, upon which event Converse shall be entitled to Liquidated Damages as set forth in Paragraph 9 herein.

(ii)    breach of Paragraph 4(b) and 4(d) Approvals and 4(f) Substandard Products; or

(iii)   breach of Paragraph 4(c) Approval of Manufacturers and 4 (e) Inspection; or

(iv)    breach of Paragraph 5 Quality Assurance; or

(v)     breach of Paragraph 7(a) with respect to Licensee's commercial practices or 7(e) with respect to the Advertising Expenditure; or

(vi)    breach of Paragraph 7(b) and 7(c) with respect to first shipping date and submission of the annual business plan; or

(vii)   breach of Paragraph 7(c) with respect to submission of a seasonal sales and marketing plan; or

(viii)  breach of Paragraph 17 Royalty Reports; or

(ix)    breach of Paragraph 18(e) with respect to provision of Balance Sheets, Profit and Loss Statement and sales report or breach of Paragraph 18 (f) Audits; or

(x)     breach by Licensee of Paragraphs 20 (a) and (b) (Converse Intellectual Property) and 22 (Protection of Trademarks); or

(xi)    failure of Licensee to pay any royalty or other payment due Converse under this Agreement for a period of thirty (30) days from the date such payment is due and payable; or

(xii)   breach by Licensee of Paragraph 23(b) regarding insurance coverage; or

(xiv)   breach by Licensee of Paragraph 19 (b) Late Payments; or



(c)    By Either Party.  In the event of the occurrence of any one or more of the following, and without limiting Converse's other termination rights under this Agreement, either party shall have the right, after thirty (30) days written notice, to terminate this Agreement by written notice thereof to the other party but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i)    liquidation or dissolution of either party or discontinuance of the active operation of the enterprise of either party; or

(ii)    the breach of or failure by either party to perform or observe any of the other terms and conditions of this Agreement, provided said breach or failure shall continue for a period of thirty (30) days after written notice thereof from the other party.

25.  Effect of Termination or Expiration.

(a)  From and after the termination of this Agreement, whether by expiration of the Contract Period or termination pursuant to Paragraph 24 or for any other reason, any and all rights acquired by Licensee to the use of the Converse Marks and Trade Secrets, shall terminate and cease absolutely, and except as provided in subsection (b) of this Article, Licensee shall not thereafter manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with Converse Marks.  It is understood and specifically agreed that upon termination of this Agreement, Licensee shall immediately cease using the Converse Marks or any reference thereto, except as otherwise provided in this Paragraph 25.

(b)  Provided that this Agreement has not been terminated by Converse for any reason, any Licensed Articles manufactured or in the process of manufacture by Licensee prior to the expiration or termination of this Agreement and as to which any of the Converse Marks has been attached or affixed may be sold by Licensee, but only during the ninety (90) day period next following the date of expiration or termination, subject to the condition that Licensee pay to Converse all Earned Royalties and other payments due and owing Converse at the date of expiration or termination and to the further condition that Licensee continues to pay to Converse all Earned Royalties accruing during such ninety (90) day period within thirty (30) days following the end of each calendar month and delivers to Converse at the time of such payment an itemized statement in the form required by Paragraph 18 hereof for each such calendar month.  Licensee agrees that all Licensed Articles shall

be sold during the ninety (90) day period shall be sold in accordance with the provisions of Paragraph 8 Distribution herein.

Notwithstanding anything to the contrary contained herein, Licensee shall not manufacture, distribute, sell or dispose of any Licensed Articles hereunder after the expiration or earlier termination of this Agreement. Licensee shall, upon termination of this Agreement, promptly assign and transfer to Converse any property rights which Licensee may have acquired in the Converse Marks and shall, within thirty (30) days, at Converse's election either destroy or return all drawings, molds, dies and similar equipment or materials in its control or possession used for the production or reproduction or imprinting of the Converse Marks on the Licensed Articles and furnish to Converse satisfactory evidence of such return or destruction. Licensee agrees, subsequent to the expiration of this Agreement, not to register, attempt to register or use, except as provided herein, any Converse Marks and trademarks that are confusingly similar to the Converse Marks.

(c)    Any Paragraphs which by their nature should survive, will survive any termination or expiration of this Agreement.

26.  Final Statement Upon Termination or Expiration.

(a)  Licensee shall deliver, as soon as practicable but in any event no later than thirty (30) days after expiration or termination of this Agreement, to Converse a statement indicating the number and description of Licensed Articles bearing any of the Converse Marks under this Agreement on hand or in process of manufacture as of (i) sixty (60) days prior to the expiration of the Contract Period; and (ii) thirty (30) days after receipt from Converse of any notice terminating the license granted hereunder or, in the event no such notice is required, thirty (30) days after the occurrence of any event which terminated such license.

(b)  Converse shall have the option, at its expense, to have an independent certified public accountant conduct a physical inventory during reasonable business hours of Licensee's manufacturing and distribution facilities in order to ascertain or verify such inventory or statement. In the event Licensee refuses to permit Converse to conduct such physical inventory, Licensee shall forfeit its right hereunder to dispose of such inventory. In addition to such forfeiture, Converse shall have recourse to all other legal remedies available to it.

Page 33

(c)    Licensee shall have ninety (90) days to dispose of Converse inventory in accordance with Paragraph 25(b), which disposal shall be consistent with its distribution channels set forth in Paragraph 8 of this Agreement.

### VIII.    MISCELLANEOUS

27.  Force Majeure.  Except for payment obligations hereunder, and Licensee's minimum guaranteed royalty and sales volume obligations, if either party to this Agreement is temporarily unable to perform its obligations hereunder because of fire, strike, freight embargoes, government restrictions or regulations, war, emergency or any other Act of God, then no liability to the other party or right to terminate shall exist for failure of the one party to perform during such period.

28.  No Assignment or Sublicense by Licensee.  None of Licensee's rights or obligations under this Agreement, including without limitation any rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee, whether by operation of law or otherwise, without the prior written consent of Converse in each instance, and, without limiting the foregoing, the change of control, merger, acquisition or reorganization of Licensee shall be deemed a prohibited assignment hereunder.  Any attempt to assign this Agreement or any rights hereunder without Converse's prior written consent shall be void.  This Agreement shall be freely assignable by Converse.  Subject to the foregoing, this Agreement and any rights herein granted shall inure to the benefit of and be binding upon the parties hereto and their permitted successors or assigns.

29.  Notices.  Any written notice authorized or required by this Agreement shall be deemed to be duly given when sent by facsimile, registered mail, postage prepaid, or by express mail or international courier service, addressed to one party or the other, as the case may be, as stated in this Article unless either party shall previously have given to the other party written notice of a change of such address.

CONVERSE

Converse Inc.
One High Street
North Andover, Massachusetts 01845
Fax: 978-983-3547



ATTENTION: Laura W. Kelley
Vice President, Legal

c.c.:    Tim Ouellette
Vice President, Licensing

LICENSEE
Altamir A. Breda
Diretor Presidente
Coopershoe – Cooperativa de Calcados Joantense
Rua Vicente Prieto, 3767
Picada Café, Rio Grande do Sul CEP 95175-000
Brazil
Fax: (55)54-285-1302

30.  No Joint Venture.  The parties hereto are independent contractors and nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers and neither party shall have the power to obligate or bind the other in any manner whatsoever.

31.  Applicable Law.  The parties agree that the laws of the Commonwealth of Massachusetts, U.S.A. governs the provisions and interpretation of this Agreement, without reference to conflict of law principles, and that the English language version thereof shall be the controlling document.

32.  Arbitration.  The parties shall attempt to settle all controversies and disputes arising hereunder amicably, promptly and fairly.  Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, rights and obligations of the parties thereunder, the capacity or authority of the parties thereto, the performance or breach thereof, and the termination, renewal or non-renewal thereof, not capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one party to the other setting forth with specificity any such controversy or claim, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association.  The award shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration Association.  The parties expressly agree that arbitration shall be held in the offices of the American Arbitration Association, in Boston, Massachusetts, U.S.A., or such other locations within the Commonwealth of Massachusetts as the American Arbitration Association may direct

conducted in the English language and the arbitrators shall apply the laws of the Commonwealth of Massachusetts. The institution of any arbitration proceeding hereunder shall not relieve the Licensee of its obligation to make payments accrued hereunder to Converse during the continuance of such proceeding. The decision by the arbitrators shall be binding and conclusive upon the parties, their successors and assigns and the parties shall comply with such decision in good faith, and each party hereby submits itself to the jurisdiction of the courts of the place where the arbitration is held, but only for the entry of judgment with respect to the decision of the arbitrators hereunder; provided, however, that judgment upon the award may be entered in any court where the arbitration takes place, or any other court having jurisdiction over the losing party. Notwithstanding the foregoing, Converse may take action in any court of competent jurisdiction without availing itself of the foregoing process to protect and enforce its rights in the Converse Marks and other intellectual property rights, including without limitation in connection with any violation or threatened violation of the terms of the license granted in this Agreement. Licensee acknowledges that its failure to comply with the terms of the license granted in this Agreement shall result in immediate and irreparable damage to Converse. Licensee also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof, Converse shall be entitled to equitable relief in the nature of an injunction and to all other available relief, at law or in equity.

33. **Significance of Headings**. Paragraph headings contained herein are solely for the purpose in aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of the Agreement.

34. **Entire Agreement, No Waiver**. This Agreement constitutes the entire agreement and understanding between the parties hereto and cancels, terminates and supersedes any prior agreement, materials exchanged between the parties, discussions or understanding relating to the subject matter hereof. None of the provisions of this Agreement can be waived or modified except expressly in writing signed by both parties hereto, and there are no representations, promises, agreements, warranties, covenants or undertakings other than those contained herein. Any provision of this Agreement that shall be or is determined to be invalid shall be ineffective and the parties agree to insert in the place thereof such other provision as shall be lawful and shall approximate as nearly as possible the intent of the severed words or provisions and shall not affect

the remaining provisions of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same agreement.

35.     Confidentiality of Agreement. Licensee may not make any public announcement or public comment regarding the relationship between the parties or otherwise relating to Converse without the prior written consent of Converse, and Licensee will refer any press or similar inquiries regarding the same to Converse. Licensee agrees that the terms and conditions of this Agreement shall be treated as the confidential information of Converse and that no reference to the existence or terms and conditions of this Agreement or to activities pertaining thereto can be made by Licensee in any form of public disclosure without the prior written consent of Converse; provided, however, that Licensee may disclose the terms and conditions of this Agreement:  (i) as required by any court, administrative agency or other governmental body; provided that Converse shall be given reasonable advance notice to obtain a protective order or other confidential treatment; (ii) as otherwise required by law, provided, that Converse shall be given reasonable advance notice to obtain a protective order or other confidential treatment; (iii) to legal counsel of the Licensee;  (iv) in confidence, to accountants, banks, and financing sources and their advisors; (v) in confidence, in connection with the enforcement of this Agreement or rights under this Agreement; or (vi) in confidence, in connection with a merger or acquisition or proposed merger or acquisition, or the like.

36.     Conduct of Business.  Licensee shall at all times conduct its business in the Territory in an ethical manner in compliance with all applicable laws and regulations and Converse's corporate policies regarding foreign business practices.   Without limiting the foregoing, Licensee and its employees and agents shall not directly or indirectly make any offer, payment, or promise to pay; authorize payment; nor offer a gift, promise to give, or authorize the giving of anything of value for the purpose of influencing any act or decision of an official of any government within the Territory (including a decision not to act) or inducing such a person to use his or her influence to affect any such governmental act or decision in order to assist Licensee or Converse in the conduct of its business.

37.     Limitation of Liability.  IN NO EVENT SHALL CONVERSE'S LIABILITY HEREUNDER EXCEED THE AMOUNTS PAID BY LICENSEE HEREUNDER. THE

TWELVE-MONTH PERIOD PRIOR TO THE CLAIM OCCURS. IN NO EVENT SHALL CONVERSE BE LIABLE TO LICENSEE FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR RELIANCE DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF CONTRACT, NEGLIGENCE OR UNDER ANY OTHER LEGAL THEORY, WHETHER FORESEEABLE OR NOT AND WHETHER OR NOT CONVERSE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL CONVERSE BE LIABLE FOR LOST PROFITS OR OTHER DAMAGES RELATING TO TERMINATION OF THIS AGREEMENT. LICENSEE AGREES THAT THESE LIMITATIONS OF LIABILITY ARE AGREED ALLOCATIONS OF RISK AND ARE REFLECTED IN THE FINANCIAL TERMS AGREED UPON BY THE PARTIES.

      38.   <u>Escrow.</u>

    (a)     Upon execution of this Agreement, Licensee shall wire to Converse the amounts currently due and to become due, representing royalties and other amounts claimed directly by Converse in a demand letter sent by Converse to Licensee. Converse shall place these funds into an interest-bearing escrow account (the "Escrow Funds"). As long as the Escrow Funds are held in the escrow account, and no longer, Converse shall indemnify and hold harmless the Licensee with respect to a claim by ALON International that the Escrow Funds are the property of ALON International ("ALON") and should be paid to ALON. The indemnity extends only to the amount of the Escrow Funds held in the escrow account, and does not extend to any other costs or claims, including, without limitation, to any interest on the Escrow Funds claimed by ALON over and above the amount of the Escrow Funds, or to any legal fees or costs claimed by ALON against Licensee, or to any legal fees or other costs incurred by Licensee in responding to any demand or claim by ALON whatsoever with respect to the Escrow Funds.

    (b)     Converse or Licensee shall commence an interpleader action in connection with the Escrow Funds in the United States District Court for the District of Massachusetts ("District Court"). When and if the District Court issues an order the effect of which is to bar Licensee from being liable to both Converse and ALON for the Escrow Funds, the indemnification given by Converse in sub-paragraph (a) above shall immediately lapse completely and become void. If Converse fails to obtain a judgment awarding it the Escrow Funds, or a settlement is entered in

Page 38

Brazil or the United States specifically awarding the Escrow Funds to ALON, Converse shall transmit the Escrow Funds to ALON.

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the date and year first above written in duplicate originals by its duly authorized representatives.

CONVERSE INC.

By _____

Title Attorny for Converse Inc.

COOPERSHOES – Cooperativa de Calcados Joanetense

By _____

Title PRESIDENT



## MASSACHUSETTS ALL-PURPOSE ACKNOWLEDGMENT

Gov. Exec. Ord. #455 (03-13), §5(d)

Commonwealth of Massachusetts

County of _Essex_ } ss.

On this the _third_ day of _January_, _2005_, before me,
_Julie A. Bornstein_, the undersigned Notary Public,
Name of Notary Public

personally appeared _Jack A. Boys_
Name(s) of Signer(s)

proved to me through satisfactory evidence of identity, which was/were
_personal Knowledge_
Description of Evidence of Identity

to be the person(s) whose name(s) is/are signed on the preceding or attached document, and
acknowledged to me that he/she/they signed it voluntarily for its stated purpose(.)

☐ as partner(s) for _____
Name of Partnership

_____, a partnership.

☑ as _CEO_ for
Title of Office

_Converse Inc._, a corporation.
Name of Corporation

☐ as attorney in fact for _____
Name of Principal Signer

_____, the principal.

☑ as _____ for _____
Type of Capacity

a/the _____
Name of Person/Entity          Type of Entity

**JULIE A. BORNSTEIN**
Notary Public
Commonwealth of Massachusetts
My Commission Expires
March 24, 2006

_Julie A. Bornstein_
Signature of Notary Public

_Julie A. Bornstein_
Printed Name of Notary

Place Notary Seal and/or Any Stamp Above     My Commission Expires _March 24, 2006_

### OPTIONAL

Although the information in this section is not required by law, it may prove valuable to persons
relying on the document and could prevent fraudulent removal and reattachment of this form to
another document.

Right Thumbprint
of Signer

Top of thumb here

**Description of Attached Document**

Title or Type of Document: _Agreement_

Document Date: _12/16/04_ Number of Pages: _40_

Signer(s) Other Than Named Above: _____

© 2004 National Notary Association • 9350 De Soto A...
Item No. 5951

## APPENDIX A

# CONVERSE



# ★CONVERSE



