## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **CONVERSE, INC.,** | : | |
| | : | **Civil Action No.** |
| **Plaintiff-Respondent,** | : | **04-CV-12591-PBS** |
| | : | |
| **v.** | : | |
| | : | |
| **ALON INTERNATIONAL, S.A.,** | : | |
| | : | |
| **Defendant-Movant.** | : | |

### ALON INTERNATIONAL, S.A.'S MOTION TO CONFIRM AND ENFORCE INTERNATIONAL ARBITRAL AWARD AND SUPPORTING MEMORANDUM OF LAW

Alon International, S.A. ("Alon") hereby respectfully moves to confirm and enforce an international arbitral award rendered in Alon's favor against Respondent Converse, Inc. ("Converse"). In support of its motion, Alon states as follows:

### INTRODUCTION

Alon has prevailed in an international commercial arbitration against Converse that recently was completed in Boston. The arbitrator issued an award in Alon's favor, which is final and enforceable under the Inter-American Convention on International Commercial Arbitration of 1975, *opened for signature* Jan. 30, 1975, OAS SER A20 (SEPEF), 14 I.L.M. 336 (1975) ("Panama Convention"), which is implemented in the United States by chapter 3 of Title 9 of the U.S. Code. *See* 9 U.S.C. §§ 301 *et seq.*

In accordance with the express mandate of Congress and the obligations assumed by the United States under the Panama Convention, this Court must enforce the Award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in

the said Convention." 9 U.S.C. § 207 (incorporated by reference at 9 U.S.C. § 302). The grounds specified in the Panama Convention are extremely limited, even more limited than the grounds available to oppose a domestic arbitral award under chapter 1 of the Federal Arbitration Act ("FAA").

No ground barring enforcement exists here. Accordingly, Alon is entitled to immediate enforcement of the Award.

## BACKGROUND

### Parties

Alon is a corporation organized and existing under the laws of Panama, with an office at 1160 E. Hallandale Beach Blvd., Hallandale, Florida 33009.

Converse is a corporation organized and existing under the laws of Delaware with an office at One High Street, North Andover, Massachusetts 01845.

### The Agreement

Alon and Converse entered into an international Manufacturing, Distribution and License Agreement ("Agreement"), whereby Converse granted Alon certain exclusive rights for the territories of Argentina, Brazil, Paraguay, and Uruguay. A duly certified copy of the parties' written Agreement is attached as Exhibit "A" hereto.

The Converse-drafted Agreement contains a clause whereby the parties agree to resolve their disputes by means of arbitration: "Any controversy or claim arising out of or relating directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto, . . . the performance or breach thereof, and the termination, renewal or non-renewal thereof . . . shall be settled by arbitration . . . ." Agreement ¶ 33. The Agreement is governed substantively by Massachusetts law. *See id.*

The Agreement expressly provides that the decision of the arbitrator shall be binding and conclusive and that judgment may be entered by a court of competent jurisdiction upon an award made pursuant to arbitration under the Agreement.  Specifically, the Agreement provides that the award:

> shall be binding and conclusive upon the parties, their successors and assigns and the parties shall comply with such decision in good faith, and each party hereby submits itself to the jurisdiction of the courts of the place where the arbitration is held . . . . [J]udgment upon the award may be entered in any court where the arbitration takes place, or any other court having jurisdiction over the losing party.

Agreement ¶ 33.

## The Arbitration

After a dispute arose between the parties, Alon initiated arbitration pursuant to the procedures set forth in the Agreement.  On or about June 14, 2005, and in accordance with the parties' Agreement, the American Arbitration Association through its International Centre for Dispute Resolution appointed an experienced commercial arbitrator, attorney James W. Constable, Esq., of Baltimore, Maryland.

The arbitrator heard 29 days of evidence and argument.  The parties  filed hundreds of pages of briefs and memoranda.  Numerous fact witnesses testified live, by written testimony, or both.  The parties also presented extensive live expert testimony.  The number of exhibits exceeded one thousand.  The transcript of the proceedings exceeds 7,000 pages.

## The Award

The arbitrator rendered a 35-page partial final award in Alon's favor dated May 5, 2006. That award requires Converse to pay Alon US$52,542,630 in damages.  The arbitrator also awarded Alon its administrative fees and costs in the amount of US$88,068.06 and its reasonable

attorneys' fees and costs to be fixed at a later date.[1]  Converse and Alon subsequently filed post-award motions with the arbitrator.  On June 27, 2006, the arbitrator issued an Order resolving those motions and clarifying certain aspects of the Award.  The May 5th Award, as amended/clarified by the June 27th Order, is herein referred to as the "Award."[2]

## JURISDICTION

This Court has subject matter jurisdiction over these proceedings pursuant to 28 U.S.C. § 1331 and 9 U.S.C. §§ 203 and 302.  *See American Life Ins. Co. v. Parra*, 269 F. Supp. 2d 519, 521 (D. Del. 2003) (federal courts have subject matter jurisdiction under section 1331 to confirm an award under the Panama Convention); *see also Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, 293 F.3d 392, 396 (7th Cir. 2002) (Panama Convention provides independent federal question jurisdiction).

Converse is subject to personal jurisdiction in this Court because it (a) filed this action, (b) submitted to jurisdiction at the place of arbitration, Massachusetts, under the terms of the Agreement, (c) operates, conducts, engages in, or carries on a business or business venture in Massachusetts, and/or (d) has an office or agency in Massachusetts.

---

[1]     On June 29, 2006, the arbitrator issued a further award fixing the amount of attorneys' fees and costs that Converse owes Alon, which amounts were agreed to by the parties.  Some small part of that award remains unpaid.

[2]     Converse has taken the position that the Award may not be publicly disclosed.  Alon disagrees with Converse's position.  In an abundance of caution, Alon does not further describe the Award or Converse's wrongful conduct that was the basis for the Award.  Alon has filed a separate motion for leave to file the Award under seal.

## <u>ARGUMENT</u>

**THE COURT SHOULD CONFIRM AND ENFORCE THE AWARD BECAUSE IT FALLS UNDER THE PANAMA CONVENTION AND NONE OF THE SPECIFIED GROUNDS UNDER THE CONVENTION FOR REFUSAL OR DEFERRAL EXISTS**

The Award is the result of an arbitration between Alon and Converse covered by the Panama Convention, which the United States has signed and ratified and is enforced by chapter 3 of Title 9 of the U.S. Code. *See* 9 U.S.C. § 301. Chapter 3 of Title 9 incorporates by reference various provisions of chapter 2, which implements the separate Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("New York Convention"). Specifically, section 302 applies to Panama Convention awards the provisions of section 207, which provides:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. *The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.*

9 U.S.C. § 207 (emphasis added); *see also Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 520 n.15 (1974) ("The goal of the convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements and international contracts and to unify the standard by which the agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries."); *Ledee v. Ceramiche Ragno,* 684 F.2d 184, 186-87 (1st Cir. 1982) (same).

In keeping with the strong federal policy favoring arbitration, the enforcement of an arbitration award under the Panama Convention is a summary procedure. *Parra*, 269 F. Supp. 2d at 524 (confirming arbitral award pursuant to the Panama Convention and stating that "'the

confirmation of an arbitration award is a summary proceeding that merely makes what is already

a final arbitration award a judgment of the court'") (citation omitted); *Empresa Constructora*

*Contex Limitada v. Iseki, Inc.*, 106 F. Supp. 2d 1020, 1024 (S.D. Cal. 2000) (noting, in a

confirmation proceeding under the Panama Convention, that confirmation is a "'summary

proceeding'" (quoting *Imperial Ethiopian Government v. Baruch-Foster Corp.*, 535 F.2d 334,

337 (5th Cir. 1976)).[3]

       The Award clearly falls under the terms of the Panama Convention.  Alon and

Converse are citizens of countries that are parties to the Convention - Panama and the United

States, respectively.  *See Parra*, 269 F. Supp. 2d at 521, 524 (Panama Convention applied to

enforcement of award rendered in New York, where proceeding was between citizens of

Argentina and Uruguay on the one hand and a Delaware corporation on the other hand); *Nicor*

*Int'l Corp. v. El Paso Corp.*, 292 F. Supp. 1357, 1372 (S.D. Fla. 2003) (Panama Convention

applied to enforcement of an award rendered in the United States between citizens of Panama

and the United States).  The Agreement and the Award also demonstrate that this matter involves

a dispute "with respect to a commercial transaction" within the meaning of the Convention.

Panama Convention, Art. 1 (stating that the Convention covers any "agreement in which the

parties undertake to submit to arbitral decision any differences that may arise or have arisen

between them with respect to a commercial transaction").[4]

---

[3]    *See also Bennington Iron Works, Inc. v. J.P. Const. Co., Inc.*, No. 94-11035-GAO, 1996 WL 208494, at *1 (D. Mass. 1996) ("The confirmation of an arbitration award is generally a summary proceeding that makes what is already a final arbitration award a judgment of the Court.").

[4]    Although the Award would also be enforceable under the New York Convention itself, chapter 3 of the FAA provides that where the requirements of both the New York and Panama Conventions are met, the Panama Convention shall apply in situations where "a majority of the parties to the arbitration agreement are citizens of a State or States that have ratified or acceded to the [Panama] Convention and are member States of the Organization of American States."  9 U.S.C. § 305(1).  Since both Panama and

The Panama Convention provides that covered awards must be enforced, except on very specific and limited grounds. "Section 207 provides that confirmation is mandatory 'unless . . . [a court] finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . [Panama] Convention.'" *Parra*, 269 F. Supp. 2d at 524 (quoting 9 U.S.C. § 207); *Empresa*, 106 F. Supp. 2d at 1024 (same). Furthermore, "[t]he burden of proof is on the party defending against enforcement of the arbitral award" under the Panama Convention. *Empresa*, 106 F. Supp. 2d at 1024.

There are only two substantive grounds on which a competent authority of a State Party may refuse to enforce an award: if "the subject of the dispute cannot be settled by arbitration under the law of that State" and if "the recognition or execution of the decision would be contrary to the public policy ("ordre public") of that State." Panama Convention, Art. 5.2. Neither exception is applicable here. Far from prohibiting the resolution of commercial disputes such as Alon's and Converse's by binding arbitration, U.S. law strongly encourages arbitration of such disputes and the recognition of resulting awards. *See, e.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.* 473 U.S. 614, 615 (1985) (noting the strong "federal policy in favor of arbitral dispute resolution, a policy that applies with special force in the field of international commerce"); *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24 (1983) (discussing the "liberal federal policy favoring arbitration"); *DiMercurio v. Sphere Drake Ins., PLC*, 202 F.3d 71, 74 (1st Cir. 2000) (noting the "federal policy favoring arbitration").

The Convention also allows a State Party to refuse enforcement if the party against which enforcement is sought raises one of the following procedural objections: incapacity of the

---

the United States, the States of which the parties are citizens, have ratified the Panama Convention and are members of the OAS, the appropriate analysis in this case is under the Panama Convention.

contracting parties or invalidity of the arbitration agreement; failure of notice; inapplicability of the arbitration agreement to the particular dispute; irregularity in the formation of the arbitral tribunal; or that the award is not yet binding or has been annulled or superseded by a competent authority. *See* Panama Convention, Art. 5.1. None of these procedural grounds applies here.

Alon is therefore entitled to immediate confirmation and enforcement of the Award under the Panama Convention and respectfully requests that the Court enter judgment accordingly.

## CONCLUSION

WHEREFORE, based on the allegations set forth above, Alon International, S.A., prays that this Court enter a judgment:

(i)    confirming and enforcing the arbitral Award rendered against Converse, Inc.;

(ii)    awarding Alon its attorneys' fees and costs;

(iii)    granting to Alon pre-judgment, post-Award interest on the sums owed under the Award at the rate of twelve per cent (12%) per annum, starting as of May 5, 2006; and

(iv)    granting Alon such other relief as this Court deems just and proper.

Dated: July 12, 2006                    Respectfully submitted,


                                                  _/s/ Richard A. Johnston_____

**ASTIGARRAGA DAVIS**                 **WILMER CUTLER PICKERING**
José I. Astigarraga, *pro hac vice*          **HALE AND DORR LLP**
701 Brickell Avenue,16th Floor          Richard A. Johnston (BBO # 253420)
Miami, Florida 33131                    Mark C. Fleming (BBO # 639358)
Telephone: (305)372-8282              60 State Street
Facsimile: (305)372-8202              Boston, Massachusetts 02109
*Counsel for Alon International, S.A.*      Telephone: (617) 526-6000
                                                  Facsimile: (617) 526-5000
                                                  *Counsel for Alon International, S.A.*

**CERTIFICATION PURSUANT TO LOCAL RULE 7.1(A)(2)**

I HEREBY CERTIFY that I conferred with counsel for Converse in this matter regarding the substance of this Motion and that Converse does not assent to the relief sought herein.

_/s/ Richard A. Johnston____
Richard A. Johnston

**CERTIFICATE OF SERVICE**

I certify that I caused a true and accurate copy of the foregoing document to be served on counsel of record for Converse Inc. through the Court's electronic filing system on July 12, 2006.

_/s/ Richard A. Johnston_____
Richard A. Johnston

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**
Docket No.: 12591-PBS

CONVERSE, INC.,

              Plaintiff,

v.

ALON INTERNATIONAL, S.A.,

              Defendant.

## DECLARATION OF RONALD DURCHFORT

I, Ronald Durchfort, being of lawful age, state as follows:

1.     I am Co-President of Alon International, S.A. ("Alon"). I have been Co-President of Alon since December of 1997. I make this Declaration based upon my personal knowledge.

2.     Since December of 1997, my responsibilities at Alon have included oversight and management of Alon's business and contractual relationships.

3.     I hereby certify that the attached Manufacturing, Distribution, and License Agreement ("Agreement") was entered into between Converse, Inc. ("Converse") and Alon International, S.A. ("Alon"), and that the attached is a true, correct, complete and unaltered copy of the original Agreement entered into between Converse and Alon.

I declare under penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746 and Mass. Gen. Laws. Ch. 268, §1A, that the foregoing is true and correct.

Executed on this 29th day of June 2006.

Ronald Durchfort
*Alon International, S.A., Co-President*

<u>02/14/02</u>

<u>MANUFACTURING, DISTRIBUTION AND LICENSE AGREEMENT</u>

BETWEEN

CONVERSE INC.

and

ALON INTERNATIONAL S.A.

## Table of Contents

I.    INTRODUCTION
1.    Definitions _____ 5
2.    Term of Agreement _____ 6

II.    GRANT OF LICENSE
3.    License _____ 7

III.    LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES
4.    Use of Converse Marks_____ 9
5.    Quality Assurance _____ 11
6.    Licensee's Use of Converse Information and Advice _____ 12
7.    Licensee Sales Program _____ 12
8.    Distribution _____ 14
9.    Licensee's Use of Converse Factories _____ 15
10.    Exportation _____ 17
11.    Government Approval _____ 17

IV.    CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES
12.    Responsibility of Converse _____ 17
13.    Converse's Alteration of Product Design and Specification ___ 18
14.    Converse's Right of Inspection of Licensee Factories_____ 18

V.    ROYALTIES, FEES AND PAYMENTS
15.    Royalties _____ 19
16.    Guaranteed Minimum Sales _____ 22
17.    Royalty Reports _____ 22
18.    Schedule of Royalty Payments and Fees _____ 24
19.    Currency In Which Payments Are To Be Made _____ 26

VI.    INTELLECTUAL PROPERTY
20.    Converse Intellectual Property _____ 27
21.    Territorial Registration of Converse Trademarks _____ 29
22.    Infringement, Counterfeit, Unfair Competition _____ 29
23.    Indemnification for Products Liability Claims _____ 30

VII.    TERMINATION
24.    Right of Termination _____ 31
25.    Effect of Termination or Expiration _____ 33
26.    Final Statement Upon Termination or Expiration _____ 34

VIII.    MISCELLANEOUS
27.    Devaluation _____ 35
28.    Force Majeure _____ 35
29.    Assignment or Sublicense by Licensee _____ 35
30.    Notices _____ 36
31.    No Joint Venture _____ 36
32.    Applicable Law _____ 37
33.    Arbitration _____ 37
34.    Significance of Headings _____ 38
35.    Assignment, Entire Agreement, No Waiver _____ 38

Appendices

A.    Converse Marks
B.    Human Rights Manual
C.    Royalty Report Form

AGREEMENT, made as of this first day of September, 2001 by and between

**CONVERSE INC.**, a Delaware corporation, having its principal place of business at One High

Street, North Andover, Massachusetts 01845 ("Converse") and **ALON INTERNATIONAL**

**S.A.**, a corporation duly registered and existing under the laws of the Republic of Panama and

having its principal office and business at Edificio Magna Corp BCSA Calle 51 y Manuel Maria

Icaza, Piso 4 oficina 410 P, Panama, Republica de Panama ("Licensee").

WHEREAS, Converse is in the business of manufacturing, advertising, distributing and

selling athletic and leisure footwear, activewear and accessories and is the exclusive owner of the

valuable trademarks "CONVERSE", "ALL STAR", "CONVERSE ALL STAR CHUCK

TAYLOR" Ankle Patch and "STAR AND CHEVRON" Design and other trademarks, of certain

trade names, and of various patterns, logos and designs associated therewith; and

WHEREAS, Licensee desires to manufacture and sell in Argentina, Brazil, Paraguay and

Uruguay on an exclusive basis, athletic and leisure footwear, activewear and accessories identical

or substantially identical to the athletic and leisure footwear and activewear and accessories

manufactured for Converse and sold by Converse in the United States of America under the

Converse name and trademarks, and to obtain the advisory services and assistance of Converse in

connection therewith.

NOW THEREFORE, in consideration of the mutual covenants, representations and

promises herein contained, Converse and Licensee agree as follows:

I.    DEFINITIONS

1.    For purposes of this Agreement, the following definitions shall apply:

(a)  "Contract Period" shall mean that period of time commencing on September 1, 2001 and ending on December 31, 2004.

(b)  "Contract Year" shall mean the twelve calendar months of the year, beginning with January 1.  The first Contract Year shall be the period from September 1, 2001 through December 31, 2002.

(c)  "Contract Year Quarter" shall mean the four (4) three month periods of the calendar year.  The first Contract Year Quarter will commence January 1, 2002 and will include any activities from the commencement date of this Agreement.

(d)  "Converse Factories" shall mean Converse's authorized factories.

(e)  "Converse Marks" shall mean the logos and trademarks set forth in Appendix A.

(f)  "F.O.B. Cost" shall mean the costs of Footwear Licensed Articles purchased by the Licensee directly from Converse Factories as shown on the approved invoice from the factory for each shipment of product, if applicable.

(g)  "Licensed Articles" shall mean the athletic and leisure footwear, activewear and accessories which are set forth more specifically in Paragraph 3(a) below and which are identical or substantially identical to the athletic and leisure footwear, activewear and accessories manufactured for Converse and sold by Converse in the United States. There are three types of Licensed Articles:  Non-Footwear, Footwear and Original Licensed Products as defined below.

(h)  "Net Sales" shall mean the total gross invoice amount of Licensed Articles sold after deducting credits for returns and allowances, trade discounts, volume rebates and any

freight charges and VAT taxes included in the invoice. No deduction shall be allowed for costs incurred in the manufacture, sale, advertisement (including cooperative and promotional allowances) or distribution of Licensed Articles, nor shall any deductions be allowed for uncollectible accounts or cash discounts.

(i) "Original Licensed Products" shall mean Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear. Original Products may also be referred to as "Originals" or "Original Licensed Footwear Products."

(j) "Publicity Materials" shall include, but not be limited to, any printed advertising, catalogs, brochures, billboards, electronic material, internet technology, and/or wireless network services in any and all manner or medium now known or hereafter devised or any video or printed material bearing the Converse Marks.

(k) "Territory" shall mean Argentina, Brazil, Paraguay and Uruguay.

2. <u>Term of Agreement</u>. In recognition of infrastructure, manufacturing and legal expenditures made by Licensee on Converse's behalf, and Licensee's continuing efforts in these areas, Converse agrees to waive the signing fee of US$28,750.00. Unless sooner terminated pursuant to the provisions of this Agreement, this Agreement shall remain in effect for the Contract Period. In the event Licensee wishes to renew this Agreement, it must notify Converse in writing of this decision by or before September 30th of the final Contract Year. Licensee may renew this Agreement for an additional term of three (3) years ("Option Years" which may be collectively referred to as "Option Period") provided Licensee exceeds the Guaranteed Minimum Royalty and Sales for Contract Year 3 by twenty-five percent (25%) and further provided that

Licensee has not breached any of the terms and conditions of this Agreement. The Guaranteed

Minimum Royalty for the first Option Year will be the greater of 25% over the Guaranteed

Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties, increasing

by ten percent (10%) for each subsequent Option Year in the Option Period. The Guaranteed

Minimum Sales for the first Option Year will be the greater of 25% over the Guaranteed

Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales, increasing by 10%

each subsequent Option Year. Any extension of the term of this Agreement shall be effective

only pursuant to a written agreement executed by Converse and Licensee. Such written

agreement shall reflect any new or revised terms or conditions agreed to by the parties.


## II.    GRANT OF LICENSE

3. License.

(a)    Licensed Articles.

i.    Non-Footwear Licensed Articles is the collective term for activewear and

accessories. Activewear shall specifically include: mens' and womens' sportswear and T-shirts.

Accessories shall specifically include: bags, socks, caps, watches, backpacks, belts, stationary

items (Notebooks and agendas, etc.).

ii.    Footwear Licensed Articles is the collective term for athletic and leisure

footwear.

iii.    Originals Licensed Footwear Products shall be defined as the following

models of footwear: Chuck Taylor All Star, Jack Purcell, Skid Grip, and One Star footwear.

(b)     Grant of License.  Converse hereby grants to Licensee, subject to the terms and conditions herein, the exclusive right and license to utilize the Converse Marks throughout the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the retail and wholesale trade, subject to the provisions set forth in Section III below.  This license does not authorize, and expressly forbids, Licensee to manufacture, export, cause to export, distribute or sell such Licensed Articles in any other part of the world, unless specifically authorized by Converse in writing.

(c)     Internet.  Licensee is also granted the rights to use the Converse Marks on its Internet site generated out of the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, distribution and sale of Licensed Articles to the resale and wholesale trade, subject to the provisions set forth in Section III below.  In the event Licensee has already registered any of Converse's Marks or any name similar to a Converse Mark as a domain name, it shall assign to Converse all its rights, title and interest in such domain name(s) as directed by Converse.  Licensee shall not register a domain name using any of the Converse Marks or any marks to be confused with the Converse marks.

(d)     Non-competition.  Licensee agrees it shall not, during the term of this Agreement, manufacture, export, distribute, advertise, promote or sell any products/licensed articles which are competitive to the Licensed Articles, irrespective of whether said products bear Licensee's trademark or those of a third party, except only in such cases that Converse has given its prior written approval.  Notwithstanding the preceding sentence, in the event Licensee is already under obligation to distribute licensed articles other than those of Converse and/or products of any competitor, Licensee shall provide Converse, prior to the execution of

Page 9

this Agreement, with a written list of all products it is under obligation to distribute. The parties agree that excluded from this paragraph are Licensee's currently held childrens' brands, such as Disney, Warner, Mattel, and McKids.

(e)    Right to Negotiation. In the event Converse does not renew license agreements with its existing licensees in the territories of all of Latin America and Mexico, Licensee shall have the right to negotiate for these territories.


III.    LICENSEE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

4. Use of Converse Marks.

(a)    Territorial. Licensee agrees to use the Converse Marks only within the Territory and during the Contract Period, and only with respect to the manufacture, promotion, advertisement, distribution and sale of the Licensed Articles and only after Licensee has received the written approval of Converse as to samples of the Licensed Articles intended to be manufactured and sold by Licensee, the specific Converse Marks Licensee intends to affix to particular Licensed Articles, Licensee's use of the Marks in Publicity Materials and Licensee's use of the Marks on Licensee's web site, if applicable.

(b)    Approvals. Licensee shall provide Converse with a full set of approval samples and Publicity Materials for each Licensed Article as set forth in Paragraph 2(a) of this Agreement prior to launch in the market. Licensee shall provide Converse with designs and/or drawings of all Licensed Articles, drawings, hang tags and packaging for approval no later than four (4) months prior to launch in the market. In the event Licensee wishes to use any of the Converse Marks on its web site, it shall provide Converse with an opportunity to review the web site no

later than sixty (60) days prior to launch in the market. Converse shall have fifteen (15) calendar days from receipt to respond, either by refusing such design or requesting any changes to the designs, drawings or contents of web site, or issuing its written approval. Licensee further agrees to follow the approval guidelines for Licensed Articles, packaging, advertising and promotional materials set forth in Converse's Licensee Handbook. The license to use the Converse Marks is granted upon the express condition that all Licensed Articles manufactured by Licensee bearing any of the Converse Marks will conform to the standards for grade, quality, and style established from time to time by Converse. Such standards shall be substantially the same as the standards for the corresponding products manufactured for Converse and distributed by Converse in the United States. Any Licensed Articles bearing any of the Converse Marks manufactured by Licensee which are seconds or irregulars shall not be sold by Licensee without the prior written consent of Converse.

In addition, all factories at which Licensee desires to have Licensed Articles manufactured shall be approved in writing by Converse in advance of the placement of any orders for or of the manufacture of Licensed Articles.

(c) <u>Inspection</u>. Converse shall at any and all times have the right to inspect the Licensed Articles bearing any of the Converse Marks manufactured by Licensee to determine whether such Licensed Articles in fact conform to the established standards and other terms of this Agreement. If at any time Converse shall be of the opinion that Licensed Articles bearing any of the Converse Marks manufactured by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee. Licensee shall promptly thereafter remove or cause to be removed any of the Converse Marks from such nonconforming products or web sites, shall cease

to affix the Converse Marks to other Licensed Articles which do not meet the standards, and shall cease thereafter to manufacture, promote, advertise, distribute or offer for sale any such nonconforming Licensed Articles bearing any of the Converse Marks. It is understood and specifically agreed that upon termination of this Agreement, Licensee shall immediately cease using the Converse Marks or any reference thereto, except as otherwise provided in this Agreement.

5.    Quality Assurance.

(a)    Licensee shall submit, for the inspection and approval of Converse, samples and comprehensive drawings or prototypes or production models of each style representative of Licensed Articles covered by this Agreement to be manufactured by Licensee.  In any event, such drawings and samples shall be submitted to Converse for approval at least four (4) months before any such Licensed Articles are shipped or sold by Licensee.  Thereafter, once each six (6) months, and also two (2) weeks prior to any change in the materials, method of manufacture or design of Licensed Articles, Licensee shall submit for inspections and approval by Converse, samples representative of Licensed Articles expected to be manufactured, shipped and sold by Licensee.  Additional samples shall also be submitted to Converse at Converse's reasonable request.  Converse shall determine whether such samples conform to its standards and shall inform Licensee of its approval or of any deficiencies.  Licensed Articles may be manufactured and sold by Licensee only after Converse shall have approved drawings and samples representative of such Licensed Articles in writing or shall have failed to disapprove them within four (4) weeks after receipt of the drawings and samples.

(b)    All Licensed Articles manufactured or sold hereunder must:

i.    be of first quality and conform to standards, including standards of design, style and quality, approved by Converse in its sole discretion, reasonably exercised;

ii.    be of the grade, quality and style handled by quality departments of quality stores, department stores and better specialty shops in the Territory;

iii.    be similar and at least equal in grade, quality, materials, workmanship, performance and style, to representative comprehensive drawings or production samples of Licensed Articles submitted by Licensee to Converse and approved by Converse; and

iv.    be advertised, marked, labeled and packaged in accordance with this Agreement and not in any manner violative of law or tending to mislead or deceive the public.

6.  Licensee's Use of Converse Information and Advice.

(a)  Licensee agrees that it shall not use, permit the use of, release, give or otherwise distribute or disclose to any third party any of the information, advice, reports, instructions, designs, drawings, specifications, technical knowledge, methods, processes, samples or materials, names and addresses of suppliers of materials, or any other information ("Trade Secrets") furnished to it by Converse or Converse contract manufacturers or other licensees except as necessary and on an as needed basis in the manufacture, distribution, promotion, advertisement, and sale of Licensed Articles bearing the Converse Marks in the Territory pursuant to this Agreement.

(b)  All Trade Secrets shall remain the sole property of Converse and shall be deemed to be strictly confidential and shall be treated accordingly.

7. Licensee Sales Program.

(a)     Licensee shall faithfully, diligently and to the best of its ability endeavor to manufacture, distribute, promote, advertise, market and increase the sales of Licensed Articles bearing the Converse Marks in the Territory.  It shall be the responsibility of Licensee to provide active and continuous sales representation in the Territory by actual salesperson contact with customers, both existing and prospective.  Licensee shall maintain adequate brand and marketing management, manufacturing, sales and service personnel and adequate inventory levels, manage, position and market the brand; conduct advertising and promotional programs and perform such other necessary functions to accomplish maximum sales and distribution of Licensed Articles within the Territory.  Licensee shall not adopt, engage in, permit or otherwise use any pricing policies, advertising campaigns, merchandising techniques or other commercial practices which are illegal under the laws of the Territory or which, in the opinion of Converse, detract from the good will and reputation of Converse.

(b)     Licensee agrees to submit to Converse an annual business plan for the sale of Licensed Articles for each region within the Territory for each Contract Year.  Such annual business plan shall be submitted to Converse no later than September 30th of each Contract Year, and shall be for the next Contract Year.  Licensee also agrees to submit to Converse, a seasonal sales and marketing plan for the sale of Licensed Articles for each region within the Territory for each Contract Year.  Such seasonal sales and marketing plan shall be submitted to Converse no later than June 15th of each Contract Year for the next Spring, and January 15th of each Contract Year for the next Fall.

(c)    Licensee shall use Converse's web-based sales and forecasting application each month to provide Converse with both annual forecasts and actual sales.

(d)  During each Contract Year, Licensee shall expend reasonable sums of money, but in any event not less than five percent (5%) of Licensee's Net Sales for that Contract Year for advertising Licensed Articles bearing the Converse Marks ("Advertising Expenditure").  Such expenditures shall be spread over each current Contract Year in a manner consistent with the overall brand and product marketing and advertising strategies outlined by Converse in the United States market. Licensee agrees to provide Converse with quarterly statements itemizing Licensee's Advertising Expenditure for the preceding Contract Year Quarter on or before the fifteenth (15th) day of April, July, October and January of each Contract Year.  Converse agrees to waive its requirement to have Licensee pay a one percent (1%) Regional Marketing Contribution during the Contract Period.  Licensee shall keep Converse continually informed as to all advertising programs undertaken pursuant to this Agreement and shall not advertise any of the Licensed Articles without receiving the prior written approval thereof from Converse, which approval shall not be unreasonably withheld or delayed.  All advertising copy shall prominently feature Converse logos and Marks used in accordance with the Converse Identity Manual or guidelines provided by Converse from time to time.

(e)  Licensee agrees to purchase a representative sample range of each new product line introduced by Converse.  The price of such samples shall be factory cost plus fifty percent (50%) plus freight cost to be paid in accordance with Paragraph 18(d) herein.

(f)    Licensee agrees it shall have, at its expense, one or more of its sales management attend Converse's global sales conferences.

8.    <u>Distribution.</u>

(a)  Licensee hereby agrees to market, sell, promote and distribute the Licensed Articles to high end, better quality athletic footwear and sporting goods retailers and specialty shops, department stores and boutiques that are consistent with the Converse brand strategy and will enhance the Converse brand image within the Territory and throughout the world.  Licensee agrees not to market, sell, promote and distribute the Licensed Articles to mass merchants, discount stores and/or chains, flea markets, open air markets, consolidators, diverters or to any distribution channels that are not consistent, in Converse's sole discretion, with the Converse brand strategy.

(b)    <u>Publicity Materials</u>.  All Publicity Materials shall be approved in writing by Converse in advance of any release or distribution.  Converse shall at any and all times have the right to inspect the Publicity Materials developed by Licensee to determine whether they conform to the established standards and other terms of this Agreement.  If at any time Converse shall be of the opinion that the Publicity Materials developed by Licensee do not conform to the required standards, it may give notice of the deficiency to Licensee, which shall promptly thereafter remove and shall cease thereafter to use or distribute any such nonconforming Publicity Materials.

9.    <u>Licensee's Use of Converse Factories.</u>

(a)    Licensee must use Converse Factories for the manufacture of regular in-line Footwear Licensed Articles and Originals when manufacturing outside the Territory.  Licensee must submit the orders for such Footwear Licensed Articles and Originals to Converse's Production Department at corporate headquarters for approval  before it can be placed with the

factory and only if placed through the following approved buying agent or such other agent as may be designated by Converse (the "Buying Agent"):

> Twin Dragons
> Pou Yuen Industrial City
> First Industrial Estate
> Shanxiang Town
> Zhongshan City, Guangdong Province, PRC
> China

In the event local production is required due to a tariff prohibition within the Territory, Licensee, upon Converse's prior written approval, may locally produce the Footwear Licensed Articles.

(b)    All such orders are to be placed with the Converse Factory with payment by Letter of Credit, (unless wire transfer payment terms have been negotiated,) terms at sight, from Bill of Lading date with such letters of credit opened so as to arrive at the factory no less than forty-five (45) days prior to the confirmed ship date.

(c)    Licensee shall pay to Converse the Buying Agent's commission upon presentation of the applicable commission invoice at the applicable percentage of the F.O.B. Costs.

(d)    Under no circumstances can Licensee cancel orders contemplated by this Paragraph 9 with Converse Factories without the prior written approval of Converse's corporate office.  In the event Converse authorizes such cancellation, Licensee hereby agrees to pay all costs incurred by the Converse Factory for such order and a cancellation charge to Converse equal to five percent (5%) of the combined F.O.B. costs of the order.

(e)    Licensee agrees it shall not approach any third party factories regarding the production of Footwear Licensed Articles, unless having prior written approval from Converse.

10.    Exportation.   Licensee shall manufacture, distribute, promote, advertise and sell Licensed Articles bearing the Converse Marks only within the Territory.  Further, Licensee shall not knowingly export or cause to be exported, and shall use its best efforts to prevent the export of, any products to other countries without the prior express written permission of Converse.  In the event that Licensee exports or causes to be exported Licensed Articles bearing the Converse Marks outside the Territory without written authorization from Converse, Licensee agrees that such action would irreparably harm Converse's business.  A breach of this Paragraph by Licensee may result in termination of this Agreement by Converse pursuant to Paragraph 24 below.

11.  Government Approval.  If applicable, Licensee shall be responsible for obtaining all necessary approvals from the government of any of the countries in the Territory with respect to this Agreement.  In the event that Licensee is unable to obtain all such approvals within one hundred eighty (180) days of the execution of this Agreement, Converse shall have the right to terminate the Agreement immediately upon written notice to Licensee.

IV.    CONVERSE OBLIGATIONS, RIGHTS AND RESPONSIBILITIES

12.  Responsibility of Converse.  In order to facilitate the manufacture, distribution, promotion, advertisement and sale of Licensed Articles by Licensee under this Agreement, Converse shall use good faith efforts to:  (a)  furnish or cause to be furnished to Licensee such

information and advice, as in the opinion of Converse, is necessary to implement this Agreement. Such information and advice may include, but is not limited to, drawings and specifications of the Licensed Articles, names and addresses of suppliers of materials, copies of advertisements and sale promotional material or such other information reasonably necessary to carry out this Agreement. Licensee shall pay Converse promptly upon billing for any articles supplied under this Paragraph 12(a) in accordance with Paragraph 18(d); (b) at Converse's discretion, to permit one or more of Licensee's representatives to attend, at Licensee's sole expense, sales conferences or other athletic sales events sponsored or attended by Converse representatives; (c) make arrangements under which representatives of Licensee may, at their sole expense, visit one or more factories in which products similar to the Licensed Articles are being manufactured by or for Converse bearing the Converse Marks to enable the representatives to study methods of manufacture and related matters.

13.     <u>Converse's Alteration of Product Design and Specification</u>. Converse reserves the right, upon sixty (60) days notice to Licensee, to modify the design and specifications for any Licensed Article made by Licensee bearing any of the Converse Marks, and any design or text. In that event, Licensee shall not manufacture Licensed Articles in accordance with the prior design or specification, except for the completion of Licensed Articles in the process of manufacture at the time Licensee received the modification. Licensee agrees not to manufacture, distribute, promote, advertise or sell any product not bearing a Converse Mark which, in the opinion of Converse, by reason of its appearance or design, might tend to be confused by the public with any of the Licensed Articles manufactured under this Agreement bearing Converse Marks, or which in the opinion of Converse infringes in any manner Converse Marks.

14.  <u>Converse's Right of Inspection of Licensee Factories</u>.

(a)  Converse shall have the right at its own expense to have its representatives from time to time, during reasonable business hours, visit and inspect the factory or factories in which Licensee is producing, or having produced, Licensed Articles bearing any of the Converse Marks for the purpose of observing the method of manufacture, quality of materials, products produced, and any other matters relevant to this Agreement.  Included in this inspection shall be the audit of the workers' rights standards pursuant to the Converse Inc. Human Rights Manual which is made part of this Agreement and is attached hereto as Appendix B.

(b)  Licensee shall reimburse Converse for any expense for travel to the Territory or elsewhere which may be incurred by representatives of Converse at the request of Licensee and such payments shall be made by Licensee to Converse in U.S. Funds within thirty (30) days from billing thereof.

## V.    ROYALTIES, FEES AND PAYMENTS

15.  <u>Royalties</u>.  In conjunction with Paragraph 18 below, Licensee shall pay to Converse the following royalties:

(a)  In consideration for the license granted to it by Converse herein, Licensee shall pay Converse a royalty equal to the following percent of the Net Sales made by Licensee of the Licensed Articles (the "Earned Royalties").  The Earned Royalties shall be based upon the Net Sales price for such products sold to the retail or wholesale trade by Licensee.

| EARNED ROYALTIES | | | |
|---|---|---|---|
| **CONTRACT YEAR** | **CALENDAR YEAR** | **Footwear (including Originals)** | **Non-Footwear** |
| 1 | 9/1/01 – 12/31/02 | 6% | 6% |
| 2 | 2003 | 7% | 6% |
| 3 | 2004 | 8% | 6% |
| Option Years | | To be negotiated | To be negotiated |
| 4 | 2005 | tbd | tbd |
| 5 | 2006 | tbd | tbd |
| 6 | 2007 | tbd | tbd |

The Earned Royalty rate for Licensed Articles for the Option Period will be negotiated prior to the Option Years taking effect.

    (b)    Notwithstanding the provisions of Article 15(a), Licensee agrees to pay Converse a guaranteed annual minimum royalty as set forth below for each Contract Year (the "Guaranteed Annual Minimum Royalty").

| **CONTRACT YEAR** | **CALENDAR YEAR** | **GUARANTEED ANNUAL MINIMUM ROYALTY** |
|---|---|---|
| | | Footwear (including Originals) and Non-Footwear |
| 1 | 9/1/01 – 12/31/02 | US$115,000.00 |
| 2 | 2003 | US$160,000.00 |
| 3 | 2004 | US$215,000.00 |
| Option Years | | |

| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Royalty for Contract Year 3 or 70% of Contract Year 3 Earned Royalties |
| 5 | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

In the event this Agreement is terminated on a date other than the last day of a Contract Year, the Earned Royalties shall be based upon actual Net Sales through the date of termination.

    (c)    <u>Third Parties</u>.

        (i)    With respect to the sale of certain Licensed Articles, Converse has, or may have in the future, an obligation to pay a royalty to an athlete or other third party ("Third Party") in conjunction with the use of the Licensed Articles (the "Third Party Articles"). In the event that Licensee purchases or manufactures, with Converse's prior written consent, any Third Party Articles, Licensee agrees to pay to Converse the amount of any royalty which Converse is obligated to pay to the applicable Third Party (the "Third Party Royalty").

        (ii)    Converse shall advise Licensee, in a timely fashion prior to Converse's approval of Licensee's submission of an order for Licensed Articles, which articles are Third Party Articles and the amount of the Third Party Royalty.

        (iii)    The applicable Third Party Royalty shall be paid by Licensee to Converse along with payment of the Earned Royalties pursuant to Paragraph 18 of this Agreement.

    (d)    Licensee shall remove Converse Marks from any defective products which do not meet Converse standards as set forth in Paragraph 5 of this Agreement entitled Quality Assurance for first quality merchandise and no royalty shall be payable hereunder with respect to the sale of

such substandard products. This requirement to remove all Converse Marks shall be operative irrespective of the fact that such substandard products may be customarily sold in the Territory for the same price as first quality merchandise. Converse shall have the right to prohibit Licensee from selling such substandard products, if, in the opinion of Converse, such products may tend to be confused by the public with any of the Licensed Articles sold under this Agreement bearing Converse Marks, or which, in the opinion of Converse, infringes in any manner the Converse Marks.

    16.   <u>Guaranteed Minimum Sales</u>. Notwithstanding the provisions of Paragraphs 15(a) and (b) above, Licensee agrees to sell not less than the following guaranteed minimum sales volume of Licensed Articles during each Contract Year as set forth below (the Guaranteed Minimum Sales Volume"):

| CONTRACT YEAR | CALENDAR YEAR | GUARANTEED MINIMUM SALES VOLUME |
|---|---|---|
| | | <u>Footwear (including Originals) and Non-Footwear</u> |
| 1 | 9/1/01 – 12/31/02 | US$1,917,000.00 |
| 2 | 2003 | US$2,300,000.00 |
| 3 | 2004 | US$2,800,000.00 |
| Option Years | | |
| 4 | 2005 | the greater of 25% over the Guaranteed Minimum Sales for Contract Year 3, or 80% of Contract Year 3 Net Sales |
| 5 | 2006 | 10% above Option Year 4 |
| 6 | 2007 | 10% above Option Year 5 |

17.    Royalty Reports

(a)    Unless otherwise specified herein, Licensee shall deliver to Converse on or before April 25th, July 25th, October 25th and January 25th of each Contract Year a Royalty report, which shall be a complete and accurate itemized statement, certified by Licensee's chief fiscal officer as being accurate and complete, stating the description by product type, number of pairs or units, gross sales price, itemized deductions from gross sales price and net sales price as well as wholesale sales of the Licensed Articles manufactured, distributed or sold by Licensee during the preceding Contract Year Quarter. Such statements shall be stated in both United States and local currency and submitted in the format set forth in Appendix C, which shall be subject to change without notice. Such quarterly statements shall be furnished to Converse whether or not any Licensed Articles bearing any Converse Marks have been sold or distributed by Licensee during the preceding Contract Year Quarter. Receipt or acceptance by Converse of any statements furnished pursuant to this Agreement or any sums paid hereunder shall not preclude Converse from questioning the accuracy thereof at any time, and in the event that any inconsistency or mistake is discovered in such statement or payments, they shall be rectified immediately and the appropriate payments shall be made by Licensee.

(b)    If applicable, the parties acknowledge that Licensee may be legally required to withhold and remit a portion of the Earned Royalties to the governments of the countries in the Territory on behalf of Converse. It is not the intent of the parties that Licensee pay any part of any tax owed by Converse. Licensee's obligation shall be satisfied if it withholds and remits in accordance with the laws of the countries in the Territory and provides Converse promptly upon

payment, one original counterpart of the certificate issued by the competent tax authorities receiving such payments. These certificates should be forwarded to Converse's Accounting Department at the address set forth in the Notice section of this Agreement. These withholding certificates, if applicable, must accompany quarterly Royalty Reports.

18. <u>Schedule of Royalty Payments and Fees.</u>

The Royalty Payments set forth below shall be paid to Converse on a quarterly basis upon invoice or no later than the end of the month in which the Royalty report was due to be submitted pursuant to Paragraph 17 above. Payments shall be in U.S. Dollars and can be made either by wire transfer in accordance with the instructions set forth in Paragraph 19 below or by check:

(a)     The Earned Royalty or one quarter of the Guaranteed Annual Minimum Royalty set forth herein for each Contract Year Quarter, whichever is greater. Once the Guaranteed Annual Minimum Royalty is satisfied, Licensee is required to pay Earned Royalties only for the remaining quarters;

(b)     The Original Products Royalty;

(c)     The Third Party Royalty, if applicable, shall be paid upon receipt of Converse's invoice;

(d)  In addition to royalties, Licensee shall pay Converse for all materials, samples, and merchandise furnished to Licensee pursuant to Paragraph 12 hereof in an amount equal to the cost of such items to Converse, including Converse's cost of preparing, packing, shipping and transporting such items. All such purchases by Licensee from Converse shall be paid upon receipt of invoice by wire transfer or check.

(e) Licensee shall maintain appropriate books of account and records, including inventory records, in accordance with generally accepted accounting principles, and shall make accurate entries concerning all transactions relevant to this Agreement. Such books of account and records shall be kept separately from those for any merchandise other than the Licensed Articles sold hereunder by Licensee. Licensee shall also, upon request by Converse, provide Converse with a sales report listing year-to-date sales generated by each of Licensee's customers.

(f) Converse shall have the right, at its own expense, during the term hereof and for three (3) years thereafter, or in the event of a dispute involving in any way such books of account and records, until the dispute is resolved, whichever is later, through any authorized representatives of its own choice, on reasonable notice to Licensee and during regular business hours, to examine and take extracts from such books of account and records, and other documents (including but not limited to invoices, vouchers, records, purchase orders, sales orders and reorders) relating to the business hereunder which shall be maintained and kept by Licensee during the term hereof. All such books of account and records shall be kept available by Licensee for three (3) years after the end of the Contract Period, or in the event of a dispute between the parties hereof involving in any way such books of account and records until that dispute is resolved, whichever is later. If upon inspection of the books and records pursuant to this paragraph or otherwise, it is discovered that Converse did not receive the correct and adequate payment, then Licensee shall pay the Company, upon written notice, the difference between what was paid and what should have been paid, within five (5) business days of receipt of said notice. If the aforesaid difference exceeds five percent (5%), then the entire difference is to be paid with interest calculated from the date the payment should have been made to the

actual date of payment at the prime rate in effect on the payment date. If Converse chooses to

employ the services of a certified public accounting firm, qualified accounting consultant firm or

Converse's internal auditors to conduct an audit and inspection of Licensee's books and records

and said audit and inspection results in a balance due for any Contract Year of this Agreement

which exceeds by five percent (5%) the payment reported due by Licensee for any such Contract

Year, then Licensee shall bear the entire cost including all fees and expenses of said audit and

inspection. If it is found that Licensee has made a larger payment than that which was due, said

excess will be returned by Converse within five (5) business days of such determination.

19. Currency In Which Payments Are To Be Made.

(a) Unless specifically set forth to the contrary herein, all payments to Converse (except

Converse Factories) required to be made by Licensee pursuant to this Agreement shall be made

in the currency of the United States of America ("U.S. Funds"), payable to Converse Inc., First

Union National Bank, Charlotte, NC, ABA No. 053000219, Account No. 2000011041218, or

such other account as may be designated by Converse from time to time (the "Account").

Converse will review the exchange rate received by Licensee in the conversion from Licensee's

local currency to U.S. Funds by comparison with the exchange rate published by the Wall Street

Journal ("WSJ") two (2) business days prior to the payment due date scheduled in Paragraph 18

of this Agreement. If there is a difference between the exchange rate received by Licensee and

the WSJ rate, Converse reserves the right to request such additional funds from Licensee as is

required to compensate for the exchange rate deficiency. In cases where payment of the particular

royalty due is more than seven (7) calendar days late, Converse reserves the right to request

additional funds from Licensee to compensate Converse for any resulting subsequent exchange

rate loss. If required, Licensee agrees it will seek the necessary government approvals to make

such payments to Converse in U.S. Funds. Any late payments will be subject to an interest

charge of one and one-half percent (1 1/2%) to Converse each month the payments remain

unpaid. In the event any such payment exceeds thirty (30) days in arrears, Converse shall have

the right, in addition to any and all other remedies available to Converse, to terminate this

Agreement pursuant to Paragraph 24.

 (b) If the actions of any government or public body make it impossible for Licensee to

pay Converse in U.S. Funds, Converse shall have the following options:

  (i) terminate the Agreement with thirty (30) days written notice to Licensee;

  (ii) require Licensee to make payment in the currency of any other country

   selected by Converse by whose currency Licensee may legally pay;

  (iii) require Licensee to deposit such payment to Converse's account in a bank

   selected by Converse in or outside the Territory.

If Converse selects option (i) it may nevertheless require Licensee to pay any sums then due or to

become due in accordance with options (ii) or (iii).

## VI. INTELLECTUAL PROPERTY

20. <u>Converse Intellectual Property</u>.

 (a) <u>Ownership</u>. Licensee acknowledges that Converse is the exclusive owner of the

Converse Marks, Converse patents, and Converse domain names, and covenants that neither it

nor any person acting for or under it will ever contest such ownership or the exclusive rights of

Converse with respect thereto anywhere in the world.

(b)     In the event that Licensee creates, or assists in the creation of, a design for a Licensed Article or Converse's web site, then such design shall become the property of Converse without any further act required on the part of Converse or Licensee. Licensee shall execute and deliver any document or instrument requested by Converse to confirm exclusive ownership by Converse of any such design.  Converse shall have the right to utilize said design itself or provide it for use by any third party.

(c)  Infringement.  Nothing in this Agreement shall constitute a warranty by Converse that there are currently no infringements of any of the Converse Marks, Converse patents, or Converse domain names within the Territory.  Licensee agrees that during the Contract Period it will diligently investigate any infringement or threatened infringement of the Converse patents, trademarks, logos, domain names or trade names within the Territory and shall immediately notify Converse of any such infringement or threatened infringement or of any act or threatened act of unfair competition which may come to Licensee's attention and Licensee shall use its best efforts to prevent such infringement or act of unfair competition.  Should litigation become necessary in Converse's sole discretion to protect Converse's interests in this regard, Licensee shall cooperate fully with Converse to the extent requested.  Converse shall be responsible for the expense of such litigation.

Converse acknowledges that it is a party to certain litigation in Brazil with All Star Artigos relating to the use and registration of the Chuck Taylor All Star and All Star logos. Converse hereby agrees that it will take the necessary actions as determined by Converse to recover the ownership of said trademarks provided it is in the best interest of Converse.

(d)    Intellectual Property Indemnification.  Licensee shall indemnify and hold Converse harmless from and against any and all claims, demands, losses, damages, liabilities, suits, judgments, and expenses, including incidental costs and attorneys' fees Converse may incur or be liable for arising out of allegations that Licensed Articles, Converse Marks, advertising and/or Publicity Materials used, designed and/or developed by Licensee violates or infringes the copyright, trademarks, service marks, or patent rights of any third party. Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.

21.  Territorial Registration of Converse Trademarks.  Converse has registered or applied for registration of certain of its trademarks and domain names in the Territory.  In this regard, Licensee agrees to take all proper actions requested by Converse to facilitate and expedite the registrations, provided that Converse reimburses Licensee for all reasonable expenses incurred in connection therewith.  If Converse is prevented from registering its trademarks or domain names in the Territory by virtue of the existence of this Agreement, Licensee agrees, at the request of Converse, to seek registration in its own name and convey to Converse all right, title and interest to the trademarks and domain names which Licensee may thereby obtain, provided that Converse shall reimburse Licensee for all reasonable expenses incurred.

22.  Infringement, Counterfeit, Unfair Competition.  Licensee agrees to notify Converse, in writing, of any infringements or counterfeits of, or any unfair competition affecting the trademarks and domain names licensed hereunder immediately upon gaining knowledge thereof and to cooperate fully in any action thereon which Converse may, in its sole discretion, deem appropriate.  Licensee shall not, however, be entitled to take or institute any action thereon,

either by way of informal protest or legal, equitable or criminal proceedings, without express written approval, nor shall Licensee be entitled to call upon Converse to take action thereof; all such matters shall be entirely within the discretion of Converse.

23. Indemnification for Products Liability Claims.

(a) Licensee agrees to indemnify Converse from any and all claims, demands or judgments, including incidental costs and attorneys' fees incurred in connection therewith against Converse for injuries or damages to purchasers or users of the Licensed Articles manufactured by Licensee. The foregoing indemnification of Converse by Licensee shall extend to any and all products liability claims arising as a result of Converse's ownership and control of the trademarks under which the Licensed Articles are manufactured and sold by Licensee, including, but not limited to, claims arising out of breach of implied or express warranties, strict tort liability or negligence, or legal claims of a comparable nature for recovery brought by litigants under the laws of the jurisdiction that apply to the Licensee.

(b) Licensee shall, at its own cost and with Converse's approval, defend against any claims brought or actions filed against Converse on a products liability theory of the Licensed Articles whether such claims or actions are rightfully or wrongfully brought or filed, and Converse shall execute all papers necessary in connection with such suit and shall testify in any such suit whenever required to do so by Licensee all, however, at the expense of Licensee with respect to travel and similar out-of-pocket disbursements.

(c) Converse shall promptly give written notice to Licensee of any claims against Converse with respect to the subject of indemnity contained herein.

(d)     Licensee shall obtain insurance to the extent of $1,000,000 per occurrence against liability for bodily injury including death resulting therefrom and $1,000,000 per occurrence against liability for damage to property including loss of use thereof, occurring in any way relating to the Licensed Articles. Such insurance policy shall insure Converse and shall name Converse as an additional insured as its interest may appear. Such insurance policy shall be cancelable or materially altered only upon ten (10) days notice to the Licensee and Converse. Licensee shall provide Converse with a certificate of its insurance policy in the amount indicated within ten (10) days of execution of this Agreement.

## VII.   TERMINATION

24. Right of Termination.

(a)     By Converse Immediately. In the event of the occurrence of any one or more of the following, Converse shall have the right to immediately terminate this Agreement by written notice thereof to Licensee but such termination shall not prejudice the rights of Converse to monies due or to become due under this Agreement:

(i)   insolvency, bankruptcy, reorganization, suspension of payments, assignment for the benefit of creditors, appointment of a receiver, institution of any proceedings by or against Licensee under bankruptcy laws or other similar laws; or

(ii)  the transfer or sale of all or a majority of the voting stock or other equitable ownership of Licensee without the written consent of Converse.

(b)     By Converse Upon Notice of Breach. In the event of the occurrence of any one or more of the following, Converse shall have the right to terminate this Agreement seven (7)

days after giving written notice thereof to Licensee, and Licensee has not remedied the

situation within such seven (7) day time period:

    (i) failure of Licensee to pay any royalty or other payment due Converse under

this Agreement for a period of thirty (30) days from the date such payment is due and

payable;

    (ii) failure of Licensee to pay the Buying Agent's commission ("Buying Agent's

Commission") for a period of thirty (30) days from the date such commission is due and

payable;

    (iii) pursuant to Paragraph 8 Distribution above, the manufacture, distribution,

advertisement or sale of Licensed Articles by Licensee in the Territory other than

pursuant to this License Agreement;

    (iv) the sale or shipment of Licensed Articles by Licensee outside of the

Territory, as set forth in Paragraph 10 herein;

    (v) the failure of Licensee to comply with the Guaranteed Annual Minimum

Royalty or Guaranteed Minimum Net Sales Volume for any Contract Year, as set forth in

Paragraphs 15 and 16 herein; or

    (vi) The breach by Licensee of Paragraphs 3(a), 4 and 6 herein.

  (c) <u>By Either Party.</u> In the event of the occurrence of any one or more of the

following, either party shall have the right, after thirty (30) days written notice, to terminate this

Agreement by written notice thereof to the other party but such termination shall not prejudice

the rights of Converse to monies due or to become due under this Agreement:

(i) liquidation or dissolution of either party or discontinuance of the active operation of the enterprise of either party;

(ii) the breach of or failure by either party to perform or observe any of the other terms and conditions of this Agreement, provided said breach or failure shall continue for a period of thirty (30) days after written notice thereof from the other party.

25. Effect of Termination or Expiration.

(a) From and after the termination of this Agreement, whether by expiration of the Contract Period or termination pursuant to Paragraph 24 or for any other reason, any and all rights acquired by Licensee to the use of the Converse Marks and Trade Secrets, shall terminate and cease absolutely, and except as provided in subsection (b) of this Article, Licensee shall not thereafter manufacture, advertise, promote, distribute or sell any Licensed Articles in the Territory in connection with Converse Marks.

(b) Any Licensed Articles manufactured or in the process of manufacture by Licensee prior to the expiration or termination of this Agreement and as to which any of the Converse Marks has been attached or affixed may be sold by Licensee, but only during the ninety (90) day period next following the date of expiration or termination, subject to the condition that Licensee pay to Converse all Earned Royalties and other payments due and owing Converse at the date of expiration or termination and to the further condition that Licensee continues to pay to Converse all Earned Royalties accruing during such ninety (90) day period within thirty (30) days following the end of each calendar month and delivers to Converse at the time of such payment an itemized statement in the form required by Paragraph 17 hereof for each such calendar month.

Licensee agrees that the Licensed Articles shall be sold during the ninety (90) day period shall be sold in accordance with the provisions of Paragraph 8 Distribution herein.

Notwithstanding anything to the contrary contained herein, Licensee shall not manufacture, distribute, sell or dispose of any Licensed Articles hereunder after the expiration or earlier termination of this Agreement. Licensee shall, upon termination of this Agreement, promptly assign and transfer to Converse any property rights which Licensee may have acquired in the Converse Marks and shall, within thirty (30) days, destroy or return all drawings, molds, dies and similar equipment or materials in its control or possession used for the production or reproduction or imprinting of the Converse Marks on the Licensed Articles and furnish to Converse satisfactory evidence of such return or destruction. Licensee agrees, subsequent to the expiration of this Agreement, not to register, attempt to register or use, except as provided herein, any Converse Marks and trademarks that are confusingly similar to the Converse Marks.

(c)    In the event Converse terminates this Agreement for breach by Licensee, Licensee will still be liable to Converse for its Minimums for the remainder of the Contract Period.

26. Final Statement Upon Termination or Expiration.

(a) Licensee shall deliver, as soon as practicable but in any event no later than thirty (30) days after expiration or termination of this Agreement, to Converse a statement indicating the number and description of Licensed Articles bearing any of the Converse Marks under this Agreement on hand or in process of manufacture as of (i) sixty (60) days prior to the expiration of the Contract Period; and (ii) thirty (30) days after receipt from Converse of any notice terminating the license granted hereunder or, in the event no such notice is required, thirty (30) days after the occurrence of any event which terminated such license.

(b)  Converse shall have the option, at its expense, to have an independent certified public accountant conduct a physical inventory during reasonable business hours of Licensee's manufacturing and distribution facilities in order to ascertain or verify such inventory or statement.  In the event Licensee refuses to permit Converse to conduct such physical inventory, Licensee shall forfeit its right hereunder to dispose of such inventory.  In addition to such forfeiture, Converse shall have recourse to all other legal remedies available to it.

(c)  Licensee shall have ninety (90) days to dispose of Converse inventory, which disposal shall be consistent with its distribution channels set forth in Paragraph 8 of this Agreement.

## VIII.  MISCELLANEOUS

27.  <u>Devaluation</u>.  In the event devaluation in any of the countries in the Territory increases by more than fifteen percent (15%) in a given year, Licensee may, at Converse's option, have the right to renegotiate its Guaranteed Annual Minimum Royalty and Guaranteed Minimum Sales Volume set forth above for the Contract Period.

28.  <u>Force Majeure</u>.  If either party to this Agreement is temporarily unable to perform its obligations hereunder because of fire, strike, freight embargoes, government restrictions or regulations, war, emergency or any other Act of God, then no liability to the other party or right to terminate shall exist for failure of the one party to perform during such period.

29.  <u>Assignment or Sublicense by Licensee</u>.  None of Licensee's rights granted by this Agreement for the use of any Converse Marks, Licensed Articles, Trade Secrets, or other

Page 36

Converse property may be assigned, transferred, sold, sublicensed or otherwise disposed of by Licensee without the prior written consent of Converse in each instance.

30.   Notices.   Any written notice authorized or required by this Agreement shall be deemed to be duly given when sent by facsimile, registered mail, postage prepaid, or by express mail or international courier service, addressed to one party or the other, as the case may be, as stated in this Article unless either party shall previously have given to the other party written notice of a change of such address.

#### CONVERSE INC.

Converse Inc.
One High Street
North Andover, Massachusetts 01845
Fax:  978-983-3547

ATTENTION:      Laura W. Kelley
                Vice President, Legal

                c.c.:   Tim Ouellette
                        Vice President, Licensing

#### ALON INTERNATIONAL S.A.

Mr. Roberto Szerer
Mr. Ronald Durchfort
ALON International
1160 E. Hallandale Beach Boulevard, Suite A
Hallandale, Florida 33009

31.  No Joint Venture.  Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers and neither party shall have the power to obligate or bind the other in any manner whatsoever.

32.  <u>Applicable Law</u>.   The parties agree that the Commonwealth of Massachusetts,

U.S.A. law governs the provisions and interpretation of this Agreement and that the English

language version thereof shall be the controlling document.

33.  <u>Arbitration</u>.  The parties shall attempt to settle all controversies and disputes arising

hereunder amicably, promptly and fairly.  Any controversy or claim arising out of or relating

directly or indirectly to this Agreement, including but not limited to transactions pursuant thereto,

rights and obligations of the parties thereunder, the capacity or authority of the parties thereto,

the performance or breach thereof, and the termination, renewal or non-renewal thereof, not

capable of satisfactory amicable resolution within thirty (30) days after written notice sent by one

party to the other setting forth with specificity any such controversy or claim, shall be settled by

arbitration in accordance with the Rules of the American Arbitration Association.  The award

shall be made by a single arbitrator, selected pursuant to the rules of the American Arbitration

Association.  The parties expressly agree that arbitration shall be held in the offices of the

American Arbitration Association, in Boston, Massachusetts, U.S.A., or such other locations

within the Commonwealth of Massachusetts as the American Arbitration Association may direct.

Such arbitration shall be conducted in the English language and the arbitrators shall apply the

laws of the Commonwealth of Massachusetts.  The institution of any arbitration proceeding

hereunder shall not relieve the Licensee of its obligation to make payments accrued hereunder to

Converse during the continuance of such proceeding.  The decision by the arbitrators shall be

binding and conclusive upon the parties, their successors and assigns and the parties shall comply

with such decision in good faith, and each party hereby submits itself to the jurisdiction of the

courts of the place where the arbitration is held, but only for the entry of judgment with respect

to the decision of the arbitrators hereunder.  Notwithstanding the foregoing, judgment upon the award may be entered in any court where the arbitration takes place, or any other court having jurisdiction over the losing party.

34.  <u>Significance of Headings</u>.  Paragraph headings contained herein are solely for the purpose in aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of the Agreement.

35.  <u>Assignment, Entire Agreement, No Waiver</u>.  This Agreement and any rights herein granted shall inure to the benefit of and be binding upon the parties hereto and their respective successors or assigns, provided, however, that this Agreement shall be freely assignable by Converse but shall not be assigned, sublicensed or encumbered by Licensee without the prior written consent of Converse.  This Agreement constitutes the entire agreement and understanding between the parties hereto and cancels, terminates and supersedes any prior agreement, materials exchanged between the parties, discussions or understanding relating to the subject matter hereof.  None of the provisions of this Agreement can be waived or modified except expressly in writing signed by both parties hereto, and there are no representations, promises, agreements, warranties, covenants or undertakings other than those contained herein.

IN WITNESS WHEREOF, each of the parties hereto have executed this Agreement as of the date and year first above written in duplicate originals by its duly authorized representatives.

CONVERSE INC.

By _____

Title _____

Witness _____

ALON INTERNATIONAL S.A.

By _____

Title _____

Witness _____